**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| MAKE THE ROAD NEW YORK, et al., | ) | |
| | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | No. 1:25-cv-00190-JMC |
| v. | ) | |
| | ) | |
| KRISTI NOEM, Secretary of the U.S. Department | ) | |
| of Homeland Security, in her official capacity, et al., | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |
| | ) | |

**<u>PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 2

    A.    The Expedited Removal Process. ............................................................. 2

    B.    For Two Decades, the Government Applied Expedited Removal Only to Limited
        Groups of Noncitizens Who Entered Without Inspection. ............................................. 4

    C.    Expansion Without Addressing the Flaws of the Existing System................................ 6

    D.    Procedural History ............................................................................. 8

LEGAL STANDARD............................................................................................................ 8

ARGUMENT ...................................................................................................................... 9

    I. Defendants Do Not Contest That Plaintiff Make the Road Has Plausibly Alleged
    Associational Standing. ................................................................................................. 9

    II. Plaintiffs' Claims Are Not Time Barred.......................................................................... 10

        A. Plaintiffs Filed This Action Less Than 60 Days After the First Implementations of the
        Rule and Guidance.................................................................................................. 10

        B. In the Alternative, the 60-Day Deadline Is Non-Jurisdictional and Subject to Equitable
        Tolling. ....................................................................................................................... 11

    III. Plaintiffs Have Plausibly Alleged That the Rule and Guidance Violate Due Process and the
    Immigration and Nationality Act. ....................................................................................... 15

        A. The D.C. Circuit's Decision in *MRNY* Does Not Bar Plaintiffs' Statutory and
        Constitutional Challenges.......................................................................................... 15

        B. Plaintiffs Plausibly Allege That the Rule and Guidance Violate Due Process................ 15

            1. *Salerno* Does Not Apply and, in Any Event, Plaintiffs Plausibly Allege a Facial
            Challenge Under *Salerno*. ................................................................................ 15

            2. *AILA* does not foreclose Plaintiffs' claims............................................................ 19

            3. Plaintiffs Plausibly Allege That the Rule and Guidance Fail to Provide Due Process.. 20

                a. Plaintiffs have a strong liberty interest in remaining in the United States. ............... 20

                b. Plaintiffs plausibly allege a risk of error and value of additional safeguards. ........... 22

                c. Plaintiffs plausibly allege that the government's interests do not outweigh the need
                for additional safeguards. .................................................................................. 28

        C. Plaintiffs Plausibly Allege the Rule and Guidance Violate The INA............................. 28

    IV. Plaintiffs Plausibly Allege That Expedited Removal Cannot Be Lawfully Applied To
    People In The Interior Solely Because They Lack Valid Entry Documents............................. 30

    V. Plaintiffs Plausibly Allege That the Guidance Unlawfully Subjects Affirmative Asylum
    Applicants To Expedited Removal. ...................................................................................... 35

VI. Plaintiffs Acknowledge That *MRNY* Forecloses Their Arbitrary-And-Capricious And Notice-And-Comment Challenges To the Rule In This Court.................................................. 39

CONCLUSION............................................................................................................................. 40

## INTRODUCTION

The Rule's expansion of expedited removal reverses a fundamental, longstanding principle: that people who have entered the United States cannot be removed without an adversarial hearing before an Immigration Judge ("IJ"), with the right to retain counsel and to prepare and present evidence. Under the Rule, an immigrant who has been residing in the United States for up to two years can instead be ordered removed by a line-level immigration officer and deported within days.

Previously, this expedited removal procedure was limited to those who had been in the country for up to 14 days and were apprehended near the border, or to those who arrived by sea. Even in that far more limited application, expedited removal was rife with errors, resulting in the swift and wrongful deportation of U.S. citizens, lawful permanent residents ("LPRs"), and bona fide asylum seekers, often to countries where they faced persecution, torture, or death. Defendants' widespread application of expedited removal in the interior of the United States under the Rule will violate due process on a massive scale.

This Court should deny Defendants' motion to dismiss. First, Defendants' threshold arguments lack merit. As the D.C. Circuit previously recognized, Plaintiff Make the Road New York ("Make the Road") clearly has standing to file suit on behalf of its members. *See Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 627-28 (D.C. Cir. 2020) ("*MRNY*"); Section I, *infra*. Plaintiffs also have satisfied the requirement that they file suit challenging the Rule and related Guidance within 60 days of their implementation—and even if they had not, that deadline is non-jurisdictional and subject to equitable tolling. Section II, *infra.*

Second, at this early stage, Plaintiffs have plausibly pled claims against the Rule and Guidance. Plaintiffs plausibly allege that the Rule and Guidance violate due process and the Immigration and Nationality Act ("INA"). Section III, *infra*. They plausibly allege that the INA

1

prohibits the expedited removal of people who have already entered the United States on the grounds that they are inadmissible under § 1182(a)(7), which applies only at the time of application for admission at the border, not after people have already entered the United States. Section IV, *infra*. And they plausibly allege that the Guidance unlawfully subjects affirmative asylum applicants to expedited removal. Section V, *infra*. Thus, Defendants' motion should be denied.

## BACKGROUND

### A.    The Expedited Removal Process.

Before 1996, all noncitizens—whether they sought admission at the border or had already entered the country—were entitled to a full hearing in immigration court before they could be deported or excluded. They were provided an opportunity to investigate and prepare their case, to retain and rely on the assistance of counsel, and to present and contest evidence before an IJ. They also were entitled to two layers of review: an administrative appeal and subsequent federal court review. *See* 8 U.S.C. §§ 1105a, 1252 (1995); 8 C.F.R. § 242.16(a) (1995).

In 1996, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), which retained full removal hearings as the standard procedure, while also creating a highly truncated process called "expedited removal." 8 U.S.C. § 1225(b)(1). In IIRIRA, Congress authorized the use of expedited removal for noncitizens seeking admission at ports of entry, and provided for possible future expansion of the procedure to the interior by administrative action, within certain limits.

Expedited removal is a one- or two-stage process. The first stage is inspection by an immigration officer. The second, where applicable, is a credible fear interview by an asylum officer. For an individual who applies for admission at a port of entry, the immigration officer must first determine if the individual is a noncitizen who is inadmissible either because they have engaged in fraud or lack valid entry documents. *See* 8 U.S.C. §§ 1225(b)(1)(A)(i), (ii) (citing 8

U.S.C. §§ 1182(a)(6)(C), (a)(7)). If the individual claims that they are a U.S. citizen, lawful permanent resident, or refugee, or that they have been granted asylum, then the individual is entitled to limited additional review. *See* 8 U.S.C. § 1225(b)(1)(C); 8 C.F.R. § 235.3(b)(5). Otherwise, if the immigration officer concludes that the individual is inadmissible under either ground, the officer "shall" order the individual removed "without further hearing or review unless the alien indicates either an intention to apply for asylum . . . or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i). At any time during the process, the immigration officer may allow the person to withdraw his or her application for admission and leave the country. *See id*. § 1225(a)(4).

During the inspection stage, the individual is detained and denied the ability to contact or be assisted by counsel. *See* Am. Compl. ¶ 52, ECF No. 27. The inspection stage generally begins and concludes in a matter of hours. *See id*. ¶ 44. The immigration officer's decision is subject only to a paper review by a supervisor. *See* 8 C.F.R. § 235.3(b)(2)(i). There is no administrative appeal, *see id*. §§ 235.3(b)(2)(ii), (7), and the statute severely limits federal court review, *see* 8 U.S.C. §§ 1252(a)(2), (e).

For many people, the inspection stage is the beginning and the end of the process. Those seeking asylum and related forms of protection may have access to the second stage—which is also flawed and does not remotely approach what is available in regular immigration proceedings. When someone indicates an intention to apply for asylum or fear of persecution, the immigration officer is supposed to refer the individual for a credible fear interview with an asylum officer. *See* 8 U.S.C. §§ 1225(b)(1)(A)(ii), (B); 8 C.F.R. §§ 208.30, 235.3(b)(4).

At that interview, the applicant must show a "credible fear" of persecution if removed – defined as "a significant possibility" that he or she is eligible for asylum. 8 U.S.C. § 1225(b)(1)(B)(v). If the asylum officer determines that the individual has a credible fear of persecution, the individual is placed into regular removal proceedings. Those who do not pass the

interview may request a review of the decision by an IJ, but they do not receive a full hearing or further administrative appellate review. *See* 8 U.S.C. § 1225(b)(1)(B)(iii)(II)-(III); *see also* 8 C.F.R. § 208.30(g)(1).

As at the inspection stage, Defendants detain noncitizens during the credible fear stage. *See* 8 C.F.R. § 235.3(4)(ii). The regulations provide that noncitizens "may consult with a person or persons of [their] choosing" to prepare for their credible fear interview and that such persons may attend the interview and "may be permitted, at the discretion of the asylum officer, to present a statement." *Id.* § 208.30(d)(4). However, applicants are not guaranteed the right to have counsel participate in either the CFI or any IJ review thereof, and the statute prohibits judicial review of a credible fear denial. *See* Am. Compl. ¶ 78.

## B. For Two Decades, the Government Applied Expedited Removal Only to Limited Groups of Noncitizens Who Entered Without Inspection.

As part of the enactment of expedited removal in 1996, Congress authorized the Attorney General to expand the application of expedited removal beyond its initial scope. At its maximum, the congressional authorization encompasses certain noncitizens who were not lawfully admitted or paroled into the country and not continuously physically present for two years or more. *See* 8 U.S.C. § 1225(b)(1)(A)(iii)(II). For twenty years, the government chose not to expand expedited removal to its statutory limits. Instead, it made only two modest expansions. In 2002, it applied expedited removal to a narrow group of people who arrived by sea, were subsequently encountered in the United States, and had not been continuously present for two years. *See* 67 Fed. Reg. 68,924, 68,925-26 (Nov. 13, 2002). In 2004, the government expanded the use of expedited removal to people who were apprehended within 100 air miles of a land border and were unable to demonstrate that they had been physically present in the United States for at least 14 days. *See* 69 Fed. Reg. 48,877, 48,880-81 (Aug. 11, 2004).

On July 23, 2019, at the direction of President Trump, the Department of Homeland Security ("DHS") published a Federal Register Notice that authorized the application of expedited removal to certain noncitizens arrested anywhere in the country who could not show that they had been continuously present in the United States for longer than two years. *See* 84 Fed. Reg. 35,409 ("2019 Rule"). Then-Judge Jackson preliminarily enjoined the 2019 Rule on the grounds that the Secretary failed to follow notice-and-comment and reasoned decision-making requirements of the Administrative Procedure Act. *See Make the Rd. N.Y. v. McAleenan*, 405 F. Supp. 3d 1, 11 (D.D.C. 2019). The D.C. Circuit reversed the district court's grant of the preliminary injunction on appeal. *See MRNY*, 962 F.3d at 618.

On February 2, 2021, President Biden issued an Executive Order that directed the DHS Secretary to review the 2019 Rule and consider, *inter alia*, legal and humanitarian obligations, and constitutional principles of due process and other applicable law. *See* Exec. Order 14010, 86 Fed. Reg. 8,267 (Feb. 5, 2021).[1]

On March 21, 2022, DHS rescinded the 2019 Rule. *See* 87 Fed. Reg. 16,022 (Mar. 21, 2022). During the period the 2019 Rule was in effect, the government used it in an exceedingly small number of cases. Am. Compl. ¶ 39; *see also* Hamed Aleaziz, *The Biden Administration Has Suspended A Trump-Era Policy That Put Immigrants At Risk Of Being Deported Without Due Process*, Buzzfeed News (Oct. 14, 2021), https://www.buzzfeednews.com/article/hamedaleaziz/expedited-removal-trump-immigrant-policy-suspended.

---

[1] In light of the Executive Order, this Court stayed its consideration of a renewed motion for preliminary injunction challenging the 2019 Rule on grounds not addressed by the vacated preliminary injunction decision. *See* Minute Order, *Make the Road v. McAleenan*, 1:19-cv-02369-JMC (D.D.C. Feb. 8, 2021).

### C.    Expansion Without Addressing the Flaws of the Existing System.

Even in its more limited use, the government's application of expedited removal procedures at the border has been plagued by systemic flaws, resulting in recurring egregious errors. *See* Am. Compl. ¶¶ 51-89. These problems have been documented in a series of in-depth reports by the U.S. Commission on International Religious Freedom, a statutorily-created federal commission that Congress tasked with studying the expedited removal system. *See id.* ¶¶ 62-67, 72, 84. The Commission has found widespread and persistent inaccuracies in immigration officers' application of expedited removal procedures. *See id.* ¶¶ 62-67. With respect to credible fear procedures, the Commission has found that people who fear persecution have frequently been removed without receiving the required screening interviews. *See id.* ¶¶ 62-64. The Commission's latest report, published in February 2025, concluded that "many of the problems it has repeatedly documented," "including flawed screening and documentation practices, [and] a lack of training and quality control," still "remain unaddressed." *Id.* ¶ 64. Other investigations and reports have documented similar enduring flaws. *See id.* ¶¶ 65, 73, 84-87. These systemic problems have led to not only frequent wrongful removals of asylum seekers without any opportunity to seek protection, but also multiple erroneous deportations of U.S. citizens. *See id.* ¶¶ 86-87.

On January 20, 2025, President Trump signed an Executive Order entitled "Protecting the American People Against Invasion." Exec. Order No. 14159, 90 Fed. Reg. 8,443 (Jan. 20, 2025). The Executive Order states that "[i]t is the policy of the United States to faithfully execute the immigration laws against all inadmissible and removable aliens" and "achieve the total and efficient enforcement of those laws." *Id*. § 2. Consistent with the President's goal of deporting millions of immigrants from the United States, the Executive Order directs the DHS Secretary to "take all appropriate action, pursuant to section 235(b)(1)(A)(iii)(I) of the INA (8 U.S.C.

1225(b)(1)(A)(iii)(I)), to apply" expedited removal procedures "to the aliens designated under section 235(b)(1)(A)(iii)(II)." *Id*. § 9.

On January 21, 2025, DHS issued a notice, effective immediately, that authorizes the application of expedited removal to certain noncitizens arrested anywhere in the country who cannot show "to the satisfaction of an immigration officer" that they have been continuously present in the United States for longer than two years. Designating Aliens for Expedited Removal, 90 Fed. Reg. 8,139 ("Rule").

On January 23, 2025, the Acting DHS Secretary issued a memorandum entitled "Guidance Regarding How to Exercise Enforcement Discretion" to implement the Rule. Benjamine C. Huffman, U.S. CUSTOMS & BORDER PROTECTION, Guidance Regarding How to Exercise Enforcement Discretion (Jan. 23, 2025) ("Guidance"), https://perma.cc/W3CL-SNDN. The Guidance directs that for "any alien DHS is aware of who is amenable to expedited removal but to whom expedited removal has not been applied[,]" officers should "[t]ake all steps necessary to review the alien's case and consider, in exercising [their] enforcement discretion, whether to apply expedited removal. This may include steps to terminate any ongoing [regular] removal proceeding . . . ." *Id*. at 2. The Guidance then states:

> [T]he expedited removal process includes asylum screening, which is sufficient to protect the reliance interests of any alien who has applied for asylum or planned to do so in a timely manner. *See* 8 U.S.C. § 1225(b)(l).

*Id*. Thus, the Guidance authorizes officers to place individuals with pending affirmative asylum applications into expedited removal.

Neither the Rule nor the Guidance, nor any other policies Defendants have instituted, address the existing flaws in the expedited removal system.

### D.    Procedural History

On January 22, 2025, Plaintiff Make the Road filed a complaint challenging the expansion of expedited removal. ECF No. 1. On March 22, 2025, Plaintiffs Make the Road and Mary and John Doe, two individuals who had been placed in and deported pursuant to expedited removal, filed an amended complaint. Am. Compl. ¶¶ 10-13.

Plaintiffs' amended complaint asserts six claims. First, the Rule and Guidance violate the Due Process Clause by depriving noncitizens of meaningful process before they are removed from the country. *Id.* ¶¶ 107-09. Second, the Rule and Guidance violate 8 U.S.C. § 1182(a)(7) and the Administrative Procedure Act ("APA") because they apply expedited removal to individuals who have already entered the country and thus are not inadmissible under § 1182(a)(7), which applies only at the time of application for admission. *Id.* ¶¶ 110-13. Third, the Rule and Guidance violate the expedited removal statute, which must be interpreted to provide meaningful process. *Id.* ¶¶ 114-16. Fourth, the Rule and Guidance are arbitrary and capricious in violation of the APA. *Id.* ¶¶ 117-18. Fifth, Defendants failed to comply with the APA's notice and comment requirements. *Id.* ¶¶ 119-24. Sixth, the Rule and Guidance violate the expedited removal statute, the asylum statute, and implementing regulations, and the APA because they apply expedited removal to people with pending affirmative asylum applications. *Id.* ¶¶ 125-28. On April 18, 2025, Defendants filed a motion to dismiss Plaintiffs' amended complaint. ECF No. 36 ("Mot.").

### LEGAL STANDARD

When reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), the Court must "assume that the complaint states a valid legal claim." *Huron v. Cobert*, 809 F.3d 1274, 1278 (D.C. Cir. 2016). The Court must also "accept the well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor[.]" *Kareem v. Haspel*, 986 F.3d 859, 865 (D.C. Cir. 2021) (internal quotation omitted). The Court "may consider

materials outside the pleadings to determine [its] jurisdiction." *Id.* at 866 n.7. "As necessary, [the Court can] cull additional facts from other parts of the record." *West v. Lynch*, 845 F.3d 1228, 1231 (D.C. Cir. 2017).

When reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court considers whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint need not include detailed factual allegations. *See Twombly*, 550 U.S. at 555. The court must "construe the complaint in favor of the plaintiff[.]" *Langeman v. Garland*, 88 F.4th 289, 294 (D.C. Cir. 2023) (cleaned up). The court must accept all factual allegations as true, "even if doubtful in fact." *Twombly*, 550 U.S. at 555.

## ARGUMENT

### I. Defendants Do Not Contest That Plaintiff Make the Road Has Plausibly Alleged Associational Standing.

Defendants' standing arguments are meritless. As an initial matter, Defendants do not challenge the standing of the two individual Plaintiffs, Mary and John Doe. And while Defendants argue that Plaintiff Make the Road has not adequately pled organizational standing under *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982), *see* Mot. 11-14, Make the Road does not assert *Havens* standing—rather, it asserts associational or membership standing. And the D.C. Circuit has squarely held that organizations—indeed, Make the Road itself—may proceed under a theory of associational standing to raise claims under 8 U.S.C. § 1252(e)(3). *MRNY*, 962 F.3d at 627-28. As before, Make the Road has alleged that its members are subject to the Rule and Guidance; it thus has membership standing. *See id.* at 621, 627-28; Am. Compl. ¶¶ 10-12, 94-104.

Similarly, Defendants argue that Make the Road does not fall within the INA's zone of interests, *see* Mot. 17-20, but make no such argument as to Make the Road's members. The zone-of-interests test is "not especially demanding" and bars only lawsuits where "a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in a statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014) (cleaned up). Here, the interests of Make the Road's members—individuals subject to placement into expedited removal under the Rule and Guidance—are directly related to the Rule and Guidance. *See Hispanic Affs. Project v. Perez*, 319 F.R.D. 3, 7-8 (D.D.C. 2016) (concluding organization's members were within the zone of interests); *Earthworks v. U.S. Dep't of Interior*, 496 F. Supp. 3d 472, 488-89 (D.D.C. 2020) (same); *Ctr. for Food Safety v. Salazar*, 898 F. Supp. 2d 130, 140-41 (D.D.C. 2012) (same).

## II.    Plaintiffs' Claims Are Not Time Barred.

### A.    Plaintiffs Filed This Action Less Than 60 Days After the First Implementations of the Rule And Guidance.

Defendants argue that Plaintiffs' first three claims are barred by the 60-day limitation on § 1252(e)(3) actions based on their view that Plaintiffs are challenging the expedited removal system first implemented in 1997. *See* Mot. 15-17. But under Defendants' theory, the population the Rule newly subjects to expedited removal could *never* challenge its legality—neither in 1997, because it did not yet apply to them (and their challenge thus would have failed on standing and ripeness grounds), nor now, because it is supposedly too late.

Defendants ignore that the Rule and Guidance are new writings that subject certain categories of noncitizens to expedited removal for the first time. Section 1252(e)(3) specifically authorizes actions to challenge whether "a regulation, or a written policy directive, written policy guideline, or written procedure" implementing the expedited removal statute is "in violation of

law." 8 U.S.C. § 1252(e)(3)(A). An action "must be filed no later than 60 days after the date the challenged section, regulation, directive, guideline, or procedure"—i.e. the challenged *writing*— "is first implemented." *Id*. § 1252(e)(3)(B). The Rule and Guidance are precisely such writings, and this action was filed "no later than 60 days after the date the" Rule and Guidance were first implemented. And Plaintiffs' claims go directly to whether these writings are "constitutional" or "otherwise in violation of law." *Id.* §§ 1252(e)(3)(A)(i)-(ii). It does not matter that the expedited removal statute was enacted in 1996 or that there were previous rules applying expedited removal to other categories of noncitizens. The Rule and Guidance made the statute and prior regulations applicable to this new group for the first time.

Defendants' position would allow them to manipulate and eliminate the availability of judicial review. In their view, Defendants can adopt regulations designed for a specific population (noncitizens stopped at or near the border), then issue new written directives that apply those procedures without alteration to an entirely different population with unique defenses to removal and with different constitutional and statutory claims, and then assert that the latter group is time-barred from asserting any challenges to the application of those new writings. But in enacting § 1252(e)(3), Congress specifically provided for judicial review of new "regulation[s], directive[s], guideline[s], or procedure[s]" implementing the expedited removal statute. It did not intend to allow Defendants to control whether judicial review would be available or eliminate it.

**B. In the Alternative, the 60-Day Deadline Is Non-jurisdictional and Subject to Equitable Tolling.**

In the alternative, the 60-day deadline is non-jurisdictional and subject to equitable tolling. Plaintiffs acknowledge that the D.C. Circuit reached the opposite conclusion in *M.M.V. v. Garland*,

1 F.4th 1100, 1109-10 (D.C. Cir. 2021). But that holding has been superseded by intervening Supreme Court precedent.[2]

Just last term, in *Harrow v. Department of Defense*, 601 U.S. 480 (2024), the Supreme Court reaffirmed that courts will "treat a procedural requirement as jurisdictional only if Congress clearly states that it is," and that "under this approach, most time bars are non-jurisdictional." *Id.* at 484 (cleaned up). *Harrow* held that a "time-bar provision"—one requiring that litigants file appeals from the Merit Systems Protection Board in the Federal Circuit within 60 days—was not jurisdictional because it did not "speak[] to a court's authority to hear a case." *Id.* at 485 (discussing 5 U.S.C. § 7703(b)(1)(A)). Further, *Harrow* reaffirmed that the Supreme Court has identified only *one* type of "exceptional" time limit "that counts as jurisdictional": "statutory deadlines to appeal from one Article III court to another." *Id.* at 488-89 (discussing *Bowles v. Russell*, 551 U.S. 205 (2007)).

Under these principles, § 1252(e)(3)(B)'s 60-day timeline is plainly non-jurisdictional. The provision is titled "[d]eadlines for bringing actions" and states that "[a]ny action . . . must be filed no later than 60 days after the date the challenged [writing] is first implemented." 8 U.S.C. § 1252(e)(3)(B). Like the provision in *Harrow*, § 1252(e)(3)(B) "describes how a litigant can obtain judicial review of [agency action]" and "sets a deadline" of 60 days. 601 U.S. at 485. It does not "speak[] to a court's authority to hear a case" or mention the court's "jurisdiction, whether generally or over untimely claims." *Id*. at 485-86. Nor does it create a deadline to appeal from one Article III court to another. *See id*. at 489. Thus, § 1252(e)(3)(B) is only a time limit and not a jurisdictional requirement.

---

[2] As explained *supra*, Plaintiffs clearly satisfy the 60-day deadline. However, Plaintiffs lay out their argument in the alternative at length to show that *M.M.V.* has been effectively overruled.

*Harrow* "eviscerate[s]" *M.M.V.*'s reasoning and "effectively overrule[s]" it. *Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1334 (D.C. Cir. 2024).[3]  It does so primarily by making clear that § 1252(e)(3)(B) cannot be treated as jurisdictional. Moreover, together with *Biden v. Texas*, 597 U.S. 785 (2022), *Harrow* makes clear that *M.M.V.*'s reasoning about two neighboring provisions also cannot stand.

The first of these provisions is § 1252(a)(2)(A), which states that "no court shall have jurisdiction to review" agency "procedures and policies" to implement expedited removal, "except as provided in subsection (e)[.]" 8 U.S.C. § 1252(a)(2)(A). *M.M.V.* reasoned that § 1252(a)(2)(A) "conditions jurisdiction on satisfaction of the requirements in subsection (e)[,]" thus supporting the conclusion that subsection (e)'s deadline is itself jurisdictional. 1 F.4th at 1109. But *Harrow* rejected the same sort of argument: There, a jurisdictional provision (28 U.S.C. § 1295) required that an appeal be filed "pursuant to" the provision (5 U.S.C. § 7703) setting forth a time limit. Thus, argued the government, "the time limit becomes a 'jurisdictional prerequisite.'" 601 U.S. at 486. The Court rejected this approach as "untenable" and explained that the statute's cross-reference could not be read to transform a "bevy of procedural rules" into jurisdictional requirements. *Id.* at 488. *M.M.V.*'s reading of § 1252(a)(2)(A) suffers from the same fatal flaw.[4]

Second, *M.M.V.* relied on a remedial provision, § 1252(e)(1)(A), which states that "no court may . . . enter" particular relief in certain expedited removal actions "except as specifically

---

[3] It is true that § 1252(e)(3)(B) is phrased in mandatory terms, providing that the action "*must* be filed no later than 60 days after the date [of implementation]." 8 U.S.C. § 1252(e)(3)(B) (emphasis added). But *Harrow* reaffirmed that this "fact is 'of no consequence' to the jurisdictional issue." 601 U.S. at 485 (cleaned up).

[4] Indeed, the same logic would render much of § 1252 jurisdictional. *See* 8 U.S.C. § 1252(a)(1) (providing that "[j]udicial review of a final order of removal . . . is governed only by chapter 158 of Title 28, *except as provided in subsection (b)*") (emphasis added); *id.* §§ 1252(b)(2)-(3) (setting forth rules on venue, forms, service, and briefing deadlines). But the Supreme Court has recently rejected that view. *See Santos-Zacaria v. Garland*, 598 U.S. 411, 422-23 (2023).

authorized in a subsequent paragraph of this subsection." 1 F.4th at 1109 (quoting 8 U.S.C. § 1252(e)(1)(A)). But the Supreme Court subsequently held that a neighboring remedial provision, § 1252(f)(1), only "withdraws a district court's 'jurisdiction or authority' to grant a particular form of relief" and does *not* "deprive the lower courts of . . . subject matter jurisdiction . . . ." *Texas*, 597 U.S. at 798. The Court reached its conclusion based on § 1252(f)(1)'s plain language (which refers to the power to "enjoin or restrain"); its title ("Limit on injunctive relief"); and Congress's use of explicit language elsewhere in § 1252 to deny subject matter jurisdiction. *See id*. at 798-99. The same reasoning confirms that § 1252(e)(1)(A) is a bar on relief and not review—based on its plain language ("no court may enter declaratory, injunctive, or other equitable relief"); title ("Limitations on relief"); and Congress's decisions to limit jurisdiction explicitly in neighboring provisions of § 1252.

Finally, because the 60-day deadline is non-jurisdictional, it is subject to equitable tolling. Plaintiffs are entitled to equitable tolling because they (1) "pursu[ed] [their] rights diligently", and (2) an "extraordinary circumstance stood in [their] way and prevented timely filing." *Holland v. Florida*, 560 U.S. 631, 649 (2010) (cleaned up). First, assuming—as Defendants argue—that Plaintiffs could only have met the 60-day deadline by filing suit decades ago, an "extraordinary circumstance" stood in their way: the fact that the government had not yet designated people in their class for expedited removal. Any attempt by Plaintiffs to sue preemptively, years prior to their designation under the Rule, would have failed for lack of standing or ripeness. Second, Plaintiffs acted diligently by filing suit within 60 days of the designation under the Rule of the category of people to which they belong, consistent with the 60-day timeframe that Congress enacted.

III.    **Plaintiffs Have Plausibly Alleged That the Rule and Guidance Violate Due Process and the Immigration and Nationality Act.**

A.  **The D.C. Circuit's Decision in *MRNY* Does Not Bar Plaintiffs' Statutory and Constitutional Challenges.**

Defendants suggest that: (1) *MRNY* held that the Secretary's decision to designate a new category of individuals for expedited removal is not subject to any review and (2) *MRNY* therefore bars Plaintiffs' constitutional and statutory challenges to the Rule. *See* Mot. 20-21, 21 n.4. But as the D.C. Circuit explained, there is no bar to "claims of legal or constitutional error in the Secretary's rules implementing expedited removal." *MRNY*, 962 F.3d at 630-31.

B.  **Plaintiffs Plausibly Allege That the Rule and Guidance Violate Due Process.**

Plaintiffs' due process challenge is that the expedited removal system as it exists cannot constitutionally be applied to the new class of people the Rule subjects to it.  It is not a challenge to the exercise of discretion or inaction, as Defendants suggest.  Mot. 28-29.[5]

1.  ***Salerno* Does Not Apply and, in Any Event, Plaintiffs Plausibly Allege a Facial Challenge Under *Salerno*.**

Defendants contend that, even if the Rule is unconstitutional or otherwise unlawful as applied to the vast majority of those it newly subjects to expedited removal, Plaintiffs' claims fail because they must show there is "no set of circumstances" under which the Rule would be permissible. *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see also* Mot. 30-31. That is incorrect.

---

[5] Defendants rely on out of circuit cases to conflate the challenges here with a challenge to a discretionary exercise of authority. *See* Mot. 28 (citing *Privett v. Sec'y, Dep't of Homeland Sec.*, 865 F.3d 375, 381 (6th Cir. 2017); *Jilin Pharm. USA, Inc. v. Chertoff*, 447 F.3d 196, 206 (3d Cir. 2006)). Not only do Defendants misconstrue Plaintiffs' due process claim, but the cases they cite are about the reviewability of denials of individual discretionary forms of relief from removal and the interpretation of § 1252(a)(2)(B). The D.C. Circuit has already rejected the applicability of that statute to systemic challenges to expedited removal pursuant to § 1252(e)(3). *MRNY*, 962 F.3d at 629.

First, the *Salerno* standard does not apply to facial, systemic challenges under § 1252(e)(3). *Salerno* is not a jurisdictional rule; rather, it is a "prudential doctrine," *City of Chicago v. Morales*, 527 U.S. 41, 55 n.22 (1999) (plurality opinion), reflecting courts' self-imposed inclination towards "judicial restraint," *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008). In ordinary cases, courts' general preference to adjudicate issues in particular factual contexts leads courts to avoid across-the-board holdings absent a strong justification. *See, e.g.*, *Sabri v. United States*, 541 U.S. 600, 608-09 (2004) (emphasizing "the lessons taught by the particular, to which common law method normally looks").[6] But like any other "judicially self-imposed limit[] on the exercise of federal jurisdiction," the *Salerno* rule plainly "can be modified or abrogated by Congress[.]" *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (internal quotation marks omitted); *see also Am. Soc. for Prevention of Cruelty to Animals v. Feld Ent., Inc.*, 659 F.3d 13, 19 (D.C. Cir. 2011) (holding Congress had "eliminate[d] any prudential standing requirements" in particular statute); *In re Directives Pursuant to Section 105B of Foreign Intel. Surveillance Act*, 551 F.3d 1004, 1008 (Foreign Int. Surv. Ct. Rev. 2008) (finding Congress can eliminate prudential limits "expressly or by fair implication").

That is just what Congress has done here. Section 1252(e)(3) was enacted "to authorize, as its title makes clear, '[c]hallenges on [the] validity of the [expedited-removal] system.'" *Grace v. Barr*, 965 F.3d 883, 895 (D.C. Cir. 2020) (quoting 8 U.S.C. § 1252(e)(3)). Under this highly unusual system, Congress specifically provided for "facial challenges to expedited-removal policies" to be heard in this Court, *id.* at 896, and filed within 60 days of those policies' implementation. At the same time, Congress severely restricted subsequent as-applied challenges.

---

[6] Reflecting the doctrine's prudential nature, courts actually apply different standards for facial relief depending on the nature of the claim and circumstances. *See Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (discussing various standards).

*See id.* at 892 (finding statute "forbids review of individual aliens' credible-fear determinations, not suits like this that challenge credible-fear policies on their face"); 8 U.S.C. § 1252(a)(2)(A), (e)(3). Taken together, these provisions mean that Congress not only permitted early facial reviews, but *required* that any claim be brought almost immediately, and correspondingly not only disfavored as-applied challenges, but outright barred them. That is the opposite scenario to the one that generally justifies application of the *Salerno* standard in other contexts.

Indeed, applying *Salerno* to § 1252(e)(3) could well eliminate all review—precisely the opposite of Congress's goal when it specifically provided for review. *See Grace*, 965 F.3d at 893 (rejecting interpretation that would eliminate all § 1252(e)(3) review of policy). After all, on Defendants' view, even a rule that was unconstitutional 95 percent of the time could not be voided facially. Yet it *also* could not be challenged as applied in those 95 percent of cases, because the application could occur after the 60-day period to challenge the policy had ended. Because Congress specifically authorized review of expedited removal policies for constitutional and legal flaws, applying a judge-made doctrine to effectively eliminate that review would represent the opposite of "respect for [Congress]." *Jarkesy v. S.E.C.*, 803 F.3d 9, 25 (D.C. Cir. 2015).

Second, in any event, the Rule and Guidance *are* unconstitutional in all their applications. People apprehended "within the United States" more than two weeks after entry cannot be removed without due process. For more than a century, the Supreme Court has recognized this core principle. *See Yamataya v. Fisher*, 189 U.S. 86, 99-101 (1903); *accord, e.g.*, *Zadvydas*, 533 U.S. at 693 ("[O]nce an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent"); *Mathews v. Diaz*, 426 U.S. 67, 77 (1976) (the Fifth Amendment applies even to those "whose presence in this country is unlawful, involuntary, or transitory"); *Maldonado-Perez*, 865 F.2d at 329-30, 332 (noncitizen apprehended one day after

unlawful entry entitled to due process); *Zheng v. Mukasey*, 552 F.3d 277, 279, 286 (2d Cir. 2009) (same for noncitizen apprehended one week after entry).

Defendants rely on *DHS v. Thuraissigiam*, but there the Court concluded that a noncitizen apprehended "25 yards into U.S. territory" could not "be said to have 'effected an entry.'" 591 U.S. 103, 139-140 (2020). That decision said nothing about the due process rights of noncitizens who had already entered the country, much less people here for weeks or longer. Defendants also cite *Landon v. Plasencia*, 459 U.S. 21 (1982), but that case never held that unlawful entrants later apprehended in the interior lacked due process protections.

Defendants' remaining cases are equally inapt. *See* Mot. 29-31, 34. Some involve noncitizens outside the United States seeking constitutional protection. *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 262, 271-72 (1990) (noncitizen seeking Fourth Amendment protection for events that took place in Mexico). Others involve noncitizens stopped at the border before entering. *E.g.*, *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 539-40 (1950). Still more actually undermine their position. *See Ibrahim v. DHS*, 669 F.3d 983, 994-97 (9th Cir. 2012) (recognizing due process applied to noncitizen outside United States who had previously lived in country on visa); *Martinez-Aguero v. Gonzalez*, 459 F.3d 618, 620-21, 625 (5th Cir. 2006) (holding Fourth Amendment applied where noncitizen's main connection to United States was regularly crossing border to accompany aunt to Social Security office); *Albathani v. I.N.S.*, 318 F.3d 365, 368–69 (1st Cir. 2003) (individual taken into custody at the port of entry).[7]

---

[7] Defendants' remaining cases are also distinguishable. To the extent that *Legal Assistance for Vietnamese Asylum Seekers v. Department of State* addressed the constitutional rights of noncitizens at all, it too involved noncitizens outside the United States. 104 F.3d 1349, 1353-54 (D.C. Cir. 1997). *Osorio-Martinez v. Attorney General* addressed the scope of the Suspension Clause, not due process, and in any event held that the noncitizens there did have Suspension Clause rights. 893 F.3d 153, 168 (3d Cir. 2018).

And as Defendants acknowledge, *see* Mot. 34, the due process analysis for any given person newly subject to expedited removal under the Rule and Guidance focuses on the risk of erroneous deprivation in "the generality of cases." *Mathews v. Eldridge*, 424 U.S. 319, 344 (1976). Under that standard, Plaintiffs plausibly allege that the procedures imposed by the Rule and Guidance are inadequate procedures for *all* such people. *See infra*. So there are no lawful applications, and *Salerno* is satisfied.

### 2. *AILA* does not foreclose Plaintiffs' claims.

Defendants assert that the *AILA* decisions foreclose Plaintiffs' claims, but Defendants read those decisions far too broadly. Mot. 25-28 (citing *Am. Immigration Lawyers Ass'n v. Reno*, 18 F. Supp. 38 (D.D.C. 1998) ("*AILA I*") and *Am. Immigration Lawyers Ass'n v. Reno*, 199 F.3d 1352 (D.C. Cir. 2000) ("*AILA II*"). Apart from the organizational plaintiffs' First Amendment claims, the merits issues in *AILA I* were limited to only two individual plaintiffs who were found inadmissible after arriving at ports of entry. *See* 18 F. Supp. 2d at 45, 47, 58-60. In rejecting the two plaintiffs' challenges to the regulations (which applied only at ports of entry), the district court focused on their status as noncitizens seeking initial entry and held that such noncitizens did not have a protected liberty interest in being permitted to enter the country. *Id*. at 58-60. The court relied heavily on cases involving noncitizens outside the United States or those (like the two individual plaintiffs) who were stopped at the border or at sea before they could enter. *Id*. By contrast, the individuals subject to the Rule here stand in a fundamentally different position because they have already entered the United States—regardless of "whether their presence here is lawful." *Zadvydas*, 533 U.S. at 693. Neither the district court nor the D.C. Circuit in *AILA* addressed, much less rejected, the constitutional claims of noncitizens who had already entered the

19

country. Nor could they have, since expedited removal did not even apply to such noncitizens at the time.[8]

### 3. Plaintiffs Plausibly Allege That the Rule and Guidance Fail to Provide Due Process.

Courts weigh three factors when determining what process is due in a given proceeding: the private interests at stake; the risk of erroneous deprivation and probable value of additional safeguards; and the government's countervailing interests. *See Mathews v. Eldridge*, 424 U.S. at 335. Plaintiffs plausibly allege that all three factors weigh in their favor.

### a. Plaintiffs have a strong liberty interest in remaining in the United States.

Plaintiffs adequately allege that people who have been in the United States for weeks, months, or years following entry have a protected liberty interest in remaining here. The Supreme Court has repeatedly held that the removal of people from within the United States implicates a "weighty" liberty interest. *Landon v. Plasencia*, 459 U.S. 21, 34 (1982); *see also Bridges v. Wixon*, 326 U.S. 135, 154 (1945) (finding deportation "visits a great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom"); *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922) (finding deportation "may result . . . in loss of both property and life, or of all that makes life worth living"). The stakes are even higher for people who fear persecution if removed. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 449 (1987) ("Deportation is always a harsh measure; it is all the more replete with danger when the [noncitizen] makes a claim that he or she

---

[8] Similarly, the *AILA I* district court examined the plaintiffs' statutory and regulatory claims through the lens of the only plaintiffs before it—noncitizen tourist visa-holders seeking entry at the border. 18 F. Supp. 2d at 52-58. For instance, in upholding the regulations' lack of a right to "consultation during the period between secondary inspection and the credible fear interview," the court observed that the government processed "ten million" people at ports of entry every year and could not afford them all a consultation right. *Id.* at 54-55; *see also id.* at 55 (upholding denial of access to counsel during secondary inspection as "reasonable" under the circumstances). Such concerns are inapplicable in the interior.

will be subject to death or persecution if forced to return to his or her home country."); *accord Kaweesa v. Gonzales*, 450 F.3d 62, 69 (1st Cir. 2006).

Plaintiffs' allegations illustrate this weighty interest. Plaintiffs Mary and John allege that they lived in the United States for 10 years before being erroneously subjected to expedited removal under the Rule. *See* Am. Compl. ¶¶ 12-13. Mary also has two U.S.-citizen children. *Id.* Already, therefore, the Rule has deprived Mary and John of residing with other members of their "immediate family, a right that ranks high among the interests of the individual." *Landon*, 459 U.S. at 34. Make the Road's members include John Does 1, 2, and 3 and Jane Doe 1, all of whom had been living in the United States for between 15 and 20 months when the amended complaint was filed. *See* Am. Compl. ¶¶ 98-101. Make the Road "also has numerous members who have lived in the country for longer than two years, but would have difficulty affirmatively demonstrating two years of physical presence, particularly if suddenly detained or given only a short period of time to do so, as is regularly the case when expedited removal orders are issued." *Id.* ¶ 102. And John Doe 2 has a pending asylum application. *See id.* ¶ 99.

Defendants contend that *Congress's* decision to permit expedited removal of people who have lived in the United States for up to two years is dispositive of whether those people have a liberty interest. Mot. 29, 33. But Congress cannot unilaterally determine whether someone has "effected an entry" and is therefore a person "within the United States" for due process purposes. *Zadvydas*, 533 U.S. at 693. The courts—not Congress—determine when the Due Process Clause applies. *See Rafeedie v. I.N.S.*, 880 F.2d 506, 519 (D.C. Cir. 1989) (rejecting notion that "Congress could unilaterally determine what satisfies the constitutional requirement of due process"); *see also Den ex dem. Murray v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 276 (1855) (Due Process Clause "is a restraint on the legislative as well as on the executive and judicial powers of the government, and cannot be so construed as to leave congress free to make any process 'due

21

process of law,' by its mere will"); *cf. Boumediene v. Bush*, 553 U.S. 723, 765 (2008) (rejecting the notion that "the political branches have the power to switch the Constitution on or off at will") (citing *Marbury v. Madison,* 1 Cranch 137, 177 (1803).[9]

Defendants' cases are distinguishable. Mot. 33-34. *Carlson v. Landon* in no way establishes that Plaintiffs lack a liberty interest. Instead, the Court in *Carlson* reaffirmed removal proceedings must be implemented in "a manner consistent with due process" and held that the detentions in that case met the requirements of the Constitution. 342 U.S. 524, 538, 541-42 (1952). *Knauff*, 338 U.S. 547, and *United States v. Villarreal Silva*, 931 F.3d 330, 333 (4th Cir. 2019) both address arriving aliens stopped at the border, and have no bearing on the liberty interests of those who have entered. *Dave v. Ashcroft*, 363 F.3d 649, 652–53 (7th Cir. 2004), held there was no "liberty or property interest in obtaining purely discretionary relief" like cancellation of removal; it did not state that there was no liberty interest in remaining in the United States.

### b. Plaintiffs plausibly allege a risk of error and value of additional safeguards.

Plaintiffs also plausibly allege a risk of error that would be reduced by additional procedural safeguards. The "troubling reality" is that expedited removal is "fraught with risk of arbitrary, mistaken, or discriminatory behavior" and can occur "without any check on whether the person understood the proceedings, had an interpreter, or enjoyed any other safeguards." *Khan v. Holder*, 608 F.3d 325, 329 (7th Cir. 2010). The complaint plausibly alleges a risk of error in imposing this process on people who have entered the United States and been present here for weeks, months, or years. *See, e.g.*, *Shume v. Pearson Educ. Inc.*, 306 F. Supp. 3d 117, 129 (D.D.C. 2018) (denying motion to dismiss where "the Court cannot conclude that the circumstances here

---

[9] Similarly, Defendants' invocation of the "sovereign prerogative" to exclude noncitizens who have not yet entered the country, Mot. 29, ignores that "Executive and Legislative Branch decisionmaking" concerning removal "is subject to important constitutional limitations," *Zadvydas*, 533 U.S. at 695.

posed no plausible risk of an erroneous deprivation of [the plaintiff's liberty] interest, or that additional procedural safeguards would not have plausibly benefitted her").

Defendants claim that that the risk of error "is categorically low" because whether a noncitizen "may be subject to expedited removal proceedings is straightforward." Mot. 34. But Plaintiffs outline the systemic flaws that have made these purportedly "straightforward" determinations error-prone in the past. *E.g.*, Am. Compl. ¶¶ 52-87. Plaintiffs further plausibly allege that similar errors will continue or be even more frequent for people impacted by the Rule. *E.g.*, *id.* ¶¶ 1-6, 51-89; *see also, e.g.*, *Schubarth v. Fed. Republic of Germany*, 891 F.3d 392, 400-01 (D.C. Cir. 2018) (holding that it was plausible for the court to infer that alleged past activity continued into the present for purposes of deciding a motion to dismiss).

Under the Rule, a noncitizen "bears the affirmative burden to show to the satisfaction of an immigration officer that the alien has been present in the United States continuously for" two years or more. 90 Fed. Reg. at 8,140. DHS officers can therefore presume, *without evidence*, that any noncitizen they arrest is subject to expedited removal. Defendants do not contest Plaintiffs' allegations that people subjected to expedited removal proceedings are "not provided with any guaranteed minimal time to prepare or means by which to gather evidence, present witnesses, or review or cross-examine DHS' evidence; nor any right to counsel recognized by the government or time to obtain counsel." Am. Compl. ¶ 52; *cf. Khan*, 608 F.3d at 326 (neither petitioner's counsel nor family "had been permitted to speak to him" while he was in expedited removal proceedings); *Cheung v. INS*, 418 F.2d 460, 463 (D.C. Cir. 1969) (discussing the importance of giving noncitizens in deportation proceedings the "opportunity to consult with friends on the outside").

In that absence of such protections, there is a plausible risk that people who should not be subject to expedited removal at all—like Plaintiffs Mary and John—will nonetheless be erroneously removed without hearings. *See* Am. Compl. ¶¶ 12-13, 85-89; *see also, e.g.*, Am. Civil

23

Liberties Union, *American Exile: Rapid Deportations that Bypass the Courtroom* 63 (2014), https://perma.cc/3E9F-H28M (documenting case of noncitizen who had been living in the United States continuously for 14 years and was wrongly subjected to expedited removal after a traffic stop); Pet'n for Writ of Habeas Corpus, ECF No. 1, *Orellana Juarez v. Moniz*, No. 25-cv-11266 (D. Mass. May 8, 2025) (individual present for more than two years issued expedited removal order). Indeed, as Plaintiffs allege, even U.S. citizens have been erroneously subjected to expedited removal. Am. Compl. ¶ 86. Multiple U.S. citizens have likewise been wrongly swept up in the Trump administration's current immigration crackdown. *See, e.g.*, Laura Barron-Lopez et al., *American Citizens Wrongly Detained in Trump Administration's Immigration Crackdown*, PBS (Apr. 23, 2025), https://www.pbs.org/newshour/show/american-citizens-wrongly-detained-in-trump-administrations-immigration-crackdown; Maria Luisa Paul, *Here Are the U.S. Citizens Caught in Trump's Immigration Crackdown*, Wash. Post (May 3, 2025), https://www.washingtonpost.com/immigration/2025/05/02/citizens-caught-trump-immigration-crackdown/.

As Plaintiffs allege—based on studies by the U.S. Commission on International Religious Freedom—information in the expedited removal forms completed by immigration officers is "often inaccurate." Am. Compl. ¶ 65; *see also id.* ¶ 63 (quoting 2016 Commission study describing "continuing and new concerns about CBP officers' interviewing practices and the reliability of the records they create" during the expedited removal process). Immigration officers consistently fail to give noncitizens an opportunity to review and respond to the statements in the required paperwork. *Id.* ¶ 67 (citing 2016 Commission study documenting that asylum seekers' statements were not read back to them, and that some asylum seekers were pressured to sign documents). Reports have also "documented that immigration enforcement officers have routinely employed

coercive tactics to force non-English speaking individuals to sign expedited removal forms in English, without any translation or interpretation." *Id*. ¶ 68.

It is also plausible, as Plaintiffs allege, that people "who are arrested while going about their daily lives—attending religious services, taking their children to school, attending community events, or even simply grocery shopping—are extremely unlikely to be carrying the necessary documentary evidence on their person." *Id*. ¶ 56. Proving at least two years of continuous physical presence, while detained and alone, would be challenging for a U.S. citizen or a lawful permanent resident, let alone for an undocumented person who may lack credit cards in their name or an identification document with a sufficiently early issue date. *See, e.g.*, USCIS, *Instructions for Consideration of Deferred Action for Childhood Arrivals*, https://perma.cc/B5Q6-TLML. For example, young people who came to this country as children may not have proof of physical presence easily accessible to them, or that evidence may be held by family members. But again, neither the Rule nor the Guidance ensures that people are afforded an opportunity to call family or counsel for help in obtaining such evidence. Am. Compl. ¶ 52.

Additionally, many noncitizens who have been present in the United States for weeks, months, or years have already applied for or obtained immigration relief, which could grant them various forms of admission or parole. *See, e.g.*, *Osorio-Martinez*, 893 F.3d at 170-71 (discussing parole based on application for Special Immigrant Juvenile Status). But without time to assemble records or the chance to speak with counsel, noncitizens will be hard-pressed to explain their situation or provide necessary documents to immigration officers.

Plaintiffs also plausibly allege that noncitizens who fear persecution or torture if removed will be erroneously removed without hearings or even credible fear screenings because of the Rule. Indeed, the U.S. Commission on International Religious Freedom has concluded that noncitizens who expressed fear of removal have been frequently removed without receiving credible fear

interviews. Am. Compl. ¶¶ 71-73. The Commission's latest study, released earlier this year, concluded that "many of the problems it has repeatedly documented," "including flawed screening and documentation practices, [and] a lack of training and quality control," still "remain unaddressed." *Id.* ¶ 64.

Defendants suggest that Plaintiffs' reliance on these reports is inadequate because they constitute "extra-record" "hearsay." Mot. 34. But Defendants chose to bring a motion to dismiss on the pleadings, which incorporate these reports; no "record" has yet been developed. And the official findings of congressionally-commissioned studies are more than enough to make out plausible *allegations* of widespread and continuing errors.

Defendants also argue that, even if taken as true, the findings in the reports Plaintiffs cite do not plausibly allege a risk of erroneous deprivation because "due process 'rules are shaped by the risk of error inherent in the truth-finding process as applied to the generality of cases, not the rare exceptions.'" Mot. 34 (quoting *Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 320 (1985)). But Plaintiffs allege more than rare exceptions. For example, Plaintiffs allege that the Commission "found that in *15 percent* of observed expedited removal cases, when a noncitizen expressed a fear of return to an immigration officer during the inspections process, the officer failed to refer the individual to an asylum officer for a credible fear interview." Am. Compl. ¶ 72 (emphasis added).  A separate study similarly found that DHS erroneously failed to refer people who expressed fear of removal for credible fear interviews "[i]n 12% of cases." *Id*. ¶ 73. Erroneously removing more than *one out of ten* people to danger without required screenings is hardly a "rare exception."

Plaintiffs also plausibly allege that additional safeguards would reduce these risks of erroneous deprivation. As the Amended Complaint alleges, in regular removal proceedings, noncitizens have "the right to an adversarial hearing" and "the right to retain and be represented

by counsel"; "can contest the factual and legal allegations against them"; and "can move to terminate the proceedings or suppress evidence based on an unlawful arrest." *Id.* ¶ 25. Unlike in expedited removal proceedings, where "a noncitizen's removability is determined by a low-level immigration enforcement officer who acts as both prosecutor and judge," regular removal proceedings are conducted "by a neutral adjudicator." *Id.* ¶ 59; *see* 8 C.F.R. § 1003.10(b). The requirement of neutral adjudicator is a hallmark of due process. Indeed, the Supreme Court has required far more procedures—a neutral adjudicator, a meaningful ability to rely on counsel, and time and ability to gather and contest evidence—for far lesser interests, including for criminals seeking release on parole (despite their having already been sentenced to the full term of their confinement) and for property deprivations. *See, e.g.*, *Morrissey v. Brewer*, 408 U.S. 471, 489 (1972); *Califano v. Yamasaki*, 442 U.S. 682, 696 (1979).

As to the value of additional safeguards, Defendants principally argue that that the existing regulations are adequate to protect noncitizens who have been in the United States for weeks, months, or longer. Mot. 35-36. As just explained, however, Plaintiffs plausibly allege that those regulations have repeatedly proven woefully *inadequate* even as applied to noncitizens present for 14 days or less.

Defendants also argue that any additional process would be inappropriate because it would "fundamentally alter Congress's scheme." Mot. 35 (quoting *United States v. Peralta-Sanchez*, 847 F.3d 1124, 1137 (9th Cir. 2017), *reh'g granted, opinion withdrawn*, 868 F.3d 852, *decided on other grounds on reh'g*, 705 F. App'x 542). But even assuming the withdrawn opinion Defendants cite has persuasive value, requiring more process would have no such effect. If Plaintiffs succeed in vacating the Rule, noncitizens newly subject to expedited removal because of the Rule would instead be afforded regular removal proceedings under 8 U.S.C. § 1229a. That is the default procedure under "Congress's scheme"—and the procedure that until now has applied to nearly all

noncitizens in the United States longer than 14 days. And while Plaintiffs do not foreclose the possibility that Defendants might be able to fashion some alternative rule adopting sufficient safeguards *within* expedited removal proceedings to satisfy due process as to this population, no such safeguards exist.

### c. Plaintiffs plausibly allege that the government's interests do not outweigh the need for additional safeguards.

Plaintiffs also adequately allege that the government's interests do not outweigh the need for additional procedural safeguards. Defendants argue that "Congress determined that expedited removal is necessary" and that requiring safeguards like those in regular removal proceedings would interfere with "effectively enforcing the expedited removal statute as drafted by Congress." Mot. 36-37. But Congress specifically did *not* mandate that expedited removal be applied to people who have been present in the United States for weeks, months, or years—and with only narrow exceptions, expedited removal has not been applied to this population before. Am. Compl. ¶¶ 32-39. Instead, until now, people like those impacted by the Rule have always been afforded the more robust protections of regular removal proceedings. Moreover, the government has an interest in the fair and accurate administration of the immigration laws. *See Nken v. Holder*, 556 U.S. 418, 436 (2009) ("[T]here is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm.").

### C. Plaintiffs Plausibly Allege The Rule and Guidance Violate The INA.

Although the expansion of expedited removal is unconstitutional, this Court need not rule on constitutional grounds. Instead, the Court can and should (1) read the expedited removal statute to require procedurally fair determinations and (2) invalidate the Rule and Guidance for failure to comply with the statute.

Courts have long construed removal statutes to require due process protections, even where the statute does not expressly provide such safeguards. The very concept of a deportation hearing arose when the Supreme Court read an early immigration statute to require a hearing in order to avoid serious due process concerns. *See Yamataya*, 189 U.S. at 100-01. The statutes at issue in *Yamataya* provided that immigration officers should "inspect" certain noncitizens arriving by sea to determine their excludability; that those determinations "shall be final" absent administrative appeal; and that the government could, "within one year after an alien of the excluded class entered the country, . . . cause him to be taken into custody and returned to the country whence he came." *Id.* at 95-96, 99. The Court rejected a "rigid construction" of those statutes and held that they "do no[t] necessarily exclude opportunity to the immigrant to be heard, when such opportunity is of right." *Id.* at 100; *accord id.* (statutory text did "not require an interpretation that would invest executive or administrative officers with the absolute, arbitrary power" to deport noncitizens without process); *see also Wong Yang Sung v. McGrath*, 339 U.S. 33, 49 (1950) ("It was under compulsion of the Constitution that this Court long ago held that an antecedent deportation statute must provide a hearing"); *Greene v. McElroy*, 360 U.S. 474, 507 (1959) ("Where administrative action has raised serious constitutional problems, the Court has assumed that Congress or the President intended to afford those affected by the action the traditional safeguards of due process."); *Gonzalez v. Freeman*, 334 F.2d 570, 579 (D.C. Cir. 1964) ("[W]e cannot agree that Congress intended to authorize [the penalty of debarment] without regulations establishing standards and procedures and without notice . . . hearings, and findings pursuant hereto.").

Consistent with *Yamataya*, courts and immigration agencies have construed other immigration statutes to provide certain unenumerated safeguards when necessary to protect due process. For example, the fair hearing provision that applies to regular removal proceedings, 8 U.S.C. § 1229a(b)(4)(B), and its precursors have long been read to require protections such as

interpretation at the hearing, *see Matter of Tomas*, 19 I. & N. Dec. 464, 465-66 (BIA 1987), the "timely production of" adverse evidence, *Bondarenko v. Holder*, 733 F.3d 899, 907 (9th Cir. 2013), and a neutral fact finder, *see Tun v. Gonzales*, 485 F.3d 1014, 1025 (8th Cir. 2007). And in *Marincas v. Lewis*, 92 F.3d 195, 199-200, 203-04 (3d Cir. 1996), the court read into the Refugee Act a requirement that stowaways seeking asylum were entitled to basic procedural safeguards, including the right to an interpreter.

This Court should similarly interpret the expedited removal statute as applied by the Rule to require fair determinations of whether, *inter alia*, the factual criteria for expedited removal are met, that the noncitizen is inadmissible for the specified grounds, and that there is a viable opportunity to express fear of removal. Reading the expedited removal statute to guard against "absolute, arbitrary power," *Yamataya*, 189 U.S. at 101, would avoid an interpretation that would create serious constitutional problems. The failure to provide reasonable safeguards in the Rule or Guidance render them fatally defective under the statute, as read to avoid constitutional doubt.

### IV.   Plaintiffs Plausibly Allege That Expedited Removal Cannot Be Lawfully Applied To People In The Interior Solely Because They Lack Valid Entry Documents.

By statute, expedited removal can only be applied to noncitizens who are inadmissible on one of two grounds: 8 U.S.C. § 1182(a)(6)(C) or § 1182(a)(7). 8 U.S.C. § 1225(b)(1)(A)(i). Section 1182(a)(6)(C) concerns noncitizens seeking to procure immigration status via fraud or who falsely claim U.S. citizenship. Section 1182(a)(7), entitled "Documentation Requirements," applies to noncitizens who, "at the time of application for admission," lack a valid visa, "border crossing identification card, or other valid entry document."

The Rule designates noncitizens who have already entered the United States, including those who entered up to two years ago, for expedited removal under both provisions. 90 Fed. Reg. at 8,139. But § 1182(a)(7) does not apply to those who have already entered the United States

30

because it applies only at "the time when a noncitizen seeks permission to physically enter United States territory." *Torres v. Barr*, 976 F.3d 918, 924 (9th Cir. 2020) (en banc). The Rule is contrary to the statute because it subjects people who have already entered the United States to expedited removal under § 1182(a)(7). *See* Am. Compl. ¶¶ 110-13.

This is made clear by both the statute's plain language and context. By its plain terms, § 1182(a)(7) applies only to a noncitizen who lacks a valid entry document at a specific moment: "*at the time of* application for admission." 8 U.S.C. § 1182(a)(7)(A)(i) (emphasis added).[10] Section 1182(a)(7) uses the phrase "at the time of application for admission" in connection with requiring a valid "*entry* document" to lawfully cross the border: the noncitizen must possess "a valid unexpired immigrant visa, reentry permit, border crossing identification card,[11] or other valid entry document." *Id*. § 1182(a)(7)(A)(i)(I) (emphasis added). It has a similar requirement for a valid "*travel* document": the noncitizen must possess a "valid unexpired passport, or other suitable travel document, or document of identity and nationality if such document is required under the regulations issued . . . under section 1181(a)." *Id.* (emphasis added). Section 1181(a) likewise concerns documents used to cross into the United States. *See* 8 U.S.C. § 1181(a). Thus, "the most

---

[10] Several of the INA's inadmissibility provisions use the phrase "at the time of," each referring to a specific time when a noncitizen must meet a certain condition. *See, e.g.*, 8 U.S.C. § 1182(a)(4)(A) (inadmissible if "at the time of" his application for a visa, admission, or adjustment of status, person "is likely . . . to become a public charge"); *id.* § 1182(a)(5)(A)(i)(I) (inadmissible if noncitizen seeks to work without certification that there were insufficient workers to fill the same job "at the time of [the noncitizen]'s application for a visa and admission"); *id.* § 1182(a)(6)(C)(ii)(II) (inadmissible if noncitizen falsely claimed citizenship unless she "reasonably believed at the time of making such representation" that she was citizen.)

[11] A "border crossing identification card" is a document issued for the "purpose of crossing over the borders between the United States and foreign contiguous territory." 8 U.S.C. § 1101(a)(6).

logical reading of [the] phrase ["at the time of application for admission"] is that it refers to the moment of applying for entry into the country." *Torres*, 976 F.3d at 925.[12]

Statutory context confirms § 1182(a)(7)'s temporal focus on the moment of entry into the United States. In contrast, a neighboring ground of inadmissibility, § 1182(a)(6)(A), renders inadmissible a noncitizen who is "*present* in the United States without being admitted or paroled." 8 U.S.C. § 1182(a)(6)(A)(i) (emphasis added). Congress chose *not* to make mere presence a basis for inadmissibility under § 1182(a)(7), focusing instead on the moment when the person applies to enter the country. Congress's choice makes clear that it did not intend for expedited removal to apply to people who are present in the United States without valid entry documents. Had Congress wanted to do so, it had a straightforward option: listing § 1182(a)(6)(A) as a basis for expedited removal.[13] *Cf. Kucana v. Holder*, 558 U.S. 233, 248 (2010) ("If Congress wanted the jurisdictional bar to encompass decisions specified as discretionary by regulation along with those made discretionary by statute . . . Congress could easily have said so.").

Defendants' counterarguments lack merit. First, Defendants argue that noncitizens who are already present in the United States somehow make an "application for admission" at the moment they are arrested and inspected by an immigration officer in the interior. Mot. 38-39. But the statute Defendants rely on, 8 U.S.C. § 1184(b), addresses the very different question of how an immigration officer should determine whether a noncitizen coming into the country is "entitled to

---

[12] This interpretation is consistent with how the INA elsewhere uses the term "application for admission." *See* 8 U.S.C. § 1361 (placing burden of demonstrating admissibility on noncitizen who "makes application for a visa or any other document required for entry, or makes application for admission, or otherwise attempts to enter the United States").

[13] And while Defendants' rely on § 1225(a)(4)'s language allowing applicants for admission to "withdraw the application," that statute does not answer the relevant question for § 1182(a)(7), which is when the "time of the application for admission" is.

nonimmigrant status" (i.e., temporary immigration status). In contrast, the INA repeatedly uses the term "application for admission" in reference to noncitizens seeking *entry* into the United States.[14]

Second, Defendants seek to define § 1182(a)(7) based on provisions of 8 U.S.C. § 1225, Mot. 38, but § 1225 sets out only *procedures* for determining inadmissibility and does not define the grounds of inadmissibility themselves—which are set forth in § 1182, titled "Inadmissible aliens." Defendants cite § 1225(a)(1), which "deem[s]" a noncitizen who enters without inspection an "applicant for admission," and argue that the provision transforms someone already within the United States into an "applicant for admission" at the moment they are arrested and inspected. Mot. 38. But § 1225(a)(1) serves an entirely different purpose. Congress enacted the provision in 1996 to eliminate longstanding distinctions between noncitizens who entered the country unlawfully and those stopped at the border, and establish that both classes of noncitizens—now deemed "applicants for admission"—would have similar procedural rights in removal proceedings.[15] Thus, in *Matter of Y-N-P-*, 26 I. & N. Dec. 10 (BIA 2012), the BIA explained that being deemed "an 'applicant for admission' under [§ 1225(a)(1)]" does not mean that one is "applying . . . for admission to the United States" under other provisions of the INA; it merely

---

[14] *See, e.g.*, 8 U.S.C. § 1182(k) (permitting waiver of inadmissibility for "immigrant coming from foreign contiguous territory, before the time of the immigrant's application for admission"); *id.* § 1326(a)(2)(A) (criminalizing unlawful reentry unless, *inter alia*, Attorney General consents to reentry "prior to [noncitizen's] reembarkation at a place outside the United States or his application for admission from foreign contiguous territory"); *id.* § 1361 (providing that noncitizen who "makes application for admission, or otherwise attempts to enter the United States," bears burden of showing admissibility); *id.* § 1503(c) (providing that U.S. national seeking to enter with identity certificate may "apply for admission to the United States at any port of entry").

[15] Before 1996, the INA provided noncitizens who had entered the country (lawfully or unlawfully) with greater procedural protections in their immigration cases than those who had not entered. *See* H.R. Rep. 104-469, pt. 1, at 225 (explaining that INA "primarily distinguished individuals on the basis of 'entry' and not 'admission'"). Section 1225(a)(1) largely erased that distinction by providing that an "applicant for admission" now bears the burden of showing that they are "clearly and beyond doubt entitled to be admitted and [are] not inadmissible." 8 U.S.C. § 1229a(c)(2)(A).

means that one is "entitle[d] . . . to a removal hearing" under § 1229a. *Id.* at 13.[16] Defendants make the error of treating a "fictive legal status for purposes of removal proceedings, as altering the meaning of a substantive ground of inadmissibility that refers to the time of a real event: an actual application for admission." *Torres*, 976 F.3d at 928.

Finally, *United States v. Gambino-Ruiz*, 91 F.4th 981 (9th Cir. 2024), on which Defendants rely, Mot. 40, is unpersuasive because it made the same error of looking to the procedural provisions in § 1225 to define the separate ground of inadmissibility. The panel reasoned that because Congress authorized the designation of noncitizens in the interior for expedited removal, Congress meant to treat people apprehended shortly after entry "as the equivalent of an arriving alien applying for admission at a port of entry." *Id.* at 989. But that conclusion has no basis in the statutory text. Section 1225(b)(1)(A)(i) creates an expedited process for a noncitizen "who is arriving"—someone applying for admission at a port of entry—*or* for someone "described" in subsection (iii), the designation provision. Where an individual is in the second category—a noncitizen who is present for less than two years continuously—§ 1225(b)(1)(A)(iii) allows the Secretary to apply expedited removal procedures—but only if the person is inadmissible under either § 1182(a)(7) or § 1182(a)(6)(C). The statutory authority to designate classes of noncitizens who are subject to the expedited removal process does not include the authority to modify the grounds of inadmissibility that the statute explicitly makes a predicate for placement in expedited removal.

---

[16] Defendants rely on *Matter of M-D-C-V-*, 28 I. & N. Dec. 18, 20-21 (BIA 2020), Mot. 38, but that decision did not address the textual and structural arguments presented here and concerned "only" the question of "whether the respondent, who was apprehended just inside the border . . . was properly considered to be 'arriving.'" *Id.* at 23. Thus, *M-D-C-V-* had no occasion to address the application of § 1182(a)(7) to an individual who was physically present for more than two weeks. *Cruz-Miguel v. Holder*, 650 F.3d 189, 198 (2d Cir. 2011) and *Ortega-Cervantes v. Gonzales*, 501 F.3d 1111, 1118 (9th Cir. 2007) do not address the meaning of § 1182(a)(7), let alone the statutory trigger of the "time of application for admission."

Nor does Plaintiffs' plain reading of § 1182(a)(7) render the designation provision superfluous. Defendants remain free to charge noncitizens with inadmissibility under § 1182(a)(7) if they are apprehended at the border without documents. And as to noncitizens in the interior who have been here for less than two years, Defendants may still apply expedited removal to those who are inadmissible for fraud under § 1182(a)(6)(C), which is not limited to fraud at entry.

## V.    Plaintiffs Plausibly Allege That The Guidance Unlawfully Subjects Affirmative Asylum Applicants To Expedited Removal.

Plaintiffs have plausibly alleged that the Guidance is contrary to the asylum regulations because it applies expedited removal to affirmative asylum applicants.[17] The regulations implementing the asylum statute, 8 U.S.C. § 1158, grant jurisdiction over affirmative asylum applications to United States Citizenship and Immigration Services (USCIS). Those regulations permit placing affirmative asylum applicants in expedited removal in only one circumstance. Yet the Guidance applies expedited removal to *all* persons covered by the Rule's designation—even if they have filed an affirmative asylum application. *See* Guidance at 2 (stating that an "alien who has applied for asylum" will be considered for expedited removal). The Guidance thus violates the *Accardi* doctrine, which "requires federal agencies to follow their own rules." *Steenholdt*, 314 F.3d at 639 (citing *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954)).

The asylum regulations exempt most affirmative asylum seekers from expedited removal. The regulations provide that "USCIS shall have initial jurisdiction over" any "asylum application filed by an alien physically present in the United States." 8 C.F.R. § 208.2(a)(1). The regulations

---

[17] Plaintiffs raise this challenge against the Guidance alone and withdraw their challenge to the Rule on this basis. *See* Am. Compl. ¶¶ 126-28. As a result, *MRNY* does not bar review of their claim because the provision limiting review—8 U.S.C. § 1225(b)(1)(A)(iii)(I)—applies to the Rule alone. In addition, 5 U.S.C. § 701(a)(2) does not commit the Guidance's application to affirmative asylum applicants to the agency's discretion because Defendants lack discretion to disregard their own regulations. *See Steenholdt v. F.A.A.*, 314 F.3d 633, 638-39 (D.C. Cir. 2003).

further provide that "USCIS *shall adjudicate* the claim of each asylum applicant whose application is complete," *id.* § 208.9(a) (emphasis added), by means of an interview by an asylum officer, *id.* § 208.9(b). After that interview, the asylum seeker generally receives one of two outcomes. First, the asylum officer may grant the application. *Id.* § 208.14(b). Second, where the officer does not grant asylum and concludes that the asylum seeker "appears to be inadmissible or deportable under [8 U.S.C. § 1182(a) or § 1227(a)], the officer "*shall refer* the application to an [IJ], together with the appropriate charging document, for adjudication in [regular] removal proceedings." *Id.* § 208.14(c)(1) (emphasis added). Thus, for most affirmative applicants, the regulations never provide that they can be placed into expedited removal.

The regulations permit an affirmative applicant to be placed in expedited removal in only one situation: where the asylum seeker was previously paroled into the United States and their parole has expired or been terminated. *Id.* § 208.14(c)(4)(ii).[18] For such asylum seekers, where the asylum officer does not grant asylum and finds that the asylum seeker is inadmissible under 8 U.S.C. § 1182(a)(6) or § 1182(a)(7), the officer will "proceed in accordance with" the expedited removal regulations. 8 C.F.R. § 208.14(c)(4)(ii)(A) (citing 8 C.F.R. § 235.3(b)).[19] By applying expedited removal to people outside this specific class, the Guidance is contrary to the regulations. *See Nasdaq Stock Market LLC v. SEC*, 38 F.4th 1126, 1137 (D.C. Cir. 2022) ("[m]ention of one

---

[18] *See* 8 U.S.C. § 1182(d)(5)(A) (authorizing the DHS Secretary to "parole into the United States temporarily . . . only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission"). The regulation excludes noncitizens who were granted "advance parole"—i.e., a form of authorization to travel from and return lawfully to the U.S. *See* 8 C.F.R. § 208.14(c)(4)(ii).

[19] In *Doe v. Noem*, a class action challenging DHS's termination of certain parole programs, a district court recently held that individuals whose parole has been terminated or expired are not subject to expedited removal under 8 U.S.C. § 1225(b)(1)(A)(iii)(II). --- F. Supp. 3d ----, 2025 WL 1099602, at *16 (D. Mass. Apr. 14, 2025). The Court need not address this issue as Plaintiffs ask only that the Court find the Guidance in violation of the asylum regulations.

thing" "implies exclusion of another thing"); *see also Doe v. SEC*, 28 F.4th 1306, 1314 (D.C. Cir. 2022) (applying this canon to a regulation).

This understanding of the regulations is consistent with the statutory scheme. 8 U.S.C. § 1158 provides that a noncitizen may apply for asylum "in accordance with this section [§ 1158] *or*, where applicable, section 1225(b) of this title." *Id.* § 1158(a)(1) (emphasis added). Section 1158 further provides that "[t]he Attorney General shall establish a procedure for the consideration of asylum applications filed under [this section]," *id.* § 1158(d)(1), and that such applications are to receive "final administrative adjudication" following an "interview" or "hearing," *id.* § 1158(d)(5)(A)(ii)-(v). The regulations implement these adjudications by assigning them, respectively, to asylum officers and IJs in regular removal proceedings. *See* 8 C.F.R. § 208.2(a)(1), (b). By contrast, the expedited removal statute, 8 U.S.C. § 1225(b)(1), provides a distinct procedure—the credible fear process—by which noncitizens may apply for asylum, "where applicable, [under] section 1225(b)." 8 U.S.C. § 1158(a)(1).

Because affirmative applicants have already applied in accordance with § 1158, they are *not* applying under § 1225(b). *See In re Espy*, 80 F.3d 501, 505 (D.C. Cir. 1996) ("[A] statute written in the disjunctive is generally construed as setting out separate and distinct alternatives.") (cleaned up). This reading also makes sense: the credible fear process was designed as an initial screening process meant primarily for "newly-arrived" asylum seekers at or near the border. *See Grace*, 965 F.3d at 887. Nothing in the statutory scheme suggests Congress sought to apply that screening process to people who already have applied for asylum affirmatively. Indeed, the language of § 1225(b) itself makes this clear: § 1225(b)(1)(A)(i) directs the immigration officer to subject the noncitizen to expedited removal "unless the alien indicates either an intention to apply for asylum . . . or a fear of persecution." Since affirmative applicants *already* have indicated their

fear of persecution and intention to apply for asylum, § 1225(b)(1)'s statutory language does not apply to them.

Finally, re-routing affirmative asylum applicants into expedited removal has significant consequences as the credible fear process provides far fewer protections than the affirmative one. An affirmative applicant may file an asylum application directly with USCIS. 8 C.F.R. § 208.2(a)(1). The applicant receives 21-days' notice of a non-adversarial interview, where they may have counsel present and may present witnesses and affidavits or other evidence, *id.* § 208.9(b), and may be granted asylum thereafter, *id.* § 208.14(b). By contrast, in the credible fear process, the asylum seeker must raise their asylum claim as a defense against expedited removal. *See* 8 U.S.C. § 1225(b)(1)(A)(ii). The applicant is generally detained, *see* 8 C.F.R. § 235.3(b)(4)(ii), limiting their access to counsel and ability to prepare their case, and the applicant generally participates in the credible fear interviews by phone—even though the officer must evaluate the asylum seeker's credibility and demeanor. *See* 8 U.S.C. §§ 1158(b)(1)(B), 1225(b)(1)(B)(v). And even where the asylum seeker passes a credible fear interview, they are merely placed into regular removal proceedings before an IJ, where they must continue to litigate their application. *See* 8 U.S.C. § 1225(b)(1)(B)(ii); 8 C.F.R. § 235.3(c).

Finally, even assuming the regulations could be read to allow for the general placement of affirmative applicants into expedited removal, the Guidance would still be arbitrary and capricious for three reasons. First, the Guidance "failed to consider . . . important aspects of the problem." *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 25 (2020) (cleaned up). Apart from a vague and conclusory statement in the Guidance,[20] Defendants never even

---

[20] *See* Guidance at 2 ("Further, the expedited removal process includes asylum screening, which is sufficient to protect the reliance interests of any alien who has applied for asylum or planned to do so in a timely manner.").

acknowledge, much less explain, that placing affirmative applicants into expedited removal is at least a significant change in policy, or that, at a minimum, there is significant tension between doing so and the regulations governing the adjudication of affirmative asylum claims. *See FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009) (holding that the agency must "display awareness that it is changing position" and "may not . . . depart from a prior policy *sub silentio* or simply disregard rules that are still on the books"); *accord Grace*, 965 F.3d at 900. Second, Defendants fail to account for the reliance interests that asylum seekers have in the greater procedural protections provided by the affirmative asylum system. *See Regents*, 591 U.S. at 30-33. And third, Defendants failed to consider alternatives within the ambit of existing policy—namely, exempting affirmative asylum applicants from expedited removal, as the regulations contemplate. *See id*. at 33.

## VI.     Plaintiffs Acknowledge That *MRNY* Forecloses Their Arbitrary-And-Capricious And Notice-And-Comment Challenges To The Rule In This Court.

Plaintiffs recognize that *MRNY*, 962 F.3d at 633-36, forecloses their APA challenges to the Rule as arbitrary and capricious and issued in violation of notice-and-comment- requirements. *See* Am. Compl. ¶¶ 117-24.

To preserve these claims for further review, Plaintiffs state the following: Plaintiffs' APA challenges to the Rule do not challenge the ultimate decision to designate new groups for expedited removal but only the procedure utilized to reach such a decision. The D.C. Circuit opinion failed to recognize the distinction between the two types of challenges. The relevant statute, 8 U.S.C. § 1225(b)(1)(A)(iii)(I), places the former outside the scope of judicial review. *See id.* ("Such designation shall be in the sole and unreviewable discretion of the [Secretary]"). However, courts may review whether the agency has adhered to procedures in issuing a designation. *See McNary v. Haitian Refugee Ctr.*, 498 U.S. 479, 491-92 (1991) (statute that barred review "of a

determination respecting an application" for immigration status did not bar review of challenge to process by which that determination was reached because "'a determination' describes a single act rather than a group of decisions or a practice or procedure employed in making decisions"); *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 56 (1993) (statute barring review over "a determination respecting an application" did not preclude review of process the agency used to reach such a determination); *ParkView Med. Assocs., L.P. v. Shalala*, 158 F.3d 146 (D.C. Cir. 1998) (distinguishing between "[t]he decision of the Secretary" to deny a hospital reclassification request (which could not be reviewed) and "the general rules leading to denial," which remained open to challenge). Indeed, requiring the agency to comply with the notice-and-comment and reasoned decision-making requirements of the APA does not preclude the agency from exercising its "sole and unreviewable discretion" to issue a designation "at any time."

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied.

Dated: May 12, 2025

Cody Wofsy (D.D.C. Bar No. CA00103)
Stephen B. Kang (D.D.C. Bar No. CA00090)
Morgan Russell
Hannah Steinberg
American Civil Liberties Union Foundation
Immigrants' Rights Project
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770
*cwofsy@aclu.org*
*skang@aclu.org*
*mrussell@aclu.org*
*hsteinberg@aclu.org*

Amy Belsher
Robert Hodgson
New York Civil Liberties Union Foundation
125 Broad St., 19th Floor
New York, NY 10004
(212) 607-3300
*abelsher@nyclu.org*
*rhodgson@nyclu.org*

Respectfully submitted,

*/s/ Anand Balakrishnan*
Anand Balakrishnan
Lee Gelernt (D.D.C. Bar No. NY0408)
Omar C. Jadwat
Michael K.T. Tan*
Sidra Mahfooz
Grace Choi
American Civil Liberties Union Foundation
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
*abalakrishnan@aclu.org*
*lgelernt@aclu.org*
*ojadwat@aclu.org*
*m.tan@aclu.org*
*smahfooz@aclu.org*
*gchoi@aclu.org*

Arthur B. Spitzer (D.C. Bar No. 235960)
Aditi Shah (D.C. Bar No. 90033136)
American Civil Liberties Union Foundation of
the District of Columbia
529 14th Street, NW, Suite 722
Washington, D.C. 20045
(202) 457-0800
*aspitzer@acludc.org*
*ashah@acludc.org*

*Attorneys for Plaintiffs*
*\* Admission to D.D.C. Bar pending*

**CERTIFICATE OF SERVICE**

I hereby certify on May 12, 2025, I caused a copy of the foregoing to be transmitted to all

Defendants through the CM/ECF filing system.

*/s/ Anand Balakrishnan*
Anand Balakrishnan
American Civil Liberties Union Foundation
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
*abalakrishnan@aclu.org*