**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MAKE THE ROAD NEW YORK, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> KRISTI NOEM, Secretary of the U.S. Department of Homeland Security, in her official capacity, *et al.*, <br><br> *Defendants.* | ) <br> ) <br> ) <br> ) <br> ) <br> )    No. 1:25-cv-00190-JMC <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION TO POSTPONE
EFFECTIVE DATE OF AGENCY ACTION**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

FACTS ................................................................................................................................... 2

   A.   The Expedited Removal Process. ................................................................................ 2

   B.   Prior Limited Expansions of Expedited Removal. ..................................................... 5

   C.   Decades of Evidence of Widespread Flaws in the Expedited Removal Process. ............... 6

   D.   The Trump Administration Dramatically Expanded Expedited Removal Without
Addressing the Flaws of the Existing System. .................................................................... 7

   E.   Defendants Are Now Aggressively Pursuing Expedited Removal Pursuant to the Rule
and Guidance. ...................................................................................................................... 8

LEGAL STANDARD ......................................................................................................... 13

ARGUMENT ....................................................................................................................... 13

   I.   Plaintiff Is Likely To Succeed On The Merits. ........................................................ 13

      A.   Plaintiff Is Likely To Prevail On Its Due Process Claim. ..................................... 13

         1.   The Private Interests At Stake Are Of The Utmost Importance. .............................. 16

         2.   The Risk Of Error Is High. ................................................................................. 18

         3.   The Probable Value Of Additional Safeguards Is High And The Government's
Interests Do Not Outweigh The Need For Them. ...................................................... 26

      B.   Plaintiff Is Likely To Prevail On Its Claim That The Rule and Guidance Violate The
Expedited Removal Statute As Interpreted To Require Adequate Procedures. ........... 29

      C.   Plaintiff Is Likely To Prevail On Its Claim That Expedited Removal Cannot Lawfully
Be Applied To Noncitizens In The Interior Based Solely On Lack Of Valid Entry
Documents. .................................................................................................................. 34

      D.   Plaintiff Is Likely To Prevail On Its Claim That Expedited Removal Cannot Lawfully
Be Applied To Affirmative Asylum Applicants. ........................................................ 37

   II.   Absent Postponement, Plaintiff's Members Will Suffer Irreparable Harm. ..................... 41

   III.   The Balance of Equities and the Public Interest Strongly Favor Postponement of
Defendants' Actions. ........................................................................................................ 42

CONCLUSION ................................................................................................................... 44

## INTRODUCTION

The Supreme Court has "long held"—and recently reaffirmed—that "[t]he Fifth Amendment entitles aliens to due process of law in the context of removal proceedings," such that "*no person* shall be removed from the United States" without due process, including reasonable notice and a meaningful opportunity to be heard. *A.A.R.P. v. Trump*, 145 S. Ct. 1364, 1367 (2025) (emphasis added) (cleaned up). Defendants' Rule expanding expedited removal and related Guidance violate due process because they permit immigration enforcement officers to summarily remove noncitizens who have already entered the United States with no advance notice, no opportunity to meaningfully contest removal, and no hearing before a neutral adjudicator.

Plaintiffs filed this action to challenge the Trump Administration's expansion of expedited removal into the interior of the United States, warning of the severe due process violations that will result from the wholesale application of a process designed for apprehensions and removal at the border to people who have already entered and been living in the United States for up to two years. Recent events necessitate emergency relief: In the past weeks, the Trump Administration has utilized the Rule and Guidance on an unprecedented, national scale to sweep into expedited removal people who were already undergoing regular removal proceedings before an immigration judge ("IJ"). With no advance notice to the noncitizens, Defendants are moving for IJs to dismiss people's removal proceedings; arresting and detaining people who have appeared for their court hearings as directed; and placing them in expedited removal proceedings, thereby denying them any meaningful opportunity to be heard before quickly removing them. This aggressive new implementation of the Rule and Guidance has sown fear in immigrant communities, as noncitizens who have been complying with their legal obligations now face the risk of arrest and summary deportation at their next court dates.

1

Plaintiff Make the Road New York ("Plaintiff" or "Make the Road New York") files this motion to prevent the irreparable harm that its members, their families, and the public will suffer absent postponement of the Rule and Guidance.[1] Defendants' actions place Plaintiff's members at imminent risk of deportation and separation from their families and communities without due process. If the Rule and Guidance are not stayed, Plaintiff's members and thousands of noncitizens like them will be removed in violation of their constitutional and statutory rights. Indeed, even in its prior and far more limited application at the border, expedited removal already was rife with errors, resulting in the swift and wrongful deportation of U.S. citizens, lawful permanent residents, and bona fide asylum seekers, often to countries where they faced persecution, torture, or death.

Because Plaintiff faces irreparable harm absent a stay, is likely to succeed on the merits of its claims, and satisfies the other criteria for preliminary relief, this Court should postpone the effective date of the Rule and Guidance pending final adjudication of this case.

## FACTS

A.    **The Expedited Removal Process.**

Before 1996, all noncitizens were entitled to full hearings in immigration court before immigration authorities could deport or exclude them, whether they sought admission at the border or had already entered the country. They were provided with the opportunity to investigate and prepare their cases, to retain and rely on the assistance of counsel, and to present and confront evidence before IJs. They also were entitled to two layers of review: an administrative appeal and subsequent federal court review. *See* 8 U.S.C. §§ 1105a, 1252 (1995); 8 C.F.R. § 242.16(a) (1995).

---

[1] Plaintiffs Mary and John, who were already unlawfully removed under the Rule and Guidance, do not seek interim relief through this motion.

In 1996, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), which retained full removal hearings as the standard procedure, while also creating a highly truncated process called "expedited removal." 8 U.S.C. § 1225(b)(1). IIRIRA authorized the use of expedited removal for noncitizens seeking admission at ports of entry and provided for possible future expansion of the procedure to the interior by administrative action, within certain limits.

Expedited removal can consist of two stages, although it often concludes after just one: first, inspection by an immigration officer, including questioning to determine whether a noncitizen fears removal and, if so, referral for a credible fear interview by an asylum officer; and second, where applicable, that credible fear interview and an opportunity for IJ review thereof. When a person applies for admission at a port of entry, the immigration officer must first determine if they are inadmissible either because they have engaged in fraud or lack a valid entry document (such as a visa). 8 U.S.C. § 1225(b)(1)(A)(i), (ii) (citing *id.* § 1182(a)(6)(C), (a)(7)). Someone who claims to be a U.S. citizen, lawful permanent resident, or refugee, or to have been granted asylum is entitled to limited additional review. *Id.* § 1225(b)(1)(C); 8 C.F.R. § 235.3(b)(5). Otherwise, if the officer concludes that the individual is inadmissible due to fraud or lack of valid entry documents, the officer "shall" order them removed "without further hearing or review unless the alien indicates either an intention to apply for asylum . . . or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i).

During the inspection stage, the individual is detained and denied the ability to contact or rely on the assistance of counsel. "Because the person is detained, he or she generally has no way to gather evidence." Declaration of Kara Hartzler ("Hartzler Decl.") ¶ 13. The inspection stage can, and generally does, begin and conclude in a matter of hours. *See* Declaration of Timothy Warden-

Hertz ("Warden-Hertz Decl.") ¶ 8 ("People who do not have legal representation can be shuffled through the process very quickly and may be deported without ever talking to an attorney."). The immigration officer's decision is subject only to a paper review by a supervisor. 8 C.F.R. § 235.3(b)(2)(i), (7). There is no administrative appeal. *Id.* § 235.3(b)(2)(ii).[2]

For many people, the inspection stage is the beginning and the end of the expedited removal process. Asylum seekers may gain access to the second stage, which is also flawed and does not remotely approach the process afforded in regular immigration proceedings. During inspection, the immigration officer must, in theory, ask the noncitizen whether they fear returning to their country and intend to apply for asylum. If the answer to either question is yes, the officer must, in theory, refer the individual for a credible fear interview with an asylum officer. *See* 8 U.S.C. § 1225(b)(1)(A)(ii), (B); 8 C.F.R. §§ 208.30, 235.3(b)(4). At that interview, the applicant must show "a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum." 8 U.S.C. § 1225(b)(1)(B)(v). Asylum seekers are generally detained during credible fear interviews, 8 C.F.R. § 235.3(b)(4)(ii), and asylum officers normally conduct the interviews by phone, Declaration of Hannah Steinberg ("Steinberg Decl."), Ex. 6 (USCIRF 2025) at 7—even though the officer must evaluate the asylum seeker's credibility, 8 U.S.C. § 1225(b)(1)(B)(v).

If the asylum officer determines that a noncitizen meets the credible fear standard, the individual is placed in regular removal proceedings. Someone who does not pass the credible fear

---

[2] Federal court review is available only on a petition for habeas corpus where the issues are limited to whether the petitioner is a citizen; whether he was ordered removed under the statute; or whether he can prove that he is a lawful permanent resident, has been admitted as a refugee, or has been granted asylum. 8 U.S.C. § 1252(a)(2)(A), (e)(2).

interview may request review by an IJ, but receives only a limited hearing and has no right to further administrative or judicial review. 8 U.S.C. §§ 1225(b)(1)(B)(iii)(II)-(III), 1252(a)(2)(A)(iii).

### B. Prior Limited Expansions of Expedited Removal.

Congress authorized the Attorney General to expand the application of expedited removal beyond its initial scope. At its maximum, the congressional authorization encompasses certain noncitizens who were not lawfully admitted or paroled into the country and not continuously physically present for at least two years. 8 U.S.C. § 1225(b)(1)(A)(iii)(II). But Congress specified that the Attorney General (or, now, the Secretary of the Department of Homeland Security ("DHS")) must affirmatively designate the scope of any expansion of expedited removal before she can subject new groups of noncitizens to these truncated procedures. *Id.* § 1225(b)(1)(A)(iii)(I). For twenty years, the government chose not to expand expedited removal to its statutory limits, and at least one prior administration rejected such an extreme expansion because of concerns it would be illegal. *See* Steinberg Decl., Ex. 11 (USA Today, Feb. 24, 2017).

Instead, the government made only two much more modest expansions. In 2002, it authorized expedited removal to be used on a narrow group of people within the United States who had arrived by sea and were not continuously present for two years. 67 Fed. Reg. 68,924, 68,925-26 (Nov. 13, 2002). In 2004, it permitted the use of expedited removal on people apprehended within 100 air miles of a land border who could not show that they had been physically present in the United States for 14 days. 69 Fed. Reg. 48,877, 48,880-81 (Aug. 11, 2004). With only minor exceptions, the government has largely used expedited removal at and near the border.

**C.      Decades of Evidence of Widespread Flaws in the Expedited Removal Process.**

Nearly three decades of expedited removal have shown the process to be profoundly flawed, even when restricted to the border. Since 2005, a series of studies undertaken at Congress's direction by the statutorily-established U.S. Commission on International Religious Freedom ("Commission" or "USCIRF")[3] has repeatedly documented "serious problems" in the expedited removal process. Steinberg Decl., Ex. 4 (USCIRF 2005) at 4-5, 10; *see id.*, Ex. 5 (USCIRF 2016) at 2 (finding "continuing and new concerns" with immigration officers' "interviewing practices and the reliability of the records they create" as well as "inadequate quality assurance procedures"); *id.*, Ex. 6 (USCIRF 2025) at 3 (concluding that "many of the problems [the Commission] has repeatedly documented," "including flawed screening and documentation practices, [and] a lack of training and quality control," still "remain unaddressed"); *see also* Declaration of Yael Schacher ("Schacher Decl.") ¶ 5.

As set forth in detail below, each stage of expedited removal is rife with errors that are left unaddressed due to the lack of a meaningful opportunity to consult with an attorney, the lack of review by a neutral adjudicator, and other procedural deficiencies. *See infra*, Argument Section I.A. At the inspection stage, immigration enforcement officers routinely make factual errors that result in erroneous expedited removal orders. This has included repeated mistakes even in applying the much narrower 14-day continuous presence requirement. Immigration officers have also repeatedly applied expedited removal to U.S. citizens and others not lawfully subject to the process. Legal service providers report systemic interpretation and translation failures throughout the process. Immigration officers routinely ignore or fail to record noncitizens' expressions of fear of

---

[3] *See* 22 U.S.C. § 6474 (authorizing study); *see also* H.R. Rep. No. 105-480, pt. 3, at 17 (1998) (recognizing that immigration officers "may not always be following [agency] procedures designed to ensure that potential asylum claimants are properly referred" for interviews).

removal, denying them the opportunity for credible fear interviews. And the credible fear interview process itself is often rushed and unfair. *See id*.

### D. The Trump Administration Dramatically Expanded Expedited Removal Without Addressing the Flaws of the Existing System.

The expedited removal system was flawed when applied to the more limited class of noncitizens apprehended near the border. Nonetheless, in July 2019, at the direction of President Trump, DHS authorized the application of expedited removal to certain noncitizens arrested anywhere in the country who could not show that they had been continuously present in the United States for at least two years. 84 Fed. Reg. 35,409 ("2019 Rule"). Then-Judge Jackson preliminarily enjoined the 2019 Rule on the grounds that the Secretary failed to follow the notice-and-comment and reasoned-decisionmaking requirements of the Administrative Procedure Act ("APA"). *Make the Rd. N.Y. v. McAleenan*, 405 F. Supp. 3d 1, 11 (D.D.C. 2019). The D.C. Circuit reversed the district court's grant of the preliminary injunction on appeal and remanded the case so that the district court could consider other grounds on which the 2019 Rule had been challenged. *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 618 (D.C. Cir. 2020).

On February 2, 2021, President Biden issued an Executive Order that directed the DHS Secretary to review the 2019 Rule and consider, *inter alia*, due process principles and humanitarian obligations. Exec. Order 14010, 86 Fed. Reg. 8,267 (Feb. 5, 2021).[4] On March 21, 2022, DHS rescinded the 2019 Rule. 87 Fed. Reg. 16,022 (Mar. 21, 2022). During the period the 2019 Rule was in effect, the government used it in an "exceedingly small number of cases." Steinberg Decl., Ex. 13 (Buzzfeed News, Oct. 14, 2021).

---

[4] In light of the Executive Order, the district court stayed its consideration of a renewed motion for preliminary injunction challenging the 2019 Rule on grounds not addressed by the vacated preliminary injunction decision. Minute Order, *Make the Rd. N.Y. v. McAleenan*, 1:19-cv-2369-KBJ (D.D.C. Feb. 8, 2021).

On January 20, 2025, President Trump issued Executive Order 14159. 90 Fed. Reg. 8,443. Consistent with the President's goal of rapidly deporting millions of immigrants, the Executive Order directed the DHS Secretary to "take all appropriate action" to apply expedited removal procedures "to the aliens designated under" 8 U.S.C. § 1225(b)(1)(A)(iii)(II). 90 Fed. Reg. at 8,445.

On January 21, 2025, DHS issued a notice, effective immediately, that authorizes application of expedited removal to certain noncitizens arrested anywhere in the country who cannot show "to the satisfaction of an immigration officer" that they have been continuously present in the United States for at least two years. 90 Fed. Reg. 8,139 ("Rule").[5]

On January 23, 2025, the Acting DHS Secretary issued a memorandum entitled "Guidance Regarding How to Exercise Enforcement Discretion" to implement the Rule. Steinberg Decl., Ex. 2 ("Guidance"). The Guidance directs DHS officers to consider "whether to apply expedited removal" to "any alien DHS is aware of who is amenable to expedited removal but to whom expedited removal has not been applied." *Id.* at 2. The Guidance authorizes officers to place individuals with pending asylum applications into expedited removal. *See id.* The Guidance further directs that applying expedited removal "may include steps to terminate any ongoing [regular] removal proceeding." *Id.*

Neither the Rule nor the Guidance, nor any other policies Defendants have instituted, address the existing flaws in the expedited removal system.

### E.    Defendants Are Now Aggressively Pursuing Expedited Removal Pursuant to the Rule and Guidance.

For the first three months after the expansion of expedited removal into the interior, Defendants appear to have been slow to implement their new authority, and Plaintiffs learned of

---

[5] The Rule is also attached as Exhibit 1 to the Steinberg Declaration.

only a handful of applications of expedited removal in the interior. That has now dramatically changed: Defendants are aggressively placing people in expedited removal pursuant to the Rule and Guidance.

In the past weeks, Defendants have undertaken an aggressive new enforcement initiative at immigration courts in New York and nationwide. This initiative specifically targets people who are in regular removal proceedings in immigration court, many of whom are pursuing asylum and other relief. *See generally* Steinberg Decl., Ex. 16 (N.Y. Times, May 30, 2025); *id.*, Ex. 17 (Wash. Post, May 23, 2025). The initiative has three basic components. First, DHS is orally moving to dismiss noncitizens' removal proceedings, with no advance notice, when people appear in immigration court for master calendar hearings (the equivalent of arraignments or pretrial conferences in criminal court), on the grounds that such proceedings are no longer in the best interests of the government under 8 C.F.R § 239.2(a)(7).[6] DHS is doing so even though the government's own Immigration Court Practice Manual requires that "filings must be submitted at least fifteen (15) days in advance of the master calendar hearing if requesting a ruling at or prior to the hearing." Steinberg Decl., Ex. 38 (Exec. Off. For Immigr. Review 2025); *see also* Koop Decl. ¶ 8. Despite that requirement, the Department of Justice issued written instructions to immigration judges stating that they may allow the government to move to dismiss orally, in court, without a written motion, and to decide that motion without allowing the noncitizen an opportunity to file a response. Dojaquez-Torres Decl. ¶ 9 & Ex. A.

---

[6] *See* Declaration of Vanessa Dojaquez-Torres ("Dojaquez-Torres Decl.") ¶ 3 (nationwide); Declaration of Gillian Rowland-Kain ("Rowland-Kain Decl.") ¶¶ 5, 8 (Varick Street and Broadway Immigration Courts in New York City and Buffalo Immigration Court); Declaration of Rosanna Eugenio ("Eugenio Decl.") ¶¶ 7, 10 (Federal Plaza Immigration Court in New York City); Declaration of Lisa Koop ("Koop Decl.") ¶¶ 6-7 (Chicago Immigration Court); Declaration of Audrey Gilliam ("Gilliam Decl.") ¶ 4 (Seattle Immigration Court); Declaration of Edna Yang ("Yang Decl.") ¶ 15 (San Antonio Immigration Court).

Second, ICE officers, in coordination with DHS trial attorneys, are stationing themselves in immigration courts—in the hallways or even in courtrooms—so that they can ambush noncitizens, immediately arresting and detaining them upon the conclusion of their court hearings.[7]

Finally, in cases where IJs have granted the government's motions to dismiss, the government has placed individuals in expedited removal—and, in some cases, deported people within a matter of days. *See, e.g.*, Declaration of Sienna Fontaine ("Fontaine Decl.") ¶¶ 35, 38 (explaining how noncitizens detained in immigration court were quickly moved out of New York City and toward deportation, such that, for example, "an individual detained in a New York City court on May 21 . . . had already been deported when a paralegal at [Make the Road New York] attempted to locate him . . . [on] May 27"); Declaration of William Botsch ("Botsch Decl.") ¶ 4 (explaining how, following their recent courthouse arrests, multiple noncitizens no longer appeared on the detainee locator system, indicating that they had most likely been removed, and one man's family confirmed that he had already been removed to Venezuela just days after being detained and placed in expedited removal).

This initiative is unprecedented. *See, e.g.*, Declaration of Rachel Levenson ("Levenson Decl.") ¶ 5 (in seven years of practice in immigration court, attorney had only once heard of an arrest there). This new initiative appears to be driven by the Trump administration's imposition of a new daily quota of 3,000 ICE arrests. *See* Steinberg Decl., Ex. 19 (Fox News, May 29, 2025);

---

[7] *See* Steinberg Decl., Ex. 16 (N.Y. Times, May 30, 2025) (describing coordination policy); Eugenio Decl. ¶ 12 (describing how plainclothes ICE officers "swarmed" noncitizens near courthouse elevator); Rowland-Kain Decl. ¶ 16 (arrests in the elevator of New York immigration court); Koop Decl. ¶¶ 7, 10 (arrests in hallway of Chicago Immigration Court); Gilliam Decl. ¶ 4 (arrests in hallway of Seattle Immigration Court); Yang Decl. ¶ 16 (arrests in hallway, lobby, and parking lot of San Antonio Immigration Court).

*see also id.*, Ex. 20 (Axios, May 28, 2025). Moreover, DHS has confirmed publicly that they are targeting people they believe are subject to the Rule and Guidance in order to move them from regular removal proceedings to expedited removal. *See id.*, Ex. 18 (Bill Melugin, May 22, 2025).

Despite their stated intentions, Defendants are nonetheless sweeping up people who are statutorily ineligible for expedited removal because they have been present in the U.S. for over two years. *See, e.g.*, Levenson Decl. ¶¶ 23-24 (detention of noncitizen who had been present for over two years); Pet. for Writ of Habeas Corpus, ECF No. 1, *Castillo Lachapel v. Joyce*, No. 25-cv-4693 (S.D.N.Y. June 4, 2025) (same); Pet. for Writ of Habeas Corpus, ECF No. 1, *Rojas Figuera v. Larocco*, No. 25-cv-3095 (E.D.N.Y. June 4, 2025) (same).

Defendants are even targeting people who have pending applications for relief, including for asylum. *See* Levenson Decl. ¶¶ 7, 18-24, 32-33 (detention of man whose partner was 8 months pregnant and who had applied for asylum, gay couple who feared persecution, asylum seeker married to a U.S. citizen, and 19-year-old who appears eligible for Special Immigrant Juvenile Status ("SIJS") and asylum due to fear of persecution); Declaration of Andres Cortes ("Cortes Decl.") ¶ 8 (motion to dismiss and detention of noncitizens who had asylum applications pending and expressed fear of return); Declaration of Siomara Umana ("Umana Decl.") ¶ 8 (same); Eugenio Decl. ¶¶ 9, 13 (same, as well as detention of a 20-year-old noncitizen eligible for SIJS).

The government's new policy has already deterred people from attending their removal proceedings. *See* Koop Decl. ¶ 16 ("The ICE arrests—as well as the noticeable presence of ICE agents near the entrance to and in the hallways outside of the Immigration Court—appear to have already caused people to miss their Immigration Court hearings"); Rowland-Kain Decl. ¶ 17 ("[I]n prior months . . . between forty to sixty pro se individuals [would appear each day at] Master Calendar Hearings; however, on May 29th, there were merely seven individuals and family units

11

who appeared."); Gilliam Decl. ¶¶ 24-26 ("unusually large number of *in absentia* removal orders" in days following courthouse arrests). Practitioners "have never witnessed this level of fear among immigrant clients in [their] years practicing immigration law." Rowland-Kain Decl. ¶ 17; Gilliam Decl. ¶ 26 ("The level of fear and distress expressed by immigrant community members . . . is unlike anything that I have seen in more than ten years of practicing immigration law.").

The government is systematically pursuing its new initiative in New York. *See* Rowland-Kain Decl. ¶ 8; Eugenio Decl. ¶¶ 7, 10. As a result—absent this Court's intervention—Plaintiff Make the Road New York's members with scheduled court dates in New York's immigration courts face the imminent risk of being placed in expedited removal and deported from the United States without due process. *See* Fontaine Decl. ¶¶ 19-26, 29 ("[T]he campaign to target individuals attending their immigration court proceedings for placement into expedited removal and detention by ICE has sent shock waves through Make the Road New York's members and the communities that we serve"); *see also* Fontaine Decl., Ex. A (Declaration of MRNY-John Doe 4 ("John Doe 4 Decl.")) ¶ 4 (member whose case DHS attempted to dismiss); *id.*, Ex. B (Declaration of MRNY-Jane Doe 2 ("Jane Doe 2 Decl.")) ¶ 4 (member in removal proceedings who fears placement into expedited removal).

In the first week of June, Defendants also launched a series of workplace raids reflecting yet another "new phase of the Trump administration's immigration crackdown." Steinberg Decl., Ex. 37 (N.Y. Times, June 7, 2025). White House "border czar" Thomas D. Homan told reporters: "You're going to see more work site enforcement than you've ever seen in the history of this nation." *Id.* A DHS spokesperson stated that "2,000 immigrants per day were arrested" during the first week in June. *Id.* It is therefore a near-certainty that even more people will be placed in expedited removal pursuant to the Rule and Guidance.

## LEGAL STANDARD

The APA authorizes district courts to "postpone" agency actions "to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. "Courts—including the Supreme Court—routinely stay already-effective agency action under Section 705." *Texas v. Biden*, 646 F. Supp. 3d 753, 770 (N.D. Tex. 2022) (citing, *inter alia*, *West Virginia v. EPA*, 577 U.S. 1126 (2016) (mem. op.)). To obtain relief under § 705, Plaintiff must show that (1) it will likely succeed on the merits, (2) it will likely suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in its favor, and (4) postponement is in the public interest. *Cath. Legal Immigr. Network, Inc. v. EOIR*, 513 F. Supp. 3d 154, 166 (D.D.C. 2021).

## ARGUMENT

### I.    Plaintiff Is Likely To Succeed On The Merits.

Plaintiff is likely to succeed on the merits of the four claims on which it bases this motion. First, the Rule and Guidance likely violate the due process rights of the noncitizens they newly subject to expedited removal. Second, the policies likely violate the expedited removal statute because they fail to provide the minimally adequate procedures the statute requires, as properly interpreted to avoid that serious constitutional question. Third, the Rule and Guidance likely violate the statute in a second respect, because the statute does not authorize the expedited removal of noncitizens who have already entered the United States on the basis that they lack valid entry documents. Fourth, the Guidance likely violates the regulations implementing the asylum statute, which do not permit the application of expedited removal to affirmative asylum applicants.

13

## A.     Plaintiff Is Likely To Prevail On Its Due Process Claim.

"Procedural due process rules are meant to protect against the mistaken or unjustified deprivation of life, liberty, or property." *A.A.R.P.*, 145 S. Ct. at 1367 (cleaned up). Indeed, the Supreme Court has "long held that 'no person shall be' removed from the United States 'without opportunity, at some time, to be heard.'" *Id.* (quoting *Yamataya v. Fisher*, 189 U.S. 86, 101 (1903)).

The Rule and Guidance violate the fundamental due process rights—to meaningful notice and the opportunity to a fair hearing before a neutral decisionmaker—of people who have already entered the United States and therefore have a strong liberty interest in avoiding removal from the country. The Rule expands expedited removal far beyond its previous limits—individuals who, like the petitioner in *DHS v. Thuraissigiam*, were apprehended soon after crossing the border and thus could not "be said to have 'effected an entry.'" 591 U.S. 103, 140 (2020). The expansion challenged here applies to people who have effected physical entry and have been present in the United States for up to two years.

The due process rights of the people to whom the Rule and the Guidance applies require far more than the Rule provides. There is no advance notice of the charges or of the government's evidence. *See* 8 C.F.R. § 235.3(b)(2)(1)(ii) (notice of charges are issued at the same time and on the same form as expedited removal order); Steinberg Decl., Ex. 40 (Sample DHS Form I-860). But due process requires that "notice must be afforded within a reasonable time and in such manner as will allow [noncitizens] to actually seek . . . relief." *Trump v. J.G.G.*, 145 S. Ct. 1003, 1006 (2025); *see also Mullane v. Central Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950) (notice must "apprise interested parties of the pendency of the action and afford them an opportunity to present their objections" and "must be of such nature as reasonably to convey the required information").

14

The process places the burden on the noncitizen rather than the government, 8 U.S.C. § 1225(b)(1)(A)(iii)(II); 8 C.F.R. § 235.3(b)(1)(ii), (6)—an inversion of the burden required when stakes are so high. *Cf. Santosky v. Kramer*, 455 U.S. 745, 763 (1982) (holding that state should bear heightened proof burden in parental neglect proceedings because, *inter alia*, its "ability to assemble its case almost inevitably dwarfs the parents' ability to mount a defense").

The government is not required to permit noncitizens time to hire a lawyer or seek the assistance of any third party. *Cf. Ardestani v. I.N.S.*, 502 U.S. 129, 138 (1991) (explaining that "the complexity of immigration procedures, and the enormity of the interests at stake, make legal representation in deportation proceedings especially important").

Finally, there is no neutral adjudicator, but rather only a determination by an immigration enforcement officer who serves as both prosecutor and judge. *See* 8 C.F.R. § 235.3(b)(2)(ii); *see also Statewide Bonding, Inc. v. DHS*, 980 F.3d 109, 119 (D.C. Cir. 2020) ("The Due Process Clause entitles a person to an impartial and disinterested adjudicator.") (cleaned up). And while claims to certain lawful status and negative credible fear determinations can be reviewed by IJs, other key issues—including removability, continuous presence, and whether a noncitizen fears removal at all—are conclusively determined by enforcement officers with no possibility for IJ review.

Each of these deficits, on its own, would render application of the expedited removal process to people already within the United States unconstitutional. Together, they amount to a complete deprivation of the fundamental right to a full and fair hearing. The need for these procedural protections is demonstrated by the expedited removal system's track record in its past use at and near the border. *See infra*, Argument, Section I.A.2. But even without the ample

evidence of those errors, the system is unconstitutional as applied to people in the interior of the United States.[8]

Courts weigh three factors when determining what process is due: the private interests at stake; the risk of erroneous deprivation and probable value of additional safeguards; and the government's countervailing interests. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). Each of these factors points in the same direction: The expansion of expedited removal to people who have already entered the United States and been in the country for up to two years violates due process.

### 1.    The Private Interests At Stake Are Of The Utmost Importance.

The private liberty interests of Make the Road New York's members and others newly subject to expedited removal are of paramount importance. The Supreme Court has repeatedly held that the removal of people from within the United States implicates a "weighty" liberty interest. *Landon v. Plasencia*, 459 U.S. 21, 34 (1982); *see Bridges v. Wixon*, 326 U.S. 135, 164 (1945) (Murphy, J., concurring) ("[D]eportation . . . may result in poverty, persecution, and even death."); *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922) (Deportation "may result . . . in loss of both property and life, or of all that makes life worth living"); *see also Ardestani*, 502 U.S. at 138

---

[8] Plaintiff relies on declarations and other evidence to support its constitutional and statutory claims. In APA cases, "when a constitutional challenge to agency action requires evaluating the substance of an agency's decision made on an administrative record, that challenge must be judged on the record before the agency." *Bellion Spirits, LLC v. United States*, 335 F. Supp. 3d 32, 43 (D.D.C. 2018), *aff'd*, 7 F.4th 1201 (D.C. Cir. 2021). However, the record rule does *not* apply where a challenge does not require such an evaluation. *See id.*; *see also McKoy v. Spencer*, No. 16-cv-1313 (CKK), 2019 WL 400615, at *11 (D.D.C. Jan. 31, 2019). Here, Plaintiff seeks interim relief on the grounds that the Rule and Guidance violate its members' due process and statutory rights and subject them to expedited removal in violation of the INA and its implementing regulations. These claims do not ask the Court to evaluate the substance of the Secretary's decision to expand expedited removal based on an administrative record (if any such record exists). Nor could Plaintiff seek relief based on such a record-based challenge, which the D.C. Circuit has held is unavailable. *See Make the Rd. N.Y.*, 962 F.3d at 631-34 (holding that prior expansion could not be challenged as arbitrary and capricious).

(acknowledging "the enormity of the interests at stake" in immigration proceedings). The stakes are even higher for people who fear persecution, torture, or death if removed. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 449 (1987) ("Deportation is always a harsh measure; it is all the more replete with danger when the [noncitizen] makes a claim that he or she will be subject to death or persecution if forced to return to his or her home country."); *accord, e.g.*, *Kaweesa v. Gonzales*, 450 F.3d 62, 69 (1st Cir. 2006) (a noncitizen "seeking asylum or protection under the Convention Against Torture . . . clearly has a weighty interest in avoiding deportation").

People being subjected to the Rule and Guidance—including in courthouses across the nation—illustrate these weighty liberty interests. For example, many people subjected to courthouse arrests have pending asylum applications and a fear of persecution; others have U.S. citizen children and spouses. *See, e.g.*, Levenson Decl. ¶¶ 18-24 (courthouse arrests of asylum seeker married to a U.S. citizen who had been present for three years, asylum seeker whose partner was 8 months pregnant, and gay couple who feared persecution); Cortes Decl. ¶ 8 (courthouse arrests of noncitizens who had asylum applications pending and expressed fear of return); Umana Decl. ¶ 8 (same); Eugenio Decl. ¶ 9 (same); Dojaquez-Torres Decl. ¶ 11 (detainees include families with children as young as two and three years old, and ICE attempted to detain a mother with a nursing infant); Yang Decl. ¶ 16 (detention of "whole family units, including adults and their minor children").

Make the Road New York's members are no exception; they include John Does 1, 2, 3, and 4, and Jane Does 1 and 2, all of whom had been living in the United States for between 15 and 20 months when the amended complaint was filed, and some of whom have asylum applications pending. *See* Fontaine Decl. ¶¶ 19-26; *id.*, Ex. A (John Doe 4 Decl.) ¶¶ 2-3; *id.*, Ex. B (Jane Doe 2 Decl.) ¶ 2. Make the Road New York "also has numerous members" who have lived in the

17

country for longer than two years, but "would have difficulty affirmatively demonstrating two years of physical presence, particularly if suddenly detained or given only a short period of time to do so." *Id.* ¶ 41.

Plaintiffs Mary and John further illustrate the grave liberty interests at stake. They lived in the United States for ten years before being erroneously subjected to expedited removal under the Rule and Guidance. *See* Declaration of Mary ("Mary Decl.") ¶¶ 3, 8-11. Mary also has two U.S.-citizen children who remain in the United States. *Id.* ¶ 7. Already, therefore, the Rule has deprived Mary and John of residing with other members of their "immediate family, a right that ranks high among the interests of the individual." *Landon*, 459 U.S. at 34.

## 2. The Risk Of Error Is High.

The procedural deficiencies inherent in the expedited removal system make the risk of erroneous deprivation unacceptably high. The "troubling reality" is that expedited removal is "fraught with risk of arbitrary, mistaken, or discriminatory behavior" and can occur "without any check on whether the person understood the proceedings, had an interpreter, or enjoyed any other safeguards." *Khan v. Holder*, 608 F.3d 325, 329 (7th Cir. 2010). Indeed, the risk of error is already high when expedited removal is applied to people at the border or to people accused by immigration officers of having very recently crossed it, but at least in those situations, the factual predicates of expedited removal are typically straightforward. By contrast, by applying expedited removal to people who have entered and are living in this country, and for whom the answers to key questions like length of residence are far from obvious, the Rule and Guidance create a constitutionally intolerable removal system.

First, there is an unacceptable risk of error in the threshold determination concerning continuous presence in the United States. A person placed in expedited removal receives no

advance notice of either the government's charges or its evidence. *See* 8 C.F.R. § 235.3(b)(2)(1)(ii) (notice of charges are issued at the same time and on the same form as expedited removal order); Steinberg Decl., Ex. 40 (Sample DHS Form I-860). At the same time, that person "bears the affirmative burden to show to the satisfaction of an immigration officer that [they have] been present in the United States continuously for" two years or more. 90 Fed. Reg. at 8,140. DHS officers therefore can presume, *without evidence*, that any individual they arrest is properly subject to expedited removal. However, the "vast majority" of undocumented immigrants in this country have been living here for longer than two years. Steinberg Decl., Ex. 30 (DHS 2024) (estimating that 79 percent of the undocumented population as of 2022 "entered before 2010"); *see also id.*, Ex. 14 (Ctr. for Migration Studies 2022) (estimating that, as of 2022, less than 12.4% of the undocumented population present for less than two years had entered without inspection).

There is no requirement that noncitizens be permitted an opportunity to gather and present evidence bearing on their continuous presence. *See* 8 C.F.R. § 235.3(b)(1)(ii); *cf. id.* § 235.3(b)(6) (providing that the noncitizen "will be allowed to present evidence or provide sufficient information to support" a claim of prior admission or parole). The Rule and Guidance do not even require that noncitizens be provided an opportunity to make a phone call to a friend or family member who can help them, or reasonable time to gather evidence. *Cf. Khan*, 608 F.3d at 326 (neither petitioner's counsel nor family "had been permitted to speak to him" while he was in expedited removal proceedings). Moreover, the government's practices effectively preclude a meaningful opportunity to gather such evidence, to prepare for the inspection by the immigration officer, or any right or time to obtain counsel. *See, e.g.*, Schacher Decl. ¶ 15 (describing a noncitizen denied an opportunity to rebut discrepancies and adverse facts caused by translation in

the wrong dialect). Nor is there any opportunity for a neutral adjudicator, such as an IJ, to review the question of continuous presence. *Id.* § 235.3(b)(2)(ii).

These procedural deficiencies, combined with the Rule's scope, make the risk of error unacceptable. Even in applying the prior 14-day continuous presence requirement, egregious errors occurred. *See, e.g.*, Steinberg Decl., Ex. 7 (ACLU 2014) at 63 (describing erroneous expedited removal of Mexican citizen who had lived in the United States for 14 years); Koop Decl. ¶¶ 27-29 (describing erroneous expedited removal of Honduran citizen who had lived in the United States for more than a decade); Declaration of Joanna Delfunt ("Delfunt Decl.") ¶¶ 7-10 (describing expedited removal order against individual who previously had not left the United States for three years).

Proving at least two years of continuous physical presence, while detained, alone, and without any opportunity to gather evidence, would be challenging for a U.S. citizen or lawful permanent resident, let alone for an undocumented person who may lack credit cards in their name or an identification document with a sufficiently early issue date. *See, e.g.*, Fontaine Decl. ¶¶ 41-43; Steinberg Decl., Ex. 15 (United States Citizenship and Immigration Services (USCIS) Form I-821D, Jan. 2025) (listing school records, employment records, bills, and military records as examples of documents to show continuous presence). For example, young people who came to this country as children may not have proof of physical presence easily accessible to them, or that evidence may be held by family members, whom they cannot contact while detained pending expedited removal proceedings. Fontaine Decl. ¶ 42. Even those who can locate such documents often will not physically have them at the time of apprehension. *Id.* ¶¶ 18, 41-43; *see also* Declaration of Holly Cooper ¶¶ 6-7 (explaining that detention centers do not provide confidential emails, fax, or other means of receiving documents other than mail, which takes 5-10 days to reach

detained clients). In addition, Make the Road New York has transgender members who recently changed their legal names, meaning that much of their proof of presence may be in a different name. Fontaine Decl. ¶ 41. In the absence of any meaningful, neutral review, there is no requirement that officers even document that contrary evidence was received, consider such evidence, or accurately weigh it in consideration of duration of continuous presence.

Without adequate due process protections, people who should not be subject to expedited removal at all—people like Plaintiffs Mary and John, who have lived in the United States for years—have already been and will continue to be erroneously removed. *See, e.g.*, Mary Decl. ¶¶ 2-12; Pet. for Writ of Habeas Corpus, ECF No. 1, *Castillo Lachapel v. Joyce*, No. 25-cv-4693 (S.D.N.Y. June 4, 2025) (person present for more than two years issued expedited removal order); Pet. for Writ of Habeas Corpus, ECF No. 1, *Rojas Figuera v. Larocco*, No. 25-cv-3095 (E.D.N.Y. June 4, 2025) (same); *Domingo-Ros v. Archambeault*, No. 25-cv-1208-DMS-DEB, 2025 WL 1425558, at *3 (S.D. Cal. May 18, 2025) (same); Delfunt Decl. ¶¶ 7-10 (noncitizens who had been present for over two years challenged expedited removal order on grounds they were not afforded an adequate process or representation by an attorney); *see also* Steinberg Decl., Ex. 7 (ACLU 2014) at 63 (noncitizen who had been living in United States continuously for 14 years wrongly subjected to expedited removal and denied a hearing).

Second, the same procedural deficiencies in the expedited removal process create a high risk of error in making the other threshold determinations about whether people are subject to expedited removal at all: whether someone has previously been admitted or paroled; whether they are inadmissible on grounds that make them subject to expedited removal; and whether they are ineligible for expedited removal because they are a U.S. citizen, lawful permanent resident, a refugee, or an asylee. Low-level officers decide these issues based on cursory interviews and

records checks. 90 Fed. Reg. at 8,139; 8 U.S.C. §§ 1225(b)(1)(A)(i), (iii); 8 C.F.R. §§ 235.3(b)(1)(i)-(ii), (b)(5). And officers have made recurring errors in these determinations even in the much more limited application of expedited removal at the border. Perhaps most egregiously, officers have even made errors in determining U.S. citizenship. *See Lyttle v. United States*, 867 F. Supp. 2d 1256, 1272-73 (M.D. Ga. 2012) (U.S. citizen erroneously issued expedited removal order without counsel); Steinberg Decl., Ex. 10 (Habeas Petition, *De la Paz v. Johnson*, No. 1:14-cv-16 (S.D. Tex., Jan. 24, 2014) (U.S. citizen erroneously subjected to expedited removal); *Matter of Lujan-Quintana*, 25 I. & N. Dec. 53, 54 (BIA 2009) (expedited removal order issued against U.S. citizen); Steinberg Decl., Ex. 8 (L.A. Times, Sept. 3, 2000) (expedited removal of U.S. citizen who was questioned by herself without counsel). Inspecting officers also routinely make errors in identifying unaccompanied minors, who by statute cannot be placed in expedited removal. 8 U.S.C. § 1232(a)(2)(B), (5)(D); *see* Hartzler Decl. ¶ 12 ("officers are often unable or unwilling to identify people who are juveniles").

Someone claiming U.S. citizenship, lawful permanent residence, or status as a refugee or asylee can in theory seek IJ review of those claims after an immigration enforcement officer issues an expedited removal order. *See* 8 U.S.C. § 1225(b)(1)(C). But unrepresented and detained people may have difficulty proving their status, as claims of lawful status can be complex and difficult to articulate. And, as noted above, the government is not required to provide noncitizens facing expedited removal with time or an opportunity to obtain counsel or the assistance of a third party. *See United States v. Ochoa-Oregel,* 904 F.3d 682, 685-86 (9th Cir. 2018) (addressing noncitizen subjected to expedited removal, despite claim that prior deportation did not extinguish his lawful permanent resident status). As the Supreme Court recently emphasized, the theoretical ability to

access review does not alone satisfy due process; the access must be real. *A.A.R.P.*, 145 S. Ct. at 1368; *J.G.G.*, 145 S. Ct. at 1006.

Third, due to the lack of procedural protections there is a well-documented risk of error in immigration enforcement officers' interviewing and documentation practices throughout the inspection process. This risk underscores the importance of review by a neutral adjudicator. USCIRF's 2005 study of the expedited removal system concluded that the statements officers take from noncitizens are "often inaccurate." Steinberg Decl., Ex. 4 (USCIRF 2005) at 74; *see also id*. at 53 (same, with respect to forms). The Commission's 2016 study "revealed continuing and new concerns" with immigration officers' "interviewing practices and the reliability of the records they create." *Id.*, Ex. 5 (USCIRF 2016) at 2. And its 2025 study found that "many of the problems it has repeatedly documented," "including flawed screening and documentation practices," "remain unaddressed." *Id.*, Ex. 6 (USCIRF 2025) at 3; Schacher Decl. ¶ 5. Often immigration officers do not even permit noncitizens to review their sworn statements;[9] they consistently fail to give noncitizens an opportunity to review and respond to the statements in the required paperwork;[10] and, even worse, they routinely pressure or coerce noncitizens into signing documents.[11] These

---

[9] *See, e.g.*, *United States v. Ochoa-Quinones*, 489 F. Supp. 3d 1184, 1187-88 (E.D. Wash. 2020) (concluding that failure to allow noncitizen to review statement violated due process); *United States v. Guzman-Hernandez*, 487 F. Supp. 3d 985 (E.D. Wash. 2020) (similar); *United States v. Caldera-Lazo*, 535 F. Supp. 3d 1037 (E.D. Wash. 2011) (similar); *United States v. Gonzales-Lopez*, No. CR-18-00213, 2020 WL 5210923 (N.D. Cal. Sep. 1, 2020) (similar); *United States v. Alvarez-Garcia*, No. 4:19-cr-6033-SMJ, 2020 WL 3445026 (E.D. Wash. June 9, 2020) (similar); Steinberg Decl., Ex. 9 (Slip Op., *United States v. Sanchez-Figueroa,* No. 3:19-cr-25 (D. Nev. July 25, 2019)) at 2, 9 (similar).

[10] Steinberg Decl. Ex. 4 (USCIRF 2016) at 21-22 (documenting that asylum seekers' statements were not read back to them, and that some were pressured to sign documents); *see also* Hartzler Decl. ¶¶ 5-10.

[11] *See* Warden-Hertz Decl. ¶¶ 5, 7; Yang Decl. ¶ 8; Hartzler Decl. ¶¶ 5-6, 10.

23

errors and abuses underscore the inherent dangers of a system in which enforcement officers serve as final adjudicators of most issues, with no review by a neutral decisionmaker.

Fourth, there is a persistent lack of adequate interpretation and translation. Once again, these errors can have devastating consequences in a process with no right to counsel or assistance and no neutral review over most key questions. Providers report systemic interpretation failures, leaving noncitizens unable to understand or communicate with government officials. *See* Declaration of Gracie Willis ("Willis Decl.") ¶¶ 7-8 ("numerous Mayan language speakers with fear-based claims . . . had little to no understanding of what was happening in their case" due to officers interviewing them in Spanish); Warden-Hertz Decl. ¶ 5 (150 Haitian men who, after being detained for a month, had yet to have any immigration official communicate with them in Creole).[12] Similarly, immigration officers have forced non-English speaking individuals to sign expedited removal forms without providing translations.[13]

Fifth, the existing system does not provide for any review of the decision to refer—or not refer—someone to an asylum officer for a credible fear interview. Multiple reports by the Commission and others have documented systemic flaws in this phase of the process, with asylum seekers who fear removal frequently denied credible fear interviews. *See* Steinberg Decl., Ex. 4 (USCIRF 2005) at 6, 53-55; *id.*, Ex. 5 (USCIRF 2016) at 2 (noting some "officers' outright skepticism, if not hostility, toward asylum claims"); *id.* at 18-23; *id.*, Ex. 6 (USCIRF 2025) at 11.

---

[12] *See also* Yang Decl. ¶ 9 (many people "received inadequate interpretation services during expedited removal interviews"); Declaration of Laura Lunn ("Lunn Decl.") ¶ 7 (same); Hartzler Decl. ¶¶ 7-8 (same); Steinberg Decl., Ex. 5 (USCIRF 2016) at 28 (same); Schacher Decl. ¶¶ 8, 12-13 (same); *see also* Steinberg Decl., Ex. 36 (DHS Advisory Comm. on Family Residential Ctrs. 2016) at 96-100 (discussing inadequate or nonexistent interpretation services during credible fear interviews and IJ reviews).

[13] *See* Hartzler Decl. ¶¶ 7-8; Yang Decl. ¶ 8; Steinberg Decl., Ex. 7 (ACLU 2014) at 35-36; *id.*, Ex. 33 (Borderland Immigr. Council 2017) at 13.

Indeed, one Commission study found that in *15 percent* of observed expedited removal cases, when a noncitizen expressed a fear of return to an immigration officer during the inspections process, the officer failed to refer the person to an asylum officer for a credible fear interview. *See* Steinberg Decl., Ex. 4 (USCIRF 2005) (emphasis added). A separate study similarly found that DHS erroneously failed to refer people who expressed fear of removal for credible fear interviews "[i]n 12% of cases." Steinberg Decl., Ex. 33 (Borderland Immigr. Council, 2017) at 12; *see also* Steinberg Decl., Ex. 34 (Human Rights Watch 2014) at 6 (fewer than half of noncitizens interviewed who expressed fear referred for credible fear interviews).

Practitioners report the same persistent problem.[14] Officers frequently record apparently "boilerplate language stating that individuals did not have a fear of return to their country of origin or that they were coming to the United States to work." Willis Decl. ¶ 5; *see also* Warden-Hertz Decl. ¶ 6 (same); Yang Decl. ¶ 7 (same); Hartzler Decl. ¶ 11 (same).[15] In other cases, officers actively interfere with noncitizens' efforts to express fear of return. *See* Koop Decl. ¶ 30 ("[Nonprofit] has spoken to people who were reluctant to express a fear of return because they experienced or witnessed violence and intimidation from CBP officers during the credible fear process."); Lunn Decl. ¶ 26 (officers told clients that "they are worthless, [that] they should give

---

[14] *See* Koop Decl. ¶ 22; Hartzler Decl. ¶ 14; Willis Decl. ¶ 9; Yang Decl. ¶¶ 4-6; Lunn Decl. ¶¶ 5-6; *see also* Steinberg Decl., Ex. 35 (Nat'l Immigr. Justice Ctr., Nov. 13, 2014) at 12-22 (reporting numerous instances in which "officials fail[ed] to capture [noncitizens' fear of removal] in the required documentation or include[d] mistaken information").

[15] Immigration officers' routine disregard of fear claims has increased in recent years under policies that eliminated the normal requirement that officers ask noncitizens if they fear removal, and instead required noncitizens to spontaneously "manifest" fear without being asked. *See* Koop Decl. ¶ 25; *see also* Steinberg Decl., Ex. 6 (USCIRF 2025) at 3; *id.*, Ex. 32 (Human Rights First, Aug. 2024) at 4-5; *id.*, Ex. 31 (Ctr. for Gender & Refugee Studies, Jan. 2024) at 1-2; Schacher Decl. ¶¶ 6, 17. The latest imposition of this "manifestation of fear" requirement was recently vacated as arbitrary and capricious. *Las Americas Immigr. Advoc. Ctr. v. DHS*, No. 24-cv-1702 (RC), 2025 WL 1403811, at *15-17, 21 (D.D.C. May 9, 2025).

up, or [that] they have no chance of staying in the United States"); Yang Decl. ¶ 6 (officer told client that "asylum does not exist [] anymore" and other clients were told that they could not apply for asylum).

Sixth, this risk of error extends to the credible fear interview stage. With no guarantee that counsel can meaningfully participate, interviews are often truncated and unfair. *See* Steinberg Decl., Ex. 12 (Congr. Testimony of Eleanor Acer, Human Rights First, Feb. 11, 2015) at 5 ("interviews are sometimes rushed, essential information is not identified due to lack of follow up questions, and/or other mistakes are made that block genuine asylum seekers from even applying for asylum and having a real chance to submit evidence and have their case fully considered"); Schacher Decl. ¶ 7 (describing accelerated timeline that interferes with preparation and access to counsel); *id.*, Ex. 3 (Am. Immigr. Lawyers Ass'n, Dec. 24, 2015) ("USCIS' negative fear determinations are often flawed, with numerous substantive problems evident in the transcripts of initial fear interviews."); Willis Decl. ¶ 12 (describing numerous issues related to interviews); Lunn Decl. ¶ 18 (interviews lacked safeguards); *see also*, *e.g.*, Warden-Hertz Decl. ¶ 9 (describing improper denial of credible fear and IJ review corrected only due to attorney intervention).

Again, these flaws were already egregious in the border context. But applying expedited removal to the interior will amplify these problems. At the border, in the mine run of cases, there is little question whether a person is arriving in the United States, and whether they lack a visa or other document as required to be subject to expedited removal. But under the Rule and Guidance, people will be arrested at courthouses or off the street and subject to these summary procedures, even though they may have lived in this country for years or may even be U.S. citizens. The endemic flaws in expedited removal will mean that people like Plaintiffs Mary and John will be summarily removed despite not being legally subject to expedited removal at all.

### 3.    The Probable Value Of Additional Safeguards Is High And The Government's Interests Do Not Outweigh The Need For Them.

Straightforward safeguards would mitigate the risk of error. Indeed, just last month, the Supreme Court held that noncitizens facing removal under the Alien Enemies Act were entitled to real, meaningful notice and an opportunity to be heard before they could be removed. *See A.A.R.P.*, 145 S. Ct. at 1367-68; *J.G.G.*, 145 S. Ct. at 1006. The same is true of noncitizens facing removal under the expedited removal statute. As explained *supra*, four basic safeguards would significantly reduce the risk of error.

First, noncitizens should be given greater notice of and an opportunity to rebut the government's charges against them and its adverse evidence. The Supreme Court held that noncitizens facing removal under the Alien Enemies Act "must receive notice that they are subject to removal under the Act within a reasonable time and in such a manner as will allow them to actually seek habeas relief before removal." *A.A.R.P.*, 145 S. Ct. at 1368 (cleaned up). Those noncitizens "must have sufficient time and information to reasonably be able to contact counsel, file a petition, and pursue appropriate relief"; "notice roughly 24 hours before removal . . . surely does not pass muster." *Id.* The same is true here: Noncitizens facing expedited removal must be given a reasonable opportunity to contest whether they are actually subject to expedited removal.[16]

---

[16] Indeed, the government recognizes that other kinds of removal orders should not be immediately executed, in order to give the noncitizen a chance to challenge them. *Accord* Deportation of Aliens in the United States; Expulsion, 51 Fed. Reg. 23,041 (June 25, 1986) (recognizing that noncitizens subject to deportation "will be held a minimum of 72 hours prior to removal by the Service, to ensure that due process is accorded the detainee"); 8 C.F.R. § 241.33(b) (preventing execution of removal order sooner than 72 hours after service of decision absent noncitizen's waiver); 8 C.F.R. § 241.22 (same); 8 U.S.C. § 1228(b)(3) (automatically staying execution of administrative removal order against noncitizens with aggravated felony convictions for 14 days unless waived by the noncitizen).

Second, immigration officers should also bear the burden of showing that the noncitizen is not admitted or paroled, and of establishing removability. In light of the government's superior access to evidence, the potential speed of the process, and the fundamental rights at stake, it is unfair to put this onus on the noncitizen. *Cf. Santosky*, 455 U.S. at 763.

Third, the simple opportunity to engage in consultation—with family, friends, or counsel—will also help ensure that noncitizens have a meaningful opportunity to gather evidence to demonstrate that they are not properly subject to expedited removal, and to respond to the government's evidence. *See Ardestani*, 502 U.S. at 138 (explaining that "the complexity of immigration procedures, and the enormity of the interests at stake, make legal representation in deportation proceedings especially important"); *Yiu Fong Cheung v. INS*, 418 F.2d 460, 463 (D.C. Cir. 1969) (discussing the importance of giving noncitizens in deportation proceedings the "opportunity to consult with friends").

Finally, and most importantly, a neutral adjudicator such as an IJ should review the questions of removability and applicability of expedited removal (including length of presence) and whether the noncitizen has a fear of removal, as opposed to a low-level immigration enforcement officer who acts as both prosecutor and judge. *See Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 618 (1993) (where "an initial determination" is "made by a party acting in an enforcement capacity," due process requires the right for "a neutral adjudicator to conduct a *de novo* review of all factual and legal issues" (cleaned up)); *Propert v. District of Columbia*, 948 F.2d 1327, 1333-34 (D.C. Cir. 1991) ("requirement of an unbiased decisionmaker" violated where "[t]he officer to whom appeal may be made is the same officer who decides that the vehicle is 'junk' in the first place").

28

The government's interest in removing people as quickly as possible cannot justify denying these basic safeguards. Indeed, that is the fundamental lesson of the recent Supreme Court decisions in the Alien Enemies Act cases. There, the government emphasized national security interests in effectuating rapid removals, but the Court was clear that due process requires real procedural protections—not meaningless procedures that do not afford an actual opportunity to contest key questions. *See A.A.R.P.*, 145 S. Ct. at 1368 ("We recognize the significance of the Government's national security interests as well as the necessity that such interests be pursued in a manner consistent with the Constitution . . . . [But] notice roughly 24 hours before removal, devoid of information about how to exercise due process rights to contest that removal, surely does not pass muster."). Indeed, the government too has an interest in the lawful and fair administration of the immigration laws. *Cf. Nken v. Holder*, 556 U.S. 418, 436 (2009) ("Of course there is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm.").

**B.    Plaintiff Is Likely To Prevail On Its Claim That The Rule and Guidance Violate The Expedited Removal Statute As Interpreted To Require Adequate Procedures.**

Although the expansion of expedited removal is unconstitutional, this Court need not rule on constitutional grounds. Instead, the Court can and should postpone the Rule and Guidance on statutory grounds. Plaintiff is likely to prevail on its claim that the Rule and Guidance violate the expedited removal statute which, as properly construed to avoid constitutional defects, requires procedurally fair determinations. The constitutional avoidance canon "is a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts." *Clark v. Martinez*, 543 U.S. 371, 381 (2005). The "rule is particularly applicable to cases involving

29

due process challenges" because courts "assume a Congressional solicitude for fair procedure, absent explicit statutory language to the contrary." *Gray Panthers v. Schweiker*, 652 F.2d 146, 152 n.15 (D.C. Cir. 1980) (cleaned up).

Courts have long construed removal statutes to require due process protections, even where the statute does not expressly provide such safeguards. The very concept of a deportation hearing arose when the Supreme Court read an early immigration statute to require a hearing in order to avoid serious due process concerns. *See Yamataya*, 189 U.S. at 100-01. The statutes at issue in *Yamataya* provided that immigration officers should "inspect" certain noncitizens arriving by sea to determine their excludability; that those determinations "shall be final" absent administrative appeal; and that the government could, "within one year after an alien of the excluded class entered the country, . . . cause him to be taken into custody and returned to the country whence he came." *Id.* at 95, 99. The Court rejected a "rigid construction" of those statutes and held that they "do no[t] necessarily exclude opportunity to the immigrant to be heard, when such opportunity is of right." *Id.* at 100; *accord id.* at 101 (statutory text did "not require an interpretation that would invest executive or administrative officers with the absolute, arbitrary power" to deport noncitizens without process); *see also Wong Yang Sung v. McGrath*, 339 U.S. 33, 49 (1950) ("It was under compulsion of the Constitution that this Court long ago held that an antecedent deportation statute must provide a hearing").

Since *Yamataya*, the Supreme Court has applied the constitutional avoidance canon to "read significant limitations into other immigration statutes." *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001) (citing *United States v. Witkovich*, 353 U.S. 194, 195, 202 (1957)). For instance, *Witkovich* addressed "a legislative scheme designed to govern and to expedite . . . deportation" and, in particular, a provision requiring noncitizens awaiting deportation to provide the

government such information "as the Attorney General may deem fit and proper." 353 U.S. at 195, 202. Applying the avoidance canon, the Court read that language to "limit the statute to authorizing" only "questions reasonably calculated to keep the Attorney General advised regarding [noncitizens'] continued availability for departure." *Id.* at 202. Similarly, *Zadvydas* considered a statute providing that a noncitizen "may be detained beyond the removal period." 533 U.S. at 689 (internal quotation marks omitted). The Court explained that "the word 'may' is ambiguous," *id.* at 697, and applied the avoidance canon to "read an implicit limitation" into the statute that permits "post-removal-period detention" only for a "reasonably necessary" period and prohibits "indefinite detention," *id.* at 689; *accord Clark*, 543 U.S. at 377; *see also R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 186-88, 190 (D.D.C. 2015) (applying canon to read due process limits into similar language in immigration detention statute).[17]

Courts have read other essential due process safeguards into other immigration statutes. The statutory requirement that noncitizens "shall have a reasonable opportunity to examine" and "present evidence" in regular removal proceedings under 8 U.S.C. § 1229a(b)(4)(B) and its precursors has long been interpreted to require protections such as interpretation at hearings, *Matter of Tomas*, 19 I. & N. Dec. 464, 465-66 (BIA 1987), the "timely production of" adverse evidence, *Bondarenko v. Holder*, 733 F.3d 899, 907 (9th Cir. 2013), and a neutral adjudicator, *Tun v. Gonzales*, 485 F.3d 1014, 1025 (8th Cir. 2007).

---

[17] The Supreme Court and D.C. Circuit have applied the same principle to read basic due process guardrails into statutes outside the immigration context. *E.g.*, *Greene v. McElroy*, 360 U.S. 474, 507 (1959) ("Where administrative action has raised serious constitutional problems, the Court has assumed that Congress or the President intended to afford those affected by the action the traditional safeguards of due process."); *Gonzalez v. Freeman*, 334 F.2d 570, 579 (D.C. Cir. 1964) ("[W]e cannot agree that Congress intended to authorize [the penalty of debarment] without regulations establishing standards and procedures and without notice . . . , hearings, and findings pursuant thereto.").

This Court should apply the same principle to interpret the expedited removal statute as applied by the Rule to require fair determinations of whether, *inter alia*, the factual criteria for expedited removal are met and a noncitizen is inadmissible based on the specified grounds, and to ensure that there is an adequate opportunity to express fear of removal. The expedited removal statute contains numerous ambiguous terms that make application of the constitutional avoidance canon appropriate. *See Gray Panthers*, 652 F.2d at 152 & n.15 (applying avoidance canon where statute did not "explicitly detail what process is due"); *R.I.L-R*, 80 F. Supp. 3d at 186 ("Although the statute is silent as to what factors may be considered in making such determinations, the Court must construe it with an eye toward avoiding 'serious constitutional doubts.'").

For example, the statute provides that "[i]f an immigration officer *determines* that an alien . . . who is arriving in the United States or is described in [§ 1225(b)(1)(A)](iii) is inadmissible under section 1182(a)(6)(C) or 1182(a)(7) of this title, the officer shall order the alien removed." 8 U.S.C. § 1225(b)(1)(A)(i) (emphasis added). But the statutory text is ambiguous as to the *process* by which immigration officers are to "determine" inadmissibility. Similarly, the statute provides that a noncitizen "described in clause (iii)," *id.*, is one "who has not been admitted or paroled into the United States, and who *has not affirmatively shown, to the satisfaction of an immigration officer*, that the alien has been physically present in the United States continuously for [a] 2-year period," *id.* § 1225(b)(1)(A)(iii)(II) (emphasis added). Again, the statute is ambiguous on the procedures for making this showing "to the satisfaction of an immigration officer." *Id.* The statute is equally ambiguous as to the process for providing noncitizens an opportunity to "indicate[] either an intention to apply for asylum under section 1158 of this title or a fear of persecution." *Id.* § 1225(b)(1)(A)(i).

The government has acknowledged that the language of these provisions is ambiguous. *See* 89 Fed. Reg. 48,710, 48,740 (June 7, 2024) ("8 U.S.C. 1225(b)(1)(A) [] does not specify the relevant aspects of the procedures that immigration officers must follow to determine whether a noncitizen who is subject to expedited removal can be ordered removed or whether the noncitizen must be referred to an [asylum officer] for a credible fear interview."); *id.* ("Congress has not provided a particular definition of the phrase 'indicates . . . an intention.'"). In the government's view, this ambiguity "gives DHS discretion to employ the procedures it reasonably concludes are appropriate." *Id.* But "[t]he APA . . . specifies that courts, not agencies, will decide *'all'* relevant questions of law' arising on review of agency action—even those involving ambiguous laws." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391-92 (2024) (internal citation omitted).

Interpreting these provisions to permit expedited removal of people who have entered the United States and lived here for up to two years using the same error-plagued procedures described above raises grave constitutional questions. *See supra* Argument, Section I.A. It is "fairly possible" to avoid those constitutional doubts by construing these ambiguous provisions to require more robust safeguards. *United States v. Hansen*, 599 U.S. 762, 781 (2023) (quotation marks omitted). And because the Court can construe the expedited removal statute's ambiguous language to guard against the kind of "absolute, arbitrary power" that the Rule and Guidance permit—and which Defendants' recent actions illustrate—it has a duty to do so. *Yamataya*, 189 U.S. at 101; *see also, e.g.*, *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 78 (1994) (it is "incumbent upon us to read the statute to eliminate [constitutional] doubts so long as such a reading is not plainly contrary to the intent of Congress").

**C.    Plaintiff Is Likely To Prevail On Its Claim That Expedited Removal Cannot Lawfully Be Applied To Noncitizens In The Interior Based Solely On Lack Of Valid Entry Documents.**

Plaintiff is also likely to succeed in showing that the Rule violates the INA in a second respect: the Rule is likely unlawful because it subjects people who have already entered the United States to expedited removal under 8 U.S.C. § 1182(a)(7).

By statute, expedited removal can only be applied to noncitizens who are inadmissible on one of two grounds: 8 U.S.C. § 1182(a)(6)(C) or § 1182(a)(7). 8 U.S.C. § 1225(b)(1)(A)(i). Section 1182(a)(6)(C) concerns noncitizens seeking to procure immigration status via fraud or who falsely claim U.S. citizenship. Section 1182(a)(7), entitled "Documentation Requirements," applies to noncitizens who, "at the time of application for admission," lack a valid visa, "border crossing identification card, or other valid entry document." The Rule explicitly "enables" DHS to subject noncitizens who have already entered the United States, including those who entered up to two years earlier, to expedited removal if they are "determined to be inadmissible" under either provision. 90 Fed. Reg. at 8,139. But § 1182(a)(7) does not apply to those who have already entered the United States because it applies only at "the time when a noncitizen seeks permission to physically enter United States territory." *Torres v. Barr*, 976 F.3d 918, 924 (9th Cir. 2020) (en banc).[18]

This is made clear by both the statute's plain language and context. By its plain terms, § 1182(a)(7) applies only to a noncitizen who lacks a valid entry document at a specific moment:

---

[18] Subsequently, in *United States v. Gambino-Ruiz*, the Ninth Circuit held that a noncitizen who was "detained near the border shortly after he crossed it," under the 14-day limitation in place prior to the Rule, could be subjected to expedited removal under § 1182(a)(7). 91 F.4th 981, 990 (9th Cir. 2024). *Gambino-Ruiz* is not persuasive for the reasons set forth in Plaintiff's Response to Defendants' Motion to Dismiss. *See* ECF 44 at 34. Moreover, the court in *Gambino-Ruiz* reaffirmed its holding in *Torres* that "'stretching the phrase 'at the time of application for admission' to refer to a period of years would push the statutory text beyond its breaking point.'" *Gambino-Ruiz*, 91 F.4th at 990 (quoting *Torres*, 976 F.3d at 926).

34

"*at the time of* application for admission." 8 U.S.C. § 1182(a)(7)(A)(i) (emphasis added).[19] Section 1182(a)(7) uses the phrase "at the time of application for admission" in connection with requiring a valid "*entry* document" to lawfully cross the border: the noncitizen must possess "a valid unexpired immigrant visa, reentry permit, border crossing identification card,[20] or other valid entry document." *Id*. § 1182(a)(7)(A)(i)(I) (emphasis added). It has a similar requirement for a valid "*travel* document": the noncitizen must possess a "valid unexpired passport, or other suitable travel document, or document of identity and nationality if such document is required under the regulations issued . . . under section 1181(a)." *Id.* (emphasis added). Section 1181(a) likewise concerns documents used to cross into the United States. *See* 8 U.S.C. § 1181(a). Thus, "the most logical reading of [the] phrase ['at the time of application for admission'] is that it refers to the moment of applying for entry into the country." *Torres*, 976 F.3d at 925.[21]

Statutory context confirms § 1182(a)(7)'s temporal focus on the moment of entry into the United States. In contrast, a neighboring ground of inadmissibility, § 1182(a)(6)(A), renders inadmissible a noncitizen who is "*present* in the United States without being admitted or paroled." 8 U.S.C. § 1182(a)(6)(A)(i) (emphasis added). Congress chose *not* to make mere presence a basis

---

[19] Several of the INA's inadmissibility provisions use the phrase "at the time of," each referring to a specific time when a noncitizen must meet a certain condition. *See, e.g*., 8 U.S.C. § 1182(a)(4)(A) (inadmissible if "at the time of" his application for a visa, admission, or adjustment of status, person "is likely . . . to become a public charge"); *id.* § 1182(a)(5)(A)(i)(I) (inadmissible if noncitizen seeks to work without certification that there were insufficient workers to fill the same job "at the time of [the noncitizen]'s application for a visa and admission"); *id*. § 1182(a)(6)(C)(ii)(II) (inadmissible if noncitizen falsely claimed citizenship unless she "reasonably believed at the time of making such representation" that she was citizen).

[20] A "border crossing identification card" is a document issued for the "purpose of crossing over the borders between the United States and foreign contiguous territory." 8 U.S.C. § 1101(a)(6).

[21] This interpretation is consistent with how the INA elsewhere uses the term "application for admission." *See* 8 U.S.C. § 1361 (placing burden of demonstrating admissibility on noncitizen who "makes application for a visa or any other document required for entry, or makes application for admission, or otherwise attempts to enter the United States").

for inadmissibility under § 1182(a)(7), focusing instead on the moment when the person applies to enter the country. Congress's choice makes clear that it did not intend for expedited removal to apply to people who are present in the United States without valid entry documents. Had Congress wanted to do so, it had a straightforward option: listing the neighboring provision at § 1182(a)(6)(A) as a basis for expedited removal. *Cf. Kucana v. Holder*, 558 U.S. 233, 248 (2010) ("If Congress wanted the jurisdictional bar to encompass decisions specified as discretionary by regulation along with those made discretionary by statute . . . Congress could easily have said so.").

Under this correct construction of the statute, Defendants remain free to charge noncitizens with inadmissibility under § 1182(a)(7) if they are apprehended at the border without valid entry documents. And as to noncitizens in the interior who have been here for less than two years, the statute still allows the government to apply expedited removal to those who are inadmissible for fraud under § 1182(a)(6)(C), which is not limited to fraud at entry. But Defendants cannot do what the Rule explicitly purports to "enable": They cannot "place in expedited removal" noncitizens "determined to be inadmissible under" § 1182(a)(7) who have already entered the United States and have been present for up to two years. *See* 90 Fed. Reg. at 8,139.

Finally, the canon of constitutional avoidance resolves any remaining doubt that Plaintiff's construction must be adopted. An interpretation of the phrase "at the time of application for admission" in § 1182(a)(7) that would permit noncitizens who have already entered and been present in the United States for up to two years based solely on their lack of valid *entry* documents raise serious due process problems. *See supra* Argument, Section I.A. Because Plaintiff's reading of the statute is "fairly possible" and avoids the constitutional question as to this group of people, the Court should adopt it. *See Hansen*, 599 U.S. at 781 (internal quotation marks omitted).

### D.   Plaintiff Is Likely To Prevail On Its Claim That Expedited Removal Cannot Lawfully Be Applied To Affirmative Asylum Applicants.

Plaintiff is also likely to succeed in showing that the Guidance is contrary to the asylum regulations because it applies expedited removal to affirmative asylum applicants. The regulations implementing the asylum statute, 8 U.S.C. § 1158, grant jurisdiction over affirmative asylum applications to USCIS. Those regulations permit placing affirmative asylum applicants in expedited removal in only one specific circumstance. Yet the Guidance applies expedited removal to *all* persons covered by the Rule's designation—even if they have filed an affirmative asylum application. *See* Steinberg Dec., Ex. 2 (Guidance) at 2 (stating that an "alien who has applied for asylum" will be considered for expedited removal). The Guidance thus violates the *Accardi* doctrine, which "requires federal agencies to follow their own rules." *Steenholdt v. Fed. Aviation Admin.*, 314 F.3d 633, 639 (D.C. Cir. 2003) (citing *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954)).

The asylum regulations exempt most affirmative asylum seekers from expedited removal. The regulations provide that "USCIS shall have initial jurisdiction over" any "asylum application filed by an alien physically present in the United States." 8 C.F.R. § 208.2(a)(1). The regulations further provide that "USCIS *shall adjudicate* the claim of each asylum applicant whose application is complete," *id.* § 208.9(a) (emphasis added), by means of an interview by an asylum officer, *id.* § 208.9(b). After that interview, the asylum seeker generally receives one of two outcomes. First, the asylum officer may grant the application. *Id.* § 208.14(b). Second, where the officer does not grant asylum and concludes that the asylum seeker "appears to be inadmissible or deportable under [8 U.S.C. § 1182(a) or § 1227(a)], the officer "*shall refer* the application to an [IJ], together with the appropriate charging document, for adjudication in [regular] removal proceedings." 8 C.F.R.

§ 208.14(c)(1) (emphasis added). Thus, for most affirmative applicants, the regulations never provide that they can be placed into expedited removal.

The regulations permit an affirmative applicant to be placed in expedited removal in only one situation: where the asylum seeker was previously paroled into the United States and their parole has expired or been terminated. *Id.* § 208.14(c)(4)(ii).[22] For such asylum seekers, where the asylum officer does not grant asylum and finds that the asylum seeker is inadmissible under 8 U.S.C. § 1182(a)(6) or § 1182(a)(7), the officer will "proceed in accordance with" the expedited removal regulations. 8 C.F.R. § 208.14(c)(4)(ii)(A) (citing *id.* § 235.3(b)).[23] By applying expedited removal to people outside this specific class, the Guidance is contrary to the regulations. *See Nasdaq Stock Market LLC v. SEC*, 38 F.4th 1126, 1137 (D.C. Cir. 2022) ("[m]ention of one thing" "implies exclusion of another thing"); *see also Doe v. SEC*, 28 F.4th 1306, 1314 (D.C. Cir. 2022) (applying this canon to a regulation).

This understanding of the regulations is consistent with the statutory scheme. 8 U.S.C. § 1158 provides that a noncitizen may apply for asylum "in accordance with this section [§ 1158] *or*, where applicable, section 1225(b) of this title." *Id.* § 1158(a)(1) (emphasis added). Section 1158 further provides that "[t]he Attorney General shall establish a procedure for the consideration of asylum applications filed under [this section]," *id.* § 1158(d)(1), and that such applications are

---

[22] *See* 8 U.S.C. § 1182(d)(5)(A) (authorizing the DHS Secretary to "parole into the United States temporarily . . . only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission"). The regulation does not apply to noncitizens who were granted "advance parole"—i.e., a form of authorization to travel from and return lawfully to the United States. *See* 8 C.F.R. § 208.14(c)(4)(ii).

[23] In *Doe v. Noem*, a class action challenging DHS's termination of certain parole programs, the court held that individuals whose parole has been terminated or expired are not subject to expedited removal under 8 U.S.C. § 1225(b)(1)(A)(iii)(II). --- F. Supp. 3d ----, 2025 WL 1099602, at *16 (D. Mass. Apr. 14, 2025), *order stayed pending appeal sub nom. Noem v. Doe*, 605 U.S. ---, 2025 WL 1534782 (U.S. May 30, 2025). This Court need not address this issue in this case as Plaintiff asks only that the Court find the Guidance in violation of the asylum regulations.

to receive "final administrative adjudication" following an "interview" or "hearing," *id.* § 1158(d)(5)(A)(ii)-(v). The regulations implement these adjudications by assigning them, respectively, to asylum officers and IJs in regular removal proceedings. *See* 8 C.F.R. § 208.2(a)(1), (b). By contrast, the expedited removal statute, 8 U.S.C. § 1225(b)(1), provides a distinct procedure—the credible fear process—by which noncitizens may apply for asylum, "where applicable, [under] section 1225(b)." 8 U.S.C. § 1158(a)(1).

Because affirmative applicants have already applied in accordance with § 1158, they are *not* applying under § 1225(b). *See In re Espy*, 80 F.3d 501, 505 (D.C. Cir. 1996) ("[A] statute written in the disjunctive is generally construed as setting out separate and distinct alternatives.") (cleaned up). This reading also makes sense: the credible fear process was designed as an initial screening process meant primarily for "newly-arrived" asylum seekers at or near the border. *See Grace v. Barr*, 965 F.3d 883, 887 (D.C. Cir. 2021). Nothing in the statutory scheme suggests Congress sought to apply that screening process to people who already have applied for asylum affirmatively.

Re-routing affirmative asylum applicants into expedited removal has significant consequences. The credible fear process provides far fewer protections than the affirmative one. An affirmative applicant may file an asylum application directly with USCIS. 8 C.F.R. § 208.2(a)(1). The applicant receives 21 days' notice of a non-adversarial interview, where they may have counsel present and may present witnesses and affidavits or other evidence, *id.* § 208.9(b), and may be granted asylum thereafter, *id.* § 208.14(b). By contrast, in the credible fear process, the asylum seeker must raise their asylum claim as a defense against expedited removal. *See* 8 U.S.C. § 1225(b)(1)(A)(ii). The applicant is generally detained, *see* 8 C.F.R. § 235.3(b)(4)(ii), limiting their access to counsel and ability to prepare their case, particularly since the interview

can occur as little as 24 hours after the noncitizen is given notice of it—even if they do not yet "have access to a phone," and even though "a significant share of the 24-hour period occurs overnight, when fewer people [will] likely be available to take calls." 89 Fed. Reg. at 81,197.[24] Asylum seekers generally participate in credible fear interviews by phone, Steinberg Decl. Ex. 6 (USCIRF 2025) at 7, even though asylum officers must evaluate their credibility, 8 U.S.C. § 1225(b)(1)(B)(v). And even when the asylum seeker passes the credible fear interview, they are merely placed into regular removal proceedings before an IJ, where they must continue to litigate their application. *See* 8 U.S.C. § 1225(b)(1)(B)(ii); 8 C.F.R. § 235.3(c).

Finally, even assuming the regulations could be read to allow for the general placement of affirmative applicants into expedited removal, the Guidance would still be arbitrary and capricious for three reasons. First, the Guidance "failed to consider . . . important aspects of the problem." *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 25 (2020) (cleaned up). Apart from a vague and conclusory statement in the Guidance[25] Defendants never even acknowledge, much less explain, that placing affirmative applicants into expedited removal is a significant change in policy, or that, at a minimum, there is significant tension between doing so and the regulations governing the adjudication of affirmative asylum claims. *See FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009) (holding that the agency must "display awareness that it is changing position" and "may not . . . depart from a prior policy *sub silentio* or simply disregard rules that are still on the books"); *accord Grace*, 965 F.3d at 900. Second,

---

[24] DHS's attempt to shorten the consultation window even further, to as little as four hours, was recently vacated as arbitrary and capricious. *Las Americas Immigr. Advoc. Ctr.*, 2025 WL 1403811, at *19-21.

[25] *See* Steinberg Dec., Ex. 2 (Guidance) at 2 ("Further, the expedited removal process includes asylum screening, which is sufficient to protect the reliance interests of any alien who has applied for asylum or planned to do so in a timely manner.").

Defendants failed to account for the reliance interests that asylum seekers have in the greater procedural protections provided by the affirmative asylum system. *See Regents*, 591 U.S. at 30-33. And third, Defendants failed to consider alternatives within the ambit of existing policy—namely, exempting affirmative asylum applicants from expedited removal, as the regulations contemplate. *See id*. at 32-33.

## II.    Absent Postponement, Plaintiff's Members Will Suffer Irreparable Harm.

The new Rule and Guidance make far-reaching changes that will cause Plaintiff Make the Road New York's members irreparable harm. Plaintiff's members face the prospect of summary removal pursuant to flawed and illegal expedited removal procedures. Plaintiff is a membership-based organization that has thousands of noncitizen members, many of whom have been subject to enforcement activities by DHS. Fontaine Decl. ¶¶ 13, 15. Plaintiff has identified at least six members who could be placed in expedited removal proceedings pursuant to the Rule, because they entered without inspection, and have been continuously present in the United States for less than two years. *Id*. ¶¶ 17-25, 40-42. Plaintiff also has other members who have been living in the United States for longer than two years and who could be erroneously subject to expedited removal because they do not have or know what documents they could use to show their legal status or their continuous presence, and do not know when and how they would be able to access this crucial information if they encounter an immigration officer at work, on the street, or at a courthouse. *See id*. ¶¶ 18, 41-43.

Furthermore, Plaintiff has members with upcoming immigration court dates whose cases DHS is likely to try to dismiss, and whom ICE may try to arrest and swiftly deport. *See id*. ¶¶ 19-26, 29 (discussing these members and explaining that "the campaign to target individuals attending their immigration court proceedings for placement into expedited removal and detention by ICE

41

has sent shock waves through [Make the Road New York's] members and the communities that we serve"). In fact, even in the early days of Defendants' new practice, DHS has already tried to dismiss the cases of Plaintiff's members. *See id.*, Ex. A (John Doe 4 Decl.) ¶ 4 (member recounting that at his May 30, 2025 immigration court hearing, "the attorney for the government wanted to end [his] case" but the IJ instead reset the hearing to August). Other members—even those who are not susceptible to dismissal, arrest, and deportation under the new policy—are scared to show up to court, which could result in an *in absentia* removal order. *See id.*, Ex. B (Jane Doe 2 Decl.) ¶ 6; *see generally* Rowland-Kain Decl. ¶ 17; Gilliam Decl. ¶¶ 24-26. Thus, absent a stay, the Rule and Guidance will cause irreparable harm to Make the Road New York.

## III.    The Balance of Equities and the Public Interest Strongly Favor Postponement of Defendants' Actions.

The remaining factors decisively favor Plaintiff. The public interest strongly favors postponement, as countless people living in the United States with their families, including U.S. citizen spouses and young children, are being swiftly detained and deported pursuant to a procedure that flouts core due process guarantees and denies them any opportunity to pursue immigration relief, including asylum. *See* Fontaine Decl. ¶ 29 (describing recent detention of a "19-year old," "a couple who . . . had children at home," "a man . . . [who] did not have vital medication with him; and a same-sex couple pulled from each others' arms"); Levenson Decl. ¶¶ 18-24 (describing detention of asylum seeker whose partner was eight months pregnant, gay couple who feared persecution, and asylum seeker married to a U.S. citizen); Dojaquez-Torres Decl. ¶ 11 (detainees include families with children as young as two and three years old, and ICE attempted to detain a mother with a nursing infant); Yang Decl. ¶ 16 (detention of "whole family units, including adults and their minor children"). These sudden arrests, detentions, and deportations cause immeasurable harm to noncitizens, who are suddenly detained, separated from

their families, and deported. *See* Fontaine Decl. ¶¶ 31("[m]any people have begun shaking or crying" upon their arrest); Levenson Decl. ¶ 15 (describing "true panic and horror on . . . faces" of noncitizens, one of whom "appeared to have a panic attack"); Eugenio Decl. ¶ 15 (describing noncitizens who were suddenly detained and had "a physical and emotional defeat in their body language that I will never unsee"); Cortes Decl. ¶¶ 4-5 ("people were in tears and shaking" and a family member "broke down in tears and expressed concern because [a detained individual] had not brought important prescription medication for his eyes."); Botsch Decl. ¶ 5 (describing the case of a Cuban man who was arrested and who started strangling himself and yelling that he would rather kill himself than be sent back to Cuba); *see also* Fontaine Decl. ¶ 33 (explaining how "[t]he experience of seeing individuals . . . some of whom had children at home or had not brought vital medication with them—being surrounded, handcuffed, and detained without warning or explanation has been deeply disturbing to [Make the Road New York] attorneys," "[s]everal of [whom have] broke[n] down in tears" and "have suffered difficulty sleeping"). And these sudden arrests and deportations are especially harmful to asylum seekers, who face removal to countries where they fear persecution. *See* Fontaine Decl. ¶¶ 30, 32 (arrest and detention of asylum seekers; Levenson Decl. ¶¶ 18-24 (same); Cortes Decl. ¶ 9 (same); Umana Decl. ¶ 9 (same). Defendants' practices are harmful not only to those detained and deported, but also to many more noncitizens who are not showing up to immigration court for fear that they will be detained, and who are consequently being ordered removed *in absentia*, even where they may have immigration relief available to them. *See* Rowland-Kain Decl. ¶ 17 (significant decrease in noncitizens who came to court in days following courthouse arrests); Gilliam Decl. ¶¶ 24-26 ("unusually large number of in absentia removal orders" following courthouse arrests).

Defendants cannot point to any harm that could outweigh that experienced by noncitizens who are detained and swiftly deported in violation of their due process rights. Indeed, as explained *supra*, Argument, Section I.A.3, the government *shares* Plaintiff's interest in the effective and fair administration of the immigration laws and in preventing erroneous removals. *Cf. Nken*, 556 U.S. at 436. Moreover, the government already provides safeguards similar to, and even beyond, those described above to all noncitizens in regular removal proceedings. *See generally* 8 U.S.C. § 1229a. Conversely, while the Rule and Guidance remain in effect, countless people living in the United States with their families could be deported pursuant to a procedure that flouts core due process guarantees. Finally, the public interest strongly favors postponement under § 705, as "[t]he public interest is served when administrative agencies comply with their obligations under the APA." *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009).

## CONCLUSION

For the foregoing reasons, this Court should grant Plaintiff's motion to postpone the effective dates of the Rule and Guidance pending adjudication of this case on the merits.

Dated: June 10, 2025                          Respectfully submitted,

                                             */s/ Anand Balakrishnan*
Cody Wofsy (D.D.C. Bar No. CA00103)          Anand Balakrishnan
Stephen B. Kang (D.D.C. Bar No. CA00090)     Lee Gelernt (D.D.C. Bar No. NY0408)
Morgan Russell                               Omar C. Jadwat
Hannah Steinberg                             Michael K.T. Tan (D.D.C. Bar No. NY0636)
American Civil Liberties Union Foundation     Sidra Mahfooz
Immigrants' Rights Project                    Grace Choi
425 California Street, Suite 700             American Civil Liberties Union Foundation
San Francisco, CA 94104                       Immigrants' Rights Project
T: (415) 343-0770                            125 Broad Street, 18th Floor
F: (332) 220-1702                            New York, NY 10004
*cwofsy@aclu.org*                            T: (212) 549-2660
*skang@aclu.org*                             F: (332) 220-1702
*mrussell@aclu.org*                          *abalakrishnan@aclu.org*
*hsteinberg@aclu.org*                        *lgelernt@aclu.org*

44

Amy Belsher
Robert Hodgson
New York Civil Liberties Union Foundation
125 Broad St., 19th Floor
New York, NY 10004
(212) 607-3300
*abelsher@nyclu.org*
*rhodgson@nyclu.org*

*ojadwat@aclu.org*
*m.tan@aclu.org*
*smahfooz@aclu.org*
*gchoi@aclu.org*

Arthur B. Spitzer (D.C. Bar No. 235960)
Aditi Shah (D.C. Bar No. 90033136)
American Civil Liberties Union Foundation of
the District of Columbia
529 14th Street, NW, Suite 722
Washington, D.C. 20045
(202) 457-0800
*aspitzer@acludc.org*
*ashah@acludc.org*

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 10, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Anand Balakrishnan*
Anand Balakrishnan
American Civil Liberties Union Foundation
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (332) 220-1702
*abalakrishnan@aclu.org*