## **DECLARATION OF SIENNA FONTAINE, CO-EXECUTIVE DIRECTOR, MAKE THE ROAD NEW YORK**

I, Sienna Fontaine, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am a co-Executive Director at Make The Road New York (MRNY). I previously served as General Counsel and before that as Legal Director at MRNY. As part of MRNY's Executive Leadership Team, I am responsible for shaping many of MRNY's organizational priorities; overseeing our staff; and fundraising. I have worked at MRNY since 2015.

2. MRNY is a nonprofit, membership-based community organization that integrates adult and youth education, legal and survival services, and community and civic engagement, in a holistic approach to help low-income New Yorkers improve their lives and neighborhoods. MRNY has five offices in the New York area, located in Brooklyn, Queens, Staten Island, and in Suffolk and Westchester Counties.

## **MRNY's structure, mission, and activities**

3. MRNY's mission is to build the power of immigrant and working-class communities to achieve dignity and justice.

4. MRNY currently has over 200 staff members who provide services to thousands of individuals a year. To fulfill our mission, MRNY engages in four key strategies: Legal and Survival Services, Transformative Education, Community Organizing, and Policy Innovation.

5. At the core of our mission, MRNY and its members advocate on behalf of immigrant communities on issues that impact their lives to effect policy changes. MRNY's organizing team leads our advocacy work and campaigns. Each year, MRNY participates in dozens of actions around the state to advocate for policy and legislative changes that would impact our members and the communities we serve. The organization engages in a deliberative process with our staff and

1

members to create an annual platform comprised of our legislative and policy priorities for the year and then dedicates significant resources to educating and mobilizing our members to support those priorities. In the past, we have helped secure important legislative victories and reforms from expansion of eligibility for drivers' licenses in New York State to creation of a groundbreaking Excluded Workers Fund for workers unable to access unemployment and pandemic benefits because of their immigration status. MRNY also regularly submits comments on proposed federal regulations. For instance, MRNY previously submitted a comment on DHS's proposed public charge inadmissibility ground, DHS Docket No. USCIS-2010-0012, and assisted approximately 300 of its members in submitting individual comments.

6. MRNY's organizing team facilitates standing committees in many areas of importance to our members. Some of our committees include the Civil Rights and Immigrant Power Project ("CRIPP"), which works on campaigns for immigration reforms at the state and federal level; the Youth Power Project (YPP), which works on issues affecting youth including access to education and police reform; and its TrIP or Trans Immigrant Project, which focuses on the rights of TGNCIQ New Yorkers.

7. MRNY's services teams, which include legal, health, and adult education, are on the front line with immigrant communities in New York and serve thousands of immigrants each year.

8. MRNY has a robust legal department.  MRNY's legal department is staffed by attorneys and advocates who provide a broad range of civil legal services to members. MRNY's immigration team provides individualized assistance to thousands of immigrant members annually including both individuals in removal proceedings and individuals filing affirmative applications for immigration benefits. Our immigration legal team covers a range of cases, including affirmative applications such as adjustment of status, naturalization, DACA, TPS, and visas for

survivors of violence, as well as removal defense before the immigration courts and motions to reopen. We represent both detained and nondetained individuals. The legal team assists other departments in advocacy, planning, and training related to pending laws or regulations and engages in impact litigation. Our housing legal team, which represents many MRNY members, assists hundreds of families in housing court cases involving evictions, hazardous conditions, and housing discrimination. Finally, our workers rights team helps individuals combat wage theft and other workplace-related violations.

9. MRNY's health team promotes the health and well-being of our community members, by providing health services to community members and advocating for improved access to healthcare for immigrants. The health team assists eligible individuals and families with applying for health insurance, including both Medicaid and New York State's Child Health First program, and other benefits including the Supplemental Nutrition Assistance Program ("SNAP") and provides information and referrals to community members, particularly individuals who do not qualify for health insurance through the New York State of Health program or who are facing food insecurity.

10. Lastly, MRNY's adult education team provides English-language classes for hundreds of individuals for whom English is not their first language and assists immigrants with civics, adult basic education, and citizenship classes.

11. The majority of MRNY's Board of Directors is composed of community members who are elected from our grassroots membership. Every three years, each of our member-led organizing committees (with the exception of our Youth Power Project committee) elects one representative from their committee to serve on the board. All elected board members are given extensive support and training to enable their full participation. All board meetings are interpreted

to accommodate members who are not bilingual. MRNY's Board of Directors meets quarterly to review the budget and fundraising goals, discuss organizational direction and strategy, and give feedback to the executive directors.

12. Members who serve on our Board of Directors provide oversight to our executive directors and determine the strategic direction of the organization. They take leadership in our organizing committees, determining the direction of our organizing work and leading organizing campaigns. Members also have come to serve in staff roles across the organization, including in senior leadership positions. Through our leadership pipeline we have trained and supported countless members in transitioning to staff roles including Community Health Workers, Health "Promotoras," Organizers, Communications Staff, Paralegals, Department Directors, Chief of Staff, and even Executive Director.

**MRNY's membership**

13. MRNY is a membership-based organization with over 28,000 members residing in New York City, Westchester County, and Long Island, and primarily in the boroughs of Queens, Brooklyn and Staten Island

14. MRNY maintains a database of its members. However, we do not have current contact information or a means of reaching all of our members, as individuals change phone numbers and addresses frequently. The frequency of these changes reflects the composition of our membership, which is drawn from low-income and working communities who often face financial hardship. While we strive to remain in contact with our members, these realities mean we cannot reliably reach all our members in a timely way.

15. Although we do not collect immigration status information for our members, our long history engaging our members in the fight for immigration reforms and supporting them in sharing

their personal stories with elected officials and others has shown that many of our members are neither U.S. citizens nor Lawful Permanent Residents.

16. Because of concerns for our members' privacy and the importance of their trust in MRNY as crucial to our mission and work, MRNY does not share our membership information with third parties including governmental agencies.

**MRNY's members are subject to the new expedited removal policy**

17. MRNY's members include noncitizens who have not been admitted to the United States by an immigration officer and who have not been continuously present for at least two years. These members may be subjected to expedited removal, per the government's January 2025 rule expanding expedited removal (the "Rule"). As a result, they may be removed from the United States without sufficient opportunity to show that they have the right to remain in the United States or to assert claims for immigration relief for which they are eligible.

18. MRNY members also include members who are noncitizens who have not been admitted to the United States by an immigration officer and have been continuously present for longer than two years. These members may be erroneously placed into expanded expedited removal either because they do not have, or do not carry, documentation of their continuous length of residence or would not be able to present that documentation on the short timeline envisioned by the Rule, especially if they are detained by immigration authorities.

19. Examples of members who have been subjected to the Rule or who could be subject to the new Rule include:

20. MRNY-John Doe 1 is a member of MRNY and a noncitizen. He entered the United States without inspection in July 2023, and has been in the country since then. He is not in removal proceedings and does not have a final order of removal.

21. MRNY-John Doe 2 is a member of MRNY and a noncitizen. He entered the United States without inspection in December 2023, and has been in the country since then. He is not in removal proceedings and does not have a final order of removal. He filed a timely application for affirmative asylum with USCIS, which remains pending.

22. MRNY-John Doe 3 is a member of MRNY and a noncitizen. He entered the United States without inspection in October 2023, and has been in the country since then. He is in removal proceedings and does not have a final order of removal.

23. MRNY-John Doe 4 is a member of MRNY who arrived in the U.S. in October 2023. He filed an application for asylum with the immigration court. At a hearing in his case in May 2025, DHS made an oral motion to dismiss his proceedings based on changed circumstances. The motion remains pending. His next hearing date was initially set for August 2025 but a week later was advanced to June 2025. Public reporting, and the first-hand account of our staff, indicates that such dismissal motions are a precursor, and part of a concerted effort by Immigration & Customs Enforcement (ICE), to initiate expedited removal proceedings pursuant to the Rule.

24. MRNY-Jane Doe 1 is a member of MRNY and a noncitizen. She entered the United States without inspection in August 2023 and has been in the country since then. An Immigration Judge dismissed her removal proceedings in January 2025. She is not in removal proceedings and does not have a removal order.

25. MRNY-Jane Doe 2 is a member of MRNY who arrived in the U.S. in March 2024. She and her family have filed an application for asylum with the immigration court date and their next hearing date is in December 2025.

26. As these individuals demonstrate, the communities MRNY serves will be harmed by the EO.

27. Attached are pseudonymous declarations from two members, John Doe 4 and Jane Doe 2, one of whom fears placement into expedited removal and the other of whom DHS has already moved to dismiss proceedings for, and both of whom fear retaliation if their identities and participation in this case is revealed. Both original non pseudonymous versions are held by our organization as well as other case documents. We are willing to provide a copy to the court for in camera review if necessary, or subject to an appropriate protective order in the course of discovery.

28. Every day, large numbers of people come to MRNY's five community-based offices or directly contact a member of our staff seeking information and assistance on a range of issues, particularly in the aforementioned areas including immigration, housing, and healthcare. Our staff regularly hold committee meetings, community-education sessions, and one-on-one meetings with our members and the communities we serve. We also regularly receive requests for help from families or individuals subject to ICE enforcement actions and our staff assists clients in ICE detention. Because of this, we experience firsthand the very harmful impact of policy changes targeting immigrants, including through this Rule.

29. The expansion of expedited removal and more recently the campaign to target individuals attending their immigration court proceedings for placement into expedited removal and detention by ICE has sent shock waves through MRNY's members and the communities that we serve. Our staff members have begun to receive panicked requests for help from individuals calling or walking into our offices because they have future court dates and are now scared to attend court and do not know what is happening, what their rights are, or what to do. Our staff has also received calls and referrals for people detained at New York City immigration courts in the past two weeks; we have had people walk into our offices seeking help; and our attorneys have obtained the information for people detained in court due to being present there and offering

7

assistance. To meet this tremendous need, we created an internal tracker of cases of people detained at immigration court appearances in that period and/or for whom DHS moved to dismiss proceedings, and who are in need of legal assistance. As of midday Friday, June 6, that list included over 60 individuals. Of these, the vast majority have a removability charge that indicates entry without inspection rather than entry with parole.

30. Beginning on May 29 and on several dates thereafter, MRNY sent legal-team members to Manhattan immigration courts to assist pro se individuals facing motions to dismiss. Our staff provided information to dozens of individuals about their rights and the nature of ICE's ongoing operation and also witnessed a high volume of detentions by ICE agents present inside the courthouses. Among those our staff witnessed be detained were a 19-year-old; a couple who told our staff they had children at home; a man whose U.S.-citizen sister pleaded with ICE officers he did not have vital medication with him; and a same-sex couple pulled from each others' arms. Staff witnessed detentions both after dismissal of cases and for individuals whose cases were *not* dismissed, despite ICE moving for the immigration judges to dismiss, either because the immigration judge denied the motion or because the judge set the case over to a future date for further consideration of the motion.

31. Our staff consistently witnessed ICE attorneys explain to immigration judges that they were seeking dismissal of the removal proceedings because of the expedited removal Rule. In some cases, our staff saw immigration judges ask pro se noncitizens whether they wanted their removal proceedings dismissed—without explaining that dismissal would facilitate ICE's strategy of then detaining and placing that person in expedited removal proceedings. Our staff has also spoken with individuals who had no understanding of the nature of DHS's motion; indeed, one woman whose proceedings were dismissed and who was then detained told an MRNY attorney

8

that DHS's motion was not even translated to her, and the judge did not ask her any questions before granting the motion and dismissing.

32. When MRNY staff have explained to pro se individuals what is happening, either before or after court, it is almost uniformly the first and only time the nature of this ongoing campaign by DHS is explained to them. Many people have begun shaking or crying and attempted to make a final call to a loved one.

33. In addition to explaining their rights to impacted individuals, MRNY attorneys have spoken directly with ICE officers. In almost every case, our attempts to intervene or explain why detention is inappropriate, including because the person's case was not dismissed or they have a future court date, have been ignored.

34. The experience of seeing individuals who are complying with their court obligations—some of whom had children at home or had not brought vital medication with them—being surrounded, handcuffed, and detained without warning or explanation has been deeply disturbing to MRNY attorneys, including experienced immigration practitioners and attorneys who regularly work with detained clients. Several of our attorneys broke down in tears; attorneys have also shared that they have suffered difficulty sleeping after observing in court.

35. On May 29, we learned that an MRNY member, John Doe 4, had court the next day. An MRNY attorney was able to accompany him to his court date at the New York - Broadway Immigration Court where ICE moved to dismiss his proceedings in order to pursue expedited removal. The case was continued without a decision and the MRNY member was able to leave the courthouse.

36. MRNY's legal team has struggled to respond to this onslaught. Exacerbating that difficulty, most detained individuals are quickly transferred out of the New York City area and are

not accessible to family members or to legal representatives for calls. We typically do not even learn their location through the ICE locator for several days, if at all. Despite the detention campaign beginning on May 21 in New York City, and MRNY attorneys beginning to observe in court on May 27, it was not until a week later that we secured our first legal calls with individuals detained. Absent or incorrect ICE locator information or delays in updates to the locator have prevented attorneys from locating or speaking with many people. For instance, on May 29, two attorneys from MRNY went to the Elizabeth Detention Center, where four individuals referred to the organization due to recent detentions, three in New York City-area courthouses, were detained according to the online ICE locator. But staff at the facility informed our team that none of the four were there anymore, even though for days afterwards several continued to show as detained at that facility on the ICE locator. Similarly, on June 5, we requested legal calls with multiple individuals whom the ICE locator showed to be at Nassau County Correctional Center only to be told by the facility they were not there. Family members of detained individuals have also told us they have not heard from their loved ones for days. On information and belief, many individuals detained in New York are initially held at the Nassau County Correctional Center which does not provide any call capabilities to ICE detainees.

37. In addition, the venue for removal cases which are not dismissed is extremely hard to track. Venue in some cases is moved; in others it has remained in New York for weeks. However, the publicly available information is unreliable and indeed some cases appear not to be venued anywhere for a significant period of time. For instance, on June 3, one of our attorneys attempted to file an opposition to dismissal for an individual detained at the Varick Immigration Court the day before. The case continued to show venue at Varick on the public EOIR portal, but the court staff informed our attorney they would not accept a motion because DHS had filed a notice of new

address. However, as of June 6 (three days later), the venue still showed at Varick. This effectively means our attorneys are not able to file an opposition because there is nowhere to file it.

38. Our member, John Doe 4, also faced significant barriers to responding to the motion. First, he was directed to respond by his next court date, which was set for August. However, the following week, an MRNY attorney checked the EOIR portal and saw the date had been moved up two months, to June 2025. This is consistent with action we are seeing in many cases where individuals were permitted to leave court and not detained: their hearing dates are now being advanced, which not only puts them *back* at risk for detention but also curtails their time to oppose dismissal with little notice. MRNY assisted John Doe 4 in preparing a pro se opposition to DHS's motion to dismiss. However, when an MRNY staff member attempted to file it at the immigration-court window, the clerk refused to accept it saying the system did not reflect a motion to dismiss, although one had been made orally and John Doe 4 had been directed to respond before his next court date. Because she insisted that the court staff review the digital audio recording (DAR), the MRNY staff member waited an hour for multiple individuals from the clerk's office to review the case, confirming the motion to dismiss was made orally, before the filing was finally accepted.

39. All of these barriers to effective response are extremely alarming because removal—or placement into expedited removal, even before the removal case is dismissed—can happen very quickly. In one case referred to RRLC on May 24, an individual detained in a New York City court on May 21 following the dismissal of his removal proceeding had already been deported when a paralegal at MRNY attempted to locate him the following business day, May 27.

40. Even MRNY members without upcoming immigration court hearings are at risk of enforcement through expanded expedited removal. Our members live in areas where encounters with ICE officers are common. Just in 2025, MRNY has assisted over 70 individuals or families

11

in the New York City area who have been detained by ICE or had a loved one detained by ICE. In the past decade, we have assisted hundreds of detained individuals who were targeted for enforcement in and around New York City. Since January, immigration enforcement has expanded from targeted raids and occasional detentions at ICE check-ins to include collateral detentions, worksite enforcement, and frequent detentions at check-ins with ICE or with ISAP.

41. MRNY has numerous members who have not been present in the United States for two years or more. These members are now at risk of placement into expanded expedited removal. Moreover, we have many members who have been present for *greater* than two years but could be subject to racial profiling and detention if they exercise their right to remain silent if they come into contact with an ICE officer.

42. Because of the communities we serve, MRNY has numerous members who would have difficulty affirmatively demonstrating two years of physical presence, particularly if suddenly detained or given only a short period of time to do so. Two of MRNY's most active committees are its Youth Power Project (YPP) and its Trans Immigrant Project (TrIP). TrIP has many transgender members, and in particular transgender women who are non-citizens, who have obtained legal name changes, which are available in New York regardless of immigration status. Some of these members may have a mix of documents with their prior and current name, and also face significant barriers in accessing documentation with their prior name.

43. Members of MRNY's Youth Power Project and other young members also face challenges in documenting presence. MRNY has assisted thousands of its members and clients apply for Deferred Action for Childhood Arrivals (DACA); many of these young people required significant time to gather documentation of physical presence in the U.S. and in some cases were

12

never able to do so because presence documents were never obtained in the young person's name, are with family members, or otherwise unavailable.

44. In addition, MRNY's members are drawn from the five boroughs of New York City, Long Island, and Westchester, where an expensive and dense housing environment means that many of our members are renters cohabitating with numerous other individuals or occupying single rooms within multi-family dwellings and do not have lease agreements or bills in their name. These members' inability to prove their addresses can make it difficult to open bank accounts or take other steps that would yield alternative documentation of presence. Undocumented members on Long Island are also unable to access any form of municipal identification.

45. MRNY members are at risk of facing significant harm as a result of the Rule. Community members we serve have expressed fear, confusion and anxiety about loss of access to their essential rights as a result of the Rule.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
Sienna Fontaine

Executed this 9th day of June, 2025

# EXHIBIT A

# DECLARATION OF MRNY-JOHN DOE 4, MEMBER OF MAKE THE ROAD NEW YORK

I, MRNY-John Doe 4, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am a member of Make the Road New York. I used to live near to the organization's Queens office; I passed by and I went inside to learn more. I have gotten a lot of help and services from the organization and I appreciate the support it offers for the immigrant community. I participate to help address the huge needs in our community, especially now.

2. I am from Ecuador. I came to the United States in October 2023. I came escaping for my life; it was not from a desire to leave my country or my family. I entered without inspection and was released on my own recognizance. My removal case was docketed and I have kept my address updated with the court. I filed an asylum application with the court in September 2024.

3. On May 30, 2025, I had a master calendar hearing at the Broadway Immigration Court in New York City. I was extremely fearful and anxious of what would happen because I saw on the news and heard from friends that people were being detained in court. Some friends told me it is better not to go but I am very respectful of the law. I called an organizer with Make the Road the night before. He connected me with an attorney who met me at the court the next morning.

4. At my court hearing, I went to the front and from what I understood, the attorney for the government wanted to end my case. The immigration judge asked me if I wanted more time and I said yes. The judge gave me a new date in August 2025. I saw three other people this happened to as well.

5. I am extremely scared of being detained and losing my chance to apply for asylum. I have tried to do everything correctly here. If the law has changed, I do not understand why it is retroactive to me because when I came here I was put into removal proceedings before the immigration court; I was not put into expedited removal. It is causing me immense anxiety.

6. I want to remain anonymous because I am terrified that I may be targeted for expedited removal or detention.

I hereby declare under penalty of perjury that the foregoing is true and correct.

>/s/ MRNY-John Doe 4
>MRNY-John Doe 4

>Executed on June 2, 2025 in Queens, NY

# EXHIBIT B

## DECLARATION OF MRNY-JANE DOE 2, MEMBER OF MAKE THE ROAD NEW YORK

I, MRNY-Jane Doe 2, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am a member of Make the Road New York (MRNY). I joined MRNY because the organization has helped my family a lot and I appreciate their work and support for the rights of immigrants in this country. I have come to MRNY's office in Queens several times and I have talked with different staff members from the organization.

2. I am from Venezuela. I came to the U.S. with my partner and our children, fleeing for safety because of the persecution and threats we faced from government-aligned gangs. We entered the United States in March 2024 through El Paso, Texas. My family and I entered without inspection and were released on our own recognizance the next day.

3. Our removal case was docketed with the immigration court and we are still in removal proceedings now. My next court date is scheduled for later this year in New York City.

4. I am extremely fearful of being placed into expedited removal proceedings. I have two children. After we entered the U.S., my husband was detained by ICE and he currently remains in ICE custody. I am extremely scared of being detained and separated from my children, who would have no one to care for them. I am also scared of losing my opportunity to apply for asylum and to include my children as derivatives on my asylum application and of not having the opportunity to testify and share my story with an immigration judge. I am very fearful of returning to Venezuela and do not want to lose those rights.

5. My family and I have tried to do everything correctly. We applied for asylum within our first year here; we got employment authorization; and we attended our appointments with ICE. My 10-year-old daughter is extremely traumatized by her father's detention. Her school has begun offering her therapy because of how upset she is.

6. I want to remain anonymous because I am terrified that I may be targeted for expedited removal or detention and separated from my children.

I hereby declare under penalty of perjury that the foregoing is true and correct.

*/s/ MRNY-Jane Doe 2*
MRNY-Jane Doe 2

Executed on May 30, 2025 in Queens, NY