## DECLARATION OF RACHEL LEVENSON

1.      My name is Rachel Levenson and I am a lead immigration attorney at Make the Road New York. I am based in our Brooklyn office, located at 301 Grove Street, Brooklyn, NY 11237. I specialize in immigration cases including representation of noncitizen clients before the immigration courts and USCIS. I am admitted as an attorney in New York State. I am fluent in Spanish.

2.      On May 29, 2025, I was present in the New York-Federal Plaza Immigration Court for much of the day and on May 30, 2025, I was present at the 290 Broadway Immigration Court, also for much of the day. I also was present at 290 Broadway Immigration Court for much of the day on June 4, 2025 and at New York – Federal Plaza Immigration Court for much of the day on June 5, 2025.

3.      Each day, I observed proceedings in several different courtrooms and provided assistance to numerous pro se individuals attending their master calendar hearings for whom DHS moved to dismiss their removal proceedings. I also provided information, advice and assistance to individuals at risk of dismissal of their proceedings and detention.

4.      My experience in the courts was unusual and shocking. Dozens of ICE agents were present throughout the courts including in the hallways immediately outside the door where the hearings were taking place as well as by the elevator banks including freight elevators.

5.      In my nearly 7 years practicing as an immigration lawyer, I have only once heard of an arrest at Immigration Court. But this week and last week, I witnessed multiple arrests and swarms of ICE agents preparing to perform even more arrests.

6.      This experience was extremely intimidating for the immigrants appearing at their scheduled court hearings as well as for me.

7.      On Thursday, May 29, 2025, I stepped out of the elevator on the 12th floor of 26 Federal Plaza, and I immediately observed ICE detain two people. I tried to get the contact information of the people detained but one did not speak any English. The other was only 19 years old. He spoke enough English to give me his A number (his DHS-assigned registration number) but the ICE officers would not let me talk to him to collect more information. He was alone and looked absolutely terrified as they whisked him into the elevator. I later looked up his A number and

learned that he is charged under INA 212(a)(6)(A)(i), 8 USC 1182(a)(6)(A)(i), indicating entry without inspection, and that his case had been dismissed in Immigration Court by IJ Tiesha Peal that day. I saw him being detained right outside the courtroom and it is my understanding he was detained as soon the hearing ended.

8.      Observing proceedings in Immigration Judge Peal's courtroom that morning, I heard the attorney for DHS move to dismiss several cases. Initially when DHS moved to dismiss, the attorney gave no reasoning for the motion besides stating that DHS was moving to dismiss. Only after I attempted to speak up and intervene did the DHS attorney cite to the dismissal regulation. But even then, the DHS attorney did not give any individualized reason why DHS was moving to dismiss the proceedings of that particular respondent. I then heard the IJ explain to that and other pro se respondents that DHS was moving to dismiss their asylum applications which would mean they would not have an asylum application pending before the court anymore but they could affirmatively file for asylum with USCIS if they wanted. Obviously, since DHS's intent in seeking dismissal was to place people into expedited removal, that was incorrect.

9.      At no point did I hear IJ Peal explain to the pro se respondents that ICE would place people into expedited removal proceedings or that after dismissal ICE agents would detain them in the hallway, as ICE had done for the 19 year old and the other man I observed outside her courtroom by the elevators when I had arrived.

10.     I observed two more motions to dismiss and collected information for both respondents. Both are charged under INA 212(a)(6), 8 USC 1182(a)(6), indicating entry without inspection. The judge set both cases over without a decision and neither respondent was detained. However I understand that colleagues of mine were in the courthouse that day and ICE detained other people for whom motions to dismiss were made, even when the IJ did not grant the DHS's motions to dismiss.

11.     On Friday, May 30, 2025, I went to the Broadway Immigration Court at 290 Broadway to accompany a member of Make the Road New York who had a court appearance and who has been in the U.S. for under 2 years. He entered the country without inspection and had applied for asylum. I was present when DHS made a motion to dismiss his case on the basis of changed circumstances. The judge did not make a decision but set a new hearing in August 2025 and instructed him to respond by then. The following week, the hearing date was suddenly advanced to June 2025, less than two weeks away.

12. On the same date that I accompanied the MRNY member, I learned while in court that ICE had been waiting for people in the lobby and detaining them as they exited the elevator to leave the building. As there was only one exit to the building, people were trapped when the elevator doors opened. I later learned that ICE was also using a freight elevator to transport people. On the day I was at 290 Broadway Immigration Court, I saw ICE on the same floor as the courtrooms and detaining people there.

13. Everyone I observed in the waiting room for a master calendar hearing was unrepresented. None appeared to have any information about expedited removal or their rights should DHS seek to dismiss their proceedings.

14. In the next courtroom I entered, that of IJ Fayaz Habib, DHS identified a total of 6 individuals by A number for whom it would seek dismissal, out of around 20 people total in the courtroom. There were approximately four to six ICE agents in the hallway outside the courtroom waiting for the end of the court proceedings.

15. With the IJ's permission, in small groups, I spoke with the individuals that DHS was seeking to dismiss their cases. The first groups were Spanish speaking. I explained the situation to a group of men, the youngest of whom was 19 years old. When I told them that the government was seeking to detain and put them into rapid deportation proceedings, I witnessed true panic and horror on their faces. One man appeared to have a panic attack in front of me. I took photos of their documents and asked for emergency contact information. The 19-year-old took out his phone and I saw that his emergency contact was listed in his phone as Mi Vida ("My Life" in Spanish). Several of them quickly texted loved ones or made brief calls to say goodbye. In total, over these first two days observing in court, I collected names and A numbers for 14 individuals whose proceedings DHS moved to dismiss. Later that afternoon, I assisted several more individuals for whom DHS moved to dismiss their cases. Using publicly available EOIR information, I confirmed that 11 of those individuals were charged with removability under INA 212(a)(6)(A)(i), which is the charge for entry without inspection or presence in the U.S. without authorization. That is not a charge used against individuals who entered the country through an appointment with CBP One and were released on parole.

16. Many noncitizens and even immigration judges did not understand what was happening, what their rights were, or the possibility of opposing DHS's motions to dismiss. One individual for whom I witnessed DHS file a motion to dismiss on Thursday May 29, whom the IJ gave time

to oppose the motion, left the court and came to an MRNY office the next day (May 30) for assistance. Although he had an interpreter present in court, it was evident when he came to our office that he did not understand what had occurred, as he informed my colleague that he believed his case was going to be closed due to inadequacies in his asylum claim. Only because I was present in court and witnessed DHS's oral motion was I able to confirm that in fact DHS had moved to dismiss proceedings to seek expedited removal. He otherwise would not have known or understood that nor been able to respond.

17. On June 4, 2025, I returned to immigration court to observe and provide assistance. I went to 290 Broadway Immigration Court to the 15th floor to the courtroom of Immigration Judge ("IJ") Anna Diao. I saw that ICE officers were waiting outside IJ Diao's courtroom. I soon witnessed a pro se person exit the courtroom behind me. As soon as he stepped out, ICE agents surrounded him and whisked him into a freight elevator. It happened quickly and silently.

18. I spoke with several unrepresented individuals outside the courtroom. The first people I spoke with were a couple from Ecuador. They each had already filed for asylum and the woman in the couple was over 8 months pregnant. I identified that they had arrived within the last two years, explained the risk of expedited removal to them and encouraged them to ask for more time if the government made a motion. After the couple was called into the courtroom, I asked the ICE officers directly if they planned on detaining the pregnant couple and asked what their plans were for family units. The officer told me that they would not be detaining the pregnant woman but did not answer when I asked about her boyfriend.

19. I went back into the courtroom and as I walked in, I saw a written decision from the IJ ordering the pregnant woman's boyfriend's case dismissed. I reviewed the paperwork which noted that he has opposed dismissal but the IJ had granted it anyways. I approached the bench and addressed the court, explaining that the couple was pregnant and sought reconsideration of the dismissal order. The IJ looked to the attorney for DHS for its position and when the DHS attorney objected, the IJ denied my request for sua sponte reconsideration. I asked if I could enter a limited appearance and make a motion. The IJ said she would take the motion but would not adjudicate it that day. I stated that ICE was waiting outside the courtroom to detain him based on the dismissed case but the IJ did not change her position.

20. I informed the couple that the fact that the case was dismissed meant that the man would be detained by ICE. They sat in the courtroom, crying. Tears streamed down the woman's face

and they both expressed confusion about how this could be happening given that they had filed for asylum and were about to have their first child. I approached a law enforcement officer working with ICE in the courtroom and the ICE officers outside and pleaded with them to not separate this young family.

21. When the expectant mother's case was called, she pled with the IJ to help her husband. I also approached the ICE attorney to show that the husband had a valid parole document and thus was not lawfully subject to expedited removal but the ICE attorney did not change her position. The IJ dismissed the case on DHS's motion.

22. The IJ continued with her docket and continued to grant the DHS attorney's oral motions to dismiss based only on the DHS attorney citing to the dismissal regulation and the January 21, 2025 notice in the federal register regarding expedited removal. At no point did I hear the lawyers for DHS state any reason specific to any respondent as to why they dismissed the case.

23. Another couple that I met who were subject to these motions were a gay couple, each of different nationality, and had been together for over seven years and feared persecution. They had only arrived several months ago and had not yet filed for asylum but intended to do so. I also spoke with a person who stated to the Immigration Judge that he has a U.S. citizen wife, they had been married for two years, he had applied for asylum and that he wanted more time on his case. He told the judge that if he were detained and deported, his wife would be left alone as a single mother. I spoke with this man after his case was called and he told me that he had been in the U.S. for three years and had entered at the border without inspection. He explained that he first had contact with immigration when pulled over while driving in Maine in January 2025. He presented to me a copy of his driver's license which confirmed his narrative as it was issued in September 2022. He also explained that he and his wife were marking their two-year wedding anniversary the next day.

24. With a copy of the man's license in hand, I approached the ACC and asked her to reconsider her position. I also addressed the IJ and explained the man could not be subject to expedited removal given his long residence. The IJ asked the ACC what her position was and she told me that the I-213 (arrest record) on file showed a different date and indicated she would oppose if the IJ sua sponte reconsidered her decision. The IJ did not reconsider her decision. That individual was subsequently detained by ICE agents and, 48 hours later, there was still no location for him listed on the ICE locator.

25. My colleague, attorney James Lopez Olvera was also present and spoke to another respondent who was unrepresented and whose case was dismissed. This man stated he also was married to a U.S. citizen and that he had mailed his asylum application days before his hearing and had a copy with him. My colleague went to try to file his application at the clerk's office to make sure it was on file but the clerk told him he could not file because the system already showed that his proceedings were dismissed.

26. Once the judge finished her docket, she ordered everyone to clear her courtroom. Once outside in the hallway, ICE officers conducted four arrests, separating the gay couple who were in tears as they were pulled apart. Given the fact that they are nationals of different countries, they are likely to face a lengthy separation. As noted above, the spouse of a U.S. citizen who has been present in the U.S. for three years was also detained.

27. On June 5, 2025, I returned to court to observe and assist when permitted. On this day, I primarily went to 26 Federal Plaza to the 12th and 14th floors where hearings are being held. When I went to one courtroom's waiting room, I immediately observed a plainclothes ICE officer sitting among the people present. I also saw approximately five ICE officers in the hallway.

28. I went to several different courtrooms to offer my assistance to unrepresented persons. I also spoke with other lawyers and advocates there that day who observed that the hallways were teeming with ICE agents. I went to IJ Amiena Khan's courtroom where I observed DHS move to dismiss one case and observed IJ Jonathan Reingold's courtroom where the DHS attorney informed me that she had moved to dismiss several cases earlier that day but had not moved to dismiss other cases.

29. The aftermath of these detentions has been extremely disturbing. As I noted above, many people do not have a detention location identified on the ICE locator for several days. I understand that many people may be detained for days at 26 Federal Plaza, in crowded conditions unsuitable for prolonged detention. Attorneys are not provided access to speak with detained persons at 26 Federal Plaza. Other people are detained at Nassau County Correctional Center, which does not provide for visits or phone access for ICE detainees.

30. In the case of the 19-year-old I saw detained on May 29, I tried to track him via the ICE Detainee Locator for several days so that I could try to schedule a legal call with him; make sure he knew he has a right to request a credible fear interview; and see if he wanted me to assist him

in moving the IJ to reconsider their decision. I had no way of locating or contacting him. It took over 72 hours after his detention for him to appear on the ICE Detainee Locator. I also entered a Form G-28 Notice of Appearance with ICE but was not provided a location or any contact information for him for the first 72 hours. After several days, his location appeared on the ICE Detainee Locator and showed he was in Louisiana. I promptly requested a phone conference with him, but the earliest time given to me was June 6, 2025, over a week after his detention.

31. On June 6, 2025, I finally spoke with him. He told me he was abandoned by both of his parents in his home county of Guinea where he is part of an ethnic minority called the Fulani people. He told me that he fears return to his home country where he received death threats from police officers and experienced other mistreatment.

32. I asked him if he understood what happened to him in court. He stated he believed he had a court date in August. I explained that this was incorrect and that his case had been dismissed by a judge. I also asked if an officer had asked him if he has a fear of return to his home country. He said he was only asked if he was willing to sign for his deportation and was not once asked about any fear of return.

33. Based on the facts he told me, it is my assessment that in addition to his prime facie eligibility for asylum, he also is eligible for Special Immigrant Juvenile Status.

34. In the case of the MRNY member for whom I witnessed DHS make a motion to dismiss on May 30 and whom I heard the IJ instruct to respond before his next court date, a colleague of mine went to file a written opposition to the motion to dismiss in person at the immigration court a week later. But the court would not accept the filing because it had no indication of a pending motion to dismiss. My colleague remained at the court for over an hour after repeatedly requesting that the clerk's office review of the Digital Audio Recording; only after multiple clerks reviewed the recording was the opposition finally accepted. Obviously, that type of advocacy would not be possible for most pro se respondents.

35. My colleague had the same experience attempting to file an opposition for another individual at 26 Federal Plaza the same day: the clerk at the window would not accept the filing, despite the Immigration Judge's instruction that an opposition be filed before the next court date, and it was only after my colleague insisted on review of the audio that the opposition was accepted.

I declare under penalty of perjury that the foregoing is true and accurate to the best of my knowledge.

Signed:                                                                                        June 9, 2025

*[signature]*

Rachel Levenson, Esq.
Lead Immigration Attorney – Brooklyn
Make the Road New York