## **DECLARATION OF ARIEL SIMS**

1. My name is Ariel Sims and I am an Immigration Staff Attorney at Make the Road New York. I am based in our Brooklyn office, located at 301 Grove Street, Brooklyn, New York 11237. I am admitted as an attorney in New York State and I am fluent in Spanish.

2. On May 30, 2025, I went to New York Immigration Court at 26 Federal Plaza in Manhattan in order to observe, document, and try to intervene in the recent pattern and practice of the Department of Homeland Security (DHS) seeking to dismiss individuals' regular removal proceedings during their court appearances and subsequently arrest and detain these individuals outside of the courtrooms to subject them to expedited removal.

3. I entered 26 Federal Plaza with a volunteer seeking to assist individuals at risk of being subjected to expedited removal, as well as a *pro se* noncitizen who I met that morning and who feared attending his 10:00 AM Master Calendar Hearing because he thought he would be arrested and detained given he had been in the country for less than two years. Once inside, we connected with another volunteer. The noncitizen had a hearing on the 14th floor, and so the four of us headed there and entered his assigned courtroom with his assigned immigration judge (IJ).

4. I remained in that IJ's courtroom for approximately four hours. During that time, I watched Master Calendar Hearings of approximately 25 noncitizens. I do not believe any of the noncitizens were accompanied by counsel. DHS requested the dismissal of three cases, and two noncitizens were detained upon leaving the courtroom.

5. Our plan was the following: Whenever DHS conveyed their intent to dismiss a noncitizen's case, I would direct the two volunteers to collect certain information about that noncitizen immediately after the hearing and accompany them out of the courtroom, in case ICE planned to arrest the noncitizen.

6. The first dismissal request happened almost immediately after I entered and sat down in the courtroom. From the courtroom audience, I stood up and asked to appear as a friend of the court and asked DHS to file its motion to dismiss in writing in order for the noncitizen to have adequate notice and the opportunity to retain counsel and respond. The IJ denied my request. However, the IJ said that he would not make a

decision on DHS's motion to dismiss "right now on the spot" and he would take the next week to "look into the request." The IJ rescheduled the noncitizen's hearing to June 6, 2025, to give himself time to review the dismissal request. A volunteer collected the noncitizen's information, though fortunately that noncitizen was able to leave the courtroom without ICE arresting him.

7. In the second instance, DHS requested the dismissal of removal proceedings for a French-speaking noncitizen from Guinea. The DHS attorney cited the reason for the request as "changed circumstances" under CFR 239.2(a)(7). The IJ responded by noting that the individual had already filed an application for asylum and asked what would happen to their asylum application. The DHS attorney did not directly answer the IJ's question, and instead described DHS's intention to place the noncitizen in expedited removal proceedings. The IJ again stated that he needed more time to review DHS's request, particularly the cases cited by the DHS attorney in his request, and that he would "pause the hearing" for today and reschedule the individual's hearing for June 6, by which point he would make a decision on DHS's motion.

8. This noncitizen was accompanied by two acquaintances hoping to help prevent his detention. I collected the noncitizen's information from the two acquaintances and communicated through them that the noncitizen was at risk of detention outside the courtroom. I instructed the two acquaintances to leave the courtroom alongside the noncitizen, write down anything that happens, and make sure that he vocalizes his fear of returning to Guinea. I followed the three of them out of the courtroom, and then watched from afar as they continued toward the elevator. Waiting in the hallway were three adult males standing several feet apart from each other, all dressed in dark plain clothes. I quickly realized the three men were ICE officers. As the noncitizen and his two acquaintances made their way past each ICE officer, each officer would turn and follow the group down the hallway. They were then met at the elevators by another handful of ICE officers. One officer put his hand on the noncitizen and made a move to handcuff him, after which he said he had a warrant, though he refused to show it upon being asked by one of the acquaintances. The acquaintance asked where they were taking him but they refused to answer. As the elevator closed, the acquaintances began to get emotional.

The individual looked emotionless and in shock, almost in disbelief as to what had just happened.

9. Outside the courtroom in the hallway, I discussed next steps and possible outcomes with the individual's acquaintances, and we began to write down everything that had just happened. A few of the ICE officers returned to the hallway but kept their distance from us. I assumed they were outside to monitor our conversation, but then I saw another noncitizen leave the same courtroom, and as he passed by each nonchalant officer in the hallway, one by one the officers turned and followed him down the hallway and toward the elevator, at which point he was arrested. I videoed the arrest.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED: June 9, 2025
Brooklyn, NY

_____
Ariel Sims