**Declaration of Gillian Rowland-Kain**

I, Gillian Rowland-Kain, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am Interim Director of Programs at the Immigrant Advocates Response Collaborative ("I-ARC"). I-ARC is a coalition of immigration legal advocates that works on increasing access to justice and access to counsel for all immigrant New Yorkers. I-ARC networks New York State's legal service providers by facilitating communication and information sharing to better support our immigrant communities; responds collectively to challenges as they arise by coordinating resources and fostering best practices among providers; and challenges anti-immigrant policies by shining a light on injustices and confronting inequalities faced by our communities in the legal system.

2. In my capacity as Interim Director, I oversee the Legal Access and Membership and Capacity teams. My primary responsibilities include managing the day-to-day operations of the programs team, including facilitating team meetings, serving as the primary liaison between the programs team and organizational leadership, and overseeing the execution of key initiatives. I also lead I-ARC's rapid response efforts and other legal access programs such as the Friend of the Court initiative.

3. I-ARC operates its Friend of the Court Program to meet the needs faced by our member organizations and the overwhelmed immigration court system. The Friend of the Court ensures newcomers have access to legal help, orientation, and referrals when they appear before an immigration judge ("IJ"). Our model allows volunteers to assist *pro se* respondents in navigating the complex immigration court system, and thereby creates greater efficiency and fairness by helping respondents better understand court proceedings.

4. Our Friend of the Court programming runs at the immigration courts at 290 Broadway, New York, NY on Thursday mornings and 201 Varick Street, New York, NY on Tuesday mornings. Friend of the Court volunteers assist *pro se* respondents and conduct a brief screening, assist with change of address forms, answer questions respondents may have, and stand with them during their initial hearing to help resolve any administrative issues preventing the case from moving forward.

5. Beginning on May 21, 2025, I-ARC began receiving reports from member organizations of arrests at two of the three New York City Immigration Courts (290 Broadway and 201 Varick Street) and the Buffalo Immigration Court. I-ARC's members noted that the Office of the Principal Legal Advisor ("OPLA") was moving to dismiss proceedings if the individual was apprehended within two years of entry into the US and/or for individuals who have been in the US for longer than one year and who have not yet filed

an application for relief. Initial reports indicated OPLA appeared to be alerting Enforcement and Removal Operations ("ERO") before they moved to dismiss so ERO could target individuals for expedited removal. ERO officers were reported in both uniform and in plain clothes in the hallways and/or outside bathrooms of the courtroom buildings. Member organizations reported that four *pro se* individuals were detained at the Buffalo immigration court, and an additional four *pro se* individuals were detained at 290 Broadway on May 21, 2025.

6. As a result, I-ARC organized our Steering Committee, made up of fourteen non-profit legal service providers and pro bono law firm representatives, to determine how we, as a coalition, could be responsive to the needs *pro se* individuals are now facing when lawfully appearing for their scheduled immigration hearings. The following week, additional reports continued to be shared amongst the I-ARC networks of further arrests at all three of the New York City Immigration Courts and the Buffalo Immigration Court.

7. On May 29, 2025, I was present at 290 Broadway to observe master calendar hearings before IJ James M. McCarthy as part of our Friend of the Court program. I observed counsel for the government move to dismiss the removal proceedings of four individuals, and ICE officers arrest and detain three of those individuals after their court hearings.

8. Before the master calendar hearings began, the Clerk of Court informed me that the removal proceedings of all the respondents scheduled for their initial hearings would be dismissed. I clarified if their cases were being dismissed so that the respondents could be placed in expedited removal. The clerk responded, "yes." I asked if the *pro se* respondents would then be detained by ERO. The clerk responded, "yes," and shared that ERO was waiting by the elevators. I mentioned I had not seen the ERO agents, and the clerk stated they were in plain clothes. This exchange made clear that the government had informed the immigration court *ex parte* that it intended to seek the dismissal of respondents' removal cases, place them in expedited removal, and detain them.

9. IJ McCarthy heard seven cases that morning. In all of the cases I-ARC assisted, the respondents were unrepresented and proceeding *pro se*.

10. Once the hearings began, the Assistant Chief Counsel ("ACC") appearing for the government did not provide her name on the record, and IJ McCarthy declined to require that the ACC provide her name. At the conclusion of the hearings, I asked the ACC what her name was, and the ACC stated that she would not tell me. The IJ asked what was going on, and when I explained, he said that was between us and he would not get involved. The ACC has since been identified as ACC Cosette Shachnow.

11. In four of the seven the cases heard that day, ACC Shachnow orally moved to dismiss the respondents' ongoing removal proceedings. (For the cases not dismissed, there were two family units and an individual who changed venue). The government had provided no notice of its intention to move to dismiss to the respondents prior to the hearing. When the ACC made the first motion to dismiss, IJ McCarthy asked if the ACC had submitted a written motion; she replied no. The IJ then asked if there was a reason she did not do so, and the ACC replied, "no," and the IJ did not press the matter further. By May 29, it was generally known—based on public statements by the Trump administration and the events in immigration courts both in New York and nationwide—that the government was seeking the dismissal of removal proceedings in order to place individuals in expedited removal. However, when asked by IJ McCarthy for the grounds of her motion to dismiss, the ACC stated only that it was no longer in the best interest of the government to continue removal proceedings. In one query, the IJ asked the ACC what circumstances had changed, and she simply replied, "circumstances." The ACC did not inform any of the respondents of the government's intention to detain them or to place them in expedited removal.

12. For each individual, after confirming the individual's address was correct and marking the Notice to Appear ("NTA") as an exhibit of the court, the IJ, in an atypical move, then asked the ACC if the government wanted to make a motion—further evidence of the apparent *ex parte* communication. Where the ACC moved to dismiss, the IJ granted the respondent ten (10) days to respond in writing. The IJ encouraged each respondent to talk to a lawyer about the government's motion and stated there would be legal ramifications for their failure to respond. However, the IJ did not explain that the respondent faced potential arrest and detention or placement in expedited removal—despite widespread knowledge that the government was engaged in such activity.

13. For each of the four individuals the government had moved to dismiss, the IJ set individual hearings for late 2026 and early 2027. Each of four individuals was *pro se* and was extremely nervous and concerned about their cases, and asked for more time to find an attorney to help them complete the process. One individual explained that he had recently been hit by a car and needed more time.

14. One of the individuals—a person from Ecuador—admitted on the record that they had entered the country without inspection in Arizona in 2023.

15. Three of the four individuals whose proceedings the government moved to dismiss had asylum applications pending in the immigration court.

16. After the hearing, U.S. Immigration anad Customs Enforcement ("ICE") officers—who had stationed themselves in the elevator and lobby areas of the courthouse—arrested three respondents whose proceedings the government had moved to dismiss. The officers were waiting in the lobby with both printed photos and photos on their phones of the respondents. As the Friend of the Court team exited the elevators at around 11:20am with the respondents from the hearing, ICE referred to a list and their photos and immediately surrounded the three respondents as we were escorting them to the exit. The ICE officers separated the respondents, brought them to a corner where they zip-tied their hands, and escorted them to a confined area of the building in an unknown location. While I was in the lobby, a male respondent from a different courtroom who was attempting to exit was also arrested and yelled, "Film this! I have family in the Bronx."

17. ICE's arrests in the immigration court have caused significant fear in the immigrant community. This is entirely unprecedented activity in New York's immigration courts. As a result of ICE's actions, we have seen a stark decrease in the number of respondents we help each week through our Friend of the Court program. For example, in prior months, we would easily assist between forty to sixty *pro se* individuals on IJ McCarthy's Thursday Master Calendar Hearings; however, on May 29th, there were merely seven individuals and family units who appeared. This is the same pattern across the other courtrooms we regularly assist with Friend of the Court. I have never witnessed this level of fear among immigrant clients in my two years of practicing immigration law. Those noncitizens who do not appear for their immigration court hearing may receive removal orders *in absentia*.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 2, 2025

_____
Gillian Rowland-Kain