# DECLARATION OF LISA KOOP
# NATIONAL DIRECTOR OF LEGAL SERVICES
# FOR THE NATIONAL IMMIGRANT JUSTICE CENTER

I, Lisa Koop, certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.

1. My name is Lisa Koop. I am the national director of legal services at the National Immigrant Justice Center (NIJC), registered as a nonprofit organization under the name NIJC, NFP. NIJC's mission is to establish and defend the legal rights of immigrants and to transform the immigration system into one that affords equal opportunity for all. I have worked with NIJC's legal services teams since 2006.

2. NIJC is a national organization headquartered in Chicago, Illinois. NIJC is the primary organization dedicated to providing legal orientation, consultations, and application support to unrepresented individuals appearing before the Chicago Immigration Court through NIJC's Immigration Court Helpdesk. NIJC also sometimes assists asylum seekers and other immigrants who face removal proceedings around the southern border.

**A. The Recent Practice of Dismissing Regular Removal Proceedings (or "240 Proceedings") to Place People in Expedited Removal**

3. The Chicago Immigration Court is split between two locations: a primary location at 55 E. Monroe Street, Suite 1500, Chicago, and a second location at 536 S. Clark Street, Chicago. There are currently about 15 Immigration Judges (IJs) assigned to the Chicago Immigration Court.

4. NIJC runs an immigration court helpdesk to respond to questions, both telephonically and in person, posed by pro se individuals. The helpdesk was developed to provide high volume legal services to unrepresented immigrants. NIJC attorneys explain the legal process to pro se individuals, orient them to immigration forms, and explain how to file for legal remedies. NIJC has been doing helpdesk work at the Chicago Immigration Court for more than 10 years.

5. To my knowledge, NIJC has never seen attorneys for the Department of Homeland Security (DHS) seek dismissal of cases in removal proceedings for the purpose of placing people into the expedited removal process. I am also not aware of a single instance of NIJC observing Immigration and Customs Enforcement (ICE) agents taking a person into custody at their removal hearing in the absence of new adverse information, such as a criminal conviction.

6. On May 21, 2025, NIJC received reports that ICE agents were arresting noncitizens at the Chicago Immigration Court. An NIJC attorney went to the Chicago Immigration Court and ascertained that DHS attorneys were orally moving for dismissal of cases. Initially, the DHS attorneys stated the basis of dismissal was government convenience. They then stated they were seeking dismissal to place people into expedited removal. DHS attorneys sought dismissal in some cases where a noncitizen had been present in the United States for less than two years.

7. These motions by DHS attorneys were made at master calendar hearings. In the cases where DHS attorneys moved for dismissal, detention of the individual usually followed. A plainclothes ICE agent in the courtroom appeared to send a message on their phone to ICE agents who were waiting outside the courtroom. The ICE officers in the hallway then arrested the individual.

8. In some cases that NIJC attorneys observed, IJs gave the individuals time, generally ten days, to respond to the DHS attorney's motion to dismiss and did not immediately grant the motion. NIJC did not see any judge refuse the motion based on DHS's failure to file it in advance of the proceeding, even though the Immigration Court Practice Manual instructs motions to be filed in advance in non-detained cases. *See* Immigration Court Practice Manual § 3.1(b). NIJC is aware of two cases where IJs granted dismissal. Even where IJs did not immediately grant dismissal for purposes of placement into expedited removal proceedings, ICE agents nonetheless detained individuals where DHS made such motions.

9. NIJC attorneys quickly organized to provide people appearing before the Chicago Immigration Court with information about their rights and the ICE arrests. NIJC returned to the courthouse on subsequent days and continued observing this process and advising noncitizens of their rights. Over the course of about a week, NIJC staff observed DHS attorneys seeking dismissal to pursue expedited removal in front of various judges in at least four different courtrooms.

10. Nearly every day since May 21, 2025, NIJC attorneys have seen ICE agents at the Chicago Immigration Court, which is outside the norm. On most days, NIJC attorneys observed at least one ICE agent assigned to monitor master calendar hearings while three agents, all in plainclothes, were stationed in the hallways outside the court rooms to arrest individuals.

11. The majority of individuals who were detained by ICE agents were not represented by attorneys. NIJC attorneys attempted to provide these individuals with basic information about their rights before and after their hearings. However, it was not possible to provide detailed information to these individuals before their detention because ICE agents would quickly arrest and move individuals from public areas of the court.

12. In the first week of observing this new trend, NIJC attorneys observed at least 10 people face dismissal and detention on this basis. This number likely reflects only a fraction of the people who experienced this process because NIJC has limited capacity to send attorneys to observe court. Moreover, NIJC usually does not assign NIJC attorneys to specific courtrooms. Instead, NIJC attorneys generally interact with people one-on-one outside of the courtrooms. To observe and advise on these issues, NIJC attorneys had to go into specific courtrooms, meaning NIJC attorneys could only observe one master calendar hearing docket at a time, even though multiple were occurring at the same time.

13. ICE arrests in the Chicago Immigration Court have caused significant fear, confusion, and distress. NIJC attorneys saw multiple people separated from their loved ones.

14. For example, ICE agents detained a young woman who appeared to have been granted parole to enter the United States with her family through the CBP One application. She appeared to have filed an application for asylum. Though the IJ did not grant the DHS attorney's motion to dismiss, ICE agents detained her. Her family waited for her outside of the courtroom for hours and only learned her whereabouts after she was finally permitted a phone call from ICE custody later that night. Her family reports worrying for the safety of their daughter, who must now proceed with her case while detained and isolated from her loved ones.

15. In another example, ICE agents detained an Arabic-speaking man who also appeared to have filed an application for asylum. ICE agents took him into custody even though the Court had not dismissed his proceedings. ICE officers separated him from the relative who had accompanied him to court and refused to answer many of that relative's questions. From what NIJC attorneys were able to observe, ICE also did not interpret any of their statements to the man into Arabic.

16. The ICE arrests—as well as the noticeable presence of ICE agents near the entrance to and in the hallways outside of the Immigration Court—appear to have already caused people to miss their Immigration Court hearings. Indeed, NIJC's helpdesk telephone line has already received calls inquiring as to whether it is safe to appear in court.

17. Noncitizens who do not appear for their Immigration Court hearing can be issued removal orders in absentia. If the individual does not move to reopen the in absentia removal order—a process which requires legally complex arguments and, often, attorney assistance—the person can be removed from the United States without even seeing an IJ.

B. **Ongoing Issues with Expedited Removal**

18. The latest developments in the use of expedited removal are particularly alarming given that DHS appears to be using expedited removal to disincentivize appearance in court and to target people who already have pending applications before the court. These issues are in addition to problems with expedited removal that have long existed.

19. During the first Trump Administration, NIJC worked in San Diego, California in collaboration with the Federal Defenders to conduct intakes and consultations with people facing expedited removal or reinstated removal proceedings following a conviction for illegal entry or reentry under 8 U.S.C. §§ 1325-1326.

20. In addition, NIJC has a long collaboration with the Border Project in Laredo, Texas, which provides Know Your Rights information and helps people prepare for the credible fear process as they face expedited removal. I was most recently in Laredo, Texas working with detained asylum seekers subjected to credible fear and reasonable fear processes in May 2025.

21. Through these experiences, NIJC has observed at least four problematic trends with respect to the expedited removal process.

22. First, NIJC has regularly encountered people who report that, although they expressed that they were afraid to go back to their country of origin, Customs and Border Protection (CBP) officers did not refer them for a credible fear interview.

23. For example, NIJC staff members have reviewed cases where CBP agents engage in adversarial questioning and conclude no asylum claim is present. NIJC staff have also reviewed cases where CBP agents made affirmative assessments about the merit of a person's claim and declined to refer cases for credible fear screening based on an incorrect view of the legal standards for asylum.

24. Even in circumstances where NIJC attorneys have tried to affirmatively raise the fear on behalf of a person, NIJC's requests have been ignored. In fact, NIJC represented individuals in litigation about the right to seek asylum at the border only to have one of NIJC's plaintiffs removed despite repeated efforts to secure a credible fear interview and despite a sworn statement in the litigation expressing fear and a desire to seek asylum. *See I.A. et al. v. Barr et. al.*, No. 1:19-cv-02530 (D.D.C.) (consolidated with *Capital Area Immigrants' Rights Coalition et al. v. Trump et al.*, 471 F. Supp. 3d 25 (D.D.C. 2020).

25. The problem of ignoring fear claims became even more pronounced under the Securing the Border Rule, which allowed officers to refrain from asking people about their fear and to refer people for the credible fear process only if they affirmatively manifested a fear of persecution or torture. *Las Americas Immigrant Advocacy Ctr. v. DHS*, --- F. Supp. 3d ---, 2025 WL 1403811 (D.D.C. May 9, 2025). That manifestation standard has since been invalidated by a federal court. *See id.*

26. Second, NIJC regularly represents clients whose expedited removal paperwork contains inaccurate information. I and other NIJC attorneys have seen arrest documentation forms, like Form I-213, that state that an individual came to "live and work" in the United States and that they have no fear of return. Many clients have refuted those statements, and in many cases the language appears to have been copied and pasted from a different document. In some instances I have reviewed, such language has been attributed to non-verbal young children. In other cases, NIJC clients report they have never heard of the city or town listed as their intended destination.

27. In one troubling situation, NIJC represented an individual who was subjected to expedited removal despite having lived in the United States for more than a decade, based on inaccurate information documented on his arrest paperwork. Elvin Alvarado-Vega was born in Honduras, but he had resided in the United States since around 2006. He had more than 10 years of continuous presence in the United States, U.S. citizen children, a father who is a U.S. citizen, and a wife who was a Deferred Action for Childhood Arrivals (DACA) recipient when DHS subjected him to expedited removal in December 2018.

28. Mr. Alvarado-Vega was apprehended by CBP agents at a checkpoint in Texas. After questioning, a CBP agent recorded on a Form I-867A that Mr. Alvarado-Vega had departed the U.S. and reentered the country five days earlier, on December 15, 2018. This information was untrue. Mr. Alvarado-Vega never told the Border Patrol officer that he

had departed the United States or reentered on the date provided. He refuted the information about his entry, but the officers continued to apply expedited removal to him.

29. NIJC tried to get this individual removed from expedited removal and placed into full removal proceedings under 8 U.S.C. § 1229a (INA § 240). Those efforts were unsuccessful until NIJC filed a petition for a writ of habeas corpus arguing that he had been improperly placed into expedited removal. Only then did DHS cancel the expedited removal order and place Mr. Alvarado-Vega in full removal proceedings.

30. Third, NIJC has spoken to people who were reluctant to express a fear of return because they experienced or witnessed violence and intimidation from CBP officers during the credible fear process. This problem became more pronounced when the Securing the Border Rule was in force, where officers used intimidation to undermine attempts by individuals to manifest a fear of return.

31. Finally, the truncated process for expedited removal means that many people never have access to counsel or the ability to consult with their families. The expedited removal statute allows for a consultation window before a credible fear interview, but the government has taken steps to shrink that timeline to as little as four hours. That reduction has been invalidated by a court, *see Las Americas*, 2025 WL 1403811, but the period remains very short—as little as 24 hours. It is NIJC's experience that people cannot contact counsel or other support or gather the information that they would need to either assert a credible fear or rebut their placement in expedited removal in that short time period.

32. NIJC has also experienced severe communication difficulties as part of the expedited removal process. In recent months, two new detention facilities have opened in NIJC's service area and have problematic phone access policies. These facilities charge money for attorney-client calls at a rate beyond what people can pay, have long delays (well more than 24 hours) for scheduling calls, and often do not allow detained individuals to make calls from a confidential setting. These factors exacerbate the challenges inherent in the truncated expedited removal process.

33. The truncated process for screening asylum claims in the expedited removal process is particularly harmful for clients who live with mental illness that impacts their competency to represent themselves. NIJC has worked with people who had legitimate asylum claims based on the mistreatment of people with mental illness in their countries of origin, but who, as a function of their disability, were not able to articulate those claims. But for having the benefit of representation in the credible fear process, these individuals would likely have been removed without an opportunity to present a full articulation of their claims for protection.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on the 4th of June 2025, in Goshen, Indiana.

S/ Lisa Koop

Lisa Koop, National Director of Legal Services
National Immigrant Justice Center
110 E. Washington St.
Goshen, IN 46528
Tel. 312-660-1321