## Declaration of Yael Schacher

I, Yael Schacher, make the following declaration based on my personal knowledge and declare pursuant to 28 U.S.C. § 1746 as follows:

1. I am an historian of U.S. immigration and asylum law and policy. I work at Refugees International, an independent non-profit organization founded in 1979 that researches and recommends policy solutions to forced displacement worldwide. Refugees International is located at 1800 M Street NW, Suite 405N, Washington D.C. 20036.

2. I received my master's in history from Harvard University in 2003 and a Ph.D. in American Studies from Harvard University in 2016. My dissertation was about the history of refugee and asylum law in the United States and was advised by immigration law faculty at the Harvard Law School. Between receiving my masters and my doctorate, I worked at the Harvard University libraries (in 2004) to develop a digital archive of primary sources on the history of immigration to the United States and taught courses related to U.S. immigration history both at Harvard (2006-2008) and the University of Connecticut (2011-2017). In 2016, I received a William Cromwell Foundation Early Career Fellowship from the American Society for Legal History to continue my research and writing on the history of U.S. asylum law. Between 2015 and 2017 I volunteered as a paralegal at the Connecticut Institute of Refugees and Immigrants. During the 2017-2018 academic year, I was a migration history postdoctoral fellow at the Institute for Historical Studies at the University of Texas at Austin. I volunteered as a paralegal for Justice for our Neighbors in Austin while living in Texas that year. I began working at Refugees International in January 2019.

3. Since receiving my doctorate, I have published several peer reviewed academic journal articles and book chapters on the history of U.S. asylum policy, including a book chapter that discusses the development of expedited removal in *Whose America: U.S. Immigration Policy Since 1980* (University of Illinois Press, 2023).

4. In 2021, I published a Refugees International policy report called "Addressing the Legacy of Expedited Removal: Border Procedures and Alternatives for Reform," that chronicles the history of the implementation of expedited removal up to that time and draws upon my observations of the credible fear process in several detention facilities and interviews with asylum seekers (in the United States but also in Guatemala and Mexico) who had been placed in expedited removal.[1] The report discusses flaws in expedited removal that had not been effectively addressed in over two decades of implementation: 1) enforcement officer failure to advise noncitizens that U.S. law

---

[1] Yael Schacher, "Addressing the Legacy of Expedited Removal: Border Procedures and Alternatives for Reform," May 13 2021, https://www.refugeesinternational.org/reports-briefs/addressing-the-legacy-of-expedited-removal-border-procedures-and-alternatives-for-reform/.

protects those facing persecution and to ask if they fear return, to accurately record fear claims and refer noncitizens with fear claims to credible fear interviews, as well as coercion of noncitizens to abandon their claims and sign documents they do not understand;  2) impediments to due process for noncitizens referred for credible fear interviews arising from their lack of access to information and counsel in detention, compounded by inadequate medical care and poor conditions of confinement; and 3) inadequate credible fear interviews that did not, as required by regulation, elicit all relevant information bearing on a credible fear of persecution or torture, and that demanded applicants meet a higher standard than the low threshold mandated by Congress.

5.  In 2024, I served as a subject matter expert and researcher for a report about expedited removal for the U.S. Commission for International Religious Freedom ("USCIRF"), an independent, bipartisan U.S. federal government commission created by the 1998 International Religious Freedom Act. The report, "Barriers to Protection as of 2024," updated previous reports by the Commission documenting flaws in the processing and detention of asylum seekers in expedited removal and assessed the implementation and relevance of the Commission's prior recommendations to address these flaws and ensure the fair and humane treatment of bona fide asylum seekers.[2] The report found that several prior Commission concerns about "flawed screening and documentation practices, a lack of training and quality control, inadequate information for noncitizens in the process, inappropriate [Immigration and Customs Enforcement] detention conditions" remained unresolved. USCIRF Report at 3.

6.  The report also pointed to new barriers to accessing and passing credible fear screenings by asylum seekers under policies put in place since 2022. These included a new "manifestation of fear" requirement for referral for a credible fear interview, instituted by the "Securing the Border" regulation first issued in June 2024. Under that requirement, noncitizens are not asked about fear when processed by enforcement officers and instead must affirmatively express fear to be referred by an officer to a credible fear interview. The report found that "CBP and ICE officers did not receive additional training on how to recognize a noncitizen's manifestation of fear; CBP and ICE facilities did not provide adequate notice to noncitizens about this new requirement; CBP officers may be improperly assessing the credibility of fear claims (an issue also identified in USCIRF's previous research); and intake procedures using contractors, virtual processing, and artificial intelligence could hinder a noncitizen from manifesting fear while in CBP custody." USCIRF Report at 3.

---

[2] USCIRF, Barriers to Protection as of 2024: Updated Recommendations on Asylum Seekers in Expedited Removal, February 2025, https://www.uscirf.gov/sites/default/files/2025-02/2025%20USCIRF%20Barriers%20to%20Protection.pdf.

7. Other new policies addressed in the report included an accelerated timeline for credible fear interviews and immigration judge reviews, and the conduct of those interviews and reviews while noncitizens are detained in Border Patrol custody. These new policies meant that many people with fear claims were not referred for interviews, and, those that were, were unable to effectively prepare for their interviews and access counsel.

8. The manifestation of fear requirement was particularly difficult for victims of gender violence and rare language speakers reluctant or unable to affirmatively raise their fears without first being informed of their right to seek asylum and asked if they feared removal. The USCIRF report notes, "whether fear is manifested is open to interpretation and up to the discretion of the [CBP or ICE] officer." USCIRF Report at 8.

9. For those noncitizens referred to interviews, the report notes, conditions in Border Patrol custody were difficult: "Detainees…are sleeping on the floor and sometimes sick from the cold conditions or the food, do not have freedom of movement, and have difficulty concentrating on their cases while taking care of their children. " USCIRF Report at 11.

10. The report also found that credible fear interviews had become lengthy and confusing for bona fide asylum seekers, even if not detained, because they included: determination of whether the noncitizen could internally relocate to avoid persecution in the country they fled, assessment of whether legally complex statutory bars to asylum applied to the noncitizen, and imposition of an elevated legal standard on those who could not meet narrow exceptions to the Circumvention of Lawful Pathways regulation.

11. Since 2018, I have observed conditions under which the expedited removal process takes place at Karnes County Immigration Processing Center, Dilley Immigration Processing Center, Rio Grande Processing Center, Laredo Processing Center, IAH Polk Adult Detention Facility, Central Arizona Florence Correctional Center, Eloy Detention Center, Otay Mesa Detention Center, as well as CBP processing facilities in El Paso and Yuma. I have also observed credible fear screenings conducted telephonically with people detained in ICE facilities in Texas and Louisiana and in CBP custody in Texas, and conducted in person with people in the non-detained Family Expedited Removal Program ("FERM"). Finally, I have interviewed at least 100 people placed in expedited removal in U.S. detention facilities, released from detention, and removed from the United States.

12. A problem that pervades the expedited removal process in all contexts is inadequate language access. A detained individual who speaks a rare language—such as an Ecuadorian national who speaks Kichwa or a Peul speaker from Burkina Faso—cannot communicate their fear to an enforcement officer, nor request a referral to a credible fear interview. Legal orientation is not available in their language that would allow them to know what to expect in a credible fear interview. They cannot ask guards to allow them to bring evidence to the credible fear interview, which anyway is frequently denied.

Credible fear interviews are frequently conducted in languages or dialects other than the asylum seeker's best or native language or dialect. This can be traumatic and confounding to the noncitizen being interviewed. I have observed a noncitizen member of an ethnic minority that speaks a rare Kurdish language pressured to answer questions in the language of his persecutor. It can also lead to grave error. I have seen how lack of access to information about the purpose of the interview and conduct of the interview without an interpreter in the best language has led to inappropriate negative credible fear determinations for an indigenous Mam speaker from Guatemala and a Hazara Dari speaker from Afghanistan.

13. On trips to Otay Mesa Detention Center in May 2023, Eloy Detention Center in December 2023, and IAH Polk Detention Facility in August 2024, a large proportion of the detained asylum seeking population were rare language speakers who could not communicate with the guards, access information or counsel in their language, and have credible fear interview in their preferred language. Even when asylum seekers who spoke rare languages, including people from Afghanistan, Bolivia, China, Chechnya, Eritrea, Ethiopia, Georgia, and Sudan, were able to pass their credible fear interviews, they remained in detention, which made it difficult for them to complete asylum applications and translate documents. This just exacerbates the difficulty of gathering documents—such as foreign medical and police records—to support asylum applications that all noncitizens face if they are detained after they pass their credible fear screenings.

14. Another systemic problem is that people who receive a negative credible fear determination do not receive an interview package with the asylum officer's notes and decision from USCIS before their review by an immigration judge. They thus do not know the basis for their failing the credible fear interview.

15. Typically, immigration judges conducting reviews of negative credible fear determinations also do not allow noncitizens to explain discrepancies in their previous statements to asylum officers or to provide additional evidence or information not detailed in the credible fear interview; judges frequently limit noncitizens to yes or no answers. For example, a noncitizen who had his credible fear interview in the wrong dialect was not given an opportunity to explain to the judge that he feared persecution not primarily as a member of a particular social group, which was what the asylum officer noted, but for political reasons. Another noncitizen told me he was not able to correct dates in the record of his credible fear interview nor to explain to the judge that his wife had been killed by the persecutors he fled, crucial information that the asylum officer did not give him a chance to discuss.

16. The expedited removal procedure is also flawed when it occurs in a non-detained setting such as in the FERM program. This is because, on an accelerated timeline, asylum seekers frequently had not had time to consult with counsel in advance of their credible

fear interviews and immigration judge reviews. There is the same problem of lack of interpretation in the asylum seekers' best language at the credible fear interview. Without orientation from counsel as to why they will be asked certain questions and without interpretation from their best language, it is very difficult for noncitizens to pass long and complicated credible fear interviews. This is especially the case if asylum officers cut off their answers, fail to ask informed follow-up questions related to country conditions and patterns and practices of persecution revealed in answers by noncitizens, and if the interviews are conducted in the presence of their children.

17. In 2024, some of the people I interviewed who were removed from the United States to Nogales, Mexico did not know they had to "manifest" fear without being asked and how to do this in order to trigger referral for a credible fear interview. Others I interviewed had told CBP officials they wanted to seek asylum and so should have been referred for credible fear interviews even under the "manifestation of fear" requirement, but instead were summarily removed without being referred for interviews. In the El Paso Border Patrol processing facility, I was told officers did not refer all noncitizens who manifested fear for credible fear screenings but only those who the officers determined, through follow up questions, were fearful of return for non-economic reasons. The manifestation of fear requirement has, in practice, given enforcement officers the discretion to determine who is worthy of access to protection.

I declare under penalty of perjury that the foregoing is true and correct to the best of knowledge and belief.

Yael Schacher

Executed on June 9, 2025 in Washington, D.C.