## Declaration of Edna Yang

I, Edna Yang, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1. I am an attorney licensed to practice law in the State of Texas. My business address is 314 East Highland Mall Blvd., Suite 501, Austin, TX 78752.

2. I have been practicing immigration law for 23 years. I am the Co-Executive Director of American Gateways, a nonprofit organization whose mission is to champion the dignity and human rights of immigrants, refugees, and survivors of persecution, torture, conflict and human trafficking through exceptional immigration legal services at low or no cost, education, and advocacy. My practice primarily involves representing immigrants in removal proceedings, especially those seeking asylum, withholding of removal, and relief under the Convention Against Torture. I also represent individuals before U.S. Citizenship and Immigration Services (USCIS) to obtain humanitarian relief and in family petitions and citizenship applications.

3. The following is based on my experience providing pro se assistance and representation to asylum seekers who are placed in expedited removal proceedings and who are held at the T. Don Hutto Residential Center, the South Texas Detention Complex, and the Karnes County Residential Center, as well as the experiences of my colleagues at American Gateways.

4. My colleagues and I have regularly met with people subject to expedited removal who fear persecution in their countries of origin but who U.S. Customs and Border Protection (CBP) officers did not refer for credible fear interviews. Most frequently, we hear about this from people who were deported through expedited removal without receiving credible fear interviews and who then came back to the United States and are held at the T. Don Hutto Detention Center. Because they now have expedited removal orders and have returned, they are in a worse position: they now have to pass reasonable fear interviews and, if successful, can only apply for withholding or CAT protection (not asylum or other forms of relief). They also are ineligible for bond hearings in the jurisdiction where I practice.

5. Many of the people who have been through expedited removal proceedings tell us that they told the CBP officer that they were afraid of returning to their home countries but didn't say the exact words "I am afraid to return." From this, we understand that CBP officers have refused to refer people for credible fear interviews if they don't use a particular phrase to explain that they are afraid of persecution. For example, clients have told me that, even though they told a CBP officer that they couldn't go back to the country they came from, the CBP officer processed them for expedited removal without a credible fear interview instead of asking whether the person was afraid of persecution.

6. In one case, a client explained to me that a CBP officer told him that asylum does not exist anymore. Several other individuals have told me that CBP officers told them that they were not allowed to apply for asylum.

7. I regularly meet with people who have expedited removal paperwork that includes false information. For example, many times the paperwork states that the person said they came to the

United States to work for two years and that they do not have a fear of return. When we follow up with our clients, they explain that they did not say what was written down on the form. Some of the expedited removal paperwork that I have reviewed has also had other substantial errors, such as listing the correct name of the individual, but the incorrect country of origin, date of birth, and other identifying information.

8. We also routinely talk to people who were told by CBP to sign paperwork that they did not understand. Generally, people are afraid of CBP officers and sign the paperwork when an officer tells them to, even if it is in English and the person cannot speak, read, or understand English. In the case of one woman who was represented by a colleague at American Gateways, a CBP officer put a document in front of the client and told her that she needed to sign the document in order to have property returned to her. The client later learned that the paperwork was actually for expedited removal and stated incorrectly that she had no fear of return to her country of origin. Other women held in the same detention center as her later advised her to call her consulate to find out if there was anything she could do because she was afraid of persecution in her home country of Honduras. The consulate told her to find another officer and tell them that she is afraid of returning. Afterwards, she was finally able to get a credible fear interview.

9. We also have spoken to many people who received inadequate interpretation services during expedited removal interviews. This is especially true for our clients from Central America who speak indigenous languages and for non-Spanish speaking clients from other parts of the world. For example, I have an Eritrean client who was arrested with a group of people from Eritrea. One of them spoke some English, and the CBP officer had that individual serve as an interpreter for the entire group, despite the individual not having true fluency in English or the ability to accurately interpret vital and complicated information.

10. I also have had clients put into expedited removal who suffered abuse and other mistreatment during their arrests and detention and had no way to challenge that abuse. One client was punched by a CBP officer, and another was physically abused. In the past we have filed complaints with the DHS Office of Civil Rights and Civil Liberties, but we have not received any responses to the complaints that we have filed.

11. We also have clients in expedited removal proceedings who received inadequate medical care that impacted their ability to make credible fear claims. One client was suffering from appendicitis and did not receive medical treatment. As a result, she was unable to articulate her fear claim to an asylum officer or to the immigration judge during a review of her negative credible fear determination. Later, we were able to get her a second interview with the asylum officer. However, the detention center where she was being held still had not provided her with sufficient medical care – they just gave her pain medication. She was very anxious to proceed with her case and so decided to go ahead with her credible fear interview even though she was seriously ill.

12. We also regularly see people who are erroneously given negative credible fear determinations. We regularly meet with people who have been found not to have a credible fear based on a finding that they are not credible, where the finding does not take into account the impact of trauma on the individuals' ability to answer questions and/or the interview included confusingly worded questions that led to the negative credibility assessment.

13. One client explained during her credible fear interview that she had fled her country of origin because she was a political activist who had been targeted by police. She received a negative credible fear determination that said she had not shown a nexus between her fear and a protected ground. My colleagues and I were able to get her a second credible fear interview, but if she had not had legal assistance, she would have been deported despite her clear credible fear of persecution by government actors on account of her political opinion.

14. The recent expansion of expedited removal and arrests of people in regular removal proceedings under Section 240 of the Immigration and Nationality Act at immigration courts to place them in expedited removal proceedings raise serious concerns about due process for many individuals.

15. Beginning this past week, attorneys with the ICE Office of the Principal Legal Advisor (OPLA) began orally moving to dismiss cases at appearances in master calendar hearings for respondents at the San Antonio immigration court. This was despite the fact that most of the respondents are actively seeking asylum or other relief from removal. The OPLA attorneys have been evasive when questioned by some immigration judges as to why these motions were not filed on paper prior to the hearing, which would allow respondents to file an opposition or response to the motion in a timely manner.

16. When the immigration judges have granted OPLA motions for dismissal over the objections of pro se respondents and attorneys for respondents, ICE agents waiting in the hallway, lobby, and parking lot of the immigration court have then been arresting and detaining individuals. ICE agents have stated that the people being detained are subject to expedited removal because Section 240 removal proceedings are no longer pending. We have even seen the arrest of whole family units, including adults and their minor children.

17. Even when noncitizens have reserved the right to appeal immigration judges' grants of dismissal of Section 240 removal proceedings, ICE is arresting individuals and subjecting them to expedited removal. This effectively cuts off their ability to appeal the immigration judges' decisions and continue seeking relief before the court.

18. Colleagues have reported that ICE has used this tactic of obtaining the dismissal of regular removal proceedings and then arresting for expedited removal proceedings against people appearing for initial hearings before filing any applications for relief; and also in cases that are more advanced and where applications for relief have already been filed with the immigration court.

I declare under penalty of perjury under the laws of the State of Texas and the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed on this 30th day of May 2025 in Austin, TX

Edna Yang
American Gateways