## DECLARATION OF KARA HARTZLER
## FEDERAL DEFENDERS OF SAN DIEGO, INC.

1. My name is Kara Hartzler, and I currently work as a lawyer at the Federal Defenders of San Diego, Inc., ("FDSDI") in San Diego, California. I have worked at FDSDI for twelve years.

2. FDSDI represents over half of all the indigent defendants charged with a federal crime in the Southern District of California. Because of our proximity to the international border with Mexico, a large percentage of our cases involve border-crossing crimes, such as illegally reentering the United States after a prior deportation under 8 U.S.C. § 1326.

3. Supreme Court law and § 1326(d) permit a person charged with illegal reentry to raise a defense if the underlying deportation order violated due process. Because of our high volume of § 1326 cases, our office regularly asserts this defense on behalf of clients.

4. To show that an underlying deportation order violated due process, a lawyer must closely examine all the immigration documents and interview the defendant to determine what happened during the deportation process. Frequently, the court will also order an evidentiary hearing to review the events surrounding a particular deportation. At this evidentiary hearing, a Border Patrol agent or other immigration officer will testify about a defendant's particular deportation or the methods that an officer generally uses when conducting deportation proceedings. As a result, our lawyers become very familiar with the practices and procedures of various types of deportation proceedings.

5. One of the most common types of deportation that our lawyers challenge is an expedited removal order under 8 U.S.C. § 1225(b). In expedited removal, the regulations require immigration officers to follow a particular protocol to make sure that noncitizens receive certain legal protections. Specifically, 8 C.F.R. § 235.3(b)(2)(i) requires immigration officers to: (1) advise noncitizens of the removal charges against them; (2) read them a four-paragraph legal advisal concerning expedited removal; (3) take a sworn statement; (4) read this sworn statement back to them; (5) have them sign and initial each page of the sworn statement and any corrections; and (6) have them sign the reverse of the expedited removal order to acknowledge receipt.

6. In my experience, immigration officers conducting expedited removal proceedings frequently do not comply with this regulation.

7. One of the major problems with expedited removal is that the immigration officer and the noncitizen often do not speak the same language. English-speaking officers with only some knowledge of Spanish regularly issue expedited removal orders even though they are unable to adequately advise noncitizens of the nature of the proceedings and the charges against them. English-speaking officers also regularly misunderstand noncitizens' answers and cannot accurately read a noncitizen's sworn statement back to them, resulting in materially incorrect answers in the sworn statement.

8. Even when an officer is fluent in Spanish, language problems may still exist. A significant number of noncitizens from Mexico and Central America who are placed in expedited removal speak an indigenous language. Not only are they unable to effectively communicate in Spanish, it is often difficult to identify them as non-Spanish speakers because they may be able to speak a small amount of Spanish. Furthermore, many people in expedited removal proceedings are from countries in Africa and Asia and do not speak either Spanish or English.

9. Although the vast majority of people in expedited removal do not speak English, the removal charges, legal advisals, sworn statement, and other documents are all printed in English. Noncitizens have no ability to independently review the documents they are signing and never receive a written explanation of the nature of the proceedings in a language they understand.

10. Immigration officers must frequently process a large number of individuals in expedited removal in a short period of time. This often makes the proceedings hurried or rushed and leads to officers cutting corners in ways that do not comply with the regulations. For instance, sometimes officers simply summarize the charges and legal advisals or do not talk about them at all. Instead, officers may tell noncitizens to "sign here" or "initial there" without telling them what they are signing. Sometimes officers omit the necessary signatures altogether.

11. Due to the rushed nature of the proceedings, officers often include boilerplate information in the sworn statement that does not apply to a particular individual. Officers may cut and paste from a form that was used for the expedited removal of another person without changing all the relevant information. As a result, it is common for sworn statements to contain errors.

12. Given the rapid pace of expedited removals, officers are often unable or unwilling to identify people who are juveniles or suffer from serious mental health issues. Although these individuals are legally incapable of signing documents or participating in expedited removal, they may nevertheless receive a deportation order.

13. Individuals in expedited removal have almost no opportunity to prepare a defense to the charge of removal. The order is usually issued within a few days, if not hours. Because the person is detained, they generally have no way to gather evidence. Nor is the person usually allowed to make a phone call to ask someone else to bring evidence to them. Individuals almost never have an opportunity to review the government's evidence against them, cross-examine the government's witnesses, or present their own witnesses. A person also has no legal means of challenging the manner of their arrest, even if it violated a statute or the U.S. Constitution.

14. One of the most troubling aspects of expedited removal is the fact that many people are denied the opportunity to apply for asylum despite having expressed fear of returning to their home country. It is not uncommon for a sworn statement or a video to show that a person stated that they were afraid to return to their country, yet that person never

    receives a credible fear interview or a reasonable fear interview. Even when our office has affirmatively advised the government that a person is afraid to return or has given the individual a letter in English requesting a credible fear interview, many people are denied the chance to apply for asylum.

15. In some cases, officers try to persuade people not to apply for asylum. Officers sometimes tell people that if they express fear, they will spend many months in jail. They may also inform people that they are not eligible for asylum or otherwise give incorrect legal advice.

16. Almost no one in expedited removal is told that they have the right to consult a lawyer. Indeed, the government takes the position that people in expedited removal have no right to counsel, even at their own expense.

17. A lawyer can have a huge impact on a person's expedited removal proceedings. Not only can a lawyer assist the person in understanding the nature of the proceedings and its legal consequences, counsel can also help the individual to assert a fear of return and request a credible fear interview, or assist the person in preparing for the credible fear interview.

18. As a result of these defects, few noncitizens in the expedited removal system realize they have been ordered deported. Instead, most believe that they have received some form of voluntary departure. Operating under this assumption, many individuals do not know that they will be barred from legally returning to the United States for a minimum of five years. Nor are they aware that if they illegally return to the United States in the future, they could be prosecuted for illegal reentry and receive up to twenty years in prison.

19. In light of these egregious and systemic flaws, many, if not most, of the expedited removal orders that currently exist are defective, unreliable, and subject to legal challenge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 9, 2025

_____
Kara Hartzler
Federal Defenders San Diego, Inc.
225 Broadway, Suite 900
San Diego, California 92101-5030
Telephone: (619) 234-8467
Kara_Hartzler@fd.org