**Declaration of Laura Lunn**

I, Laura Lunn, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1. I am an attorney licensed to practice law in the State of Oregon. My business address is 7301 Federal Boulevard, Suite 300, Westminster, Colorado 80030.

2. I have been practicing law since 2011. I am the Director of Advocacy & Litigation at Rocky Mountain Immigrant Advocacy Network (RMIAN). In my current role, I work alongside RMIAN's staff members to identify trends and patterns that are negatively impacting our clients. With this information, we determine whether litigation or broader advocacy is the best mechanism to challenge systemic problems our clients face. Previously, I served as the Detention Program Managing Attorney for RMIAN, where I oversaw a team of attorneys and advocates offering legal services to people in Immigration and Customs Enforcement (ICE) detention. Before joining RMIAN, I was the interim Managing Attorney at the CARA Pro Bono Project at the family detention center in Dilley, Texas, and prior to that provided legal advocacy in support of families detained in Artesia, New Mexico. I also worked in private practice in both Portland, Oregon and Denver, Colorado. Directly after law school I clerked for two years with the U.S. Attorney General's Honors Program where I worked for the Executive Office for Immigration Review (EOIR) at both the detained and non-detained immigration courts in El Paso, Texas.

3. My practice primarily involves federal court litigation and removal defense for adults detained at the Aurora ICE Contract Detention Facility in Colorado, including people facing expedited removal. I have represented both detained and non-detained clients placed in expedited removal proceedings when they have credible fear interviews before an asylum officer (AO) who works for U.S. Citizenship and Immigration Services (USCIS) as well as in hearings where an immigration judge reviews negative fear findings rendered by the AO.

4. I have extensive experience engaging with the expedited removal process in the United States. I worked at EOIR from 2011 until 2013. Between 2012 and when I left EOIR in 2013 there was a significant increase in the number of cases the Houston Asylum Office referred to the El Paso Immigration Court and I reviewed many negative credible fear findings made by USCIS when cases were referred to the court for the Immigration Judges to review the negative credible fear determinations. Subsequently, I have directly represented clients placed in expedited removal proceedings since I became a practicing immigration attorney in 2013.

5. In 2014, I began working in the family detention context, where all families were placed in expedited removal. As a result, I represented a high volume of families who were subject to expedited removal and articulated a fear of return to their countries of origin.

6. In 2016, I began representing detained adults placed in expedited removal. In addition to offering direct legal representation, I also mentor other attorneys—both from RMIAN as well as pro bono counsel—who represent people placed in expedited

1

removal. In 2017, RMIAN stood up a pro bono referral program where large law firms accepted clusters of cases each week referred by RMIAN, so that adults in detention could have access to counsel while navigating their expedited removal proceedings.

7. In 2023, expedited removal proceedings were expanded beyond the traditional boundaries—instead of just being applied to people in detention, it was utilized more broadly pursuant to the Family Expedited Removal Management (FERM) policy. I directly represented families before the AO and appealed negative credible fear determinations before the Denver Immigration Court. I also helped duplicate the pro bono referral program RMIAN created in 2017 to place FERM cases with experienced pro bono counsel for their credible fear interviews before the AO and occasional appeals to the immigration court.

8. The following is based on my experience since 2014 representing people subject to expedited removal in New Mexico, Texas, and Colorado as well as through supervising other attorneys who provide similar representation.

9. U.S. Customs and Border Protection (CBP) officers conduct an initial interview with noncitizens when they are first apprehended. That conversation is memorialized in a Form I-213, Record of Deportable/Inadmissible Alien. At that time, the CBP officer is charged with making an initial determination about how best to process the case. Prior to the expansion of expedited removal this past January, this most commonly occurred within 1-3 days of a person's initial entry into the United States. Once a person is placed into expedited removal, they can immediately be removed from the United States if they do not articulate a fear of return. If the person expresses a fear, the case is referred to the AO for a credible fear interview to assess the viability of fear-based relief from removal from the United States.

10. I have personally represented multiple individuals placed in expedited removal proceedings who are afraid to return to their countries of origin, but who were not immediately referred to the AO for a credible fear interview. For example, in the summer of 2018 I directly represented three women in expedited removal proceedings pursuant to the family separation policy. Government officials initially told each of them that they would be summarily removed and they were not originally referred for a credible or reasonable fear interview with an AO. Each client reported that they expressed a fear of return during screening interviews with CBP officers at the border and when they were held in ICE custody at other detention facilities before arriving to Colorado. One of them was prosecuted under the zero-tolerance policy but the other two were simply being held in ICE custody without a referral to the AO. It was not until these three women were transferred and detained in Aurora that they gained access to basic legal information from attorneys at RMIAN. I entered on their cases and contacted USCIS on their behalf, which was the catalyst to get them scheduled for credible fear interviews. Had they not had access to counsel, it is possible that DHS would have summarily deported them through expedited removal without the possibility of having a credible fear interview—and without reunifying them

with their young children. Instead, the AO made positive fear finding and referred each of their cases to the immigration court for full removal proceedings.

11. Similarly, when I worked at the family detention centers in Dilley, Texas and Artesia, New Mexico, I met with at least a dozen women who told me that they had previously come to the United States and expressed fear of return to CBP but were deported without a credible fear interview. They continued to experience persecution in their countries of origin after deportation, so they returned to the United States. However, upon return, because they had previous removal orders, they were no longer eligible to apply for asylum in the United States. Similarly, I have represented at least three clients in Aurora who faced the same problem—they had prior expedited orders of removal where CBP never referred their cases for credible fear interviews despite the individuals having a fear of return.

12. In my experience, CBP improperly failed to refer many people for credible fear interviews who did not have an adequate interpreter during their inspection by CBP, especially those who spoke indigenous languages and were not interviewed at the border in their native language. CBP officers almost exclusively communicate in Spanish with people who speak Mayan languages from countries like Mexico, Guatemala, El Salvador, Honduras, Peru, and Ecuador. When people are screened for fear-based claims in a language that is not their best language, indicators of fear are often missed.

13. Gender and sexual minorities also disproportionately are improperly screened for fear-based relief through the expedited removal process. Most CBP officers are men, and this plays a significant factor in failures in the expedited removal screening process for identifying fear of return. For example, countless female clients have failed to report past sexual abuse because they did not feel comfortable going into detail about the reasons for their fear of return or they have also reported that CBP officers were dismissive of their claimed fear. The same is true for people who are LGBTQI+, who do not want to disclose their sexual orientation or do not wish to reveal their gender identity to CBP officers.

14. For the past nine years, I have served as court-appointed counsel for people who an immigration judge has deemed mentally incompetent. This group of people is disproportionately harmed by the cursory screening afforded to people placed in expedited removal proceedings. Many clients lack insight to their mental illness or cognitive impairments or do not realize that their diagnoses have any significance when it comes to the risks posed should they be deported to their countries of origin. I have worked with numerous clients who are not eligible for asylum because they were previously subjected to expedited removal. In those cases, the curtailed process provided often failed to capture information necessary to properly screen these individuals for fear-based relief.

15. CBP officers often fail to meaningfully engage with people on an individualized basis when conducting initial screening interviews. I repeatedly see Form I-213 interview transcripts that contain boilerplate, stock language stating that our clients came to the United States to work, that the person intends to stay in the country only for a very limited period of time, and that the person does not fear

return. Throughout my time working with clients in expedited removal, I have been told by at least 50 clients with that boilerplate language in their paperwork that they never made those statements to CBP. Many of these same clients go on to prevail on bona fide asylum claims, but their claims are more difficult because EOIR doubts their credibility because of the conflicting language in the paperwork.

16. When I worked at the family detention centers, I would see the same identical language on paperwork for children. On numerous occasions, the paperwork for a pre-verbal child said that the child had stated to a CBP officer that they came to the United States to work. On one occasion, I represented a non-detained woman placed in expedited removal before being released from CBP custody. Her border interview with a CBP officer contained the same stock language saying she had no fear of return. I filed a Freedom of Information Act request for her and received more of her immigration records from her encounter at the border. The records I received included a handwritten note that she had someone write for her in English (she only spoke Spanish) stating that she was afraid and asking to please not to be sent back to her country of origin. Eventually, she won protection under the Convention Against Torture.

17. I have spoken to many people in expedited removal proceedings who are told to sign paperwork that they do not understand. It is largely arbitrary who signs the paperwork and who does not. When I was in Artesia, I remember a client telling me that CBP turned off the air conditioning in the holding facility and it became dangerously hot. The CBP officers then told people that if they signed paperwork, they would be awarded burritos. The women who signed the paperwork were signing their deportation orders. The women who refused were allowed to legally pursue asylum but were punished by never being provided the food the other women received.

18. The credible fear interview process does not afford necessary safeguards or access to reasonable accommodations for people who have qualifying disabilities. Over the years, I have worked with countless people who have experienced extreme trauma and/or have symptoms of a qualifying disability under Section 504 of the Rehabilitation Act of 1973. I am familiar with many cases where people were forced to move forward with their credible fear interviews without access to counsel or any safeguards or accommodations to ensure that the interview was conducted in a manner that comported with fundamental fairness. There is no formal process for notifying the AO about competency concerns, other than emailing a contact to advise the office of the issue. However, if someone does not have an attorney advocating on their behalf, there is no formal screening mechanism that the AO uses to determine whether someone is able to meaningfully understand the credible fear process and, unlike Immigration Court, there is no inquiry regarding whether individuals are mentally capable of representing themselves in these life-or-death proceedings.

19. Access to counsel is limited during the expedited removal process. In the past, clients reported being held at the border in hieleras (iceboxes) or perreras (dog kennels) for a month or more, where there is no access to attorneys. People also

report being transferred between multiple facilities after being detained, making it hard to connect to attorneys even in places where there are attorneys available, like Aurora.

20. Even people who have attorneys struggle to exercise their rights in immigration proceedings. I have struggled to have the AO provide any advance notice of my clients' credible fear interviews, even when I have entered my appearance with their office. AOs do not notify attorneys of when the interviews are going to take place until they are about to start and then, if the attorney is not immediately available, often ask the client (who may have already been detained for weeks or months) whether they want to proceed with the interview without an attorney present. I have prepared clients to exercise their right to counsel and request that the AO call me before proceeding with the interview, with mixed success. Clients are often hesitant to do anything that they think could jeopardize their chance of success at the interview and fear AO retaliation if they do not proceed with the interview. In most instances, if I have been lucky enough to attend the interview when an AO calls, I am only able to participate in the interview telephonically, rather than in person.

21. In 2024, I represented a mother and her daughter processed through the FERM program. I appeared with them in-person at the USCIS Office in Centennial, Colorado. The AO conducted the interview telephonically. Despite the fact that the credible fear interview pertained to a family unit, USCIS had no plan in place for providing childcare to ensure the child was not in the room listening to sensitive information during the interview. I had to make a special request to allow the 12-year-old to sit in the waiting room while her mother recounted years of domestic violence she suffered at the hands of the girl's father. My understanding is that most families processed for expedited removal through FERM were all in one room during the credible fear interview, which likely had a significant impact on the type of information people were willing to share with the AO over the telephone.

22. In that same case, I returned with my clients to USCIS one week later to receive the AO's decision. USCIS did not provide a copy of the interview transcript to my clients, even though it is required by regulation. I requested proper service, which was effectuated. However, for months afterward staff members from RMIAN reported that people who received negative fear findings and were referred to the immigration court for a judge to review those findings were regularly not served with the interview transcript. Moreover, that information was not served on the court. This procedural defect occurred time and again, with multiple judges vacating the negative decisions because they had no basis for the finding.

23. Also in 2024, I represented a family subject to FERM before the immigration court after an AO made a negative fear finding in the credible fear interview process. The family clearly articulated a political opinion claim—they fled Colombia because members of the Revolutionary Armed Forces of Colombia (FARC) murdered a family member and targeted the family on multiple occasions. The AO failed to identify a nexus ground for the family's claim, despite the very clear political opinion claim. The immigration judge overturned the AO's decision. I

5

regularly see glaring legal errors committed by AOs, resulting in significant delays and waste in the legal system.

24. I represented a FERM family before the immigration court where the son's case was not processed with the parents' case. A 4-year-old boy's case was scheduled for a negative fear review (indicating he was placed in expedited removal) as a stand-alone case. It is illegal to place unaccompanied minors into expedited removal, yet somehow his case has been processed as such by the immigration court. As attorney of record, I was able to identify the problem for the court and have it remedied. People without access to counsel would likely not understand docketing errors, which could have potentially resulted in an *in absentia* deportation order for a very young child, despite his family's case being vacated and referred for full removal proceedings.

25. At the end of May 2025, ICE officials began arresting people while they were appearing before the Denver Immigration Court for regular removal proceedings. This included both single adults and families with small children. In my fourteen years of practice, this is truly unprecedented. It is not uncommon for CBP to detain people when they are being processed at the border and place them into expedited removal. I have never before heard of ICE detaining people when they are appearing for their removal proceedings for the sole purpose of forcing people to pursue protections through the expedited removal process.

26. One of the worst problems I see is that asylum seekers, who fled traumatic experiences in their countries of origin and, in many cases, faced more trauma during their journey to the United States, are re-traumatized when they are taken into immigration custody and put into the expedited removal process. Throughout my years of experience representing people in credible fear proceedings, I have heard innumerable complaints from clients recounting that CBP officers told them they are worthless, they should give up, or they have no chance of staying in the United States. They are imprisoned in CBP jails and face verbal abuse and dehumanizing conditions, where they are overcrowded and cannot move. Women report that during their time in CBP custody they do not have access to showers, clean clothes, or products for menstruation, and then CBP officers tell them that they are filthy and that they stink like animals. I have spoken to dozens of clients, each of whom had tears streaming down their face as they described the dehumanizing conditions they endured when they were held in CBP custody. Clients who are placed in expedited removal are so afraid to return to their home countries that they are willing to endure horrific conditions to prevent being deported back to the harm they fled.

27. Clients face similar harms in ICE custody. RMIAN has assisted clients with filing group complaints to the Department of Homeland Security oversight bodies underscoring the poor conditions of confinement at the Aurora facility. Clients have shared examples of inadequate medical care, instances of staff at the detention facility failing to follow COVID-19 public health policies during the pandemic, incidents of racial discrimination, overuse and misuse of solitary confinement, and harms people who are transgender and nonbinary suffered while detained.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed on this 4th day of June, 2025 in Denver, Colorado.

*[signature]*

Laura Lunn

*Director of Advocacy & Litigation*

ROCKY MOUNTAIN IMMIGRANT ADVOCACY NETWORK

7