## Declaration of Gracie Willis

I, Gracie Willis, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am an attorney licensed to practice law in Texas and Georgia. My business address is PO Box 685212, Austin, TX, 78768.

2. I have been practicing law since November 2015. Currently, I am the Raids Response Coordinator at the National Immigration Project. Previously I worked at the Southern Poverty Law Center (SPLC) as a Senior Lead Attorney with SPLC's Southeast Immigrant Freedom Initiative (SIFI). Prior to that, I also served as a Staff Attorney for the SPLC's Immigrant Justice Project and before that as a lead attorney and direct services attorney with SIFI in Lumpkin, GA. In my various roles at SPLC, I represented people in immigration detention and in litigation challenging unlawful policies related to asylum access, detention, and due process within the immigration system. Prior to working for SPLC, I was a senior staff attorney for the Dilley Pro Bono Project (DPBP) (previously CARA Family Detention Project), which served the detained mothers and children in immigrant detention in the South Texas Family Residential Center (STFRC) in Dilley, Texas.

3. The following is based on my experience serving as a staff attorney for the DPBP from July 2016 through July 2017 and as a senior lead attorney with SIFI from October 2021 through September 2024.

4. At the DPBP, I represented numerous families subject to expedited removal, including clients in credible fear proceedings before USCIS Asylum Officers as well as before the Executive Office for Immigration Review (EOIR) after a negative determination from the Asylum Office.

5. In the course of my work, I regularly reviewed sworn statements (Forms I-867A&B) completed on behalf of my clients by Customs and Border Protection (CBP) officers as part of the expedited removal process. It was common for CBP officers to record what appeared to be boilerplate language stating that individuals did not have a fear of return to their country of origin or that they were coming to the United States to work. When this occurred, I would assist clients to correct the record to reflect their fears of return so that they would receive credible fear interviews (CFIs).

6. In addition, on most of the forms, in response to the question of how long the individual intended to stay in the United States, the response was regularly recorded as between two and five years. Whenever I asked my clients about these purported statements, not one client confirmed having made such

statements.

7. The STFRC detention center in Dilley received rare language speakers who had been placed in expedited removal proceedings every week. Consistently, my clients who identified as Mayan language speakers reported that CBP officers had conducted their inspections in Spanish, despite the fact that they were not fluent Spanish speakers. As a result, I represented numerous Mayan language speakers with fear-based claims who had little to no understanding of what was happening in their cases.

8. In addition, some of my clients who spoke Spanish reported that the CBP officers conducting their inspections did not speak Spanish proficiently and, as a result, the clients could not understand many of the questions they were asked.

9. Many asylum seekers who I represented had not been properly referred to U.S. Citizenship and Immigration Services (USCIS) for CFIs despite telling CBP officers that they feared return. Others had never been given the opportunity to express their fears of removal to CBP. Without attorney intervention, they would not have had the opportunity to be screened by USCIS and would have been summarily removed despite their fears of persecution and torture.

10. During my time as a senior lead attorney with SIFI between 2021 and 2024, I supported three teams: one representing people at Stewart Detention Center in Lumpkin, GA; one representing people at Folkston ICE Processing Center in Folkston, GA; and one providing legal services at multiple detention centers within the New Orleans ICE Field Office Area of Responsibility. I attended our teams' case rounds, consulted on issues with our staff, and represented a small number of individual clients.

11. The Louisiana team conducted regular Know Your Rights presentations at the various detention centers within the New Orleans ICE Area of Responsibility, which included surveying issues facing the people detained there, supporting with pro se communication with ICE and USCIS, and documenting and reporting these issues to ICE and USCIS. We discussed these issues in our case rounds, which were held weekly or biweekly.

12. During the three years that I supported and worked with our Louisiana team, people detained in the New Orleans ICE Area of Responsibility faced numerous issues related to their CFIs. During most of this time, the interviews were conducted by the Houston Asylum Office.

13. Similar to my experience at the family detention center in Dilley described above, it was not uncommon for a CFI to be conducted in a language that the applicant did not speak fluently, especially when they spoke a rare language. In particular,

this impacted Mayan language speakers and speakers of less-common dialects of African languages. Rather than the Department of Homeland Security (DHS) issuing a Notice to Appear for full removal proceedings based on its inability to find an interpreter in a timely manner, DHS officers would often either pressure the asylum seeker to attend an interview in a language they did not speak fluently or make them wait a long period of time – sometimes over two months – for an interview. During a stakeholder tour of one detention center, a DHS official told our team that there were no options available to asylum seekers who were deaf and communicated in sign language because telephones were the only way DHS had to conduct CFIs.

14. In general, there were time periods when people were waiting between a month and a half to two months for their CFI while detained in Louisiana.

15. At one point, DHS practice in Louisiana shifted from long wait times to CFIs moving so quickly that people did not have time to prepare or find legal representation at all, with interviews scheduled on the weekends and without notice to counsel.

16. Generally, it was very common for applicants to undergo a CFI and not receive the written decision, including the Asylum Officer interview notes, in a timely manner. It was very common for applicants to be scheduled for an Immigration Judge review of their negative CFI without having had an opportunity to see or review the USCIS Asylum Officer's decision.

17. People were subjected to CFIs when they were not able to meaningfully participate, including when they had COVID and associated brain fog, were otherwise sick, or had been diagnosed or exhibited indicia of a lack of competency to understand the proceedings.

18. The Louisiana SIFI team made numerous complaints about the CFI process to ICE, USCIS, EOIR, the DHS Office for Civil Rights and Civil Liberties, and the DHS Office of Inspector General.[1] Louisiana SIFI staff also served as research resources for other organizations regarding the issues they were observing and documenting.[2]

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my information, knowledge and belief.

---

[1] See, e.g., https://nipnlg.org/sites/default/files/2023-04/2022_27April-CFI-complaint.pdf
[2] See, e.g, https://www.laaclu.org/sites/default/files/inside_the_black_hole_systemic_human_rights_abuses_against_immigrants_detained_disappeared_in_louisiana.pdf; https://law.tulane.edu/sites/default/files/TLS%20No%20End%20In%20Sight%20Single%20Pages%20FINAL.pdf; https://humanrightsfirst.org/wp-content/uploads/2023/09/Disability-report_Sept-2023_formatted.pdf.

Executed on this 2nd of June, 2025.

_____
Gracie Willis