**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MAKE THE ROAD NEW YORK, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>KRISTI NOEM, Secretary of the Department of Homeland Security, in her official capacity, et al.,<br><br>*Defendants*. | No. 1:25-cv-00190-JMC |

**<u>DECLARATION OF HANNAH STEINBERG</u>**

I, Hannah Steinberg, declare as follows:

1. I am over eighteen years of age and am competent to make this declaration.

2. I am a Staff Attorney at the American Civil Liberties Union Immigrants' Rights Project. I represent the Plaintiffs in this case.

3. Attached hereto as exhibits are true and correct copies of the following:

| Exhibit | Document |
|---|---|
| 1 | U.S. Dep't of Homeland Sec., Designating Aliens for Expedited Removal, 90 Fed. Reg. 8,139 (Jan. 24, 2025), https://perma.cc/5AF6-LRYH. |
| 2 | Memorandum from Benjamine C. Huffman, Acting Sec'y, Dep't of Homeland Sec., to Caleb Vitello, Acting Dir., Immigr. & Customs Enf't, et al., Guidance Regarding How to Exercise Enforcement Discretion (Jan. 23, 2025), https://perma.cc/W3CL-SNDN. |
| 3 | Letter from Am. Immigr. Lawyers Ass'n, et al., to Leon Rodríguez, U.S. Citizenship & Immigr. Servs., and Sarah Saldana, Immigr. & Customs Enf't (Dec. 24, 2015), https://perma.cc/34JT-H7PN. |
| 4 | U.S. Comm'n on Int'l Religious Freedom, *Report on Asylum Seekers in Expedited Removal: Volume I: Findings & Recommendations* (2005), https://perma.cc/4UFX-26BK. |

| | |
|---|---|
| 5 | U.S. Comm'n on Int'l Religious Freedom, *Barriers to Protection: The Treatment of Asylum Seekers in Expedited Removal* (2016), https://perma.cc/YB27-K8FQ. |
| 6 | U.S. Comm'n on Int'l Religious Freedom, *Barriers to Protection as of 2024* (2025), https://perma.cc/6ED5-6UF4. |
| 7 | Am. C. L. Union, *American Exile: Rapid Deportations that Bypass the Courtroom* (2014), https://perma.cc/N5DP-4YQ7. |
| 8 | Ian James, *Wrongly Deported, American Citizen Sues INS for $8 Million*, L.A. Times (Sept. 3, 2000), https://perma.cc/D4N4-67R9. |
| 9 | Order, ECF No. 37, *United States v. Sanchez-Figuero*, No. 3:19-cr-00025-MMD-WGC (D. Nev. July 25, 2019). |
| 10 | Pet. for Writ of Habeas Corpus, ECF No. 1, *Maria de la Paz v. Jeh Johnson*, No. 1:14-CV-016 (S.D. Tex. Jan. 24, 2014). |
| 11 | Alan Gomez, *Trump's Quick Deportation Plan May Be Illegal, Past Immigration Chiefs Say*, USA Today (Feb. 24, 2017), https://perma.cc/SQJ3-VJU7. |
| 12 | *Interior Immigration Enforcement Legislation: Hearing Before the Subcomm. on Immigr. & Border Sec. of the H. Comm. on the Judiciary*, 114th Cong. (2015) (statement of Eleanor Acer, Dir., Refugee Prot., Human Rights First), https://perma.cc/WPV7-LWBU. |
| 13 | Hamed Aleaziz, *The Biden Administration Has Suspended A Trump-Era Policy That Put Immigrants At Risk Of Being Deported Without Due Process*, Buzzfeed News (Oct. 14, 2021), https://www.buzzfeednews.com/article/hamedaleaziz/expedited-removal-trump-immigrant-policy-suspended. |
| 14 | Ctr. for Migration Studies, *Estimates of Undocumented and Eligible-to-Naturalize Populations by State*, https://perma.cc/KW2H-3WRQ. |
| 15 | U.S. Citizenship & Immigr. Servs., *Instructions for Consideration of Deferred Action for Childhood Arrivals* (Jan. 20, 2025), https://perma.cc/B5Q6-TLML. |
| 16 | Hamed Aleaziz et al., *How ICE Is Seeking To Ramp Up Deportations Through Courthouse Arrests*, N.Y. Times (May 30, 2025), https://perma.cc/GQ6N-LCL5. |
| 17 | Arelis R. Hernández & Maria Sacchetti, *Immigrant Arrests at Courthouses Signal New Tactic in Trump's Deportation Push*, Wash. Post (May 23, 2025), https://perma.cc/P9WL-SCS8. |
| 18 | Bill Melugin (@BillMelugin_), Twitter (May 22, 2025), https://perma.cc/P63W-GZ29. |

| | |
|---|---|
| 19 | Cameron Arcand, *Trump Administration Sets New Goal of 3,000 Illegal Immigrant Arrests Daily*, Fox News (May 29, 2025), https://perma.cc/Q5XP-Y5NY. |
| 20 | Brittany Gibson & Stef W. Kight, *Scoop: Stephen Miller, Noem Tell ICE to Supercharge Immigrant Arrests*, Axios.com (May 28, 2025), https://perma.cc/KY9F-SED4. |
| 21 | Gwynne Hogan, *ICE Agents Arrest at Least Seven Immigrants as Courthouse Blitz Continues*, The City (May 29, 2025), https://perma.cc/L73F-3P6K. |
| 22 | Luis Ferré-Sadurní & Dana Rubenstein, *ICE, Shifting Tactics, Detains High School Student at N.Y.C. Courthouse*, N.Y. Times (May 27, 2025), https://perma.cc/7FLS-VSDU. |
| 23 | Ted Hesson & Kristina Cooke, *ICE Arrests Migrants at Courthouses, Opens Door to Fast-track Deports*, Reuters (May 23, 2025), https://perma.cc/GRV8-J7TS. |
| 24 | Camilo Montoya-Galvez & Nidia Cavazos, *ICE Ending Migrants' Court Cases in order to Arrest and Move to Deport Them*, CBS News (May 23, 2025), https://perma.cc/QKS3-5LBQ. |
| 25 | Michael Elsen-Rooney, *A Bronx High Schooler Showed up for a Routine Immigration Court Date. ICE Was Waiting*, Chalkbeat (May 26, 2025), https://perma.cc/A75D-PCC5. |
| 26 | Nat'l Immigr. Just. Ctr., *22 People Arrested in ICE Raids Announce Federal Court Action Challenging Unlawful Warrantless ICE Arrests Under New Trump Administration* (Mar. 17, 2025), https://perma.cc/L88H-YMQT. |
| 27 | Judd Legum, *US Citizen Jose Hermosillo Was Wrongly Detained by ICE. The Government's Account Is False.*, Mother Jones (Apr. 23, 2025), https://perma.cc/RV2U-3KSR. |
| 28 | Laura Barron Lopez et al., *American Citizens Wrongly Detained in Trump Administration's Immigration Crackdown*, PBS NewsHour (Apr. 23, 2025), https://perma.cc/LH6V-U5TV. |
| 29 | Dell Cameron, *ICE's Facial Recognition Dragnet Is Getting More Dangerous*, SLATE (June 6, 2025), https://perma.cc/9EW4-TSEB. |
| 30 | Bryan Baker & Robert Warren, *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2018–January 2022*, Off. of Homeland Sec. Statistics (Apr. 2024), https://perma.cc/JG94-X8FY. |
| 31 | *"Manifesting" Fear At the Border: Lessons from Title 42 Expulsions*, Ctr. for Gender & Refugee Studies (Jan. 30, 2024), https://perma.cc/HZD7-S7SJ. |
| 32 | Human Rts. First, *"Don't Tell Me About Your Fear": Elimination of Longstanding Safeguard Leads to Systematic Violations of Refugee Law*(Aug. 2024), https://perma.cc/3J73-D4X2. |

| | |
|---|---|
| 33 | Borderland Immigr. Council, *Discretion to Deny: Family Separation, Prolonged Detention, and Deterrence of Asylum Seekers at the Hands of Immigration Authorities Along the US-Mexico Border* (Feb. 2017), https://perma.cc/Q7S2-6FAG. |
| 34 | Hum. Rts. Watch, *"You Don't Have Rights Here:" US Border Screening and Returns of Central Americans to Risk of Serious Harm* (Oct. 2014), https://perma.cc/9H2G-3C6K. |
| 35 | Nat'l Immigr. Just. Ctr., *Re: Inadequate U.S. Customs and Border Protection (CBP) Screening Practices Block Individuals Fleeing Persecution From Access to the Asylum Process*, (Nov. 13, 2014), https://perma.cc/Z4U5-NGZW. |
| 36 | Immigr. & Customs Enf't, *Report of the DHS Advisory Committee on Family Residential Centers*, (Sept. 30, 2016), https://perma.cc/TP5U-A4TA. |
| 37 | Lydia DePillis & Ernesto Londoño, *Trump Targets Workplaces as Immigration Crackdown Widens*, N.Y. Times (June 7, 2025), https://perma.cc/LF7E-328V. |
| 38 | Exec. Off. for Immigr. Rev., Immigration Court Practice Manual, Chapter 3.1, https://perma.cc/CBS9-FQAP. |
| 39 | Refugees Int'l, *Addressing the Legacy of Expedited Removal: Border Procedures and Alternatives for Reform*, (May 2021), https://perma.cc/42PQ-TPZA. |
| 40 | U.S. Dep't of Homeland Sec., Sample Form I-860 Notice and Order of Expedited Removal (Rev. Aug. 1, 2007), https://perma.cc/8352-7W26. |
| 41 | Jackie Llanos, *Cuban Man Tries to Strangle Himself Following Arrest in Miami Immigration Court*, Florida Phoenix (May 30, 2025), https://perma.cc/N3JH-AJY7. |

I hereby declare under penalty of perjury of the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.

Executed on June 10, 2025, in San Francisco, CA.



Hannah Steinberg

# EXHIBIT 1

**DEPARTMENT OF HOMELAND SECURITY**

**Office of the Secretary**

## Designating Aliens for Expedited Removal

**AGENCY:** Office of the Secretary, Department of Homeland Security

**ACTION:** Notice.

**SUMMARY:** This Notice rescinds the March 21, 2022 Notice, *Rescission of the Notice of July 23, 2019, Designation for Expedited Removal.* This Notice also restores the scope of expedited removal to the fullest extent authorized by Congress.

**DATES:** This designation is effective on 6:00 p.m. EST on Tuesday January 21, 2025.

**FOR FURTHER INFORMATION CONTACT:** Joseph Mazarra, Office of the General Counsel, Department of Homeland Security, 202–282–9256.

**SUPPLEMENTARY INFORMATION:**

### I. Background

This Notice rescinds the March 21, 2022 Notice, *Rescission of the Notice of July 23, 2019, Designating Aliens for Expedited Removal,*[1] which limited the application of expedited removal procedures to certain aliens under the Immigration and Nationality Act (INA), to the extent the March 21, 2022 Notice is inconsistent with this Notice. This Notice enables the U.S. Department of Homeland Security (DHS) to exercise the full scope of its statutory authority to place in expedited removal, with limited exceptions, aliens[2] determined to be inadmissible under sections 212(a)(6)(C) or (a)(7) of the INA who have not been admitted or paroled into the United States and who have not affirmatively shown, to the satisfaction of an immigration officer, that they have been physically present in the United States continuously for the two-year period immediately preceding the date of the determination of inadmissibility. Presently, immigration officers may apply expedited removal to aliens apprehended anywhere in the United States for up to two years after the alien arrived in the United States, provided that the alien arrived by sea and the other conditions for expedited removal were satisfied. For aliens who entered the United States by crossing a land border other than at a port of entry, with the March 21, 2022 Notice, the Secretary of DHS effectively exercised his discretion under the INA to limit the use of expedited removal to aliens apprehended by an immigration officer within 100 air miles of the United States international land border and who were continuously present in the United States for less than 14 days immediately prior to the date of encounter.

The INA grants the Secretary of Homeland Security the ''sole and unreviewable discretion'' to modify at any time the discretionary limits on the scope of the expedited removal designation. The Secretary is exercising his statutory authority through this Notice to designate for expedited removal the following categories of aliens not currently designated: (1) Aliens who did not arrive by sea, who are encountered anywhere in the United States more than 100 air miles from a U.S. international land border, and who have been continuously present in the United States for less than two years; and (2) aliens who did not arrive by sea, who are encountered within 100 air miles from a U.S. international land border, and who have been continuously present in the United States for at least 14 days but for less than two years. Therefore, the designation in this Notice restores the scope of expedited removal to the fullest extent authorized by Congress, as was previously established in the July 23, 2019 Notice, *Designating Aliens for Expedited Removal.* To the extent there is an ambiguity in this Notice, the intended effect of this notice is to apply expedited removal to the fullest extent authorized by statute.

The effect of this change will be to enhance national security and public safety—while reducing government costs—by facilitating prompt immigration determinations. In particular, the full application of expedited removal authority will enable DHS to address more effectively and efficiently the large volume of aliens who are present in the United States unlawfully, without having been admitted or paroled into the United States, and ensure the prompt removal from the United States of those not entitled to enter, remain, or be provided relief or protection from removal.

### II. This Notice Is Immediately Effective

In keeping with the practice followed in announcing the previous designations, and consistent with implementing regulations at 8 CFR 235.3(b)(1)(ii),[3] this designation is effective without prior notice and comment or a delayed effective date. *See, e.g.,* 67 FR 68923, 68925 (2002 Notice); 69 FR 48877, 48880 (2004 Notice); 82 FR 4769, 4769 (2017 elimination of exception for Cuban nationals arriving by air); 82 FR. 4902, 4902 (2017 elimination of exception for Cuban nationals encountered in the United States or arriving by sea); 84 FR 35409, 35413 (2019 Notice); 87 FR 16022, 16024 (2022 Notice).

Congress explicitly authorized the Secretary to designate categories of aliens to whom expedited removal procedures may be applied. It also made clear that ''[s]uch designation shall be in the sole and unreviewable discretion of the [Secretary] and may be modified at any time.'' *See* INA 235(b)(1)(A)(iii)(I), 8 U.S.C. 1225(b)(1)(A)(iii)(I)(emphasis added). Therefore, the Secretary's designation, within statutory bounds, is ''committed to agency discretion by law and . . . there is no cause of action to evaluate the merits of the Secretary's judgment under APA standards.'' *Make the Road N.Y.* v. *Wolf,* 962 F.3d 612, 633–634 (D.C. Cir. 2020). Furthermore, as the D.C. Circuit held, based on the statutory language allowing for modification of the designation ''at any time'' and in his ''sole and unreviewable discretion,'' the Department does not have to undertake the notice-and-comment rulemaking process. *Id.* at 635. As discussed above, the rulemaking procedures of the APA do not apply to this Notice and the expansion or contraction of a designation may be made ''at any time.'' *Id.* at 634–635 (internal quotation marks omitted).

### III. Notice of Designation of Aliens Subject to Expedited Removal

Pursuant to INA 235(b)(1)(A)(iii), 8 U.S.C. 1225(b)(1)(A)(iii), and 8 CFR 253.3(b)(1)(ii), I order, in my sole and unreviewable discretion, as follows:

(A) The Notice titled *Designating for Expedited Removal,* 87 FR 16022 (March 21, 2022), is hereby rescinded, effective immediately.

(B) I designate for expedited removal the following categories of aliens not

---

[1] The 2022 notice was published at 87 FR 16022. The 2019 notice was published at 84 FR 35409.

[2] The term ''alien'' is defined in statute as ''any person not a citizen or national of the United States.'' 8 U.S.C. 1101(a)(3). Going forward, DHS will adhere to statutory language and use the proper terminology.

[3] 8 CFR 235.3(b)(1)(ii) (providing that ''[t]he Commissioner shall have the sole discretion to apply the provisions of section 235(b)(1) of the Act, *at any time,* to any class of aliens described in this section'' and that this ''designation shall become effective upon publication of a notice in the **Federal Register**'' as well as that, ''if the Commissioner determines, in the exercise of discretion, that the delay caused by publication would adversely affect the interests of the United States or the effective enforcement of the immigration laws, the Commissioner's designation shall become effective immediately upon issuance, and shall be published in the **Federal Register** as soon as practicable thereafter'' (emphasis added)).

currently designated: (1) Aliens who did not arrive by sea, who are apprehended anywhere in the United States more than 100 air miles from a U.S. international land border, and who have been continuously present in the United States for less than two years; and (2) aliens who did not arrive by sea, who are apprehended within 100 air miles from a U.S. international land border, and who have been continuously present in the United States for at least 14 days but for less than two years. Each alien placed in expedited removal under this designation bears the affirmative burden to show to the satisfaction of an immigration officer that the alien has been present in the United States continuously for the relevant period. This designation does not apply to aliens who arrive at U.S. ports of entry, because those aliens are already subject to expedited removal. Nor does this designation apply to or otherwise affect aliens who satisfy the expedited removal criteria set forth in any of the previous designations. *See* 82 FR 4902, 69 FR 48877; 67 FR 68923.

(C) With the exception of the March 21, 2022 Notice rescinded above, this Notice does not supersede, abrogate, or amend or modify any of the Pre-2019 Designations,[4] which shall remain in full force and effect in accordance with their respective terms.

Signed at Washington, DC.

**Benjamin C. Huffman,**

*Acting Secretary of Homeland Security.*

[FR Doc. 2025–01720 Filed 1–21–25; 4:45 pm]

**BILLING CODE 9110–9M–P**

## INTERNATIONAL TRADE COMMISSION

**[Investigation Nos. 701–TA–606 and 731–TA–1416 (Review)]**

## Quartz Surface Products From China

### Determinations

On the basis of the record[1] developed in the subject five-year reviews, the United States International Trade Commission (''Commission'') determines, pursuant to the Tariff Act of 1930 (''the Act''), that revocation of the countervailing duty and antidumping duty orders on quartz surface products from China would be likely to lead to continuation or recurrence of material injury to an industry in the United States within a reasonably foreseeable time.

### Background

The Commission instituted these reviews on June 3, 2024 (89 FR 47614) and determined on September 6, 2024 that it would conduct expedited reviews (89 FR 97653, December 9, 2024).

The Commission made these determinations pursuant to section 751(c) of the Act (19 U.S.C. 1675(c)). It completed and filed its determinations in these reviews on January 17, 2025. The views of the Commission are contained in USITC Publication 5578 (January 2025), entitled *Quartz Surface Products from China: Investigation Nos. 701–TA–606 and 731–TA–1416 (Review).*

By order of the Commission.

Issued: January 17, 2025.

**Lisa Barton,**

*Secretary to the Commission.*

[FR Doc. 2025–01632 Filed 1–23–25; 8:45 am]

**BILLING CODE 7020–02–P**

## INTERNATIONAL TRADE COMMISSION

**[Investigation No. 337–TA–1433]**

## Certain Glass Substrates for Liquid Crystal Displays, Products Containing the Same, and Methods for Manufacturing the Same; Notice of Institution of Investigation

**AGENCY:** U.S. International Trade Commission.

**ACTION:** Notice.

**SUMMARY:** Notice is hereby given that a complaint was filed with the U.S. International Trade Commission on December 18, 2024, under section 337 of the Tariff Act of 1930, as amended, on behalf of Corning Incorporated, Corning, New York. A supplement to the Complaint was filed on January 7, 2025. The complaint, as supplemented, alleges violations of section 337 based upon the importation into the United States, the sale for importation, and the sale within the United States after importation of certain glass substrates for liquid crystal displays, products containing the same, and methods for manufacturing the same by reason of the infringement of certain claims of U.S. Patent No. 7,851,394 (''the '394 patent''); U.S. Patent No. 8,627,684 (''the '684 patent''); and U.S. Patent No. 9,512,025 (''the '025 patent''). The complainant, as supplemented, also alleges violations of section 337 based upon the importation and sale of certain glass substrates for liquid crystal displays, products containing the same, and methods for manufacturing the same by reason of misappropriation of trade secrets the threat or effect of which is to destroy or substantially injure a domestic industry. The complaint, as supplemented, further alleges that an industry in the United States exists as required by the applicable Federal Statute. The complainant requests that the Commission institute an investigation and, after the investigation, issue a general exclusion order, or in the alternative a limited exclusion order, and cease and desist orders.

**ADDRESSES:** The complaint, except for any confidential information contained therein, may be viewed on the Commission's electronic docket (EDIS) at *https://edis.usitc.gov.* For help accessing EDIS, please email *EDIS3Help@usitc.gov.* Hearing impaired individuals are advised that information on this matter can be obtained by contacting the Commission's TDD terminal on (202) 205–1810. Persons with mobility impairments who will need special assistance in gaining access to the Commission should contact the Office of the Secretary at (202) 205–2000. General information concerning the Commission may also be obtained by accessing its internet server at *https://www.usitc.gov.*

**FOR FURTHER INFORMATION CONTACT:** Pathenia M. Proctor, The Office of Unfair Import Investigations, U.S. International Trade Commission, telephone (202) 205–2560.

**SUPPLEMENTARY INFORMATION:**

*Authority:* The authority for institution of this investigation is contained in section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. 1337, and in section 210.10 of the Commission's Rules of Practice and Procedure, 19 CFR 210.10 (2024).

*Scope of Investigation:* Having considered the complaint, the U.S. International Trade Commission, on January 17, 2025, *ordered that*—

(1) Pursuant to subsection (b) of section 337 of the Tariff Act of 1930, as amended, an investigation be instituted to determine:

(a) whether there is a violation of subsection (a)(1)(B) of section 337 in the importation into the United States, the sale for importation, or the sale within the United States after importation of certain products identified in paragraph (2) by reason of infringement of one or more of claims 1, 5, 6, and 8–10 of '394 patent; claims 1, 2, 4, 7, and 10–12 of the '684 patent; and claims 15–20 of the '025 patent, and whether an industry in the United States exists as required by subsection (a)(2) of section 337;

[4] *See, e.g.,* 82 FR 4902 (Jan. 17, 2017); 69 FR 48877 (Aug. 11, 2004); 67 FR 68924 (Nov. 13, 2002).

[1] The record is defined in § 207.2(f) of the Commission's Rules of Practice and Procedure (19 CFR 207.2(f)).

# EXHIBIT 2

Secretary
U.S. Department of Homeland Security
Washington, DC 20528

Homeland Security

January 23, 2025

MEMORANDUM FOR: Caleb Vitello
Acting Director
U.S. Immigration and Customs Enforcement

Pete R. Flores
Senior Official Performing the Duties of the Commissioner
U.S. Customs and Border Protection

Jennifer B. Higgins
Acting Director
U.S. Citizenship and Immigration Services

FROM: Benjamine C. Huffman
Acting Secretary

SUBJECT: Guidance Regarding How to Exercise Enforcement Discretion

On January 20, 2025, I signed a memorandum entitled Exercising Appropriate Discretion Under Parole Authority. That memorandum clarifies DHS's position regarding the scope of the parole statute, 8 U.S.C. § 1182(d)(5), and directs a variety of actions to implement the memorandum. The memorandum also authorizes DHS components to pause, modify, or terminate, effective immediately, any parole program that is inconsistent with the memorandum—subject to certain conditions designed to ensure any such actions are lawful.

On January 21, 2025, I signed and transmitted to the Federal Register a notice entitled Designating Aliens for Expedited Removal. That notice expands the scope of expedited removal to the statutory maximum under 8 U.S.C. § 1225(b)(1) which, as further explained in the notice, includes certain aliens who have not been continuously present in the United States for two years.

This memorandum provides guidance regarding how to exercise enforcement discretion in implementing these policies.

"[T]he Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case." *United States v. Nixon*, 418 U. S. 683, 693 (1974). That principle applies with equal force to immigration enforcement. *United States v. Texas*, 599 U.S. 670, 679 (2023); *see*

*also Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 484 (1999) (Scalia, J.) (describing the Executive Branch's broad discretion to initiate or abandon removal proceedings).

To effectively implement these two new policies, consistent with the principles of enforcement discretion discussed above, I am directing you to take the following actions.

(1) For any alien DHS is aware of who is amenable to expedited removal but to whom expedited removal has not been applied:
   a. Take all steps necessary to review the alien's case and consider, in exercising your enforcement discretion, whether to apply expedited removal. This may include steps to terminate any ongoing removal proceeding and/or any active parole status.

(2) For any alien DHS is aware of who does not meet the conditions described in (1) but has been granted parole under a policy that may be paused, modified, or terminated immediately under the January 20 memorandum:
   a. Take all steps necessary to review the alien's case and consider, in exercising your enforcement discretion, whether any such alien should be placed in removal proceedings; and
   b. Review the alien's parole status to determine, in exercising your enforcement discretion, whether parole remains appropriate in light of any changed legal or factual circumstances.

The actions contemplated by this memorandum shall be taken in a manner consistent with applicable statutes, regulations, and court orders. They shall also be taken in a manner that takes account of legitimate reliance interests. It should be noted, however, that parole is a positive exercise of enforcement discretion to which no alien is entitled and that parole "shall not be regarded as an admission of the alien." 8 U.S.C. § 1182(d)(5)(A). Further, the expedited removal process includes asylum screening, which is sufficient to protect the reliance interests of any alien who has applied for asylum or planned to do so in a timely manner. *See* 8 U.S.C. § 1225(b)(1). To maximize efficiency in the short term, DHS components may wish to prioritize aliens eligible for expedited removal who failed to apply for asylum within the statutory deadline. *See* 8 U.S.C. § 1158(a)(2)(B) (setting a one-year deadline); *but see id.* § 1158(a)(2)(D) (discussing a very narrow exception to that deadline).

# EXHIBIT 3

AILA | CATHOLIC LEGAL IMMIGRATION NETWORK, INC. | American Immigration Council | human rights first | RAICES

December 24, 2015

León Rodríguez
Director, U.S. Citizenship and Immigration Services
20 Massachusetts Avenue, NW
Washington, DC 20529

Sarah Saldaña
Director, Immigration and Customs Enforcement
Department of Homeland Security
500 12th Street, SW
Washington, DC 20536

Dear Director Rodríguez and Director Saldaña:

The undersigned organizations provide legal assistance to parents and children detained in Dilley and Karnes City, Texas and Berks County, Pennsylvania.[1] We write to raise urgent concerns regarding egregious due process violations taking place inside family detention centers.

On August 21, 2015, Judge Dolly Gee ordered the Department of Homeland Security (DHS) to comply with the *Flores* Settlement Agreement by October 23, 2015.[2] Since that deadline, practitioners and advocates on the ground in all three family detention facilities have witnessed the implementation of a rapid deportation strategy that has short-circuited due process, rivaling the unlawful processes in place during the summer of 2014 at the Artesia, New Mexico family detention center.

The vast majority of mothers and children detained at the Dilley, Karnes, and Berks facilities have fled the regional refugee crisis caused by extreme violence in the Northern Triangle of Central America, which continues to escalate. The United States has both a legal and a moral obligation to give these families a meaningful opportunity to establish their claims for protection before taking steps to deport them. The danger of wrongfully returning someone — especially a child — to the very danger that prompted his or her family's flight, is very real. *The Guardian*

---

[1] Catholic Legal Immigration Network (CLINIC), the American Immigration Council, Refugee and Immigrant Center for Education and Legal Services (RAICES), and the American Immigration Lawyers Association (AILA) are partners in the CARA Family Detention Pro Bono Project, which provides legal services at the Dilley and Karnes detention facilities. Human Rights First (HRF) coordinates pro bono representation for some families detained at the Berks facility.
[2] *Flores, et al. v. Lynch, et al.*, No. 2:85-cv-04544, 2015 U.S. Dist. LEXIS 112911 (C.D.Ca. Aug. 21, 2015).

recently reported more than eighty confirmed cases since January 2014 in which Central Americans deported from the U.S. were killed upon return.[3]

Yet the U.S. government has deported many vulnerable, traumatized mothers and children with viable claims for protection based on a flawed credible and reasonable fear process. These problems have been compounded since October 23, because DHS has introduced practices that offend fundamental principles of due process and run rough-shod over key protections built into the expedited removal process. Specifically:

- USCIS' negative fear determinations are often flawed, with numerous substantive problems evident in the transcripts of initial fear interviews. Further, USCIS is adjudicating requests for reconsideration of negative fear determinations based on a heightened standard, which has led to the removal of families with viable claims for protection.

- USCIS and ICE have deprived parents and children of their statutory right to immigration judge review of a second negative fear determination.

- USCIS is effectively depriving certain children of the opportunity to assert their claims for asylum by refusing to fully consider children's claims independently of their parents' claims.

- ICE has deported represented parents and children while their cases are still in progress. In particular, ICE has disregarded pending and scheduled requests for reconsideration by a USCIS asylum officer, pending civil rights complaints, and pending petitions for review to the federal courts.

- DHS has transferred represented mothers and children away from counsel sometimes without any notice and more recently, without meaningful notice.

These changes, which are discussed in more detail below, have led to the unlawful deportation of many families who have legitimate claims for asylum or other protection under U.S. law. These problems also illustrate why expedited removal is simply the wrong approach for a traumatized population of families, many of whom have survived horrendous violence, rape or domestic violence.

## I. <u>Flawed fear interviews and use of a heightened standard to adjudicate requests for reconsideration of negative fear determinations</u>

There are many reasons why an initial fear interview, which is often conducted within days of apprehension, can go awry. Asylum-seeking mothers, who are frequently sick from their journeys and from their time in Customs and Border Protection (CBP) short-term holding facilities prior to arriving at Dilley, Karnes, or Berks, are often far too traumatized to reveal personal details of rape or other abuse, especially in front of their children or if the asylum officer is male. Those who speak indigenous languages may not be able to communicate at all.

---

[3] Sibylla Brodzinsky and Ed Pilkington, *U.S. Government deporting Central American migrants to their death*, THE GUARDIAN, Oct. 12, 2015, http://www.theguardian.com/us-news/2015/oct/12/obama-immigration-deportations-central-america (last visited Dec. 22, 2015).

These hurdles are compounded in the case of a child. It often takes experienced asylum attorneys many hours or even days to build a relationship of trust with a client before she is ready to reveal the circumstances that prompted her to flee to the United States.[4]

Immigration judge review, while very important in the asylum pre-screening process, does not replace the need for reconsideration. Immigration judge review does not always involve testimony and seldom involves attorney participation. At Dilley, CARA Project attorneys receive the next day's immigration court docket in the late afternoon, usually around 3:30 or 4:00 pm. With hearings beginning at 8:00 am the next morning, our clients have little to no time to prepare for their immigration judge reviews. At Karnes, RAICES pro bono attorneys do not even receive the docket from the San Antonio immigration court, which poses obvious challenges to representation and preparation for negative fear reviews before immigration judges. Consequently, families at Karnes often do not access legal representation until after an immigration judge has affirmed a negative fear determination. The reconsideration process provides a critical opportunity to correct factual errors, provide additional explanation, and ensure that individuals with meritorious cases can meaningfully access the protections our law affords. The CARA Project typically spends at least twenty hours per family for those who request reconsideration.

USCIS' new approach to reconsideration requests has undermined its regulatory charge to prevent the erroneous deportation of bona fide asylum seekers. USCIS has the regulatory authority to reconsider a negative credible fear determination. 8 C.F.R. § 1208.30(g)(2)(iv)(A) ("the Service … may reconsider a negative credible fear finding that has been concurred upon by an immigration judge after providing notice of its reconsideration to the immigration judge."). Under longstanding agency policy, the government has previously exercised its discretion to reconsider an asylum seeker's negative credible fear determination when she "has made a reasonable claim that compelling new information" in her case exists and should be considered. *See* Michael A Benson, Executive Assoc. Commissioner for Field Operations, Immigration & Naturalization Service, Memorandum, *Expedited Removal: Additional Policy Guidance* (Dec. 30, 1997).

However, on or around October 23, 2015, USCIS changed its approach and now will only reconsider a negative fear determination under egregious circumstances. Under 8 C.F.R. § 208.30(e), USCIS should find a credible fear where the facts and law give rise to a "significant possibility" that an individual will prove a claim for asylum. Given the life and death consequences of an erroneous fear determination, any type of error by USCIS — whether egregious or not — indicating that an applicant may in fact meet this standard, should prompt reconsideration.

Data collected by the CARA Project at Dilley demonstrate the consequences of USCIS' new standard, which coincided with a substantial increase in denials of requests for reconsideration. Notably, the denial rate jumped from 23% to 66% in the weeks following October 23. During

---

[4] *See, e.g.*, Jane Herlihy, et al., *Asylum Claims and Memory of Trauma: Sharing Our Knowledge*, THE BRITISH JOURNAL OF PSYCHIATRY, June 2007, 191 (1) 3-4, http://bjp.rcpsych.org/content/191/1/3 (last visited Dec. 22, 2015); Dr. Julian Gojer et al., *Post-Traumatic Stress Disorder and the Refugee Determination Process in Canada: Starting a Discourse*, UNHCR POLICY DEVELOPMENT AND EVALUATION SERVICE, March 2014, http://www.unhcr.org/53356b349.pdf (last visited Dec. 22, 2015).

the same period, the length of time USCIS takes to adjudicate a request for reconsideration was sharply reduced. Whereas USCIS previously took a week or more, the Houston Asylum Office now issues a decision on a request for reconsideration within twenty-four to forty-eight hours, and sometimes on the same day that the request was submitted.

The data strongly suggest that USCIS has shifted its approach to the reconsideration process to match its twenty-day representation to Judge Gee about processing times — notwithstanding the grave risk to bona fide asylum seekers who will be unlawfully deported as a result. A substantive comparison of recent denials with pre-October 23 approvals does not reveal any distinguishable characteristics. Specifically, CARA Project staff have observed that requests for reconsideration by families articulating the same type of fear, very similar past persecution, and a comparable fear of future persecution, which were frequently granted in the past, are now denied.

The impact of USCIS's new approach on bona fide asylum seekers is plain. Neither its heightened standard for reconsideration nor the pace of its adjudications aligns with a desire for accuracy. For example:

- During "Sofia's"[5] credible fear interview at the Dilley facility on November 25, 2015, she had trouble understanding the interpreter, was extremely nervous, and felt sick. She and her twelve-year-old daughter "Carolina" felt paralyzed by fear during their interview. These difficulties prevented Sofia from explaining the threats her daughter faces from a known sexual predator and gang member in Honduras, as well as her fears that any attempt to protect her daughter could provoke lethal retaliation from the gang. On December 3, without allowing any attorney participation, the immigration judge affirmed Sofia's negative credible fear finding. On December 6, CARA Project attorneys submitted a request for reconsideration detailing the significant threats that Sofia and her daughter would face if forced to return to Honduras. These new facts demonstrate that Sofia and Carolina have faced past persecution and have a well-founded fear of future persecution on account of Sofia's political opinion against the gang preying on her child, as well as her membership in the particular social group of young women without male protection in Honduras. The trauma that Sofia and Carolina have suffered, coupled with Sofia's severe anxiety during her initial fear interview, prevented her from fully presenting the facts of her case and warrant reconsideration. Nonetheless, the Asylum Office denied her request for reconsideration on December 8. On December 15, the CARA Project submitted a request for reconsideration for Sofia's daughter, which the Asylum Office denied the very next day. The family is at risk of imminent deportation while Sofia's attorneys try to persuade USCIS to reconsider her case.

- An asylum officer interviewed "Martiza" at the Karnes facility on November 24, 2015. Although she had suffered severe domestic violence at the hands of her husband, who started abusing her while she was pregnant with their second son and repeatedly threatened to kill her, Martiza only discussed the threats she received from MS-13 gang members during her credible fear interview. For Martiza, who comes from El Salvador, a country where domestic violence is common, the threats from the MS-13 gang members,

[5] For confidentiality reasons, pseudonyms are used in all case summaries.

who had threatened to kill her in an effort to extort money, seemed more important.[6] Moreover, the asylum officer never inquired about her experience of domestic violence. Martiza received a negative fear determination, which was affirmed by the immigration judge. On December 7, her counsel filed a request for reconsideration outlining new information that had not been covered in her initial interview. On December 9, the Asylum Office denied the request. On December 10, Martiza filed a new request for reconsideration, including additional evidence. On December 14, the Asylum Office denied the new request. Martiza, who was deported on December 15, never had an opportunity to explain the domestic violence she endured to an asylum officer.

- "Adriana" fled El Salvador with her daughter due to threats from gangs and sexual harassment of her daughter at school. On October 17, 2015, while detained at the Karnes facility, Adriana had her initial credible fear interview. On October 23, she received a negative determination, which an immigration judge affirmed on November 2. That same day, her attorneys submitted a request for reconsideration, citing interpretation problems, the fact that the asylum officer had repeatedly cut Adriana off, and additional information regarding her daughter's case that had not been elicited in the initial interview. The Asylum Office denied this request. Adriana's attorneys placed multiple phone calls with asylum officers and eventually secured a second interview for her daughter on the basis that the child's first interview did not meet the USCIS child asylum guidelines. In the course of this process, Adriana and her daughter were placed in medical isolation after refusing to sign their removal orders because they were still trying to fight their case. The family was finally released more than a month after their initial detention.

- When "Kezia" was ten years old, her uncle raped her. Now in her early twenties, she has a three-year-old daughter and remains unmarried. Before leaving her home country, Kezia and her daughter lived in a small village without male protection. Shortly before they fled to the United States, Kezia received an anonymous letter making it clear that local gang members had targeted Kezia and her daughter for sexual assault. Convinced that the police could not protect them, Kezia and her daughter fled the country. Following their arrival in the United States, they were detained at Dilley.

  During Kezia's initial fear interview, she did not have an opportunity to explain all the problems that had led to flee her home country and why she was afraid to return. As Kezia explained to CARA staff, "The officer only allowed me to make very short answers, or to answer 'yes' or 'no' to her questions." She received a negative fear determination, which an immigration judge affirmed two days later without allowing any attorney participation in the process. Kezia subsequently requested reconsideration, but the Asylum Office denied her request.

[6] While persecution based on threats of extortion is an evolving area of asylum law, a recent decision from the Fourth Circuit Court of Appeals held that nexus to a protected ground exists between gang extortion threats and the proposed particular social groups in that case. *See Ortega Oliva v. Lynch*, Slip Op. No. 14-1780, __ F.3d __, 2015 WL 7568245 (4th Cir. Nov. 25, 2015).

## II. <u>Refusing to afford immigration judge review of negative fear determinations.</u>

DHS has interfered with our clients' statutory right to administrative review by an immigration judge. The Immigration and Nationality Act (INA) and the applicable regulations require that all individuals who receive negative credible fear determinations have access to administrative review by an immigration judge. INA § 235(b)(1)(B)(iii)(III) ("The Attorney General shall provide by regulation and upon the alien's request for prompt review by an immigration judge of a determination under subclause (I) that the alien does not have a credible fear of persecution."); 8 C.F.R. 1208.30(g)(2)(i) (unless an applicant specifically declines immigration judge review, "[t]he asylum officer's negative decision regarding credible fear shall be subject to review by an immigration judge[.]"). The immigration judge's decision "is final and may not be appealed." 8 C.F.R. § 1208.30(g)(2)(i).

Likewise, an asylum officer may reconsider a negative determination. 8 C.F.R. § 1208.30(g)(2)(iv)(A). Upon reconsideration, the Asylum Office may grant a positive finding or may re-interview the noncitizen. The process for credible fear interviews, whether initial or subsequent, is laid out in INA § 235(b)(1)(B), which contains mandatory procedural protections that apply to all such interviews. Thus, a written record is required in the event of a negative determination, INA § 235(b)(1)(B)(iii)(II), and the applicant has a right to administrative review by an immigration judge, INA § 235(b)(1)(B)(iii)(III).

Longstanding agency policy makes clear that when a noncitizen requests and receives a re-interview, the procedural protections set forth by statute and regulation, including the right to seek administrative review of any negative credible fear determination, attach. *See* Michael A. Benson, Executive Assoc. Commissioner for Field Operations, Immigration & Naturalization Service, Memorandum, *Expedited Removal: Additional Policy Guidance* (Dec. 30, 1997) ("Re-interviews will occur when the Office of International Affairs determines that the alien has made a reasonable claim that compelling new information concerning the case exists and should be considered. Districts should cooperate by continuing to detain the alien until the second adjudication, and potentially also a second review by the immigration judge, is completed.").

Notwithstanding these procedural protections, sometime after November 5, 2015, USCIS and ICE began refusing to file necessary paperwork with the immigration courts to allow parents and children to avail themselves of their statutory right to immigration judge review of a negative credible fear determination following a re-interview by USCIS.[7] In several cases where parents and children independently filed motions with the immigration courts to obtain such review, immigration judges denied these motions.

[7] Recently, USCIS appears to have adopted another new practice. After an immigration judge has reviewed certain cases and affirmed negative determinations, instead of granting a new interview, USCIS has purported to conduct follow-up questioning to the initial § 235(b)(1)(B) interview. But that practice seems statutorily problematic. The statute authorizes asylum officers to undertake particular duties, and the regulations further delineate and constrain those duties. INA § 235(b)(1)(B) provides the only authority for interviewing a noncitizen for purposes of making a fear determination, and that section requires a written negative finding at the conclusion of the interview – not in the middle. Moreover, every negative finding requires immigration judge review.

- "Juliza" and her three children were apprehended on October 7, 2015. Fearing that gang members would target her family if they were forced to return to El Salvador, Juliza expressed her intent to seek asylum in the United States. On October 14, while detained at the Dilley facility, Juliza was interviewed by an asylum officer, who rendered a negative decision. Juliza explained during that interview that she only understood "a little, not much" of what the officer was asking her. On October 20, without allowing any attorney participation in the review, an immigration judge affirmed the negative determination. On November 5, Juliza requested reconsideration by the Asylum Office. Her request was granted, but her second interview was interrupted because one of her children was very sick. At the conclusion of the interview, Juliza was told that if "the asylum officer determines that you do not have a credible fear of persecution or torture, you may ask an Immigration Judge to review the decision. If you are found not to have a credible fear of persecution or torture and you do not request review, you may be removed from the United States as soon as travel arrangements can be made." The asylum officer subsequently issued a negative determination in writing.

  Despite Juliza's statutory and regulatory right to have an immigration judge review that decision, DHS refused to facilitate that process. On or about November 9, immigration officials refused to refer Juliza's case to the immigration judge for review of the negative determination. On or about November 12, immigration officials from USCIS and ICE informed Juliza's representatives that ICE had refused to refer her case to EOIR because she was not entitled to administrative review and would be scheduled for deportation.

  On or about November 13, Juliza filed a motion with EOIR requesting review under INA § 235(b)(1)(B)(iii)(III). On November 16, DHS filed an opposition brief stating that Juliza is not entitled to administrative review and erroneously relied upon 8 C.F.R. § 235.3(b)(7), which applies solely to review of expedited removal orders rather than immigration judge review of adverse fear determinations. DHS also erroneously stated that Juliza is a Mexican national. On November 17, EOIR refused to undertake an administrative review and denied Juliza a hearing. Recognizing that USCIS had granted Juliza a new credible fear interview pursuant to 8 C.F.R. § 1208.30(g)(2)(iv)(A), EOIR declined to review that determination because she "does not have the opportunity for any further review by statute or regulation."

  On November 17, ICE initiated the removal of Juliza and her three children and advised that they would be deported without any administrative review. Immigration officials took Juliza and her children to the airport to put them on a flight to El Salvador. However, due to a health concern Juliza had for one of her children, she and her family were taken back to the Dilley facility at the last minute. Three days later, Juliza and her children were deported. Since they arrived in El Salvador, Juliza and her children have received threats from members of the same gang who had targeted them before they fled. Juliza's husband, who lives in the United States, remains terrified that they will be harmed.

## III. Failing to consider a child's asylum claim independently from the parent's claim.

INA § 235(b)(1) sets forth the scheme through which foreign nationals subject to expedited removal shall be referred to the Asylum Office for a fear determination if they indicate an intention to apply for asylum or a fear of persecution, which may be expressed any time prior to deportation. This rule does not exclude minors who have been placed in expedited removal from being referred for a fear determination.[8]

Recognizing children's unique vulnerabilities, USCIS created a special set of guidelines for analyzing children's asylum claims.[9] These guidelines require asylum officers to view events from the child's perspective, taking into account the unique physical and psychological capacity of a child who is developing.[10] Thus, children may have claims distinct from their parents or stronger claims based on the same facts.[11]

Notwithstanding the USCIS guidelines, asylum officers have often failed — in the name of expeditiously processing families — to carry out their duty to conduct comprehensive, individualized screenings of children. In recent weeks, attorneys have observed that many requests for independent, initial interviews or re-interviews for children have been denied. Further, many initial credible fear "interviews" of children have lasted only a few minutes and have involved only brief, perfunctory questioning in the middle of, or immediately after, the mother's interview. Immigration judges often affirm the resultant negative findings without even speaking with the affected children. Given ICE's refusal to refer negative fear determinations issued after reconsideration to immigration judges for review, these children will receive *less* process than other asylum seekers – although they are among the most vulnerable asylum seekers the government encounters. The children's lack of review safeguards available to other asylum seekers prejudices them in establishing eligibility for asylum.

- Nine-year-old "Danny" was never given the chance to speak to an asylum officer or an immigration judge before being deported with his five-year-old brother, two-year-old sister, and mother (see Juliza's story in section II, above). Danny was terrorized by a Mara 18 gang member who accosted him outside the grounds of his school. The gang member threatened to take Danny away if he did not deliver a certain amount of money. On October 16, 2015, without speaking to Danny, the Asylum Office issued him a

---

[8] The regulations specifically note that a noncitizen may be – but does have to be – included in the principal's credible fear determination. *See* 8 C.F.R. § 208.30(b) Treatment of dependents (providing that a spouse or child who arrived in the United States concurrently with the principal "may have his or her credible fear evaluation and determination made separately, if he or she expresses such a desire").
[9] Memorandum from Jeff Weiss, Acting Director, Office of International Affairs, to Asylum Officers, Immigration Officers and Headquarters Coordinators (Refugees and Asylees), "Guidelines for Children's Asylum Claims" (December 10, 1998), http://www.aila.org/infonet/ins-guidelines-for-childrens-asylum-claims.
[10] Asylum Officer Basic Training Course Lesson Plan, "Guidelines for Children's Asylum Claims," at 37 (Sept. 1, 2009), http://www.uscis.gov/sites/default/files/USCIS/Humanitarian/Refugees%20%26%20Asylum/Asylum/AOBTC%20Lesson%20Plans/Guidelines-for-Childrens-Asylum-Claims-31aug10.pdf.
[11] The practice of subjecting *any* minor to the expedited removal process is questionable for reasons beyond the scope of this letter. One question that bears mention is whether there could ever be a jurisdictional basis for lodging the necessary predicate charge under INA § 212(a)(6) or (a)(7) against a minor – especially an infant – who plainly lacks the capacity to form the intent required under either provision.

negative credible fear determination, solely on the basis of his mother's interview. On October 20, an immigration judge, who also did not speak to Danny, affirmed this determination. As previously discussed, Danny's mother requested reconsideration of the fear finding by USCIS because, as she clearly stated during her initial interview, she understood only "a little, not much" of what the officer was asking her. Danny's mother's reconsideration interview had to be interrupted because her daughter was sick. When the interview was completed, the Asylum Office again issued a negative determination. Danny's mother sought immigration judge review of that decision, which was denied on or around November 9. On November 17, the CARA Project requested that the Asylum Office conduct an independent interview of Danny; that request was denied on November 18. In the early morning hours of November 20, Danny and his family were deported.

- Twelve-year-old "Carolina" was asked only nine questions in the middle of her mother's credible fear interview (see Sofia's story in section I, above). None of these questions addressed whether she was afraid to return to Honduras or, if so, why. The asylum officer, who was male, spoke to Carolina for only a few minutes before resuming her mother's interview and then issued a negative determination for both Carolina and her mother. But Carolina has a strong asylum claim of her own, separate and apart from her mother's. Carolina was repeatedly and directly targeted for predatory sexual acts and has been aggressively stalked, at times with knives and machetes, by a gang member who raped her friend. Carolina fears not only that this man will rape or kill her, but also the consequences of having reported her friend's rape to her mother and community members and of having defied the wishes of a gang member. The questioning Carolina received during her mother's credible fear interview was brief, perfunctory, and wholly insufficient to elicit information from a terrified preteen girl. She states in the declaration accompanying her own request for reconsideration that she had not even shared with her mother many of the harrowing details of the sexual harassment to which she was subjected. Despite Carolina's inability to explain the persecution she faces during the original credible fear interview, the Asylum Office denied her request for reconsideration. Carolina and her mother are now in danger of imminent deportation. Meanwhile, her attorneys are continuing to try to persuade USCIS to reconsider her case.

- "Eliana," a Guatemalan Mam-speaking mother, and her four children, ages four, five, nine, and thirteen, were detained at Dilley for more than a month. An asylum officer interviewed Eliana on November 18, 2015. But the transcript of the interview revealed clear communication difficulties because Eliana could not understand the particular dialect spoken by the Mam interpreter, who in turn spoke to a telephonic Spanish interpreter, who then communicated with the asylum officer. On multiple occasions, Eliana asked for a different interpreter and stated she did not understand the language being used, but the asylum officer responded that this was "proably [sic] as good as it gets" and forged ahead with the interview. At two points of the interview, the interpreter service was disconnected, first for twenty minutes and then for five minutes. The only child to whom the asylum officer spoke was "Jorge," Eliana's eldest child. The officer asked Jorge only six questions, not one of which was meaningfully designed or intended to elicit evidence regarding a credible fear for a child; like his mother, Jorge understood little of what was said. Yet on the basis of that flawed interview, the asylum officer

concluded that neither Eliana nor any of her children had a fear of return. Without allowing any attorney participation, an immigration judge affirmed that decision for the entire family. Eliana requested reconsideration, but the Asylum Office denied that request. The family's attorneys then requested an initial interview for Eliana's daughter as well as a re-interview for Jorge, who had never been meaningfully interviewed in the first place. The Asylum Office denied those requests, too, and the family was scheduled for deportation. The family's return to danger was only stayed at the last minute after Eliana's attorneys filed a complaint with the DHS Office for Civil Rights and Civil Liberties.

- As an eleven-year-old boy, "Ricardo" found the fear determination process very intimidating. He was so nervous during his initial fear interview that his hands were sweaty and shaking and he "was crying a little bit." Since the age of five, Ricardo has suffered from memory retention problems, which prevented him from fully explaining his fear of return to the asylum officer. Throughout his childhood, Ricardo endured severe trauma. His grandfather physically abused his mother and murdered his grandmother. On one occasion, Ricardo's grandfather locked him in the house with his mother, walked around with a machete, and threatened to kill both of them. Despite significant case law establishing that domestic violence constitutes persecution and that gangs specifically target boys Ricardo's age without male protection, the asylum officer only questioned Ricardo briefly during his mother's interview. His subsequent request for an independent interview was denied, and Ricardo and his mother were deported the next day.

## IV. <u>Disregarding pending and scheduled requests for reconsideration and other ongoing legal processes.</u>

Since early November 2015, ICE has disregarded pending requests for reconsideration and other ongoing legal processes in deporting families. Previously, when attorneys informed the Asylum Office that they were preparing requests for reconsideration on behalf of particular families, the Asylum Office would request stays of removal for those families with their ICE counterparts. This practice changed around early November, when ICE's Office of Chief Counsel informed CARA Project staff on the ground at the Dilley facility that this "gentleman's agreement" would no longer be honored. As a result of this change in practice, several families with valid claims for protection have been deported, sometimes even after a request for reconsideration has been granted and a re-interview has been scheduled. In addition, CARA Project staff have also observed that ICE effectuates deportations regardless of other pending legal processes, including in certain instances stay requests with federal courts of appeals, of which CARA staff routinely notify ICE upon filing.

- In May 2014, three M-18 gang members attacked "Iliana" and her sisters and held them hostage for ransom in their home country of Honduras. In August 2015, the same gang members began threatening Iliana again and, on one occasion, grabbed her, held a knife to her neck, and demanded money. The gang members later appeared at her home and again threatened her if she refused to pay. Once the gang members realized that Iliana lived alone with her twelve-year-old son, they repeatedly returned to her home, threatening to kill her and her son if she did not pay. In early September 2015, Iliana fled

to the United States with her son. They were detained at the Karnes facility, and Iliana did not receive any legal advice prior to her initial credible fear interview on October 10, 2015. After the Asylum Office issued a negative decision on October 12, Iliana's attorneys filed a request for reconsideration, which was granted on October 29. The Asylum Office scheduled Iliana's new credible fear interview for November 3 at 8 am. However, when an attorney arrived at the Karnes facility and attempted to attend the re-interview, Iliana could not be found. Shortly thereafter, the Asylum Office confirmed that Iliana had been deported on the evening of November 2, despite having a re-interview scheduled for the following morning.

- "Yatzil" an indigenous K'iche-speaking woman, fled her home country of Guatemala after non-indigenous men from a neighboring community repeatedly targeted and threatened her. The threats began around August 2015 when a masked man came into Yatzil's store, grabbed her daughter, and threatened to kidnap her if Yatzil did not give him money. After fleeing to the United States, Yatzil and her daughter were detained at Karnes on September 28, 2015. Yatzil underwent a credible fear interview, which was conducted in Spanish, on October 8 and received a negative determination. On October 26, CARA attorneys submitted a request for reconsideration, explaining that Yatzil's credible fear interview had been conducted in Spanish even though she is a K'iche speaker. The request explained further that Yatzil had received new information from her mother that members of the gangs who had previously threatened her had returned to their home.

  Yatzil's request for reconsideration was submitted by e-mail with attachments in excess of 10 MB. Given that the e-mail did not bounce back, her attorneys presumed it had been delivered. Having received no acknowledgement from the Asylum Office, they resubmitted the request on October 27, and copied a specific asylum officer. The attorneys also directly contacted ICE to alert them that the request was pending. The ICE officer who responded advised that Yatzil's deportation was imminent, and that he would continue moving forward until he heard otherwise. On October 28, the attorneys again contacted the Asylum Office to confirm that Yatzil's request had been received. That day, for the first time, the Asylum Office advised the attorneys that their servers could not accept attachments in excess of 10 MB. Accordingly, the attorneys re-submitted the request for reconsideration for the third time in as many days, in three separate emails. Later that day, the Asylum Office advised Yatzil's attorneys that they could not adjudicate the request because Yatzil had been deported that morning. Since her return to Guatemala, Yatzil has lived in hiding, afraid to leave her house because she knows that the men who were threatening her before she left still want to kill her and her daughter.

- As a single mother, "Lillian" was targeted and repeatedly raped over a period of seven months by her former employer. She and her thirteen-year-old daughter "Maribel" fled Guatemala after known rapists and drug traffickers began targeting Maribel. Armed men known for raping young girls chased Maribel on two separate occasions. Lillian and Maribel's decision to seek protection in the United States was driven in part by the nearly identical recent experiences of two other girls around Maribel's age, who had been

pursued and raped. Additionally, the same men went to Lillian's home and threatened to harm her if she refused to work for their drug trafficking ring.

On November 10, 2015, an Asylum Officer interviewed Lillian and issued a negative fear determination. The asylum officer never interviewed Maribel, even though Lillian's claims focused on protecting her daughter. On November 20, the immigration judge affirmed the negative determination. On November 24, CARA attorneys filed a request for reconsideration, which the Asylum Office denied the following day. On December 2, CARA attorneys filed another request for reconsideration based on additional information, including a declaration detailing the danger that Maribel faced. The Asylum Office denied that request the same day.

When Lillian arrived in the United States, she was suffering from an infection that required surgery, but she did not receive adequate medical attention while detained. Instead, after going to the medical clinic and complaining of her pain on three separate occasions, she was given pain medication. When ICE attempted to deport Lillian and Maribel, they were removed from the airplane due to concern that Lillian would be traveling under dangerous conditions because she did not have an adequate supply of her medication.

Despite pending claims under the Federal Torts Claim Act on behalf of Lillian and Maribel, ICE deported them on December 14, in direct violation of the agency's policy not to deport any individual with a pending civil rights claim against the government.[12] Lillian and Maribel are currently living in hiding in Guatemala. Already, in the weeks since their return, Lillian has received two letters under her door threatening to kidnap Maribel if Lillian refuses to cooperate in drug trafficking.

## V. <u>Transferring Represented Families Without Notice to Counsel</u>

Shortly after October 23, the CARA Project and Human Rights First became aware that DHS was transferring families from Dilley and Karnes to Berks after they had been detained in the Texas facilities for around seventeen days. Very often, the families who were transferred had either a pending request for reconsideration or a scheduled re-interview.

On November 2, 2015, the CARA Project sent DHS and ICE Headquarters a list of nineteen client families who had been transferred from Dilley to Berks, along with six client families who had been transferred from Karnes to Berks, without any prior notice to their counsel. Prior to these transfers, the lawyers for each of the clients had a G-28 (Notice of Appearance as Attorney or Representative) on file with the local ICE office. On November 16, the CARA Project advised ICE that the *Flores* Settlement Agreement requires *advance* notice to counsel of any transfer of a child in DHS custody.[13] Since then, the advance notice provided has often not been meaningful

---

[12] Memorandum of Understanding, Director John Morton, *Prosecutorial Discretion: Certain Victims, Witnesses and Plaintiffs* (June 17, 2011).

[13] Flores Settlement Agreement, No. CV-85-4544 (C.D.Cal. 1997), at para. 27, https://www.aclu.org/sites/default/files/assets/flores_settlement_final_plus_extension_of_settlement011797.pdf (last visited Dec. 22, 2015).

because ICE does not tell counsel when a family is scheduled for transfer — only that the family will at some indeterminate time in the future be transferred, making it nearly impossible for attorneys to take steps to prepare their clients.

The transfer of represented families has interfered with representation efforts by the CARA Project and caused our clients a great deal of stress. For example:

- The CARA Project notified ICE on October 28, 2015 that one client, "Jenny," had been transferred from the Dilley facility to the Berks facility with no notice to counsel. CARA staff explained that Jenny was a particularly vulnerable client whose mental state was very fragile. In fact, on October 25, a licensed clinical social worker at Dilley had found that Jenny was suffering from Post-traumatic Stress Disorder (PTSD) with anxiety features and depression. When Jenny learned that she had received a negative credible fear determination, she ran to the bathroom, vomited, and then had a panic attack — after which she was rushed out of the legal visitation trailer on a stretcher. After an immigration judge affirmed the asylum officer's negative fear determination, Jenny had another panic attack outside the court trailer. By that point, Jenny and her children, ages six and three, had been detained for more than five weeks. Despite Jenny's submission of a request for reconsideration on October 27, she and her children were transferred to the Berks facility the following day with no warning to her or her counsel.

  Transferring Jenny away from her attorneys, with whom she had built trust through numerous meetings to prepare her case, worsened her fragile psychological state. On November 7, following her transfer to the Berks facility, a licensed clinical social worker who met with Jenny reported that she appeared highly fearful and distraught during most of the interview and had again displayed symptoms consistent with PTSD. As CARA staff have observed with many other transfers, ICE officials did not tell Jenny where she was going when they took her to the airport. Jenny and her children were transported on a flight with a number of men and women shackled at the back of the plane. Jenny was so afraid that she refused to allow her six-year-old daughter to use the bathroom at the rear of the plane and instead diapered her for the duration of the flight. Following her arrival at the Berks facility, her attorneys had to refile Jenny's request for reconsideration with the Newark Asylum Office and secure local counsel at the Berks facility. Jenny's request for reconsideration was ultimately granted, and her re-interview resulted in a positive determination.

- "Alejandra's" husband was killed by local MS-13 gang members in her home country of El Salvador on June 20, 2015. After her husband's murder, Alejandra had contact with the police in the course of getting papers signed for her husband's life insurance policy. Because she was seen in a police car, certain gang members assumed she was cooperating with the police and began threatening her and her children. After two months in hiding, Alejandra and her children fled to the United States. While detained at the Karnes facility, Alejandra received a negative reasonable fear determination and her children received negative credible fear determinations. CARA attorneys filed G-28s for Alejandra and her children before their cases were reviewed by an immigration judge, who subsequently affirmed the negative determinations. On October 26, 2015,

Alejandra's attorney called her deportation officer to alert him that a request for reconsideration was being prepared. However, only after filing the request on October 28 did Alejandra's attorney learn that she and her children had been transferred to the Berks facility. Her attorneys received no prior notice of the transfer.

**Conclusion**

The shifts in USCIS and ICE practices detailed in this letter undermine due process protections for the vulnerable population of families fleeing violence in Central America and seeking protection in the United States. These shifts underscore the reality that this Administration's experiment with family detention has failed. We hope that this letter will prompt your agencies to reconsider the implications of these practices and to immediately end the misguided policy of detaining children and their parents in Texas and Pennsylvania.

Benjamin Johnson

American Immigration Council

Jeanne Atkinson

Catholic Legal Immigration Network, Inc.

Victor D. Nieblas Pradis

American Immigration Lawyers Association

Jonathan Ryan

Refugee and Immigrant Center for Education and Legal Services

Eleanor Acer

Human Rights First

cc:

Cecilia Muñoz, Assistant to the President and Director, White House Domestic Policy Council

Alejandro Mayorkas, Deputy Secretary, Department of Homeland Security

Esther Olavarria, Senior Counselor to the Secretary of Homeland Security

Serena Hoy, Senior Counselor to the Deputy Secretary of Homeland Security

Juliet Choi, Chief of Staff, U.S. Citizenship and Immigration Services

Leonard P. Joseph, Chief of Staff, U.S. Immigration and Customs Enforcement

# EXHIBIT 4

UNITED STATES COMMISSION ON INTERNATIONAL RELIGIOUS FREEDOM

# Report on Asylum Seekers in Expedited Removal

## VOLUME I: FINDINGS & RECOMMENDATIONS

*As authorized by Section 605 of the International Religious Freedom Act of 1998*



205-851 CRF cover.indd 1 2/1/05 1:15:39 PM

# REPORT ON ASYLUM SEEKERS IN EXPEDITED REMOVAL

FEBRUARY 2005

U.S. Commission on International Religious Freedom
800 North Capitol Street, NW
Suite 790
Washington, DC 20002
202-523-3240
202-523-5020 (fax)

*www.uscirf.gov*

# United States Commission on International Religious Freedom

Preeta D. Bansal

*Chair*

Felice D. Gaer

Nina Shea*

*Vice Chairs*

Archbishop Charles J. Chaput

Michael Cromartie

Khaled Abou El Fadl

Elizabeth H. Prodromou

Bishop Ricardo Ramirez

Michael K. Young

Ambassador John V. Hanford, III, *ex officio*

Joseph R. Crapa
*Executive Director*

Tad Stahnke
*Deputy Director of Policy*

Mark Hetfield
*Immigration Counsel*

*Asylum Seekers in Expedited Removal Subcommittee*

Preeta D. Bansal

Michael Cromartie

Bishor Ricardo Ramirez

Michael K. Young

Felice D. Gaer, *ex officio*

* Due to personal demands on her time, Commissioner Shea did not review or participate in the Study.

## Study on Asylum Seekers in Expedited Removal


### Authors

Refugee and Asylum Experts

Mark Hetfield, *Editor and Director of Study*
*(U.S. Commission on International Religious Freedom)*

Kate Jastram
(*University of California at Berkeley, Boalt Hall School of Law)*

Allen S. Keller, M.D.
*(NYU School of Medicine, Bellevue-NYU Program for Survivors of Torture*)

Charles H. Kuck*
(*Weathersby, Howard, and Kuck, LLC, Atlanta*)

Detention Advisor

Craig Haney, Ph.D.
*(University of California at Santa Cruz)*

Chief Methodologist

Fritz Scheuren, Ph.D.
*(National Opinion Research Center, University of Chicago)*

Leading Research Staff

Patrick Baier, *Statistician*
*(National Opinion Research Center)*

Cory Fleming, *Statistician*
*(National Opinion Research Center)*

Tala Hartsough, *Research Coordinator*
*(University of California at Berkeley, Boalt Hall School of Law)*

Susan Kyle, *Research Coordinator*
*(U.S. Commission on International Religious Freedom)*

Andrew Rasmussen, Ph.D., *Research Director*
*(Bellevue-NYU Program for Survivors of Torture)*

Kim Reeves, *Research Coordinator*
*(Bellevue-NYU Program for Survivors of Torture)*

Barry Rosenfeld, Ph.D., *Port of Entry Study Methodologist*
*(Fordham University)*


---

* Replaced Robert C. Divine, who resigned on June 30, 2004 to accept an appointment at the Department of Homeland Security as the Chief Counsel to U.S. Citizenship and Immigration Services.

## RESEARCHERS

U.S. COMMISSION ON INTERNATIONAL RELIGIOUS FREEDOM
Claire Morris Clark
Robin Gary
Anne Marie Harkins
Karen Luong

NATIONAL OPINION RESEARCH CENTER
Ali Mushtaq

UNIVERSITY OF CALIFORNIA AT BERKELEY BOALT HALL SCHOOL OF LAW
Michael Burstein
Shelley Cavalieri
Carol Chacon
Amy Cucinella
Allison Davenport
Kathleen Glynn
Steven Herman
Olivia Horgan
Tara Lundstrom
Lauri Owen
Kyra Sanin
Rani Singh
Rebecca Tanner
Kaja Tretjak
Kristie Whitehorse

BELLEVUE-NYU PROGRAM FOR SURVIVORS OF TORTURE
Monica Aguirre
Christopher Barrett
Pamela Blair
Rona Carter
Charlotte Labys
Tracy Chu
Adam Cohen
R. Meghan Davis
Nirva Delva
Mariel Diaz
Tia Dole
Darlene Dowling
Cristina Fernandez
Lara Gamble
Sanida Halebic
Jonathan Hill
Jessica Hood
Marissa Huang
Allison Korn
Charlotte Labys
Christina Luna
Jane Marshall
Christina Mathieson
Melody Moezzi
Valentina Nikulina
Lorelei Prevost
Claudia Rincón
Jamie Rosenman
Evan Silverman
Sylvia Sullivan

# TABLE OF CONTENTS
# REPORT ON ASYLUM SEEKERS IN EXPEDITED REMOVAL
# VOLUME I: FINDINGS & RECOMMENDATIONS


ACKNOWLEDGEMENTS................................................................................. vii

EXECUTIVE SUMMARY..................................................................................1

INTRODUCTION...........................................................................................10

STUDY EXPERT BIOGRAPHIES.......................................................................17

BACKGROUND BRIEF AND GLOSSARY ON EXPEDITED REMOVAL.................................20

EXPEDITED REMOVAL FLOW CHART............................................................. 29

ORGANIZATIONAL CHART FOR DEPARTMENT OF HOMELAND SECURITY..........................31

QUICK STATISTICS......................................................................................32

HIGHLIGHTS OF THE STUDY METHODOLOGY.......................................................36

U.S. AND INTERNATIONAL ASYLUM STANDARDS.................................................40

STUDY FINDINGS........................................................................................50

STUDY RECOMMENDATIONS............................................................................63

# SUMMARY TABLE OF CONTENTS
# REPORT ON ASYLUM SEEKERS IN EXPEDITED REMOVAL
# VOLUME II: EXPERT REPORTS


EVALUATION OF CREDIBLE FEAR REFERRAL IN EXPEDITED REMOVAL AT PORTS OF ENTRY IN THE UNITED STATES
Allen Keller, Andrew Rasmussen, Kim Reeves, and Barry Rosenfeld………………………. 1

A-FILE AND RECORD OF PROCEEDING ANALYSIS OF EXPEDITED REMOVAL
Kate Jastram and Tala Hartsough.………………………………………………………… 44

REPORT ON CREDIBLE FEAR DETERMINATIONS
Mark Hetfield……………………………………………………………………………….165

CONDITIONS OF CONFINEMENT FOR DETAINED ASYLUM SEEKERS SUBJECT TO EXPEDITED REMOVAL
Craig Haney……………………………………………………………………………… 178

LEGAL ASSISTANCE FOR ASYLUM SEEKERS IN EXPEDITED REMOVAL: A SURVEY OF ALTERNATIVE PRACTICES
Charles Kuck……………………………………………………………………………..232

STATISTICAL REPORT ON EXPEDITED REMOVAL, CREDIBLE FEAR, AND WITHDRAWAL,
FY 2000-2003
Cory Fleming and Fritz Scheuren…………………………………………………….. 281

STATISTICAL REPORT ON DETENTION, FY 2000-2003
Cory Fleming and Fritz Scheuren…………………………………………………….. 323

STATISTICAL REPORT ON IMMIGRATION COURT PROCEEDINGS, FY 2000-2004

Susan Kyle, Cory Fleming, and Fritz Scheuren……………………………………….383

SELECTED STATISTICAL ANALYSES OF IMMIGRATION JUDGE RULINGS ON ASYLUM APPLICATIONS, FY 2000-2003
Patrick Baier……………………………………………………………………………...674

ACKNOWLEDGEMENTS

*The authors of this Study would like to express our appreciation to the following individuals and organizations who were of great assistance during our research. We would especially like to thank the Commissioners on the Expedited Removal Subcommittee for their tireless support, their counsel, and for accompanying us to numerous detention centers and ports of entry. We would also like to express our gratitude to the many men and women around the country at the Department of Homeland Security and the Executive Office for Immigration Review who provided us with their time and insights on the Expedited Removal Process.*

DEPARTMENT OF HOMELAND SECURITY
**Customs and Border Protection (CBP) –** especially our primary liaison, Linda Loveless, as well as Salvador Flores and Dana Graydon;
**Immigration and Customs Enforcement (ICE) –** especially our primary liaison, Elizabeth Herskovitz, as well as John Bjerke and Teresa Logue;
**Office of Immigration Statistics –** especially our primary liaison, Michael Hoefer, and Jim Fitzsimmons; and
**U.S. Citizenship and Immigration Services (USCIS)** – especially our primary liaison, Georgia Papas, as well as Karen Fitzgerald and Marc Sanderson.

DEPARTMENT OF JUSTICE
**Executive Office for Immigration Review (EOIR) –** especially our primary liaison, Marta Rothwarf, as well as Isabelle Chewning, Steven Lang, Scott Rosen, Brett Endres and Pamela Calvert.

GOVERNMENT ACCOUNTABILITY OFFICE (GAO) **–** especially Richard Stana and Jim Blume, who interrupted his retirement to discuss the GAO Study with us.

UNITED NATIONS HIGH COMMISSIONER FOR REFUGEES (UNHCR) – especially Larry Katzman, Dianne Curran, Elizabeth Dallam, Jane Kochman, Janice Marshall and Andrew Painter.

NON-GOVERNMENTAL ORGANIZATIONS AND ACADEMIC INSTITUTIONS
**American Bar Association, Washington, D.C.** – especially Andrea Siemens for her invaluable guidance on the detention standards;
**Center for Gender and Refugee Studies, UC Hastings College of the Law, San Francisco** – especially Karen Musalo for sharing her extensive expertise and groundbreaking efforts;
**Florida Immigrant Advocacy Center (FIAC), Miami –** especially Cheryl Little for facilitating meetings with clients to hear about their experiences in Expedited Removal;
**Georgetown University, Washington, D.C. –** especially Dean T. Alexander Aleinikoff of the Law Center, and Andrew Schoenholtz at the Institute for the Study of International Migration, for hosting a roundtable on the Study;
**Hebrew Immigrant Aid Society (HIAS), New York –** especially Frank Lipiner, Reena Arya and Simon Wettenhall for facilitating meetings to hear about their clients' experiences;
**Human Rights First, New York** – especially Eleanor Acer, Archi Pyati, Erin Corcoran and Anwen Hughes for facilitating meetings to hear about their clients' experiences; and
**Migration Policy Institute (MPI), Washington, D.C. –** especially Kathleen Newland for hosting a roundtable marking the beginning, and a briefing marking the end, of the Study.

***And the many other NGOs around the country who met with us on Expedited Removal.***

# ASYLUM SEEKERS IN EXPEDITED REMOVAL

*A Study Authorized by Section 605 of the International Religious Freedom Act of 1998*
(The entire study is available at www.uscirf.gov)

## EXECUTIVE SUMMARY

### *THE UNITED STATES COMMISSION ON INTERNATIONAL RELIGIOUS FREEDOM*

The U.S. Commission on International Religious Freedom (USCIRF) was established by the International Religious Freedom Act of 1998 (IRFA). USCIRF is an independent and bipartisan federal agency created to monitor religious freedom in other countries and advise the President, Secretary of State and Congress on how best to promote it.

IRFA also authorized the Commission to appoint experts to conduct a study to advise whether certain legislative changes to asylum, enacted in 1996, were impairing America's obligation – and founding tradition – of offering refuge to those suffering persecution.

The Study examined how the new immigration procedure – known as "Expedited Removal" – was affecting asylum seekers, regardless of whether or not the claim was based on religion, race, nationality, membership in a particular social group, or political opinion.

### *EXPEDITED REMOVAL*

In 1996, President Bill Clinton signed the Illegal Immigration and Immigrant Responsibility Act (IIRAIRA), the most comprehensive immigration reform legislation in over 30 years. Among other reforms, the legislation established Expedited Removal, which was intended to strengthen the security of America's borders, without closing them to those fleeing persecution.

Specifically, prior to IIRAIRA, immigration inspectors could not compel an improperly documented alien to depart the United States. The inspector had the discretion to offer the alien the opportunity to withdraw his application for admission, or to refer the alien to an immigration judge for a hearing. If the inspector did refer the alien to an immigration judge, the alien could be detained until the hearing, but would generally be released due to bed-space shortages.

Under IIRAIRA, immigration inspectors were authorized to summarily remove aliens who lacked appropriate travel documents, or who obtained their travel documents through fraud or misrepresentation. Concerned, however, that *bona fide* asylum seekers not be removed to countries where they may be persecuted, Congress also included provisions to prevent the Expedited Removal of refugees fleeing persecution.[1] Specifically, an alien who indicates an

---

[1] Under the 1967 Protocol to the 1951 Convention relating to the Status of Refugees, which the United States has ratified, as implemented by the Refugee Act of 1980 and other amendments to the Immigration and Nationality Act, the United States may not return any individual to a country where that individual may face persecution on the basis of race, religion, nationality, membership in a particular social group or political opinion. In addition, the United

intention to apply for asylum or a fear of return is entitled to a "credible fear interview" by an asylum officer. If the asylum officer determines that an alien has a "significant possibility" of establishing eligibility for asylum, he is entitled to ask the immigration judge for relief from removal.[2] If credible fear is not found, the asylum officer orders the alien removed (although this decision is subject to review by an immigration judge).

Congress also required that aliens, including asylum seekers, subject to Expedited Removal be detained until the United States physically removes them, after which they may not return to the United States for five years. If an asylum officer determines that an alien has credible fear, however, the alien may be considered for release while waiting for an asylum hearing. While decisions of release ("parole") are discretionary, agency memoranda instruct that "parole is a viable option and should be considered for aliens who meet the credible fear standard, can establish identity and community ties, and are not subject to any possible bars to asylum involving violence or misconduct."[3]

On March 1, 2003, the Immigration and Naturalization Service (INS), the lead agency on Expedited Removal, was abolished by the Homeland Security Act of 2002. The functions of the former INS were dispersed to various components within the newly created Department of Homeland Security. The immigration judges, however, remained in the Executive Office for Immigration Review (EOIR) within the Department of Justice. [4]

Expedited Removal is mandatory for aliens arriving at ports of entry. Congress, however, also authorized the Attorney General to exercise discretion in applying Expedited Removal in the interior of the United States to undocumented aliens apprehended within two years after entry. On November 13, 2002, Expedited Removal was expanded by the INS to apply to undocumented non-Cubans who entered the United States by sea within the prior two years.

On August 11, 2004, the Department of Homeland Security announced that, effective immediately, it was exercising its discretion to further expand Expedited Removal authority to the Border Patrol for undocumented aliens apprehended within 14 days after entry and within 100 miles of the border, in the Tucson and Laredo Border Patrol sectors.[5]

---

States has ratified and implemented regulations to execute the Convention Against Torture (CAT), and may not remove anyone to a country where (s)he is in danger of being tortured.

[2] "Credible fear" is defined in section 235(b)(1)(B)(v) of the Immigration and Nationality Act, 8 USC 1225(b)(1)(B)(5) (2004).

[3] INS Memorandum, *Expedited Removal: Additional Policy Guidance* (Dec. 30, 1997) from Michael A. Pearson, Executive Associate Commissioner for Field Operations, Office of Field Operations, to Regional Directors, District Directors, Asylum Office Directors, reproduced in 75 *Interpreter Releases* 270 (Feb. 23, 1998).

[4] EOIR oversees the Immigration Judges who review negative credible fear determinations made by asylum officers and who hear asylum claims from aliens placed in Expedited Removal. It also houses the Immigration Judges' appellate review unit, the Board of Immigration Appeals (BIA).

[5] Designating Aliens for Expedited Removal, 69 Fed. Reg. 48,877 (2004).

***THE STUDY***

In the International Religious Freedom Act of 1998 (IRFA), Congress authorized the USCIRF to appoint experts to examine whether immigration officers, in exercising Expedited Removal authority over aliens who may be eligible for asylum, were:

(1) Improperly encouraging withdrawals of applications for admission;
(2) Incorrectly failing to refer such aliens for credible fear determinations;
(3) Incorrectly removing such aliens to countries where such aliens may face persecution; or
(4) Improperly detaining such aliens, or detaining them under inappropriate conditions.

Congress authorized the USCIRF-appointed experts to have virtually unrestricted access to Expedited Removal proceedings.

IRFA also required the Government Accountability Office (GAO) to complete its own study on asylum seekers in Expedited Removal, which was released in September 2000. That study found that, in spite of some deficiencies in the process, INS was generally in compliance with its own Expedited Removal procedures. GAO, however, relied primarily on the review of INS records, statistical analyses, and whether INS was following its own procedures. GAO chose not to critically review legal determinations made by INS or the Executive Office for Immigration Review.

The Commission began its effort in the Fall of 2003, after the absorption of most Expedited Removal operations into the Department of Homeland Security (DHS). Like the GAO, USCIRF appointed experts chose to avoid reviewing legal analyses performed by the Departments of Homeland Security and Justice, focusing instead on building on the file review and statistical analyses gathered by GAO. The USCIRF Study, however, also differed from the GAO effort in several respects. Specifically, the USCIRF-appointed experts chose to:

- Observe inspections at seven major ports of entry (GAO did not collect data from observations of Expedited Removal proceedings);
- Compare the detention standards to correctional standards, and ascertain whether correctional standards where "appropriate" for a non-criminal asylum seeker population (GAO instead accepted the INS detention standards, and measured INS compliance with some of those standards);
- Review the use of documents created during the Expedited Removal process are used as evidence during asylum hearings; and
- Examine the impact of representation on asylum claimants subject to Expedited Removal.

In collecting data for the Study, under the guidance of a chief methodologist and other experts in research methods, the experts:

- Observed, and collected data from, 404 secondary inspections and interviewed 194 aliens in Expedited Removal proceedings (with 155 of those aliens being both interviewed and observed);

- Reviewed randomly selected subsamples of an additional 339 files from the Ports of Entry; 32 files of aliens who dissolved their asylum claims; 163 records of proceeding from the Board of Immigration Appeals; and 321 Alien Files of Asylum Seekers who were referred for credible fear;
- Surveyed all eight asylum offices and 19 detention facilities;
- Interviewed, and collected data from, 39 asylum seekers who were dissolving their asylum claim;
- Reviewed 50 files provided by DHS of negative credible fear determinations; and
- Compiled nation-wide statistics with the assistance of EOIR and DHS.

***OVERVIEW OF FINDINGS AND RECOMMENDATIONS OF THE USCIRF STUDY***

The Study found mandatory procedures in place to ensure that asylum seekers are protected under Expedited Removal. Some procedures were applied with reasonable consistency, but compliance with others varied significantly, depending upon where the alien arrived, and which immigration judges or inspectors addressed the alien's claim. Most procedures lacked effective quality assurance measures to ensure that they were consistently followed. Consequently, the outcome of an asylum claim appears to depend not only on the strength of the claim, but also on which officials consider the claim, and whether or not the alien has an attorney. Similarly, while DHS has developed criteria relating to the release of detained asylum seekers, the implementation of these criteria also varies widely from place to place.

There are a few areas, however, where the Study identified problems other than inconsistent practices. For example, with regard to detention, the Study found that asylum seekers are consistently detained in jails or jail-like facilities, which the experts found inappropriate for non-criminal asylum seekers. There were, however, a small number of exceptions to this rule, the most prominent being a contract facility in Broward Country, Florida, which represents a secure, but appropriate and non-correctional, environment for non-criminal asylum seekers.

The Study also found that asylum seekers without a lawyer had a much lower chance of being granted asylum (2 percent) than those with an attorney (25 percent). This difference was consistent whether the alien resided – or was detained – in an area with a high rate of representation, or a low rate of representation. The Study does, however, identify a number of locations where public-private initiatives involving DHS, the Executive Office for Immigration Review, and non-governmental organizations, have put legal assistance within reach of more detained asylum seekers. These programs, however, are limited to only a few select locations.

With regard to credible fear determinations, the Study found that asylum officers screened-in more than 90 percent of credible fear applicants, and made a negative credible fear finding in only 1 percent of cases. Quality assurance procedures – requiring much more extensive documentation and review of negative claims than of positive ones, may have created a built-in bias in the credible fear screening, undermining the objectivity of the process.

Each stage of the Expedited Removal Process relies upon the information collected in previous stages:

(1) The alien is referred by Customs and Border Protection (CBP) for a credible fear interview, or removed; then
(2) Referred by an asylum officer at U.S. Citizenship and Immigration Services (USCIS) for an asylum hearing, or ordered removed (subject to immigration judge review of the negative credible fear determination); then
(3) Detained or paroled by Immigration and Customs Enforcement (ICE); and then
(4) With the participation in the courtroom by an ICE Trial Attorney, granted or denied asylum, withholding, or Convention Against Torture (CAT) relief by the immigration judge (in the Department of Justice Executive Office for Immigration Review – EOIR).

The impediments to communication and information sharing within DHS, however, are serious. By the end of the process – the asylum hearing – unreliable and/or incomplete documentation from CBP and USCIS is susceptible to being misinterpreted by the ICE Trial attorney, misapplied by the Immigration Judge, and may ultimately result in the denial of the asylum-seeker's claim. The Study did not seek to determine whether asylum claims were incorrectly denied, but did determine that immigration judges, even within the same court, had significantly different rates of granting or denying asylum claims. Furthermore, in denying asylum applications on the basis of credibility, immigration judges frequently cited documents which the Study found to be unreliable and incomplete records. The unreliability of the documentation was documented by the Port of Entry study (Keller, et al), and its incompleteness and its use in immigration proceedings were documented by the File Review (Jastram, et al).

The Study also noted that Expedited Removal has been expanded twice in recent years, without first addressing the flaws in the system which undermine the protections for asylum seekers.

The Study urges the incoming Secretary of Homeland Security to ensure that it is no longer he – but a high ranking official who reports to him – who is responsible for coordinating refugee and asylum matters among the various bureaus. Without day-to-day oversight of asylum policy and its implementation department-wide, the flaws in the system identified in this Study cannot be effectively addressed, leaving asylum seekers in Expedited Removal at risk of being returned to countries where they may face persecution.

## SPECIFIC FINDINGS AND RECOMMENDATIONS

### *FINDINGS*

### Question One

*ARE IMMIGRATION OFFICERS, EXERCISING EXPEDITED REMOVAL AUTHORITY, IMPROPERLY ENCOURAGING ASYLUM SEEKERS TO WITHDRAW APPLICATIONS FOR ADMISSION?*

*Department of Homeland Security (DHS) regulations, and Customs and Border Protection (CBP) procedures and training materials make it clear to CBP inspectors that the withdrawal of an application for admission is "strictly voluntary" and "must not be coerced in*

*any way." While most officers observed complied with these procedures, in one port of entry the Study observed a few instances in which immigration officers improperly encouraged asylum seekers to withdraw their applications for admission.*

**Question Two**

*ARE IMMIGRATION OFFICERS, EXERCISING EXPEDITED REMOVAL AUTHORITY, INCORRECTLY FAILING TO REFER ASYLUM SEEKERS FOR A CREDIBLE FEAR INTERVIEW?*

*DHS regulations state that an immigration inspector must refer an alien for a credible fear determination if that alien indicates "an intention to apply for asylum, a fear of torture, or a fear of return to his or her country." In accordance with these regulations, nearly 85 percent (67/79) of arriving aliens observed by the Study expressing a fear of return were referred for a credible fear interview. CBP Guidelines, however, provide the inspector with more discretion than the regulations, allowing the inspector to decline referral in cases where the fear claimed by the applicant is unrelated to the criteria for asylum. Indeed, in 15 percent (12/79) of observed cases when an arriving alien expressed a fear of return to the inspector, the alien was not referred. Moreover, among these twelve cases were several aliens who expressed fear of political, religious, or ethnic persecution, which are clearly related to the grounds for asylum. Of particular concern, in seven of these twelve cases, the inspector incorrectly indicated on the sworn statement that the applicant claimed he had no fear of return.*

*DHS regulations require immigration inspectors to follow a standard script informing each alien that (s)he may ask for protection if (s)he has a fear of returning home. In approximately half of inspections observed, inspectors failed to inform the alien of the information in that part of the script. Aliens who did receive this information were seven times more likely to be referred for a credible fear determination than those who were not.*

*While DHS guidance requires that asylum seekers at land ports of entry be placed in Expedited Removal and referred for a credible fear interview, the Study interviewed two groups of aliens (one from the Middle East, the other from East Africa) who requested the opportunity to apply for asylum but were refused and "pushed back" at primary inspection. We became aware of these cases only because, in each case, the asylum seekers tried again on a different day and were referred into Expedited Removal as well as for a credible fear interview. CBP has stated that it is "very concerned and dismayed that this is happening contrary to policy, and is taking steps to address this."*[6]

**Question Three**

*ARE IMMIGRATION OFFICERS, EXERCISING AUTHORITY UNDER EXPEDITED REMOVAL, INCORRECTLY REMOVING ASYLUM SEEKERS TO COUNTRIES WHERE THEY MAY FACE PERSECUTION?*

---

[6] Letter from Michael J. Hrinyak, Acting Executive Director , Immigration Policy and Programs, Office of Field Operations, to Mark Hetfield, USCIRF (February 2, 2005). *See also* "Aliens Seeking Asylum at Land Border Ports of Entry," Memorandum from Michael A. Pearson, Executive Associate Commissioner, Office of Field Operations, Immigration and Naturalization Service, to Regional Directors (2/6/2002).

*The second Study question concerned bona fide asylum seekers who are improperly denied a referral for a credible fear determination. While such asylum seekers may be removed to a country where they may face persecution, those findings are not repeated here. Rather, to respond to this question, the focus is on asylum seekers who are removed after the credible fear interview. In addressing this question, it is also appropriate to examine asylum seekers ordered removed by the immigration judge at the conclusion of their asylum hearing, focusing on the characteristics of the proceeding which are unique to cases that originate in Expedited Removal.*

*Asylum officers reach a negative credible fear determination in only one percent of cases referred. Moreover, a negative credible fear determination is subject to strict quality assurance procedures by Asylum headquarters, and may then be reviewed by an immigration judge, who vacates negative credible fear findings reached by asylum officers more than ten percent of the time.*

*Under the current system, immigration judges – not asylum officers – determine eligibility for asylum for aliens in Expedited Removal proceedings. We found very significant variations in the asylum approval rates of individual judges Furthermore, in nearly 40% of the immigration judge decisions examined where relief was denied, the judge cited that the applicant's testimony was inconsistent with his or her initial asylum claim, as expressed to the immigration inspector or the asylum officer at the time of the credible fear interview. In nearly one-fourth of these cases, the Judge found that the asylum-seeker's testimony was not credible because the alien "added detail" to the prior statements. Such negative credibility findings fail to take into account that the records of these prior statements are, according to the findings of the Study, often unreliable and incomplete. Finally, immigration judges granted relief to 25 percent of represented asylum applicants but only two percent of unrepresented asylum seekers.*

*After being denied asylum, an alien who continues to claim a fear of persecution or torture may appeal a negative immigration judge decision to the Board of Immigration Appeals (BIA). While the BIA sustained 23 percent of Expedited Removal asylum appeals in FY2001, only two to four percent of such appeals have been granted since 2002, when the court began allowing the issuance of "summary affirmances" rather than detailed decisions. Statistically, it is highly unlikely that any asylum seeker denied by an immigration judge will find protection by appealing to the BIA.*

**Question Four**

*ARE IMMIGRATION OFFICERS, EXERCISING AUTHORITY UNDER EXPEDITED REMOVAL, DETAINING ASYLUM SEEKERS IMPROPERLY OR UNDER INAPPROPRIATE CONDITIONS?*

*Asylum seekers subject to Expedited Removal must, by law, be detained until an asylum officer has determined that they have a credible fear of persecution or torture, unless release (parole) is necessary to meet a medical emergency need or legitimate law enforcement objective. The Study found that most asylum seekers are detained in jails and in jail-like facilities, often with criminal inmates as well as aliens with criminal convictions. While DHS has established detention standards, these detention facilities closely resemble, and are based on, standards for correctional institutions.*

*In one particularly innovative Immigration and Customs Enforcement (ICE) contract facility, located in Broward County, Florida, asylum seekers are detained in a secure facility which does not closely resemble a jail. While Broward could be the model in the United States for the detention of asylum seekers, it is instead the exception among the network of 185 jails, prisons and "processing facilities" utilized by DHS to detain asylum seekers in Expedited Removal.*

*DHS policy favors the release of asylum seekers who have established credible fear, identity, community ties, and no likelihood of posing a security risk. However, there was little documentation in the files to allow a determination of how these criteria were actually being applied by ICE.*

*In FY2003, only 0.5 percent of asylum seekers subject to Expedited Removal in the New Orleans district were released prior to a decision in their case. In Harlingen, Texas, however, nearly 98 percent of asylum seekers were released. Release rates in other parts of the country varied widely between those two figures.*

## *RECOMMENDATIONS*

### Recommendation One

IN ORDER TO MORE EFFECTIVELY PROTECT BOTH HOMELAND SECURITY AND BONA FIDE ASYLUM SEEKERS, THE DEPARTMENT OF HOMELAND SECURITY SHOULD CREATE AN OFFICE- HEADED BY A HIGH-LEVEL OFFICIAL- AUTHORIZED TO ADDRESS CROSS CUTTING ISSUES RELATING TO ASYLUM AND EXPEDITED REMOVAL.

### Recommendation Two

THE BURDEN ON THE DETENTION SYSTEM, THE IMMIGRATION COURTS, AND BONA FIDE ASYLUM SEEKERS IN EXPEDITED REMOVAL THEMSELVES SHOULD BE EASED BY ALLOWING ASYLUM OFFICERS TO GRANT ASYLUM IN APPROVABLE CASES AT THE TIME OF THE CREDIBLE FEAR INTERVIEW, JUST AS THEY ARE ALREADY TRAINED AND AUTHORIZED TO DO FOR OTHER ASYLUM SEEKERS. ALIENS WHO ESTABLISH CREDIBLE FEAR BUT, FOR WHATEVER REASON, HAVE NOT YET ESTABLISHED AN APPROVABLE ASYLUM CLAIM, SHOULD CONTINUE TO BE REFERRED TO AN IMMIGRATION JUDGE.

### Recommendation Three

DHS SHOULD ESTABLISH DETENTION STANDARDS AND CONDITIONS APPROPRIATE FOR ASYLUM SEEKERS. THE AGENCY SHOULD ALSO PROMULGATE REGULATIONS TO PROMOTE MORE CONSISTENT IMPLEMENTATION OF EXISTING PAROLE CRITERIA, TO ENSURE THAT ASYLUM SEEKERS WITH A CREDIBLE FEAR OF PERSECUTION- WHO ESTABLISH IDENTITY AND THAT THEY POSE NEITHER A FLIGHT NOR A SECURITY RISK- ARE RELEASED FROM DETENTION.

### Recommendation Four

EXPAND EXISTING PRIVATE-PUBLIC PARTNERSHIPS TO FACILITATE LEGAL ASSISTANCE FOR ASYLUM SEEKERS SUBJECT TO EXPEDITED REMOVAL, AND IMPROVE ADMINISTRATIVE REVIEW AND QUALITY

ASSURANCE PROCEDURES TO IMPROVE CONSISTENCY IN ASYLUM DETERMINATIONS BY IMMIGRATION JUDGES.

### Recommendation Five

THE DEPARTMENT OF HOMELAND SECURITY SHOULD IMPLEMENT AND MONITOR QUALITY ASSURANCE PROCEDURES TO ENSURE MORE RELIABLE INFORMATION FOR HOMELAND SECURITY PURPOSES, AND TO ENSURE THAT ASYLUM SEEKERS ARE NOT TURNED AWAY IN ERROR.

SPECIFICALLY, IT SHOULD:

- CREATE A RELIABLE INTER-BUREAU SYSTEM THAT TRACKS REAL-TIME DATA OF ALIENS IN EXPEDITED REMOVAL PROCEEDINGS.
- RECONCILE CONFLICTING FIELD GUIDANCE TO REQUIRE THAT ANY EXPRESSION OF FEAR AT THE PORT OF ENTRY MUST RESULT IN EITHER A REFERRAL FOR A CREDIBLE FEAR DETERMINATION OR, IN CASES WHERE THE INSPECTOR OR BORDER PATROL AGENT BELIEVES THE ALIEN WOULD "CLEARLY NOT QUALIFY" FOR ASYLUM OR CAT RELIEF, CONTACT WITH AN ASYLUM OFFICER TO SPEAK TO THE ALIEN VIA A TELEPHONIC INTERPRETATION SERVICE TO DETERMINE WHETHER OR NOT THE ALIEN NEEDS TO BE REFERRED.
- IMPROVE QUALITY ASSURANCE BY EXPANDING AND ENHANCING THE VIDEOTAPE SYSTEMS CURRENTLY USED AT HOUSTON AND ATLANTA TO ALL MAJOR PORTS OF ENTRY AND BORDER PATROL STATIONS TO UNINTRUSIVELY RECORD ALL SECONDARY INTERVIEWS, AND CONSIDER EMPLOYING THE USE OF UNDERCOVER "TESTERS" TO VERIFY THAT EXPEDITED REMOVAL PROCEDURES ARE BEING PROPERLY FOLLOWED.
- INCLUDE, ON SWORN STATEMENT FORM I-867B, AN EXPLANATION OF THE SPECIFIC PURPOSE FOR WHICH THE DOCUMENT IS DESIGNED TO SERVE, AND ITS LIMITATIONS.
- ENHANCE THE EFFICIENCY OF THE EXPEDITED REMOVAL PROCESS BY AMENDING DHS QUALITY ASSURANCE PROCEDURES FOR THE CREDIBLE FEAR INTERVIEW TO SUBJECT NEGATIVE AND POSITIVE DETERINATIONS TO SIMILAR QUALITY ASSURANCE PROCEDURES.

### Recommendation Summary

*THIS STUDY HAS PROVIDED TEMPORARY TRANSPARENCY TO EXPEDITED REMOVAL – A PROCESS WHICH IS OPAQUE NOT ONLY TO THE OUTSIDE WORLD, BUT EVEN WITHIN THE DEPARTMENT OF HOMELAND SECURITY. AS A RESULT OF THIS TRANSPARENCY, SERIOUS – BUT NOT INSURMOUNTABLE – PROBLEMS WITH EXPEDITED REMOVAL HAVE BEEN IDENTIFIED. THE STUDY'S RECOMMENDATIONS CONCERNING BETTER DATA SYSTEMS, QUALITY ASSURANCE MEASURES, ACCESS TO REPRESENTATION, AND A DHS REFUGEE COORDINATOR WOULD ALL CONTRIBUTE TO A MORE TRANSPARENT AND EFFECTIVE EXPEDITED REMOVAL PROCESS. WE ALSO RECOMMEND THAT CONGRESS REQUIRE THE DEPARTMENTS OF JUSTICE AND HOMELAND SECURITY TO PREPARE AND SUBMIT REPORTS, WITHIN 12 MONTHS OF THE RELEASE OF THIS STUDY, DESCRIBING AGENCY ACTIONS TO ADDRESS THE FINDINGS AND RECOMMENDATIONS OF THIS STUDY.*

# ASYLUM SEEKERS IN EXPEDITED REMOVAL:

*A Study Authorized by Section 605 of the International Religious Freedom Act of 1998*

## FINDINGS

### QUESTION ONE

*(1) ARE IMMIGRATION OFFICERS, EXERCISING EXPEDITED REMOVAL AUTHORITY, IMPROPERLY ENCOURAGING ASYLUM SEEKERS TO WITHDRAW APPLICATIONS FOR ADMISSION?*

*Department of Homeland Security (DHS) regulations, and Customs and Border Protection (CBP) procedures and training materials make it clear to CBP inspectors that the withdrawal of an application for admission is "strictly voluntary" and "must not be coerced in any way." While most officers observed complied with these procedures, in one port of entry the Study observed a few instances in which immigration officers improperly encouraged asylum seekers to withdraw their applications for admission.*

**Specific Findings**

**A. Department of Homeland Security (DHS) policy and training aims to prevent immigration inspectors from encouraging asylum seekers to withdraw their applications for admission.**

DHS procedures make it clear to inspectors that a withdrawal of an application for admission "is strictly voluntary, and should not be coerced in any way." Moreover, the training materials instruct that "if an alien is (subject to Expedited Removal but offered withdrawal), a sworn statement should be taken whenever possible, using Form I-867A and B. This ensures that all the facts of the case are recorded, especially in potentially controversial cases, and protects against accusations of coercing the alien into withdrawing, especially when there may have been an issue of fear of persecution."

**B. In only one port of entry (Houston) did the Study observe inspectors pressuring individuals to retract their fear claims (4/4 cases in which fear was expressed).**

In two of these four cases, the aliens actually withdrew their applications for admission. However, in the other two instances, the asylum seekers persisted with their credible fear claims and were referred to an asylum officer. In these four cases the officers used strong language to coerce applicants into withdrawing.

There were, however, cases in other ports of entry in which CBP officers told aliens about other consequences of pursuing asylum claims "off script." Two were told that because they entered illegally they might not have a chance to present their cases. Five were told they would be held in detention for three weeks or more, three of these for over a month. Because it was sometimes difficult to differentiate between appropriate factual responses to alien questions and deliberate attempts to discourage fear claims, the Study did not consider these disclosures to

reflect deliberate coercion; nevertheless they could arguably be construed as encouraging asylum seekers to withdraw their claims.

### C. Customs and Border Protection (CBP) quality assurance mechanisms are inadequate to ensure that all officers comply with the policy that all withdrawals be "strictly voluntary."

As described above, even when being monitored, a few inspectors engaged in conduct encouraging asylum seekers to withdraw their applications for admission. While a handful of ports of entry use video cameras to help protect inspectors from allegations of coercive behavior, most ports rely primarily on supervisory review of paper files to determine whether inspectors are following procedures. Paper files created by an unobserved inspector are not sufficient to monitor whether that inspector engaged in improper coercive conduct. The Study was not made aware of any other quality assurance mechanisms in place, such as direct observations of interviews by supervisors.

While the regulations require that Forms I-876A and B must be used for any alien who is ordered expeditiously removed, the regulations do not *require* that they be used for withdrawals. Rather, CBP training materials instruct immigration inspectors to use those forms "whenever possible." According to the CBP Inspector Training Materials on Expedited Removal, the forms should be used to prevent allegations that immigration inspectors improperly encouraging asylum seekers to withdraw their applications for admission. Form I-867A contains a script that informs the applicant that, if ordered removed, (s)he will be barred from re-entry for "a period of 5 years or longer." (This is in contrast to a withdrawal, which does not carry with it any such bar.)

The script also requires the CBP inspector to inform the alien that if (s)he has any reason to fear persecution, torture, or other harm upon being returned to his or her home country, (s)he should inform the inspector during the interview and may seek protection from return under U.S. law.

The inspector is not required to inform the alien of the possibility of withdrawing his or her application for admission, which does not carry the penalties associated with Expedited Removal. This is because withdrawal is offered only at the discretion of the inspector. The alien does not have the "right" to request a withdrawal of his or her application for admission.

The Study found that, when Form I-867A is used, aliens are frequently informed of the penalties of Expedited Removal but not of the availability of protection if they fear being returned. When subject to Expedited Removal, a potential asylum seeker who is offered withdrawal may be led to believe (s)he has only two choices: (1) to withdraw his or her application for admission, without penalty or (2) to be expeditiously removed with a five year bar from admission. Even in cases which resulted in the issuance of an order of Expedited Removal, the Study found that a significant percentage of aliens are not informed of a third choice: the right to apply for protection from return. Inspectors observed using Form I-867A and B during the Study failed to convey the protection information to the applicant approximately half of the time, even though that information was on the I-867A script.

### D. The role of asylum officers in the "dissolve" process reduces the risk that asylum seekers will be improperly encouraged to withdraw their applications for admission.

The Study examined whether aliens might be "improperly encouraged" to withdraw their applications for admission by DHS detention officers after they have been referred for credible fear. We interviewed 45 aliens who were dissolving (i.e. abandoning) their asylum claims while in detention, and asked each of them whether any DHS official had encouraged them to withdraw their applications for admission. While a substantial number reported that the conditions of their detention influenced their decision to withdraw their application for admission, no one in this sample indicated that any detention official had improperly encouraged him or her to withdraw his or her application for asylum.

DHS has procedures in place at detention facilities to ensure against improper withdrawals of applications for admission. Specifically, before a detention officer can permit an alien to withdraw his or her application for admission or otherwise abandon his or her credible fear claim, an asylum officer "must speak to the alien to ensure that (s)he is aware of the consequences of dissolving an asylum claim, and to ascertain why the alien no longer wishes to remain in the credible fear process…(The asylum officer) must also read and explain the contents of the (form) *Request for Dissolution of Credible Fear* to the alien.[1] If, after the (asylum officer) explains the contents of the form, the alien changes his or her mind and wants to remain in the credible fear process, the (officer) continues processing the alien through the credible fear process."[2]

The role of asylum officers (who belong to U.S. Citizenship and Immigration Services (USCIS), a different agency than Immigration and Customs Enforcement, Office of Detention and Removal Operations (ICE-DRO), whose detention officials would authorize the withdrawal) in the dissolution process leaves detained asylum seekers less vulnerable to improperly encouraged withdrawals than aliens at ports of entry. ICE cannot authorize an applicant to withdraw his application for admission until an asylum officer has had the opportunity to talk to the alien and document the voluntary nature of his decision to dissolve the credible fear claim and, if applicable, withdraw the application for admission. This is different than the withdrawal of applications for admission at ports of entry, as the decision to authorize withdrawals is solely at the discretion of CBP inspectors.

---

[1] The dissolution form confirms that an asylum officer explained to the applicant that (s)he has "freely and voluntarily" decided to stop pursuing protection from removal, that (s)he understands that DHS will either permit him or her to withdraw his or her application for admission or issue an order of removal which would bar him or her from seeking readmission to the US for five years or more. The form also reiterates that, if the alien changes his or her mind again any time prior to departure from the United States, (s)he may again ask for protection from removal through the credible fear process. Finally, the alien is required to state the reason (s)he has decided not to ask for protection at this time.

[2] USCIS Credible Fear Procedures Manual, p. 35.

QUESTION TWO

*(2) ARE IMMIGRATION OFFICERS, EXERCISING EXPEDITED REMOVAL AUTHORITY, INCORRECTLY FAILING TO REFER ASYLUM SEEKERS FOR A CREDIBLE FEAR INTERVIEW?*

*DHS regulations state that an immigration inspector must refer an alien for a credible fear determination if that alien indicates "an intention to apply for asylum, a fear of torture, or a fear of return to his or her country." In accordance with these regulations, nearly 85 percent (67/79) of arriving aliens observed by the Study expressing a fear of return were referred for a credible fear interview. CBP Guidelines, however, provide the inspector with more discretion than the regulations, allowing the inspector to decline referral in cases where the fear claimed by the applicant is unrelated to the criteria for asylum. Indeed, in 15 percent (12/79) of observed cases when an arriving alien expressed a fear of return to the inspector, the alien was not referred. Moreover, among these twelve cases were several aliens who expressed fear of political, religious, or ethnic persecution, which are clearly related to the grounds for asylum. Of particular concern, in seven of these twelve cases, the inspector incorrectly indicated on the sworn statement that the applicant stated he had no fear of return.*

*While DHS guidance requires that asylum seekers at land ports of entry be placed in Expedited Removal and referred for a credible fear interview, the Study interviewed two groups of aliens (one from the Middle East, the other from East Africa) who requested the opportunity to apply for asylum but were refused and "pushed back" at primary inspection. We became aware of these cases only because in each case, the asylum seekers tried again on a different day and were referred into Expedited Removal as well as for a credible fear interview. CBP has stated that it is "very concerned and dismayed that this is happening contrary to policy, and is taking steps to address this."*[3]

**Specific Findings**

**A. DHS policy does not clearly define whether all expressions of fear by an alien in Expedited Removal proceedings should result in a referral for a credible fear determination.**

DHS policy requires that immigration inspectors ask scripted questions from the Form I-867B to determine whether the alien should be referred for a credible fear interview on the basis of a fear of return.[4] DHS instructs its inspectors that for any alien who responds to these questions by expressing a fear of return, verbally or otherwise, a CBP inspector must refer the alien for a credible fear determination. Section 17.15 of the Inspector Field Manual, however, is not entirely consistent with DHS regulations. The Manual states that an inspector may choose

---

[3] Letter from Michael J. Hrinyak, Acting Executive Director , Immigration Policy and Programs, Office of Field Operations, to Mark Hetfield, USCIRF (February 2, 2005). *See also* "Aliens Seeking Asylum at Land Border Ports of Entry," Memorandum from Michael A. Pearson, Executive Associate Commissioner, Office of Field Operations, Immigration and Naturalization Service, to Regional Directors (2/6/2002).

[4] Those four questions are: (1) "Why did you leave your home country or country of last residence"; (2) Do you have any fear or concern about being returned to your home country or being removed from the United States"; (3) "Would you be harmed if you returned to your home country or country of last residence"; and (4) "Do you have any questions or is there anything else you would like to add."

not to refer a case when the alien's expression of fear "would clearly not qualify that individual for asylum." We observed examples of failures to refer aliens who expressed a fear of return that may have ensued from this unclear guidance.

**B. DHS regulations require immigration inspectors to follow a standard script informing each alien that (s)he may ask for protection if (s)he has a fear of returning home. In approximately half of inspections observed, inspectors failed to inform the alien of the information in that part of the script. Aliens who did receive this information were seven times more likely to be referred for a credible fear determination than those who were not.**

**C. DHS inspectors observed by Study researchers asked, "Do you have any fear or concern about being returned to your home country or being removed from the United States?" 94 percent of the time; DHS inspectors observed by Study researchers asked, "Would you be harmed if you were returned to your home country or country of last residence?" 87 percent of the time. At least one of these questions was asked 95 percent of the time.**

**D. Approximately 85 percent (67/79) of arriving aliens whom the Study observed expressing a fear of return were referred for a credible fear interview, in accordance with DHS regulations. However, in 15 percent of observed cases (12/79) where an arriving alien expressed a fear of return to the inspector, that alien was not referred.**

The 12 cases that were not referred included expressions of economic fear but also fear related to political, religious, or ethnic persecution, as well as unspecified fear, fear of spouse abuse, and fear of smugglers. Under DHS regulations, all of these aliens should have been referred for a credible fear interview.

**E. While monitoring the San Ysidro land border port of entry, researchers interviewed two groups of aliens who were previously refused a referral to secondary inspection, despite expressing an intention to apply for asylum. Aliens at busy land ports of entry are particularly vulnerable to improper denials of credible fear referrals, even though this is contrary to DHS policy.**

While monitoring the San Ysidro port of entry, the Study became aware of two instances in which primary inspectors improperly refused entry to the United States for applicants lacking proper documentation and "pushed back" those applicants without referring them to secondary inspection or creating a record of the primary inspection. In contrast, at airports, aliens cannot simply be put on a return flight without an inspector documenting the interaction. Moreover, primary inspections at any busy port of entry are difficult for observers or supervisors to monitor. This is particularly true in San Ysidro, where primary inspectors inspect an average of 25,000 pedestrians per day and 50,000 automobile passengers, with 24 lanes of traffic. Nevertheless, while in San Ysidro, Study researchers encountered two small groups of aliens who reported asking for asylum at primary inspection, but were nevertheless refused a referral to secondary

inspection or a credible fear determination in clear violation of DHS procedures.[5] These aliens came to the attention of the Study after they made a subsequent, successful request for a credible fear referral the following day.

**F. Files of cases resulting in Expedited Removal generally included the required documents used to screen aliens to determine whether the alien had a fear of return, and whether he or she should be referred for a credible fear interview. The reliance of Customs and Border Protection (CBP) on file reviews for quality assurance, however, is insufficient to ensure that aliens who express a fear of return are referred for a credible fear determination.**

CBP does not have sufficient controls in place to ensure that inspectors are referring all aliens who express a fear of return for a credible fear determination. While a handful of ports of entry use video cameras to help protect inspectors from allegations of improper conduct during secondary inspections, most ports rely heavily on paper files to determine whether inspectors are following procedures. While the paper files generally appear to be complete, Study observations indicate that paper files created by the inspector are not always reliable indicators of whether that inspector should have referred an alien for a credible fear determination. Study researchers found that the file often indicated that all four fear questions were asked of the alien, even when they were not. Conversely, when the questions were asked, the file occasionally indicated they had not been. Of special concern in the 12 cases mentioned above where the alien responded to the fear question by asserting that (s)he had a fear of return, seven of the files memorializing those inspections incorrectly indicated that the alien responded that (s)he had no fear of return.

[5] While field guidance was distributed on February 6, 2002 instructing INS Inspectors on these procedures for referring asylum seekers at land ports of entry, it appears that the Inspectors Field Manual has not yet been updated to reflect those instructions, in spite of an indication in the memorandum that it would be.

QUESTION THREE

*(3) ARE IMMIGRATION OFFICERS, EXERCISING AUTHORITY UNDER EXPEDITED REMOVAL, INCORRECTLY REMOVING ASYLUM SEEKERS TO COUNTRIES WHERE THEY MAY FACE PERSECUTION?*

*The second Study question concerned bona fide asylum seekers who are improperly denied a referral for a credible fear determination. While such asylum seekers may be removed to a country where they may face persecution, those findings are not repeated here. Rather, to respond to this question, the focus is on asylum seekers who are removed after the credible fear interview. In addressing this question, it is also appropriate to examine asylum seekers ordered removed by the immigration judge at the conclusion of their asylum hearing, focusing on the characteristics of the proceeding which are unique to cases that originate in Expedited Removal.*

*Asylum officers reach a negative credible fear determination in only one percent of cases referred. Moreover, a negative credible fear determination is subject to strict quality assurance procedures by Asylum headquarters, and may then be reviewed by an immigration judge, who vacates negative credible fear findings reached by asylum officers more than ten percent of the time.*

*Under the current system, immigration judges – not asylum officers – determine eligibility for asylum for aliens in Expedited Removal proceedings. We found very significant variations in the asylum approval rates of individual judges Furthermore, in nearly 40% of the immigration judge decisions examined where relief was denied, the judge cited that the applicant's testimony was inconsistent with his or her initial asylum claim, as expressed to the immigration inspector or the asylum officer at the time of the credible fear interview. In nearly one-fourth of these cases, the Judge found that the asylum-seeker's testimony was not credible because the alien "added detail" to the prior statements. Such negative credibility findings fail to take into account that the records of these prior statements are, according to the findings of the Study, often unreliable and incomplete. Finally, immigration judges granted relief to 25 percent of represented asylum applicants but only two percent of unrepresented asylum seekers.*

*After being denied asylum, an alien who continues to claim a fear of persecution or torture may appeal a negative immigration judge decision to the Board of Immigration Appeals (BIA). While the BIA sustained 23 percent of Expedited Removal asylum appeals in FY2001, only two – four percent of such appeals have been granted since 2002, when the court began allowing the issuance of "summary affirmances" rather than detailed decisions. Statistically, it is highly unlikely that any asylum seeker denied by an immigration judge will find protection by appealing to the BIA.*

**Specific Findings**

**A. DHS and the Executive Office for Immigration Review (EOIR) have implemented a screening standard and procedures which ensure that asylum officers conducting the credible fear screening do not incorrectly remove asylum seekers subject to Expedited Removal to countries where they may face persecution.**

According to statistics compiled for the Study, in FY2003 90 percent of aliens referred were found to have a credible fear of persecution, nine percent withdrew their credible fear claims, and only one percent were found by the asylum officer not to have a credible fear. Furthermore, among those aliens who requested that an immigration judge review the negative credible fear determination, ten percent were ultimately found to have a credible fear. In addition to the right of review by an immigration judge, USCIS requires that the Asylum office at USCIS headquarters review every negative credible fear determination.

The Form I-870 documents that an alien has a credible fear of persecution due to "a significant possibility" that during a full asylum hearing, (1) "the applicant would be found to be credible"; and (2) the applicant has a fear of torture or would establish a fear of return which could have a nexus to one of the grounds for asylum. Nevertheless, because USCIS imposes much more labor intensive quality assurance procedures for negative credible fear findings than for positive ones, the agency may be inadvertently encouraging its asylum officers to find "credible fear" even in cases where it may not be warranted.

**B. The "Record of Sworn Statement" (Form I-867A and B) records created at ports of entry during the Expedited Removal process are often incomplete and less than reliable. Reliance on these records by immigration judges for purposes of assessing the credibility of an asylum applicant's testimony in court could, therefore, lead to the incorrect removal of asylum seekers to countries where they may face persecution. In 31 percent (43/137) of transcripts reviewed, immigration judges denying asylum cited the asylum seeker's statement made to the immigration inspector at the port of entry, as recorded on Form I-867A and B.**

The Form I-867A and B is written in question and answer format, implying that it is a verbatim transcript. Moreover, it includes a paragraph informing the applicant that (s)he may apply for protection if (s)he has a fear of return. The Study observed that this paragraph, which is part of the sworn statement "verbatim" script, is in fact read to the applicant only 44 percent of the time (164/354). In addition, while each of the required questions relating to the applicant's fear of return was asked approximately 95 percent of the time, in 32 of the 37 cases when a particular fear question was not asked, the sworn statement in the file inaccurately indicated that it had been asked – and answered. Finally, the form indicates that the information on the sworn statement was read back to and verified by the alien. However, the statement was not, in fact, reviewed by the alien, interpreter, or interviewing officer in 72 percent of the cases observed (268/373).

The Inspector Field Manual instructs immigration inspectors taking the sworn statement: "Do **not** go into detail on the nature of the alien's fear of persecution or torture (emphasis in original)." Nevertheless, in 23.3 percent of cases (10/43) reviewed in which the judge cited the sworn statement as a basis for denying asylum, the judge found that the applicant was not credible because the alien's testimony in court reflected additional detail not in the original document from the port of entry.

Finally, with the exception of Houston and Atlanta airports, the ports of entry observed did not create an audio or videotape of the secondary inspection interview, but relied entirely on

an unwitnessed statement as transcribed by the interviewing officer. Even in Atlanta and Houston, where secondary inspections are videotaped, the videos are taped over within a few months. They are, therefore, seldom available to the government or the alien during consideration of the alien's asylum application before the immigration judge.

**C. The asylum officer's notes from the asylum seeker's credible fear interview, as recorded on the Form I-870, are generally incomplete summaries of the asylum seeker's claim and not a verbatim transcript of the credible fear interview itself. Nevertheless, in 29 percent (40/137) of transcripts reviewed, immigration judges denying asylum on credibility grounds cited these notes.**

In a survey conducted at all eight regional asylum offices, the offices unanimously affirmed the Study's characterization that the statement taken at the time of the credible fear interview is used "to record just the basics of a positive determination, to show whether the alien has met the threshold for credible fear. The credible fear statement does not generally represent a complete description of the alien's asylum claim." Nonetheless, in 25 percent (10/40) of the cases in which the credible fear notes were cited as a basis to find that the applicant lacked credibility, the immigration judge specified that the applicant was not credible because at the immigration hearing, (s)he added detail to the claim originally expressed during the credible fear interview.

After a revision of the Form I-870 (November 21, 2003), the form indicated that: "The following notes are not a verbatim transcript of this interview…There may be areas of the individual's claim that were not explored or documented for purposes of this threshold screening." While this language on the form I-870 was not in effect until after the period covered by the Study, it nevertheless confirms the limitations of the evidentiary value of the form.

**D. The outcomes of asylum claims for asylum seekers who were placed in Expedited Removal vary significantly across courts and judges.**

The Study identified wide statistical variations of grant rates of individual immigration judges for asylum seekers in Expedited Removal proceedings, even among aliens of the same nationality or among judges with the same caseload sitting in the same court.

**E. In recent years, there has been a substantial decrease in the granting of alien appeals by the Board of Immigration Appeals (BIA).**

Moreover, statistics gathered in the Study demonstrate that since the BIA decision to permit "affirmances without opinion" (rather than opinions specifying the reasons for the decision) for asylum, withholding, and relief under the Convention Against Torture (CAT), the BIA, in deciding appeals filed by asylum seekers subject to Expedited Removal, has gone from reversing 23 percent of immigration judge decisions to reversing only two to four percent of such decisions. With wide variations in asylum approval rates among judges (discussed above), and only two to four percent of those decisions now being overturned on appeal, the BIA may now offer little protection from the possibility of erroneous immigration judge decisions.

**F. Asylum seekers subject to Expedited Removal who are represented by an attorney are granted relief 25 percent of the time; this contrasts with asylum seekers representing themselves, who are granted relief two percent of the time.**

Asylum hearings before an immigration judge are adversarial proceedings, where an asylum applicant faces not only the immigration judge but also a DHS trial attorney who almost without exception argues that the alien should be removed. Asylum applicants in Expedited Removal proceedings are entitled to counsel, but only at no expense to the government. The Executive Office for Immigration Review (EOIR), the Arlington Asylum Office (in cooperation with the Capital Area Immigrants' Rights Coalition), and numerous non-profit organizations have developed various programs which assist detained asylum seekers in receiving legal advice and finding legal counsel. Most of these, however, are largely dependent on the local supply of legal representation. However, many of the approximately 185 detention facilities used by DHS to house asylum seekers subject to Expedited Removal are in areas, which are served by neither of these programs nor by private asylum attorneys.

QUESTION FOUR

*(4) ARE IMMIGRATION OFFICERS, EXERCISING AUTHORITY UNDER EXPEDITED REMOVAL, DETAINING ASYLUM SEEKERS IMPROPERLY OR UNDER INAPPROPRIATE CONDITIONS?*

*Asylum seekers subject to Expedited Removal must, by law, be detained until an asylum officer has determined that they have a credible fear of persecution or torture, unless release (parole) is necessary to meet a medical emergency need or legitimate law enforcement objective. The Study found that most asylum seekers are detained in jails and in jail-like facilities, often with criminal inmates as well as aliens with criminal convictions. While DHS has established detention standards, these detention facilities closely resemble, and are based on, standards for correctional institutions.*

*In one particularly innovative Immigration and Customs Enforcement (ICE) contract facility, located in Broward County, Florida, asylum seekers are detained in a secure facility which does not closely resemble a jail. While Broward could be the model in the United States for the detention of asylum seekers, it is instead the exception among the network of 185 jails, prisons and "processing facilities" utilized by DHS to detain asylum seekers in Expedited Removal.*

*DHS policy favors the release of asylum seekers who have established credible fear, identity, community ties, and no likelihood of posing a security risk. However, there was little documentation in the files to allow a determination of how these criteria were actually being applied by ICE.*

*In FY2003, only 0.5 percent of asylum seekers subject to Expedited Removal in the New Orleans district were released prior to a decision in their case. In Harlingen, Texas, however, nearly 98 percent of asylum seekers were released. Release rates in other parts of the country varied widely between those two figures.*

**Specific Findings**

**A. The law and regulations require that aliens in Expedited Removal be detained until it is determined that they have a credible fear of return unless parole is necessary to meet a medical emergency or legitimate law enforcement objective.**

**B. The overwhelming majority of asylum seekers in Expedited Removal are detained in jails and jail-like facilities, often with criminal inmates and aliens with criminal convictions.**

The standards applied by ICE for all of their detention facilities are identical to, and modeled after, correctional standards for criminal populations. In some facilities with "correctional dormitory" set-ups, there are large numbers of detainees sleeping, eating, going to the bathroom and showering out in the open in one brightly lit, windowless and locked room. Recreation in ICE facilities often consists of unstructured activity of no more than one hour per day in a small outdoor space surrounded by high concrete walls or a chain link fence. All

detainees must wear prison uniforms, and a guard is posted in each dormitory room all day and night. Conditions do vary from facility to facility, but nearly all are prisons or prison like. In contrast, the Executive Committee of the United Nations High Commissioner for Refugees, of which the United States is a member, has recommended that national legislation and administrative practice make the necessary distinction between criminals, refugees and asylum seekers, and other aliens.[6]

**C. DHS detains some asylum seekers in Expedited Removal in a secure facility which does not resemble a conventional jail and at a cost comparable to that of other DHS detention centers.[7] The facility, located in Broward County, Florida, has the potential to be copied in other locations, but has not yet been.**

The Broward County facility allows detainees to walk outside in a secure grassy courtyard during all daylight hours, use the toilet and the shower without anyone else watching, wear civilian clothing, and freely walk to class or other programmed activities without an armed escort.

**D. DHS Policy Guidance, while not set in regulation, favors the release of asylum seekers who establish credible fear, identity, community ties, and who do not pose a security or flight risk.**

**E. The decision-making criteria applied by Immigration and Customs Enforcement (ICE) in considering parole are not readily discernible from the information contained in the file.**

ICE has not developed a form that documents the decision-making process for parole. Thus, it cannot be easily ascertained from ICE records whether the criteria are being appropriately applied to asylum seekers subject to Expedited Removal.

**F. The USCIS (U.S. Citizenship and Immigration Services) Form I-870, completed by an asylum officer during the credible fear interview, collects information relating to some of the criteria which DHS guidance indicates should be applied to parole decisions. The asylum officer, however, does not make a recommendation to ICE concerning release. ICE and USCIS, however, seem to have different interpretations of key definitions relevant to the release criteria. For example, while**

---

[6] UNHCR Executive Committee Conclusion No. 44 (1986) on Detention of Refugees and Asylum Seekers, paragraphs (a), (d) and (f). In that conclusion, the Executive Committee "(a) *Noted* with deep concern that large numbers of refugees and asylum seekers in different areas of the world are currently the subject of detention or similar restrictive measures by reason of their illegal entry or presence in search of asylum, pending resolution of their situation; …(d) *Stressed* the importance for national legislation and/or administrative practice to make the necessary distinction between the situation of refugees and asylum seekers, and that of other aliens; and (f) *Stressed* that conditions of detention of refugees and asylum seekers must be humane. In particular, refugees and asylum seekers shall, whenever possible, not be accommodated with persons detained as common criminals, and shall not be located in areas where their physical safety is endangered…"

[7] The Broward County facility costs DHS approximately $83 per bed per night, compared to a national average cost of $85.

**ICE does not define its interpretation of release criteria, USCIS determines identity on the basis of "a reasonable degree of certainty."**

According to the file review, 20 percent of asylum seekers whom USCIS determined identity with a reasonable degree of certainty and collected community ties information were not released from detention by ICE prior to their asylum hearing. From most of these files, the Study could not ascertain the basis for ICE's decision whether or not to release the alien.

**G. The Study found no evidence that ICE is consistently applying release criteria.**

Statistical review also revealed that while the average ICE district releases 63 percent of asylum seekers prior to their asylum hearing, release rates varied in major districts from .5 percent (New Orleans) to 97.6 percent (Harlingen). With such variations, the Study concludes that the formal release criteria are not being consistently applied. Moreover, the Study's statistical review found that variations in parole rates from ICE facilities across the country are associated with factors other than the established parole criteria, including port of entry and country of origin.

**H. DHS regularly places aliens with facially valid documents in Expedited Removal and mandatory detention, for the sole reason that they expressed an intention to apply for asylum.**

According to the review of 353 files, 18 asylum seekers with facially valid documents were placed in Expedited Removal proceedings and were subject to mandatory detention, solely because they informed the inspector of an intention to apply for asylum. Six of these asylum seekers volunteered their intention to apply for asylum at primary inspection. According to CBP, such asylum seekers "in most cases" are subject to Expedited Removal because, while they hold a temporary visa, their intention to apply for asylum indicates that they intend to reside in the United States permanently.[8]

---

[8] In its policy memorandum on the topic, DHS (then INS) does not define "most cases." *See* "Aliens Seeking Asylum at Land Border Ports of Entry," Memorandum from Michael A. Pearson, Executive Associate Commissioner, Office of Field Operations, Immigration and Naturalization Service, to Regional Directors (2/6/2002).

## RECOMMENDATIONS

### OVERVIEW

In establishing Expedited Removal, Congress included a number of safeguards and mandated that the Attorney General ensure that legitimate asylum seekers fleeing persecution or torture would not be "expeditiously removed" to the countries they had fled. The Immigration and Naturalization Service (INS), indeed, implemented procedures intended to protect bona fide asylum seekers from involuntary return, and those procedures remain in effect today. INS (now Department of Homeland Security) officers were, and continue to be, trained in these procedures.[1] With some exceptions, however, such procedures have not been enforced through effective quality assurance measures. The Study observed several failures to comply with a number of required procedures. It also observed some aliens who expressed a fear but were nevertheless returned without being referred to an asylum officer, as the CBP inspector is required to do by law.

### DHS detention practices are ill-suited to the non-criminal asylum seeking population

Prior to the establishment of Expedited Removal, criminal aliens generally took priority over arriving asylum seekers in the allocation of INS detention bed space. With the establishment of Expedited Removal, however, INS was required to detain nearly all arriving asylum seekers. In spite of this, INS did not create any program to oversee the new challenges posed by its growing population of non-criminal asylum seekers in detention. No new procedures or trainings were created within INS to address challenges posed by its mandate to detain non-criminal asylum seekers at least until their credible fear hearing. The Study found that asylum seekers subject to Expedited Removal are detained under the same conditions as criminal inmates, and that standardized procedures have not been implemented to determine whether – or not – an asylum seeker should be released.

### Agency Coordination

On March 1, 2003, INS was abolished and its components separated into different lines of reporting within the newly created Department of Homeland Security (DHS). Four different components of DHS are now involved in Expedited Removal. Under the current structure of DHS, any differences among these agencies must be resolved by the Secretary or Deputy Secretary of Homeland Security. This makes it exceedingly difficult to address inter-bureau issues regarding Expedited Removal, as those officials already oversee an amalgamation of 22 former federal agencies, including INS. As a practical matter, procedural difficulties regarding credible fear, parole, and conditions of detention cannot compete with the myriad of demands on the Secretary's time and attention and indeed should be resolved at lower levels. In addition, the prominent role in asylum matters retained by the Executive Office for Immigration Review

---

[1] INS, an agency within the Department of Justice, was abolished by the Homeland Security Act of 2002 and its functions were folded into the Department of Homeland Security (DHS) in March 2003.

(EOIR), which remained in the Department of Justice, further complicates the capability of DHS to address cross-cutting issues of Expedited Removal policy, implementation and quality assurance.

While the refugee and asylum programs are housed within U.S. Citizenship and Immigration Services (USCIS) at DHS, neither USCIS nor any other office has been given the authority to resolve, or even to act as a forum on, inter-bureau issues relating to the impact of Expedited Removal on asylum seekers and refugees. Rather, DHS has relied on ad hoc "working groups," such as the recently formed working group on credible fear determinations, to address particular issues after they arise.

**Expansion of a System with Serious Flaws**

Congress mandated that Expedited Removal be applied to improperly documented aliens at ports of entry. It also permitted Expedited Removal to apply, at Departmental discretion, to aliens apprehended within 24 months after an entry without inspection. In November 2003, the Commissioner of the INS exercised his discretion to expand Expedited Removal to aliens who entered without inspection by sea within 24 months prior to apprehension. In August 2004, the Secretary of Homeland Security further expanded Expedited Removal to aliens who enter without inspection by land and are apprehended within 100 miles of the border within 14 days after their last entry. Both of these expansions of Expedited Removal occurred at a time when coordination among the different actors in Expedited Removal was particularly difficult, i.e. as the INS was being disassembled and its components placed in different sections of DHS.

The Study has cited several ways in which asylum seekers who express a fear of return are nevertheless at some risk of being returned without being permitted to speak to an asylum officer. If referred, they are almost certain to be detained in jail or under jail-like conditions.

We are concerned that Expedited Removal has been expanded several times without an official mechanism – such as a Refugee Coordinator - to resolve the problems which arise in its implementation, particularly those requiring inter-bureau or inter-agency cooperation. We are also concerned that the following recommendations would be difficult to implement without such a mechanism.

**RECOMMENDATION ONE**

IN ORDER TO MORE EFFECTIVELY PROTECT BOTH HOMELAND SECURITY AND BONA FIDE ASYLUM SEEKERS, THE DEPARTMENT OF HOMELAND SECURITY SHOULD CREATE AN OFFICE- HEADED BY A HIGH-LEVEL OFFICIAL- AUTHORIZED TO ADDRESS CROSS CUTTING ISSUES RELATING TO ASYLUM AND EXPEDITED REMOVAL.

**1.1** ***The Department of Homeland Security should create an office headed by a high-level Refugee Coordinator, with authority to coordinate DHS policy and regulations, and to monitor the implementation of procedures affecting refugees or asylum seekers, particularly those in the Expedited Removal process.***

The Study found that responsibilities for the treatment of asylum seekers in Expedited Removal are divided among several entities within DHS; therefore, resolving policy or procedural issues in this area currently requires the involvement of the Secretary or Deputy Secretary.[2]

The Study also found that there was no effort or program at DHS to assess on an agency-wide basis the treatment of asylum seekers in Expedited Removal. Nor were there adequate quality control measures in place to assess the impact on asylum seekers of the individual pieces of the process.

The Study also identifies significant problems in implementing and maintaining the safeguards for asylum seekers that Congress established. In order for these problems to be addressed, and given the current structure and lines of authority at DHS, a coordinating office is necessary to (a) ensure consistent asylum policy and legal interpretations Department-wide; (b) coordinate implementation of necessary changes set forth in the Study's recommendations; and (c) monitor the system on an agency-wide basis to see that changes take hold and that emerging problems are addressed as they arise. For example, the office would address problems identified in this Study concerning credible fear referrals at ports of entry; credible fear determinations; decisions concerning withdrawals of applications for admission; dissolutions of credible fear claims; the development of detention standards and facilities specific to asylum seekers; and information relating to parole criteria and conditions of detention specific to asylum seekers. Addressing these problems would require a consistent DHS-wide asylum and refugee policy, as well as inter-bureau discussions of how the various pieces of the process function and relate to one another.[3]

With the expansion of Expedited Removal authority, there are now four entities within DHS that can enter an Expedited Removal order: CBP Inspectors at ports of entry (for arriving aliens); Border Patrol (for aliens apprehended in the interior pursuant to the inland Expedited Removal procedures promulgated on August 11, 2004); the Office of Asylum (for aliens who fail to establish a credible fear of persecution); and Immigration and Customs Enforcement (ICE). It is critical to have these four entities treating asylum seekers by the same rules and procedures,

---

[2] Although overall DHS was cooperative, difficulties in liaising with the agency during this study re-enforced the conclusion concerning the need for an individual with coordinating authority across bureaus. Specifically, DHS was unable to name any individual in a position to act as the primary liaison between the Department and Commission experts. While DHS assigned USCIS as the nominal primary contact, conducting the Study required establishing separate working relationships with Detention and Removal Operations within the Bureau of Immigration and Customs Enforcement (ICE-DRO), Inspections, Border Patrol, USCIS, the Office of Immigration Statistics, as well as the Executive Office for Immigration Review (EOIR), in the Department of Justice. While the Study was being conducted, the experts were unable to discern who at DHS had responsibility for inter-bureau policy or DHS-wide operational asylum issues. Nevertheless, all agencies with whom we worked were cooperative in working with the Study. A number of agency officials confirmed that inter-bureau differences in approach are currently difficult to resolve.

[3] We recognize, however, that such an office need not be focused exclusively on Expedited Removal issues, but other inter-bureau refugee and asylum issues as well; e.g. refugee issues arising from interdictions of aliens at sea; asylum issues arising from the Memorandum of Understanding on Asylum with Canada; the detention of asylum seekers other than those in Expedited Removal proceedings; linkages between overseas enforcement programs and the refugee resettlement program, etc.

and to ensure that information is being adequately shared. At this point, such coordination is only possible if done by the Office of the Secretary. The Secretary should delegate this responsibility to an individual who is authorized to coordinate the various entities' work relating to the protection of refugees and asylum seekers. Otherwise, with the recent expansions of Expedited Removal, and its serious flaws, the United States' tradition of protecting asylum seekers – not to mention those asylum seekers' lives – continues to be at risk.

### RECOMMENDATION TWO

DECREASE THE BURDENS ON IMMIGRATION COURTS, THE DETENTION SYSTEM, AND THE APPLICANTS BY PERMITTING ASYLUM OFFICERS TO GRANT ASYLUM CLAIMS DURING THE CREDIBLE FEAR INTERVIEW.

**2.1** ***The burden on the detention system, the immigration courts, and bona fide asylum seekers in Expedited Removal themselves should be eased by allowing asylum officers to grant asylum in approvable cases at the time of the credible fear interview, just as they are already trained and authorized to do for other asylum seekers.***

With some amendments to the regulations, the credible fear interview could further expedite both the removal of aliens without bona fide asylum claims and the adjudication of asylum claims. These changes would reduce the time spent in, and government funds spent on, detention.

Asylum officers are already trained and authorized to adjudicate asylum claims; therefore, they should be permitted to grant asylum at the time of the credible fear interview for those asylum seekers in Expedited Removal who are able to establish that they meet the criteria at that early juncture. This is precisely what asylum officers do for asylum seekers whose claims are addressed in the "affirmative asylum" process. In that process, asylum officers are already trained in, and accustomed to, adjudicating full asylum applications from applicants who entered without inspection, or who successfully passed through the inspection process in spite of a lack of proper documentation.

Under this proposal, at the time of the credible fear interview, asylum officers would either (1) order the alien removed if (s)he fails to meet the credible fear standard (subject to review by an immigration judge); (2) grant the applicant asylum if (s)he establishes a well-founded fear of persecution; or (3) refer the alien to an immigration judge for a *de novo* proceedings if the alien's fear is credible but the case requires further consideration or corroboration to warrant a grant of asylum. Allowing asylum officers to grant asylum at this stage would reduce demands on detention beds, EOIR resources, trial attorney time, and reduce the time the bona fide asylum seeker spends in detention.

Moreover, in informal interviews with asylum seekers in Expedited Removal, it became evident that the high screen-in rate at the credible fear stage may give aliens a false sense of confidence about their eligibility for asylum. By allowing for an asylum determination at the time of the credible fear interview, an asylum seeker who is merely referred to an immigration judge rather than granted asylum may be in a position to better understand whether or not (s)he is

eligible for asylum. Therefore, this reform may lead to more aliens dissolving their asylum claims and spending less time in detention.

However, such reform would require an understanding among attorneys and aliens that continuances could not be granted by an asylum officer to delay the credible fear interview and that asylum seekers who needed more time would still have the benefit of a referral to an immigration judge. This reform would not require a change in the Immigration and Nationality Act, as the statute does not specify who shall make the asylum determination in the case of an asylum seeker with a credible fear of persecution.

INS had once endorsed this idea in the early years of Expedited Removal. One argument against the proposal was that an asylum officer's decision not to approve an asylum claim at the time of the credible fear interview could prejudice the immigration judge's consideration of the asylum claim. However, this concern is not supported by statistics made available to the Study by EOIR. As seen in EOIR Table V, each year immigration judges grant asylum to approximately 20 percent of affirmative cases referred to them by asylum officers. This compares with an approval rate of approximately 25 percent for credible fear cases referred to immigration judges by asylum officers. By granting relief in 20 percent of cases where asylum officers have declined to, immigration judges do not appear to be prejudiced by asylum officer determinations in the affirmative process. With proper training and an understanding that compressed time frames may make it difficult for asylum seekers in Expedited Removal to establish eligibility at the time of the credible fear interview, immigration judges would not likely be prejudiced by asylum officer decisions not to grant asylum at the credible fear stage.

### RECOMMENDATION THREE

ESTABLISH DETENTION STANDARDS AND CONDITIONS APPROPRIATE FOR ASYLUM SEEKERS. DHS SHOULD ALSO PROMULGATE REGULATIONS TO PROMOTE MORE CONSISTENT IMPLEMENTATION OF EXISTING PAROLE CRITERIA, TO ENSURE THAT ASYLUM SEEKERS WITH A CREDIBLE FEAR OF PERSECUTION- AND WHO POSE NEITHER A FLIGHT NOR A SECURITY RISK- ARE RELEASED FROM DETENTION.

**3.1** ***DHS should address the inconsistent application of its parole criteria by codifying the criteria into formal regulations.***

The INS established criteria for the release of asylum seekers (i.e. credible fear, community ties, establishment of identity, and not a suspected security risk) and these criteria continue, in theory, to be in effect at DHS. The Study, however, found that rates of release vary dramatically in different parts of the country and there is no evidence that these criteria are being applied consistently. Codification of the parole criteria into regulations will help ensure that DHS consistently detains those aliens who do not meet the criteria and releases those who do.

**3.2** ***DHS should develop standardized forms and national review procedures to ensure that its parole criteria are more consistently applied nation-wide.***

In addition to codifying its criteria in formal regulations, DHS should create standardized forms and review procedures to address inconsistent application of its release criteria for asylum

seekers. In trying to understand the wide variations in release rates, the Study found no evidence of quality assurance procedures to ensure that these criteria are being followed. Nor do DHS files usually include the information or forms necessary to ascertain whether or not the criteria are being applied. Detention and Removal Operations (ICE-DRO) should develop a form, perhaps modeled after the USCIS Form I-870, as well as associated national review procedures, to assess consistent application of the parole criteria. This will help ensure that asylum seekers who do not pose a security risk and who establish a credible fear of persecution, community ties, and identity are not improperly detained. The form would require DHS to document its assessment of each of the parole criteria.

**3.3** ***When non-criminal asylum seekers in Expedited Removal are detained, they should not be held in prison-like facilities, with the exception of those specific cases in which DHS has reason to believe that the alien may pose a danger to others. Rather, non-criminal asylum seekers should be detained in "non-jail-like" facilities such as the model developed by DHS and INS in Broward County, Florida. DHS should formulate and implement nationwide detention standards created specifically for asylum seekers. The standards should be developed under the supervision of the proposed Office of the Refugee Coordinator, and should be implemented by an office dedicated to the detention of non-criminal asylum seekers, developing a small number of centrally managed facilities specific to and appropriate for, asylum seekers. The current DHS standards – based entirely on a penal model -- are inappropriate.***

U.S. law and DHS regulations are silent on whether asylum seekers should have detention standards that are different from those applied to other aliens. The Executive Committee of the United Nations High Commissioner on Refugees (UNHCR) has, however, spoken on the subject. Specifically, in UNHCR Executive Committee Conclusion No. 44 (1986) on Detention of Refugees and Asylum Seekers, the Executive Committee noted "deep concern" that large numbers of asylum seekers are the "subject of detention" and "stressed the importance for national legislation or administrative practice to make the necessary distinction between the situation of refugees and asylum seekers, and that of other aliens" and "stressed that conditions of detention of refugees and asylum seekers must be humane and that, in particular, refugees and asylum seekers shall, whenever possible, not be accommodated with persons detained as common criminals…."

We have found that detained asylum seekers in Expedited Removal are subjected to conditions of confinement that are virtually identical to those in prisons or jails. These conditions create a serious risk of institutionalization and other forms of psychological harm. They are inappropriate, particularly for an already traumatized population of asylum seekers, and unnecessary. ICE's own "non-jail-like detention" model in Broward County, Florida has demonstrated that asylum seekers may be securely detained in an environment which does not resemble a jail and which is no more expensive than more secure facilities. Broward is, however, the only such non-jail-like detention facility among the 185 jails, prisons, and detention centers where ICE detains asylum seekers.

The Study concurs with the UNHCR Executive Committee that asylum seekers have different issues and needs than those faced by prisoners or even other aliens, and standards should be developed in recognition of this important distinction. While DHS has its own

"Detention Standards" to ensure that aliens are detained under acceptable conditions, these standards are virtually identical to, and indeed are based on, correctional standards. Asylum seekers who are not criminals should not be treated like criminals.

We recommend that the proposed Office of the Refugee Coordinator oversee the development and implementation of those standards, and that an office be established to oversee the centralized development and management of non-jail-like asylee detention facilities. Standards appropriate for asylum seekers cannot be implemented in the existing decentralized network of 185 detention facilities, nearly all of which are either jails or jail-like detention centers.

**3.4** ***DHS should ensure that personnel in institutions where asylum seekers are detained are given specialized training to better understand and work with a population of asylum seekers, many of whom may be psychologically vulnerable due to the conditions from which they are fleeing.***

In the Study's survey of approximately 20 detention facilities that house more than 70 percent of the population of asylum seekers subject to Expedited Removal, only one facility indicated that line officers or guards were explicitly told which detainees were asylum seekers. In addition, staff at very few facilities were given any specific training designed to inform them of the special needs or concerns of asylum seekers, and in only one facility did the staff receive any training to enable them to recognize or address any of the special problems which victims of torture or other victims of trauma may have experienced. As noted above, asylum seekers have different needs than, and should be distinguished from, other aliens. Indeed, unlike other migrants, bona fide asylum seekers have a well-founded fear of persecution, and may also have special needs and problems stemming from that fear. This distinction underscores the need for specialized training for guards and other detention center employees.

**3.5** ***DHS should exercise discretion and not place a properly documented alien in Expedited Removal – and mandatory detention – when the sole basis for doing so is the alien's expression of a desire to apply for asylum at the port of entry***.

Under DHS policy, when an alien at a port of entry indicates a desire to seek asylum, that alien is placed in Expedited Removal after being charged with inadmissibility as an intending immigrant under section 212(a)(7)(A)(i)(l) of the Immigration and Nationality Act for having misrepresented the purpose of obtaining a visa to the United States. According to DHS, the intention to apply for asylum is not permissible with a visa for a temporary stay in the United States. The Study reviewed 353 files of aliens referred for credible fear from FY2002 to FY2003, and found 18 asylum seekers who had valid documents and were placed in Expedited Removal proceedings after expressing an intention to apply for asylum.[4]

[4] Recently, this practice was the subject of press attention, when the 81 year old Reverend Joseph M. Dantica, a frequent visitor to the United States in possession of a valid visitor visa from Haiti, was placed in Expedited Removal proceedings. Rev. Dantica was placed in Expedited Removal because, when asked by the inspector how long he intended to remain, the Reverend responded that he intended to apply for "temporary asylum." Dantica was sent to the Krome detention center in Florida, where he collapsed during his credible fear interview and died shortly thereafter.

The Study questions whether it is necessary or desirable to place such aliens with facially valid documents and whose identity is not in doubt in Expedited Removal and mandatory detention solely because the alien expresses an intention to apply for asylum. We urge DHS to revisit its presumption that an intention to apply for asylum is tantamount to an intention to "immigrate" to the United States. Asylee status is not "immigrant" status. In fact, asylees may not apply for "immigration" status (i.e. lawful permanent residence) until twelve months after they receive asylum. Even then, asylees can only become lawful permanent residents after an "asylum adjustment" number becomes available, which now takes more than a decade.

**RECOMMENDATION FOUR**

EXPAND EXISTING PRIVATE-PUBLIC PARTNERSHIPS TO FACILITATE LEGAL ASSISTANCE FOR ASYLUM SEEKERS SUBJECT TO EXPEDITED REMOVAL, AND IMPROVE ADMINISTRATIVE REVIEW AND QUALITY ASSURANCE PROCEDURES TO IMPROVE CONSISTENCY IN ASYLUM DETERMINATIONS BY IMMIGRATION JUDGES.

**4.1** ***Statistics specific to Expedited Removal establish that asylum seekers without legal representation are at a significant disadvantage in presenting their asylum claim to the immigration judge. At the same time, other studies have shown that legal assistance actually improves the efficiency of the removal hearing process. Two programs in particular should be expanded:***

4.1.a *The Legal Orientation Program (LOP), administered by the Executive Office for Immigration Review (EOIR) in partnership with non-governmental organizations (NGO's), should be expanded beyond the seven facilities in which it is currently administered.*

With approval rates of 25 percent for represented asylum seekers in Expedited Removal and 2 percent for those who are unrepresented, the findings of the Study clearly underscore that unrepresented applicants have serious difficulties presenting their claim for asylum in an adversarial asylum proceeding. The LOP, directed by EOIR in partnership with numerous NGOs, has proven to be an effective and efficient model of facilitating representation for asylum seekers and other detainees at seven facilities. EOIR and a major study by the Department of Justice have demonstrated that such programs not only assist aliens with meritorious claims, but assist the government as well. Because they provide aliens without a realistic possibility of relief a better understanding of their prospects, legal orientation programs result in more efficient use of court and detention resources.

Regrettably, while Congress instructed that INS (now ICE) transfer $1 million in appropriated funds to EOIR for the LOP program each year from FY2002-2004, the funds for FY2003 have yet to be transferred. ICE did, however, agree to transfer $1 million in FY2005 funding on February 1, 2005. LOP funding should continue and, to the extent possible, be expanded system-wide.

4.1.b *Each of the local eight asylum offices should form partnerships with service providers in their area to ensure that asylum seekers have an attorney to consult with during the credible fear process. Such a collaborative project between the Arlington,*

*Virginia Asylum Office and the Capital Area Immigrants Rights Coalition has already demonstrated that it can enhance the efficiency of the asylum process.*

The partnership developed between the Arlington asylum office (DHS-USCIS) and the Capital Area Immigrants' Rights Coalition, which endeavors to facilitate legal assistance for asylum seekers awaiting a credible fear interview, serves as another efficiency model. Specifically, since the launch of the program, the frequency of asylum seekers dissolving their claims in Arlington has increased by 50 percent, and it now has the highest dissolve rate of any asylum office in the country. After receiving legal counseling, an alien with no available relief is more likely to retract his or her claim and ask to be returned home, saving the government detention and immigration court costs and the alien wasted time in detention. Moreover, in many cases, legal assistance facilitated for purposes of the credible fear interview extends to representation at the time of the asylum hearing and helps ensure that asylum seekers with valid claims will not be returned to countries where they may face persecution.

Both of these public-private partnerships should be expanded for asylum seekers subject to Expedited Removal on a national basis to supplement other effective, but under-resourced, models of pro bono representation in various parts of the United States. Facilitating asylum seekers' access to legal assistance, however, will remain logistically difficult until DHS implements the Study's recommendation that detained asylum seekers be concentrated in a limited number of detention centers appropriate to asylum seekers.

4.1.c *ICE and EOIR should also collaborate with local service providers to ensure that NGO's, particularly those that conduct "Know Your Rights Presentations" at DHS detention facilities in LOP, should have access to aliens in Expedited Removal proceedings, including those aliens who have not been referred for a credible fear determination, so long as such interviews do not delay the Expedited Removal process.*

The LOP model, and similar programs such as the "Know Your Rights Presentations" conducted by the Florence Immigrant and Refugee Rights Project (FIRRP), may also be useful in helping DHS identify cases which should be referred for a credible fear interview. When Commissioners and Study Experts visited Arizona in August 2004 in order to learn about the implementation by the Border Patrol of Expedited Removal, Border Patrol officials erroneously assured the delegation that all aliens in Expedited Removal would, while detained, be able to attend "Know Your Rights" presentations at the detention facility in Florence. According to subsequent conversations with other DHS officials and the FIRRP, which conducts such presentations, the only aliens who are able to meet with FIRRP are those scheduled for a hearing with an immigration judge. By definition, this limitation means that the only aliens in Expedited Removal who may meet with FIRRP are those whom Border Patrol has referred for a credible fear determination *and* who have then been found to have a credible fear of persecution by an asylum officer. By facilitating meetings with all aliens in Expedited Removal, DHS could both instill confidence that the Expedited Removal process is properly referring asylum seekers for a credible fear determination, and also allow organizations to bring to DHS' attention aliens who should *not* be returned without first seeing an asylum officer.

EOIR has already taken steps in this direction by allowing its contractors in the Legal Orientation Program to provide "self-help" training workshops when needed for unrepresented

aliens interested in pursuing relief from removal or subject to special procedures. The Study hopes that EOIR will be given the necessary resources to help ensure that aliens have the information they need to make the system both more efficient, and more just as well.

***4.2 The Study found significant variations in immigration judge grant rates for asylum claims referred through the Expedited Removal process. This is true not only from court to court, but also from judge to judge within individual courts. The Study also found that many immigration judges are relying heavily on Expedited Removal documents, which the Study found to be incomplete and less than reliable. We recommend that these quality assurance and administrative review issues be addressed in the following ways:***

4.2.a *The Board of Immigration Appeals (BIA) should revisit its recently adopted practice of allowing summary affirmances for asylum, withholding, and Convention Against Torture (CAT) relief since there are indications that this practice may be undermining the Board's effectiveness as the primary review mechanism for decisions by immigration judges.*

The BIA is the primary means for reviewing immigration judge decisions and correcting judicial error. Three years ago, in order to "increase efficiency," the BIA authorized the use of one-sentence summary affirmances of immigration judge decisions. Since that time, the sustain rate for appeals filed by asylum seekers subject to Expedited Removal has fallen from 23 percent to 4 percent. This difference has not been adequately explained by EOIR and should be thoroughly investigated. By making it significantly easier to affirm - rather than vacate - an immigration judge decision, the BIA may be inadvertently undermining its effectiveness as a quality assurance mechanism. The application of summary affirmances to cases involving asylum, withholding and CAT relief should be revisited to ensure that the review process is equitable.

4.2.b *EOIR should reinstate funding for immigration judge training and consider additional quality assurance procedures (i.e. peer review) to address the significant variations in approval and denial rates among immigration judges. In particular, immigration judges should be provided training specific to issues related to the reliability of DHS forms that they use to ascertain the credibility of testimony; e.g. the Forms I-867 and I-870 analyzed by this study.*

The Study's statistical findings on the variability of immigration judge decisions on relief for asylum seekers in Expedited Removal highlight the need for these differences to be examined and explained in order to develop and implement appropriate training and quality assurance mechanisms. Moreover, immigration judges should be trained and otherwise advised on the mechanics of the Expedited Removal process (i.e. the extremely limited probative value of the I-867 and I-870 forms). Other methods of quality assurance, e.g. peer review panels, should be considered as well. Yet, due to budget shortfalls, the immigration judges have not held a training conference for several years. Such trainings are necessary, and should be re-established.

## RECOMMENDATION FIVE

IMPLEMENT AND MONITOR QUALITY ASSURANCE PROCEDURES TO ENSURE MORE RELIABLE INFORMATION FOR HOMELAND SECURITY PURPOSES, AND TO ENSURE THAT ASYLUM SEEKERS ARE NOT TURNED AWAY IN ERROR.

### System Wide

**5.1 *Create a reliable inter-bureau system that tracks real-time data of aliens in Expedited Removal proceedings.***

The Office of Immigration Statistics within DHS is currently dependent on each of the organizational components (USCIS, ICE, CBP) spread across this vast agency – and beyond (with the EOIR in the Department of Justice) – in order to obtain statistics on immigration activities in general, and Expedited Removal/Asylum activities in particular. There is currently no capability to track statistics of aliens from the beginning of the Expedited Removal process – at the port of entry, through detention, and up until the completion of the hearing before the immigration judge at the Department of Justice. Most of the statistics in this Study had to be cobbled together from different non-interactive systems with different data. Other statistics sought – such as breakdowns by nationality of aliens permitted to withdraw their applications for admission – were simply not being tracked by DHS databases. Quality assurance and integrated operations cannot be done until DHS develops an agency-wide (and beyond) system that tracks real time data of aliens in Expedited Removal proceedings. The lack of reliable real time data shared among the bureaus in the DHS raises concerns about its ability to protect not only asylum seekers, but homeland security as well.

Simply put, DHS should have an information system that will allow it to readily monitor the types of issues which were examined during the Study.

### Inspections and Border Patrol

**5.2 *Reconcile conflicting field guidance to require that any expression of fear at the port of entry must result in either a referral for a credible fear determination or, in cases where the inspector or Border Patrol agent believes the alien would "clearly not qualify" for asylum or CAT relief, contact with an asylum officer to speak to the alien via a telephonic interpretation service to determine whether or not the alien needs to be referred.***

CBP regulations and guidance provide conflicting instructions to CBP officers on whether all expressions of fear by the alien during inspection should result in a referral to an asylum officer. We recommend that the conflicting guidance be clarified. When an inspector has a question about whether the fear is related to the grounds for asylum, the regulations do not provide him or her with discretion to make that determination, and the alien should be referred to an asylum officer. The Field Manual, however, authorizes inspectors not to refer aliens whose expression of fear "would clearly not qualify that individual for asylum." DHS guidance also instructs immigration inspectors to contact the asylum office point(s) of contact "when necessary

to obtain guidance on questionable cases involving an expression of fear or a potential asylum claim."

Immigration inspectors and Border Patrol agents are not trained in asylum law and should not make determinations about whether a fear is related to the grounds of asylum or CAT relief. On the other hand, if an alien's expression of fear has no relationship to the grounds for asylum or CAT relief, there is no benefit to subjecting the alien to detention for several days at government expense.

DHS should require that, when an alien expresses a fear of return, the immigration inspector or Border Patrol agent must either (1) refer the alien for a credible fear determination or (2) when the inspector believes the alien's expression of fear is not related to grounds for relief, initiate an interview, with appropriate privacy, between the alien and an asylum officer via a telephonic interpretation service. The asylum officer would then determine whether the alien should be referred for a credible fear determination and provide a short form documenting the consultation for the file.

**5.3 *DHS should improve quality assurance by expanding and enhancing the videotape systems currently used at Houston and Atlanta to all major ports of entry and Border patrol stations to unintrusively record all secondary interviews, and consider employing the use of undercover "testers" to verify that Expedited Removal procedures are being properly followed.***

The Study found current CBP quality assurance procedures to be inadequate and to rely entirely on "self-reporting" by immigration inspectors. The Study has shown that sworn statements taken at ports of entry are often inaccurate and are almost always unverifiable. The unintrusive video-taping systems currently in place in Houston and Atlanta should be expanded to all major ports of entry and the tapes should be reviewed and retained for a sufficient period of time to be useful for quality assurance purposes. The Study found the tapes to be useful because they may be used to protect aliens from improper conduct by inspectors, and to protect inspectors from specious allegations of improper conduct. In addition, video should also be used by CBP to monitor the accuracy of sworn statements and the proper implementation of all CBP procedures. As a quality assurance measure, CBP should also consider utilizing "testers" (undercover actors) who could verify that aliens with fraudulent documents are placed in Expedited Removal and that asylum seekers are properly referred for a credible fear determination. A "tester" would have the benefit of verifying compliance with procedures without the intrusiveness of a third-party monitor in the room, which would likely have an effect on the conduct of the officer.[5] In the meantime, however, CBP should monitor ports of entry on a periodic basis much in the way this Study has done.

Primary inspection at land ports of entry, however, is much more difficult to monitor due to the volume of inspections performed. While monitoring San Ysidro, the Study became aware of two separate incidents in which religious asylum seekers from Africa and the Middle East were turned away at primary inspection instead of being referred to Expedited Removal

[5] Testers are already routinely used by DHS at the Transportation Security Administration (TSA), which employs them to test the effectiveness of airport passenger and baggage screening procedures.

proceedings and a credible fear interview as required. In both cases, the asylum seekers were eventually referred to secondary inspection, but only after returning on a subsequent day and describing their difficulties to the secondary inspector. When a secondary inspector or an asylum officer becomes aware of such incidents, employees should be reminded of their responsibility to refer such cases for secondary inspection and the incident should be reported to both CBP and Asylum Headquarters.

**5.4** ***Sworn Statement Form I-867B should include an explanation of the specific purpose for which the document is designed to serve, and its limitations.***

The Study found that immigration judges frequently deny asylum claims on the basis of aliens "adding detail" to claims originally expressed in the sworn statement taken by CBP officers at the secondary inspection. The Study also found that such forms are often incomplete and less than reliable. CBP should amend its sworn statement forms (I-867B) in the same way that USCIS recently amended its credible fear assessment form (I-870), with a prominently displayed notation that the form is not a transcript and, echoing the language in the Inspector Field Manual, is "not intended to go into detail about any fear of persecution or torture."

**5.5** ***Current DHS procedures concerning the administration of the Form I-867A and B should be maintained, but should be more vigorously monitored.***

Current CBP procedures are designed to protect bona fide asylum seekers from being removed without a hearing. They already require that immigration inspectors (1) explain the Expedited Removal process to the alien by reading the script on the Form I-867A; (2) ask the alien all four of the "fear questions," as written on Form I-867B; (3) review the alien's Sworn Statement, as recorded on the Form I-867A and B, by reading it back to the alien (with the assistance of an interpreter, if necessary); (4) inquire whether the alien understood what was read back to him; and (5) correct any inaccuracies pointed out by the alien and ask him or her sign the statement to confirm its accuracy.

The Study, however, found lapses in compliance with these procedures. Implementation of the procedures, could be maintained and enforced through more effective quality assurance efforts including the use of videotapes, testers, as well as ongoing training.

Finally, while the use of language specific videotape presentations to explain the Expedited Removal and credible fear process to the alien could be a useful tool to help ensure that the alien better understands the process, at least one port of entry sometimes plays a video tape in lieu of the officer reading the script to the alien. This practice falls short of the Inspector Field Manual guidance that an immigration inspector must be "absolutely certain that all required procedures have been adhered to and that the alien has understood the proceedings against him or her." A videotape presentation is a good addition to, but should not substitute for, the required steps mentioned above.

**Asylum**

**5.6 *The efficiency of the Expedited Removal process should be enhanced by amending DHS quality assurance procedures for the credible fear interview.***

The credible fear determination by an asylum officer, which – by law – is reviewable by an immigration judge, has proven successful at ensuring that bona fide asylum seekers referred from the port of entry will not be removed without a full asylum hearing. The credible fear process fails, however, at making asylum more efficient by failing to screen out invalid claims and thus putting more strain on detention and immigration court resources. With a screen-in rate consistently exceeding 90 percent, and a negative determination rate of approximately 1 percent, some view the credible fear process itself as somewhat lacking in credibility. The Asylum Division subjects negative determinations to a much more intensive quality assurance process than positive determinations. This lopsided treatment may be resulting in lopsided credible fear determinations. We would suggest that this bias in favor of positive credible fear determinations be addressed by subjecting them to similar quality assurance procedures as negative determinations, and that immigration judges continue to review negative determinations, unless the asylum seeker indicates he does not wish for the decision to be reviewed.

**RECOMMENDATION SUMMARY**

THIS STUDY HAS PROVIDED TEMPORARY TRANSPARENCY TO EXPEDITED REMOVAL – A PROCESS WHICH IS OPAQUE NOT ONLY TO THE OUTSIDE WORLD, BUT EVEN WITHIN THE DEPARTMENT OF HOMELAND SECURITY. AS A RESULT OF THIS TRANSPARENCY, SERIOUS – BUT NOT INSURMOUNTABLE – PROBLEMS WITH EXPEDITED REMOVAL HAVE BEEN IDENTIFIED. THE STUDY'S RECOMMENDATIONS CONCERNING BETTER DATA SYSTEMS, QUALITY ASSURANCE MEASURES, ACCESS TO REPRESENTATION, AND A DHS REFUGEE COORDINATOR WOULD ALL CONTRIBUTE TO A MORE TRANSPARENT AND EFFECTIVE EXPEDITED REMOVAL PROCESS. WE ALSO RECOMMEND THAT CONGRESS REQUIRE THE DEPARTMENTS OF JUSTICE AND HOMELAND SECURITY TO PREPARE AND SUBMIT REPORTS, WITHIN 12 MONTHS OF THE RELEASE OF THIS STUDY, DESCRIBING AGENCY ACTIONS TO ADDRESS THE FINDINGS AND RECOMMENDATIONS OF THIS STUDY.

# EXHIBIT 5

# BARRIERS TO PROTECTION

## THE TREATMENT OF ASYLUM SEEKERS IN EXPEDITED REMOVAL



U.S. Commission on International Religious Freedom

Barbed wire is seen at Casa del Migrante in Reynosa, Mexico. Casa del Migrante provides housing, food, clothing and medical care to people who are planning to cross the border and to those have have been deported from the United States (Reuters/Eric Thayer).

U.S. COMMISSION ON INTERNATIONAL RELIGIOUS FREEDOM

# BARRIERS TO PROTECTION

## THE TREATMENT OF ASYLUM SEEKERS IN EXPEDITED REMOVAL

## COMMISSIONERS

Thomas J. Reese, S.J.
*Chair*

Daniel Mark
James J. Zogby
*Vice Chairs*

Kristina Arriaga de Bucholz
Sandra Jolley
John Ruskay
Jackie Wolcott
Ambassador David N. Saperstein, *ex officio,* non-voting member

## AUTHORS OF THIS REPORT

Elizabeth Cassidy
*Co-Director for Policy and Research*

Tiffany Lynch
*Senior Policy Analyst*

## TABLE OF CONTENTS

Acronyms . . . vi
Expedited Removal Process Flow Chart . . . vii
Executive Summary . . . 1
Background . . . 7
Methodology . . . 9
The Expedited Removal Process . . . 11
The Expansion of Expedited Removal . . . 13
Findings and Recommendations . . . 17
- Management and Coordination . . . 17
- Initial Processing . . . 18
- Credible Fear Screening . . . 34
- Detention . . . 38
- Access to Information and Counsel . . . 50
- Adjudication of Asylum Claims . . . 54
- Prosecution of Asylum Seekers . . . 56
- The 2014 Surge . . . 57

Glossary of Terms . . . 67
Appendices . . . 73

## ACRONYMS

| | |
|---|---|
| **ABA** | American Bar Association |
| **ATD** | Alternatives to Detention |
| **BIA** | Board of Immigration Appeals |
| **BP** | U.S. Border Patrol |
| **CBP** | U.S. Customs and Border Protection |
| **DHS** | Department of Homeland Security |
| **DOJ** | Department of Justice |
| **EOIR** | Executive Office for Immigration Review |
| **HPI/GPI** | Honduran and Guatemalan Pilot Initiatives |
| **ICE** | U.S. Immigration and Customs Enforcement |
| **IIRIRA** | 1996 Illegal Immigration Reform and Immigrant Responsibility Act |
| **INA** | Immigration and Nationality Act |
| **ISAP** | Intensive Supervision Appearance Program |
| **LOP** | Legal Orientation Program |
| **OFO** | U.S. Customs and Border Protection Office of Field Operations |
| **OIG** | Department of Homeland Security Office of Inspector General |
| **ORR** | Department of Health and Human Services Office of Refugee Resettlement |
| **PBNDS** | 2011 Performance Based National Detention Standards |
| **RCA** | Risk Classification Assessment |
| **UAC** | Unaccompanied non-citizen children |
| **USCIRF** | U.S. Commission on International Religious Freedom |
| **USCIS** | U.S. Citizenship and Immigration Services |
| **VTC** | video teleconference |

# EXPEDITED REMOVAL PROCESS FLOW CHART



## EXECUTIVE SUMMARY

Unprecedented numbers of individuals worldwide are forcibly displaced by conflict or persecution or migrating in search of improved economic opportunities. For example, in 2015, more than one million refugees and migrants undertook treacherous journeys across the Mediterranean Sea to reach Europe. In fiscal year 2014, 52,000 unaccompanied non-citizen children and 68,000 family units from Central America crossed into the United States from Mexico.

These large, mixed flows of people require that nations have credible, effective immigration laws and processes to identify and protect *bona fide* refugees and asylum seekers. In the United States, one such system is the Expedited Removal process. Under Expedited Removal, foreign nationals arriving in the United States without proper documentation or with fraudulent documentation can be returned to their countries of origin without delay, and without the immigration court removal hearings, unless they establish a credible fear of persecution or torture. This report examines the U.S. government's treatment of asylum seekers in Expedited Removal.

Expedited Removal is a complicated administrative process carried out by multiple agencies of the U.S. Department of Homeland Security (DHS), including U.S. Customs and Border Protection (CBP) and U.S. Immigration and Customs Enforcement (ICE). For asylum seekers, DHS's U.S. Citizenship and Immigration Services (USCIS) and the Executive Office for Immigration Review (EOIR) of the U.S. Department of Justice (DOJ) also are involved.

CBP first encounters non-citizens when they apply for admission to the United States at U.S. ports of entry, or after they cross the U.S. border, and identifies those subject to Expedited Removal and, from that group, those seeking asylum. During this initial processing, CBP officials are required to explain Expedited Removal and its consequences, advise non-citizens to ask for protection without delay if they have any fear or concern about being returned home, and ask four questions related to fear of return. CBP then turns non-citizens subject to Expedited Removal over to ICE for detention and removal. While in ICE detention, those who claimed fear of return are screened by USCIS asylum officers to determine if their fear is credible, defined as "a significant possibility" of establishing eligibility for protection. If USCIS finds a credible fear of persecution or torture, the asylum officer places the non-citizen in removal proceedings before an EOIR immigration judge, in which he or she may apply for asylum or other relief or protection from removal, and ICE may release the asylum seeker from detention while the immigration court proceeding is pending. If USCIS does not find credible fear, the non-citizen may request a review by an immigration judge, but if credible fear is again denied the person is removed promptly thereafter.

*These large, mixed flows of people require that nations have credible, effective immigration laws and processes to identify and protect bona fide refugees and asylum seekers.*

The International Religious Freedom Act of 1998 authorized the U.S. Commission on International Religious Freedom (USCIRF) to designate experts to conduct a study to assess the situation of asylum seekers in Expedited Removal. USCIRF released its first assessment in the 2005 *Report on Asylum Seekers in Expedited Removal*, which documented serious flaws placing asylum seekers at risk of return to countries where they could face persecution and inappropriate, prison-like detention conditions. To address these problems, USCIRF made a series of recommendations designed both to help protect U.S. borders and ensure the fair and humane treatment of *bona fide* asylum seekers.

This follow-up report, based on field research and a review of public information conducted by USCIRF between 2012 and 2015, evaluates the current situation of asylum seekers in Expedited Removal and the implementation of USCIRF's 2005 recommendations. The research revealed that, although DHS had taken some measures in response to the 2005 study, there were continuing and new concerns about the processing and detention of asylum seekers in Expedited Removal, and most of USCIRF's 2005 recommendations had not been implemented. Furthermore, since USCIRF's original research, both the U.S. government's use of Expedited Removal and the number of individuals in Expedited Removal seeking asylum have grown significantly. As a result, flaws in the system now potentially affect even more asylum seekers.

**Key findings include:**

- There continues to be a need for a high-ranking DHS official to coordinate refugee and asylum issues among the various agencies involved in Expedited Removal.
- USCIRF's observations and research revealed continuing and new concerns about CBP officers' interviewing practices and the reliability of the records they create, including: flawed Border Patrol internal guidance that conflates CBP's role with that of USCIS; certain CBP officers' outright skepticism, if not hostility, toward asylum claims; and inadequate quality assurance procedures.
- CBP's and USCIS' reliance on technology to process and interview increased numbers of border crossers has improved efficiency, but the impersonal nature of the interviews raises concerns that this may be at the expense of identifying and protecting asylum seekers.
- USCIS' 2014 revised lesson plan for asylum officers on credible fear and a new detailed interview checklist may have moved what should be a screening interview closer to a full asylum adjudication.
- ICE continues to detain asylum seekers before their credible fear interviews, and, in some cases even after being found by USCIS to have credible fear, under inappropriate penal conditions.

- ICE's 2009 directive on parole, and its increased use of Alternatives to Detention, have improved opportunities for release of asylum seekers found to have a credible fear, in line with USCIRF's 2005 recommendations.
- ICE's failure to develop uniform procedures to determine bond amounts and its extensive use of ankle bracelets over other alternatives, without individually assessing each asylum seeker's non-appearance risk, raise serious concerns.
- Detained asylum seekers with whom USCIRF met lack any real understanding of their rights, responsibilities, and, if relevant, the next steps in their asylum cases.
- The prioritization of funding for the agencies involved in the enforcement aspects of Expedited Removal has resulted in adjudication delays and backlogs at both USCIS and EOIR.
- CBP's referral of non-citizens who claim fear to DOJ for prosecution for illegal entry or illegal re-entry without first allowing USCIS to assess their fear claim is problematic and may violate the United States' international obligations.
- The U.S. government's detention of mothers and children in Expedited Removal who expressed fear of return is inherently problematic and several courts have found that the facilities used do not comply with the U.S. government's own standards for child detention as defined in a 1997 legal settlement, the *Flores* Agreement.
- CBP's and ICE's implementation of the Honduran and Guatemalan Pilot Initiatives to detain separately and remove speedily adults from these two countries who do not claim fear has the negative effect of limiting these non-citizens' opportunities to learn about their legal rights.

## KEY RECOMMENDATIONS INCLUDE

### To the Secretary of Homeland Security

- Appoint a high-ranking official with sufficient authority and resources to make the reforms necessary to ensure the protection of asylum seekers in Expedited Removal and to oversee implementation.
- Reiterate to all agencies and officers implementing Expedited Removal that their law enforcement mandate includes fully implementing U.S. laws and regulations governing the protection of individuals seeking refuge from return to persecution or torture.
- Request that the DHS Office of Inspector General audit the Expedited Removal process for compliance with laws and policies regarding the protection of asylum seekers.

### To CBP

- Video record all Expedited Removal processing interviews and require supervisory and headquarters review of the recordings of a sampling of interviews for quality assurance purposes.
- Retrain all officers and agents on their role in the Expedited Removal process, the proper procedures for interviewing non-citizens, and the special needs and concerns of asylum seekers and other vulnerable populations.
- Establish a dedicated corps of specially-trained, non-uniformed interviewers to interview women and children to identify fear claims, and ensure that female interviewers are included.
- Track the results of interviews conducted by virtual processing against those conducted in person to determine if the two methods are producing materially different outcomes.
- Develop a document that briefly and clearly explains the Expedited Removal process, its consequences, the right to seek protection for those who fear return, and the right to request a private interview, and provide this document to all individuals, in a language they understand, as soon as possible when they come into CBP custody.

### To USCIS

- Track whether credible fear interview referrals are coming from CBP or ICE to better understand when in the process most fear claims are being raised.
- Reaffirm in the asylum officers' lesson plan that the credible fear standard is a screening standard requiring a showing of a "significant possibility" of eligibility for asylum, not a full assessment of the merits of the case.
- Continue to track the results of credible fear interviews conducted telephonically and those conducted in person to determine if the two methods are producing materially different outcomes.
- Allow asylum officers to convert and adjudicate appropriate Expedited Removal cases in which credible fear is found as affirmative asylum cases.

### To ICE

- Detain all adult asylum seekers who must be detained, whether before or after a credible fear determination, in civil facilities only.
- Require an individualized re-assessment of the need for custody for all detainees with a positive credible fear finding, and apply a presumption

## KEY RECOMMENDATIONS INCLUDE (CONTINUED)

of bond for detainees with credible fear who do not fall under the 2009 parole directive.

- Increase the use of Alternatives to Detention, such as monitored release, for asylum seekers, beyond bond and parole opportunities.
- Expand the Know Your Rights presentations that provide detainees with basic legal information to all facilities that house asylum seekers.
- If families are placed in Expedited Removal, detain them only in facilities that meet the standards of the *Flores* Agreement and individually re-assess the need for custody after credible fear is found, with a presumption of release.
- Ensure that programs that detain nationals of particular countries separately do not have the effect of preventing them from learning about the right to seek asylum.

### To EOIR

- Retrain immigration judges that the interview record created by CBP is not a verbatim transcript of the interview and does not document the individual's entire asylum claim in detail, and should be weighed accordingly.
- Expand the Legal Orientation Program available in some facilities to all detention facilities housing asylum seekers, and provide it to detainees before their credible fear interviews.

### To CBP, USCIS, and DOJ

- Work together to develop procedures to allow USCIS to conduct credible fear interviews for non-citizens being referred for prosecution who express fear before DOJ pursues their criminal cases.

### To Congress

- Authorize and fund another independent, comprehensive study of the treatment of asylum seekers in Expedited Removal at all stages of the process.
- Request the Government Accountability Office to conduct a study to assess whether non-citizens removed to their home countries under Expedited Removal have faced persecution or torture after their return.
- Increase funding for the adjudicatory aspects of Expedited Removal to enable USCIS and EOIR to address backlogs, conduct timely adjudications, and provide due process.
- Increase funding to EOIR to expand the Legal Orientation Program to all facilities housing asylum seekers and to enable it to be provided to detained asylum seekers before their credible fear interviews.

# FINDINGS AND RECOMMENDATIONS

## MANAGEMENT AND COORDINATION

The 2005 Study found extensive problems with DHS's overall management and coordination of the Expedited Removal process, including poor communication among the responsible agencies, insufficient quality assurance and data management practices, and no mechanism to address system-wide issues. USCIRF's main recommendation to address these flaws was that the Secretary of Homeland Security appoint a high-ranking official to coordinate refugee and asylum matters among the various agencies and implement reforms.

Although then-Secretary Michael Chertoff appointed a Senior Advisor for Refugee and Asylum Policy in 2006, that position was never at the level, nor had the authority and resources, necessary to address USCIRF's findings. The position did not report to the Secretary or Deputy Secretary, but rather was within the DHS Office of Policy. The position was filled from 2006 to 2011, but since then has been vacant.

USCIRF's current research revealed continuing and new concerns about the treatment of asylum seekers in Expedited Removal and confirmed that most recommendations from the 2005 Study remain unimplemented. A high-ranking official, with the Secretary's clear support and sufficient authority and resources, is still needed to implement the required reforms, ensure consistent asylum policy and practice, manage the Expedited Removal system, and address issues as they arise.

*USCIRF's current research revealed continuing and new concerns about the treatment of asylum seekers in Expedited Removal and confirmed that most recommendations from the 2005 Study remain unimplemented. A high-ranking official, with the Secretary's clear support and sufficient authority and resources, is still needed to implement the required reforms, ensure consistent asylum policy and practice, manage the Expedited Removal system, and address issues as they arise.*

### RECOMMENDATIONS

#### To the Secretary of Homeland Security

- As recommended in 2005, appoint a high-ranking official with sufficient authority and resources to make the reforms necessary to ensure the protection of asylum seekers in Expedited Removal and to oversee implementation, including by chairing a regular interagency working group of all agencies involved in the Expedited Removal process.
- Reiterate to all agencies and officers implementing Expedited Removal that their law enforcement mandate includes fully implementing U.S. laws and regulations governing the protection of individuals seeking refuge from return to persecution or torture.
- Request that the DHS Office of Inspector General audit the Expedited Removal process for compliance with laws and policies regarding the protection of asylum seekers.

#### To Congress

- Authorize and fund another independent, comprehensive study of the treatment of asylum seekers in Expedited Removal at all stages of the process.
- Request the Government Accountability Office to conduct a study to assess whether non-citizens removed to their home countries under Expedited Removal have faced persecution or torture after their return.

*Why did you leave your home country or country of last residence?*

*Do you have any fear or concern about being returned to your home country or being removed from the United States?*

*Would you be harmed if you are returned to your home country or country of last residence?*

*Do you have any questions or is there anything else you would like to add?*

## INITIAL PROCESSING

As discussed above, CBP first encounters non-citizens at ports of entry or after they cross the border and identifies those subject to Expedited Removal and from that group, those seeking asylum. OFO officers process non-citizens arriving at ports of entry and BP agents process non-citizens apprehended along the border through interviews taken as sworn statements on Form I-867. Form I-867 seeks to ensure that non-citizens who fear return are identified and not erroneously returned to countries where they may face persecution. The form has two parts: (1) side A (see Appendix A) includes a required script explaining the Expedited Removal process and its consequences and advising non-citizens to ask for protection without delay if they have any reason to fear being returned home;[20] and (2) side B (see Appendix B) includes four required questions relating to fear of return.[21]

---

[20] Form I-867 Side A reads as follows:

> I am an officer of the United States Department of Homeland Security. I am authorized to administer the immigration laws and to take sworn statements. I want to take your sworn statement regarding your application for admission to the United States. Before I take you statement, I also want to explain your rights, and the purpose and consequences of this interview.
>
> You do not appear to be admissible or to have the required legal papers authorizing your admission to the United States. This may result in your being denied admission and immediately returned to your home country without a hearing. If a decision is made to refuse your admission into the United States, you may be immediately removed from this country, and if so, you may be barred from reentry for a period of 5 years or longer.
>
> This may be your only opportunity to present information to me and the Department of Homeland Security to make a decision. It is very important that you tell me the truth. If you lie or give misinformation, you may be subject to criminal or civil penalties, or barred from receiving immigration benefits or relief now or in the future.
>
> Except as I will explain to you, you are not entitled to a hearing or review.
>
> > U.S. Law provides protection to certain persons who face persecution, harm or torture upon return to their home country. If you fear or have a concern about being removed from the United States or about being sent home, you should tell me so during this interview because you may not have another chance. You will have the opportunity to speak privately and confidentially to another officer about your fear or concern. That officer will determine if you should remain in the United States and not be removed because of that fear.
>
> Until a decision is reached in your case, you will remain in the custody of the Department of Homeland Security.
>
> Any statement you make may be used against you in this or any subsequent administrative proceeding.

[21] The four questions on Form I-867 Side B are:

> Why did you leave your home country or country of last residence?
>
> Do you have any fear or concern about being returned to your home country or being removed from the United States?
>
> Would you be harmed if you are returned to your home country or country of last residence?
>
> Do you have any questions or is there anything else you would like to add?

At the time of the research for the 2005 Study, Expedited Removal applied at OFO ports of entry only. More than two dozen trained researchers and several expert supervisors observed more than 400 secondary inspection interviews at seven ports of entry, spending from two to six weeks at each site. They also reviewed case files and spoke with interviewees.

Their findings were alarming. In more than half of the interviews observed in the research for the 2005 Study, OFO officers failed to read the required information advising the non-citizen to ask for protection without delay if s/he feared return. At least one of the four required fear questions was asked approximately 95 percent of the time, but in 86.5 percent of the cases where a fear question was not asked, the record inaccurately indicated that it had been asked, and answered. And in 72 percent of the cases, asylum seekers were not allowed to review and correct the form before signing, as required. Thus, USCIRF found that, although they resemble verbatim transcripts, the I-867 sworn statements were neither verbatim nor reliable, often indicating that information was conveyed when in fact it was not and sometimes including answers to questions that never were asked. Yet immigration judges often used these unreliable documents against asylum seekers when adjudicating their cases.[22]

Additionally, in nearly 15 percent of the cases observed in the research for the 2005 Study, asylum seekers who expressed a fear of return were removed without referral to a USCIS asylum officer for a credible fear determination. Moreover, in nearly half of those cases, the files indicated that the asylum seeker had not expressed any fear. Some of these non-referrals may have been because of problematic language in the CBP Field Manual in use at the time stating that an officer may decline referral where the fear claimed by the applicant "would clearly not qualify that individual for asylum," but several involved expressions of fear of political, religious, or ethnic persecution. Finally, at one port of entry, the researchers found a few instances when CBP officers improperly pressured asylum seekers to retract their fear claims and withdraw their applications for admission.

To address these interviewing and recordkeeping flaws, USCIRF recommended that CBP: (1) videotape all Expedited Removal processing interviews for quality assurance review purposes, and use undercover "testers" to further verify that correct procedures are being followed; (2) revise field guidance to make clear that any expression of fear must result in a referral for a credible fear determination; and (3) amend Form

---

[22] As the 2005 Study noted, the records created by CBP during initial interviews or by USCIS asylum officers during credible fear interviews are often used by ICE trial attorneys to impeach asylum seekers' credibility and/or cited by immigration judges in denying relief. USCIS has since amended the Form I-870, on which it documents credible fear interviews, to include a statement that "[t]he following notes are not a verbatim transcript of this interview . . . There may be areas of the individual's claim that were not explored or documented for purposes of this threshold screening." CBP has not similarly modified the I-867.

I-867 to include a prominently displayed notation that it is not a verbatim transcript and is not intended to document the applicant's entire asylum claim in detail.

For the current research, one or two USCIRF staff visited five OFO ports of entry and four BP stations on a series of trips during 2014 and 2015, touring the facilities, meeting with officers, and observing a few in-person interviews.[23] At three ports of entry (Los Angeles International Airport, John F. Kennedy International Airport, and Otay Mesa Port of Entry) and one BP station (McAllen Station), USCIRF observed a total of five partial, in-person interviews. During four of these interviews, USCIRF observed the taking of the I-867 sworn statement but not the interviewee's review and signing (see Appendix C and Appendix D); for the fifth, the reverse was observed.[24] At McAllen and El Paso Border Patrol stations, USCIRF observed both sides of the virtual processing that is now used for most Expedited Removal cases involving border-crossers in the Rio Grande Valley CBP sector.

## Interviewing and Record Keeping Practices

Despite the small sample of CBP interviews observed, USCIRF found several examples of non-compliance with required procedures, including: failure to read back the answers to the interviewee and allow him to correct errors before signing, as required;[25] interviewing individuals together instead of separately and in private; failure to read the required script from the I-867A; and failure to record an answer correctly. For example, in one case, a BP agent did not read the I-867A script until the end of the interview, after he had already asked and filled out answers to the four fear questions on the I-867B. In another case, in response to the last of the four I-867B questions ("[d]o you have any questions or is there anything else you would like to add?"), the interviewee asked how long the process would take, and the agent answered that he did not know and could not say. On the sworn statement, however, the interviewer indicated "no" to question four.

*Despite the small sample of CBP interviews observed, USCIRF found several examples of non-compliance with required procedures*

[23] The ports of entry were: John F. Kennedy International Airport, Los Angeles International Airport, Hidalgo Port of Entry, Otay Mesa Port of Entry, and San Ysidro Port of Entry. The Border Patrol sites were: Chula Vista Station, El Paso Station, McAllen Station (twice), and Ramey Station. The time spent at each facility ranged from a half-day to two days.

[24] The other OFO ports and BP stations were not conducting any Expedited Removal interviews when USCIRF was there. All observations were done with the consent of the interviewee. The observations were partial because the full interview process took longer than the amount of time USCIRF was at the sites.

[25] Asked why, the OFO officer told USCIRF that he only reads back the contents if the interviewee requests it because it takes too long, and that the interviewee's initialing each page simply indicates that s/he received a copy of that page. A supervisor later confirmed that reading back the form is required and initialing signifies approval of the contents, and said he would remind all interviewing officers.

The credible fear interviews USCIRF observed at USCIS asylum offices[26] further raised concerns about CBP's interviewing and record-keeping practices. In three of the five observed credible fear interviews, asylum seekers' I-867 forms indicated "no" answers to the fear questions in his or her BP interview, but the asylum seeker said that s/he had articulated a fear or was not asked. These individuals were referred for credible fear interviews when they raised a fear of return to ICE while detained awaiting removal. For example, in one credible fear interview, the asylum seeker's form indicated he did not express a fear of return, but he told the asylum officer that the agents had not asked him if he was afraid, they only asked for his identifying information. He also said he had a letter from a helpful police officer in El Salvador saying he had been threatened by gang members, which he said the agent told him he would have to present to the asylum officer but then took and kept. In another, a woman's form also showed no expression of fear, but said she was coming to the United States to work; however, the asylum seeker stated in the credible fear interview that she remembers saying to BP that she was afraid to return to Guatemala and that she did not say she was coming to the United States to seek employment. She said "I had a good job in Guatemala but had to leave it because I needed protection."

Asylum officers reported to USCIRF that this was a common occurrence. They also said that they were seeing many forms with identical answers,[27] and others with clearly erroneous ones (*i.e.* the form said that the individual was asked, and answered, whether she was pregnant when the person is a man).[28]

While many asylum seekers in ICE detention centers reported that CBP officers did ask them about fear of return, others reported that CBP officers did not ask them the fear questions, asked them incorrectly, recorded "no" when interviewees answered "yes," inquired into their fear claims in detail, and/or dismissed assertions of fear. Some said their statement was not read back to them and/or that they were pressured to sign documents. For example, a detained asylum seeker from Nepal, apprehended at the southern border in Texas, reported that the BP agents asked her questions and she gave answers, but they did not write down what she said, they wrote down that she was coming to the United States to work. Another detained Nepali asylum seeker who crossed the border told

---

[26] USCIRF visited the Los Angeles, Houston, New Jersey, New York, and Miami asylum offices. The credible fear interviews were observed at the New Jersey and New York offices.

[27] This could be explained by the use of the interviewing templates discussed in the *Introduction of Virtual Processing* section.

[28] Similarly, a *pro bono* attorney with whom USCIRF met on one of our trips told us of a case where a 4-year-old child's file indicated that he said that he came to the United States to work.

USCIRF that the BP agents only asked him questions about his identity and did not ask him about fear. A detained asylum seeker from Somalia, who entered through an OFO port of entry and announced his intent to apply for asylum on arrival, said that the interviewing officer asked him the fear questions and told him that he would need proof of his story. However, at the end of the interview, he was asked to sign his statement and did so, but it was not translated back to him before signing.

Of particular concern are reports of CBP officials denying non-citizens in Expedited Removal the opportunity to claim fear. For example, a Guatemalan asylum seeker in ICE custody who had previously been deported told USCIRF that on her first apprehension by BP, she "was not given the opportunity to talk;" instead, she said that when she tried to explain why she had fled to the United States, the agent forced her to sign papers instead. One Central American man said he was told "whether you sign or not, we are going to deport you." Others said BP agents told them that "it's better if you just ask to be deported" or "we're going to throw you out." USCIRF heard an especially troubling account from a detained Bangladeshi asylum seeker. He recounted that he and two other Bangladeshis arrived at an OFO land port of entry and immediately asked the first officer they encountered for asylum. He said that officer turned them away, telling them to seek asylum in Mexico. They returned an hour later and the same officer again told them to go back to Mexico. However, he said that this time they refused and were taken inside, interviewed by a different officer, processed, and sent to ICE detention.

*These reports are consistent with information from USCIS, which told USCIRF anecdotally that the majority of their credible fear interview referrals come from ICE, not CBP.*

These reports are consistent with information from USCIS, which told USCIRF anecdotally that the majority of their credible fear interview referrals come from ICE, not CBP. In the credible fear interviews USCIRF observed, the asylum officers proactively asked each asylum seeker during the interview if CBP asked him or her about fear of return. Under the circumstances, USCIRF considers this to be a good practice.

In another troubling finding, USCIRF observed fear claims being examined beyond the four required questions, such as OFO officers and BP agents asking detailed questions about why the individual left his or her country or asking what an individual knows about the asylum process. When USCIRF asked one interviewing officer how he documents the raising of a fear claim, he responded that he asks "how it all started" and then asks about each arrest or incident in order. He further explained that he is "looking for the little details," which he records on the I-867.

Detainees in ICE custody reported similar experiences. For example, an ICE detainee from Ethiopia, who came to a port of entry and said he stated immediately that he was a refugee, told USCIRF that the interviewing officer asked him about the situation in his country and asked "a lot of follow-up questions" about his problems. Another detained Somali, also a

port of entry arrival, said that he was asked twice if he feared returning to his country and then was asked in detail about why he could not go back.

U.S. law requires that CBP simply document that a person in Expedited Removal expressed fear and then notify and send that person's file to USCIS, which is responsible for examining and assessing the fear claim. Positively, supervising OFO and BP officers interviewed by USCIRF stated, correctly, that interviewing officers are not supposed to ask too many questions regarding the situation that the individual fled and fears.

Additionally, a conversation with two interviewing BP agents revealed both a lack of knowledge of, and non-compliance with, DHS policy on withdrawals of fear claims. One agent said that interviewees who claim fear often ask what will happen next, and he tells them that the process may take a long time and that, in his experience, many people get sent back in the end, especially in gang-related cases. He said that after hearing this some people say that they do have a fear of return but do not want to wait and ask to be sent home. He felt, and the other agent agreed, that this required him to adjust the answers on Form I-867 to reflect that the individual does not want to seek asylum and should not be referred for a credible fear determination.

*U.S. law requires that CBP simply document that a person in Expedited Removal expressed fear and then notify and send that person's file to USCIS, which is responsible for examining and assessing the fear claim.*

## Quality Assurance

CBP has not implemented USCIRF's 2005 recommendations to videotape interviews for quality assurance purpose and use testers. CBP does subject all secondary inspection decisions to two levels of supervisory review, but this consists of reviews of the file and conversations with the officer, not observing the interview. In addition, beginning four years ago, OFO started a quarterly headquarters review of information submitted by its field offices on all port of entry Expedited Removal cases, but this also does not include interview observations.[29] BP does not conduct such a headquarters review.

[29] As described to USCIRF by OFO, every quarter each field office collects and reports to headquarters information on five aspects of such cases: (1) was the question and answer sufficient?; (2) was the narrative done correctly?; (3) was there supervisory concurrence?; (4) were the fear questions addressed?; and (5) was the correct charge under INA section 212 used? OFO headquarters reviews the information and reports back to the field offices and to the Assistant Commissioner. OFO stated that, in the year between April 2014 and April 2015, the ports of entry handled around 220,000 adverse actions, of which about 29,000 were Expedited Removals. Of those 29,000, the headquarters review found errors in only 15, according to OFO. Most of these were what OFO described as procedural errors, such as using the wrong form, failing to use a translator, or interviewing a mother on behalf of a child. Only one involved an error where a person who claimed fear was removed; OFO stated that they worked with the State Department to bring the individual back to the United States for a credible fear interview with USCIS. In addition, OFO officials told USCIRF that they recently developed and started offering a new eight-hour refresher course on five core categories of adverse actions, including Expedited Removal, based on information learned through the headquarters review process. As of October 2015, this training reportedly had been provided to supervisors and officers at 10 locations.

*In February 2015, agents in McAllen told USCIRF that 100,000 people had been processed this way since virtual processing started in mid-2013. However, USCIRF is concerned that processing efficiency is coming at the expense of identifying and protecting asylum seekers.*

## The Introduction of Virtual Processing

Since 2013, BP's central processing facility for non-citizens apprehended in the Rio Grande Valley sector, McAllen Station, has used virtual processing for interviews of most first-time apprehensions who speak English or Spanish.[30] Agents in McAllen do the initial collection and checks of identifying information, and then assign the cases to a BP agent at the El Paso, Texas, or El Centro, California, stations, who complete the Form I-867. The non-citizen sits at a bank of computers in McAllen, in front of a monitor and, using a phone handset, is interviewed by an El Paso or El Centro BP agent through Skype and an internet-based communicator. As with in-person interviews, supervisory review is only of the paper files. USCIRF visited the El Paso Station and observed the interviewing agents, work in a room that looks like a computer lab, with a dozen terminals. Supervisors at McAllen and El Paso stations said the virtual processing improves processing efficiencies and allows agents in sectors other than the Rio Grande Valley, who otherwise do not do much processing, to refresh and maintain their skills.

BP reports that virtual processing has allowed McAllen Station to double its processing output with half the manpower. In February 2015, agents in McAllen told USCIRF that 100,000 people had been processed this way since virtual processing started in mid-2013.[31] Indeed, USCIRF observed the efficiencies of virtual processing – as an individual was being video interviewed, USCIRF saw McAllen BP agents pulling together that individual's paper file while other agents prepared other individuals for their interviews.

However, USCIRF is concerned that processing efficiency is coming at the expense of identifying and protecting asylum seekers. Agents are given incentives for speedy processing. BP agents at Mc Allen told USCIRF that fewer than 10 percent of the applicants processed there claim fear and this low rate had been consistent over the past several years. This seems inconsistent with the dramatic increase in fear claims assessed by USCIS, especially from individuals apprehended in the Rio Grande Valley sector, since FY2013.

USCIRF is particularly concerned by the use of interviewing "templates" observed during the virtual processing. As they conducted the virtual interviews, the El Paso agents relied on Microsoft Word documents with standardized questions and responses, from which they copied and pasted text into the E3 software that BP uses for processing. In another

[30] Virtual processing is not used for unaccompanied minors under the age of 14 or non-citizens who may be referred to prosecution, even if they speak English or Spanish.

[31] BP began the virtual processing then because their projections were predicting an increase in arrivals, although the surge in 2014 exceeded even those projections.

effort to improve efficiency, McAllen Station created the templates, which are organized by county and case type (Expedited Removal, family Expedited Removal, etc.) and cover the narrative and sworn statement sections of the interview process. USCIRF observed that when a BP agent opened the templates to begin the interview, answers were already included and would require deletion by the agent. While using a standard list of questions on its own could be a good practice, having prepared answers seemed to prompt the interviewers to use leading questions in important areas. This risks suggesting to the interviewee that what the agent said is the correct answer, as opposed to eliciting an independent response. For example, instead of asking "why did you come to the United States?," USCIRF observed an interviewer ask "why did you come to the United States – to live and work and provide a better life for your children?" USCIRF also observed one agent cutting and pasting the answers from the template into the sworn statement even before the interviewee had finished giving his answers.

*While using a standard list of questions on its own could be a good practice, having prepared answers seemed to prompt the interviewers to use leading questions in important areas.*

The impersonal nature of the virtual interviews also is problematic. Facial expressions and other non-verbal cues are important ways for BP agents to tell if an interviewee is uncomfortable articulating a fear claim at the counter and needs a private interview. The director of virtual processing in El Paso recognized this, and admitted that it is harder to read these signals in a virtual interview. Furthermore, during USCIRF observations, the interviewing agents rarely looked into the camera to make eye contact with the interviewees, focusing instead on their own computer screen or keyboard. This makes it even less likely that they would detect any non-verbal cues.

Finally, occasional malfunctioning of technology presents concerns. BP agents at both McAllen and El Paso said they feel that the virtual processing generally runs smoothly, technology permitting. Unfortunately, USCIRF observed several technical problems that interrupted interviews, including Microsoft Word or computers crashing and cameras freezing. One interviewer who experienced multiple crashes did not give any explanation to the interviewee for the interruptions.

## Privacy

At the various OFO and BP facilities USCIRF visited, interviews are conducted in settings that range from private or semi-private offices to large rooms where multiple interviews are done simultaneously. All four of the partial, in-person interviews USCIRF observed at OFO ports of entry were conducted in private rooms, but in one case, a mother was interviewed with her young daughter present. Because telephonic interpretation was required, the partial, in-person interview observed at a BP station was conducted in a semi-private room set up for two officers but being used at the time by one. However, three individuals from the same country were interviewed together. They had been apprehended as a group and,

according to the supervisor, interviewing them as a group "helps us get through the process."

At BP facilities, there typically is a counter with around eight agents at computers processing different individuals or groups at the same time, with other interviewees waiting nearby. At one such facility, USCIRF noted that asylum seekers might be afraid to express fear with others around them, but the agents said they did not view this as a problem and placed the burden on the interviewee to ask for a private room. BP officials said that most BP facilities do not have the space to permit private interview spaces. A positive exception was BP's Ramey Station, which, after a recent renovation, has private interview rooms with acoustic padding to stop sound from carrying. The supervisor reported that the renovation "has been a big asset," further stating that "Before, the people would be frightened to express fear. The private rooms also help with intelligence gathering because people are more forthcoming."

The experience of a detained Somali asylum seeker with whom USCIRF spoke at an ICE facility underlines the need for private interviews. He arrived with a group of Somalis at an OFO port of entry and was interviewed at the windows in the waiting room, where "everyone could hear each other." He said that when asked why he had come to the United States, he whispered his answer because he feared the other Somalis would hear him answer that he is from a persecuted minority tribe. When the officer could not hear what he was saying, he had to write it down.

An open, counter set-up is used for the virtual interviews at McAllen Station. The agents there stated that they believe virtual processing provides more privacy than speaking to an agent in-person at a counter, since it is harder to overhear someone who is speaking into a telephone handset. One agent said "the subjects open up more over videoconferencing because it's more confidential." USCIRF observed groups of people clustered together to be interviewed virtually, with one person speaking on the phone handset and others crowded around him or her, sitting on the same fixed stool or immediately adjacent stools. BP agents said that this seating arrangement was to keep the virtual processing moving along, since groups that travel together have the same route information, and also so that agents "don't have to wait [between interviews] for the next body to be brought out." Asked what would happen if an interviewee who had a fear felt uncomfortable talking about it in front of others, the agents said that the interviewer would notice that and would ask the person if s/he wanted a private interview. However, as discussed above, such non-verbal cues may not be easy to detect in virtual interviews.

McAllen Station is planning to move its processing to a new facility nearby, the Ursula facility. When USCIRF asked if the new facility would have partitions between the computer stations to improve privacy, the agents said CBP had deemed this impossible for security and staffing

reasons. However, in an improvement, they did say that at the new facility, groups will not have to sit clustered together in front of the screen; rather, one person at a time will be at the computer station and the others will wait on benches placed farther away from the counter.

## Interpretation

OFO uses other officers as interpreters whenever possible, rather than telephonic interpretation.[32] In two of the interviews USCIRF observed at ports of entry, the OFO officer who was supposed to be serving as the interpreter instead acted as a second interviewer. In one of these cases, the interpreting officer questioned the applicant more aggressively than the interviewing officer did. In the other, in addition to asking questions, the interpreting officer had difficulty translating and a supervisor who spoke the language had to step in.

OFO occasionally uses airline employees as interpreters at airport ports of entry. Although supervisors said they do not use state airline employees to interpret if they believe the individual is an asylum seeker from that country, this still is potentially problematic. Airline employees are not professional interpreters, and an airline can be fined if a passenger is denied admission to the United States and returned. USCIRF observed a preliminary interview, not an I-867 sworn statement interview, where the airline employee clearly was answering the officer's questions herself instead of interpreting. Positively, the officer stopped the interview, dismissed the airline employee, and used a different interpreter.

All BP agents are required to speak Spanish as a condition of their employment. They conduct interviews in Spanish themselves, although some lawyers and NGOs with whom USCIRF met expressed concerns about their ability to do so adequately, particularly for interviewees who speak local dialects. For languages other than Spanish, BP agents are supposed to use professional telephonic interpretation, but this does not always occur. A supervisory BP agent complained about the need to use telephonic interpretation, because it slows down processing and the interviewing agent cannot tell if the interpretation is accurate or not.

USCIRF heard from BP, as well as USCIS, about ongoing difficulties in finding telephonic interpreters for Central American indigenous languages. BP agents at McAllen said that indigenous language speakers usually speak some Spanish, but get to a point in the interview where their Spanish is insufficient. The agent then switches from virtual processing to an in-person interview, using another "subject" (meaning another non-citizen being processed) to interpret. The agents also reported that sometimes they reach

[32] To serve as interpreters, OFO officers must be certified as proficient in the language by the State Department and must renew that certification every year.

out to the relevant consulate, which they said usually can provide interpreters relatively quickly. Both of these approaches are inappropriate ways to secure interpretation for a person who might be an asylum seeker.

Detainees at ICE facilities interviewed by USCIRF reported instances where interpretation was not used for Expedited Removal processing interviews. For example, a detained Ethiopian asylum seeker who arrived at an OFO port of entry said that he was a Somali speaker but there was no Somali interpretation available; instead, another Somali non-citizen in custody interpreted. However, he stated that this person did not go over with him in detail what was written down on the forms, he just told him where to sign. Another detained Somali who arrived at a port of entry said that no Somali interpreter was available for his interview so he spoke as best he could in English.

## Interviewer Training and Guidance

The interviewing problems USCIRF observed raise questions about the adequacy of CBP's training and guidance on Expedited Removal processing. In response to USCIRF inquiries on these topics, OFO and BP provided some general information about their training, but USCIRF was not allowed to review the content and therefore cannot assess its substance. The relevant training was described as follows: As part of their 89-day basic training course, new OFO officers receive a two-hour lecture on Expedited Removal processing and two hours of practical exercises. After the academy, new officers are assigned to a port of entry, where they observe processing for 11 weeks, then have three more weeks of classroom training that includes a module on all adverse actions, including Expedited Removal. After this, they begin conducting processing themselves, initially with a more experienced officer observing. BP agents' 19 weeks of basic training includes a two-hour lecture on Expedited Removal processing, plus 30 minutes of practical exercises. Following this, they are assigned to a station, where they are paired with mentors. After about three weeks at a station, the new agents receive a one to one-and-a-half hour review lesson on Expedited Removal, which reiterates what was covered in basic training. Despite the foregoing, neither OFO nor BP agents in the field interviewed by USCIRF said they received any specific training on interviewing or on working with victims of persecution or torture.

*The interviewing problems USCIRF observed raise questions about the adequacy of CBP's training and guidance on Expedited Removal processing*

USCIRF was, however, permitted to see the current internal guidance on Expedited Removal fear claims. The OFO guidance accurately describes the process, but the BP guidance does not. On a positive note, as of 2012, OFO no longer uses the Field Manual with the problematic language noted in the 2005 Study that suggested that CBP inspectors can assess an applicant's fear. The current OFO guidance on processing

Expedited Removal cases, contained in an October 2014 memo/muster,[33] is an improvement, and accurately describes the steps OFO officers are required to follow to give a non-citizen in Expedited Removal the opportunity to express fear. Unfortunately, it is not clear what guidance was used between 2012 and 2014.

The October 2014 document consists of a one-page cover memo and a three-page muster.[34] The cover memo cites a 1997 statement of the then-INS Commissioner about the importance of protecting the rights of aliens in Expedited Removal, particularly those who fear persecution. The muster states that when an alien expresses fear, it is against DHS policy to encourage withdrawal, fail to refer to USCIS, improperly remove, or detain in inappropriate conditions; that OFO officers should not estimate the time the alien will spend in detention; and that if an alien answers yes to a fear question or asks for asylum and then asks to be sent home, the OFO officer must consult with the USCIS asylum office. If a supervising asylum officer cannot be reached, the case must be referred. It reminds OFO officers that aliens who express fear cannot be removed until an asylum officer has interviewed them to determine if they have credible fear. Finally, it states that it is CBP's responsibility to protect the alien's identity and not reveal to any foreign national or government that the alien might have sought refuge in the United States.

*The [OFO] muster states that when an alien expresses fear, it is against DHS policy to encourage withdrawal, fail to refer to USCIS, improperly remove, or detain in inappropriate conditions. It reminds OFO officers that aliens who express fear cannot be removed until an asylum officer has interviewed them to determine if they have credible fear. By contrast, the BP guidance erroneously conflates the roles of BP agents and USCIS asylum officers.*

By contrast, the BP guidance erroneously conflates the roles of BP agents and USCIS asylum officers. This guidance is contained in a "Muster Module about Credible Fear Determination," (see Appendix E) which consists of a one-page cover memo from BP headquarters dated November 2014 and two one-page musters dated September 2014.[35] Both musters are titled "Credible Fear Determination," with one addressing Expedited Removal and the second on unaccompanied non-citizen children's cases. Although the documents correctly state that BP agents must ask the four required fear questions and record the responses, they conflate this questioning with the credible fear process and instruct BP agents on how to determine credible fear. The text provides the legal standard for credible fear of persecution twice, and also includes the legal standard for credible fear of torture. It includes a text box that

[33] According to OFO, memo/musters are sent to each field office, and, when circulated, are read and distributed to officers at the muster at the beginning of each of that day's shifts. They also are available in OFO's electronic library. OFO is working on a replacement to the Field Manual, the Officer's Reference Tool, but it is not yet complete. Chapter 11 was made available on the OFO intranet in July 2015; it contains the existing memo/musters on admissibility.

[34] OFO would not provide the 2014 document but permitted USCIRF to read it at their offices and take notes.

[35] Border Patrol headquarters told USCIRF that the previous guidance was a March 2009 policy memo, which USCIRF did not review.

reads as follows: "An individual will be found to have a credible fear of persecution if he/she establishes that there is a 'significant possibility' that he/she could establish in a full hearing before an Immigration Judge that he/she has been persecuted or has a well-founded fear of persecution or harm on account of his/her race, religion, nationality, membership in a particular social group, or political opinion if returned to his/her country." Further, the BP muster suggests agents should go beyond the four required fear questions to have a "dialogue" with the interviewee in order to assess if s/he has credible fear. For example, the muster on UAC cases states that "agents are not limited to asking only [the four required] questions. . . . The provided questions are intended to establish a dialogue with the UAC that may allow agents to gather additional information to assist in their determination." This is not the role of BP agents, but rather of USCIS asylum officers. USCIS, however, is not mentioned anywhere in the documents.

## Processing of Women and Children

CBP encounters large numbers of largely Central American women and children, many of whom could have protection needs,[36] but it does not have enough female agents or officers to have women interviewing women and children. This is particularly true at BP, which is only 4.5 to five percent female, although it has been trying to recruit more women. As a result, the officers and agents who interview women and children to identify those with fear claims are overwhelmingly men who receive no specific training on working with children and families. Asked about their interactions with children, BP agents at McAllen Station admitted that many children do not want to talk to a male agent in uniform.

*CBP encounters large numbers of largely Central American women and children, many of whom could have protection needs,but it does not have enough female agents or officers to have women interviewing women and children.*

Another concern relates to CBP's approach to processing family units with children under the age of 14. The agency's policy is to interview children over 14 individually. If a child is under that age, the mother or parent answers the questions for the child, and this is indicated on the form. This is potentially problematic, as a child could have a fear claim independent of his or her parents, or because of them. Asked about these scenarios, BP agents responded to USCIRF that they had never seen that come up and moreover, that they were confident that, since the child had made it to the safety of the United States, s/he would voice any concerns s/he had.

[36] *See, e.g.,* UNHCR, *Children on the Run* (2014) (finding that, of 404 unaccompanied children from El Salvador, Guatemala, Honduras, and Mexico who arrived in the United States in or after October 2011, no less than 58 percent had actual or potential international protection needs); UNHCR, *Women on the Run* (2015) (finding that, in El Salvador, Guatemala, Honduras, and some parts of Mexico, women face a startling degree of violence in their daily lives and receive no protection).

## Attitudes toward Asylum

CBP has two vital roles in Expedited Removal: first, to ensure that inadmissible non-citizens are not permitted to enter the United States and second, to ensure that non-citizens who fear persecution or torture have the opportunity to seek asylum, even if they otherwise would be inadmissible. These dual roles are not easy to balance, especially in the post-9/11 era and under the strain of large numbers of arrivals. OFO officers and BP agents must be able to alternate between examining non-citizens who arrive without proper documents and identifying and providing protection to those who need it. Given these requirements, USCIRF was concerned by the skepticism some CBP officials openly expressed of asylum claims, either generally or from certain nationalities. Moreover, these officers and agents appeared to have little recognition of the potential negative implications their skepticism might have for case processing.

*CBP has two vital roles in Expedited Removal: first, to ensure that inadmissible non-citizens are not permitted to enter the United States and second, to ensure that non-citizens who fear persecution or torture have the opportunity to seek asylum, even if they otherwise would be inadmissible.*

For example, two different OFO officers told USCIRF that migrants, especially Mexicans, believe they will be let into the country if they say they are afraid or want political asylum, and then try to retract those claims when they learn they will be detained. One stated that "political asylum is putting the smugglers out of business." Another OFO officer told USCIRF that he believes that many individuals who claim fear on arrival are not really afraid, because "those with real fear can apply overseas and bring their family."[37] However, he also said that if a person claims fear "I would never try to talk anybody out of it." USCIRF observed this officer conduct a confrontational interview, where he and another officer (who was supposed to be interpreting but instead acted as a second interviewer) aggressively questioned a non-citizen and responded to his answers with obvious distrust based on their skepticism of his intentions for entry and his supposed fear claim. The individual in fact was not claiming fear of return, but the officers assumed that he was going to because another citizen of the same country who arrived on the same flight had sought asylum earlier that day.[38]

A BP agent at one station drew a distinction between "legitimate" asylum seekers who present themselves at ports of entry, as opposed to those apprehended along the border. USCIRF also heard this view from a BP headquarters official, who said that asylum seekers show up at ports of entry, they do not get apprehended by BP.

Another BP agent stated that Mexican asylum seekers all tell the same stories about fleeing the cartels, which he viewed as indicating coaching,

[37] This seems to be a reference to applying for resettlement as a refugee through the U.S. Refugee Admissions Program, a different legal process than asylum. A person cannot apply for asylum from overseas under U.S. law.

[38] USCIRF also observed part of the interview of the asylum seeker from the same country by a different officer/interpreter team, and it was conducted respectfully and calmly.

if not fraud. A second agent at the same station said that hearing the same stories over and over made the agents "jaded" and that he believed the vast majority of those claiming fear did not meet the definition for asylum, although he did recognize that this was not BP's job to determine.

One BP agent implied that all fear claims made to ICE are invalid, stating that they result from individuals talking to other detainees and receiving the Know Your Rights orientation.[39] He also drew a distinction between Central Americans and other asylum seekers, saying that Central Americans almost always have family in the United States, "unlike Somalis, for example, who are coming here because they really want to get away" from their country. A supervisor at this station expressed skepticism about Chinese claims of religious persecution, telling USCIRF that Chinese individuals often say they are Christian but cannot even name the church they attend; when USCIRF informed him that many Chinese Christians worship in homes, not churches, he seemed surprised.

To be sure, not all claims of fear are credible or warrant asylum under U.S. law, and persecution is more common in some countries than others. Nevertheless, it is not CBP's role to assess the credibility or merits of fear claims, but rather to ask if a person is afraid of return, record the answer, and, if it is yes, refer the person to USCIS. The agency must do so fairly and accurately for all individuals it encounters. The comments described above may indicate that this may not always be happening, especially when considered in light of BP's flawed internal guidance (discussed above) and evidence of discrepancies between CBP's referrals and USCIS' credible and reasonable fear caseloads for certain populations.[40]

---

[39] See *Information Provided in ICE Custody* section.

[40] Human Rights Watch, *"You Don't Have Rights Here:" U.S. Border Screening and Returns of Central Americans to Risk of Serious Harm*, pg. 21-24 (2014). Human Rights Watch analyzed CBP data on apprehensions and dispositions between October 2010 and September 2012, and found that only 0.1 of Mexicans, 0.8 percent of Guatemalans 1.9 percent of Hondurans, and 5.5 percent of Salvadorans in Expedited Removal or Reinstatement of Removal were referred to USCIS for credible or reasonable fear screening, as compared to 21 percent of migrants from other countries in the same proceedings in the same years. *Id.* at 21-22. Meanwhile, however, both the number and proportion of the three Central American nationalities in USCIS's caseload increased, with most referrals coming from other agencies, like ICE, that are not required to ask systematically about fear. *Id.* at 24. For example, USCIS' credible and reasonable fear caseload of Hondurans increased from 1,108 individuals in 2006 to 8,539 in 2013. Id. In 2012, USCIS did 2,405 credible fear interviews of Hondurans, but CBP referred only 615 of these. *Id.*

## RECOMMENDATIONS

### To CBP

- As recommended in 2005, amend Form I-867 to include a prominently displayed notation that it is not a verbatim transcript of the interview and is not intended to document the individual's entire asylum claim in detail.
- As recommended in 2005, videorecord all Expedited Removal processing interviews at all OFO ports of entry and BP stations, including virtual processing interviews, and require supervisory and headquarters review of the recordings of a sampling of interviews for quality assurance purposes. Until videorecording is established, require supervisors to sit in on and observe a sampling of interviews, and use testers to further verify that proper interviewing procedures are being followed.
- Retrain all OFO officers and BP agents on their role in the Expedited Removal process, the proper procedures for interviewing non-citizens, and the special needs and concerns of asylum seekers and other vulnerable populations.
- Remove any and all language in internal guidance that suggests that OFO officers or BP agents have the authority to reject or assess claims of fear or eligibility for asylum.
- Establish a dedicated corps of specially-trained, non-uniformed interviewers to interview women and children to identify fear claims, and ensure that female interviewers are included. Until such a corps is established, use female OFO officers and BP agents to interview women and children whenever possible, and continue to work to increase the number of women in these positions.
- Track the results of interviews conducted by virtual processing against those conducted in person, to determine if the two methods are producing materially different outcomes.
- Ensure that all interviewees have access to completely private interviews and that parents are not interviewed with their children present.
- Use only professional interpreters, not officers, agents, or any other individual, during the I-867 interviews, and do not use airline employees as interpreters at any point in the inspection process.

### To USCIS

- Continue the good practice of asking asylum seekers during credible fear interviews about discrepancies in their fear claims documented in the I-867 forms and fear claims raised with ICE authorities in detention.
- Track whether credible fear interview referrals are coming from CBP or ICE to better understand when in the Expedited Removal process most fear claims are being raised.

### To EOIR

- Retrain immigration judges about the fact that Form I-867 it is not a verbatim transcript of the interview and is not intended to document the individual's entire asylum claim in detail, and instruct them that it should be weighed accordingly.

## CREDIBLE FEAR SCREENING

Within DHS, the USCIS Asylum Division is responsible for screening for credible fear persons who express to CBP or ICE a fear of persecution or torture if returned to their countries of origin. Under IIRIRA, the credible fear screening is to determine if the person has "a significant possibility" of establishing eligibility for asylum or eligibility for protection under the Convention Against Torture through withholding of removal or deferral of removal and therefore is entitled to a full hearing before an immigration judge. The credible fear screening is not a full adjudication; rather it is an initial review meant to quickly identify potentially meritorious claims and screen out frivolous ones.

*The credible fear screening is to determine if the person has "a significant possibility" of establishing eligibility for asylum or eligibility for protection under the Convention Against Torture through withholding of removal or deferral of removal and therefore is entitled to a full hearing before an immigration judge.*

Credible fear screenings are done by asylum officers, who have received training on relevant U.S. and international legal standards and non-adversarial interview techniques. Asylum officers are required by law to have access to information about the conditions in asylum seekers' countries of origin to make well-informed credible fear determinations.[41]

The 2005 Study found that USCIS had developed procedures and protections to help ensure that *bona fide* asylum seekers in Expedited Removal were not returned to countries erroneously where they could face persecution.

Since the release of the 2005 Study, the number of persons in Expedited Removal claiming fear has grown from 9,465 in FY2005 to 51,001 in FY2014.[42] Wait times for credible fear interviews also increased. In order to address increased workloads, USCIS increased its authorized staffing levels by 100 asylum officers in FY2014 and began to hire and train new officers; redeployed staff to conduct the increased volume of credible fear interviews;[43] and increased the use of telephonic interviews.

In addition, as fear claims in Expedited Removal increased, so too did the rate of positive credible fear findings. To address what USCIS headquarters felt were potentially inflated credible fear determination rates, USCIS in 2014 issued a revised credible fear lesson plan for asylum officer training to reinforce and remind officers of the legal requirements of the credible fear screening process and updated their quality assurance procedures.

[41] The use of country of origin information is required in the INA, section 208(b)(1)(B)(iii).

[42] Referrals to USCIS for credible fear screenings in FY2015 fell to 48,052.

[43] USCIS' movement of asylum officers from the affirmative asylum process to address credible fear and reasonable fear delays has led to a growing backlog of affirmative asylum filings, which have also risen during this time period. As of the end of 2014, USCIS had over 73,000 affirmative asylum cases pending.

## New Lesson Plan

When the U.S. Congress considered the enactment of Expedited Removal, Senator Orrin Hatch of the Senate Judiciary Committee affirmed that "[T]he (credible fear) standard . . . is intended to be a low screening standard for admission into the usual full asylum process."[44]

In February 2014, USCIS issued a revised lesson plan to train asylum officers on evaluating asylum seekers' fear (see Appendix F). USCIS headquarters told USCIRF that the purpose of the revised lesson plan was to re-emphasize the requirement that asylum seekers must show a nexus between their personal fear claims and a protected ground.[45] Namely, each asylum seeker must demonstrate that s/he personally experienced, or if returned would personally experience, persecution as a member of a group that is persecuted based on a protected ground; a positive credible fear determination cannot be made simply because an asylum seeker belongs to such a group. DHS further reported to USCIRF that the change in the lesson plan clarified the standard of proof and that the lesson plan makes it clear that "[e]ssentially, the asylum officer is applying a threshold screening standard . . ."[46]

Nevertheless, the lesson plan's language raised concerns among some stakeholders that the credible fear standard had been raised to require an in-depth assessment more like a full adjudication of asylum claims. For example, the new lesson plan eliminated the above statement from Senator Hatch about the low screening standard, but bolded language declaring that a claim that has no possibility, or only a minimal or mere possibility, of success would not meet the "significant possibility" standard.[47] Positively, the revised lesson plan does reiterate that the purpose of the credible fear interview is to "quickly identify potentially meritorious claims to protection and to resolve frivolous ones with dispatch"[48] and to allow immigration judges to further examine the former. It also reminds asylum officers that asylum seekers are not required to show that the chances of success are more likely than not.[49]

To assist this determination, asylum officers now are required to use a standard checklist for the credible fear interview. The checklist initially

*When the U.S. Congress considered the enactment of Expedited Removal, Senator Orrin Hatch of the Senate Judiciary Committee affirmed that "[T]he (credible fear) standard . . . is intended to be a low screening standard for admission into the usual full asylum process."*

[44] Senate, "Proceedings and Debates of the 104th Congress, Second Session," *Congressional Record*, Vol. 142 No. 136, September 27, 1996.

[45] International and U.S. refugee law recognize five protected grounds: race, religion, nationality, membership in a particular social group and political opinion.

[46] U.S. Citizenship and Immigration Services, *Lesson Plan Overview*, February 28, 2014, pg. 12

[47] *Id.* pg. 14

[48] *Id.*, pg. 11.

[49] *Id.*, pg. 14.

was piloted by the Houston Asylum Office in April 2013. USCIS found it to be an efficient tool and with the surge of credible fear referrals in 2014, began using it nationwide. The checklist replaced the previous format of the written analysis for credible fear determinations. At the end of the interview, asylum officers continue to be required to write a short summary of relevant facts (see Appendix G).

Asylum officers interviewed by USCIRF provided mixed assessments of the revised lesson plan and checklist. They noted that they are helpful to increase the specifics and knowledge of an asylum seeker's claim. At the same time, they said the credible fear interview is intended to be a screening but the checklist leads them to develop a fuller analysis and record of the claim, bringing it close to the point of a full adjudication on the merits. They said interviews under the new lesson plan are more detailed and take longer. Asylum officers estimated that most credible fear interviews are now around 1 hour and 15 minutes.

Following the deployment of the new lesson plan, credible fear grant rates fell from 81.4 percent in February 2014 to 70.2 percent for FY2015 and 77.15 percent for FY2016 through February 2016.

*Following the deployment of the new lesson plan, credible fear grant rates fell from 81.4 percent in February 2014 to 70.2 percent for FY2015 and 77.15 percent for FY2016 through February 2016.*

## Telephonic Interviews

USCIS also has expanded significantly its reliance on telephonic interviews for credible fear screenings. Only two percent of all 5,369 credible fear interviews were conducted by phone in 2009. By contrast, 59 percent of the 51,001 interviews were done that way in FY2014, according to the USCIS Ombudsman.[50] The greatest use of telephonic interviews is for asylum seekers in Expedited Removal who crossed the southern border. This is due to the high numbers of that population, the lack of space in detention facilities for asylum officers to conduct in-person interviews, and the remote locations of the detention facilities.

The move toward telephonic credible fear interviews has raised concerns. Asylum seekers interviewed by telephone may find it more difficult to recount fully to the asylum officer, through an interpreter, the details of violent and traumatic events. Some legal service providers reported to USCIRF that telephonic credible fear interviews are shorter, less accurate, and more confusing than in-person interviews. Additionally, telephonic interviews limit asylum officers' ability to assess asylum seekers' credibility. Indeed, the USCIS 2014 credible fear lesson plan recognizes this limitation, stating that telephonic interviews "further limits the reliability of and ability to evaluate [demeanor, candor, and responsiveness]

[50] U.S. Citizenship and Immigration Services Ombudsman, *Annual Report 2015*, June 29, 2015, pg. 62.

in the credible fear context."[51] USCIS told USCIRF it has attempted to use videoconferencing for credible fear interviews, but connectivity and other technical issues prevented the expansion of this option. Despite these concerns, USCIS headquarters reported to USCIRF that positive fear determination rates are slightly higher for telephonic interviews than for in-person interviews.

When USCIS started using telephonic credible fear interviews, it instituted quality assurance mechanisms to take into account some of the concerns discussed above. Initially, asylum officers were required to conduct a follow-up interview with persons determined not to have a credible fear either in person or by videoconference. However, that requirement ended in June 2013; follow-up interviews are now left to the discretion of asylum office directors.

## Quality Assurance

In the 2005 Study, USCIRF drew attention to an imbalance in USCIS' review and quality assurance procedure: negative credible fear determinations required 100 percent headquarters review and extra documentation, whereas positive determinations did not. USCIRF cautioned that this discrepancy could create a bias in favor of positive credible fear determinations. In June 2014, USCIS headquarters implemented a new procedure to review randomly 10 percent of all pre-decisional positive and negative credible fear determinations. This was a return to a quality assurance policy that USCIS first implemented in 2006 following the release of USCIRF's 2005 Study, but ceased for unknown reasons.

## RECOMMENDATIONS

### To USCIS

- Reaffirm in the Asylum Officers' Lesson Plan that the credible fear standard is a screening standard requiring a showing of a "significant possibility" of eligibility for asylum, not a full assessment of the merits of the case.
- Continue to track the results of credible fear interviews conducted telephonically and those conducted in person to determine if the two methods are producing materially different outcomes, and in the meantime reinstate in-person re-interviews, when requested by the non-citizen, of negative credible fear findings from telephonic interviews.
- Continue the good practice of headquarters' review of a statistical sampling of both positive and negative credible fear determinations for quality assurance purposes, as recommended in 2005.

[51] U.S. Citizenship and Immigration Services, *Lesson Plan Overview*, February 28, 2014, pg. 18.

# EXHIBIT 6

# Barriers to Protection as of 2024

## UPDATED RECOMMENDATIONS ON ASYLUM SEEKERS IN EXPEDITED REMOVAL



UNITED STATES COMMISSION ON INTERNATIONAL RELIGIOUS FREEDOM

# USCIRF'S MISSION

*To advance international freedom of religion or belief, by independently assessing and unflinchingly confronting threats to this fundamental right.*

CHAIR Stephen Schneck

VICE CHAIR Meir Soloveichik

COMMISSIONERS Ariela Dubler
Mohamed Elsanousi
Maureen Ferguson
Susie Gelman
Vicky Hartzler
Asif Mahmood

EXECUTIVE DIRECTOR Erin D. Singshinsuk

This report is based on research conducted in 2023–24 into policies and practices in place at that time. Policies and practices implemented in 2025 are not covered.

February 2025

UNITED STATES COMMISSION ON INTERNATIONAL RELIGIOUS FREEDOM

# CONTENTS


1 About The United States Commission on International Religious Freedom

2 Executive Summary

4 Introduction

5 The Expedited Removal Process

- 7 Scope of Application
- 7 Initial Screenings by CBP Officers
- 8 Credible Fear Interviews

10 Research Methodology and Findings

- 10 Methodology
- 10 Findings

16 Analysis of USCIRF's 2016 Recommendations

19 Updated Policy Recommendations

- 19 To the Secretary of Homeland Security
- 19 To CBP
- 19 To USCIS
- 20 To ICE
- 20 To EOIR
- 20 To Congress

21 Glossary of Acronyms

22 About the Authors

*This page intentionally left blank.*

# ABOUT THE UNITED STATES COMMISSION ON INTERNATIONAL RELIGIOUS FREEDOM

## WHO WE ARE

The U.S. Commission on International Religious Freedom (USCIRF) is an independent, bipartisan U.S. federal government commission created by the 1998 International Religious Freedom Act (IRFA). USCIRF uses international standards to monitor violations of freedom of religion or belief abroad and makes policy recommendations to the president, the secretary of state, and Congress. USCIRF Commissioners are appointed by the president and congressional leaders of both political parties. The Commission's work is supported by a professional, nonpartisan staff of regional and subject matter experts. USCIRF is separate from the U.S. Department of State, although the department's ambassador-at-large for international religious freedom is a nonvoting, ex officio Commissioner.

## WHAT RELIGIOUS FREEDOM IS

Inherent in religious freedom is the right to believe or not believe as one's conscience leads and to live out one's beliefs openly, peacefully, and without fear. Freedom of religion or belief is an expansive right that includes the freedoms of thought, conscience, expression, association, and assembly. While religious freedom is America's first freedom, it also is a core human right that international law and treaty recognize; a necessary component of U.S. foreign policy and America's commitment to defending democracy and freedom globally; and a vital element of national security, critical to ensuring a more peaceful, prosperous, and stable world.

# EXECUTIVE SUMMARY

When Congress enacted the expedited removal process in 1996 to establish stronger controls at the border and ports of entry (POEs), it included safeguards to protect bona fide asylum seekers. In 1998, Congress enacted the International Religious Freedom Act (IRFA), which authorized the U.S. Commission on International Religious Freedom (USCIRF) to conduct a study to examine the treatment of asylum seekers in expedited removal. This study aimed to ensure immigration officials implemented expedited removal in a manner consistent with the United States' obligations to protect noncitizens fleeing persecution.

In 2005, USCIRF released its *study*, which revealed serious flaws in the processing and detention of asylum seekers in expedited removal and made recommendations to address them. Since then, USCIRF has periodically assessed whether the 2005 study's recommendations have been implemented and, if not, whether they remain relevant or need to be revised. Specifically, USCIRF released a 2007 *report card*, a 2013 *assessment* of the implications of detention reforms, and a 2016 *report* on the effects of changes in the expedited removal process overall. Since USCIRF's last report in 2016, there have been several significant policy changes that altered the legal and procedural standards for asylum seekers in expedited removal. Altogether, the passage of time and these policy changes led USCIRF to commission this report to reevaluate the status and relevance of USCIRF's 2016 recommendations. The research took place in 2023 and 2024 and looked at policies and implementation practices in effect during that period.

## THE EXPEDITED REMOVAL PROCESS

Expedited removal is a streamlined process to screen and swiftly remove certain noncitizens. Although quick, the expedited removal process is complex, involving numerous agencies within both the Department of Homeland Security (DHS) and the Department of Justice (DOJ). These include DHS's Customs and Border Protection (CBP), Immigration and Customs Enforcement (ICE), and U.S. Citizenship and Immigration Service (USCIS), and DOJ's Executive Office for Immigration Review (EOIR) and Board of Immigration Appeals (BIA). (A glossary of these and other relevant acronyms can be found at the end of the report.)

If CBP decides to subject a noncitizen to expedited removal, they can be deported without an immigration court hearing unless they express an intention to apply for asylum or a fear of persecution, torture, or return to their home country. If they express such intention or fear, they are typically referred to USCIS for a credible fear interview (CFI), which is a screening interview conducted while they are detained to determine whether there is a *significant possibility* that they would later be able to show that they qualify for asylum or other protections in an immigration court. If a USCIS asylum officer determines they have a credible fear, an EOIR immigration judge (IJ) then decides whether they are eligible for asylum or other protection and can remain in the United States. If the asylum officer determines they do not have a credible fear, the noncitizen can either ask for an IJ to review the CFI decision or they are swiftly removed from the country.

The expedited removal process has changed significantly over the past few years. At the time of the research, there had been several recent policy changes that:

- Fast-tracked the process further and allowed for processing, detention, and CFIs (as well as IJ reviews of CFI decisions) to take place in CBP facilities;
- Changed the legal standard and procedure for deciding these asylum claims;
- Applied a different process to families in expedited removal allowing their conditional release from detention; and
- Prevented certain noncitizens, whom an asylum officer determined to have a credible or reasonable fear of return, from being released from detention on bond while an IJ considers their asylum or protection claim.

## METHODOLOGY

The findings in this report are based on a literature review conducted from December 2023 to February 2024 and primary research conducted from May to August 2024. The primary research consisted of interviews, survey responses, observations, site visits, and consultations with DHS officials. The research was less extensive in time and scope than USCIRF's prior research on expedited removal but did allow for an assessment, in light of conditions during the research period, of the status and relevance of USCIRF's 2016 recommendations and the development of new recommendations.

## KEY FINDINGS

Based on primary and secondary research, it was determined that some of USCIRF's 2016 recommendations were implemented, several were not and are still relevant, and several are no longer relevant due to recent policy changes. The research also revealed several important new concerns raised by expedited removal policies in place in 2024. Most notably:

- **The "shout test" that CBP is using under the Securing the Border policy to identify whether a noncitizen fears return may prevent bona fide asylum seekers from receiving a chance to access legal protection.** Under policies in force during periods of high encounters, noncitizens are not asked about fear during CBP screenings, as they were in the past. Instead, noncitizens must express fear on their own volition to be referred for a CFI. Previously, CBP officers were required to ask four questions about fear of return set forth on Forms I-867, although USCIRF's past research revealed inconsistent compliance with this requirement. The research for this report found that: CBP and ICE officers did not receive additional training on how to recognize a noncitizen's manifestation of fear; CBP and ICE facilities did not provide adequate notice to noncitizens about this new requirement; CBP officers may be improperly assessing the credibility of fear claims (an issue also identified in USCIRF's previous research); and intake procedures using contractors, virtual processing, and artificial intelligence could hinder a noncitizen from manifesting fear while in CBP custody.
- **Coupled with the fast-tracked processes, detention in CBP facilities makes it difficult for asylum seekers to prepare for and undergo their CFIs and for lawyers to advise and represent them.** Since 2023, many steps of the expedited removal process have taken place in CBP processing facilities, including overnight multi-day holding, CFIs, and IJ reviews. Previously, CBP handled intake and CFI referrals in its facilities and then transferred detainees to ICE detention centers, which are better equipped for multi-day stays, access to counsel, and CFIs. The research found that CBP facilities are designed for short-term processing; that legal representatives are not allowed inside and have difficulty contacting detained noncitizens and obtaining notice of appearance forms; that phone access for detainees is rushed and sporadic; that lawyers do not receive adequate notice of their clients' CFIs and IJ reviews; and that CFIs, which are telephonic, are held at odd hours, including on weekends and holidays, and can be lengthy given the exceptions and additional issues that are now considered.

## RECOMMENDATIONS

Finally, this report includes reiterated and updated policy recommendations from the 2016 report as well as new ones reflecting changes in policies. Like USCIRF's prior recommendations in this area, these recommendations seek to further Congress's intent that the expedited removal process both protect U.S. borders and ensure the fair and humane treatment of bona fide asylum seekers. USCIRF is troubled that many of the problems it has repeatedly documented since 2005 in the U.S. government's treatment of asylum seekers in expedited removal—including flawed screening and documentation practices, a lack of training and quality control, inadequate information for noncitizens in the process, inappropriate detention conditions, and insufficient coordination and oversight—remain unaddressed 20 years later. These flaws raise serious concerns that the United States is erroneously returning asylum seekers to countries where they could face persecution or torture in violation of both U.S. and international law.

For the full list of detailed recommendations to DHS, DOJ, and Congress, see pages 19 to 20. While the specific policies in place at the time of the research for this report are Biden administration policies, the first Trump administration put in place a similar fast-tracked process for CFIs in CBP detention and used expedited removal to the fullest extent allowed under the law. Given that the second Trump administration is also expected to vigorously implement expedited removal, the recommendations in this report on how to better protect asylum seekers in this process while also securing U.S. borders remain relevant.

# INTRODUCTION

When Congress enacted the expedited removal process in 1996 to establish stronger controls at the border and POEs, it included safeguards to protect bona fide asylum seekers.[1] Congress purposely set a low screening standard to ensure that asylum seekers were not returned to countries of persecution.[2] In 1998, Congress enacted IRFA, which authorized USCIRF to conduct a study to determine whether U.S. immigration officials, in exercising expedited removal authority over noncitizens who may be eligible for asylum, were (1) improperly encouraging withdrawals of applications for admission; (2) incorrectly failing to refer such noncitizens for credible fear determinations; (3) incorrectly removing such noncitizens to countries where they may face persecution; or (4) improperly detaining such noncitizens or detaining them under inappropriate conditions.[3]

In 2005, USCIRF released a comprehensive study[4] that documented serious implementation flaws that placed asylum seekers at risk of being returned to countries where they could face persecution and prison-like detention conditions. USCIRF made a series of recommendations to various federal agencies to address these flaws, ensure fair and humane treatment of asylum seekers in expedited removal, and help protect U.S. borders. Since then, USCIRF has periodically assessed whether the 2005 study's recommendations were implemented and, if not, whether they remain relevant or need revision. Specifically, USCIRF released a 2007 report card, a 2013 assessment of the implications of detention reforms, and a 2016 report on the effects of changes in the expedited removal process overall.[5] The most recent report, which was titled *Barriers to Protection*, found that even though some of the 2005 recommendations were implemented by 2016, there were continuing and new concerns about the processing and detention of asylum seekers. Between 2016 and 2023, the circumstances and policies surrounding the expedited removal process had changed considerably and required reevaluation, which led USCIRF to commission this report.

This follow-up report is divided into four sections. First, it explains the expedited removal process as implemented when the research was conducted. Second, it provides key findings from primary research gathered through a survey, interviews, site visits to DHS facilities, observations of CFIs, and consultations with DHS HQ officials. Third, the report reevaluates the recommendations made in the 2016 report to determine whether they were implemented and, if not, whether they remain relevant. Finally, it provides reiterated, updated, and new recommendations that reflect this research and the expedited removal process as of 2024.

---

1 Illegal Immigration Reform and Immigrant Responsibility Act, INA § 235(b)(1), 8 U.S.C. § 1252 (1996). https://www.govinfo.gov/content/pkg/COMPS-13677/pdf/COMPS-13677.pdf.

2 *See* 142 Cong. Rec. S11491-92 (September 27, 1996). See statement of Senator Orrin Hatch, former Chair of the Senate Judiciary Committee: "The (credible fear) standard ... is intended to be a low screening standard for admission into the usual full asylum process."

3 International Religious Freedom Act of 1998, Pub. L. 105-292 § 605 (1998), 112 Stat. 2787 § 6474.

4 U.S. Commission on International Religious Freedom (USCIRF). 2005. *Asylum Seekers in Expedited Removal: A Study Authorized by Section 605 of the International Religious Freedom Act of 1998*. Washington, DC: USCIRF. https://www.uscirf.gov/publications/report-asylum-seekers-expedited-removal.

5 U.S. Commission on International Religious Freedom (USCIRF). 2007. "Expedited Removal Study Report Card: 2 Years Later." *https://www.uscirf.gov/sites/default/files/Reportcard%20Scorecard_0.pdf*. *See also* U.S. Commission on International Religious Freedom (USCIRF). 2007. "Expedited Removal Study Recommendations Report Card." *https://www.uscirf.gov/sites/default/files/Score%20Card%20Grades_0.pdf*; U.S. Commission on International Religious Freedom (USCIRF). February 8, 2007. "USCIRF Finds Disappointing Response from Departments of Justice and Homeland Security to Its Recommendations on Expedited Removal Process." Press Release. *https://www.uscirf.gov/news-room/releases-statements/uscirf-finds-disappointing-response-departments-justice-and-homeland*; U.S. Commission on International Religious Freedom (USCIRF). 2013. *Assessing the U.S. Government's Detention of Asylum Seekers: Further Action Needed to Fully Implement Reforms*. Special Report. Washington, DC: USCIRF. *https://www.uscirf.gov/sites/default/files/resources/ERS-detention-reforms-report-April-2013.pdf*; U.S. Commission on International Religious Freedom (USCIRF). 2016. *Barriers to Protection: The Treatment of Asylum Seekers in Expedited Removal*. Washington, DC: USCIRF. *https://www.uscirf.gov/sites/default/files/Barriers%20To%20Protection.pdf*.

# THE EXPEDITED REMOVAL PROCESS

Expedited removal is a streamlined removal process utilized to screen and swiftly remove certain noncitizens.[6] If DHS decides to subject a noncitizen to expedited removal, they can be deported without an immigration court hearing unless they express an intention to apply for asylum or fear of persecution, torture, or return to their home country. If they do, they are typically referred for a CFI, which is a screening interview to determine whether there is a *significant possibility* that they would later be able to show they qualify for asylum or other protections in immigration court. If an asylum officer determines they have a credible fear, an IJ then decides whether they are eligible for asylum or other protection.

Noncitizens subject to expedited removal, who are not referred for a CFI, do not have a right to counsel[7] or a hearing,[8] and there is little opportunity for them to challenge an expedited removal order.[9] Those who receive an expedited removal order are rapidly deported from the United States without a full hearing before an IJ and are typically barred from reentering the country for five years.[10]

Although quick, the expedited removal process is complex and involves several steps and multiple federal agencies, including DHS and its component agencies CBP, ICE, and USCIS as well as DOJ's EOIR and BIA.

From 2023 to 2024, there were several significant policy changes that altered the way these agencies implement expedited removal:

- The Enhanced Expedited Removal (EER) policy fast-tracked the process, providing noncitizens 24 hours to speak to a legal representative and prepare for their CFIs.[11] It also allowed noncitizens to be processed and detained and to undergo their CFIs, as well as IJ reviews of CFI decisions, in CBP processing facilities. Previously, noncitizens were detained and had their CFIs in ICE detention centers.
- The Circumvention of Lawful Pathways (CLP) rule presumes that noncitizens are ineligible for asylum if they do not enter the United States in specific ways and did not seek protection or asylum in a country they traveled through, unless they meet certain exceptions.[12] They can still seek other forms of protection but are held to a higher legal standard (*reasonable possibility*) to receive them. Whether a noncitizen meets the exceptions to this rule or the higher standard for protection is now considered during their CFI.
- The Securing the Border (STB) policy (including a presidential proclamation and final rule) prevents noncitizens from entering the United States at the southern border during periods of high encounters, unless they meet

---

6 8 U.S.C. § 1225, I.N.A. § 235. https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1225&num=0&edition=prelim.

7 The statutory right to consult does not attach until a noncitizen is referred for a CFI, and the noncitizen must pay for representation or access pro bono services. INA 235(b)(1)(B)(iv), 8 U.S.C. 1225(b)(1)(B)(iv). These consultations are also made available under the policies and procedures of the detention facility where they are detained. *See* 8 CFR 235.3(b)(4)(ii).

8 8 U.S.C. § 1225, I.N.A. § 235. https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1225&num=0&edition=prelim. *See also* 8 C.F.R. § 235.3(b)(2)(ii).

9 *Id. See also* U.S. Department of Homeland Security v. Thuraissigiam, 591 U.S. (2020). https://supreme.justia.com/cases/federal/us/591/19-161/. (The Supreme Court held that IIRIRA 8 U.S.C. § 1252(e)(2) limits on judicial review of expedited removal orders (preventing habeas corpus challenges in federal court), and this does not violate the Suspension or Due Process clauses of the Constitution.)

10 8 U.S.C. § 1182(a)(9)(A)(i), I.N.A. § 212(a)(9)(A)(i). https://uscode.house.gov/view.xhtml?req=granuleid%3AUSC-prelim-title8-section1182&num=0&edition=prelim.

11 U.S. Department of Homeland Security. 2023. "Fact Sheet: U.S. Government Announces Sweeping New Actions to Manage Regional Migration." https://www.dhs.gov/news/2023/04/27/fact-sheet-us-government-announces-sweeping-new-actions-manage-regional-migration. EER was not the first time the CFI process has been fast-tracked. In 2019, under the first Trump administration, DHS began implementing two pilot programs, the Prompt Asylum Claim Review (PACR) and Humanitarian Asylum Review Process (HARP). Noncitizens in the CFI process were given 24 to 72 hours to prepare for their CFI, and they were detained in CBP custody (instead of ICE custody) until they were either removed or their case was decided by an IJ. The programs were implemented until March 2020, when Title 42 blocked asylum seekers from entering the country for public health reasons, which remained in force until May 2023. In 2021, the Biden administration issued an executive order directing DHS to stop the PACR and HARP programs. Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border, E.O. 14010, 86 F.R. 8267 (February 2, 2021). https://www.federalregister.gov/documents/2021/02/05/2021-02561/creating-a-comprehensive-regional-framework-to-address-the-causes-of-migration-to-manage-migration.

12 Under the CLP policy, noncitizens entering the United States at its borders are presumed ineligible for asylum if they (1) approach U.S. POEs without an appointment through the CBP One app (or without using other existing lawful pathways) or cross the border irregularly between POEs and (2) did not seek protection or asylum in a third country they traveled through on their way to the United States. If noncitizens cannot meet these requirements, they can only seek asylum if they can prove they meet one of the following exceptions: they are facing imminent threats to their lives; they are victims of severe forms of trafficking; they cannot access the CBP One app to make an appointment due to technical or other accessibility issues; they face an acute medical emergency; or they face other exceptionally compelling circumstances that immigration officers determine to be sufficient to provide an exception on a case-by-case basis. *See* Circumvention of Lawful Pathways 88 F.R. 11704, 8 C.F.R. 208 (May 11, 2023). https://www.federalregister.gov/documents/2023/05/16/2023-10146/circumvention-of-lawful-pathways; U.S. Department of Homeland Security. May 11, 2023. "Fact Sheet: Circumvention of Lawful Pathways Final Rule." https://www.dhs.gov/news/2023/05/11/fact-sheet-circumvention-lawful-pathways-final-rule.

certain exceptions.[13] While this policy is in effect, CBP officers are no longer required to ask noncitizens specific questions about whether they fear persecution or return as part of the initial screening process; instead, noncitizens must express this fear on their own volition to be referred for a CFI. The STB policy also further fast-tracked the process, providing noncitizens four hours to prepare for their CFIs, which are conducted in CBP custody. Like the CLP rule, the STB policy presumes noncitizens are ineligible for asylum if they do not enter the country a certain way or meet exceptions, and those not within the exceptions must meet an even higher legal standard (*reasonable probability*) to receive other forms of protection. This policy also allows families to be detained in CBP facilities and undergo their CFIs there.

- DHS started requiring asylum officers to consider whether noncitizens are subject to statutory bars to asylum during CFIs.[14] These were previously considered later in the process by IJs.
- DHS and DOJ created a dedicated Recent Arrivals docket for certain cases of those who crossed the southwest border, without inspection, between POEs (which may arise from positive CFI determinations).[15] This is intended for IJs to decide these cases as fast as possible.
- The Family Expedited Removal Management (FERM) program allows certain families in expedited removal to be conditionally released from detention while they go through their CFIs.[16]
- DHS policies, which are being challenged in the ongoing *Padilla v. ICE* lawsuit, prevent certain noncitizens, whom an asylum officer determined to have a credible fear during a CFI, from being released from detention on bond while an IJ considers and decides their asylum or protection claim.[17]

Table 1 describes the roles of the various agencies in the process, as implemented during the research period.

13 Under the STB policy, most noncitizens are barred from entering the United States at the southern border until daily encounters fall below a certain level. There are exceptions for certain noncitizens who approach POEs, including: unaccompanied minors; victims of severe forms of trafficking; those with CBP One appointments; those whom CBP officers permit to enter based on the totality of the circumstances, including consideration of law enforcement, officer and public safety, and urgent humanitarian and public health interests; and those permitted to enter due to operational consideration at the time of entry or encounter. While the STB policy is in force, noncitizens who approach a POE or are encountered at or near the border are deemed ineligible for asylum unless they meet one of the foregoing exceptions or show exceptionally compelling circumstances. This includes cases where the noncitizen or their family member: faced an acute medical emergency; faced an imminent and extreme threat to life or safety; or meet the definition of a victim of a severe form of trafficking under federal regulations. *See* Securing the Border Proclamation 10773, 89 F.R. 48487 (June 3, 2024). https://www.federalregister.gov/documents/2024/06/07/2024-12647/securing-the-border; Securing the Border Interim Final Rule (IFR) 89 F.R. 48710 (June 5, 2024). https://www.federalregister.gov/documents/2024/06/07/2024-12435/securing-the-border; A Proclamation Amending Proclamation 10773, 89 F.R. 80351 (September 27, 2024). https://www.federalregister.gov/documents/2024/10/02/2024-22942/amending-proclamation-10773; Securing the Border Final Rule, 89 F.R. 81156 (October 7, 2024). https://www.federalregister.gov/documents/2024/10/07/2024-22602/securing-the-border.

14 Application of Certain Mandatory Bars in Fear Screenings, 89 F.R. 41347, 8 C.F.R. 208 (May 13, 2024). https://www.federalregister.gov/documents/2024/05/13/2024-10390/application-of-certain-mandatory-bars-in-fear-screenings.

15 Efficient Case and Docket Management in Immigration Proceedings, 89 F.R. 46742 (May 29, 2024). https://www.federalregister.gov/documents/2024/05/29/2024-11121/efficient-case-and-docket-management-in-immigration-proceedings; U.S. Department of Homeland Security. May 16, 2024. "DHS and DOJ Announce 'Recent Arrivals' Docket Process for More Efficient Immigration Hearings." https://www.dhs.gov/news/2024/05/16/dhs-and-doj-announce-recent-arrivals-docket-process-more-efficient-immigration.

16 U.S. Immigration and Customs Enforcement. May 10, 2023. "ICE Announces New Process for Placing Family Units in Expedited Removal." Press Release. https://www.ice.gov/news/releases/ice-announces-new-process-placing-family-units-expedited-removal.

17 U.S. Department of Justice. March 20, 2019. Matter of M-S-, 27 I&N Dec. 509 (A.G. 2019); National Immigration Litigation Alliance (NILA), Northwest Immigrant Rights Project (NIRP), and American Immigration Council (AIC). 2024. "Padilla v. ICE and Delays in Credible Fear Interviews." Practice Alert. https://www.americanimmigrationcouncil.org/sites/default/files/practice_advisory/padilla_practice_alert_-_032224.pdf.

## Table 1: Roles of Federal Agencies in the Expedited Removal Process

| Federal Agency | Sub-Agency | Role |
|---|---|---|
| **U.S. Department of Homeland Security (DHS)** | U.S. Customs and Border Protection (CBP) | CBP conducts initial screenings to determine whether certain noncitizens should be subject to expedited removal at POEs and along the border. Office of Field Operations (OFO) officers screen noncitizens at POEs, and Border Patrol agents screen those apprehended at or near the border. If a noncitizen expresses an intention to apply for asylum or a fear of persecution, torture, or return to their home country, CBP refers them to USCIS for a CFI (or a reasonable fear interview [RFI] if they were previously ordered removed or their deportation, exclusion, or removal order was reinstated). Since 2023, most noncitizens stay in CBP custody until they receive an order of expedited removal or a USCIS decision on their CFI. |
| | U.S. Immigration and Customs Enforcement (ICE) | Previously, noncitizens referred for CFIs were transferred to ICE custody until their CFIs and sometimes their immigration court hearings, but since 2023 most remain in CBP custody at least until their CFI is completed. Some are still transferred to ICE facilities under certain circumstances, including a lack of space in CBP facilities. ICE Enforcement and Removal Operations (ERO) works with CBP to facilitate removals. ICE also conducts check-ins and provides ankle monitors and other alternatives to detention (ATD) aspects of the FERM program. |
| | U.S. Citizenship and Immigration Services (USCIS) | USCIS conducts CFIs or RFIs for noncitizens who express to CBP or ICE officers an intent to apply for asylum or a fear of persecution, torture, or return to their home country. These interviews are done over the phone by a USCIS asylum officer (who could be anywhere in the country) within 24 hours (under the EER process) or four hours (if the STB policy is in effect) from the time the detained noncitizen is given an opportunity to consult with a legal representative or other consultant. These timeframes usually begin when the noncitizen is provided access to phones or given information about the expedited removal and CFI process. During the interview, the asylum officer determines whether there is a significant or reasonable possibility (or probability under the STB policy) that the noncitizen would later show that they qualify for asylum, withholding of removal, or Convention Against Torture (CAT) protection in immigration court. |
| **U.S. Department of Justice (DOJ)** | Executive Office of Immigration Review (EOIR) | If an asylum officer determines that the noncitizen has a credible or reasonable fear, they are placed in removal proceedings before an EOIR IJ who determines whether to grant them legal protection. If the asylum officer determines that the noncitizen does not have a credible or reasonable fear, the noncitizen can request that an IJ review this determination. If the IJ reverses the asylum officer's determination, they will be placed in removal proceedings before an IJ to seek asylum and other legal protections. |
| | Board of Immigration Appeals (BIA) | The BIA decides appeals of the decisions made by EOIR IJs. |

## SCOPE OF APPLICATION

DHS is authorized, but not required, to apply expedited removal to any noncitizen who enters the United States without inspection or with fraudulent or misrepresented documents who cannot demonstrate that they have been physically present in the country for at least two years.[18] It typically applies to noncitizens who do not have proper documentation to enter the country at U.S. POEs,[19] entered the United States by sea without inspection,[20] or entered the United States by land without inspection and are encountered within 100 miles of a U.S. land border within 14 days of their unauthorized entry into the country.[21]

## INITIAL SCREENINGS BY CBP OFFICERS

CBP conducts initial screenings to determine whether certain noncitizens should be subject to expedited removal and referred for a CFI at POEs and the border. Typically, CBP OFO officers screen these noncitizens at POEs, and Border Patrol agents screen those who are apprehended at or near the border.

---

18 8 U.S.C. § 1225(b)(1)(A)(iii)(II), I.N.A. § 235(b)(1)(A)(iii)(II). https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1225&num=0&edition=prelim.

19 When expedited removal was first implemented in 1997, it only applied to these noncitizens. Illegal Immigration Reform and Immigrant Responsibility Act, I.N.A. § 235(b)(1), 8 U.S.C. § 1252 (1996). https://www.govinfo.gov/content/pkg/COMPS-13677/pdf/COMPS-13677.pdf.

20 In 2002, the Immigration and Naturalization Service (INS) expanded expedited removal to apply it to these noncitizens. Notice Designating Aliens Subject to Expedited Removal I.N.A. § 235(b)(1)(A)(iii), 67 F.R. 68924 (November 13, 2002). https://www.federalregister.gov/documents/2002/11/13/02-29038/notice-designating-aliens-subject-to-expedited-removal-under-section-235b1aiii-of-the-immigration.

21 In 2004, DHS—which succeeded the INS—expanded its use of the expedited removal process again and began to also apply it to these noncitizens. Designating Aliens for Expedited Removal, 69 F.R. 48877 (August 11, 2004). https://www.federalregister.gov/documents/2004/08/11/04-18469/designating-aliens-for-expedited-removal. In 2019, the Trump administration expanded its use of expedited removal again to the fullest extent possible under the Illegal Immigration Reform and Immigrant Responsibility Act, applying it to these noncitizens encountered anywhere in the United States who have been in the country for less than two years, removing the 100-mile encounter location and 14-day limits. *See* Designating Aliens for Expedited Removal, 84 F.R. 35409 (July 23, 2019). https://www.federalregister.gov/documents/2019/07/23/2019-15710/designating-aliens-for-expedited-removal). In 2022, the Biden administration rescinded that rule, reverting to the above application of the expedited removal process. *See* Recission of the Notice of July 23, 2019, Designating Aliens for Expedited Removal, 87 F.R. 16022 (March 21, 2022). https://www.federalregister.gov/documents/2022/03/21/2022-05961/rescission-of-the-notice-of-july-23-2019-designating-aliens-for-expedited-removal.

During these initial screenings, CBP officers were previously required to ask mandatory questions and take a sworn statement documenting the noncitizen's fears and intentions using Forms I-867A and B before issuing a notice and order of expedited removal (Form I-860).[22] This included four carefully designed questions about fear of persecution or return to ensure that no refugee or asylee was returned to a country of persecution, as required by the Refugee Act of 1980 and the Refugee Protocol.[23] However, under the STB policy, this standard has changed since June 2024.[24]

While the STB policy is in effect, CBP officers neither ask the required questions nor take a sworn statement using I-867 forms. They will only refer noncitizens for CFIs if the noncitizens manifest fear on their own volition. This fear can be expressed in several ways (i.e., verbally, in written form, through bodily signals, etc.) during screenings or while they are in CBP or ICE custody, but whether fear is manifested is open to interpretation and up to the discretion of the officer. Under the STB policy, instead of using I-867 forms to record how and whether a noncitizen manifested fear, DHS uses a Form I-213 with a "credible fear" stamp to record the details of the person's apprehension and immigration history.

The overall number of southern border credible fear screening referrals and decisions over the past decade shows that 2023 registered a peak with 148,480 referrals. This figure is 29.5 percent higher than the number recorded in 2019, prior to the COVID-19 pandemic.[25] However, after the STB policy was implemented in June 2024, there was a drastic decrease in the number of credible fear referrals and decisions.[26] Between May and August 2024, the total monthly CFI referrals plummeted from 20,010 to 1,382, an approximately 93 percent drop. CFI decisions also decreased by approximately 87 percent (from a total of 18,515 decisions in May to 2,390 in August 2024).

Previously, CBP officers usually turned over noncitizens referred for CFIs to ICE custody, and CFIs were not done in CBP facilities.[27] However, since 2023 many remain in CBP custody while they await their CFI and before they receive an order of expedited removal or a hearing with an IJ.[28]

## CREDIBLE FEAR INTERVIEWS

If a noncitizen expresses an intention to seek asylum or a fear of persecution, torture, or return to their home country during CBP's initial screenings or while they are in CBP or ICE custody, they are typically referred to USCIS for a CFI. During this screening interview, a USCIS asylum officer determines whether there is a *significant possibility* that they would later show they qualify for asylum or other legal protection in immigration court.[29] If a noncitizen was previously ordered removed or their deportation, exclusion, or removal order was reinstated, they are referred to USCIS for an RFI instead of a CFI.[30] In this case they would not be eligible for asylum and would only receive withholding of removal or CAT protection if the asylum officer determines there is a *reasonable possibility* (which is a higher legal standard) that they can later show they qualify for these protections in court. DHS cannot remove those who are referred for CFIs and RFIs until their claim is evaluated.

When noncitizens are referred for CFIs, CBP (or ICE) officers must provide them with a written explanation of the CFI process (Form M-444 or a form titled "Information About the Credible Fear Interview Sheet," which is a modified version of Form M-444) to explain the circumstances under the STB policy. This includes information about the purpose of the referral and a description of the CFI process; the right to consult with an attorney or accredited representative (who will not be provided or paid for by the U.S. government) prior to and after their interview; what happens after they receive a positive or negative credible fear determination; and the right to request a review by an IJ of the asylum officer's fear determination.[31]

The CFI process was fast-tracked twice: in May 2023 by the EER policy and again in June 2024 by the STB policy. Under these policies, CFIs shall occur within 24 hours (under

---

22 8 C.F.R. § 235.3(b)(2)(i). https://www.ecfr.gov/current/title-8/chapter-I/subchapter-B/part-235.

23 Refugee Act of 1980, S. 643 P.L. 96-212 96th Cong. (March 17, 1980). https://www.congress.gov/bill/96th-congress/senate-bill/643/text; Protocol Relating to the Status of Refugees, G.A. Res. 2198 (XXI) (January 31, 1967).

24 *See* Securing the Border, 89 C.F.R. 48710 *supra* note 13; and U.S. Department of Homeland Security, Immigration and Customs Enforcement. (June 4, 2024). "Memorandum for Daniel A. Bible, Executive Associate Director Enforcement and Removal Operations, 'Implementation Guidance for Noncitizens Described in Presidential Proclamation of June 3, 2024, *Securing the Border*,' and 'Interim Final Rule, *Securing the Border*.'" https://drive.google.com/file/d/1jedC-2TzM0wzDaKWy4F_y7niS1fFkbhj/view.

25 U.S. Office of Homeland Security Statistics. March 2024. "Immigration Enforcement and Legal Processes Monthly Tables." https://www.dhs.gov/ohss/topics/immigration/enforcement-and-legal-processes-monthly-tables.

26 U.S. Office of Homeland Security Statistics. "Semi-Monthly Credible Fear and Reasonable Fear Receipts and Decisions. Data July 1, 2023–August 31, 2024." https://www.uscis.gov/tools/reports-and-studies/semi-monthly-credible-fear-and-reasonable-fear-receipts-and-decisions.

27 Hillel Smith. October 8, 2019. "Expedited Removal of Aliens: Legal Framework." Congressional Research Service. https://crsreports.congress.gov/product/pdf/R/R45314.

28 *See* DHS 2023 *supra* note 11 and Securing the Border 89 CFR 48710 *supra* note 13. This practice was also applied under previous programs the Trump administration implemented in 2019 that were rescinded in 2021. These pilot programs were the Prompt Asylum Claim Review (PACR) and Humanitarian Asylum Review Process (HARP).

29 8 C.F.R. § 235.3(b)(4). https://www.ecfr.gov/current/title-8/chapter-I/subchapter-B/part-235.

30 8 C.F.R. 208.31. https://www.ecfr.gov/current/title-8/chapter-I/subchapter-B/part-208/subpart-B/section-208.31.

31 Information about Credible Fear Interview Form M-444 (Rev. 5-31-2022).

EER) or four hours (if apprehensions reach certain levels and the STB policy is implemented) from the time the noncitizen is given information about the CFI process and phone access to consult with a legal representative or other consultant. Previously, USCIS's policy was to wait at least 48 hours from the noncitizen's arrival in ICE custody to conduct a CFI. Asylum officers completed most CFIs in 20 days or less between 2014 and 2019.[32]

During CFIs, USCIS asylum officers typically determine whether noncitizens may qualify for asylum or other protections under the *significant possibility* legal standard, explained above. However, under the CLP rule (since May 2023) and the STB policy (since June 2024), certain noncitizens who do not enter the country in certain ways are presumed ineligible for asylum. Unless they meet certain exceptions, they can only seek withholding of removal and CAT protections and are subject to different legal standards. If they do not meet exceptions, an asylum officer determines whether there is a *reasonable possibility* (under the CLP rule—a higher standard than *significant possibility*) or a *reasonable probability* (under the STB policy—an even higher standard than *reasonable possibility*) that they can later show they qualify for these legal protections in court. USCIS HQ confirmed that asylum officers received training on the new legal standards under the CLP and STB policies.

Although noncitizens can still receive withholding of removal or CAT protection if they do not meet an exception to the CLP and STB rules, these protections are not substitutes for asylum. Unlike asylum, withholding of removal and CAT protection do not provide permanent residence or a pathway to citizenship. In addition, the noncitizen can still be deported to a third country, and spouses and unmarried children under 21 cannot receive derivative protection as family members of the noncitizen.[33]

If the asylum officer determines through the CFI or RFI that a noncitizen has a credible or reasonable fear, the noncitizen receives a notice to appear (NTA) before an IJ, is placed in removal proceedings, and can seek legal protection in immigration court. The noncitizen must file an application with the court, and an IJ eventually decides whether to grant them asylum, withholding, or CAT protection.

If an asylum officer determines that the noncitizen does not have a credible or reasonable fear, the noncitizen may request that an IJ review this determination.[34] If the noncitizen does not make this request, they may be swiftly deported. The IJ review happens quickly, usually at most seven days after the noncitizen receives the negative determination. An IJ review is not a full hearing on the merits of the case; it only reviews the asylum officer's CFI determination. If the IJ agrees with that determination, the noncitizen will receive a removal order and be deported shortly thereafter. If the IJ does not agree, the noncitizen receives an NTA and is placed in removal proceedings to apply for asylum or other protection and have a full hearing.

Most noncitizens subject to expedited removal are detained (whether they wind up receiving an order of expedited removal or a referral for a CFI).[35] If an asylum officer determines that a noncitizen has a credible fear, they are typically granted parole and released from CBP or ICE custody, unless they pose certain security risks.[36] Those who do not qualify for parole are kept in detention until their case is decided by an IJ and they are transferred from CBP to ICE custody.[37]

---

32 Government Accountability Office (GAO). February 19, 2020. *Immigration: Actions Needed to Strengthen USCIS's Oversight and Data Quality of Credible and Reasonable Fear Screenings*. GAO-20-250, Washington, DC: GAO. https://www.gao.gov/products/gao-20-250. USCIS did not require CFIs to be completed within a certain timeframe and used timeliness goals to monitor their CFI workload.

33 *See* U.S. Department of Justice. 2021. "Model Hearing Program Substantive Law Lecture: Asylum, Withholding of Removal, and Protection under the U.N. Convention Against Torture." https://icor.eoir.justice.gov/substantive_law_lecture_asylum_withholding_cat_accessible.pdf.

34 8 U.S.C. § 1225(b)(1)(B)(iii)(III). https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1225&num=0&edition=prelim. *See also* 8 C.F.R. 280.30(g)(1).

35 8 C.F.R. § 235.3(b)(4)(ii). https://www.ecfr.gov/current/title-8/chapter-I/subchapter-B/part-235.

36 ICE HQ confirmed this during consultations. *See* "Parole of Arriving Aliens Found to Have a 'Credible Fear' of Persecution or Torture," ICE Policy Directive No. 11002.1, December 8, 2009. (In 2009, ICE issued a directive to automatically consider these noncitizens for parole if they entered at POEs.) https://www.ice.gov/doclib/dro/pdf/11002.1-hd-parole_of_arriving_aliens_found_credible_fear.pdf. *See also* ICE. 2023. "Parole of Arriving Aliens Found to Have Credible Fear of Persecution or Torture." https://www.ice.gov/factsheets/credible-fear.

37 8 U.S.C. § 1225(b)(1)(B)(ii), and (iii)(V). https://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title8-section1225&num=0&edition=prelim. *See also* 8 C.F.R. § 212.5(b). https://www.ecfr.gov/current/title-8/chapter-I/subchapter-B/part-212/section-212.5.

# RESEARCH METHODOLOGY AND FINDINGS

## METHODOLOGY

The findings in this report are based on a literature review conducted from December 2023 to February 2024 and primary research conducted from May to August 2024. The primary research consisted of interviews, survey responses, observations, site visits, and consultations with DHS officials. The research was less extensive in time and scope than USCIRF's prior research on expedited removal but did allow for an assessment—in light of conditions during the research period—of the status and relevance of USCIRF's 2016 recommendations and the development of new recommendations.

The primary research involved the following: First, the research team conducted 14 interviews and circulated a survey that received 18 responses from a total of 26 legal representatives from 15 different organizations and four private law firms that work with asylum seekers in expedited removal. As of the research period, few legal representatives and organizations represent asylum seekers in expedited removal. When this research was conducted in the summer of 2024, only five organizations provided pro bono legal services to noncitizens in CBP custody; five provided these services to those enrolled in the FERM program; 16 organizations provided these services in the eight ICE detention centers that held asylum seekers in expedited removal; and few private attorneys took on these noncitizens as clients. In addition, the research team interviewed policy experts about border and expedited removal policy as well as representatives of shelters and other service providers near the southwest border.

Second, the research team conducted several site visits to DHS facilities in Texas and Arizona in July and August 2024. This included in-person site visits to four CBP processing facilities in Donna, McAllen, and El Paso, TX, and Tucson, AZ, and a virtual visit and briefing at the Brownsville, TX, POE. In-person site visits were also conducted in August 2024 to the IAH Polk and Eloy ICE Detention Centers (two of the eight detention centers holding asylum seekers in expedited removal at that time) in Livingston, TX, and Eloy, AZ. These visits allowed the research team to observe the conditions of these facilities and speak with CBP and ICE officers. However, the team was not able to observe screening and intake procedures or to formally interview noncitizens in CBP and ICE custody.

Third, the research team observed six CFIs, randomly chosen by USCIS, at asylum offices in Newark, NJ, Arlington, VA, and Houston, TX, in August 2024. Four of the observed interviews were conducted virtually (with asylum seekers who were in CBP and ICE custody) and two were in person (with families enrolled in the FERM program). The observed CFIs involved noncitizens from several countries who spoke different languages, including one who identified as indigenous and another who spoke a rare language.

Finally, the research team consulted with officials from DHS HQ, including its component agencies CBP, ICE, and USCIS, to gather information about their new protocols and procedures and understand whether some of the 2016 report's recommendations were implemented and still relevant. The research team sent written questions to DHS HQ and component agencies and received their responses in August 2024. They also reached out to EOIR several times to do the same but did not receive a response.

## FINDINGS

The research identified several barriers that bona fide asylum seekers face in accessing asylum or other forms of legal protection under policies in place in 2024. As discussed further in this section:

- Many asylum seekers may not be aware of the new "shout test" requirement or may not be able to affirmatively manifest fear to be referred for a CFI.
- The conditions in CBP custody are not suitable for multi-day stays, the detention of families, access to counsel, or preparing for and undergoing CFIs.
- Legal representatives face so many obstacles representing noncitizens in CBP custody that many have decided to stop doing so. ICE facilities, by contrast, provide more appropriate detention conditions and better access to counsel and other legal resources.
- CFIs are lengthy, are conducted telephonically, and take place at odd hours and on short notice. Lack of availability of interpreters for CFIs, especially for rare languages, can be an issue.
- Families enrolled in the FERM program and released from CBP custody experience unique challenges.

- Joint Processing Centers, where CBP, ICE, and USCIS operate under the same roof, could help these agencies better manage the expedited removal process.

## The Shout Test

As discussed above, under the STB policy, to be referred for a CFI, noncitizens must manifest fear on their own volition either during CBP's initial screenings or while they are in CBP or ICE custody. This new requirement—coupled with issues identified by the research team, including a lack of training, signage, or opportunities to manifest fear during intake—increases the risk that bona fide asylum seekers are not receiving the opportunity to seek legal protection. This concern is heightened by DHS data showing that CFI referrals and decisions plummeted after the STB policy was implemented in June 2024.

During consultations with DHS HQ and site visits, the research team confirmed that CBP and ICE officers did not receive additional training on how to identify manifestations of fear. They were only given guidance memorandums providing some examples of verbal, nonverbal, and physical ways noncitizens may show fear.[38] During site visits, CBP officers told the researchers that if a detainee claims fear, officers follow up with questions to verify that fear and, depending on their view of the adequacy of the response, do not necessarily refer the detainee for a CFI. This practice exceeds CBP's role in the process, which does not include assessing the credibility of fear claims.

The research team also observed a lack of visible, easily understandable signs in the CBP and ICE facilities they visited to inform detainees of the need to express fear on their own and the significance of this requirement. Some CBP facilities had posted standard-size pieces of paper that explained the new requirements in dense paragraphs in four languages (English, Spanish, Chinese, and Hindi), but they were not easily noticeable and did not convey that they contained important information. The Eloy ICE Detention Center had the same signs, but they were available in at least 10 additional languages, and it also had videos about manifesting fear playing in the intake area. At the IAH Polk ICE Detention Center and El Paso CBP facility, the research team did not observe any signage or videos on manifestation of fear or the new requirements.

Because the fear questions are no longer asked during screenings, the brief intake period presents the only opportunity for a noncitizen to manifest fear before CBP takes the next step on their case (whether that is a CFI referral, release, or deportation). In some CBP facilities that the research team visited, CBP officers or staff conducted this intake. Others used contractors (who may not have the training and experience to recognize manifestations of fear),[39] virtual processing (by video conference with CBP officers located elsewhere), and/or artificial intelligence software (to pull data from biographical documents and fill in intake forms). These forms of intake may prevent noncitizens from manifesting fear or affect whether it is recognized, potentially making it less likely that a bona fide asylum seeker will be referred for a CFI.

## Detention Conditions in CBP Facilities

CBP facilities are designed for short-term processing. However, since the EER policy was implemented in May 2023, CBP is handling additional aspects of the expedited removal process, including longer-term stays, on top of their other preexisting duties. Detention conditions in CBP facilities are inadequate for such stays, especially when they exceed their capacity during periods of high apprehensions. For example, CBP officers at the El Paso facility told the research team it has capacity to hold 2,500 individuals, but during surges in apprehensions it held up to 7,000 individuals. During site visits, the research team observed that the pods where single adult detainees were held were crowded and uncomfortable, and this was during periods of low apprehensions.[40] The holding pods were empty rooms without beds or other basics for overnight stays. Officers indicated that they try to keep an average of about 15–16 people in each pod but exceed this during times of high volume of encounters. In the pods, the research team observed detainees sleeping on the floor with foil blankets, side by side, with the lights on when they arrived early in the morning.

When the researchers spoke to CBP officers about their experiences adapting to the fast-tracked approach and their additional responsibilities under the EER and STB policies, they said that initially, the new CFI process sometimes took longer than intended but had become more efficient over time. For example, they reported that at the Donna facility,

---

38 U.S. Department of Homeland Security, Immigration and Customs Enforcement. June 4, 2024. "Memorandum for Daniel A. Bible, Executive Associate Director Enforcement and Removal Operations, 'Implementation Guidance for Noncitizens Described in Presidential Proclamation of June 3, 2024,' *Securing the Border*, and 'Interim Final Rule, *Securing the Border*.'" https://drive.google.com/file/d/1jedC-2TzM0wzDaKWy4F_y7niS1fFkbhj/view.

39 According to CBP HQ, CBP staff trains the contractors to assist with parts of the intake process, while CBP officers oversee and compete immigration processing, and if a contractor identifies something that seems to be a manifestation of fear, the contractor must bring that information to a CBP officer. However, CBP HQ did not confirm whether these contractors were trained or received memoranda or guidance to understand different ways fear could be manifested.

40 For example, at the CBP facilities in Donna and McAllen, TX, CBP officers said they were receiving about 150–300 people per day when the team visited in July 2024, but in the past, they had experienced 2,000–4,000 people per day. This decrease was also reflected in CBP southwest border encounter statistics overall. Comparing the percentage change in total encounters at the southwest border from July 2023 to July 2024, encounters were down by 57.5 percent, from 132,642 to 56,399. *See* U.S. Customs and Border Protection. 2024. "Southwest Land Border Encounters (By Component)." https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters-by-component.

noncitizens referred for CFIs were held for 15–16 days, and in El Paso 11–20 days, when apprehensions were high. But CBP officers in El Paso indicated that the holding period was down to five days when the research team visited in July 2024.

The facilities holding women and children had separate pods for unaccompanied children and families and a designated area for children under six years old. More space was provided, and phones were available so these detainees could call family members without limitations. Children under six years old were held in separate areas that had toys, blankets, and televisions, with contractors who took care of the children. CBP officers told the research team that there were time limits on detaining children and families (72 hours for unaccompanied minors and 120 hours for families), but at least one legal representative interviewed was aware of families and children being held in CBP custody for periods of five to 15 days.

### Access to Counsel and CFI Preparation in CBP Facilities

CBP facilities are also not designed to facilitate access to counsel or CFI preparation. The research revealed that: phone access for detainees can be rushed, sporadic, and granted at unusual hours; legal representatives are not allowed inside the facilities and have difficulty contacting detained noncitizens and obtaining signed notice of appearance forms; detainees typically only have a few hours and at most one phone call with counsel to prepare for their CFIs; and lawyers do not receive adequate notice of their clients' CFIs and IJ reviews, which may be held at odd hours, on weekends, or on holidays, limiting their ability to attend. Among the legal representatives surveyed, almost all of them (94.1 percent) indicated it was easier to work with clients in ICE custody than in CBP custody. Seven out of 18 legal representatives interviewed said that they have drastically reduced, or entirely ceased, working with clients in CBP custody because it was too difficult to represent them in good faith. Several more indicated in the survey that they, or their organization, only work with FERM or ICE custody clients.

During site visits to CBP facilities, the research team asked about detainee phone access. The officers explained that it is provided "when operationally feasible." Legal representatives interviewed reported that CBP sometimes provides this access outside of normal business hours, such as during the night or very early in the morning, when they are not available to answer these calls. They also indicated that they had trouble communicating with CBP officers and the DHS Office of Chief Counsel (OCC) to facilitate contact with or call back detainees. DHS and DOJ do provide a list of points of contact for CFIs in CBP custody with emails and phone numbers for CBP, USCIS, and EOIR in various Border Patrol sectors in Texas, Arizona, and California.[41] DHS HQ said that these points of contact were established in 2023. However, legal representatives interviewed and surveyed reported that their calls and emails frequently go unanswered, and some only learned about this list in August 2024.

When detainees and their counsel do manage to talk by phone, the call is usually rushed, complicated information needs to be covered very quickly, and detainees do not have access to pens and paper. The four- and 24-hour consultation periods under the STB and EER policies and limited phone access mean that detainees in CBP custody typically are given one phone call before their CFIs, and if they manage to reach a lawyer, that call is their only opportunity to prepare for this highly consequential interview.

Legal representatives interviewed and surveyed also reported that their clients in CBP custody, especially families, are not in any condition to prepare themselves for CFIs. Detainees are traumatized from their journey to the border, are sleeping on the floor and sometimes sick from the cold conditions or the food, do not have freedom of movement, and have difficulty concentrating on their cases while taking care of their children. Family units are unable to prepare for their CFI together; they are typically detained separately, with women and young children placed in a different facility than their male family members, and they only reunite for the CFI.

### Detention Conditions and Access to Counsel in ICE Facilities

ICE facilities are better suited for multi-day stays, with beds and other basic necessities, and they provide better access to counsel and legal resources than CBP facilities. As of August 2024, only eight ICE detention centers held asylum seekers in expedited removal. The research team was able to visit two: the Eloy Center in Arizona and IAH Polk Center in Texas. Although only 16 organizations provided pro bono legal services to these eight facilities, that is more than triple the amount that served CBP facilities nationwide at that time. The ICE detention centers the team visited provided multiple mechanisms to contact legal representatives. For example, at Eloy, detainees had access to tablets with an app to chat with and send messages to legal representatives[42] and to virtual attorney visitation (VAV)[43] video conferencing systems. In addition, representatives could visit the facilities

[41] American Immigration Lawyers Association. August 12, 2024. "Points of Contact for Credible Fear Interviews in CBP Custody."

[42] U.S. Immigration and Customs Enforcement. 2024. "Tablet Legal Orientation Program Initiative." https://www.ice.gov/doclib/detention/tabletLOPinitiative.pdf.

[43] U.S. Immigration and Customs Enforcement. 2024. "Virtual Attorney Visitation Program." https://www.ice.gov/detain/detention-facilities/vav.

in person and make appointments for calls to detained clients. Some ICE detainees also have access to law libraries, Legal Orientation Program (LOP) group and individual orientations, pro se workshops, referrals to pro bono services, and Know Your Rights (KYR) materials and presentations.

ICE HQ confirmed during consultations that these resources vary depending on location. For example, the research team observed differences between Eloy and IAH Polk. IAH Polk was also set up for VAV, but detainees there had less access to tablets, the facility could accommodate fewer attorney visits, there was insufficient indoor space for in-person group LOP presentations, and detainees usually needed to contact the LOP provider by phone if they wanted to talk to legal representatives.

## CFIs and IJ Reviews

Many legal representatives interviewed or surveyed said they were unable to attend CFIs or IJ reviews for clients in CBP custody because they were scheduled so rapidly and with little or no notice. By contrast, those representing clients in ICE custody indicated they received notice some or most of the time. According to USCIS HQ, if a notice of appearance is on file at the time of scheduling or received before the CFI, the asylum officer must notify the legal representative—via email, phone, or voicemail—of the date and time at least one business day beforehand, if operationally feasible. If this is not operationally feasible, the asylum officer must notify the legal representative at the time of the interview.[44] Several legal representatives indicated they received notice this way, and if they did not answer the phone or were unavailable at the time, they could not attend.

CFIs may be scheduled at odd hours, on weekends, or on holidays, and are done telephonically. The asylum officer, noncitizen, and legal representative may be in different time zones. According to USCIS HQ, they schedule CFIs based on the length of time the case has been pending and the number of asylum officers available in a variety of locations nationwide. CFIs are conducted by telephone seven days a week and on federal holidays, beginning at 7:30 a.m. until about 8:00 p.m. local time at the CBP or ICE detention facility where the noncitizen is held.

The CFIs observed by the research team took about two to five hours to complete. Asylum officers confirmed that these interviews take longer than they did before the 2023–24 policies were implemented. During site visits, ICE officers told the team that CFIs can even take up to eight hours. With additional factors to adjudicate, including exceptions and statutory bars to asylum, a CFI must cover extensive ground. This is particularly true for CFIs with FERM families, where each family member's claim must be considered, including children.

Undergoing a lengthy telephone interview with a stranger about traumatic events can be difficult and exhausting, especially when done from a small phone booth while in detention. A phone interview also does not allow the asylum officer to see the interviewee's face, expressions, and body language. The phone booths used for CFIs at the IAH Polk ICE Detention Center are small closets with all-black walls and floor. The CBP facilities the research team visited had new phone booths for CFIs and IJ reviews that seemed to be more private and soundproof but are not large enough to fit a family of more than two people. Each had a landline phone and a Teams phone to connect to Microsoft applications but no video conference capability. Incorporating video conferencing by adding webcams, computers, or tablets could help improve conditions for conducting CFIs and IJ reviews from CBP and ICE detention.

None of the noncitizens in the observed CFIs had legal representatives, which may also have contributed to the length of the interview. Noncitizens who meet with counsel beforehand or have representation during CFIs are more likely to understand the protection they are applying for and to be better prepared to answer complicated questions, making interviews more efficient. The research team noted that the noncitizens in the observed interviews did not seem to understand how important some questions were to meet the legal requirements to receive asylum or other protection. The research team also observed that some asylum officers were sensitive and accommodating to the noncitizens and their children and spent time making sure they were comfortable and understood certain requirements, while one was impatient, cut off the noncitizens' answers, and may have intimidated them from sharing critical details.

Some legal representatives interviewed or surveyed noted that IJ reviews, which are usually a noncitizen's one chance to appeal a negative CFI decision, are cursory and short. They also explained that IJs often treat CFI transcripts as verbatim records and afford them significant weight, when in fact these documents are only the asylum officer's notes from the interview and not a comprehensive recounting of the interviewee's entire claim.

---

44 *See also* U.S. Citizenship and Immigration Service. 2023. "Credible Fear Procedures Manual." Last updated October 5, 2023. https://www.uscis.gov/sites/default/files/document/guides/CredibleFearProceduresManual.pdf (which highlights similar protocols).

### Interpretation Issues

Due to the rapid nature of the expedited removal process, noncitizens who speak rare or indigenous languages do not always receive adequate interpretation. According to legal representatives interviewed and surveyed, these noncitizens may receive interpreters who speak a different dialect of their language that they cannot understand, or they feel pressured to go forward with the CFI or IJ review in more common languages like English, Spanish, or French to get out of detention faster. In these situations, the noncitizen may be unable to provide a clear story or may get confused, potentially leading to misinterpretations or misunderstandings that negatively impact their ability to receive legal protection.

The research team observed one CFI with a rare language speaker. The asylum officer tried but was unable to find a USCIS-certified interpreter in the noncitizen's language. The asylum officer asked the noncitizen if he wanted to proceed in another language or reschedule; the noncitizen agreed to go forward but mentioned he may not be able to express himself well. The officer told the research team that the asylum office he worked in was seeing rare language speakers every other day. During consultations with DHS HQ, the research team asked USCIS about the procedure for providing interpreters to rare or indigenous language speakers. USCIS explained that if a noncitizen's preferred language is not serviced and they do not agree to proceed with their CFI in another language, they will be issued an NTA. If their preferred language is serviced but an interpreter cannot be scheduled or secured within three business days, then USCIS also may issue them an NTA.

### FERM Program

DHS has been applying a different CFI process to certain families in expedited removal through the FERM program since May 2023.[45] This program seeks to keep some families in expedited removal out of CBP custody and move them through the CFI process quickly. The program aims to issue decisions on their cases within 30 days of their CFI referral. Initially, it was implemented in four cities but expanded to 45 during its first year.[46]

At the time of the research, only certain FERM families that reside near nine cities can receive an asylum merits interview after a positive CFI determination, instead of an NTA.[47] In these cases, an asylum officer would later decide whether to grant them asylum, withholding, or CAT protection instead of an IJ. These families are subject to a different CFI process that was previously applied to noncitizens in expedited removal from June 2022 to April 2023.[48] Under this process, their positive CFI determination is treated as a full application for asylum, withholding, or CAT protection, and they do not need to file a separate one.[49] If the asylum officer decides to grant them protection, they do not need to go to immigration court afterward. If the asylum officer decides not to grant them asylum, they would then be placed in removal proceedings before an IJ where they would need to file a new application with the court.

---

45 U.S. Immigration and Customs Enforcement. May 10, 2023. "ICE Announces New Process for Placing Family Units in Expedited Removal." Press Release. https://www.ice.gov/news/releases/ice-announces-new-process-placing-family-units-expedited-removal. *See also* U.S. Citizenship and Immigration Service. 2023. "Implementation of the Credible Fear and Asylum Processing Interim Final Rule." Fact Sheet. https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum/fact-sheet-implementation-of-the-credible-fear-and-asylum-processing-interim-final-rule; and Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 F.R. 18078 (2023). https://www.federalregister.gov/documents/2022/03/29/2022-06148/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat. Families are selected for enrollment based on factors including whether they are nationals of countries to which ICE has regular removal flights, whether they intend to live within 75 miles of one of the designated cities, and whether the head of household is eligible for ICE's Alternatives to Detention (ATD) program.

46 These cities are in the following states: Indiana, Ohio, Maryland, District of Columbia, Massachusetts, New Jersey, Rhode Island, Florida, Georgia, Kentucky, Louisiana, North Carolina, Tennessee, Virginia, Missouri, Minnesota, Colorado, California, Nevada, Oregon, Utah, Washington, Arizona, and Texas. *See* ICE 2023 *supra* note 16.

47 *See* U.S. Immigration and Customs Enforcement. 2023. "Implementation of the Credible Fear and Asylum Processing Interim Final Rule." Fact Sheet. https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum/fact-sheet-implementation-of-the-credible-fear-and-asylum-processing-interim-final-rule.

48 Even though the CFI process is different for families enrolled in the FERM program, they are still subject to the CLP rule and the STB policy and are held to the legal standards described above. *See* Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 F.R. 18078 (2023). https://www.federalregister.gov/documents/2022/03/29/2022-06148/procedures-for-credible-fear-screening-and-consideration-of-asylum-withholding-of-removal-and-cat.

49 *Id.*

The research found that families enrolled in the FERM program face unique difficulties, even though they are released from detention. All five legal representatives interviewed who worked with FERM families reported that the required check-ins with ICE or the program's contractor, which are weekly and in person, were so frequent and time-consuming they did not have sufficient time to prepare their clients for their CFIs and IJ reviews. They also reported that the use of ankle monitors, GPS tracking, and curfews feels punitive to the families. In addition, the legal representatives interviewed noted the length of the CFIs of FERM families. One recounted a CFI that lasted for six hours (three hours for CLP exceptions and three hours for asylum screening standards). Another said they tell FERM families to be prepared to be at the USCIS asylum office all day.

The research team observed two CFIs of FERM families. Both took between three and four hours. It can be difficult for a parent to talk about trauma, persecution, or torture they faced in front of their children during a CFI, as well as for an asylum officer to ask children similar questions about their experiences. Some asylum officers may be sensitive to these difficulties, and some may not. For example, during one observed CFI, the asylum officer asked a nonverbal baby about their asylum claim, expecting answers, and did not let the parent testify on the baby's behalf.

### Joint Processing Centers

CBP officers at the facilities that the research team visited expressed interest in and support for more Joint Processing Centers (JPCs). These centers are a new concept and allow all component agencies involved in the expedited removal process (including CBP, ICE, and USCIS) to operate under one roof. CBP HQ confirmed that construction of the first JPC in Laredo, TX, started in 2024, and Congress set aside $200 million to build two JPCs along the border in FY 2022.[50] CBP officers explained that JPCs would make it easier for them to coordinate with USCIS (to schedule CFIs and handle issues during and after the interview) and ICE (to handle deportation, ATD aspects of the FERM program, and release of detainees), making the expedited removal process more efficient. These JPCs are also designed to provide healthcare, childcare, legal support, adjudication of cases, and border security. DHS HQ did not provide the research team with much detail on how JPCs would be managed, but if they incorporate better conditions for multi-day stays and better coordination throughout the process, they could improve circumstances both for DHS and for asylum seekers in expedited removal.

[50] Consolidated Appropriations Act, 2022, H.R. 2471 P.L. 117–103 117th Cong. (March 15, 2022). https://www.congress.gov/117/plaws/publ103/PLAW-117publ103.pdf.

# ANALYSIS OF USCIRF'S 2016 RECOMMENDATIONS

This section analyzes the recommendations made in USCIRF's 2016 expedited removal report.[51] It lists the 2016 recommendations, organized by agency, and provides an assessment of whether they have been implemented and, if not, whether they remain relevant.

## TO THE SECRETARY OF HOMELAND SECURITY

In 2016, USCIRF made three recommendations to the Secretary of Homeland Security:

1. Appoint a high-ranking official with authority to make reforms and oversee implementation to ensure protection of asylum seekers going through the expedited removal process. ***Finding: Not Implemented.***
2. Request that the DHS Office of Inspector General (OIG) audit the expedited removal process for compliance with laws and policies regarding the protection of asylum seekers. ***Finding: Partially Implemented.*** There have been several DHS OIG audits of specific operations along the U.S. southern border that incorporate evaluation of the treatment of asylum seekers in expedited removal.[52] But there have been no broad audits of the expedited removal process, and DHS HQ confirmed that it has not made a specific request to OIG for this type of audit.
3. Reiterate to all agencies and officers implementing expedited removal that their law enforcement mandate includes fully implementing U.S. laws and regulations governing the protection of individuals seeking refuge from return to persecution or torture. ***Finding: Fully Implemented*** and is part of training for all component agencies.

## TO CBP

The 2016 report made five recommendations to CBP, ***none of which were implemented:***

1. Videorecord all expedited removal processing interviews and require supervisory and headquarters review of the recordings of a sampling of interviews for quality assurance purposes. ***Finding: Not Implemented.*** CBP HQ confirmed that it does not videorecord all expedited removal processing because it is not operationally feasible, but it noted that portions of the process may be captured via CCTVs in CBP facilities and body cameras worn by Border Patrol officers. CBP did not comment on whether any of this video is reviewed in the manner recommended in 2016.
2. Retrain officers and agents on their role in the expedited removal process, procedures for screening noncitizens, and special needs of asylum seekers and other vulnerable populations. ***Finding: Not Implemented.*** CBP provides officers in the field with policy guidance and memorandums when there are changes in the process but does not retrain them.
3. Establish a dedicated corps of specially trained, nonuniformed officers, including female interviewers, to interview women and children to identify fear claims. ***Finding: Not Implemented.*** CBP HQ confirmed that it did not establish a dedicated corps of this sort.
4. Track the results of interviews conducted by virtual processing against those conducted in person to determine if the two methods are producing materially different outcomes. ***Finding: Not Implemented.*** CBP HQ confirmed that the fourth recommendation was not implemented and that it does not track the results of virtual vs. in-person processing interviews.
5. Develop a document that briefly and clearly explains the expedited removal process, its consequences, the right to

---

51 U.S. Commission on International Religious Freedom (USCIRF). 2016. *Barriers to Protection: The Treatment of Asylum Seekers in Expedited Removal.* Washington, DC: USCIRF. https://www.uscirf.gov/sites/default/files/Barriers%20To%20Protection.pdf.

52 *See, e.g.,* OIG. September 25, 2023. *CBP Needs to Improve Its Video and Audio Coverage at Land Ports of Entry.* Report OIG-23-54. Washington, DC: OIG. https://www.oig.dhs.gov/sites/default/files/assets/2023-09/OIG-23-54-Sep23.pdf; OIG. 2023. *Results of Unannounced Inspections of CBP Holding Facilities in the San Diego Area.* OIG-24-07. Washington, DC: OIG. https://www.oig.dhs.gov/sites/default/files/assets/2023-11/OIG-24-07-Nov23.pdf; OIG. January 25, 2021. *Prompt Asylum Claim Review: DHS Has Not Effectively Implemented the Prompt Asylum Pilot Programs.* OIG-21-16. Washington, DC: OIG. https://www.oig.dhs.gov/taxonomy/term/2622; OIG. 2020. *CBP Has Taken Steps to Limit Processing of Undocumented Aliens at Ports of Entry.* OIG-21-02. Washington, DC: OIG. https://www.oig.dhs.gov/sites/default/files/assets/2020-10/OIG-21-02-Oct20.pdf; and OIG. 2020. *CBP Separated More Asylum-Seeking Families at Ports of Entry than Reported and for Reasons Other than Those Outlined in Public Statements.* OIG-20-35. Washington, DC: OIG. https://www.oig.dhs.gov/sites/default/files/assets/2020-06/OIG-20-35-May20.pdf.

seek protection for those who fear return, and the right to request a private interview, and provide this document to all individuals, in a language they understand, as soon as possible when they come into CBP custody. ***Finding: Not Implemented.*** Such a document was not developed. The 2016 report recommended the creation of this document to incorporate information present in I-867 forms to provide noncitizens with an overview of the expedited removal process. This was originally recommended to ensure that bona fide asylum seekers were not summarily removed because they did not understand the information provided by CBP officers from this form during initial screenings, or because the officer did not provide it. Now that I-867 forms are no longer being used during initial screenings under the STB policy, this recommendation is even more relevant.

## TO USCIS

In the 2016 report, USCIRF made four recommendations to USCIS:

1. Track whether CFI referrals are coming from CBP or ICE to better understand when in the process most fear claims are being raised. ***Finding: Not Implemented.*** USCIS confirmed that it does not track when in the process most fear claims are being raised.

2. Reaffirm in the asylum officers' lesson plan that the credible fear standard is a screening standard that requires showing a ***significant possibility*** of eligibility for asylum, not a full assessment of the merits of the case. ***Finding: No Longer Relevant*** as the Biden administration changed the standards applied during credible fear interviews.

3. Continue to track the results of CFIs conducted telephonically and those conducted in person to determine if the two methods are producing materially different outcomes. ***Finding: No Longer Relevant.*** Nearly all CFIs are now performed telephonically, aside from those done under the FERM program. USCIS HQ also indicated that when it tracked and compared the results of telephonic and in-person CFIs, there were no significant differences in outcomes. However, the researchers did not receive or analyze this data.

4. Allow asylum officers to convert and adjudicate appropriate expedited removal cases in which credible fear is found as affirmative asylum cases (decided by an asylum officer instead of an IJ). ***Finding: Partially Implemented.*** Through the FERM program, in some cities, asylum officers are conducting asylum merits interviews to adjudicate cases with positive CFI determinations. However, this is being done in a limited fashion and does not apply to anyone outside the FERM program.

## TO ICE

In the 2016 report, USCIRF made six recommendations to ICE:

1. Require an individualized reassessment of the need for custody for all detainees with a positive credible fear finding and apply a presumption of bond for detainees with credible fear who do not fall under the 2009 parole directive. ***Finding: No Longer Relevant*** because noncitizens who receive positive CFI determinations do not have access to bond hearings under DHS policy at the time of the research.

2. Ensure that programs that detain nationals of particular countries separately do not have the effect of preventing them from learning about the right to seek asylum. ***Finding: No Longer Relevant.*** ICE HQ confirmed that they are not detaining nationals of particular countries separately.

3. Increase the use of Alternatives to Detention, such as monitored release, for asylum seekers, beyond bond and parole opportunities. ***Finding: Partially Implemented.*** The recommendation was implemented for families in the FERM program but not for other noncitizens in expedited removal.

4. If families are placed in expedited removal and detained, detain them only in facilities that meet the standards of the Flores Agreement and individually reassess the need for custody after credible fear is found, with a presumption of release. ***Finding: Partially Implemented.*** ICE HQ confirmed that it stopped holding families in ICE detention centers by FY 2022 and only holds single adults there as of the time of the research. Families are also being released from detention through the FERM program. However, some families are still being held in CBP facilities under the STB policy while they wait to undergo their CFI. It is unclear how long and under what conditions they are being held and whether their detention complies with the Flores Agreement.[53]

5. Detain all adult asylum seekers who must be detained, whether before or after a credible fear determination, in civil facilities only. ***Finding: Unclear.*** From a review of the eight ICE facilities that held asylum seekers in expedited removal at the time of the research, most seem to be civil facilities. However, at least two, the Torrance County Detention Facility in New Mexico and IAH Polk, hold other prisoners charged with crimes, in addition to ICE detainees.[54] ICE HQ also

[53] Santamaria, Kelsey Y. 2021. "Child Migrants at the Border: The *Flores* Settlement Agreement and Other Legal Developments." Congressional Research Service. https://crsreports.congress.gov/product/pdf/IF/IF11799.

[54] TRAC Immigration. "Detention Facilities Average Daily Population." https://tracreports.org/immigration/detentionstats/facilities.html.

did not confirm whether penal facilities held asylum seekers in the past, and it is unclear whether this will be done in the future.

6. Expand the KYR presentations that provide detainees with basic legal information to all facilities that house asylum seekers. ***Finding: Unclear.*** ICE HQ confirmed that the location of KYR presentations is dependent on capacity and EOIR and other local funding and can change at any time.

## TO EOIR

In the 2016 report, USCIRF made two recommendations to EOIR:

1. Retrain IJs that the interview record created by CBP is not a verbatim transcript of the interview and does not document the individual's entire asylum claim in detail and should be weighed accordingly. ***Finding: Unclear.*** The research team asked EOIR about the implementation of these recommendations and did not receive any response. They were also unable to confirm the information independently. Training materials for IJs are not publicly available.

2. Expand the LOP available in some facilities to all detention facilities housing asylum seekers and provide it to detainees before their CFIs. ***Finding: Partially Implemented.*** As of fall 2024, the LOP was available in all ICE detention centers that house asylum seekers in expedited removal, except for the Torrance County Detention Facility.[55] However, LOP services vary between ICE detention centers and are not available to all detainees before their CFIs. The LOP also has not been expanded overall. Historically, EOIR has managed the LOP through contracts with nonprofit organizations. Until 2022, EOIR's contracting partner was the Vera Institute of Justice. According to the Vera Institute of Justice's website,[56] the program was operational in 40 facilities. As of 2024, the LOP is managed by another organization, Acacia Center for Justice. According to Acacia's website, LOP services are available in 35 ICE facilities.[57]

## TO CONGRESS

In the 2016 report, USCIRF made four recommendations to Congress:

1. Authorize and fund another independent, comprehensive study of the treatment of asylum seekers in expedited removal at all stages of the process. ***Finding: Not Implemented.***

2. Request the Government Accountability Office (GAO) to conduct a study to assess whether noncitizens removed to their home countries under expedited removal have faced persecution or torture after their return. ***Finding: Not Implemented.***

3. Increase funding for the adjudicatory aspects of expedited removal to enable USCIS and EOIR to address backlogs, conduct timely adjudications, and provide due process. ***Finding: Partially Implemented.*** EOIR and USCIS received more funding since 2016, and some of it was specific to addressing the backlogs, increasing legal representation, and adding staff.[58] Despite these efforts and modest increases in budgets, the immigration court backlog has continued to grow tenfold and USCIS still struggles with an overwhelming number of asylum and credible and reasonable fear cases.[59]

4. Increase funding to EOIR to expand the LOP to all facilities housing asylum seekers and to enable it to be provided to detained asylum seekers before their CFIs. ***Finding: Unclear.*** Although recent EOIR congressional budgets included efforts to increase access to LOP resources, these efforts are grouped with Legal Access initiatives in the most recent budget, which was allotted a small portion of the budget and included multiple programs.[60]

---

55 Acacia Center for Justice. "Legal Orientation Program (LOP)." https://acaciajustice.org/what-we-do/legal-orientation-program-lop/ (Accessed on Sept. 23, 2024).

56 Vera Institute of Justice. "Legal Orientation Program." https://www.vera.org/projects/legal-orientation-program/legal-orientation-program-lop-facilities (accessed on September 23, 2024).

57 Acacia Center for Justice. "Legal Orientation Program (LOP)." https://acaciajustice.org/what-we-do/legal-orientation-program-lop/. (Accessed on Sept. 23, 2024).

58 EOIR. 2016. "Executive Office for Immigration Review (EOIR) FY 2017 Budget Request at a Glance." https://www.justice.gov/jmd/file/821961/download. EOIR. 2023. "Executive Office for Immigration Review (EOIR) FY 2024 Budget Request at a Glance." DHS. 2023. "United States Citizenship and Immigration Services Budget Overview Fiscal Year 2023." https://www.dhs.gov/sites/default/files/2022-03/U.S.%20Citizenship%20and%20Immigration%20Services_Remediated.pdf. USCIS. 2022. "USCIS Announces New Actions to Reduce Backlogs, Expand Premium Processing, and Provide Relief to Work Permit Holders." https://www.uscis.gov/newsroom/news-releases/uscis-announces-new-actions-to-reduce-backlogs-expand-premium-processing-and-provide-relief-to-work. USCIS. 2024. "Completing an Unprecedented 10 Million Immigration Cases in Fiscal Year 2023, USCIS Reduced Its Backlog for the First Time in Over a Decade." https://www.uscis.gov/EOY2023.

59 TRAC (Transactional Records Access Clearinghouse) Immigration. December 18, 2023. "Immigration Court Backlog Tops 3 Million; Each Judge Assigned 4,500 Cases." https://tracreports.org/reports/734/ (the immigration court backlog also increased drastically from approximately 516,000 cases in 2016 to over three million cases at the start of 2024). DHS and USCIS. 2023. "Asylum Application Processing Fiscal Year 2022." https://www.dhs.gov/sites/default/files/2023-08/23_0717_uscis_asylum_application_processing.pdf. (The amount of affirmative asylum and credible and reasonable fear cases that USCIS asylum officers had to tackle increased by 166 percent between 2021 and 2022, a huge jump compared to previous years.)

60 DOJ. 2022. *United States Department of Justice Executive Office for Immigration Review FY 2023 Performance Budget Congressional Budget Submission*. Washington, DC: DOJ. 2021. *United States Department of Justice Executive Office for Immigration Review FY 2022 Congressional Budget Submission*. Washington, DC: DOJ. https://www.justice.gov/jmd/page/file/1398381/download; and DOJ. 2020. *United States Department of Justice Executive Office for Immigration Review FY 2021 Congressional Budget Submission*. Washington, DC: DOJ. https://www.justice.gov/doj/page/file/1246381/download.

# UPDATED POLICY RECOMMENDATIONS

Considering recent policy changes, the research findings, and the analysis of the 2016 recommendations, updated policy recommendations are necessary to address new and evolving concerns and circumstances. Below are reiterated and updated policy recommendations from the 2016 report and new ones that reflect the expedited removal process as implemented during the research period.

## TO THE SECRETARY OF HOMELAND SECURITY

### Reiterated and Updated 2016 Recommendations:

- Appoint a high-ranking official with authority to make reforms and oversee implementation to ensure protection of asylum seekers going through the expedited removal process.
- Request that the DHS OIG audit the expedited removal process and all relevant recent policy changes for compliance with laws and policies regarding the protection of asylum seekers and their due process rights.

### New Recommendation:

- Expand the use of JPCs to improve coordination among the component agencies involved in expedited removal, enhance the efficiency of the process, and provide better conditions for multi-day detention and access to legal support.

## TO CBP

### Reiterated and Updated 2016 Recommendations:

- Develop a document that provides information that was previously read to noncitizens from the I-867 forms during the screening process. The document should explain the expedited removal process, its consequences, the right to seek protection for those who fear return, and the right to request a private interview. It should be provided to all individuals, in a language they understand, as soon as possible when they come into CBP custody.
- Videorecord all expedited removal screening and intake procedures (conducted by CBP OFO and Border Patrol) and require supervisory and headquarters review (overseen by the high-ranking official referenced above) of a sampling of recordings of these procedures for quality assurance purposes.
- Provide CBP officers with regular training to understand new and updated policies, their role in the expedited removal process, procedures for screening noncitizens, and the special needs of asylum seekers and other vulnerable populations.
- Establish a dedicated corps of specially trained, nonuniformed officers, including female interviewers, to interview women and children to identify fear claims.
- If families are placed in expedited removal and detained, detain them only in facilities that meet the standards of the Flores Agreement (which governs the duration and conditions of family detention) and individually reassess the need for custody after credible fear is found, with a presumption of release. (This recommendation was made to ICE in 2016 but is now more appropriate for CBP because ICE HQ confirmed it stopped detaining families in its facilities in 2022.)

### New Recommendations:

- Display prominent signage and informational videos on manifestation of fear requirements under the new "shout test" in CBP facilities and train CBP officers on how to identify manifestation of fear.
- Make conditions in CBP facilities more hospitable for overnight stays and access to counsel, including by allowing detainees to meet with legal representatives (in person or via tele- or videoconferencing), making available KYR presentations, and creating a central email and phone number that lawyers can use to reach their clients.

## TO USCIS

### Reiterated and Updated 2016 Recommendations:

- Track whether CFI referrals are coming from CBP or ICE to better understand when in the process most fear claims are being raised.
- Allow asylum officers to convert and adjudicate appropriate expedited removal cases, in which credible fear is found, as affirmative asylum cases through asylum merits interviews instead of having them adjudicated by an IJ. (As of the research period, this is only done for some cases in the FERM program.)

### New Recommendations:

- Video and/or audiorecord CFIs so that there is an accurate record and transcript of the interview for IJ reviews and hearings in case any details need to be further evaluated.
- Conduct CFIs with noncitizens in CBP and ICE custody via video conferencing instead of voice calls to allow the asylum officer to observe the noncitizen's body language, physical features, and emotional reactions and make the noncitizen more comfortable to express necessary details about their case.
- If there is a notice of appearance (Form G-28) on file for a noncitizen, provide the legal representative with timely notice of the date, time, and location (in person or virtual) of the CFI. If a noncitizen indicates they have or want a legal representative during a CFI, provide a continuance and reschedule the interview to make sure the representative can prepare for and attend it.

## TO ICE

### Reiterated and Updated 2016 Recommendations:

- Require an individualized reassessment of the need for custody for all detainees with a positive CFI determination.
- Increase the use of Alternatives to Detention, such as monitored release, for asylum seekers (aside from those in the FERM program) beyond parole opportunities.
- Detain all adult asylum seekers who must be detained, whether before or after a credible fear determination, in civil facilities only.
- Expand the KYR presentations that provide detainees with basic legal information to all facilities that house asylum seekers.

## TO EOIR

### Reiterated and Updated 2016 Recommendations:

- Retrain IJs that the record created by CBP during screenings and CFI transcripts (consisting of notes written by asylum officers during CFIs) are not verbatim transcripts, do not document the noncitizen's entire asylum claim in detail, and should be weighed accordingly.
- Expand LOP resources at all CBP and ICE facilities housing asylum seekers and provide these resources to detainees before their CFIs and IJ reviews.

### New Recommendation:

- If there is a notice of appearance (Form EOIR-28) on file for a noncitizen, provide the legal representative with timely notice of the date, time, and location (in person or virtual) of the IJ review. If a noncitizen indicates they have or want a legal representative during an IJ review, provide a continuance and reschedule the IJ review to make sure their representative can prepare for and attend it.

## TO CONGRESS

### Reiterated and Updated 2016 Recommendations:

- Authorize and fund another independent, comprehensive study of the treatment of asylum seekers in expedited removal at all stages of the process.
- Request the GAO to conduct a study to assess whether noncitizens removed to their home countries under expedited removal faced persecution or torture after their return.
- Increase funding for the adjudicatory aspects of expedited removal to enable USCIS and EOIR to address backlogs, conduct timely adjudications, and provide due process.
- Increase funding to EOIR to expand the LOP to all CBP and ICE facilities housing asylum seekers and enable it to be provided to detained asylum seekers before their CFIs.

### New Recommendation:

- Appropriate resources and direct DHS and EOIR to develop and activate a "reserve corps" of officers and IJs to provide surge capacity to support expedited removal proceedings when there are significant increases in arrivals at or between POEs.

# GLOSSARY OF ACRONYMS

## GOVERNMENT AGENCIES

**USCIRF:** U.S. Commission on International Religious Freedom

**DHS:** Department of Homeland Security

**CBP:** Customs and Border Protection

**OFO:** CBP Office of Field Operations

**ICE:** Immigration and Customs Enforcement

**ERO:** ICE Enforcement and Removal Operations

**USCIS:** U.S. Citizenship and Immigration Services

**OCC:** DHS Office of Chief Counsel

**OIG:** DHS Office of Inspector General

**GAO:** Government Accountability Office

**DOJ:** Department of Justice

**EOIR:** Executive Office for Immigration Review

**BIA:** Board of Immigration Appeals

## LEGAL AND PRACTICAL TERMS

**CFI:** Credible Fear Interview

**RFI:** Reasonable Fear Interview

**IJ:** Immigration Judge

**IRFA:** International Religious Freedom Act

**NTA:** Notice to Appear

**CAT:** Convention Against Torture

**LOP:** Legal Orientation Program

**KYR:** Know Your Rights

**ATD:** Alternatives to Detention

**POE:** Port of Entry

## POLICY ACRONYMS

**CLP:** Circumvention of Lawful Pathways Rule

**EER:** Enhanced Expedited Removal

**FERM:** Family Expedited Removal Management Program

**STB:** Securing the Border Policy

# ABOUT THE AUTHORS

This research was conducted by HIAS. The report was made possible by the contributions of several authors, contributors, technical advisors, and reviewers. **Melissa Katsoris** authored the report and directed phase two (primary research component) of this project. She also conducted secondary and primary research by providing legal and policy analysis, collecting data, and leading outreach, interviews, site visits, observations, information gathering, and consultations. **Vanessa Dojaquez-Torres** and **Yael Schacher** contributed to this report by conducting and facilitating outreach, interviews, site visits, observations, and real-time analysis of the evolving laws and policies governing expedited removal (which were changing as this project was underway). **Bonnie Ip** guided the conceptualization of the survey and interview structure, conducted qualitative analysis to derive findings from the research team's interviews and survey, and analyzed publicly available data for this report.

**Mark Hetfield** provided technical guidance throughout the project to develop an overall research plan, facilitate outreach, and provide his expertise and in-depth review based on his experience directing and authoring USCIRF's 2005 expedited removal study. **Andy Schoenholtz** provided research guidance and legal expertise and conducted an in-depth review of the report to ensure quality and accuracy of the legal analysis and research. **Rachel Levitan** reviewed the report and provided practical support to the authors and contributors throughout the project.

**Guillermo Cantor** led the conceptualization and development of the research plan, directed the first phase of this project (secondary research) and coauthored the interim report, which provided the conceptual foundation for this report. **Ingrid Eagly** provided technical guidance and review during the first phase of the project.

The authors and contributors would like to thank all the legal representatives, shelters, service providers, policy experts, congressional staff, and current and former government officials who participated in this research and provided their knowledge, interviews, and survey responses. They would like to thank the government officials from the Department of Homeland Security who facilitated site visits, observations, consultations, and information sharing. This was crucial to the research team's understanding of the expedited removal process and the development of primary research findings and policy recommendations.

## PROFESSIONAL STAFF

| | |
|---|---|
| SENIOR STRATEGIC ADVISOR | Elizabeth K. Cassidy |
| DIRECTOR OF RESEARCH AND POLICY | Guillermo Cantor |
| DEPUTY DIRECTOR OF RESEARCH AND POLICY | Kurt Werthmuller |
| SUPERVISORY POLICY ADVISOR | Mingzhi Chen |
| CHIEF ADMINISTRATIVE OFFICER | Thomas Kraemer |
| SUPERVISORY POLICY ANALYST | Scott Weiner |
| CHIEF OF PUBLIC AFFAIRS | Nathan Wineinger |
| POLICY ANALYST | Michael Ardovino |
| SENIOR POLICY ANALYST | Susan Bishai |
| POLICY ANALYST | Mollie Blum |
| SENIOR POLICY ANALYST | Sema Hasan |
| PUBLIC AFFAIRS SPECIALIST | Veronica McCarthy |
| POLICY ANALYST | Hilary Miller |
| OPERATIONS SPECIALIST | Nora Morton |
| POLICY ANALYST | Dylan Schexnaydre |
| POLICY ANALYST | Katie Todd |
| POLICY ANALYST | Jean Wu |

# EXHIBIT 7

# AMERICAN EXILE

## Rapid Deportations That Bypass the Courtroom



December 2014

ACLU
AMERICAN CIVIL LIBERTIES UNION

# AMERICAN EXILE

## Rapid Deportations That Bypass the Courtroom

© 2014 ACLU Foundation

ACLU
AMERICAN CIVIL LIBERTIES UNION

American Civil Liberties Union
125 Broad Street
New York, NY 10004
www.aclu.org



Cover, interior, and back photographs: Sam Frost

*Cover and interior images:* Tijuana, Mexico, March 2014. Men standing on the beach look across the border to California as U.S. Border Patrol officers arrest two migrants.
*Back cover image:* The U.S. fence separating California and Mexico, expanded and fortified in 2011 and jutting 30 feet into the Pacific Ocean.

# CONTENTS


Executive Summary ... 2
Key Recommendations ... 8
Methodology ... 9
**I.** Summary Deportation Procedures: An Introduction ... 10
- **A.** Expedited Removal ... 15
- **B.** Reinstatement of Removal ... 19
- **C.** Administrative Voluntary Departure/Voluntary Return ... 23
- **D.** Administrative Removal Under INA § 283b ... 26
- **E.** Stipulated Orders of Removal ... 29

**II.** Who Is Getting Deported Without a Hearing? ... 31
- **A.** Asylum Seekers Returned to Danger ... 32
  - **1.** Expedited Removal and the Impediments for Asylum Seekers ... 33
  - **2.** Language and Information Barriers ... 34
  - **3.** Failure to Refer Asylum Seekers to an Asylum Officer ... 37
  - **4.** Asylum Seekers with Prior Removal Orders ... 40
- **B.** People Lawfully in the United States Who Are Deported Without a Hearing ... 44
  - **1.** U.S. Citizens Deported Through Summary Procedures ... 44
    - a. U.S. Citizens with Mental Disabilities ... 48
    - b. U.S. Residents with Valid Status ... 50
  - **2.** Expedited Removal of Tourists and Business Visitors ... 54
- **C.** Longtime Residents Removed Without a Hearing ... 59
  - **1.** Deportations at the Border ... 60
  - **2.** Apprehended and Deported in the Interior of the United States ... 63
    - a. Voluntary Return ... 63
    - b. Administrative Removal Under 238b ... 66
- **D.** Children Arriving Alone ... 69
  - **1.** Legal Background ... 69
  - **2.** Accessing the Protections of the System ... 71
  - **3.** Mexican Children and the TVPRA ... 73
  - **4.** The TVPRA in Practice ... 73

**III.** After Deportation: The Aftermath of an Unfair Removal ... 80
- **A.** Erroneous Deportations and the Lack of Oversight ... 80
- **B.** Reinstatement of Removal ... 83
- **C.** Prosecution for Returning ... 87
- **D.** American Families Living in the Shadows ... 94

**IV.** International Law and Restrictions on Summary Removals ... 97
- **A.** Access to Justice and the Right to a Fair Hearing ... 97
- **B.** The Right to Apply for Asylum and Right to Protection from Persecution ... 99
- **C.** Special Protections for Children ... 100
- **D.** Limitations on Detention ... 102
- **E.** The Right to Family Unity ... 102

Recommendations ... 104
Glossary of Terms ... 118
Acknowledgements ... 122
Endnotes ... 123

# II. WHO IS GETTING DEPORTED WITHOUT A HEARING?

Or rather, who isn't? The overwhelming majority—83 percent—of people deported from the United States today never saw a judge, did not get a hearing, and never had the chance to be heard. But that does not mean that 83 percent of the people deported had no rights to enter and remain in the United States; rather, the summary removal infrastructure rapidly and reflexively deported hundreds of thousands of people, including people who are eligible for relief from deportation or who were already in or entering the United States lawfully.

In the 136 cases documented by the ACLU through interviews and case file review, the majority were *not* simply economic migrants coming to the United States for the first time with no connection to the country. Those deported (sometimes repeatedly) without a hearing include longtime residents of the United States with U.S. citizen children, asylum seekers escaping—and being returned to—violence, and people who were lawfully in the United States on visas or working with valid authorization. U.S. citizens have been deported when misidentified as undocumented individuals and quickly removed without the opportunity to get assistance and prove their citizenship. Families are torn apart when parents or their children are coerced into signing a deportation order despite having claims to be in the United States or when they are automatically expelled at the border after a short trip abroad. Asylum seekers, fleeing immediate persecution and often unable to procure travel documents (not that they would necessarily help them), arrive at the U.S. border seeking sanctuary but instead find a detention cell, an expedited removal order, and deportation back to danger.

Several individuals interviewed by the ACLU, including but not limited to asylum seekers, were attacked, kidnapped, raped, or robbed after their deportation from the United States. Many were returned to countries they had not seen in years or decades, separated from young U.S. citizen children or other relatives they were supporting in the United States, and deported without the chance to say goodbye, without money or the opportunity to plan their next steps, and now face years of separation from loved ones. Young children arriving alone and fleeing violence or trafficking have been quickly removed without any inquiry into their situation or concern for what will happen to them. And these are only the stories of people who survived deportation to share their ordeal or eventually returned to the United States and found help.

Immigration law is notoriously complex, and a system that requires immigration enforcement officers to make complicated legal determinations about an individual's rights within minutes or hours and without legal training will inevitably allow the deportation of people with rights to enter and remain in the United States. Indeed, we know that it already has, and that U.S. citizens have been deported through these summary processes. Not every case is complicated, however; and in some cases, people are unjustly deported not because of a misunderstanding about the law but due to coercion, intimidation, and misinformation from immigration officers whose focus on accelerating and multiplying deportations comes at the expense of basic fairness and people's lives.

# A. ASYLUM SEEKERS RETURNED TO DANGER

> "I think it ennobles us as a country, and it also speaks volumes to the rest of the world, when we open our country up to help those in the worst of circumstances. … [O]ur Nation has a long and noble tradition of being a country of refuge. We are the world's leader in the protection of refugees and asylum seekers, and I am pleased that we are and I want us to continue to be that."
> —Former Senator Samuel Brownback[178]

The United States has a long tradition of providing protection to individuals fleeing persecution and violence. Even contemporary critics of the U.S. asylum system accept this narrative as a valuable American tradition to be preserved.[179] Under human rights law, every person has the right to seek asylum from persecution.[180] Moreover, international law recognizes the obligation of receiving countries not to return an asylum seeker to a place where they are likely to be persecuted or tortured. The United States ratified both the Convention Against Torture and the Convention Relating to the Status of Refugees ("Refugee Convention") and adopted them into domestic law, so that both federal and international human rights law prohibit the expulsion of asylum seekers to places where they face persecution.[181] The Refugee Convention further provides that a non-citizen should not be penalized for attempting to enter, without authorization, in order to seek protection,[182] and when expedited removal was introduced, in recognition of the U.S. obligation to protect asylum seekers, the statute included a carve-out for asylum seekers who would be referred to an asylum officer to be interviewed instead of deported if they claimed fear.

Of the 136 cases in this report (which include 11 unaccompanied children), 89 of the individuals interviewed by the ACLU received a summary removal order (expedited removal or reinstatement or voluntary return in the case of unaccompanied minors) within the broad U.S. border zone (i.e., at a port of entry or within 100 miles of the U.S. border).[183] Of those individuals, 49 (55 percent) said they were never asked about their fear

New York, NY. The Statue of Liberty has traditionally been a symbol of hope and freedom for individuals fleeing persecution and seeking sanctuary in the United States. Today, many asylum seekers are returned to danger before they have had the opportunity to ask for protection.



## Fifty-five percent said they were not asked about fear or persecution of torture. Forty percent who were asked and said they were afraid were ordered deported without seeing an asylum officer.

of persecution, or that they were not asked anything in a language they understood.

Only 25 (or 28 percent) said they were asked about fear of returning to their country of origin by a border officer or agent, and 10 of those individuals (40 percent) said they told the officer they were afraid of returning to their country but were nevertheless not referred to an asylum officer. Of the 25 individuals who said they were asked about fear, four said they had not been asked on other attempts to come to the United States.

Only one of the 11 unaccompanied children (all Mexican) interviewed by the ACLU was asked about fear of returning to his country of origin, and all were quickly returned to Mexico.

The remaining 15 individuals (17 percent of the 89 individuals) did not recall specifically being asked or not asked; in the majority of these cases, their primary reason for coming to the United States was not to seek protection but because of family ties, claims to U.S. citizenship, to visit friends or work on valid visas, or in search of economic opportunities. Two individuals said they did tell border officials, of their own initiative, of their fear of returning to their countries. One was referred to an asylum officer; the other was not.

There is no formal mechanism for an individual unjustly denied a credible fear interview (CFI) and deported to get review and a second chance. Rather, often they must put themselves in danger and at risk of prosecution and imprisonment by seeking to reenter the United States. This danger is more than theoretical. While some of the individuals interviewed by the ACLU did eventually return and win withholding of removal or CAT (mandatory relief that is more limited than asylum), often they first had to experience additional violence in their home country, followed by detention and, in some circumstances, prosecution when they returned to the United States.

### 1. Expedited Removal and the Impediments for Asylum Seekers

Expedited removal requires that DHS officers refer a non-citizen who claims to be afraid of persecution in his or her country of origin for an interview by an asylum officer.[184] To ensure that individuals are aware of their right to seek asylum, federal regulations require that interviewing officers read the following script, in full, at the outset of the interview, and state that interpreters shall be used if necessary[185]:

> Except as I will explain to you, you are not entitled to a hearing or review. U.S. law provides protection to certain persons who face persecution, harm or torture upon return to their home country. If you fear or have a concern about being removed from the United States or about being sent home, you should tell me so during this interview because you may not have another chance. You will have the opportunity to speak privately and confidentially to another officer about your fear or concern. That officer will determine if you should remain in the United States and not be removed because of that fear.[186]

This rights recital, significantly, says nothing about the *source* of the fear—i.e., whether it comes from a governmental or non-governmental actor—nor does it ask DHS officers to screen for specific facts that would trigger an asylum claim. What triggers a referral is intentionally broad and was intended to ensure that asylum seekers could claim and explain their fear to a trained asylum officer with specialized knowledge of asylum law.[187]

# Yazan S., a 19-year-old from Syria with a congenital heart defect, tried to request asylum but was deported at the airport instead.

It is essential that this language is read to all arriving immigrants because most asylum seekers arriving in the United States are unlikely to have a sophisticated or even rudimentary understanding of U.S. asylum law and procedures, and may not even know they exist. As attorney Kaveena Singh observes, "A lot of our clients don't know they are eligible for asylum when they arrive; they are just trying to escape danger. Some—probably the most deserving—are so traumatized they are reluctant to share their stories, even with us. They aren't getting an orientation at the border about their rights."[188]

Asylum seekers are dependent upon the border officials who arrest, detain, and interrogate them to also explain their rights and refer them to an asylum officer. In many cases documented by the ACLU and others, border officers are not providing necessary information in the language spoken by the asylum seeker—if at all—and sometimes fail to refer individuals for a CFI even when those individuals are able to articulate a fear of returning to danger.[189] For asylum seekers who may be traumatized from the harm they fled, their dangerous journey, and finally, arrival into a detention center, claiming and adequately communicating that fear of being removed may be extremely challenging. But it is not only reticence or post-traumatic stress that prevents individuals who risked their lives to seek protection from asking for asylum: systemic failures and, in some instances, abuse and coercion by the screening border officer prevent some asylum seekers from ever requesting assistance when they reach the United States.

## 2. Language and Information Barriers

Most of the individuals interviewed by the ACLU stated that they were given forms to sign in English, which most did not speak or read, and often were not interviewed by an immigration officer who fluently spoke their language or through an interpreter. The asylum protections in place can be activated only when a person is informed of those rights, and the consequences if they waive them, in a language they understand. Because many officers may not speak languages other than English fluently, there is a fundamental breakdown in their ability to communicate with individuals about their rights and ask the critical questions about fear of returning.

Yazan S., a 19-year-old Syrian with a congenital heart defect and attention deficit hyperactivity disorder, speaks Arabic and very little English. He came to the United States alone in October 2013 after shelling devastated his neighborhood in Damascus. Shortly after the conflict started, his family says, Yazan—who is Christian—was stabbed on the street by Islamic extremists, severing his pacemaker; he came to the United States to seek both medical care and protection from the violence. En route to his uncle in California, Yazan transferred through Detroit, where CBP officers interrogated him for hours and detained him at a local police department overnight. Although Yazan's uncle Manaf hired a lawyer, DHS officials refused to let either the attorney or Manaf speak with Yazan. A CBP officer did call Manaf to confirm Yazan's identity: "I repeatedly asked to speak to my nephew. Finally the agent just hung up on me. I called back [and] I told them, this guy has been through a lot of trauma. . . . The officer said to me, 'You guys come here and take advantage of our system.'" Yazan told his uncle that six officers were standing around him, telling him to sign a form and that they would not provide him with an interpreter or the chance to call his uncle until he signed. In his limited English, Yazan tried to tell officers that he was afraid to return to Syria but was nevertheless deported through expedited removal.[190]

Hilda, a 35-year-old from Honduras, fled death threats from gangs and domestic violence perpetrated by her husband. In 2013, after a severe beating, Hilda miscarried the twins she was pregnant with and fled to the United States, still bleeding daily. "We never want to return," says



Spencer Platt/Getty

A woman and her child walk past gang graffiti in a neighborhood with heavy gang violence on July 20, 2012, in Tegucigalpa, Honduras. Honduras now has the highest per capita murder rate in the world and its capital city, Tegucigalpa, is plagued by violence, poverty, homelessness, and sexual assaults.

Hilda. “All you’re going to find in Honduras is death.” She took her two-year-old and 14-year-old children with her, arriving in Texas in November 2013. “I was caught crossing the river,” recalls Hilda:

> It was 8 p.m. at night. They took me and my kids to a cell. . . . They started to ask us to sign a lot of papers. The problem was I didn’t understand anything he was asking me. Since he saw that I didn’t understand, [the officer] would just write and write and just tell me, “Sign.” … He would just put [the form] in front of me and say “Sign, next one, sign.” . . . I was bleeding when I arrived. I was afraid [to ask for help]. Everyone there was afraid. [The officers] don’t let you even talk to them. . . . The fear they instill in you doesn’t let you ask for help. . . . I needed help and it just felt horrible to be rejected like that.[191]

## “All you’re going to find in Honduras is death.”

Hilda and both her children were given expedited removal orders, and Hilda says they were never asked about fear of returning to Honduras.[192]

Ana N. R., a 47-year-old from El Salvador with two U.S. citizen kids, had gone back to El Salvador to see family when a gang burned down her family’s beauty salon and raped an employee. Her children were going to petition for her to join them in the United States, but given the danger, she could not wait. Arriving in McAllen, Texas, in March 2014, Ana said the officers asked about her fear of being returned but said if she claimed fear, she would be detained for a year:

> I said I would prefer one year in jail alive to death. They wanted me to sign papers after I told them about my fear. But I wouldn’t sign. The officer said “Sign or I’m going to sign for you.” They slammed the door in my face because I wouldn’t sign. The papers were in English. I asked what they were for and said I would sign if they were in Spanish. I saw people saying no, they wouldn’t sign, and the officers just signed for them. They called us pigs and said we smelled like fish. There were 10 kids lying on the floor. They would insult us all the time. I thought, maybe this isn’t the U.S. Maybe this is Cuba. After all the years I spent in the U.S., I had such a good impression of it. I was really shocked.[193]

Carlos C. Z., an asylum seeker from El Salvador, was moved from *hielera* (“icebox,” a term commonly used to refer to CBP holding cells) to *hielera* when he first arrived in the United States. He came to the United States fleeing violence from the Mara Salvatrucha gang (“MS-13”), which left him with scarring and deformed fingers. Although he told a Spanish-speaking officer by phone at the first holding facility that he was afraid to go back to El Salvador, Carlos says that another officer who spoke very little Spanish then came into the room and gave him forms to sign. Carlos does

## Hieleras—"Ice Boxes"

In many cases, individuals are afraid to talk to CBP officers because of the conditions in which they are held. An investigation by Americans for Immigrant Justice found that individuals apprehended by CBP were held for up to 13 days in freezing cells with no blankets, little food, no showers, no privacy for using the restroom, and little space.[197] Almost everyone interviewed by the ACLU described inhumane detention conditions while in CBP custody, citing verbal abuse, freezing conditions, inadequate food, lack of adequate medical care, and overcrowding. For some individuals fleeing violence, the experience of being detained and in inhumane conditions is traumatizing, and as a result, some individuals with strong asylum claims nevertheless decide to abandon them and accept deportation rather than remain in detention.

not read or speak English and refused to sign the forms.[194] At that point, as detailed in Carlos's declaration, the officer became angry and "slapped [Carlos] across the face with the forms. At that point, [Carlos] asked to speak to a judge, to which he recalls the officer replied, 'Here, I'm the judge, the attorney, and the one who is going to deport you.' A different officer then wrote on every page of the forms that [Carlos] refused to sign. [Carlos] did not learn what the form stated until another immigrant translated it for him at a different detention facility in Pennsylvania weeks later."[195]

At seven years old, Karen R. L., now a 21-year-old from El Salvador, was coerced into joining the gang that murdered her mother; the gang members, Karen said, "told me I had to finish paying the accounts of my mom."[196] When she tried to leave the gang, she says, she was sexually assaulted by gang members and threatened with death. Arriving in South Texas, Karen recalls, the officers initially gave her forms to sign in English: "I started asking what they were but [the officers] just said, 'Sign here, sign here,' really loudly. When I found out what I was signing, I said, 'But I'm afraid and I can't go back to my country.'"[198] Karen was finally given a CFI, which she passed.

For individuals who do not know about the asylum process, it may not occur to them to raise their fear if they are never asked. Ponchita, a 33-year-old woman from Mexico, said she was not asked and did not mention the domestic violence she was fleeing because "in Mexico we are just used to no one asking about it."[199]

Many asylum seekers interviewed for this report said they were unaware of the existence of asylum; generally, the only individuals who were aware of the right to apply for asylum were persons who, after receiving an expedited removal order from CBP, were taken to an ICE facility to await a plane to take them back to their country of origin. While in detention, they learned for the first time from ICE officers, legal services organizations, and sometimes other detainees about the existence of the asylum process.

Many individuals told the ACLU that the only information CBP officers gave them was that they would be detained a long time—and probably deported anyway—unless they immediately signed a removal order. Moreover, many said the environment in which they were detained suggested that they had no rights.

Few people recalled CBP ever telling them of the existence of asylum, but several were given misinformation by CBP officials. Nydia R., a transgender woman from Mexico, said she told border officials that she had been attacked in Mexico and wanted help, but she was not referred for a CFI; she later successfully entered the United States without being apprehended, applied for and was granted asylum. "I didn't know the immigration agents could have helped me," Nydia said, recalling her previous attempts to enter the United States. "They had known all the reasons I was trying to come back to the U.S. and even knowing them, they sent me back."[200]

Cesar, who had been in the United States for 14 years when he was arrested by CBP, says he was not asked anything about his fear of returning to Mexico: "They didn't ask me anything. They were just mocking me. They asked why would I come into their land. I was trying to explain that there is a lot of violence in Mexico, and I don't want to die. . . . I asked to call my family, my sister or my wife, but they said they only give Central Americans, the elderly and kids that privilege." Cesar was deported to Reynosa, where he

still has some family: "I didn't last long because there were a lot of shootings."[201]

Felipe R., a 32-year-old Mexican, left the United States and his two U.S. citizen children to attend his father's funeral in Michoacán, Mexico, where he was kidnapped and held for ransom. He escaped and was caught by border officers when he attempted to reenter the United States in Laredo, Texas. Although he told the officers what had happened, Felipe said, "Border Patrol said I didn't have the right to claim asylum because the U.S. doesn't give asylum to Mexicans." He has tried multiple times to return to his children but says he has never been asked about fear of returning to Mexico.[202]

## 3. Failure to Refer Asylum Seekers to an Asylum Officer

While the majority of individuals interviewed by the ACLU said they were never asked about their fear of being deported, some did attempt to tell border officials that they were in danger and needed assistance, but they were still not referred to an asylum officer.

The regulation requiring border officers to refer a person to an asylum officer if they fear persecution or torture if returned to their country says nothing about the identity of the perpetrator; however, our interviews and a recently leaked UNHCR report indicate some border officers incorrectly think that violence from non-state actors, such as gangs or a family member, can never be the basis of an asylum claim and refuse to refer these asylum seekers for an interview.[203] In fact, if a government is unable or unwilling to protect an individual who otherwise satisfies the eligibility requirements for asylum, a perpetrator's non-state identity does not foreclose asylum.[204]

Nydia R., a transgender woman who had already been granted asylum in the United States, was issued an expedited removal order when she arrived at the U.S. border after being attacked and raped by a gang; the gang had also tried to cut out her breast implants, and the wounds were fresh when she explained her story to CBP. CBP nevertheless deported her. Nydia returned, and although DHS records available to and in fact procured by the officers showed she had asylum status, DHS officers reinstated her removal order and deported her once again. In Mexico, she was raped, kidnapped by Los Zetas, and repeatedly attacked by gangs and other men because of her transgender status until she could return, without inspection, to the United States.[205]

Roberto Lopez-Gutierrez, a Mexican national, was kidnapped in Mexico and held for ransom in caves on the U.S.-Mexico border; when he escaped, he was arrested by CBP and referred for illegal entry prosecution. Although the CBP agent did ask if he was afraid of returning to Mexico and he said yes, the agent wrote that he said no, explaining in subsequent testimony that she wrote he had no fear because "he was afraid of kidnappers, not of government persecution."[206] The agent later admitted in court testimony that she was not trained in asylum law and that the regulation was silent on whether the violence needed to come from the government for a person to



After being attacked by a gang in Mexico, Nydia returned to the United States, where she had asylum status. Immigration officers ordered her deported.

be referred for an asylum interview;[207] nevertheless, she excluded all of Mr. Lopez-Gutierrez's statements about the kidnapping from his sworn statement.[208]

Similarly, Telma M. did explain her fear of being deported, which was recorded by CBP officers in her sworn statement, but the question she recalls being asked was, "Are you afraid of your government?" to which she says she responded, "No, not the government, but I am afraid of my husband back in El Salvador."[209] Although she may be eligible for asylum based on domestic violence,[210] Telma was issued an expedited removal order and transferred from Texas to the Broward Transitional Center in Florida to be deported.

In other circumstances, CBP officers simply reject individuals' statements regarding fear, perhaps because they do not believe the individuals, but CBP officers are not trained to determine credibility or to assess whether a specific experience meets international protection standards.

Juan Manuel C., from El Salvador, says he told CBP officers he was afraid to return to El Salvador, where he had been a victim of gang extortion, but they did not refer him for a CFI: "They didn't care; they said it was my country, I had to go." Instead, they told him he had to sign an expedited removal order even though he wanted to see a judge: "I didn't want to sign. But then they told me I would be in jail from 18 months to 5 years." After his deportation to El Salvador, gangs began to demand money from him: "The Mara Salvatrucha were charging me $500 a month; they took $7,000. They send you three notes and on the third time they kill you or your family. People have been killed right in front of my house."[211]

Bessy M., a 34-year-old woman from Honduras, came to the United States after her husband was murdered by her brother-in-law. She tried repeatedly to tell the border officers she was afraid to return to Honduras, but she was issued an expedited removal order. By the time she was transferred to Port Isabel, a detention center in South Texas, Bessy said, she retracted her statements, even though she was finally referred for a CFI: "I said I wasn't afraid because I was scared of saying yes. Everyone said I would be in jail for a long time."[212] But while waiting for deportation at the T. Don Hutto Residential Center, an immigration detention facility in Taylor, Texas, Bessy says she felt she had made a mistake.[213]

> **"The officer filled out a form and asked me to sign, but I refused. . . . They grabbed my fingers and pushed them on the paper."**

Lucila O. fled domestic violence in Nicaragua and was arrested by Border Patrol agents in Texas: "I told them I was afraid. . . . [The agent] just told me, 'You are getting deported. . . . Even if you are afraid you are going to get deported."[214] Ericka E. F., a 33-year-old woman from Honduras, fled gang violence and sexual and physical violence from her partner and was arrested in Texas: "I crossed in Laredo and I told them I needed asylum. I needed to stay here to protect myself. . . . I told him I was fleeing for protection because of the violence. They said women always come here with lies. I told them it was true. [The officer] just laughed and laughed."[215]

Braulia A., a Guatemalan national and mother of four U.S. citizen children, was arrested by CBP officers at San Ysidro after she briefly left the United States. She told officers that she was afraid to be deported to Guatemala, where her father had been murdered and her mother was the target of extortion by gangs. According to Braulia, "The officers said, 'We don't care if you are killed there. Don't even think about coming back or we will put you in jail for a long time.' They just said, 'You don't have a right to anything, you are a criminal, you are worthless.'" Although Braulia told them she was illiterate, they forced her to initial that she had read the interview, which incorrectly stated that Braulia did not claim fear. She refused to sign the expedited removal order but was deported to Guatemala, where she was subsequently raped and shot by a gang; her son, who joined her in Guatemala, was murdered by the same gang.[216]

The experience of being interrogated can be intimidating,

and the environment in which these interviews are conducted suggests to the asylum seeker that he or she has no rights. In its recent report, Human Rights First observed that CBP interviews with asylum seekers were sometimes conducted in crowded and loud rooms with no privacy.[217] Wendy, a 26-year-old woman from Honduras who had lived in the United States for almost a decade, recalled, "There were a lot of officers in a big line with all the officers around you. They did ask about fear but when I said yes, they said, 'You all say the same thing. I don't know why you guys say you are afraid. That is your country. This is not your home.'"[218]

Rosa, a 22-year-old woman, fled domestic violence in El Salvador and was arrested by border officials when crossing into Texas. Although she was asked about fear, she was never referred to an asylum officer:

> ICE said I had no reason to complain because I was already being deported. I was asked to sign forms my first day. I found out later it was my deportation order. The form was in English. … At that time, they didn't give us the opportunity to ask any questions.[219]

After her deportation, Rosa's ex-boyfriend found her, and the harassment and abuse continued. She returned to the United States and says she was not asked about fear when she was caught by CBP again in South Texas. "They just gave me some forms to sign, but I refused."[220] She was eventually allowed to get a credible fear interview, which she passed.

Too often, whether an asylum seeker is given a credible fear interview or, instead, deported with an expedited removal order is a matter of chance that depends on the particular officer. Because expedited removal orders are often issued quickly, with limited internal review and with little supporting evidence required, an asylum seeker can be erroneously deported without any opportunity—in the moment or later on—to challenge this deportation order.

Maria, Marian, and Rosemarie, three sisters from El Salvador, fled extortion and threats by gangs in El Salvador and came to the United States to join their brother (who has Temporary Protected Status) in May 2013. After crossing the Rio Grande into Texas, the sisters were caught



Maria, Marian, Rosemarie, and their brother.

by Border Patrol agents. Although all three were caught the same day and came with the same claim, they had very different experiences. Maria was the only one asked about her fear of being deported and referred for a credible fear interview: "I said yes [I was afraid], and he was just writing. He asked me to sign if I wanted to sign. I said no. The form was in English but I think it was to throw me back to El Salvador."[221] Her sisters had very different experiences. Marian recalls, "They did not ask me any questions. They just took my ID. The officer filled out a form and asked me to sign, but I refused. He was very angry because I wouldn't sign. He stood up, pulled me up, and they grabbed my fingers and pushed them on the paper."[222] Rosemarie spoke with a Border Patrol agent who spoke Spanish, and she tried to ask for help, but when she explained why she was afraid, she was told "those are old stories":

> They didn't ask me any questions, just my name and where I was from. I said to the official, "What are the possibilities for us to stay if we hire an attorney because I was afraid of going back." He said that's what everyone says and there is no possibility for us because there are already too many people inside the U.S. He said they don't

> give permits anymore—they used to but no longer… I asked to make a call to my brother because I was afraid of going back and he said no because we were going to be deported. . . . They said if I didn't sign [the expedited removal order] they would grab me and make me sign. I just put one fingerprint down then.[223]

Even Maria was not told at first that she would be allowed to seek asylum, so all three spent days in detention, sleeping on the floor in a crowded cell and certain they would be deported. Ultimately, Maria was issued a Notice to Appear and released on an order of supervision to report to ICE near her brothers' home in Florida. Maria has since won her immigration case before a judge. Marian and Rosemarie were also given orders of supervision and allowed to join their brother. However, Marian and Rosemarie currently have no way of affirmatively applying for asylum, as they were issued deportation orders and not referred for an asylum interview. For now, they are hoping they will not be deported back to danger and can stay together. If deported back to El Salvador, Rosemarie said, they would be in even more danger than when they left and would try to return to safety in the United States: "Since they made us pay that 'rent,' if we were to go back, we would have a bill. Since we left, they don't like it. Whoever doesn't pay, they kill them. We know people who've been killed. One girl said [to the police] that the gangs were threatening her, and 10 minutes after telling the police she was dead."[224]

Milton, a government electrician in Honduras, came to the United States after gang members repeatedly threatened to kill him and his family in revenge for a motor accident he was in that left the other individual, who was associated with the gang, disabled. Although he moved repeatedly within Honduras, nevertheless the gang repeatedly found him. Milton was not referred for a CFI by border officials but was issued an expedited removal order and released into the United States on an order of supervision; his attorney believes this is because he was with his young daughter.[225] When he checked in with ICE, he once again expressed his fear of returning to Honduras; the ICE officer, instead of referring him to an asylum officer, incorrectly told him that it was his responsibility to get proof that he had had a credible fear interview or else he



Reynosa, Mexico, April 2014. A migrant shelter providing services primarily to Central American migrants heading toward or being deported from the United States. Migrants and recent deportees are targets for kidnapping and theft by local drug cartels and gangs.

would be deported.[226] Through advocacy with DHS, his attorney, Jacqueline Bradley Chacon, was finally able to get him referred for a credible fear interview, which he passed. Had he been deported to Honduras, Ms. Bradley Chacon says, "He [would] be killed, I have no doubt."[227]

## 4. Asylum Seekers with Prior Removal Orders

For asylum seekers whom the system fails, and who receive an expedited removal order instead of a credible fear interview, the consequences are immense: these individuals can be deported to danger,[228] and if they try again to get protection in the United States, they can be prosecuted for illegal reentry and placed in reinstatement proceedings. Several of the individuals interviewed by the ACLU experienced all three.

For individuals who are able to eventually get before an immigration judge, the impact of the prior removal order and CBP's written recording that they had no fear continues to have consequences. Although the concern over border officials not asking about fear or misrecording the answer is not new and was documented in the 2005 USCIRF report, some judges and asylum officers nevertheless assume that these officers are asking the required questions in a way the asylum seeker understands. As one attorney noted, when an asylum seeker's sworn statement records that he or she has no fear, it can be used against him or her in court: "In one such case, I had a client with a strong gender-based claim for relief. Both the DHS

trial attorney and the immigration judge raised insistent concerns over my client's credibility, largely based on her alleged statements in her border interview that she was not afraid of returning to her home country. She stated that she had never been asked by authorities if she had a fear of return. These comments seemed to have been added into her file without her knowledge or consent, yet they plagued her for the rest of her case."[229]

Before winning relief under the Convention Against Torture, Braulia A. struggled to explain to the judge why she would sign a statement claiming she had no fear if that was incorrect, and the court was resistant to finding that the Border Patrol agent had lied. Eventually, given the weight of the evidence that Braulia had experienced extreme violence in Guatemala, the judge found in her favor without opining on whether she or the border official was more credible. Similarly, Ana D. eventually got an interview with an asylum officer while waiting for her removal—*after* CBP had already issued an expedited removal order and written that she had no fear. The asylum officer questioned her as to why CBP would say that:

> **Q:** "Did you ever tell an immigration officer anything different?"
>
> **A:** "I told him the same thing I am telling you now."
>
> **Q:** "Why did you think he wrote that you had no fear?"
>
> **A:** "I don't know."[230]

At a substantive level, the same benefits and protections are simply not available for an asylum seeker with a prior deportation order who has been removed. This is true even if the only reason they have a deportation order is the failure of CBP to inquire into fear or to refer an individual who claims fear for an asylum interview. As acknowledged by the Asylum Office of USCIS, the standard for "reasonable fear" is higher than the standard of proof required to establish a "credible fear" of persecution,[231] so individuals who might have met the lower threshold showing in a credible fear interview may have more difficulty passing a reasonable fear interview—even when the facts (on which the claim is based) are identical.

Moreover, immigrants seeking protection while in reinstatement proceedings (i.e., because they have a prior removal order) are likely to be detained for a long period of time. For years, advocates have been concerned about the delays immigrants face in getting an interview with an asylum officer and then getting their decision, and in April 2014, the ACLU and partners filed a lawsuit challenging the extensive delays in receiving a "reasonable fear" interview, delays resulting in many months of detention for asylum seekers with a prior removal order or a particular criminal conviction.[232] Under federal regulations, individuals with a "reasonable fear" of persecution or torture must be referred to an asylum officer to be interviewed and receive a decision within 10 days.[233] In fact, however, individuals subject to reinstatement awaiting a *reasonable* fear interview will wait in detention an average of 111 days.[234]

Alejandro first came to the United States in 1995, when he was a teenager, fleeing gang violence in El Salvador. He was twice summarily deported without the chance to apply for asylum. Once back in El Salvador, he says he was threatened by gang members constantly, despite moving to different locations. Finally, the threats to his wife and daughter became too much: "They said, 'We are going to hit you where it hurts and take what you value.'"[235] The family fled and settled in New Jersey. Eight years later, he was arrested by police when having an argument with his wife; ICE arrived and picked him up from jail. While in immigration detention, Alejandro asked to see a judge: "The officer tried to force me to sign a deportation order but because I understood English, I refused to sign it. When I refused to sign it, the officer tried to force me to put my fingerprint. He said, 'You have no chance, you're getting deported.'"[236] Fortunately, he was referred to an asylum officer prior to being deported, but he then spent four months in detention before he was able to see a judge and be released on bond; his case is ongoing.[237]

Luis B. R., a 28-year-old gay man from Guatemala, experienced sexual and physical violence throughout his childhood, including from a police officer, because of his sexual orientation. He eventually fled to the United States but was arrested, detained for three months, and given some papers to sign (which appear to be an expedited removal order) before being deported back to Guatemala; he does not recall ever being asked about his fear of

## The distinction between who can and cannot access the full range of protections and benefits of asylum is not supported by international or domestic law.

returning to Guatemala. After his deportation, the fear, threats, and attacks continued, so he returned to the United States and was able to enter without inspection. A few years later, however, after being assaulted by his then-boyfriend, Luis was arrested by the police, even though he was not the perpetrator. The police then turned Luis over to ICE. Luis then spent six months in detention before eventually winning his case with the assistance of pro bono counsel.

Finally, a person who wins withholding of removal or CAT relief will not receive the same benefits as a person who wins asylum, such as the right to petition to bring his or her family to the United States, to travel internationally, and to eventually become a lawful permanent resident and a U.S. citizen.[238] Moreover, that individual may still be removed to a third country, even if he or she cannot be deported to his or her country of origin.[239] For asylum seekers who are in reinstatement only because U.S. immigration officers incorrectly deported them when they first sought refuge, this distinction feels particularly undeserved and punitive. But for all asylum seekers, the distinction between who can and cannot access the full range of protections and benefits of asylum is not supported by international or domestic law. While advocates are challenging this unjustified and damaging distinction, for most people who can currently only access safeguards through reinstatement proceedings, many critical protections are foreclosed.[240]

Hermalinda L. and her husband, both indigenous Guatemalans, fled political violence and sought protection in the United States in 2006, leaving their daughter with family. They were able to enter the United States without inspection, but in 2008, they returned to Guatemala because Hermalinda's mother was ill. Thinking the security situation had improved, Hermalinda decided to stay in Guatemala, and she and her husband had a second daughter. Hermalinda and her husband were both politically active in the opposition party and, in particular, in challenging mining companies' extraction activities. Their activism put them in danger, however. Hermalinda recalls, "On the 5th of March, 2011, about four men came to our house and beat us. Two were police officers and two were dressed in civilian clothes. They beat us and took us 30 minutes by car. Then they made us get out of the car and they beat us more. They took off my clothes and they raped me."[241] Hermalinda and her husband again fled to the United States, but were caught by Border Patrol at San Ysidro. The officers did not ask if she was afraid of returning to Guatemala: "They didn't give me any papers [to sign]. They just put my finger down like this," said Hermalinda, motioning to show her thumb being pushed on a table.[242] Hermalinda did not know that the papers were an expedited removal order; she found out what they were years later, when she applied for asylum in the United States and went to her interview, where she was met by ICE. Fortunately, she was not detained, but because she is in reinstatement proceedings, even if she wins her case when the time comes (her hearing is set for 2017), she will not be able to bring her daughters to the United States.

* * *

The failure to refer asylum seekers for an interview during which they can explain their fears is not new. Even before expedited removal was expanded geographically, the U.S. government was aware that the expedited removal process was resulting in the deportation of asylum seekers before they had the opportunity to be heard and seek protection.

In 2004, Congress commissioned the United States Commission on International Religious Freedom (USCIRF) to conduct a study on asylum seekers in expedited removal.[243] The study, which included first-hand monitoring of CBP interviews at ports of entry, evaluated whether asylum seekers at ports of entry were in fact able to claim the protections intended for asylum seekers. The report found "serious implementing flaws which place asylum seekers at risk of being returned from the U.S. to countries where they may face persecution."[244]

In particular, the study found the following:

1. In 50 percent of expedited removal interviews observed by USCIRF researchers, arriving non-citizens were not informed they could ask for protection if they feared being returned to their home country;

2. In 72 percent of cases observed, individuals signed the sworn statement drafted by the immigration officer, which they were supposed to review and correct, without being given any opportunity to review it;

3. These sworn statements were not verbatim and sometimes included incorrect or made-up information; and,

4. In 15 percent of observed interviews, a person who expressed a fear of returning was nonetheless deported without a referral to an asylum officer; in 50 percent of those interviews, the files even stated that the person had claimed fear and yet the referral did not take place.[245]

Notably, these are findings based on interviews between immigration officers and non-citizens that took place in the physical presence of a USCIRF researcher, with the full knowledge of the interviewing immigration officer. And yet, this monitoring was not sufficient to ensure that immigration officers followed the regulations. In 2007, USCIRF issued a report card on DHS's progress in addressing the failures identified by the report, noting that

> [T]wo years later, most of the Study's recommendations have not been implemented. The Commission's overarching recommendation was that Expedited Removal not be expanded until the serious problems identified by the Study—which place vulnerable asylum seekers at risk—were resolved. Despite this recommendation, and the failure to resolve the problems cited in the study, DHS has in fact expanded Expedited Removal from a port-of-entry program to one that covers the entire land and sea border of the United States.[246]

The Commission gave CBP a score of "F" for its failure to apply the study's recommendations on protections for asylum seekers to ensure procedures were followed[247] and for its failure to ensure the recommendations were implemented *before* expedited removal was expanded.[248]

Almost a decade later, none of these systemic failures have been corrected, nor have USCIRF's recommendations been adopted. Indeed, it is likely that problems with the process have only increased with the expansion of expedited removal across the entire border, as today even more people are arrested, detained, interviewed, and removed through this process without the opportunity for independent review. Non-governmental organizations continue to document problems with the credible fear process, including failure by border officers to ask about fear and refer individuals to credible fear interviews.[249] And yet, in 2013 and 2014, congressional hearings—in their titles if not in the testimony—have suggested that the asylum process is too lax and ripe for manipulation by non-citizens.[250]

The allegation that this system is easily manipulated is not supported by fact, and indeed, agency officials are confident that their tools for detecting fraud are effective.[251] As a recent Human Rights First report detailed at length, there are already numerous investigative and prosecutorial resources that can be used to punish and deter fraud in the asylum system,[252] and CBP and ICE officers are not concerned that their existing tools are insufficient or could be manipulated.[253] Moreover, any individual who is found to have made a fraudulent claim for asylum is not only barred from receiving asylum but can also be prosecuted and imprisoned and is permanently barred from receiving *any* immigration relief in the future.[254]

Finally, even if some individuals may be fraudulently or just incorrectly applying for asylum, it does not appear that the majority of people attempting to enter the United States are trying to manipulate the asylum system. The actual number of individuals referred for a CFI at the border remains relatively small, with estimates that between 5 and 15 percent of individuals subject to expedited removal in FY 2013 expressed a fear of return and were placed in the credible fear screening process.[255] The journey to the United States is fraught with incredible dangers;[256] given how well-known these dangers are, it is not a journey someone would undertake lightly.

## B. PEOPLE LAWFULLY IN THE UNITED STATES WHO ARE DEPORTED WITHOUT A HEARING

Summary removal procedures are not supposed to apply to people with the right to be in the United States—for example, U.S. citizens, lawful permanent residents (LPRs), or individuals with asylum status. Despite the expansion of these processes geographically and numerically, the U.S. government maintains that these processes are meant to speed the deportations of people who are unlawfully entering the United States. For example, Congressional and Administration statements in support of deportations without a hearing (as well as the new "expedited hearings" taking place along the southern U.S. border) take for granted that they are applied to newcomers who are unlawfully entering the United States and have no right to enter or remain here.[257] However, due to coercion at the border, the absence of rigorous screening, and, in some cases, governmental misconduct, individuals lawfully residing in the United States have been deported without seeing a judge or even the chance to call an attorney. As a result of these rapid and hazardous processes, several U.S. citizens have been deported and able to return to the United States only after advocacy and legal representation.

A U.S. citizen, LPR, or asylee may at least seek judicial review of his or her deportation, although sometimes with considerable expense and difficulty, and perhaps have only a period of banishment from the United States. That U.S. citizens can be—and have been—deported from the United States by an immigration officer should not be surprising: while some U.S. citizens have been deported despite having verifiable evidence of their status, other citizenship cases involve complicated legal analysis and factual investigation. Summary removal procedures like expedited removal are not equipped for this intensive analysis, and given their speed, the absence of legal assistance, and the relative secrecy of these proceedings, are likely to result in erroneous deportations. But U.S. citizens are not the only individuals who can lawfully work and live in the United States and who have been erroneously subjected to summary removal proceedings. People with valid work or study visas, lawful permanent residence, or other nonimmigrant visas have been deported without a hearing, sometimes in a matter of minutes, resulting in separation from family, unemployment, and significant difficulties in ever returning.

### 1. U.S. Citizens Deported Through Summary Procedures

> "To deport one who so claims to be a citizen obviously deprives him of liberty ... [and may] result also in loss of both property and life, or of all that makes life worth living. Against the danger of such deprivation without the sanction afforded by judicial proceedings, the Fifth Amendment affords protection in its guarantee of due process of law."
> —Justice Louis D. Brandeis,
> *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922).

Given the intimidating and militarized environment at ports of entry and along the border, combined with the apparent lack of training for CBP officers and the complexity of immigration law, it is inevitable that people who have status, including U.S. citizens, will be illegally deported by border officers and agents. Attorney Jaime Díez, who practices immigration law in Brownsville, Texas, says he routinely sees individuals who are U.S. citizens, or eligible for U.S. citizenship, who are deported by CBP. Some officers, he observes, "have stereotypes of who a U.S. citizen is. They assume people who don't speak English can't be a U.S. citizen. These officers don't understand the

**Some people are automatically U.S. citizens even when they were not born in the United States. As of 2010, around 2.5 million U.S. citizens were born abroad.**



John Moore/Getty

Dominican immigrant Roberto Mercer holds his daughter Gianela, 10 months, at a special Valentine's Day naturalization ceremony for married couples on February 14, 2013, in Tampa, Florida.

reality of the border. . . . What I see all the time is people who shouldn't be removed getting removed."[258]

Identifying citizens is, at once, a simple and a complex issue. Legal scholar Jennifer Koh Lee explains that while the citizen/non-citizen distinction appears straightforward, in fact, that fundamental line is sometimes "unclear and unresolved."[259] Similarly, legal scholar Rachel Rosenbloom observes, "Although most citizenship claims are easily documented, there remain many U.S. citizens who have a tenuous evidentiary hold on their status."[260] U.S. citizens are not required to "register" in a national database, and most of us do not carry our birth certificates or other proof of U.S. citizenship on our person. Moreover, some people are automatically U.S. citizens by law under "acquired citizenship" without being born in the United States.

As of 2010, there are approximately 2.5 million U.S. residents who appear to have acquired citizenship when born abroad.[261] Similarly, under derivative citizenship, a foreign-born child can obtain citizenship if at least one parent naturalizes before the child turns eighteen and meets other statutory criteria.[262] Jennifer Koh Lee observes that in both these cases, citizenship is conferred to the child upon birth "by operation of law, even if the individual is unaware of their U.S. citizenship status or lacks documentary proof of it."[263] For these individuals, proving their citizenship when stopped by immigration enforcement officers can be very challenging both in the absence of documentary evidence on hand and also because law enforcement officers may not be trained on the various ways in which a person can be a U.S. citizen.

The danger that more U.S. citizens will be erroneously arrested and deported through a summary removal procedure has increased as reliance on these processes swells and with the general expansion of immigration enforcement in border communities. As Rosenbloom notes, while a person with U.S. citizenship presenting him or herself at a port of entry is likely to be prepared for inspection and have his or her passport on hand, "the exponential expansion of immigration enforcement over the past few decades has increased the potential for individuals with a variety of statuses—from undocumented immigrants to those in lawful immigrant or non-immigrant status to those who are U.S. citizens—to interact with such enforcement in one form or another."[264] The possibility

of being misidentified and funneled into the immigration system is compounded by incorrect assumptions about the "identifiability" of a U.S. citizen and, as several advocates along the southern border note, a lack of understanding about border communities and their fluidity.

> **"For three years, I've been waiting to have my day in court. We are stranded in Mexico and desperate to return to the United States."**

Oscar Olivas is a U.S. citizen with a U.S. citizen daughter with disabilities. He was born in Los Angeles County in 1969. His mother, who was undocumented at the time (but is now a U.S. citizen), was afraid to go to a hospital given her undocumented status and so she gave birth with the assistance of a midwife in a private home. He was issued a delayed birth certificate when five months old. In 2009, Mr. Olivas began the process of applying for an immigrant visa for his wife and stepson, both Mexican nationals; the couple already had a U.S. citizen daughter but decided to move to Mexicali, Mexico (near the Californian border), while the application process went forward. The family planned that Mr. Olivas would work in the United States, crossing the border each day and taking his U.S. citizen daughter to school in the United States where she would receive the treatment and therapy she requires for her speech and language impairment.

As part of Mr. Olivas's wife's application process, the U.S. Consulate in Juárez, Mexico, interviewed Mr. Olivas's mother, interrogating her for hours and coercing her to sign a "confession" that her son had been born in Mexico.







Oscar Olivas, a U.S. citizen, with his wife, stepson, and U.S. citizen daughter in Mexicali, Mexico. The U.S. government refuses to recognize Oscar as a U.S. citizen, so he and his family are in limbo in Mexico, which does not recognize Oscar as a Mexican citizen.

In 2011, while attempting to return to the United States, Mr. Olivas was told by CBP officers that he could not enter but would see an immigration judge to verify his citizenship claim. That hearing never came, but on one of Mr. Olivas's attempts to speak with CBP about his hearing, he was informed by a CBP officer that a removal order had been issued against him. "For three years, all I've wanted is my day in court so that I can prove that I am a U.S. citizen and that my family and I should be allowed to return to the United States. But the government has denied me any opportunity to prove my case. As a result, my family and I have been stranded in Mexico. We are desperate to return to the country we call home." After the ACLU filed a lawsuit on Mr. Olivas's behalf in June 2014, the U.S. government revealed that it had never filed the removal order—but it also had never served Mr. Olivas with an Notice to Appear in immigration court, leaving him in limbo these last three years. Mr. Olivas's attorney, Gabriela Rivera, observed that her client's case, while complicated, was not exceptional given the procedural and structural deficiencies in the expedited removal system: "Mr. Olivas's unlawful expulsion was not an innocent mistake by immigration enforcement officers," says Ms. Rivera. "It was the predictable consequence of a system that relies on racial and ethnic stereotypes, empowers officers to act as judge, jury and executioner, and all but prohibits affected individuals from seeking judicial review."[265] Mr. Olivas and his family continue to live in Mexico, in limbo, where Mr. Olivas cannot work to support his family and where his daughter is unable to access the necessary care and treatment she needs for her disabilities.[266] Ms. Rivera observes that the U.S. government's continued refusal to allow Mr. Olivas to return to his homeland is more than a symbolic injury for Mr. Olivas and others in his situation: "The benefits of citizenship—including stability, mobility, political rights, and protection against arbitrary expulsion—are not theoretical. They have real-life implications for people like Mr. Olivas and his family."[267]

Peter V. has always believed that he was a U.S. citizen like his siblings, even though part of his childhood was spent in Mexico, a not-uncommon experience along the southern U.S. border. His mother died when he was two, and his father, whom Peter and his family believe to be a U.S. citizen, was not a part of his life. But while serving a criminal sentence in California in 2003 for "resisting, delaying or obstructing an officer or emergency medical technician," he was questioned by prison staff about his citizenship: "I said I don't know where I was born but I think I was born here, in the U.S. . . . I told them I grew up in part in Mexico. Then they just took me out and deported me."[268] Several days later, he walked to the port of entry and asked to speak with a border official: "I said I needed help. I said, 'I think I'm a U.S. citizen.' They just put me in handcuffs and took me to CCA [a detention facility]."[269] Peter was given the chance to see a judge, but the immigration judge incorrectly placed the burden on Peter to provide proof of citizenship and ordered him removed, suggesting he try to apply for a passport.[270] Once again, Peter tried to return to his family in the United States but was turned back: "I just signed the papers without knowing what they were. I asked if this was going to get me in trouble and they said, 'No, it's just for your release.' They would ask where I was born and I would say, 'I don't know, I thought I was born here in the U.S.'"[271] Peter was finally able to enter without inspection, restart his life in California, and became engaged to a U.S. citizen. Three years later, CBP showed up at the gym where he worked, arrested him, and referred him for federal prosecution for illegal reentry. Peter then spent 13 months in federal prison for reentering; with the help of his federal public defender, Peter is appealing and hopes to win recognition as a U.S. citizen. In the meantime, with no Mexican birth certificate and no ID, he is constantly harassed by Mexican police in Tijuana and feels lost: "What am I doing here?" he asked.[272]

Maria de la Paz is a 30-year-old U.S. citizen who, like her two sisters, was born in Houston, Texas; her mother is an LPR. When Maria was 18, she was issued an expedited removal order at a port of entry in Texas by a CBP officer who refused to believe she was a U.S. citizen. As detailed in her habeas petition, the officer who inspected her at the border said that someone who did not speak English could not be a U.S. citizen and ordered her removed.[273] Although

**"I said I needed help, [that] I think I'm a U.S. citizen. They just put me in handcuffs..."**

# "It was as if we had been kidnapped."

her birth was properly recorded in Texas, there were errors in the spelling of her name and her mother's name (not picked up by her mother, who did not read or write), and her birth was also registered in Mexico. In Mexico, Ms. de la Paz tried to apply for a U.S. passport, but over several months, the U.S. Consulate asked for successive pieces of evidence of her U.S. birth, including school records that included photos (which did not exist). Finally, in January 2014 and apparently "thinking that there was no other way to come to the United States to be with her family," Ms. de la Paz attempted to cross into the United States but was caught, arrested, and detained by CBP.[274] While in custody, she again explained that she was born in Texas; according to the petition, the CBP officer did not attempt to verify her claim before reinstating her prior expedited removal order and banning her from returning to the United States for 20 years.[275] After her attorney, Jaime Díez, filed a habeas petition on her behalf, the U.S. Consulate in Mexico finally agreed to issue her a passport and allow her to return to the United States. She returned in July 2014.[276]

Some cases, like that of Ms. de la Paz, may be complicated by factual inconsistencies, even when they can be clarified and resolved. But as Ms. de la Paz's case also suggests, some immigration officers may assume that citizenship is straightforward and always looks the same—and some may be resistant to the idea that a person who does not speak English or was not born in a hospital could be a U.S. citizen. In 2010, several U.S. citizens who were born in Texas with the assistance of midwives filed a federal lawsuit challenging the effective denial of their citizenship without a fair opportunity to defend their rights. The plaintiffs' cases highlighted the coercion, intimidation, denial of counsel, and misconduct by border officials at ports of entry who abused their authority with ongoing consequences for both the U.S. citizens and their families.[277]

Two of those women, sisters Laura and Yuliana Castro, were born in Brownsville, Texas, in 1980 and 1984 but raised in Mexico by their Mexican-citizen mother, Trinidad. In 2009, Laura and Yuliana were traveling to the United States with their mother, who had a valid tourist visa, and Yuliana's infant daughter. Laura had her U.S. passport and Yuliana, who had applied for a passport but had not yet received it, showed her Texas ID, the receipt for her application for a U.S. passport, and the Texas birth certificate.[278] When the CBP officer in Brownsville, Texas, noted that Yuliana had had a midwife birth, he detained and interrogated the women for over ten hours.[279] Speaking later to a journalist, Trinidad said, "It was as if we had been kidnapped."[280] After hours of threats, the officer extracted a "confession" from Trinidad that the daughters had been born in Mexico; he then seized all their documents, treated Laura and Yuliana as having "withdrawn" their applications, and issued an expedited removal order for Trinidad, also charging her as inadmissible for fraud.[281] Although the U.S. government later recognized that Yuliana and Laura were U.S. citizens after their lawsuit in federal court, Trinidad is, to this day, banned from entering the United States given the erroneous fraud finding.

Another plaintiff in the case, U.S. citizen Jessica Garcia, lived in Mexico with her husband but worked in Texas. In 2009, she was trying to cross through the Brownsville, Texas, port of entry on her way to work when she was taken to secondary inspection, locked in a room, and accused by CBP officers of making false representations. When Ms. Garcia refused to sign any paperwork or "confess" to using a false birth certificate, the officer confiscated all of her documents, including her Texas birth certificate. Although a Notice to Appear (NTA) was issued and she should have been given the chance to see a judge, DHS never filed the NTA, so a hearing was not scheduled; instead, Ms. Garcia was stuck in limbo and lost her job.[282]

## a. U.S. Citizens with Mental Disabilities

As the ACLU and Human Rights Watch previously documented in a joint 2010 report, *Deportation by Default*, individuals with mental disabilities may be at particular risk of erroneous deportation given the complexity of immigration law, the continued absence of appointed counsel in all immigration proceedings, and (in the absence of a lawyer) the reliance on a person's own statements and admissions as the primary evidence.[283] As that investigation




U.S. officials deported Mark Lyttle, a U.S. citizen with mental disabilities, through expedited removal after a prior unlawful deportation.

demonstrated, a person with a severe mental disability facing deportation must rely upon an immigration judge who is able to recognize that a person facing removal has a disability and does not understand the proceeding to try to help them—but sometimes this occurs quite late in the case and any assistance is limited in the absence of appointed counsel.[284] However limited courtroom proceedings have proven to be, they at least provide some statutory and regulatory safeguards for people with mental disabilities.[285] Individuals ordered deported through summary removal proceedings, which can be very quick and are handled by immigration enforcement officers, do not even have the limited safeguards available to individuals with disabilities in court. As a result, there have been several cases of U.S. citizens with mental disabilities deported from the United States.

In 2000, Sharon McKnight, a U.S. citizen with cognitive disabilities, was deported through expedited removal when returning to New York after visiting family in Jamaica; CBP believed her passport was fraudulent.[286] In 2007, Pedro Guzman, a 29-year-old U.S. citizen with developmental disabilities, was serving a sentence for trespassing in a jail in California when ICE misidentified him as a non-citizen and coerced him to sign a voluntary departure order. He was deported to Mexico, where he was lost for almost three months before he was found by family and able to return to his family in California.[287] In 2008, U.S. citizen Mark Lyttle, diagnosed with bipolar disorder and developmental disabilities, was misidentified by jail and ICE personnel as a Mexican citizen and deported to Mexico (and from there to Honduras and then Guatemala). Mr. Lyttle quickly attempted to return to the United States but was removed with an expedited removal order. It took four months for Mr. Lyttle to return home to the United States and even when he did, with a U.S. passport sent to the U.S. Consulate in Guatemala, his prior deportation raised a red flag with CBP at the airport.[288] Fortunately, his attorney was present and able to ensure his release and return to his family.[289]

**U.S. citizen Mark Lyttle was misidentified as Mexican and deported; he was deported again through expedited re-moval when he tried to return.**

In 2003, U.S. citizen Michael C. was interviewed by ICE while serving a sentence for assault in a Texas state prison and deported through 238b as a non-citizen convicted of an aggravated felony. Although ICE contends he admitted to being a Mexican citizen, Michael's birth certificate from Texas demonstrates he was born in the United States,[290] and on the notice of intent to issue a final administrative order, he contested his deportability and told ICE that he was a U.S. citizen.[291] Before the end of his sentence, he wrote to ICE wishing to know if they still intended to deport him even though he was a U.S. citizen; in response, DHS wrote that he had not produced any evidence of his citizenship while in prison.[292] He was removed to Mexico but managed to return to the United States; his case is ongoing.[293]

* * *

If there are any bright-line rules in U.S. immigration law, one of them is certainly that U.S. citizens cannot

be deported from the United States. Thus, an individual who claims to be a U.S. citizen when subject to expedited removal is entitled to a formal removal hearing before an immigration judge with the required safeguards, including the right to counsel (at one's own expense) and the right to appeal the immigration judge's order.[294] After Pedro Guzman was erroneously deported and a lawsuit brought on his behalf by the ACLU, ICE issued guidance on citizenship claims by detainees; under this guidance, ICE officers must consult with the Office of Chief Counsel in cases with "some probative evidence" of citizenship and must "fully investigate the merits" of such claim.[295] It is unclear whether CBP has similar guidance and what training, if any, exists to verify and investigate claims to U.S. citizenship.

The number of known cases of U.S. citizens deported from the United States remains low, and according to DHS data provided to The New York Times in response to a FOIA request and analyzed by the ACLU, in FY 2013, only 97 individuals were referred to an immigration judge for a claimed status review hearing, where individuals who claim U.S. citizenship can seek review of their expedited removal order.[296] Individuals are supposed to be referred to an immigration judge if they claim "under oath or under penalty of perjury" to be a U.S. citizen, LPR, asylee, or refugee.[297] There could certainly be many more U.S. citizens who were not referred for review. And there could be others who did not know about their U.S. citizenship because they have derivative or acquired status. Timothy D., a Canadian interviewed by the ACLU, believes he has a derivative citizenship claim; he did not raise that claim when issued an expedited removal order because he believed he was already lawfully in the United States on his business visa and the U.S. citizenship was not his foremost reason for being in the United States. Now that he has been deported and is separated from his U.S. citizen wife and two U.S. citizen children, he is pursuing his claim that he is a U.S. citizen so he can at least visit his family.[298]

**"I showed the officers the markings on my body from being beaten and they didn't seem to care."**

### b. U.S. Residents with Valid Status

While the deportation of a U.S. citizen is the epitome of an unlawful deportation, other individuals such as lawful permanent residents (LPRs), refugees, asylees, and others on valid work or tourist visas are not supposed to be deported without seeing a judge. In some circumstances, these individuals may nonetheless lose their immigration status and be deported, for example, if convicted of certain criminal conduct; however, even in these circumstances, they are entitled to a hearing in immigration court to determine whether they are, in fact, removable and whether they are nonetheless eligible for relief from deportation.

As previously noted, sometimes removability is a complex determination, and it may not be obvious to an arresting immigration enforcement officer that a person has status that makes them non-deportable. The speed with which these removal procedures occur, combined with the lack of supervision and legal assistance, make errors in identification of a non-citizen inevitable.

In some cases, the individual's status is not so difficult to determine and can be easily verified; even in these cases, however, immigration officers have quickly deported individuals with lawful status in the United States—sometimes sending them to life-threatening situations. For example, Nydia R. is a 36-year-old transgender woman from Mexico with asylum in the United States who, since securing asylum, has twice been illegally deported through summary removal procedures. After years of threats and harassment for being transgender, Nydia fled to the United States in 2003. Three years later, her nephew in Mexico was dying of cancer, so she returned to see him; the danger and threats persisted, so she attempted to return to the United States. At the border, she told the immigration officers about the violence she experienced in Mexico but was nonetheless deported to Mexico without being referred for a credible fear interview. "I showed the officers the markings on my body from being beaten and they didn't seem to care," Nydia told the ACLU.[299] She eventually managed to enter the United States without inspection

# Nydia had asylum in the U.S. when she was illegally deported—twice—at the border. Deported to Mexico, Nydia was kidnapped and raped.



Nydia, a transgender Mexican immigrant, already had asylum when U.S. border officials deported her back to danger in Mexico.

and, in 2008, she applied for and received asylum. Nydia told the ACLU that she planned to apply to adjust her status and become a lawful permanent resident but did not have the money.

In 2010, Nydia's mother died, and Nydia returned to Mexico for the funeral. "I was afraid [to go back], but in the moment, I just blocked out everything that had happened to me; when I got there, I thought 'Oh my God, why am I here?' . . . All I could think about was how much I wanted to see my mother for the last time, but once I got there, I was terrified."[300] In Mexico, Nydia says her family rejected her, and she was attacked by groups of men who tried to remove her breast implants, and then beat and raped her. Nydia was robbed of her money and all her documents and spent almost a year trying to find help in Mexico so she could return to the United States. Finally, on March 18, 2011, she tried to enter the United States through San Ysidro. Nydia recalls:

> I was so desperate; all I wanted was to be here [in the United States]. In Tijuana I met someone who sold me an ID. I tried to enter and that's when they detained me. I explained my situation and asked to see a judge. …The officials were trying to find out if I was actually a woman "naturally." They were saying, "You look her over!" "No, you look her over!" Finally, they told me to take off my pants in front of two men. . . . Just imagine, you try so hard to be the person you want to be, you undergo surgery, which is incredibly painful. And then they don't even treat you like a person.[301]

Despite this terrifying treatment, Nydia did tell the officer, as documented in her interview, that she had asylum status and that she was afraid to go back to Mexico. According to the sworn statement, recorded during her interview with CBP, Nydia said she left Mexico because she was "discriminated against by my family and by people in the city. About a week and a half ago … some gang members grabbed me in the street. They tried to stab me and take out my implants. . . . They hit, beat, and raped me."[302] Close to 3 a.m., after hours of questioning, her statement was read back to her in Spanish, and she signed it. Minutes later, Nydia says, the officer told her that seeing a judge would be useless; still, Nydia recalls, "I said I would rather see a judge and stay in detention."[303] At that point, she was brought more papers to sign—in English, which she could not read—and she signed them, assuming they were the same papers she just signed in Spanish. In fact, it was an expedited removal order. According to the form, the officer wrote, "At approximately 0445 hours, [ ] admitted to not having a fear and concern and requested to be returned to Mexico." Nydia, who was still bruised from her recent attack and rape, was placed in a van and dropped in

# Even with a U visa and 15 years in the United States, Francisco was deported and then given an expedited removal order when he asked for help at the border.

Mexico, where she slept on the streets, afraid to go back to her hometown.

On April 26, 2011, Nydia again tried to return to the United States; when she was arrested by immigration officers, she tried to explain that she already had asylum in the United States. The officers ran a Central Index System check, which showed that Nydia was in fact an asylee.[304] Nonetheless, she was processed through reinstatement and given a removal order prohibiting her from reentering the United States for 20 years. Deported again to Mexico, and immediately in danger on the streets, Nydia looked for work along with another transgender woman but faced abuse wherever she went. Says Nydia, “That is when the other transgender woman and I were kidnapped and forced to work for Los Zetas [cartel]. They made us prostitute our bodies for them.” Nydia was able to escape after several months and returned to the United States without being arrested. “I really like living here in the U.S. The thing I like the most is that I feel free. Obviously, I'm still afraid but the truth is that I feel protected.”[305]

Other individuals interviewed by the ACLU were also deported without a hearing when they were misidentified as having no status in the United States, and although their deportations were not authorized by law, there was no immediate legal recourse to ensure their safe return.

Francisco N. G., a 21-year-old from Mexico, came to the United States with his family in 1999. He was six years old when his family settled in Texas, where he attended elementary, middle, and high school. When he was a senior in high school, his father attacked him and his mother. Francisco, who was trying to protect his mother, called the police and testified against his father in court; because of their cooperation, both he and his mother were able to apply for a U visa (a nonimmigrant visa for victims of crimes). Recalls Francisco, “A few months later, we attended court and won the case that put us on a path away from my dad.”[306] In early 2014, Francisco was driving himself and coworkers to work at a construction site near San Antonio, Texas, when he was pulled over by police for having an expired registration sticker. The police called ICE, who arrested everyone in the car. Francisco was also arrested and handcuffed by an officer who, Francisco recalls, told him he was going “back to where I came from.”[307] Francisco was detained and questioned by several officers about what he was doing in the United States. After approximately 12 hours, he was moved from San Antonio to Laredo, where



On the bridge between El Paso, Texas, and Ciudad Juárez, Mexico.

he says officers threw away his U visa ID and accused him of lying about his status:

> The officer who had the forms told me that it didn't matter, that even if I was telling the truth the judge could overturn the decision and send me back to Mexico. …I had three or four officers telling me, watching, and waiting for me to give up and sign that sheet. . . . When I explained about my status and asked if I could call [my attorney at] American Gateways, they said no. When I asked to call my family, they said no. I kept asking but finally one of the officers told me to understand that I would get no call until they were finished with me. The only call I got to make was (as I was leaving) to my mother to let her know what had happened.[308]

The officers, Francisco says, told him he was being charged with smuggling, and the other men in the car wanted to be deported, so if he went to court there would be no one to testify in his defense and he would go to prison for many years. The next day, he was deported to Piedras Negras, Mexico, where he knew no one.

At the time of his deportation, Francisco was saving up for dentistry school and working to support his mother and brother. His deportation was incredibly difficult for his family in Texas. Recalls Francisco, "I was a really big help to my Mom in raising my younger brother and helping out with the bills. So financially and emotionally, they [were] going through some difficult times."[309] After Francisco's deportation to Mexico, Francisco's father was also deported and started threatening to harm his son. Although he has valid U status, Francisco still needed authorization to reenter the United States after his removal; however, the normal route, consular processing (which includes fees and an interview with a U.S. consulate), would have been very lengthy and expensive, as he would also have had to apply and wait for a waiver. Because of the threats he was facing from his father, Francisco presented himself at the U.S. border, accompanied by an attorney, and asked to be paroled into the United States because he had U status.[310] CBP, however, refused to admit him and appears to have issued an expedited removal order. Fortunately, Francisco was able to explain his fear of being deported to Mexico. Although his attorneys and family are in Texas, he was transferred to a detention center in Washington State to await his credible fear interview. After several days, Francisco was released from detention, his expedited removal order was terminated, and he returned to his family in Texas.

Guadeloupe was also deported despite having been approved for a U visa and after showing the approval paperwork to CBP officers.[311] Guadeloupe, a 36-year-old mother of five U.S. citizen children, came to the United States when she was 15 after the death of her mother to join her U.S. citizen and LPR brothers, who were living in Texas. In Texas, where she has lived for almost 21 years, she raised five U.S. citizen children but was physically abused by both her partners; the first was a U.S. citizen and the second an LPR. Guadeloupe was twice deported at the port of entry in El Paso, Texas; both times, the forms were in English and she says she did not understand what was happening. On the second occasion, in 2011, Guadeloupe was prosecuted for illegal reentry and served 11 months in federal prison, but while in prison she was able to apply and receive approval for a U visa, based on the domestic violence she experienced. In 2013, during a routine check-in with her probation officer in El Paso, the probation officer called CBP to come and interview Guadeloupe. Guadeloupe explained that she had an approved U visa and presented the papers, but the CBP officer proceeded with her deportation. "He took [the visa paperwork] away and said it was no good," recalls Guadeloupe. "He then handed over my deportation order that had my signature already

**Javier Pelayo, an LPR with mental disabilities, was deported by an officer who assumed he was undocumented. He died apparently trying to return to his family.**

signed."[312] Guadeloupe was deported to Ciudad Juárez, Mexico, where she was homeless for over two months: "In Mexico, I had no ID, no money, no connections to start my life again, no way to get a job. I was legitimately afraid of dying there."[313] Advocacy from her attorney and the American Immigration Council eventually secured her return to her children in Texas, but she remains afraid that at any moment, she could again be picked up and deported.[314]

Javier Pelayo was an LPR with mental disabilities who came to the United States as a young child and grew up in Texas. Given his disabilities, his family encouraged him not to carry his LPR card with him so that he would not lose it. In April 2000, Mr. Pelayo went to a fast food restaurant and was arrested by Border Patrol agents who apparently assumed he was undocumented and deported him, after almost 20 years in the United States. His mother, also an LPR and a farm worker, searched for him at jails and hospitals to no avail. "At first when he disappeared I tried to find him, asking everybody for information," she said. "That was for weeks. Then they told me he was dead."[315] A month later, his body turned up in the river; he had apparently tried to swim back to his family in Texas.[316]

Rocio and Nicolas L., a retired LPR couple originally from Argentina, had been LPRs for over 20 years; they lived in California near their daughter and her family. The couple was returning to the United States after seeking less expensive medical treatment abroad when a CBP officer pressured them to "abandon" their LPR status at the Atlanta, Georgia, airport. Under federal law, a lawful permanent resident (LPR) is not treated as an arriving non-citizen seeking admission when they return to the United States.[317] However, there are some exceptions, notably (1) if the individual "has abandoned or relinquished that status" or (2) if he or she "has been absent from the United States for a continuous period in excess of 180 days."[318] In these circumstances, an immigration officer can treat the individual as having abandoned their status as an LPR.

Rocio, accompanied by her husband, who has some mental health difficulties, had been receiving cancer treatment in Argentina and was returning after four months abroad. After hours of detention and interrogation, they were allowed to call their daughter, Gabriela H., who explained to the CBP officers that her mother was very ill and that her parents do not speak English. Gabriela recalls that the officer told her that her parents could either abandon their LPR status or go before an immigration judge. "[The officer] let me talk to my mom, and my mom said, 'I don't know what they are talking about, I don't understand.'"[319] Gabriela and her mother decided she should ask to see a judge who could verify their right to return home to the United States, and Gabriela communicated this to the CBP officer. Gabriela says several hours went by before the CBP officer called her back and stated her parents were being processed for abandonment of LPR status.[320] Although CBP did not ultimately issue a summary removal order while also stripping the couple of their LPR status, this couple is now in legal limbo and without a formal means to challenge this deprivation of their rights and status.

* * *

In all of these cases, while the person's status might not have been obvious to the arresting and interviewing DHS officer, the claim should have triggered more serious review and at least an opportunity for the individual to speak to a lawyer and see a judge before more penalizing action was taken. Even for those deported who were eventually able to return to the United States, the emotional and financial costs to them and their families have sometimes been significant and yet have no redress.

## 2. Expedited Removal of Tourists and Business Visitors

Expedited removal allows immigration officers to remove non-citizens who are "inadmissible," meaning they are attempting to enter the United States without valid travel documents or through fraud and misrepresentation. In practice, immigration officers at ports of entry sometimes remove individuals with seemingly valid entry documents whom an officer suspects of not complying with their visa. For example, if a border officer believes that someone on a valid tourist or business visa actually intends to immigrate, he or she might accuse the individual of fraud or misrepresentation. Or, according to advocates interviewed and cases documented for this report, if an officer suspects the individual is doing work not authorized by that specific

visa, the officer might cancel the visa and also immediately issue an expedited removal order.

Officers have enormous discretion to make these determinations, and there are no regulations specifying what facts and evidence an officer must consider and produce when deciding to cancel a visa and issue an expedited removal order. Courts have recognized the incredible power this gives to line officers at a port of entry (and beyond). In *Khan v. Holder*, the U.S. Court of Appeals for the Seventh Circuit, while recognizing limits on its authority to dissect an expedited removal order, observed:

> The troubling reality of the expedited removal procedure is that a CBP officer can create the [] charge by deciding to convert the person's status from a non-immigrant with valid papers to an intending immigrant without the proper papers, and then that same officer, free from the risk of judicial oversight, can confirm his or her suspicions of the person's intentions and find the person guilty of that charge. The entire process—from the initial decision to convert the person's status to removal—can happen without any check on whether the person understood the proceedings, had an interpreter, or enjoyed any other safeguards. To say that this procedure is fraught with risk of arbitrary, mistaken, or discriminatory behavior (suppose a particular CBP officer decides that enough visitors from Africa have already entered the United States) is not, however, to say that courts are free to disregard jurisdictional limitations.[321]

## For Mexicans and Canadians who lawfully work in the United States each day, expedited removal—or seizure of their visa—is a looming threat.




Thousands of people enter and leave the United States each day. Many lawfully enter the United States to work or study while living in Mexico or Canada.

As with most expedited removal orders, there is no meaningful opportunity to challenge these orders or have them rescinded. In a recent decision, however, the U.S. Court of Appeals for the Ninth Circuit determined that despite limitations on reviewing whether a CBP officer correctly identified someone as inadmissible,[322] courts *do* have the ability to review the threshold question of whether CBP had legal authority under the statute to place a non-citizen in expedited removal proceedings.[323] For example, if a person was, as a legal matter, incorrectly identified as inadmissible (and thus, given an expedited removal order), he or she should still have the opportunity to bring this to a court

and dispute that CBP had the legal authority to place him or her into the expedited removal process in the first place. This is a new decision, however, and for most people, challenging an expedited removal order and its factual basis—however tenuous—will continue to be difficult.

Along the southern and northern U.S. land borders, where people from Mexico and Canada routinely and lawfully work or study in the United States and cross the international border as part of their daily commute, expedited removal remains a threat. Officers have enormous power to issue orders or take away a person's visa based on subjective assumptions and with limited evidence. Human rights advocate Crystal Massey, working in New Mexico at the Southwest Asylum & Migration Institute, has observed that people with valid visas who cross into the United States to visit family, go shopping, or attend church services can suddenly have their border crossing cards taken with no explanation and little recourse: "There is no investigation; the government doesn't have to share anything at all. And it's too late when they've taken your visa."[324]

Rosalba, a 56-year-old Mexican woman, has regularly traveled to the United States, always on a valid tourist visa that she has never overstayed. In 2010, she married a U.S. citizen who lives in Texas; they kept separate residences, Rosalba in Mexico and her husband Raoul in Texas, visiting each other every couple of weeks. Raoul is ill with throat cancer; he requires surgery every two months and his disability checks are his only source of income. On September 24, 2010, Rosalba was driving to Texas to see her husband and his sister, who was in the hospital. She recalls that the border officials stated they wanted proof her sister-in-law was in the hospital and took her into an office, searched her, and then pressured her to sign an expedited removal order: "The official was insisting and insisting, and telling me I lived in San Antonio, and that if I didn't admit [it], he could put me in jail. . . . I was scared, so I signed it."[325] According to Rosalba's attorneys, even though staff at the U.S. Consulate in Mexico agree that Rosalba should not have been issued an expedited removal order, she must still apply for a waiver and remain outside of the United States for now.[326]

For years, Yolo Medical, a Canadian medical distribution company, had a distribution branch in Washington State, where products under warranty could be inspected. Scott L., one of Yolo Medical's employees trained in highly specialized technical repair work, lives in British Columbia and would periodically drive to Washington State to perform routine repair work on Yolo products at the distribution center. Yolo Medical prepared a B-1 (business) visa application, which Scott brought to CBP, but it was rejected and he was told he could perform only warranty inspection work in the United States. Yolo Medical engaged a lawyer, adjusted the application, and brought it to CBP, which then said that Scott would need to pick up any products for repair and bring them to Canada for repair. One day, visiting the Washington distribution center, Scott picked up products for repair; before returning to Canada, he noticed that one customer's product needed only a small adjustment to be fixed, which he did at the distribution center. Scott says he did not think anything of it, but when he got to the border, he was questioned by an immigration officer: "CBP asked me if I did any work in the U.S., and I said no because I didn't consider that actual work; but they called the warehouse and asked if I had any tools, and [the] receptionist said yes, I had a screwdriver. Then they said I had intentionally lied to the border agent."[327]

Scott was detained for approximately 8 hours until he signed an expedited removal order. The result, says Scott's supervisor Lorenzo Lepore, is that Yolo Medical has closed its branch in the United States, laying off U.S. citizen employees, and added significant costs and time to its operations: "Customers pay a lot more to get their warranty work. . . . No one crosses the border anymore to do this work. It's really complicated the process, made it longer and much more expensive." For Mr. Lepore, it does not make sense to try again to get permission for an employee to cross the border, after their last experience, even though the company previously planned to expand operations in the United States:

> We tried to comply with whatever we were told to do. . . . [E]ven after we did everything [CBP] told us to do, [Scott] still ended up with an expedited removal order. The biggest thing we take from this is that you, as an individual or a company, have no rights. We did everything by the books and we still lost. . . . It's just been one bad thing

## "We did everything by the books and we still lost. . . . It's just been one bad thing after another when we are just following the rules."

> after another when we are just following the rules. The ever-changing rules.[328]

For Scott, the expedited removal order has been particularly problematic because his siblings live in the United States and he has had to miss family reunions while waiting for the five years to pass so he can lawfully return.

Zayyed is a professional chef in Mexico; friends in California invited him to visit and asked if he would cook, for free, for a party during his stay. Zayyed, who always traveled to the United States on a valid tourist visa, which he claims never to have overstayed, was stopped at the airport upon his arrival in the United States. According to his brother Antonio, an LPR living in California, Zayyed was handcuffed, detained for two days, and repeatedly told to admit that he was working without authorization in the United States. Antonio says that Zayyed's friends confirmed by phone to CBP that Zayyed was not being paid but was just going to help them out; nevertheless, he was forced to sign an expedited removal order and is banned from visiting the United States, where his siblings live, for five years.[329]

Misguided and unsupported assumptions by DHS officers can lead to unfair deportation orders that cannot be effectively rectified. To be sure, in some cases immigration officers may correctly identify a person attempting to enter the United States without authorization or by misrepresenting the purpose of their visit.[330] Even in those situations, however, it is possible that some of the alleged "misuse" was not willful. In such cases, expedited removal is a blunt and drastic response; in addition to barring the individual from reentering for five years or more (with no right to judicial review of the circumstances), some advocates report that once a person has been issued an expedited removal order, getting another visa to reenter the United States—even after the five years have passed—can be difficult. In cases where a person appears to be making a mistake and not willfully attempting to commit fraud or immigrate or work without authorization, allowing the individual to withdraw their application would be a more rights-protective and less punitive approach that also recognizes the realities of the interviews at ports of entry and the complexity of immigration law.

Roland J., a 41-year-old Indian national, works in the computer software field. He first came to the United States in 2003 on an H-1B visa (a work permit) and later converted to a different nonimmigrant work visa in 2013. Roland regularly traveled to Canada for his work and in September 2013, while his new visa was pending, he says he called several CBP offices to see if he could travel while his visa was being converted. Unable to get an answer by phone, Roland went to a port of entry and asked a CBP officer who, Roland recalls, told him that he could travel while the visa was pending. Roland went to Canada but on his return was told he could not reenter. "The supervisor came and he started laughing. He asked me to prove that I spoke to the [other] officer yesterday," says Roland. "I went to another border crossing because I thought these officers were making a mistake."[331] But the officers at the next border crossing said they could not help him either. He tried yet another port of entry where an officer approached his car. According to Roland,

> I explained I didn't want to gain entry but I wanted to find the solution to the problem. He said I had to turn over to the booth so he could talk to me. . . . I was there 3 hours and they started to fill out a lot of paperwork. They asked me to sign a paper—I asked if it was good or bad and, they said, "neither good or bad," so I signed. But then he told me it was a removal order.[332]

Desperate and confused, Roland tried to get into the United States one more time, where his house, his job, and all his life savings were located. But immigration officers reinstated his prior expedited removal order. "The officer had checked with his own pen where I was supposed to

## "From my experience, I've learned you can be a law-abiding person and this can happen for no reason."

sign saying I didn't want legal help. He said I could change my mind at any time. I didn't know what I was signing."[333] CBP then referred him for prosecution for illegal reentry. Because he was able to show that he had not committed any fraud, his sentence was reduced from illegal reentry to illegal entry, and he was given time served. But with his reinstatement order, he is banned from the United States for 20 years. "From my experience, I've learned you can be a law-abiding person and this can happen for no reason."[334]

Timothy D., a Canadian national, first came to the United States in 2001 on a TN (business) visa[335] to teach at a university in Detroit, Michigan. He bought a home, married a U.S. citizen, and has a six-year-old U.S. citizen child; he and his first wife divorced, and Timothy remarried another U.S. citizen with whom he is expecting a child. In 2012, after spending the day in Canada, Timothy was crossing back into the United States when CBP officers at the port of entry in Detroit pulled him into secondary inspection and started inquiring into his work. Timothy explained that in addition to being a professor, he did some graphic design contract work (for which he had registered with the State of Michigan and was paying taxes). Timothy says the CBP officer told him he needed a different visa for that work, which Timothy says he did not realize.[336] Getting a removal order was a shock: "The longer you're present in the U.S., the less you think they are going to kick you out," says Timothy.[337] Timothy recognizes that despite his deportation and separation from his family, he is one of the fortunate ones; he has been twice allowed into the United States on parole to see his son, and his son has been able to spend summers with him in Canada: "I know plenty of people who don't get parole. . . . For people who don't have resources or education, this must be disastrous. I'm lucky."[338]

* * *

In some instances, it is difficult for an immigration officer not trained in highly complex immigration law and with dozens of cases to process to determine whether an individual lacks lawful status in the United States and is removable. Summary removal procedures, in which immigration officers are the adjudicator and deporter, place enormous responsibility on a single officer to investigate and determine the facts and law in a short period of time. In cases where the facts and legal rights at issue are complicated, referring the individual to an immigration judge to have his or her case evaluated with a full hearing, and allowing him or her the opportunity to secure counsel and evidence to support his or her case, can make all the difference—and does not jeopardize an immigration enforcement officer's ability to perform his or her duties. Unwinding and correcting an unfair and illegal deportation order—even in the limited cases where that is possible—is a long and difficult road.

## C. LONGTIME RESIDENTS REMOVED WITHOUT A HEARING

The summary removal procedures created by IIRIRA have diverted hundreds of thousands of people away from court and funneled them through quick administrative processes. While expedited removal in particular was largely a political response to the large numbers of Cuban and Haitian migrants arriving in the United States in the early 1990s,[339] expedited removal and related summary deportation procedures are not used only against "arriving" migrants with no ties to the United States. People who have lived in the United States for most of their lives and have U.S. citizen family are also swept up into these procedures that bypass not only the courtroom but also critical constitutional and statutory protections.

In the past, while recognizing that non-citizens have rights in the United States, federal law has drawn a distinction between the rights of immigrants who have entered the United States and those who are seeking entry at the border. Immigrants within the United States have due process rights under the U.S. Constitution to a fair hearing, the assumption being that we owe more to non-citizens who are part of our community and have built ties and claims here. On the other hand, courts have held that non-citizens arriving at the U.S. border are not entitled to all the protections of U.S. constitutional law and, consequently, may have fewer claims that can be made when entry is denied. As the Supreme Court explained in one of the first U.S. cases on the rights of immigrants seeking admission explained:

> It is not within the province of the judiciary to order that foreigners who have never been naturalized, nor acquired any domicil[e] or residence within the United States, nor even been admitted into the country pursuant to law, shall be permitted to enter, in opposition to the constitutional and lawful measures of the legislative and executive branches of the national government. As to such persons, the decisions of executive or administrative officers, acting within powers expressly conferred by Congress, are due process of law.[340]

In subsequent years, courts have reaffirmed the position that non-citizens at the border, seeking admission, have

Tijuana, Mexico. U.S. Border Patrol officers at the U.S. border near San Diego, California, look for migrants attempting to enter the United States without authorization.



Sam Frost

more limited due process rights.[341] Yet under the drastic changes brought about by the 1996 IIRIRA summary removal procedures, certain people who have entered the United States are nonetheless denied a removal hearing. Today, the people diverted from the courtroom and deported without a hearing are not all strangers without ties to the United States, and some might also win the right to remain here if given a fair hearing.

Almost a decade ago, when expedited removal was expanded beyond ports of entry, advocates warned that individuals who are eligible for discretionary relief (such as cancellation of removal) but were picked up within the United States could lose the opportunity to apply for relief if immigration officers treated any absence from the United States as invalidating that opportunity.[342] Unfortunately, these concerns have been corroborated. Many people interviewed by the ACLU were longtime residents with U.S. citizen children but were deported without a hearing and without *any* inquiry into whether or not they had family in the United States or how long they had been outside of the country. Indeed, it is not only individuals who left the United States and are returning whose lives in the United States are arbitrarily ignored; individuals arrested by immigration officials *anywhere* in the United States and coerced into accepting voluntary departure or removed because of a criminal conviction are also deported without seeing a judge.

In all these situations, DHS retains discretion to place individuals in formal removal proceedings before a judge; instead, DHS sometimes treats these individuals as outsiders with no claims, essentially erasing all their years in and ties in and to the United States. For undocumented longtime residents of the United States who may be eligible for relief, defending their rights and winning relief is a matter of chance.

**"I was told I would be taken to see a judge the next day, but instead I was taken to the border and told to go."**

## 1. Deportations at the Border

At the border, most people arriving without authorization, including undocumented immigrants returning to their families in the United States, are processed through expedited removal and quickly repatriated. The one thing the expedited removal form requires border officers to ask when processing an individual for expedited removal is whether he or she is afraid of returning to his or her country of origin. As documented in previous chapters, this questioning is not always done and even when it does occur, is often superficial.

Although DHS's notice expanding expedited removal in 2005 stated that DHS does not *have to* place a person in "interior" expedited removal proceedings where the equities weigh against it, no guidance has been publicly issued that indicates how a DHS officer would make such a decision. Indeed, expedited removal does not require *any* further questioning by border officials or screening for possible claims to enter and remain in the United States; whatever equities a person may have—U.S. citizen children, long residence in the United States, etc.—often remain invisible throughout this process. The ACLU interviewed several people in migrant shelters in Mexico and others now in immigration proceedings who had been issued an expedited removal order at the border but had never been asked about their ties to the United States or referred for formal removal proceedings at the border. In some circumstances documented by the ACLU, individuals who had lived in the United States for many years left the country only briefly to see their families, attend funerals, or for other compelling reasons, and yet, upon their return, they were subjected to expedited removal. Not only has this practice separated families, but it has also returned some people, and their U.S.-based family, to very dangerous conditions in violation of U.S. and international law.

Wendy D. G., a 26-year-old woman from Honduras, came to the United States when she was 15. She attended high school in California and has two U.S. citizen children. In 2012, Wendy decided to return to Honduras to see her

family: "I decided after so many years, I wanted to see my family. . . . I never thought my country would be worse than when I left. But it was. . . . There was so much violence in the streets. I was thinking, 'Why did I come here?'"[343] Wendy soon attempted to return to the United States, leaving her daughter with family in Honduras until she could safely be sent for. When Wendy crossed into Texas, CBP arrested and detained her, and issued an expedited removal order. "I regret that I went back [to Honduras]. I've been living here [so long]."[344] Wendy was moved through several different detention facilities before being released on an order of supervision. She is now living in Miami with her two U.S. citizen children, working with a temporary permit, and reporting to ICE. But at any moment, she could be deported. Says Wendy, "I'm a mom that wants to work for my kids. I want to succeed."[345]



Wendy, holding the passport of her U.S. citizen daughter, was ordered deported after she visited family in Honduras—her first time there in almost a decade.

## "I said I don't know how to read or write and so he shouldn't give me any papers, but he just said, 'Sign here on each page.'"

Inocencia C. came to the United States from Mexico when she was 12 years old and is the mother of three U.S. citizen children. After living in California for approximately 15 years, she left the United States under coercion from her abusive partner, the father of her children. The abuse only intensified when the family returned to Mexico, so after a few months, Inocencia sent her children back to the United States and then tried to cross herself. At the port of entry in San Ysidro, border officers told her she would lose her children and forced her to sign an expedited removal order. Inocencia recalls,

> I said I don't know how to read or write and so he shouldn't give me any papers, but he just said, "Sign here on each page". . . . The officer spoke Spanish and he yelled at me, "The government can keep your kids because you are illegal. It is a crime, what you did." I didn't know anything about the law. Here I know if you abandon your kids they will take them away from you.[346]

She made three attempts to return to the United States and escape her violent ex-partner; eventually, she was *not* referred to an asylum officer or for a hearing but was instead referred for prosecution for illegal reentry.[347] After a federal judge gave her "time served" for illegal reentry and released her, and with intervention and advocacy from her federal public defenders, ICE agreed to place her in immigration proceedings, which are ongoing.

In January 2014, Maria D., who had lived in the United States for 23 years, left the United States to attend her father's funeral in Mexico. According to her attorney, Maria's U visa, based on an assault and attempted rape

she suffered in Los Angeles, was pending when she left. Returning home to California, she presented herself at the San Ysidro Port of Entry and was issued an expedited removal order, even though the interviewing officer noted that she had a pending U visa.[348] Maria's daughter, Claudia, who lives in California, went to visit her in Tijuana after Maria was released from U.S. custody. Claudia recalls, "[Maria] was depressed and crying. Only she knows how she felt when she was in there. . . . They were being pressured to sign, and people were saying, 'If you say you are afraid, you will stay here for 3 months and not be able to talk to your family.' So she got afraid. All she wanted at that moment was to be released."[349] Maria remains in Mexico, separated from her family in the United States.

Braulia A. is a mother of five (including four U.S. citizens) from Guatemala who entered the United States without inspection in 1991. She left Guatemala with her son, fleeing violence from both police and gangs: her father had been murdered and she had been raped by police officers as a teenager. Braulia moved to California, married, started a family, and sent money to her mother in Guatemala. Starting in 1999, the money attracted the attention of gangs that demanded money from Braulia's mother. In 2005, a friend of Braulia's recommended that she visit a dentist in Tijuana. Not realizing that she could not travel on her Employment Authorization Document ("EAD card"), Braulia, who is not literate in Spanish or English, went to Tijuana for the day. When she called her husband before returning to California, and he explained that she could not travel on her EAD card, Braulia says she panicked and attempted to reenter by hiding in a truck.[350] Arrested at the San Ysidro Port of Entry, Braulia told immigration officers that she lived in the United States and was afraid to return to Guatemala, given the threats against her family. The officers wrote on her record of sworn statement that she had no fear and that she had gone to Tijuana for a party, both of which Braulia denies:[351]

> The officers said, "We don't care if you are killed there. Don't even think about coming back or we will put you in jail for a long time." They just said, "You don't have a right to anything, you are a criminal, you are worthless." The officer was reading some papers and wanted me to sign them. I said I can't read or write in English or Spanish. The officer said well you've got to sign and I said no. The officer said I don't care if you sign….look, I already signed for you.[352]

## After almost 15 years in the United States, Braulia was deported without a hearing to Guatemala, where her son was killed. Then his murderers raped and shot her.

Braulia was detained at CCA Otay Mesa Detention Facility (an ICE detention center) and then deported with an expedited removal order. Almost immediately upon her arrival in Guatemala, Braulia says, she began to receive threats from gangs. Braulia's U.S. citizen children joined her in Guatemala when she was first deported, but it quickly became too dangerous, so she sent them home to California: "They were being followed. People were calling and threatening the children, saying offensive things about my 12-year-old girl. Gangs were shooting at our front porch."[353] Her nephew, who was the head of a gang and was in prison for the murder of a family, started demanding conjugal visits from Braulia (his aunt) and sending her threats. Finally, she fled to Mexico; but around that time in 2006, her oldest son, Wilmer, who was living undocumented in California, missed her too much and attempted to rejoin her in Guatemala.

Recalls Braulia, "I said just come to Mexico and we will figure it out. He was going to come, but a week before his birthday he was killed [in Guatemala]." Devastated, Braulia returned to Guatemala for her son's funeral and begged the Guatemalan police to investigate his murder. Braulia says that the officers told her it was a police bullet that killed her son and demanded money to investigate further. Days later, Braulia herself was kidnapped, shown photos of her murdered son, gang-raped, her eyes and mouth taped, shot nine times, and left for dead. It has since been confirmed

by police and media sources that her nephew, who was released from prison, was behind the murder of her son and the rape and attempted murder of Braulia.[354]

With help from her family, Braulia eventually returned to the United States in October 2007 after a difficult journey through the mountains in Guatemala and then across Mexico. Even after returning to the United States, she says she continued to be harassed and threatened by gangs in Guatemala: "They called me at my home here in San Diego and they asked for money. They told me that if I did not give them money they would cut off my sister's or my nephew's head."[355] Several years later, in September 2011, immigration officers came to Braulia's home looking for someone else and took her into custody when they realized she had a prior order of removal. After a few weeks, she was referred for a reasonable fear interview and remained in detention until January 2012, when she was released on bond. She finally won relief under the Convention Against Torture in March 2014.

As discussed above, since the expedited removal procedure was expanded horizontally and vertically across the entire border (within 100 miles of the U.S. international border), even individuals who are not at a port of entry and may not have left the country can be swept up by expedited removal. Under the regulations, individuals who have been in the United States for 14 days or more should be referred to an immigration judge, but our investigation suggests that in many cases, Border Patrol officers are not asking individuals when they first came to the United States. As a result, some individuals who have been in the United States for many years without leaving are also deported without a hearing.

For example, Cesar came to the United States in 2000 and has a U.S. citizen stepdaughter whom he has raised since she was five. In early 2014, Cesar, who worked as a landscaper and had lived continuously in the United States for 14 years, was stopped by local police in Weslaco, Texas, while driving with a colleague to a waste management facility. Weslaco is considered part of the border zone because it is within 100 miles of the U.S.-Mexico border. The police officers who stopped Cesar did not charge him or his colleague with any traffic violation; rather, they called CBP to arrest the two men. After many hours of interrogation and threats by CBP, Cesar signed a form, which his attorney believes to be an expedited removal order. Cesar remembers, "When I was taken to the facility, I was given documents to sign and was told I would be taken to see a judge the next day, but instead I was taken to the border and told to go." Cesar had not been back to Mexico in 14 years.[356]

Cesar's inclusion in expedited removal is not exceptional even though it was unlawful given his long residence in the United States, but it may not be unique. A report published by the ACLU of New Mexico showed that many longtime undocumented residents are swept into these deportation processes, which deny them a hearing, *not* when they attempt to enter the United States but when arrested by Border Patrol in their "border" communities.[357] For example, 16-year-old Sergio was picked up by Border Patrol on his way to harvest lettuce 70 miles from the border; he had lived in the United States for eight years (since he was eight) but was deported that same day and separated from his widowed mother and two younger siblings.[358]

## 2. Apprehended and Deported in the Interior of the United States

Even beyond the border area, however, immigration officials have deported longtime residents of the United States without giving them the opportunity to see a judge through administrative voluntary departure (or "voluntary return"), stipulated orders of removal, or administrative orders of removal ("238b"). While 238b is supposed to be used exclusively against individuals convicted of certain enumerated offenses, voluntary departure can be—and is—applied to anyone, including individuals who would otherwise be eligible for discretionary relief such as non-LPR cancellation of removal.

### a. Voluntary Return

While voluntary return is not considered a "formal" removal order like an expedited order of removal or a 238b order, it comes with consequences that may be just as severe, particularly for individuals who have been living in the United States without authorization for over six months and who are subject to bars on reentry. It may,

however, have benefits for some individuals, as it preserves the ability to apply for relief in the future.[359]

Voluntary return is supposed to be given only at the *request* of the non-citizen after he or she has been made aware of all its consequences—notably, that a person who accepts voluntary return cannot make any claims for relief.[360] For individuals who would be eligible to apply for relief from removal and might be able to formalize their status in a hearing, voluntary return is often *not* to their benefit, and it appears that this information is not communicated to individuals by immigration enforcement officers.[361] Moreover, although voluntary return is not a formal removal order, in practice it has many of the same consequences. In particular, individuals who have lived in the United States for more than one year without authorization are subject to a 10-year inadmissibility ban on reentry;[362] individuals who have lived in the United States for over 180 days but less than one year are subject to a 3-year ban.[363] For parents of U.S. citizen children, the separation is often longer because a person applying for a waiver and to adjust status must wait until the "qualifying relative" is 21 years of age.

Veronica V. came to the United States when she was 19. She married a U.S. citizen and has three U.S. citizen kids, all of whom live in Texas; she had lived in the United States for 20 years. In 2013, Veronica and her husband were driving to a hardware store near San Antonio when they were pulled over by local police who asked her for identification. Veronica, who was the passenger, did not have any documentation with her, and the police officer asked if she was undocumented. She explained that she was in the process of applying to adjust her status, but the officer called ICE, which came to the scene two or three hours later. "I asked the immigration officer if this was correct, what the police officer had done. He said, 'No, because you weren't driving, you have no criminal history, and he has no reason to have done this,'" Veronica recalls, "but since the police officer had called, [the immigration officer said] he had to take me in."[364] Veronica's husband immediately called an immigration attorney and went home to collect the paperwork showing that Veronica was applying for immigration status. Although the attorney immediately contacted ICE, Veronica was not allowed to speak to the attorney or her husband. Instead, she was presented with a voluntary departure order:

> I told [the ICE officer] I wasn't going to sign because I wanted to see the judge. But he was really mean, and he kept insisting and insisting. When 3 hours had passed, I told them I wasn't going to sign anything until my husband arrived so he could show the papers [that showed] we were applying for my status. And then the officer came back and said your husband came and showed me the papers, and the papers he showed me are useless to me. I told him I wanted to talk to my husband. He said, "You are not going to talk to your husband. What you are going to do is sign this *salida voluntaria* or you are going to jail." That is when I signed because they said there were bad people in jail who could do something to hurt me.[365]

Although the voluntary return statute allows up to 120 days for the individual to leave the United States, 24 hours later, without the chance to speak to her children or husband or attorney, Veronica was taken to Nuevo Laredo, Mexico. She is trying to apply for a waiver so she can return to her children sooner, but for now, Veronica remains in Mexico, separated from her young daughters. Says Veronica, "Every day I remember the day that they stopped me. It's been a year and it hurts a lot. My family, my husband, we have always been very close. It hurts me so much to be separated from them."[366]

Emmanuel M., a 25-year-old from Mexico, came to the United States as a young child and lived in California continuously for approximately two decades. In 2012, as he was leaving his house in San Diego for work, he was stopped by ICE officers. "I kept on asking what was happening and they said they could not tell me."[367] The officers gave him several forms to sign, which turned out to be voluntary return, and said he would be released. Emmanuel says, "I was happy because I thought I was going to leave. I signed, they put me back in the cell, and then a few hours later they took me to Tijuana."[368] Emmanuel had not been back to Mexico since leaving as a small child. After two years, Emmanuel says he missed his family too much ("I'd never been this far away from them," he says) and

tried to cross back to the United States for Thanksgiving but was arrested, detained, and driven to Arizona to be summarily deported. He now works for a call center in Tijuana, Mexico, and is applying for a U visa from Mexico (he was the victim of a violent hate crime prior to his deportation). "I would love to go back," he said. "My whole family is there."[369]

Laura S. came to the United States from Mexico as a teenager with her young son and was murdered soon after her deportation to Mexico. According to a complaint filed on behalf of her mother and children, Laura had two children with an increasingly violent and abusive man while living in Texas. Laura was able to get a protection order against him from local police in Texas, but he continued to threaten her until he returned to his native town in Mexico, according to Laura's family's attorney, and joined a drug cartel. In June 2009, several years after Laura first came to the United States, Laura and her cousin were stopped by police for an alleged traffic violation; Laura was turned over to DHS. Laura begged the officers not to deport her, as she feared being attacked by her ex-partner if deported to Mexico, and because she had three young children in the United States, one of whom was scheduled for surgery at a U.S. hospital. Instead, the complaint alleges, DHS officers coerced her to sign a voluntary departure form and dropped her at the bridge to Reynosa, Mexico. Her ex-partner murdered her soon after her return to Mexico.[370]

Immigration attorney Marisol Pérez says she and her colleagues routinely see cases where the individual was coerced into signing a voluntary departure order without understanding its consequences. Immigration officers, she says, tell people "either you sign or you are going to jail." Even individuals who already have attorneys are vulnerable when threatened, in the absence of a lawyer, with jail: "We don't have control over what happens when we are not there, in the back room. The officers should be giving rights advisals . . . Instead, they tell them, you want your rights, you are going to go to jail."[371]

In June 2013, the ACLU filed a lawsuit in Southern California challenging the coercive use of voluntary departure and immigration officials' failure to apply the necessary procedural safeguards.[372] For example, the lawsuit alleges that officers gave false information to non-citizens about their ability to stay in the United States and their ability to apply to return once they were in Mexico, and also used a misleading form that failed to notify individuals that taking voluntary departure meant they cannot apply for relief and lose the procedural protections that apply in court. Named plaintiffs in this lawsuit include:



Yadira Felix, with her grandmother Candelaria Felix, at their home in San Diego, California. Yadira, who has mental disabilities, was effectively kidnapped by CBP and left in Mexico.

- Isidora Lopez-Venegas, the mother of an autistic U.S. citizen son, who was arrested by CBP and told that if she refused to sign for voluntary departure, she could be detained for several months, thereby separating her from her autistic son. The agents further misinformed Ms.

Lopez-Venegas that it would be easier for her to obtain legal status through her son once in Mexico; in fact, her son's age made this impossible for years to come. She and her U.S. citizen son had to leave the United States after she was coerced into signing the form.

- Yadira Felix, appearing in the case through her grandmother, Candelaria Felix, has significant cognitive disabilities. Yadira Felix had lived in the United States for over 20 years when Border Patrol agents approached her at a bus stop, drove her to the U.S.-Mexico border, and pushed her, crying, across to Mexico.
- Marta Mendoza, appearing in the case through one of her six U.S. citizen daughters, Patricia Armenta, has bipolar disorder, as does her 16-year-old son, who depends on Ms. Mendoza for support. She had lived in the United States for over 30 years when police arrested her on suspicion of shoplifting and took her to a jail where ICE officers coerced her into signing the voluntary departure form.
- Ana Maria Dueñas, a mother and grandmother of U.S. citizens, who was arrested by CBP while waiting for a bus in California. A Border Patrol agent, knowing she spoke only Spanish, provided her with a voluntary departure form in English; incorrectly told her that she could *not* obtain relief from an immigration judge in the United States, but could easily and quickly obtain legal status once in Mexico; said she would be detained for months if she did not sign the form; and failed to allow her to speak with an attorney or the Mexican Consulate.

In August 2014, the ACLU reached a settlement with DHS, which allowed the named plaintiffs to return to the United States and their families and required DHS to make changes to its practices in using voluntary return in Southern California. However, the CBP practices and misconduct documented in Southern California are similar to those reported by immigration attorneys and non-citizens coerced to accept voluntary return in other parts of the country.

### b. Administrative Removal Under 238b

Individuals all over the United States can also be deported without a hearing if they have particular criminal convictions. Under the INA, undocumented individuals who are convicted of an aggravated felony[373] or a crime involving moral turpitude[374] are subject to administrative removal, a summary removal procedure that bypasses the courtroom and allows immigration officers to determine that a person has been convicted of a qualifying offense and is removable. The determination that a particular conviction actually is an aggravated felony can require complex legal analysis and attention to the changing state of the law; it is a determination that can be erroneously made even by immigration judges but is exponentially more prone to error when undertaken by someone without legal training. Despite the limitations of a 238b proceeding, there are still some required safeguards that advocates report are too often ignored.

In 1990, when he was eight months old, Ricardo S. A. came to the United States from Mexico with his family. The next time he left the United States was at his deportation at age 20, in 2009. Growing up in Nevada, Ricardo completed the eleventh grade, played soccer for his high school, worked at night, and had planned to marry his U.S. citizen girlfriend. But when he was 19, Ricardo pleaded guilty to conspiracy to commit burglary, a misdemeanor for which he spent two days in jail and was originally sentenced to probation and a suspended sentence of one year.

On September 16, 2009, a few months after his conviction, Ricardo checked in with his probation officer and was arrested by immigration officials. "I explained to them right away about my case. I said, 'Let me see an immigration judge,'" Ricardo recalls.[375] In fact, Ricardo *did* have the right to see an immigration judge and to have a regular immigration hearing, which would have allowed him to make claims to remain in the United States or at least to avoid a formal removal order. Instead, ICE issued a Notice of Intent to Issue a Final Administrative Removal Order and claimed that Ricardo was convicted of an aggravated felony.

At the time of his deportation, Ricardo's misdemeanor conviction was clearly not an aggravated felony under Ninth Circuit law, which governed his proceedings.

However, alone in detention, without an attorney's assistance, 20-year-old Ricardo did not know what his rights were or that he had not been convicted of an "aggravated felony." Initially, Ricardo insisted that he wanted to see a judge and checked off the box on the notice issued by ICE, indicating that he wanted to contest the removal order. "I explained I wanted to fight [my case]," recalls Ricardo. "The [ICE] officer said, 'You have no chance.' It was my first real time incarcerated and I was scared. I signed because she told me you don't have a chance to win because of your crime. …. She made it seem like I was wasting my time, and I would be incarcerated for no reason."[376] Having been convinced by the ICE officer—who was not a lawyer or a judge—that his crime was an aggravated felony and appeal was futile, Ricardo withdrew his request for review on September 21, 2009.

However, after learning that Ricardo had been ordered deported because of his conviction, on September 29, 2009, Ricardo's defense attorney filed a motion for resentencing to lessen Ricardo's sentence so that it would indisputably be recognized that his crime was not an aggravated felony.[377] But on September 30, 2009, Ricardo was deported back to Mexico, where he had no immediate family and which he had no memory of, having left as a baby. The Nevada state court subsequently reduced Ricardo's sentence to less than a year and noted that it might even have recommended diversion, if the immigration consequences had been presented at that time. All this came too late for Ricardo, who had been deported and remains separated from his family while they are unable to leave the United States while they apply for status.[378]

## Ricardo came to the United States as a baby but was deported back to Mexico when an ICE officer incorrectly determined he had committed an "aggravated felony."

Jose Gonzalez-Segundo came to the United States from Mexico in the 1960s as a young child; he has five U.S. citizen children, all born in Texas. From the third grade, Jose worked as a fruit picker alongside his mother and never learned to write in English or Spanish. In 2001, Mr. Gonzalez-Segundo was convicted of possession of a controlled substance, which, at the time, was considered an aggravated felony in the Fifth Circuit.[379] While in prison, Mr. Gonzalez-Segundo was interviewed by an immigration officer in a mixture of Spanish and English, as the officer spoke limited Spanish. Mr. Gonzalez-Segundo later testified that the officer gave him only one of the two required pages and told him to sign it in order to be released. He could not read or understand the pages, nor did the officer translate them for him. He was deported to Mexico, which he had not returned to in more than 35 years.[380]

In both these cases, individuals in criminal custody relied upon ICE officers to make a complex legal determination and also to educate them on their rights. The threshold question as to whether a person was convicted of an aggravated felony and can even be processed through administrative removal (238b) is complex, and given the complexity and the volatility of the law on what constitutes an aggravated felony, this high-stakes question should not be delegated to an immigration enforcement officer. But the procedure is also problematic because it denies individuals the opportunity to apply for most forms of relief, and takes place while the individual is in criminal custody and without information on his or her rights in the immigration system.

Placement in 238b is not mandatory; a DHS officer can choose to place the individual in regular court proceedings where an immigration judge can undertake the more complex analysis as to whether a person has a conviction for an aggravated felony and whether he or she is nonetheless eligible for relief. For many non-citizens in 238b proceedings, the only available relief they will hear about is withholding of removal or CAT if the individual fears being removed to his or her country of origin. But that is not the only form of relief the individual may be eligible for: he or she may be eligible for a U or T visa or

may not even be removable. But while immigration officers in 238b are required to refer a person who claims fear of removal for a reasonable fear interview, they are not required to inform the individual of what other forms of relief he or she is entitled to.

In 1989, Ofelia H. came to the United States, where she raised her children and later adopted a U.S. citizen whose parents had been murdered (while also raising two of her grandchildren.) For years she worked at a factory using what she believed was a fake Social Security number so she could work and support her family. In 2007, it emerged that the Social Security number was real; she served eight months for identity theft. At the end of her sentence, she was transferred to immigration custody. "I was right at the exit of the jail and my daughter was waiting for me—I could see her," she recalls. "Immigration handcuffed me without telling me why." Ofelia was taken to a different immigration detention facility, where she was processed through administrative removal (238b) as an "aggravated felon" and deported. The forms were in English and Ofelia does not recall being given any information about her rights. After her deportation, her adopted daughter, then four years old, joined her in Mexico but could not adjust to life there; Ofelia and her adopted daughter therefore returned to the United States in 2008. Even at the time of her deportation, Ofelia was in fact eligible for a U visa after being attacked with a deadly weapon while working at an apartment complex, but without a lawyer and any assistance she was unable to apply and attempt to stop her removal. She is now working with an attorney and in the process of applying for a visa.

Although reliance on these summary removal tools has become routine—even the default, in many circumstances—immigration officers still have discretion to place a person in formal removal proceedings before a judge. In cases where the person has obvious equities—long residence and/or family in the United States, for example, or where it may be difficult to determine whether the individual has a claim (e.g., an individual with a severe mental disability, someone with a minor conviction that may or may not be an aggravated felony, etc.)—it makes sense to allow them to present their case in court where a judge can make those critical determinations. Placing a person in formal removal proceedings triggers important procedural rights and many more opportunities to apply for relief from removal. It is unclear how often immigration officers use this authority, but there are certainly many cases where officers do not use their discretion to refer someone to a full hearing and instead condemn them to immediate deportation, which can have irreparable consequences for the individual and his or her family in the United States.

# D. CHILDREN ARRIVING ALONE

> "We are talking about large numbers of children, without their parents, who have arrived at our border—hungry, thirsty, exhausted, scared and vulnerable. How we treat the children, in particular, is a reflection of our laws and our values."
> —Secretary Jeh C. Johnson, U.S. Department of Homeland Security[381]

Being arrested, detained, interrogated, and deported by an immigration officer can be a harrowing experience. For children who come to the United States alone after a dangerous journey during which many are victimized, the need for additional protections when they arrive is acute. In recent years, the disastrous human rights situation in Central America—in Honduras, Guatemala, and El Salvador, in particular—has been reflected in the escalating number of children arriving in the United States. As recently documented by the United Nations High Commissioner for Refugees, the majority of these children are escaping violence, lawlessness, threats, and extortion, and may have strong claims to protection under human rights law.[382]

In the past few years, the number of children arriving in the United States to seek protection (and, in some cases, to be taken care of by family) has risen dramatically, with an estimated 90,000 arriving in the United States in FY 2014.[383] Recognizing the swelling numbers of children arriving alone and the violence they are fleeing, President Barack Obama declared the unfolding crisis to be a humanitarian situation; [384] but at the same time, the response from the Obama administration and many in Congress has been to seek to dismantle, rather than reinforce, protections for non-citizen children seeking help in the United States.

Arrival at the U.S. border is not the end of the story. While Central American children are supposed to be brought before a judge, in some circumstances they are instead removed without a hearing, in violation of federal law,[385] and seemingly without consideration for the humanitarian catastrophe into which they are being returned. For Mexican children, this is the status quo: unless (and even if) they meet additional screening criteria, the majority of Mexican children are quickly returned to Mexico without the opportunity to see a judge. As such, these children are often treated not as kids in need of protection, but as a problem to be removed.



Spencer Platt/Getty

A child and her family in their gang-plagued neighborhood in Tegucigalpa, Honduras.

## 1. Legal Background

For years, unaccompanied children[386] were regularly turned away at the U.S. border; if they did make it inside the United States and were apprehended by immigration officers, they were detained by the Immigration and Naturalization Service[387] in adult detention facilities.[388] In 1997, after over a decade of litigation, the *Flores v. Reno* settlement agreement ("the Flores settlement") created nationwide standards on the treatment, detention, and release of children.[389] The agreement requires the federal

government to provide unaccompanied children with basic necessities such as drinking water and medical assistance; to keep children separated from non-related adults; and to release children from immigration detention as soon as possible. If no release option is immediately available, children must be placed promptly in the "least restrictive setting" that is "appropriate to the minor's age and special needs."[390]

The Flores settlement marked the beginning of the U.S. government's recognition (now unfortunately in decline) that unaccompanied children are entitled to due process rights. In particular, all unaccompanied children must be given (1) Form I-770, Notice of Rights and Final Disposition, which informs children of their rights and options; (2) a list of free legal services; and (3) an explanation of the right to judicial review in court.[391] A subsequent lawsuit, *Perez-Funez v. INS*, also established that unaccompanied children must be advised by DHS of their right to a hearing before they are presented with a voluntary departure form.[392] Children from Mexico and Canada must be given the *opportunity* to consult with an adult friend or relative, or a legal services provider, before accepting voluntary departure; this consultation is a mandatory prerequisite for children from countries other than Mexico and Canada.[393] Once in immigration court, children can apply for several forms of relief from removal, including asylum and Special Immigrant Juvenile (SIJ) Status.[394]

In the years following *Flores* and *Perez-Funez*, Congress developed additional safeguards for unaccompanied children apprehended and detained in the United States. Notably, the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 codified that children arriving alone in the United States cannot be expelled through expedited removal,[395] and the Homeland Security Act of 2002 transferred responsibility for unaccompanied children from the INS to the Office of Refugee Resettlement ("ORR") within the U.S. Department of Health & Human Services (and thus outside of the newly formed Department of Homeland Security).[396] This move provided additional protections for children awaiting an immigration hearing. Although human rights advocates have continuously found that the agencies that apprehend kids (DHS) and hold them during their hearings (ORR) have failed to fully implement the Flores settlement agreement,[397] by taking kids out of adult detention facilities and providing them with necessary social services, this system is significantly more rights-protective than the previous system and the existing adult system.

These humanitarian protections for children are necessary in and of themselves, given children's inherent vulnerability and susceptibility to abuse and coercion.[398] But these protections have also proved instrumental in safeguarding children's legal rights in court. Detention has a strong coercive effect, so removing children from detention as soon as possible is important, not just to avoid unnecessary harm and trauma, but also to protect their rights to seek relief.

The experiences of Kevin G. and his brother Javier illustrate the negative impact of detention on a young non-citizen's ability to pursue asylum, even when they have a bona fide claim. Kevin G. fled gang violence in Honduras, leaving home for the United States at age 16 and traveling by himself for most of the journey. "I would not want my brothers to travel like that; I don't want them to go through what I did," he told the ACLU.[399] He was arrested crossing into the United States and, as a minor from Central America, placed in removal proceedings and housed in a shelter in Los Angeles. His brother Javier, who had been attacked with a machete by a gang—the same gang that threatened Kevin—when he refused to join them and participate in murders, followed Kevin in 2012; Javier was 23. As an adult, Javier was placed in a detention center where he spent several months waiting for an interview with an asylum officer. Finally, Kevin says, his brother decided to accept deportation rather than wait

**Sixty-four percent of Mexican children coming alone to the United States have international protection claims according to the UNHCR.**

in detention; Kevin says that soon after Javier returned to Honduras, he was murdered by the gang he had originally fled.[400]

The safeguards that the Flores settlement, *Perez-Funez*, and the Homeland Security Act initiated for unaccompanied children—diversion from detention and the right to a hearing—are essential to ensure that children like Kevin are able to present their cases and defend their rights. But these protections are triggered only when (1) a child is correctly identified as an unaccompanied minor and (2) the border officers who apprehend and question the child follow the law and ensure he or she is referred to the alternate ORR system and placed in formal removal proceedings. Unfortunately, this is not always the case.

## 2. Accessing the Protections of the System

While the ORR system is designed to be child-centered, the Border Patrol stations are not.[401] Even as decades of litigation eventually removed children from long-term detention in adult facilities, children continue to face abuse and threats while in short-term adult detention. In June 2014, a complaint to the DHS Office for Civil Rights and Civil Liberties and the Office of Inspector General ("CRCL/OIG complaint"), filed by several organizations including the ACLU, documented 116 cases of abuse by CBP against children, ages 5 through 17, including shackling, rape, death threats, and denial of medical care.[402] The investigation is ongoing, but the complaints raised are not new.[403] It should come as no surprise, then, that some children, like adults, may forfeit their rights while in CBP custody—for example, by saying they are adults, have no fear of being deported, or want to be returned to their country of origin. In such an environment, it is unlikely that children would feel comfortable disclosing sensitive information about their lives, their families, or the violence they have fled.

The protections for children traveling alone are not automatically activated; often, children must claim those protections by volunteering personal information about themselves—starting with their age—without knowing what the benefits or consequences are of providing that information. Some children will be misidentified as adults, either due to their appearance or their own misstatements. For example, Maria, a 15-year-old Mexican girl deported to Agua Prieta, Mexico, was trying to reunite with her father in the United States when she was apprehended by Border Patrol; she told the officers that she was 19 years old "because I thought they would deport me easier and quicker [as an adult]."[404] Mexican immigration staff in Nogales, Sonora, Mexico, reported that they had frequently seen kids who were presumed to be adults while in CBP custody.[405]

**Somers found 56 percent of repatriated Guatemalan children were misidentified as adults, detained in adult U.S. facilities, and deported without a hearing.**

In 2012, attorney Aryah Somers interviewed unaccompanied children who had been repatriated to Guatemala. In one three-week observation period alone, Somers found that 34 of the 61 unaccompanied children who were repatriated had been classified as adults and, consequently, had been detained in adult detention facilities in the United States; two of those children, Ms. Somers said, "were immediately identified as potentially eligible for Special Immigrant Juvenile Status."[406] Some children claimed to be 18 or older out of "fear, pressure from immigration officers, misinformation from the *coyote* or *pollero* that children are treated worse than adults in the U.S., and a belief that they would be detained until their 18th birthdays."[407] Misidentified as adults, these children were not only detained in adult facilities, in violation of federal law, but were also deprived of the opportunity to apply for humanitarian protections and other forms of relief from deportation, or even to see a judge or consult with a lawyer.[408]

It is unclear to what extent CBP officers are trained in the significance of the procedural protections in place




A Border Patrol agent with Alejandro, 8, who traveled by himself across the Rio Grande.

for children or why a valid waiver of those rights is so significant. But in some cases, it appears that border officials are deliberately interfering with those rights. For example, according to the CRCL/OIG complaint, CBP accused a 16-year-old of lying about his age, then strip-searched him and threatened that he would be made "the wife" of a male detainee for lying about his age.[409] In another case documented in the same complaint, CBP officials confiscated a 16-year-old's birth certificate, and instead of immediately referring him to ORR, attempted to force him to sign a form that he believes was for his deportation; when the child attempted to read the form, "officials tore up the document, offered a new one, and again told him to sign."[410]

Even when children are properly identified as minors and specifically request to see a judge, they are not always referred into ORR care and to the immigration court for a hearing. Deyvin S., a teenager from Honduras, had been in the United States for three weeks when he was arrested by Border Patrol officers while walking near a checkpoint in Brownsville, Texas.[411] He says he repeatedly asked if he could speak to a lawyer and that he wanted to see a judge. Deyvin says the officers told him "it was impossible that a judge or lawyer could do anything for me."[412]

While legal developments since the 1980s ensure that many children will be referred for a hearing, regardless of what happens in their interview with border officials, for Mexican children this initial interaction with Border Patrol is the most consequential. Unlike children from "noncontiguous countries,"[413] Mexican children are not automatically referred to an immigration judge and can be returned "voluntarily" upon apprehension in the border area. For Mexican children, then, this first interaction with border officials can make a decisive difference, leading to either the chance to be heard in court or immediate repatriation.

## 3. Mexican Children and the TVPRA

Mexican children are not exempt from the violence and other international protection concerns that plague children in Central America; a recent UNHCR study, which included interviews with 102 unaccompanied Mexican children, found that 64 percent had potential international protection needs, particularly from violence and coercion to assist smugglers.[414] Similarly, Refugees International recently recorded that in Mexico, violent activities such as kidnappings and extortions are at "their highest levels in more than 15 years," and found that children in particular have been victims of kidnapping, assassination, extortion, and disappearances.[415]

In the years after the Flores settlement and the Homeland Security Act of 2002, despite heightened safeguards for unaccompanied kids, Mexican children continued to be routinely turned around at the border, just like most adults, without any evaluation of the risks they face if repatriated. Partly in response to this ongoing problem, Congress passed the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), which strengthened some of the *Flores* and HSA provisions on children's rights in custody while also adding additional screening requirements for Mexican children.

The TVPRA requires that any border officer who apprehends an unaccompanied Mexican child must interview the child and confirm that he or she (i) is *not* a potential victim or at risk of trafficking, (ii) has *no* possible claim to asylum, and (iii) can (and does) voluntarily agree to go back home.[416] Only if all three criteria are met, and the CBP officer is convinced the child has no potential asylum or trafficking claim and also has the capacity to consent to his or her return to Mexico, may the unaccompanied Mexican child be repatriated without a hearing.[417] This places considerable authority in the hands of the CBP officer, who must screen the child and determine whether or not he or she can be removed. To ensure that eligible Mexican children are able to benefit from the TVPRA's protections, the statute requires that "[a]ll Federal personnel . . . who have substantive contact with unaccompanied alien children" must receive "specialized training," including training in "identifying children who are victims of severe forms of trafficking in persons, and children for whom asylum or special immigrant relief may be appropriate."[418] But fundamentally, the TVPRA as written presumes that an unaccompanied Mexican child cannot be immediately returned to Mexico and is in a vulnerable position; the required screening places the burden on the examining officer to determine that a child can safely be repatriated and is able to understand that decision. In practice, however, the burden is on the child to speak up and be heard while in detention and while being interviewed by a law enforcement officer. For Mexican children, removal has become the default.

**UNHCR found that most interviews involved "merely perfunctory questioning of potentially extremely painful and sensitive experiences for children."**

## 4. The TVPRA in Practice

When the TVPRA was introduced, advocates expected a deluge of unaccompanied Mexican kids into temporary shelters within the United States; in fact, this never happened. According to CBP statistics on FY 2013 apprehensions, 17,240 Mexican unaccompanied children were apprehended at the border;[419] similarly, figures from official Mexican immigration sources estimate that in 2013, 14,078 Mexican unaccompanied children were repatriated from the United States.[420] And yet, during the same time period, ORR reported only 740 Mexican unaccompanied kids in its custody.[421] This figure reflects all Mexican children in ORR custody, including those apprehended far from the border anywhere in the United States, and so likely significantly overestimates the number of Mexican unaccompanied children in ORR custody. Even so, these figures suggest that the overwhelming majority of Mexican children arriving alone—around 96 percent—are turned around when CBP apprehends them at the border.

UNHCR has similarly estimated that 95.5 percent of Mexican children are returned without seeing a judge.[422]



Sam Frost

Tijuana, Mexico. Stenciled on the Mexico side of the fence between the United States and Mexico are families being lifted to freedom by balloons.

Thus, despite the additional protections the TVPRA was supposed to enable, Mexican unaccompanied children continue to be turned away from the United States. The additional screening requirements operate like a sieve, creating procedural and substantive hurdles for Mexican children to overcome before they can get before an immigration judge and win relief. At the substantive level, under the TVPRA, a Mexican child's right to a hearing is triggered *only* if he or she presents an asylum- or trafficking-based claim, or if the government chooses to pursue a formal removal order (as opposed to voluntary return). Other valid claims for relief will not get a Mexican child arrested in the border zone into court. For example, Arturo, a 15-year-old from Tabasco, Mexico, was attempting to come to the United States and reunite with his mother and two U.S. citizen siblings when he was caught by DHS officers in Arizona. His father had abandoned him in Mexico: "There is no reason for me to stay [in Mexico] if my dad doesn't want me here."[423] Because he had been abandoned by at least one parent, Arturo might have qualified for Special Immigrant Juvenile status (SIJ) and, if successful in court, been able to remain in the United States and one day adjust his status. But even if Arturo were eligible for SIJ, he would not have the opportunity to present that claim because it does not trigger a right to go to court and be heard under the TVPRA.[424] By contrast, non-Mexican children arrested at the border with the exact same claims are not pre-screened by CBP and will have the opportunity to raise *any* claim for relief in their removal proceeding. As such, the TVPRA screening effectively narrows the grounds of eligibility for unaccompanied Mexican children to enter and remain in the United States.

Yet even children who *are* eligible under the TVPRA to enter the country and see a judge are routinely denied that opportunity when CBP officers fail to conduct the TVPRA screening. Of the 11 Mexican unaccompanied children the ACLU interviewed in Sonora, Mexico, ranging in age from 11 to 17, only one, Hector, said that he had been asked any questions about his fear of returning to Mexico. Hector recalls: "I asked if there was any benefit and the *migra* said, 'No, there is probably no benefit. You just crossed through the desert so you're going to be deported.'"[425] Brian, an unaccompanied child from Nogales, Mexico, whose father is in Tucson, said he had been trying to enter the United States since age 14 but in his three attempts, he had never been asked about his fear of returning to Mexico or if he wanted to see a judge.[426]

Even when Mexican children attempt to explain their need for protection, in at least some instances border officials apparently refuse to believe them. For example, 16-year-old M. E. is a Mexican girl who sought asylum in the United States after her family received multiple death threats and demands for money from a gang, which she believes led to her brother's disappearance in early 2014. M. E. recalls, "Then they said that if we could not negotiate with money we may as well buy bulletproof vests for the whole family because they were going to kill us."[427] According to what M. E. related to her attorney, and as explained in the CRCL/OIG complaint, an immigration official asked M. E., "What right do you have to come to our country?" When M. E. tried to explain the danger she fled, according to her

statement and the CRCL/OIG complaint, "the official told her she would not get through with her *pinche mentira* [fucking lie] because he knew how to detect a liar like her."[428] M. E. continually returned to the U.S. border to seek asylum and was returned to Mexico multiple times before she was ultimately allowed into the United States and transferred to an ORR shelter.[429]

Beyond requiring affirmative screening for asylum and trafficking claims, the TVPRA requires that immigration officials ensure that children voluntarily choose to go back to the Mexico, but children interviewed by the ACLU did not appear to have been subject to this inquiry. Jesús, a 16-year-old unaccompanied Mexican child, said, "They just put [the form] in our face and said sign. They wouldn't give us any information. . . . They didn't give us [the] opportunity to ask anything; they just called us up to sign."[430] Hiram, 11 years old, and his brother Pepe, 16 years old, said they had not been asked anything except their age when Border Patrol agents detained them.[431] Federal regulations and the Flores settlement further require that any child under the age of 14 be read the I-770 form in a language that he or she understands.[432] This did not appear to take place for Hiram.

In interviews conducted by the ACLU, it was clear that the children had no idea what rights—if any—they had, or what was happening in the process. Similarly, in interviews by the Center for Public Policy Priorities (CPPP) with children who had been turned away at the U.S. border, some children did not even understand that they had been in the United States when arrested and removed.[433] Mexican immigration staff told the ACLU that in some cases, Central American children claim to be Mexican, not knowing that there are additional protections in place for Central American children at the moment.[434] In its study, CPPP regularly encountered such children in Mexican shelters; one child, Daniel, had fled gang violence in Honduras only to be quickly turned around and sent to Mexico by CBP without being asked about his fear of returning.[435]

In the absence of a designated professional advocating for the child in CBP custody or providing any meaningful information to the child about their rights, the burden is on the child, who has just made a difficult and dangerous journey, to volunteer information. That children would be afraid or hesitant to volunteer information to an armed U.S. law enforcement officer, while in detention and without any assistance (and often without an interpreter), is unsurprising. And yet, this is the context in which children, arriving alone, are required to vindicate their rights or else, if Mexican, be quickly deported. Responding to proposals to put Central American children through the same screening and summary removal system as Mexican children are, Lawrence Downes of The New York Times wrote,

> There are several reasons why this is a terrible idea. It starts with handing the responsibility for humanitarian interviews to a law-enforcement agent with a badge and a gun, whose main job is to catch and deport illegal border crossers, and who may not even speak Spanish. This is not the person you want interviewing a traumatized 15-year-old Honduran girl to find out whether the abuse she endured at home or the rape she suffered en route qualifies her for protection in the United States. . . . It would be criminal to subject Central American refugees to the same system. They need lawyers and victim advocates, clean, safe shelter and the chance to be heard in court.[436]

In addition to ACLU interviews with unaccompanied children conducted in Sonora, Mexico, two thorough investigations by the UNHCR and Appleseed into TVPRA compliance across the entire southern U.S. border demonstrated that screening failures are widespread and routine.

The 2013 UNHCR investigation included in-person observation of TVPRA interviews at four locations and was conducted at the request of the federal government. According to this report, 95.5 percent of unaccompanied Mexican children apprehended by CBP are returned across the border—not because they did not have claims but because "CBP's practices strongly suggest the presumption of an absence of protection needs for Mexican UAC [unaccompanied children]."[437] This is the exact opposite of what the TVPRA was designed to do—namely, to put the burden on U.S. immigration officials to show that a child would *not* be in danger if removed from the United States.

CBP is unable to complete this mandate, however, as most agents appear unfamiliar with many of the issues

they are screening for—risk of trafficking, asylum claims, and ability or inability to consent to voluntary return. The mandatory screening forms, the UNHCR found, were not only inscrutable to the children, but also to the officers doing the questioning, often in public settings and sometimes without an interpreter. Overall, the investigation concluded, "The majority of the interviews observed by UNHCR involved what was merely perfunctory questioning of potentially extremely painful and sensitive experiences for the children. And in the remainder, the questioning, or lack of questioning, was poorly executed."[438]

The "virtual automatic voluntary return" of Mexican unaccompanied children, the UNHCR found, was not due to officer callousness but a lack of education and systematic failures to understand and implement the TVPRA screening. According to the UNHCR report, CBP officers failed to ask several (or sometimes any) of the required screening questions; sometimes conducted an interview without an interpreter; by default, interviewed children in public places about sensitive issues; had no training in child-sensitive interviewing techniques; and did not understand the legal background and rationale for the screening activities. In some cases, children were told to sign forms that had already been filled out.[439]

Perhaps most disturbingly, the investigation found that CBP officers do not understand what human trafficking means and are unable to identify child victims of human trafficking—which includes recruitment and coerced participation in the human trafficking industry. Although the U.S. Department of State recognized Mexico as one of the top countries of origin for victims of human trafficking in FY 2012, according to the UNHCR, "None of the agents or officers interviewed said they had ever identified a child trafficking victim or one at risk of trafficking."[440] Rather, the UNHCR found, some officers expressed concern that they could not refer these children, who may have been coerced by gangs to participate as guides in the human trafficking industry, for criminal prosecution.[441]

From 2009 to 2011, Appleseed interviewed children on both sides of the U.S.-Mexico border, as well as U.S. and Mexican government officers, and found similarly that the majority of Mexican children arriving alone are quickly returned due to significant failures in the TVPRA screening.[442] Appleseed found that the few unaccompanied Mexican children who *do* make it into the ORR system are

Mexican immigration office on the Mexican side of the border with Nogales, Arizona. Mexicans deported from the United States to Nogales, Mexico, are interviewed by Mexican immigration officers who assist them in their journey on to their hometown. Unaccompanied Mexican children are briefly held here before being transferred to shelters, which contact their parents or guardians to come and pick them up.



## "A lot of [these children] should be asking for asylum in the United States; they've been abused before."

children caught in the interior of the United States who cannot automatically be repatriated.[443] Mexican children at the border, however, are inconsistently and inadequately screened under the TVPRA:

> Roughly half of the children we interviewed […] were not asked any questions that might elicit information about whether they have a credible fear of persecution upon return. Likewise, approximately half of the children stated that they were not asked any questions that would touch upon the trafficking indicators set out in the form. … Even though Form I-770 explicitly states that "no [minor] can be offered or permitted to depart voluntarily from the United States except after having been given the notice [of their rights]," approximately three-quarters of the children we interviewed […] stated that they were not informed of their rights. Notably, many children stated that they were never asked whether they wanted voluntary departure; they were simply told that they would be returning to Mexico.[444]

Mexican immigration officials in Sonora, Mexico, told the ACLU that while they see approximately 20 unaccompanied children deported to Nogales every day, it is extremely rare to find a child who has been before a judge.[445] That Mexican children are rarely referred for a formal hearing does not mean that these children have no claims to relief. One Mexican immigration official who sees unaccompanied kids every day observed, "A lot of [these children] should be asking for asylum in the United States; they've been abused before."[446] Dr. Alejandra Castañeda, an investigator at the Mexican think tank El Colegio de la Frontera Norte, similarly observed that under the current system, Mexican children face the same risks as Central American children but are quickly deported: "A lot of unaccompanied minors from Mexico share the same conditions of risk, of already being victims. They should be given a chance to prove that."[447]

It is unclear what questions CBP officials are asking kids apprehended at the border—and what questions are actually required, under the TVPRA or by CBP policy, to effectuate the screening. Indeed, DHS has not promulgated regulations on the types of questions that should be included to screen for a trafficking or asylum claim, and it does not appear that DHS has developed any specific guidelines on the issue either.[448] The UNHCR and Appleseed both found, however, that even the minimal forms that exist to screen for trafficking or asylum claims are either not used or are so formulaic and incomprehensible to a child that their utility is marginal at best.[449]

In addition to these predictable inconsistencies in screenings and referrals, DHS lacks regulations on how to assess whether a decision to return to Mexico and withdraw the application for admission is "independent" or voluntary—or whether the child, who may be as young as four years old, has the capacity to make that decision alone. Explaining this prong of the TVPRA, one reporter noted that the question has been reduced to this: "[C]an they decide on their own to turn around and go back home after making a long, scary journey by themselves? If the Border Patrol agent thinks the answer is yes, off they go."[450] Wendy Cervantes, Vice President of Immigration and Child Rights Policy at First Focus, observes, "[M]ost people would argue that no child should make that decision."[451]

The existing regulations do require that all unaccompanied children, including Mexican children, be explained their rights and provided with a Notice of Rights and Disposition (Form I-770).[452] Mexican children are supposed to be given the *opportunity* to consult with a relative or free legal services provider prior to even being given the voluntary departure form[453]; in practice, this opportunity is often illusory. None of the children interviewed by the ACLU recalled being asked if they wanted to use the phone to call their families or to seek help from a lawyer; none said the I-770 form was read or explained to them; and while one was told he might be able

to see a judge, none were told that there were options for them except to return to Mexico.

CBP officers are supposed to use Form 93, a screening form to determine if the child is a potential trafficking victim or has an asylum claim. Appleseed notes this form is rarely used by CBP officers, but even when it is used, the form questions are formulaic and are not designed to help the agent draw out the details and history necessary to determine whether the child has a claim.[454] The form includes no guidance or test for whether the child has the capacity to accept voluntary return, as required under the TVPRA. Only one child interviewed by the ACLU recalled being asked anything except for their name and, in some cases, their age, and while part of this may be attributable to the language barriers, it is also likely that the nature of the questioning—when and if conducted—did not suggest to the child that this was an opportunity to share their story.

"Informed consent" in this context has been reduced to a set of mechanical questions on a form that children interviewed were not given the chance to review, and which Appleseed found to be anyway facially inadequate.[455] The whole rationale behind the TVPRA was to interrupt the practice of immediately returning Mexican children and to provide procedures that would ensure these children were screened for and made aware of their rights; instead, it appears that the TVPRA, as implemented by CBP, has done neither. Since the TVPRA went into effect in March 2009, Appleseed observes, Form 93 and the short accompanying memo constitute, to date, "the only significant change in practice adopted by the CBP in response to the TVPRA."[456] Nonetheless, in Appleseed's assessment, "[n]either the memo nor the form itself could be characterized as 'specialized training' that would equip CBP officers to deal with and screen detained Mexican minors. Senior CBP officials do not contend otherwise."[457]

An undocumented immigrant apprehended in the desert near the U.S.-Mexico border is processed before being transported to a detention center on June 1, 2010, near Sasabe, Arizona.



The inadequacies of the forms and formal procedures place additional responsibility on the individual border officer to adequately and sensitively question each child. Although the statute requires specialized training for officers interviewing unaccompanied children, it is unclear what that training entails or how regularly it is provided. The training materials and any related guidance is not publicly available, and although ACLU FOIAs requesting this information have not yet been answered, responses to similar requests by Appleseed demonstrated "no indication of any specialized training."[458]

Even where officers are attempting to conduct the screening, many do not speak Spanish despite working with a largely Spanish-speaking population. Most children interviewed by the ACLU said the CBP officers spoke only English and did not use an interpreter. None of the unaccompanied children interviewed by the ACLU for this report spoke any English at the time of their apprehension. Two of the unaccompanied minors interviewed in Agua Prieta, Mexico, spoke an indigenous language and knew very little Spanish.[459]

* * *

For most Mexican children traveling alone, the closest they get to the U.S. justice system is an interview with a CBP officer and a night in a detention facility. It is unlikely that children arriving alone and seeking protection have any idea what their rights are, and their experience with CBP, in many cases, is unlikely to encourage them to volunteer traumatic or difficult facts about their experiences—even when that information is the only key to getting into court.

After examining where CBP interrogates children, Appleseed found that while the interview/interrogation setup varied, in every location the environment was uniformly distressing and antithetical to providing children with security:

> Everything about this experience tells these unaccompanied children that they are in a detention center run by a powerful U.S. law enforcement agency and that the alternative to repatriation is to be "locked up" in the United States. It is unreasonable to expect that most children in this environment would divulge sensitive information that would indicate that they had been trafficked or otherwise feared abuse. Indeed, one CBP agent we spoke with told us that he does not expect Mexican minors to trust him or his colleagues in this "police station" environment.[460]

This interrogation is the only chance a Mexican child has to get into the immigration court system and be heard. But for many children, this experience is too intimidating to help them. While CBP questioning appears too short and automated to elicit or provide any meaningful information, the children interviewed by the ACLU all said they just wanted to get out of detention. Once returned to Mexico, they talked about being yelled at, kept in freezing and dirty cells that they were forced to clean, and then, right before their removal, told to sign a form (in English) they did not understand before being bussed back to Mexico. They described brief interviews during which most were asked only their names and age, with no real questions that could determine whether they had claims that the TVPRA was designed to screen for, or that would suggest the decision to return to Mexico was voluntary. The escalating number of children arriving alone and passing through CBP detention may exacerbate the current systemic failures, given the strain on resources and focus on non-Mexican arrivals. But the result is that an increasing number of children who *do* have claims to enter the United States have been and will be turned away and returned to danger.

# EXHIBIT 8

Los Angeles Times Log In

ADVERTISEMENT

# Wrongly Deported, American Citizen Sues INS for $8 Million

By IAN JAMES

SEP. 3, 2000
12 AM

ASSOCIATED PRESS

AMITYVILLE, N.Y. — When Sharon McKnight arrived home this summer after a year of visiting relatives in Jamaica, she anticipated warm embraces from her mother and sister.

Instead, immigration agents at John F. Kennedy International Airport accused her of using a fake passport, shackled her hand and foot, detained her overnight and deported her to Jamaica the next day.

McKnight, who is 35 and mentally handicapped, unable to read or write, could not persuade the agent at the window that the passport picture was hers and that she was a U.S. citizen.

"He said, 'Lady, this not you,' " McKnight recalls, "and I said, 'It's me.' "

More agents questioned her, but none believed her pleas.

McKnight's deportation was like that of thousands who are nabbed by immigration agents at U.S. airports each month. But in this case, she was right and the U.S. Immigration and Naturalization Service was wrong.

Now she and her family are suing federal officials for $8 million. Their attorney, Mitchell Zwaik, says the 1996 law that allowed her deportation ended up splitting a family and humiliating a U.S. citizen who only wanted to go home.

A provision of the law, known as “expedited removal,” allows agents to quickly deport people whom they determine are trying to enter the country fraudulently, without allowing them an appeal before judges.




SPONSORED CONTENT

Music, Food and Drinks: 5 Reasons San Diego Will Be Lit This Autumn

By San Diego Tourism


“The law has to be changed,” Zwaik says. “You have immigration people making snap decisions at local airports.”

With the help of Zwaik and U.S. Rep. Michael Forbes (D-N.Y.), the woman’s family eventually convinced immigration authorities that McKnight was a citizen, and she returned home to Amityville, in New York’s suburban Long Island, on June 18, seven days after she was deported.

INS spokesman Russ Bergeron said the quick deportation process is used only when there is “clear evidence” someone is trying to enter the country fraudulently. He declined to speak specifically about McKnight’s case because of the pending lawsuit.

Previously, however, INS officials have asserted that McKnight told agents the passport was not hers, said she had been born in Jamaica and that she gave the name of a cousin from Jamaica rather than her own.

McKnight disagrees with their account but acknowledges she was confused by the rapid questioning. Born on Long Island but reared much of her childhood in Jamaica, her mother’s homeland, McKnight speaks with a Jamaican accent.

Led into an airport room for further questioning, McKnight recalls the agent asking her, “Where did you get this passport?”

“And I said, ‘My cousin. My mother left it with my cousin to give to me when I’m coming up.’ And they said I’m lying.”

McKnight’s mother, Eunice Benloss-Harris, confirmed later that she had given the passport to her niece, Hilda Brown, for safekeeping until McKnight’s return to New York.

McKnight says the agents repeatedly asked her name, and she told them she was Sharon Rose McKnight.

“They said, ‘That’s not your name,’” McKnight recalls. “I said, ‘How are you telling me it’s not my name? And I know my own name.’ ”

The agents were convinced she wasn’t the person pictured in the passport, so they took her to a room full of other detainees. She was shackled at her ankles and wrists, with both sets of restraints chained to a leather belt. She sat hunched over for hours, shivering in the over-air-conditioned room.

"I spent the night there, nothing to eat," she says. She said she was refused permission to use a restroom. "I peed right on myself," she says.

Elsewhere in the airport, meanwhile, family members who had come to meet McKnight were frantically calling the INS from a pay phone, trying to convince officials the woman they were holding was indeed Sharon McKnight.

Her mother and sister arrived around midnight with a birth certificate, but agents deemed it a fake. The family was not allowed to see McKnight.

The following morning, June 11, two agents led McKnight, still handcuffed, to a plane. She landed in Kingston without money or food.

An airport skycap who recognized McKnight gave her the equivalent of $12 and put her on a bus to downtown Kingston, where she could catch another bus to Manchester, the small town where her cousin lives. She arrived that night minus her two bags, apparently stolen along the way.

Five days later, McKnight's mother and sister arrived in Kingston. McKnight was waiting for them.

"When I saw her, I was in tears," her mother says. A photographer from the Long Island newspaper Newsday, alerted by Zwaik to the woman's plight, captured their embrace. Forbes contacted U.S. authorities in Jamaica to help clear up the misunderstanding and got Air Jamaica to cover return airfare.

When McKnight got off the plane in New York and spotted two uniformed immigration officers at the doorway, she turned to her mother and said, "Don't let them take me again."

An immigration official apologized to the family, but they decided to sue. They are seeking compensatory damages of $7.5 million and $500,000 in punitive damages, which are limited against federal agencies. Among other criticisms, the lawsuit alleges inadequate training of immigration agents.

McKnight says she has nightmares of being handcuffed again.

"It was mean and nasty. They treated me like an animal," she says. "I won't forget about this. It's still in me."

*

On the Net:

INS: https://www.ins.usdoj.gov

**Around the Web**

Ads by Revcontent

# EXHIBIT 9

Case 3:19-cr-00025-MMD-WGC Document 37 Filed 07/25/19 Page 1 of 12

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

UNITED STATES OF AMERICA,

Plaintiff,

v.

JUAN CARLOS SANCHEZ-FIGUEROA,

Defendant.

Case No. 3:19-cr-00025-MMD-WGC

ORDER

## I. SUMMARY

Defendant Juan Carlos Sanchez-Figueroa is indicted on one count of unlawful reentry under 8 U.S.C. § 1326(a). (ECF No. 11 at 1.) The charge is predicated on Sanchez-Figueroa's sole prior removal on or about March 31, 2013. (*See id.*) Sanchez-Figueroa has moved to dismiss the indictment, arguing that his prior removal was invalid. (ECF No. 20 ("the Motion").[1]) In addition, the Court held an evidentiary hearing ("the Hearing") on the Motion on July 19, 2019, where Border Patrol Agent Joseph Acree and Sanchez-Figueroa both testified.[2] (ECF No. 35.) The Court will grant the Motion because Sanchez-Figueroa's sole prior removal was fundamentally unfair and thus invalid.

## II. BACKGROUND

The following factual information comes from the Hearing. (ECF No. 35.) The parties offered competing testimony as to what transpired with respect to the removal process as noted below.

///

[1]The Court has reviewed the Government's response and supplement (ECF Nos. 25, 32) as well as Sanchez-Figueroa's reply (ECF No. 36).

[2]The Court also admitted Defendant's exhibits 501 through 505 pursuant to the parties' stipulations. These exhibits are the same as the documents attached to Defendant's brief. For ease of reference, the Court cites to the exhibits attached to Defendant's brief.

Sanchez-Figueroa—a 30-year-old citizen of Mexico—entered the United States when he was 15 years old. He completed the third grade of middle school. He described his life in Mexico as “poor and violent.” He could only afford to eat once a day, and he started work at age seven, taking care of cattle and selling vegetables. A cartel near his home killed 15 to 20 people he knew of, but violence also pervaded his household. He testified that his father hit him daily and also hit his siblings and mother.

In the U.S., Sanchez-Figueroa worked in construction. He also met a life partner with whom he has had two children.

Sanchez-Figueroa returned to Mexico in 2012 to take care of his mother, who was dying of cancer. He moved her from Michoacan to Mexico City, where he took her to medical appointments and shared a room with her until she died in early 2013. He then set out to return to the U.S.

Sanchez-Figueroa traveled back to the U.S. by foot, a trip that took approximately two weeks. When Sanchez-Figueroa was stopped by immigration officials, he had been walking without sleep for 36 hours. He had no water, food, or money. On March 30, 2013, Sanchez-Figueroa was handcuffed with hard plastic cuffs and taken to a detention center. He was placed into a cell with six or seven people. The events that followed are primarily disputed.

Sanchez-Figueroa testified that after about 4 hours (during which he did not sleep), he was taken to an office at the detention center to speak with Agent Acree. Sanchez-Figueroa testified that Agent Acree only spoke to him in English and only asked Sanchez-Figueroa what his name was, where he was born, whether he was a citizen of Mexico, and whether his parents were citizens of Mexico. Agent Acree gave him a form and essentially told him where to sign without providing any Spanish translation.

Agent Acree did not provide testimony about his interaction with Sanchez-Figueroa because he could not remember it. Instead, Agent Acree testified about his typical practices during expedited removal proceedings. He testified that he developed a methodical approach to ensure that he does not skip steps and “gets the best product for

his time." He testified that he is proficient in Spanish and would have communicated with Sanchez-Figueroa in Spanish. The Court discusses the weight of the evidence *infra*.

Sanchez-Figueroa was removed as the result of an expedited removal proceeding under 8 U.S.C. § 1225(b)(1). (ECF No. 20-2 at 2; ECF No. 20-1 at 4.) Sanchez-Figueroa was charged with a violation of 8 U.S.C. § 1182(a)(7)(A)(i)(I) as an immigrant who is not in possession of a valid visa or entry document. (ECF No. 20-2 at 2; *see also* ECF No. 20-1 at 4.) Sanchez-Figueroa did not challenge the notice and was removed to Mexico on March 31, 2013, within a day of his detention and charge. (*See* ECF No. 20-3 at 2.)

## III. LEGAL STANDARD

To obtain a conviction for unlawful reentry under 8 U.S.C. § 1326(a), the government must establish that the defendant was previously, validly removed from the United States before the alleged reentry. *See United States v. Cisneros-Rodriguez*, 813 F.3d 748, 755 (9th Cir. 2015). A defendant charged with unlawful reentry under § 1326(a) "has a Fifth Amendment right to collaterally attack his removal order because the removal order serves as a predicate element of his conviction." *United States v. Ubaldo-Figueroa*, 364 F.3d 1042, 1047 (9th Cir. 2004). A defendant may successfully challenge a predicate removal order by showing: (1) he exhausted all administrative remedies available to him to appeal his removal order; (2) the underlying removal proceedings where the order was issued improperly deprived him of the opportunity for judicial review; and (3) the entry of the removal order is fundamentally unfair. *See* 8 U.S.C. § 1326(d); *see also Ubaldo-Figueroa*, 364 F.3d at 1047 (noting that "the Due Process Clause of the Fifth Amendment requires a meaningful opportunity for judicial review of the underlying deportation" in a § 1326 prosecution). The entry of a removal order is fundamentally unfair if the deportation proceedings violated the defendant's due process rights, and that violation prejudices the defendant. *United States v. Ortiz-Lopez*, 385 F.3d 1202, 1204 (9th Cir. 2004).

## IV. DISCUSSION

The parties only dispute whether Sanchez-Figueroa's prior removal was fundamentally unfair. The Court finds that Sanchez-Figueroa's prior removal as the result

Case 3:19-cr-00025-MMD-WGC Document 37 Filed 07/25/19 Page 4 of 12

of an expedited removal proceeding was fundamentally unfair. The Court explains how expedited removal proceedings typically work before evaluating whether Sanchez-Figueroa's due process rights were violated and whether he suffered prejudice as a result.

**A. Expedited Removal Proceeding**

"An expedited removal proceeding under 8 U.S.C. § 1225 allows immigration officers to (1) determine whether certain [individuals] are inadmissible, and (2) enter removal orders, generally without hearing or further review." *United States v. Raya-Vaca*, 771 F.3d 1195, 1199 (9th Cir. 2014). During the proceeding, an immigration officer must conduct an inspection and determine whether the individual is inadmissible. *Id.* Individuals may be found inadmissible because they do not possess a valid entry document. *Id.* Sanchez-Figueroa was found inadmissible for this reason. (ECF No. 20-2 at 2.)

"When making a finding of inadmissibility, the examining immigration officer must 'create a record of the facts of the case and statements made by the [individual].'" *Raya-Vaca*, 771 F.3d at 1199-1200 (quoting 8 C.F.R. § 235.3(b)(2)(i)). The officer must "have the [individual] read (or have read to him or her) the statement." *Id.* (quoting 8 C.F.R. § 235.3(b)(2)(i)). "Moreover, the officer '[must] advise the [individual] of the charges against him or her on Form I–860, Notice and Order of Expedited Removal, and the [individual] shall be given an opportunity to respond to those charges in the sworn statement.'" *Id.* (quoting 8 C.F.R. § 235.3(b)(2)(i)). "Then, if the officer determines the [individual] to be inadmissible, 'the officer [must] order the [individual] removed from the United States without further hearing or review unless the [individual] indicates either an intention to apply for asylum . . . or a fear of persecution.'" *Id.* (quoting 8 U.S.C. § 1225(b)(1)(A)(i)).

At the time of the expedited removal proceeding, Sanchez-Figueroa was considered an applicant for admission. (*See id*. at 1199; *see also* ECF No. 20-4 at 2 ("I want to take your sworn statement regarding your application for admission to the United States.").) "[T]he Attorney General has the discretion to provide a type of statutory relief to certain [individuals]: withdrawal of application for admission." *Raya-Vaca*, 771 F.3d at 1200 (citing 8 U.S.C. § 1225(a)(4)). "When an individual is permitted to 'withdraw' his

application for admission, he may leave voluntarily and without a removal order, and thus without facing formal immigration consequences." *Id.* (citing 8 C.F.R. § 1235.4).

**B. Due Process**

Due process requires that individuals subject to expedited removal proceedings be informed of the charges against them and be provided an opportunity to review their sworn statements. *See Raya-Vaca*, 771 F.3d at 1204. In *Raya-Vaca*, the Ninth Circuit found that the defendant-appellant's due process rights were violated during an expedited removal proceeding when "no immigration officer explained to [Raya-Vaca] either the nature of the removal proceedings or that he could be ordered removed from the United States." *Id.* at 1205. The Ninth Circuit also based its decision on the immigration officer's failure to read the information in the sworn statement to Raya-Vaca or to allow Raya-Vaca to review the sworn statement. *Id.*

Like Raya-Vaca, Sanchez-Figueroa argues that the immigration officer who conducted his expedited removal proceeding—Agent Acree—never informed him of the charges against him or provided him a meaningful opportunity to review the sworn statement. (ECF No. 20 at 5-9.) The Court finds Sanchez-Figueroa's argument persuasive in light of the evidence presented at the Hearing.

Sanchez-Figueroa testified at the Hearing that he spent a total of 3 to 5 minutes with Agent Acree, during which time Agent Acree asked Sanchez-Figueroa—in English—what his name was, where he was born, whether he was a citizen of Mexico, and whether his parents were citizens of Mexico. Sanchez-Figueroa testified that Agent Acree never explained that he was being deported[3] or the legal consequences of deportation, *e.g.*, that he could not enter the country for 5 years or return to the U.S. without permission. Sanchez-Figueroa also testified that he did not have an opportunity to review the sworn

///

[3]While the government appeared to suggest at the Hearing that Sanchez-Figueroa could have determined he was facing deportation by talking to others in his cell, the government cannot rely on private individuals to provide information that would ensure adequate due process. Moreover, there is no evidence in the record to show that Sanchez-Figueroa would have known of the legal consequences of deportation, particularly given that this was his first removal.

Case 3:19-cr-00025-MMD-WGC Document 37 Filed 07/25/19 Page 6 of 12

statement. Rather, Agent Acree told Sanchez-Figueroa to initial and sign pages of the sworn statement—which is entirely in English—without ensuring that Sanchez-Figueroa actually understood what he was signing.

The government offered the testimony of Agent Acree to support its contention that Sanchez-Figueroa was informed of the charges against him and that the expedited removal process was followed. Agent Acree testified about his methodical approach to deportation proceedings rather than any specific recollection of his interaction with Sanchez-Figueroa. In fact, Agent Acree testified that he did not remember Sanchez-Figueroa.[4] In a nutshell, Agent Acree's testimony relies on the documents in the record and his methodical process in how he typically handles deportation proceedings because he has no independent recollection of his interactions with Sanchez-Figueora.

But portions of the documents in the record support instead of undermine Sanchez-Figueroa's specific recollection. Sanchez-Figueroa's testimony cast significant doubt on the quality of the purported attestation (the jurat) in the sworn statement. The jurat indicates the following:

> "I have read (or have had read to me) this statement, consisting of 1 [the numeral 1 is superimposed in typeface above a blank space] pages (including this page). I state that my answers are true and correct to the best of my knowledge and that this statement is a full, true and correct record of my interrogation on the date indicated by the above named officer of the Department of Homeland Security. I have initialed each page of this statement (and the corrections noted on page(s) 0 [the numeral 0 is superimposed in handwriting above a blank space])."

(ECF No. 20-4 at 5.) Sanchez-Figueroa's signature appears below this attestation.

///

///

---

[4]This is understandable in light of Agent Acree's testimony that he has handled at least 1,000 deportations and possibly as many as 2,000 or 3,000. And just as it is understandable that Agent Acree would not specifically recall one individual among the thousands with whom he has interacted, it is understandable that Sanchez-Figueroa would remember his interaction with Agent Acree given that it was his sole prior removal from the U.S. And while the government suggests that Sanchez-Figueroa's testimony is unreliable because it is based on an aged recollection (ECF No. 25 at 9), the Court finds that the traumatic nature of the deportation experience would cause Defendant's recollection to be stronger than a typical recollection from the same time period.

Case 3:19-cr-00025-MMD-WGC Document 37 Filed 07/25/19 Page 7 of 12

There are numerous inconsistencies in the sworn statement and jurat that suggest Sanchez-Figueroa did not actually read or have read to him the sworn statement as required under 8 C.F.R. § 235.3(b)(2)(i). These inconsistencies also suggest that Agent Acree never asked Sanchez-Figueroa most of the questions in the sworn statement. First, the filled-in numeral 1 in the attestation indicates that Sanchez-Figueroa only read or had read to him the page containing the jurat—not the three additional pages making up the sworn statement.[5] Second, the sworn statement indicates that Sanchez-Figueroa came to the U.S. to find work and only intended to stay for two years. (ECF No. 20-4 at 4.) This is inconsistent with Sanchez-Figueroa's testimony that he leads an established life in the U.S. with a life partner and small children. It is implausible that Sanchez-Figueroa intended to come to the U.S. for only two years to find work. Indeed, he testified at the Hearing that he intended to stay for life. Third, the sworn statement indicates that Sanchez-Figueroa did not have an address in the U.S. even though he testified that he had an address in Sun Valley, Nevada. (*Id.* at 3.) Fourth, the sworn statement indicates that Sanchez-Figueroa entered the U.S. near Naco, Arizona on March 24, 2013, around 4:00 pm, but Sanchez-Figueroa testified that he entered near Nogales on March 27, 2013. (*Id.*) Fifth, the sworn statement indicates that Sanchez-Figueroa estimated he was ten miles from the border when he was arrested, but Sanchez-Figueroa testified that he estimates distances in kilometers—not miles. (*Id.*) Sixth, the jurat indicates that Sanchez-Figueroa had no fear of staying in Mexico, but Sanchez-Figueroa testified that he was in fact afraid to stay in Mexico. (*Id.* at 5.) Seventh, Sanchez-Figueroa did not sign each page of the sworn statement as required by the governing regulation. (*See id.* at 2-5; *see also* 8 C.F.R. § 253.3(b)(2)(i).) There is no evidence in the record to suggest that Sanchez-Figueroa

///

---

[5]The same inconsistency supported the Ninth Circuit's finding of a due process violation in *Raya-Vaca*. *See* 771 F.3d at 1205 ("Further, Raya-Vaca acknowledged on the Jurat that he had 'read (or . . . had read to [him] ) this statement, consisting of 1 pages (including this page).' However, the Record of Sworn Statement and Jurat together totaled four pages, and the Jurat—the sole page Raya-Vaca acknowledged having read—include[ed] only four questions he was asked and answered, none of which spoke to his admissibility.").

fabricated any of his responses. Rather, the evidence—consisting of Sanchez-Figueroa's testimony to this effect—suggests that Agent Acree never actually asked Sanchez-Figueroa for responses to these questions.

Additionally, Agent Acree testified at the Hearing that he does not typically review in Spanish the completed sworn statement (Form I-867) with individuals subject to expedited removal proceedings. He testified that he would have communicated the questions in Spanish and translated the answers to English when he typed them, but he would not have read the answers back to the individual involved. This is not fully consistent with the first sentence in the jurat indicating that the individual has "read" or has "had read to [him]" the sworn statement. (ECF No. 20-4 at 5.) Moreover, while Agent Acree testified that he would have communicated and translated all documents to Sanchez-Figueroa in Spanish as part of his methodical approach, the removal records show that Agent Acree only identified Form I-867 as having been "read and explained to [Sanchez-Figueroa] in the Spanish language." (ECF No. 20-1 at 4.) This testimony and evidence supports the finding that the Notice to Alien Ordered Removed/Departure Verification informing Sanchez-Figueroa of the consequence of removal—he was prohibited from entering or attempting to enter the United States for a period of 5 years (ECF No. 20-3 at 2)—was not translated for him, which is consistent with Sanchez-Figueroa's testimony. Thus, the Court cannot find that Agent Acree reviewed the completed sworn statement with Sanchez-Figueroa in Spanish or that Agent Acree even informed Sanchez-Figueroa of the charges against him or the legal consequences of deportation.

Finally, Agent Acree's own testimony undercut the government's assertion that he rigidly follows a methodical approach to deportation proceedings. Agent Acree acknowledged on cross-examination that his typical practices—such as requiring individuals to sign the back of the sworn statement—have changed over time, but he did not know when he made that change or whether it was tied to a change in the governing law.

///

Case 3:19-cr-00025-MMD-WGC Document 37 Filed 07/25/19 Page 9 of 12

Consequently, this case appears to be very similar to *Raya-Vaca*. Like the defendant-appellant in *Raya-Vaca*, Sanchez-Figueroa was not informed of the charge against him and never received a meaningful opportunity to review the sworn statement. The government argues that *Raya-Vaca* is distinguishable because Agent Acree informed Sanchez-Figueroa in Spanish of the charges against him and read and explained the sworn statement to Sanchez-Figueroa. (ECF No. 25 at 6-7.) But the government did not produce direct evidence that Agent Acree did any of this. Rather, the government relied upon circumstantial evidence of Agent Acree's typical practices that cannot be squared with either Sanchez-Figueroa's specific recollection of what occurred or portions of the record.

Accordingly, the Court finds that Sanchez-Figueroa's due process rights were violated.

**C. Prejudice**

Individuals challenging an expedited removal order as fundamentally unfair must also establish that they suffered prejudice as a result of the order's entry. *Raya-Vaca*, 771 F.3d at 1206. To do so, individuals must show that they had "plausible grounds for relief" from the removal order. *Id.* (quoting *United States v. Jimenez–Marmolejo*, 104 F.3d 1083, 1086 (9th Cir. 1996)).

Even though Sanchez-Figueroa did not formally apply for admission to the United States, he is considered to have been an applicant for admission and as such was eligible for withdrawal of application for admission. *See id*. As discussed *supra*, an individual granted leave to withdraw his application for admission may exit the United States voluntarily and without a removal order. *Id.* Sanchez-Figueroa contends that he had plausible grounds for relief from removal in the form of withdrawal of his application for admission. (ECF No. 20 at 9.)

Courts follow a two-step process to determine whether a defendant has shown that she plausibly would have been granted a discretionary form of relief from removal. *Id.* (citing *United States v. Rojas–Pedroza*, 716 F.3d 1253, 1263 (9th Cir. 2013)). First, courts

Case 3:19-cr-00025-MMD-WGC Document 37 Filed 07/25/19 Page 10 of 12

identify the factors relevant to the agency's exercise of discretion for the relief sought. *Id.* (citing *Rojas–Pedroza*, 716 F.3d at 1263). Then, courts determine whether it was plausible that the agency official considering the defendant's case would have granted relief from removal in light of the factors relevant to the form of relief sought and based on the unique circumstances of the defendant's own case. *Id.* (citing *Rojas–Pedroza*, 716 F.3d at 1263).

Immigration officers are instructed "to consider all facts and circumstances related to the case to determine whether permitting withdrawal would be in the best interest of justice." *Id.* Immigration officers also are instructed to consider six enumerated factors: "(1) the seriousness of the immigration violation; (2) previous findings of inadmissibility against the [individual]; (3) intent on the part of the [individual] to violate the law; (4) ability to easily overcome the ground of inadmissibility; (5) age or poor health of the [individual]; and (6) other humanitarian or public interest considerations."[6] *Id.* The list of considerations is non-exhaustive. *Id.*

Sanchez-Figueroa need only prove the plausibility of relief. *Id.* He must show more than a theoretical possibility of relief, but he is not required to prove that relief was probable. *Id.* Sanchez-Figueroa need only establish "some evidentiary basis on which relief could have been granted." *Id.* (quoting *United States v. Reyes–Bonilla*, 671 F.3d 1036, 1049-50 (9th Cir. 2012)).

Sanchez-Figueroa has carried his burden of showing the plausibility of relief. Sanchez-Figueroa did not commit fraud, which is an overriding consideration in assessing whether to grant withdrawal relief. *See United States v. Barajas-Alvarado*, 655 F.3d 1077, 1091 (9th Cir. 2011) (noting that the Field Manual emphasizes the disqualifying effect of "obvious, deliberate fraud on the part of the applicant"). Sanchez-Figueroa also had no prior findings of inadmissibility as this was Sanchez-Figueroa's first encounter with immigration officials. (ECF No. 20 at 10-11.) Sanchez-Figueroa also never had been sentenced to a day in jail before his removal and had never received a conviction more

///

[6]These factors are listed in the Immigration and Naturalization Service's Inspector's Field Manual ("Field Manual"). *Raya-Vaca*, 771 F.3d at 1201, 1207.

serious than a misdemeanor. (*Id.* at 11.) Some of the convictions Sanchez-Figueroa received might be expected of those living without legal status—such as driving without a valid driver's license.[7] (*Id.*) Finally, Sanchez-Figueroa presented significant humanitarian considerations. Sanchez-Figueroa's closest family—his partner and small children—resided in the United States. His family ties weigh significantly in his favor because "there is a compelling humanitarian interest in keeping families united." *See Raya-Vaca*, 771 F.3d at 1208 (quoting *United States v. Haro–Munoz*, 552 F. App'x 689, 690 (9th Cir. 2014)) (additional citations omitted).

The government argues that withdrawal is not plausible because Sanchez-Figueroa demonstrated intent to violate law; he could not easily overcome the ground of inadmissibility; and he was young and in good health. (ECF No. 25 at 8-9.) But beyond its ipse dixit, the government offers no argument to support its points. (*See id*.) Moreover, the government's focus on just three of the six factors further suggests that Sanchez-Figueroa has shown "some evidentiary basis on which relief could be granted," as discussed *supra*. The government implicitly concedes that several of the factors weigh in favor of granting withdrawal relief. Finally, the government draws the Court's attention to Sanchez-Figueroa's misdemeanor conviction of conspiracy to utter forged instruments (ECF No. 25 at 8) but provides no additional details about the crime. Given that the defendant-appellant's multiple misdemeanor convictions in *Raya-Vaca* did not preclude withdrawal relief, *see* 771 F.3d at 1198-99, 1209, the Court finds that Sanchez-Figueroa's misdemeanor conviction is inconsequential here.

Accordingly, because Sanchez-Figueroa has demonstrated that his prior removal—the predicate offense for the charge in the indictment—violated his due process rights and caused him prejudice, the Court will dismiss the indictment.

///

///

---

[7]The Government's description of Sanchez-Figueroa's alleged criminal activity in 2017 (ECF No. 25 at 4) is irrelevant because it would not have been a factor in exercising discretion over withdrawal in 2013.

Case 3:19-cr-00025-MMD-WGC Document 37 Filed 07/25/19 Page 12 of 12

## V. CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the motion before the Court.

It is therefore ordered that Sanchez-Figueroa's motion to dismiss (ECF No. 20) is granted. The indictment charging Sanchez-Figueroa with unlawful reentry is dismissed.

The Clerk of the Court is instructed to enter judgment accordingly and close this case.

DATED THIS 25th day of July 2019.

MIRANDA M. DU
UNITED STATES DISTRICT JUDGE

# EXHIBIT 10

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE, TEXAS**

**MARIA ISABEL DE LA PAZ,** )
**PETITIONER/ PLAINTIFF** )
)
**v.** )
)
**JEH JOHNSON, Secretary of Homeland Security,** )
**JOHN KERRY, Secretary of State, and** )
**UNITED STATES OF AMERICA,** )
**RESPONDENTS/ DEFENDANTS** )
)

**PETITION FOR WRIT OF HABEAS CORPUS AND**
**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Petitioner/Plaintiff MARIA ISABEL DE LA PAZ, files her Petition for Habeas Corpus, under 8 U.S.C. §1252(e)(2) and 28 U.S.C. §2241, seeking to vacate an order of expedited removal, and any orders purporting to reinstate said order. Pursuant to 8 U.S.C. §1503 with 28 U.S.C. §2201, (denial of rights and privileges as U.S. Citizen), she also seeks a declaration that she is a U.S. citizen by virtue of her birth in a hospital in Houston, Texas, because the U.S. Embassy in Mexico City constructively denied her application for U.S. Passport, as evidenced by their refusal to issue her a passport, although she applied for one on or about July 26, 2013, or even to respond to counsel's letter demanding adjudication of said application. In the alternative, Plaintiff seeks a declaration of U.S. citizenship under 28 U.S.C. §1331, with the Administrative Procedure and Declaratory Judgment Acts, as well as declaratory and injunctive relief, in order to obtain the return of documents confiscated from her when she was detained by the Department of Homeland Security when she attempted to enter the U.S. on January 20, 2014, and to require Defendants to retract any information they may have divulged to any State or Federal Agency, indicating that she was not born in the U.S., and to prohibit any such future communications.

At the moment this action is being filed, Petitioner MARIA ISABEL DE LA PAZ, is within the United States, at the Port of Entry in Brownsville, Texas, but cannot return to her residence in Houston, Texas, because Respondents claim that she is not a U.S. citizen, and have reinstated an order of expedited removal against her, even though she has presented proof that she was born in Jefferson Davis Hospital in Houston, Texas. Exhibit A, Tab 1, incorporated herein.

## I. JURISDICTION AND VENUE

1. Jurisdiction lies under 8 U.S.C. §1252(e)(2) with 28 U.S.C. §2241 (habeas corpus); 8 U.S.C. §1503, (denial of rights and privileges as a U.S. Citizen), and 28 U.S.C. §1331, with the Administrative Procedure and Declaratory Judgment Acts (in order to obtain injunctive and declaratory relief, as an alternative basis for obtaining a declaration of U.S. citizenship, to secure the return of her documents, and to force Defendants to retract any allegations they have made to other agencies that she is not a U.S. citizen). Ms. DE LA PAZ claims a residence within the Southern District of Texas, in Houston, Texas, with her mother and siblings.

2. At the time the petition is being filed, Ms. DE LA PAZ is within the United States, at a port of entry, unable to return to her residence in Houston, Texas, as a result of the abusive and arbitrary acts of Respondents/Defendants.

## II. THE PARTIES

3. Maria Isabel De La Paz was born in July, 1984, at Jefferson Davis Hospital in Houston, Texas.

4. Respondent JEH JOHNSON is the duly appointed and confirmed Secretary of the Department of Homeland Security, and Respondent JOHN KERRY is the duly appointed Secretary of State of the United States. Both are sued in their official capacities only. The United States of America is also a named Defendant.

Case 1:14-cv-00016 Document 1 Filed on 01/24/14 in TXSD Page 3 of 10

## III. THE FACTS

5. Maria Isabel De La Paz was born in July, 1984 at Jefferson Davis Hospital in Houston, Texas. Her birth record was timely filed by the hospital. However, when her birth record was filed the Hospital misspelled her last name. Instead of spelling her last name Paz with "z" they spelled it with the letter "s" Pas. Also, the hospital incorrectly wrote that her mother's last name was "Navarro" when it was "Moreno" (See Exhibit A, Tab 1)

6. On November 25, 1984 when Maria Isabel De La Paz was approximately 4 months old she was baptized in Houston, Texas showing that she was born in Houston, Texas on the same day as her Texas Birth Certificate. Her baptismal certificate correctly spells her last name as "Paz" and also her mother's last name as "Moreno". (See Exhibit A, Tab 2)

7. On October 19, 1986, more than two years after the birth of Maria Isabel De La Paz, she was incorrectly registered in Mexico by her parents, indicating that she was born in the State of Michoacan on the same day as her Texas birth certificate. (See Exh. A Tab 3).

8. On August 3, 2003 Maria Isabel De La Paz was expeditiously removed from the United States at the Gateway Port of Entry after the officer who inspected her refused to believe that she was a U.S. citizen. At the time she was 18 years of age and she was told by the Custom and Border Protection Officer who inspected that "she could not have a (valid) Texas Birth Certificate if she couldn't speak English". (See Exhibit A, Tab 4)

9. On July 26, 2013 Maria Isabel De La Paz applied for her U.S. Passport at the U.S. Embassy in Mexico City. At the time of her interview she was given a letter requesting additional evidence - evidence which they apparently wanted to substantiate their

Case 1:14-cv-00016 Document 1 Filed on 01/24/14 in TXSD Page 4 of 16

belief that she was actually born in Mexico. (See Exhibit A, Tab 5).

10. On October 24, 2013 Maria Isabel De La Paz with the help of counsel, prepared a letter for the U.S. Consulate explaining to the Consulate that she had previously been wrongfully removed from the United States and why she was incorrectly removed by presenting the documents from her two older siblings, who were also born at the Jefferson Davis Hospital in Houston and were also incorrectly registered in Mexico by their parents as having been born in Mexico. (See Exhibit A, Tab 6) The documents from her two older siblings which were presented to the U.S. Embassy in Mexico to document her parents' erroneous custom of registering their U.S. born children in Mexico, as born in Mexico, even though they were born at a Hospital in Houston, Texas.

From Rosendo de La Paz, older brother of Petitioner (Attached as Exhibit A, Tab 7)

a- Texas Birth Certificate of Rosendo de La Paz that shows that he was born in March, 1982 at the Jefferson Davis Hospital in Houston, Texas. His birth record was timely filed in March 22, 1984 by the hospital. When the hospital registered him, as they did on all of his sibling's case they misspelled his and his father's last name by using an "s" instead of a "z" at the end of "Paz."

b- Baptismal Certificate of Rosendo de La Paz shows that he was born in March, 1982 in Houston, Texas. He was baptized on July 8, 1984 when he was two years old. His Baptismal Certificate correctly spells his and his father's last name (Paz) with a "z"

c- Mexican Birth Certificate of Rosendo de la Paz that incorrectly states that he was born in March, 1982 in Michoacan, Mexico. This document was registered by his parents on June 17,

1987 when he was already five years old. Moreover, it was registered the same day as the Mexican birth certificate of his sister Guadalupe de la Paz.

d- U.S. Passport of Rosendo de La Paz issued in March of 2006.

From Guadalupe De La Paz, older sister of petitioner (Attached as Exhibit A, Tab 8)

a- Texas Birth Certificate of Guadalupe de La Paz that shows that she was born in July, 1983 at the Jefferson Davis Hospital in Houston, Texas. Her birth record was timely filed on July 29, 1983 by the hospital. However, when the hospital registered her, as they did in all of her sibling's cases, they misspelled hers and her father's last name by using an "s" at the end of "Paz."

b- Mexican Birth Certificate of Guadalupe de la Paz, incorrectly stating that she was born in July, 1983 in Michoacan, Mexico. This document was registered by her parents on June 17, 1987, when she was almost 4 years old. Moreover, it was registered the same day as the Mexican birth certificate of her brother Rosendo.

11. In the letter Maria Isabel De La Paz gave to the U.S. Consulate she informed them that this was all the evidence that she had and gave them until November 26, 2013 to issue a decision in her case. The letter stated that if no response was received by this date she would deem their non response to constitute a denial her application and would proceed accordingly. As to the filing of these petitioner Maria Isabel De La Paz, nor her counsel of record with DOS (Form DS-5505) has been contacted regarding her application (See Exhibit A, Tab 9.)

12. On that date the Consul refused to read the letter or review the accompanying documents. Instead, they demanded other documents, including Mexican school records, with her picture. She told them that her school records had no pictures so she

could not comply.

13. On January 20, 2014, Maria Isabel De La Paz thinking that there was no other way to come to the United States to be with her family she attempted to cross into the United States through a place other than a port of entry. However, she was detained by Border patrol for two days and removed again to Mexico on January 22, 2014. While in Border Patrol Custody she told them she was a United States Citizen born in Houston, Texas in a Hospital. No attempt was ever made by these officers to verify her claim. Instead she was told before being returned to Mexico that she could not return to the United States for 20 years, and that if she did, she would be imprisoned.

## V. CAUSES OF ACTION

### A. HABEAS CORPUS

### 8 U.S.C. §1252(e)(2) WITH 28 U.S.C. §2241

14. Maria Isabel De La Paz hereby incorporates by reference the allegations of paragraphs 1 through 13, above.

15. Maria Isabel De La Paz seeks review of the order of expedited removal, under 8 U.S.C. §1252(e)(2).

### B. DECLARATORY JUDGMENT

### 8 U.S.C. §1503 WITH 28 U.S.C. §2201

16. Maria Isabel De La Paz hereby incorporates by reference the allegations of paragraphs 1 though 13, above.

17. Maria Isabel De La Paz also seeks a declaration that she is indeed a United States citizen, under 8 U.S.C. §1503.

### C. DECLARATORY JUDGMENT AND CORRESPONDING INJUNCTIVE RELIEF

### 28 U.S.C. §1331 WITH §2201, AND THE APA

18. Maria Isabel De La Paz hereby incorporates by reference the allegations of paragraphs 1 though 13, above.

19. Maria Isabel De La Paz seeks a declaration that she is

a United States citizen, and that Defendants acted arbitrarily and capriciously in confiscating her documents, and taking other steps based on their hasty conclusion that she was not a U.S. citizen, which conclusion was reached without meaningful investigation of her claim. There are no administrative remedies for these actions.

20. Maria Isabel De La Paz also seeks corresponding injunctive relief, requiring Defendants to return the documents confiscated from her, to retract any advisals they may have given to other agencies that she allegedly is not a United States citizen, and enjoining them from issuing any such advisals in the future.

**D. DECLARATORY JUDGMENT AND CORRESPONDING INJUNCTIVE RELIEF 28 U.S.C. §1331 WITH §2201, AND THE APA**

21. Maria Isabel De La Paz hereby incorporates by reference the allegations of paragraphs 1 though 13, above.

22. Maria Isabel De La Paz further urges that the Department of State U.S. Consular Officers acted arbitrarily and capriciously in refusing to review the evidence presented when she applied for her Passport; in demanding documents, many of which do not exist, which appeared calculated to support their theory that she was born in Mexico, in failing to respond to counsel's letter, and refusing to either grant or formally deny her passport application.

23. Maria Isabel De La Paz therefore urges that this Court enjoin Defendant Kerry from not issuing her a United States passport forthwith.

**D. DECLARATORY JUDGMENT AND CORRESPONDING INJUNCTIVE RELIEF 28 U.S.C. §1331 WITH §2201, AND THE APA**

24. Maria Isabel De La Paz hereby incorporates by reference the allegations of paragraphs 1 though 22, above.

25. Maria Isabel De La Paz seeks a declaration that the acts of the DHS officers in detaining her and refusing to investigate her claim of birth in a hospital in Houston, Texas, and instead threatening her with possible jail if she did not stay outside of the United States for twenty years violated her rights under the Fifth Amendment of the U.S. Constitution.

26. Maria Isabel De La Paz will also request a preliminary injunction, allowing her to enter the U.S. to pursue the instant action, and a permanent injunction, enjoining Defendants from not returning the documents confiscated from her.

27. Maria Isabel De La Paz also seeks an injunction, mandating that Defendants not advise the State of Texas or any state or federal agency of their belief that she is not a United States citizen, or if they have already done so, to retract said advisals, and to take remove from the DHS and DOS computer systems all lookouts and other indications that she is not a United States citizen, and remove any information from the DHS or DOS computer systems indicating that her parents committed fraud in registering her birth in Texas, as having been born here.

## V. PRAYER FOR RELIEF

Maria Isabel De La Paz urges the Court to issue a Writ of Habeas Corpus, vacating the order of expedited removal, and any order purporting to reinstate said order of expedited removal, on the grounds that she is a United States citizen.

Plaintiff also urges the Court to issue a Declaratory Judgment, declaring Maria Isabel De La Paz to be a U.S. citizen.

Plaintiff also urges the Court to declare that Defendants'

actions violated Ms. Paz' constitutional rights, and issue corresponding injunctive relief, requiring that they: 1) return the documents they confiscated, 2) retract any advisals to the State of Texas or any other State or federal agency that she was born in Mexico; 3) refrain from making any such advisals in the future, 4) remove from the DHS and DOS computer systems all lookouts and other indications that she is not a United States citizen, 5) remove any information from the DHS or DOS computer system that her parents committed fraud in registering her as having been born in Texas, and 6) issue forthwith a United States passport.

Plaintiff further requests a preliminary injunction, refraining and enjoining Defendants from not allowing Ms. Paz to return to the United States for the duration of the instant litigation.

Finally, it is also urged that the Court require Defendants to pay Plaintiffs' costs, and reasonable attorneys fees, and grant such other and further relief as the Court may consider appropriate.

Respectfully Submitted,

s/ Jaime M Diez
Attorney at Law
Jones & Crane
PO BOX 3070
Brownsville, TX 78523
Federal Id: 23118
Texas State Bar: 00783966
(956) 544-3565
(956) 550-0006 (fax)

VERIFICATION OF COUNSEL

I, Jaime M. Diez, hereby certify that I am familiar with the facts as stated above, and that they are true and correct to the best of my knowledge and belief.

s/ Jaime M Diez

Case 1:14-cv-00016 Document 1 Filed on 01/24/14 in TXSD Page 10 of 10

**VERIFICATION OF PETITIONER**

I, **Maria Isabel De La Paz,** hereby declare that I am presently at the port of entry in Brownsville, Texas, on the U.S. side of the international boundary, and that I intend to remain here until I have been informed that the above petition has been filed. I also declare that the facts as stated above are true and correct to the best of my knowledge and belief.

Maria Isabel de la Paz M.

January 24, 2014

# EXHIBIT 11

USA TODAY

NEWS Illegal immigrants Add Topic

# Trump's quick deportation plan may be illegal, past immigration chiefs say

**Alan Gomez** USA TODAY

Feb. 24, 2017 | Updated Feb. 26, 2017, 1:00 p.m. ET

Former immigration enforcement chiefs are questioning the legality of President Trump's plan to ramp up a program that allows federal agents to quickly deport suspected undocumented immigrants without appearing before a judge.

"Expedited removals" have been in force for 20 years but have only been used against people caught within 100 miles of the U.S.-Mexican border and who are alleged to have entered the country within the previous two weeks.

Now, Homeland Security Secretary John Kelly has ordered an expansion of the program to apply nationwide and for anyone who entered the country within the previous two years.

That expansion threatens the constitutional rights of undocumented immigrants who may get mistakenly deported, warned John Sandweg, who headed Immigration and Customs Enforcement (ICE) under President Obama.

"The Supreme Court has consistently held that even undocumented immigrants are entitled to due process," he said.

Sandweg added that expedited removals have been a valuable tool for immigration agents working near the border when they are dealing with clear-cut cases of illegal entry.

Julie Myers Wood, who headed ICE under President George W. Bush, agreed. She said her team considered expanding expedited removals, but decided against it because of legal concerns. She said other aspects of Trump's tougher immigration enforcement plan also may run afoul of the law.

"Many of these authorities have never been used that way," Wood said. "The administration is really testing the parameters of what's acceptable. There is some litigation risk there."

**Read more:**

Homeland Security unveils sweeping plan to deport undocumented immigrants

5 ways Trump will increase deportations

Trump immigration raids show greater focus on non-criminals

Trump laid out his planon Jan. 25, and Kelly issued orders for implementing it Tuesday.

Congress created "expedited removals" in 1996. It allows federal agents to interview each subject to determine if the person should be deported. The agent reviews any documents the person has to establish how long they've been in the country.

If the undocumented immigrant claims fear of persecution or torture if returned to their home country, the agent is supposed to turn them over to U.S. Citizenship and Immigration Services to determine if the detainee has a "credible fear" and should be allowed to apply for political asylum.

The law allows for removal of undocumented immigrants who entered the country within the previous two years. But the Clinton administration limited its use to people caught at ports of entry who had arrived in the previous 14 days. The Bush administration expanded that to people caught within 100 miles of the border, and President Obama maintained that guideline.

Kelly's order said an expansion is necessary because immigration courts are so backlogged it can take up to five years to deport people brought before a judge, creating a "national security vulnerability."

Critics say that approach will rush undocumented immigrants through a process they barely understand without the right to an attorney and few options to appeal their deportation.

The U.S. Commission on International Religious Freedom, an independent commission created by Congress, concluded in a 2016 report that those fears are well grounded. Researchers observed expedited removal proceedings in several states and found that immigration officers frequently skipped legally required steps, which it called an "alarming" trend.

In some cases, agents failed to fully advise detainees of their rights and did not let them review documents they were forced to sign. The commission also found that some agents disregarded immigrants' political asylum claims.

In one case, a man from El Salvador showed an immigration agent a letter from a police officer in his hometown saying he had been threatened by gang members. But the report found that the agent simply kept the letter, which was not used to determine if he should be allowed to seek asylum.

That's why Sandweg and Wood both said it's important for ICE to provide updated training to provide clear guidance on the kinds of documents agents can use to establish how long a person has been in the country. In a statement, ICE said all new deportation officers already undergo a 20-week training course that includes training on expedited removals.

It's unclear how many people could be deported immediately under Trump's plan. The Pew Research Center estimates that 1.5 million undocumented immigrants have been in the U.S. for fewer than five years, but it does not have data on those in the country fewer than two years.

Homeland Security has not yet formally expanded the expedited removal process. It must first publish its new plan in the *Federal Register*.

# EXHIBIT 12

human rights first

Statement for the Record of Eleanor Acer

Director, Refugee Protection

Human Rights First

Hearing before the House Judiciary Subcommittee on Immigration and Border Security

"Interior Immigration Enforcement Legislation"

February 11, 2015

Human Rights First is a non-profit, nonpartisan human rights advocacy organization that challenges America to live up to its ideals. For over 30 years, we've built bipartisan coalitions and teamed up with frontline activists and lawyers to tackle issues that demand American leadership, including the protection of the rights of refugees. With offices in Houston, New York, and Washington D.C., Human Rights First oversees one of the largest pro bono legal representation programs for refugees in the country, working in partnership with volunteer attorneys at many of the nation's leading law firms.

Human Rights First appreciates the opportunity to submit its views for this hearing. For the reasons outlined below, Human Rights First strongly opposes the "Asylum Reform and Border Protection Act" (HR 5137), as well as the "Protection of Children Act" (HR 5143) and the "Strengthen and Fortify Enforcement Act" - commonly known as the "SAFE Act" (HR 2278).

**American Values and Refugee Protection Commitments**

Protecting the persecuted is a core American value. Reflecting this country's deep-seated commitment to liberty and human dignity, as well as its pledge under the Refugee Convention's Protocol, the United States has long led efforts to protect those who flee from political, religious, and other persecution. The U.S. asylum system has protected thousands of refugees from being returned to places where they would face political, religious, or other persecution. Through our pro bono legal representation initiatives, we see these people day in and day out: they are victims of religious persecution from China; women targeted for honor killings, trafficking and horrific domestic violence; gay men attacked in countries where they face constant threats; human rights advocates who stand up against oppression in Syria or against the perpetrators of brutal violence in Central America; and ordinary people who are persecuted for who they are or what they believe.

**A Strong System is Staffed Adequately to be Timely, Fair, and Effective**

A strong asylum and immigration system that adjudicates cases in a fair and timely manner and includes effective tools for fighting abuse is essential both for ensuring the integrity of the U.S. immigration process as well as protecting refugees from return to places of persecution. However, in order to effectively secure the integrity of the system, the agencies responsible for asylum adjudication – the Department of Justice's Executive Office of Immigration Review (EOIR) and the Department of Homeland Security's United States Citizenship and Immigration Services (USCIS) – must be properly staffed and resourced to adjudicate cases in a fair and timely manner, and to eliminate backlogs that can leave the system vulnerable to abuse.

According to the most recent data, about 430,000 immigration removal cases have now been pending for an average of 585 days in the U.S. immigration courts. While immigration enforcement and related funding have increased significantly in recent years, funding and staffing for the immigration courts has lagged well behind. Over the years, resources for immigration enforcement, including Customs and Border Protection (CBP) and Immigration and

Customs Enforcement (ICE) have quadrupled – rising from $4.5 billion in 2002 to $18 billon in FY 2013. This funding imbalance needs to be righted as outlined in our recommendations below.

Not only can delays increase the vulnerability of our immigration system to abuse and prevent refugees from having their cases adjudicated in a timely manner, but they often leave refugee families stranded in difficult and dangerous situations abroad. For example:

- **Wife and Children of Christian Missionary Stranded, Hiding from Boko Haram**. "Joshua" is a Christian missionary and social outreach worker from Nigeria, married and the father of young children. He was targeted by Boko Haram militants because of his religious activities and his assistance in providing information about Boko Haram crimes to the police. Boko Haram militants are believed to have shot Joshua's brother along with another guest at Joshua's home in Joshua's absence. Boko Haram militants later kidnapped Joshua himself. Released by security forces who stopped his captors' vehicle, but unable to find protection in Nigeria, Joshua fled to the United States after a period in hiding. At his first hearing in immigration court, in late 2013, Joshua was scheduled for a hearing on the merits of his case in 2016. Joshua's wife and children are currently in hiding. Joshua, who already blames himself for the death of his brother, fears for their safety but cannot petition to reunite with them until his asylum case is heard.
- **Family of Syrian torture survivor, stranded and threatened in Syria**. "Hisham"* was detained and tortured repeatedly by both governmental and non-governmental armed forces in Syria, each of which wrongly believed him to be supporting the other side. All factions also abused him very severely for challenging what they were doing. His hands were permanently damaged by the torture. Hisham finally fled Syria. Since arriving in the United States, his sole priority has been to secure the protection of asylum so that he can get his wife and adolescent son out of Syria. He applied for asylum without the assistance of counsel and was referred to an immigration court that is severely backlogged. When he first appeared in court without counsel, his case was adjourned for nearly a year. Meanwhile, there have been threats against his family back home, and his son, who has been unable to attend school for months because of these threats, will be called up for military service in a little over a year, and his Syrian passport will expire, meaning that the boy must be gotten out of Syria before then. If Hisham cannot get his case heard in immigration court in time to petition for his family, all his efforts to gain protection will be meaningless to him.
- **Separation from Family Prolonged for Tibetan Persecuted for Religious Activity.** S.T. is Tibetan and a lay monk in a sect of Buddhism. He was beaten and imprisoned for over two years by the Chinese government for performing religious ceremonies at which he praised the Dalai Lama and some attendees expressed a desire for a free Tibet. He fled to the United States and applied for asylum. His case has been pending before the immigration court since 2009. During this time, S.T. has been living here alone, with no legal status and no friends or family. His family is still in Tibet, and he is afraid to contact them for fear of jeopardizing their safety. He wants to contact them once he has asylum so that he can try to arrange for a safe exit for them to join him in the United States, but they have now been separated for years, S.T. has been completely cut off from those he cares about, and at this point the family does not even know if he is dead or alive.

*The names of these asylum seekers have been changed for security reasons.

**The Proposals in H.R. 5137 Would Send Legitimate Refugees and Children Back to Danger**

The provisions included in H.R. 5137, the Asylum Reform and Border Protection Act of 2014, would severely undermine access to asylum and protection in the United States. The bill would lead to the deportation of legitimate refugees with well-founded fears of persecution, leave others in immigration detention for months and put children at risk of return to trafficking, death, and persecution in their home countries. The bill is inconsistent with American ideals and would erode the United States' legacy as a global leader in protecting refugees and victims of trafficking.

The bill seeks to make it harder for those fleeing persecution and torture to file for asylum in the United States, a process already fraught with obstacles. The bill appears to eliminate the statutory basis for release on parole for detained asylum seekers, including children, which would leave asylum seekers in jails and facilities with conditions similar to jails despite the existence of more cost-effective and humane alternative measures that result in compliance and appearance at hearings. The bill would also eviscerate the limited procedural protections available to unaccompanied children in the immigration system. It would overturn provisions that protect children from return to traffickers and would subject them to expedited removal proceedings entirely unsuited to their age, making it difficult for them to access the asylum and immigration process.

Among many changes to law, the bill would:

- **Raise the expedited removal screening standard for those seeking this country's protection at the border to an unduly high standard.** The bill would require that an asylum seeker – in order to even be allowed to apply for asylum – not only show a "significant possibility of establishing eligibility for asylum," but also prove that it is more likely than not that his or her statements are true. This standard is inappropriate for what is intended to be a screening, and the conditions under which these interviews are conducted – in immigration detention facilities and jails, sometimes over the phone, with traumatized applicants speaking to government officials they sometimes cannot see, communicating through interpreters of variable quality, at times with young children present in the same room – would lead to the deportation of many asylum seekers with legitimate claims to protection.

- **Appear to prevent arriving asylum seekers who have passed the credible fear screening process from being paroled from immigration detention**, instead leaving them in jails and facilities with conditions that resemble jails for months or longer, even though there are more fiscally-prudent and humane alternatives that have been proven effective. Although other provisions of the bill assume the release on parole of some applicants, the changes to the parole statute itself are so significant that they would not only impact asylum seekers but would prevent the United States from quickly bringing prominent political dissidents or human rights advocates at risk abroad to safety here.

- **Overturn provisions in the Trafficking Victims Protection Reauthorization Act (TVPRA) that protect children from return to traffickers or persecution by putting all unaccompanied children into expedited removal proceedings.** The bipartisan U.S. Commission on International Religious Freedom has documented substantial flaws in the implementation of expedited removal and other studies have detailed deficiencies in the screenings of children at the border, all of which leave vulnerable individuals – adults and children – at risk of return to persecution and harm.
- **Drastically narrow the definition of an "unaccompanied child,"** and allow unaccompanied children to be held in the custody of Immigration & Customs Enforcement (ICE) for as long as a month rather than being transferred to the more appropriate care of the Department of Health and Human Services.
- **Subject unaccompanied children to the arbitrary one-year asylum filing deadline bar.** The flawed asylum filing deadline has already led the United States to deny asylum to refugees with well-founded fears of persecution and has created inefficiencies by unnecessarily putting the cases of legitimate refugees into the overstretched immigration court system. To apply this legal technicality to children subjects the most vulnerable of the vulnerable to an already arbitrary bar from protection.
- **State that the Government not bear expense for counsel.** The bill also states that in no instance will the government bear expense for counsel for anyone in removal or appeal proceedings. Studies have confirmed that representation encourages appearance for court and saves the government money. Children – including babies and toddlers - the mentally disabled, and other vulnerable people cannot represent themselves in our complex immigration system.
- **Allow asylum applicants, including unaccompanied children, to be bounced to third countries in the absence of any agreement between the United States and the countries in question for the reception of asylum seekers.**

*A Note on Expedited Removal*

As outlined above, the bill seeks to further heighten the credible fear screening standard – which is used to determine whether an asylum seeker who has been put into expedited removal will be allowed to apply for asylum. (It is not the standard for asylum itself, but simply a screening process to weed out cases that should not even be allowed to submit an application for asylum.)

However, even under the current statutory screening standard, we regularly learn of reports of legitimate asylum seekers who are denied "credible fear" – and the chance to even file an application for asylum - even though they should meet the standard and may be eligible for asylum. In some cases, interviews are sometimes rushed, essential information is not identified due to lack of follow up questions, and/or other mistakes are made that block genuine asylum seekers from even applying for asylum and having a real chance to submit evidence and have their case fully considered. The bipartisan U.S. Commission on International Religious Freedom has documented the prison-like conditions used to detain asylum seekers during this process, and

found that safeguards put in the system to protect asylum seekers from mistaken deportation under expedited removal were often not implemented. Here are just a few examples of the mistakes that occur under the current credible fear screening process.

- **LGBT Human Rights Activist Nearly Deported Under Expedited Removal**: "Toni" is a gay man with a female gender identity from El Salvador who suffered severe physical and mental harm at the hands of the Salvadoran government and others. Toni worked to improve the plight of the LGBT community in El Salvador through work with a human rights organization. During the course of that work, police beat Toni. Eventually, Toni was forced to flee El Salvador due to threats against his life. After seeking protection at the U.S. southern border in 2014, Toni was put into immigration detention. Toni was nearly deported back to danger under expedited removal without even being allowed to apply for asylum. The Asylum Office initially denied Toni's credible fear interview, without examining any of the country conditions evidence documenting the extreme violence perpetrated against the LGBT community in El Salvador. An immigration court failed to vacate this decision despite letters from LGBT human rights organizations explaining the risks Toni would face if returned. After the intervention of pro bono counsel and a reconsideration request, Toni was finally allowed to apply for asylum.
- **Woman Persecuted Due to Ethnicity Deported Under Expedited Removal.** A Guatemalan woman and indigenous language speaker detained at the Karnes family detention center in Texas was deported under expedited removal based on a credible fear interview conducted in Spanish, a language in which she was not fluent. It was clear to a Human Rights First staff attorney who met with her that she did not have the vocabulary to express her thoughts. For example, the notes from her credible fear worksheet showed that the asylum officer understood an event to have happened ten times, while in fact she was referring to the number of perpetrators. The Human Rights First attorney who met with her was unable to complete a full interview due to the language difficulties, but based on the information communicated, there appeared to be sufficient basis to pass the credible fear screening, as the woman was persecuted on account of her indigenous ethnicity. This woman was deported from the United States under expedited removal before she could secure legal counsel.

**The System Already has Many Strong Measures for Identifying, Prosecuting Fraud**

Some have pointed to the increase in the numbers of individuals from three Central American countries who requested U.S. protection as evidence of "fraud" in the system. However, multiple studies and media reports have documented the devastating escalation of violence and persecution in the three Central American countries – El Salvador, Guatemala, and Honduras. A study conducted by the U.N. Refugee Agency concluded that about 60% of children it interviewed from these countries had potential claims to asylum or other international protection.

Certainly, if individuals or groups are defrauding the asylum system, it hurts everyone, and steps should be taken to counter those abuses and punish the perpetrators. U.S. authorities have a range of effective tools to address abuses. As outlined in Appendix A to this statement, U.S. agencies conduct multiple identity and background checks, have personnel in multiple agencies charged

with detecting and investigating fraud, and have the ability to refer for prosecution individuals who perpetrate and orchestrate fraud. Many of these tools have been enhanced over the years, and the prosecution of criminal charges is critical for sending a message that efforts to defraud the immigration systems will not be tolerated.

The use of these tools, tailored to identifying and addressing abuse, are the answer – rather than sweeping proposals – like those included in H.R. 5137 – that would cause the United States to turn away, and send back to danger, legitimate refugees with credible asylum claims. The bottom line is that U.S. immigration authorities have the legal and policy mechanisms necessary to detect and address abuse, including referring for prosecution individuals who attempt to orchestrate fraud on the system. While additional staffing and resources are needed for the asylum, credible fear, and immigration court removal systems, additional changes to laws – to make it even more difficult for refugees to access the asylum system – are inconsistent with our values and make the system more inefficient by leading to mistaken decisions to deport legitimate refugees.

**Strengthen Rather than Weaken Protections**

As we seek to strengthen the system, we should address the many ways in which our current asylum system fails to provide protection in a manner consistent with this country's commitments and legal obligations to protect refugees fleeing persecution. Over the years, so many barriers and hurdles have been added to the asylum system through multiple rounds of legislation that refugees who seek the protection of the United States often find themselves denied asylum, delayed in receiving protection, or lingering for months in jails and jail-like immigration detention facilities. In addition to supporting a fair and timely decision-making process for those seeking this country's protection, Congress should eliminate unjust barriers that deny or delay U.S. protection to refugees and implement the recommendations of the U.S. Commission on International Religious Freedom relating to expedited removal and detention.

Changes in law that would further prolong detention for many asylum seekers or risk turning refugees back to persecution are not necessary, and are inconsistent with this country's commitments and values. America should stand firm as a beacon of hope that will not turn its back on those seeking protection from persecution.

As the Council on Foreign Relations Independent Task Force on Immigration Policy, co-chaired by former Florida Gov. Jeb Bush and former Clinton White House chief of staff Thomas "Mack" McLarty, pointed out: "The treatment of refugees and asylum seekers is [a] dimension of immigration policy that reflects important American values." That task force's report also stressed the example that the United States sets for the world: the U.S. commitment to protect refugees from persecution is "enshrined in international treaties and domestic U.S. laws that set the standard for the rest of the world; when American standards erode, refugee face greater risks everywhere."

**Recommendations**

Congress should not pass proposals, like those included in H.R. 5137, that would prevent refugees from accessing or receiving asylum from persecution. Instead, Congress should take the steps outlined below. These recommendations are informed by Human Rights First's multiple visits to key border points, border patrol stations, and immigration detention facilities in Arizona, California, and Texas as well as our first-hand experience assisting and providing pro bono representation to asylum seekers including some who have come to this country through the southern border. Human Rights First released a detailed Blueprint of its recommendations in June 2014, and a subsequent set of recommendations focused on families seeking asylum.

In addition to supporting efforts to address the human rights conditions in Central America prompting many to flee their homes, Congress should take steps to strengthen the asylum system, including:

- **Increase Immigration Court Staffing to Address Removal Hearing Delays and Eliminate Hearing Backlog.** To address the incoming removal caseload and the backlog, the immigration courts will need at least 300 additional immigration judge teams – significantly more than the administration's fiscal 2016 request for 55 additional immigration judge teams. Both the American Bar Association and the Administrative Conference of the United States (ACUS) have expressed concern that the immigration courts do not have the resources necessary to deal with their caseloads. The Wall Street Journal and other media have recently reported on immigration court delays, which have led non-priority non-border cases to be calendared for their hearings in late November 2019 – nearly five years from now. The delays and backlogs resulting from insufficient staffing and resources undermine the integrity of the system by exposing it to potential abuse and by leaving individuals who are desperately awaiting their asylum hearings in limbo for years.

- **Increase Asylum Office Staffing to Address Backlogs, Provide Timely Referrals into Removal Proceedings.** As asylum officers have been redeployed to conduct credible fear interviews, delays and backlogs for affirmative asylum interviews have grown. A timely and effective asylum office interview process is essential for maintaining the integrity of the U.S. asylum system and will ensure that those who are not eligible for asylum are promptly referred into immigration court removal proceedings. Delays also undermine the ability of refugees to rebuild their lives and bring stranded spouses and children to safety in this country. The USCIS asylum office should also have sufficient resources to conduct prompt and effective credible fear and reasonable fear interviews, and to conduct its interviews in person. These interviews are integral components of the enforcement tools of expedited removal and reinstatement of removal, and should be funded commensurately with the funding provided to CBP to conduct these summary removal processes.

- **Utilize Multiple Existing Anti-Fraud Tools**. ICE and USCIS should continue and increase where needed their use of the many available tools for combatting fraud and abuse in the immigration and asylum systems. As detailed in Appendix A, these include training, enhanced background biographical and biometric checks, fraud detection and investigation

capacities, and referral of cases for criminal prosecution. If additional resources are needed, the Administration should request and Congress should appropriate funding to ensure that DHS and DOJ have the resources required to adequately combat fraud. Prosecutors should also prioritize prosecutions of individuals who orchestrate schemes that defraud the immigration and asylum systems. Prosecuting the perpetrators of fraudulent schemes will reduce fraud and abuse and enhance the integrity of the asylum and immigration systems, as well as protect the immigrants who are often victims of these schemes. The American Bar Association, the New York Immigrant Representation Study Group, and others have recommended strict penalties for those who engage in unauthorized practice of law.

- **Implement U.S. Commission on International Religious Freedom (USCIRF) Recommendations on those fleeing religious and other forms of persecution and Request Updated USCIRF Study**. Department of Homeland Security and Immigration and Customs Enforcement should implement U.S. Commission on International Religious Freedom recommendations, including: using detention facilities that do not have jail-like conditions when asylum seekers are detained; maintaining, effectively implementing, and codifying the existing parole guidance into regulations; and expanding legal orientation presentations. Congress should request and support an updated USCIRF study on the conduct of expanded removal and its impact on asylum seekers.

- **End the Detention of Children and their Families, Effectively Implement Parole and Release Procedures**. Immigration and Customs Enforcement should end the detention of families, a policy that runs contrary to American values and sets a poor example for the rest of the world. ICE should end its submission of materials and arguments relying on the flawed reasoning of former Attorney General John Ashcroft in *Matter of D-J-,* and should instead base bond positions on true assessments of the circumstances of the individual in question. ICE should also effectively implement the existing asylum parole guidance, ensuring that eligible arriving asylum seekers are assessed for parole under the specified criteria, and released when they meet those criteria; and – in accordance with that guidance – not releasing any individual who presents a danger to the community or flight risk. Human Rights First has assisted many individuals who fled persecution and arbitrary detention for their prodemocracy or human rights advocacy only to languish in jail-like facilities in the United States while awaiting adjudication of their asylum requests. The traumatizing effects of detention on a torture survivor are immense and have been well documented.

- **Use Cost-Effective Alternatives to Detention rather than more detention**. Where individual asylum seekers are in need, based on an assessment of their individual circumstances, of supervision and/or case management to assure their appearance, Immigration and Customs Enforcement should utilize cost-effective alternatives to detention. Alternatives have been demonstrated to produce high appearance rates – with ICE's current contracted supervision program reporting a 97.4 percent appearance rate at final hearings and an 85 percent compliance rate with final orders where case management is utilized. As Alex Nowrasteh of the Cato Institute has pointed out, the family detention facility in Dilley, Texas

will cost the U.S. government about $300 a day per person to operate—amounting to roughly $260 million each year. By contrast, community-based support programs and other alternative measures, proven to uphold appearance for immigration hearings and deportation, are much more fiscally prudent, costing only 17 cents to $17 a person a day. The U.S. Conference of Catholic Bishops and Lutheran Immigration and Refugee Services have also piloted and are willing to run community-based appearance support programs that can help make sure immigrants show up for hearings. Groups from across the political spectrum, including the Council on Foreign Relations' Independent Task Force on U.S. Immigration Policy, the International Association of Chiefs of Police, and the Texas Public Policy Foundation (home to Right on Crime), have recommended alternatives to detention for their cost-savings. Many states are increasingly turning to the use of alternatives in the criminal justice system, prompted by Right on Crime and other reform experts. Congress should shift funding from detention to alternatives, or at least support flexibility in funding, so that Immigration and Customs Enforcement can utilize these alternatives to save costs in cases where detention is not necessary to meet the government's need for appearance, where additional supervision would assure appearance, and the individual poses no danger.

- **Support Legal Orientation Programs and Access to Counsel Measures that Improve Fairness and Efficiency of the Immigration System**. Legal Orientation Programs (LOP), which have been praised for their cost-effectiveness and for increasing immigration court efficiency, currently provide legal information and, in some cases, referrals to counsel, to some but not all immigration detainees. Approximately 80 percent of detained individuals do not have representation in their immigration proceedings. LOPs – and quality legal counsel - can help non-represented individuals understand their eligibility, and in some cases lack of eligibility, for asylum and other potential forms of immigration relief. Congress should sufficiently fund DOJ to ensure that LOPs are funded and in place at all facilities used for immigration detention. According to a 2012 DOJ report, LOP reduced the amount of time to complete immigration proceedings by an average of 12 days. Factoring in the savings – primarily to DHS through reduced length of time spent in detention – LOP has been shown to have a net savings of approximately $18 million. Rather than seeking to restrict funding for legal representation, Congress should support increased funding for counsel. Recent studies have confirmed that counsel in immigration proceedings encourages appearance for hearings, and saves government money.

**Remove Unnecessary Impediments that Delay Cases and Block Refugees from this Country's Protection**. This includes elimination of the asylum filing deadline which bars legitimate refugees from asylum, and needlessly adds to the number of cases in the immigration courts. As Dr. Richard Land, President of Southern Evangelical Seminary, has described, "When people escape horror and come to the United States in desperate need of freedom and safety, we shouldn't turn them away because of a bureaucratic technicality." Under no circumstances should this flawed deadline be applied to the asylum requests of children.

# APPENDIX A

## Mechanisms in the System for Addressing Fraud

The U.S. asylum system and U.S. law contain many measures that are specifically aimed at, and closely tailored to, identifying fraud and protecting the integrity of the system. The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) contained strict security provisions, including a requirement that identity checks be conducted against federal government databases and records for all individuals applying for asylum. Section 208 (d)(5)(a)(i) of the INA requires that "asylum cannot be granted until the identity of the applicant has been checked against all appropriate records or databases maintained by the Attorney General and by the Secretary of State … to determine any grounds on which the alien may be inadmissible to or deportable from the United States, or ineligible to apply for or be granted asylum." These checks can help identify fraudulent cases as well as any individual who might present a security risk. Anti-fraud and security check measures continue to be strengthened, as well new ones initiated, and many additional steps have been added since both 1996 as well as in the years since the study on fraud, based on a sample of cases from 2005, reported on in the *Washington Times* on February 6, 2014. Outlined below are just some of the mechanisms that are designed to protect the immigration and asylum systems from abuse.

In December 2013 written testimony, DHS stated that: "Before individuals are granted asylum, they must all establish identity and pass all requisite national security and law enforcement background security checks. Each asylum applicant is subject to extensive biometric and biographic security checks. Both law enforcement and intelligence community checks are required – including checks against the FBI, the Department of Defense, the Department of State, and other agency systems." Some of the key measures that the USCIS Asylum Division uses to prevent abuse of the asylum system include: [1]

**Mandatory Biographical Checks (Checks Using the Applicant's Name, Date of Birth, and Aliases)**: These include checks in USCIS Central Index System; CBP TECS; ICE ENFORCE Alien Removal Module; FBI Name Checks; and DOS Consular Consolidated Database**.** Mandatory biographical checks are conducted in multiple databases, using the applicant's name, date of birth, and aliases.

- **USCIS Central Index System**: In conducting background screenings, asylum applicants are first checked against the USCIS Central Index System to determine if they have previously been issued an alien number.
- **TECS**: They are also screened against TECS, CBP's primary law enforcement and national security database, which contains enforcement, inspection, and intelligence records. TECS

[1]See Department of Homeland Security (DHS), Combined Testimony of DHS before the House Judiciary Homeland Security Committee for a hearing on "Asylum Abuse: Is it Overwhelming Our Borders" (December 12,2013) available at http://judiciary.house.gov/_cache/files/e9043d83-e429-4d21-9621-c681c6499251/combined-dhs-testimony.pdf; fact sheet from U.S. Citizenship and Immigration Services (USCIS) on file with Human Rights First; USCIS, Affirmative Asylum Procedures Manual (November 2013) *available at* http://www.uscis.gov/sites/default/files/files/nativedocuments/Asylum_Procedures_Manual_2013.pdf.

contains various types of information from a variety of Federal, state, local, and foreign sources, and the database contains records pertaining to known or suspected terrorists, wanted persons, and persons of interest for law enforcement and counterterrorism purposes.

- **EARM – ENFORCE Alien Removal Module**: This ICE database contains records of aliens in detention, exclusion, and removal processes.
- **FBI name check**: The FBI searches for the applicant's name(s) and date(s) of birth in their records.
- **CCD – Consular Consolidated Database**: Asylum office personnel access the Department of State's web-based CCD to obtain information about the identity, previous travel history, method of entry into the U.S. and/or background of an asylum applicant.

**Mandatory Biometric Checks (Checks Using the Applicant's Fingerprints and Photograph)**: These checks include FBI fingerprint check, US-VISIT/IDENT, and DOD/ABIS vetting for certain applicants.

- **FBI Fingerprint Checks**: With respect to affirmative asylum applications, as described in DHS's testimony from December 2013: "A USCIS Application Support Center takes a complete set of fingerprints and biometrics (signature, photograph and index print) of asylum applicants between the ages of 12 years 9 months and 79 years. The FBI electronically searches the fingerprints within the Integrated Automated Fingerprint Identification System." Asylum officers and immigration judges are not authorized to grant asylum until the applicant's fingerprints have been run through the FBI database and the results are received and reviewed.
- **US-VISIT/IDENT**: US-VISIT/IDENT is a DHS system managed by the National Protection and Programs Directorate's (NPPD) Office of Biometric Identity Management (OBIM), and includes biometric information related to the travel history of foreign nationals and Watchlist information. It also contains visa application information owned by the Department of State. This system is used to confirm identity, determine previous interactions with government officials and detect imposters. The 10 fingerprints – referenced above in connection with the FBI fingerprint check - are also electronically submitted to the US-VISIT/IDENT database, where they are stored and matched to existing fingerprint records. This system is used to confirm identity and determine previous interactions with government officials. Through the US-VISIT SIT tool, asylum officers have the ability to verify that the person who went to the Application Support Center (ASC) for fingerprinting is the same person appearing at the asylum office for interview.
- **DOD Automated Biometric Identification System**: A biometric check against the Department of Defense (DOD) Automated Biometric Identification System (ABIS) is conducted for certain cases.
- **National Counterterrorism Center**: The Asylum Division also screens the biographic information of new asylum applicants against the National Counterterrorism Center's terrorism holdings.

For protection requests that enter the system through the credible fear process, the DHS testimony explains that USCIS Asylum Officers conduct a mandatory check of both TECS (described above) and US-VISIT/IDENT (referenced above) during the credible fear process. These checks help to confirm identity and inform lines of questioning. In addition, with respect to cases that enter the system through the credible fear process, asylum officers – at the credible fear stage - also ensure that the Federal Bureau of Investigation (FBI) name check and fingerprint checks have been initiated. DHS, in its December testimony, stated that "The USCIS asylum officer's determination as well as information on the individual's identity, including how he or she established it, results of the security checks, and any adverse information is recorded and placed in the alien's file upon completion of the credible fear process. This information is then provided to ICE." As a result, ICE will have this information with respect to individuals who pass the credible fear screening process and are put into immigration court removal proceedings and to consider in detention determinations.

**Fraud Detection and National Security Teams**

USCIS's Office of Fraud Detection and National Security aids in identifying fraudulent asylum claims by training asylum officers and providing technical support. Through this office, asylum officers may refer suspected fraudulent applications to ICE for criminal investigation and prosecution. These specially trained officers review asylum files to monitor the asylum caseload for fraud and they liaise with various law enforcement entities. These officers also help train asylum officers on detecting and addressing fraud**.** The FDNS officers also conduct in-depth vetting on cases with national security concerns. This includes liaising with local Joint Terrorism Task Forces regarding these cases. Asylum Offices also have on their staff trained document experts, Forensic Document Laboratory Certified Document Instructors (FDLCDIs), who have been trained by the Department of Homeland Security's Forensic Document Laboratory. FDLCDIs examine for fraud documents submitted to the Asylum Office by asylum applicants and train Asylum Office staff on how to recognize certain documents for irregularities and fraud indicators.

**Asylum Officer Training and Mandatory Supervisory Review of all Asylum Decisions**

Affirmative asylum interviews and credible fear interviews are conducted by specially trained USCIS asylum officers who are trained and dedicated full-time to the adjudication or screening of protection claims. They are, as DHS has explained in recent testimony, extensively trained in national security issues, the security and law enforcement background check process, eligibility criteria, country conditions, interview techniques, making proper credibility determinations, and fraud detection. During an asylum interview, "The asylum officer fully explores the applicant's persecution claim, considers country of origin information and other relevant evidence, assesses the applicant's credibility and completes required security and background checks. The asylum officer then determines whether the individual is eligible for asylum and drafts a decision." Supervisors review 100 percent of asylum officers' determinations prior to issuance of a final decision, and they also review 100 percent of credible fear determinations.

**Government-Funded Interpreter Monitors**

Current regulations require that asylum applicants provide interpreters at their own expense when they cannot proceed effectively in English at the asylum interview. The Asylum Division uses neutral, government-funded interpreters to monitor the interpretation of asylum interviews at all Asylum Offices, in order to ensure that interpreters brought by applicants are correctly interpreting interview questions and answers. Procedures for securing an interpreter monitor apply in all affirmative asylum cases where the applicant does not speak English.

When cases are referred from the USCIS Asylum office into the immigration courts, the information used by the asylum office to make a determination on the individual's claim, including the interview notes, biographic information, completed security checks and decisional documents, is placed into the individual's file and is available for use by ICE attorneys during immigration court removal proceedings.

**Applicants Who Knowingly Make a Frivolous Application Permanently Barred**

INA 208(d)(6) provides that "If the Attorney General determines that an alien has knowingly made a frivolous application for asylum, the alien shall be permanently ineligible for any benefits under the Act."

**Asylum Applications Signed Under Penalty of Perjury**

When the legacy Immigration and Naturalization Service (INS) overhauled the asylum system in 1995, it revised the asylum application form to require both the asylum applicant and the individual preparing the application to sign the application "under penalty of perjury" that the application and the evidence submitted with it are true and correct. In addition, the asylum applicant is put under oath at the Asylum Office interview, and must execute a record of that oath. The interpreter must also be placed under oath and execute a record of oath as well.

**Fraudulent Filers, Preparers, and Attorneys Can Be Prosecuted**

Individuals who seek to defraud the immigration and asylum system can be and have been prosecuted. Unscrupulous "notarios" and attorneys take advantage of immigrants by untruthfully telling them they are eligible for certain benefits and then preparing fraudulent applications – including asylum applications – for large fees. To facilitate prosecution of fraudulent filers, USCIS is a member of the Immigration and Customs Enforcement's (ICE) Document and Benefit Fraud Task Force, which coordinates with U.S. Attorney's Offices to identify and prosecute fraudulent immigration benefit claims. Charges have been brought against such preparers in many states, including California, New York, Texas, Florida, and Arizona. On June 9, 2011 the Federal Trade Commission with the Departments of Justice and Homeland Security announced a multi-agency, nationwide initiative to combat immigration services scams.

**Identification and Response to Fraud and Abuse in the Immigration Court System**

As noted above, asylum applicants can only be granted asylum if the identity of the applicant has been checked against all appropriate records or databases. EOIR also has a Fraud Program designed to assist court judges and staff with identifying fraudulent cases and systemic evidence

of schemes to defraud the system. In addition, ICE trial attorneys are charged with identifying potential fraud. In cases before the immigration court, where ICE trial attorneys may present evidence if the government suspects fraud, Immigration Judges have the authority to find a case fraudulent or frivolous, a finding that comes with severe consequences for the applicant.

In addition, as described by EOIR Director Juan Osuna in November 2013 testimony before the House Committee on Oversight & Government Reform Subcommittee on National Security: "EOIR has a robust and active program for identifying and referring claims of fraud encountered by immigration judges and the BIA. ….The complaints and requests for assistance the Fraud and Abuse Program receives each year are almost evenly divided between unauthorized practice of immigration law (UPIL) complaints and fraudulent claims perpetrated against the government." That testimony also stated that: "Because EOIR has no authority to conduct investigations or prosecute, UPIL complaints are referred to federal, state and local law enforcement, and bar associations for investigation and prosecution. EOIR also files complaints of UPIL fraud with the Federal Trade Commission's Consumer Sentinel Network (Sentinel) and collaborates with USCIS's Fraud Detection and National Security Directorate and other government agencies in combating fraudulent immigration activity. EOIR consistently is among the top-ranked government agencies in referring UPIL fraud to Sentinel." EOIR also regulates the professional conduct of immigration attorneys and representatives, EOIR's Disciplinary Counsel investigates complaints involving alleged misconduct associated and can initiate formal disciplinary proceedings. Since the program's inception in 2000, EOIR reports that it has disciplined more than 1,100 attorneys.

**Wrongdoers and Security Threats Excluded from Protection**

In addition, the Refugee Convention's "exclusion clauses" require host countries to exclude from the Convention's protections any person who has committed heinous acts or grave crimes that make him undeserving of international protection as a refugee, even if that individual has a well-founded fear of persecution. A separate provision of the Convention allows the return of a refugee who poses a danger to the security of the host country. The United States incorporated into its law the Refugee Convention's promise to provide protection to refugees, but also codified bars to asylum and withholding of removal intended to reflect the Convention's exceptions.

U.S. immigration laws prohibit granting asylum and any form of refugee protection to: people who engaged in or assisted in or incited the persecution of others; people who have been convicted of a particularly serious crime in the United States; people who have committed a serious non-political crime abroad; people who have engaged in terrorist activity; people who are representatives of foreign terrorist organizations; or people who otherwise pose a threat to the security of the United States.[2]

The recent exemptions to immigration law inadmissibility provisions issued by the Department of Homeland Security in February 2014 – pursuant to authority provided by Congress –

---

[2] INA § 208(b)(2) (8 U.S.C. § 1158(b)(2)) (bars to asylum); INA § 241(b)(3)(B) (8 U.S.C. § 1231(b)(3)(B)) (bars to withholding of removal).

specifically exclude a long list of individuals including anyone who poses a danger to the safety and security of the United States or has not passed all relevant security and background checks. These exemptions do not apply to situations involving groups that are actually listed or designated as "terrorist organizations" by the United States government. These inadmissibility provisions have ensnared refugees with no real connection to terrorism, such as a refugee from Burundi who had a rebel group rob him of four dollars and his lunch and an Iraqi former interpreter for the U.S. Marine Corps was informed that his past connection to a Kurdish group allied with the United States and opposed to Saddam Hussein made him inadmissible. These exemptions do not address the situation of individuals who had innocent interactions with designated or listed groups – like for instance, an Iraqi widow who had a member of a designated terrorist organization buy flowers in her flower shop (incidentally while the group was under U.S. military protection).[3]

**The Importance of a Timely and Effective Process in Deterring Abuse**

The integrity of any system is protected by its ability to operate fairly and in a timely manner. In the 1990s, the asylum system was under-resourced and under-staffed. Faced with a large number of asylum filings prompted by a wave of brutal civil wars and human rights abuses in Central America, the asylum system developed a substantial backlog. This multi-year backlog and lack of adequate staffing left the U.S. asylum system vulnerable to abuse. Some individuals sought to exploit the system. Some people were told by unscrupulous lawyers or others that they could sign a form and would then be allowed to remain in the United States for years with work authorization. This backlog had a devastating impact on the cases of many bona fide asylum seekers. Their lives were in limbo for years, and the delays in their asylum grants left many separated from their children and spouses for years.

The U.S. Immigration and Naturalization Service (INS) launched a major reform effort and took a number of steps to address these challenges. These steps included quicker adjudications, quicker referrals to deportation proceedings for those not granted asylum after an asylum interview, and increased staffing to ensure timely adjudication. The INS also terminated the automatic grant of work authorization to asylum applicants at the time they apply – a step that has left many legitimate asylum seekers without the means to support themselves while they await adjudication of their asylum requests.[4]

As a result of the asylum processing improvements that were put in place at the time, and continued for many years after, individuals who applied for asylum would generally have their asylum interviews within a month or two of filing. Individuals who applied for asylum saw their cases promptly put into removal proceedings if they were not found eligible for asylum by the asylum office. However, in recent years, due to inadequate funding and increased demand,

---

[3] For more background, *see* Human Rights First, *Refuge at Risk: The Syria Crisis and U.S. Leadership*, November 2013; Human Rights First, *Denial and Delay: The Impact of the U.S. Immigration Law's "Terrorism Bars" on Asylum Seekers and Refugees in the United States*, 2009.

[4]Human Rights Watch and the Seton Hall University School of Law's Center for Social Justice "At Least Let Them Work: The Denial of Work Authorization and Assistance for Asylum Seekers in the United States," November 2013.

backlogs and delays have been allowed to grow in both the asylum and immigration court systems.

At USCIS, the asylum division has redeployed its asylum officers to address the escalating number of credible fear interviews at the border. Backlogs in the asylum office have risen over the last two years and some asylum seekers are now waiting many months and sometimes longer for their interviews. While prompt conduct of credible fear interviews should be a top priority, USCIS needs the resources and staffing to conduct prompt in-person credible fear interviews as well as to conduct affirmative asylum interviews in a timely manner. Adequate staffing and resources are essential for maintaining the integrity of the asylum system.

The immigration court system, which is within the Department of Justice's Executive Office for Immigration Review (EOIR), has for a number of years been widely acknowledged to be overstretched, backlogged, and underfunded.[5] In recent years, resources for immigration enforcement have escalated or remained high, leading many more cases to be place into immigration court removal proceedings. At the same time, the resources for the immigration court system have lagged behind leaving the immigration courts under-staffed. Over 350,000 immigration removal cases, including those involving claims for asylum, have now been pending for an average of 570 days.[6]

The Administrative Conference of the United States (ACUS), based on its study of the immigration court system, concluded in June 2012 that the immigration court backlog and "the limited resources to deal with the caseload" present significant challenges. In 2010, the American Bar Association's Commission on Immigration, in its comprehensive report on the immigration courts, concluded that "the EOIR is underfunded and this resource deficiency has resulted in too few judges and insufficient support staff to competently handle the caseload of the immigration courts."

The delays and burden on the immigration courts can be exacerbated when cases that could or should be granted at the asylum office level are put into the immigration court system. As documented by a comprehensive statistical study on the asylum filing deadline, thousands of asylum cases have been placed into the immigration court system unnecessarily due to the asylum filing deadline.[7] Other categories of asylum cases could also be more efficiently resolved

---

[5] American Bar Association, *Reforming the Immigration Detention System* (2010), pp. 2-16 available at http://www.americanbar.org/content/dam/aba/migrated/Immigration/PublicDocuments/aba_complete_full_report.authcheckdam.pdf; Administrative Conference of the United States (ACUS), "Immigration Removal Adjudication, Committee on Adjudication, Proposed Recommendation, June 14-15, 2012," available at http://www.acus.gov/wp-content/uploads/downloads/2012/05/Proposed-Immigration-Rem.-Adj.-Recommendation-for-Plenary-5-22-12.pdf

[6] Immigration Court Backlog Tool. Backlog as of December 2013. *Transactional Records Clearing House* available at http://trac.syr.edu/phptools/immigration/court_backlog/.

[7] Philip G. Schrag, Andrew I. Schoenholtz, Jaya Ramji-Nogales, and James P. Dombach. "Rejecting Refugees: Homeland Security's Administration of the One-year Filing Deadline." *William and Mary Law Review*. 52, No. 3 (2010); Human Rights First. *The Asylum Filing Deadline: Denying Protection to the Persecuted and Undermining Government Efficiency* (November 2010).

if they were referred initially to the USCIS asylum office.[8] The lack of legal counsel for asylum seekers and other immigrants, in part exacerbated through detention practices that inhibit access to counsel, also impacts the efficiency and fairness of the immigration court system. EOIR itself has explained that: "Non-represented cases are more difficult to conduct. They require far more effort on the part of the judge."[9]

Court backlogs and extended asylum processing times also have a grave impact on asylum seekers themselves. While they wait – sometimes two to three years - to have their claims heard, many remain separated from spouses and children who may be in significant danger in their home countries. Without access to work authorization for months or longer while awaiting their immigration court hearings, many asylum seekers are unable to support themselves and their families. Some become homeless or destitute. As the pro bono leaders at some of the nation's leading law firms wrote in June 2013, the backlog in the immigration courts is resulting in years-long delays and making it increasingly difficult to recruit pro bono counsel.[10]

---

[8] Administrative Conference of the United States (ACUS), "Immigration Removal Adjudication, Committee on Adjudication, Proposed Recommendation, June 14-15, 2012," available at http://www.acus.gov/wp-content/uploads/downloads/2012/05/Proposed-Immigration-Rem.-Adj.-Recommendation-for-Plenary-5-22-12.pdf

[9] Charles H. Kuck, *Legal Assistance for Asylum Seekers in Expedited Removal: A Survey of Alternative Practices* (Dec. 2004), available at http://www.uscirf.gov/images/stories/pdf/asylum_seekers/legalAssist.pdf.

[10] Association of Pro Bono Counsel, June 4. 2013, available at http://www.endthedeadline.org/uploads/pdfs/APBCo-Letter.pdf.

# EXHIBIT 13

BuzzFeed News

SIGN IN

IMMIGRATION

**Subscribe** to BuzzFeed Daily Newsletter

# The Biden Administration Has Suspended A Trump-Era Policy That Put Immigrants At Risk Of Being Deported Without Due Process

The decision comes after BuzzFeed News inquired about data detailing how the little-known policy was used for several immigrants this year.



**Hamed Aleaziz**
BuzzFeed News Reporter

Updated on October 14, 2021, 10:26 pm
Posted on October 14, 2021, 8:28 pm

Immigrants from Honduras are escorted back across the border in Hildalgo, Texas.

*David J. Phillip / AP*

A Trump-era policy that allows ICE officers to arrest and rapidly deport certain undocumented immigrants without access to a judge was suspended by the Biden administration Thursday after BuzzFeed News obtained government data that showed it had been used several times this year.

“DHS’s review of expanded expedited removal is ongoing. This particular application of expedited removal was used in an exceedingly small number of cases under the Biden Administration and will not be used moving forward until the Department’s review is completed,” a DHS spokesperson said in a statement.

From Jan. 20 to late August, ICE officials said they have deported four immigrants under the policy, including one person who was not in possession of a valid visa in the Dallas area and another who had entered the country through Texas in late June without authorization. Prior to Jan. 20, 17 immigrants had been deported since the implementation of the so-called expanded expedited removal policy last October.

The data given to BuzzFeed News by ICE appears to be the first public acknowledgment by government officials on the use and scope of the policy.

“The administration is right to direct that expanded expedited removal not be used while review is ongoing. [Department of Homeland Security Secretary Alejandro] Mayorkas should now move swiftly to rescind this Trump era policy,” said Anand Balakrishnan, an ACLU attorney who led a lawsuit over the policy.

The controversial effort, which was initially instituted in 2019 by the Trump administration and faced an immediate legal challenge that delayed its deployment, allows ICE officers to arrest and deport undocumented immigrants without a hearing in front of an immigration judge. The policy was blocked by a federal judge in 2019 before an appellate court lifted the preliminary injunction last year. ICE officials later issued guidance to its officers last October on how to use it.

At the time of its implementation, the effort was seen as a way the Trump administration could increase deportations while circumventing a court system that is severely backed up and short on resources. Advocates for immigrants have said it would destroy their due process rights and questioned the use of “expedited removal” away from the border, where it had been previously used. Within the US, ICE officers typically arrest immigrants and place them into deportation proceedings. These include a hearing before an immigration judge — a process that can take years.

Since last year, questions about the scale and scope of the expansion of expedited removal have gone unanswered.

The data provided to BuzzFeed News also comes months after President Joe Biden ordered Mayorkas in February to review the policy and decide whether to modify, revoke, or rescind it. It was expected that the Biden administration would move to undo the policy.

“The review shall consider our legal and humanitarian obligations, constitutional principles of due process and other applicable law, enforcement resources, the public interest, and any other factors consistent with this order that the Secretary deems appropriate,” Biden wrote.

“Expedited removal” is most commonly used within 100 miles of the border and for those who have been in the country for up to two weeks. Border officials long used expedited removal near

the border, regardless of administrations. The changes made by Trump officials, however, were unprecedented. In July 2019, Trump expanded the policy so that expedited removal could be used anywhere in the country and for anyone who could not prove that they had lived in the US for longer than two years.

Experts have noted that the vast majority of unauthorized immigrants have lived in the US for 10 years or more, but said such a policy would instill fear within immigrant communities. What's more, while ICE officials told officers and prosecutors last year that immigrants could use bankbooks, leases, school records, employment records, or other materials to prove the length of their presence in the country, advocates have explained that such information could be difficult to quickly round up, especially if the person is in detention.

Marielena Hincapié, executive director of the National Immigration Law Center, said any continued use of the expanded expedited removal policy would directly contradict Biden's promise to revamp the immigration system.

"This policy promotes racial profiling and eviscerates due process by allowing immigration officers to rapidly deport people – including those with meaningful ties here – without ever appearing before an immigration judge," Hincapié said in a statement. "Like the administration's recent decision to label people seeking safety and a better life at our borders as security threats in their new enforcement guidelines, this is yet another example of how the Biden administration continues to rely on destructive immigration policies and a failed deterrence-based strategy."

In a 2019 lawsuit, the ACLU and the American Immigration Council challenged the expansion of expedited removal, noting that the policy allows for officers to deport immigrants soon after they are arrested without a chance to speak to their attorneys or gather evidence. The new process was a "major departure" from a century-long norm of allowing noncitizens in the United States with "notice, access to counsel, an opportunity to prepare, and a contested hearing when they face removal."

Since its creation two decades ago, the lawsuit notes, expedited removal was only authorized in limited circumstances, specifically for those arrested near the border shortly after arrival into the US. The group argued that the experience with expedited removal at the border should dissuade

the courts to allow its use throughout the country, specifically finding that the government had wrongly deported individuals, including US citizens, through the process.

“The unprecedented expansion means that low-level DHS officers can now immediately subject hundreds of thousands of additional individuals to expedited removal, without any consideration of their family ties — including ties to U.S. citizen or lawful permanent resident family members — or their strong ties to their communities,” the group wrote in its initial complaint.

## MORE ON THIS

### The Biden Administration Is Moving To End Mass Worksite Raids That Resulted In Hundreds Of Immigrants Being Arrested

### The Biden Administration Is Giving ICE Officers Flexibility In Targeting "Public Safety" Threats

### Biden’s Approach To Immigration Is Causing A Huge Internal Rift And Leading To A Lot Of Confusion

## Topics in this article

Immigration



**Hamed Aleaziz**
BuzzFeed News Reporter

**BuzzFeed News**

a **BuzzFeed** brand.

© 2025 BuzzFeed, Inc Press RSS Privacy Consent Preferences User Terms Accessibility Statement Ad Choices Help Contact

Sitemap

# EXHIBIT 14

State and National Data Tool    **About the Data**



# Estimates of Undocumented and Eligible-to-Naturalize Populations by State

Step 1. CHOOSE A POPULATION (Click one of the population types below)

| | |
|---|---|
| (●) Undocumented | ( ) Eligible-to-Naturalize |

Step 2. CHOOSE A GEOGRAPHY (National estimates are shown when no area is selected)

Select a state or multiple states on the map below. Then scroll down the page.



Excel Word

| | 2012 | Pct. Dist. | 2022 | Pct. Dist. |
|---|---|---|---|---|
| Total: All Countries | 11,110,455 | 100.0% | 10,939,004 | 100.0% |
| North America | 6,162,485 | 55.5% | 4,517,410 | 41.3% |
| Central America | 1,516,839 | 13.7% | 2,435,380 | 22.3% |
| Asia | 1,596,580 | 14.4% | 1,788,854 | 16.4% |
| South America | 675,103 | 6.1% | 1,037,933 | 9.5% |
| Caribbean | 508,143 | 4.6% | 462,773 | 4.2% |
| Africa | 303,013 | 2.7% | 343,406 | 3.1% |
| Europe | 323,348 | 2.9% | 312,398 | 2.9% |
| Oceania | 24,943 | 0.2% | 33,241 | 0.3% |

# Top Countries of Origin (U.S., 2022)

| | 2022 ▲ | Pct. Dist. |
|---|---|---|
| Mexico | 4,484,620 | 41.0% |
| Guatemala | 858,008 | 7.8% |
| El Salvador | 808,091 | 7.4% |
| India | 693,394 | 6.3% |
| Honduras | 640,040 | 5.9% |
| China | 355,943 | 3.3% |
| Venezuela | 303,359 | 2.8% |
| Brazil | 221,353 | 2.0% |
| Dominican Republic | 205,967 | 1.9% |
| Colombia | 202,154 | 1.8% |

| | 2022 ▲ | Pct. Dist. |
|---|---|---|
| Haiti | 114,307 | 1.0% |
| Nicaragua | 97,079 | 0.9% |
| Vietnam | 95,130 | 0.9% |
| Jamaica | 89,004 | 0.8% |
| Nigeria | 78,570 | 0.7% |
| Peru | 73,222 | 0.7% |
| Ukraine | 55,503 | 0.5% |
| Pakistan | 52,576 | 0.5% |
| Afghanistan | 42,607 | 0.4% |
| Bangladesh | 39,475 | 0.4% |
| Ethiopia | 38,116 | 0.3% |
| Russia | 36,816 | 0.3% |
| Nepal | 36,322 | 0.3% |
| Canada | 32,792 | 0.3% |
| Argentina | 30,843 | 0.3% |
| Poland | 29,880 | 0.3% |

## Period of Entry

| | 2012 | Pct. Dist. | 2022 | Pct. Dist. |
|---|---|---|---|---|
| Total | 11,110,455 | 100.0% | 10,939,004 | 100.0% |
| 2020 to 2022 | N/A | N/A | 1,357,758 | 12.4% |
| 2010 to 2019 | N/A | N/A | 4,516,933 | 41.3% |
| 2005 to 2009 | 2,711,749 | 24.4% | 1,400,696 | 12.8% |

| | | | | |
|---|---|---|---|---|
| Before 1990 | 979,049 | 8.8% | 409,787 | 3.7% |

## Years in the United States

| | 2012 | Pct. Dist. | 2022 | Pct. Dist. |
|---|---|---|---|---|
| Total | 11,110,455 | 100.0% | 10,939,004 | 100.0% |
| Less than 5 | 1,874,059 | 16.9% | 2,685,755 | 24.6% |
| 5 to 9 | 2,898,704 | 26.1% | 2,383,547 | 21.8% |
| 10 to 14 | 3,052,375 | 27.5% | 1,231,370 | 11.3% |
| 15 to 19 | 1,507,522 | 13.6% | 1,571,817 | 14.4% |
| 20 or more | 1,777,791 | 16.0% | 3,066,517 | 28.0% |

## Arrived Before Age 16

| | 2022 |
|---|---|
| All who entered at below 16 years of age | 2,885,327 |
| Arrived between 2020 and 2022 | 377,109 |
| Arrived between 2010 and 2019 | 1,141,665 |
| Arrived between 2000 and 2009 | 765,508 |
| Arrived between 1990 and 1999 | 445,207 |
| Arrived before 1990 | 155,830 |

## Language Spoken at Home (5 years and older)

| | 2012 | Pct. Dist. | 2022 | Pct. Dist. |
|---|---|---|---|---|
| Total | 11,006,024 | 100.0% | 10,765,620 | 100.0% |
| Spanish | 8,087,927 | 73.5% | 7,415,370 | 68.9% |
| English | 654,100 | 5.9% | 846,563 | 7.9% |
| Chinese | 331,571 | 3.0% | 358,768 | 3.3% |

| | | | | |
|---|---|---|---|---|
| Filipino | 234,015 | 2.1% | 135,963 | 1.3% |
| Dravidian | 164,829 | 1.5% | 313,950 | 2.9% |
| Portuguese | N/A | N/A | 207,994 | 1.9% |
| Sub-Saharan African languages | N/A | N/A | 134,803 | 1.3% |
| Other language | 864,031 | 7.9% | 923,559 | 8.6% |

## Ability to Speak English (5 years and older)

| | 2012 | Pct. Dist. | 2022 | Pct. Dist. |
|---|---|---|---|---|
| Total 5 years and older | 11,006,024 | 100.0% | 10,765,620 | 100.0% |
| Does not speak English | 1,758,351 | 16.0% | 1,757,918 | 16.3% |
| Speaks English a little | 3,145,957 | 28.6% | 2,665,115 | 24.8% |
| Speaks English well | 2,400,744 | 21.8% | 2,367,147 | 22.0% |
| Speaks English very well (or only English) | 3,700,970 | 33.6% | 3,975,439 | 36.9% |

## School Enrollment (3 years and older)

| | 2012 | Pct. Dist. | 2022 | Pct. Dist. |
|---|---|---|---|---|
| Total 3 years and older | 11,061,707 | 100.0% | 10,860,769 | 100.0% |
| Enrolled in school | 1,785,489 | 16.1% | 1,597,521 | 14.7% |
| Not enrolled in school | 9,276,216 | 83.9% | 9,263,250 | 85.3% |

## Educational attainment (18 years and older)

| | 2012 | Pct. Dist. | 2022 | Pct. Dist. |
|---|---|---|---|---|
| Total 18 years and older | 9,914,231 | 100.0% | 9,637,496 | 100.0% |
| Less than high school diploma or equivalent | 4,539,487 | 45.8% | 3,779,961 | 39.2% |
| High school diploma or equivalent | 2,566,626 | 25.9% | 2,610,605 | 27.1% |
| Some college | 1,443,663 | 14.6% | 1,290,070 | 13.4% |

| | 2012 | Pct. Dist. | 2022 | Pct. Dist. |
|---|---|---|---|---|
| Total | 11,110,455 | 100.0% | 10,939,004 | 100.0% |
| Under 5 | 104,432 | 0.9% | 173,385 | 1.6% |
| 5 to 17 | 1,091,789 | 9.8% | 1,128,125 | 10.3% |
| 18 to 20 | 498,946 | 4.5% | 372,911 | 3.4% |
| 21 to 24 | 961,634 | 8.7% | 722,807 | 6.6% |
| 25 to 34 | 3,348,406 | 30.1% | 2,474,218 | 22.6% |
| 35 to 44 | 2,984,962 | 26.9% | 3,032,732 | 27.7% |
| 45 to 64 | 2,068,376 | 18.6% | 2,936,069 | 26.8% |
| 65 and older | 51,909 | 0.5% | 98,757 | 0.9% |

## Sex

| | 2012 | Pct. Dist. | 2022 | Pct. Dist. |
|---|---|---|---|---|
| Total | 11,110,455 | 100.0% | 10,939,004 | 100.0% |
| Female | 5,070,504 | 45.6% | 4,935,566 | 45.1% |
| Male | 6,039,952 | 54.4% | 6,003,431 | 54.9% |

## Access to a computer or the internet (2022 only)

| | 2022 | Pct. Dist. |
|---|---|---|
| Total | 10,939,004 | 100.0% |
| Access to a computer | 791,717 | 7.2% |
| Access to internet | 83,842 | 0.8% |
| Access to both | 9,873,048 | 90.3% |

## Poverty Status

| | 2012 | Pct. Dist. | 2022 | Pct. Dist. |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| At or below poverty threshold | 3,131,404 | 28.2% | 2,075,903 | 19.0% |

## Employment status (16 years and older)

| | 2012 | Pct. Dist. | 2022 | Pct. Dist. |
|---|---|---|---|---|
| Total | 10,182,671 | 100.0% | 9,851,486 | 100.0% |
| Labor Force | 7,751,096 | 100.0% | 7,603,550 | 100.0% |
| Employed | 7,050,368 | 69.2% | 7,298,170 | 74.1% |
| Unemployed (but seeking work) | 700,719 | 6.9% | 305,385 | 3.1% |
| Not in labor force | 2,431,576 | 23.9% | 2,247,936 | 22.8% |

## Occupation

| | 2022 | Pct. Dist. |
|---|---|---|
| Total (16 and over in the labor force) | 7,603,550 | 100.0% |
| Management, business, science & arts | 1,454,789 | 19.1% |
| Services | 1,937,966 | 25.5% |
| Sales and office | 855,419 | 11.3% |
| Natural resources, construction & maintenance | 1,882,943 | 24.8% |
| Production, transportation & material moving | 1,390,930 | 18.3% |

## Health Insurance Coverage

| | 2012 | Pct. Dist. | 2022 | Pct. Dist. |
|---|---|---|---|---|
| Total | 11,110,446 | 100.0% | 10,939,002 | 100.0% |
| with coverage | 3,623,255 | 32.6% | 5,647,172 | 51.6% |
| with no coverage | 7,487,198 | 67.4% | 5,291,828 | 48.4% |

## Race by Ethnicity

| | 2012 | Pct. Dist. | 2022 | Pct. Dist. |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| Asian (not Hispanic) | 1,516,049 | 13.6% | 1,727,515 | 15.8% |
| Black (not Hispanic) | 569,093 | 5.1% | 543,937 | 5.0% |
| White (not Hispanic) | 594,119 | 5.3% | 458,501 | 4.2% |
| Other (not Hispanic) | 129,352 | 1.2% | 279,885 | 2.6% |

# Privacy Notice

***Privacy of Respondents***

A number of procedures were used by the US Census Bureau to ensure privacy in the ACS public use data. In addition, the estimates are based on an approximately one percent sample; they are shown in relatively broad categories; and estimates are not shown for countries that have fewer than 1,000 estimated undocumented residents.

These estimates are based on sample data and are subject to sampling variability as well as other possible non-sampling errors. A number of statistical adjustments were made to the actual ACS PUMS sample data, including an adjustment for undercount of the undocumented in the ACS. For these reasons, the estimates shown here are not comparable to the original ACS data. Because of the adjustment for undercount, in a few cases, the estimates of undocumented residents may be near or even slightly higher than the number of noncitizens reported in the ACS. Finally, estimates of less than a few thousand should be used with caution.

See Methodology for more information on these estimates.

Published by the Center for Migration Studies, all rights reserved.
Based on the augmented American Community Survey based IPUMS (Integrated Public Use Microdata Series).
Web tool developed and maintained by the IBRC at Indiana University.

Research and Policy
Data
Reports
Briefings
International Migration Review

Latest Insights
Migration Update
Dispatches and Reflections
Multimedia
Other Resources and Publications

Team
Board
Careers
Archive
Contact

**The Center for Migration Studies (CMS)**

CMS is a member of the Scalabrini International Migration Network (SIMN).

Donate Subscribe

**Website designed and developed by Indietech Solutions**

Privacy Policy

The Center for Migration Studies (CMS). All Rights Reserved.

# EXHIBIT 15

# Instructions for Consideration of Deferred Action for Childhood Arrivals

**Department of Homeland Security**
U.S. Citizenship and Immigration Services

**USCIS**
**Form I-821D**
OMB No. 1615-0124
Expires 02/28/2027

## What is the Purpose of this Form?

An individual may file Form I-821D, Consideration of Deferred Action for Childhood Arrivals, to request that U.S. Citizenship and Immigration Services (USCIS) exercise prosecutorial discretion in his or her favor under the Deferred Action for Childhood Arrivals (DACA) process, including consideration for Renewal of deferred action. USCIS considers deferring action (including Renewal of deferred action) on a case-by-case basis, based on the guidelines in the **What is a Childhood Arrival for Purposes of This Form** section of these instructions. Deferred action is a discretionary determination to defer removal of an individual as an act of prosecutorial discretion. Individuals who receive deferred action will not be placed into removal proceedings or removed from the United States for a specified period of time, unless the Department of Homeland Security (DHS) chooses to terminate the deferral. See 8 CFR Part 236, Subpart C; see also **www.uscis.gov/DACA**.

## When Should I Use Form I-821D?

Use this form to request consideration of Initial DACA or Renewal of DACA. Deferred action is a discretionary determination to defer removal action of an individual as an act of prosecutorial discretion. Individuals filing Form I-821D, whether for an Initial or a Renewal of deferred action, must also file Form I-765, Application for Employment Authorization, and Form I-765 Worksheet, Form I-765WS. See the **Evidence for Initial Requests Only** and **Evidence for Renewal Requests Only** sections of these instructions for more information.

**CAUTION:** If you file this request more than 150 days prior to the expiration of your current period of deferred action, USCIS may reject your submission and return it to you with instructions to resubmit your request closer to the expiration date. **USCIS encourages Renewal requestors to file as early in the 150-day period as possible - ideally, at least 120 days prior to the DACA expiration date.**

**NOTE:** If you have received DACA and you are filing within one year after your last period of deferred action expired, and your last period of deferred action was not terminated by USCIS, please follow the instructions provided below for Renewal requestors. If you are filing more than one year after your last period of deferred action expired or at any time after your last period of deferred action was terminated, please follow the instructions provided below for Initial requestors.

**NOTE:** If you are currently in immigration detention, you may request consideration of DACA as an Initial or Renewal requestor from USCIS. However, if USCIS determines a favorable exercise of discretion is warranted to grant you DACA, USCIS will not approve your DACA request until you are released from detention. If you are requesting DACA, you should tell your deportation officer.

## What is a Childhood Arrival for Purposes of This Form?

An individual may be considered for Initial DACA if he or she:

1. Was under 31 years of age as of June 15, 2012;
2. Came to the United States before reaching his or her 16th birthday;
3. Has continuously resided in the United States since June 15, 2007, up to the present time;

4. Was present in the United States on June 15, 2012 and at the time of making his or her request for consideration of deferred action with USCIS;

5. Had no lawful status on June 15, 2012;

   **NOTE:** No lawful status on June 15, 2012 means that:

   **A.** You never had a lawful immigration status on or before June 15, 2012; or

   **B.** Any lawful immigration status or parole that you obtained prior to June 15, 2012 had expired as of June 15, 2012.

6. Is currently in school, has graduated or obtained a certificate of completion from high school, has obtained a general educational development (GED) certificate, or is an honorably discharged veteran of the U.S. Armed Forces or U.S. Coast Guard; and

7. Has not been convicted of a felony, a significant misdemeanor, or three or more misdemeanors, and does not otherwise pose a threat to national security or public safety.

An individual may be considered for **Renewal** of DACA if he or she met the guidelines for consideration of Initial DACA (see above) AND he or she:

1. Has continuously resided in the United States since he or she submitted his or her most recent request for DACA that was approved up to the present time; and
2. Has not been convicted of a felony, a significant misdemeanor, or three or more misdemeanors, and does not otherwise pose a threat to national security or public safety.

## Who May File Form I-821D?

1. **Childhood Arrivals Who Have Never Been in Removal Proceedings.** If you have never been in removal proceedings, submit this form to request that USCIS consider deferring action in your case. You must be 15 years of age or older at the time of filing and meet the criteria described in 8 CFR Part 236, Subpart C.

2. **Childhood Arrivals Whose Removal Proceedings Were Terminated.** If you were in removal proceedings which have been terminated by the immigration judge prior to this request, you may use this form to request that USCIS consider deferring action in your case. You must be 15 years of age or older at the time of filing and meet the criteria described in 8 CFR Part 236, Subpart C to be considered for deferred action.

3. **Childhood Arrivals In Removal Proceedings, With a Final Removal Order, or With Voluntary Departure.** If you are in removal proceedings, have a final order of removal, exclusion, or deportation issued in any other context, have a voluntary departure order, or if your proceedings have been administratively closed, you may use this form to request that USCIS consider deferring action in your case, even if you are under 15 years of age at the time of filing. For the purpose of this form, "removal proceedings" includes exclusion or deportation proceedings initiated before April 1, 1997, an Immigration and Nationality Act (INA) section 240 removal proceeding, expedited removal, reinstatement of a final order of exclusion, deportation, or removal, an INA section 217 removal after admission under the Visa Waiver Program, removal as a criminal alien under INA section 238, or any other kind of removal proceeding under U.S. immigration law in any other context (e.g., at the border or within the United States by an immigration agent).

4. **Childhood Arrivals Whose Case Was Deferred and Who Are Seeking Renewal of DACA.** If USCIS deferred action in your case under DACA, you may use this form to request consideration of Renewal of DACA from USCIS.

## General Instructions

We provide free forms through the USCIS website. To view, print, or complete our forms, you should use the latest version of Adobe Reader, which you can download for free at http://get.adobe.com/reader/. If you do not have internet access, you may call the USCIS Contact Center and ask that we mail a form to you.

**Signature.** You (or your signing authority) must properly complete your request. USCIS will not accept a stamped or typewritten name in place of any signature on this request. If you are under 14 years of age, your parent or legal guardian may sign the request on your behalf. A legal guardian may also sign for a mentally incompetent person. If your request is not signed, or if the signature is not valid, we will reject your request. See 8 CFR 103.2(a)(7)(ii)(A). If USCIS accepts a request for adjudication and determines that it has a deficient signature, USCIS may deny the request.

**Validity of Signatures.** USCIS will consider a photocopied, faxed, or scanned copy of an original handwritten signature as valid for filing purposes. The photocopy, fax, or scan must be of the original document containing the handwritten ink signature.

**Filing Fee.** There is no filing fee for Form I-821D. However, you must file Form I-765 and I-765WS with Form I-821D and pay applicable fees for Form I-765. See Form G-1055, available at www.uscis.gov/forms, for specific information about the fees applicable to this form.

**Evidence.** You must submit all required evidence and supporting documentation with your request at the time of filing. See the **Evidence for Initial Requests Only** and **Evidence for Renewal Requests Only** sections of these instructions for more details.

You should keep all documents that support how you meet the DACA guidelines so you can provide them if they are requested by USCIS.

**NOTE:** If you are submitting a **Renewal Request** for consideration of DACA to USCIS, you do not need to re-submit documents you already submitted with your previous DACA requests.

**Biometric Services Appointment.** USCIS may require that you appear for an interview or provide biometrics (fingerprints, photograph, and/or signature) at any time to verify your identity, obtain additional information, and conduct background and security checks, including a check of criminal history records maintained by the Federal Bureau of Investigation (FBI), before making a decision on your request. If we determine that a biometric services appointment is necessary, we will send you an appointment notice with the date, time, and location of your appointment.

At your biometrics appointment, you must sign an oath reaffirming that:

1. You provided or authorized all information in the request;
2. You reviewed and understood all of the information contained in, and submitted with, your request; and
3. All of this information was complete, true, and correct at the time of filing.

If you fail to attend your biometrics services appointment, we may deny your application. Failure to comply with the notice may result in the denial of your deferred action request. USCIS may, in its discretion, waive the collection of certain biometrics.

**Copies.** You should submit legible photocopies of requested documents unless the Instructions specifically instruct you to submit an original document. USCIS may request an original document at any time during our process. If we request an original document from you, we will return it to you after USCIS determines it no longer needs the original.

**NOTE:** If you submit original documents when they are not required or requested, **USCIS may destroy them after we receive them.**

**Translations.** If you submit a document with information in a foreign language, you must also submit a full English translation. The translator must sign a certification that the English language translation is complete and accurate, and that he or she is competent to translate from the foreign language into English. The certification must also include the translator's signature, printed name, the signature date, and the translator's contact information.

**USCIS Contact Center.** For additional information on the application and Instructions about where to file, change of address, and other questions, visit the USCIS Contact Center at www.uscis.gov/contactcenter or call at **800-375-5283** (TTY **800-767-1833**). The USCIS Contact Center provides information in English and Spanish.

**Disability Accommodations/Modifications.** To request a disability accommodation/modification, follow the instructions on your appointment notice or at www.uscis.gov/accommodationsinfo.

**Advance Parole.** If you wish to file a request for Advance Parole, please follow the instructions for filing Form I-131, Application for Travel Documents, Parole Documents, and Arrival/Departure Records. You can get the most current information on how to apply for advance parole by visiting the USCIS website at www.uscis.gov/i-131 or calling the National Customer Service Line at **1-800-375-5283** or **1-800-767-1833** (TTY for the hearing impaired). Customer service officers are available Monday - Friday from
8 a.m. - 6 p.m. in each U.S. time zone.

**Travel Warning.** On or after August 15, 2012, if you travel outside of the United States before USCIS has determined whether to defer action in your case, you will not be considered for deferred action. Even after USCIS has deferred action in your case under DACA, you should not travel outside the United States unless you have been issued an Advance Parole Document by USCIS. USCIS may terminate deferred action in your case, and your ability to renew DACA may be adversely impacted, if you travel outside the United States without obtaining an Advance Parole Document from USCIS. In addition, leaving the United States, even with an Advance Parole Document, may impact your ability to return to the United States.

**How To Complete Form I-821D**

**1.** This form consists of eight parts. Requestors for Initial DACA and those requestors seeking Renewal of DACA should fill out most parts. However, only requestors for Initial DACA should complete **Part 3.** See below for greater detail.

**Part 1. Information About You.** All requestors must complete this part.

**Item Number 13. Country of Citizenship or Nationality.** Provide the name of the country where you are a citizen and/or national. This is not necessarily the country where you were born. If you do not have citizenship in any country, type or print "stateless" and provide an explanation in **Part 8. Additional Information**.

**Part 2. Residence and Travel Information.** All requestors must complete this part. Please be aware that Initial requestors must provide more extensive information than Renewal requestors.

**Part 3. For Initial Requests Only.** Renewal requestors should skip this part.

**Part 4. Criminal, National Security, and Public Safety Information.** All requestors must complete this part.

**Part 5. Statement, Certification, Signature, and Contact Information of the Requestor.** All requestors must complete this part.

**Part 6. Contact Information, Certification, and Signature of the Interpreter.** Any requestor using an interpreter must complete this part.

**Part 7. Contact Information, Declaration, and Signature of the Person Preparing this Request, If Other than the Requestor.** If you had someone else prepare your request, he or she must complete this part.

**Part 8. Additional Information.** Any requestor may complete this part if additional space is needed.

**2.** Further Information on filling out Form I-821D:

**A.** Type or print legibly in black ink.

**B.** If you need extra space to complete any item within this request, use **Part 8. Additional Information** and make additional copies of this sheet as needed. Type or print your name and Alien Registration Number (A-Number) (if any) at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

**C.** Answer all questions fully and accurately. If an item is not applicable or the answer is "none," type or print "N/ A," unless otherwise directed.

**D.** All dates must be entered as mm/dd/yyyy. You may provide approximate dates if you do not know the exact date. Do not leave a date response blank.

**E. Processing Information.** You must provide the biometrics information requested in **Part 1.**, **Item Numbers 15. - 20.** Providing this information as part of your request may reduce the time you spend at your USCIS ASC appointment.

**F. Part 5. Statement, Certification, Signature, and Contact Information of the Requestor.** Select the box that indicates whether someone interpreted this form for you. If applicable, the attorney, accredited representative, or other individual who helped prepare this form for you must complete **Part 7.** and sign and date the form. Every request must contain the requestor's original signature. A photocopy of a signed request or a typewritten name in place of a signature is **not** acceptable. Sign and date the form and provide your daytime telephone number, mobile telephone number, and email address. If you are under 14 years of age, your parent or legal guardian may sign the request on your behalf. A designated representative may sign if the requestor is unable to sign due to a physical or developmental disability or mental impairment.

**G. Part 6. Contact Information, Certification, and Signature of the Interpreter.** If you used an interpreter to read the instructions and complete the questions on this form, the interpreter must fill out **Part 6.** The interpreter must provide his or her full name, the name of his or her business or organization, an address, a daytime telephone number, and an email address. He or she must also sign and date the form.

**H. Part 7. Contact Information, Declaration, and Signature of the Person Preparing this Request, If Other Than the Requestor.** If the person who completed this request, is someone other than the person named in **Part 1.**, he or she must complete this section of the request, provide his or her name, the address of his or her business or organization (if any), and his or her contact information. If the person completing this request is an attorney or accredited representative, he or she must submit a completed Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative, along with this request. Further, the attorney or accredited representative, and anyone who assisted in preparing your request, must sign and date the request. This section of the request **MUST** contain the original signature of the attorney or accredited representative, and anyone who assisted in preparing your request. A typewritten name in place of a signature is not acceptable.

## Evidence for Initial Requests Only

**NOTE:** If you are submitting an **Initial Request** for consideration of DACA to USCIS, you will need to submit documents showing how you believe you have satisfied each DACA guideline.

**1.** What documents should you submit with your Form I-821D?

**A.** You do not need to submit original documents unless USCIS requests them.

**B.** Evidence and supporting documents that you file with your Form I-821D should show that you are at least 15 years of age at the time of filing, if required (see the **Who May File Form I-821D** section of these instructions for more information), and that you meet all of the following guidelines:

**(1)** Were born after June 15, 1981 (i.e., You were not age 31 or older on June 15, 2012);

**(2)** Arrived in the United States before 16 years of age;

**(3)** Have continuously resided in the United States since June 15, 2007, up to the present time;

**(4)** Were present in the United States on June 15, 2012, and at the time of making your request for consideration of deferred action with USCIS;

**(5)** Had no lawful status on June 15, 2012; and

**(6)** Are currently in school, graduated or received a certificate of completion from high school, obtained a GED certificate or other equivalent state-authorized exam in the United States, or that you are an honorably discharged veteran of the U.S. Armed Forces or U.S. Coast Guard.

**2.** What documents do you need to provide to prove identity?

Submit copies of any of the following:

**A.** Passport;

**B.** Birth certificate accompanied by photo identification;

**C.** Any national identity document from your country of origin bearing your photo and/or fingerprint;

**D.** Any U.S. government immigration or other document bearing your name and photograph (e.g., EADs, visas, driver's licenses, non-driver cards);

**E.** Any school-issued form of identification with photo;

**F.** Military identification document with photo;

**G.** State-issued photo ID showing date of birth; or

**H.** Any other document with photo that you believe is relevant.

**NOTE:** Expired documents are acceptable.

**3. What documents may show that you came to the United States before your 16th birthday?**

Submit copies of any of the following documents:

**A.** Passport with an admission stamp indicating when you entered the United States;

**B.** Form I-94, I-94W, or I-95 Arrival-Departure Record;

**C.** Any Immigration and Naturalization Service (INS) or DHS document stating your date of entry (e.g., Form I-862, Notice to Appear);

**D.** Travel records, such as transportation tickets showing your dates of travel to the United States;

**E.** School records (e.g., transcripts, report cards) from the schools that you have attended in the United States, showing the names of the schools and periods of school attendance;

**F.** Hospital or medical records concerning treatment or hospitalization, showing the names of the medical facilities or physicians and the dates of the treatment or hospitalization;

**G.** Official records from a religious entity in the United States confirming your participation in a religious ceremony, rite, or passage (e.g., baptism, first communion, wedding); or

**H.** Any other document that you believe is relevant.

**4. If you left the United States for some period of time before your 16th birthday and returned on or after your 16th birthday to begin your current period of continuous residence, what documents may show that you established residence before your 16th birthday?**

Submit copies of any of the following documents:

**A.** School records (e.g., transcripts, report cards) from the schools that you have attended in the United States, showing the names of the schools and periods of school attendance;

**B.** Employment records (e.g., pay stubs, W-2 Forms, certification of the filing of Federal income tax returns, state verification of the filing of state income tax returns, letters from employers, or, if you are self employed, letters from banks and other firms with whom you have done business);

**C.** Documents evidencing that you were physically present in the United States for multiple years prior to your 16th birthday; or

**D.** Any other relevant document.

**5. What documents may show that you continuously resided in the United States since June 15, 2007, up to the present date?**

Submit copies of any relevant documents such as:

**A.** Rent receipts, utility bills (e.g., gas, electric, phone), or receipts or letters from companies showing the dates during which you received service. You may submit this documentation even if it only has the name of your parents or legal guardians, as long as you also submit other evidence (e.g., third party documentation) that connects you to your residence at that address;

**B.** Employment records (e.g., pay stubs, W-2 Forms, certification of the filing of Federal income tax returns, state verification of the filing of state income tax returns, letters from employers, or, if you are self employed, letters from banks and other firms with whom you have done business);

**NOTE:** In all of these documents, your name and the name of the employer or other interested organization must appear on the form or letter, as well as relevant dates. Letters must include: your address at the time of employment, exact periods of employment, periods of layoff, and duties with the employer. Letters must also be signed by the employer and include the employer's contact information.

**C.** School records (e.g., transcripts, report cards) from the schools that you have attended in the United States, showing the names of the schools and periods of school attendance;

**D.** Military records (e.g., Form DD-214, Certificate of Release or Discharge from Active Duty; NGB Form 22, National Guard Report of Separation and Record of Service; military personnel records; or military health records);

**E.** Hospital or medical records concerning treatment or hospitalization, showing the names of the medical facilities or physicians and the dates of the treatment or hospitalization;

**F.** Official records from a religious entity in the United States confirming your participation in a religious ceremony, rite, or passage (e.g., baptism, first communion, wedding);

**G.** Money order receipts for money sent in or out of the country; passport entries; birth certificates of children born in the United States; dated records of bank transactions; correspondence between you and another person or organization; automobile license receipts, title, vehicle registration, etc.; deeds, mortgages, rental agreements, contracts to which you have been a party; tax receipts; insurance policies; receipts; postmarked letters; or

**H.** Any other relevant document.

**6. Do brief departures interrupt continuous residence?**

A brief, casual, and innocent absence from the United States will not interrupt your continuous residence. If you were absent from the United States for any period of time, your absence will be considered brief, casual, and innocent, if it was on or after June 15, 2007, and before August 15, 2012, and:

**A.** The absence was short and reasonably calculated to accomplish the purpose for the absence;

**B.** The absence was not because of an order of exclusion, deportation, or removal;

**C.** The absence was not because of an order of voluntary departure or an administrative grant of voluntary departure before you were placed in exclusion, deportation, or removal proceedings; and

**D.** The purpose of the absence and/or your actions while outside of the United States were not contrary to law.

**In Part 3. Arrival/Residence Information,** list all your absences from the United States since June 15, 2007. Include information about all your departure and return dates, and the reason for your departures. Documents you can submit that may show your absence was brief, casual, and innocent include, but are not limited to:

**A.** Plane or other transportation tickets or itinerary showing the travel dates;

**B.** Passport entries;

**C.** Hotel receipts showing the dates you were abroad;

**D.** Evidence of the purpose of the travel (e.g., you attended a wedding or funeral);

**E.** Copy of Advance Parole Document issued by USCIS; and

**F.** Any other evidence that could support a brief, casual, and innocent absence.

**7. What documents may demonstrate that you were present in the United States on June 15, 2012?**

Submit copies of any relevant documents such as:

**A.** Rent receipts, utility bills (e.g., gas, electric, phone), or receipts or letters from companies showing the dates during which you received service You may submit this documentation even if it only has the name of your parents or legal guardians, as long as you also submit other evidence (e.g., third party documentation) that connects you to your residence at that address;

**B.** Employment records (e.g., pay stubs, W-2 Forms, certification of the filing of Federal income tax returns, state verification of the filing of state income tax returns, letters from employers, or, if you are self employed, letters from banks and other firms with whom you have done business);

**NOTE:** In all of these documents, your name and the name of the employer or other interested organization must appear on the form or letter, as well as relevant dates. Letters must include: your address at the time of employment, exact periods of employment, periods of layoff, and duties with the employer. Letters must also be signed by the employer and include the employer's contact information.

**C.** School records (e.g., transcripts, report cards) from the schools that you have attended in the United States, showing the names of the schools and periods of school attendance;

**D.** Military records (e.g., Form DD-214, Certificate of Release or Discharge from Active Duty; NGB Form 22, National Guard Report of Separation and Record of Service; military personnel records; or military health records);

**E.** Hospital or medical records concerning treatment or hospitalization, showing the names of the medical facilities or physicians and the dates of the treatment or hospitalization;

**F.** Official records from a religious entity in the United States confirming your participation in a religious ceremony, rite, or passage (e.g., baptism, first communion, wedding);

**G.** Money order receipts for money sent in or out of the country; passport entries; birth certificates of children born in the United States; dated records of bank transactions; correspondence between you and another person or organization; automobile license receipts, title, vehicle registration, etc.; deeds, mortgages, rental agreements, contracts to which you have been a party; tax receipts; insurance policies; receipts; postmarked letters; or

**H.** Any other relevant document.

**8. What documents may show you had no lawful status on June 15, 2012?** (Submit documents if you were admitted or paroled, or otherwise obtained a lawful immigration status, on or before June 15, 2012, or you were or are in removal proceedings.)

Submit copies of any of the following documents:

**A.** Form I-94, I-94W, or I-95 Arrival/Departure Record showing the date your authorized stay expired;

**B.** If you have a final order of exclusion, deportation, or removal issued as of June 15, 2012, submit a copy of that order and related charging documents, if available;

**C.** An INS or DHS charging document placing you into removal proceedings, if available; or

**D.** Any other document that you believe is relevant to show that on June 15, 2012, you had no lawful status.

**9. What documents may demonstrate that you: a) are currently in school in the United States at the time of filing; b) have graduated or received a certificate of completion or a certificate of attendance from a U.S. high school, a U.S. public or private college or university, including community college; or c) have obtained a GED certificate or other equivalent state-authorized exam in the United States?** (If applicable)

USCIS recognizes that schools, educational programs, school districts, and state education agencies around the country issue educational records in a variety of formats. USCIS does not require educational records to be presented in any particular format.

**A.** To be considered "currently in school," you are to demonstrate that you are currently enrolled in one of the following:

**(1)** A U.S. public, private, or charter elementary school, junior high or middle school, high school, secondary school, alternative program, or home school program meeting state requirements;

**(2)** An education, literacy, or career training program (including vocational training) that has a purpose of improving literacy, mathematics, or English or is designed to lead to placement in post-secondary education, job training, or employment, and where you are working toward such placement, and that the program:

**(a)** Is administered by a non-profit entity; or

**(b)** Is funded in whole or in part by Federal, state, local, or municipal funds; or

**(c)** Is of demonstrated effectiveness;

**(3)** An education program in the U.S. assisting students in obtaining a regular high school diploma or its recognized equivalent under state law (including a certificate of completion, certificate of attendance, or alternate award), or in passing a GED exam or other equivalent state-authorized exam, and that the program:

**(a)** Is administered by a non-profit entity; or

**(b)** Is funded in whole or in part by Federal, state, local, or municipal funds; or

**(c)** Is of demonstrated effectiveness;

**(4)** A U.S. public or private college or university including community college.

Evidence of enrollment may include, but is not limited to: school registration cards, acceptance or other letters demonstrating enrollment or attendance, current transcripts, report cards, progress reports, or other documents issued by a school district, state education agency, school, or program. These documents should show your name; the name of the school district, or state educational agency, school, or program issuing the record; the dates or time periods of enrollment you are seeking to establish; and your current educational or grade level.

If you have been accepted for enrollment and your classes have not yet begun, you may submit an acceptance letter with evidence that you have registered for classes or any other relevant evidence showing you have committed to starting classes on a certain date, including, for example, a copy of your tuition bill, your class schedule, or your Individualized Educational Program.

If you are enrolled in an educational, literacy, or career training program (including vocational training or an ESL course), evidence that the program is funded in whole or in part by Federal, state, local, or municipal funds includes a letter or other documentation from an authorized representative of the program that includes information such as: your name and date of enrollment, the duration of the program and expected completion date, the program's source of public funding, and the program's authorized representative's contact information.

If you are enrolled in an education, literacy, or career training program that is not publicly funded, evidence that the program is of demonstrated effectiveness may include information from an authorized school representative relating to: the duration of the program's existence; the program's track record in placing students in employment, job training, or post-secondary education; receipt of awards or special achievement or recognition that indicate the program's overall quality; and/or any other information indicating the program's overall quality.

**B.** Evidence to show that you meet the educational guideline because you have "graduated from school" or "obtained a GED certificate" or other equivalent state-authorized exam in the United States includes, but is not limited to:

**(1)** A high school diploma from a U.S. public or private high school or secondary school;

**(2)** A recognized equivalent of a U.S. high school diploma under state law, including a GED certificate or other equivalent state-authorized exam, a certificate of completion, or a certificate of attendance;

**(3)** A transcript that identifies the date of graduation or program completion;

**(4)** An enrollment history that shows the date of graduation or program completion;

**(5)** A degree from a public or private college or university or a community college; or

**(6)** An alternate award from a U.S. public or private high school or secondary school.

These documents should show your name; the name of the U.S. school district, educational agency, school, or program issuing the record; the dates or time periods of enrollment you are seeking to establish; and your date of graduation or completion.

**10. What documents may demonstrate that you are an honorably discharged veteran of the U.S. Armed Forces or U.S. Coast Guard?** (If applicable)

Submit copies of the following documents:

**A.** Form DD-214, Certificate of Release or Discharge from Active Duty;

**B.** NGB Form 22, National Guard Report of Separation and Record of Service;

**C.** Military personnel records;

**D.** Military health records; or

**E.** Any other relevant document.

**11. What additional documents should you submit if you are currently or have been in removal proceedings?**

Submit a copy of the removal order, any document issued by the immigration judge, or the final decision of the Board of Immigration Appeals (BIA), if available. If you have not been in removal proceedings, this question does not apply to you.

**12. What evidence should I submit to demonstrate my criminal history?**

If you have been arrested for or charged with any felony (i.e., a Federal, state, or local criminal offense punishable by imprisonment for a term exceeding one year) or misdemeanor (i.e., a Federal, state, or local criminal offense for which the maximum term of imprisonment authorized is one year or less but greater than five days) in the United States, or a crime in any country other than the United States, you must submit evidence demonstrating the results of the arrest or charges brought against you. If the charges against you were handled in juvenile court, and the records are from a state with laws prohibiting their disclosure, this evidence is not required.

**A.** If you have ever been arrested for any felony or misdemeanor in the United States, or a crime in any country other than the United States, and no charges were filed, submit an original official statement by the arresting agency or applicable court order confirming that no charges were filed for each arrest. If you are unable to provide such documentation or if it is not available, you must provide an explanation, including a description of your efforts to obtain such evidence, in **Part 8. Additional Information.**

**B.** If you have ever been charged with or convicted of a felony or misdemeanor in the United States, or a crime in any country other than the United States, submit an original or court-certified copy of the complete arrest record and disposition for each incident (e.g., dismissal order, conviction and sentencing record, acquittal order). If you are unable to provide such documentation or if it is not available, you must provide an explanation, including a description of your efforts to obtain such evidence, in **Part 8. Additional Information.**

**C.** If you have ever had any arrest or conviction vacated, set aside, sealed, expunged, or otherwise removed from your record, submit:

**(1)** An original or court-certified copy of the court order vacating, setting aside, sealing, expunging, or otherwise removing the arrest or conviction; or

**(2)** An original statement from the court that no record exists of your arrest or conviction.

If you are unable to provide such documentation or if it is not available, you must provide an explanation, including a description of your efforts to obtain such evidence, in **Part 8. Additional Information.**

**NOTE: You do not need to submit documentation concerning minor traffic violations such as driving without a license unless they were alcohol - or drug-related.**

## Evidence for Renewal Requests Only

**NOTE:** If you are submitting a **Renewal Request** for consideration of DACA to USCIS, you do not need to re-submit documents you already submitted with your previous DACA requests.

If you are seeking a **Renewal** of DACA, respond to all questions, except where the section or question indicates "For Initial Requests Only."

If you are currently in exclusion, deportation, or removal proceedings, see **Item Number 11.** (above) for additional guidance.

If you have any criminal history, see **Item Number 12.** (above) for additional guidance.

With your Renewal request, you only need to submit any new documents pertaining to removal proceedings or criminal history that you have not already submitted to USCIS with prior DACA request. If USCIS needs more documentation from you, USCIS will send a Request for Evidence to you explaining the needed information. However, you should submit new documents if any of the following situations apply to you:

**1.** You are currently in exclusion, deportation, or removal proceedings (please note, you do not need to submit these documents if your case was administratively closed); or

**2.** You have been charged with, or convicted of, a felony or misdemeanor (please note, you do not need to submit these documents if you already submitted them with a previous DACA request).

**NOTE:** You should keep all documents that support how you meet the DACA guidelines so you can provide them if they are requested by USCIS.

**NOTE:** You do not need to submit documentation concerning minor traffic violations such as driving without a license unless they were alcohol-or drug- related.

## Additional Information Relevant to ALL Requests for DACA

**1. What other factors will USCIS consider when making a determination on deferred action?**

USCIS will also conduct a background check. USCIS may consider deferring action in your case even if you have been arrested or detained by any law enforcement officer and charges were filed, or if charges were filed against you without an arrest. USCIS will evaluate the totality of the circumstances in reaching a decision on deferred action.

In accordance with 8 CFR Part 236, Subpart C, if USCIS determines that you have been convicted of a felony, a significant misdemeanor, or three or more misdemeanors not occurring on the same date and not arising out of the same act, omission, or scheme of misconduct, or that you otherwise pose a threat to national security or public safety, USCIS is unlikely to defer action in your case, except where DHS determines that exceptional circumstances exist. See the Frequently Asked Questions at **www.uscis.gov/childhoodarrivals**.

Even if you satisfy the threshold criteria for consideration of DACA, USCIS may deny your request if it determines, in its unreviewable discretion, that an exercise of prosecutorial discretion is not warranted in your case.

**2. What else should you submit with Form I-821D?**

USCIS will not consider deferring action in your case unless your Form I-821D is accompanied by Form I-765 and Form I-765WS. If you do not include Form I-765 with all applicable fees with your Form I-821D, your entire submission will be rejected.

**Optional E-Notification of Request Acceptance.** You may submit Form G-1145, Notification of Application/Petition Acceptance, an optional form, which will notify you electronically when USCIS accepts your request for DACA.

## Where to File?

Please see our website at **www.uscis.gov/I-821D** for the most current information about where to file this request.

## Address Change

If you are not a U.S. citizen, you must notify USCIS of your new address within 10 days of moving from your previous residence. For information on changing your address, go to our website at **www.uscis.gov/addresschange**, or call the USCIS Contact Center.

**NOTE:** Do not submit a change of address request to the USCIS Lockbox.

## Processing Information

**Initial Processing.** Once USCIS accepts your request, we will check it for completeness. If you do not properly complete this request, you will not establish a basis for your eligibility and we may reject or deny your request.

**Requests for More Information, Including Biometrics or Interview.** USCIS may request that you provide more information or evidence to support your request, or we may request that you appear at a USCIS office for an interview. We may also request that you provide the originals of any copies you submit. If we request an original document from you, we will return it to you after USCIS determines it is no longer needed.

If the same documents are required for both Form I-821D and Form I-765 that are filed together, the documents only have to be submitted once.

At the time of any interview or other appearance at a USCIS office, USCIS may require that you provide biometric information (e.g., photograph, fingerprints, signature) to verify your identity and/or update background and security checks.

**Decision.** USCIS will review your request to determine whether the exercise of prosecutorial discretion is appropriate in your case. Each case will be considered on an individual, case-by-case basis. Even if you satisfy the threshold criteria for consideration of DACA, USCIS may determine, in its unreviewable discretion, that deferred action is not warranted in your case. You will be notified of the decision in writing. There is no motion to reopen/reconsider the decision and there is no right to appeal.

## USCIS Forms and Information

To ensure you are using the latest version of this request, visit **www.uscis.gov**.

## Penalties

If you knowingly and willfully provide materially false information on Form I-821D, you will be committing a Federal felony punishable by a fine, or imprisonment up to five years, or both, under 18 U.S.C. Section 1001. In addition, individuals may be placed into removal proceedings, face severe penalties provided by law, and be subject to criminal prosecution.

## DHS Privacy Notice

**AUTHORITIES:** The information requested on this form, and the associated evidence, is collected under the Immigration and Nationality Act, section 101, et seq. and 8 CFR Part 236, Subpart C.

**PURPOSE:** The primary purpose for providing the requested information on this form is to determine if you should be considered for deferred action as a childhood arrival. The information you provide will be used in making a decision whether to defer removal action in your case as an exercise of prosecutorial discretion.

**DISCLOSURE:** The information you provide is voluntary. However, failure to provide the requested information, and any requested evidence, may delay a final decision in your case or result in denial of your form.

**ROUTINE USES:** The information you provide on this form may be shared with other Federal, state, local, and foreign government agencies and authorized organizations following approved routine uses described in the associated published system of records notices [DHS/USCIS-001 - Alien File, Index, and National File Tracking System and DHS/USCIS-007 - Benefits Information System] and the published privacy impact assessments [DHS/USCIS/PIA-003(a) Integrated Digitization Document Management Program (IDDMP), DHS/USCIS/PIA-016a Computer Linked Application Information Management System and Associated Systems, and DHS/USCIS/PIA-056 USCIS Electronic Immigration System] which can be found at **www.dhs.gov/privacy**].

**OTHER DISCLOSURE INFORMATION:** Information provided in this request will not be used by ICE and U.S. Customs and Border Protection (CBP) for the purpose of immigration enforcement proceedings against the requestor, unless DHS is initiating immigration enforcement proceedings against the requestor due to a criminal offense, fraud, a threat to national security, or public safety concerns. Information contained in this request related to the requestor's family members or guardians will not be used for immigration enforcement purposes against such family members or guardians. Any information may be shared with national security and law enforcement agencies, including ICE and CBP, for purposes other than removal, including for assistance in the consideration of a deferred action for childhood arrivals request itself, to identify or prevent fraudulent claims, for national security purposes, or for the investigation or prosecution of a criminal offense.

This policy is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

## Paperwork Reduction Act

USCIS may not conduct or sponsor an information collection, and you are not required to respond to a collection of information, unless it displays a currently valid Office of Management and Budget (OMB) control number. The public reporting burden for this collection of information is estimated at 2.817 hours per response, including the time for reviewing instructions and completing and submitting the form. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to: U.S. Citizenship and Immigration Services, Regulatory Coordination Division, Office of Policy and Strategy, 5900 Capital Gateway Drive, Mail Stop #2140, Camp Springs, MD 20588-0009; OMB No. 1615-0124. **Do not mail your completed Form I-821D to this address.**

## Reminder

### *For Initial and Renewal Requests*

- ☐ Did you submit the filing fee for Form I-821D?
- ☐ Did you submit Form I-765 along with the required fees and a completed Form I-765WS?
- ☐ Did you answer every relevant **Item Number**?
- ☐ Did you provide an original, handwritten signature and date your request?
- ☐ Did you submit the necessary documents? For Initial requests, did you submit documents to meet each guideline? For Renewal requests, see the section titled Evidence for Renewal Requests Only.
- ☐ If you were issued a final order of exclusion, deportation, or removal, did you include a copy of that final order (if available and if you had not already submitted it to USCIS)?
- ☐ If your exclusion, deportation, or removal proceedings were terminated by an immigration judge, did you include a copy of the immigration judge's termination order (if available and if you had not already submitted it to USCIS)?
- ☐ If you have ever been arrested for, charged with, or convicted of any felony or misdemeanor in the United States or any crime in any country other than the United States, did you submit an original, official, or court-certified document that shows your complete arrest record and final disposition for each incident (if available and if you had not already submitted it to USCIS)?

### *For Initial Requests Only*

- ☐ Did you submit evidence to show that you came to the United States while under 16 years of age?
- ☐ Did you submit evidence to prove your identity, date of initial entry, and continuous residence from June 15, 2007 (or earlier) up to the present time?
- ☐ Did you submit evidence that you are currently in school, have a GED certificate, have graduated or received a certificate of completion from high school, or are an honorably discharged veteran of the U.S. Armed Forces or U.S. Coast Guard?
- ☐ Did you provide evidence showing that you had no lawful status as of June 15, 2012?

# EXHIBIT 16

# How ICE Is Seeking to Ramp Up Deportations Through Courthouse Arrests

nytimes.com/2025/05/30/us/politics/ice-courthouse-arrests.html

Hamed Aleaziz, Luis Ferré-Sadurní, Miriam Jordan May 30, 2025




Federal agents detained two men after immigration court hearings in Phoenix last week.Credit...Ross D. Franklin/Associated Press

A hearing on Tuesday at immigration court in Van Nuys, Calif., was supposed to be routine for a young family from Colombia, the first step in what they hoped would be a successful bid for asylum.

To their surprise, the judge informed the father, Andres Roballo, that the government wished to dismiss his deportation case. Taken aback, Mr. Roballo hesitated, then responded: “As long as I stay with my family.”

Moments later, as they exited the courtroom into a waiting area, Mr. Roballo was encircled by plainclothes federal agents who ushered him into a side room. Other agents guided his shaken wife, Luisa Bernal, and their toddler toward the elevator.

Outside the courthouse, Ms. Bernal collapsed on a bench. “They have him, they have him,” she wailed. “We didn’t understand this would happen.”

Mr. Roballo’s arrest was part of an aggressive new initiative by Immigration and Customs Enforcement to detain migrants at immigration courts, the latest escalation by the Trump administration in its all-out effort to ramp up deportations.

Agents have begun arresting migrants immediately after their hearings if they have been ordered deported or their cases have been dismissed, a move that enables their swift removal, according to immigration lawyers and internal documents obtained by The New York Times.

The operations, which have taken place across the country in the past week, have required a high level of coordination between the government lawyers in the courtrooms and the ICE officers waiting to make the arrests, according to the documents.

The tactic is a significant break from past practice, when immigration officials largely steered clear of courthouse arrests out of concern that they would deter people from complying with orders. Critics, including some former homeland security officials, say the practice is deceptive and could backfire.

“Arresting people there subverts the legal process and will make others too scared to show up in the future, ultimately pushing people further into the shadows and out of legal status,” said Deborah Fleischaker, a senior ICE official during the Biden administration.

“We don’t actually have an immigration process if we make it impossible for people to comply and move through the system as ours was designed,” she said. “People showing up for their immigration court hearings are by definition complying.”

Federal officials say the initiative saves valuable resources, allowing Immigration and Customs Enforcement to more quickly to identify migrants who are subject to deportation rather than deploying officers to try to track down people after they leave court and often slip out of view.

“If an individual is going through proceedings and he’s going to take a deportation order, then and there we want to make the arrest of that individual,” Garrett J. Ripa, a senior ICE official in Miami, said in an interview.

“It’s easier on us,” he added, noting that the approach also avoided arrests in communities.

When asked whether the arrests could deter people from showing up to court, Mr. Ripa said it was not clear.

“I think it’s really just in the initiative stage,” he said. “So I don’t have any concrete evidence to show one way or the other.”

A senior ICE official said in a statement that the agency's prosecutors still had discretion to dismiss cases.

Tricia McLaughlin, a spokeswoman for the Department of Homeland Security, added that most migrants who illegally entered the United States in the past two years were subject to expedited removals.

"Biden ignored this legal fact and chose to release millions of illegal aliens, including violent criminals, into the country with a notice to appear before an immigration judge," she said in a statement. "ICE is now following the law and placing these illegal aliens in expedited removal, as they always should have been."

The migrants being targeted in court are typically there because the federal government has initiated deportation proceedings against them for their illegal entry into the United States, not for other alleged crimes. A number of them may also be seeking asylum as a defense to deportation because they fear returning to their countries.

Greg Chen, a senior director at the American Immigration Lawyers Association, said his organization had documented dozens of arrests in courthouses across 11 states and 16 cities since last week. Those detained have included migrants whose statuses have not been resolved by the courts or who have opposed efforts to dismiss their cases, lawyers said.

"We are concerned that this is a form of collusion between the courts and ICE," Mr. Chen said. "Many are eligible for asylum or other legal protections, but because the Trump administration is pressuring judges in courtrooms to dismiss the cases so that ICE can arrest and fast-track their deportation, it is depriving them of a fair hearing."

A spokeswoman for the Executive Office for Immigration Review, the agency in the Justice Department that runs the immigration courts system, declined to comment.

In New York on Wednesday, ICE officers wearing face masks and carrying photographs of migrants they were seeking to arrest waited by the elevators of the courthouses in Lower Manhattan. Outside, protesters tried to block vans carrying detained migrants, leading to the arrests of 23 people.

Image




A homeland security agent pepper sprayed protesters as they tried to block vans after immigration court hearings in Manhattan on Wednesday.Credit...The New York Times

Among the migrants arrested in a Manhattan courthouse lobby was a young Venezuelan man who appeared to be the first public school student in New York City to be detained by ICE since President Trump returned to office. The student, a 20-year-old named Dylan, entered the country last year by registering through a mobile app the Biden administration had offered migrants to temporarily live and work in the United States while they applied for asylum.

When he showed up for a May 21 court date, his case was dismissed. He was followed into the elevator by ICE officers, who then arrested him in the lobby, according to his mother, Raiza.

“It was like a trap,” said Raiza, who spoke on the condition that her last name be withheld.

Dylan’s arrest followed the new playbook.

The day before, on May 20, Immigration and Customs Enforcement had circulated an internal memo instructing government prosecutors to help deportation officers with the operation, according to a copy obtained by The Times. The agency was seeking to arrest

people who were either likely to be ordered deported or “amenable” to a fast-track deportation process known as expedited removal, the memo said.

Expedited removal, which does not require a hearing before a judge, was a process previously reserved for migrants picked up within 100 miles of the border. The Trump administration has expanded it to apply to migrants who have been in the country for fewer than two years.

If an undocumented migrant no longer has a case pending before the court, they can be subject to expedited removal. Under the new policy, Immigration and Customs Enforcement is encouraging prosecutors to look for cases that could be dismissed, which could accelerate deportations of more people, according to the internal guidance.

The prosecutors were told to give ICE officers at least two days to plan for an arrest in court and to give the courts a 24-hour warning as well. Prosecutors were also instructed to give deportation officers “the exact location of the courtroom at which the alien’s hearing is being held and an estimate of the time frame for the hearing,” the memo said.

Usually, having a deportation case dismissed is a positive outcome for a migrant. However, according to lawyers, judges have not been informing migrants that a dismissal can now lead to their arrest. And, in some instances, judges have agreed to dismiss cases even though migrants objected, the lawyers said.

On the day the guidance was issued, Leandro B. Ferrer, an immigration lawyer, said that ICE officers ambushed him and his clients — two men from Cuba with pending asylum claims — as they left a courthouse in Phoenix. A judge had just granted a request by government lawyers to have their cases dismissed.

“Naturally, as a lawyer, this is news that you want to hear: A dismissal in immigration court is equivalent to dismissing the criminal charges against a defendant in criminal court,” Mr. Ferrer said.

Then ICE officers arrested his clients, who remain detained, he said.

“It was a trap, nothing short of a trap,” said Mr. Ferrer, who predicted that the tactics could deter migrants from showing up in court and lead to their deportations as a result of missed hearings.

Many immigration advocates said they had never seen ICE agents in court until the past week. Brittany Triggs, a lawyer in Buffalo, said she spotted them in the lobby, in the hallways near restrooms and in a waiting area.

At a recent hearing, she recalled, the judge gave a Venezuelan immigrant until June 5 to respond to the government’s motion to close his case. The hearing ended, and the man left several minutes before Ms. Triggs. Later, she said, she wondered, “Oh my God, what if they

arrested him anyway?"

The following morning, she checked the ICE detainee locator online and found that the man was being held at a facility in Batavia, N.Y., about 45 minutes away.

Immigrants who enter the United States unlawfully are usually placed in deportation proceedings and must appear in court for several hearings, even if they apply for asylum, as their cases wind through the backlogged system.

Image




ICE agents detained a Haitian migrant at a courthouse in New York on Wednesday.Credit...David Dee Delgado/Reuters

The federal government has a right to detain people while they are in immigration proceedings. But after they enter the United States unlawfully and are processed at the border, immigrants are generally allowed to fight their cases while living in communities around the country. Many are not considered public security threats, and it is expensive, if impractical, to hold so many people in detention facilities.

In recent days, as news rapidly circulated on social media that immigrants were being detained in court, some of them appeared to be skipping their hearings.

On Tuesday in Van Nuys, a neighborhood in Los Angeles, only five of the 15 migrants who had scheduled cases reported for their hearings in Courtroom 1. One was an unaccompanied minor who had crossed the border. Another was a man who said he had lived in the United States for a long time. A Guatemalan man attended by video.

The government lawyer asked the judge to dismiss the case of another immigrant, a woman in a white dress, over her objection.

“I am going to dismiss your case without prejudice,” the judge, Joseph A. Weiner, told her. “You can appeal that decision if you choose to do so.”

As she left the courtroom, the woman was immediately met by two agents. “Hola, come with us,” one of them said, and escorted her to the room where Mr. Roballo, the Colombian man, had been taken earlier.

Sitting outside the courthouse, Mr. Roballo’s wife was inconsolable. Ms. Bernal said she could not grasp why only her husband had been arrested when they were all part of the same immigration case. (Men are frequently arrested alone, leaving their wives and children free, according to lawyers.)

The couple and their daughter had crossed the border with Mexico seven months ago, she said, eventually settling in the San Fernando Valley, where they had friends. They had hoped to hire a lawyer and apply for asylum.

Now, with her husband in federal custody and likely to be deported, Ms. Bernal’s emotions were raw. “They separated my family,” she said between sobs. “I don’t know what we are going to do.”

Her 2-year-old daughter, Mia Sofia, stood beside her. “Papa, Papa,” she called out, her voice small but insistent as she scanned the surroundings for her father.

Wesley Parnell contributed reporting from New York.

# EXHIBIT 17

*Democracy Dies in Darkness*

EXCLUSIVE

# Immigrant arrests at courthouses signal new tactic in Trump's deportation push

U.S. Immigration and Customs Enforcement officers have been instructed to arrest people immediately after a judge has ordered them to be deported or after prosecutors move to drop their cases.

May 23, 2025

By Arelis R. Hernández and Maria Sacchetti

Masked officers descended on courthouses across the country this week and arrested stunned immigrants showing up for scheduled immigration hearings as part of a new directive from federal officials aimed at dramatically accelerating deportations.

U.S. Immigration and Customs Enforcement officers in Arizona, Virginia and more than 20 other states have been instructed to arrest people immediately after a judge has ordered them to be deported or after prosecutors move to drop their cases, according to internal documents issued this month and reviewed by The Washington Post.

The Trump administration is planning to then place immigrants whose cases are dismissed and who have been in the country less than two years into a fast-track removal process that does not involve a hearing before a judge.

The coordinated operation is the government's latest attempt to quickly remove people from the country — even if officials have to bypass the courts — as concern grows in the White House that President Donald Trump won't be able to fulfill his campaign promise to remove millions of undocumented immigrants from the United States.

Homeland Security Secretary Kristi L. Noem "is reversing Biden's catch and release policy that allowed millions of unvetted illegal aliens to be let loose on American streets," department spokeswoman Tricia McLaughlin said. "ICE is now following the law and placing these illegal aliens in expedited removal, as they always should have been."

In January, Trump signed an executive order to expand a process known as expedited removal to speed up deportations. The measure was created in a 1996 law that sought to crack down on illegal immigration. Migrants can request asylum from immigration officers if they fear persecution if returned home. But if they are denied, their only recourse is a cursory review by an immigration judge, not a full hearing.

Historically, expedited removals have been more commonly used at the border, but the Trump administration is expanding their use throughout the nation's interior. The president made a similar attempt in 2019 during his first term but was stopped by a federal judge.

The American Civil Liberties Union and other groups filed a federal lawsuit in January in the District of Columbia seeking to block the latest expansion, saying it violates immigrants' constitutional rights as well as other U.S. laws. They said asylum seekers "would get less due process contesting their deportation than they would contesting a traffic ticket."

As the case remains ongoing in court, Trump officials are moving forward with pushing through his effort to quickly arrest and deport immigrants. Department of Homeland Security attorneys in cities and states across the country this week moved to dismiss scores of deportation cases, saying people were free to go. But as soon as the immigrants left the courtrooms, a phalanx of federal law enforcement officers were waiting to handcuff them and take them to immigration detention.

In Phoenix, nearly two dozen masked federal law enforcement officers assembled in the parking garage of a U.S. office building and arrested men and women coming out of court as family members and others protested. Seattle attorneys were stunned when government lawyers filed motions to dismiss. In Chicago, plainclothes federal officers popped into courtrooms with lists of names, searching for their targets.

**puente.az**
awareness.advocacy.change · Original audio

View profile





View more on Instagram

**3,083 likes**

**puente.az**

Today, ICE showed up in large numbers at Phoenix Immigration Court. Agents waited outside while people came out thinking their cases were over. They were taken. No warning. No lawyers. Just arrests and a bus waiting to take them away.

If you or someone you know has to go to immigration court, do not go alone. Bring an attorney if possible, or a trusted friend or family member who is a permanent resident or U.S. citizen. Someone who can witness and document what happens. We need to keep each other safe and keep the public informed about what is happening in our communities.

-

Hoy, agentes federales llegaron a las cortes de inmigración en Phoenix. Estuvieron afuera esperando a que saliera la gente, muchos pensando que ya habían terminado su cita con inmigración. Pero se llevaron a varias personas, sin previo aviso, sin abogado y con un camión listo para llevárselos.

Si tú o alguien que conoces tiene una cita con inmigración, no vayan solos. Vayan con un abogado si pueden, o con alguien de confianza que sea residente o ciudadano. Alguien que pueda estar pendiente y grabar lo que pase. Tenemos que cuidarnos entre todos y seguir denunciando lo que está pasando en nuestras comunidades.

View all 261 comments

Add a comment...

More than 30 immigration attorneys around the country said they witnessed their clients being apprehended in the mass dragnet, a process they said was unfair to people who were complying with the law by attending their court hearings and seeking legal immigration options.

San Diego immigration attorney Michael Hirman, who described himself as a Republican who voted for Trump, was in immigration court this week representing a client who said he had been a military commander in Venezuela. The man fled because he didn't want to "gun down fellow Venezuelans in the street" and enforce draconian laws handed down by the authoritarian government of Nicolás Maduro, Hirman said.

The man entered the United States three days before Trump's inauguration and immediately applied for asylum.

When government attorneys filed a motion to dismiss his client's case — signaling they would stop their efforts to remove him from the country — Hirman thought that meant the Venezuelan was free to pursue his request for asylum with U.S. Citizenship and Immigration Services, a less adversarial process than in the courts. It felt like a small victory until about a dozen ICE agents approached them. It was the first time Hirman had ever had a client detained at court that way.

"My client went from hugging his family to being led away in handcuffs," Hirman said.

He called the move a "sneaky new policy" that trapped people who had shown up for their court hearings in good faith — and whose lives are now at risk.

While some people may make false asylum claims, Hirman said, there is no doubt that his client "will be quietly removed from this world if returned to Venezuela."

The Biden administration, which prioritized the deportation of criminals, dismissed tens of thousands of deportation cases because the immigrants were minors or adults seeking refuge, leaving them to search for another form of immigration relief. Biden officials also said officers generally should not arrest people in immigration courts, saying it could have a chilling effect on people's willingness to show up for hearings and "impair the fair administration of justice."

The American Immigration Lawyers Association has been tracking the enforcement actions to determine whether this fast-track procedure violates court rules and the rights of immigrants to appeal the termination of their cases. Greg Chen, the group's senior director of government relations, said the administration's undermining of the court process will produce immediate and long-term collateral effects.

“The Trump administration is pressuring judges in immigration courtrooms to function more like cogs in the mass deportation machinery rather than as fair and balanced arbiters of the law,” he said. “That is not the way Americans want and understand our judicial system to work. Immigration judges should be worried about this.”

Retired judge Jennie Giambastiani said that throughout her years working in Chicago’s immigration courts, arrests would occur only if someone was wanted in another court for a crime. Immigration courts are civil proceedings under the Justice Department. If the government seeks to terminate a deportation case there is little a judge can do, she said. ICE has the authority to place individuals in expedited removal and detention.

“It’s deeply disturbing and it seems unfair, but I think it is within DHS’s authority,” Giambastiani said. “The blindsiding of these people who appear in court, it’s heartbreaking and it’s not what I want this country to be, but this is what it’s turning into.”

Detaining people who are seeking lawful status is “just a cruel tactic to spread fear amongst the community,” said attorney Melissa Shepard with the California-based Immigrant Defenders Law Center. She said that although she expects the majority of her firm’s clients to continue going to court, there are thousands of people fighting their case pro se — representing themselves without an attorney — who could be discouraged. Missing a hearing could result in a deportation order.

Attorney Khiabett Osuna said she was in court Thursday when someone behind her asked for information about the case she was representing.

The man, whom she later identified as a plainclothes ICE agent, had a list he was checking and sat in the court gallery with the public, she said. Outside the courtroom, there were about a half dozen agents with laptops reviewing lists of names.

“It’s a whole operation,” she said.

**What readers are saying**

The comments overwhelmingly criticize the tactic of arresting immigrants at courthouses, describing it as cruel, cowardly, and authoritarian. Many commenters express outrage at ICE agents wearing masks, likening them to secret police or gang members, and suggesting that this... Show more

This summary is AI-generated. AI can make mistakes and this summary is not a replacement for reading the comments.

# EXHIBIT 18

Post

**Bill Melugin**
@BillMelugin_

NEW: ICE sources confirm to @FoxNews that they've started arresting illegal aliens at their immigration court hearings nationwide and are placing them into expedited removal. We are told they are targeting migrants who crossed the border illegally within the last two years. DHS moves to drop their immigration cases, then they are arrested after leaving court, and they are placed into expedited removal. Expedited removal places the aliens into a fast track for deportation, allowing for almost immediate removal without a hearing before an immigration judge. Expedited removal can't happen if there is an active, pending case, which is why DHS is dropping them - which an immigration judge has to sign off on.

DHS tells FOX they are reversing Biden era catch and release policies and are enforcing expedited removal provisions that the Biden administration refused to.

DHS statement to FOX:

**Don't miss what's happening**
People on X are the first to know.
Log in
Sign up

illegal aliens to be let loose on American streets. This Administration is once again implementing the rule of law.

Most aliens who illegally entered the United States within the past two years are subject to expedited removals. Biden ignored this legal fact and chose to release millions of illegal aliens, including violent criminals, into the country with a notice to appear before an immigration judge. ICE is now following the law and placing these illegal aliens in expedited removal, as they always should have been.

If they have a valid credible fear claim, they will continue in immigration proceedings, but if no valid claim is found, aliens will be subject to a swift deportation."

3:50 PM · May 22, 2025 · **342.5K** Views

287 1.2K 5.2K 154

**Read 287 replies**

**New to X?**
Sign up now to get your own personalized timeline!
Sign up with Google
Sign up with Apple
**Create account**
By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Something went wrong. Try reloading.
Retry

Terms of Service | Privacy Policy | Cookie Policy | Accessibility | Ads info | More ··· © 2025 X Corp.

# EXHIBIT 19

Opinion Media Entertainment More

Mix Salt with Vaseline and Watch What Happens
Click Here »

Trump details 'Trump accounts' for newborns
The situation in LA was 'created by those on the...

# immigrant arrests daily

Officials back higher ICE arrest numbers to target criminal aliens and improve public safety



The Trump administration has a new goal of 3,000 arrests of illegal immigrants daily, which was publicly confirmed by White House Deputy Chief of Staff Stephen Miller.

"Under President Trump's leadership, we are looking to set a goal of a minimum of 3,000 arrests for ICE every day," ...



On "America's Newsroom" on Thursday morning, border czar Tom Homan reaffirmed his statement, saying that officials are "asking for an increase" in arrests.

"We've gotta increase these arrests and removals," Homan said.

"The numbers are good, but I'm not satisfied. I haven't been satisfied all year long," noting that there's a major "public safety" risk with hundreds of thousands of illegal immigrants still in the country from the Biden administration and earlier.

TRUMP NABS 30K ILLEGAL IMMIGRANTS IN 100 DAYS



During Trump's first 100 days, ICE arrested 66,463 illegal immigrants and more than 65,000 illegal immigrants were deported. Of that figure, more than 17,000 had criminal convictions or charges for crimes such as driving under the influence, assault, or "weapon offenses," according to ICE.

CLICK HERE FOR MORE IMMIGRATION COVERAGE

The agency deported 17,200 people in April, which is roughly 6,000 higher than the year prior, when former President Joe Biden was in office, according to NBC News.

"Under Secretary Noem, we are delivering on President Trump and the American people's mandate to arrest and deport criminal illegal aliens and make America safe," DHS Assistant Secretary Tricia McLaughlin stated.

ILLEGAL IMMIGRANT ARRESTS SKYROCKET UNDER TRUMP ICE COMPARED TO BIDEN LEVELS LAST YEAR: 'WORST OF THE WORST'



The goal increases as the administration pushes Congress to pass the reconciliation bill, which has just been passed by the House. The bill is expected to ramp up funding to get 10,000 more ICE agents and tens of thousands more beds for detention facilities.

CLICK HERE TO GET THE FOX NEWS APP

"This bill will add infrastructure and technology to make our gains on the borders permanent. It puts more boots on the ground to target cartel activity, alien smuggling, child trafficking and drug smuggling. It will provide the needed funds and manpower to increase the great work of ICE on our deportation operations nationwide," Homan said of the bill after its House passage, according to the White House.

Deals You May Like




Sponsored Stories You May Like

Large Prostate Has Nothing To Do With Age: Just Stop Doing This One Common Habit
Mens Health

Seniors Born 1949-1979 Can Now Fly Business Class For Price Of Economy
Online Shopping Tools

Neuropathy is not from Low vitamin B. Meet the Real Enemy of Neuropathy (Stop Doing This)
Health Insight Journal

Urologist: Losing Weight After 50 Comes Down To This One Thing
Primal Health Discovery

Muscle After 60: It's Not About Protein
Alpha Health Secrets

Amazon's Worst Nightmare: Clever Trick Causing Many to Cancel Prime in 2025
Online Shopping Tools

Kate Middleton Sad News Regarding Prince George
TipHero

Taylor Swift and Travis Kelce's First Major Setback: Are They...
TMSPN

Nostradamus' Chilling 16th Century Prediction Resurface...
TipHero

Taylor Swift Gives Travis Kelce Firm Warning Ahead Of Super Bowl, Keeping Chiefs Star In...
TipHero

Experts think this could be like buying Amazon at $0.77.
The Motley Fool

7 Things Changing for Seniors on Social Security in 2025
healthywallet.co

Ask A Pro: "I'm 70 With $1.4M in IRAs. Should I Convert $160k/ Year to a Roth to Save on...
smartasset.com

Rosie O'Donnell Makes Huge Admission After Fleeing America To Move To Ireland
The Mix

Alan Alda, 89, Admits He Didn't Recognize His Own Daughter Amidst Devastating Health Battle
The Mix

Sponsored Stories

- Large Prostate Has Nothing To Do With Age: Just Stop Doing This One Common Habit
  Mens Health
- Neuropathy is not from Low vitamin B. Meet the Real Enemy of Neuropathy (Stop Doing This)
  Health Insight Journal
- Top Doctor: If You Eat Banana Every Day, This Is What Happens
  wellnessguide104.com
- Seniors Born 1949-1979 Can Now Fly Business Class For Price Of Economy
  Online Shopping Tools
- Sleep Apnea Pillow Goes Viral! Thousands Say They Finally Sleep Deeply
  myhealthyhabit.co
- Ask A Pro: "I'm 70 With $1.4M in IRAs. Should I Convert $160k/ Year to a Roth to Save on RMDs?"
  smartasset.com

More From Fox News

- Musk does immediate 180 on Trump as soon as LA riots rage
  Politics
- Miley Cyrus drips in crystals while turning heads with risqué sheer dress
  Entertainment
- Supreme Court releases 3 major unanimous rulings
  Fox News
- Trump border czar responds to Newsom's 'arrest me' challenge as California riots over ICE raids
  Fox News
- New York City block becomes open-air brothel with alleged prostitutes working in the open
  Fox News
- Elon Musk wants to speak to Trump as he debates giving away Tesla
  Fox News

More From Fox News

Ex-NASCAR star Danica Patrick sounds off on trans athlete debate amid Simone Biles-Riley Gaines feud

Federal agency leaving Los Angeles due to Democratic mayor 'siding with illegal aliens' over law enforcement

Minnesota state representative admits she is in the US illegally during legislative debate

Invasive reptile spotting in California prompts warning in Santa Clara County's top park

'Lunatic' Democrat ripped for 'demonic' video message demanding ICE agents 'get the f--- out' amid CA chaos

Riley Gaines says Simone Biles 'sold out' young female athletes in heated debate over transgender sports

Ex-NFL receiver Golden Tate details how Jalen Ramsey's treatment of his pregnant sister led to fight

Ex-NFL kicker calls out Simone Biles over personal attack on Riley Gaines

Olympian Simone Biles faces fierce backlash after clash with Riley Gaines over trans athletes debate

## Related Topics

Immigration | Tom Homan | Kristi Noem | Congress

## Conversation 91 Comments

3 Viewing

Discussions are moderated. For more details, click here.

What do you think?

Sort by Best

**4EVERTrump696**
29 May, 2025
That's only 90,000 per month when 250,000 a month came in. So only 10 years or so to get back where brandon started.
Reply · 10 · Share
3 replies

**wdw2031**
29 May, 2025
It is a good thing that the republicans are back in control of the White House, the House majority & the Senate majority. President Trump is helping return America to greatness. He will save us from the horrible economy that has been brought to us by Lyin' Biden, Harris & the dems. The nightmare...
**See more**
Reply · 6 · 1 · Share

**Pavane**
29 May, 2025
Biden hired more IRS agents, and Trump hires more ICE agents. Their different agendas are very clear.
Reply · 5 · Share
1 reply

**TiredOfThisBS410**
29 May, 2025
Just go to any WalMart and you'll find what you need. They will have to leave those full carts behind.
Reply · 9 · 1 · Share
1 reply

**cws0004**
29 May, 2025
great goal. keep up with good work guys
Reply · 11 · 1 · Share

**wdw2031**
29 May, 2025
The moral compass of the US left when the dems started treating their lgbtq lifestyle choice people friends & the illegal aliens better than everyone else. The liberal media & the dems are the reason that many families are broken, kids are disrespectful, people would rather collect welfare instead ...
**See more**
Reply · 10 · 1 · Share

**closethefed**
29 May, 2025
Thank you Mr. President & Mr. Homan , , ,
for continuing the important work of Mass Deportations.

It will take years to amend the stench and stain left by corrupt, dithering, one term Joe Biden.

.
Reply · 5 · Share

**mercutio**
29 May, 2025
This effort is only necessary because the previous administration (Auto-Pen Team) allowed a completely unregulated border. The USA allows more LEGAL IMMIGRANTS than any other civilized western country. us us us
Reply · 3 · Share

**jackedbydems**
29 May, 2025
Thank You, Team Trump and ICE!!! They are not all here to pick vegetables! Are you kidding me?
Reply · 11 · 1 · Share

**FedUpIn11215**
29 May, 2025
Get them ALL out! Every last one! KEEP UP THE AWESOME WORK, MR. H!!!!
usususususususus
Reply · 9 · 1 · Share

*This comment violated our policy.*

**shannyoganigan**
29 May, 2025
Won't work. What will work is, when you witness a crime - illegal alien being present in the country, just like any other crime - call ICE. They should show up, arrest the illegal and give you a reward.
Reply · 2 · Share
Show 2 more replies

Show More Comments

Powered by OpenWeb — Terms | Privacy | Feedback



This material may not be published, broadcast, rewritten, or redistributed. ©2025 FOX News Network, LLC. All rights reserved. Quotes displayed in real-time or delayed by at least 15 minutes. Market data provided by Factset. Powered and implemented by FactSet Digital Solutions. Legal Statement. Mutual Fund and ETF data provided by Refinitiv Lipper.

# EXHIBIT 20

AXIOS

May 28, 2025 - Politics & Policy

# Scoop: Stephen Miller, Noem tell ICE to supercharge immigrant arrests

Brittany Gibson, Stef W. Kight



Photo illustration: Lindsey Bailey/Axios. Photo: Bloomberg/Getty Images

In a tense meeting last week, top Trump aide Stephen Miller and Homeland Security Secretary Kristi Noem demanded that

immigration agents seek to arrest 3,000 people a day, according to two sources familiar with the meeting.

**Why it matters:** The new target is triple the number of daily arrests that agents were making in the early days of Trump's term — and suggests the president's top immigration officials are full-steam ahead in pushing for mass deportations.

- The increased pressure on agents comes as border-crossing numbers have plummeted in Trump's first four months. It signals an increasingly aggressive approach to making arrests in non-border communities nationwide.
- It also comes as the Trump administration's heavy-handed tactics in rounding up unauthorized immigrants — and in some cases, legal residents and even U.S. citizens — appear to have contributed to President Trump's slipping poll numbers on immigration.

**Zoom in:** Miller, the White House's deputy chief of staff and leading architect of President Trump's immigration policy, laid into top immigration officials during the May 21 meeting at Immigration and Customs Enforcement (ICE) headquarters in D.C., according to four people familiar with the meeting.

- Miller demanded that field office directors and special agents in charge get arrest and deportation numbers up as much as possible, pointing to the waves of unauthorized immigrants who were able to enter the U.S. during the Biden administration.

**Noem took a milder approach** in pushing for more arrests, soliciting feedback from ICE leaders. Special government employee Corey Lewandowski, a former Trump campaign aide, also spoke.

- Miller's directive and tone had people leaving the meeting feeling their jobs could be in jeopardy if the new targets aren't reached,

two of the sources said. A third person said Miller was trying to motivate people with a harsh tone.

- It's not the first time Miller has yelled at senior DHS officials about getting arrest and deportation numbers up, sources said.

**Zoom out:** Immigration officers have almost 49,000 people in ICE custody, according to the latest government data from early May. That's significantly more people in detention than what Congress has appropriated funding to accommodate.

- But even as the Trump administration has carried out a series of controversial deportation flights to other nations, deportation totals are roughly the same as they were during President Biden's last year in office.

- Border-area deportations are lower because fewer migrants are attempting to cross into the U.S., while ICE's removals from the country's interior have increased, according to an analysis by the Transactional Records Access Clearinghouse (TRAC), an independent organization.

**To help ramp up deportations**, Capitol Hill Republicans are working on providing an extra $147 billion in immigration funds over the next 10 years — part of the Trump-backed "big beautiful bill" that passed the House last week.

- In the meantime, DHS and ICE have begun posting official requests for additional staffing, bed space and resources.

- ICE also has signed agreements to open up limited, additional bed space at existing detention spaces across the country.

- Such efforts to add space at a New Jersey detention center recently led to protests that resulted in the arrest of Rep. Rep.

LaMonica McIver (D-N.J.), sparking outrage among Democrats.

**What they're saying:** "Keeping President Trump's promise to deport illegal aliens is something the administration takes seriously," White House spokesperson Abigail Jackson said in a statement.

- "We are committed to aggressively and efficiently removing illegal aliens from the United States, and ensuring our law enforcement officers have the resources necessary to do so. The safety of the American people depends upon it."

**The big picture:** Immigration advocates have warned that if ICE gets more money and resources, more Americans and legal immigrants will be wrongfully detained and possibly deported.

- Trump and Vice President Vance have made clear they want to run the largest deportation operation in the country's history, with a goal of a million deportations a year.



Want more stories like this? Sign up for Axios AM En Subscribe

## Go deeper



Brittany Gibson, Stef W. Kight
May 29, 2025 - Politics & Policy