# EXHIBIT 21

THE CITY

TRUMP ADMINISTRATION

# ICE Agents Arrest at Least Seven Immigrants as Courthouse Blitz Continues

*Some agents wore masks that shielded their faces, while government attorneys involved refused to give their names.*

BY **GWYNNE HOGAN** |
MAY 29, 2025, 5:51 P.M.

REPUBLISH




Federal agents wait in the lobby of the Ted Weiss Federal Building for people leaving immigration hearings, May 29, 2025. Credit: Ben Fractenberg/THE CITY

ICE agents continued arresting immigrants after routine immigration court proceedings in another Lower Manhattan courthouse Thursday.

THE CITY witnessed seven arrests throughout the morning Thursday, which followed another **seven arrests** yesterday at an immigration courthouse across the street at 26 Federal Plaza.

The Trump administration has said the arrests are part of a new nationwide push to speedily deport people who entered the country less than two years ago, outside of a typical immigration court proceeding, through a process called "expedited removal."

Case after case, inside immigration courtrooms at a federal building at 290 Broadway Thursday morning, government attorneys asked immigration judges to dismiss deportation cases — only so they could be switched to "expedited removal" proceedings. During the hearings, about two dozen ICE agents, some wearing masks, lurked in the lobby below.

"Film this!" one young man urged a reporter in French as he was being detained by agents in the lobby after his hearing, adding "my family is in the Bronx." ICE officers then took his belongings and escorted him away.

Another woman stood with shaking hands after her husband was whisked away. She remained in the lobby for hours, after agents told her to wait. She left the building, alone, shortly before 5pm.

"We'd been here for appointments before and nothing happened," she said in Spanish, saying her husband was from the Dominican Republic.

Inside the immigration courtrooms above, Trump administration attorneys laid out various explanations for the moves towards expedited removal.

"The circumstances surrounding this case have changed. We have now elected to proceed through expedited removal proceedings," one government attorney, who refused to give her name after the hearing, told Judge Aviva Poczter during the case of a Dominican man named Juan. THE CITY is withholding his last name given the precarity of his legal status.

The lawyer went on to cite the Trump Administration's **Jan. 24 regulation** that expanded the rules for "expedited removal" allowing the government to seek to deport anyone outside of the protections of the typical immigration court process if they had been in the country for less than two years. Previously the rule only targeted people within 100 miles of the border.

The new process allows the government to "effectively and efficiently" deport, "the large volume of aliens who are without having been admitted or paroled," the attorney went on.

Judge Poczter approved the dismissal, saying, "the Department of Homeland Security has wide authority to dismiss cases under our laws."

Sitting before the judge without an attorney and speaking through a translator, Juan asked, "I wanted to know what has happened to the asylum application."

"They are going to put you into a different type of proceeding where they will address your application" Judge Poczter replied.

Minutes later, as he rode the elevator downstairs and emerged into the building's lobby, he was surrounded by masked ICE agents, who arrested him and escorted him back inside.

Pressed by a THE CITY reporter after the hearing the government attorney refused to provide her name. Judge Poczter declined to comment after learning from THE CITY that the person who had exited her courtroom was now detained in ICE custody.

Similar scenes repeated throughout the day.

"The circumstances have changed," another government attorney, who also declined to give her name, told immigration Judge James McCarthy in another courtroom, in the case of an Ecuadorean woman who had a pending asylum case.

"Is there any reason why you have not filed anything in writing?" McCarthy wondered.

"No, your honor," she replied.

"Don't you think it makes more sense to let these people know before they walk in here that you're making a motion to dismiss," McCarthy asked back.

That woman was able to leave court, making her way past the groups of ICE agents in the lobby without being detained.

That attorney also refused to identify herself at a reporter's request, as well as a request from a pro bono immigration attorneys in the courtroom.

Asked what impact they thought the arrests would have on the functioning of immigration courts, Kathryn Mattingly, a spokesperson for the Executive Office for Immigration Review at the U.S. Department of Justice, declined to comment. Marie Ferguson, an ICE spokesperson, previously referred THE CITY to a Department of Homeland Security statement on the courthouse arrests.

"Secretary Noem is reversing Biden's catch and release policy that allowed millions of unvetted illegal aliens to be let loose on American streets," the statement read. "This Administration is once again implementing the rule of law."

At one point in the morning, Democratic Congressman Dan Goldman, who has an office in the building, tried to confront the roving federal agents in the lobby, asking them why so many were wearing masks.

"One guy said it was because it's cold," he told THE CITY. "It's about 65 degrees. When I followed up, he walked away."

"We've all been told over and over and over again that they are only going after murderers and rapists and convicted criminals. This is the exact opposite of that," Goldman told THE CITY. "These are people who are following proper procedures to immigrate to this country."

While the new expedited removal rule change has been on the books since January, this past week was the first to see the Trump administration begin to deploy it to target people in immigration courts in large numbers, in New York City and other locations across the country from **San Diego** to **Chicago. Several** **legal challenges** to the new rule are wending their way through the federal court system.

Rumours started spreading among activists and immigration attorneys last week of the new tactic starting in New York City and **Chalkbeat reported** earlier this week on the detention of a 20-year-old Bronx public school student who was detained outside in a similar fashion.

As courthouse **arrests escalated this week,** a crowd of activists descended on one Lower Manhattan immigration courthouse Wednesday evening attempting to block buses of detainees being moved to another location. Dozens of NYPD agents responded, arresting the demonstrators and clearing the path for the vans to leave the area, and people inside banged on the caged tinted window.

Immigration attorneys, already in direly short supply, were at a loss grappling on what advice they might offer people headed to court.

"I've been an immigration lawyer for 20 years and I'm just trying to process this," said one attorney who observed proceedings at 290 Broadway on Thursday. "I've never seen such craziness."

© 2025 THE CITY REPORT, INC. ALL RIGHTS RESERVED
POWERED BY NEWSPACK

# EXHIBIT 22

# ICE, Shifting Tactics, Detains High School Student at N.Y.C. Courthouse

nytimes.com/2025/05/27/nyregion/new-york-student-arrested-ice.html

Luis Ferré-Sadurní, Dana Rubinstein May 27, 2025




When a 20-year-old from Venezuela was arrested last week at an immigration courthouse in New York, it was the first reported instance of a public school student in the city being apprehended by federal officials since the start of President Trump's second term.

It also signaled a shift in strategy by immigration authorities who are intent on expediting deportations.

Immigration and Customs Enforcement officers last week began standing inside and outside of immigration courts across the United States in an effort to detain certain migrants who are appearing for scheduled hearings. Immigration lawyers said ICE officers — from San Diego and Los Angeles to Boston and Miami — were targeting migrants shortly after their cases were dismissed by judges. Government lawyers are requesting that the cases be dismissed in order to place the migrants in expedited deportation proceedings.

Dylan, the New York student, was arrested on Wednesday in the lobby of a courthouse in Lower Manhattan by ICE officers who showed up at the city's immigration courts in large numbers. Dylan's last name was withheld at the request of his family, which fears retaliation

from the government.

Image



Dylan, 20, was arrested after he showed up to court for what he thought would be a routine hearing.Credit...Raiza

On Tuesday, Mayor Eric Adams fended off a barrage of questions about the student's arrest.

Mr. Adams, who oversees a school system serving thousands of immigrant students, sought to distance himself from Dylan's apprehension, saying that the arrest was a federal issue beyond his purview because it did not happen on school grounds.

"I'm interested that you all are using all this time to talk about something without my span of control," Mr. Adams told reporters during an unrelated news conference on Tuesday. "I don't handle federal enforcement policies, let's be clear on that."

"My opinion," he continued, "doesn't matter."

ICE appears to be using the new strategy to place the apprehended migrants in deportation proceedings that can be fast-tracked and don't require court hearings, an escalation of the Trump administration's efforts to meet the president's deportation goals.

Dylan, whose arrest was reported earlier by Chalkbeat, was detained by ICE agents at the immigration courthouse after he showed up for a mandatory hearing. He was enrolled in Ellis Prep. Academy in the Bronx, which is part of the public school system and serves older

immigrants learning English. Dylan is one of more than 40,000 migrant students who have entered the city's schools in recent years.

The young man left Venezuela last year and entered the United States in April 2024 under a Biden administration program that permitted thousands to temporarily live and work in the country while applying for asylum, according to his mother and lawyers. He did not have a criminal record, according to them, and, when not in school, worked part time as a delivery driver to help his mother and two younger siblings save enough money to move out of a shelter.

"He was like a father to my two children," his mother, Raiza, who also asked that her last name be withheld, said in an interview in Spanish.

Dylan showed up at court — with his mother but without a lawyer — believing the hearing would be routine. Instead, he was arrested by ICE agents in plainclothes shortly after his case was dismissed, which stripped him of certain legal protections, his lawyers said.

He was whisked away in an unmarked car and has remained in detention since May 21, his mother said.

"My son is not a criminal," she said. "My fear is that he will be deported to Venezuela and arrested there or worse."

Dylan has been moved between facilities in New Jersey, Texas, Virginia and Pennsylvania, his lawyers said.

"Dylan entered the United States with permission to seek asylum, and his detention robs him of the opportunity to seek that relief with the full protections offered to him under the law," the New York Legal Assistance Group, an organization that provides free aid to low-income clients and is representing him, said in a statement. "He works, goes to school, has friends and was fully complying with immigration proceedings. All this does is disrupt communities and unnecessarily put people in chaotic and potentially harmful situations."

Tricia McLaughlin, a spokeswoman for the Department of Homeland Security, which oversees ICE, said in a statement that Dylan had "illegally" entered the United States last year, even though his lawyers and family said that he had used a Biden-era mobile app that allowed migrants to arrive legally through a port of entry to claim asylum. The White House has questioned the legality of the app, which officials argue was abused by the Biden administration to let hundreds of thousands of migrants into the country.

"Most aliens who illegally entered the United States within the past two years are subject to expedited removals," Ms. McLaughlin said. "ICE is now following the law and placing these illegal aliens in expedited removal, as they always should have been."

ICE issued guidance in January allowing its officers to conduct arrests near courthouses, and federal officials have said that arresting undocumented immigrants there is safer for ICE agents, and the public, because the migrants have already gone through security screenings.

Dylan's arrest unsettled administrators at his Bronx high school and prompted Melissa Aviles-Ramos, the schools chancellor appointed by Mr. Adams, to issue a statement on Monday saying, "Our hearts go out to the student who was detained by ICE."

"While this incident did not occur on school grounds, we want to reassure our families: We will continue to speak out and advocate for the safety, dignity and rights of all of our students," she wrote in a post on X, encouraging parents to continue sending their children to school.

Michael Mulgrew, the president of the United Federation of Teachers, a union representing thousands of New York educators, said that Dylan had been "taken advantage of and stripped of his legal rights during a court hearing."

New York City's so-called sanctuary laws preclude city officials from helping with most federal immigration enforcement matters. But after successfully lobbying the federal government to abandon his criminal corruption charges, the mayor, a Democrat, has shown reluctance to criticize the Trump administration's efforts. The government sought to dismiss the charges, arguing, in part, that the indictment limited the mayor's ability to aid the White House's deportation agenda.

Mr. Adams has said that while he supports the intent of the sanctuary city laws, they go too far inlimiting cooperation with the federal government. He has fostered an apparently good working relationship with Thomas Homan, the president's border czar, who famously promised to be up "his butt" should Mr. Adams not advance the Trump administration's agenda.

The mayor sought to allow ICE to open an office at the Rikers Island jail complex, but the City Council filed a lawsuit that has temporarily stymied that effort.

On Tuesday, Mr. Adams insisted he could not comment substantively on Dylan's case because the issue was outside the ambit of New York's mayor.

"You have to speak to the federal authorities," he said, responding to a question from The New York Post about whether the arrest might undermine efforts to have immigrants cooperate with law enforcement. "I don't know how I could be any clearer. Federal authorities handle ICE. I don't control the borders."

He also seemed to suggest that he could not leverage his relationship with Mr. Homan to help the student, because it might run afoul of the sanctuary laws.

“We have to be extremely careful, because the New York City Council laws are limited on what coordination I can do,” he said.

That explanation made little sense to Rendy Desamours, a spokesman for the Council’s speaker, Adrienne Adams, who is running for mayor.

“Neither the city’s sanctuary laws nor any other city law prevent the mayor from advocating for New Yorkers being targeted by federal immigration overreach,” he said.

Troy Closson contributed reporting.

Add the Sunday Times in print to your subscription. 50% off the first year. Learn more.

# EXHIBIT 23

Learn more about LSEG

Reuters



# ICE arrests migrants at courthouses, opens door to fast-track deportations

By **Ted Hesson** and **Kristina Cooke**

May 23, 2025 1:35 PM PDT · Updated 14 days ago

Aa




Give Feedback

Law enforcement officers, including HSI and ICE agents, take people into custody at an immigration court in Phoenix, Arizona, May 22. REUTERS/Caitlin O'Hara Purchase Licensing Rights

WASHINGTON, May 23 (Reuters) - Federal immigration officials arrested dozens of immigrants following their immigration court hearings in multiple U.S. cities this week, in operations that advocates said appeared to target people who had been in the country for less than two years.

U.S. Immigration and Customs Enforcement officers detained migrants at courthouses in New York City, Phoenix, Los Angeles and Seattle, according to family members, attorneys and news reports.

> The Reuters Tariff Watch newsletter is your daily guide to the latest global trade and tariff news. Sign up here.

AD 00:08 **Coming up:** Kilmar Abrego Garcia is back in the US to face charges, Bondi says




Give Feedback

In at least some of the arrests, immigration judges had just dropped active cases against migrants, family members and advocates said. The move could potentially allow U.S. authorities to put them in a fast-track deportation process known as expedited removal.

President Donald Trump, a Republican, aims to deport record numbers of immigrants in the U.S. illegally but has complained that U.S. courts and existing laws have slowed the effort. ICE guidance issued earlier this year directed officers to consider all immigrants previously released for expedited removal if they had not affirmatively applied for asylum.

Advertisement · Scroll to continue

The operation showcases a new strategy to speed up deportations and bypass lengthier immigration processes.

A senior U.S. Department of Homeland Security official said the effort aimed to deport immigrants allowed to enter the U.S. under former President Joe Biden, a Democrat.

"ICE is now following the law and placing these illegal aliens in expedited removal, as they always should have been," the official said in a statement.

Advertisement · Scroll to continue

Give Feedback

In Phoenix, Arizona, on Tuesday and Wednesday, ICE arrested several people outside the immigration court.

Among them, Geovanni Francisco and his mother from Guerrero, Mexico, who entered the country legally in 2023, after making an appointment using the Biden-era CBP One app, according to his aunt Hilda Ramirez. Their case was dismissed Wednesday morning, records show.

"They didn't even give them a chance to gather their things," said Ramirez, who accompanied her sister and nephew to their hearing.

Reporting by Ted Hesson in Washington and Kristina Cooke in San Francisco; Additional reporting by Liliana Salgado in Phoenix, Daniel Cole in Los Angeles; Editing by Mary Milliken and Alistair Bell

Our Standards: **The Thomson Reuters Trust Principles.**

Suggested Topics:

United States

Purchase Licensing Rights

**Ted Hesson**
Thomson Reuters

Ted Hesson is an immigration reporter for Reuters, based in Washington, D.C. His work focuses on the policy and politics of immigration, asylum and border security. Prior to joining Reuters in 2019, Ted worked for the news outlet POLITICO, where he also covered immigration. His articles have appeared in POLITICO Magazine, The Atlantic and VICE News, among other publications. Ted holds a master's degree from the Columbia University Graduate School of Journalism and bachelor's degree from Boston College.

**Kristina Cooke**
Thomson Reuters

Kristina Cooke is an investigative reporter with Reuters focused on immigration and criminal justice. She and colleagues were Pulitzer Prize finalists for a series on migrant child labor in 2023. Her work has received several journalism awards, including a George Polk award, a National Headliner award and an Overseas Press Club award. Originally from Germany, she joined Reuters in London in 2005, and is now based in San Francisco.

Give Feedback

## Read Next

United States

# EXHIBIT 24

LG STUDIO Elevate your space with LG STUDIO appliances. Shop now



POLITICS

# ICE ending migrants' court cases in order to arrest and move to deport them

By Camilo Montoya-Galvez, Nidia Cavazos
Updated on: May 23, 2025 / 9:53 AM EDT / CBS News




Noem opening statement at Senate hearing

Vito Schnabel and Julia Fox on new movie

Ballerina Misty Copeland announces retirement

RZA talks Wu-Tang Clan's final tour

The Trump administration has launched an operation to terminate the immigration court cases of certain migrants, in order to arrest them and place them in a fast-tracked deportation process instead, government officials and attorneys told CBS News.

Lawyers and advocates this week reported arrests of migrants outside of immigration courthouses across the U.S., saying teams of Immigration and Customs Enforcement officers had detained individuals whose cases in front of immigration judges had just been terminated at the request of the government.

Two Department of Homeland Security officials told CBS News that ICE is conducting an operation to expedite the deportation of migrants with court hearings scheduled in the near future. It's the latest step taken by the Trump administration to dramatically ramp up immigration arrests across the country and fulfill what the president has promised will be the largest deportation campaign in American history.

The operation involves ICE prosecutors asking immigration judges to terminate the court cases of certain migrants, so agents at the agency can instead arrest those individuals and place them in a more rapid deportation process known as "expedited removal," the officials said.

Unlike immigration court proceedings, which can take years to complete due to a massive backlog of 4 million pending cases, the expedited removal process allows officials to more quickly deport migrants, if their cases satisfy certain conditions.

AD




Migrants who lack proper documents and can't prove they have been in the U.S. for more than two years are eligible to be deported under expedited removal, without a court hearing.

Historically, officials were only allowed to use expedited removal on unauthorized immigrants detained within 100 miles of an international border and who had been in the U.S. for less than two weeks. But the Trump administration vastly expanded its scope soon after taking office.

Expedited removal can also be applied to unauthorized migrants who entered the U.S. with the government's permission at legal entry points, and there's no two-year entry limit for those cases. That would place the nearly 1 million migrants who entered the U.S. under a Biden administration program known as CBP One at risk of being targeted by the new ICE operation.

While those placed in expedited removal can be deported without a hearing in immigration court, they are entitled to an interview with an asylum officer if they say they are afraid of being persecuted in their home country. If they pass those screenings, they get a chance to plead their case in immigration court.




In a statement, Department of Homeland Security spokeswoman Tricia McLaughlin faulted the Biden administration for releasing many migrants with notices to appear in immigration court, instead of trying to deport them quickly through expedited removal.

"ICE is now following the law and placing these illegal aliens in expedited removal, as they always should have been," McLaughlin said.

Leandro Ferrer, an immigration lawyer based in Phoenix, Arizona, said his clients, two Cuban migrants, appear to have been swept up in the ICE operation when they showed up to their immigration court hearing on Tuesday.

"There was a sense of relief when the government prosecutors moved to dismiss the removal proceedings," Ferrer recounted. "This has always been, historically, a result that is highly sought after and either we try to win a case on the merits of an application or we try to dismiss the removal proceedings."

But to his shock and dismay, Ferrer said ICE agents arrested his clients immediately after they left the courtroom.

"They did not provide identification, they did not have an arrest warrant, they did not make any attempt to establish whether or not they had committed a crime," Ferrer added. "They just went in and took them."

Ferrer said his Cuban clients entered the U.S. in 2022, after showing up to a legal entry point along the U.S.-Mexico border, hoping to request asylum.




Even amid ICE's efforts to arrest some migrants after they show up to court, immigration lawyers said they are still strongly advising their clients against missing their hearings, as failure to do so could be grounds for judges to issue a deportation order.

The ICE arrests at immigration courts were reported across the country in several cities with large immigrant populations, including Los Angeles, Seattle, Chicago, Dallas, Las Vegas and Miami.

"I began getting calls from family members of those getting arrested asking for help," said Antonio Ramos, a Miami-based immigration lawyer, adding that the phone calls began on Monday.

Ramos said he's trying to make preparations for his clients who have upcoming court hearings.

"They're going to come to my office first, we are going to take them to court and we are not going to leave them alone for one second in the building," he said.

"People need to consult with an attorney before going to court, somebody that can take a look at the case, evaluate options and not a notary," Ramos added.

**More from CBS News**

- Full transcript of "Face the Nation with Margaret Brennan," June 8, 2025
- What to know about the L.A. immigration protests over ICE operations
- Poll: Trump deportation program nets positive approval, contrasting views on scope

Camilo Montoya-Galvez
Camilo Montoya-Galvez is the immigration reporter at CBS News. Based in Washington, he covers immigration policy and politics.

© 2025 CBS Interactive Inc. All Rights Reserved.

## More from CBS News

- Full transcript of "Face the Nation with Margaret Brennan," June 8, 2025
- What to know about the L.A. immigration protests over ICE operations
- Feds warn about threats to Israeli and Jewish institutions in U.S.
- Warren asks for contingency plans on national security after Trump, Musk fall out



Experts Warn: This Debt Explosion Could Crush Retirements
PAID CONTENT BY AMERICAN HARTFORD GOLD

He Bought a Couch for $50
Then Found a Bag of Cash Stuffed Inside
PAID NEWS Learn More

Costco Shoppers Say This Wrinkle Cream Is "Actually Worth It"
PAID THE SKINCARE MAGAZINE

7 Things Changing for Seniors on Social Security in 2025
Senior Benefits And Discounts Are One Of The Few Truly Great Perks That Come With Getting…
PAID HEALTHYWALLET Learn More

8 Dumbest Things Middle-Class Americans Waste Money On
Are you making these money mistakes?
PAID FINANCEBUZZ Read More

I Replaced My Sonicare Toothbrush with TAO. I Love It!
Discover the revolutionary sonic toothbrush with 40,000 brush strokes per minute and UV …
PAID TAOCLEAN Learn More

Arizona Launches New Rule for Cars Used Less Than 50 Miles/day
PAID BINDRIGHT

The New Buick Envista Is Absolutely Mind Blowing (Take a Look)
PAID TOP SEARCHER NOW | AUTO Learn More

People Are Replacing Their Hearing Aids With This
See why audiologists are calling it a breakthrough in hearing technology.
PAID HEAR.COM

This Wrinkle Cream Keeps Selling Out At Costco (Find Out Why)
PAID THE SKINCARE MAGAZINE

10 American Inventions You Still Use Today
We use them or consume them on a regular basis.
PAID NEWS Learn More

Sponsored

The judge losing his patience with the Trump administration
James Boasberg is at the centre of an escalating conflict between the executive and the judiciary
PAID THE ECONOMIST Learn More

Costco Shoppers Say This Neck Pillow Is "Actually Worth It"
PAID SLEEP DIGEST PUBLICATION

Los conductores abandonan sus compañías de seguros de automóviles...
Muchos conductores ignoran estos grandes descuentos en seguros de automóvil
PAID OTTO INSURANCE Más información

Empty Cruises Departing From Arizona That Seniors Can Book For Cheap
PAID GOSEARCHES | SEARCH ADS

Protein Isn't Enough - Here's What Really Builds Muscle After 60
PAID APEX LABS

Cardiologists: 1 spoonful on an empty stomach slims the waist from XL to P (do...
Heart experts back this trick! A single spoonful daily targets belly fat first. Women drop from XL…
PAID WOMEN'S HEALTH Learn More

Subaru Is Back & Better Than Ever With Its Incredible New 2025...
PAID POPULARSEARCHES | SEA… Learn More

Fmr. Pres. Clinton on health scare, future of U.S.
CBS NEWS

What loss of the penny might mean for U.S.
CBS NEWS

Arizona: consigue un seguro de coche más barato en cinco minutos
Muchos conductores ignoran estos grandes descuentos en seguros de automóvil
PAID OTTO INSURANCE Más información

Why Don't More Americans Know About This Debt Relief Program?
PAID SMART FINANCE

Avoiding cancer-causing ingredients? Top 5 Detergents
Many laundry products are made overseas. #1 is not!
PAID INGREDIENT HONESTY Learn More

Seniors Born 1941-1979 Receive 7 Benefits If They Ask
The benefits that most Seniors don't know about but could help them save big on their budget.
PAID BETTER FINANCES Learn More

Arizona: Retirees Are Unaware Of Reduced Car Insurance Rates Based On...
Don't pay your next auto insurance bill until you read about this!
PAID SMART LIFESTYLE TRENDS Learn More



Copyright ©2025 CBS Interactive Inc. All rights reserved.

# EXHIBIT 25

Become a Chalkbeat sponsor

TRUMP ADMINISTRATION POLITICS & POLICY ENGLISH LANGUAGE LEARNERS

# A Bronx high schooler showed up for a routine immigration court date. ICE was waiting.

By Michael Elsen-Rooney | May 26, 2025, 5:35pm PDT

REPUBLISH

Privacy - Terms



*Dylan (center) is flanked by his younger siblings. Dylan was detained by Immigration and Customs Enforcement after showing up for a routine court date on May 21, 2025.* | (Courtesy of Raiza)

*Leer en español*

*Sign up for Chalkbeat New York's free daily newsletter to get essential news about NYC's public schools delivered to your inbox.*

The Bronx high school student from Venezuela was trying to do everything right.

Dylan, 20, fled his home country last year and turned himself in at the U.S. border in April 2024 through a Biden-era entry program. He requested asylum and was permitted to enter the country while he awaited a court date, allowing him to obtain a work permit and driver's learner permit, according to his lawyers and his mom, Raiza.

He joined his mom and two younger siblings in the Bronx, finding part-time work as a delivery driver to help Raiza scrape together enough money to move the family out of

a city-run homeless shelter and into their own apartment.

And even though he had already finished high school in Venezuela, he enrolled in a Bronx high school that caters to older newcomers, determined to continue studying and make it to college.

So when Dylan's mandatory court date arrived last Wednesday, he and Raiza had little hesitation about showing up in person as instructed in lower Manhattan, assuming it would be a routine check-in, according to Raiza, who asked to use only their first names for fear of retaliation from immigration authorities.

Instead, Raiza said, Dylan, who attended the court hearing without a lawyer, unwittingly relinquished his legal protections and was promptly arrested by Immigration and Customs Enforcement, or ICE, agents who followed him out of the courtroom and into the courthouse lobby.

Dylan's arrest was part of a nationwide blitz. In courthouses across the country, government lawyers asked judges to dismiss cases against migrants, then immediately reopened them as "expedited removal" cases — allowing authorities to apprehend their targets on the spot and thrust them into a sped-up deportation process with fewer legal checks, according to lawyers and numerous news reports.

"It seems like a dirty game on their part," Raiza told Chalkbeat in Spanish. "When someone appears in front of a judge, it's because they don't have any criminal record, they want to do the right thing. … The only thing he wants is to study."

Become a Chalkbeat sponsor

The arrest has sent shockwaves through ELLIS Prep, the tight-knit Bronx high school Dylan attends, and is the first known example of a current New York City public school student detained by ICE during Trump's second administration, according to several immigration advocates and educators.

ELLIS Prep Principal Norma Vega gathered staff members last Friday to tell them about Dylan. "One of our kids was taken," she said.

Vega said she's been heartened by the support Dylan is already receiving and hopes to organize more efforts to fight for his release. "They thought he was easy pickings and [a] nobody … [but] there are a lot of people out there willing to support."

In a statement in response to a Chalkbeat inquiry and later posted to social media, schools Chancellor Melissa Aviles-Ramos said, "Our hearts go out to the student who was detained by ICE, and we are deeply saddened for their family. While this incident did not occur on school grounds, we want to reassure our families: we will continue to speak out and advocate for the safety, dignity, and rights of all of our students."

In the five days since he was detained on May 21, Dylan, who suffers from severe stomach issues, has been shuttled between four different states — New Jersey, Texas, Louisiana, and Pennsylvania, according to his lawyers and mom.

The rapid moves have prevented his lawyers from making contact with him, since it usually takes several days after a transfer to set up a consultation, according to an attorney from the New York Legal Assistance Group, or NYLAG, which is representing Dylan. Raiza, who has spoken to Dylan by phone, said he has not received medical care and has spent most of the time with his hands and feet cuffed.

ICE did not respond to Chalkbeat's inquiry about Dylan's case.

## A grueling journey leads to more struggle and hope

Dylan's family is part of a historic wave of migrants arriving in New York City in recent years. Raiza first took her two younger kids — now ages 7 and 10 — through the dangerous Darien Gap in 2023. But she couldn't afford Dylan's trip at the time, and he had to undertake the journey on his own a year later.

The experience was traumatic. Dylan was kidnapped in Mexico by the notorious Sinaloa cartel and held for ransom, Raiza said.

Once she secured his release, Dylan entered the country with an appointment through the CBP One App, a Biden-era program recently revoked by Trump that was meant to formalize and streamline the process of entering the country. Dylan was allowed to enter the U.S. while he awaited his first court date, and he applied — without the help of a lawyer — for asylum and for Special Immigration Juvenile Status, a type of legal protection for youth, according to his attorney at NYLAG.

Become a Chalkbeat sponsor

Dylan's legal status allowed him to qualify for both a work authorization and a driver's permit, according to his mom. He was able to buy his own e-bike and work part time as a delivery driver.

**We're on a need-to-know basis.**

Every weekday morning, Chalkbeat New York is bringing thousands of subscribers the news on public schools and education policy that they need to start their day. Sign up for our free newsletter to join them.

Email (required)

SIGN ME UP

*By signing up, you agree to our Privacy Notice and European users agree to the data transfer policy. You may also receive occasional messages from sponsors.*

Life in the U.S. wasn't easy for his family. His mom worked multiple jobs — including selling chocolate, cleaning apartments, and assisting a carpenter — to help move her family out of the homeless shelter where they were staying in the Bronx. Then Raiza said she almost lost thousands of dollars in an apartment rental scam and only recovered some of it back after threatening to call the police.

Dylan struggled to balance work and school, at one point considering dropping out until the school and Raiza intervened, she said. And most recently, Dylan was struggling with severe bouts of illness that kept him out of school, Raiza added. Dylan was in the process of getting additional medical testing when he was detained, Raiza said.

But despite all of their struggles, Raiza was proud of the life she and her children forged in New York City.

"The only thing I want is a better future for them," said Raiza. "Unfortunately, my country doesn't lend itself to that."



*Dylan, third from left, poses with his mom and younger siblings.* | (Courtesy of Raiza)

All three kids loved their schools. Dylan, a homebody with little interest in partying, took an active role in caring for his younger siblings as Raiza worked long hours. He

picked them up from school and corrected their behavior when necessary, she said.

And Dylan, who often wears his black hair shaggy and shoulder-length, won many admirers among staff and students at ELLIS for his shy but kind demeanor. One classmate recalled him freely sharing his arepas, a popular Venezuelan dish of fried cornmeal stuffed with meat or cheese. Dylan used to play Uno at lunch with a group of friends and was interested in learning the guitar in music class, his guidance counselor said.

## A court date turns into handcuffs

Normally, a court date like Dylan's would have been relatively straightforward. But when Dylan and his mom arrived at immigration court at 290 Broadway in lower Manhattan, the government lawyers made an unusual request. They asked the judge to dismiss the deportation proceedings against Dylan, according to his mom and lawyers.

But when Dylan's deportation proceedings were dismissed, his asylum claim was too, leaving him without legal protection and allowing the government to initiate an expedited removal.

If the family had a lawyer present, they might have been able to oppose the request to dismiss, or might have more fully understood the possible repercussions, said Dylan's NYLAG attorneys. But Raiza said she had looked in vain for an attorney before the hearing and could not afford a private one.

Become a Chalkbeat sponsor

After Dylan's case was dismissed, Raiza said two men entered the courtroom and then followed her and Dylan outside and into the elevator.

"When we got out of the elevator, they said, 'get up against the wall,'" Raiza recalled. Next to them, another girl was screaming while she was detained, recalled Raiza, who was also cuffed initially. She pleaded with the officers that Dylan had no criminal record, and told them she has young kids at home. The officers released Raiza, but took Dylan into an unmarked car, she said.


*Raiza and her son Dylan.* | (Courtesy of Raiza)

The practice of making arrests at courthouses "will cause fear and cause people to be afraid to go to hearings and to assert their right to asylum," said Dylan's lawyer, who spoke on the condition of anonymity so as not to jeopardize his case. But missing a court date can also lead to a deportation order, she noted.

The hours after Dylan's arrest were a blur of activity as Raiza tried in vain to get more information about Dylan's detention. She called her son's guidance counselor, Hedin Bernard, at ELLIS Prep, who referred her to a church that could help connect her with legal representation and case management.

Under expedited removal proceedings, which do not require a hearing with a judge, Dylan will have an interview with an asylum officer about whether he has "credible fear" of returning to Venezuela, and his answers could determine whether he has any

legal basis to remain in the country. He likely won't have access to a lawyer during the process, his attorneys said.

That means Dylan will essentially have to start the process of applying for asylum "all over again, but detained and alone," said his attorney.

According to Raiza, Dylan has no close family left in Venezuela, and she worries that he could be imprisoned by the government if he returns. "This is what I despair about," she said. "It's not going to turn out well."

Dylan's lawyers said there are multiple reasons his detention and the attempt at expedited removal are legally dubious. There is an ongoing lawsuit challenging whether people who entered the country in the same way as Dylan can be placed in expedited removal. And his lawyers say Dylan has an upcoming hearing in his request for Special Juvenile Immigration Status.

Dylan's detention has devastated his two elementary-age siblings, who see him as "a dad," said Raiza.

When Raiza didn't come home on time the day Dylan was detained, her younger kids began frantically calling. She had to break the news by phone.

"The boy started to cry desperately ... they were just asking, 'when is he going to return?'" she said. "I told them that their brother was taken by ICE, to keep up their faith in God that everything is going to be okay, and that they should pray, because God listens to kids."

Dylan has put on a brave face during her phone calls with him, Raiza said, but she knows he's scared.

As for Raiza, her grueling journey to the U.S. has made her fearless about most things. Except for one: "The only thing I'm scared of is something happening to my kids," she

said. "I don't want to lose my son."

*Michael Elsen-Rooney is a reporter for Chalkbeat New York, covering NYC public schools. Contact Michael at melsen-rooney@chalkbeat.org*

## The Latest



### ICE detained another NYC public school student, the Education Department confirms

The student's name and school have not been released. Chancellor Melissa Aviles-Ramos said she was 'deeply saddened' by the arrest.

By Cara Fitzpatrick | Today, 5:28pm PDT



### Chicago's teacher leadership program aims to empower and keep teachers

The program started in seven Chicago schools in 2019. Today, it's expanded to about 400 schools.

By Reema Amin | Today, 3:54pm PDT



### District officials say their options are 'limited' after Detroit student arrested by ICE

The detention highlights the limits of districts in protecting students from immigration enforcement off campus.

By Hannah Dellinger | Today, 3:29pm PDT



### Closures ahead? Here's how NYC mayoral candidates would manage the rising number of small schools.

Small schools are expensive to operate and simultaneously struggle to afford basic programs. But closing them will likely spark community backlash.

By Alex Zimmerman | Today, 1:25pm PDT



## DPS considers lease deal for a historic chapel it owns near Denver School of the Arts

Whatley Chapel is currently unusable. The proposed deal would bring the historic building back to life.

By Melanie Asmar | Today, 9:19am PDT



## More school closures could be coming as Denver Public Schools predicts enrollment declines

The northwest, southwest, and central parts of the city are expected to be hit the hardest, according to the district's new Strategic Regional Analysis.

By Melanie Asmar | June 5



CHALKBEAT IS A CIVIC NEWS COMPANY NEWSROOM ©2025

# EXHIBIT 26

National Immigrant Justice Center launches new visual identity and website

Learn More

National Immigrant Justice Center

# 22 People Arrested in ICE Raids Announce Federal Court Action Challenging Unlawful Warrantless ICE Arrests Under New Trump Administration

March 17, 2025 / Press Release

Twenty-two people, including a U.S. citizen from Chicago, subjected to unlawful arrests and detention by U.S. Immigration and Customs Enforcement (ICE) in the early weeks of the second Trump administration, are asking a federal court to demand the release of two people still detained and additional remedies to avoid future unlawful arrests. The motion filed last Thursday in Chicago also seeks to hold ICE accountable for multiple violations of a 2022 federal court settlement.

EN

"On January 26, when my husband was coming back from buying tamales for the family, he was arrested. Since that day my family has been facing a lot of challenges ... we have been living in a crisis," said **Yolanda Orozco, wife of plaintiff Abel Orozco who was arrested by ICE without a warrant near his home in Lyons, Illinois.** "All that I ask is for my husband's release. Is it a crime to get up everyday early in the morning to support your family?"

"My father has been here for over 27 years, he owns his own company, he cuts down trees for a living, he has never been arrested in his entire life," said **Eduardo Orozco, Abel Orozco's son**. "He just goes to work and he comes back to his family. He is loving, he is caring, he is responsible, he is someone to look up to, and he is an honest man and he should not have been arrested. I just want to ask the government to please look into who he is so they can do what's right.

The National Immigrant Justice Center and ACLU of Illinois filed a motion to enforce the *Castañon Nava* settlement in U.S. District Court for the Northern District of Illinois on behalf of U.S. citizen Julio Noriega, who ICE officers detained for more than 10 hours in late January and then released to the street without documenting the arrest; nine individuals including Mr. Orozco who have been subject to warrantless and often violent arrests in their neighborhoods or vehicles; and 12 people who were arrested in a single incident at a restaurant in Liberty, Missouri, without warrants or probable cause.

"Last week ICE issued a press release bragging about tens of thousands of arrests the administration has carried out since January, maki EN without evidence about who they swept into immigration detention while

bragging that thousands of these arrests were so-called 'collateral' arrests, meaning ICE officers had no warrant or probable cause when they handcuffed people and took them into detention. Based on the dozens of cases NIJC and our partners have screened from Chicago and throughout the Midwest, we condemn the administration's claims that those detained as a result of ICE's illegal tactics pose any danger to our communities," said **Mark Fleming, associate director of litigation at National Immigrant Justice Center**. "Most are people who have built lives here over decades, have families, many own businesses and like most of us, were going about their lives trying to do their best when they became collateral damage of the Trump administration's inhumane and illegal mass deportation agenda."

The motion to enforce demands the release of unlawfully detained plaintiffs without bond, along with other remedial measures to ensure ICE officers and other agencies assigned to conduct immigration enforcement comply with the settlement. Because of the number and scale of violations which occurred in just a few weeks after Trump took office and the likelihood that violations will continue, the plaintiffs also ask the court to produce a report of all immigration arrests since January 20, 2025, and to provide weekly reports going forward of all immigration arrests.

The plaintiffs' lawyers and community organizers who have been supporting families impacted by ICE arrests held a press conference Monday to discuss the court action and demand accountability for the Trump administration's ongoing unlawful attacks on immigrant communities.

EN

"It is clear that internal ICE policy has little impact in reducing the harm this institution causes in our communities. Not only do we, as community members, need to be 'well educated' in the Constitution but we cannot even rely on ICE internal policies to curtail their disregard for people's most basic rights," said **Xanat Sobrevilla, organizer with the Organized Communities Against Deportations**.

"The Trump Administration once again shows itself to be lawless and reckless," said **Rebecca Glenberg, Chief Supervising Litigation Counsel: First Amendment at the ACLU of Illinois**. "They blithely violate the U.S. Constitution and Congressionally enacted laws, ignore court-approved settlement agreement and trample on people's legal rights to serve their dangerous and harmful agenda. The people named in this motion deserve protection from the authoritarian and monarchial impulses of this administration."

"Even before the start of the administration, [Trump's "border czar" Tom] Homan and Trump declared war on many members of my community, my friends, my community," said **Noemi Avelar, who spoke on behalf of U.S. Representative Delia Ramirez**. "They have declared war on our neighbors, and just in 60 days of the administration we have seen the impact of the war: Federal agents empowered to violate our civil rights, raids that target immigrants without criminal records, the detention of veterans and citizens, deportation of children with cancer, and the division of families who are now in pain and scared. At the same time we have shown this administration that we know our rights, we are united and organized, we will continue to fight to protect and bring families together again."

EN

"As this administration attempts to follow through on its threats of 'mass deportation,' immigrant communities and allies must reaffirm the rights and protections that all people in the United States enjoy under the US Constitution," said **Fred Tsao, senior policy counsel at the Illinois Coalition for Immigrant and Refugee Rights, one of the named organizational plaintiffs in *Castañon Nava***. "Whenever this administration violates these basic rights, we must call them to account."

**Read the motion to enforce Castañon Nava.**

**Watch a recording of the press conference.**

## Related Posts

### Advocates Agree: The Reconciliation Bill Hurts Children

Press Release / June 6, 2025

### NIJC Condemns Trump's Escalation of Attacks Against Immigrant Communities with New Travel Ban and ICE Roundups

Press Release / June 5, 2025

EN

111 W. Jackson Blvd., Suite 800,
Chicago, IL 60604

EN

The National Immigrant Justice Center (NIJC, NFP) is a 501c3 nonprofit organization (EIN: 93-3878636).

National Immigrant Justice Center and NIJC, NFP are registered in U.S. Patent and Trademark Office.

© 2011-2025 National Immigrant Justice Center | Privacy Policy

EN

# EXHIBIT 27

ADVERTISEMENT
DISCOVER WORLD CLASS CARE
Cleveland Clinic
Learn More
Advertise with *Mother Jones*



POLITICS | APRIL 23, 2025

# US Citizen Wrongly Detained by the Border Patrol Says Government's Account Is False

*Jose Hermosillo was held for 10 days at a private detention facility in Arizona.*

JUDD LEGUM
Bio



Jose Hermosillo. Popular Information, courtesy of Jose Hemosillo

ADVERTISEMENT
NEW FROM UC PRESS
Examining why society should pool and spread the financial risk that individual families now bear.
PATRICIA A. McCOY
SHARING RISK
THE PATH TO ECONOMIC WELL-BEING FOR ALL
UNIVERSITY OF CALIFORNIA PRESS
Advertise with Mother Jones

*publication to which you can subscribe here.*

**On April 8,** Jose Hermosillo, a 19-year-old U.S. citizen, was wrongfully incarcerated by immigration authorities in Arizona, who claimed he was an undocumented immigrant. He was held for 10 days at Florence Correctional Center, a privately run immigration detention facility, before being released on April 17.

These facts are not disputed.

On X, the Department of Homeland Security said, "Hermosillo's arrest and detention were a direct result of his own actions and statements." According to DHS, "Jose Hermosillo approached Border Patrol in Tucson Arizona stating he had ILLEGALLY entered the U.S. and identified himself as a Mexican citizen."

DHS also released what purports to be a transcript of Hermosillo's conversation with a Border Patrol agent signed "JOSE." In the transcript, Hermosillo allegedly said he was born in Mexico, was a citizen of Mexico, and entered the United States illegally.

***Hermosillo says he tried to tell staff at Florence Correctional Center he was a US citizen, but "they say, tell your lawyer."***

In an interview with Popular Information, Hermosillo said DHS's account was false.

According to Hermosillo, he was visiting his girlfriend's family in Tucson from his home in Albuquerque, New Mexico. Several hours before his arrest, Hermosillo was transported to a hospital in Tucson by ambulance after suffering from a seizure. He has a New Mexico state ID, but did not take it with him during the medical emergency.

After being released from the hospital following treatment, Hermosillo did not know how to return to where he was staying. He approached the Border Patrol officer because he was looking for someone to help him. "I saw a car, and I ask[ed] him for help," Hermosillo said. He told the officer that he was staying in Tucson.

"You're not from here. Do you have your papers?" the officer said, according to Hermosillo. When the officer asked where he was from, Hermosillo said he told the officer, "New Mexico." The officer then accused Hermosillo of lying. "Don't make me [out] like [I'm] stupid," the officer said. "I know you're from Mexico." After that, Hermosillo said, he was arrested.

Hermosillo said that he never told the officer that he was born in Mexico, was a citizen of Mexico, or entered the country illegally—and he would not have said those things because they are not true. He signed the transcript released by DHS because the officer ordered him to "sign everything." But Hermosillo did not read it, because he cannot read.

According to Hermosillo's girlfriend, Grace Hernandez, Hermosillo has learning disabilities and can only write his name. Hermosillo said he did not graduate from high school and dropped out after the 10th grade.

I have read (or have had read to me) the foregoing statement consisting of ______ pages. I affirm that the answers attributed to me herein are true and correct to the best of my knowledge and belief and that this statement is a full, true, and correct record of my questioning by the above-named officer of the Immigration and Naturalization Service. I have initialized each page of this statement (and the corrections noted on page(s) ________).

Signature of alien: J O S E

The officer also signed the document, which said Hermosillo "read" the document or had it read to him. But Hermosillo said no one read him the document.

Other documents created by the officer have inaccuracies. For example, the criminal complaint says that Hermosillo was detained "at or near Nogales, Arizona." But Hermosillo was detained in Tuscon, which is more than 70 miles from Nogales. John Mennell, a spokesperson for the U.S. Border Patrol, said that it was an "unintentional" error.

Hermosillo said he was detained with about 15 other men in a cell at the Florence Correctional Center. He was served only cold food. He said he contracted the flu because "they have it cold in there and everybody's getting sick." Hermosillo said he requested medicine but was not provided with any.

Hermosillo said he tried to tell people at Florence Correctional Center that he was a US citizen, but was dismissed. "They say, tell your lawyer," he recalled. Hermosillo, a father to a six-month-old, said he spent time while he was detained crying because he was afraid "they're not going to let me out."

Two days after his detention, Hermosillo told a judge that he was a US citizen. Prosecutors then requested that the hearing be delayed and that Hermosillo be detained until it was rescheduled. Hermosillo was held for an additional seven days until, at the next hearing, his family provided the court with his birth certificate.

Since his release, Hermosillo has struggled. "When I dream, I dream I'm still in there," he said.

**BEFORE YOU CLICK AWAY!**

"Lying." "Disgusting." "Scum." "Slime." "Corrupt." "Enemy of the people." Donald Trump has always made clear what he thinks of journalists. **And it's plain now that his administration intends to do everything it can to stop journalists from reporting things they don't like**—which is most things that are true.

No one gets to tell *Mother Jones* what to publish or not publish, because **no one owns our fiercely independent newsroom**. But that also means we need to directly raise the resources it takes to keep our journalism alive. There's only one way for that to happen, and it's readers like you stepping up. Please help with a donation today if you can—even a few bucks will make a real difference. A monthly gift would be incredible.

Donate Now

More about: Donald Trump | Immigration | Immigration and Customs Enforcement

## RELATED



A Conservative Judge Just Issued a Dire Warning About the Abrego Garcia Case
FEMA LEVY



The Shocking Far-Right Agenda Behind the Facial Recognition Tech Used by ICE and the FBI
LUKE O'BRIEN



ICE Is Reportedly Violating Detained Tufts Student's Right to Medical Care
SOPHIE HURWITZ AND JULIA MÉTRAUX



The Future of the Border Is Even More Dystopian Than You Thought
LAUREN MARKHAM

## WE RECOMMEND



Tech Moguls Want to Build a Crypto Paradise on a Native American Reservation
KIERA BUTLER



The ICE Policy That Set Off Chaos in LA
JULIANNE MCSHANE

"No," Trump Says, He Does Not Want to Repair Relationship with Musk
JULIANNE MCSHANE

The Trump-Musk Wrestling Match Is Far From Over
INAE OH

## LATEST

A Federal Program to Protect US Cities Against Extreme Heat Has Just Evaporated
MATT SIMON

More States Consider Curbing Drug Testing at Childbirth
SHOSHANA WALTER

"Green Aviation" Exception in GOP Budget Bill Is a "Big, Beautiful" Bipartisan Boondoggle
MICHAEL GRUNWALD

The Trump White House Is a Giant National Security Red Flag
INAE OH

+ VIEW COMMENTS

**Independent. In print. In your mailbox.**

Inexpensive, too! Subscribe today and get a full year of *Mother Jones* for just $19.95.

Subscribe



August 2025



June 2025



April 2025

**Bold. Brave. Beautiful.**

Award-winning photojournalism. Stunning video. Fearless conversations.

Follow us on Instagram >

**Looking for news you can trust?**

*Subscribe to the Mother Jones Daily to have our top stories delivered directly to your inbox.*

Sign Up

By signing up, you agree to our privacy policy and terms of use, and to receive messages from Mother Jones and our partners.



This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

Copyright © 2025 Mother Jones and the Center for Investigative Reporting. All Rights Reserved.

Terms of Service | Privacy Policy

Powered by WordPress VIP

# EXHIBIT 28

# American citizens wrongly detained in Trump administration's immigration crackdown

Apr 23, 2025 6:40 PM EDT

**Correction:** In this piece, we misspoke when describing the IDs that Lopez-Gomez presented and proper forms of identification under the law. Lopez-Gomez said he presented both his social security card and state ID to officials. Together, these are a proper form of ID. A social security card alone is not an acceptable form of ID. The transcript has been updated. We regret the error.

A federal judge accused the Trump administration of trying to obstruct the truth about the wrongful deportation of Kilmar Abrego Garcia. Judge Paula Xinis said the administration's refusal to answer questions "reflects a willful and bad faith refusal to comply with discovery obligations." Addressing the case, President Trump said he wants to bypass due process. Laura Barrón-López reports.

## Read the Full Transcript

*Notice: Transcripts are machine and human generated and lightly edited for accuracy. They may contain errors.*

---

**Geoff Bennett:**

Last night, a federal judge in Maryland said the Trump administration is trying to obstruct the truth about the wrongful deportation of Kilmar Abrego Garcia to El Salvador. The judge added, the administration's refusal to answer questions about its assertion that Garcia is an MS-13 gang member, nor provide details about its contract with the Salvadoran government — quote — "reflects a willful and bad-faith refusal to comply with discovery obligations."

---

**Amna Nawaz:**

Addressing the case this week, President Trump repeatedly said he wants to bypass due process required by the Constitution in order to fulfill his migrant crackdown.

Donald Trump, President of the United States: We have thousands of people that are ready to go out. And you can't have a trial for all of these people. They emptied out insane asylums into our country. We're getting them out. And a judge can't say, no, you have to have a trial. But let's — the trial is going to take two years.

---

**Amna Nawaz:**

Our White House correspondent, Laura Barron-Lopez, joins us now for more.

So, Laura, the judge has a very strong word there for the Trump administration, bad-faith refusal to comply. Where do things stand now?

---

**Laura Barron-Lopez:**

So Judge Xinis has essentially given the Trump administration until this evening to — quote — "respond to all outstanding discovery requests" and to essentially provide the factual basis for their assertion that Garcia is an MS-13 gang member.

And, so far, there have been a number of depositions of Trump administration officials. But we should note, Amna, that now, over the last 24 hours, there have been a number of sealed filings in the case, including one from the Trump administration seeking a seven-day stay of Judge Xinis' discovery and daily status reports.

And so we expect to hear from Judge Xinis soon, but we don't know how she's going to rule on that.

---

**Amna Nawaz:**

So the president has said he wants to get rid of the legally required due process here for the immigrants he wants to deport. All of that is despite a Supreme Court ruling that blocks more deportations under that Alien Enemies wartime act.

So what are lawyers telling you right now about their ability to get due process for their clients?

---

**Laura Barron-Lopez:**

Multiple lawyers that I have talked to said that it's been increasingly difficult to represent their clients that are being targeted for deportation because the Trump administration is moving these migrants from jurisdiction to jurisdiction.

And these lawyers have also had limited access to their clients to get interviews and information from them. I spoke to Holly Cooper. She's the co-director of the Immigration Law Clinic at U.C. Davis. And she warned that the administration's actions are weakening due process rights.

---

**Holly Cooper, Co-Director, Immigration Law Clinic, U.C. Davis:**

Without these structures, these pillars of due process, we are going to end up erroneously deporting a lot of individuals into very extreme conditions like what we're seeing in CECOT in El Salvador.

So this is really even like — it wouldn't be in exaggeration to say this is a life-or-death situation to provide fair procedures for our immigrants and for people who aren't even immigrants who are citizens. Those traditional procedural protections that have demarcated us as a democracy are completely eroding before our eyes.

---

**Laura Barron-Lopez:**

Holly Cooper said that she and other immigration lawyers are also concerned about the escalation, potential escalation, of racial profiling.

And while there's no requirement for U.S. citizens to carry I.D.s, she said that she may start advising U.S. citizens to carry some form of identification.

---

**Amna Nawaz:**

And you have been reporting on the case of one U.S. citizen, right, from Georgia who was arrested and detained. What happened there?

---

**Laura Barron-Lopez:**

That's right. The U.S. citizen is Juan Carlos Lopez-Gomez, and he was detained by ICE for nearly 48 hours in Florida. He was arrested during a traffic stop under a state law that makes it illegal for undocumented immigrants to cross into — that are over the age of 18 to cross into Florida.

And, now, the key thing here was that law was suspended by a judge when Carlos Gomez was arrested. Now, we asked the Homeland Security Department about this.

A senior DHS official said in a statement to "News Hour" that: "After a stop by a Florida highway patrol trooper, a dual citizen of Mexico and the U.S. was detained after he said that he was in the U.S. illegally. Immediately after learning the individual was a United States citizen, he was released.'

Now, my producer Shrai Popat and I spoke to Juan and his mother, and Juan disputes Homeland Security's claim, and he said that he told Highway Patrol that he was a United States citizen and shared his story with us.

---

**Juan Carlos Lopez-Gomez, Detained U.S. Citizen (through interpreter):**

As soon as I arrived at the detention center, they asked me, if I am a U.S. citizen, why do I not speak English? They were just laughing in my face.

After that, they took photos of me and they made me sign a lot of papers, and I didn't know what I was signing. I immediately got desperate because I didn't want to be in there and I just felt hopeless.

---

**Laura Barron-Lopez:**

Juan said that he presented his Social Security card to officials, and that they dismissed it.

And Juan and his mother described the entire experience as traumatic and Juan said that he's afraid it could happen again.

Now, Juan Lopez-Gomez's lawyer said that they are very likely to sue the state of Florida.

---

**Amna Nawaz:**

And, as you report this out, you found this wasn't an isolated incident. Is that right? There's another U.S. citizen's case you're following?

**Laura Barron-Lopez:**

There is. Jose Hermosillo, he's 19. He was arrested in Tucson, Arizona, where he was detained for nearly 10 days. An ICE agent said that Hermosillo told them that he was — quote — "a citizen of Mexico."

Now, a senior DHS official told us in a statement that standard procedures were followed for an individual who self-identifies as a — quote — "illegal alien." They said that agents were not aware of a learning disability that Hermosillo has.

Now, we were not able to reach Hermosillo, but in interviews with other reporters, he has said that he made clear that he was a United States citizen, Amna. And the attorney general for Arizona says that they are looking into this incident.

**Amna Nawaz:**

All right, Laura Barron-Lopez, thank you for your reporting.

**Laura Barron-Lopez:**

Thank you.

*By* — **Laura Barrón-López**

Laura Barrón-López is the White House Correspondent for the PBS News Hour, where she covers the Biden administration and the incoming Trump administration for the nightly news broadcast. She is also a CNN political analyst.

*By* — **Shrai Popat**

*By* — **Ali Schmitz**

# EXHIBIT 29

SLATE

STILL FUNNY, BIZARRE, AND COMPELLING ENOUGH

USERS

# Facial Recognition Is Getting a Lot More Invasive Under Trump

The tech's mistakes are dangerous, but its potential for abuse when working as intended is even scarier.

BY JASON TAPER

JUNE 06, 2025 • 5:45 AM



Photo illustration by Slate. Photo by Justin Lane/Pool/Getty Images.

*Sign up for the Slatest to get the most insightful analysis, criticism, and advice out there, delivered to your inbox daily.*

Juan Carlos Lopez-Gomez, despite his U.S. citizenship and Social Security card, was arrested on April 16 on an unfounded suspicion of him being an "unauthorized alien." Immigration and Customs Enforcement kept him in county jail for 30 hours "based on

biometric confirmation of his identity"—an obvious mistake of facial recognition technology. Another U.S. citizen, Jensy Machado, was held at gunpoint and handcuffed by ICE agents. He was another victim of mistaken identity after someone else gave his home address on a deportation order. This is the reality of immigration policing in 2025: Arrest first, verify later.

That risk only grows as ICE shreds due process safeguards, citizens and noncitizens alike face growing threats from mistaken identity, and immigration policing agencies increasingly embrace error-prone technology, especially facial recognition. Last month, it was revealed that Customs and Border Protection requested pitches from tech firms to expand their use of an especially error-prone facial recognition technology—the same kind of technology used wrongly to arrest and jail Lopez-Gomez. ICE already has nearly $9 million in contracts with Clearview AI, a facial recognition company with white nationalist ties that was at one point the private facial recognition system most used by federal agencies. When reckless policing is combined with powerful and inaccurate dragnet tools, the result will inevitably be more stories like Lopez-Gomez's and Machado's.

guring out what the "best restaurant" is, and should locals get discounts? Perfecting the Ba Read More

Studies have shown that facial recognition technology is disproportionately likely to misidentify people of color, especially Black women. And with the recent rapid increase of ICE activity, facial recognition risks more and more people arbitrarily being caught in ICE's dragnet without rights to due process to prove their legal standing. Even for American citizens who have "nothing to hide," simply looking like the wrong person can get you jailed or even deported.

**Related From Slate**



STAFF

She Was Tortured. America Shut Her Out.

READ MORE

While facial recognition's mistakes are dangerous, its potential for abuse when working as intended is even scarier. For example, facial recognition lets Donald Trump use ICE as a more powerful weapon for retribution. The president himself admits he's using immigration enforcement to target people for their political opinions and that he seeks to deport people regardless of citizenship. In the context of a presidential administration that is uncommonly willing to ignore legal procedures and judicial orders, a perfectly accurate facial recognition system could be the most dangerous possibility of all: Federal agents could use facial recognition on photos and footage of protests to identify each of the president's perceived enemies, and they could be arrested and even deported without due process rights.

And the more facial recognition technology expands across our daily lives, the more dangerous it becomes. By working with local law enforcement and private companies, including by sharing facial recognition technology, ICE is growing their ability to round people up—beyond what they already can do. This deputization of surveillance infrastructure comes in many forms: Local police departments integrate facial recognition into their body cameras, landlords use facial recognition instead of a key to admit or deny tenants, and stadiums use facial recognition for security. Even New York public schools used facial recognition on their security camera footage until a recent moratorium. Across the country, other states and municipalities have imposed regulations on facial recognition in general, including Boston, San Francisco, Portland, and Vermont. Bans on the technology in schools specifically have been passed in Florida and await the governor's signature in Colorado. Any facial recognition, no matter its intended use, is at inherent risk of being handed over to ICE for indiscriminate or politically retaliatory deportations.

At state and local levels, however, there is a way to fight back. For example, there is a package of "Ban the Scan" bills in the New York State Legislature and New York City Council to curb the use of facial recognition: by police (S5609/A1045), by landlords (A6363 and Intro. 425), by public accommodations (A6211 and Intro. 217), and to make permanent the ban on its use in schools (S3827/A6720). And while New York, the most surveilled city in the country, has the opportunity to lead the way, legislative protections against the risks of facial recognition must proliferate nationwide to fully protect our communities. The only

way to completely prevent Trump—or any future authoritarian—from allowing this tech to do his and ICE's bidding is to prevent the use of facial recognition in the first place.

Because of the immense power of facial recognition to target political enemies and indiscriminately deport any of us, and because the system's racially biased inaccuracy is already causing wrongful arrests, banning facial recognition is an essential step toward preventing authoritarian overreach. The New York State Legislature can and should pass the Ban the Scan package of facial recognition bills, and the rest of the country should follow suit in protecting communities from this force multiplier for tyranny.

**Get the best of news and politics**

Sign up for Slate's evening newsletter.

Email address:

Send me updates about Slate special offers.

By signing up, you agree to our Privacy Policy and Terms.

Sign Up

## RECOMMENDED FOR YOU



**Why the Supreme Court's Liberal Justices Are Playing So Nice Right Now**



**This App Warns You When ICE Is Nearby. It Might Not Be Enough.**



**My Husband Would Not Have Sex With Me Until We Were Married. Oh Boy, What Have I Done?**



**Help! My Husband's Internet Mistress Is Extorting Him for Cash. Am I Allowed to be Mad at Him?**



**Help! My Wife Made a Scene at a Nice Restaurant. Then I Learned It Was Her Wicked Plan All Along.**



**Traveling This Summer? Here's What You Need to Know About Getting Through American Airports.**



**I Want to Get My Nephew's College Acceptance Revoked. My Husband Is Standing In My Way.**



**She Was One of the Biggest Pop Stars in the World. Now She's America's Favorite Punch Line. What Happened?**



**Apparently John Roberts Is Fine With Disappearing People to El Salvador**



**America's New Favorite Song Is by Its New No. 1 Wife Guy**



**We're Finally Seeing the "Evidence" Against the Migrants Deported by Trump. It's Unbelievable.**

**What's Happening Inside This ICE Facility in Texas Should Shock Your Conscience**





I Refused to Do This One Sex Move to My Girlfriend. Now She's Throwing a Fit.



I Can't Help It: I'm on Trump's Side in the Musk Rift



I've Been Spending a Lot of Time With a Younger Man at Work. What My Husband Doesn't Know Won't Hurt Him.

Slate is published by The Slate Group, a Graham Holdings Company.

All contents © 2025 The Slate Group LLC. All rights reserved.

# EXHIBIT 30



Population Estimates

# Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2018–January 2022

Bryan Baker and Robert Warren

*April 2024*

Office of Homeland Security Statistics
U.S. Department of Homeland Security

This report presents annual estimates of the size and characteristics of the unauthorized immigrant population residing in the United States as of January 1 for the years 2018 through 2020 and for 2022.[1] The population must be estimated because there is no nationally representative survey or census that includes information on the legal status of foreign-born residents. Results are tabulated according to available demographic characteristics, including period of entry, country of origin, state of residence, age, and sex. As in previous editions, the estimates were calculated using the residual method in which the unauthorized population is the remainder (or residual) after the legally-resident, foreign-born population—naturalized citizens, children who derived citizenship from one or more parents, lawful permanent residents (LPRs), asylees, refugees, and certain nonimmigrants—is subtracted from the total foreign-born population.[2] The legally-resident subpopulation was estimated primarily based on the Department of Homeland Security's (DHS) administrative records along with modeled components of population change (such as emigration and mortality), and the total foreign-born population estimate was derived from the U.S. Census Bureau's American Community Survey (ACS) with adjustments for undercount and choice of reference date.

In summary, the Office of Homeland Security Statistics (OHSS) estimates 11.0 million unauthorized immigrants were living in the United States on January 1, 2022, down from 11.6 million in 2010 and up from 10.5 million in January 2020. This increase ends a declining trend from January 2016 to January 2020 or 2021.[3] Forty-four percent of unauthorized immigrants in 2022 were from Mexico, compared to 59 percent in 2010 and 55 percent in 2015. Seventy-nine percent entered prior to January of 2010 and 42 percent resided in California or Texas.

# Definitions

## Legal Residents

The legally-resident, foreign-born population, as defined for these estimates, includes naturalized citizens, children who derived citizenship from one or more parents, persons granted lawful permanent residence, persons granted asylum, persons admitted as refugees, and persons admitted as resident nonimmigrants (i.e., students and temporary workers, as opposed to tourists) who have unexpired authorized periods of admission.

## Unauthorized Immigrants

The resident unauthorized immigrant population is defined as all foreign-born noncitizens who are not legal residents as defined above. Most unauthorized immigrants either entered the United States without inspection or were admitted temporarily and remained past the date they were required to depart. Persons who are beneficiaries of Temporary Protected Status (TPS), Deferred Action for Childhood Arrivals (DACA) or other forms of prosecutorial discretion, or who are residing in the United States while awaiting removal proceedings in immigration court are included among the estimates of the unauthorized population. Unauthorized immigrants applying for adjustment to LPR status under the Immigration and Nationality Act (INA) are considered to be part of the resident unauthorized population until they have been granted lawful permanent residence. Individuals who were paroled into the United States are considered to be unauthorized immigrants until they are admitted or otherwise acquire immigration status.

[1] Estimates as of January 1, 2021 are not available due to limitations in the 2020 edition of the U.S. Census American Community Survey (ACS), as discussed below.

[2] Previous editions of this report are available at: https://www.dhs.gov/ohss/topics/immigration. Although the method in this report is very similar to that used in earlier editions, the current report includes methodological updates that are discussed in the appendix.

[3] The last year of the declining trend is unknown because an estimate for January 2021 is unavailable, as discussed below.

# Methodology Overview and Data

This report estimates two populations to derive the unauthorized immigrant population estimate: 1) the total foreign-born population living in the United States on January 1 of each year in the series, and 2) the legally-resident, foreign-born population on the same dates. The unauthorized immigrant population estimate is the residual when the second population is subtracted from the first population.

Data on the total foreign-born population that entered during 1980–2021 by country of birth, state of residence, year of entry, age, and sex were obtained or derived from the 2017–2019 and 2021 editions of the ACS.[4] The ACS is a nationally representative survey that collects information from U.S. households and other group living arrangements on social, demographic, and economic characteristics, including country of birth and year of entry of the foreign-born population.[5] Foreign-born residents who entered the United States prior to 1980 are assumed to be legally resident and are therefore excluded from the calculations.[6]

Data for several subsets of the legally-resident, foreign-born population are derived from DHS and other administrative records. Administrative records from U.S. Citizenship and Immigration Services (USCIS) include data on persons who obtained LPR status or naturalized, Department of State records include data on refugee arrivals, USCIS and the Department of Justice Executive Office for Immigration Review maintain records of persons granted asylum affirmatively or defensively, and the U.S. Customs and Border Protection (CBP) Arrival and Departure Information System (ADIS) database includes person-level information on nonimmigrant arrivals, departures, and nonimmigrant status.[7] Each of these systems includes information on subjects' country of birth or nationality, state of residence, age, sex, category of admission, and year of entry.

OHSS generates its estimate of the unauthorized population by subtracting the legally-resident, foreign-born population from the total foreign-born population. Demographic data in the ACS and administrative records allow OHSS to generate estimates for the 10 leading countries of birth and states of residence and by age and sex.

See Appendix 1 for more detailed information on each component of the estimation process, including changes from previous editions of this report in the methods and data sources.

4 Data to estimate the population on January 1 of 2018, 2019, 2020, and 2022 were obtained from each of the prior years' ACS surveys. As a result of substantial challenges related to COVID-19, the 2020 ACS was not considered a reliable source for the purpose of this report (see Daily et al., 2021) and estimates as of January 1, 2021 are not available as a result.

5 OHSS uses the ACS to build its estimates because of its large sample size: about three million households per year, compared to about 100,000 annually for the Current Population Survey, which is the primary alternative source of national data on the foreign-born population.

6 The vast majority of otherwise-unauthorized immigrants who entered the United States prior to 1980 and who still reside in the country likely obtained lawful status prior to 2015 under Section 249 of the INA, which allows qualified persons who have resided continuously in the United States since prior to January 1, 1972 to apply for LPR status under the so-called registry provision, or under the Immigration Reform and Control Act (IRCA) of 1986 (Pub. L. No. 99-603, 100 Stat. 3359 (1986)), which allowed qualified persons who have resided continuously in the United States since prior to January 1, 1982 to adjust to lawful status.

7 The use of the ADIS database to estimate the legally resident nonimmigrant population represents a methodological change from previous editions of this report, in which the nonimmigrant population was estimated using trend-based modeling that could not be continued due to Coronavirus-Disease 2019 (COVID-19)-related disruption of nonimmigrant travel trends. See Appendix 1 for further discussion.

# Findings

**Figure 1**

**Unauthorized Immigrant Population Estimates by Year: 2000–2022**




Notes: The estimates for the 2005–2010 series were based on ACS vintages tied to the 2000 decennial census, the estimates for the 2010–2015, 2015–2018, and 2018–2020 series were based on ACS vintages tied to the 2010 decennial census, and the 2022 estimate was based on an ACS vintage tied to the 2020 decennial census. The estimate for 2018 has been updated compared to the previous edition of this report. Estimates for 2001–2004 and 2021 are not available. See Appendix 2 for details and values for each year estimated.
Source: Office of Homeland Security Statistics

Figure 1 summarizes OHSS' estimates of the unauthorized population for 2000, 2005–2020, and 2022. Readers should exercise caution when describing changes in these estimates over time because some year-to-year variation may reflect sampling error in the ACS and/or non-sampling error in the estimation method (see Appendix), and OHSS does not have a methodology to evaluate the statistical significance of these fluctuations. Longer-term trends are also difficult to interpret because of several disjunctures in the data series: estimates for 2000 are directly based on the 2000 Census; estimates for 2005–2010 are based on ACS data tied to the 2000 Census; estimates for 2010–2020 are based on ACS data tied to the 2010 Census; and estimates for 2022 are based on ACS data tied to the 2020 Census. In addition, estimates for 2015–2018 and 2018–2022 incorporate minor updates to improve upon the methodology employed in previous years. For each of the 2010, 2015, and 2018 break points, the figure includes estimates generated under earlier and later data sources/assumptions.

## Period of Entry

The size of the unauthorized immigrant population that arrived since 2010 declined by 280,000 from 2018 to 2020, then grew by 630,000 from 2020 to 2022 (Table 1 and Figure 2). The vast majority of the population (79 percent) entered before 2010, but that percentage is declining (from 83 percent in 2018) as new unauthorized entrants arrive and earlier entrants emigrate, die, or adjust to legally resident status.

**Table 1**

**Unauthorized Immigrant Population Estimates by Period of Entry: 2018–2020 and 2022**

| Period of Entry | 2018* | 2019 | 2020 | 2022 |
|---|---|---|---|---|
| Total | 11,570,000 | 11,110,000 | 10,510,000 | 10,990,000 |
| 1980–1990 | 1,560,000 | 1,520,000 | 1,480,000 | 1,460,000 |
| 1990–1999 | 3,820,000 | 3,540,000 | 3,420,000 | 3,360,000 |
| 2000–2009 | 4,230,000 | 4,180,000 | 3,930,000 | 3,860,000 |
| 2010 or later | 1,960,000 | 1,870,000 | 1,680,000 | 2,310,000 |

* The estimate for 2018 has been updated compared to the previous edition of this report.
Notes: Detail may not sum to totals because of rounding. Estimates for 2021 are not available.
Source: Office of Homeland Security Statistics.

**Figure 2**

**Unauthorized Immigrant Population Estimates by Period of Entry: 2018–2020 and 2022**




* The estimate for 2018 has been updated compared to the previous edition of this report.
Note: Estimates for 2021 are not available.
Source: Office of Homeland Security Statistics.

## Estimates by Country of Birth

The unauthorized immigrant population from Mexico continued the decline observed in the previous edition of this report,[8] from 5.54 million in 2018 to 4.81 million in 2022, a reduction of about 0.73 million or 180,000 people per year (Table 2).[9] Despite this long-term declining trend, Mexico remains by far the largest country of origin for the unauthorized immigrant population.

After Mexico, the next largest unauthorized immigrant populations were from Guatemala, El Salvador, and Honduras. The numbers of unauthorized immigrants from Guatemala (750,000) and Honduras (560,000) increased from 2018 by 21 and 24 percent, respectively, mostly between January 2019 and January 2020, while the number from El Salvador (710,000) remained relatively unchanged from 2018.

Like Mexico, the unauthorized immigrant populations from India and China also declined during the period, both by substantial percentages.[10] The Indian population fell by 54 percent, or 260,000 people, from 480,000 in 2018 to 220,000 in 2022, while the Chinese population declined by 47 percent, or 180,000, from 390,000 to 210,000.

[8] See Baker, 2021.

[9] Throughout this report, percentages and percent change were calculated prior to rounding.

[10] This edition of the report groups Hong Kong and Macau with China, whereas previous editions did not.

The populations from Colombia (240,000) and Brazil (230,000) declined from 2018 to 2019 before increasing from 2019 through 2022 by about 3 to 5 percent per year. The population from Venezuela grew steadily by 17 percent per year, from 190,000 in 2018 to 320,000 in 2022.

**Table 2**

**Unauthorized Immigrant Population Estimates by Top 10 Countries of Birth: 2018–2020 and 2022**

| Country | 2018* | 2019 | 2020 | 2022 |
|---|---|---|---|---|
| Total | 11,570,000 | 11,110,000 | 10,510,000 | 10,990,000 |
| Mexico | 5,540,000 | 5,350,000 | 4,970,000 | 4,810,000 |
| Guatemala | 620,000 | 670,000 | 780,000 | 750,000 |
| El Salvador | 730,000 | 750,000 | 750,000 | 710,000 |
| Honduras | 450,000 | 450,000 | 550,000 | 560,000 |
| Philippines | 370,000 | 360,000 | 340,000 | 350,000 |
| Venezuela | 190,000 | 220,000 | 260,000 | 320,000 |
| Colombia | 210,000 | 190,000 | 190,000 | 240,000 |
| Brazil | 190,000 | 180,000 | 190,000 | 230,000 |
| India | 480,000 | 390,000 | 340,000 | 220,000 |
| China, People's Republic | 390,000 | 330,000 | 270,000 | 210,000 |
| All other countries | 2,400,000 | 2,220,000 | 1,870,000 | 2,600,000 |

* The estimate for 2018 has been updated compared to the previous edition of this report.
Notes: Detail may not sum to totals because of rounding. Estimates for 2021 are not available. The estimates for China include Hong Kong and Macau.
Source: Office of Homeland Security Statistics.

## Estimates by State of Residence

California and Texas remained the leading states of residence of the unauthorized population in 2022, with 2.6 million and 2.1 million people, respectively, together accounting for 42 percent of the total unauthorized population (Table 3). The next leading states were Florida (590,000), New Jersey (490,000), Illinois (420,000), and New York (410,000). The 10 leading states represented 72 percent of the total unauthorized population in 2022. From 2018 to 2022, the unauthorized population fell by nearly 100,000 in Florida and 200,000 in New York and increased by 110,000 in Texas.

**Table 3**

**Unauthorized Immigrant Population Estimates by Top 10 States of Residence: 2018–2020 and 2022**

| State | 2018* | 2019 | 2020 | 2022 |
|---|---|---|---|---|
| Total | 11,570,000 | 11,110,000 | 10,510,000 | 10,990,000 |
| California | 2,640,000 | 2,620,000 | 2,410,000 | 2,600,000 |
| Texas | 1,950,000 | 1,950,000 | 1,900,000 | 2,060,000 |
| Florida | 680,000 | 650,000 | 610,000 | 590,000 |
| New Jersey | 460,000 | 390,000 | 400,000 | 490,000 |
| Illinois | 460,000 | 440,000 | 370,000 | 420,000 |
| New York | 600,000 | 510,000 | 370,000 | 410,000 |
| North Carolina | 360,000 | 340,000 | 360,000 | 360,000 |
| Georgia | 390,000 | 360,000 | 360,000 | 340,000 |
| Washington | 310,000 | 330,000 | 340,000 | 340,000 |
| Arizona | 340,000 | 330,000 | 340,000 | 290,000 |
| Other or Unknown | 3,380,000 | 3,200,000 | 3,040,000 | 3,090,000 |

* The estimate for 2018 has been updated compared to the previous edition of this report.
Notes: Detail may not sum to totals because of rounding. Estimates for 2021 are not available.
Source: Office of Homeland Security Statistics.

## Estimates by Age and Sex

The unauthorized immigrant population aged from 2015 to 2022 (Figures 3 and 4 and Table 4). Although the total unauthorized population size declined by about 450,000 (4 percent, from 11.44 in 2015 million to 10.99 million in 2022) during this period, the number who were ages 18 to 34 declined by 1.8 million (49 percent), and the number ages 45 and older increased by 1.3 million (61 percent). While the overall trend in Figure 4 is supported by available data, some of the steep change from 2020 to 2022 may be related to the recalibration of the ACS series from a basis on the 2010 decennial census to the 2020 decennial census.[11]

**Figure 3**

**Unauthorized Immigrant Population Estimates by Age and Sex: 2022**




Source: Office of Homeland Security Statistics.

**Figure 4**

**Unauthorized Immigrant Population Estimates by Age Group: 2015–2022**




Note: Estimates for 2021 were not available and are shown as the averages for 2020 and 2022.
Source: Office of Homeland Security Statistics.

[11] The timing of the increase in older males from 2020 to 2022 aligns with the recalibration of the ACS, and the size and character of the change are not consistent with the younger group aging in to the older group, the relatively small number of illicit border crossers in that age group, or changes in the populations of resident nonimmigrants or nonimmigrant overstayers; this suggests that the increase may be attributable to "corrections" to the size and/or demographic characteristics such as age in the ACS series rather than an actual increase.

**Table 4**

**Unauthorized Immigrant Population Estimates by Age and Sex: 2018–2020 and 2022**

| Age and Sex | 2018* | 2019 | 2020 | 2022 |
|---|---|---|---|---|
| **Males and Females** | | | | |
| **Total** | 11,570,000 | 11,110,000 | 10,510,000 | 10,990,000 |
| **Under 18** | 1,100,000 | 1,050,000 | 1,010,000 | 1,230,000 |
| **18–24** | 990,000 | 940,000 | 840,000 | 760,000 |
| **25–34** | 2,920,000 | 2,700,000 | 2,420,000 | 2,120,000 |
| **35–44** | 3,630,000 | 3,480,000 | 3,330,000 | 3,380,000 |
| **45–54** | 2,040,000 | 2,100,000 | 2,110,000 | 2,420,000 |
| **55 and over** | 890,000 | 830,000 | 820,000 | 1,080,000 |
| **Male** | | | | |
| **Total** | 6,010,000 | 5,780,000 | 5,510,000 | 5,960,000 |
| **Under 18** | 570,000 | 550,000 | 540,000 | 630,000 |
| **18–24** | 550,000 | 480,000 | 460,000 | 410,000 |
| **25–34** | 1,590,000 | 1,500,000 | 1,290,000 | 1,140,000 |
| **35–44** | 1,890,000 | 1,840,000 | 1,770,000 | 1,850,000 |
| **45–54** | 1,040,000 | 1,060,000 | 1,090,000 | 1,320,000 |
| **55 and over** | 380,000 | 350,000 | 370,000 | 610,000 |
| **Female** | | | | |
| **Total** | 5,560,000 | 5,330,000 | 5,000,000 | 5,030,000 |
| **Under 18** | 530,000 | 500,000 | 470,000 | 600,000 |
| **18–24** | 450,000 | 450,000 | 380,000 | 350,000 |
| **25–34** | 1,330,000 | 1,200,000 | 1,130,000 | 970,000 |
| **35–44** | 1,740,000 | 1,640,000 | 1,560,000 | 1,520,000 |
| **45–54** | 1,000,000 | 1,040,000 | 1,020,000 | 1,110,000 |
| **55 and over** | 510,000 | 480,000 | 450,000 | 470,000 |

* The estimate for 2018 has been updated compared to the previous edition of this report.
Notes: Detail may not sum to totals because of rounding. Estimates for 2021 are not available.
Source: Office of Homeland Security Statistics.

# Alternative Estimates

## Residual Estimates

The Pew Research Center and the Center for Migration Studies (CMS) also estimate the unauthorized immigrant population (see Passel and Krogstad, 2023, and Warren, 2024). The OHSS, Pew, and CMS estimates are generally similar, but key differences in methodological details mean the estimates are not identical. Some of these methodological differences are described below:

- Survey undercount. The residual model estimates the total foreign-born population based on U.S. Census survey data, but the Census is believed to under-count the foreign-born population—and particularly the unauthorized immigrant population—at higher rates than the native-born population. The exact degree of the undercount and how it may differ with time spent in the United States and for different sub-groups is unknown and must be estimated or modeled.

- Emigration modeling. The residual method uses estimates of the lawful permanent resident population which are based on previous immigration inflows, adjusted for mortality and emigration (i.e., lawful immigrants who depart the United States). Mortality rates can be estimated with precision based on standard demographic tables, but similar tables do not exist for emigration rates.

- Methods for estimating the nonimmigrant, refugee, and asylee populations. OHSS estimates nonimmigrants, refugees, and asylees based on previous admissions data, controlling for estimated deaths and observed or measured outflows. Pew and CMS identify these populations based on their expected characteristics in Census data. These methodological differences affect the estimated size of the legally-resident population and therefore have an influence on the estimated size of the unauthorized population.

- Techniques used to control for entry-year heaping in the ACS. Census data on the foreign-born population indicate an unexpectedly large number of immigrants who report entering the United States in 1980 (along with other round-numbered years) relative to surrounding years ("heaping" on 1980). Unauthorized immigrants who entered prior to 1980 are assumed to have legalized through the INA registry provision or the Immigration Reform and Control Act, so how analysts control for this heaping effect has an impact on the resulting population estimate.

- Base populations used in the residual method. The residual method used by OHSS starts with all foreign-born persons who entered in 1980 or later and subtracts off all legally-resident, foreign-born persons. One alternative would be to start with foreign-born noncitizens and subtract off all legally-resident, foreign-born noncitizens, i.e., to exclude naturalized citizens altogether from the calculations. Another alternative would be to start with the population who entered in 1982 or later instead of 1980. OHSS and Pew include naturalized citizens and people who entered in 1980–1981, whereas CMS does not. These different choices of starting populations can lead to different estimates due to recall bias (recollecting the exact year of entry), coverage changes, and/or over-reporting of citizenship in the ACS.

- Estimation date. Estimates for a given year may vary if they reflect different times of the year. For example, some residual estimates that use the ACS may reflect the average population size over the course of the year, whereas OHSS estimates are for January 1 of the given year.

These methodological differences result in some variation around a common "ballpark" estimate. In total, CMS estimated 10.94 million unauthorized immigrants living in the United States in 2022, compared to 10.99 million estimated by OHSS and 10.5 million estimated by Pew for 2021.[12] All three organizations show a generally declining trend from 2016 or earlier until around 2020. For unauthorized immigrants from Mexico, CMS estimated 4.45 million in 2022, compared to 4.81 million estimated by OHSS and 4.1 million estimated by Pew for 2021.

[12] As of the time of this writing, 2022 estimates were not yet available from the Pew Research Center.

## "Inflow-Outflow" Estimates

In 2018, a team of academic researchers published a new estimate of the unauthorized population based on a different methodology (Fazel-Zarandi, Feinstein, and Kaplan 2018). Starting from an assumed 1990 baseline population of 3.5 million unauthorized immigrants, the Fazel-Zarandi et al. study combines separate estimates of population inflows (illegal entries and visa overstayers) and population outflows (deaths, emigration, repatriations, and acquisitions of legal status) to calculate year-over-year population changes. Their analysis aggregates inflow and outflow estimates over 16 years to produce an average estimate for 2016 of 22.1 million unauthorized immigrants.[13]

Preliminary research by OHSS replicates the Fazel-Zarandi et al. methodology and assesses the possibility that the size of the unauthorized population was in the range of 16.2–29.5 million on January 1, 2017, as Fazel-Zarandi et al. conclude, rather than 11.4 million as the DHS residual model estimates. One key finding is that the difference between Fazel-Zarandi et al.'s results and DHS's residual model is entirely driven by high estimated growth in Fazel-Zarandi et al.'s model during the 1990s—yet key data required for inflow-outflow modeling are not available for those years. These data limitations, along with a number of questionable modeling assumptions, give OHSS little confidence in Fazel-Zarandi et al.'s findings about population growth in 1990–2000.

[13] Fazel-Zarandi et al. assume probability distributions around each inflow and outflow component and simulate the model over a range of values; the simulation yields a range of estimated totals as of 2017 with a mean estimate 22.1 million and a 95 percent probability interval of between 16.2 and 29.5 million unauthorized immigrants.

# Appendix 1: Component Estimation Details and Limitations

## Method and Components

The unauthorized immigrant population estimate is the residual when the estimated legally-resident population is subtracted from the estimated total foreign-born population. This appendix describes the methodology and estimated populations for each component of the 2022 estimate; see Table A1 for corresponding values for 2018–2020.

This edition of the report includes an update to the method for estimating the legally-resident nonimmigrant populations that takes advantage of continued maturation of the CBP ADIS data and that was necessitated by disruption in nonimmigrant travel trends during the COVID-19 pandemic. This update is described below.

No unauthorized immigrant population estimate is available for 2021 due to 2020 ACS data collection and validity challenges related to COVID-19. Among other challenges, pandemic precautions disrupted response rates by interrupting the distribution of the mail-in survey and by preventing in-person follow-up interviews. Further, the data that were successfully collected underrepresented people who were less educated, had lower incomes, or lived in multi-family dwellings—populations in which the unauthorized are over-represented. The Census Bureau ultimately decided that the 2020 ACS did not meet quality standards and elected not to release the usual single-year data products. Without this information on the population present in 2020, OHSS could not estimate the unauthorized immigrant population for January 2021.

### 1) Total foreign-born population

#### a. Foreign-born population in 2021, entered 1980–2021 (38.1 million)

The initial estimate of the total foreign-born population that entered in 1980 to 2021 was obtained from the 2021 ACS Public Use Microdata Sample (PUMS), along with data on the distribution of the foreign-born population by country of origin, state of residence, year of entry, age, and sex. A 3-year moving average was applied to PUMS data for year of entry to reduce so-called heaping effects in which ACS survey responses disproportionately focus on round numbers.

Prior editions of this report reduced the overall PUMS estimate for the total foreign-born population to remove the Cuban-born population since all Cubans were assumed to take advantage of the Cuban Adjustment Act. The PUMS estimate was not reduced for Cubans entering in 2017 or later due to the termination in January 2017 of the wet-foot/dry-foot policy.

#### b. Shift in reference date to January 1, 2022 (420,000)

The 2021 ACS estimates of the foreign-born population are "centered on" the middle of 2021 and therefore do not count the full population that arrived in 2021. For example, the 2019 ACS estimated about 50 percent more foreign-born persons who entered the United States in 2018 than the 2018 ACS estimated for the same entry-year cohort. Over the 2017–2019 ACS vintages,[14] this adjustment averaged 0.59. This report assumes the adjustment for 2021 entrants in the 2021 ACS will be similar and multiplies that estimate by 1.59.

[14] Ordinarily we would use the immediately preceding three ACS vintages (2018–2020), but the 2020 vintage was of insufficient quality due to COVID-19-related challenges.

**c. Undercount of nonimmigrants in the ACS (280,000)**

The Census is believed to undercount nonimmigrants at higher rates than the native-born population. This report assumes that the undercount rate for nonimmigrants was 10 percent—the same rate assumed in DHS estimates for 2000 and 2005–2015 (U.S. Department of Homeland Security, 2003).

**d. Undercount of LPRs, refugees, and asylees in the ACS (650,000)**

This report assumes the undercount rate for LPRs, refugees, and asylees in the ACS was 2.5 percent—the same rate assumed in DHS estimates for 2000 and 2005–2018 (U.S. Department of Homeland Security, 2003).

**e. Undercount of unauthorized immigrants in the ACS (390,000)**

This report assumes that the undercount rate for unauthorized immigrants in the ACS is 13 percent for those who arrived in the most recent year and declines by 7.5 percent with each year of presence.[15] This is the same model used for the 2000 and 2015–2018 editions of this report.

**f. Total estimated foreign-born population, January 1, 2022 (39.8 million)**

The sum of 1a. through 1e. (above) is the estimated foreign-born population on January 1, 2022 that entered the United States during the 1980–2021 period.

## 2) Legally-resident, foreign-born population

**g. LPR, refugee, and asylee flow, entered 1980–2021 (36.1 million)**

The 1980–2021 flow was calculated separately for LPRs, refugees, and asylees using DHS administrative data (Miller and Baker, 2023). LPRs consist of two groups: new arrivals and those who have adjusted status. New arrivals include all persons with immigrant visas issued by the Department of State who were admitted at a U.S. port of entry. For new arrival LPRs, the date of entry into the United States is the same as the date of approval for LPR status. For LPRs adjusting status, year of entry was assumed to be the most recent year of entry prior to adjustment.

The refugee and affirmative asylee populations were estimated by matching the previous 5 years of records for refugee arrivals and persons affirmatively granted asylum to records of LPR adjustment that occurred prior to January 1, 2022. The January 1, 2022 refugee and affirmative asylum populations consist of those persons who had not adjusted to LPR status by that date. Individual, detailed records were not readily available for defensive asylees, so that population was estimated by assuming the LPR adjustment rates were the same for defensive asylees as for affirmative asylees from the same country and granted asylum in the same year.

**h. Mortality of legally-resident flow, 1980–2021 (3.5 million)**

Data are not collected on the mortality of the legally-resident, foreign-born population. The LPR population was survived forward in time (from the year in which LPR status was obtained to January 2022) using National Center for Health Statistics mortality rates by age and sex from 1999–2001 (Arias et al., 2008).

**i. Emigration of legally-resident flow, 1980–2021 (6.7 million)**

Emigration is a major component of immigrant population change. In the absence of data that directly measure emigration from the United States, researchers have developed indirect estimates based largely on Census data. For this report, annual emigration rates were calculated from estimates of emigration of the foreign-born population based on 1980 and 1990 Census data (Ahmed and Robinson, 1994). The emigration model is similar to that used for the DHS LPR population estimates report, except that emigration risk was suspended until after naturalization for LPRs who became citizens. Further, refugees and asylees, with little likelihood of returning to their country of origin, were assumed not to emigrate. The model assumes 3.26 percent of new LPRs emigrate in their first year, declining by 5 percent per year of residence, resulting in a total effective emigration rate of 18.5 percent for this edition of the report.

[15] This declining model was used for the 1990–2000 estimates published in 2003.

**j. LPR, refugee, and asylee population, January 1, 2022 (26.0 million)**

Subtracting mortality (2h.) and emigration (2i.) from the LPR, refugee, and asylee flow during 1980–2021 (2g.) results in the total estimated LPR, refugee, and asylee resident population on January 1, 2022.

**k. Nonimmigrant population, January 1, 2022 (2.8 million)**

The number of nonimmigrants living in the United States on January 1, 2022 was calculated by matching administrative records of nonimmigrant arrivals to subsequent records indicating departure in the CBP Arrival Departure Information System (ADIS), and then counting the number of resident-class nonimmigrants present in valid status during the 12-month period centered on January 1, 2022. The method starts with all admission records since October 2014, filtered to those reflecting admissions under nonimmigrant classes associated with residence.[16] Next, for the 15th of each month from July 2021 to June 2022, ADIS checks for matched records indicating departure or expiration of status prior to that date and omits those, leaving 12 monthly counts of resident-class nonimmigrants present in valid status. Lastly, averaging the 12 monthly counts yields an annual average count centered on January 1, 2022.

This method (counting arrival records in ADIS and filtering out any with a matching departure record or for a person whose status expired) is new to the 2018–2022 series. OHSS previously planned to implement the new method for the 2022 estimates and beyond, but not for earlier estimates, because October 2014 is the earliest arrival date available in the ADIS data, and that restriction means substantial numbers of nonimmigrants who entered before October 2014 are excluded from the 2018–2022 estimates as explained below (see Limitations section). The new method was updated earlier than planned because the previous method was reliant on the stability of travel trends over time and was compromised by sudden, extreme changes in travel patterns in response to COVID-19.

**l. Estimated legally-resident, immigrant population, January 1, 2022 (28.8 million)**

Adding the population of LPRs, refugees, and asylees on January 1, 2022 (2j.) to the nonimmigrant population on the same date (2k.) results in the total estimated legally resident immigrant population in the United States on January 1, 2018.

### 3) Unauthorized population

**m. Estimated unauthorized population, January 1, 2018 (11.0 million)**

Subtracting the estimated legally-resident, foreign-born immigrant population (2l.) from the total foreign-born population on January 1, 2022 (1f.) yields the estimate of the unauthorized population.

## Limitations

Annual estimates of the unauthorized population are subject to sampling error in the ACS and considerable non-sampling error because of uncertainty in some of the assumptions required for estimation described above.

*Sampling error in the ACS.* The estimates of the total foreign-born population that moved to the United States in the 1980–2021 period are based on a sample and are thus subject to sampling variability. Actual year-to-year fluctuations in the population size may be larger or smaller than estimated in the ACS, particularly when the foreign-born population is subdivided by state of residence or country of origin. The estimated margin of error for the estimate of the total foreign-born population in the 2021 ACS PUMS at the 90 percent confidence level is plus or minus approximately 165,000.

*Assumptions about undercount of the foreign-born population in the ACS.* The foreign-born—particularly unauthorized immigrants and nonimmigrants—are less likely than native-born Americans to respond to or to be included in responses to government surveys. To control for undercount of these "hard to count" populations, analysts must make assumptions about the extent of the undercount and then adjust the ACS survey estimates accordingly. The estimates are sensitive to these undercount adjustments.

[16] See Baker, 2021, for a list of nonimmigrant classes associated with residence.

*Assumptions about rates of emigration*. The preexisting legally-resident, foreign-born population declines over time through mortality and emigration. Mortality rates can be estimated from standard demographic tables, but current, nationally representative data necessary to construct similar tables for emigration rates do not exist. The estimates are sensitive to emigration modeling assumptions.

*Accuracy of year of entry reporting*. Census data suggest that respondents provide unreliable answers to the Census year-of-entry question ("When did this person come to live in the United States?"), with disproportionate numbers of responses "heaping" on round numbers. Errors also occur in converting DHS administrative dates for LPRs into year of entry dates.

*Assumptions about the nonimmigrant population estimate*. ADIS was designed for operational (not statistical reporting) purposes, and there are some important challenges and limitations when using it for population estimates. First, the accuracy of the counts is dependent on the completeness of the data feeds and the reliability of the matching algorithm. Departures by land into Mexico are generally not recorded, so some people who departed may continue to be counted as present until their status expires or until another record is generated that indicates absence from the country (e.g., the person attends a visa interview abroad or applies for admission at a port of entry). Next, people who change to another nonimmigrant class or adjust to LPR status while within the United States continue to be counted under their prior nonimmigrant class until they leave and are subsequently readmitted. Both of these challenges result in overcounts of nonimmigrants. On the other hand, all trips that started prior to October 1, 2014 are excluded, which results in undercounts that are large in the first few months or years, but converge to zero over time.[17] Further, the classes "associated with residency" do not conform perfectly to the definition of residence in the ACS.[18] For example, a tourist might stay in the United States visiting family for several months and be considered a "resident" in the ACS, but not in the DHS estimates. Conversely, student and worker classes are generally associated with residency, but some individuals admitted under those classes may be present too briefly to meet the ACS residency definition. No statistical or demographic adjustments were made to account for these limitations, but might be made in the future as the data system and methodology continue to mature.

*Accuracy of state of residence for the non-naturalized legally-resident, foreign-born population*. The state of residence for the non-naturalized, legally-resident, 1980–2022 entrants is assumed to be the state of residence on the date the most recent status (e.g., refugee, LPR) was obtained; however, the accuracy of the estimates may be affected by state-to-state migration that occurred between the date of the status change and January 1, 2022.

*Comparisons across years*. Although DHS has been producing annual estimates since 2005, comparisons across multiple years are problematic. In addition to sampling error and the uncertainty surrounding the estimates described above, the series of DHS estimates is not fully consistent. Estimates of the foreign-born population from the 2011–2019 ACS vintages were based on the 2010 Census (adjusted for births, deaths, and migration), whereas estimates from earlier ACS vintages were based on the 2000 Census, and estimates from the 2021 ACS were based on the 2020 Census. DHS also made minor methodological updates to take fuller advantage of available data beginning with the 2015–2018 estimates and changed the data source and methodology for estimating the resident nonimmigrant component starting with the revised estimate for 2018. Comparisons across multiple years should be interpreted with caution.

---

[17] For example, nonimmigrants who are admitted under the H1-B class and subsequently apply for an extension of stay may not be required to depart for 6 years or longer, so people admitted in FY 2014 or earlier on H1-B visas who didn't depart and arrive again by January 2018 were excluded from the 2018 estimates.

[18] In the ACS, an individual is considered to be a "resident" if the person was "living or staying [at the given address] for more than 2 months" or if they do not have another place to stay, even if they were staying at that address for less than 2 months.

**Table A1-1**

**Component Estimates (in thousands) of the Unauthorized Immigrant Population: 2018–2020 and 2022**

| Age and Sex | 2018* | 2019 | 2020 | 2022 |
|---|---|---|---|---|
| **1) Foreign-born population** | | | | |
| a. Foreign-born population, entered 1980–2021 | 36,480,000 | 36,900,000 | 37,090,000 | 38,080,000 |
| b. Adjustment for shift in reference date from July 1, 2017 to January 1, 2022 | 690,000 | 590,000 | 550,000 | 420,000 |
| c. Undercount of nonimmigrants in ACS | 260,000 | 280,000 | 280,000 | 280,000 |
| d. Undercount of other legally resident immigrants (LPRs, recent refugee/asylee arrivals) in ACS | 610,000 | 620,000 | 640,000 | 650,000 |
| e. Undercount of unauthorized immigrant population in ACS | 520,000 | 470,000 | 410,000 | 390,000 |
| f. Estimated foreign-born population, January 1, 2022 | 38,560,000 | 38,860,000 | 38,970,000 | 39,820,000 |
| **2) Legally resident population** | | | | |
| g. LPR, refugee, and asylee flow January 1, 1980–December 31, 2021 | 32,650,000 | 33,700,000 | 34,800,000 | 36,140,000 |
| h. Mortality 1980–2021 | 2,570,000 | 2,780,000 | 3,000,000 | 3,450,000 |
| i. Emigration 1980–2021 | 5,690,000 | 5,950,000 | 6,180,000 | 6,680,000 |
| j. LPR, refugee, and asylee resident population, January 1, 2022 | 24,390,000 | 24,970,000 | 25,630,000 | 26,010,000 |
| k. Nonimmigrant population on January 1, 2022 | 2,590,000 | 2,790,000 | 2,830,000 | 2,830,000 |
| l. Estimated legally resident population, January 1, 2022 | 26,980,000 | 27,760,000 | 28,460,000 | 28,840,000 |
| **3) Unauthorized immigrant population** | | | | |
| m. Estimated resident unauthorized immigrant population, January 1, 2022 | 11,570,000 | 11,110,000 | 10,510,000 | 10,990,000 |

* The estimate for 2018 has been updated compared to the previous edition of this report.
Notes: Detail may not sum to totals because of rounding. Estimates for 2021 are not available.
Source: Office of Homeland Security Statistics.

# Appendix 2: Updated Historical Estimates for January 2000 Through January 2022

**Table A2-1**

**Estimates of the Unauthorized population (in thousands) by Country of Birth and State of Residence: 2000, 2005–2020, and 2022**

| Country | 2000 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2010* | 2011 | 2012 | 2013 | 2014 | 2015 | 2015** | 2016 | 2017 | 2018 | 2018** | 2019 | 2020 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | 8,460 | 10,490 | 11,310 | 11,780 | 11,600 | 10,750 | 10,790 | 11,590 | 11,510 | 11,430 | 11,210 | 11,460 | 11,960 | 11,440 | 11,750 | 11,410 | 11,390 | 11,570 | 11,110 | 10,510 | 10,990 |
| Mexico | 4,680 | 5,970 | 6,570 | 6,980 | 7,030 | 6,650 | 6,640 | 6,830 | 6,800 | 6,720 | 6,450 | 6,450 | 6,580 | 6,200 | 5,970 | 5,860 | 5,420 | 5,540 | 5,350 | 4,970 | 4,810 |
| Guatemala | 290 | 370 | 430 | 500 | 430 | 480 | 520 | 520 | 520 | 560 | 590 | 620 | 620 | 600 | 610 | 610 | 620 | 620 | 670 | 780 | 750 |
| El Salvador | 430 | 470 | 510 | 540 | 570 | 530 | 620 | 670 | 660 | 690 | 690 | 670 | 750 | 720 | 750 | 750 | 730 | 730 | 750 | 750 | 710 |
| Honduras | 160 | 180 | 280 | 280 | 300 | 320 | 330 | 380 | 380 | 360 | 390 | 390 | 440 | 420 | 430 | 500 | 450 | 450 | 450 | 550 | 560 |
| Philippines | 200 | 210 | 280 | 290 | 300 | 270 | 280 | 290 | 270 | 310 | 340 | 330 | 370 | 350 | 410 | 300 | 370 | 370 | 360 | 340 | 350 |
| Venezuela | *** | *** | *** | 60 | 50 | 50 | 30 | 50 | 50 | 60 | 50 | 40 | 80 | 80 | 100 | 120 | 190 | 190 | 220 | 260 | 320 |
| Colombia | 100 | 110 | 140 | 130 | 130 | 100 | 110 | 120 | 130 | 130 | 160 | 130 | 140 | 130 | 140 | 130 | 210 | 210 | 190 | 190 | 240 |
| Brazil | 100 | 170 | 210 | 190 | 180 | 150 | 180 | 150 | 150 | 130 | 110 | 110 | 100 | 100 | 110 | 150 | 200 | 190 | 180 | 190 | 230 |
| India | 120 | 280 | 210 | 220 | 160 | 200 | 200 | 270 | 240 | 260 | 320 | 390 | 470 | 450 | 560 | 490 | 540 | 480 | 390 | 340 | 220 |
| China | 190 | 230 | 170 | 290 | 220 | 120 | 130 | 300 | 280 | 210 | 190 | 230 | 320 | 320 | 420 | 410 | 410 | 390 | 330 | 270 | 210 |
| All others | 2,180 | 2,500 | 2,510 | 2,290 | 2,240 | 1,880 | 1,750 | 2,020 | 2,030 | 2,010 | 1,920 | 2,090 | 2,110 | 2,080 | 2,260 | 2,090 | 2,260 | 2,400 | 2,220 | 1,870 | 2,600 |

| State | 2000 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2010* | 2011 | 2012 | 2013 | 2014 | 2015 | 2015** | 2016 | 2017 | 2018 | 2018** | 2019 | 2020 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | 8,460 | 10,500 | 11,310 | 11,780 | 11,600 | 10,750 | 10,790 | 11,590 | 11,510 | 11,430 | 11,210 | 11,460 | 11,960 | 11,440 | 11,750 | 11,410 | 11,390 | 11,570 | 11,110 | 10,510 | 10,990 |
| California | 2,510 | 2,770 | 2,790 | 2,840 | 2,850 | 2,600 | 2,570 | 2,910 | 2,830 | 2,820 | 2,780 | 2,730 | 2,880 | 2,760 | 2,860 | 2,790 | 2,610 | 2,640 | 2,620 | 2,410 | 2,600 |
| Texas | 1,090 | 1,360 | 1,620 | 1,710 | 1,680 | 1,680 | 1,770 | 1,780 | 1,790 | 1,830 | 1,750 | 1,850 | 1,940 | 1,860 | 1,910 | 1,870 | 1,940 | 1,950 | 1,950 | 1,900 | 2,060 |
| Florida | 800 | 850 | 960 | 960 | 840 | 720 | 760 | 730 | 740 | 730 | 740 | 710 | 810 | 540 | 610 | 610 | 660 | 680 | 650 | 610 | 590 |
| New Jersey | 350 | 380 | 420 | 470 | 400 | 360 | 370 | 440 | 420 | 430 | 410 | 450 | 440 | 420 | 420 | 450 | 460 | 460 | 390 | 400 | 490 |
| Illinois | 440 | 520 | 530 | 560 | 550 | 540 | 490 | 550 | 550 | 540 | 520 | 530 | 450 | 440 | 520 | 440 | 450 | 460 | 440 | 370 | 420 |
| New York | 540 | 560 | 510 | 640 | 640 | 550 | 460 | 690 | 630 | 580 | 610 | 570 | 590 | 630 | 630 | 620 | 520 | 600 | 510 | 370 | 410 |
| North Carolina | 260 | 360 | 360 | 380 | 380 | 370 | 390 | 390 | 400 | 360 | 400 | 390 | 390 | 370 | 360 | 320 | 350 | 360 | 340 | 360 | 360 |
| Georgia | 220 | 470 | 490 | 490 | 460 | 480 | 460 | 430 | 440 | 400 | 390 | 410 | 390 | 370 | 400 | 400 | 380 | 390 | 360 | 360 | 340 |
| Washington | 170 | *** | 280 | 260 | 260 | 230 | 200 | 260 | 260 | 270 | 240 | 280 | 270 | 260 | 280 | 280 | 290 | 310 | 330 | 340 | 340 |
| Arizona | 330 | 480 | 490 | 530 | 560 | 460 | 470 | 350 | 360 | 350 | 350 | 350 | 380 | 360 | 330 | 340 | 330 | 340 | 330 | 340 | 290 |
| All others | 1,750 | 2,750 | 2,860 | 2,940 | 2,980 | 2,760 | 2,840 | 3,040 | 3,100 | 3,110 | 3,010 | 3,190 | 3,430 | 3,420 | 3,430 | 3,300 | 3,390 | 3,380 | 3,200 | 3,040 | 3,090 |

*Revised to be consistent with estimates derived from the 2010 Census (U.S. Census Bureau, 2011).

**Revised to show the impact of the updated methodology.

***Estimates are not available.

Notes: Detail may not sum to totals because of rounding. Estimates shown for Colombia 2000–2013, Brazil 2010–2015, and Venezuela 2007–2015 are approximations based on historical estimation and project notes. The revised 2018 estimate and the 2019–2020 and 2022 estimates for China include Hong Kong and Macau, whereas the earlier estimates did not. Estimates for 2021 are not available.

Source: Office of Homeland Security Statistics.

# References

Ahmed, Bashir and J. Gregory Robinson, 1994. "Estimates of Emigration of the Foreign-Born Population: 1980–1990," Technical Working Paper No. 9, U.S. Bureau of the Census.

Arias, Elizabeth and Lester R. Curtin, Rong Wei and Robert N. Anderson, 2008. "U.S. Decennial Life Tables for 1999–2001, United States Life Tables," *National Vital Statistics Report* 57 (1), National Center for Health Statistics, Centers for Disease Control.

Baker, Bryan, 2021. "Population Estimates of Nonimmigrants Residing in the United States: Fiscal Years 2017–2019," Office of Immigration Statistics, Policy Directorate, U.S. Department of Homeland Security.

Baker, Bryan, 2021. "Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2015–January 2018," Office of Immigration Statistics, Policy Directorate, U.S. Department of Homeland Security.

Daily, Donna, Patrick J. Cantwell, Karen Battle, and David G. Waddington, 2021. "ACS RESEARCH AND EVALUATION REPORT MEMORANDUM SERIES # ACS21-RER-04," U.S. Census Bureau.

Fazel-Zarandi, Mohammad M., Jonathan S. Feinstein, and Edward H. Kaplan, 2018. "The number of undocumented immigrants in the United States: Estimates based on demographic modeling with data from 1990 to 2016," PLOS One, https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0201193.

Miller, Sarah, and Bryan Baker, 2023. "Estimates of the Lawful Permanent Resident Population in the United States and the Subpopulation Eligible to Naturalize: 2023," Office of Homeland Security Statistics, U.S. Department of Homeland Security.

Passel, Jeffrey S. and Jens Manuel Krogstad, 2023. "What we know about unauthorized immigrants living in the U.S.," Pew Research Center, https://www.pewresearch.org/short-reads/2023/11/16/what-we-know-about-unauthorized-immigrants-living-in-the-us/.

U.S. Census Bureau, 2011. "Change in Population Controls," American Community Survey Research Note.

U.S. Department of Homeland Security, 2003. "Estimates of the Unauthorized Immigrant Population Residing in the United States: 1990 to 2000," http://www.dhs.gov/xlibrary/assets/statistics/publications/Ill_Report_1211.pdf.

Warren, Robert, 2024. "After a Decade of Decline, the US Undocumented Population Increased by 650,000 in 2022," Journal on Migration and Human Security, Center for Migration Studies, https://journals.sagepub.com/doi/10.1177/23315024241226624/.

U.S. Department of Homeland Security
*Office of Homeland Security Statistics*

# EXHIBIT 31

CGRS | Center for Gender & Refugee Studies

# "Manifesting" Fear At the Border: Lessons from Title 42 Expulsions

*January 30, 2024*

## Title 42 Expulsion Policy and Legal Challenge

In March 2020, under the pretext of the COVID-19 pandemic, the Trump administration began expelling people seeking asylum at the U.S. southern border pursuant to a policy known as Title 42. The U.S. government carried out the expulsions without screening individuals for fear of persecution or torture, in violation of its obligations under international and domestic law. Before the policy ended in May 2023, over two million expulsions were completed, putting many refugees directly in harm's way.

Advocates brought litigation successfully challenging the policy. But the Biden administration was permitted to continue effectuating expulsions with no screening whatsoever while the litigation wound its way through the appellate process. However, in March 2022, the U.S. Court of Appeals for the D.C. Circuit upheld a lower court ruling prohibiting the government from expelling families to places where they risked harm. Although the court concluded the administration had the authority to expel, it had to do so in compliance with the U.S. obligation of *non-refoulement*, which prohibits the return of refugees to countries where they face persecution or torture.

## Implementation of the Manifestation of Fear Guidance

While Title 42 was in place, the U.S. government could have required that border officers ask individuals apprehended near the border whether they had a fear of persecution or torture in Mexico or any other country of expulsion. If so, they would have been required to refer the individuals for a more complete interview with a trained Asylum Officer. This has in fact been the mandatory process at the border since 1996. Instead, the government adopted a "manifestation of fear" process. Also known as the "shout test," it requires an individual to affirmatively raise their fear of return to receive any sort of screening for protection. The "shout test" was first designed by the United States to repel Haitians intercepted at sea in the 1980s and has operated as intended ever since, to keep refugees out and deny them safe haven.

To comply with the March 2022 order in the Title 42 litigation, U.S. Customs and Border Protection (CBP) issued guidance in May 2022 on the processing of individuals "manifesting a fear" of expulsion. Pursuant to that guidance, as with the "shout test" applied to migrants at sea, border officers were to "consider all available information within the scope of their operations." A manifestation of fear could be either "verbal," such as statements of fear or recounting of previous harms, or "non-verbal," such as "panic attacks" or "an unusual level of silence."

**Subjecting Refugees to the "Shout Test" Flouts U.S. Obligations**

Following issuance of the guidance, the Center for Gender & Refugee Studies (CGRS) and other immigrant rights organizations based at the border monitored implementation of the injunction. From June-October 2022, advocates interviewed at least 97 families expelled to cities along the U.S.-Mexico border, including Ciudad Juárez, Reynosa, and Tijuana, Mexico. Of those interviewed, over half (51 families) reported that they had verbally expressed a fear of return, and nearly three-quarters (73 families) reported having non-verbally expressed a fear. Yet CBP did not refer a single family for a fear screening as required under the guidance. Instead, families disclosed that CBP officers verbally abused them, telling them to "shut up," declaring they had "no right" to an interview, or completely ignoring their attempts to communicate.

The cases below illustrate CBP's failure to follow its own guidance and the inadequacy of a "manifestation of fear" requirement to protect against *refoulement*. Each family feared return, but none received a screening to determine the viability of their protection claims.

- A Salvadoran mother with her seven-year-old child feared return because her brother-in-law, a gang member, had attempted to kill her. When she tried to express her fear, CBP did not allow her to speak before expelling her on June 8, 2022.
- A Honduran mother traveling with her 10-year-old child feared return because she had witnessed gang members killing her neighbor and received threats as a result. She was too afraid to speak because of how CBP officers treated her and other asylum seekers. She was expelled on June 11, 2022.
- A Salvadoran mother fled her home with her seven-year-old daughter after her husband threatened to kill her. As he had followed her when she escaped, she feared he would find her in Mexico. CBP did not allow her to speak before expelling her on June 11, 2022.
- A Honduran father fled with his nine-year-old child after his brother was killed, fearing the same fate. CBP officers did not allow him to speak before expelling him on June 11, 2022.
- A Honduran mother and her four-year-old child were kidnapped and held for 22 days in Mexico, before finally escaping and attempting to seek asylum in the United States. CBP did not permit her to speak before expelling her back to Mexico on August 9, 2022.
- An Indigenous Guatemalan woman traveling with her three-year-old child could not explain her fear. She did not speak Spanish well, and CBP did not provide an interpreter or permit her to speak. She was expelled on September 20, 2022.

These harrowing stories represent just the tip of the iceberg. Experience shows that relying on a "shout test" results in refugees being returned to danger. Any legislative proposal to revive this approach will make a mockery of our international commitments and must be rejected.

# EXHIBIT 32

Human Rights First

HOPE

IMMIGRANT DEFENDERS Law Center

Kino Border Initiative
Iniciativa Kino para la Frontera

RAICES

Refugees International

# "DON'T TELL ME ABOUT YOUR FEAR"

## Elimination of Longstanding Safeguard Leads to Systematic Violations of Refugee Law

August 2024

## Overview

As part of a June 2024 asylum ban rule, the Biden administration eliminated a safeguard that had been in place for nearly 30 years to protect people seeking asylum from being summarily deported without a chance to present their asylum claim. This provision, included in an Interim Final Rule (IFR) titled "Securing the Border" that went into effect immediately on June 5th, eradicates a key requirement for immigration officers to ask people arriving in the United States about their fear of return.

In just two months, this change has had disastrous consequences. Based on countless interviews conducted by our legal service organizations with asylum seekers impacted by this policy since it was implemented in June, immigration officials are failing to comply with U.S. and international refugee law and summarily deporting people who fear return without a screening on their asylum claim (referred to as a "credible fear interview," or CFI). The effects of the new policy include:

- **Immigration officers are removing people from the United States without a CFI** even when they are required by law to be referred for a CFI because they express fear of return, including survivors of gender-based violence, people whose family members were assassinated, LGBTQI+ people, individuals with visible marks and bruises from attacks, and people fleeing death threats and other harms with young children.

- **Many people who are detained and processed under expedited removal are not given an opportunity to express their fear of return** and are summarily deported without a CFI, with immigration officers routinely telling them they are not allowed to speak, that there is no more asylum, and that they are being deported.

- **Elimination of the safeguard is fueling family separation,** where family members are arbitrarily removed from the United States without a CFI while their loved ones are referred for a CFI, including where their asylum cases could have been processed together.

The IFR includes other provisions that also increase the risk of returning (refouling) refugees to harm, including banning the majority of people who arrive between ports of entry at the U.S.-Mexico border from being granted asylum and imposing a higher standard of proof during the CFI process to make it more difficult to access lesser forms of protection (withholding of removal and protection under the Convention against Torture).

A joint report issued in July 2024 documents the consequences of the first six weeks of implementation of the IFR.

U.S. agencies should immediately rescind the IFR, including its elimination of the requirement to ask about fear, and Congress should reject any attempts to enact such a provision into law.

## Background

U.S. law requires immigration officers to ensure that any person arriving in the United States who is subject to deportation under the “expedited removal” process and expresses fear of return or an intent to apply for asylum is interviewed by an asylum officer about their asylum claim in a CFI. Congress incorporated this requirement when it enacted the expedited removal process in 1996 to ensure that there would be “no danger that [a non-citizen] with a genuine asylum claim will be returned to persecution.” Shortly after expedited removal was implemented, the Immigration and Naturalization Service—the agency that handled immigration matters at the time including expedited removal—issued a regulation requiring immigration officers to ask people who are processed under expedited removal whether they fear return, among other questions, in order to ascertain whether they should be referred for a credible fear interview (CFI). The agency designed these requirements due to concerns that asylum seekers may be reluctant to express a fear of return to an officer immediately upon arrival or may be unaware that they need to do so.

This requirement remained in effect for nearly three decades until the Biden administration’s IFR eradicated it and replaced it with a nontransparent practice whereby Customs and Border Protection (CBP) officers need only refer people for a fear screening if CBP perceives them to “manifest” a fear of return or otherwise express an intention to apply for asylum, fear of persecution or torture, or fear of return. This practice has been facetiously referred to as the “Shout Test,” referencing the fact that people seeking protection must now spontaneously shout out their fear upon arrival to be referred for CFIs. A filing submitted by Human Rights First, Hope Border Institute, Immigrant Defenders Law Center, Kino Border Initiative, and Refugees International in litigation challenging the IFR details the history of the crucial requirement to ask about fear and consequences of the newly imposed Shout Test.

## Under the IFR, immigration officials are ignoring and summarily deporting people expressing fear

Immigration officials are required by U.S. law to refer for a credible fear interview any person who expresses fear of return or intent to apply for asylum. Regulations in effect for nearly thirty years previously required officials to ask everyone processed for expedited removal about their fear of return, among other questions included on the I-867AB form, to identify who must be referred for a credible fear interview. Immigration officials would complete the I-867AB form during the expedited removal process and use it to record responses. The regulations required that officials provide oral interpretation into the person’s language where needed when completing the form.

The IFR’s elimination of the requirement to ask about fear and document responses on the I-867AB form is causing failures to refer for CFIs and the summary deportation of people who *do* explicitly express fear of return or an intent to apply for asylum. It has led to a disturbing lack of accountability for compliance with U.S. law.

- Since the implementation of the IFR, our groups have interviewed asylum seekers who have expressly **requested asylum, relayed their past persecution, explained their asylum claims, showed agents their injuries, had anxiety attacks, and visibly sobbed and begged to be heard**. However, they were summarily deported after facing an intimidating and hostile environment in CBP custody, being ignored by officers, or told that they would be deported anyway.

- In June, **more than 75% of hundreds of people** arriving at Kino Border Initiative (KBI)[1] in Nogales, Mexico after being removed from the United States reported to KBI staff that they were either ignored or not allowed to ask for asylum.

People seeking protection who spoke with our groups expressly told CBP officers that they fear return or intend to seek asylum but were unlawfully deported without a CFI, including[2]:

- A seven-month-pregnant Mexican woman escaping harm and death threats by her partner;

- a Mexican survivor of gender-based violence who was so violently harmed that she suffered a miscarriage;

- a Mexican woman with young children who showed an officer severe bruises from an attack suffered in Mexico;

- a Mexican man fleeing with his family who showed officers marks on his body from when he had been kidnapped and tortured; and

- a Mexican woman fleeing with her son after her husband was assassinated and her son received death threats;

Even in some cases where attorneys have intervened and communicated with U.S. immigration officials about their clients' fear of return, officials have still deported their clients without a CFI.

The failure to refer people for CFIs in accordance with U.S. law, even where an attorney creates a written record of the statutory obligation, demonstrates the lack of accountability and scale of refugee law violations occurring as a result of the IFR. For instance:

[1] Kino Border Initiative is a binational Catholic organization that provides direct humanitarian assistance and holistic accompaniment to people removed or returned to Nogales, Sonora or who are in transit to the United States.

[2] The high proportion of Mexican nationals in these examples is due to the fact that asylum seekers of other nationalities, upon summary removal by the United States at the U.S.-Mexico border, are frequently turned over to Mexican immigration authorities who transport them away from the border areas where interviews and research was conducted by our groups. Return of Mexican nationals to Mexico without a proper protection screening leads to direct, unlawful refoulement.

- Immigration officials **disregarded emails from immigration attorneys** with Texas Rio Grande Public Defender stating that their clients intended to seek refugee protection and summarily removed their clients to their countries of feared persecution without CFIs.

- Four people seeking protection from Guatemala, Honduras, and Mexico represented by attorney David Square were **summarily deported even though Square submitted written requests to CBP for a CFI in all four cases**. Square also heard three of the clients call over a CBP officer and express fear of return while on legal calls with them.

The IFR is creating an **arbitrary and non-transparent system where the fate of people seeking protection is decided at random**, often depending on the CBP officer, whether the person has an opportunity to speak, and whether they continue to express their fear after being told not to speak, that they cannot apply for asylum, or that they are being deported. In some instances, people who persisted in repeatedly expressing their fear were referred to a CFI whereas those who did not or could not do so were summarily deported.

- A Nicaraguan asylum seeker fleeing political persecution was only given a CFI after insisting on needing asylum, **whereas other people detained with him were summarily removed despite also expressing that they were seeking asylum**. Initially, CBP officers told the group that they could not apply for asylum, but then only referred for CFIs the men who continued to insist on needing asylum and removed the rest.

- A Black gay man from Peru fleeing sexual and physical violence, including physical assaults by police officers, **was ordered removed without referral for a CFI despite expressing an intent to seek asylum to CBP officers and was only referred for a CFI after he had been transferred to ICE custody for removal and continued to insist that he was afraid of return**. He reported to the Texas Rio Grande Public Defender that he was not asked any questions by CBP officers, was unable to give CBP a letter indicating that he intended to seek asylum because his belongings had been confiscated, was told "no" when he asked whether he could have an interview, was frequently told not to speak by officers, and was jailed in a cell for days after initial processing without any opportunity to speak with officers. Seven days after he was transferred to ICE detention with a deportation order, he was able to speak with an ICE officer and insist that he was afraid and wanted an asylum interview. He was finally referred for a CFI and received a positive credible fear determination.

- A Colombian LGBTQI+ woman and other women seeking protection were told that they would be deported despite expressing fear, forcing the women to beg and cry to be referred for CFIs. **When the women told the officer that they "feared death," "were afraid," and "were seeking refuge," the officer told them they would be deported because they did not use the word "asylum," due to the new policy.** The women reported to a legal service provider that when they began to cry and beg, the officer told them to **"stop crying and speak like normal, decent people."** He also stated that he **did not want "to see more immigrants taking American jobs"**

**and that "everyone says the same story."** The women persisted in pleading for CFIs and were eventually referred.

The IFR has led to widespread mistreatment of asylum seekers by CBP officers who blatantly and repeatedly disregard obligations under U.S. law after elimination of the requirement to affirmatively ask about fear. According to interviews conducted by our groups since the IFR went into effect, immigration officers have responded to peoples' expressions of fear of return with the following statements before summarily removing them:



## Due to the IFR, many people seeking protection are denied opportunity to claim fear before deportation

The deficient "manifestation" of fear approach imposed by the IFR is depriving many people seeking protection of an opportunity to express their fear. Under the prior regulations, the requirement for CBP officers to complete the I-867AB form with each person processed under expedited removal was intended to provide a setting where people could express fear and be referred to a CFI. Since the agencies eliminated this requirement, many people have reported to our groups that they were not asked about fear of return and did not even have an opportunity to speak to officers in CBP custody, let alone feel safe expressing their fear. Barriers to expressing fear in the wake of the IFR include:

**Prohibition against speaking, intimidation, threats in CBP custody**

- **"They didn't let us talk"** was a sentiment commonly expressed by people seeking protection who were removed without a CFI in the past two months since the IFR went into effect and spoke with Kino Border Initiative. People have also reported to our groups that they were unable to express their fear because officers forbade them from speaking, reprimanded them, intimidated them, threatened them with prolonged detention, or told them there was no asylum anymore.

- A woman fleeing with her three-year-old son **was unable to express her fear of return because she was not allowed to speak** and was instructed by a Border Patrol agent to sign a deportation order to "continue the process." She and her child were summarily removed without a CFI. She reported to Human Rights First that when they sought protection a second time, an agent told her there was no asylum and no more hearings and removed her again.

- A Mexican woman was removed with her two young children after being detained in CBP custody for four days and prohibited from speaking to officers. She and others grew desperate and **began to cry, pleading that the officers let them speak. "After everything we went through in Guerrero, for them to not even let us speak of the fear we carry with us,"** she told Human Rights First. Instead, she was reprimanded and told she had broken the law, that "asylum has closed," and that her children would be taken from her if she ever returned.

**Environment in CBP custody impedes people from expressing fear under IFR**

- In the wake of the IFR, people have reported to Human Rights First that they cannot speak confidentially with CBP officers because they are called to sign their deportation orders, at times together or in groups, and jailed in holding cells without any chance to speak privately with an officer.

- Lack of a confidential space to express fear particularly endangers **survivors of rape, torture, and other trauma, LGBTQI+ people, political dissidents** and other at-risk refugees who are now expected to shout out or otherwise volunteer

personal, traumatic information about their fear of return to uniformed officers in immigration jail, potentially in front of many people including others from their home country. For instance, LGBTQI+ refugees may be afraid or hesitant to express fear of harm relating to their sexual orientation, gender identity, or other persecution in a non-confidential setting and as a result will not be properly identified and referred for fear screenings.

- People with disabilities, including individuals with speech impediments, cognitive disabilities, and mental health issues—including PTSD resulting from trauma and persecution—may be unable to express fear in CBP custody before deportation, and our groups are not aware of any agency guidance to ensure that they will have a meaningful opportunity to express fear. Additionally, some people may not spontaneously shout out or otherwise express their fear due to cultural norms and will be summarily deported to their countries of feared persecution.

**Lack of interpretation under the new rule's elimination of safeguards**

- Since the IFR was issued, CBP officers are no longer required to ask fear questions with interpretation. People attempting to tell officers that they fear return or intend to seek asylum have been told **"I don't speak good Spanish" and "I don't speak Spanish; I don't know what you are saying."** They were then summarily deported without a CFI.

- The hurdles will be even greater for people who speak other languages, including **people fleeing China, Russia, Syria, Sudan, the Democratic Republic of Congo, as well as Indigenous language speakers**, who may not have any opportunity to convey fear in their language before they are summarily deported.

**Lack of information and false claims by CBP in the wake of the rule**

- As a result of the IFR, many asylum seekers will not know how or when to express their fear and will be summarily removed merely because they do not know that they were required to shout or otherwise "manifest" their fear immediately upon arrival. **A Colombian man fleeing political persecution was processed for deportation without a CFI because he did not know that he needed to spontaneously express fear of return.** His deportation was narrowly averted due to the intervention of an attorney at the Immigrant Defenders Law Center.

- In the past two months, people detained and processed under expedited removal have been told that **"there is no asylum," "what you say doesn't matter," "everyone here is wasting their time," "don't tell me about your fear," "the law has changed," "they are not going to give you asylum," "we are no longer giving asylum to anyone," "there is no political asylum these days, just deportation," "there is no asylum since the President signed [an order] on the 4th at 9 PM," and "by orders of President Biden, we are no longer giving asylum to anyone."** This false information and hostile, intimidating environment will lead people to believe that the decision to deport them has already been made and that they

cannot safely raise fears about their deportation. Indeed, there is a long history of CBP officers telling people in custody that they are being deported, subjecting them to verbal and physical abuse, and threatening and pressuring them into signing deportation orders.

**Confiscation of belongings prevents people from expressing fear under new rule**

- People who intended to show officers documentation of their fear of return have been unable to do so because CBP and ICE confiscated their belongings when jailing them. Texas Rio Grande Public Defender's clients had letters expressing fear of return to their country of nationality but were unable to present their letters to CBP and ICE officers because their belongings were confiscated.

---

## IFR separates families by causing arbitrary failures to refer people for CFIs

Since the implementation of the IFR, the arbitrariness of who is referred for a CFI and who is summarily removed has already resulted in family separation, **with family members separated in CBP custody, removed within hours and days without knowing their loved ones' whereabouts, and experiencing disparate outcomes** where some family members can seek asylum while others face summary removal despite having similar and/or related asylum claims.

- **A Colombian family fleeing persecution was separated, and three of the four family members were removed without a credible fear screening** despite all of them expressing their fear based on the same asylum claim. One of the women, who had been raped and threatened by her persecutors due to her political opinion and Indigenous identity, told Immigrant Defenders Law Center that she was referred for a credible fear interview while her husband, sister-in-law, and brother-in-law were removed.

- **A Colombian man fleeing persecution due to his political opinion was separated from his partner and processed for deportation because he did not know that he needed to tell CBP officers about his fear of return,** whereas his partner expressed fear and was referred for a CFI. The man was told to sign papers in English without having the contents translated for him and was then processed for deportation. His removal was narrowly averted due to the intervention of an attorney at the Immigrant Defenders Law Center, who contacted immigration officials about his case. He was finally referred for a CFI, received a positive credible fear determination, and has reunited with his partner in the United States.

## Mission statement

Human Rights First works to create a just world in which every person's intrinsic human rights are respected and protected, to build societies that value and invest in all their people. To reach that goal demands assisting victims of injustice, bringing perpetrators of abuse to justice, and building institutions that ensure universal rights.

Human Rights First is a nonprofit, nonpartisan international human rights organization based in Los Angeles, New York, and Washington D.C.

## Acknowledgments

This report was researched by Hope Border Institute, Human Rights First, Immigrant Defenders Law Center, Kino Border Initiative, RAICES, and Refugees International. Our profound thanks to Attorney David Square and Texas Rio Grande Public Defender, who also provided case stories for this report. We deeply appreciate and honor the numerous asylum seekers who bravely shared their stories in hopes of bettering the system for all those who seek protection and refuge in the United States.

© 2024 Human Rights First All Rights Reserved.

This report is available online at humanrightsfirst.org

# EXHIBIT 33

# DISCRETION TO DENY

## FAMILY SEPARATION, PROLONGED DETENTION, AND DETERRENCE OF ASYLUM SEEKERS AT THE HANDS OF IMMIGRATION AUTHORITIES ALONG THE US-MEXICO BORDER



COVER PHOTO: Getintoit/ flickr.com

# DISCRETION TO DENY

## FAMILY SEPARATION, PROLONGED DETENTION, AND DETERRENCE OF ASYLUM SEEKERS AT THE HANDS OF IMMIGRATION AUTHORITIES ALONG THE US-MEXICO BORDER

*Borderland Immigration Council*
*February 2017*



## THE BORDERLAND IMMIGRATION COUNCIL

The Borderland Immigration Council (BIC) is an El Paso-Las Cruces based coalition of immigration attorneys and service providers, advocacy organizations and concerned community members. BIC is addressing serious concerns with the treatment of migrants and their attorneys by local immigration authorities. This report is a direct response to the need to document trends of due process violations and barriers asylum-seekers face vis-a-vis the Department of Homeland Security (DHS), particularly with ICE and CBP in the El Paso Sector.

## THE HOPE BORDER INSTITUTE

Hope Border Institute (HBI) is an independent grassroots community organization working in the El Paso-Ciudad Juárez-Las Cruces region, that seeks to bring the perspective of Catholic social teaching to bear on the social realities unique to our region. Through a robust program of research, reflection, leadership development, advocacy and action, HBI develops and aligns the border's community leaders engaged in the work of justice from across the Mexico-US border to deepen solidarity across borders and transform our region.

## AUTHORS

This report was researched and written by Theodora Simon, Associate Director for Advocacy and Leadership Development; Edith Tapia, Policy Research Analyst; and Dylan Corbett, Executive Director, all of the Hope Border Institute. Interviews were conducted by Theodora Simon, Edith Tapia, and Anai Ramirez, Communications Manager of the Hope Border Institute.

## ACKNOWLEDGMENTS

We would like to thank the following organizations and individuals for dedicating their time and experiences towards the creation of this report: Las Americas Immigrant Advocacy Center; Diocesan Migrant & Refugee Services (DMRS); the Texas Civil Rights Project; The Law Offices of Carlos Spector; Noble & Vapri, P.A., El Paso; Beckett Law Firm; Catholic Charities of Southern New Mexico; Frontera Immigration Law; The Law Office of Daniel Caudillo; Janos Zavala & Villalpando, LC; the Southwest Asylum & Migration Institute; the Law Office of David Haro Jr.; the Law Office of Antonio Williams; Texas RioGrande Legal Aid, El Paso; the Law Offices of Armendariz & Holguin; Mexicanos en Exilio; the members of the Detained Migrant Solidarity Committee; CIVIC Las Cruces; and all the other legal service providers and community members who were interviewed in this process.

We express our gratitude to those who provided invaluable expertise to this project in other ways, including reviewing drafts, offering guidance, and providing inspiration for this project: the ACLU Regional Center for Border Rights, the University of Texas at El Paso's Center for Inter-American and Border Studies, the Programa de Defensa e Incidencia Binacional, the Detention Watch Network, the Southern Poverty Law Center, the KINO Border Initiative, the University of Dayton's Human Rights Center, and the Southern Border Communities Coalition.

Finally, the Hope Border Institute and this report's authors are exceptionally grateful to Linda Rivas, Melissa Lopez, Jessie Miles, Carlos Spector, Gloria Amesquita, Eddie Beckett, Alan Dicker, Nellie Alvarado, and Brian Jacobi for their leadership, solidarity, and commitment to advocating for the rights and dignity of all people. This report would not have been possible without them.

We dedicate this report to the people whose experiences motivate its writing, and those whose testimonies appear herein.

# TABLE OF CONTENTS


- Executive Summary .......... 1
- Introduction .......... 4
- Methodology .......... 6
- Enforcement & Family Separation .......... 7
- Systematic Deterrence of Asylum Seekers .......... 11
- Unaccountable, Arbitrary Denial of Stays of Removal .......... 16
- Unaccountable, Arbitrary Denial of Parole .......... 19
- Violations of Due Process & Barriers to Effective Representation .. 22
- Recommendations .......... 25
- Conclusion .......... 28
- Appendix .......... 29
- Endnotes .......... 37

# EXECUTIVE SUMMARY

This report identifies failures of immigration agencies and officials in the El Paso Sector to respect fundamental human rights and dignity. These systemic failures are indicative of an intricate border security complex -- an overlapping web of individuals and agencies, detention centers and courts, and enforcement priorities and mechanisms -- that denies justice at the cost of the most vulnerable: immigrant and mixed-status families, children, and those who come to the U.S. fleeing violence, persecution and insecurity.

In the border enforcement region commonly known as the El Paso Sector, encompassing counties in West Texas and all of New Mexico, immigrants and asylum-seekers routinely face situations in which Department of Homeland Security (DHS) agencies use a broad and unaccountable mechanism of "discretion" to separate families, remove asylum seekers and keep people in situations of prolonged detention. El Paso Sector U.S. Customs and Border Protection (CBP) and U.S. Immigration and Customs Enforcement (ICE) officials make fateful decisions regarding use of discretion, ones which fail to advance DHS enforcement priorities or humanitarian claims and at times contravene stated DHS policy. Far from serving our community and national interests, these decisions undermine the values of justice, fairness and democracy.

In the summer of 2016, private attorneys, legal service providers and advocacy organizations in the El Paso area formed the Borderland Immigration Council to address growing abuses in the immigration enforcement system. Between September 2016 and January 2017, the Hope Border Institute conducted in-depth research on enforcement and detention policies and practices in the El Paso Sector. An analysis of over 100 documented cases revealed the following troubling trends:

1. **ENFORCEMENT & FAMILY SEPARATION**
CBP and ICE routinely separate families at ports of entry and through detention and enforcement. Minors are torn from parents and caregivers, forcing children into state custody or foster care. Adult male caregivers and other male family members are systematically isolated from family units through detention and deportation. This family separation results in detrimental impacts on legitimate asylum claims as well as the mental, material and physical well-being of children and other family members.

2. **SYSTEMATIC DETERRENCE OF ASYLUM SEEKERS**
CBP and ICE practices deter and dissuade asylum seekers at all points of the asylum process, from intimidation and harassment of individuals arriving at ports of entry and agents' failure to screen for credible fear, to the use of prolonged detention and the abuse of asylum seekers while in custody. These practices, intended to break the spirits of asylum seekers, lead to the deportation of people seeking refuge, often to situations of extreme danger.

3. **UNACCOUNTABLE, ARBITRARY DENIAL OF STAYS OF REMOVAL**
ICE increasingly denies even the most urgent humanitarian requests for stays of removal with little to no explanation, even to attorneys. This results in the deportation of individuals with longstanding ties to communities, parents of minor children dependent on their care, and individuals whose prior requests for stays of removal were approved. This new practice has serious negative effects not only on those deported, but also on the communities and lives and livelihoods of family members they leave behind.

4. **UNACCOUNTABLE, ARBITRARY DENIAL OF PAROLE**
The arbitrary nature of parole denials in the El Paso Sector represents a distinct deviation from previous leadership. Parole denials include those with established family ties and community sponsors, those responsible for family members with urgent medical situations, and parents of minor children. ICE provides minimal or no justification for these denials, holding immigrants and asylum seekers in detention, hindering their cases and causing mental and physical strain.

5. **VIOLATIONS OF DUE PROCESS AND BARRIERS TO COUNSEL FOR DETAINED MIGRANTS**
Numerous obstacles to effective legal representation, including access to legal representatives, amount to a serious crisis of due process for individuals in immigration proceedings. Patterns identified in the El Paso sector include impediments to attorney-client meetings and confidentiality, the execution of deportation orders without notification to legal counsel; and other practices that inhibit due process.

These findings are not isolated events, but represent systematic and pervasive practices which deter asylum seekers and criminalize immigrants in the El Paso Sector. Furthermore, these documented cases, most dating from after December 2015, are representative of broader trends in immigrant detention and the treatment of asylum seekers across the United States. We reference reports and documentation presented by human rights, advocacy and faith-based organizations identifying many of these same patterns and practices throughout the country.

We join the many advocates in the United States and around the world in the call to end private immigrant detention and to treat asylum seekers with respect and dignity. Given the devastating human consequences this report depicts, we recommend the following:

1. **EFFECTIVE TRANSPARENCY AND ACCOUNTABILITY**
   CBP and ICE should implement effective vehicles of transparency and accountability in the areas of asylum, detention and prosecutorial discretion.

2. **LIMIT USE AND DURATION OF IMMIGRANT DETENTION**
   Detention should not be used as a punitive measure and only as necessary to ensure public safety and appearance in court. ICE and EOIR should prioritize alternatives to detention and utilize prosecutorial discretion to release detainees in accordance with DHS memos, to prioritize humane enforcement and detention that respects dignity and rights.

3. **END DETERRENCE & MASS DETENTION OF ASYLUM SEEKERS**
   CBP and ICE must offer asylum seekers the protections afforded to them by US and international law. Asylum seekers should not be processed as border crossers and detention should not be used as a deterrence for those who seek protection and refuge in the United States.

4. **HUMANE ENFORCEMENT OF REMOVAL**
   ICE should utilize prosecutorial discretion to grant stays of removal to prioritize humane enforcement in a way that respects basic dignity and rights and should ensure that legal counsel and deportees are advised of impending deportation.

5. **END FAMILY SEPARATION**
   DHS agencies tasked with immigration enforcement should prioritize child wellbeing and family unity in all decision making, including in asylum, detention and enforcement processes.

6. **GUARANTEE ACCESS TO COUNSEL AND RESPECT DUE PROCESS**
   ICE and private detention contractors should implement measures to improve and ensure detainees' access to counsel and due process.

*This report illustrates policies, practices, patterns and a culture of abuse particular to the El Paso Sector, in which local officials exploit the opaque domain of discretion and in so doing deny fundamental human rights. This situation has become more acute since the arrival of ICE Field Office Director Corey Price. El Paso-based CBP and ICE leadership, along with EOIR, have the power to address these systematic abuses. In doing so, they can protect the most fundamental rights of migrants and asylum-seekers while upholding the law, promoting justice and preserving the integrity of the immigration system in the El Paso sector.*

# INTRODUCTION

**This report details the effects of an increasingly harsh border enforcement paradigm in the area known to immigration officials as the El Paso Sector, encompassing counties in West Texas and all of New Mexico. It provides a snapshot of the human impacts of the metastasizing systems of border enforcement at the twilight of the Obama Administration and the beginning of the Trump Administration. The testimonies and findings presented here illustrate how local immigration officials have repurposed a sprawling complex of border security and immigration control and made of it a means to separate families, dissuade and discourage asylum seekers, block humanitarian claims, deport an ever-increasing number of immigrants, and detain more persons for longer periods of time.**

The progressive militarization of the southern border and criminalization of the migrant have deep roots in the history of our country and the region.1 In recent times, following the implementation of the North American Free Trade Agreement (NAFTA) and in the aftermath of the 9/11 terrorist attacks, a relatively fluid border was significantly hardened. The state apparatus of border and immigration enforcement mushroomed, often under the pretext of national security. This meant an exponential growth in immigration enforcement agents, checkpoints, walls, surveillance technology, immigrant detention centers, and punitive policies criminalizing migrants through programs like Operation Streamline.

IN 2014, IN AN ATTEMPT TO SHUT DOWN OUR BORDERS TO THE THOUSANDS OF MIGRANTS AND REFUGEES ESCAPING EXTREME POVERTY, POLITICAL INSTABILITY AND DANGEROUS SITUATIONS OF CRIME IN CENTRAL AMERICA, THE OBAMA ADMINISTRATION PUBLICLY COMMITTED ITSELF TO AN AGGRESSIVE "STRATEGY OF DETERRENCE."

This deterrence strategy included a massive expansion of immigrant detention, including the detention of mothers and children, and the priority deportation of "border crossers" through expedited removal. The Obama Administration's deterrence strategy marked an inflection point. Harsh measures of enforcement, expressly intended to "send a message" to those who would undertake the treacherous journey to the United States in order to escape economic and political collapse in countries of origin, were no longer just the actions of a renegade few. These measures became official policy.

Following the implementation of this deterrence strategy, attorneys and advocates in the border communities of El Paso, TX and neighboring Las Cruces, NM began to encounter an increasing number of obstacles to effective representation of immigrant clients. Attorneys noticed growing patterns of harsh and abusive treatment among clients at the hands of immigration enforcement agents, in immigration courts and in immigrant detention centers. Asylum seekers were detained in greater numbers, separated from family members. Stays of deportation and grants of humanitarian parole were on the decline. Expedited removal and prolonged detention were on the rise.

These troubling patterns grew more acute with the arrival of U.S. Immigration and Customs Enforcement (ICE) Field Office Director Corey Price in December 2015.

The deported and detained are made invisible by the immigration enforcement system. In the El Paso Sector, an estimated 4,000 immigrants are held in detention on any given night. ICE and U.S. Customs and Border Protection (CBP) are notorious for providing incomplete information regarding their operations and decision making and often assume a defensive posture when confronted with the claims of advocates and attorneys.

***Discretion to Deny*** aims to shine a light on processes, practices and agencies urgently in need of transparency and accountability. We hope to lift up the people whose lives are impacted by this broken system and illustrate the moral impacts of an ever harsher system of border enforcement.

This report is not intended to demonize the men and women that work for ICE or CBP. It is agency leadership who is responsible for instilling and perpetuating an institutional culture that prioritizes accountability, transparency and human dignity. Practices that dehumanize and demoralize asylum seekers and migrants also dehumanize and demoralize agents and officials.

THE REPORT PRESENTS FIVE KEY FINDINGS: FAMILY SEPARATION, DETERRENCE OF ASYLUM SEEKERS, ARBITRARY DENIALS OF STAY OF REMOVAL, ARBITRARY DENIALS OF HUMANITARIAN PAROLE, AND BARRIERS TO DUE PROCESS.

The findings are illustrated by case studies, demonstrating the multiple dimensions of an increasingly punitive system of border enforcement. We follow these findings with a series of broad recommendations for ICE, CBP, and immigration courts in the El Paso sector.

It is our assertion that these abuses of authority are not isolated incidents. The cases on which this report is based represent systematic and pervasive practices which further militarize the border and criminalize immigrants. This report demonstrates not the scattershot anecdotes of a few, but documents trends and patterns of abuse in the El Paso Sector based on the experiences of dozens of legal experts and more than 100 clients. These practices represent a crisis in human rights on the U.S.-Mexico border and a significant challenge to constitutionality and the rule of law.

# METHODOLOGY

**This report is based on in-depth, one-on-one interviews conducted between September 2016 and January 2017 with 25 legal experts in the El Paso and Las Cruces area. Our goal was to collect evidence to document increased restrictions on due process and access to counsel, in detention centers and during legal proceedings, as well as increased use of detention as a deterrence for asylum-seekers and undocumented immigrants.**

A survey instrument for interviews was developed by researchers at the Hope Border Institute (HBI), focusing on the experiences of legal representatives in detention centers and immigration courts as well as in interactions with ICE and CBP officials and agents. Interviews took place at attorney and community organization offices and ranged in duration from 60 minutes to two hours or more. HBI researchers transcribed and coded the interviews and identified major thematic areas.

Detailed information on over 120 cases of asylum seekers, persons requesting humanitarian parole or relief, and individuals detained was collected, coded, analyzed and classified. Additional documentation collected included attorney testimony, redacted affidavits and redacted court documents. Supplemental interviews were conducted with a number of local migration advocates in order to supplement the data. These interviews further corroborated concerns expressed by the legal community regarding growing restrictions pertaining to prosecutorial discretion and the treatment of asylum seekers. While this report is primarily based in the testimonies of legal experts and the content of legal documents, when accessible, testimonies from asylum seekers were also incorporated into the analysis.

## LIMITATIONS

This report reflects attorney cases from 2014 to 2016, with the vast majority taking place after December 2015. Being the first study of its kind to be carried out in the El Paso Sector, it documents a discreet but meaningful sample of cases. Research findings are consistent with a wider body of academic and policy literature on the experience of migrants in the US-Mexico borderlands in the context of their interactions with immigration enforcement and control actors.

The findings in this report are based primarily on attorney interviews. While these representatives have access to a great deal of information about their clients and immigration proceedings, this method does present some limitations. Analysis was limited to information which attorneys could provide. Data is primarily qualitative, as the present study constitutes the first of its kind and no systematic tool for data collection has been implemented or used by local organizations to document or report incidents of abuse of prosecutorial discretion. Furthermore, collecting data on victims of intimidation and harassment at the hands of state actors is difficult to obtain. Additionally, there are numerous barriers to obtaining official statistics from ICE and CBP. Given this lack of official statistics, our ability to compare government data on the practices prior to and after the arrival of ICE Field Director Corey Price is limited.

Attorneys were the focus of interviews for this report precisely because of the consequences of trends and practices identified herein. This report describes a system that makes migrants, asylum seekers and those in detention invisible. Many of the clients whose cases are documented have been deported and are thus difficult to contact - either due to unknown whereabouts or because they are in hiding.

This report does not reflect the experiences of migrants or asylum seekers who acted ***pro se*** or who did not have the assistance of an attorney. This unrepresented population makes up the vast majority of those caught up in the immigration system.[2] As migrants and asylum seekers with legal counsel have greater access to avenues for relief and prosecutorial discretion, it is our contention that the patterns and practices identified in this report affect a much broader population than is represented here.

# ENFORCEMENT & FAMILY SEPARATION

In the El Paso Sector, although immigration enforcement officers have the ability to exercise discretion to preserve family unity and protect the most fundamental rights of children, ICE and CBP demonstrate callous indifference towards family unity.[3] Officers routinely make decisions about detention, prosecution and deportation that tear families apart. Minors are separated from parents and caregivers, forcing children into state custody or foster care. Adult male caregivers and other male family members are systematically isolated from family units through detention and deportation. The consequences of family separation are clear and well-documented: detrimental impacts on legitimate asylum claims and harm to the mental, material, and physical well-being of children and other family members. The overarching pattern of total disregard for family unity throughout the immigration enforcement system has been detailed by countless organizations over many years.

*"Children seeking asylum are separated from their parents and forced into state custody."*

Arbitrary family separation occurs routinely in the El Paso Sector: nearly one-third of the cases documented for this report involved the separation of families. Shockingly, in over one quarter of the cases, minor children were torn from one or both parents or caretakers.

Family separation occurs at every step in the migration process - while families are in transit, as they cross the border, at the time of apprehension, in or through detention, at the time of deportation, and long after deportation.[4] Given the scope of this study, our findings focus on decisions that separate nuclear families through apprehension, detention and deportation.

## SEPARATING CHILDREN FROM THEIR ONLY PARENT OR CAREGIVER

While the ICE Parental Interests Directive indicates that immigration enforcement activities should not "unnecessarily disrupt the parental rights of both alien parents or legal guardians of minor children" regardless of the dependent's citizenship, the cases and testimony documented for this report demonstrate that ICE and CBP in the El Paso Sector fail to respect this directive.[5]

The most egregious cases documented in our study were those in which ICE and CBP decisions separated minor children from their primary caretakers, forcing children - often asylum seekers - into state-sponsored shelters or foster care. One attorney interviewed indicated that, in nearly a decade of practice prior to December 2015, she saw children separated from single parents with whom they traveled only a handful of times. But, between January and July 2016, she recorded over 30 such incidents. In fact, a governmental advisory committee report in September 2016 found that "disconcertingly, recent evidence suggests that some families are separated and adults detained and placed in expedited removal or reinstatement proceedings while children are sent to the Office of Refugee Resettlement."[6]

**VERONICA[7]**

*Veronica, a 24-year old Guatemalan woman with an asylum claim based on domestic violence and abuse, requested asylum at a port of entry in El Paso in mid August, 2016, along with her five year-old daughter, who had been witness of the violence experienced by her mother. Veronica was separated from her young daughter and detained, likely on the basis of an immigration record. Veronica passed a credible fear interview only two weeks after her initial request for asylum, but was kept in detention. There were no family members in the United States who were able to assume custody of the five-year old girl, and she was subsequently put into state care. During her initial period of detention, Veronica was unable to obtain information regarding the whereabouts or condition of her young daughter, and experienced stress-induced strokes. With the added trauma of separation from her mother, the little girl stopped eating.*

*Veronica requested parole in mid-November 2016, as the only parent and caretaker for her young daughter. Despite DHS guidance that responses to parole requests should be issued within a week's time, Veronica's request was met with silence. After nearly five months of detention, given her daughter's condition and the toll of the separation, Veronica requested removal. Although she wished to continue her asylum claim, Veronica simply could not stand to see her daughter placed into foster care.*

As *Veronica*'s experience evidences, once separated by detention decisions, it can be extremely difficult for families to locate one another, maintain communication, and reunite.[8] This only increases the stress and trauma of detention and separation.[9]

These practices cause trauma for children, families and communities, and stand in direct violation of the best interests of children, parental rights, and DHS's own directives. Legal experts interviewed for this report further argue that this practice is costly for the government; when children are separated from primary caregivers and forced into government custody or foster care, they become a financial responsibility for taxpayers.[10]

**ERICA**

*ICE called Erica, a Mexican woman in her mid-forties, to come in to discuss her request for a stay of removal. Erica has six U.S. citizen children, between the ages of 7 and 18. Her husband, a U.S. citizen, is disabled and has a serious medical condition, which prevents him from working and leaves him dependent on Erica's daily care and assistance.[11] Erica had been granted two prior stays of removal. As the only caregiver and income-earner, Erica's family is entirely dependent on her.*

*The interview was not about her request for a stay; it was to place Erica in removal proceedings. While Erica was held in detention, her attorney fought her case. A month after her apprehension, Erica's husband underwent heart surgery. Despite her role as her family's main caregiver and breadwinner, and the precarious health of her husband, Erica was deported without notice. Neither her family nor her attorney on record received notification of her deportation until after she had been deported.*

## SEPARATION OF FAMILIES THROUGH APPREHENSION, DETENTION AND DEPORTATION

Another practice uncovered by this study is that of separating families at the time of apprehension or when they request asylum at ports of entry. "We have seen hundreds of cases like this. They [CBP officers] began granting parole at the border to asylum seekers, but only to women and children; they would hold the men. This became standard practice; men would be detained and often deported."[12]

This trend has been identified in other border regions; numerous reports point to the arbitrary and unjustified practice of releasing mothers with children, while separating adult males from their families through detention. This extends to single fathers, who are often separated from their minor children upon contact with immigration officials.[13]

**MIGUEL**

*Three generations of a Mexican family were subject to violent persecution in their hometown. The elderly grandfather was shot and wounded, and the rest of the family witnessed the attack. The grandfather requested asylum in the U.S. and was granted humanitarian parole because of his injury.*

*The man's son, Miguel, a young man in his 20's with a partner and children, requested asylum in December 2015. Although Miguel's partner and their children were released into the*

*U.S., and sent to live with the grandfather to continue their asylum application, Miguel was detained and placed into removal proceedings.*

*A stay of removal was filed in March 2016, based on humanitarian circumstances; Miguel was seeking asylum, his elderly father been shot and needed care during recovery, and Miguel was the primary caregiver of his two children, as their mother was ill and unable to adequately care for them. Despite the shared asylum claim, and the rest of the family's positive credible fear, Miguel's request for a stay of removal was denied. Torn from his family, Miguel was detained for six months and then deported.*

As Miguel's case evidences, family units requesting asylum under the same asylum claim are routinely separated, not only creating additional burdens on the immigration adjudication system and attorneys who represent asylum seekers by duplicating caseloads, but leading to divergent outcomes for family units seeking asylum.[14] Long-term separation compounds the trauma children and families fleeing violence face and, for the family members deported, may lead to continued persecution, violence and even death.

Agency practices that separate families have impacts beyond recent arrivals and asylum seekers. Family unity is impacted by immigration enforcement decisions to reinstate orders of removal and deny stays of removal. Our research found that both ICE and CBP fail to utilize discretion in maintaining family unity by denying humanitarian parole and holding family members in detention despite compelling humanitarian concerns, including serious illness of immediate family members.[15] These findings are discussed in greater detail in further sections.

Systematic practices resulting in family separation are on the rise and have devastating, long-term impacts on all those involved: "deportation of noncitizens with U.S. family ties affects the economic, emotional and physical well being of children and spouses who remain in the United States."[16] Extensive research has been conducted into the devastating impacts that parental deportation has on minor children, which include poverty, diminished access to food and health care, mental health and behavioral problems and limited educational opportunities.[17] In No Safe Haven Here, researchers find that the practice of family separation "piles on additional trauma and creates additional risk for depression, anxiety, and post-traumatic stress."

While immigration officers can favorably utilize prosecutorial discretion to preserve family unity, our study reveals a pattern of detaining and deporting parents of minor children - legal permanent residents and U.S. citizens, as well as undocumented children - despite the guidelines of the parental directive. These decisions, which have a significant impact on children's welfare and family unity, are arbitrary, in El Paso and beyond.[18] As deportations rise, so, too, do family separation and its devastating consequences.[19]

The inexplicable and inhumane pattern of arbitrary family separation in the El Paso Sector is traumatic for children, has far-reaching impacts on affected families and communities, and puts asylum seekers at risk.



# SYSTEMATIC DETERRENCE OF ASYLUM SEEKERS

CBP and ICE practices deter and dissuade asylum seekers at all points of the asylum process, from intimidation and harassment of individuals arriving at ports of entry and agents' failure to screen for credible fear, to the use of prolonged detention and the abuse of asylum seekers while in custody. While asylum seekers, fleeing extreme violence and persecution, should be treated with respect and dignity, they encounter practices intended to compel them to abandon their claims. This is deeply concerning not only because it violates DHS policy and international norms, but leads to the deportation of people to situations of extreme danger.

> *"You'll just be detained for six months and then deported anyway."*

The United States has moral and legal obligations to respect and protect those seeking asylum who arrive at our borders. U.S. and international law require that authorities offer protection to those facing persecution in their home countries. Because of their vulnerability, asylum seekers are to be treated in a manner decidedly distinct from other non-citizen border crossers and offered protections to ensure *non-refoulement*.[20]

Since 2014, the number of Central Americans - unaccompanied minors, family units and individuals - arriving to the U.S. has remained at historic highs. Tens of thousands of Central Americans, hailing from one of the most violent regions in the world, have since requested asylum. The El Paso Sector has seen influxes of asylum seekers from other regions of the world in recent years, including Haitians, Bangladeshis, Chinese, Cubans and families and individuals from other countries, as well as many people seeking asylum from governmental and drug-cartel related persecution in Ciudad Juarez and throughout Mexico.

Every legal expert and community advocate interviewed for this report stated that CBP and ICE practices intended to deter asylum seekers were common. Over one-third of the cases documented include verbal dissuasion from requesting asylum during apprehension; intimidation and inhumane treatment of asylum seekers in CBP and ICE custody; the use of prolonged detention to pressure asylum-seekers to abandon their claims; and language barriers that prolong the asylum process and create obstacles for asylum seekers. The extent and prevalence of these deterrence practices demonstrate a culture of disregard for the rights and lives of asylum seekers.

These systematic trends of deterring asylum seekers at all points in the asylum process are not unique to the El Paso Sector. These practices have been widely documented across the borderlands and throughout the U.S., signaling the uniform practice of an unwritten rule rooted in DHS culture.[21]

## INTIMIDATION AND HARASSMENT AT PORTS OF ENTRY AND FAILURE TO SCREEN FOR CREDIBLE FEAR

Deterrence efforts intended to force asylum seekers to give up their claims begin during initial contact with CBP and Border Patrol officers in the El Paso Sector. CBP officers and Border Patrol agents are not asylum officers; they are required to ask why an individual left his or her home country and if they fear persecution, and refer immigrants who may qualify for asylum on to immigration courts for asylum determination.[22] However, our research indicates that CBP and Border Patrol officers in the El Paso Sector routinely and intentionally discourage people from seeking asylum. In 12% of the cases documented for this report, individuals expressing fear of violence upon return to their country of origin were not processed for credible fear screenings and instead, were placed into removal proceedings.[23] Attorneys interviewed for this report maintain that it is commonplace for asylum seekers to be placed in expedited removal proceedings and summarily deported without appearing before a judge or having had an opportunity to present their asylum claim, despite expressing fear.[24]

**PEDRO**

*Pedro, a young Honduran, requested asylum, having faced persecution because of his sexual orientation. Although he told CBP officers he feared for his life, Pedro was put into expedited removal proceedings, because, according to the CBP officers who detained him, sexual orientation is not a basis for asylum. Pedro's family was able to retain an attorney, who immediately tracked down Pedro's whereabouts and sent documentation to notify ICE that Pedro was seeking asylum. Pedro was transferred overnight to a facility in Louisiana for immediate deportation. Following days of persistent efforts from Pedro's attorney, Pedro was finally returned to the West Texas Detention Facility where he faced constant, ongoing harassment from the detentions guards because of his sexual orientation.*

This is not an isolated event; Pedro's attorney asserts that many LGBTQ asylum seekers have been denied access to the asylum process by CBP officers and face harassment and abuse while in detention.

According to legal experts interviewed for this report, immigrants are subjected to hours-long "interviews" during CBP screening, which more closely resemble interrogations, with intending asylum seekers being badgered by authorities until they provide the answers DHS officials seek - that an individual has come to the United States to work or reunite with family, not seeking safety.

Our findings are supported by research identifying numerous flaws at this initial stage in the asylum process, including lack of knowledge of the asylum process among would-be asylum seekers, screenings conducted by uniformed and armed government agents, and the conditions in which screenings are conducted.[25] The U.S. Commission on International Religious Freedom recently observed significant inconsistencies and non-compliance during CBP interviews, in El Paso and nationwide, including a vast majority of screenings in which individuals were not asked if they feared return to their home country, as is required.[26]

## LANGUAGE BARRIERS

In sixteen documented cases, asylum seekers faced language barriers that nearly prevented them from seeking asylum and prolonged their claims. In the El Paso Sector, one of the most prevalent language-related findings was related to indigenous asylum seekers, who often do not speak English or Spanish well enough to fully comprehend what immigration authorities ask or tell them or to express their fears in a meaningful way.[27]

**SANDRA**

*Sandra, a 23 year old indigenous woman from Guatemala, was apprehended crossing into the US in early 2016. Sandra spoke an indigenous language, and her understanding of Spanish was very limited; when asked in Spanish by CBP is she was afraid to return to Guatemala, she said no. Sandra had been gang raped in Guatemala and received no protection or support from local police. She was, indeed, afraid to return, but signed a sworn affidavit - in English - that she was not afraid and was placed in removal proceedings.*

*Sandra was later able to communicate her fears, and passed a credible fear interview. However, during a bond hearing, an immigration judge questioned Sandra's credibility due to the discrepancies between her sworn affidavit and her asylum claim. Sandra received no mental health support while in detention, and quickly became demoralized and disheartened. Facing indefinite detention, Sandra gave up and requested voluntary departure to Guatemala, where she faces violence and danger.*

Half of the attorneys interviewed for this report stated that CBP affidavits are often inconsistent with asylum-seekers' own accounts. Individuals are forced to sign legal documents in English without translation. For those that are able to proceed with their asylum claims, these inconsistencies lead to an asylum seeker's "credibility" being questioned by government attorneys and immigration judges. This not only leads to prolonged detention but also jeopardizes the asylum claim.[28]

## PROLONGED DETENTION UNDER CRIMINALIZED, ABUSIVE CONDITIONS

Asylum seekers face verbal, physical and mental harassment at the hands of CBP, ICE, and security contractors throughout the apprehension, detention and asylum processes.[29] Twenty-eight such cases were documented for this report.

Criminalized, punitive immigrant detention is a deterrent in itself[30] and other reports of abuse and maltreatment of detainees in the El Paso Sector and across the country have been made public.[31] Verbal harassment to deter asylum seekers includes comments such as: "You'll just be detained for six months and then deported anyway." These abusive practices compound the trauma asylum seekers have experienced.

**SILVIA**

*Silvia, a Mexican woman in her 50s, asked for political asylum after being raped and persecuted by drug cartels. She was initially told by a CBP officer that "Mexicans don't get asylum," and was denied entry to the U.S. She tried to ask for asylum a second time but was detained and charged with illegal re-entry. Her mental health issues and posttraumatic stress disorder caused Silvia to have a nervous breakdown during her credible fear interview and she was unable to complete it. An immigration judge refused to declare her incompetent and would not grant her a second credible fear interview. Meanwhile, Silvia remained in detention while her physical and mental health deteriorated.*

In a dozen cases documented for this report, asylum seekers held in detention needed mental health care, not available to them in detention. Conditions of detention aggravated the mental health situation of many of these individuals. Asylum seekers have been through traumatizing events, and detention comes to represent yet another traumatic event in their lives.

**JULIA**

*Julia, a Brazilian woman in her mid-30s, traveled to the US southern border with her six year old daughter to request asylum. Although Julia presented proof of parental relationship, she and her daughter were separated - Julia was detained and her daughter was sent first to a child crisis center, then transferred to two distinct foster homes, then sent back to the child crisis center.*

*The little girl is a U.S. citizen and was a witness to the domestic abuse that is the basis for Julia's asylum claim. Already traumatized, she is now facing separation from her mother and the instability of bouncing around between foster homes and child crisis centers. They have scarcely been able to see each other, as visitation is only permitted on certain days of the week and depends on the policies of child crisis centers and the wishes of foster families.*

*Julia did not appear before a judge until after having been detained for two months and, as no interpreter was present, her hearing was postponed another month. Despite having a community sponsor, Julia's request for parole was denied because she was deemed a flight risk, based on a prior order of deportation issued in absentia of which Julia was unaware.*

Nearly one-quarter of the cases documented involved prolonged detention, in which asylum seekers are held for over six months, and sometimes up to two years, in criminalized detention facilities. Despite having authority to release asylum seekers,[32] failure to utilize discretion leaves many asylum seekers languishing in detention for unjustifiably long periods of time. Furthermore, when separated from their families, prolonged detention impacts the children and life partners of those detained. When physical, verbal and mental abuse and harassment occur in prolonged detention, asylum seekers are compelled to drop their claims to end confinement. As one attorney interviewed stated: "People are having to choose between their lives and their freedom."

**ARUN**

*Arun, a Bangladeshi asylum seeker, was detained at the El Paso Processing Center for almost two years. His case was delayed for a multitude of reasons, including a hearing scheduled for insufficient time and a hearing rescheduled because an interpreter was not present.*

*Arun requested parole, stays of removal, and two custody redeterminations. These requests were all denied, citing Arun as a flight risk and a terrorist bar - based on his affiliation to a political party, which was the basis for his asylum claim. Arun strongly believed that he was denied parole because of his religion. His health severely suffered in detention; a petite man, Arun lost over 20 pounds and his diabetes - previously under control through diet alone - worsened.*

Prolonged detention is impacted by numerous decisions and decision makers, including ICE decisions on parole and EOIR practices regarding bond (see appendix for further discussion of bond). The practice of prolonged detention has legal consequences for asylum seekers; there is an enormous difference in outcomes for immigrants held in detention as compared to their non-detained counterparts.[34] The reason for this disparity is clear: it is much more difficult to prepare an asylum case from inside an immigration detention center because of limited ability to gather evidence, contact witnesses, and even use a phone, along with the numerous barriers to due process imposed by detention facilities.[35]

As a global leader, it is the United States' responsibility to protect asylum seekers in accordance with national laws and international norms. Far from offering refuge and protection to the vulnerable, this section has described how immigration authorities in the El Paso Sector engage in deterrence practices at all points in the asylum process, from the moment asylum seekers come into contact with agents and officials through prolonged detention. The patterns and practices identified in this section are deeply woven into the immigration enforcement system and seem designed to induce suffering for a highly vulnerable population: asylum seekers, a population who has already endured violence and persecution before arriving at the US's southern border. This forces families and individuals to relinquish their requests for protection opting instead to return to danger. In short, it is a system designed to "break the spirit" of asylum seekers, as one seasoned attorney described. Such deterrence undercuts the integrity of the immigration system, puts asylum seekers' lives at risk, and is in violation of U.S. and international law.

**RONALDO**

*As of January 2017, Ronaldo had been detained for 11 months. This young man fled Honduras because he was persecuted by a gang who killed his brother. He appeared with his mother at the El Paso port of entry and together, they requested asylum. Ronaldo was taken into custody and separated from his mother, who was paroled and reunited with a legal resident daughter. ICE reported that he had "eluded inspection" and was charged with illegal entry. His request for parole was denied in August 2016, indicating he was a flight risk. Ronaldo has no criminal record and did not elude inspection - he asked for asylum at a port of entry. Despite efforts from his attorney and advocates, at the time of publication of this report, Rolando was still in detention and his final determination hearing had yet to take place.*[33]

# UNACCOUNTABLE, ARBITRARY DENIAL OF STAYS OF REMOVAL

ICE El Paso systematically and with increasing frequency denies even the most urgent humanitarian requests for stays of removal with little to no explanation, even to attorneys. A stay of removal allows a person with a compelling humanitarian claim to temporarily postpone his or her deportation, one way in which a broken immigration system allows for justice and fairness. These denials result in the deportation of individuals with longstanding ties to communities, parents of minor children dependent on their care, and individuals whose prior requests for stays of removal had been approved. This practice, not previously employed in the El Paso Sector, has serious negative effects not only on those deported - the parent of a seriously ill child, the primary caregiver for an infirm elderly person, the primary caregiver of a U.S. citizen minor child - but on the communities and lives and livelihoods of family members they leave behind.

*"This is something new. People who are here on stays [of removal] now know that they are in jeopardy."*

ICE officials have the power to grant temporary relief from deportation to individuals with compelling humanitarian arguments, including individuals with "family or community ties in the United States ... or compelling humanitarian factors such as poor health, age, pregnancy, a young child, or a seriously ill relative" who do not otherwise represent "a threat to national security, border security, or public safety."[36] This stay of removal does not grant an individual any kind of legal status, but allows the person to remain in the United States for a predetermined period of time.

Attorneys interviewed for this report insist that, prior to December 2015, ICE El Paso leadership utilized discretion to grant requests for stays of removal for compelling cases. Since that time, even exceptional requests for stays of removal are routinely denied. Fourteen percent of the cases documented in this report involved denials of stays of removal.

**ROSA MANI**

*Rosa Mani is the mother of three children, including Emily, an 11-year-old US citizen suffering from a rare form of Systemic Juvenile Idiopathic Arthritis, with epilepsy and depression. Emily's family could not afford the treatment available to her in Mexico, and so the children's father travelled with them to Chicago. Rosa requested a visa to join her family through legal means, and when denied, sought to cross the border. She was apprehended, detained for two months, and deported. In desperation, Rosa re-attempted to cross the border only to be apprehended again in August 2016. Despite clear, compelling humanitarian exceptions - a very ill US citizen daughter who needed her mother's care - Rosa's request for a stay of removal was denied, and she was deported to Ciudad Juarez late at night, in violation of the Local Repatriation Arrangement. Emily's mental health has worsened without the presence of her mom.*

SEE APPENDIX FOR DOCUMENTS DETAILING ROSA'S CASE.

Denials of stays of removal provided by ICE El Paso are often one-page boilerplate forms, making little or no reference to the details of the case and providing limited, if any, explanation of the grounds for denial. Little attention or weight is given to supporting evidence presented as a part of a request for a stay of removal, and exceptional cases do not receive due attention by ICE officials.[37] This suggests that ICE El Paso is electing not to review requests for stays in any meaningful sense and echoes the findings of a 2015 report on prosecutorial discretion nationwide: "Prosecutorial discretion requests receive a truncated review, if they are reviewed at all."[38] Lack of meaningful response in denying requests for stays of removal further impedes attorneys' ability to present more complete or favorable petitions for stays of removal in the future or to determine with their clients whether that effort has a chance at success. Finally, with absolutely no detail provided in denials, it is impossible to provide oversight or monitoring of ICE El Paso's inconsistent, arbitrary decisions.[39]

According to one attorney interviewed: "This is something new. People who are here on stays [of removal] now know that they are in jeopardy."

**RICARDO**

*Ricardo, a 35-year old father of a three-year old U.S. citizen child and married to a U.S. citizen, entered the U.S. without documents as a teenager. In the fall of 2016, he was apprehended by immigration authorities and placed in detention. While his attorney presented a request for a stay of removal, Ricardo's mental health quickly deteriorated and he suffered from severe insomnia and anxiety. He attempted suicide and was transferred to an area hospital; Ricardo was in the hospital under surveillance when ICE denied his request for a stay and immediately deported him. Neither Ricardo's family nor his attorney were informed that he was to be deported, but instead, found out when Ricardo called them from Mexico.*

Individuals whose requests for stays of removal have been arbitrarily denied in the El Paso sector in recent years do not pose any threat to public safety or national security. As their petitions demonstrate, use of discretion would clearly and demonstrably serve the public interest by allowing them to stay. ICE El Paso's practice of failing to favorably utilize its discretionary powers for individuals clearly worthy of such discretion not only causes serious, detrimental effects on the person who is deported, but on lives and livelihoods of their family members and communities.

In three of the cases documented, previous requests for stays of removal had been granted; the only change was ICE leadership in El Paso.

These cases demonstrate an increasing trend not only of arbitrarily denying even the most compelling humanitarian stays of removal, but a concerning practice of misleading petitioners in order to get them to report to ICE for deportation, alongside ICE's failure to inform attorneys of record about impending deportations.

**GUILLERMO**

*Guillermo is a 45-year-old Mexican national and resident of the U.S. for over 20 years. He is a father of four U.S. citizen children - aged 20, 17, 15 and 10 - and a 24-year-old DACA recipient and has substantial ties to the community. Guillermo applied for a fourth stay of removal as the primary caregiver of his three minor children.40 Despite having an attorney of record, Guillermo received a call directly from ICE officers asking him to report in person. He did so, and was detained based on a prior removal order.41 Guillermo's family called his attorney, who filed a request for a stay of removal. The stay was denied, and Guillermo was deported just before Christmas. The same stay of removal request was granted three years in a row to allow this father of five to remain in the U.S. to care for his children.*



# UNACCOUNTABLE, ARBITRARY DENIAL OF PAROLE

The arbitrary nature of parole denials in the El Paso Sector represents a distinct deviation from previous leadership. Parole denials include those with established family ties and community sponsors, those responsible for family members with urgent medical situations, and parents of minor children. ICE provides minimal or no justification for these denials, holding immigrants and asylum seekers in detention, hindering their cases and causing mental and physical strain.

## *Asylum seekers and individuals with urgent humanitarian claims are held in criminalized detention facilities, face barriers to their constitutional rights to due process, and are separated from families and communities.*

Parole is not a final determination of admissibility or an asylum claim; it is a way to ensure that individuals are not needlessly detained at great cost to themselves and the immigrant detention system. U.S. law states that noncitizens in removal proceedings must not be detained or required to pay bond unless they pose a demonstrated public-safety or flight risk.[42] The 2009 "Parole of Arriving Aliens Found to Have Credible Fear of Persecution or Torture" directive grants Field Office Directors the express authority to utilize discretion to parole "arriving aliens" in the asylum process for "urgent humanitarian reasons" or "significant public benefit," including for "aliens whose continued detention is not in the public interest."[43] The directive instructs appropriate ICE officers to parole asylum seekers who have been found to have credible fear, who establish their identity, and who are neither flight risks nor dangers to the community. Still, many such individuals continue to be detained in the El Paso Sector.

The overwhelming majority of lawyers and advocates interviewed for this report maintain that discretion has become nearly non-existent in the El Paso Sector as of late 2015. ICE routinely elects to deny parole for even the most urgent, humanitarian and exceedingly reasonable requests. One attorney estimated that in one year, less than ten percent of her organization's parole requests were granted, a significant decrease over previous years.[44]

One fifth of the cases documented for this report involved arbitrary, unexplained, and unjustified denials of parole. This trend is echoed by reports from across the country of asylum seekers routinely denied parole and bond,[45] even after meeting appropriate criteria.[46] Furthermore, parole denials are communicated on a rote form where a box is ticked but frequently, no additional details are provided. As is the case with denials of stays of removal, this leads us to question the extent to which parole requests are reviewed on a case-by-case basis, as is required in the directive. Finally, ICE is exceedingly slow in responding to parole requests, during which time individuals are deprived of freedom and held in detention.

**RENE**

*Rene is a Mexican national in his 30s. Rene, his twin brother, and a cousin were detained and tortured by members of the Mexican federal police in 2013; Rene's brother was killed and his cousin was disappeared. Rene laid next to his brother's lifeless body for hours in the back of a truck until he was let go. He came to an El Paso point of entry and requested asylum, and was detained based on a prior misdemeanor charge. Despite the harrowing basis for Rene's asylum claim, several parole requests were denied, and he was held in detention for two years.*

ICE El Paso elects not to publicize numbers of parole requests or denials; as such, it is difficult to hold ICE leadership accountable in their lack of compliance with internal directives. ICE's 2009 directive explicitly calls on ICE Detention and Removal Operations (DRO) to monitor parole statistics and implement a quality assurance processes.

**MARIANA**

*A young Mexican mother fleeing violence and subjugation at the hands of a powerful cartel leader in Ciudad Juarez, Mariana was separated from her infant child, who was still breastfeeding, after the family requested asylum in El Paso in February 2016. Mariana was originally released on parole with her infant in order to pursue their*

*asylum claim. She was later called to report to the ICE office and left her baby with an aunt with whom they were staying. After a few hours, when Mariana hadn't come home, the family called to ask after her. They were told that she had been detained.*

*Mariana's attorney requested parole the following week; what they received in response was a simple, rote form, indicating without further explanation that Mariana was a flight risk. Mariana and her sister, Laura, together with their mother, Cristina, were denied parole even though the U.S. Citizenship and Immigration Services (USCIS) deemed the family to have a viable, credible asylum claim. ICE disregarded agency humanitarian policies even as Mariana remained separated from her six-month old baby.*

*Mariana was finally released from detention in late October, 2016, under the terms of the Convention Against Torture, but placed on restrictive conditions, including ankle bracelet monitoring, home visits, and telephone check-ins. Her mother, inexplicably, was held in detention for another month before being released.*

## DETENTION AND PHYSICAL & MENTAL HEALTH

Detention has a detrimental impact on the physical and mental health of detainees, aggravating previously existing conditions and triggering mental health episodes. Twenty cases of serious health concerns were documented for this report, consistent with allegations of medical neglect at the El Paso Processing Center and other detention facilities nationwide.[47]

**SUSAN**

*In January 2016, Susan came to the southern U.S. border seeking asylum, facing persecution and threats from the government in her home country government because of her activism. Susan passed her credible fear interview, but failed to disclose her engagement to a U.S. citizen. Despite having no criminal record, no immigration violations and strong ties to the community, she was denied parole three times and labeled a flight risk. As of January 2017, Susan remains in detention, under threat of deportation. Susan is suffering from depression and has shown suicidal ideations. Susan's parole denials offered no explanation as to why ICE considered her a flight risk.*

This report sheds light on a pattern of arbitrary decision making by ICE leadership in the El Paso Sector; a process that is wholly unaccountable and offers little by way of explanation, but one that has devastating consequences. Asylum seekers and individuals with urgent humanitarian claims are held in criminalized detention facilities, face barriers to their constitutional rights to due process, and are separated from families and communities.



# VIOLATIONS OF DUE PROCESS & BARRIERS TO EFFECTIVE REPRESENTATION

Numerous obstacles to effective legal representation amount to a serious crisis of due process for individuals in immigration proceedings. Patterns identified in the El Paso Sector include obstacles to access to legal representatives, impediments to attorney-client meetings and confidentiality, the execution of deportation orders without notification to legal counsel, and other practices that inhibit the fundamental constitutional right to due process.

Although representation at government expense is not a right in civil proceedings like immigration, detainees do have a right to counsel in immigration proceedings and due process rights.[48] Policies and practices in the El Paso Sector clearly infringe on this most basic right, at times at the expense of a legitimate asylum claim or family separation.

A recent study by the American Immigration Council found that access to counsel is scarce and uneven across the United States, with rates of representation far worse for immigrants held in detention than non-detained immigrants, and that immigrants with representation fare better at every stage of the court process, from custody hearings to outcomes of relief decisions.[49] Although representation of detained immigrants at the El Paso Processing Center (EPC) is higher than the national average, attorneys who attempt to provide representation at EPC report a wide variety of challenges and barriers in accessing clients and in preparing and presenting cases.

Concerns regarding access to counsel and violations of due process in the El Paso Sector were described in detail in an open letter sent to ICE Field Office Director Corey Price and other local leadership of the Department of Homeland Security and Department of Justice in January 2017. These concerns include:

### 1. UNREASONABLE RESTRICTIONS AND IMPEDIMENTS TO CONFIDENTIAL ATTORNEY-CLIENT MEETINGS

Because of lack of access to adequate facilities, attorney-client meetings at EPC are not confidential. Detention center guards, other detainees and other attorneys are privy to private and sensitive information. This presents a serious burden to asylum cases, as asylum seekers are afraid to share information in a non-confidential environment. Attorneys are routinely denied access to contact rooms and are forced to utilize malfunctioning phone booth for meetings. On rare occasions when representatives are granted access to contact rooms, these do not have even minimally appropriate furnishing for case preparation, including lack of writing surfaces.[50]

> "YOU CAN HEAR GUARDS YELLING TO EACH OTHER OR AT DETAINEES, YOU CAN HEAR GUARDS TALKING TO ONE ANOTHER, LAUGHING. IF YOU CAN HEAR THEM, THEY CAN HEAR YOU."

### 2. EXECUTION OF DEPORTATION ORDERS WITHOUT ATTORNEY NOTIFICATION

Prior to December 2015, interviewees report that clients and attorneys would receive advance notification of deportation. Since that time, attorneys increasingly receive written notices only after a client has been deported. Failure to notify attorneys of impending deportation dates not only prevents attorneys from filing appeals, but in numerous cases has put the lives of asylum-seekers and migrants at risk.

> "I HAVE NEVER BEEN ADVISED AHEAD OF TIME THAT OUR CLIENT IS GOING TO BE REMOVED. WE GET [A NOTIFICATION] IN THE MAIL DAYS LATER, BUT WE GET A CALL FROM THE CLIENT FROM MEXICO BEFORE THEN. WE HAVE NEVER, EVER BEEN ADVISED AHEAD OF TIME."

### 3. DIRECT AND INDIRECT BARRIERS TO ACCESSING EXPERTS AND INTERPRETERS FOR CASE PREPARATION

Barriers for experts, including lengthy wait times for background checks, to access individuals in detention make use of such experts prohibitive. These issues have led to clients abandoning valid asylum claims or having stays of removal denied -- not based on the facts of their cases, but because of an inability to access expert witnesses and effective representation. Additionally, accredited representatives and clergy with pre-clearance have been denied access to detainees at EPC. Lastly, many detainees in the El Paso Sector are non-English and non-Spanish speaking, but interpreters are not provided during hearings and detention centers impede access to interpretation services.[51]

"YOU NEED TO BE ABLE TO COLLECT EVIDENCE AND CORROBORATE CLAIMS. YOU HAVE TO DO RESEARCH, PULL POLICE RECORDS, LOOK FOR NEWS ARTICLES TO BACK UP ASYLUM CASES; YOU CAN'T DO THIS WITHOUT NAMES AND IDENTITIES."

### 4. BURDENSOME AND INEXPLICABLE WAIT TIMES FOR ATTORNEY-CLIENT MEETINGS

Legal representatives face unduly burdensome wait times - often up to two hours - to meet with clients at EPC. This forces representatives to plan entire schedules around the detention facility and increases the cost of legal representation.

### 5. LACK OF ACCESS TO NECESSARY CLIENT DOCUMENTATION PRIOR TO HEARINGS

Attorneys are often prevented from obtaining necessary case files and documents to prepare and present cases. Clients cannot present a defense if they do not have access to their own immigration records.

### 6. INEXPLICABLE RESTRICTIONS ON ACCESS TO COURTROOMS

Attorneys depend on detention center guards to allow them into the courtroom for hearings; guards routinely fail to do so in a timely manner. Presiding judges admonish attorneys for their tardiness and this has led to rescheduling of hearings, thereby prolonging detention. Immigration attorneys also lack access to computers, printers and internet in the context of court, equipment widely available to government attorneys. This places migrants' counsel in serious disadvantage, being unable to access files, statutes, and precedents while in court.

"WE DON'T HAVE INTERNET ... ALL THE CODES, LAWS, POLICIES YOU NEED TO HAVE THEM, AND THE ONLY ALTERNATIVE IS TO HAUL IN A STACK OF BOOKS WITH YOU. THIS IS INHERENTLY UNFAIR WHEN GOVERNMENT ATTORNEYS DO HAVE INTERNET ACCESS."

### 7. RESTRICTION ON ACCESS TO AND LACK OF CLEAR GUIDELINES ON TECHNOLOGY IN DETENTION CENTERS

There are no clear regulations regarding use of technology during attorney-client meetings, and legal teams report frequent and arbitrary denial of cell phone use upon arrival at the EPC. Attorneys need access to telephonic interpreters to interview their clients and prepare cases. Attorneys seek various mechanisms to use personal cell phones for interpretation, including emailing ICE for written permission, however private security guards allow or deny cell phones seemingly at their whim.

### 8. ARBITRARY PRACTICES THAT NEGATIVELY AFFECT ATTORNEY ABILITY TO REPRESENT CLIENTS

In addition to the serious systematic impediments to due process detailed above, the legal community reports many more subtle ways in which agencies, officers and private security contractors denigrate them and make daily work more difficult. These include the denial of water, sexual harassment by guards and a general lack of written policies and rules.

Individually and as a whole, these barriers to basic due process serve to deter those seeking asylum,[52] by prolonging detention and also by contributing to a general environment of mistreatment at immigrant detention and processing centers in the sector.[53]

# RECOMMENDATIONS

**The findings in this report reveal an entrenched culture of disregard for human dignity within the immigration enforcement system in the El Paso Sector. Far from isolated incidents, these cases demonstrate systemic abuses obscured by opaque decision making processes and unaccountable leadership, which result in long-term, devastating impacts on the lives of asylum-seekers and migrants.**

Immigration enforcement officials in the El Paso Sector should treat every individual humanely and respectfully while guaranteeing their legal rights. This includes the treatment of asylum-seekers at ports of entry and upon apprehension and extends to decisions and processes to remove individuals from the United States. Detention should not be used as a mechanism to deter asylum claims and should not be the default strategy of immigration authorities. The decisions made by ICE, CBP, and Executive Office for Immigration Review in El Paso are not without consequence. These decisions often have irreparable ramifications on the families and communities affected by them. In the case of asylum-seekers, these practices may mean life or death.

While immigration law and enforcement policies are complex and local actors must inevitably balance a complicated nexus of national priorities, memorandums and legislative actions, local authorities still exercise significant power and discretion in enforcing immigration law. The following broad recommendations are aimed at rectifying the unaccountable and inhumane nature of decision making in the El Paso Sector and injecting rationality, fairness and coherence into this system. We call on the responsible Department of Homeland Security and Department of Justice authorities in the El Paso Sector to:

1. **Increase and Promote Transparency and Accountability**
2. **Limit Use and Duration of Immigrant Detention**
3. **End Deterrence & Mass Detention of Asylum Seekers**
4. **Enforce Removal in a Humane Manner**
5. **End Family Separation**
6. **Guarantee Access to Counsel & Respect for Due Process**

## INCREASE AND PROMOTE TRANSPARENCY AND ACCOUNTABILITY

CBP and ICE should implement effective vehicles of transparency and accountability in the areas of asylum, detention and prosecutorial discretion.

In addition to improving training for ICE and CBP agents, creating mechanisms for accountability, and improving communication regarding decision making, CBP and ICE should publish statistics related to asylum, detention and prosecutorial discretion. The 2009 ICE parole directive clearly states that DRO Field Offices shall maintain national and local statistics on parole determinations and establish a quality assurance process.[54] Implementation of this directive is critical. As an important first step towards increasing transparency, EOIR and ICE El Paso should publish information on a wide range of relevant data, including, but not limited to:

- **Length of detention of asylum seekers for FY 2015 & 2016.**
- **Children and family separation**
- **Issuance of parole to arriving aliens with credible fear determinations for FY 2015 & 2016**
- **Issuance of bond for FY 2015 & 2016**
- **Detention and alternatives to detention for FY 2015 & 2016**
- **Applications for stays of deportation for FY 2015 & 2016**

A complete list of the information under each of these areas is detailed in the appendix.

We refer local authorities to additional reports, which present specific mechanisms and implementation steps to promote accountability, including community engagement and relationship-building between immigration authorities and civil society.[55]

## LIMIT USE AND DURATION OF IMMIGRANT DETENTION

Immigration detention should only be utilized when necessary to ensure public safety and appearance in court. Immigrant detention should not be the default decision. ICE should make individualized detention decisions, especially for those seeking asylum and long-term residents of the U.S. with family ties (including legal permanent resident or citizen spouses and children).[56] The burden of proof should lie with agencies to justify holding individuals in detention facilities.

ICE and EOIR should also prioritize the use of alternatives to detention for asylum seekers, migrants with mental and physical health problems, and migrants with immediate family in the United States. Alternatives to detention are not only a moral imperative, they are effective.[57]

Additionally, ICE should utilize prosecutorial discretion to release asylum seekers and immigrants from detention in accordance with existing DHS memos, in a way that prioritizes humane enforcement and detention practices that respect human dignity. When ICE elects to deny requests for parole, it should provide detailed and case-specific reasons, demonstrating a serious assessment of both positive factors and risk factors. The current denial form, often vague or nearly blank, suggests arbitrariness and lacks meaningful specifics.[58]

EOIR should follow the lead of the U.S. Court of Appeals for the 9th Circuit and establish automatic detention determination hearings at the six-month mark, as required by the U.S. Constitution.[59]

Finally, detention facilities should be decriminalized and should reflect the civil nature of proceedings. Such steps should include expanded visitation for family, clergy and friends; greater freedom of movement; and humane treatment and conditions.[60]

## END DETERRENCE & MASS DETENTION OF ASYLUM SEEKERS

Agencies should take every step necessary to ensure that asylum seekers are offered the protections afforded to them by U.S. and international law, including the ability to request asylum at ports of entry and upon apprehension and the ability to present asylum claims before an immigration judge.

Asylum seekers should not be miscategorized as border crossers for purposes of removal and detention and detention should not be used as deterrence for those who seek protection and refuge in the United States. Given the undue burden detention places on asylum seekers - on legal claims and wellbeing - asylum seekers should not be detained unless the state can demonstrate that detention is in the interest of the community.

The burden should lie with the state to prove that an individual is a public security or flight risk. Agency officials and federal prosecutors should decline to prosecute those who express fear of persecution with illegal entry/re-entry, so as to avoid detention and a higher bar for processing what are otherwise legitimate asylum claims.[61]

Furthermore, CBP and ICE officials should cease all practices that intimidate, abuse, harass or otherwise dissuade asylum seekers. Extensive recommendations for improved training, accountability mechanisms, and oversight have been set forth by non-governmental organizations with expertise in these areas, and we refer agency leadership to these reports.[62] Implementation plans should be expanded to include all those who come into contact with asylum seekers, including private security contractors.

## ENFORCE REMOVAL IN A HUMANE MANNER

ICE should utilize prosecutorial discretion and grant stays of removal to prioritize humane enforcement in a way that respects human dignity and rights. Greater weight should be placed on humanitarian concerns of those requesting relief, and these considerations should be made on a case-by-case basis.

Furthermore, ICE should desist from misrepresenting the purpose of in-person meetings and all communication regarding case-related issues should be conducted only through the attorney of record, in the case of individuals with representation. No one should be pressured to sign final deportation orders or other documents. Individuals should be provided these documents in their primary language and should not be denied access to their attorney or the ability to consult with an attorney.

Legal counsel and deportees should be advised in a timely manner before deportation orders are executed to ensure that all legal measures have been exhausted and so that a deportee and her family can make necessary preparations for safe removal. Finally, deportation should always respect Local Repatriation Agreements.

## END FAMILY SEPARATION

DHS agencies tasked with immigration enforcement should prioritize child wellbeing and family unity in all decision-making, including in asylum, detention and enforcement processes.

Families should not be separated at any point in enforcement processes by CBP or ICE, including the detention of parents and caregivers of minor children, or those with mental or physical health concerns. Furthermore, ICE and CBP should take positive steps to reunify families when they have been separated through failure to utilize prosecutorial discretion and decisions regarding detention and parole.

Numerous reports with recommendations for DHS agencies regarding family separation, parental rights and reunification have published in recent years. We refer agency leadership to these reports for additional guidance on implementation steps to respect and guarantee family unity within the immigration enforcement system.[63]

## ACCESS TO COUNSEL & RESPECT FOR DUE PROCESS

Given the extent, gravity and systemic nature of barriers to access to counsel and violations of due process, ICE, EOIR and the Office of the Chief Counsel should implement corrective measures throughout the El Paso Sector to improve and guarantee detainee access to counsel. These recommendations have been detailed and presented to DHS and DOJ leadership through an official complaint letter.[64]

- **Detention facilities should permit legal counsel maximum access and flexibility in meeting and speaking with, advising and representing clients, and authorities should ensure confidentiality of attorney-client communications.**
- **Detention facilities should ensure timely access to experts (including psychological experts and others).**
- **EOIR and OCC should implement policies and procedures that eliminate investigative disparity between immigration attorneys/respondents and the government.**
- **Detention facilities and EOIR should establish clear, consistent policies regarding use of technology in client meetings and the courtroom.**
- **Government and private attorneys should be treated equally as officers of the court.**
- **Detention facilities and EOIR should ensure that respondents are able to participate meaningfully in proceedings by facilitating language access during communication with attorneys and other officers of the court.**

# CONCLUSION

**On November 8th, Donald J. Trump was elected President of the United States on a wave of rhetoric and campaign promises demonizing migrants, border communities, Mexicans and many others. Since that time, advocates and immigrants have experienced a further emboldened CBP and ICE, manifested in the deepening of a culture of inhumane treatment that violates the basic human dignity of those encountering the immigration system in El Paso.**

Since his inauguration, President Trump has signed a number of highly controversial executive orders. Through these orders, predicated on a "surge of illegal immigration" and a "significant increase in violent crime and United States deaths," the President directs government agencies to "construct a physical wall along the southern border;" increase immigrant detention and expedited removal proceedings; expand the size of CBP and ICE forces; engage local law enforcement "to perform the functions of an immigration officer;" prioritize the prosecution of "offenses ***having a nexus*** to the southern border;" and placing substantial restrictions on refugee and asylum programs.

While it is, as yet, unclear how many of these executive orders will be carried out to the letter and under what timeline, advocates along the US-Mexico border see a new stage in an already long process -- one that has led to the hyper-criminalization of the migrant and the militarization of the southern border. There is well-founded fear that these executive orders, along with new departmental leadership and the policies and memoranda they may implement, will further reduce the use of prosecutorial discretion, allow for increasingly arbitrary decisions with less oversight, and erect further obstacles to due process and fundamental human rights through an expanded immigrant enforcement and detention system. In short, advocates fear that the egregious violations of human dignity depicted in this report will worsen.

By shedding light on the human and moral consequences of a broken border enforcement paradigm, we hope to begin to repair the institutional culture embedded in immigration enforcement agencies. Today, this culture rejects engagement with local communities and advocates, shies away from transparency and accountability, and is enabled by racist rhetoric, xenophobia and general disregard for human rights. The efforts of the many advocates, grassroots leaders, and members of the legal community in El Paso, TX and Las Cruces, NM who work to build a more just border renew our hope in the power of local communities to overcome systems of oppression by working together. Their efforts are the inspiration for this report.

# APPENDIX

## CASE SUMMARY TABLE

Detailed information on over 120 cases of asylum seekers, individuals requesting humanitarian parole or relief, and detained and deported people was collected, coded, analyzed and classified in the creation of this report. The following chart presents the raw number and percentage of cases in which people were subjected to ICE and CBP practices and decisions:

| FINDING | TOTAL | % |
|---|---|---|
| Families separated by immigration enforcement decisions | 36 | 30 |
| Minor children separated from parents and/or caregivers | 31 | 25 |
| Immigrants and asylum seekers deported as a result of deterrence practices and or abuse of prosecutorial discretion | 25 | 20 |
| CBP & ICE practices intended to deter and dissuade asylum seekers | 44 | 36 |
| Deterrence practice: failure to process credible fear interviews | 14 | 11 |
| Deterrence practice: Language barriers during initial interviews | 16 | 13 |
| Deterrence practice: Verbal, physical, and mental harassment and abuse while in detention | 28 | 23 |
| Inconsistencies between sworn affidavits written by CBP & Border Patrol and client's testimonies | 9 | 7 |
| Detention exceeding six month period | 27 | 22 |
| Untreated physical and mental health problems in detention | 26 | 21 |
| Unaccountable, arbitrary denial of parole | 23 | 19 |
| Unaccountable, arbitrary denial of stays of removal | 18 | 15 |

## BOND

In addition to the findings presented in the report, researchers identified bond as another major issue in the immigration system in the El Paso Sector. Numerous attorneys reported that bond hearings are treated, by many EOIR judges, as preliminary asylum hearings, and if significant evidence and documentation of the asylum claim are not presented, Judges do not consider bond. The merits of a full asylum claim have nothing to do with whether the individual in detention represents a flight risk or security risk. Furthermore, asylum seekers have the highest court appearance rates in the immigration system, an indication that releasing asylum seekers from punitive detention does not create a high risk of failure to appear. Finally, given the many challenges to preparing an asylum claim from detention, forcing counsel and asylum seekers to argue the asylum claim while detained presents a serious burden. In addition to treating bond hearings as preliminary asylum hearings, attorneys report that when granted, bond amounts are exorbitant -- well above $10,000 and up to $30,000.

The issue of bond - how hearings are treated as well as denial rates - is an important concern, but one that went beyond the scope of this report. Researchers believe this is an important area for future study.

## INCREASE AND PROMOTE TRANSPARENCY AND ACCOUNTABILITY: DETAILED INFORMATION

The following information should be made available to attorneys and advocates through the Borderland Immigration Council, as well as published by ICE on a biannual basis:

- **Length of Detention of immigrants claiming fear of return to home country ("Asylum Seekers") in El Paso sector for FY 2015 & 2016.**
  - How many immigrants claimed fear of return in the El Paso sector for FY 2015 & 2016?
  - What was the average length of detention for asylum seekers in the El Paso Sector for FY 2015 & 2016?
  - How many asylum seekers withdrew their claim of fear in the FY 2015 & 2016 (i.e. took a removal order or voluntary departure in lieu of pursuing asylum claim)?
  - How many of those who withdrew or abandoned their applications for asylum were in detention for more than 6 months?
- **Children and Family Separation**
  - How many immigrant children arrived or were encountered in the El Paso Sector for FY 2015 & 2016?
    - How many of these children were asylum seekers?

- How many immigrant children who arrived or were encountered in the El Paso Sector were unaccompanied by an adult relative (UACs) for FY 2015 & 2016?
- How many children who arrived with or were encountered in the El Paso Sector with an adult relative in 2015 & 2016 were separated from their adult relative?
- How many adult asylum seekers arrived or were encountered in the El Paso Sector with a child in the FY 2015 & 2016?
- Of these adult asylum seekers, how many were been separated from the child?
- How many of these adult asylum seekers who arrived with a child were detained by ICE for at least 48 hours?
- How many of these adult asylum seekers who were detained were sent to a family detention center with the child they arrived with (i.e. Dilley, Karnes, Artesia), and how many were detained without the child at another ICE location?

**Issuance of Parole to Arriving Aliens with Credible Fear Determinations for FY 2015 & 2016**

- Please clarify that ICE is responsible for determining whether an arriving alien who claims fear will be detained or paroled.
- How many people were designated as “arriving aliens” in the El Paso Sector for 2015 & 2016?
- How many arriving aliens were granted parole by ICE in El Paso Sector in the FY 2015 & 2016?
    - How many of those granted parole were adults who arrived with children, were pregnant, or had medical issues which served as the basis of parole?
    - How many of those granted parole were children?
- How many arriving aliens were denied parole by ICE in El Paso Sector for FY 2015 & 2016?
    - How many of those denials were based on danger to the community?
    - How many of those denials were based on flight risk or “overriding militating factors”?

**Issuance of bond by ICE for FY 2015 & 2016**

- Please clarify whether the the Risk Classification Assessment Tool (“RCA”) is being utilized in each office for every bond eligible alien.
- Please provide numbers of how many people were run through the RCA system in the El Paso Sector for FY 2015 & 2016, by the field office where the RCA was administered (i.e. Albuquerque Field Office, Midland/Odessa Field Office, El Paso Field Office, etc).
- How many people (total) were granted bond or Release on Recognizance (RoR) by ICE in the El Paso Sector for FY 2015 & 2016, broken down by field office)?
- How many asylum seekers were run through the RCA in the El Paso sector for FY 2015 & 2016 by field office, and how many were issued bond or RoR?

- **Detention and Alternatives to Detention for FY 2015 & 2016**
  - How many people were detained in the El Paso Sector each month in 2015 & 2016?
  - How many people were enrolled in an Alternative to Detention ("ATD") program, (such as GPS monitoring or telephone check-ins) each month in the El Paso Sector for FY 2015 & 2016?
  - How many people were under orders of supervision administered by the El Paso Sector for FY 2015 & 2016?
    - How many of those under an order of supervision were asylum seekers?
    - How many of those under an order of supervision were children?

- **Applications for Stays of Deportation for the El Paso Sector for FY 2015 & 2016**
  - How many applications for Stays of Deportation were filed in El Paso Sector in FY 2015 & 2016?
  - How many were approved?
    - How many of these approvals were based on eligibility for some of relief (ex. U visa, DACA, etc.)?
    - How many of these approvals were based on compelling humanitarian factors alone?
  - How many applications for stay of deportation were denied (by month if possible) in 2015 and 2016?
  - Of the applications that were denied, how many claimed eligibility for a U visa or other form of relief?

*Office of Enforcement and Removal Operations*
U.S. Department of Homeland Security
11541 Montana Avenue, Suite E
El Paso, Texas 79936

U.S. Immigration and Customs Enforcement

1 2 OCT 2016

Carlos Spector, Esq.
Law Offices of Carlos Spector
1430 E. Yandell
El Paso, TX 79902

Re: [redacted] A[redacted]

Dear Mr. Spector:

This letter is in response to your client's Application for a Stay of Deportation or Removal filed with U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) on September 15, 2016.

This office has thoroughly reviewed the information and documentation provided with your request, taking into consideration the individual circumstances of your client's case. I have determined that your client's removal from the United States is a priority under The Department's civil immigration enforcement priorities and as such he does not warrant a favorable exercise of prosecutorial discretion. Please see the Department's Civil Immigration Enforcement Priorities 2014 and 2015. This case was also reviewed under the terms of the August 23, 2013 ICE Directive, *Facilitating Parental Interests in the Course of Civil Immigration Enforcement Activities*, also referred to as the Parental Interests Directive.

Upon review of the evidence submitted, I determined that your client does not warrant a favorable exercise of prosecutorial discretion under the Directive. Your client's application for a stay of removal is hereby denied. You may not appeal this decision; however, it does not prohibit your client from seeking any other form(s) of relief available. If you have any questions regarding this matter, please contact Deportation Officer Patricia Noga at [redacted]

Sincerely,

Corey A. Price
Field Office Director

RECEIVED OCT 1 5 2016

www.ice.gov

*Office of Enforcement and Removal Operations*

U.S. Department of Homeland Security
11541 Montana Avenue Suite E
El Paso, TX 79936

U.S. Immigration and Customs Enforcement

August 18, 2016

[redacted]
C/O El Paso Processing Center
8915 Montana Avenue
El Paso, Texas 79925

In Reference to: [redacted]

## NOTIFICATION DECLINING TO GRANT PAROLE

Dear [redacted]

This letter is to inform you that U.S. Immigration and Customs Enforcement (ICE) has decided not to parole you from detention at this time. Under ICE policy, arriving aliens determined by an Asylum Officer to have a credible fear of persecution or torture are initially considered for parole. While the decision whether to grant parole is discretionary, ICE policy is generally to grant parole to aliens determined to have a credible fear if they establish their identity and that they pose neither a flight risk nor danger to the community.

As part of its determination whether to parole you, on 04/06/2016, ICE conducted an initial interview with you. Your immigration files and any supplemental documentation that you provided were reviewed at that time. After reviewing all available information, ICE has determined that parole is not appropriate in your case at this time based on the following reason(s):

- ☐ You have not established your identity to the satisfaction of ICE.
  - ☐ You did not present valid, government-issued documentation of identity, or any documents you submitted did not, to ICE's satisfaction, establish your identity.
  - ☐ You did not provide third-party verification of your identity, or any third-party information you provided did not, to ICE's satisfaction, establish your identity.
  - ☐ You did not, to ICE's satisfaction; establish your identity through credible statements.

- ☒ You have not established to ICE's satisfaction that you are not a flight risk.
  - ☐ You failed to provide, to ICE's satisfaction, a valid U.S. address where you will reside while your immigration case is pending.
  - ☐ You did not establish, to ICE's satisfaction, substantial ties to the community.
  - ☒ Imposition of a bond or other conditions of parole would not ensure, to ICE's satisfaction, your appearance at required immigration hearings pending the outcome of your case.

☐ You have not established to ICE's satisfaction that you are not a danger to the community or U.S. security. In making this determination, ICE has taken into account any evidence of past criminal activity, activity contrary to U.S. national security interests, activity giving rise to concerns of public safety or danger to the community, disciplinary infractions or incidents, or other criminal or detention history that shows you have harmed or would likely harm yourself or others.

☐ Additional exceptional, overriding factors (e.g., law enforcement interests or potential foreign policy consequences) in your case militate against parole, as follows:

Subject is a recent entrant and a flight risk. Subject only has a LPR sister who resides in the United States.

☐ ICE previously provided you with a written decision declining to grant parole, and you have failed to provide additional documentation or to demonstrate any significant changed circumstances which would alter ICE's previous determination.

You may request a redetermination of this decision in writing, based upon changed circumstances in your case or additional documentation you would like ICE to consider. Such changed circumstances or documentation should relate to the reason(s) indicated above why ICE is not paroling you from custody at this time. For example, if you have not established your identity to ICE's satisfaction, you may wish to consider providing previously unfurnished government-issued documents such as passports, birth certificates, or identity cards. Identity can also be established through written statements prepared by individuals whom you know in the United States and whose identity ICE can verify to its satisfaction. These statements should include the address of the person you know in the United States and evidence of his or her identity. Finally, if there are multiple grounds checked above, you should try to provide further evidence addressing each of them.

If you request redetermination of this decision, please direct your written request to the address above, include a copy of this letter and any other prior ICE written decision(s) declining to grant you parole, and clearly explain what changed circumstances or additional documents you would like considered. Failure to provide satisfactory documentation and explanation may result in a denial of your request for redetermination.

Sincerely,

AFDFO

*Alfredo Fierro*
*Deputy Field Office Director*
El Paso Field Office

(x) cc: Attorney of Record or Designated Representative
( ) cc: A-File

9400 Viscount Blvd, Suite 100
El Paso, TX 79925

U.S. Customs and
Border Protection

December 9, 2016

Robert Reed
Sonoma Springs Covenant Church
3940 Sonoma Springs Avenue
Las Cruces, New Mexico 88011

Dear Mr. Reed,

Thank you for your correspondence received on December 6, 2016 on behalf of Rosa [redacted] regarding her request for parole and subsequent denial on October 28, 2016 at the Port of El Paso.

First, please allow me to express regret for her situation. CBP is tasked with protecting our Nation's borders as well as enforcing numerous laws at our Nation's ports of entry on behalf of a variety of other Government agencies, including state and local law enforcement. All international travelers attempting to enter the United States, including all U.S. citizens, are subject to examination upon each arrival into this country.

CBP does not have the authority to admit an inadmissible alien. Certain discretionary mechanisms, such as parole or waiver of the requirement to present certain documents during the inspection/admission process, may be applied in appropriate situations. The exercise of discretion to grant parole into the United States is an extraordinary measure, sparingly used only for urgent or emergency circumstances or for significant public benefit. Parole is not to be used to circumvent normal passport and visa requirements. Moreover, discretion cannot be exercised favorably for a person that poses a substantial risk to contributing to the illegal population of the U.S. nor for any potential threat of committing criminal acts. After careful review, it has been determined that the denial of Ms. [redacted]'s parole request at the Port of El Paso on October 28, 2016 was appropriate.

CBP is greatly committed to maintaining the physical integrity of all individuals under our custody, and as such, we regret that Ms. [redacted]'s repatriation during the early hours of September 3, 2016 was not in accordance with our established practices. We have already addressed this issue with the Mexican consulate, by providing a written explanation of the timeline and events that occurred during the early hours of September 3, 2016, and have taken steps to ensure that our officers will comply with the terms of the repatriation agreement. Additional information regarding U.S. Customs and Border Protection may be found at www.CBP.gov.

Sincerely,

Hector A. Mancha
Director, Field Operations
Office of Field Operations

# ENDNOTES

1 For more on the historical context of the El Paso area, see: Staudt, Kathleen and Josiah Heyman. "Immigrants Organize Against Everyday Life Victimization" in *The Immigrant Other: Lived Experiences in a Transnational World, ed.* Furman, Rich et al. (Columbia University Press 2016), 75-89.

2 Early, Ingrid and Steven Shafer. "Access to Counsel in Immigration Court." American Immigration Council Special Report. September 2016.

3 While we support calls to expand the definition of "family" to extended family units in order to protect asylum seekers and reduce vulnerability of migrants upon deportation, for the purposes of this report, we focus on separation of immediate family members (spouses and minor children) at the moment of apprehension and through detention and deportation.

4 This report focuses on family separation through decisions regarding detention and deportation. For background on the practices and consequences of separation prior to apprehension and post-deportation, see:
Danielson, Michael S. *Documented Failures: the Consequences of Immigration Policy on the U.S./Mexico Border.* Nogales, AZ and Sonora, Nogales, Mexico: Jesuit Refugee Service/USA, Jesuit Conference of the United States, and Kino Border Initiative. 2013.

5 U.S. Immigration and Customs Enforcement. *Facilitating parental interests in the course of civil immigration enforcement activities.* Washington, DC: US Department of Homeland Security Immigration and Customs Enforcement. 2013.

6 DHS Advisory Committee on Family Residential Centers, ACFRC Consolidated Draft Subcommittees' Recommendation Report, "Report of the DHS Advisory Committee on Family Residential Centers. September 2016. Available at: https://www.ice.gov/sites/default/files/documents/Report/2016/ACFRC-sc-16093.pdf (accessed 31 January 2017)

7 In order to ensure the privacy and protection of the individuals whose cases and testimonies appear in this report, we use pseudonyms for the vast majority of these cases.

8 The KINO Report, *Our Values on the Line,* details many of these barriers, and the challenges faced by individuals separated from their families and held in detention who are seeking to relocate their family members: "In most cases separation is attributable to predictable consequences of an increased criminalization of unauthorized migration or an administrative failure of U.S. immigration authorities to determine familial relationships and keep track of the whereabouts of family members through the process of detention and deportation." (Page 1.)
*See also,* Lutheran Immigration and Refugee Services. *Separation of Immigrant Families in U.S. Immigration Custody.* March 2016. "When families are detained in different federal facilities, there is no way to regularly monitor this or inform the detainee where their family member is located, making it nearly impossible to reunite or pursue a joint asylum claim without counsel." (Page 2)

9 *See,* Family Detention: Still Happening, Still Damaging. Human Rights First. October 2015.
For documentation of other traumatic cases of family separation through detention, see: O'Connor, Kathleen; et al. *No Safe Haven Here: Mental Health Assessment of Women and Children Held in U.S. Immigration Detention.* Unitarian Universalist Service Committee, October 2015.
"ICE separates families as a matter of course and in a way that risks family members losing each other permanently. One of the women interviewed had been separated from her 10-ˇyear old son as well as from her husband. The husband, interned on the East Coast somewhere, was desolate at losing his family and tried to commit suicide. The mother and her young daughter were released on the last day of the team's field trip but are stuck in the shelter waiting for her son to be released. The woman reported experiencing migraines and not being able to sleep or eat since she could not stop thinking about her son. Her two youngest children would hear their mother cry at night and would also start crying, wondering why their brother and father were not with them." (Page 8)

10 *No Safe Haven Here* authors state that "if the human cost of family separation is not sufficient to warrant ending the practice, the government should consider taxpayer burden when spending tax dollars on foster care subsidies that would be unnecessary if families were kept intact." (8-9)

11 Due to a prior unauthorized re-entry charge, Erica is ineligible to apply for legal status despite being married to a U.S. citizen.

12 Interview. Transcript on record at Hope Border Institute.

13 Women's Refugee Commission. *Backgrounder: Separation of Immigrant Families in U.S. Immigration Custody.* March 2016. Available at https://www.womensrefugeecommission.org/rights/gbv/resources/document/download/1384 (accessed on January 31, 2017).

## ENDNOTES

"Decisions to prosecute immigrants and asylum seekers for illegal re-entry have increased the number of minor children separated from family members with whom they are traveling, resulting in these children being classified as unaccompanied minors and referred to ORR custody." (2)
See also, *Report of the DHS Advisory Committee:* "Currently, the criteria and conditions for admissions and releases of mothers with minor children and fathers with minor children appear to be different and arbitrary, with insufficient justification." (12)

*14* Barrick, Leigh. *Divided By Detention: Asylum Seeking Families' Experience of Separation*. American Immigration Council. August 2016.
"Far from preserving family unity, DHS custody and release decisions for family members that have fled violence together are inconsistent and result in the separation of asylum seekers from their loved ones, especially when they fall outside of the ICE definition of a family unit as parents with children, or its de facto definition as mothers with children ... By separating asylum-seeking families, DHS throws new hurdles into what is already an arduous legal process. It jeopardizes families' well-being and access to humanitarian protection, while multiplying the government resources required to adjudicate the same asylum claim..." (22)
See also, *Backgrounder: Separation of Immigrant Families in U.S. Immigration Custody*, 2016:
"Family separation can impede the ability of families to access asylum and other protection mechanisms because individual family members may be unable to apply for the same benefit they are legally entitled to apply for as a family unit." (1)
"[ICE custody determination]has widespread negative consequences: loss in immigration relief determinations (e.g. asylum) because of separate claims ... or result in removal of some family members while others continue to pursue relief." (3)
*See also,* Campos, Sara, Esq. and Joan Friedland, Esq. *Mexican and Central American Asylum and Credible Fear Claims: Background and Context.* Washington, DC: American Immigration Council, 2014.

*15* United Nations Commissioner of Refugees. Working Group on Arbitrary Detention: Preliminary Findings from its visit to the Unites States of America. October 11-24, 2016. Available at: http://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=20746&LangID=E Accessed January 31, 2017.

*16* Srikantiah, Jayashri, Charles Abbott, Lisa Weissman-Ward, and Francisco Quintana. "Report on Prosecutorial Discretion and Family Unity: US Government Officials' Failure to Consider the Impact of Deportation on Families." In support of the Request for Public Thematic Hearing Concerning U.S. Deportation Policy and the Rights of Migrants before the Inter-American Commission on Human Rights. 149th Period of Sessions. Mills Legal Clinic, Stanford Law School and CEJIL. 2016.
*See also,* Wessler, Seth Freed et al. *Shattered Families: The Perilous Intersection of Immigration Enforcement and the Child Welfare System.* Applied Research Center. November 2011.
"In fiscal year 2011, the United States deported a record-breaking 397,000 people and detained nearly that many. According to federal data ... a growing number and proportion of deportees are parents ... These deportations shatter families and endanger the children left behind." (5)
*See also,* Amnesty International USA. *In Hostile Terrain: Human Rights Violations in Immigration Enforcement in the US Southwest.* March 2012.

*17* Satinsky, Sara, et. al; *Family Unity, Family Health: How Family-Focused Immigration Reform Will Mean Better Health for Children and Families.* Human Impact Partners. June 2013.
*See also:* Shattered Families 2011.

*18* Women's Refugee Commission. *Torn Apart by Immigration Enforcement: Parental Rights and Immigration Detention.* New York: December 2010.

*19* *Our Values on the Line* (2015) found that mothers, fathers, and guardians deported by ICE in Arizona are often separated from their citizen children; of their sample, three-fifths of adults deported were torn from a child remaining in the U.S.
For numbers on the increase in deportation of parents of minor children, see Satinsky, Sara, et. al; *Family Unity, Family Health: How Family-Focused Immigration Reform Will Mean Better Health for Children and Families.* Human Impact Partners. June 2013.
See also*, Shattered Families.*

*20* The U.S. has ratified the International Covenant on Civil and Political Rights (ICCPR), the Convention Against Torture (CAT), and the Refugee Protocol. Available at: https://www.state.gov/j/drl/reports/treaties/index.htm#ftn2. Accessed on January 29, 2017.

*21* *See,* Human Rights First. *Lifeline on Lockdown: Increased U.S. Detention of Asylum Seekers.* July 2016.
*And,* Amnesty International. *Home Sweet Home? Honduras, Guatemala and El Salvador's Role in a Deepening Refugee Crisis.* London: 2016.
Hiskey, Jonathan T.; et, al. *Understanding the Central American Crisis: Why They Are Fleeing and How U.S. Policies are*

## ENDNOTES

*Failing to Deter Them.* American Immigration Council. February 2016.
Wolgin, Philip E. *A Short-Term Plan to Address the Central American Refugee Situation.* Center for American Progress. May 2016.

22 U.S. Citizenship and Services website. *Credible Fear FAQs.* DOI (https://www.uscis.gov/faq-page/credible-fear-faq#t12831n40132) Accessed on December 13, 2016.

23 More egregious still, there are many reports of CBP agents turning asylum seekers away at ports of entry. The American Immigration Council recently presented a complaint addressing this very issue. *See,* "U.S. Customs and Border Protection's Systemic Denial of Entry to Asylum Seekers at Ports of Entry on U.S.-Mexico Border." American Immigration Council. 13 January 2017.

24 *See,* U.S. Customs and Border Protection's Systemic Denial of Entry to Asylum Seekers at Ports of Entry on U.S.-Mexico Border. The American Immigration Council. January 13, 2017. Available at: https://www.americanimmigrationcouncil.org/content/us-customs-and-border-protections-systemic-denial-entry-asylum-seekers-ports-entry-us.
*And,* Martinez, Daniel, Guillermo Cantor, and Walter Ewing. "No Action Taken: Lack of CBP Accountability in Responding to Complaints of Abuse." American Immigration Council Special Report. May 2014.
*And,* Human Rights First. "How to Protect Refugees and Prevent Abuse at the Border: A Blueprint for US Government Policy." June 2014.

25 See, Rosenblum, Marc R., et.al. *The Deportation Dilemma: Reconciling Tough and Humane Enforcement.* Migration Policy Institute. April 2014.
*See also,* Dominguez, Lara et al. "U.S. Detention and Removal of Asylum Seekers: An International Human Rights Law Analysis," prepared at the request of Human Rights First. June 20, 2016.

26 Cassidy, Elizabeth and Lynch, Tiffany. *Barriers to Protection: The Treatment of Asylum Seekers in Expedited Removal.* The U.S. Commission on International Religious Freedom. November 2016.

27 For further analysis, see: Gentry, Blake. *Exclusion of Indigenous Language Speaking Immigrants in the U.S. immigration System, a technical review.* Ama Consultants. June 2015.

28 The USCIRF report *Barriers to Protection* (2016) found that sworn statements "were neither verbatim nor reliable, and often indicating that information was conveyed when in fact it was not and sometimes including answers to questions that never were asked," and in 72 percent of the cases, asylum seekers are not allowed to review the document before signing it. (19)

29 This is happening in El Paso as well as nationally. The USCIRF report "found that asylum seekers continue to be detained under inappropriate penal conditions before their credible fear interviews, and in some cases, even after being found to have a credible fear." (40).

30 See*, Report of the DHS Advisory Committee.*

31 *See,* Detained Migrant Solidarity Committee "*'I was treated like a dog instead of a human being:' Degradation, negligence, and abuse in ICE's El Paso Processing Center."* El Paso: November 2016.
Also see, *Shadow Prisons: Immigrant Detention in the South.* Southern Poverty Law Center, National Immigration Project of the National Lawyers Guild, Adelante Alabama Worker Center. November 2016.
*U.S. Detention of Asylum Seekers: Seeking Protection, Finding Prison.* Human Rights First. June 2009.

32 U.S. Immigration and Customs Enforcement. *Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture.* December 2009.

33 The letter denying Rolando's parole application can be found in the Appendix.

34 Steering Committee of the New York Immigrant Representation Study Report, "Accessing Justice I: The Availability and Adequacy of Counsel in Removal Proceedings," Cardozo Law Review, (2011) Vol. 33:2, p. 364 and seriatim, available at http://www.cardozolawreview.com/Joomla1.5/content/33-2/NYIRS%20Report.33-2.pdf

35 *U.S. Detention of Asylum Seekers, 2009.*

36 Johnson, Jeh Charles, Secretary of U.S. Department of Homeland Security, Memorandum for Thomas S. Winkowski et al. re: Policies for the Apprehension, Detention and Removal of Undocumented Immigrants. November 2014.

## ENDNOTES

37 These issues are not limited to the El Paso sector, or any specific national or ethnic group. For example, *see:* Automatic Injustice: A Report on Prosecutorial Discretion in the Southeast Asian American Community. October 2016.
"Even SEAAs whose stories are indeed "compelling and exceptional," who indeed are valued family members (mothers, fathers, aunts and uncles), and who have demonstrated rehabilitation and pose no threat to those around them continue to be deported." (4)
And, Letter from Congress Calling for DHS Accountability on Immigration Enforcement Priorities. **AILA Doc. No. 15051208**. 11 May 2015. Available at: http://www.aila.org/advo-media/whats-happening-in-congress/congressional-updates/congress-calling-dhs-accountability-on-enforcement
"[I]n many instances, ICE summarily denies a request for prosecutorial discretion with little or no review of a request." (2)

38 Canizales, Carolina; Shah, Paromita. *Prosecutorial Discretion DENIED.* United We Dream. April 2015.

39 For further discussion of the inconsistency in DHS decision making regarding stays, see:
Hing, Bill Ong. The Failure of Prosecutorial Discretion and the Deportation of Oscar Martinez (2013).
*And*, The Scholar: St. Mary's Law Review on Race and Social Justice, Vol. 15, 2013; Univ. of San Francisco Law Research Paper No. 2013-10. Available at SSRN: https://ssrn.com/abstract=2215989

40 This stay of removal would have been Guillermo's last petition; he was going to be able to adjust his status in the coming year.

41 While ICE officers insisted they had notified Guillermo's attorney of the removal order, the attorney on record had not received any such notice.

42 In Human Right First (June 2016) from Matter of Patel, 15 I&N. Dec. 666, 666 (B.I.A. 1976).

43 *Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture.*

44 As a non-profit service provider with limited resources and many clients, this attorney further maintained that her organization is selective about the parole requests it submits.

45 See appendix for further discussion of bond in the El Paso Sector.

46 Human Rights First. *Reducing the Immigration Court Backlog and Delays*. Fact Sheet. July 2016. Available at: http://www.humanrightsfirst.org/resource/reducing-immigration-court-backlog-and-delays

47 See, *"I Was Treated Like A Dog Instead of a Human Being."*
And, Amnesty International. *Jailed Without Justice: Immigrant Detention in the USA.* March 2009.

48 *Dakane v. U.S. Attorney General,* 371 F.3d 771 (11th Cir. 2004).

49 Early, Ingrid and Steven Shafer. "Access to Counsel in Immigration Court." American Immigration Council Special Report. September 2016.

50 *See also, See also*, Penn State Law and Legal Action Center of the American Immigration Council, "Behind Closed Doors: An Overview of DHS Restrictions on Access to Counsel," May 2012, as cited in, Human Rights Watch. *You Don't Have Rights Here: US Border Screening and Returns of Central Americans to Risk of Serious Harm.* October 2014.
"ICE fails to provide or facilitate access to counsel when questioning represented individuals, restricts attorney-client communications in detention facilities, and has also discouraged noncitizens from seeking legal counsel." (30)
And, *Lifeline on Lockdown:* "individual facility operators, which in effect set their own rules regulating attorney access to facilities, sometimes impede access to counsel." (33)

51 See, American Immigration Lawyers Association. *Due Process Denied: Central Americans Seeking Asylum and Legal Protection in the United States.* AILA Doc. No. 16061461. June 2016.

52 *See also, Report of the DHS Advisory Committee on Family Residential Centers.*

53 For documentation of human rights abuses and inhumane treatment at the El Paso Processing Center see*,*
*"'I was treated like a dog instead of a human being."*

54 *Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture.*

55 *See:*

## ENDNOTES

*Barriers to Protection,* 2016.
*Lifeline on Lockdown,* 2016.
*Letter from Congress,* 2015.
Government Accountability Office. *Immigration Detention-Additional Actions Needed to Strengthen DHS Management of Short-Term Holding Facilities.* May 2016.
*Fatal Neglect: How ICE Ignores Deaths in Detention*. American Civil Liberties Union, Detention Watch Network, and Heartland Alliance's National Immigrant Justice Center. February 2016.
*ICE's Failed Monitoring of Immigration Detention Contracts: A Policy Brief from Heartland Alliance's National Immigrant Justice Center.* Heartland Alliance's National Immigrant Justice Center. September 2016.

56 *See:* Jennings v. Rodriguez oral arguments. November 30, 2016. Available at (https://www.supremecourt.gov/oral_arguments/argument_transcripts/2016/15-1204_k536.pdf. Accessed on January 20, 2017.

57 Please refer to the following reports for in-depth recommendations on the use of alternatives to detention:
Danielson, Michael S. *Our Values on the Lines: Migrant Abuse and Family Separation at the Border.* Kino Border Initiative. Study prepared for the Jesuit Conference of Canada and the United States. September 2015.
*Locking Up Family Values, Again.* Lutheran Immigration & Refugee Service and the Women's Refugee Commission. 2014.
*Punishment Before Justice: Indefinite Detention in the US.* Physicians for Human Rights. 2011. Available at: https://s3.amazonaws.com/PHR_Reports/indefinite-detention-june2011.pdf.
*Barriers to Protection* 2016.

58 *Automatic Injustice* 2016. SEARAC states that parole denial forms should include a detailed analysis outlining the decision making process, including the weighing of positive factors against information the government has against a request for parole.

59 Letter to Secretary Johnson from former Immigration Jurists. October 31, 2016. Available at: http://www.immigrantjustice.org/sites/default/files/content-type/press-release/documents/2016-11/ImmJudges_IncreasedDetention_Letter_October2016.pdf

60 See: *"I was treated like a dog instead of a human being."* 2016.
*Jailed Without Justice* 2008.

61 This recommendation is echoed by numerous human rights organizations; see:
*Barriers to Protection* 2016.
*Lifeline on Lockdown* 2016.
*Fatal Neglect* 2016.
*Jailed Without Justice* 2009.
United Nations Commissioner of Refugees 2016.

62 See, United States Commission on International Religious Freedom. *Report of Asylum Seekers in Expedited Removal.* February 2005.
*And,* Amnesty International USA. *In Hostile Terrain: Human Rights Violations in Immigration Enforcement in the US Southwest.* March 2012.
*You Don't Have Rights Here* 2014.

63 *See:*
*Divided by Detention,* 2016.
*Locking up Family Values, Again: A Report on the Renewed Practice of Family Immigration Detention.* Lutheran Immigration & Refugee Service and the Women's Refugee Commission. October 2014.
*Torn Apart by Immigration Enforcement,* 2010.
*DHS Advisory Committee,* 2016.
*Backgrounder: Separation of Immigrant Families in U.S. Immigration Custody,* 2016.
Family Detention: Still Happening, Still Damaging, 2015.

64 Available on request; contact the Hope Border Institute.


borderlandimmigrationcouncil.org
BORDERLAND
IMMIGRATION COUNCIL

# EXHIBIT 34




HUMAN RIGHTS WATCH

# "You Don't Have Rights Here"

## US Border Screening and Returns of Central Americans to Risk of Serious Harm

HUMAN RIGHTS WATCH

# "You Don't Have Rights Here"

## US Border Screening and Returns of Central Americans to Risk of Serious Harm

Copyright © 2014 Human Rights Watch
All rights reserved.

Printed in the United States of America

ISBN: 978-1-6231-32002

Cover design by Rafael Jimenez

Human Rights Watch defends the rights of people worldwide. We scrupulously investigate abuses, expose the facts widely, and pressure those with power to respect rights and secure justice. Human Rights Watch is an independent, international organization that works as part of a vibrant movement to uphold human dignity and advance the cause of human rights for all.

Human Rights Watch is an international organization with staff in more than 40 countries, and offices in Amsterdam, Beirut, Berlin, Brussels, Chicago, Geneva, Goma, Johannesburg, London, Los Angeles, Moscow, Nairobi, New York, Paris, San Francisco, Sydney, Tokyo, Toronto, Tunis, Washington DC, and Zurich.

For more information, please visit our website: http://www.hrw.org

OCTOBER 2014 978-1-6231-32002

# "You Don't Have Rights Here"

## US Border Screening and Returns of Central Americans to Risk of Serious Harm

Summary ........................................ 1

Methodology ........................................ 11

I. Background on Threats in Honduras ........................................ 12

II. First-Hand Accounts: Threats Facing Returned Hondurans ........................................ 15

III. Expedited Removal, Reinstatement of Removal, and Screening for Credible Fear ... 20

IV. First-Hand Accounts: Asylum Seekers' Experiences in Expedited Removal ............ 26

V. Detention and Access to Counsel ........................................ 30

VI. US Law and International Refugee Law ........................................ 36

Recommendations ........................................ 41

Acknowledgments ........................................ 44

# SUMMARY

> "I told them, I cried, that I couldn't go back to my country… but they deported us."
>
> —Alicia R., deported from the United States following Border Patrol screening in August 2014 with her two children, ages 3 and 10, feared retribution from gang members in Honduras after witnessing the murder of her mother.[1]



Migrants from Central America and Mexico seek to enter the United States without authorization for many reasons. Some seek economic opportunity. Others are fleeing violent gangs in countries such as Guatemala, El Salvador, and Honduras, where local officials may be complicit with gangs or otherwise unable or unwilling to provide meaningful protection. Many have mixed motives for leaving, including poverty, gang violence, and reuniting with separated family members.

At the US-Mexico border, US immigration officers issue deportation orders to unauthorized migrants in accelerated processes known as "expedited removal" or "reinstatement of removal." These processes include rapid-fire screening for a migrant's fear of persecution or torture upon return to their home country or an intention to apply for asylum. As detailed in this report, this cursory screening is failing to effectively identify people fleeing serious risks to their lives and safety.

1 Human Rights Watch interview with Alicia R. (pseudonym), San Pedro Sula, Honduras, September 8, 2014. The names of migrants quoted in this report have been changed in the interest of the security of those concerned.



Alicia R. after being deported from the United States in August 2014 with her two children.

Photographs by Stephen Ferry




Graffiti of the MS-13 (Mara Salvatrucha) transnational criminal gang in San Pedro Sula, Honduras. Bullet holes are visible alongside the graffiti.







Honduran military police beside a bus with “Honduras is my land” painted on the side in downtown San Pedro Sula.

In the past two decades, US laws and policies have become less responsive to the risks faced by arriving migrants seeking asylum from persecution. In 1996, and subsequently in 2006, the US government severely undermined the system for identifying asylum seekers through the establishment and expansion of expedited removal. The flaws of that approach are readily apparent today at the US-Mexico border.

This report is based on 35 interviews with Central American migrants in detention in the US or recently deported to Honduras. While focusing on the situation facing Hondurans, our findings and recommendations apply to others coming to the US from Central America and Mexico.

All migrants we interviewed expressed a fear of returning to Honduras. Some of those who had been returned to Honduras had fear so acute that they were living in hiding, afraid to go out in public. Several who were recently deported provided accounts that, if true, should qualify them for asylum in the US. They said that, prior to attempting to enter the US, they had been subject to serious threats from gangs in Honduras. These included small business owners who refused to make demanded payments to gangs; victims of or witnesses to gang crimes, including murder and rape; and fear of a gang



Man shows scars from bullet wounds from gang attack that prompted him to flee to the United States. He is now back in San Pedro Sula after having been deported.

forcibly recruiting a family's young son. Others fled abusive domestic partners or violence related to sexual orientation, both grounds for asylum under US law.

Virtually all of those we interviewed who had been apprehended at or near the border were deported summarily, via expedited removal or reinstatement of removal. Many said they had expressed their fears to US Border Patrol officials charged with screening for fear of return before being deported, but fewer than half of these were referred by US Border Patrol for a further assessment of whether they had a "credible" or "reasonable" fear of returning to Honduras. US law requires that when a migrant in expedited or reinstatement of removal expresses a fear of return to their country of origin, they be referred to a US Citizenship and Immigration Services (USCIS) asylum officer for an interview to determine whether their fear might qualify them for asylum or other protection.

Human Rights Watch was unable to corroborate claims about the specific dangers interviewees said they faced in Honduras. However, the experiences they described and the fears they expressed should have led US immigration authorities to give their cases sufficient scrutiny before they were returned to their home country. The principle of nonrefoulement, the right not to be returned to a place where one would likely face threats to life or freedom or other serious harm, recognized under both US and international law, demands as much.

* * *



Murder victim in the central neighborhood of the Rivera Hernandez district of San Pedro Sula, Honduras, September 8, 2014.

The vast majority of migrants crossing the US-Mexico border without authorization are placed in detention and undergo a hasty two-part assessment by US officials under either "expedited removal," for first-time border crossers, or "reinstatement of removal," for migrants who have previously been deported from the United States.

In either case, to pass the first stage an agent from Customs and Border Protection (CBP) or another US immigration agency must flag the person for a "credible fear" or "reasonable fear" assessment. To pass the second stage, migrants meet with an asylum officer from USCIS who determines whether their fear of return is "credible," or in reinstatement cases, "reasonable" – that is, whether there is a significant possibility they will prevail in immigration court on their claim for asylum or protection from deportation to a country where they are likely to face torture.

While there is evidence that fewer people are passing through this second stage,[2] Human Rights Watch's investigations in Honduras suggests that many asylum seekers are being turned away in the first stage. The failure of CBP and other US immigration agencies to identify asylum seekers raises concerns that the US government is violating its international human rights obligations to examine asylum claims before returning them to places where their lives or freedom would be threatened.

---

2 Ana Campoy, "Illegal Immigrants Seeking Asylum Face a Higher Bar," Wall Street Journal, September 28, 2014, http://online.wsj.com/articles/illegal-immigrants-seeking-asylum-face-a-higher-bar-1411945370 (accessed October 9, 2014).

Data for 2011 and 2012 that Human Rights Watch obtained from Customs and Border Protection under the Freedom of Information Act indicate that few Central American migrants are identified by CBP as people who fear return to their country in the first stage of the expedited removal process. The data show that the vast majority of Hondurans, at least 80 percent, are placed in fast-track expedited removal and reinstatement of removal proceedings but only a minuscule minority, 1.9 percent, got flagged for credible fear assessments by CBP. The percentages for Mexico, Honduras, El Salvador, and Guatemala are similar, ranging from 0.1 to 5.5 percent. By comparison, 21 percent of migrants from other countries who underwent the same proceedings in the same years were flagged for credible fear interviews by CBP.

CBP has a proactive duty to initially screen migrants for fear of return to their country of origin when it apprehends them crossing the border and places them in expedited or reinstatement of removal. However, a migrant may be identified as fearing return to their country by an immigration official after they have left CBP custody and entered the custody of Immigration and Customs Enforcement (ICE), the agency responsible for more prolonged detention of migrants. ICE, however, does not have a duty to proactively screen all migrants in its custody for their fear of return. It is telling, then, that the majority of credible and reasonable fear referrals that USCIS received in 2011 and 2012 did not come from CBP, but from ICE and other immigration agencies that learn of migrants' fear of return on an ad-hoc basis. In 2012, for example, CBP referred only 615 of the 2,405 Hondurans who eventually were flagged for credible fear interviews by USCIS.[3] Approximately three-quarters of the credible fear referrals USCIS conducted in 2012 came from agencies other than the CBP, even though that year CBP was responsible for approximately 57 percent of all noncitizen apprehensions.

Migrants who feared returning to Honduras told Human Rights Watch about problems they encountered at all stages of the summary removal process: some said that US border officials ignored their expressions of fear and removed them with no opportunity to have their claims examined; others said border officials acknowledged hearing their expressions of fear but pressured them to abandon their claims. For those who were referred for "credible fear" interviews, some said they were intimidated and confused by the interview process and complex immigration court asylum proceedings that they had to navigate on their own while detained and without legal assistance.

When immigration officials place potential asylum seekers from Honduras and other Central American countries in summary removal without putting them into the "credible fear" process, the migrants have no opportunity to have an asylum officer or immigration judge consider their case. US immigration courts are badly backlogged, but many migrants apprehended in the interior of the country – and thus not subject to Customs and Border Protection custody – are able to present their defenses against removal from the United States, including any claims to asylum, before a decision-maker who can make a more thorough examination of their claims.

Things are different at the border. Research by Human Rights Watch and others show that the CBP's methods for interviewing migrants in expedited removal procedures are seriously flawed. Unlike "credible or reasonable fear" assessments, which usually last over 45 minutes and take place at least 48 hours after a migrant is in ICE custody, Border Patrol screening interviews occur in Border Patrol stations and are much shorter. Uniformed CBP officers are usually armed while apprehending migrants; when they interview the migrants a few hours or days later their holsters are empty but visible; they often conduct interviews in crowded settings, without confidentiality from family members or others. All of these factors appear to hamper the ability of officers to identify those in need of more in-depth screening. The migrants we interviewed said that the CBP officers whom they encountered seemed singularly focused on removing them from the United States, which impeded their ability to make their fears known.

One man who was deported in September 2014 told Human Rights Watch that when he informed a Border Patrol officer of the threats to his life in Honduras, "He told me

3 Some noncitizens, apprehended in the interior of the country and placed in reinstatement of removal by ICE, may not pass through CBP custody and should be screened by ICE for fear of return.




there was nothing I could do and I didn't have a case so there was no reason to dispute the deportation.... I told him he was violating my right to life and he said, 'You don't have rights here.'"

Returned migrants board a bus to Tegucigalpa in front the Center for Returned Migrants, San Pedro Sula airport, Honduras. September 2014.

Arriving migrants in expedited removal or reinstatement of removal are subject to mandatory detention under US law. In recent years, this has meant US immigration officials have exercised their discretion not to use these accelerated procedures for most arriving families with children, which would mean they would be mandatorily detained, opting instead to place families in removal proceedings before immigration judges. In 2009, facing lawsuits and under pressure from rights organizations, the Obama administration ended family detention at the T. Don Hutto Detention Center, which had 490 beds for the detention of migrant families with children. Since it was one of two migrant facilities in the country equipped to detain families with children (the other, in Berks, Pennsylvania, has 85 beds), this decision indicated an intention to drastically reduce the practice of detaining families.

Since that time, however, the US government has reversed its plans. In June 2014, the Department of Homeland Security (DHS) established two detention facilities in Artesia, New Mexico, and Karnes, Texas, with between 500 and 700 beds each to hold arriving families. In September 2014, DHS announced plans to contract with a private prison company, the Corrections Corporation of America, to build a 2,400-bed family detention facility in Dilley, Texas. The facilities now in operation

have been used to detain families primarily from Honduras, Guatemala, and El Salvador who are in the process of expedited removal.

International law prohibits the detention of migrant children and discourages the detention of asylum seekers. Detention interferes with individuals' ability to assert claims to asylum, access counsel, and harms the physical and mental health of children as they struggle with life behind bars and the uncertainties of indefinite detention. These policies also contravene international standards against the use of immigration detention to deter asylum seekers.

Human Rights Watch urges the Obama administration and the Congress to immediately address US border policies that are risking the lives of Central American migrants. They should cease fast-tracking Central American migrants for deportation to ensure migrants have an adequate opportunity to make a claim for asylum. If fast-tracking continues, the US should take immediate measures to ensure all migrants who express fear are being flagged for further screening. The administration should also reverse its decision to expand the detention of migrant families, evidenced by the creation of two new family detention facilities in June and July and plans announced in September to build a 2,400-bed facility in Dilley, Texas. Finally, the government should increase migrants' access to legal counsel, which would improve handling of asylum claims and better ensure the US does not return people to countries where they face persecution or torture.

# Methodology

This report is based largely on interviews conducted by Human Rights Watch from September 4 to 12, 2014 in three cities in Honduras—San Pedro Sula, Comayagua, and Tegucigalpa—as well as interviews in July and September 2014 in family detention facilities in Artesia, New Mexico, and Karnes, Texas. We also interviewed officials at Border Patrol facilities in McAllen, Texas in July 2014. Human Rights Watch interviewed 25 Hondurans who were recently deported from the United States, 10 Central American detainees in family detention centers, and one in an adult detention center in the United States. We also interviewed migrant services providers, lawyers, academics, and government officials in Honduras and in the United States.

Human Rights Watch carried out interviews in English or in Spanish, depending on the preference of the interviewee, without interpreters. We informed the interviewees of the purpose of our research and did not pay them or offer them other incentives to speak with us. In some cases in the report, we have used pseudonyms and withheld other identifying information to protect interviewees and their families from possible retaliation.

The report also contains quantitative analysis of data acquired from CBP via US Freedom of Information Act requests. The data contains information on all CBP apprehensions through fiscal years 2011 and 2012 (more than 683,000 apprehensions). Analysis is focused on descriptive statistics of the nationality and disposition variables.

# I. Background on Threats in Honduras

Honduras suffers from rampant crime and impunity for human rights abuses. The murder rate, which has risen consistently over the last decade, was the highest in the world in 2013.[4] For young adult males between the ages of 20 and 34, the murder rate in Honduras exceeds 300 per 100,000.[5]

Violence in Honduras is largely the result of conflict over control of drug trafficking routes and turf wars between criminal groups,[6] although, as in many other countries, these groups target other people in their communities as well. Local street gangs, the key drivers of violence, are primarily affiliated with transnational gangs such as the Mara Salvatrucha (or MS-13) or Barrio 18 (also known as Calle 18, La 18 or Mara-18).[7] Both groups exert influence over entire neighborhoods, profiting economically by levying an *impuesto de guerra* or "war tax" on residents and local business people.[8] Failure to pay this "tax" can result in violent retaliation by gangs.[9]

Witnesses to gang-related crimes in Honduras fear retaliatory violence, whether or not they speak out about what they have seen.[10] "Here in Honduras, you can't make a complaint, because then the gang comes and finishes your family," said one man who survived a near-fatal attack by a gang member.[11]

Gang death threats may follow a person wherever they go within the country. As Central American gang expert Thomas Boerman puts it, "if you go to a new community everyone

---

[4] United Nations Office on Drugs and Crime (UNODC), "Global Study on Homicide 2013: Trends, Contexts, Data," April 2014, http://www.unodc.org/gsh/ (accessed October 9, 2014).

[5] Ibid.

[6] Ibid.

[7] Ibid.

[8] "Miles de reclutas de las maras cobran el 'impuesto de guerra'," *La Tribuna*, March 12, 2013, http://www.latribuna.hn/2013/03/12/miles-de-reclutas-de-las-maras-cobran-el-impuesto-de-guerra/ (accessed October 9, 2014).

[9] United Nations High Commissioner for Refugees (UNHCR), "Guidance Note on Refugee Claims Relating to Victims of Organized Gangs," March 31, 2010, http://www.refworld.org/docid/4bb21fa02.html (accessed October 13, 2014); Human Rights Watch interview with Marlon J. (pseudonym), San Pedro Sula, Honduras, September 6, 2014.

[10] Nicholas Phillips, "In Honduras, Going From Door to Door to Prosecutors," *New York Times*, March 4, 2014, http://www.nytimes.com/2014/03/04/world/americas/in-honduras-going-from-door-to-door-to-prosecutors.html (accessed October 9, 2014).

[11] Human Rights Watch interview with Marlon J. (pseudonym), San Pedro Sula, Honduras, September 6, 2014.

recognizes you as a stranger including the police officers and the gang members. It takes only a little bit of time for anyone looking for you to find you."[12]

Young people are often targeted by gangs for recruitment and to carry out crime.[13] Gangs typically recruit poor, homeless, or marginalized youth, sometimes putting them through initiation rituals involving violent acts. Membership is seen as a life-long commitment and desertion is severely punished. One father, speaking of his 10-year-old son, told Human Rights Watch, "I'm scared for him. They already start making them do things at 10."[14]

Girls may also be targeted by gangs for forced recruitment or sexual harassment and abuse.[15] Cecilia N., a 14-year-old girl who was deported from the US with her mother, said, "I'm terrified because they have taken girls from my school and raped them."[16] After her visit to Honduras in July 2014, the United Nations special rapporteur on violence against women noted that violent deaths among women had increased by 263 percent between 2005 and 2013 and that reports indicated a 95 percent rate of impunity for femicide and sexual violence crimes.[17]

Bias-motivated attacks on lesbian, gay, bisexual, transgender, and intersex (LGBTI) people are also a serious problem. The alleged involvement of Honduran police in some of these violent crimes is of particular concern. In 2011 and 2012, the government established special prosecutors' units to investigate these crimes, yet there is no evidence that these efforts have resulted in a significant increase in prosecutions.[18]

---

[12] Human Rights Watch telephone interview with Thomas Boerman, Central American Security Specialist, Eugene, Oregon, August 28, 2014.

[13] UNHCR, "Guidance Note On Refugee Claims Relating To Victims Of Organized Gangs," March 2010, http://www.uscrirefugees.org/2010Website/5_Resources/5_4_For_Lawyers/5_4_1%20Asylum%20Research/5_4_1_2_Gang_Related_Asylum_Resources/5_4_1_2_4_Reports/UNHCR_Guidance_Note_on_Refugee_Claims.pdf (accessed October 10, 2014).

[14] Human Rights Watch interview with Jacobo E. (pseudonym), San Pedro Sula, Honduras, September 7, 2014.

[15] CIDEHUM, UNHCR, "Forced Displacement and Protection Needs Produced by New Forms of Violence and Criminality in Central America," May 2012, http://www.nanseninitiative.org/sites/default/files/UNHCR%20Research%20Paper%20May%202012.pdf (accessed October 10, 2014).

[16] Human Rights Watch interview with Cecilia N. (pseudonym), San Pedro Sula, Honduras, September 8, 2014. Cecilia N. and her mother, Josefa N. (pseudonym) were detained from July 28, 2014 until they were deported on September 6, 2014 at the Immigrations and Customs Enforcement family detention center in Artesia, New Mexico.

[17] Rashida Manjoo, "Special Rapporteur on violence against women finalizes country mission to Honduras and calls for urgent action to address the culture of impunity for crimes against women and girls," July 7, 2014, http://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=14833&LangID=E#sthash.aEX2teov.dpuf (accessed October 13, 2014).

[18] Human Rights Watch, *World Report 2014: Honduras* (New York: Human Rights Watch, 2014), http://www.hrw.org/world-report/2014/country-chapters/honduras/.

Perpetrators of killings and other violent crimes in Honduras are rarely brought to justice. The institutions responsible for providing public security continue to be largely effectual and are marred by corruption and abuse, while efforts to reform them have made little progress.[19] Criminal groups have reportedly deeply penetrated the Honduran national police, demanding bribes and passing information to criminal groups.[20]

[19] Ibid.
[20] InSight Crime, "Honduras," undated, http://www.insightcrime.org/organized-crime-profile/honduras (accessed October 9, 2014).

# II. First-Hand Accounts: Threats Facing Returned Hondurans

Hondurans interviewed by Human Rights Watch who had been recently deported from the United States said they were subject to specific threats that, if true, would make them eligible for asylum in the United States. Many described threats from gangs in Honduras. Some of these threats arose from the common practice of gangs demanding extortion payments from small business owners. Others were victims or witnesses to crimes such as murder and rape and targeted on that basis. One said that he feared the forced recruitment of his young son into a gang. Others faced dangers from other sources, including abusive domestic partners. Nearly all said they had no meaningful protection from such violence in Honduras.

Some said their fear was so acute that they were afraid to go out in public after they were deported to Honduras.[21] One 27-year-old man told Human Rights Watch he could not leave his sister's house nor tell his four young children that he was back in the country for fear of being found by gangs. He described leaving the house only rarely and, even then, only when wearing a motorcycle helmet with a darkened visor.[22] A deported woman described moving from house to house among her relatives every few days for fear of retaliation by the gang that she had witnessed murder her mother.[23] Almost everyone suffering these kinds of threats told Human Rights Watch that they planned to try to flee the country again as soon as possible.

Mateo S., who was deported from the United States to Honduras on September 9, 2014, told Human Rights Watch:

> It's run by a gang where I live. I can't say the name, because it wouldn't be safe, but they are in charge…. I had my own business here in my city. I sold bleach and other cleaning supplies from house to house. At some point,

---

[21] See Jorge Ramos and Daniel Lieberman, "Deported mom lives in fear after returning to Honduras," *Fusion*, August 20, 2014, http://fusion.net/story/6335/deported-mom-lives-in-fear-after-returning-to-honduras/ (accessed October 13, 2014).

[22] Human Rights Watch interview with Jacobo E. (pseudonym), San Pedro Sula, Honduras, September 7, 2014 (Jacobo was deported from the US in August 2014).

[23] Human Rights Watch interview with Alicia R. (pseudonym), San Pedro Sula, Honduras, September 8, 2014. (Alicia told US border officials that she and her children were Mexican. She and her children were deported from the United States to Mexico and then from Mexico to Honduras in August 2014.)

> the gang started to ask me for money. Here, they call it a "war tax." Eventually, they were asking me for about US$300 dollars a month, which is the same thing here as the minimum wage. It was impossible for me. They saw that I couldn't pay this money so they started to mess with my family, with my son, who is seven years old, and with my wife. Eventually, they were threatening me all the time. I was paying them money for six to eight months, every month. And then I couldn't pay it anymore and my business went bankrupt and then I was using our savings to pay the gang members. I had to pay because I was afraid they would do something to my family.
>
> Then they tried to kidnap my son in June 2014. I usually come early to school to pick up my son at lunchtime. They got there maybe 10 or 20 minutes before the kids come out. I recognized them. They had already told me that something was going to happen to my son and to my wife. I didn't hesitate. I jumped the school fence with my son. I pushed him over and then I jumped. Later in the day, the teachers told me that [the gang members] were looking for a kid of my son's age. I didn't send him back to school.... We had some savings from three or four years so I sent my son and my wife to the United States. Once I knew they were safe, I fled too.[24]

Mercedes R. also felt threatened because of her inability to pay "taxes" to the gangs in Honduras. She said, "I was facing threats from the gangs because I had a store that sold food. Starting in 2013, I spent a year paying them dollars and then I couldn't anymore. I felt like I wasn't living anymore. I mistrusted everyone. I didn't feel safe."[25]

People who witness murders or other crimes committed by gangs often fear for their lives. Roberto L., who was deported from the United States to Honduras in September 2014, said:

> They killed my mother right in front of me. She had a small clothing shop. I was shot at the same time. This was in September 2013. I have been fleeing since, because I know they are looking for me. I have two kids here but I can't

[24] Human Rights Watch interview with Mateo S. (pseudonym), San Pedro Sula, Honduras, September 9, 2014. (Mateo was deported to Honduras from the United States in September 2014.)

[25] Human Rights Watch interview with Mercedes R. (pseudonym), Karnes Detention Center, Texas, September 16, 2014. (Mercedes was detained at Karnes with her seven-year-old son.)

> see them because that would put them in danger. They can't know I'm here. The assassins who are looking for me are at a national level, they will find me anywhere. I'm just going to be here for three weeks, then I'll try again.[26]

Alicia R. explained that her witnessing her mother's murder put her at risk from gang members:

> They took my mother's life.... The day that she died I was going to pick her up because she had some money to give me. I got there and then the criminals who killed her arrived. I witnessed everything that happened.... They were coming to kill somebody who was there and she was there too. She didn't have any problems. The issue is that I saw it and they saw me. They were supposedly from a gang called "18" here. The people from the gangs don't have any heart, whether with adults, children. They don't have hearts.
>
> We buried my mother … and then I had to leave the house we lived in because they came to look for us. I left everything. I went to my mother in law's house and then an aunt's house. I keep moving between these places for protection because when you get to one place or another, they find out quickly. They check. So as not to be in danger I always move, so that I'm never in the same place … I can't rest. I can't even work here. I've always lived here but now I have to stay on the move from place to place to protect myself from them and to protect the lives of my children. I don't have any peace. I don't want to be in this country because my life is in danger.[27]

Jacobo E., who was deported from the United States to Honduras in August 2014, said he was living in fear for his life. He told Human Rights Watch,

> I've always worked. I've never been in a gang. I was baptized as a Mormon in 1994 and I have four kids with my wife. I had to flee though because my wife started an affair with a guy from "18." … I saw the guy leaving my house one day and we had a fight. Then they told my sister that the gang

---

[26] Human Rights Watch interview with Roberto L. (pseudonym), San Pedro Sula, Honduras, September 9, 2014. (Roberto was deported from the United States in September 2014, after being detained for six months while seeking asylum.)

[27] Human Rights Watch interview with Alicia R. (pseudonym), San Pedro Sula, Honduras, September 8, 2014. (Alicia was deported from the United States to Mexico in August 2014 before being returned to her native Honduras.)

> was going to kill me, so I fled. Now that I'm back here again I don't go out. I can't. My parents are supporting me and I live with my sister…. I put on a motorcycle helmet inside the house to come here.
>
> I can't work. If I look for work they'll see me. They are in charge in many places, the "18" is nearly everywhere. Being locked up like this is ugly. I think about my children all the time. I can't contact them or tell them that I'm back in the country though. That would be dangerous.

The pervasive nature of gang violence in Honduras places random individuals under threat. Marlon J., who was deported from the United States to Honduras in August 2014, said,

> I was a door-to-door salesman in a neighborhood called La Canada. One day I was passing by a corner with three guys just standing there. I wasn't afraid because I usually walked around there. But then one of them ran at me and shot me seven times in the back. They left me for dead … I spent two months in the hospital and it took seven months to be able to walk.
>
> When I came back to work one of my clients told me the gang was after me because that guy was going through a test. He had to kill the first person who walked by, to show he was brave. He would have to kill me now since I was supposed to be dead. I went to another part of the city, but then my brother-in-law was killed for not paying the "war tax." That made me even more afraid.
>
> I'm a father of two kids, two and five years old. I have a lot to live for. When they deported me from the United States they said they would put me in prison for six months if I come back. It doesn't matter to me if I get six months, at least in Port Isabel [detention center in Texas], it's safe. What I want is to be out of here.[28]

Returned migrants to Honduras did not feel the Honduran authorities were able or willing to protect them. As Marlon J., put it, after receiving seven gunshot wounds at the hands of

[28] Human Rights Watch interview with Marlon J. (pseudonym), San Pedro Sula, Honduras, September 6, 2014. (Marlon was deported from the United States in August 2014.)

a gang initiate, "Here in Honduras, you can't file a police complaint because after that the gang comes and finishes your family. Delinquency is what governs."[29]

Alicia R., who witnessed her mother's murder, also felt she could not seek protection from Honduran police:

> I never filed a complaint because sometimes in this country there is a lot of corruption.... Sometimes the police work together with the criminals.... If you go do something like that [lodge a complaint] sometimes that means they are going to be waiting for you outside of the police station.[30]

---

[29] Ibid.

[30] Human Rights Watch interview with Alicia R. (pseudonym), San Pedro Sula, Honduras, September 8, 2014.

# III. Expedited Removal, Reinstatement of Removal, and Screening for Credible Fear

The Universal Declaration of Human Rights provides that "[e]veryone has the right to seek and to enjoy in other countries asylum from persecution."[31] In the past two decades, US laws and practices have increasingly narrowed that right.

In 1996, as part of the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), the US Congress enacted a new provision called "expedited removal." It allows the summary expulsion of noncitizens who have not been admitted or paroled into the US, who have been in the US for less than two years, and who present fraudulent documents or have no documents. Unless they express a fear of persecution or torture upon return to their home countries or indicate an intention to apply for asylum, they may be deported immediately and will be barred from returning to the US for at least five years, and often much longer.[32]

Initially, the US government applied expedited removal provisions only to noncitizens arriving at official entry points along the border or at airports known as "ports of entry." Over the last decade, however, the Department of Homeland Security (DHS), which was established in 2002 after the September 11, 2001 attacks on the United States, has applied expedited removal procedures to people apprehended along the entire US border. Under DHS regulations this includes people apprehended within 100 miles of the border.[33]

For asylum seekers—those in need of protection from forced return—the IIRIRA created another hurdle, called reinstatement of removal. If an individual is removed or voluntarily leaves under an order of removal, and subsequently reenters the United States illegally, they face the reinstatement of the previous order.[34] A border crosser whose order has been

---

[31] Universal Declaration of Human Rights (UDHR), adopted December 10, 1948, G.A. res. 217A (III), U.N. Doc A/810 at 71 (1948).

[32] Immigration and Nationality Act (INA) 235(b), codified as 8 U.S.C. 1225(b) and enacted as regulation at 8 C.F.R. 235.3(b)(c); INA 241(c), codified as 8 U.S.C. §1231(c) and enacted as regulation at 8 C.F.R. 241; INA 212(a)(9)(a) and (a)(9)c)(i), codified as 8 U.S.C. 1182(a)(9)a) and (a)(9)(c)(i).

[33] Designating Aliens for Expedited Removal, 69 Fed. Reg. 48877 (August 11, 2004); "DHS Streamlines Removal Process Along Entire US Border," DHS press release, January 31, 2006, http://www.govtech.com/policy-management/Department-of-Homeland-Security-Streamlines-Removal.html (accessed October 10, 2014).

[34] INA 241(a)(5), codified as 8 U.S.C. 1231(a)(5).

reinstated is barred from applying for asylum but may access other remedies such as withholding of removal or protection from return to torture under the Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("Convention against Torture"), to which the US is a party.[35]

Many individuals crossing the border first discuss their cases with a Customs and Border Protection agent who, under US law, is supposed to inform them that they may ask for protection if they have a fear of returning home. If a fear of return is expressed, the agent should flag them for a more thorough assessment known as a "credible fear" interview.[36] Research by Human Rights Watch and others show that the CBP's methods for interviewing migrants in expedited removal procedures are seriously flawed.[37]

A primary finding of Human Rights Watch's investigation in Honduras is that individuals seeking asylum are not being flagged for credible fear interviews by CBP officers. This is supported by US government data. Between October 2010 and September 2012, the vast majority of Hondurans, 81 percent, were placed in the fast-track expedited removal and reinstatement of removal proceedings; only a miniscule minority, 1.9 percent, were flagged for credible fear assessments by CBP.[38]

---

[35] Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("Convention against Torture"), G.A. Res. 39/46, annex, 39 U.N. GAOR Supp. (No. 51) at 197, U.N. Doc. A/39/51 (1984), entered into force June 26, 1987. The US ratified the Convention against Torture in1994 and passed enabling legislation with Foreign Affairs Reform and Restructuring Act of 1998, P.L. 105-277. The US currently implements its duties under the Convention against Torture through a process called "withholding of removal." 8 C.F.R. 208.16. The protections granted by the United States under the Convention against Torture are narrower than the protections afforded to refugees. A higher burden of proof must be shown to establish eligibility; it provides a narrower scope of relief, such as restrictions on international travel; and there is limited opportunity for conversion to legal permanent resident status.

[36] 8 C.F.R. 235.3(b)(4) (stating that if an applicant requests asylum or expresses a fear of return, the "examining immigration officer shall record sufficient information in the sworn statement to establish and record that the alien has indicated such intention, fear, or concern," and should then refer the alien for a credible fear interview).

[37] Human Rights First, "How to Protect Refugees and Prevent Abuse at the Border: Blueprint for U.S. Government Policy," June 2014, http://www.humanrightsfirst.org/sites/default/files/Asylum-on-the-Border-final.pdf (accessed October 10, 2014); Sara Campos and Joan Friedland, "Mexican and Central American Asylum and Credible Fear Claims: Background and Context," American Immigration Council Special Report, May 2014, http://www.immigrationpolicy.org/sites/default/files/docs/asylum_and_credible_fear_claims_final.pdf (accessed October 10, 2014); Michele R. Pistone and John J. Hoeffner, "Rules are Made to be Broken: How the Process of Expedited Removal Fails Asylum Seekers," Villanova University School of Law, 2006, http://digitalcommons.law.villanova.edu/cgi/viewcontent.cgi?params=/context/wps/article/1049/&path_info= (accessed October 14, 2014); US Commission on International Religious Freedom, "Study on Asylum Seekers in Expedited Removal," February 2005, http://www.uscirf.gov/reports-briefs/special-reports/report-asylum-seekers-in-expedited-removal (accessed October 10, 2014).

[38] Calculated from CBP data on apprehensions provided to Human Rights Watch via a Freedom of Information Act request.

The data also show low rates of credible fear referrals by CBP for nationals of Mexico, El Salvador, and Guatemala. Only 0.1 percent of Mexicans, 0.8 percent of Guatemalans, and 5.5 percent of Salvadorans in expedited or reinstatement of removal were referred to a credible or reasonable fear interview by CBP. However, 21 percent of migrants from countries other than these, who underwent the same proceedings in the same years, were flagged for credible fear interviews by CBP. On October 9, 2014, Human Rights Watch requested updated apprehension data from CBP, which could shed light on the trends in CBP credible fear referral rates during the 2013 and 2014 influx of migrant adults, families and children from Central America.



## US CUSTOMS AND BORDER PROTECTION APPREHENSIONS

FY2011-2012, countries with > 100 apprehensions

| COUNTRY | NUMBER OF APPREHENSIONS | PERCENTAGE REFERRED TO CREDIBLE FEAR INTERVIEW |
|---|---|---|
| Mexico | 537,136 | 0.1% |
| Guatemala | 52,472 | 0.8% |
| Honduras | 42,093 | 1.9% |
| El Salvador | 31,986 | 5.5% |
| Ecuador | 3,380 | 3.3% |
| India | 3,150 | 57.1% |
| China | 1,837 | 66.8% |
| Romania | 1,503 | 6.7% |
| Nicaragua | 1,478 | 2.4% |
| Cuba | 1,377 | 0.1% |
| Dominican Republic | 1,282 | 6.4% |
| Brazil | 643 | 3.7% |
| Peru | 627 | 5.9% |
| Canada | 564 | 0.0% |
| Colombia | 534 | 7.9% |
| Sri Lanka | 326 | 63.8% |
| Nepal | 224 | 75.4% |
| Haiti | 209 | 27.3% |
| Costa Rica | 208 | 1.0% |
| Jamaica | 196 | 2.0% |
| Bangladesh | 180 | 77.8% |
| Belize | 102 | 2.9% |

Source: CBP data acquired by Human Rights Watch via FOIA request

As discussed above, those unauthorized migrants who are flagged for having a fear of return, proceed to a pre-asylum screening to determine whether there is a significant possibility that they can establish persecution or fear of persecution before an immigration judge.[39]

In recent years, migrants from Honduras, Guatemala, and El Salvador have formed an increasing proportion of the credible fear referrals received by USCIS.[40] Absolute numbers of Central Americans identified for credible or reasonable fear screening have also been increasing. Referrals of Hondurans, for instance, have increased from 1,108 individuals in 2006 to 8,539 in 2013.[41]

Most of these referrals, however, do not come from CBP, despite CBP's proactive duty to screen migrants it places in expedited or reinstatement of removal for fear of return to their country of origin. In 2012, for example, CBP referred only 615 of the 2,405 Hondurans who eventually received credible fear interviews.[42] Approximately three-quarters of the credible fear referrals USCIS conducted in 2012 came from agencies other than the CBP, even though that year CBP was responsible for approximately 57 percent of all noncitizen apprehensions.[43]

A migrant may be referred by an immigration official after they have left CBP custody and entered the custody of Immigrations and Customs Enforcement (ICE), the agency responsible for more prolonged detention of migrants. ICE, however, does not have a duty to proactively screen all migrants in its custody for their fear of return. The majority of credible and reasonable fear referrals that USCIS received in 2011 and 2012 did not come from CBP but other immigration agencies, which learn of migrants' fear of return on an ad-hoc basis.

For those who are referred to credible fear interviews, the likelihood of being permitted to apply for asylum appears to have fallen significantly in recent months. This comes in the wake of problematic new guidance for asylum officers conducting interviews (referred to as

---

39 INA 235.3(b)(4).

40 In FY 2013, 65 percent of credible fear referrals and 58 percent of reasonable fear referrals were for nationals of Honduras, Guatemala and El Salvador, combined. In 2004, nationals from these three countries represented less than 2.5 percent of referrals. Calculated from USCIS, "Credible Fear Nationality Report, 2014," http://www.uscis.gov/sites/default/files/USCIS/Outreach/Notes%20from%20Previous%20Engagements/AdditionalStatisticRequestedApril2014AsylumStakeholderEngagement.pdf (accessed October 10, 2014).

41 Ibid.

42 Ibid.

43 Calculated from Department of Homeland Security, "Immigration Actions: 2012," Table 1, http://www.dhs.gov/sites/default/files/publications/ois_enforcement_ar_2012_1.pdf (accessed October 13, 2014).

the "lesson plan") issued in February 2014.[44] Before the lesson plan was enacted, in January 2014, 83 percent of those who received credible fear interviews were permitted to apply for asylum. In July 2014, six months later, that figure was 63 percent.[45] While this could be an artifact of a larger number of credible fear referrals or a smaller sample size of the months since the plan, this evidence suggests that the lesson plan has reduced the proportion of interviews in which credible fear is found. The precipitous apparent decline occurred in the period after the release of the new lesson plan, and not in tandem with the rise in referrals. Asylum law experts have criticized the lesson plan for inappropriately raising the burden of proof required at the credible or reasonable fear stage.[46]

If a noncitizen is found to have a credible fear, they may then apply for asylum as a defense against deportation in immigration court. Though the asylum seeker will be able to go before a judge to make their claim for protection, they have no right to a government-appointed lawyer to assist them. ICE may detain noncitizens going through these immigration court procedures for the duration of the deportation process on a discretionary basis, though some become eligible for release on bond or on their own recognizance once they are transferred to immigration court.

---

[44] "Credible Fear," Lesson Plan, Refugee, Asylum, and International Operations Directorate Officer Training; Asylum Division Officer Training Course, February 28, 2014, http://cmsny.org/wp-content/uploads/credible-fear-of-persecution-and-torture.pdf (accessed October 10, 2014).

[45] Ana Campoy, "Illegal Immigrants Seeking Asylum Face a Higher Bar," *Wall Street Journal*, September 28, 2014, http://online.wsj.com/articles/illegal-immigrants-seeking-asylum-face-a-higher-bar-1411945370 (accessed October 10, 2014).

[46] Bill Ong Hing, Memorandum to John Lafferty, Chief, USCIS Asylum Division Concerning Lesson Plan, Credible Fear of Persecution and Torture Determinations, April 21, 2014, http://static.squarespace.com/static/50b1609de4b054abacd5ab6c/t/53558353e4b02071f74ee3c4/1398113107754/Response%20to%20USCIS%20Credible%20Fear%20Memo,%20Bill%20Hing,%2004.21.2014.pdf (accessed October 13, 2014).

# IV. First-Hand Accounts: Asylum Seekers' Experiences in Expedited Removal

US Customs and Border Protection officers are required to screen people in expedited removal for fear of return to their country and, if the noncitizen expresses fear, refer them for a credible fear interview.[47] Despite this requirement, Human Rights Watch spoke with deportees who reported that they were not informed of the availability of protection or that they were not referred to an asylum officer for a credible fear interview after they told a Border Patrol agent they were afraid to return to their country.[48] Some would-be asylum seekers also reported that Border Patrol officers harassed, threatened, and attempted to dissuade them from applying for asylum.

Additionally, CBP officers conduct interviews about fear of return in a sometimes crowded and public enforcement setting and without confidentiality from family members or others, factors that appear to hamper the ability of the officers to identify those in need of more in-depth screening. Human Rights Watch observed the interview location for detainees at the McAllen Border Patrol station in Texas in July 2014. CBP officers showed Human Rights Watch a large public space in which they process migrants at a horseshoe-shaped table designed to accommodate multiple officer-migrant pairs in close proximity. Holding cells ring the room, with concrete floors and walls and toilets behind half-high barriers. CBP

---

[47] 8 C.F.R. 235.3(b)(2) ("In every case in which the expedited removal provisions will be applied and before removing an alien from the United States pursuant to this section, the examining immigration officer shall create a record of the facts of the case and statements made by the alien. This shall be accomplished by means of a sworn statement using Form I-867AB, Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act. The examining immigration officer shall read (or have read) to the alien all information contained on Form I-867A. Following questioning and recording of the alien's statement regarding identity, alienage, and inadmissibility, the examining immigration officer shall record the alien's response to the questions contained on Form I-867B, and have the alien read (or have read to him or her) the statement, and the alien shall sign and initial each page of the statement and each correction."). Form I-867A includes the provision that the immigration officer read the following statement:

> U.S. law provides protection to certain persons who face persecution, harm or torture upon return to their home country. If you fear or have a concern about being removed from the United States or about being sent home, you should tell me so during this interview because you may not have another chance. You will have the opportunity to speak privately and confidentially to another officer about your fear or concern. That officer will determine if you should remain in the United States and not be removed because of that fear.

Form I-867B requires that the immigration officer ask and record the answer to the question, "Do you have any fear or concern about being returned to your home country or being removed from the United States?" Forms I-867A&B available in Appendix A of Charles Kuck, "Legal Assistance for Asylum Seekers in Expedited Removal: A Survey of Alternative Practices" Expert Report in US Commission on International Religious Freedom, "Report on Asylum Seekers in Expedited Removal," February 8, 2005, http://www.uscirf.gov/sites/default/files/resources/stories/pdf/asylum_seekers/legalAssist.pdf (accessed October 13, 2014).

[48] Human Rights Watch interviews, San Pedro Sula, Honduras, September 6, 7, 8, and 9, 2014.

officers told and demonstrated to Human Rights Watch how they check their weapons before entering, but wear their uniform with holsters – which can be particularly intimidating to persons fearful of the security forces in their home countries.[49] CBP officers told Human Rights Watch that the McAllen Border Patrol station was physically similar to many other such stations along the Mexican border.

Migrants who were not referred for a credible fear interview told Human Rights Watch that interviews by CBP are brief and focused on explaining additional consequences of deportation, such as bars to return for set periods of time, rather than exploring their fear of return. "The officers don't pay attention to you. If you say you are afraid they say they 'can't do anything," Marlon J. told Human Rights Watch. "All they said to me was that if I came back they would give me six months in prison." [50]

Some Border Patrol officers apparently tried to convince border crossers not to apply for asylum. "I asked for asylum," said Jacobo E., who fled after being shot and seeing his mother killed for her failure to pay fees to gang members to run her small clothing business. "The officer told me don't apply, 90 percent of the people who do don't get it."[51] Some deportees and detainees with whom we spoke reported that they resisted signing forms offered by Border Patrol, or were coerced into signing something they did not understand. "'Fingerprint, fingerprint,' they just kept saying, I didn't know what I was signing," said Jacobo E. who was in hiding in Honduras after being deported.[52] Maribel V., who was deported from the Artesia, New Mexico family detention center with her children, said:

> They made me sign the deportation in the "icebox" [slang for the cold Border Patrol detention cells]. No judge or lawyer spoke with me. They called me and they said that I had to sign this paper. They told me that it was for a judge to see my case. But I never saw a judge and they told me I had a deportation order. They told me I was already deported.[53]

---

[49] Human Rights Watch visit to McAllen Border Patrol Station, McAllen, Texas, July 25, 2014.

[50] Human Rights Watch interview with Marlon J. (pseudonym), San Pedro Sula, Honduras, September 6, 2014. ("*Los oficiales ya a uno no le prestan atención. Si uno dice que tiene miedo dicen que no pueden hacer nada,* 'I'm sorry,' *lo siento.*")

[51] Human Rights Watch interview with Roberto L. (pseudonym), San Pedro Sula, Honduras, September 9, 2014.

[52] Human Rights Watch interview with Jacobo E. (pseudonym), San Pedro Sula, Honduras, September 7, 2014.

[53] Human Rights Watch interview with Maribel V. (pseudonym), Comayagua, Honduras, September 6, 2014. (Maribel was deported with her children in September 2104. "Ice box" or *hielera* is how migrants commonly refer to Border Patrol detention, in reference to the cold temperatures in the cells.)

Mateo S., who had fled death threats from a gang, said he tried to not sign papers agreeing to his deportation:

> I was detained for six days in the cold rooms. They just asked me my name, where I came from, and they told me I was punished for five years and I had to sign the deportation. I didn't want to sign. When the moment of the interview came I said I wouldn't sign. The officer insulted me. They started waking me up every couple of hours and moving me from cell to cell. It was hard…. The officer filled out all the paperwork and told me to sign, I told him I wouldn't sign and I hoped the US government would admit me. He ripped up all the paper and threw it almost at my face. He told me I was deported anyway. He said he "had the law in his hand and he was going to sign for me." I told him he was violating my right to life and he said, "You don't have rights here."[54]

Alicia R., an asylum seeker who crossed the border with her two children, 3 and 10 years old, told officers of her fear of returning to Honduras. In an attempt at self-preservation, thinking it would keep her from being deported to Honduras, she also told them she was from Mexico:

> The truth is because I didn't want to come back here [to Honduras], I told them that I was from Mexico. I told them, I cried, I said I couldn't return to my country. Sometimes you are so afraid … to be sent back so you just say something.[55]

After two days, US officials turned Alicia and her children over to the Mexican government, which deported them two weeks later back to Honduras.[56]

---

[54] Human Rights Watch interview with Mateo S. (pseudonym), San Pedro Sula, Honduras, September 9, 2014. (Mateo was deported to Honduras from the United States in September 2014.) Immigration attorneys have reported hearing from other migrants of similar treatment in the McAllen Border Patrol station. Human Rights Watch email correspondence with Carlos Garcia, Immigration Attorney in McAllen, Texas and Rex Chen, Immigration attorney at Catholic Charities of Newark, September 9, 2014.

[55] Human Rights Watch interview with Alicia R. (pseudonym), San Pedro Sula, Honduras, September 8, 2014.

[56] Ibid.

Some migrants told Human Rights Watch that when they tried to tell US officials about their fear of returning, they were denied further exploration of that claim, and were put in touch with consular officers from their country of origin. This practice runs counter to international protection standards, which recognize the problematic relationship asylum seekers may have with officials from their home countries. “The [US] officers don’t speak with you. They just set it up so you can speak with a consular officer and then so you sign the papers,” said Marlon J.[57]

In some cases, migrants reported that consular officers dissuaded them from making international protection claims. Mateo S. explained,

> They put me in touch with someone who they said was the consul of Honduras on a video screen. I explained to him in total confidence that I was fleeing my country and the threats I was facing. He told me I didn’t have a case, so why try?[58]

---

[57] Human Rights Watch interview with Marlon J. (pseudonym), San Pedro Sula, Honduras, September 6, 2014.
[58] Human Rights Watch interview with Mateo S. (pseudonym), San Pedro Sula, Honduras, September 9, 2014.

# V. Detention and Access to Counsel

None of the asylum seekers Human Rights Watch met with who had been deported to Honduras had had lawyers while in the United States, though several had tried to obtain them. While many asylum seekers without financial resources have difficulty obtaining legal counsel in the US, it is particularly difficult for those who are placed in detention facilities near the border and put in expedited proceedings.

Detention of noncitizens in expedited removal proceedings and reinstatement of removal is mandatory under US law.[59] Because nearly all arriving Central Americans without authorization are placed in expedited removal proceedings, the vast majority are also detained prior to deportation.

Detention adds to the burdens and fears asylum seekers face. The fact that it is administrative rather than criminal detention may be of little practical consequence. Several told Human Rights Watch how being detained weighed on them. "I didn't have any idea what a prison was," said Jacobo E. "They just treated me like a criminal."[60]

Detention also makes it more difficult for asylum seekers to gather evidence that might be useful in their cases. Roberto L. was detained for six months while he attempted to apply for asylum on the basis of threats and past harm. "They said I needed proof," he said. "But they said you have to be detained for [an additional] six months [to keep applying for asylum], so I signed the deportation."[61]

Detainees also face considerable obstacles in obtaining legal counsel, a challenge made more difficult when they are held in detention facilities. "I need to find a lawyer but it seems impossible," one woman from Honduras then detained in Artesia, New Mexico told Human Rights Watch. "I will die if I am sent back to my country."[62] Maria F. was deported in September after being detained at Karnes family detention center with her 8-year-old

---

59 INA 235(b)(1)(b)(iii)(iv) ("Any alien subject to the procedures under this clause shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed."); 8 U.S.C. 1225(b)(1)(b)(iii)(iv). 8 U.S.C. 1231(a)(2) ("During the removal period, the Attorney General shall detain the alien.").

60 Human Rights Watch interview with Jacobo E. (pseudonym), San Pedro Sula, Honduras, September 7, 2014.

61 Human Rights Watch interview with Roberto L. (pseudonym), San Pedro Sula, Honduras, September 9, 2014.

62 Human Rights Watch Interview with Noemi M. (pseudonym), Artesia, New Mexico, July 22, 2014.

daughter. "They give you a paper with [the names of] free lawyers. But nobody answers when you call."[63]

One legal service provider in San Francisco agreed that detained migrants had difficulty locating legal counsel:

> We get many calls from people whose family members are in detention, including in Texas. Usually we get the call after they've called multiple other organizations or lawyers. The few legal service providers who have called them back charge very high fees. There's just a very high demand and not enough supply. We never get initial calls from detainees themselves. They need to have someone on the outside who can help them find a lawyer and even then it's very difficult.[64]

In 2005, the United States Commission on International Religious Freedom (USCIRF), a government agency, found that the expedited removal process lacks adequate safeguards to prevent improper removal and extended detention of bona fide refugees in the United States.[65] USCIRF's analysis also found that asylum seekers in expedited removal who are represented by an attorney were granted relief 25 percent of the time, while asylum seekers who were representing themselves were granted relief 2 percent of the time.[66] Robert A. Katzmann, a judge of the US Court of Appeals for the Second Circuit, summed up the results of a two-year study on immigrant representation in New York: "The two most important variables affecting the ability to secure a successful outcome in a case (defined as relief or termination) are having representation and being free from detention."[67]

---

63 Human Rights Watch interview with Maria F. (pseudonym), Comayagua, Honduras, September 6, 2014.

64 Human Rights Watch phone interview with Niloufar Khonsari, Immigration Attorney and Executive Director at Pangea Legal Services in San Francisco, California, October 11, 2014.

65 US Commission on International Religious Freedom, "Study on Asylum Seekers in Expedited Removal," February 2005, http://www.uscirf.gov/reports-briefs/special-reports/report-asylum-seekers-in-expedited-removal (accessed October 10, 2014).

66 Ibid.

67 Robert Katzmann, "You Shall Love the Stranger: Meeting the Urgent Legal Needs of the Immigrant Poor," The Jethro Lecture, New York City, February 1, 2013, http://www.americanbar.org/content/dam/aba/administrative/immigration/katzmannimmlecture_feb13.authcheckdam.pdf (accessed October 13, 2014).

Human Rights Watch has previously documented how detaining noncitizens, sometimes far from family members and friends, affects their access to counsel.[68] The Executive Office for Immigration Review recently reported that the percentage of represented cases in immigration court has increased in the past five years from 35 percent in 2009 to 59 percent in 2014.[69] Yet there is a large gap between representation rates for detained versus non-detained immigrants in immigration court proceedings. The New York Immigrant Representation Study found in 2011 that 40 percent of detained immigrants and 73 percent of non-detained immigrants in the New York City area had lawyers.[70]

Things are even worse for migrants detained in south Texas, like most of those interviewed for this report. Texas Appleseed, a non-profit legal services organization, found 86 percent of immigration detainees in Texas were unrepresented in 2009.[71] Several more recent reports indicate that systematic problems with detainees' access to counsel have not been resolved.[72] The American Immigration Council and Penn State Law found in 2012 that,

> ICE fails to provide or facilitate access to counsel when questioning represented individuals, restricts attorney-client communications in detention facilities, and has also discouraged noncitizens from seeking legal counsel.[73]

---

68 Human Rights Watch, *Locked Up Far Away: The Transfer of Immigrants to Remote Detention Centers in the United States*, December 2, 2009, http://www.hrw.org/sites/default/files/reports/us1209webwcover.pdf.

69 US Department of Justice, Executive Office for Immigration Review, "FY 2013 Statistics Yearbook," April 2014, http://www.justice.gov/eoir/statspub/fy13syb.pdf (accessed October 13, 2014).

70 New York Immigrant Representation Study, "Accessing Justice: The Availability and Adequacy of Counsel in Immigration Proceedings," *Cardozo Law Review* vol. 33 (2011), http://www.cardozolawreview.com/Joomla1.5/content/33-2/NYIRS%20Report.33-2.pdf (accessed October 13, 2014).

71 Texas Appleseed, "Justice for Immigration's Hidden Population: Protecting the Rights of Persons with Mental Disabilities in the Immigration Court and Detention System," March 2010, http://www.texasappleseed.net/index.php?option=com_docman&task=doc_download&gid=313 (accessed October 13, 2014), p.13.

72 Penn State Law and Legal Action Center of the American Immigration Council, "Behind Closed Doors: An Overview of DHS Restrictions on Access to Counsel," May 2012, http://www.legalactioncenter.org/sites/default/files/docs/lac/Behind_Closed_Doors_5-31-12.pdf (accessed October 12, 2014); National Immigrant Justice Center, "Isolated in Detention: Limited Access to Counsel in Immigration Detention Facilities Jeopardizes a Fair Day in Court," September 2010, https://www.immigrantjustice.org/sites/immigrantjustice.org/files/Detention%20Isolation%20Report%20FULL%20REPORT%202010%2009%2023.pdf (accessed October 12, 2014).

73 Penn State Law and Legal Action Center of the American Immigration Council, "Behind Closed Doors: An Overview of DHS Restrictions on Access to Counsel," May 2012, http://www.legalactioncenter.org/sites/default/files/docs/lac/Behind_Closed_Doors_5-31-12.pdf (accessed October 12, 2014).

Dani A., one of the few individuals interviewed by Human Rights Watch who had passed the credible fear interview stage, ended up deported to Honduras apparently due to her inability to secure counsel while in detention. At 21, Dani had been in an abusive relationship for four years in which her husband regularly beat her and kicked her. Two years ago, her husband's cousin ambushed her in a deserted part of town and raped her. She went to the police to report the rape, but "nothing was resolved."[74] Not knowing she had made a complaint, the cousin told her that if she told anyone about the attack he would kill her. She feared the cousin would harm her again and that her husband would seek her out and harm her.

After entering the United States and being identified by CBP for further screening, Dani spoke with an asylum officer who found that there was "a significant possibility" she could establish in a full hearing that she would qualify for refugee status.[75] A recent decision by the Board of Immigration Appeals recognizes domestic violence as a basis for asylum, establishing a formally binding precedent upholding earlier immigration court rulings.[76]

Detained in Houston, Texas, with only three years of formal schooling and no money to pay a lawyer, Dani tried to move forward with her asylum claim. Gender-based asylum claims, including those related to domestic violence like Dani experienced, are particularly legally complex. Officials gave her a list of free legal services providers in the area but she said, "They never answered my calls." With the help of other detainees who spoke more English, she filled out the application for asylum or withholding of removal. To the question "Are you afraid of being subjected to torture in your home country or any other country to which you may be removed?," Dani's asylum application read, "Am afraid to go back to abusers. Nature of turture: sexual assault and beat to death." [sic] Where the form asked if she feared harm or mistreatment if she returned to her home country the form stated: "1) Kill by gang husband gang members 2) Husband and husband gang members 3) because I am running away from my husband, he can kill me and sexsually asult." [sic]

These two responses formed the substance of Dani's asylum application. She told Human Rights Watch that the judge in charge of her case ordered her deported at the first hearing after she filed the application. "I wanted to get a lawyer," she said. "I didn't have one."

---

[74] Human Rights Watch interview with Dani A. (pseudonym), San Pedro Sula, Honduras, September 9, 2014.
[75] Ibid.
[76] *Matter of A-R-C-G- et al., Respondents,* Board of Immigration Appeals, August 26, 2014. 26 I&N Dec. 388 (BIA 2014).

Family detention presents particular due process problems. In its guidelines on international protection for child asylum claims, the United Nations High Commissioner for Refugees (UNHCR), the UN refugee agency, recommends separate and confidential interviews for all family members to give each an opportunity to discuss any independent claims for protection.[77] UNHCR has also found that a lack of confidentiality could hinder the ability of women to fully access asylum procedures and recommended that "a confidential personal interview, that is gender and culturally sensitive, should be guaranteed in the asylum process, to help ensure access."[78]

Officials at the Artesia, New Mexico, family detention center told Human Rights Watch in July 2014 that credible fear interviews were being conducted with female detainees in the presence of their children. The children's presence may have inhibited women from speaking frankly, interfering with their ability to make their claim, and may further traumatize both the mother and her children.

Noemi M., who was detained while awaiting an asylum interview, told Human Rights Watch that she would only speak about the death threats she received from gangs in Honduras when her 8- and 11-year-old children were out of earshot.[79] DHS officials have since told Human Rights Watch that women in Artesia are being interviewed by asylum officers separately from their children.[80]

Once a noncitizen in expedited removal has passed a credible fear interview, detention is no longer legally mandated but at the discretion of immigration officials. US officials in Artesia told Human Rights Watch that women and children who file for asylum in immigration court could be detained throughout the entire process, which can last months or even years. Immigration attorneys report that ICE is opposing bond requests from women and children in family detention, arguing that the families pose national security

---

[77] UNHCR, "Guidelines on International Protection No. 8: Child Asylum Claims under Articles 1(A)2 and 1(F) of the 1951 Convention and/or 1967 Protocol relating to the Status of Refugees," December 22, 2009, HCR/GIP/09/08, http://www.refworld.org/docid/4b2f4f6d2.html (accessed October 10, 2014).

[78] UNHCR, "Untold stories...families in the asylum process," June 2013, http://www.unhcr.org.uk/fileadmin/user_upload/pdf/aUNHCR_Report_Untold_Stories.pdf (accessed October 10, 2014).

[79] Human Rights Watch interview with Noemi M. (pseudonym), Artesia New Mexico July 22, 2014.

[80] Human Rights Watch meeting with Serena Hoy, Department of Homeland Security, October 9, 2014.

threats.[81] Such prolonged detention, with no defined end date, can cause serious psychological harm, especially for children, including anxiety, depression, and long-term cognitive damage.[82] Marleen V. from El Salvador, who had been detained with her 2-year-old daughter for two weeks at the time she spoke with Human Rights Watch, said of her daughter, “I notice her losing weight. She just won’t eat.”[83]

---

[81] John Stanton, “Government Declares Undocumented Immigrant Child, Mother A ‘National Security Threat’,” *Buzzfeed*, August 5, 2014, http://www.buzzfeed.com/johnstanton/government-declares-undocumented-immigrant-child-mother-a-na#24rdgfh (accessed October 9, 2014).

[82] Alice Farmer, “The impact of immigration detention on children,” *Forced Migration Review*, September 2013, http://www.fmreview.org/detention/farmer (accessed October 9, 2014).

[83] Human Rights Watch interview with Marleen V. (pseudonym), Artesia, New Mexico, July 22, 2014.

# VI. US Law and International Refugee Law

The United States committed to the central guarantees of the 1951 Refugee Convention by its accession to the Refugee Convention's 1967 Protocol.[84] The US government passed the Refugee Act of 1980 in order to bring the country's laws into compliance with the Refugee Convention and Protocol, by incorporating into US law the convention's definition of a "refugee" and the principle of nonrefoulement, which prohibits the return of refugees to countries where they would face persecution.[85]

The US, as a party to the Convention against Torture, is also obligated not to return someone to a country "where there are substantial grounds for believing that [they] would be in danger of being subjected to torture."[86]

As described above, Human Rights Watch is concerned that the US system of expedited removal and reinstatement of removal fails to ensure that the US complies with these international legal obligations, and defeats other mechanisms already in place in US law (specifically the asylum process in US immigration courts) to ensure that asylum seekers are identified and have a fair process through which to present their claims.

In particular, the Hondurans interviewed for this report described rushed interviews and unsympathetic reactions from CBP officials that run contrary to international standards on appropriate procedures for the determination of refugee status. The UNHCR's authoritative Handbook on Procedures and Criteria for Determining Refugee Status ("UNHCR Handbook"), states,

> It should be recalled that an applicant for refugee status is normally in a particularly vulnerable situation. He finds himself in an alien environment

---

[84] Convention Relating to the Status of Refugees, 189 U.N.T.S. 150, entered into force April 22, 1954, http://www.unhcr.org/3b66c2aa10.html; U.N. Protocol Relating to the Status of Refugees, 606 U.N.T.S. 268, entered into force October 4, 1967. The United States acceded to the 1967 Protocol in 1968.

[85] The US incorporated the provisions of the 1967 Protocol into domestic law through the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat 102 (1980). As the Supreme Court has confirmed, a primary purpose of Congress in passing the Refugee Act "was to bring United States refugee law into conformance with the 1967 United Nations Protocol." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 426 (1987); see also *INS v. Stevic*, 467 U.S. 407, 416-24 (1984) (providing a history of the incorporation of the Refugee Convention standards into US law through the Refugee Protocol and the Refugee Act of 1980.)

[86] Convention against Torture, art. 3(1).

> and may experience serious difficulties, technical and psychological, in submitting his case to the authorities of a foreign country.[87]

CBP's role in the process—involving the same uniformed and armed agents responsible for apprehending migrants that screen them for fear of return—conflicts with additional guidance from the UNHCR Handbook:

> A person who, because of his experiences, was in fear of the authorities in his own country may still feel apprehensive vis-à-vis any authority. He may therefore be afraid to speak freely and give a full and accurate account of his case.[88]

The rapid-fire nature of the expedited removal process, in particular the role played by CBP at the outset, is at odds with the recognition by UNHCR's Executive Committee ("Excom") that expedited procedures may be fair only when applied to cases that are "clearly fraudulent or not related to the criteria for the granting of refugee status laid down in the [1951 Refugee Convention]."[89]

Human Rights Watch is also concerned that interviews of Honduran asylum seekers by Honduran consular officials do not meet international standards. The UNHCR Handbook states that, by definition, a refugee's relationship with their country of origin may be severely strained. The Handbook also states that, "it is, of course, of the utmost importance that the applicant's statements will be treated as confidential." In all cases in which a migrant has expressed a fear of returning home to US border or immigration officials, it is a serious breach of confidentiality to encourage and facilitate meetings

---

[87] UNHCR, Handbook on Procedures and Criteria for Determining Refugee Status, UN Doc. HCP/1P/4/Eng/REV.2, 1979, (edited 1992), para. 190. The UNHCR Handbook was prepared at the request of member countries of UNHCR's Executive Committee ("ExCom") for the guidance of governments. The Handbook is an authoritative interpretative guide and is treated as such by governments. See Guy Goodwin-Gill, *The Refugee in International Law*, (Oxford: Oxford University Press, 1996), p. 34.

[88] UNHCR Handbook, para. 198.

[89] UNHCR Executive Committee Conclusion No. 30 (XXXIV) – 1983 – The Problem of Manifestly Unfounded or Abusive Applications for Refugee Status or Asylum, para. (d). The Executive Committee of the High Commissioner's Program is UNHCR's governing body. Since 1975, ExCom has passed a series of Conclusions at its annual meetings. The Conclusions are intended to guide states in their treatment of refugees and asylum seekers and in their interpretation of existing international refugee law. While the Conclusions are not legally binding, they do constitute a body of soft international refugee law. They are adopted by consensus by the ExCom member states, are broadly representative of the views of the international community, and carry persuasive authority. Since the members of ExCom, which includes the US, have negotiated and agreed to their provisions, they are under a good faith obligation to abide by the Conclusions.

between an asylum seeker and an official of the asylum seeker's home government. US immigration officials, first, should take all reasonable measures to determine whether a migrant is an asylum seeker, and, second, should preserve confidentiality, which includes insulating them from home government officials while their claims are pending.

Detention of asylum seekers should always be a measure of last resort and should only be for reasons clearly recognized in international law, such as concerns about danger to the public, or an inability to confirm an individual's identity.

Expanding family detention is inconsistent with international standards, particularly the fundamental principle—reflected in both international and US law—that "best interest of the child" should govern the state's actions toward children.[90] If detention of children is used at all, it should only be in rare and exceptional cases, and for the shortest amount of time and in an appropriate setting where the children's needs can be addressed without causing further trauma or harm.[91] Deprivation of liberty has a negative effect on children's capacity to realize various fundamental rights, including the rights to education, health, and family unity.[79]

---

[90] The Convention on the Rights of the Child (CRC) in article 3(1) gives the child the right to have their best interests assessed and taken into account as a primary consideration in all actions or decisions that concern them, both in the public and private sphere. Convention on the Rights of the Child, G.A. res. 44/25, annex, 44 U.N. GAOR Supp. (No. 49) at 167, U.N. Doc. A/44/49 (1989), entered into force Sept. 2, 1990. The US has signed but not ratified the CRC, meaning that it may not take any action that is contrary to the object and purpose of the treaty. The Committee on the Rights of the Child, which monitors adherence to the CRC, has identified article 3(1), as one of the four general principles of the CRC for interpreting and implementing all the rights of the child, and applies it as a dynamic concept that requires an assessment appropriate to the specific context. UN Committee on the Rights of the Child, General Comment No. 14 (2013) on the right of the child to have his or her best interests taken as a primary consideration (art. 3, para. 1), U.N. Doc. CRC /C/GC/14 (2013), available at http://www2.ohchr.org/English/bodies/crc/docs/GC/CRC_C_GC_14_ENG.pdf (accessed July 1, 2014). In the United States, all states and the District of Columbia have statutes "requiring that the best interests of the child be considered whenever specified types of decisions are made regarding a child's custody, placement, or other critical life issues." Child Welfare Information Gateway, Department of Health and Human Services, "Determining the Best Interests of the Child," 2012, available at https://www.childwelfare.gov/systemwide/laws_policies/statutes/best_interest.cfm (accessed October 13, 2014) (listing state statutes requiring best interests considerations and factors considered for such determinations). One form of immigration relief, Special Immigrant Juvenile Status, requires consideration of the best interests of the child. INA 101(a)(27)(J), 8 U.S.C. 1101 (requiring, in part, a finding that return to the child's country of origin is not in the child's best interests).

[91] The Committee on the Rights of the Child in February 2013 urged states to "expeditiously and completely cease the detention of children on the basis of their immigration status," concluding that such detention is never in the child's best interest. In the interim, the committee stated, while immigration detention of children remains, governments should impose strict time limits to the child's detention in order to minimize the loss of education and impact on mental health. UN Committee on the Rights of the Child, "Report of the 2012 Day of General Discussion on the Rights of All Children in the Context of International Migration," para. 78, February 2013, available at www2.ohchr.org/english/bodies/crc/docs/discussion2012/2012CRC_DGD-Childrens_Rights_InternationalMigration.pdf (accessed September 15, 2014).

Previously, the US government made greater use of alternatives to detention for families, such as proven "appearance support" programs that ensure migrants in immigration proceedings understand how and when to appear.[92]

Finally, using detention explicitly as a deterrent to entry into the United States for people seeking international protection is unlawful under international law[93] and US law.[94] However, the Obama administration has openly stated that one purpose for the increase in family detention beds is to deter all unauthorized migrants from entering the country. DHS Secretary Jeh Johnson has referred to detention as part of an "aggressive deterrence strategy" in Senate testimony and has told the media that he believed detention "would deter future illegal crossings."[95] The ICE Assistant Director of Investigative Programs for Homeland Security Investigations has stated that "[i]mplementing a 'no bond' or 'high bond' policy would help alleviate these disruptions by deterring further mass migration."[96] The ICE press release announcing the Dilley, Texas family detention facility stated: "These facilities will help ensure more timely and effective removals that comply with our legal and international obligations, while deterring others from taking the dangerous journey and illegally crossing into the United States."[97]

---

92 Vera Institute of Justice, "The Appearance Assistance Program, Attaining Compliance with Immigration Laws Through Community Supervision," 1998, available at http://www.vera.org/sites/default/files/resources/downloads/aap.pdf (accessed October 13, 2014).

93 According to UNHCR, "detention policies aimed at deterrence are generally unlawful under international human rights law as they are not based on an individual assessment as to the necessity to detain." See UNHCR, "Detention Guidelines: Guidelines on the Applicable Criteria and Standards relating to the Detention of Asylum-Seekers and Alternatives to Detention," 2012, http://www.unhcr.org/505b10ee9.html (accessed October 10, 2014). Detention that is imposed to deter future asylum seekers, or to dissuade those who have commenced their claims from pursuing them, is inconsistent with international norms. Furthermore, detention is not permitted as a punitive—for example, criminal—measure or a disciplinary sanction for irregular entry or presence in the country. See 1951 Refugee Convention, art. 31.

94 See *Zadvydas v. Davis*, 533 U.S. 678 (2001), https://supreme.justia.com/cases/federal/us/533/678/ (accessed October 13, 2014) (describing immigration detention as "nonpunitive in purpose and effect"); *Wong Wing v. United* States, 163 U.S. 228 (1896), https://supreme.justia.com/cases/federal/us/163/228/ (accessed October 13, 2014) (finding that under the Fifth and Sixth Amendments to the Constitution, the detention of non-citizens was valid only to facilitate the "expulsion of aliens.").

95 "Statement by Secretary of Homeland Security Jeh Johnson Before the Senate Committee on Appropriations," DHS press release, July 10, 2014, available at http://www.dhs.gov/news/2014/07/10/statement-secretary-homeland-security-jeh-johnson-senate-committee-appropriations (accessed October 9, 2014); Mónica Ortiz Uribe, "New Detention Center To Begin Deporting Immigrant Families," *Fronteras,* July 11, 2014, http://www.fronterasdesk.org/content/9708/new-detention-center-begin-deporting-immigrant-families (accessed October 9, 2014).

96 César Cuauhtémoc, "Is DHS Admitting Immigration Detention is Punishment?," post to Crimmigration (blog), September 25, 2014, http://crimmigration.com/2014/09/25/is-dhs-admitting-immigration-detention-is-punishment/ (accessed October 9, 2014).

97 "ICE to open additional facility in South Texas to house adults with children," ICE press release, September 22, 2014, http://www.ice.gov/news/releases/1409/140922dilley.htm (accessed October 9, 2014).

As we were finalizing this report, the Obama administration on September 30, 2014 announced a targeted program to process from inside their home countries children with lawfully present parents in the United States for admission to the United States as refugees.[98] The program, according to administration officials, would provide a safe alternative to the dangerous journey to the United States through Mexico for those children who would qualify to be reunited with a lawfully present parent.

While this program could potentially assist the relatively small group of children who would qualify, it would do nothing to address the protection needs of the vast majority of children and adults who do not have a lawfully present parent in the United States or who did have such a parent but who would be too afraid to wait for months or years to be processed after being threatened by a gang. The existence of this program should not be used as an excuse for continuing or even expanding the harsh measures already in place at the border—and in Mexico—to block Central Americans from seeking asylum and to summarily return them to places where they face a serious risk of harm.

Whatever policies the Obama administration seeks to put in place to deter unauthorized migration, it needs to preserve the right to seek asylum from persecution. The US government should ensure that it does not deport people crossing the US-Mexico border without proper consideration of their need for international protection.

[98] Michael D. Shear, "Obama Approves Plan to Let Children in Central America Apply for Refugee Status," *New York Times*, September 30, 2014, available at http://www.nytimes.com/2014/10/01/us/obama-approves-plan-to-let-children-apply-for-refugee-status-in-central-america.html (accessed October 13, 2014); United States Department of State, Proposed Refugee Admissions for Fiscal Year 2015: Report to Congress, http://www.state.gov/documents/organization/232029.pdf (accessed October 13, 2014).

# Recommendations

The recommendations below apply to US treatment of unauthorized migrants not only from Honduras, the research focus of this report, but from similarly situated countries where large numbers of migrants and asylum seekers are fleeing violence by non-state actors and conditions that prevent that country's nationals from returning to a situation of basic security, notably Mexico, El Salvador, and Guatemala.

## To ensure that migrants arriving at the US-Mexico border who express fear of return to their countries are flagged for screening that would permit them to access refugee protection or protection under the Convention Against Torture:

*The Department of Homeland Security should:*

- Cease the use of expedited removal for individuals and families arriving at the US border with Mexico from countries experiencing conditions that prevent the country's nationals from returning to a situation of basic security;
- Ensure via training; modification of oversight mechanisms; accountability measures, including better quality assurance supervision; and any and all other appropriate measures that initial interviews of arriving noncitizens conducted by Customs and Border Protection (CBP) properly identify individuals who express fear of return so that they are afforded "credible" or "reasonable" fear assessments;
- Until that time, instruct CBP to apply a presumption of fear of return for migrants in expedited removal or reinstatement of removal who are nationals of countries experiencing conditions that prevent the country's nationals from returning to a situation of basic security; and
- Unless and until Department of Homeland Security (DHS) can implement appropriate protection interviews as a part of expedited removal or it instructs CBP to adopt a presumption for asylum screening for Central Americans, instruct Immigration and Customs Enforcement (ICE) to conduct a proactive screening for fear of return for every non-citizen arriving in its custody from CBP custody.

## To ensure that credible and reasonable fear interviews are fair and efficient:

*The Department of Homeland Security should:*

- Ensure that United States Citizenship and Immigration Services (USCIS) has adequate staffing levels, training, and supervision; and
- Review guidance for USCIS staff to ensure that the procedures used in "credible fear" interviews do not unduly bar asylum seekers from access to immigration courts.

*Congress should:*

- Adopt legislation that would allow the USCIS to conduct timely in-person "credible fear" and "reasonable fear" screening interviews and address backlogs, without creating delays for affirmative asylum interviews;
- Adopt legislation to address removal-hearing delays, eliminate backlogs and conduct prompt hearings, including by increasing the number of immigration court judges, law clerks, government immigration lawyers and related resources, as well as increasing incentives for legal aid and private lawyers to represent migrants in underserved areas.

## To protect children and adults from the harmful effects of detention and ensure the due process rights of asylum seekers:

*The Department of Homeland Security should:*

- Revert to previous US government policy that limited the detention of arriving migrant families with children. This would entail closing the new family detention center in Artesia, New Mexico, reverting the family detention center in Karnes, Texas back to a civil detention facility for adults, and converting plans to build a 2,400-bed facility in Dilley, Texas from family detention to adult civil detention. DHS should augment alternative custody and monitoring programs that ensure court appearances instead of detention for families and other border arrivals who present no danger or need assistance to appear in court; and
- Apply a presumption in favor of release on bond or parole for asylum seekers who have passed credible or reasonable fear screenings.

## To respect asylum seekers' right to access counsel, improve disposition of asylum claims, and better ensure that the US does not return people to countries where they face repression or torture:

*The administration and Congress should:*

- Approve reallocation of already appropriated funds to increase access to counsel for indigent asylum seekers and those requesting protection under the Convention Against Torture;
- Consider passing a law concerning asylum seekers akin to the provision in the Senate Border Security, Economic Opportunity and Immigration Modernization Act (S.744) of 2013 that mandates the US attorney general to appoint counsel, at government expense if necessary, for unaccompanied minors, people with mental disabilities, and other non-citizens "considered particularly vulnerable;" and
- Consider passing legislation to allow immigration judges the discretion to appoint counsel for indigent non-citizens in all standard immigration removal proceedings.

# Acknowledgments

This report was researched and written by Clara Long, US Program researcher on immigration and border policy at Human Rights Watch. Antonio Ginatta, advocacy director for the US program, conducted interviews in the Karnes family detention facility. Brian Root, quantitative analyst at Human Rights Watch, conducted data analysis.

Alison Parker, US program director, edited and contributed to research and writing of the report. The report was also edited by Bill Frelick, refugee rights director; José Miguel Vivanco, Americas director; Meghan Rhoad, women's rights researcher; and Alice Farmer, child rights researcher. Samantha Reiser and W. Paul Smith, associates in the US Program, also contributed to editing. James Ross, legal and policy director, provided legal review. Joe Saunders, deputy program director, provided program review. Grace Choi, publications director, coordinated layout and production.

Human Rights Watch thanks the government officials, lawyers, social service providers and others who spoke with us during the research for this report. We are especially grateful to the Central American migrants and asylum seekers whose participation in this research made this report possible.



In recent years, the United States has apprehended growing numbers of Central Americans crossing the US-Mexico border without authorization. These migrants have left their countries for many reasons, including fleeing rising violence by gangs involved in the drug trade.

US Customs and Border Protection deports the overwhelming majority of migrants it apprehends from Central America in accelerated processes known as "expedited removal" or "reinstatement of removal." These processes include rapid-fire screening for a migrant's fear of persecution or torture upon return to their home country.

*"You Don't Have Rights Here"* details how summary screening at the US border is failing to identify people fleeing serious risks to their lives and safety. It is based primarily on the accounts of migrants sent back to Honduras or in detention in US migrant detention facilities. An analysis of US government deportation data shows that the Border Patrol flags only a tiny minority of Central Americans for a more extended interview to determine if they have a "credible" fear of returning home. Migrants said that Border Patrol officers seemed singularly focused on deporting them and their families despite their fear of return. Some said that after their deportation they went into hiding, fearful for their lives.

Human Rights Watch calls on the US government to ensure that immigration authorities give the cases of Central American migrants sufficient scrutiny before returning them to risk of serious harm. It also urges US authorities to stop detaining migrant children, and to improve migrants' access to lawyers.

*(above) Police patrolling in Chamelecón neighborhood, San Pedro Sula, Honduras. In 2012, the MS-13 (Mara Salvatrucha) transnational criminal gang forced many residents of the neighborhood to flee their homes.*

*(front cover) Returned migrants at the Attention Center for the Returned Migrant, San Pedro Sula airport, Honduras.*

*Photos © 2014 Stephen Ferry for Human Rights Watch*

**hrw.org**

# EXHIBIT 35

NATIONAL IMMIGRANT JUSTICE CENTER
A HEARTLAND ALLIANCE PROGRAM

November 13, 2014

VIA FEDEX AND E-MAIL

Megan H. Mack
Officer of Civil Rights & Civil Liberties
Department of Homeland Security
245 Murray Lane, SW
Building 410
Washington, D.C. 20528

John Roth
Inspector General
Department of Homeland Security
245 Murray Lane, SW
Building 410
Washington, D.C. 20528

**Re: Inadequate U.S. Customs and Border Protection (CBP) screening practices block individuals fleeing persecution from access to the asylum process**

Dear Ms. Mack and Mr. Roth:

The undersigned organizations write to raise concerns regarding the failure by U.S. Customs and Border Protection (CBP) to properly screen individuals who flee to the United States and are taken into custody at the border, resulting in their unjust expedited removal to countries where they face persecution. Federal law states that when an individual apprehended at the border or point of entry expresses a fear of persecution, CBP must refer the individual to U.S. Citizenship and Immigration Services (USCIS) for a credible fear interview, the first step in the asylum process for those in the expedited removal process.[1] The National Immigrant Justice Center (NIJC), in collaboration with American Gateways, American Immigration Lawyers Association (AILA), the Center for Gender & Refugee Studies (CGRS), Centro Legal de la Raza, Human Rights First, Lawyers' Committee for Civil Rights of the San Francisco Bay Area (LCCR), the Texas Civil Rights Project, the Immigration Clinic of the University of Texas Law School, and the Women's Refugee Commission submit this complaint on behalf of 9 noncitizens who were denied the opportunity to seek asylum because of flaws in CBP's screening process. (*See* Exs. A-I, *Individual Complaints.*)

Concurrent with the filing of the attached individual complaints, AILA has separately filed a submission to the Office of Civil Rights and Civil Liberties (CRCL) with names and A-numbers for additional individuals who also were denied access to the asylum process. (*See* Ex. J, *AILA Chart of Individual Complainants.*) AILA filed a similar complaint in November 2013, and these additional cases supplement that complaint. (*See* Ex. K, *Letter to AILA from the CRCL acknowledging complaint filed on November 26, 2013*). In addition, advocates from signatory organizations and other legal service providers have provided affidavits explaining their firsthand observations of common shortcomings in CBP's screening and referral procedures. (*See* Exs. L-P, *Legal Service Provider Affidavits.*) Based on the attached complainants' affidavits, the cases collected

---

[1] *See* 8 U.S.C. § 1225(b)(1)(A)(ii).

by AILA, and the observations of legal service providers, there is no doubt that a thorough investigation would reveal that CBP errors are systemic in nature and prevent meritorious asylum claims from being heard.

This letter (1) details the U.S. government's increased dependence on summary removal procedures and its harmful consequences for asylum seekers, (2) describes CBP's legal obligations to ensure that those who flee persecution have access to the asylum process, (3) describes the long-standing systemic failure by CBP to meet its legal obligations, (4) summarizes the experiences of the individual complainants while highlighting the serious errors made by CBP in their cases, and (5) offers recommendations that CBP should implement to ensure that individuals who come to the United States are afforded the right to seek asylum as the law requires and as Congress intended.

The experiences of complainants and the observations of legal service providers demonstrate three stages of consequences for asylum seekers. Some CBP officers fail to properly screen individuals for asylum at the border and points of entry and, as a result, issue expedited removal orders when they should instead refer individuals for credible fear interviews with the Asylum Office. In many cases, those individuals subject to erroneous expedited removal orders are then compelled to return to the United States following their deportations because they experience additional persecution abroad. And when they return, CBP officers' errors are exacerbated when the government reinstates the expedited removal orders and deems these returning refugees ineligible for asylum.

In light of the serious due process and civil rights violations that occur when CBP fails to adequately screen asylum seekers and instead deports legitimate asylum seekers to face further persecution in their home countries, the undersigned organizations strongly urge CRCL to investigate CBP's practices and provide guidance and oversight to improve the agency's screening, referral, and treatment of asylum seekers.

## I. Increased dependence on summary removal procedures and its consequences

In enacting the expedited removal provision of U.S. immigration law, Congress made the already expansive power of immigration officers at the border even more substantial.[2] This provision authorizes officers to summarily order removal (deportation) for certain noncitizens without providing a hearing or review.[3] A critical detail, however, is that expedited removal is prohibited when an individual expresses a fear of persecution or intent to apply for asylum. These individuals must instead be referred to the Asylum Office for credible fear interviews and, if credible fear of persecution is found, are to be afforded the opportunity to seek asylum before

---

[2] For a history on the creation and evolution of the CBP as an agency, *see* Garrett M. Graff, *The Green Monster: How the Border Patrol became America's most out-of-control law enforcement agency*, POLITICO MAGAZINE, November/December 2014, *available at* http://politi.co/11cmvam.

[3] 8 U.S.C. § 1225(b)(1)(A)(i). By regulation, the agency affords itself authority to apply expedited removal to noncitizens who are encountered within 100 miles of the border and who entered the United States without inspection less than 14 days before they are encountered. *See* 69 FED. REG. 48,877-81 (Aug. 11, 2004).

the immigration court.[4] Congress was clear in creating this scheme that it did not want its expedited removal system to result in the expulsion of *bona fide* refugees.[5]

Nonetheless, expedited removal orders have been a central tool in U.S. deportation strategies for nearly 18 years, particularly following expansion of the program in 2004.[6] The number of expedited removal orders issued by the Department of Homeland Security (DHS) has more than doubled from 72,911 in 2005 to 193,092 in 2013.[7] In 2013, expedited removals accounted for 44 percent (up 5 percent from FY 2012) of all removals.[8] Almost all expedited removals—98 percent—were issued against nationals from Mexico, Guatemala, El Salvador, and Honduras.[9]

The CBP officers who issue these orders are neither lawyers nor judges, yet they hold extraordinary power in determining the fate of arriving asylum seekers.[10] They screen individuals (who are generally detained and unrepresented) and make unilateral decisions without any type of hearing before a neutral party, in many cases within hours of the individual's arrival after a journey that is typically arduous and often dangerous.[11] Further, these decisions are generally not subject to appellate review.[12] Despite the scope of this authority, CBP seems to prioritize the issuance of expedited removal orders over its other duty: ensuring that those who fear returning to their home countries are properly referred to the Asylum Office for further screening.

The impact that CBP's errors have on particularly vulnerable populations is especially troubling. Based on the observations of undersigned organizations, a significant number of the individuals who are deported under expedited removal orders despite having valid claims to asylum are women or young adults with domestic violence claims or individuals with sexual-orientation-

---

[4] 8 U.S.C. § 1225(b)(1)(A)(ii).

[5] *See, e.g.*, H.R. Rep. No. 104-469, pt. 1, at *13 (1996) ("Throughout the process, the procedures protect those aliens who present credible claims for asylum by giving them an opportunity for a full hearing on their claims."); *id.* at 107-08 ("[A]rriving aliens with credible asylum claims will be allowed to pursue those claims."); *id.* at 158 ("If the alien meets this [credible fear] threshold, the alien is permitted to remain in the U.S. to receive a full adjudication of the asylum claim—the same as any other alien in the U.S."); *id.* ("Under this system, there should be *no danger* that an alien with a genuine asylum claim will be returned to persecution.") (emphasis added).

[6] 8 C.F.R. § 1240.16; Illegal Immigration Reform and Immigration Responsibility Act of 1996, Pub. L. 104-208 (Sept. 30, 1996) (establishing expedited removals); *see also* American Immigration Council, *Removals Without Recourse: The Growth of Summary Deportations From the United States,* April 28, 2014, [hereinafter AIC Removals Without Recourse], *available at* http://bit.ly/1wJO8Fk.

[7] *See* U.S. Dep't of Homeland Sec. Office of Immigration Statistics, "Immigration Enforcement Actions: 2013," *Annual Report Sept. 2014* at 5 (Table 7) [hereinafter "DHS 2013 Annual Report"], *available at* http://1.usa.gov/1wMj45G; *cf.* U.S. Dep't of Homeland Sec. Office of Immigration Statistics, "Immigration Enforcement Actions: 2005," *Annual Report November 2006* 5, Table 2 (Nov. 2006), *available at* http://1.usa.gov/1n5Ww88.

[8] *See* DHS 2013 Annual Report, *supra,* note 7, at 1, 5 (Table 7).

[9] *Id.* at 6.

[10] Ian Gordon, *4 Reasons Why Border Agents Shouldn't Get to Decide Whether Child Migrants Get to Stay in the U.S.*, MOTHER JONES, July 1, 2014, *available at* http://bit.ly/1u2ThFS.

[11] *See* 8 U.S.C. § 1225(b)(1)(A)(i)(instructing that the officer "shall order the alien removed from the United States without further hearing or review" unless the individual expresses a fear of return).

[12] *Id.*; *see id.* § 1225(b)(1)(C) (no administrative review except for individuals claiming to have lawful permanent resident, refugee, or asylee status); *id.* § 1252(a)(2)(no judicial review).

based claims.[13] CBP's failure to properly screen these individuals can be fatal, sending individuals back into environments where they are targeted for extreme violence.[14] For example, in Honduras, a country with a population smaller than New York City, an average of one woman is murdered a day.[15] Another report documents that El Salvador has the world's highest number of "femicides."[16] LGBT individuals face similar risks. In Guatemala and El Salvador, LGBT people live in an "environment of intolerance" where most of the population and the government believe homosexuality is morally repugnant.[17] Mexico has the second highest LGBT murder rate in the Western Hemisphere.[18] The Honduran government—particularly since the government change in 2009—has condoned social cleansing of LGBT people.[19]

When individuals who receive expedited removal orders are forced to return to the United States to seek safety—sometimes immediately, sometimes after enduring additional persecution abroad—they risk automatic removal anew and have limited opportunities for protection. In such instances, if apprehended, individuals are then subject to another summary removal procedure known as "reinstatement of removal."[20] Like expedited removal orders, these orders are issued by immigration officers, are subject to similar limits on appellate review, and are

---

[13] The ability to win asylum claims based on these factors is well established. *See, e.g.*, *Matter of A-R-C-G-*, 26 I. & N. Dec. 388 (BIA 2014) (regarding domestic violence claims); *Matter of Toboso-Alfonso*, 20 I. & N. Dec. 819 (BIA 1990) (regarding LGBT claims).

[14] *See* HUMAN RIGHTS WATCH, *You Don't Have Rights Here: U.S. Border Screening and Returns of Central Americans to Risk of Serious Harm*, October 2014 [hereinafter "HRW 2014 Report"] *available at* http://bit.ly/1EmsHsq. HRW interviewed deported Hondurans and documented that many are now living in fear and hiding. *See also* HUMAN RIGHTS FIRST, *How to Protect Refugees and Prevent Abuse at the Border: Blueprint for U.S. Government Policy*, June 2014, 10-12 [hereinafter "HRF 2014 Blueprint for Change"] *available at* http://bit.ly/1pScydh (The Report notes that the expansion of expedited removal "puts the United States at risk of deporting asylum seekers … without giving them a meaningful opportunity to apply for asylum." The Report goes on to recommend numerous changes to the screening process that would address this concern.); Brad Wong, *Domestic Violence Survivor Killed By Ex-Boyfriend After Deportation To Mexico, Lawsuit Says*, HUFFINGTON POST: LATINO VOICES, June 19, 2013, *available at* http://huff.to/1zfHFPQ (This article tells the story of a woman who was killed in Mexico by her abusive ex-partner after being deported from the United States.).

[15] NOBEL WOMEN'S INITIATIVE, *From Survivors to Defenders: Women Confronting Violence in Mexico, Honduras & Guatemala*, 2012, *available at* http://bit.ly/O9Y2Ll.

[16] *See* GENEVA DECLARATION SECRETARIAT, *The Global Burden of Armed Violence 2011: Lethal Encounters* 113, 2011, *available at* http://bit.ly/1wf5t4X; *see also* CENTER FOR GENDER & REFUGEE STUDIES, *Central America: Femicides and Gender-Based Violence*, 2013, *available at* http://bit.ly/WE5AKv.

[17] *See* UNIV. OF CALIFORNIA, BERKELEY, INT'L HUMAN RIGHTS LAW CLINIC, *Sexual Diversity in El Salvador: A Report on the Human Rights Situation of the LGBT Community*, July 2012, *available at* http://bit.ly/10Nwx0g; PEW RESEARCH CENTER, *Global Views on Morality: Homosexuality*, Apr. 15, 2014, *available at* http://pewrsr.ch/1yrAral; INT'L GAY & LESBIAN HUMAN RIGHTS COMMITTEE, ET. AL, *Human Rights Violations of Lesbian, Gay, Bisexual, and Transgender (LGBT) People in Guatemala: A Shadow Report*, March 2012, *available at* http://bit.ly/1xEsE8Z.

[18] *See* Angeles Cruz Martínez, *Mexico, Second in L[atin] A[merica] in Homophobic Murders*, LA JORNADA, May 17, 2008, *available at* http://bit.ly/10Nxrdi; Patricia Monreal, *Mexico: Michoacan, Third in the Nation for Homophobic Crimes* CAMBIO DE MICHOACAN, Sept. 4, 2011, *available at* http://bit.ly/1EmtHwv.

[19] *See* Suyapa Portillo Villeda, *Outing' Honduras: A Human Rights Catastrophe in the Making*, UPSIDE DOWN WORLD, Dec. 3, 2012, *available at* http://bit.ly/1EmtYzw.

[20] 8 U.S.C. § 1231(a)(5). While any prior removal order, regardless of the circumstances in which it was issued, can be used as the basis for reinstatement, this complaint specifically documents circumstances in which the prior removal order relied upon is an erroneously issued expedited removal order under 8 U.S.C. § 1225(b)(1)(A)(i).

generally issued against individuals who are detained and unrepresented.[21] Reinstatement orders were the second-largest category of removal orders in 2013, accounting for 39 percent of all removal orders (170,247).[22] That number nearly quadrupled between 2005 and 2013.[23]

The increase in both expedited and reinstated removals is dramatic:[24]




In total, more than more than 80 percent of all removals occur behind closed doors at the discretion of immigration officers—without judges or attorneys and through completely non-transparent processes. In light of the current violence in Central America forcing families and children to seek safety in the United States, pressures on CBP to quickly deport those arriving to this country have only increased, risking further escalation of mistakes and abuses.[25]

<u>A Note about Withholding of Removal</u>

The series of events described above begins with an expedited removal order of an asylum seeker and often culminates in a reinstated removal order. For those who are able to express fear of persecution and have that fear acknowledged before the issuance of a reinstated removal order and a second deportation, the most significant consequence of that reinstated removal order is that, according to the government, it limits the applicant to withholding of removal as

---

[21] 8 U.S.C. § 1231(a)(5); 8 C.F.R. § 241.8(a). Individuals subject to reinstatement of removal who express a fear of return must also be referred to the Asylum Office. *See* 8 C.F.R. § 1208.31(a).
[22] *See* DHS 2013 Annual Report, *supra,* note 7.
[23] *Id.*
[24] *See* AIC Removals Without Recourse, *supra*, note 6.
[25] *See* Letter from Barack Obama to Harry Reid, Mitch McConnell, and Nancy Pelosi, *Efforts to Address the Humanitarian Situation in the Rio Grande Valley Areas of Our Nation's Southwest Border*, June 30, 2014, *available at* http://1.usa.gov/1mg5i7R (discussing the need to return unlawful migrants to their home countries "quickly").

her only form of protection.[26] Individuals limited to withholding of removal must meet a higher burden of proof (which itself can result in the exclusion of *bona fide* refugees) and are:

1. **Unable to petition for spouse and children:** A grant of withholding of removal, unlike a grant of asylum, does not allow an applicant to sponsor a spouse or children for derivative status. Those like complainants PMA and NBS (discussed below) are thus forced to choose between reuniting with family and compromising their own safety.[27]
2. **Excluded from permanent lawful status:** Withholding recipients cannot apply for lawful permanent residence or citizenship.[28] Instead, they are left in permanent limbo; they must apply annually for work authorization, and they can be deported if DHS determines that there has been a change in the conditions that supported their claim for protection. They also cannot travel outside of the United States or access benefits.
3. **Subject to prolonged detention:** Most of the complainants faced some time in immigration detention. Indeed, only PMA avoided prolonged detention—likely only because she was pregnant when she was taken into custody.[29]

* * *

The undersigned organizations have witnessed firsthand the troubling cycle of summary removal that *bona fide* asylum seekers face when erroneous expedited removal orders turn into reinstated orders of removal. Because these summary procedures have the inherent potential of being employed against individuals fleeing persecution and with limited accountability, it is crucial that CRCL—perhaps the only entity able to do so—employ the oversight mechanisms available to it to ensure respect for the right to seek asylum. The practice of prioritizing expedient removals through summary removal orders cannot come at the expense of the right to seek asylum that is afforded by statute to "any alien" in this country who has suffered or is at risk of persecution.[30]

## II. CBP's responsibilities to asylum seekers as gatekeeper to the United States

Given CBP's obligations under U.S. law, agency guidance requires that before CBP officers issue expedited removal orders, they must:[31]

---

[26] 8 C.F.R. §§ 1208.31(e), (g)(2)(i). Withholding of removal is available by statute, *see* 8 U.S.C. § 1231(b)(3), and under the Convention Against Torture (CAT), *see* 8 C.F.R. § 1208.16. This complaint does not directly challenge the validity of the provisions precluding noncitizens in reinstated removal proceedings from applying for asylum, but complainants and the undersigned organizations take the view that this limitation is impermissible. That argument has been advanced by some of the undersigned organizations in multiple cases, and in at least one case, the agency agreed to cancel the expedited removal order and allow the individual a chance to seek asylum. *See Maldonado Lopez v. Holder*, No. 12-72800 (9th Cir. voluntarily dismissed Feb. 4, 2014). A summary of that case, as well as party and amicus briefs, is available at http://bit.ly/1xsGXhK.

[27] U.S. DEP'T OF JUSTICE EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, *Fact Sheet: Asylum and Withholding of Removal Relief, Convention Against Torture Protections*, Jan. 15, 2009, *available at* http://1.usa.gov/1nOG2q9.

[28] *Id.*

[29] See HRW 2014 Report, *supra*, note 14 at 32-34 (discussing the adverse effects detention has on asylum seekers, both in terms of access to counsel and emotional well-being). While not the subject of this complaint, the undersigned share concerns raised in the HRW report around the mandatory detention of asylum seekers, including the expansion of detention facilities to hold women and children.

[30] *See* 8 U.S.C. § 1158(a) (noting that "any alien who is physically present in the United States…irrespective of such alien's status" has the right to seek asylum subject to limitations not applicable here).

[31] 8 C.F.R. § 235.3(b)(2)(i).

- Read to the noncitizen a notice explaining the expedited removal process and the opportunity to express concerns about persecution in the home country
- Interview the noncitizen and create a record of the facts of the case and statements made (using forms I-867A, I-867B, discussed below in more detail)
- Read the recorded information to the noncitizen
- Advise the noncitizen of the charges of inadmissibility and give the noncitizen an opportunity to respond to the charges

Agency guidance thus incorporates the duty for CBP officers to screen asylum seekers and begins with the notice provided on Form I-867A, reproduced below, which officers must read verbatim to all noncitizens subject to expedited removal:

> I am an officer of the United States Department of Homeland Security. I am authorized to administer the immigration laws and to take sworn statements. I want to take your sworn statement regarding your application for admission to the United States. Before I take your statement, I also want to explain your rights, and the purpose and consequences of this interview.
>
> You do not appear to be admissible or to have the required legal papers authorizing your admission to the United States. This may result in your being denied admission and immediately returned to your home country without a hearing. If a decision is made to refuse your admission into the United States, you may be immediately removed from this country, and if so, you may be barred from reentry for a period of 5 years or longer.
>
> This may be your only opportunity to present information to me and the Department of Homeland Security to make a decision. It is very important that you tell me the truth. If you lie or give misinformation, you may be subject to criminal or civil penalties, or barred from receiving immigration benefits or relief now or in the future.
>
> Except as I will explain to you, you are not entitled to a hearing or review.
>
> U.S. law provides protection to certain persons who face persecution, harm or torture upon return to their home country. If you fear or have a concern about being removed from the United States or about being sent home, you should tell me so during this interview because you may not have another chance. You will have the opportunity to speak privately and confidentially to another officer about your fear or concern. That officer will determine if you should remain in the United States and not be removed because of that fear.

The highlighted language is intended to implement CBP officers' duty to raise the possibility of asylum to individuals that they apprehend, as CBP is the first and potentially *only* entity to encounter individuals fleeing persecution. The subsequent questions on Form I-867A record the person's name, age, nationality, willingness to participate in the interview, and ties to the United States.[32]

CBP officers also must read verbatim the questions on Form I-867B.[33] Those questions are:

1. Why did you leave your home country or country of last residence?
2. Do you have any fear or concern about being returned to your home country or being removed from the United States?

---

[32] *See id.*

[33] *See* KATE JASTRAM & TALA HARTSOUGH, UNITED STATES COMM'N ON INT'L RELIGIOUS FREEDOM, *Study on Asylum Seekers in Expedited Removal*, (2005) [hereinafter "USCIRF 2005 Study"], *available at* http://bit.ly/XxTG6k (Vol. I) and http://bit.ly/1pt6Tmr (Vol. II). See page 44, for an explanation and analysis of these questions.

3. Would you be harmed if you are returned to your home country or country of last residence?
4. Do you have any questions or is there anything else you would like to add?

If, in the course of asking these questions, the CBP officer determines that a noncitizen has expressed a fear of persecution or torture, that person is to be referred to the Asylum Office for a credible fear interview. If the CBP officer determines that a noncitizen does not have a fear or—as in the case of the undersigned complainants—precludes or ignores an expression of fear, then the individual will be deported, *without any process or review.*

Of particular importance, nothing in the immigration statute, regulations, or agency field guidance instructs CBP officers to judge the strength of asylum seekers' stated fears or determine if individuals warrant asylum. In fact, CBP is instructed to do exactly the opposite:

| **Legal guidance to CBP on the credible fear referral process** | |
|---|---|
| Statute | "If an immigration officer determines that an alien…who is arriving in the United States…indicates either an intention to apply for asylum… or a fear of persecution, the officer shall refer the alien for an interview by an asylum officer."[34] |
| Regulation | "If an alien subject to the expedited removal provisions indicates an intention to apply for asylum, or expresses a fear of persecution or torture, or a fear of return to his or her country, the inspecting officer shall not proceed further with removal of the alien until the alien has been referred for an interview by an asylum officer."[35] |
| CBP Inspector's Field Manual | "[I]f the alien indicates in any fashion that he or she has a fear of persecution, or that he or she has suffered or might [suffer] torture, you are required to refer the alien to an asylum officer for a credible fear determination. … [T]he inspecting officer has a responsibility to ensure that anyone who indicates a fear of persecution is referred to an asylum officer for a credible fear determination. Inspectors should consider verbal as well as non-verbal cues given by the alien. The obligatory questions on the Form I-867B are designed to help in determining whether the alien has such fear. … Do not go into detail on the nature of the alien's fear of persecution or torture; leave that for the asylum officer. If an alien asserts a fear or concern which is clearly unrelated to an intention to seek asylum or a fear of persecution, then the case should not be referred to an asylum officer. In determining whether to refer the alien, inspectors should not make eligibility determinations or weigh the strength of the claims, nor should they make credibility determinations. … The inspector should err on the side of caution and apply the criteria generously, referring to the asylum officer any questionable cases. … Do not make any evaluation as to the merits of such fear; that is the responsibility of the asylum officer."[36] |

[34] 8 U.S.C. § 1225(b)(1)(A)(ii).
[35] 8 CFR § 235.3(b)(4).
[36] CUSTOMS AND BORDER PROTECTION (CBP), *Inspector's Field Manual*, Feb. 10, 2006 at 114, *available at* http://bit.ly/1zhH7c4.

These texts offer important lessons on the proper treatment of potential asylum seekers:

1. **No "magic words" are required.** An individual can express a fear "in any fashion."[37] There is no need to expressly state a desire to seek asylum, to mention the words persecution or torture, or to link a fear to a protected ground. In fact, non-verbal cues can be sufficient to illustrate a fear and merit referral to the asylum office.[38]
2. **Individuals do not need to express fear in response to a question.** Even if the person expresses a fear after the formal interview is complete or before it begins, that should trigger the duty to refer the individual for a credible fear interview.[39]
3. **CBP officers must refrain from attempting to parse individuals' expressed fears with the "refugee" definition.** The purpose of the referral to the Asylum Office is at least twofold. Not only are asylum officers specifically trained how to ask survivors of persecution about their fear in a confidential setting, but they also are trained on the complexities of asylum law and are far better able to assess whether individuals have a substantial likelihood of meeting the refugee definition.
4. **When in doubt, CBP should refer to the asylum office.** CBP officers should err on the side of caution when determining whether or not fears are sufficiently "related" to potential asylum claims. This requirement is particularly important in cases involving noncitizens whose claim may be based on membership in particular social groups because the requirements for defining social groups are nuanced, rapidly evolving, and involve a complex legal and factual analysis.[40]

In sum, expedited removal orders comport with the law only if CBP officers advise individuals of their right to seek protection and give them a fair opportunity to do so. Officers must take care in the process and err on the side of caution. The risks of mistakes are simply too high for the process to be handled otherwise. When the process fails—as it has in the case of each underlying complainant—the undersigned organizations argue that the removal order and any subsequent reinstatement of that order should be considered invalid.

---

[37] *Id.*

[38] As the legal service providers who have submitted affidavits attest, and as federal courts have noted, there are many legitimate reasons why asylum seekers, particularly those with highly sensitive claims or accompanied by children, might be hesitant to disclose them to border officials in their initial interviews. *See* Exs. L-P; *see also e.g., Moab v. Gonzales*, 500 F.3d 656, 661 (7th Cir. 2007) (hesitancy to disclose sexual orientation); *Balogun v. Ashcroft*, 374 F.3d 492, 505 (7th Cir. 2004) (reluctance to disclose personal information); *Kebede v. Ashcroft*, 366 F.3d 808, 811 (9th Cir. 2004) (hesitancy to disclose rape).

[39] 8 U.S.C. § 1225(b)(1)(A)(ii); 8 CFR § 235.3(b)(4).

[40] Although the Board of Immigration Appeals' test for determining what constitutes a "particular social group" was first announced nearly 30 years ago in *Matter of Acosta*, 19 I. & N. Dec. 211 (BIA 1985), the Board has frequently revisited the test. *See, e.g.*, *Matter of S–E–G–,* 24 I. & N. Dec. 579 (BIA 2008); *Matter of A–M–E & J–G–U–,* 24 I. & N. Dec. 69 (BIA 2007). Faced with this case law, at least two courts declined to recognize the Board's conclusion that a social group must be "visible" and defined with "particularity," finding these requirements arbitrary. *See Valdiviezo-Galdamez v. Holder*, 663 F.3d 582 (3d Cir. 2011); *Gatimi v. Holder*, 578 F.3d 611, 615 (7th Cir. 2009). Following these decisions, the Board again clarified its understanding of the meaning of "particular social group." *See Matter of M-E-V-G*; 26 I. & N. Dec. 227 (BIA 2014); *Matter of W-G-R-*, 26 I. & N. Dec. 208 (BIA 2014). The first court to address the Board's clarified precedent granted the appeal, finding that the BIA had failed to adhere to its own test, noting that the determination regarding whether a "particular social group" is cognizable is a highly fact-specific query. *See Pirir-Boc v. Holder*, 750 F.3d 1077, 1084 (9th Cir. 2014). CBP officers are ill-equipped to respond to this evolution.

## III. Flaws in CBP's issuance of expedited removals and the impact on asylum seekers

As the attached complainants' affidavits and AILA case examples document, despite the clear requirements of the law and the grave stakes involved, CBP's processing of arriving asylum seekers is marred by careless errors, subversion of even minimal procedures, willful indifference, and, in some cases, outright intimidation or coercion. These failings have repeatedly been documented over many years.

In 2005, the U.S. Commission on International Religious Freedom (USCIRF) documented substantial noncompliance by CBP officers in screening noncitizens with potential asylum claims in the expedited removal process.[41] These problems were observed at every point in the process. For example, CBP officers frequently failed to read any of the information provided on Form I-867A, and in half of the cases, officers failed to read the only paragraph dedicated to the asylum process:[42]

> I am an officer of the United States Department of Homeland Security. I am authorized to administer the immigration laws and to take sworn statements. I want to take your sworn statement regarding your application for admission to the United States. Before I take your statement, I also want to explain your rights, and the purpose and consequences of this interview.
>
> You do not appear to be admissible or to have the required legal papers authorizing your admission to the United States. This may result in your being denied admission and immediately returned to your home country without a hearing. If a decision is made to refuse your admission into the United States, you may be immediately removed from this country, and if so, you may be barred from reentry for a period of 5 years or longer.
>
> **CBP OFFICER DID NOT READ IN 19.5% OF CASES**
>
> This may be your only opportunity to present information to me and the Department of Homeland Security to make a decision. It is very important that you tell me the truth. If you lie or give misinformation, you may be subject to criminal or civil penalties, or barred from receiving immigration benefits or relief now or in the future.
>
> **CBP OFFICER DID NOT READ IN 38.6% OF CASES**
>
> Except as I will explain to you, you are not entitled to a hearing or review.
>
> U.S. law provides protection to certain persons who face persecution, harm or torture upon return to their home country. If you fear or have a concern about being removed from the United States or about being sent home, you should tell me so during this interview because you may not have another chance. You will have the opportunity to speak privately and confidentially to another officer about your fear or concern. That officer will determine if you should remain in the United States and not be removed because of that fear.
>
> **CBP OFFICER DID NOT READ IN 50.5% OF CASES**

Even when noncitizens expressed fear, doing so did not guarantee referrals to the Asylum Office; in one-sixth of these cases, CBP made no referrals and instead ordered individuals removed or permitted them to withdraw the applications for entry.[43]

The USCIRF study uncovered not just a failure to ask required questions but also a failure to properly record and verify answers. In about 10 percent of cases referred to the Asylum Office, there were "marked differences" between the official files prepared by CBP officers and what the USCIRF study's experts observed.[44] In seven percent of cases, CBP officers failed to record "considerable detail" that noncitizens expressed about their fears, simply recording "yes" or

---

[41] USCIRF 2005 Study, *supra*, note 33.
[42] *Id.* at 14, Table 2.1.
[43] *Id.* at 20, 23.
[44] *Id.* at 16.

"no" responses.[45] Finally, the study found that in about 16 percent of cases, CBP officers failed to ask noncitizens to confirm the accuracy of recorded statements, yet "every statement was signed by the aliens being interviewed."[46] These recording problems have become sufficiently obvious that federal courts of appeals have expressed concern about the accuracy and validity of CBP screening interviews, particularly in cases where they are later used to impugn the credibility of asylum applicants—a tactic that continues to be employed into the present, as some of the legal service providers observe (*see infra* Part IV).[47]

Such systemic shortcomings continue seemingly unabated, as witnessed and documented by complainants and the undersigned organizations nearly a decade after the USCIRF report. [48] There is no indication that any remedial actions by CBP have improved upon or resolved the problems that the USCIRF study identified. In fact, last month Human Rights Watch (HRW) issued a report documenting similar, ongoing, concerns with CBP's screening process.[49] HRW noted that several of the deported Hondurans who were interviewed "provided accounts that, if true, should qualify them for asylum."[50] Upon apprehension at the U.S.-Mexico border, some said they were not informed that asylum was a possibility, and those who tried to seek asylum often were outright discouraged.[51] One young man stated that when he told a Border Patrol officer who dismissed his request for asylum that "he was violating my right to life," the officer responded, "[y]ou don't have rights here."[52] HRW also highlighted the troubling disparity between the percentages of Honduran nationals subjected to expedited removal (81 percent) with the "miniscule" percent of individuals who were referred to the Asylum Office for credible fear interviews (1.9 percent).[53] While the report focused largely on Honduras, HRW noted that

---

[45] *Id.*
[46] *Id.* at 18.
[47] *See e.g., Ramsameachire v. Ashcroft*, 357 F.3d 169, 180 (2d Cir. 2004) (noting numerous barriers to reliability of border interviews); *Balasubramanrim v. INS*, 143 F.3d 157 (3d Cir. 1998) (addressing language barriers in border interviews).
[48] Other reports have also documented problems in the expedited removal system. The American Immigration Council (AIC) published a report in May that exposed problems in the expedited removal process similar to those experienced by complainants. They included efforts to dissuade people from seeking asylum through tactics such as berating and yelling, threats of lengthy detention and separation from family, failure to document the fears that were expressed, and insistence that individuals did not qualify for asylum. *See* SARA CAMPOS & JOAN FRIEDLAND, AMERICAN IMMIGRATION COUNCIL, *Mexican and Central American Asylum and Credible Fear Claims: Background and Context*, May 2014, *available at* http://bit.ly/1wMl9i2. AIC also partnered with the American Civil Liberties Union, the Northwest Immigrant Rights Project and the National Immigration Project of the National Lawyers Guild on a project called Hold CBP Accountable, which highlights CBP officers' coercion, misinformation, and other disregard for the already minimal procedures that are attendant to expedited removal and other summary deportations. *See* Hold CBP Accountable, http://holdcbpaccountable.org (last visited Nov. 11, 2014). Human Rights First's June 2014 report also addresses this issue, along with many other problems with refugee and asylum screening at the border, while offering numerous practical recommendations. *See* HRF 2014 Blueprint for Change, *supra,* note 14.
[49] HRW 2014 Report, *supra*, note 14.
[50] *Id.* at 5.
[51] *Id.* at 27.
[52] *Id.* at 9.
[53] *Id.* at 21.

this particular finding also applied to Mexico and other countries of Central America.[54] As HRW noted, the failure by CBP to properly screen asylum seekers violates both domestic and international law.[55]

HRW's findings mirror the experiences of these complainants and the observations of legal service providers. The most common and significant errors in complainants' cases were:

1. **Failure to communicate rights:** CBP officers fail to affirmatively inform asylum seekers of their right to seek protection.
2. **Failure to ask about fear:** CBP officers fail to ask asylum seekers whether they are afraid of returning to their home countries.
3. **Failure to acknowledge fear:** CBP officers fail to acknowledge any expression of fear, including non-verbal cues, as a sign that a case should be referred to the Asylum Office.
4. **Use of intimidation:** CBP officers directly discourage asylum seekers from expressing their fears or applying for asylum by, for example, stating that they will be deported in the end anyway, using the prospect of prolonged detention to dissuade noncitizens from expressing fear, denying them the opportunity to discuss their cases in private, or stating that the expressed fears are not covered by asylum law.
5. **Use of coercion:** CBP officers utilize coercive tactics to undermine the process by, for example, yelling at noncitizens or forcing them to sign forms they do not understand.
6. **Failure to record an expression of fear in the written record and/or including inaccurate information:** When applicants express fears, CBP officials fail to capture those statements in the required documentation or include mistaken information.

## IV. Experiences of Complainants and Legal Service Providers

Each complainant has experienced one or more of the failures identified in the previous section. As the legal service providers attest, their experiences are not outliers; to the contrary, they are emblematic of a serious and persistent problem in CBP's screening and referral.

### Complainant 1: KBS (Ex. A.) – Currently Detained

KBS is a young man from Honduras who came to the United States fleeing domestic abuse from his father. From the time KBS was a toddler to just prior to his entry to the United States, his father beat him and verbally abused him. Sometimes his father choked him in his sleep. When his mother intervened, his father hit her too. As a result of this abuse, KBS suffered convulsions, frequent nosebleeds, and a great deal of physical pain. When KBS and his mother filed a complaint against his father for the abuse they suffered, the police never responded, and KBS's father beat him even more after he learned about the report.

---

[54] For Mexico, HRW documented 537,136 apprehensions, with a referral rate to the Asylum Office of less than 1 percent. There were 52,472 apprehensions of Guatemalans, and again less than 1 percent got a credible fear referral. *Id.* at 23.
[55] *Id.* at 36-40.

When KBS first entered the United States in early 2014, he told the CBP officer he was afraid to return to Honduras. The CBP officer did not acknowledge these statements, nor did he refer KBS to the Asylum Office for a credible fear interview. Instead, the CBP officer accused KBS of lying and told KBS that his case would not go to a judge. KBS then told the officer that he was afraid to go back to Honduras because his father beat him constantly. The CBP officer replied that he didn't care, that KBS did not have a right to fight for his case, and that he would be deported back to Honduras. KBS was deported without ever speaking to any asylum officer.

← Failure to acknowledge fear

← Intimidation

← Failure to acknowledge fear

KBS knew he would continue to suffer in Honduras, so he spent only three days in hiding before fleeing a second time. CBP officers again apprehended him at the border, and KBS again told them that he feared returning to Honduras because his father abused him. One CBP officer told him that his prior deportation prevented him from being allowed to apply for asylum. When KBS told the CBP officer that he had also been afraid of returning to Honduras the first time he was detained, the officer said he had bad luck to talk with an officer who did not believe his story. This officer did, however, refer KBS to the Asylum Office for a reasonable fear interview. The asylum officer found KBS's testimony about his experiences in Honduras and his attempts to communicate those experiences on his first entry credible. The asylum officer referred KBS to the court for withholding-only proceedings. KBS is currently detained awaiting a decision on his case.

**<u>Complainant 2: BBM (Ex. B.)</u>**

BBM is a young man from Honduras who was a vocal opponent of the gang violence that has plagued his country. Mara 18 regularly tried to recruit him, but he resisted because the gang had killed his friends and neighbors. BBM even joined a peaceful community group that was formed to speak out against gang violence in his community.

Over time the violence became too great for BBM, leading him to flee in 2013. After making it to the United States, the first time he learned about any of his rights as an asylum seeker was from another detained individual, not from any immigration official. The individual told him that because this was BBM's first time entering the United States, he could fight his case and should have a chance to stay and tell a judge about his fear. Equipped with this information, BBM sent three written requests to immigration officers telling them about his fear and asking for a chance to apply for asylum. Instead of responding to these requests by referring him to the Asylum Office, immigration officers responded that they were sending him back to Honduras and that he had no right to see a judge. While he was detained prior to this deportation, county-jail guards yelled at him when he tried to reiterate

← Failure to communicate rights

← Failure to acknowledge fear

← Intimidation

his fear of returning to Honduras.

BBM was deported back to Honduras without being given a chance to seek asylum. He was scared to go home, so he went to his grandmother's village. There, members of the MS-13 gang threatened him. Those threats forced BBM to return to his hometown where he was again attacked by Mara 18. Facing intensified threats, murders of additional friends and family, and no prospect of protection, BBM fled back to the United States in 2014. This time, BBM's statements of fear were acknowledged, and he was referred to the Asylum Office. He was given a reasonable fear interview and later granted withholding of removal. He is now protected, but without the rights and benefits of an asylee, despite having met an even higher burden of proof.

**Complainant 3: PMA (Ex. C.)**

PMA is a young woman from Honduras who tried to escape her country four times because she suffered from seemingly endless gender-based violence from partners, friends, and family.

When PMA first entered the United States in 2007, immigration officials apprehended and detained her for 22 days. During that time, no one informed her about the asylum process or explained to her that there might be legal mechanisms for her to remain in the United States. Moreover, officials never asked if she feared returning to Honduras. Because PMA had suffered extreme sexual violence at the hands of government officials in Honduras, she did not trust that she could tell the male official who questioned her about the abuse she suffered and she was never given a chance to speak to a female officer, in private.

← Failure to communicate rights

← Failure to ask about fear

After PMA was deported to Honduras, she suffered more abuse. Her ex-partner's family controlled her money, and his brother forced her to endure incredibly cruel and vicious gender-based harm—raping her, threatening her, impregnating her, and forcibly aborting her fetus with a bottle of pills, which caused excruciating suffering. Her ex-partner's brother also stalked her to the point that she feared being kidnapped.

The continuing abuse became so unbearable that PMA fled Honduras again in 2008. In Mexico, she was deported to Honduras. In 2009, she again set out for the United States but ran into the same problems with Mexican immigration. A few months later, she tried again and successfully entered the United States. Years later, PMA was taken into immigration custody from her home. PMA believes her former partner reported her to ICE. She said these officials "did not ask me even once if I was afraid to return to my home country." PMA's boyfriend helped her find a lawyer who advocated so that she could get a reasonable fear interview, and PMA is now in the process of applying for withholding.

But even if she wins, withholding will not allow her to petition to have her son—who remains abroad—reunite with her in the United States.

**Complainant 4: JCM (Ex. D.)**

JCM is a young man from Mexico whose family and classmates beat and abused him for being effeminate, so much so that he became suicidal as a child. He made six attempts to escape for a safer life in the United States; four times, U.S. immigration authorities apprehended him and, as a Mexican national, immediately returned him. JCM reports that during his first time at the U.S. border, in 1998, he was "never asked" if he feared returning to Mexico, and was automatically deported. One week later, he returned to the border and entered the United States without being apprehended, making his way to Chicago.

← Failure to ask about fear

He was forced to briefly return to Mexico in 2000, and was again apprehended at the border upon his return. Once again, immigration officials did not ask if he feared returning to Mexico; he was immediately deported the same day. A few days later, JCM tried entering the United States again and was not apprehended. He made a second brief trip back to Mexico in 2006, and CBP again apprehended him and again failed to ask him if he feared returning to Mexico. He was immediately deported the next day.

← Failure to ask about fear

← Failure to ask about fear

JCM made his last attempt to enter the United States later that same week, this time without being apprehended. JCM was arrested in 2014 when stopped while driving without a license. He was transferred to immigration custody, where ICE gave him papers saying he would be deported again without seeing a judge. At that point, JCM filled out a grievance form with ICE stating that he was afraid to return to Mexico. As a result, officers referred him to a reasonable fear interview. At that interview, the Asylum Office found that JCM had a reasonable fear of persecution based on his sexual orientation, and because of events that endured in Mexico, which would have made him eligible for asylum at any of the prior points when he had been returned to Mexico. Because he had never been given a chance to express his fear and was instead removed, the government limited his options for protection to withholding of removal, which a judge recently granted.

**Complainant 5: NBS (Ex. E.)**

NBS is a young woman from Peru who fled gender-based violence. In Peru, an individual affiliated with drug cartels threatened to hurt her family if she refused him, and then raped her at gunpoint. He once pushed her out of a car and, on multiple occasions, tried to force her to use cocaine. NBS could not find the protection she needed in Peru, so fled to the United States in 2012.

During her initial entry at the border, NBS tried telling a CBP officer that she feared returning to Peru. But instead of listening to her fear or complying with the required process, the officer told her that entering the United States without documents was a crime and that she was being immediately deported. NBS was then detained in Georgia to await removal. After a month, and despite repeated attempts to tell the officers that she was afraid of returning to Peru, NBS was deported.

← Failure to acknowledge fear
← Intimidation
← Failure to acknowledge fear

Back in Peru, NBS's tormentor found her and the persecution grew worse: he tried to control her completely, stalked her, raped her, and, with increased frequency, threatened to kill her. NBS's persecutor also began to demand money. He warned NBS that if she reported him to the police, he would hire assassins to kill her family one by one before killing her.

By 2014 NBS had suffered all she could and fled to the United States for a second time. Immigration officials caught her at the border and detained her. Because of her prior removal, she is deemed ineligible to seek asylum, and she spent months in custody awaiting a reasonable fear interview. NBS was found to have a reasonable fear of persecution and has been released from immigration custody, and is awaiting adjudication of her claim for protection. But a grant of withholding of removal will not end her suffering. Her children remain in Peru, and even if she is granted protection, she will not be permitted to petition for them to join her in the United States.

**<u>Complainant 6: RAM (Ex. F.)</u>**

RAM is a gay man from El Salvador who was sexually abused as a child and who spent most of his life trying to hide his sexual orientation.

In March 2009, RAM decided to come to the United States, hoping that he could finally live his life as an openly gay man. He had been to the United States on two prior occasions (both on valid visas), and on those trips he realized that in the United States he would have an opportunity to be openly gay. But on RAM's March 2009 entry, he did not have a visa, and he was caught at the border. When he was detained, RAM expressed his desire to apply for asylum. But the officer told him that he did not qualify, and when RAM asked why, the officer told him he had no rights. RAM continued to press the issue, but was continually told that he did not qualify for asylum. RAM was not referred to the Asylum Office for a credible fear interview and never saw an asylum officer or an immigration judge during his time in detention. The officers never asked RAM why he might be interested in asylum, and so RAM never felt that he had an opportunity to safely explain that he is gay.

← Failure to acknowledge fear
← Failure to ask about fear

Approximately five days after being detained, RAM started feeling sick.

He asked to see a doctor, and after days of being ignored, he collapsed. He had lost a significant amount of weight, but the only information he was given, after asking a number of times, was that he had pneumonia. He asked for the results of the multiple medical tests, but no one would give him answers. After a week in the hospital, RAM was returned to the general population and deported just days later. ← Intimidation

Back in El Salvador, it took RAM a couple of months to recover from his experience, and he stayed with his aunt during that time. After he recovered, he tried to find work as a teacher (his previous profession), but was unable to do so and therefore began working at a bar with a quiet gay scene. Once he started working there, he was verbally attacked regularly. Just a month after starting, RAM and his boss were beaten and robbed; about a month later, they were kidnapped and raped.

Because of this trauma, RAM decided that it was not safe for him in El Salvador. He reentered the United States in December 2010 to escape the risk of further sexual and physical abuse. RAM was not caught on his second entry, and he now finds himself in a difficult position. He knows that his prior removal order makes him ineligible for asylum or other immigration benefits, including adjustment of status based on his relationship with a U.S. citizen. But he remains fearful of returning to El Salvador. RAM knows that, because of the prior erroneous expedited removal order, any action he takes with immigration could lead to his detention and deportation.

**Complainant 7: JVC (Ex. G.) – Currently Detained**

JVC is a young woman from Guatemala who fled to the United States to seek safety from her abusive ex-partner, who regularly extorted money from bus drivers and appeared complicit with local officials. When JVC learned of her ex-partner's illicit activities, he became increasingly violent—beating and kicking her, padlocking her to the stairs for days, and firing what JVC believed at the time to be a loaded gun at her head. JVC also overheard her ex-partner order someone to make her cousin, who worked for a local bus company, disappear. Though JVC filed a report with the National Civil Police, she was unable to find the protection she needed in Guatemala.

JVC first entered the United States in January 2014 and was apprehended by immigration authorities shortly thereafter. Though JVC expressed her fear of return to Guatemala to an immigration officer, she was told not to fight her case because she would be detained with criminals for nine months. JVC was issued an expedited removal order and deported to Guatemala. ← Failure to acknowledge fear ← Intimidation

JVC was in Guatemala for about 10 days before she left again for the United States. She entered the country around April 2014, and was again apprehended at the border. JVC was able to obtain legal representation and had a reasonable fear interview in June 2014. About two months later, JVC learned the Asylum Office had found she had a reasonable fear of persecution; however, because she has a prior removal order, she is only able to apply for withholding of removal.

**Complainant 8: RSC (Ex. H.) – Currently Detained**

RSC is a woman from Guatemala who sought protection in the United States due to repeated persecution on account of her status as an indigenous woman. RSC was harassed, abused, and raped on four occasions before fleeing her country for the first time. She was ordered removed twice from the United States and suffered additional persecution in Guatemala. Although RSC filed police reports on two occasions, they were not taken seriously and she was unable to obtain the protection she needed.

RSC first entered the United States around December 2013. After she was apprehended by immigration authorities, she expressed her fear to the border patrol agents but was told: "don't talk. These are all lies. Stop speaking….All Guatemalans are telling the same lies." Terrified, RSC was forced to sign a removal order without being given the opportunity to speak to an asylum officer about her fear. RSC spent only 10 days back in Guatemala—during which time she was drugged, raped, and impregnated—before returning to the United States around April 2014. Again, RSC was not given an opportunity to express her fear of return and was deported within days.

← Failure to acknowledge fear

← Coercion

← Failure to acknowledge fear

RSC remained convinced that she would not be safe in Guatemala, and entered the United States with her eight-year-old son in about July 2014, after both she and her son were threatened by armed men who entered their home. She presented herself to border officials and was finally able to express her fear of return and obtain an interview with an asylum officer. However, because RSC's son was present during the interview, she was afraid to speak freely about the rapes in front of him and was given a negative determination. Through counsel, RSC was able to obtain another interview, but was not able to have her attorney participate telephonically. Scared, nervous, and intimidated by the asylum officer, RSC was again not able to fully express her fear of return and again received a negative determination. Ultimately, RSC's attorney represented her at a hearing before an immigration judge who determined RSC does have a reasonable fear of persecution and vacated the asylum officer's decision. Nonetheless, because RSC has prior removal orders—despite her repeated attempts to express her fear of return—she is in withholding-only proceedings and cannot apply for

the more permanent protection that asylum would allow. Ironically, RSC's eight-year-old son was referred for a credible fear interview, which he passed, making him eligible for asylum and consideration for release from DHS custody, while RSC is not. Even if RSC's son wins asylum, due to his status as a minor, he will be unable to petition for her.

**<u>Complainant 9: EYT (Ex. I.) – Currently Detained</u>**

EYT is a young man from Honduras. He fled after members of the Barrio 18 gang threatened to kill him for cooperating with police in the arrest of two gang members. Twice, he attempted to flee to the United States, and members of his family have also been killed.

EYT first entered the United States around May 2013. Upon entry, he was kidnapped at the border, beaten severely, and held for ransom. EYT's family in the United States paid the ransom in hopes of rescuing him, but the kidnappers took EYT to the desert, assaulted him, and left him for dead. A man found EYT in the desert and called immigration.

When CPB officers picked up EYT in the desert, EYT told them about the kidnapping and that he was afraid to return to Honduras. EYT does not recall them acknowledging this fear. Given his critical condition, EYT was taken to a hospital for leg surgery; the hospital performed four different surgeries. EYT was sleeping and recovering from surgery when CBP officers came into his room and woke him up. Although EYT was disoriented and semi-conscious, the CBP officers showed him some documents written in English. EYT could not understand what they were saying and in fact thought they were hospital forms. Against EYT's will, one of the officers grabbed his hand to sign the forms. EYT later learned that these documents contained the order for his expedited removal. CBP officers never explained the nature of their visit to EYT, never asked him about a fear of return, and never explained the documents. Further, they did not investigate, to EYT's knowledge, the circumstances of the crime committed against him at the border.

← Failure to acknowledge fear

← Coercion

← Failure to ask about fear

EYT was later transferred to immigration detention and in August 2013, he was deported to Honduras. Upon return to Honduras, EYT's uncle met him at the airport to warn him that his life was in danger. EYT turned around immediately and traveled back to the United States seeking safety. In May 2014, EYT re-entered the United States and was again taken into immigration custody. He is currently detained and applying for protection based on his fear of return to Honduras.

**Observations of Legal Service Providers**

The experiences of these individuals are not isolated incidents. AILA's members regularly hear similar accounts from their clients, and the organization has recently collected 14 case examples that illustrate problems with the CBP screening and referral process. These cases supplement 19 other cases that AILA submitted to CRCL in November 2013. *See* Exs. J-K. In addition, five legal service providers have provided affidavits summarizing their collective breadth of experience with the issue. *See* Exs. L-P. Their knowledge spans over a decade and covers diverse geographic regions:

- Denise L. Gilman, Immigration Clinic, University of Texas School of Law (Texas)
- Robin Goldfaden, Lawyers' Committee for Civil Rights of the San Francisco Bay Area (LCCR) (California)
- Benjamin Harville, Florence Immigrant and Refugee Rights Project (FIRRP) (Arizona)
- Stephanie Taylor, American Gateways (Texas)
- Eleni Wolfe Roubatis, Centro Legal de la Raza (California)

While the problems in the screening and referral process occur largely at the U.S.-Mexico border, these providers report they have encountered the same issues nationwide in their everyday work with asylum seekers. Highlights of their observations, detailed in the attached affidavits, include:

*Failure to screen for fear or acknowledge fear*
All the legal service providers have encountered individuals who received expedited orders of removal as a result of CBP's failure to screen for or acknowledge a fear of return. Wolfe Roubatis reports that "[m]any individuals with prior orders were not able to express a fear during their initial interviews with [CBP] because they were told…they had no option but to accept a removal order." According to Taylor, "it is not surprising that the complainants would have endeavored to express a fear of persecution before they were improperly subject to an expedited removal order" and that what should have been understood as a claim for asylum was instead ignored. Gilman observes, "In some cases, CBP agents improperly advise detainees about their claims, for example, indicating that fear of domestic violence or gangs will not qualify an individual for asylum and discouraging expression of fear."

*Use of intimidation and coercion*
Legal service providers also say that some asylum seekers are too afraid of CBP officers to raise their claims. Taylor reports that "[m]any recent arrivals report being afraid or intimidated by Border agents such that they do not feel safe disclosing their reasons for fleeing their home countries." Gilman adds that confusion and despair at being apprehended, detention conditions, and confidentiality or privacy concerns also make asylum seekers fearful of raising claims. She notes that some recent arrivals have reported being too afraid to raise a fear following "harsh and threatening" questioning by CBP officers who, in some cases, have even been physically abusive.

Wolfe Roubatis notes that individuals have been afraid to express their fear because "officers stood near them with guns while reading through interview questions."[56]

*Failure to record an expression of fear and/or including inaccurate information*
If individuals do raise a fear of return, CBP officers sometimes simply do not record it. Wolfe Roubatis notes, "Many individuals report…that they did express a fear but that the CBP officer told them that the fear they expressed was not a valid one and marked 'no fear' on the form despite one having been expressed."

Another troubling trend that legal service providers encounter relates to discrepancies between what CBP officers record in the required forms and what individuals recount as having stated. One common discrepancy noted by Wolfe Roubatis, Goldfaden, and Taylor relates to the responses to the questions on Form I-867B. In response to the question about why an individual came to the United States, they say, CBP officers record that the individual came to "work and live" in a particular place; when asked about this response, the asylum seekers routinely deny having given that answer. Wolfe Roubatis observes "there is no variety in the way that the response is phrased." In some instances, it appears that the forms completed by CBP during border interviews contain information that relates to another individual. "I frequently come away with the distinct impression that answers to the question on these forms have been auto-filled, with the same response carried over from form to form," explains Harville. Gilman describes the rushed circumstances in which CBP officers prepare documentation, what appears to be "cut and paste" of information by CBP officers onto forms, and incorrect designations of gender or point of entry.

These errors create further anguish for individuals who are already anxious about their immigration status, given the persecution they have endured or fear. Often, these border statements are used against asylum-seekers in later removal proceedings in attempts to impeach their credibility. According to Harville, "[a]nother problem seen frequently is that the shoddy documentation of initial interviews by CBP and other flaws in border officers' handling of the process later prompt government attorneys or immigration judges to question the credibility of those who eventually are able to get a hearing before an immigration judge." Wolfe Roubatis says, "I have seen firsthand for years the surprise, frustration and terror that asylum seekers feel when I tell them what their documentation from their initial interview contains."

Because of the prevalence of CBP errors, the service providers who have supplied affidavits say they no longer regard CBP officers' records to be reliable accounts of border interviews, reliable bases for expedited removal orders, or grounds upon which to dismiss a potential asylum seeker as not credible. In fact, in light of the repeated discrepancies, Goldfaden explains that LCCR engaged in an internal audit of 34 cases to more closely study the problem. In over 60 percent of the examined cases, CBP officers had recorded no fear of return but the Asylum Office later made positive credible fear findings. According to Goldfaden, "even if the overall national rate of discrepancy between what CBP records and the actual level of fear is only a small fraction of

---

[56] HRW also observes that Border Patrol officers are visibly armed when they apprehend individuals at the border, and in subsequent individual interviews, "their holsters are empty but visible," *See* HRW 2014 Report, *supra* note 14, at 8.

the rate that LCCR found in its internal audit, the situation is deeply troubling. It would mean that the United States is sending a substantial number of bona fide refugees back to… persecution and possibly torture or even death."

Given the frequency with which service providers encounter these issues, it is important to emphasize that the cases included in this complaint represent a fraction of the population that has fallen prey to screening errors by CBP. It is impossible to know the exact number of individuals unjustly subject to expedited removal because those individuals would be deported before having a chance to consult with legal service providers.[57] But given the accounts of the individuals whose cases are included this complaint, the accounts of legal services providers, and the recent findings by HRW, there is strong reason to believe that the failure by CBP to properly screen asylum seekers is systemic and widespread.

## IV. Recommendations to restore fairness to the CBP asylum screening process

CBP is the gatekeeper to the U.S. asylum process for those who flee persecution and come into custody near the border, but its actions keep the gate closed to a significant number of *bona fide* refugees. CBP officers seem to perceive their job as one of deporting noncitizens as quickly as possible, neglecting that another key function of their work is to identify those who do have potential protection claims and refer them to the Asylum Office. This dereliction of duty has resulted in the return of many asylum seekers, like the included complainants, to unimaginable pain and suffering. This harm is compounded when individuals make a second attempt to reach safety and are shut out of asylum by other rules limiting individuals with prior removal orders to the more limited protection of withholding of removal.

To remedy a range of problems that have been documented, CRCL should instruct CBP to make the following modifications to its administration of the expedited removal process.

1. **Training:** CBP officers need better training to ensure their understanding and compliance with existing law and procedure—including directives in the agency's own manual—with respect to the treatment of asylum seekers who are apprehended at the border or a point of entry.[58]

   In addition to training in policy and procedures, CBP officers should receive sensitivity training to improve their understanding of why some asylum seekers may be hesitant to disclose fear during initial interviews shortly after crossing the border. CBP officers must be aware that, particularly in cases involving gender or sexual-orientation-based violence or when individuals previously were abused by state actors, applicants may be extremely hesitant to disclose the sensitive information that could give rise to a valid asylum claim.

2. **Supervision and monitoring:** CBP officers must be strictly required to comply with the proper asylum screening procedures during the expedited removal process. CBP must monitor and audit individual officers' compliance on a periodic basis. CBP officers must

---

[57] HRW 2014 Report, *supra*, note 14, at 30-31.
[58] *See* 8 U.S.C. § 1225(b)(1)(A)(ii); 8 CFR 235.3(b)(4); CBP Inspector's Field Manual, *supra,* note 36, at 113-14.

be penalized for intimidating or coercing asylum seekers in ways that could dissuade *bona fide* applicants. Failure to comply with the proper standards must result in concrete disciplinary measures. CBP should also keep and make public its own data on compliance, supervision, and auditing.

3. **Deference to the Asylum Office:** CBP must reinforce to its officers that they are not to evaluate individuals' asylum claims. CBP officers must adhere to their statutory duty of actively acknowledging *any* indication that asylum seekers may have fears of returning to their home countries and refer these individuals to the Asylum Office for credible fear interviews. CBP officers are not sufficiently trained in the nuances of the law governing the "refugee" definition, nor should they be tasked with engaging in such complex legal analysis. This limitation is particularly important in cases involving potential claims based on membership in a particular social group, a rapidly evolving area of law.

   Given the complexity of asylum law, and to ensure there is no confusion among CBP officers as to their responsibility to refer those with fear to the Asylum Office, the following sentence should be removed from CBP Field Guidance: "If an alien asserts a fear or concern which is clearly unrelated to an intention to seek asylum or a fear of persecution, then the case should not be referred to an asylum officer." [59]

## CONCLUSION

In creating the expedited removal system, Congress vested remarkable authority in immigration officers, but it did so in tandem with the requirement that potential asylees be afforded a meaningful chance to express fear and seek protection. There can be no doubt that CBP officers have great power when it comes to executing expedited removal orders. They must take more seriously their corresponding responsibility to ensure that individuals who seek protection under U.S. refugee laws have an opportunity to be heard. When that safety net is removed, and particularly when it is removed as an act of conscious disregard, the integrity of the system is destroyed. Moreover, the due process and civil rights violations inherent in this failed process are compounded when a faulty summary removal order is simply "reinstated" against a *bona fide* refugee, precluding the individual from the full protection of our laws.

When individuals fleeing persecution and violence see the United States as a beacon of hope and security, the U.S. government should embrace the opportunity to implement the laws and procedures that make this country admirable to people around the world.

The complainants and legal service providers await CRCL's response and look forward to working with CRCL to provide guidance to ensure that CBP vigorously upholds its duty to protect those who flee persecution.

---

[59] CBP Inspector's Field Manual, *supra*, note 36, at 114.

Respectfully submitted,

Keren Zwick
National Immigrant Justice Center

Stephanie Taylor
American Gateways

Kate Voigt
American Immigration Lawyers Association

Karen Musalo and Lisa Frydman
Center for Gender & Refugee Studies, U.C., Hastings College of the Law

Eleni Wolfe Roubatis
Centro de la Raza Legal

Eleanor Acer
Human Rights First

Robin Goldfaden
Lawyers' Committee for Civil Rights of the San Francisco Bay Area

Amelia Fischer
Texas Civil Rights Project

Denise L. Gilman
Immigration Clinic, University of Texas Law School

Katharina Obser
Women's Refugee Commission

# EXHIBIT 36

# Report of the DHS Advisory Committee on Family Residential Centers

**September 30, 2016**

Table of Contents


**Introduction ........ 1**

**1. Decisions to Detain and Release ........ 1**

A. Limit or Eliminate the Use of Expedited Removal and Reinstatement of Removal for Families ........ 2

B. Avoiding Detention During Credible and Reasonable Fear Processes ........ 7

C. Inconsistency in Criteria for Release of Families ........ 11

D. Unduly Onerous Conditions of Release ........ 15

**2. Reform of Detention and Alternatives-to-Detention (ATD) ........ 21**

A. Population Management ........ 21

1. Incorrect Assumptions about Civil Detainees ........ 21
2. Insufficient Information and Analysis, Planning, and Preparedness ........ 25
3. Outsourcing vs. Acquiring Internal Expertise ........ 26

B. Detention Management ........ 28

1. Normalization ........ 28
2. Building a Culture of Safety ........ 31

C. Accountability ........ 34

1. Roles and Responsibilities of Government Actors ........ 34
2. Roles and Responsibilities of Public and Private Sector Contractors ........ 34
3. Transparency: Government's Core Commitment to Good Governance ........ 35

**3. Access to Counsel ........ 37**

A. Overarching Recommendations ........ 38

B. Meeting and Communicating with Counsel ........ 42

1. Meeting with Counsel ........ 44
2. Care of Children During Attorney-Client Meetings ........ 45
3. Location of Attorney-Client Meetings ........ 45
4. Ensuring Attorney Teams Can Function in their Role as Counsel ........ 45

C. Counsel's Role in Decisions Critical to Detainees' Safety and Right to Due Process ........ 46

D. Counsel's Role in Decisions to Separate Children from Parents ........ 47

E. Meaningful Access to a Law Library ........ 48

F. Access to Information Specific to Crime and Trauma Victims ........ 51

**4. Education Services and Programs ........ 54**

A. Early Childhood Education ........ 56

1. Access to Child Care ........ 56
2. Child Care and Pre-Kindergarten Programming ........ 56
3. Program Quality ........ 57
4. Pre-Kindergarten Preparation and School Readiness ........ 58
5. Early Childhood Development ........ 59

B. K-12 School Schedule ........ 59

C. K-12 Curriculum and Instruction ....60
1. Qualified Staff ....60
2. Curriculum ....61
3. Instruction ....62
4. English Language Instruction ....63
D. Assessing and Communicating K-12 Student Progress ....64
1. Grade-Level Placements ....65
2. Feedback to Students and Parents about Progress ....65
E. Special Education Services ....65
1. Eligibility ....66
2. Provision of Services ....67
F. K-12 Student Orientation to Transition to U.S. Schools ....67
G. Trauma-Informed Education Practices ....69
1. Social-Emotional Learning ....69
2. Classroom Management Practices ....69
3. Trauma-Informed Practices ....70
H. Educator Professional Development ....71
1. Instruction ....71
2. Performance Evaluation ....72
3. Trauma ....72
4. Prevention and Reporting ....73
I. K-12 School Performance ....73
J. Education Records ....74
K. Parent Education ....74
1. Information about K-12 Schooling ....75
2. Orientation to Transition Children to U.S. Schools ....75
3. Parenting Support ....76
4. English Language Instruction ....76
5. Newcomer Education ....76
**5. Language Access ....77**
A. Non-Spanish Speakers: Overarching Recommendation ....79
B. Disability Access ....80
C. Identification ....82
D. Orientation ....85
E. General Provision of Language Access Services ....88
F. Access to Fair Immigration Procedures: Law Library ....91
G. Access to Fair Immigration Procedures: Credible and Reasonable Fear Processes ....93
1. Conversation with Potential or Retained Immigration Lawyers ....93
2. Asylum Orientations ....93
3. Asylum Officer Interviews ....94
4. Conversations with ICE Personnel, Including Deportation Officers and Lawyers ....95
5. Appearances Before an Immigration Judge. ....95
H. Grievances and Requests ....100
1. Grievances ....100
2. Non-grievance Requests ....101
I. Medical and Mental Health Care ....102

J. Discipline ....................104
K. Release ....................105
L. Training ....................106
M. Quality Monitoring and Improvement ....................107
**6. Medical, Mental Health and Trauma-Informed Care ....................109**
A. Medical Assessment and Care ....................111
1. Essential Health Care Screenings ....................112
2. Medical Screenings for Children ....................114
3. Children's Health Care ....................115
4. Parents Accompanying Children Needing Hospital Care or Mental Health Residential Treatment ....................115
5. Communicable Screening for the Zika Virus ....................117
6. Sexual Assault, Domestic Violence, and Human Trafficking Screenings....................117
7. Prison Rape Elimination Act Implementation ....................120
8. Communication of Medical Screening and Test Results....................121
9. Dental Health ....................122
10. Pharmaceutical Management....................123
11. Care of Pregnant Women....................123
12. Emergency Medical Services and Procedures ....................124
13. Accreditation and Compliance with Joint Commission on the Accreditation of Health Care Organizations (JCAHO) Standards....................125
B. Mental Health Assessment and Care ....................126
1. Mental Health Screening....................126
2. Mental Health Referrals and Response....................128
3. Psychiatric Management and Pharmacotherapy ....................131
4. Credentials of Mental Health Professionals....................132
5. Psychotherapies....................133
6. Support/Therapeutic Groups....................134
C. Trauma-Informed Care ....................135
1. Implementing a SAMHSA Trauma-Informed Approach ....................137
2. Trauma-Informed Approach: Elimination of Nighttime Bed Checks ....................139
3. Trauma-informed Approach: Supports for Parenting....................140
D. Release Preparation, Case Management, Continued Care and Access to Mental Health Professionals ....................141
E. Medical, Dental, and Mental Health Records....................143
**7. Inspections, Complaints, and Oversight....................145**

**Appendix A: Members of the DHS Advisory Committee on Family Residential Centers....................148**
**Appendix B: Advisory Committee on Family Residential Centers (ACFRC) Committee Tasking ....................149**
**Appendix C: A Brief History of INS/ICE Family Residential Facilities....................150**
**Appendix D: Examples of Federal Resources, Tools, and On-Line Trainings on Trauma-Informed Care....................152**
**Appendix E: Acronyms Used in the Report ....................158**

## INTRODUCTION

Prompted by controversy over DHS's policies and practices relating to family detention, Secretary Jeh Johnson announced the establishment of the DHS Advisory Committee on Family Residential Centers (ACFRC or the Committee) on June 24, 2015.[1] Secretary Johnson explained that:

> ICE Director Saldaña and I understand the sensitive and unique nature of detaining families, and we are committed to continually evaluating it. We have concluded that we must make substantial changes to our detention practices when it comes to families.

Among the responses he announced was the formation of this Committee, "to advise Director Saldaña and me concerning family residential centers." The Committee's charter confirms a broad scope for our advice-giving:

> The Committee provides advice and recommendations to the Secretary of the Department of Homeland Security (DHS) through the Assistant Secretary for U.S. Immigration and Customs Enforcement (ICE) on matters concerning ICE's family residential centers as it relates to primary education, immigration law, physical and mental health, trauma-informed services, family and youth services, detention management, and detention reform.[2]

And similarly, our March 2016 tasking directed the ACFRC to:

> Develop recommendations for best practices at family residential centers that will build on ICE's existing efforts in the areas of educational services, language services, intake and out-processing procedures, medical staffing, expansion of available resources and specialized care, and access to Legal Counsel . . . Detail mechanisms to achieve recommended efficiencies in the following focus areas: 1) educational services . . . 2) language services . . . 3) detention management . . . 4) medical treatment . . . 5) access to counsel.

The Committee's members are listed at this Report's Appendix A; the Committee's tasking is attached to this Report as Appendix B.[3]

Prior to presenting this report to ICE and DHS, the Committee met twice, once in Washington, D.C. in December 2015, and once in Texas in March 2016, in order to participate in guided site visits of two of the Family Residential Centers (FRCs), the South Texas Family Residential Center (Dilley) and the Karnes County Residential Center (Karnes). A much smaller group visited the third FRC, the Berks Family Residential Center (Berks), in June 2016. In order to fulfill our tasking, the Committee submitted numerous information requests to ICE, which supplied some of the requested documents and other information. Unfortunately, ICE deemed a number of our requests beyond the Committee's scope, which it considered more limited than our charter or our

---

[1] Jeh C. Johnson, Secretary of Homeland Security, *Statement by Secretary Jeh C. Johnson On Family Residential Centers* (June 24, 2015), https://www.dhs.gov/news/2015/06/24/statement-secretary-jeh-c-johnson-family-residential-centers.
[2] U.S. Immigration and Customs Enforcement Advisory Committee on Family Residential Centers (July 24, 2015), https://www.ice.gov/sites/default/files/documents/Document/2015/acfrcCharter.pdf.
[3] *See* Advisory Committee on Family Residential Centers (ACFRC), *Committee Tasking,* https://www.ice.gov/acfrc.

tasking. We have therefore supplemented the information ICE provided with information from credible non-governmental organizations, federal court filings, and the ACFRC's own individual members' expertise. This report covers all the areas in our tasking, and notes the basis of our information and recommendations.

The detention of migrant children and families by the U.S. government has been controversial since its inception. Child and family detention has been the subject of a number of federal lawsuits – most notably, the *Flores* litigation (currently captioned *Flores v. Lynch*), filed in 1985 and still in active litigation.[4] Since its inception, many reports by government agencies (including the Government Accountability Office (GAO) and various subunits of DHS), the United Nations High Commissioner for Refugees (UNHCR), the American Bar Association (ABA), and advocacy organizations have made similar and negative findings. In this report, the ACFRC adds our voice to those prior critiques. We offer numerous recommendations to improve detention management and conditions. But these should be understood in light of our basic conclusion and first recommendation, which is repeated and discussed in depth in Part I, below:

**Recommendation 1-1: DHS's immigration enforcement practices should operationalize the presumption that detention is generally neither appropriate nor necessary for families – and that detention or the separation of families for purposes of immigration enforcement or management, or detention is never in the best interest of children. DHS should discontinue the general use of family detention, reserving it for rare cases when necessary following an individualized assessment of the need to detain because of danger or flight risk that cannot be mitigated by conditions of release. If such an assessment determines that continued custody is absolutely necessary, families should be detained for the shortest amount of time and in the least restrictive setting possible; all detention facilities should be licensed, non-secure and family-friendly. If necessary to mitigate individualized flight risk or danger, every effort should be made to place families in community-based case-management programs that offer medical, mental health, legal, social, and other services and supports, so that families may live together within a community.**

Our report proceeds as follows: We complete this Introduction with some background on family detention. We then proceed in seven parts, addressing:

1. Decision to Detain and Release
2. Reform of Detention and Alternatives-to-Detention (ATD)
3. Access to Counsel
4. Education Services and Programs
5. Language Access
6. Medical, Mental Health, and Trauma-Informed Care
7. Inspections, Complaints, and Oversight

---

[4] For a summary of the litigation, see CIVIL RIGHTS LITIGATION CLEARINGHOUSE, *Case Profile Flores v. Reno*, http://www.clearinghouse.net/detail.php?id=9493. *See especially* Stipulated Settlement Agreement, Flores v. Reno, No. 85-cv-4544-RJK(Px) (C.D. Cal. Jan.17, 1997), http://www.clearinghouse.net/chDocs/public/IM-CA-0002-0005.pdf.

**Background:**

In 2009, at the beginning of the Obama Administration, ICE funded two FRCs – the Berks County Family Residential Center, in Leesport, PA, and the T. Don Hutto Residential Center in Taylor, TX (Hutto). Total capacity was an estimated 384 beds. Within nine months, ICE had stopped detaining families at Hutto, reducing its family detention capacity by about 500 beds. Since then, ICE has opened and closed one temporary FRC and then opened two new FRCs, over time increasing its total capacity to detain families by over 3,200 beds. (See Appendix B: A Brief History of INS/ICE Family Residential Facilities.)

Today, midway through the Administration's eighth and final year, ICE maintains three FRCs, each operated by a different contractor, although of course ICE is responsible for all three.[5] As is ordinary practice, we refer to the facilities, which are described below,[6] by their location rather than their formal name/abbreviation. The contracting organizations have hundreds of staff, and ICE also has employees who work at the facilities, both to monitor conditions and to carry out immigration processing. Their total operating capacity is 3,326 beds:

- Karnes County Residential Center. This facility, in Karnes City, Texas, is operated by the GEO Group – a private prison company. It has been a family detention center since August 2014. As of August 2016, it held 595 women and children, which is approximately its operating capacity. As of June 2016, ICE reported 49 ICE staff at Karnes.
- South Texas Family Residential Center. This facility, in Dilley, Texas, is operated by Corrections Corporation of America; it opened in December 2014. It has a 2,400 bed capacity, but as of August 2016 held 1,374 women and children; in June 2015, ICE reported 41 ICE staff at Dilley.
- Berks Family Residential Center. This facility, in Berks County, Pennsylvania, is owned and operated by Berks County. It originally opened in March 2001. In February 2013 the facility was moved to a new building, also operated by the county, reconfigured with original capacity for 96 but potential capacity for up to 200, and designed as a non-secure residential facility for children and their parents. It currently has a maximum capacity of 96, but as of August 2016, held 75 people. Fathers have in the past been detained at Berks, but it is our understanding that ICE currently is using the facility to detain only mothers and their children. We do not know how many ICE staff work at Berks.

ICE was unwilling to share with us information on the length of detainees' stays, but according to the federal government's public filings in the *Flores* litigation, looking at families initially booked into ICE's FRCs starting October 23, 2015 (that is, excluding any families taken into custody prior to that date), the statistics as of May 16, 2016 were:

- Total detainees over the 7-month period: 18,706.
- Average length of stay: 17.7 days for those still detained as of that date; 11.8 days for those no longer in detention.
- Over the entire population (both detained as of May 2016 and previously released):

[5]

[6] Descriptions are largely based on Decl. of Jon Gurule at ¶ 5, Flores v. Holder, No. 2:85-cv-04544 (C.D. Cal. June 3, 2016), www.clearinghouse.net/chDocs/public/IM-CA-0002-0030.pdf.

a. 58% were released in 10 days or less.
b. 96% were released in 20 days or less.
c. 99% were released in 30 days or less.[7]

The same filing also included snapshot-type information. Looking at the population detained on May 16, 2016:

- There were a total of 1,734 detainees.
- 44% at that point in time had so far been detained for 10 days or less.
- 88% at that point in time had been detained for 20 days or less.
- 94% at that point in time had been detained for 30 days or less.[8]

We have been told that after U.S. District Judge Dolly Gee entered an order in *Flores* in July 2015[9] requiring speedier release of most children from family detention, the Texas facilities have mostly had families pass through in less than three weeks; families housed at Berks have faced very substantially longer detention periods with some families remaining in detention for over a year.

Each FRC is covered by ICE's Family Residential Standards, which are publically available at https://www.ice.gov/detention-standards/family-residential. In addition, materials provided by ICE to the ACFRC Subcommittees confirm that when the 2011 Performance Based National Detention Standards (PBNDS 2011) provide a higher level of care for detainees, FRCs are required to adhere to that higher standard. With respect to medical and mental health care, FRCs are also required to comply with ICE Health Care Service Corps (IHSC) policies and procedures, but these were not made available to the ACFRC.

Each facility has adopted its own facility-specific policies, which are supposed to implement and expand upon the Standards. These are not publically available but we have obtained a few of them from ICE. In addition, each FRC provides its detainees with a resident handbook, which summarizes the rules, policies, and procedures that affect them; we were provided the handbooks in English, but they are also available in Spanish.[10]

---

[7] *Id.* at 12–13.
[8] *Id.* at 13.
[9] Flores v. Johnson, 2:85-cv-04544 (C.D. Cal. July 24, 2015), http://www.clearinghouse.net/chDocs/public/IM-CA-0002-0017.pdf. In her July 2015 *Flores* decision, Judge Gee found that the DHS's family detention policies were out of compliance with the stipulated settlement in the case, which regulated the treatment and conditions of children in INS custody. The settlement is available at http://www.clearinghouse.net/chDocs/public/IM-CA-0002-0005.pdf.
[10] Each of the existing FRC resident handbooks is publically available, because they were filed in the *Flores* litigation. The Karnes handbook, in English and Spanish, is available as exhibits 1 and 2 to the Decl. of Juanita Hester, Flores v. Holder, No. 2:85-cv-04544 (C.D. Cal. June 3, 2016), www.clearinghouse.net/chDocs/public/IM-CA-0002-0029.pdf. The Dilley handbook, in English and Spanish, is available as exhibits 1 and 2 to the Decl. of Valentin de la Garza, Flores v. Holder, No. 2:85-cv-04544 (C.D. Cal. June 3, 2016), www.clearinghouse.net/chDocs/public/IM-CA-0002-0029.pdf. The Berks handbook is available, in English only, as exhibit 2 to the Decl. of Joshua G. Reid, Flores v. Holder, No. 2:85-cv-04544 (C.D. Cal. June 3, 2016), http://www.clearinghouse.net/chDocs/public/IM-CA-0002-0030.pdf.

## 1. DECISIONS TO DETAIN AND RELEASE

In the view of the ACFRC, it is well within our broad mandate and tasking, quoted above, to evaluate DHS's policies relating to decisions to detain, the length of detention, decisions to release, and conditions of release. Operating on this premise, and beginning in December 2015 and continuing to the present, members of the ACFRC and its Subcommittees requested relevant information regarding detention and release policies. DHS was unresponsive to these requests; ICE ultimately stated in a July 2016 exchange with the ACFRC that issues concerning decisions to detain, length of detention, conditions of release, and related questions are "outside the scope" of our mandate to develop best practices applicable to FRCs. This conclusion contradicts the Committee's charter and appointment documents.

In the absence of requested information from DHS, the Committee has consulted a wide range of other credible sources, including, for example, the United States Commission on International Religious Freedom, the American Bar Association, reports by well-respected non-governmental organizations, and public statements made by Secretary Johnson.

Each recommendation in this Part is preceded by a brief overview of the controlling law and policies relevant to detention and release, and a summary of current practice. The recommendations are intended to improve current practice consistent with extant U.S. law and policy.

First and most importantly, our overarching recommendation is for DHS simply avoid detaining families. We recommend that DHS *not* place asylum seeker families in expedited removal or reinstatement of removal, and instead to return to its prior practice of placing these families in regular removal proceedings via a Notice to Appear (NTA) and releasing them. with the use of appropriate follow up support or compliance requirements as alternatives to detention where needed to address public safety or flight risk concerns.

**Recommendation 1-1: DHS's immigration enforcement practices should operationalize the presumption that detention is generally neither appropriate nor necessary for families – and that detention or the separation of families for purposes of immigration enforcement or management, or detention is never in the best interest of children. DHS should discontinue the general use of family detention, reserving it for rare cases when necessary following an individualized assessment of the need to detain because of danger or flight risk that cannot be mitigated by conditions of release. If such an assessment determines that continued custody is absolutely necessary, families should be detained for the shortest amount of time and in the least restrictive setting possible; all detention facilities should be licensed, non-secure and family-friendly. If necessary to mitigate individualized flight risk or danger, every effort should be made to place families in community-based case-management programs that offer medical, mental health, legal, social, and other services and supports, so that families may live together within a community.**

In the event that DHS declines to accept this recommendation in full, we make additional recommendations on, *inter alia*, the proper release of families in expedited removal processes and against the use of prolonged detention of families in almost any circumstance. This Part concludes with recommendations relating to conditional release, bond, and case management for released families.

### A. Limit or Eliminate the Use of Expedited Removal and Reinstatement of Removal for Families

In 1996, the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) created a new "expedited removal process," giving immigration officers the authority to order certain categories of immigrants removed without a hearing or review by an immigration judge.[11] The expedited removal statute, INA Section 235, states that "any alien subject to the procedures under this clause shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed."[12] The government interprets this language to require detention in the specified circumstances. Similarly IIRIRA also established Reinstatement of Removal for individuals returning with prior orders of removal.[13]

Since the initial implementation of expedited removal, the categories of people to which it applies have been successively expanded[14] by DHS and the number of immigrants placed in expedited removal proceedings has increased dramatically.[15] Nationals from Mexico, Guatemala, Honduras,

---

[11] Immigration and Nationality Act (INA) § 235.
[12] *Id.* § 235(b)(1)(B)(iii)(IV).
[13] Like those in expedited removal, immigrants whose prior removal orders are reinstated are also subject to curtailed administrative procedures. INA § 241(a)(5); 8 C.F.R. § 1241.8. However, individuals in reinstatement of removal who are found to have a reasonable fear of persecution or torture are eligible for withholding of removal or protection under the Convention Against Torture. Although DHS takes the position that these individuals are *not* eligible for asylum, litigants have raised contrary views, which have been accepted by at least some immigration judges. As the Committee's recommendations in this section focus primarily on expedited removal, we do not here engage in a detailed discussion of reinstatement of removal procedures. The curtailed reinstatement procedures, however, raise many of the same concerns regarding lack of due process and the possibility of *refoulement* of refugees in violation of international and domestic legal obligations. In addition, some of the detainees at FRCs will be immigrant crime victims with pending VAWA, T or U visa cases. In the Violence Against Women Act of 2005, Congress urged the Department of Homeland Security to exercise its discretion not to subject immigrant victims with pending or approved VAWA self-petitions, U visas or T visas to reinstatement of removal, which prevent securing such relief. *See* Extension of Remarks by John Conyers Regarding VAWA, 151 CONG. REC. E2605-07 (Dec. 18, 2005).
[14] Expedited removal was first implemented in 1997 when IIRIRA entered into force and at that time only applied to arriving non-citizens at ports of entry, per INA § 235(b)(1)(A)(i). INA §235(b)(1)(A)(iii) also gives the Attorney General authority to apply expedited removal to other categories of immigrants. In November 2002, expedited removal was expanded to apply to undocumented non-Cubans entering the U.S. by sea and by September 2005 had been expanded to apply to undocumented non-Cubans apprehended within 14 days after entry within 100 miles of the U.S. Southwest border. ELIZABETH CASSIDY & TIFFANY LYNCH, U.S. COMM'N ON INT'L RELIGIOUS FREEDOM (USCIRF), BARRIERS TO PROTECTION: THE TREATMENT OF ASYLUM SEEKERS IN EXPEDITED REMOVAL 13 (2016), http://www.uscirf.gov/sites/default/files/Barriers%20To%20Protection.pdf [hereinafter "USCIRF REPORT"]. In 2006, this provision was extended to all U.S. borders. American Immigration Council, *Removal Without Recourse: The Growth of Summary Deportations from the United States* (Apr. 28, 2014), https://www.americanimmigrationcouncil.org/research/removal-without-recourse-growth-summary-deportations-united-states. Data from USCIS Asylum Division Quarterly Stakeholder Meetings shows that in FY2014, 80% of people put into expedited removal were non-citizens crossing the border versus 20% non-citizens entering at ports of entry. In contrast, in FY2005, non-citizens crossing the border comprised 10% of expedited removal cases and ports of entry 90%. USCIRF REPORT at 14.
[15] In FY 1998, there were 23,487 expedited removals (representing 20% of all removals). In FY 2013, there were 193,032 expedited removals (representing 44% of all removals). USCIRF REPORT, *supra* note 14, at 12 (citing data from the DHS Office of Immigration Statistics, Annual Reports on Immigration Enforcement Actions and Statistical Yearbook).

and El Salvador accounted for 98% of all expedited removals in FY 2013.[16] However the use of expedited removal and reinstatement of removal is discretionary and not mandatory. DHS has the option of using or not using expedited removal or reinstatement of removal in individual cases. In fact, prior to 2014, families were typically not put into expedited removal and rarely reinstated but instead generally issued Notices to Appear and released.[17] In fact, ICE officials stated in 2011 that it was ICE policy to place families apprehended at or near the border in regular removal proceedings under Section 240 of the INA, rather than expedited removal.[18]

Following the increase in arrivals of unaccompanied children as well as families (often referred to as the "surge") in the summer of 2014, this policy changed. DHS Secretary Jeh Johnson began stating publicly that families would be detained in order to deter others from coming to the U.S.[19] To effect this policy, DHS began putting families – primarily mothers and their children – in expedited removal proceedings[20] and reinstatement proceedings, and detaining them. In 2014, there was only one family detention center in operation, the Berks County Family Residential Center, with a 96-bed capacity.[21] As it began scaling-up the use of expedited removal for families

---

[16] USCIRF REPORT, *supra* note 14, at 13. *See also* HUMAN RIGHTS FIRST, FREQUENTLY ASKED QUESTIONS: ASYLUM SEEKERS AND THE EXPEDITED REMOVAL PROCESS (Nov. 2015), http://www.humanrightsfirst.org/sites/default/files/FAQ-asylum-seekers-and-the-expedited-removal-process.pdf ("The overwhelming majority of individuals placed in expedited removal are from El Salvador, Guatemala, Honduras, and Mexico.").

[17] *See, e.g.,* COMM'N ON IMMIGRATION, AMERICAN BAR ASS'N, FAMILY IMMIGRATION DETENTION: WHY THE PAST CANNOT BE PROLOGUE 22 (July 31, 2015), https://www.americanbar.org/content/dam/aba/publications/commission_on_immigration/FINAL%20ABA%20Family%20Detention%20Report%208-19-15.authcheckdam.pdf ("In the years immediately prior to the summer of 2014, almost all families arriving at the U.S. border seeking asylum were released to live in the community while their immigration hearings moved forward") [Hereinafter ABA FAMILY DETENTION REPORT].

[18] INTER-AM. COMM'N ON HUMAN RIGHTS, REPORT ON IMMIGRATION IN THE UNITED STATES: DETENTION AND DUE PROCESS note 568 (Dec. 30, 2011), https://www.oas.org/en/iachr/migrants/docs/pdf/Migrants2011.pdf.

[19] *See, e.g.*, Statement by Secretary of Homeland Security Jeh Johnson Before the Senate Committee on Appropriations (July 10, 2014), https://www.dhs.gov/news/2014/07/10/statement-secretary-homeland-security-jeh-johnson-senate-committee-appropriations; Jeh C. Johnson, Secretary of Homeland Security, Readout of Secretary Johnson's Visit to Texas (June 20, 2014), https://www.dhs.gov/news/2014/06/20/readout-secretary-johnsons-visit-texas; ABA FAMILY DETENTION REPORT, *supra* note 16, at 23 (describing the Administration's "no-release" policy intended to deter other families from seeking asylum in the U.S.).

[20] CATHOLIC LEGAL IMMIGRATION NETWORK, EXPEDITED REMOVAL AND FAMILY DETENTION: DENYING DUE PROCESS 1 (2015), https://cliniclegal.org/sites/default/files/cara/Expedited-Removal-Backgrounder.pdf ("[T]he number of families the government has placed into the expedited removal process and subsequently detained has increased.").

[21] *See* ABA FAMILY DETENTION REPORT, *supra* note 16, at 8–12 for a history of family detention in the United States, including a summary of the opening in 2006 and subsequent decommissioning in 2009 of the T. Don Hutto Family Residential Center as a place to detain families. The Berks County Family Residential Center was opened in 2001, converted from a former nursing home, with 84 beds. It has since been expanded to its current 96-bed capacity.

in response to the "surge," ICE opened additional family detention facilities[22] to hold the dramatically larger number of detained families.[23]

In February 2015, the U.S. District Court for the District of Columbia issued a preliminary injunction enjoining DHS from using deterrence as a factor in initial custody determinations and in arguments against release of families on bond.[24] In June 2015, Secretary Johnson announced that DHS had "discontinued invoking general deterrence as a factor in custody determinations in all cases involving families."[25]

Nevertheless, at the individual immigration officer level, it remains unclear what factors are used for custody determinations, and how they are applied. It is also unclear whether these decisions are made by ICE or Customs and Border Protection (CBP). The ACFRC repeatedly requested information on this point, but ICE did not provide the requested information. In the absence of information from ICE, we have looked to data and analysis provided by other credible sources, a number of which have found that the decision to put women and children in expedited removal has not seemed to follow any clear applicable standard, but appears largely dependent on whether there is available bed space in FRCs. We do not know if this remains true in recent months, when the *Flores* court's insistence on speedier processing of families has reduced the population in the FRCs to well below capacity. But prior to that change in circumstances, the United States Commission on International Religious Freedom (USCIRF) report found, for example, that the McAllen Border Patrol station tracks family detention bed space and, if there are no beds available, releases families with bus tickets and Notices to Appear.[26] The Inter-American Commission on Human Rights (IACHR) also concluded, "but for capacity limitations, all families would be detained under current policy . . . No substantive criteria are used, nor is an individualized

---

[22] DHS Press Office, *South Texas ICE Detention Facility to House Adults With Children* (July 31, 2014), https://www.dhs.gov/news/2014/07/31/south-texas-ice-detention-facility-house-adults-children (Karnes, formerly an adult-male facility, was repurposed and opened as a family detention center on August 1, 2014); ICE Newsroom, *ICE's New Family Detention Center in Dilley, Texas to Open in December* (Nov. 17, 2014), https://www.ice.gov/news/releases/ices-new-family-detention-center-dilley-texas-open-december (South Texas Family Residential Center – that is, Dilley – slated to open December 2014).

[23] HUMAN RIGHTS FIRST, FAMILY DETENTION: STILL HAPPENING, STILL DAMAGING 2–3 (Oct. 2015), http://www.humanrightsfirst.org/sites/default/files/HRF-family-detention-still-happening.pdf ("If the pace of detention continues as it has over the past month, DHS may hold 45,000 children and parents in family detention this year, as compared to approximately 6,000 individuals who were detained last year."). U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, ICE ENFORCEMENT AND REMOVAL OPERATIONS REPORT: FISCAL YEAR 2014, at 3 (Dec. 19, 2014), https://www.ice.gov/doclib/about/offices/ero/pdf/2014-ice-immigration-removals.pdf ("[F]amily units apprehended at the border may be placed into expedited removal proceedings and detained. However, this process requires ICE to maintain an increased level of family detention space, which historically has been limited to fewer than 100 beds nationwide…As a result, in the summer ICE sought substantial resources and authority to build additional detention capacity to detain and remove family units, and since then ICE has opened three additional facilities for this purpose.").

[24] Court Order, RILR v. Johnson, 1:15-cv-0011-JEB (D.D.C. Feb. 20, 2015), https://www.aclu.org/legal-document/rilr-v-johnson-order?redirect=immigrants-rights/rilr-v-johnson-order. Note that this preliminary injunction was dissolved by agreement of the parties after DHS announced a new policy whereby it would abide by injunction terms.

[25] Jeh C. Johnson, Secretary of Homeland Security, Statement On Family Residential Centers (June 24, 2015), https://www.dhs.gov/news/2015/06/24/statement-secretary-jeh-c-johnson-family-residential-centers.

[26] USCIRF REPORT, *supra* note 14, at 62.

assessment conducted."[27] Several NGOs have asserted that although the Administration has disavowed the deterrence rationale for detention publicly, its continued over-detention of asylum seekers – including women and children – may indicate otherwise.[28]

DHS is not required to place families in expedited or reinstatement of removal, with their attendant policy of detention. There is clear authority holding that immigration officials have the discretion to refer any individual who could be subject to expedited removal or reinstatement of removal to regular Section 240 removal proceedings before an immigration judge instead.[29] In February 2016, a coalition of organizations, including faith-based organizations, sent a letter to Secretary Johnson and Deputy Secretary Alejandro Mayorkas calling on DHS to exercise this discretion and to "stop using fast-track removal procedures, such as expedited removal, against Central Americans."[30] The letter argued that "these fast-track processes deprive asylum seekers of their right to due process and results in vulnerable children and their mothers being deported to the very dangers they fled."[31]

---

[27] INTER-AM. COMM'N ON HUMAN RIGHTS, HUMAN RIGHTS SITUATION OF REFUGEE AND MIGRANT FAMILIES AND UNACCOMPANIED CHILDREN IN THE UNITED STATES ¶ 135 (Oct. 2015), http://www.oas.org/en/iachr/reports/pdfs/Refugees-Migrants-US.pdf [Hereinafter IACHR OCTOBER 2015 REPORT]; *see also* LUTHERAN IMMIGRANT REFUGEE SERVICES (LIRS) AND THE WOMEN'S REFUGEE COMMISSION (WRC), LOCKING UP FAMILY VALUES, AGAIN 3 (Oct. 2014), http://lirs.org/wp-content/uploads/2014/11/LIRSWRC_LockingUpFamilyValuesAgain_Report_141114.pdf ("DHS officials have stated that there is no set standard or policy to determine which families are detained and which families are released except for the availability of bed space.").

[28] HUMAN RIGHTS FIRST, LIFELINE ON LOCKDOWN: INCREASED U.S. DETENTION OF ASYLUM SEEKERS LIFELINE ON LOCKDOWN 3(July 2016), http://www.humanrightsfirst.org/sites/default/files/Lifeline-on-Lockdown_0.pdf ("Some detention and release decisions appear to be based on a desire to deter asylum seekers from seeking U.S. protection. Some of ICE's decisions to continue detention and/or deny parole appear to be motivated by a legally impermissible objective of deterrence."); Guillermo Cantor, *Deterrence Strategy Targeting Central American Asylum Seekers Comes at a High Human Cost,* IMMIGRATIONIMPACT.COM (May 18, 2016), http://immigrationimpact.com/2016/05/18/central-americans-deported/.

[29] *Matter of E-R-M & L-R-M,* 25 I. & N. Dec. 520 (BIA 2011) (DHS argued before the BIA that it had discretion to place an arriving alien in Section 240 removal proceedings rather than invoking expedited removal. The BIA agreed, finding that "Congress' use of the term 'shall' in Section 235(b)(1)(A)(i) of the Act does not carry its ordinary meaning, namely, that an act is mandatory. It is common for the term 'shall' to mean 'may' when it relates to decisions made by the Executive Branch of Government on whether to charge an individual and on what charges to bring.") *See also* HUMAN RIGHTS FIRST, FREQUENTLY ASKED QUESTIONS, *supra* note 16, at 2 (explaining that expedited removal is discretionary).

[30] Letter from Advancement Project et al., to Jeh Johnson, Secretary of Homeland Security, and Alejandro Mayorkas, Deputy Secretary of Homeland Security (Feb. 18, 2016), http://www.lawg.org/storage/documents/JohnsonMayorkas_letter_final_signed_2232016.pdf.

[31] *Id.* Other NGOs have raised similar concerns about whether the widespread use of expedited removal violates due process and results in the removal of persons with legitimate grounds for relief. *See, e.g.,* American Immigration Council, *Removal Without Recourse, supra* note 14, at 2 ("[E]xpedited removal can lead to erroneous deportations of individuals who are not deportable or who would be eligible to apply for lawful status in the United States or to seek prosecutorial discretion if processed through normal immigration court procedures. In addition, individuals who may have resided in the United States for decades, and left only for a brief period of time, may be deported pursuant to expedited removal despite having significant ties to the United States."); CATHOLIC LEGAL IMMIGRATION NETWORK, EXPEDITED REMOVAL AND FAMILY DETENTION, *supra* note 20, at 2; AMERICAN CIVIL LIBERTIES UNION, AMERICAN EXILE: RAPID DEPORTATIONS THAT BYPASS THE COURTROOM 4 (Dec. 2014), https://www.aclu.org/files/assets/120214-expeditedremoval_0.pdf ("DHS officials use these procedures not only to rapidly deport genuine asylum seekers arriving at our borders, but also to remove longtime residents with U.S. citizen family; children; individuals with valid

ICE's stated policy is to "prioritize[] detention bed space for: (1) aliens it is required to detain under the INA; (2) those who pose a risk to public safety if released; and (3) those at risk of absconding."[32] Prior to 2014, ICE was seemingly adhering to this practice by not putting families in expedited removal and detention. Expedited and reinstatement of removal is discretionary and, at present, appears to be applied to families arbitrarily, dependent on available bed space in family detention centers.

Of critical importance here, the vast majority of families placed into expedited removal or reinstatement of removal and subjected to family detention are fleeing the Northern Triangle countries of Guatemala, Honduras, and El Salvador. The region is undergoing a well-documented human rights crisis[33] and nearly 90% of individuals in family facilities from these countries pass their credible or reasonable fear interviews.[34] The use of expedited removal, reinstatement, and detention, against a population that has so overwhelmingly demonstrated credible claims is unnecessary and wasteful. Moreover, while the Committee believes strongly that bona fide asylum seekers in general should not be needlessly detained, this is particularly true for children, whose best interests must be paramount in all enforcement decisions pertaining to them. The harmful effects of detention on children are well established.

Given that Secretary Johnson has acknowledged that deterrence should not be a factor in custody determinations and recognizing the myriad concerns about expedited removal and reinstatement of removal[35] raised by NGOs and others, DHS should discontinue the widespread application of expedited removal and reinstatement of removal to families. Instead, DHS should release asylum seeker families with a Notice to Appear unless DHS makes a determination, based on individualized factors, that a family presents a danger to the community or a risk of flight that cannot be mitigated.[36] Moreover, any decision to detain a family should be reviewed by ICE Headquarters and reassessed at the Headquarters level at least once a month.

---

work and tourist visas; and others with significant ties or legal claims to be in the United States. Some individuals quickly deported through these processes are eligible for relief from deportation and would win the right to remain in the United States if brought before an immigration judge.").

[32] OFFICE OF INSPECTOR GENERAL, DEP'T OF HOMELAND SECURITY, OIG-15-22, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT'S ALTERNATIVES TO DETENTION (REVISED) 3 (Feb. 4, 2011), https://www.oig.dhs.gov/assets/Mgmt/2015/OIG_15-22_Feb15.pdf [Hereinafter OIG ISAP REPORT].

[33] *See, e.g.,* Diego Zavala, *Fleeing for Our Lives: Central American Migrant Crisis*, AMNESTY USA (Apr. 1, 2016, 12:12 PM), http://blog.amnestyusa.org/americas/fleeing-for-our-lives-central-american-migrant-crisis/; Lily Folkerts, *A Look at the Northern Triangle of Central America in 2016: Sustained Violence and Displacement,* LATIN AMERICA WORKING GROUP (Aug. 15, 2016) http://www.lawg.org/action-center/lawg-blog/69-general/1709-a-look-at-the-northern-triangle-of-central-america-in-2016-sustained-violence-and-displacement.

[34] AMERICAN IMMIGRATION LAWYERS ASS'N, DUE PROCESS, DENIED: CENTRAL AMERICANS SEEKING ASYLUM AND LEGAL PROTECTION IN THE UNITED STATES 3 (June 15, 2016), http://www.aila.org/infonet/report-due-process-denied (citing USCIS data at note 2).

[35] INA § 241(a)(5), 8 U.S.C. § 1231(a)(5), 8 C.F.R. § 241.8. For a summary of reinstatement procedure and practice, see Trina Realmuto, American Immigration Council, *Practice Advisory: Reinstatement of Removal* (April 29, 2013), https://www.americanimmigrationcouncil.org/sites/default/files/practice_advisory/reinstatement_of_removal_4-29-13_fin.pdf.

[36] *See* 8 C.F.R. § 236.1(c)(8); *cf.* Zadvydas v. Davis, 533 U.S. 678 (2001) (discussing permissible uses of civil immigration detention under INA § 241).

**Recommendation 1-2: DHS should not use detention for the purpose of deterring future family migration or punishing families seeking asylum in the U.S. Any contrary policy is unlawful, and ineffective.**

**Recommendation 1-3: DHS should return to its prior practice of not putting families into expedited removal and reinstatement of removal. Instead, DHS should place families in regular proceedings via issuance of a Notice to Appear and in all but the most unusual situations release them promptly as a family.**

### B. Avoiding Detention During Credible and Reasonable Fear Processes

Current practice indicates that DHS typically detains individuals under INA Section 235(b) and INA Section 241(a)(5) during the course of credible fear and reasonable fear interviews and following a negative credible or reasonable fear determination until removal. Although it has characterized such detention as mandatory, DHS has recognized and exercised humanitarian parole authority pursuant to INA Section 212(d)(5) to release individuals detained under INA Section 235(b) for humanitarian reasons or a significant public benefit.[37] Regulations explicitly list as a category of immigrants meriting parole those "who have serious medical conditions in which continued detention would not be appropriate" or present medical emergencies, in addition to those whose release would favor law enforcement objectives.[38] Serious medical conditions include mental health conditions that may be exacerbated by prolonged detention and isolation.

Many asylum seekers suffer from post-traumatic stress disorder, depression, anxiety disorders, and other psychological disorders[39] that qualify as serious medical conditions. For many of the women and children detained in FRCs, these medical conditions resulted from domestic violence, sexual assault, attempted sexual assault, and/or other traumatic events in their home country, during their travel, and after arriving in the U.S. UNHCR, in particular, has documented that many of the detained women and children have particularly high rates of trauma sustained both in the home country and en route to the U.S.[40] For mothers and children with these conditions, "continued

---

[37] *See* INA § 212(d)(5)(A); 8 C.F.R. § 212.5(b). *See, also, e.g.*, Decl. of Denise Gilman at ¶¶ 3-4, Flores v. Lynch, No. 2:85-cv-04544 (C.D. Cal. Aug. 14, 2015), ECF 187-7, Exh. 96 (attesting to knowledge of instances in which asylum seekers placed in expedited removal were paroled pending their credible fear interviews); Arlington Asylum Office, *Stakeholder Engagement Meeting Minutes* (Feb. 25, 2015) at 6, http://www.ga-al.com/wp-content/uploads/2015/08/2015-02-25-Stakeholder-Meeting-Minutes.pdf (reporting that the number of pending non-detained credible fear cases was 308).

[38] 8 C.F.R. §§ 212.5(b)(1), 235(b)(4)(ii).

[39] UNITED NATIONS HIGH COMM'R FOR REFUGEES, REFUGEE RESETTLEMENT: AN INTERNATIONAL HANDBOOK TO GUIDE RECEPTION AND INTEGRATION 233 (Oct. 1, 2002), http://www.unhcr.org/en-us/protection/resettlement/4a2cfe336/refugee-resettlement-international-handbook-guide-reception-integration.html (citing clinical studies that found rates of PTSD in refugees ranged from 39-100%, compared to 1% in the general population, and rates of depression in refugees ranged from 47-72%). *See also* CARA Family Detention Pro Bono Project, Office for Civil Rights and Civil Liberties Complaint, *Ongoing Concerns Regarding the Detention and Fast-Track Removal of Children and Mothers Experiencing Symptoms of Trauma* 2 (Mar. 28, 2016), http://www.aila.org/advo-media/press-releases/2016/cara-crcl-complaint-concerns-regarding-detention ("[M]any detained families suffer from Post-traumatic Stress Disorder (PTSD), anxiety, depression or other emotional or cognitive disorders").

[40] UNITED NATIONS HIGH COMMISSIONER FOR REFUGEES (UNHCR), WOMEN ON THE RUN (Oct. 2015), http://www.unhcr.org/en-us/publications/operations/5630f24c6/women-run.html; UNITED NATIONS HIGH COMMISSION

detention would not be appropriate."[41] Numerous studies have documented how detention exacerbates existing mental trauma and is likely to have additional deleterious physical and mental health effects on immigrants – particularly traumatized persons like asylum seekers. [42] NGOs maintain that it is especially inappropriate to detain women and children given allegations of sexual abuse in FRCs[43] that threaten to further traumatize detainees, many of whom fled their countries due to sexual violence.[44]

Many mothers and children in family detention may also have suffered crime victimization or domestic violence while in the U.S. or were trafficked to the U.S., and could qualify for a U-visa, VAWA self-petition, or T visa as a result. Children who have been abused, abandoned, or neglected by one of their parents may qualify for Special Immigrant Juvenile Status (SIJS). Detention, however, prevents women and children from learning about and pursuing these other forms of relief, especially as ICE fails to screen for or even inform them of such relief. Detention may also impede law enforcement objectives by hindering cooperation with authorities regarding crimes – necessary in particular for U-visa applicants.[45] Potential eligibility for any of these forms of relief should counsel in favor of release.

---

FOR REFUGEES (UNHCR), CHILDREN ON THE RUN (Mar. 2016), http://www.unhcr.org/en-us/about-us/background/56fc266f4/children-on-the-run-full-report.html?query=children%20on%20the%20run.

[41] 8 C.F.R. § 212.5(b)(1).

[42] Katy Robjant, Rita Hassan, & Cornelius Katona, *Mental Health Implications of Detaining Asylum Seekers: Systematic Review,* THE BRITISH J. OF PSYCHIATRY, 306-312 (Apr. 2009), http://bjp.rcpsych.org/content/bjprcpsych/194/4/306.full.pdf; IACHR OCTOBER 2015 REPORT, *supra* note 27, ¶ 145; LUTHERAN IMMIGRANT REFUGEE SERVICES (LIRS) AND THE WOMEN'S REFUGEE COMMISSION (WRC), LOCKING UP FAMILY VALUES, AGAIN, *supra* note 27; American Immigration Lawyers Ass'n,et al., Office for Civil Rights and Civil Liberties Complaint, *The Psychological Impact of Family Detention on Mothers and Children Seeking Asylum* (June 30, 2015) http://www.aila.org/advo-media/press-releases/2015/impact-family-detention-mental-health/complaint-crcl; Unitarian Universalist Service Center, *No Safe Haven Here: Mental Health Assessment of Women and Children Held in U.S. Immigration Detention* (Oct. 2015), ,https://www.researchgate.net/publication/283014905_No_Safe_Haven_Here_Mental_Health_Assessment_of_Women_and_Children_Held_in_US_Immigration_Detention; CARA Family Detention Pro Bono Project, Office for Civil Rights and Civil Liberties Complaint, *Ongoing Concerns Regarding the Detention and Fast-Track Removal of Children and Mothers Experiencing Symptoms of Trauma*, *supra* note 39.

[43] Mexican American Legal Defense and Educational Fund, et al., *[CRCL] Complaints Regarding Sexual Abuse of Women in DHS Custody at Karnes County Residential Center* (Sept. 30, 2014), http://www.maldef.org/assets/pdf/2014-09-30_Karnes_PREA_Letter_Complaint.pdf; Renée Feltz, *Immigration Facility Guard Given Jail Time for Sexual Assault of Detainee*, THE GUARDIAN (Apr. 23, 2016, 7:00 PM) https://www.theguardian.com/us-news/2016/apr/23/immigration-detention-center-guard-sexual-assault-prison (describing sexual assault at Berks County Residential Center);

[44] *U.S.: Trauma in Family Immigration Detention*, HRW.ORG (May 15, 2015, 12:22 PM) https://www.hrw.org/news/2015/05/15/us-trauma-family-immigration-detention-0; AMERICAN CIVIL LIBERTIES UNION, IMMIGRANT FAMILY DETENTION IN THE UNITED STATES 1 (Apr. 17, 2015), https://www.aclu.org/files/field_document/ACLU%20-%20Family%20Detention.pdf ("According to Physicians for Human Rights and the Bellevue/NYU Program for Survivors of Torture, detention can also exacerbate the trauma experienced by both children and adults who have fled violence in their home countries…In addition, there have been allegations of abusive conditions at the different family detention facilities, including sexual abuse, threats by guards to separate mothers from their children, retaliation against mothers for engaging in actions to protest their detention, and inadequate mental health and medical care.").

[45] Research has found both U visa victims and VAWA self-petitioners who have begun the process of filing for immigration relief under these programs call the police to report crimes at significant rates. This is true although

In addition to these humanitarian concerns, release of mothers and children from detention would have significant public benefit, a factor favoring release under the statute. The argument for public benefit has been made by NGOs that cite to the high cost of immigration detention and point to "the cost created for U.S. taxpayers of needless, long-term detention of individuals seeking protection."[46] These NGOs and others additionally assert that due process violations impede the ability of detained families to effectively apply for asylum while detained, creating situations contrary to the public interest in which bona fide refugees are returned to face continued persecution, including death, in their countries of origin.[47]

DHS policy guidance on discretionary factors to consider in enforcement decisions so as to free up limited law enforcement resources for more pressing cases supports the release of families during credible fear processes. Secretary Johnson's November 2014 *Policies for the Apprehension, Detention and Removal of Undocumented Immigrants* memorandum addresses issues pertinent to the release of families; it specifically states:

> Absent extraordinary circumstances or the requirement of mandatory detention, field office directors should not expend detention resources on aliens who are known to be *suffering from serious physical or mental illness*, who are disabled, elderly, pregnant, or nursing, *who demonstrate that they are primary caretakers of children* or an infirm person, or *whose detention is otherwise not in the public interest* . . . If an alien falls within the above categories and is subject to mandatory detention, field

---

VAWA self-petitioners have no cooperation requirement related to the VAWA self-petitioning program. KRISZTINA E. SZABO, DAVID STAUFFER, BENISH ANVER & LESLYE E. ORLOFF, EARLY ACCESS TO WORK AUTHORIZATION FOR VAWA SELF-PETITIONERS AND U VISA APPLICANTS, NATIONAL IMMIGRANT WOMEN'S ADVOCACY PROJECT 31–32 (Feb. 12, 2014), http://niwap.org/reports/Early-Access-to-Work-Authorization.pdf (36.2% of VAWA self-petitioners and 25% of U visa victims file police reports for future abuse after filing their immigration cases and 73.1% of U visa victims actively cooperate in criminal investigations and prosecutions); LESLYE ORLOFF, LEVI WOLBERG, & BENISH ANVER, U-VISA VICTIMS AND LAWFUL PERMANENT RESIDENCY, NATIONAL IMMIGRANT WOMEN'S ADVOCACY PROJECT (Sept. 6, 2012), http://library.niwap.org/wp-content/uploads/2015/pdf/PB-Tkit-UVisaLawfulPermanentResidency-9.6.12.pdf (70% of U visa victims continue actively to cooperate in criminal investigations and prosecutions and another 29% want to offer cooperation but the criminal investigation or prosecution in their case is not moving forward).

[46] LIFELINE ON LOCKDOWN, *supra* note 28, at 30 (indicating that DHS requested an allocation of $2.2 billion for immigration detention in FY 2017); AMERICAN CIVIL LIBERTIES UNION, ALTERNATIVES TO IMMIGRATION DETENTION: LESS COSTLY AND MORE HUMANE THAN FEDERAL LOCK-UP (2015), ,https://www.aclu.org/sites/default/files/assets/aclu_atd_fact_sheet_final_v.2.pdf (citing Senate estimates that family detention costs $266 per person per day in 2014).

[47] GUILLERMO CANTOR & TORY JOHNSON, AMERICAN IMMIGRATION COUNCIL, DETAINED, DECEIVED, AND DEPORTED (May 2016), https://www.americanimmigrationcouncil.org/sites/default/files/research/detained_deceived_deported_experiences_of_recently_deported_central_american_families.pdf; Sibylla Brodzinsky & Ed Pilkington, *U.S. Government Deporting Central American Migrants to their Deaths*, THE GUARDIAN (Oct. 12, 2015, 8:57 AM), https://www.theguardian.com/us-news/2015/oct/12/obama-immigration-deportations-central-america (discussing a study finding that as many as 83 Central American migrants were murdered soon after being deported from the U.S. in 2015); Letter from Benjamin Johnson, American Immigration Council, et al., to Léon Rodríguez, Director, U.S. Citizenship and Immigration Services, and Sarah Saldaña, Director, Immigration and Customs Enforcement (Dec. 24, 2015), http://www.aila.org/advo-media/aila-correspondence/2015/letter-uscis-ice-due-process (enumerating a number of due process concerns implicated in family detention and warning against "the danger of wrongfully returning someone – especially a child – to the very danger that prompted his or her family's flight").

> office directors are encouraged to contact their local Office of Chief Counsel for guidance.[48] (emphasis added)

Families seeking asylum fall into a number of the categories articulated by Secretary Johnson. We have stated above that expedited removal, reinstatement of removal, and detention is not mandatory for these families and even if it were, the memorandum indicates that release may nonetheless be appropriate. In the past, the government has released individuals in expedited removal before they underwent their credible fear interviews. The Committee requested information related to this issue but it was not produced. So it is unclear to us whether there are clear guidelines on when immigrants in expedited removal or reinstatement of removal can be paroled prior to a positive credible fear or reasonable fear determination. Per statute and regulations, and given the humanitarian, public benefit, and other considerations described in this section, if DHS chooses to place families in expedited or reinstatement of removal (notwithstanding the earlier recommendation to cease doing so), it should broadly grant parole or release rather than detention for families.

Disconcertingly, recent evidence suggests that some families are separated and adults detained and placed in expedited removal or reinstatement proceedings while children are sent to the Office of Refugee Resettlement.[49] Family separation in these circumstances raises serious concerns and violates the best interests of the child – which requires prioritizing family integrity and the maintenance of emotional ties and relationships among family members. The same family integrity and unity considerations favor joint release of families with other family members in the U.S. (and who often may be mixed-status families). The best interests of the child should be paramount in all custody decisions regarding family members apprehended by DHS, including in the custody decisions about adults arriving with their children, and should favor release of the whole family together as soon as possible – even if some family members are undergoing expedited removal or reinstatement procedures.

If DHS does detain a family, ICE should immediately work to facilitate release as soon as possible, verifying community ties, and putting in place release provisions that mitigate flight risks. Situations may change, as well, as a family's immigration case proceeds.

**Recommendation 1-4: Even if (notwithstanding Recommendation 1-2) DHS chooses to place a family or any family members in expedited removal or reinstatement of removal proceedings, DHS should generally exercise its authority to release family members, together as a family, as soon as possible. Detention should be only long enough to process a family for release into alternatives to detention, and any decision to detain rather than release should be reviewed at least monthly at the ICE Headquarters level. When DHS concludes that it should, or must, release a child from family detention it should release the child with her parent and siblings absent extraordinary circumstances, given the traumatic and detrimental**

---

[48] Memorandum from Jeh Charles Johnson, Secretary of Homeland Security, *Policies for the Apprehension, Detention and Removal of Undocumented Immigrants* 5 (Nov. 20, 2014), https://www.dhs.gov/sites/default/files/publications/14_1120_memo_prosecutorial_discretion.pdf.

[49] Leigh Barrick, *Divided By Detention: Asylum Seeking Families' Experience of Separation*, AMERICAN IMMIGRATION COUNCIL (Aug. 31, 2016), https://www.americanimmigrationcouncil.org/research/divided-by-detention-asylum-seeking-families-experience-of-separation.

**impact of that separation, and because in most cases, there are less restrictive means to ensure the parent's continued participation in the legal process.**

### C. Inconsistency in Criteria for Release of Families

With the expansion of family detention following the "surge" in the summer of 2014, families were kept in detention for months or up to a year, even with a positive credible fear or reasonable fear determination.[50] This occurred notwithstanding DHS guidance that set the presumption that immigrants with a positive credible fear or reasonable fear determination should be released from detention. A 2009 memorandum from ICE provides guidance on *Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture* and requires that persons found to have a credible fear be automatically reviewed by ICE for parole eligibility with a decision no more than 7 days after the parole interview.[51] The stated purpose of the memorandum was to "explain[] how the term ["public interest"] is to be interpreted by DRO when it decides whether to parole."[52] The memorandum instructs that parole should be granted following a positive credible fear determination if the person establishes identity, poses no danger to the community and is not a flight risk because "continued detention is not in the public interest."[53] Although the 2009 parole memorandum applies explicitly only to "arriving aliens" – immigrants who arrive at an official port of entry or via interdiction at sea – the recognition that the public interest favors release of *bona fide* asylum seekers applies broadly to any asylum seeker who has established credible fear or reasonable fear, whether an "arriving alien" or not. Moreover, for those pursuing asylum in regular immigration proceedings, the Immigration and Nationality Act generally does *not* require

---

[50] ELEANOR ACER & OLGA BYRNE, HUMAN RIGHTS FIRST, U.S. DETENTION OF FAMILIES SEEKING ASYLUM: A ONE-YEAR UPDATE 1 (June 2015), http://www.humanrightsfirst.org/sites/default/files/hrf-one-yr-family-detention-report.pdf ("About five thousand children and mothers have been held in U.S. immigration detention since June 2014. Some have been held for nearly a year, and as of April 25, 2015, nearly one-third has spent more than two months in U.S. detention facilities."); IACHR OCTOBER 2015 REPORT, *supra* note 27, at ¶5 ("According to the information received, families for whom there is capacity at an immigration detention center are automatically and arbitrarily being detained for the duration of the immigration proceedings initiated against them, even in cases where the mother has passed an initial asylum screening."); *Id.* at ¶138 ("[F]or those families who were eligible for bond and a custody review, the Commission observed with concern that those families are usually being kept in detention for the duration of their immigration proceedings…ICE attorneys have been arguing since the peak of arrivals in 2014 that every family at Karnes must remain detained because they 'pose a danger to national security,' as well as for 'deterrence of mass illegal migration.'"); Complaint at ¶¶4–5, RILR v. Johnson (D.D.C. 2014), https://www.aclu.org/legal-document/rilr-v-johnson-complaint ("[B]eginning in June 2014, faced with increased numbers of Central American migrants entering or seeking to enter the United States through the southwest border, DHS decided to start detaining families in large numbers. At the same time, DHS adopted a blanket No-Release Policy for Central American families in order to deter additional migrants from coming to the United States. Under this policy, even though Plaintiffs have all demonstrated a credible fear of persecution – entitling them to pursue their asylum claims before the immigration court – and even though they are eligible under the immigration laws to be considered for release on bond, recognizance, or other conditions, Defendants [DHS] are refusing to consider them for release and instead ordering their continued detention."); ABA FAMILY DETENTION REPORT, *supra* note 17, at 24 ("Between June 2014 and February 2015, ICE denied release to nearly all detained families in its initial custody determination, even those who had passed their screening interviews.").

[51] U.S. Immigration and Customs Enforcement, Directive No. 11002.1, *Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture* ¶ 8.2 (Dec. 8, 2009), https://www.ice.gov/doclib/dro/pdf/11002.1-hd-parole_of_arriving_aliens_found_credible_fear.pdf.

[52] *Id.* at ¶4.4.

[53] *Id.* ¶ 6.2.

detention but instead broadly favors release unless ICE demonstrates individualized danger or flight risk.[54] Absent such showing, the presumption should be to release or parole any families who establish a credible or reasonable fear.

The November 2014 memorandum from Secretary Johnson, referred to above, supports this position. The memorandum lists as a Priority 1 category for enforcement "aliens apprehended at the border or ports of entry while attempting to unlawfully enter the United States…*unless* they qualify for asylum or another form of relief under our laws, or *unless*…there are compelling and exceptional factors that clearly indicate the alien is not a threat to national security, border security, or public safety and should not therefore be an enforcement priority."[55] As mentioned previously, DHS has found credible fear or reasonable fear for 90% of mothers and children held in family detention. Parents and children seeking protection and especially those who have been found to have a credible or reasonable fear of persecution or torture should not be viewed as an enforcement priority, and costly detention resources should not be expended on them.[56]

A similar presumption should apply for those parents and children in detention who might qualify for Violence Against Women Act (VAWA), T or U visa immigration relief based on having suffered crime victimization in the U.S., even if they do not establish credible fear. Credible and reasonable fear processes are not designed to uncover such eligibility and DHS does not currently screen separately for it.

Moreover, ICE should ensure that presumptions against the use of detention for families apply equally to men and women. Currently, the criteria and conditions for admissions and releases of mothers with minor children and fathers with minor children appear to be different and arbitrary, with insufficient justification. Historically, fathers and their children have been assigned to Berks only. During the ACFRC's summer 2016 site visit of Berks there were no fathers present. This is consistent with reports by advocates that fathers with children had either been released to the community or separated from their families, with the fathers assigned to detention facilities designated for housing adult males and their children transferred to the custody of Office of Refugee Resettlement (ORR). ICE has declined to answer the Committee's questions on this topic, either as to current or future practice.

Following the February 2015 *RILR v. Johnson* decision[57] and July 2015 *Flores v. Johnson* decision,[58] it appears that DHS changed some of its policies and the amount of time that

---

[54] *See* INA § 236; 8 C.F.R. § 236.3. Mandatory detention during the course of removal proceedings is required only for certain classes of individuals based on criminal history, national security risk, or ties to terrorism – generally not applicable to any of the mothers and children in family detention. INA § 236(c).
[55] *Memorandum from Jeh Charles Johnson*, *supra* note 48, at 3 (emphasis added).
[56] *Id.* at 5.
[57] *RILR v. Johnson* was a class action by mothers and children in family detention with a positive credible fear determination who alleged that the government had effectively adopted a "no-release policy," which interfered with their ability to pursue asylum and violated U.S. immigration law as well as constitutional right to due process. On February 20, 2015, the U.S. District Court for the District issued a preliminary injunction prohibiting the government from using deterrence as a factor in family custody decisions. Court Order, RILR v. Johnson, supra note 24. The preliminary injunction was dissolved – with agreement of parties– after DHS announced a new policy whereby it would abide by the injunction terms.
[58] Flores v. Johnson, 2:85-cv-04544 (C.D. Cal. July 24, 2015), http://www.clearinghouse.net/chDocs/public/IM-CA-0002-0017.pdf.

immigrants are held in family detention has shrunk substantially. ICE announced in July 2015 that it would generally not detain a family (a mother and her child(ren)) if they had a positive credible or reasonable fear determination.[59] ICE recently reported that 94% of people are released from family detention within 30 days, and the majority sooner, within 10-20 days.[60] However, it is critical to note that while it appears most people in family detention are being released more quickly, there are others that continue to be held for long periods. A group of 22 women detained with their children at Berks in August 2016 engaged in a hunger strike to protest their detention "from 270 days to 365 days . . . with children ages 2 to 16 years old," according to their open letter to Secretary Johnson.[61] Although some of these women and children may have been contesting negative credible or reasonable fear determinations or possibly subject to reinstatement of removal (a process separate from expedited removal), the length of time is nevertheless concerning. Asylum seekers should not be subject to prolonged detention absent individualized danger or flight risk that cannot be mitigated. Moreover, as mothers and children are not being informed about or

---

[59] Email from Richard Rocha, U.S. Immigration and Customs Enforcement Spokesperson, *ICE July 2015 Family Detention Announcement* (July 13, 2015), http://immigrantjustice.org/ice-july-2015-family-detention-announcement.

[60] Decl. of Jon Gurule, *supra* note 6, at, ¶13 Decl. of Jon Gurule at ¶ 13, Flores v. Holder, No. 2:85-cv-04544 (C.D. Cal. , ¶13 (June 3, 2016), www.clearinghouse.net/chDocs/public/IM-CA-0002-0030.pdf (stating that 94% of people in family detention from 10/23/2015-5/16/2016 were detained for 30 days or less). Decl. of Joshua Reid, Assistant Field Office Director for ICE at the Berks Family Residential Center, Flores v. Holder, No. 2:85-cv-04544 (C.D. Cal. June 3, 2016) at ¶7, http://www.clearinghouse.net/chDocs/public/IM-CA-0002-0030.pdf ("Soon after arrival at the BFRC, ERO will review the family's alien files, briefly interview the Head of Household (HOH) in order to verify previously provided information, to include potential sponsors…"); Decl. of Juanita Hester, Flores v. Holder, No. 2:85-cv-04544 (C.D. Cal. June 3, 2016) ¶ 4, http://www.clearinghouse.net/chDocs/public/IM-CA-0002-0029.pdf ("Staff will begin efforts to identify sponsors and future release options as soon as practicable after a family is booked into KCRC. ERO FRC staff will interview the head of household (i.e. the adult parent or legal guardian accompanying the child or children) to determine if the child or children has/have another parent or legal guardian in the United States to whom the child or children may be released."); Decl. of Valentin de la Garza, Flores v. Holder, No. 2:85-cv-04544 (C.D. Cal. June 3, 2016) ¶ 7, http://www.clearinghouse.net/chDocs/public/IM-CA-0002-0029.pdf ("Since October 2015, ICE/ERO has updated its procedures to ensure families are processed as expeditiously as possible…ERO FRC staff will being efforts to identify sponsors and future release options as soon as practicable after a family is booked into STFRC. ERO FRC staff will interview the head of household to determine if the child or children has another parent or legal guardian in the United States to whom that child or children may be released."). *See also* ABA FAMILY DETENTION REPORT, *supra* note 17, at 27 (chart showing changes in family detention pre-2014, post-surge, and post-*RILR*/*Flores*); USCIRF REPORT, *supra* note 14, at 12 (indicating that USCIRF observed a similar timeline as that described by ICE with CFI usually within 14 days after USCIS receives referral and immigration judge review of negative determinations usually happens within a week); Josh Gerstein, *Johnson: Feds Looking at Family Immigration Detention Changes*, POLITICO (Aug. 4, 2016, 7:39 PM), http://www.politico.com/blogs/under-the-radar/2016/08/johnson-dhs-looking-at-family-detention-changes-in-wake-of-court-ruling-226694 (quoting Peter Schey, President and Executive Director of the Center for Human Rights and Constitutional Law, who is leading the effort to enforce the *Flores* settlement: "Detention [of families] has gone from an average of 60-plus days to an average of about 10 days.").

[61] Berks County Residential Center Detainees, *Open Letter to Jeh Johnson* (Aug. 10, 2016), http://www.humanrightsfirst.org/sites/default/files/BerksWomenLettertoJohnson.pdf. It should also be noted that although *Flores* and *RILR* have had an ameliorative effect on family detention, it does not apply across the board to immigration detention more generally. *See, e.g.,* LIFELINE ON LOCKDOWN, *supra* note 28, at 3 (91% of nonprofit attorneys consulted for the report stated that "ICE denies parole in cases where asylum seekers appear to meet all the criteria for release" and data from a FOIA request by the ACLU/CGRS showed that only 47% of parole requests were granted in the first nine months of 2015.).

screened for other forms of immigration relief, individuals eligible for U visas, T visas, VAWA, or Special Immigrant Juvenile Status may be among those detained longer periods of time.

We note that a year in detention, particularly in the life of a child, is an extraordinarily long time that has serious repercussions for legal access, education, medical and mental health, and civil liberties more generally. Such detention should not be prolonged *regardless* of the status of a legal claim to protection. Prolonged detention of families should be an absolute last resort, used only when no conditions can mitigate serious danger to the community or serious risk of flight.

In July 2016, the 9th Circuit upheld the District Court's *Flores* ruling as to the minors in custody but held that the District Court had erred in interpreting the settlement to require the release of accompanying adults.[62] However, this decision does not authorize family detention, does not affect ICE's ability to release parents with their children, and in no way requires separation or continued detention.

For the humanitarian, public interest, and other reasons discussed above, ICE should not resort to detaining parents separately from their children and should not seek continued justification for the detention of families.

**Recommendation 1-5: Children should not be separated from their parents in order to continue to detain the adults, or to continue to hold the children by placing them in ORR care.**

**Recommendation 1-6: To avoid inappropriate gender-based disparate treatment, and in keeping with the recommended criteria and conditions, the presumption of release together as a family should apply equally to mothers and fathers arriving with minor children, and neither fathers nor mothers should face separation from their minor children.**

**Recommendation 1-7:**

a) **As soon as practicable, DHS should check its systems for pending VAWA, T, or U applications for any families in detention. If present, families should be released and any expedited removal or reinstatement processes against them halted pursuant to DHS's prosecutorial discretion or other authority to ensure eligibility for crime-based relief. DHS should also expeditiously process families' pending applications for other relief.**
b) **Going forward, DHS should ensure timely screening, prompt release, and preservation of eligibility for individuals in family detention who may have claims for crime-based immigration relief. DHS should not detain immigrant crime victims with pending and approved VAWA confidentiality-protected cases. Children of VAWA confidentiality-protected victims should be released along with their parents without regard to whether the children are included in the victims' application.**

[62] Flores v. Lynch, 828 F.3d 898 (9th Cir. 2016).

### D. Unduly Onerous Conditions of Release

When DHS releases individuals from detention, it may generally do so on recognizance, parole, bond, or conditions of supervision. At present, a condition commonly imposed includes enrollment in a program known as the Intensive Supervision Appearance Program (ISAP). ICE is also piloting a case management-based alternatives-to-detention program for families, which remains limited in scope.

For many families, release on recognizance with information about rights and responsibilities and referrals to legal services and psycho-social supports is sufficient to ensure compliance with immigration proceedings. Other families may benefit from community-based case management alternatives to detention or case management programs that provide more robust support. Only where an individualized assessment has demonstrated need does it make sense to enroll a family in a more intensive form of supervision such as the Intensive Supervision Appearance Program. The Committee requested information from ICE regarding release on bond and bond amounts, and ICE declined to provide such information. Therefore, the Committee has looked to other credible sources of information on bond practice. It has been reported that when DHS releases individuals on bond, it often imposes amounts that are too high for families to afford, and then defends those high amounts when individuals who are eligible for a bond hearing ask an immigration judge to lower bond.[63] According to the August 2016 report from the United States Commission on International Religious Freedom (USCIRF):

> [D]uring USCIRF monitoring visits at ICE detention centers and in meetings with ICE officials and legal service providers…USCIRF heard of bond amounts ranging from $1,500 minimum to $7,000. When ICE officials were asked how a bond rate was determined, one detention supervisor said they give a blanket $2,000 bond rate because 'that is a number we are comfortable with from the INS days.' An ICE official at headquarters said bond rates are determined in different areas based on bed space – rates are lower when there are fewer beds available since there is nowhere to detain the individual and vice versa."[64]

In July 2016, Human Rights First released a report in which they surveyed attorneys around the country, nearly 70% of whom reported that ICE sets bond too high for asylum seekers and immigrants to pay.[65]

---

[63] Human Rights First, *A One-Week Snapshot: Human Rights First at Dilley Family Detention Facility Post-*Flores *Ruling* (Aug. 2015), http://www.humanrightsfirst.org/sites/default/files/A%20One-Week%20Snapshot-%20Human%20Rights%20First%20at%20Dilley%20Family%20Detention%20Facility%20Post-Flores%20Ruling%20ob.pdf (describing 40 cases where initial bond was set between $7,000-$9,500, including one case in which "an ICE trial attorney stated that he had received instructions to 'vigorously contest' release of mothers and children on conditional parole and to 'request high bond amounts' instead. Even when mothers had close family ties in the United States and presented no safety risks, ICE argued that the family was a flight risk as justification for denying release, or demanding high bonds.").

[64] USCIRF REPORT, *supra* note 14, at 47-48.

[65] LIFELINE ON LOCKDOWN, *supra* note 28, at 25. *See also* IACHR OCTOBER 2015 REPORT, *supra* note 27, ¶ 138 ("[A]t the culmination of bond hearings, immigration judges have been setting extremely high bond amounts, up to $15,000 or more, such that those who may qualify to be released are unable to meet the required amount."); USCIRF REPORT,

In June 2015, Secretary Johnson announced that he had worked with ICE Director ICE Sarah Saldaña to ensure that the bond would be set at an amount that is "reasonable" and based on an assessment of the family's ability to pay.[66] However, sources have reported that this policy has not been implemented and it does not appear that ICE has issued any formal guidance to field offices instructing ICE officers how to assess a family's ability to pay.[67] This is concerning particularly as asylum seeker families, many of whom were impoverished in their home countries and/or forced to flee with nothing, are especially likely to have limited ability to pay even a low bond.

Whether or not immigrants are required and able to pay bond, they have been frequently enrolled in the ISAP upon release from detention.[68] ISAP widely imposes electronic surveillance – including for most mothers released from family detention – in the form of ankle monitors, which participants have described as physically painful, traumatizing, and humiliating.[69] ISAP is run by a for-profit firm, Behavioral Interventions Incorporated, which was acquired by the GEO Group in 2010.[70] The Request for Expressions of Interest published by ICE when looking to award the ISAP III contract describes the program as relying on telephonic reporting, unannounced home visits, and in-person interviews at an assigned ISAP office, in addition to the electronic monitoring devices.[71]

---

*supra* note 14, at 59 (reporting "USCIRF heard from several NGOs and legal service providers of bond rates as high at $7,500, much higher than the statutory minimum of $1,500").

[66] *Statement by Secretary Jeh Johnson*, *supra* note 1.

[67] LIFELINE ON LOCKDOWN, *supra* note 28, at 25 ("[I]t is not clear whether ICE has issued any formal guidance to field offices instructing ICE officers how to assess an individual's ability to pay – with respect to families in detention or individuals generally. Reports from attorneys serving asylum seekers and other immigrants do not indicate that any such policy has been implemented.") The Committee requested information about bonds and bond amounts but ICE declined to provide any information.

[68] ISAP I was originally piloted in ten cities from 2004-2009. In June 2008, Congress funded the first year of the nationwide ISAP II program. And in November 2014 Congress appropriated $90 million for the existing ISAP III program. OIG ISAP REPORT, *supra* note 32, at 3.

[69] *See, e.g.*, Oakland Centro Legal de la Raza, et al., Office for Civil Rights and Civil Liberties Complaint, *Violations of Due Process and Liberty Rights of Asylum Seekers by U.S. Immigration and Customs Enforcement through the Use of the Intensive Supervision and Appearance Program (ISAP)* (Apr. 20, 2016) at 6–14, http://centrolegal.org/wp-content/uploads/2016/05/Complaint-to-OCRCL-Cover-Letter.pdf [Hereinafter Oakland Centro Legal de la Raza, et al. Complaint]; E.C. Gogolak, *Ankle Monitors Weigh on Immigrant Mothers Released From Detention*, N.Y. TIMES (Nov. 15, 2015), http://www.nytimes.com/2015/11/16/nyregion/ankle-monitors-weigh-on-immigrant-mothers-released-from-detention.html?_r=1.

[70] Lutheran Immigration and Refugee Service, *Backgrounder: Alternatives to Detention (ATD): History and Recommendations* (July 6, 2015), http://lirs.org/wp-content/uploads/2015/07/LIRS-Backgrounder-on-Alternatives-to-Detention-7.6.15.pdf.

[71] *Intensive Supervision Appearance Program (ISAP III): Request for Expressions of Interest* (July 26, 2014), http://www.dgmarket.com/tenders/np-notice.do?noticeId=10972659. ("ISAP III is a core community-based supervision and in-person reporting program designed to provide cost-effective electronic monitoring supervision and case management for individuals who are not subject to mandatory detention but have been determined to require a higher level of monitoring than being released on recognizance or with bond conditions alone. These individuals may be at any stage in the Immigration Court system. Activities of aliens released from ICE custody and placed in the program (i.e. participants) may be monitored by case specialists (i.e. contractors) or directly by the ICE officers themselves. Aliens participating in this alternative program must comply with a variety of activities and reporting requirements designed to successfully reintegrate the alien into his or her community while navigating the immigration process from initial of proceedings through departure. Program requirements for compliance include, but are not limited to: unannounced home visits, scheduled office visits, electronic monitoring, and submission of a valid travel

When ISAP expanded to a nationwide program in 2009, ERO identified three high priority categories: "(1) aliens with final removal orders who are not removable from the United States and cannot be legally held in custody more than 6 months, but who are a danger to the community; (2) aliens in removal proceedings, not issued final removal orders, who are at high risk of absconding; and (3) aliens with final removal orders, previously released under supervision, who violate the terms of supervision by committing crimes or otherwise fail to comply with release conditions."[72] None of these categories applies as a blanket matter to individuals held in family detention. However, it appears that ICE is routinely requiring ISAP, including ankle monitors, as a general condition of release from family detention.[73]

In 2011, ERO headquarters changed the criteria for participation in ISAP and instructed field offices to "limit GPS monitoring for aliens who did not yet have a removal order, but were waiting to appear in immigration court . . . ERO headquarters recommended using another monitoring method during this period, such as having participants report telephonically."[74] However, USCIRF concluded in its August 2016 report that "it appears that electronic monitoring is being used extensively without full individualized assessments of whether an asylum seeker is a non-appearance risk."[75] In fact, Secretary Johnson told the House Judiciary Committee that ICE was "ramping up" its use of ankle monitors and intended to double the number of monitors from 23,000 in 2015 to 53,000 in 2016.[76]

Many civil society organizations have raised concerns about ISAP and the use of electronic monitors, including a group of 17 NGOs who filed a DHS Office for Civil Rights and Civil Liberties (CRCL) complaint about ISAP in April 2016;[77] the American Bar Association in a letter to Secretary Johnson in March 2016;[78] 73 organizations in a letter to Secretary Johnson and

---

document. To ensure successful outcomes, the program relies on Electronic Monitoring (EM) devices, telephonic reporting and unannounced home visits. Participants must also report to their assigned ISAP office regularly for face-to-face interviews.").

[72] OIG ISAP REPORT, *supra* note 32, at 4.

[73] *E.g.,* A group of CA-based NGOs have an internal ICE email dated May 15, 2015 stating that "Absent extraordinary circumstances, *all* persons released from a family residential center or adult detention facility by ERO *will be enrolled* in some form of ATD under the provisions of the ISAP II contract." Oakland Centro Legal de la Raza, et al, Complaint, *supra* note 69, at n.17 ("The reliance on ankle shackles, along with burdensome reporting requirements and arbitrary practices, interferes with the due process and liberty rights of the complainants – primarily mothers – fleeing severe harm in their countries of origin and seeking protection in the United States."). The complaint was submitted by the following organizations: Centro legal de la Raza, Community Legal Services of East Palo Alto, the East Bay Community Law Center, and members of the San Francisco Immigrant Legal Defense Collaborative – Asian Pacific Islander Legal Outreach, Central American Community Resource Center, Center for Gender & Refugee Studies, Dolores Street Community Services, Immigration Center for Women and Children, Immigrant Legal Resource Center, La Raza Centro Legal, La Raza Community Resource Center, Lawyers' Committee for Civil Rights of the San Francisco Bay Area, Legal Services for Children, Pangea Legal Services, the Bar Association of San Francisco, and University of San Francisco Immigration and Deportation Defense Clinic.

[74] OIG ISAP REPORT, *supra* note 32, at 7.

[75] USCIRF REPORT, *supra* note 14, at 48.

[76] Molly Hennesy-Fiske, *Immigrants Object to GrowingUse of Ankle Monitors After Detention*, L.A. TIMES (Aug. 2, 2015, 3:30 AM), *available at* http://www.latimes.com/nation/immigration/la-na-immigrant-ankle-monitors-20150802-story.html.

[77] Oakland Centro Legal de la Raza, et al. Complaint, *supra* note 69, at 1.

[78] Letter from Paulette Brown, President, American Bar Association, to Jeh Johnson, Secretary, Department of Homeland Security (Mar. 18, 2016),

Deputy Secretary Mayorkas in Feb 2016;[79] and the CARA Family Detention Pro Bono Project (consisting of the American Immigration Lawyers Association, the American Immigration Council, the Catholic Legal Immigration Network, and the Refugee and Immigrant Center for Education and Legal Services) in a letter to ICE Director Saldaña in July 2015.[80] Many of the concerned organizations have indicated that there is no clarity around either the criteria for putting individuals on ISAP or for de-escalation (such as having monitors removed).[81] They raise serious concerns about ISAP and the use of electronic monitors including physical and mental harms,[82] economic harms,[83] and de facto criminalization of asylum seekers.[84]

ICE has also begun to pilot the use of a case-management-based alternative to ISAP for certain families. The ICE Family Case Management Program (FCMP) is contracted through GEO Care, another affiliate of the GEO Group, and began in January 2016. The program provides a case management-based alternative to detention in five metropolitan regions, including Baltimore/Washington D.C., New York City/Newark, Chicago, Miami, and Los Angeles. Families receive case management from GEO Care to ensure that they comply with their immigration obligations, including ensuring family members understand those obligations, have transportation arrangements for court proceedings, and are proactively connected to needed community-based services.

The program, however, remains very limited. While the program's initial pilot states a capacity for 800 participants, at the time that ICE shared data with this Committee, only 48 families had been

---

http://www.americanbar.org/content/dam/aba/administrative/immigration/ABALetter_anklemonitors2016.authcheckdam.pdf ("The ABA believes that any restrictions or conditions placed on noncitizens to ensure their appearance in immigration court or for their removal should be the least restrictive, nonpunitive means necessary to further these goals. The use of electronic monitors is an extreme measure that is often overly restrictive and intrusive in nature.").

[79] Letter from Advancement Project *et al.*, *supra* note 30 (asserting that persons released from family detention are "frequently forced to wear ankle monitors despite demonstrating no significant risk of flight.").

[80] Letter from CARA Family Detention Pro Bono Project, to Sarah Saldaña, Director, Immigration and Customs Enforcement (July 27, 2015), http://www.aila.org/File/DownloadEmbeddedFile/65278 (stating that ICE was using coercive tactics and intimidation to require that women at Dilley wear ankle monitors as a condition of release).

[81] Oakland Centro Legal de la Raza, et al. Complaint, *supra* note 69, at 14; RUTGERS SCHOOL OF LAW-NEWARK IMMIGRANT RIGHTS CLINIC & AMERICAN FRIENDS SERVICE COMMITTEE, FREED BUT NOT FREE: A REPORT EXAMINING THE CURRENT USE OF ALTERNATIVES TO IMMIGRATION DETENTION 13-14 (July 2012), http://afsc.org/sites/afsc.civicactions.net/files/documents/Freed-but-not-Free.pdf, [hereinafter FREED BUT NOT FREE]; Letter from CARA Family Detention Pro Bono Project, *supra* note 80, at 4 ("There is no transparency or consistency regarding how ICE sets bond amounts, why certain individuals are required to pay a bond in addition to an ankle monitor, and why restrictive forms of supervision like ankle monitors are necessary to mitigate a particular flight risk.").

[82] Kyle Barron & Cinthya Santons Briones, *No Alternative: Ankle Monitors Expand the Reach of Immigration Detention*, NACLA (Jan. 6, 2015), http://nacla.org/news/2015/01/06/no-alternative-ankle-monitors-expand-reach-immigration-detention ("The use of the ankle monitors requires a period of physical adjustment, causing swelling of the foot and leg, as well as severe cramps. The person must be tethered to an outlet as the device is charged for hours, twice every day…The greatest challenge that people under ISAP face with the use of the monitor is the psychological effects. The international coordinator of the Honduran solidarity group OFRANEH, Carla Garcia, explains that for her, the shackle conjures up the brutal history of her people in the Americas.); Freed But Not Free, *supra* note 81, at 17-18; Letter from Paulette Brown, American Bar Association, to Jeh Johnson, *supra* note 78.

[83] To cite two of many possible examples, frequency and duration of check-ins impede ISAP participants' ability to work; and there are expenses associated with traveling to ISAP office for check-ins. FREED BUT NOT FREE, *supra* note 81, at 16-17.

[84] Molly Hennesy-Fiske, *Immigrants Object*, *supra* note 76.

enrolled. Moreover, there is so far little data on the program's efficacy. Based on preliminary reports from advocates and the materials ICE shared with the Committee, FCMP appears to be a less punitive option than ISAP for providing safe release. The Committee is, however, concerned over the award of the contract to a for-profit company. In the Committee's view, neither the operation of facilities, community supervision program, nor case management services for families should be driven by profit motives, and conflicts of interest with respect to use or expansion of detention should be avoided. Instead, families should be served by culturally-sensitive, community-based organizations with expertise in social service provision.

In light of recent findings questioning the efficacy and standards of private prison contracts, the decision by the Department of Justice to discontinue private prison contracts, and Secretary Johnson's announcement that DHS will conduct a review to assess the policy for DHS facilities, we recommend that alternatives-to-detention programs be included in the review.[85]

**Recommendation 1-8: In the absence of individualized assessment of clear flight risk or danger, detained families should be released on their own recognizance. Where bonds are set, the amounts should be reasonable based on the family's ability to pay.**

**Recommendation 1-9:**

a) **Any conditions for release, including community supervision, should be the least restrictive means consistent with the needs and risk that the family presents in a community setting, and only for as long as necessary. Factors that should be considered in determining the most appropriate and least restrictive placement include the best interest if the child, the strength or durability of each family's community ties, and whether removal is likely.**
b) **ICE should retain personnel with clinical degrees and expertise in assessment to ascertain what needs and risks, if any; each family being considered for release presents, and then to identify the conditions or precautions to adopt in order to mitigate any concerns and achieve compliance in the community. Conditions of release to the community should be specifically tailored to reflect individuals' assessed needs and risks, yielding both the least restrictive and most effective means of achieving excellent outcomes.**
c) **Supervision, including community programs, electronic monitoring, and other restrictive alternatives to detention, should be imposed only after an individualized determination of danger or flight risk, and with clear standards and timeframes for eliminating these controls, especially removal of ankle monitors.**
d) **Detention should not be used due to a lack of available space in such programs; instead community support and case management alternatives should be expanded with a thorough review of contracting processes, examining efficacy, quality of services, and the appropriateness of using a for-profit prison company for case management.**

---

[85] *See* Deputy Attorney General Sally Q. Yates, Phasing Out Our Use of Private Prisons, JUSTICE.GOV (Aug. 18, 2016), https://www.justice.gov/opa/blog/phasing-out-our-use-private-prisons; Jeh C. Johnson, Secretary of Homeland Security, Statement on Establishing Review of Private Immigration Detention (Aug. 29, 2016), https://www.dhs.gov/news/2016/08/29/statement-secretary-jeh-c-johnson-establishing-review-privatized-immigration.

**e) Families that have similar community ties, risks and needs should receive the same access to ATDs and should not be over-supervised or under-supervised due to lack of appropriate options in the area to which the family is released.**

**f) ICE should regularly review placements that limit freedom of movement or carry other restrictions to determine whether a family could be "stepped down" to a less restrictive option.**

**Recommendation 1-10: Any ankle monitors used for electronic monitoring should be no more restrictive than necessary, and should minimize inconvenience, discomfort, and stigmatization. For example, the ankle monitors used should minimize weight, heat, and the time the wearer must spend physically next to an outlet charging the device.**

## 2. REFORM OF DETENTION AND ALTERNATIVES-TO-DETENTION (ATD)

Much criticism has been leveled against criminal incarceration and yet, amongst its many questionable practices, the criminal justice system has not detained families with children for several hundred years. As already stated, the ACFRC believes that ICE should generally discontinue its use of FRCs, and should place a family in detention only when it is absolutely necessary. Even when custody is necessary, alternatives to the FRCs should be used where possible; custodial arrangements that fall short of physical detention may suffice. When detention is necessary, families should be detained only for the briefest possible period of time and in the least restrictive setting possible. Parts 3 to 7 address particular areas of concern; in this Part, the Committee recommends more general significant substantive improvements, grouped in three interdependent and complementary areas of policy and practice: population management, detention management, and accountability.

### A. Population Management

Population management encompasses the continuum and the conditions of control that ICE exercises over those in its custody and under its supervision in the community from least to most restrictive, and includes the core assumptions and overarching strategies by which it manages families. It consists of the policies and processes that constitute ICE's system for detaining and supervising families, including the specific strategies by which families are monitored and may be admitted to, released, and returned to family detention. The Committee identified three key problems in ICE's approach to population management.

#### 1. Incorrect Assumptions about Civil Detainees

The current management of the FRCs is, improperly, premised upon criminal justice models rather than civil justice requirements or needs. Immigration detention is intended to hold individuals only as long as necessary, when absolutely necessary, pending removal or relief. Criminal incarceration, on the other hand, is fundamentally punitive in its purposes and goals. Consistent with its statutory mandate and case law, DHS's use of civil detention, including alternative forms of detention and alternatives to detention (ATD), should be premised upon civil, rather than criminal, principles. This premise is imbedded in case law that migrants must not be detained to deter,[86] detained to punish,[87] or detained indefinitely,[88] and that children in immigration custody be placed in the "least restrictive setting,"[89] in the community. Moreover, when used, detention should always be

---

[86] Deterrence is not a valid governmental purpose that could overcome the presumption of liberty to justify immigration or other civil detention. *See, e.g.*, R.I.L.R., 2015 U.S. Dist. LEXIS 20441.
[87] *Zadvydas v. Davis*, 533 U.S. 678 (2001) (noting that civil detention does not result from a criminal conviction and holding it is legitimate only where shown to be necessary in an individual case).
[88] *Id. at 690.* (liberty is the rule and that government detention of immigrants violates the Due Process Clause of the U.S. Constitution unless a specific justification, usually prevention of flight risk or danger, outweighs the "individual's constitutionally protected interest in avoiding physical restraint"). *See also Demore v. Kim*, 538 U.S. 510 (2003) (detention is permissible only 'to facilitate deportation, or to protect against risk of flight or dangerousness); *Doan v.* INS, 311 F.3d. 1160, 1162 (9th Cir. 2002) ("serious questions arise about the reasonableness of the amount of bond if it has the effect of preventing one's release").
[89] Stipulated Settlement Agreement, Flores v. Reno, No. 2:85-cv-04544 (C.D. Cal. Jan. 17, 1997), http://www.clearinghouse.net/chDocs/public/IM-CA-0002-0005.pdf. For a summary of the litigation, see CIVIL RIGHTS LITIGATION CLEARINGHOUSE, *Case Profile Flores v. Reno*, http://www.clearinghouse.net/detail.php?id=9493.

for the briefest amount of time possible.[90] This report concludes, as have many reports preceding it, that inappropriately punitive conditions continue to exist, and that, in fact, it is not practical to detain families in a manner that is in keeping with the civil objective of immigration detention.

Top among the many factors that contribute to inappropriate conditions is that the current management of the FRCs is premised upon the incorrect assumption that migrant families present significant risks to others. In fact, the FRC population consists of families with minor children, many of them seeking asylum – not of criminal defendants and convicted inmates. For the most part, families with children are high functioning, self-sufficient, independent, autonomous and responsible individuals who are pursuing long-term gains. They have made a dangerous journey in search of safety for themselves and their children. They have job skills, were gainfully employed and provided for their children, hold religious beliefs, paid taxes, owned homes, and voted where it was permitted in their home countries. And despite ICE's assertions that it is necessary to detain so many families, to our knowledge none of those held in FRCs have criminal records. In fact, most families are fleeing pervasive violence, and are using appropriate channels to seek asylum. But once in ICE custody, they are managed by ICE and its contractors in the same manner that the criminal justice system manages criminal defendants and convicted inmates.

Further, ICE's commitments to mitigating psychological trauma and creating a safe residential environment by providing trauma-informed care (and presumably custody and control as well) are undermined by its evident key operative assumptions about civil detainees and the risk they present. The very experience of detention, as well as some of its alternatives (most notably electronic monitoring), is a continuing source of trauma for families who fled to the U.S. seeking safety. In sum, the very principles the guide and shape family detention and alternatives to detention are wrong. There are two fundamental errors that must be corrected: *criminalization* and *prisonization*. The remedy is *normalization*.

*Criminalization* of the population – managing migrants and their children as if they are pretrial defendants or convicted inmates – no matter whether intentional or accidental, diminishes their self-esteem; impedes their access to the asylum system; negates their status as parent, protector, and provider; undermines family relationships; and contributes to the erosion of their physical, psychological, and social well-being, all of which are contrary to ICE's express commitment to creating a safe place.

*Prisonization* of detention – operating FRCs like jails – is contrary to both ICE's statutory mandate and case law. Prisonized policies, practices, physical plant, and personnel all contribute to families' sense of anomie and anxiety. They are harmful, unnecessary and unnecessarily costly. Yet ICE's Family Residential Standards are based upon, and extremely similar to, standards developed by the American Correctional Association for adult criminal defendants incarcerated

---

[90] Committee members' conversations with mothers at Berks and with pro bono legal staff, as well as recent news accounts of families engaged in hunger strikes all substantiate long stays, often in excess of a year. *See* Renée Feltz, *Mothers at US Immigration Center on Hunger Strike to Protest Year in Custody*, GUARDIAN (Aug. 15, 2016), https://www.theguardian.com/us-news/2016/aug/15/immigration-women-hunger-strike-pennsylvania-berks-county, *Mothers at Berks County Residential Center Suspend Hunger Strike, Reading Eagle* (Aug. 26, 2016), http://www.readingeagle.com/news/article/mothers-at-berks-county-residential-center-suspend-hunger-strike, Liz Robbins, *22 Migrant Women Held in Pennsylvania Start a Hunger Strike to Protest Detention*, N.Y. TIMES (Sept. 2, 2016), http://www.nytimes.com/2016/09/03/nyregion/22-migrant-women-held-in-pennsylvania-start-a-hunger-strike-to-protest-detention.html.

pretrial. Both Karnes and Hutto were correctional facilities when they opened. Additionally, the FRCs are largely staffed and monitored by correctional employees.

*Normalization* – permitting persons to live their lives as normally as possible – on the other hand, is consistent with both case law and ICE's avowed policy posture. Normalization should be the goal of policies and procedures, personnel, physical plant, programs, and services. Normalization would empower families to remain intact, maintaining their equilibrium; it would maximize families' opportunity to function as pro-social and productive members of the community. Obviously, normalization can best be achieved by releasing families seeking asylum or other protection, with case management programs if needed. Community-based placements should be as normalized as possible. In addition, the FRCs too, if they remain in use, should be thoroughly normalized; this is appropriate whether families are released to the community or removed.

The number of families detained, the conditions and circumstances under which they are detained, and the lengths of time they spend in detention are not supported by either the needs and risks they present or the available case law and the field's preferred practices. Similarly, the number of families assigned to Alternatives to Detention, the conditions and circumstances under which they are supervised, and the lengths of time they spend supervised in the community are not supported by the needs and risk they present.

In 2009, ICE began to develop a risk assessment instrument to objectively identify detainees likely to succeed with community supervision and the circumstances under which success could be maximized through conditions of supervision ranging from least (none) to most restrictive (continuous monitoring, electronic and otherwise). The instrument was completed in 2010 and adopted in 2011. Assessments of its implementation found that the instrument was ineffective overall due in large part to a blanket pre-emption of the tool by mandatory detention determinations and its reliance on factors from the criminal context that are not necessarily appropriate in the immigration context.[91] In 2015, ICE introduced a revised instrument primarily to address the number of adult males who had failed to report or had absconded.[92] Families in custody most often consist of female heads of household and their children; their detention and release decisions cannot reasonably be based on assumptions or findings relating to adult males. An instrument specifically normed for families and not pre-empted mandatory detention determinations, is necessary and will improve outcomes. This instrument and its corresponding interview protocols should also be sensitive to gender roles and other cultural as well as language differences.

**Recommendation 2-1: To allow objective and accurate determination of which families must be detained due to individualized determinations of flight risk or danger, and also the use of ATD, ICE should retain one or more subject matter experts to create needs and risk assessment instruments specifically for families, to be used regardless of assumptions about mandatory detention. This instrument and its corresponding interview protocols should be specifically normed to families' demographics; sensitive to gender and to cultural and language differences; mindful of community ties and other factors that inform consideration**

---

[91] Mark Noferi & Robert Koulish, *The Immigration Detention Risk Assessment*, 29 GEORGETOWN IMM. L.J. 45 (2014).

[92] *See* OFFICE OF INSPECTOR GENERAL, DEP'T OF HOMELAND SECURITY, OIG-15-22, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT'S ALTERNATIVES TO DETENTION (REVISED) 3 (Feb. 4, 2011), https://www.oig.dhs.gov/assets/Mgmt/2015/OIG_15-22_Feb15.pdf. [Hereinafter OIG ISAP REPORT].

**for release; and validated to accurately ascertain any risk family members may present or face. ICE's recently revised ATD Risk Assessment Instrument may not currently be appropriately normed for families and female heads of household.**

**Recommendation 2-2: ICE's bed capacity and community supervision slots should be consistent with the actual numbers of families objectively appropriate for detention or supervision in the community. Under no circumstances should families be assigned to inappropriate or unlicensed facilities due to a lack of appropriate beds; similarly, families should be neither over- nor under-supervised in the community due to lack of appropriate placement options in the areas to which families are released.**

**Recommendation 2-3: DHS contract terms should not incentivize the otherwise unwarranted use of detention or supervision capacity; for example, contracts should not reduce the per bed price when the population exceeds a certain percent of occupancy, or pay for all beds, whether or not occupied. ICE should renegotiate any contracts with such terms. Contract terms should clearly state all costs. Contracts should include penalties for failure to satisfactorily perform all terms as stipulated.**

**Recommendation 2-4: Both the FRCs and community-based placements should eliminate as many characteristics of criminalization and prisonization as practicable, and become as normalized as possible in their design and operation. Families should be afforded every opportunity to continue to function as families, to exercise autonomy regarding parenting and their daily lives, including activities of daily living (e.g., when to wake and go to bed, menu and food preparation, wardrobe, hygiene, sanitation, discipline, and worship). Families in custody should be allowed easy access to immediate family members, whether themselves in custody or the community, by contact visitation and no-cost phone, email, and skype. Families should be permitted to live as intact groups and all members of a family group should be assigned to the same sleeping and living quarters.**

**Recommendation 2-5: Consistent with the commitment to normalization, when detention is necessary, ICE should only use small, non-institutional and non-secure facilities and assign staff specifically selected to work with families, especially families exposed to the documented trauma this population has experienced. Correctional facilities and personnel should not be used under any circumstances. All facilities should be licensed to provide child welfare consistent conditions and services in accordance with the *Flores* Settlement Agreement.**

**Recommendation 2-6: The current monitoring instruments developed by ICE and used by ICE and its contractors to ascertain whether FRCs meet minimum operating expectations should be replaced with instruments and methods that will accurately assess compliance with its contracts and MOUs as well as the Family Residential Standards, both those in effect today and upon its their revision. The FRCs should be held to the highest applicable standard of care – whether that is in the Family Residential Standards or the PBNDS.**

**Monitoring of ICE's compliance with applicable standards should be done by an entity with child welfare expertise and experience.**[93]

### 2. Insufficient Information and Analysis, Planning, and Preparedness

DHS's core mission is national emergency planning and preparedness. Emergency planning and preparedness requires viable plans and ample practice. DHS must prepare and plan for periodic increases in the migration of families seeking relief in the U.S. – and DHS plans should rely on routine secure detention or excessive close supervision.

In 2009, at the beginning of the current Administration, ICE operated the largest system of detention and community release programs in the country with 378,582 migrants from 221 countries in its custody or under its supervision.[94] Today, in the eighth and final year of the Administration, ICE continues to operate the largest system of detention and community release programs in the country with 783,454 migrants from 178 countries in its custody or under its supervision. It also continues to be one of the largest national systems of detention and community release programs with the most highly transient and diverse populations of any detention system in the world. The measures that the current, and the next, Administration take with regard to its response to families and other migrants seeking safety in the U.S. are watched closely by other governments and are frequently emulated.

In order to effectively manage a national system, both day-to-day and over a foreseeable period of time, with reliable information at the ready for mid-range and long-term planning and evaluation, ICE should identify, define, collect, scrub, and publish key indicators on a continuous basis.

**Recommendation 2-7:**

a) **ICE should convene its stakeholders to introduce detention management key indicators, describe data collection methods and finalize definitions with the group. ICE should consider additional data proposed by stakeholders. Data collection should begin with the next quarter.**
b) **Key indicators should be collected and published, online. They should include, at least:**
   i. **actual capacity (both beds and ATD slots by type of ATD),**
   ii. **operating capacity,**
   iii. **capacity utilization (i.e., the average daily population (ADP) detained and on ATD),**
   iv. **actual and average lengths of stay (ALOS) in ICE custody and at each facility while in ICE custody.**
   v. **frequency distributions for detainee age and gender,**
   vi. **frequency distributions of family members' risk assessment and mental health risk assessment scores,**

[93] Dayna International, a marketing consultant (and effective 2016 a wholly owned subsidiary of DLH Holdings Corp. Co.) "offering technology-enabled services to achieve social impact for the government," does not appear to have the requisite experience to adequately assess ICE's compliance with either the current or ideal Family Residential Standards; its performance should be assessed and addressed as warranted.
[94] Dora Schriro, U.S. Immigration and Customs Enforcement, *Immigration Detention: Overview and Recommendations* (Oct. 6, 2009), https://www.ice.gov/doclib/about/offices/odpp/pdf/ice-detention-rpt.pdf.

vii. **frequency distributions of family members' medical and psychiatric diagnoses,**
viii. **the number of mental health visits (primary care mental health visits, mental health professional evaluations, individual psychotherapy, group therapy, psychiatric evaluations, psychiatric follow-up visits),**
ix. **the number of scheduled and emergency hospitalizations,**
x. **the number and duration of seclusion and restraint episodes, including all uses of isolation housing, and their justifications,**
xi. **releases due to deteriorating health or mental health condition, and their justifications,**
xii. **deaths in detention (or in a hospital while still in ICE custody, after detention),**
xiii. **frequency distributions of family members' primary and secondary languages, including literacy rates,**
xiv. **the number and location of failures to appear and absconders previously in detention, or in ATD, and**
xv. **per diem cost and total operating cost (bed by facility, slot by ATD type, and total).**

c) **In general, data should be published at least monthly; some data should be published more frequently. For example, actual capacity, operating capacity, capacity utilization should be updated weekly online; and deaths in detention should be updated daily online.**

**Recommendation 2-8: ICE should engage in strategic planning on an on-going basis, actively involving both field staff and stakeholders, and should develop a five-year strategic plan that is updated annually consistent with data trends, case law, and other key factors.**

**Recommendation 2-9: ICE should prepare a Continuity of Operations (COOP) plan and update it annually. A COOP is a federal government initiative, required by Presidential directive, to ensure that agencies are able to continue performance of essential functions under a broad range of circumstances including localized acts of nature, accidents and technological or attack-related emergencies. Periodic increases, or surges, in the migration of families, seeking relief in the U.S. are situations well-suited for this measure.**

**Recommendation 2-10: ICE should create the infrastructure – including data collection, planning processes, personnel with specialized skill sets suited to the work at hand, and a continuum of viable placement and program options – to receive and assess and then release or refer families in less than 24 hours and without detaining them. ICE should consider models used by social service and not-for-profit organizations with child welfare expertise that specialize in emergency response and relief.**

**Recommendation 2-11: Even in the event of ebbs and flows in population, ICE should create capacity to keep families in the community in lieu of temporary detention whenever possible and to detain families only when necessary and for the briefest period of time, in temporary, family-friendly, non-secure and licensed settings.**

### 3. Outsourcing vs. Acquiring Internal Expertise

Since its inception, ICE has relied primarily upon an outsourced correctional workforce and model to perform most work associated with detention and its alternatives. Contracting with public and

private sector correction providers on a large-scale basis in the immediate aftermath of its inception – and at a time that government's policy changed from one of more frequent release of apprehended migrants to one of greater use of detention – may have been necessary and certainly it was expedient, but it is no longer sufficient or appropriate. Reliance on public and private sector corrections providers has resulted in many unfortunate compromises including use of unduly punitive facilities designed and constructed for penal purposes and of personnel who are unfamiliar with non-criminal, foreign-born populations. Like ICE, its private and public sector partners lack the requisite knowledge, skills, and abilities to envision how this civil system should be organized and operated to achieve its lawful goals, without criminalization or prisonization. And outsourcing has meant that ICE has not itself acquired the critical skills to make informed, independent decisions about detention and its alternatives.

On August 18, 2016, the U.S. Department of Justice (DOJ) announced that the Federal Bureau of Prisons (BOP) would reduce and ultimately end its use of private prisons. The DOJ determined that its private prisons were neither as efficient nor as effective as its own, federally-operated correctional facilities. On August 29, 2016, Secretary Johnson directed the Homeland Security Advisory Council to evaluate whether ICE should move in the same direction regarding its operation of immigration detention facilities. Outsourcing to public corrections entities is not the antidote to privatization, however. County governments and their agencies – including, especially, sheriffs' departments – lack the expertise and to serve migrant families. In addition, they may be motivated by their desire to augment their operating budgets, avoid layoffs, and fill empty buildings. These are circumstances that can incentivize prolonged and unnecessary custody, and result in failures to meet the needs of migrant individuals or families in DHS custody.

ICE is composed primarily of law enforcement personnel with extensive expertise performing removal functions, but not in the design and delivery of residential detention and community-based alternatives. Yet the agency has been charged with both prosecuting families for unlawful entry and caring for them while they are in federal custody. Assigning two highly distinctive and conflicting functions to the same agency is the equivalent of combining corrections and the criminal courts. Outsourcing of detention operations to public and private correction providers has not been effective in alleviating this tension due to the profit motivations discussed above and a lack of non-criminal expertise.

The solution does not lie in retaining the services of and leasing facilities from either private or public sector criminal justice entities. Rather, to effectively and humanely detain families for any period of time, ICE must itself acquire requisite knowledge, skills and abilities to envision how this system should be organized and operated to achieve its lawful goals. Moreover, it should separate enforcement and custodial functions.

**Recommendation 2-12: ICE should develop sufficient internal expertise to perform and monitor key functions that are currently out-sourced, by providing extensive in-service training of qualified enforcement personnel and by hiring, as ICE staff, subject matter experts to design and implement reform, including this Committee's recommendations. Subject matter experts should have a work history and professional orientation related to child and family welfare, not criminal justice.**

**Recommendation 2-13:**

a) **ICE should immediately cease the expansion of the current FRCs' capacities. ICE should provide timely notice to those vendors that their contracts for family residential housing and services will not be renewed.**
b) **In place of the FRCs, when detention or ATDs are necessary, ICE should pursue placements in small, licensed group homes and evidence-based community supervision programs.**
c) **If larger facilities must be used, they should nonetheless be small, in order to facilitate a sense of safety and well-being, and should have ample space to separate one function from another (e.g., sleeping areas from recreational areas). Facility design and construction should provide ample natural light and fresh air, ready access to the outdoors, and building materials similar to those used in residential settings (not cinder block or industrial-sized porcelain tiles on the walls). Furnishings should be family-friendly as well; for example, using fabric and wood rather than plastic or metal and including privacy-protective window treatments.**
d) **Available placements should be sufficient in number, operated by non-criminal-justice subject matter experts, and located nearby population centers with ample access to legal counsel, public transportation, access to emergency health care, and a diverse and qualified workforce.**

**Recommendation 2-14: Ideally, DHS should separate enforcement and custodial/supervision functions from one another within ICE, with ERO focusing exclusively on enforcement and a new division focusing exclusively on envisioning and executing a system of temporary non-secure housing and supervision strategies specifically tailored to the objectively assessed needs and risks presented by migrant individuals and families. ICE should acquire the expertise to perform custodial/supervision functions itself, or those functions should be assigned to another governmental entity that is appropriately expert in non-criminal population welfare and services.**

### B. Detention Management

Detention management focuses on the core operating assumptions, rules, regulations and expectations as enumerated in case law and implemented via the Family Residential Standards, contracts and Memoranda of Understanding (MOUs), and FRC policies and procedures. The Committee identified three key issues specific to detention management: normalization, creation of a culture of safety, and commitment to regulatory requirements.

#### 1. Normalization

Instead of institutionalized/prisonized conditions of detention and alternatives to detention, both should be normalized. The policies and procedures that have guided ICE's operation of the FRCs and community supervision programs have not been either efficient or effective. For the most part, migrant families with children seeking status in the U.S. are intact families, with parents capable of caring for their children, providing for themselves, and contributing to their communities. Over-supervising families who require little or no supervision, regardless of its form, is costly and counterproductive. Limiting or impeding parents' ability to make decisions about the care of their children and threatening families with separation as means of control or retaliation breaks down the families and erodes the appropriate parent/child relationship. Families cannot thrive in settings

such as these. The resulting negative effects of detention and unduly harsh community supervision on children and families have been well documented.

ICE has made efforts to improve the FRCs and expand its electronic monitoring, including, for example, adopting a language access policy and trauma-informed practices and care coordinators, but these changes are insufficient. They are not yet fully or successfully implemented; they suffer from insufficient oversight; and most fundamentally, they do not address the root cause of the reoccurring problem – superimposition of a criminal justice system on a non-criminal population.

At times – whether due to medical or other considerations – it is necessary for ICE to temporarily remove a parent from an FRC or otherwise separate him or her from the general population. This may occur, for example, if a parent is too ill to care for his or her child or must be hospitalized. Separation can be acutely frightening for children, and can leave children in ad hoc care situations that compromise their safety and well-being. It can also be traumatizing and extremely stressful for the parent who is dealing with the underlying situation but also possible feelings of guilt and worry for their child. This situation poses challenges for normalization, and is addressed in its own recommendation.

**Recommendation 2-15: ICE should realign its core operating assumptions and expectations – as expressed in its rules and regulations, existing and future contracts and memoranda of understanding, and current Family Residential Standards – with the individuals actually in its custody and under its supervision, who are neither criminal defendants nor sentenced inmates within a criminal justice system.**

**Recommendation 2-16: ICE should work with NGOs and other entities and experts with experience in child welfare to significantly modify the Family Residential Standards, eliminating all of the components of the FRCs that are characteristic of prisons and jails, normalizing to the greatest extent possible families' time both in detention and under ICE supervision in the community. The approach taken should be trauma-informed, and follow principles outlined by SAMHSA. The many facets of ICE's care, custody and control warranting substantive modification include: counts and bed checks, the daily schedule, rules governing grooming and personal appearance and other activities of daily living, housing/bed assignments, access to immediate family members and to others, and the addition of a Family Bill of Rights. Additional attention must be given to other key areas discussed at length in this Report, notably access to legal counsel; language access; health, mental health and trauma informed care; and free and appropriate education services.**

**Recommendation 2-17: For situations in which families must be detained, detention rules and practices should be normalized in at least the following ways:**

a) **<u>Counts and Bed Checks</u>: Both parents and children need their sleep. All bed checks should stop immediately. If there is a bed check to be made, it should be by children's parents, if they feel one is necessary. ICE should develop means to account for and ensure the safety of everyone in its care that do not involve entering rooms at night when parents and/or children are sleeping.**
b) **<u>Daily Schedule</u>: The prototypical institution schedule should be eliminated. In its place, "wake-up" and "lights-out" as well as the meal service schedule should be determined by parents. A flexible sleep schedule would help to demarcate weekends and holidays from weekdays and school days, and reduce idleness. Getting up early**

**with no place to go makes little sense, and adds to the feeling of helplessness that so many in the population expressed.**

**c) <u>Food Service</u>: The menu has been a significant source of concern for parents detained in the FRCs; many of them have worried about their children's weight loss. ICE should adopt alternative means of planning and preparing meals with the active participation of parents, affording them opportunity to prepare breakfast and lunch with staples kept at the ready and to modify dinner with seasonings, sauces, and fresh fruits and vegetables that are familiar to them. Healthy snacks, water, and juice should be made available to parents and their children 24 hours per day.**

**d) <u>Grooming and Personal Appearance</u>: As much as possible, ICE should afford families in detention unencumbered access to personal property, toiletries and shaving supplies, their own clothes (or new garments but not used clothes, used undergarments and used shoes) and their children's toys and books, laundry soap, mending kits, ironing boards and irons, and haircuts as often as needed. Children should be allowed to keep toys, stuffed animals and other property in their living space and to hang artwork and other decorations on the walls.**

**e) <u>Other Activities of Daily Living</u>: ICE should provide parents opportunities to launder/tailor the family's clothes, tend a garden that they control, and assign their children household responsibilities as appropriate. Both parents and older children should be offered opportunities to perform meaningful work for wages and hours set by the U.S. Department of Labor. Subminimum wages should be prohibited.**

**f) <u>Housing/Bed Assignments</u>: ICE should modify and deinstitutionalize FRC sleeping quarters by housing family members together in private rooms with attached bathrooms; and using privacy panels, or hanging curtains or doors, in the restrooms, bedrooms and changing areas.**

**g) <u>Family Bill of Rights</u>: Intact families' parental decisions and authority should not be subordinated by ICE rules and contractor practices. ICE should develop a Family Bill of Rights that ensures the protection of a detained or supervised parent's fundamental right to make decisions about the care of his or her child, while protecting children from abuse and neglect.**

**h) <u>Access to Immediate Family Members</u>: ICE should ensure families in detention have reliable, routine, and affordable access in person and by phone, email, and mail, to their family members, whether those family members reside in the U.S. and elsewhere, and whether the family members are detained in another ICE facility, supervised by ICE in the community, or in the custody of ORR or the child welfare system. ICE should afford any indigent detainees ready access to phone calls and email to facilitate meaningful contact with family members.**

**i) <u>Access to Others</u>: Families in detention require contact with many individuals who are not their relatives and with government agencies – for example, former and prospective employers, consulates, victim-advocacy programs, and child welfare agencies – to manage their affairs prior to their release or removal and in anticipation of the release or removal. ICE should ensure families in detention have reliable, routine, and affordable access to community resources, by phone, email, and mail, as well as by contact visits.**

**Recommendation 2-18:**

a) **ICE should develop and implement a consistent policy for caring for children who are temporarily out of the care of their parents. All details of this policy should be developed by child and family welfare experts and with the input of counsel who have expertise in FRC detainee representation. Each FRC should employ a qualified child welfare coordinator with designated responsibility for overseeing implementation of this policy.**
b) **Any child who is out of the care of his or her parent should be supervised and cared for by a staff member with child welfare expertise. At no time should ICE or contractor personnel use the threat of family separation or actual family separation to discipline or retaliate against a parent or child. In every case where they have the mental and physical capacity to communicate a choice, parents should have a choice as to what happens with their child in their absence. In any case where circumstances indicate that the parent will be unavailable to care for their child for more than 72 hours the parent should be consulted regarding options including reunifying the child with family members or sponsors in the community, or ORR custody as an unaccompanied child.**
c) **Decisions regarding separation because of abuse or neglect should be made by a child/family welfare professional only. ICE personnel and contractors should immediately report any suspected maltreatment of a child – whether by a parent, ICE personnel or contractor staff – to the relevant jurisdiction's child welfare agency, consistent with obligations under state and federal law. In any case in which a child is separated from a parent due to accusations of abuse or neglect, the child should be provided with an advocate or legal counsel, and the parent should have the right to an attorney or advocate to assist him or her.**

### 2. Building a Culture of Safety

ICE should build a culture of safety. When the government places someone in its custody or under its supervision, the government assumes the responsibility for their safety and well-being. ICE's commitment to trauma-informed care appears to be earnest. However, both the agency and its agents' understanding of what it means for care to be trauma-informed appear quite limited, as is its awareness of the nexus between ICE's policies and practices and harm to families. The criminalization/prisonization already discussed inadvertently re-traumatizes those in its care, most of whom have already experienced considerable trauma in their past.

Small differences can and do contribute to considerable distress. The inability to communicate in one's own language, to eat familiar food, to wear one's own clothes, to care for one's own family, to seek and receive crime victim services and trauma-informed care, to name but a few of the many topics discussed in this Report, quickly add up even during a short stay. The cumulative effect over the course of longer stays can be and has been devastating for many families. We discuss trauma-informed care in depth in Part 6.C. Here, we discuss other aspects of promoting safety for detainees.

Orientation: Most detainee families have had no prior exposure to incarceration. Therefore, their familiarity with and their ability to anticipate ICE's expectations are significantly limited. Their introduction to detention is a process, not an event. Access to information and explanations need to

be ongoing; detainees need to feel welcome and invited to have conversations and ask questions of staff.

**Recommendation 2-19: ICE should provide both an orientation and a handbook that is easy to understand, communicated in a manner that it is accessible to detainees, highly likely to meet the informational needs of detained families, and encourages questions and conversations between detainees and FRC and ICE staff.**

Staff cultural competence: The Committee experienced considerable difficulty obtaining information about ICE and FRC staff, including their selection, training, and supervision. With regard to the medical and mental health personnel working at the FRCs, no information was provided regarding credentials or qualifications. The resulting deficit of information includes: not knowing the numbers of positions funded and positions filled by job title, job descriptions, minimum job qualifications, credentials, persons working in limited capacities or with restricted licenses, and staff's demographics, as well as employers' minimum pre-service and in-service training requirements and staffs' satisfaction of those requirements. Based largely upon Committee members' observations during the tours, firsthand knowledge drawn from their primary work duties, and credible reports published by reputable organizations, it is believed that most of the ICE and contractor staff that interfaces with detained families were hired to perform enforcement functions and for the most part, previously worked with pretrial inmates and sentenced prisoners. And, although there are a significant number of multi-lingual and culturally competent potential employees and contractors in the immediate areas of the three FRCs, it seems that many staff are not bilingual and have no particular background or training to ensure cultural competence, or professional competence to work with trauma and crime victims. Cultural competence is "a set of congruent behaviors, attitudes, and policies that come together in a system, agency, or among professionals that enables effective work in cross-cultural situations." It is vitally important if a system is going to function effectively "within the context of the cultural beliefs, behaviors, and needs presented by consumers and their communities."[95]

**Recommendation 2-20: ICE and the FRCS should employ and assign both line staff and supervisors whose skills, languages, education and training, and prior employment and work histories are compatible with the needs of detainee families, and should ensure that staff receive pre-service and ongoing in-service instruction in meeting the needs of protection-seeker children and families that is sufficiently in-depth and of adequate duration for personnel to perform their duties with proficiency. ICE should designate a child welfare coordinator with expertise in working with traumatized children and families at each FRC to oversee implementation of a child-friendly service model and provide ongoing training of staff.**

Regulatory Requirements, Licensing, and States' Certifications of FRCs to Operate. ICE's use of the FRCs and the conditions at the FRCs themselves do not appear to satisfy, in letter or in spirit, the *Flores* court's requirements that ICE assign families to facilities only when such assignments are necessary, and that facilities be non-secure (that is, have an open campus in both design and

---

[95] U.S. DEP'T OF HEALTH AND HUMAN SERVICES, OFFICE OF MINORITY HEALTH, WHAT IS CULTURAL COMPETENCY, http://www.cdc.gov/nchhstp/socialdeterminants/docs/what_is_cultural_competency.pdf.

operation) and duly licensed to care for children.[96] The FRCs are far from non-secure. Whether or not there is a lock on the door or a fence around the property perimeter, they exhibit key characteristics of secure facilities. For example, they conduct numerous invasive counts daily and dictate when families rise and go to bed; when they eat and what they eat; what they wear; and when they can go outdoors, confer with counsel and receive visitors. ICE has resisted the idea of civil licensure by urging host state and county governments to license facilities that do not meet existing core requirements or to create licenses solely for its use.

Likewise, ICE has not yet fully complied with the DHS Prison Rape Elimination Act (PREA) regulation.[97] None of the FRCs is PREA-compliant and cross-gender supervision strategies are still inappropriate. Families also report problems with bullying and intimidation, often about sexual identity and orientation. Vendors employ persons to work as guards who have criminal histories, older children are routinely reassigned to sleep in rooms with adults to whom they are not related, children of both sexes and their parents are assigned to sleeping quarters that lack privacy screens for changing and toileting, and bed checks are routinely performed by guards of the opposite sex. As a result, family members' sexual and physical safety and families' overall well-being are not yet assured.

**Recommendation 2-21: ICE should comply in both letter and spirit with the concept of operating only non-secure and fully credentialed facilities for families; FRCs should be licensed as child care facilities by the appropriate state regulatory agencies.**

**Recommendation 2-22: DHS and ICE should comply in full with federal laws and regulations that impact the conditions of families' detention. They should not expend efforts to secure exemptions; instead, DHS and its agencies should lead by example. In all residential custodial settings – including those that are community-based – ICE should ensure compliance in full with PREA and the DHS PREA regulation. ICE should ensure that individuals who are victims of sexual abuse or assault are not transferred away from legal counsel without their explicit consent and that victims are advised of and assessed for potential U visa eligibility.**

---

[96] Stipulated Settlement Agreement, Flores v. Reno, No. 2:85-cv-04544 (C.D. Cal. Jan. 17, 1997). http://www.clearinghouse.net/chDocs/public/IM-CA-0002-0005.pdf. Both Dilley and Karnes sought to obtain child care licenses following Judge Gee's July 2015 decision, discussed *supra* note 9 and accompanying text. In April 2016, the Texas Department of Family and Protective Services (DFPS) approved a child care license for Karnes. *Judge Halts Child Care License for Dilley Detention Center*, TEXAS OBSERVER (June 2, 2016), https://www.texasobserver.org/immigrant-family-detention-license-hold/. Dilley also applied for a child care license but a state district judge temporarily enjoined the grant of that license in June 2016, pending additional litigation. *See Case Profile: Grassroots Leadership v. Texas Department of Family and Protective* Services, CIVIL RIGHTS LITIGATION CLEARINGHOUSE (Aug. 4, 2016). The child care license at Berks expired in February 2016 and was not renewed by the Pennsylvania Department of Family Services. American Immigration Council, *A Visit to Berks Family Detention Center Makes Clear Why They Lost their License* (Feb. 22, 2016), http://immigrationimpact.com/2016/02/22/berks-family-detention-center/. The County has appealed the decision and the case will be heard in November. Liz Robbins, *22 Migrant Women Held in Pennsylvania Start a Hunger Strike to Protest Detention*, N.Y. TIMES (Sept. 2, 2016), http://www.nytimes.com/2016/09/03/nyregion/22-migrant-women-held-in-pennsylvania-start-a-hunger-strike-to-protest-detention.html.

[97] 28 C.F.R. § 115.

### C. Accountability

Accountability encompasses the operating framework by which ICE provides oversight, ensures compliance with its standards of care and other benchmarks, commits to and pursues continuous improvement, and achieves transparency in the fulfillment of its executive duties. It is the keystone to the development and implementation of an appropriate response to families seeking to remain in the U.S.

#### 1. Roles and Responsibilities of Government Actors

DHS and ICE are charged with the responsibility of immigration enforcement, which includes both the detention and community supervision of foreign-born migrants, including families. ICE may delegate many of its duties to other public or to private actors but it is always responsible for their acts and outcomes.

Like many others, the Committee has concerns about the processes by which ICE selects public and private sector actors, ascertains actor compliance, decides whether to retain and sanction or remove actors, and determines the costs for goods and services received. Typically, ICE foregoes the competitive bid process instead; it enters into contracts and executes MOUs under exigent circumstances or by emergency provisions. The terms and conditions to which ICE agrees are often unfavorable to both ICE and the families in its custody. For example, ICE has sometimes agreed to pay for beds whether or not they are occupied. ICE has sometimes accepted contractor personnel without conducting independent background investigations or reviewing credentials.

**Recommendation 2-23: To realize better outcomes at less cost, ICE should become more proactive and less reactive. ICE should engage in ongoing strategic planning, eliciting feedback from within the agency and input by its stakeholders, publishing a five-year strategic plan and updating it annually. The focus of this process should be on expanding the use of release and alternatives to detention, housing those families who are detained in group home settings near urban areas, and ensuring that contractors and their personnel are appropriately suited to the families in its custody.**

#### 2. Roles and Responsibilities of Public and Private Sector Contractors

The FRCs' problems are longstanding and much-noted. There is a tendency to blame privatization as the source of longstanding FRC performance issues. This is not necessarily the case. Both public and private sector providers have performed poorly; and both the profit and not-for-profit sectors should do better. Nonetheless, ICE has delegated undue authority to its contractors, leading to unjustifiable variation and a lack of accountability across the FRCs, and an imbalance of power that sometimes allows contractors to dictate or unduly influence conditions of care, population management, and other practices. For example, the contractors that run the FRCs have made major modifications to the rules governing detainee conduct. There are 28 common rules in effect at all three FRCs, but Berks has added 64 additional rules; violation of any one of 34 of these rules can result in punishment of detainees. Similarly, the FRCs vary in their decision whether detainees may wear their own clothes and if not, whether they will be provided new or donated clothing, shoes, and undergarments, and how many of each article of clothes may kept in their possession.

**Recommendation 2-24: ICE should not delegate substantive decision-making to its contractors, since it is ICE that is ultimately responsible for the safety and well-being of those in its custody. Instead, ICE should raise FRC standards and then hold FRCs**

**accountable to them. The strategic planning process is a credible process by which to begin to accomplish this work but meaningful monitoring, oversight and accountability measures are also critical.**

**Recommendation 2-25: Reforms adopted by ICE at the beginning of the Obama Administration – in particular, adding on-site oversight and deploying Office of Detention Oversight teams to its largest facilities -- have not yielded optimal outcomes; they should be revisited and revised. Other proposals were not implemented, including creation of in-house expertise relating to the care and custody of families, to oversee reform. This should be pursued immediately and in earnest.**

### 3. Transparency: Government's Core Commitment to Good Governance

As mentioned in other parts of this Report, a significant lack of information hindered the Committee's efforts to fulfill our tasking. It is unclear whether some of the information that was requested was not routinely collected and or retained by ICE or whether decisions were made to not provide it to the Committee. But either way, the type of administrative information sought from ICE is routinely provided to public bodies by state and local governments. Even basic information about the number and characteristics of the detained population was unavailable to the Committee. Examples of basic demographic information that the Committee requested but did not receive are (1) the number of mothers and fathers and children, by gender and age, in custody; (2) primary and secondary languages spoken; (3) the number of families released to the community; (4) the number of families separated from one another; and (5) families' actual total length of stay in ICE custody.

Similarly, the Committee was unable to obtain from ICE basic information about FRC operations and outcomes, including (1) each FRC's health care staffing and formulary; (2) the number of avoidable illnesses, injuries and/or deaths in detention year to date; (3) the number of children enrolled in school; (4) students' grade gains; and (5) the number of incidents of sexual misconduct reported. Likewise, the Committee could not obtain information about special populations and requests: (1) special diet requests, (2) accommodations for holy day observances, (3) scheduling off-site medical care, providing emergency off-site medical treatment, and arranging for corresponding child care; and (4) death and serious illness notifications.

A third category of basic information ICE declined to provide related to contract monitoring and oversight of contractors, including information about contract compliance, audits and evaluations, and possible corrective actions. Examples of information that the Committee requested but did not receive are (1) copies of the audit and evaluation instruments currently in use; (2) evidence of vendors' compliance with FRC minimum standards, (3) evidence of vendor's compliance with contractual or MOU commitments to ICE; and (4) corrective actions taken and consequences imposed by ICE for negative findings, failures to remediate negative findings, frequently reoccurring negative findings, including sanctions imposed including contracts and MOUs modified or cancelled. Also difficult to obtain was a clear, consistent description or mapping of the process of submitting, investigating or responding to a grievance or allegation of a rule violation or child or sexual abuse including how detainee and staff interviews are conducted. And finally, the Committee received no requested information about the ICE's expenditures. Examples of information that the Committee requested but did not receive are (1) copies of current contracts and MOUs for beds, community supervision program services, health care, education services, and

contract monitoring; (2) cost per bed day per facility and vendor; and (3) per diem cost per community supervision slot.

**Recommendation 2-26: ICE should manifest its commitment to detention reform by making the most of every opportunity to improve transparency and accountability. ICE should publish on the internet FRC policies and performance measures, and quarterly accountability reporting results. ICE should consider improving transparency and accountability by publishing its contracts and MOUs (suitably redacted if need be) and corresponding audits and evaluations.**

## 3. ACCESS TO COUNSEL

Parents and children detained in FRCs face the highest of stakes: the loss of liberty; the right to freely exercise the rights and responsibilities of parenting and being a member of a family; separation from parents, children, siblings and spouses; and the risk of removal (deportation) to a country where they may face violence or death. These stakes necessitate a fair and just decision-making process: not just in regard to those decisions made by officials with the authority to order removal, but any decision that may impact liberty, family integrity, and life.

The specific families the government has targeted for family detention since 2014 – their communities of origin, the circumstances from which they are fleeing, and the composition of their families – heightens the government's need and obligation to take special care to ensure due process. The government has targeted families who do not speak English and who often speak a language other than Spanish for which interpreters are limited (for example, languages indigenous to Central America). Family members – both adults and children – are unfamiliar with our legal system and may hold deep fear or suspicion of authority figures as a result of experiences in their countries of origin, or countries of transit. Many of the families may have experienced traumatic events – including violence and threats of violence – from which they have not had an opportunity to recover. Children arriving with parents range in age from infants to teenagers, and have varying abilities to communicate and express their wishes. Thus the government must work even harder to ensure these families receive due process as they navigate an entirely new system in which their liberty and family integrity are curtailed.

For these reasons, this Committee believes that full and unhindered access to an attorney is a necessary, but insufficient, prerequisite to fair and just decision-making for every family held in immigration detention. There is overwhelming evidence that individuals seeking the protection of asylum and other forms of violence – protection from persecution as provided for in the Immigration and Nationality Act (INA) – are significantly more successful when the individuals are represented by counsel. Not surprisingly, attorneys representing mothers at DHS's Family Residential Centers (FRCs) report high success rates when they represent women during their initial interviews (whether they are credible fear or reasonable fear interviews) but also when they represent women as they seek to overturn adverse, initial findings made when the women lacked an attorney and appeared *pro se*. Yet access to counsel is much more difficult for people who are detained.[98]

We therefore recommend, without reservation, that the federal government should provide an attorney to every individual held in family detention. While this responsibility may be shared by the Department of Justice (DOJ), rather than the Department of Homeland Security (DHS) which tasked us with making recommendations regarding detainees' access to counsel, no agency can ignore the consequences of the failure to ensure due process; if necessary, government agencies should coordinate to meet this obligation. At the very least, the lack of counsel should never be a basis for expediting a proceeding involving a claim for protection from harm. The Committee further recommends that the most effective way in which to facilitate access to counsel for families facing deportation is to release families to communities with clear information about their right to

---

[98] *See* Ingrid V. Eagly & Steven Shafer, *A National Study of Access to Counsel in Immigration Court*, 164 U. PENN. L. REV. 1 (2015) (finding that only 14% of detained immigrants have representation, as compared to 37% of all immigrants in proceedings).

counsel and how to find counsel, and their obligation to appear in court and information about the court in the jurisdiction where they will reside.

The recommendations that follow attempt to address the current situation of families in detention and the current system of decision-making about custody, immigration relief, and ultimately, deportation for families apprehended and detained by DHS. These recommendations are not intended as a justification of that system, nor do we believe they will effectuate an amelioration of the problems inherent in this system. But we do believe they fulfill the specific tasking given to us by the Secretary of Homeland Security.

### A. Overarching Recommendations

There is no dispute regarding the critical role of counsel in advocating for and protecting the rights of detained families. Detention standards promulgated by ICE affirm the right of detainees to meet and communicate confidentially with counsel. Both the Karnes and Dilley facilities in Texas have rooms where detainees can meet privately with counsel, though these spaces appeared to Committee members, and have been reported by nongovernment entities, as entirely insufficient for the number of detained individuals and the scope of legal issues to be addressed by families in detention. Moreover, those rooms appeared to lack the tools critical for representing detained families in expedited proceedings—from small, portable printers and scanners to access to phones and internet for attorney teams building factual records and legal arguments for families in expedited proceedings. Similarly, both the Karnes and Dilley facilities include spaces designated as law libraries. However, both were empty during Committee site visits and, as described below, were ill-equipped to be of much use for the families detained at each facility.

During Committee site visits to the FRCs, committee members were struck, above all, by two observations. First was the glaring absence of an understanding – in written policies, in practice, and among facility leadership and staff selected to give guided tours – of the essential role of attorneys in ensuring a fair and just process for detainees. Second was the inconsistent, widely varying, and constantly shifting policies regarding detainee access to counsel, which individually might be merely a headache, but collectively paralyze the ability of legal organizations to provide effective representation to detainees. This is critical not just for detainees who seek a fair opportunity for their claims to be heard, but also relieves pressure on and benefits the DHS and the Department of Justice because counsel who understand both the procedure and substance of the law governing detainees' claims make the process more fair and efficient.

Time and again, when we asked about access to counsel and whether detainees had the right to attorneys during particular processes or decisions, we were told "If the women think they need an attorney, all they have to do is ask for one." This is unreasonable to the point of being unjust. Detainees who do not get to make decisions as simple as where their child sleeps[99] are nevertheless expected to intuit that a decision such as whether to accept an ankle monitor as a condition of release could benefit from the advice of counsel and then ask their jailer to wait while they make a call or schedule an appointment to seek legal counsel. Rather than putting the burden on women – many of whom have no real understanding of their rights – to affirmatively ask for an

---

[99] For example, at the Berks facility, mothers are prohibited from sharing a room with any of their children age 12 or older. *See* Berks Resident Handbook 9-10.

attorney, facility personnel should consistently communicate that families have this right and should encourage them to exercise it whenever decisions affecting their rights are being made.

Moreover, we never once heard children referred to as decision-makers within their cases even though they are subject to the immigration detention and adjudication process; and not surprisingly, none of the materials designed to inform detainees of their rights – from posters in laundry rooms to materials in law libraries – were designed for children or adolescents, further diminishing the likelihood that they would know how to ask for help from an attorney. By contrast, unaccompanied children placed in the custody of the Office of Refugee Resettlement (ORR) receive "Know Your Rights" presentations tailored to the children's ages and stages of development, so that even fairly young children can understand that there are adults who are willing to meet to talk about their needs and wishes in a private matter. The children detained at ICE family residential centers have no less of a need than children in ORR custody to understand the circumstances of their detention, their right to seek protection in the United States and to request release from detention, and their right to speak with an attorney in confidence. Just like their parents, children in family detention face removal (deportation) to circumstances that may threaten their safety and well-being. And they may be eligible to apply for asylum, T- and U- non-immigrant status, special immigrant juvenile status or other forms of protection, in addition to any claims for relief made by their parents. They have no less need for opportunities to speak with an attorney to determine whether they have claims for relief from removal that are separate or different from their parents.

One deeply troubling result of this misconception of the necessary role of counsel is that there is simply no effective mechanism in place to direct every detainee to an attorney. At one facility, detainees receive a "Know Your Rights" presentation in which newly-arrived mothers and children are presented with information about immigration procedures and at least some of the complex forms of relief from removal for which they may be eligible (subjects many law students struggle to master in an entire semester).[100] Yet this occurs in a meeting in which the presenters cannot provide legal advice and where presentations must be approved in advance by ICE.[101] Detainees are then asked if they wish to speak with an attorney, without necessarily understanding what an attorney is, the confidential nature of attorney-client conversations, and the difference between government officials responsible for detaining them and deporting them, and independent

---

[100] To the best of the Committee's understanding, their presentations address the subject of asylum; but it is not clear whether they also address other immigration benefits such as T and U non-immigrant status, VAWA relief, or special immigrant juvenile status for children abused, neglected, or abandoned by a parent.

[101] U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, FAMILY RESIDENTIAL STANDARDS 6.3, LEGAL RIGHTS GROUP PRESENTATIONS, https://www.ice.gov/doclib/dro/family-residential/pdf/rs-legal-rights-presentations.pdf, requires attorneys or legal organizations who wish to make group presentations to provide a syllabus or outline of the presentation to ICE, which may accept or reject the presentation and which "is under no obligation to seek a replacement provider" if the presentation is not approved. By contrast, children detained as unaccompanied minors in facilities run by the Office of Refugee Resettlement also receive a "Know Your Rights" presentation. In recent years, led by organizations such as South Texas Pro Bono Asylum Representation Project (ProBAR) in Harlingen, Texas, those presentations have evolved into "charlas" in which skilled members of attorney teams help children understand the most important information at that moment in time, the beginning of their period in custody – the right to an attorney, the confidentiality that attaches to attorney-client conversations, the difference between government and non-government actors – in language and with visuals developed for children who have experienced trauma and separation and which are built on well-established pedagogical principles.

attorneys who may be able to assist them in securing release from detention and possibly relief from removal. The names of those parents who affirmatively request to meet with an attorney at a later time are eventually forwarded to the legal services organizations that have mobilized to provide counsel to these families – but that information-sharing may not take place until *after* a parent has had her first and most critical interview by immigration authorities, the "credible fear" or "reasonable fear" interview, which determines whether an individual may pursue a claim for relief or will be removed.[102] At Berks, there are a handful of private attorneys and a few NGOs who have stepped forward to try and identify and meet with detained families and either represent or find representation for them; however, they are under-resourced and are unable to meet the high demand. Furthermore, evidence suggests that periods of detention at Berks are far longer than the average on other facilities[103] (our persistent requests for data on the average length of stay for families at Berks and how those statistics are calculated were repeatedly denied) which may result in a larger number of issues for attorney teams to address with clients.

The remote location of current FRCs further hampers access to counsel and due process. All of the FRCs in use at the writing of these recommendations are over an hour's drive one-way from major, metropolitan areas. This significantly hampers access to attorney teams, interpreters, physical and mental health providers and other experts who could help to ensure fair and just process. In order to visit the two Texas-based facilities, Committee members traveled nearly two hours (one way) from San Antonio by van to the Dilley detention facility before returning to San Antonio and then embarking on another trip (this time approximately 90 minutes each way) to the Karnes detention facility. Attorneys in San Antonio, the nearest metropolitan area, must make similar journeys in order to meet with clients, as must *pro bono* attorneys who periodically fly in from other parts of the country to provide representation to detained families.

Although United States Citizenship and Immigration Services (USCIS) officers have been detailed to the two Texas facilities to provide on-site credible fear and reasonable fear interviews, there are no on-site immigration courts, and detainees who appear before immigration judges during their stay do so via videoconference – a procedure whose limitations and impact on due process have

---

[102] Previous reports indicate that representation by counsel during expedited immigration proceedings has a significant impact on an individual's likelihood of success in the preliminary interview (which determines whether the individual may proceed with her claim for protection). *See* American Immigration Council, Immigration Policy Center, *Removal without Recourse: The Growth of Summary Deportations from the United States* (May 2014), https://www.americanimmigrationcouncil.org/research/removal-without-recourse-growth-summary-deportations-united-states. Attorneys working at Karnes and Dilley report similar success in reversing negative determinations made while detainees appeared *pro se* (without counsel). that when they are able to work with detainees whose initial claims were denied in a credible fear or reasonable fear interview in which the detainees appeared *pro se* (without counsel). In other words, when women and children have the benefit of an attorney who understands which parts of their stories are relevant to the decisions the government is making, they are more successful than when they need to figure this all out on their own. Facilitating representation prior to the credible fear interview would likely alleviate the need for a significant number of appeals and therefore conserve a significant amount of government resources (including the staff who must review and adjudicate the appeal, as well as the additional expense of detaining families while they successfully appeal an erroneous, initial decision.)

[103] *See, e.g.,* Human Rights First, *Long-Term Detention of Mothers and Children in Pennsylvania* (2016), http://www.humanrightsfirst.org/sites/default/files/HRF-Long-Term-Detention-Brief.pdf (indicating periods of detention "upwards of six months" for most families at the time of a July 2016 visit).

been detailed in prior reports.[104] Notably, at the time of our visit to Dilley and Karnes, detainees scheduled for hearings before immigration judges (which take place after on-site interviews to screen for a "credible fear" of return or a "reasonable fear" of return) appeared by video-conference before immigration judges located in other cities. For hearings, the detainee appears in a "courtroom" at the facility – but the Immigration Judge and the attorney representing the government and pursuing the case against the detainee, were located together in another immigration courtroom in another city. The Berks facility is located over an hour from Philadelphia and from its immigration court, legal services providers, and community of *pro bono* attorneys.

**Recommendation 3-1: DHS should develop, implement and train staff to operate on the principle that it is best – for detainees and for the efficiency of the system as a whole – for detainees to consult with an attorney before making any significant decisions about their case, the conditions of custody, or the conditions of release from custody. Staff should consistently inform detainees of their right to speak with counsel and provide access to counsel whenever detainees invoke that right. Rather than waiting for detainees to affirmatively request an opportunity to speak with an attorney, detainees should be offered affirmatively the opportunity to consult with an attorney (in person, over the phone or by video conferencing) before making any decisions about their case, conditions of custody, or conditions of release. ICE staff and USCIS asylum officers should be directed not simply to ask detainees whether they want an attorney or whether they think they need one, when detainees might not know how an attorney could help, and may not be aware that an attorney will maintain confidentiality, or that the attorney may provide free services. DHS and USCIS should also inform detainees of their right to representation, and what that representation entails, and that counsel (independent from the government) are on-site and available to meet with them prior to any government interviews.**

**Recommendation 3-2: Before any detainee appears for a credible fear interview, reasonable fear interview or bond hearing, DHS should confirm that the detainee has received a "Know Your Rights" or "Legal Orientation Presentation" and has had an opportunity to meet with an attorney. If the detainee has not secured counsel she should be provided an opportunity to do so unless she affirmatively states a preference to proceed without counsel. In all cases in which the desire for counsel has been expressed, DHS should take all possible steps to ensure that the individual has an attorney without undo delay, before proceeding with /any decisions that could result in removal.**

**Recommendation 3-3: Legal services organizations and other attorney groups (authorized in advance by DHS or DOJ) who provide pro bono counseling and representation to detainees should be given a daily census of all detainees with information that protects individuals' privacy but allows attorneys to prioritize cases for pro bono consultation. The census should include the age and gender of the adult family member, date of arrival, country of origin, the ages and number of children detained with the parent, primary (or preferred) language and, importantly, the date(s) of credible or reasonable fear interviews or any other scheduled**

---

[104] *See, e.g.*, Legal Assistance Foundation of Chicago and Chicago Appleseed Fund for Justice, V*ideoconferencing in Removal Proceedings: A Case Study of the Chicago Immigration Court* (Aug. 2, 2005), http://chicagoappleseed.org/wp-content/uploads/2012/08/videoconfreport_080205.pdf.

**hearing for any member of the family—and a numerical indicator that will allow DHS to notify the detainee if the attorney or legal services organization wishes to schedule a meeting. DHS can establish procedures to limit the number of attorney groups and legal services organizations who receive this information, protect confidential information, and require the legal services organizations and attorney groups to prevent further disclosure.**

**Recommendation 3-4: Detention facilities should not be located more than 30 minutes from major metropolitan areas with immigration courts to increase access to counsel (NGO counsel, pro bono counsel, paid counsel) and should be designed to ensure in-person appearances before immigration judges, USCIS officials and other government officials, which will result in more just and efficient adjudication of cases.[105]**

**Recommendation 3-5: DHS should ensure that children who wish to speak with an attorney, or whose parents wish for them to speak with an attorney, know about their right to access counsel and have the ability to meet with counsel. This would require DHS to contract with legal services providers with experience representing and working with children to create and provide developmentally appropriate "Know Your Rights" presentations; and to provide time and child-appropriate space for attorneys to meet privately with children.**

**Recommendation 3-6: In order to ensure that families—parents and children—have a fair opportunity to present claims for relief as they transition into communities, enroll children in school, seek help for medical and mental health concerns and obtain other services, ICE's Office of Chief Counsel (responsible for representing the government in removal proceedings) should not:**

a) **oppose requests for continuances submitted by counsel for families previously detained in FRCs, given the challenges of preparing their legal case;**
b) **seek *in absentia* removal orders the first time a family previously detained in an FRC fails to appear at immigration court, but instead asks that the court reschedule/reset and send notice to the last known address; and**
c) **oppose motions to reopen filed by post-release families, whether represented or *pro se*, when they do appear in court after a prior *in absentia* removal order.**

### B. Meeting and Communicating with Counsel

On site visits to Karnes and Dilley, Committee members were informed by ICE and facility staff that detainees could meet with counsel whenever they wished to. Yet on those same visits, mothers identified a number of hurdles that delayed or prevented their ability to meet with counsel, including not knowing or not understanding that non-government attorneys were available to meet with them at no cost; not being able to access child care during meetings; and not knowing whether or when they could meet with counsel. Some of those concerns were echoed during the public comment period of the Committee's March meeting in San Antonio. Reports published by credible

[105] Committee members have been told both by immigration judges and asylum officers that they prefer to adjudicate cases in which individual is represented.

non-governmental organizations detail similar, and sometimes more wide-ranging concerns with the ability of detained families to meet with attorney organizations.[106]

The logistical obstacles to meeting with counsel are unnecessary and easily overcome. These obstacles, imposed by ICE policy or practice, include but are not limited to: requiring attorneys to identify, in advance of meetings, prospective clients with whom they wish to meet (without, as noted in the prior section, knowing which new detainees have yet to meet with counsel); requiring attorneys to identify, in advance of meetings, current clients with whom they wish to meet without knowing whether clients' circumstances have changed such that they might prioritize visits differently; insufficient space for attorneys to meet privately with clients; the inability of attorneys to complete the essential tasks of lawyering due to constantly-shifting policies regarding technology, entry/exit, and even things as simple as access to printers, phones, food and bathrooms; and insufficient efforts to provide adequate and appropriate child care so that mothers can share details about past, traumatic experiences without worrying about where their children are or what they might witness or overhear.

The spaces allotted for attorney-client meetings are far from optimal and may even be prejudicial to ensuring effective communication and collaboration between attorneys and detainees. At Dilley, parents who wish to meet privately with an attorney cannot see the area in which their children are cared for (on our site visit Committee members observed rows of children sitting in a small room and staring silently at a TV while a facility worker sat along a back wall). At Karnes, children whose parents are meeting with counsel but who wish to be in the same area appear to wait in a large, open and sterile area.

At Berks, detainees are able to meet with a law student or paralegal who forwards requests for legal assistance to the Pennsylvania Immigration Resource Center (PIRC) and the local immigration bar. PIRC attorneys and other counsel meet with clients in a small office on the first floor of the facility. The office has a window to a waiting area where children can be observed by the client, but the area is not equipped with anything to divert a child's attention from his or her mother's meeting with the attorney (*e.g.*, no toys, television, or reading materials). There is a telephone in the office, but there do not appear to be any legal materials available in this area, nor a printer for producing any legal documents.

Tasked by the Secretary of Homeland Security to advise the department on "existing resources and tools" that affect access to counsel, the recommendations that follow address these concerns. They should apply equally to attorneys considering whether to represent detainees in any type of matter; to attorneys retained by detainees (for a fee or on a pro bono basis) to represent them in immigration or other proceedings in the U.S. or abroad (including but not limited to custody cases, other family law cases involving their children, tort actions, or civil rights claims); and to any support staff authorized by such an attorney to carry out the attorney's work – including, but not limited to, BIA-accredited representatives, paralegals, law students, interpreters, subject matter,

---

[106] *See, e.g.*, American Bar Association Commission on Immigration, *Family Immigration Detention: Why the Past Cannot be Prologue* (July 31, 2015), https://www.americanbar.org/content/dam/aba/publications/commission_on_immigration/FINAL%20ABA%20Family%20Detention%20Report%208-19-15.authcheckdam.pdf. *See also* U.S. Commission on Civil Rights, *With Liberty and Justice for All: The State of Civil Rights at Immigration Detention Facilities* (Sept. 2015), http://www.usccr.gov/pubs/Statutory_Enforcement_Report2015.pdf.

medical or mental health experts, and administrative support staff of the attorney or law firm. We refer to these individuals in the collective, as "attorney teams."

Finally, but no less importantly, when we refer to detainees and their right to meet with counsel, we are referring to all adult family members detained in the facility; any child whose parent or legal guardian wishes for the child to meet independently with an attorney; and any child of any age who expresses a wish to meet with an attorney.

### 1. Meeting with Counsel

**Recommendation 3-7: Detention facilities should allow attorney teams (attorneys and supporting professionals including law students, paralegals, interpreters and experts) maximum access and flexibility in meeting and speaking with detained persons and advising or representing them in proceedings that take place while the person is detained.**

**Recommendation 3-8: Visitation policies at each facility – including but not limited to visiting hours, technology permitted in counsel visitation rooms, and child care provided during attorney-client meetings – should remain consistent. Frequent changes undermine counseling and representation and may deny notice to attorneys and their support staff and to the detainees and their families for timely attorney-client meetings to take place. Signs and posters to this effect, in different languages, should be posted in housing units, cafeterias, recreational areas, and law libraries.**

**Recommendation 3-9: FRC handbooks, manuals and policies should be amended to clearly state that detainees – including the children of parents detained at the facility – have the right to meet with an attorney at any time the attorney is available within facility visiting hours, and to contact their attorney by telephone at any time; detainees should not be precluded from meeting with or calling an attorney because they failed to make an advance request.[107]**

**Recommendation 3-10: Legal services organizations should not be required to identify particular detainees with whom they desire to meet before arriving at the facility, in order to provide free legal consultations and/or legal representation. Specifically, they should be able to establish "drop in" hours or meet with prospective or retained clients on an as-needed basis and detainees should be able to request a same-day meeting with a member of an attorney team and should be informed and encouraged to seek legal advice as available.**

**Recommendation 3-11: ICE should use available technology (such as pagers) to allow detainees who wish to meet with an attorney to sign up and then continue with their daily activities until an attorney is available.**

This would not obligate attorney organizations to meet with everyone who makes such a request; attorney teams will exercise their discretion to prioritize appointments. But there is no need for detainees to have to wait for hours in a room and miss other activities (including meals); with a

---

[107] The Berks Resident Handbook says only "You have the right to pursue legal assistance at no cost to the U.S. government." The Resident "Rights and Responsibilities" section doesn't say anything else about counsel, and the section on visitation don't mention attorneys. Berks Resident Handbook 6–7.

pager or other similar technology they could be notified immediately when an attorney is available to meet with them.

**Recommendation 3-12: Detainees should be able to prioritize meetings with counsel over nearly all other "activities" while in custody. Detainees should never be discouraged from meeting with counsel or members of the legal team (including experts) because they might miss a planned activity, meal or (for children) even school, or because the meetings increase demands on child care providers within the facility.**

### 2. Care of Children During Attorney-Client Meetings

**Recommendation 3-13: ICE should design spaces for counsel to meet with parents from which parents can see their children in an open, shared play space (rather than closed-off or separate rooms where children have only enough space to watch TV) so that they can focus on communicating with their attorneys knowing exactly where their children are.**

**Recommendation 3-14: Child care hours should be extended to match hours when parents can meet with attorney teams, for parents who wish to use child care during this time. ICE should provide sufficient day care space and staffing to allow all parents who wish to meet with counsel outside the presence of their children to do so.**

### 3. Location of Attorney-Client Meetings

**Recommendation 3-15: ICE should immediately re-design or re-organize space within each FRC to increase and ensure sufficient private, sound-proof spaces for detainees to meet with attorney teams, both in small groups and individually. Detainees need to meet with counsel prior to and in preparation for each proceeding or interview at which the detainee is scheduled to appear related to the detainee's immigration case or any other proceeding in which the detainee is involved. Reorganization of space should be undertaken in consultation with attorney teams and considering data including the number of detainees in the facility, the average length of stay, the number of interviews or proceedings per detainee (each of which requires different consultation with counsel). Committee members requested much of this data but were denied the information.**

### 4. Ensuring Attorney Teams Can Function in their Role as Counsel

**Recommendation 3-16: Facilities should establish clear, consistent policies permitting attorney teams to bring food and drink into the facility and/or (if they choose) to leave the facility for meals and return later in the day. Attorneys and detainees should be able to eat and drink during meetings, and to use the bathrooms as needed during meetings, without having to terminate meetings.**

**Recommendation 3-17: Attorney teams should be permitted to bring and easily access cell phones, laptops, printers, scanners and wireless internet connections in designated spaces while meeting with detainees. This technology should be available in the same space in which attorneys are meeting with detainees.**

**Recommendation 3-18: ICE should develop a simple form by which detainees in any facility can request copies of any document from their file including documents the individuals had**

**with them at the time of apprehension,[108] unless the record requires a Health Insurance Portability and Accountability Act (HIPAA)-compliant release, and which permits release of the document to both the detainee and the detainee's attorney team. This form should be consistent across facilities and be translated consistent with the recommendations in Part 5.**

**Recommendation 3-19: ICE should make available a HIPAA-compliant release form that detainees could sign while in the facility and should implement procedures that ensure that information covered by HIPAA is released by the FRC to the person designated by the detainee (including members of their legal team) within one business day after receipt of a the HIPAA-complaint release, unless the individual indicates a more immediate need for the information (such as a hearing). Providing counsel access to medical, dental, and mental health records is part of a trauma-informed approach. The information can both strengthen the legal cases and also provide background essential to counsel's ability to offer trauma-informed representation to the trauma victim.[109]**

### C. Counsel's Role in Decisions Critical to Detainees' Safety and Right to Due Process

Notwithstanding policies that anticipate meetings between detainees and counsel and that recognize the role of counsel in protecting detainees' rights,[110] attorneys serving detainees report systematic and fundamental breaches in access to counsel with respect to the movement of detainees from one facility to another, and with respect to their removal (deportation) during the pendency of proceedings.[111] Those same standards acknowledge the right of detainees to be represented by, or even accompanied by counsel as early as their first interview; yet it appears that many if not most of those interviews take place before detainees are advised of their rights or have the opportunity to meet with counsel. In 2015, attorneys representing detainees in Karnes and Dilley filed a complaint with the Department's Office for Civil Rights and Liberties alleging that detainees were denied access to counsel during meetings that determined the conditions of release.[112] In some cases, free legal services providers received notice of hearings within hours of the actual hearing, precluding both in-person meetings with clients and anything that might be

---

[108] U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, FAMILY RESIDENTIAL STANDARD 2.3, FUNDS AND PERSONAL PROPERTY, https://www.ice.gov/doclib/dro/family-residential/pdf/rs_funds_and_personal_property.pdf (requiring that funds, valuables, baggage, and personal inventory be inventoried, receipted, stored, and safeguarded).

[109] *See* KRISZTINA SZABO ET AL., ADVOCATE'S AND ATTORNEY'S TOOL FOR DEVELOPING A SURVIVORS STORY: TRAUMA INFORMED APPROACH (2013), http://niwaplibrary.wcl.american.edu/pubs/tool-trauma-informed-approach/http://library.niwap.org/wp-content/uploads/2015/pdf/TRAUM-Qref-AdvocatesToolDevelopingSurvivorStory.pdf; MARY ANN DUTTON ET AL., TRAUMA INFORMED STRUCTURED INTERVIEW QUESTIONNAIRE (2013), http://library.niwap.org/wp-content/uploads/2015/SIQI.edited.di-tb-6.15.15.pdf.

[110] U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, FAMILY RESIDENTIAL STANDARD 6.2, LAW LIBRARIES AND LEGAL MATERIAL 1, https://www.ice.gov/doclib/dro/family-residential/pdf/rs_law_libraries_and_legal_material.pdf.

[111] *See, e.g.*, AILA CLINIC, AIC, Human Rights First and RAICES, Letter to Director León Rodriguez and Director Sarah Saldaña 10-14 (Dec. 24, 2015) [hereinafter AILA et al. letter] (documenting specific cases in which ICE deported families with pending requests for reconsideration of negative credible fear determinations and transferred families with counsel from a facility in Texas to a facility in Berks without representation).

[112] Complaint Regarding Coercion and Violations of Right to Counsel at the South Texas Family Residential Center in Dilley, Texas (Sept. 30, 2015), http://www.aila.org/File/DownloadEmbeddedFile/65906.

considered adequate preparation time.[113] This undermines due process and is inconsistent with the stated intent of ICE policy to provide access to counsel.

**Recommendation 3-20: DHS policy and facility design should allow attorneys to be present with detainees during interviews with asylum officers or any other immigration officials and any disciplinary hearing or action regarding the detainee or the detainee's child.**

**Recommendation 3-21: ICE should never move a detainee from one ICE detention facility to another without providing notice to the detainee and her counsel, and without providing an opportunity for the detainee's counsel to respond to proposed relocation.**

**Recommendation 3-22: Detainees presented with a release alternative or conditions of release should be informed that they can consult with an attorney while making decisions, and given phone access to attorneys during this process. A detainee's decision to consult with an attorney should not delay her release more than the time such consultation takes.**

**Recommendation 3-23: ICE should never deport a detainee while the detainee's case is in progress – in particular, but not limited to, if a detainee has filed a request for reconsideration of a claim, or has any pending petition for review before a federal court, or any pending VAWA, T or U visa case. If a detainee has a pending civil rights complaint, the office investigating that complaint should have a full opportunity to interview the detainee and, if it so chooses, to delay deportation.**

### D. Counsel's Role in Decisions to Separate Children from Parents

Detainees who met Committee members expressed tremendous confusion and uncertainty about their future; fear of return to their countries; anxiety over the health and well-being of their children; and in some cases, fear of separation from their children. These concerns are not unfounded. In the professional experience of multiple Committee members, in recent years children held in detention at Berks and at least one of the Texas FRCs have been separated from mothers, designated as unaccompanied children, and transferred to ORR facilities in other states. Without transparent processes and an opportunity for counsel to advocate for families prior to separation in DHS custody, there is a risk that separation will violate the parent's constitutional right to the care and custody of her child or result in separations that are contrary to the child's best interests. The Department has previously declared its interest in protecting the constitutional rights of children and parents facing separation as a result of immigration proceedings with its Parental Interests Directive, issued by the Department in 2013, to ensure the participation of detained parents' in child welfare proceedings involving their children.[114]

**Recommendation 3-24: ICE should never separate a parent from a child without providing notice to the parent, the child, and the parent's and the child's counsel (absent extreme emergencies), and an opportunity for the parent, child, the parent's counsel and the child's**

---

[113] *See*, *e.g.*, AILA et al. letter, supra note 111, at 2 (noting that at Dilley, *pro bono* attorneys receive court dockets in the late afternoon for hearings the next morning, while at Karnes *pro bono* attorneys do not receive the immigration court docket at all).

[114] U.S. Immigration and Customs Enforcement, Facilitating Parental Interests in the Course of Civil Immigration 1, 2 (Directive 11064.1Aug. 23, 2013), https://www.ice.gov/doclib/detention-reform/pdf/parental_interest_directive_signed.pdf.

**counsel to appear before and make arguments to the ICE official making the decision. If the basis for the separation is a concern about the detained parent's failure to care for, or maltreatment of, the child, the matter should be referred to local child welfare authorities for investigation before the parent and child are separated (absent an imminent threat to the child's safety or well-being, which should result in the child's separation from the parent but remaining within the facility). Referral to the local child welfare authorities and a review of the decision to separate and reunification if appropriate pending further investigation should occur within the time required under state law for reports and investigations of child abuse or neglect. This will help ensure that the right afforded all parents to the care and custody of their child, regardless of immigration status, are protected.[115]**

**Recommendation 3-25: Threats of or actual separation of a parent and child should never be used as punishment or retaliation for exercising rights, nor as a means of discouraging the exercise of rights.**

**Recommendation 3-26: If ICE intends to separate a parent and child because of concerns regarding the legal relationship between the parent and child, and renders the child an unaccompanied minor pursuant to 6 U.S.C. § 1279(g), ICE should provide meaningful notice (at least 48 hours) to the parent, child and parent's and child's counsel and an opportunity for the parent, child, the parent's counsel and the child's counsel to appear before and make arguments to the ICE official making the decision, prior to transferring the child to the Office of Refugee Resettlement (ORR) custody.[116]**

**Recommendation 3-27: In exceptional cases in which DHS separates a parent and child, renders the child unaccompanied, and transfers the child to the custody of the Office of Refugee Resettlement, the agency should submit a concurrent referral for the appointment of an independent Child Advocate pursuant to the Trafficking Victims Protection Reauthorization Act (TVPRA).**

### E. Meaningful Access to a Law Library

ICE Residential Standards and implementing policies at each facility establish detainees' right to access legal materials to "facilitate the preparation of documents."[117] Yet the Texas facilities visited by Committee members failed to reflect either the needs or (suspected) demographics of the population detained in each facility – libraries presumed a high degree of literacy, of computer literacy, experience with computerized databases, and fluency in written English. Moreover, at both Karnes and Dilley, law libraries were located in areas inaccessible to attorneys and legal teams, precluding any collaboration between attorney teams and detainees to make better use of these libraries and their equipment.

---

[115] Under the U.S. Constitution immigrant parents have the same rights to care, custody, and control over their children without regard to their documented or undocumented status or their detention or deportation. *See*, *e.g.*, In re Interest of Angelica L., 277 Neb. 984, 1007, 1009-1010 (2009) (there is an "[o]verriding presumption that the relationship between parent and child is constitutionally protected and that the best interests of a child are served by reuniting the child with his or her parent. This presumption is overcome only when the parent has been proven unfit").
[116] Pursuant to federal law, ICE has 72 hours to transfer unaccompanied minors to the Office of Refugee Resettlement (ORR). 8 U.S.C. § 1232(b)(3).
[117] FAMILY RESIDENTIAL STANDARD: LAW LIBRARIES AND LEGAL MATERIAL, *supra* note 110, at 1.

Two of the three facilities visited by Committee members – Karnes and Dilley – had areas designated as “law libraries.” At Karnes, the law library consisted of two rooms adjacent to the main library. They contained tables, and chairs, computers, and some printed information. We were advised that detainees are able to get onto computers (in the law library and main library) to access email accounts and news sites. To the best of Committee members’ recollection there were no hard copy books in the Karnes “law library” except for a binder with “Know Your Rights” information authored by the American Bar Association and reproduced in several languages. Committee members were told by facility staff that detainees could use an electronic law library (specifically LexisNexis); that service is available only in English. The law library at Dilley included printed materials in a central room, with a computer room to each side. The Dilley library also included copies of the American Bar Association’s “Know Your Rights” document – notably, there was no copy available in Spanish, although copies were available in other languages.

**Recommendation 3-28: Detainees should be informed of the law library and the legal resources available for assistance in their asylum applications during the intake process and throughout their time in detention. Posters or other easily-observed notices informing residence of the law library should be posted in common areas throughout the facility, including near monitors showing the Know Your Rights video. Such notices should include the following:**

- **a) that a law library is available;**
- **b) the hours of the law library;**
- **c) that no permission is needed to access the law library;**
- **d) that the law library has the legal materials listed below;**
- **e) the procedure for requesting materials not available in the law library;**
- **f) that the law library has the equipment (e.g., computers) listed below;**
- **g) that materials reviewed or prepared by detainees will not be read by facility staff; and**
- **h) that the detainee may be accompanied by counsel in the law library.**

**Recommendation 3-29: FRC law libraries should be open 7 days per week, from 8 am to 8 pm. Detainees’ use of the law library should not be restricted by time (i.e., length of usage), unless crowded conditions require restricting access. Detainees’ use of the law library should not be restricted or denied due to any violation of facility rules, by adult residents or children, nor by medical condition, unless required by a compelling medical concern. Detainees facing a legal deadline should have priority in accessing the law library. Supervision of detainees using the law library should not include reading any of their materials.**

**Recommendation 3-30: All FRC law libraries should be supplied with materials necessary for effective education, research and advocacy by detainees, including:**

- **a) pamphlets or similarly portable hard-copy publications providing basic legal information about the asylum process, and other related forms of relief, such as withholding and protection under the Convention against Torture under United States law in Spanish and other languages used by facility detainees;**
- **b) all of the materials listed in Attachment A to the *Karnes City Residential Policy and Procedure Manual, Part 6: Justice*; and**

**c) contact information for pro bono asylum/immigration services in the locality or region where the detainee indicates she will reside after release.**

**Lost or damaged legal materials should be replaced as soon as practicable.**

**Recommendation 3-31: All FRC law libraries should include the following equipment:**

**a) access to electronic legal research products (e.g., Westlaw or LexisNexis);**
**b) computers**
**c) printers;**
**d) copier(s);**
**e) scanner(s);**
**f) writing utensils (pens, pencils); and**
**g) paper.**

**This equipment should not be restricted to legal research and work product, but should be allowed to be used to prepare or copy grievances, letters regarding facility conditions, or any matter relating to immigration, asylum and other forms of relief, release or the care and custody of children. Upon request, detainees should be provided with a means of saving legal research and/or work product in a convenient electronic format (e.g., thumb drive or flash drive).**

**Recommendation 3-32: Detainees should be allowed to email documents, including scanned and original documents. Indigent detainees should be provided with free envelopes and stamps for mail relating to legal matters, including correspondence with counsel (or in search of counsel), and any court.**

**Recommendation 3-33: ICE should designate a staff member or members to regularly to inspect each FRC law library equipment and legal materials. Legal materials should be regularly updated; staff should check to determine whether updates are available no less than annually.**

**Recommendation 3-34: FRC law libraries should be available to pro bono counsel, to facilitate provision of legal services to detainees without requiring unnecessary repeat visits. The use of an FRC law library should be sufficient justification for her a detainee to request and receive monitored, short-term care for her children.**

**Recommendation 3-35: FRC libraries should prominently display and provide, in English and Spanish, copies of the USCIS-produced brochure on VAWA, T and U visa and SIJS immigration relief.[118] Detainees who are illiterate or whose primary language is one other than a language in which the brochures are translated should be able to receive information about these forms of crime victims related immigration relief though interpretation into their primary language.**

---

[118] U.S. Citizenship and Immigration Services, *Immigrant Options for Victims of Crimes, Information for Law Enforcement, Healthcare Providers, and Others* (Feb. 2010), https://www.uscis.gov/sites/default/files/USCIS/Humanitarian/Battered%20Spouse,%20Children%20&%20Parents/Immigration%20Options%20for%20Victims%20of%20Crimes.pdf.

**Recommendation 3-36: ICE and the FRCs should accept published or unpublished legal materials from outside persons or organizations for inclusion in each FRC law library and/or distribution to detainees. Any such materials should identify on the cover: (1) the identity of the author; (2) a statement that ICE did not prepare and is not responsible for the content of the publication; and (3) the date of submission to the facility. The facility should forward the material to ICE for review and approval. If approval is declined, the author or person/entity responsible for its submission should be informed of the reason(s) for its being declined.**

### F. Access to Information Specific to Crime and Trauma Victims

Many parents and children detained in FRCs may qualify for other forms of crime-victim based immigration relief.[119]

Specifically, VAWA relief, T non-immigrant status ("T visas"), U non-immigrant status ("U visas") and special immigrant juvenile status (SIJS) are immigration benefits for which detainees and/or their children may be eligible to apply. Despite the high rates of past violence and traumatic experiences among detainees at FRCs, it is not clear the extent to which detained families receive information about the primary forms of immigration relief available to crime victims in the U.S. To the extent any of this information is provided it might be included in Legal Orientation Program presentations and it may be explained as an option by attorneys or attorney teams who provide legal representation for detainees at the FRCs. Access to information about immigration benefits for crime victims will help detainees to determine whether to pursue these benefits after establishing their credible or reasonable fear. Existing literature produced or distributed by the

---

[119] The primary forms of crime-victim based immigration relief that FRC detainees may qualify for are:

- VAWA immigration relief (self-petitioning, VAWA cancellation of removal, VAWA suspension of deportation) for immigrant spouses and children who have suffered battering or extreme cruelty perpetrated by their U.S. citizen or lawful permanent resident spouse, parent or step-parent. It is not uncommon for immigrant spouses and children of U.S. citizen and lawful permanent resident abusers to end up outside of the U.S. often for reasons related to the abuse.
- U non-immigrant status ("U visas") for immigrant victims of certain crimes perpetrated in the United States. The vast majority of U visa cases filed in the United States are filed by victims of domestic violence, sexual assault and human trafficking. Any detained parent or child who suffered abuse, trafficking or sexual assault in the United States would qualify for a U visa upon certification from a law enforcement agency. This includes victimization occurring in and outside of DHS custody.
- T non-immigrant status ("T visas") for victims of human trafficking. Human traffickers have networks that operate inside the U.S. and abroad and prey on both adults and children. Detained mothers and children could include human trafficking victims eligible to file for T visas. Law enforcement officials may also request that the ICE Law Enforcement Parole Branch grant continued presence for victims of human trafficking who are potential witnesses in trafficking investigations or prosecutions. Continued presence provides temporary immigration status and work authorization for one year (with the possibility of one-year renewals). for T visas and/or continued presence.
- Special Immigrant Juvenile Status (SIJS) for immigrant children who have been abused, abandoned or neglected either in the U.S. or abroad by one of their parents. Children in family detention may have suffered abuse, sexual assault, neglect or abandonment perpetrated by their father. In these cases, the child would independently qualify for SIJS immigration relief in addition to qualifying to be included in their parent's petition for an immigration benefit.

federal government should help ensure that this information is readily available to detainees and their families, while in custody and upon their release.[120]

ICE must ensure that the FRCs, as well as the organizations running the legal orientation programs at each FRC, are providing information to detainees on VAWA, T and U visa, special immigrant juvenile visas, and other forms of immigration relief in addition to information about asylum, withholding, and CAT protection. The best way for detainees to learn about and understand their rights and options is through participating in information sessions and, most importantly, leaving FRCs with hard copies of brochures and/or pamphlets detailing their rights and immigration options in a language they understand well.

**Recommendation 3-37: FRCs should organize and offer informational group sessions that explicitly provide information about domestic violence, sexual assault, and human trafficking and should provide information about VAWA self-petitioning, VAWA cancellation of removal, U visa and T visa immigration relief, and SIJS immigration relief. Ensuring delivery of this service should be among the responsibilities of the Trauma Informed Care Coordinator working at each FRC.**

**Recommendation 3-38: FRCs should provide each detained family with a copy of the following USCIS brochures, which should be distributed at legal orientation programs, by Trauma Informed Care Coordinators, and again to each detainee upon release from detention:**

a) **"Immigration Options for Victims of Crimes" at intake and upon release. The brochure should be provided in the detainee's primary language.**
b) **Pamphlet for K-1, K-3, IR-1/CR-1, and F2A Immigrant Visa Applicants under the International Marriage Broker Regulation Act (IMBRA). This pamphlet is available in various languages on the State Department website.[121] The IMBRA pamphlet should be readily available at all FRCs and distributed to detainees.**

---

[120] ICE's Performance Based National Detention Standards 2011 require use of the ICE custody classification worksheet that screens for special vulnerabilities that include victims of sexual abuse, violent crime, human trafficking, persecution, or torture. U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, 2011 OPERATIONS MANUAL ICE PERFORMANCE-BASED NATIONAL DETENTION STANDARDS (2012), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011.pdf [hereinafter PBNDS 2011], at Appendix 2.2A, 78. Many of these factors could be a basis for immigration relief under the VAWA, U or T visa programs. Additionally, USCIS has developed a pamphlet entitled "Immigration Options for Victims of Crimes" that provides an overview of VAWA, T and U visa immigration relief for immigrant crime victims. U.S. CITIZENSHIP AND IMMIGRATION SERVICES, RESOURCES FOR VICTIMS OF HUMAN & OTHER CRIMES, https://www.uscis.gov/tools/humanitarian-benefits-based-resources/resources-victims-human-trafficking-other-crimes (for resources available in English, Spanish, Russian, Chinese). USCIS has also developed an informational fact sheet for child welfare workers that could be used to inform detainees and their children about SIJS. USCIS, Special Immigrant Juvenile Status: Information for Child Welfare Workers available at http://niwaplibrary.wcl.american.edu/pubs/uscis-sijs-info-for-childwelfareworkers/. Finally, the U.S. Department of State has developed a brochure entitled "Information on the Legal Rights Available to Immigrant Victims of Domestic Violence in the United States and Facts About Immigrating on a Marriage Based Visa" that provides information on domestic violence, hotlines, and human trafficking. U.S. DEP'T OF STATE – BUREAU OF CONSULAR AFFAIRS, RIGHTS AND PROTECTIONS FOR FOREIGN-CITIZEN FIANCÉ(E)S AND SPOUSES OF U.S. CITIZENS AND SPOUSES OF LAWFUL PERMANENT RESIDENTS, https://travel.state.gov/content/visas/en/general/IMBRA.html (available in: Arabic, Chinese, Spanish, English, Farsi/Dari, French, German, Hindi, Japanese, Korean, Polish, Portuguese, Romanian, Russian, Tagalog, Thai, Ukrainian, Uzbek, Vietnamese).
[121] *Id.*

c) **"Special Immigrant Juvenile Status: Information for Child Welfare Workers" should be translated into Spanish and should be provided at intake and upon release to all FRC detainees.**

## 4. EDUCATION SERVICES AND PROGRAMS

The ACFRC was appointed to develop recommendations to strengthen the education services and programs provided to families detained in Family Residential Centers (FRCs). It is our opinion that, to fulfill our mandate, education services and programs should span infant and toddler child care, pre-kindergarten for children age 4, the conventional K-12 grades for all children ages 5-18, as well as parent education to support parents under tremendous stress related to their immigration journey, detention experience, and transition to new lives in U.S. communities.

The practice of detaining migrating families has presented FRCs with an unfamiliar challenge of providing an education for children apprehended with their parents. Under federal law, all children in the U.S. are entitled to a free basic public elementary and secondary education regardless of race, color, national origin, citizenship, immigration status, or the immigration status of their parents or guardians.[122]

Because FRCs detain women and children who are new arrivals to the U.S., many of whom are likely to a remain and become members of our communities, and because FRCs house children ranging from newborns to age 18 (as specified by the Homeland Security Act of 2002 and Trafficking Victims Protection Reauthorization Act of 2008),[123] the span of education services and programs is necessarily broad. While detained for an uncertain period of time, parents need child care for their young children in order for them to attend to their immigration cases, to meet with attorneys, to receive health and mental health care, to cope in the detention environment, and to prepare their children to enter kindergarten ready to learn in U.S. schools. Likewise, school age children living in FRCs have the right and responsibility to attend school daily. The *Flores* settlement also specifies that education be provided to children in immigration custody.[124]

Access to education is a basic human right. It helps to stabilize immigrants, reduce poverty, develop knowledge useful in daily life, and normalize the otherwise very unsettling circumstances of living in FRCs and adjusting to a new country. Education is key to the promise of a better life for detained families when they are released into U.S. communities.

The FRCs are required to provide "comprehensive educational services and programs to children eligible for formal education as defined by applicable state laws and regulations."[125] The Family Residential Standards for education consist of very basic guidelines for the pre-kindergarten and the K-12 programs, but omit even basic guidelines about infant and toddler child care and parent education. Similarly, there is scant information about the education services and programs in each of the three FRC resident handbooks. The handbooks simply document that each FRC operates an on-site pre-kindergarten program and K-12 school Monday through Friday throughout the year, and that attendance is mandatory for children age 5 and older. Upon enrollment, students are

---

[122] U.S. DEP'T OF JUSTICE & U.S. DEP'T OF EDUCATION, FACT SHEET: INFORMATION ON THE RIGHTS OF ALL CHILDREN TO ENROLL IN SCHOOL (May 2014), www.justice.gov/sites/default/files/crt/legacy/2014/05/08/plylerfact.pdf.

[123] Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (2002); William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, 122 Stat 5044 (2008).

[124] Stipulated Settlement Agreement, Flores v. Reno, No. 2:85-cv-04544 (C.D. Cal. Jan. 17, 1997), http://www.clearinghouse.net/chDocs/public/IM-CA-0002-0005.pdf.

[125] U.S. IMMIGRATION & CUSTOMS ENFORCEMENT, FAMILY RESIDENTIAL STANDARD 5.2, EDUCATION POLICY 4 (Dec. 21, 2007), http://www.ice.gov/doclib/dro/family-residential/pdf/rs_educational_policy.pdf [hereinafter FAMILY RESIDENTIAL STANDARD: EDUCATION POLICY].

assessed for grade level knowledge and skill and evaluated for special needs. The academic program includes state-specific, standards-based instruction in language arts, math, science, social studies, and physical education.

Beyond that, the standards and resident handbooks offer virtually no specific information about curriculum, instruction, classroom management, social-emotional learning, addressing childhood trauma in the classroom, or preparing students to transition to new schools in their post-release communities. Without more specific standards, ICE cannot hold itself or its contractors accountable for the content, quality, and consistency of its education services and programs, including addressing the recommendations made by the ACFRC.

**Recommendation 4-1: ICE should review and revise its FRC standards for education to add needed detail about the expected content and quality of the education services and programs and to align with the Committee's education recommendations. To inform new education standards that specify best practices, ICE should also elicit input from a panel of education advisors with expertise in the following fields: child care; pre-kindergarten education; K-12 curriculum, instruction, and assessment; newcomer students and English language learners; interrupted schooling, dropout prevention, parent engagement, adult learners (including parents), and trauma-informed classroom practices.**

On-site visits to the FRCs provided some additional information about how schools and classrooms were organized and how education contractors designed and delivered the infant-toddler, pre-kindergarten, and K-12 programs. Information from ICE staff, education contractors, and parents at these site visits corroborated that, in general, young children had not participated in out-of-home child care or pre-kindergarten programs in their home countries and that many K-12 students were far behind grade level academically due to interruptions in their formal schooling, and entered FRCs speaking one or more languages but with no or limited English language skills.

Despite written and verbal requests from the ACFRC to ICE for more detailed information about its education services and programs, little additional information was provided, and it remains unclear to the ACFRC how well the existing services and programs are working. While ICE provided some additional helpful information, we also received incomplete information on a number of key education issues and, in certain instances, information that conflicted with our site visit observations and FRC standards.

In the absence of better information, including an examination of curricula, systematic observations of classroom practices and school operations, and interviews with contract monitors, educators, parents, and students, the ACFRC consulted with, in addition to sources provided by ICE, other credible sources from education research and practice to develop the recommendations. In doing so, we focused mostly on best education practices for immigrant and English learner students, students with interruptions in their formal education, and students who experienced childhood trauma.

While in ICE custody, children should have a caring school experience, an engaging curriculum, and high quality instruction, and parents should receive compassionate and practical support to help their children succeed in school while their families are detained. This part is a set of very specific recommendations to better align FRC education services and programs with key best education practices.

### A. Early Childhood Education

While detained, parents of young children may need child care options in order to manage family life in FRCs, to attend personal appointments, and to address their immigration case. High quality care includes qualified teachers, culturally sensitive and responsive caregiving, stimulating cognitive and language development, and programming in safe and healthy spaces. Yet the Family Residential Standards for education do not specify if FRCs are expected to offer child care or include guidelines about the content or quality of infant and toddler care in the existing programs at Dilley and Karnes. In fact, the ACFRC has been informed by advocacy organizations and some detained mothers during site visits that parents are expected to supervise their children at all times. This is interpreted as not allowing a mother to ask another mother to watch her child while she, for example, takes a nap, conducts an errand, or needs a break. Children age 13 or older are allowed to walk through FRCs unaccompanied by their parent but children under age 13 must be supervised by a parent or in school.

The Family Residential Standards for education are clearer about offering a pre-kindergarten program. As stated, the pre-kindergarten program "shall provide comprehensive child development services such as educational, health, nutritional, and social services to eligible four-year-old children and their families."[126] Eligibility criteria and program characteristics are not defined. The resident handbooks suggest that pre-kindergarten is a half-day program.

#### 1. Access to Child Care

**Recommendation 4-2: Infant and toddler child care should be:**

a) **provided at all FRCs (currently, Berks does not offer an official structured child care program); and**
b) **available to parents for any reason, and not restricted to times when parents are engaged in legal or medical-related business.**

**Recommendation 4-3: FRC child care programs should be accessible and expanded programmatically to be age appropriate for children under the age of 13 when not in school, and available upon request from parents, regardless of whether they are attending to legal- or medical-related business. Currently, child care programs are only for infants and toddlers. FRCs do not permit children to be separated from their parents until age 13, yet there are no supervised care options for these children.**

#### 2. Child Care and Pre-Kindergarten Programming

**Recommendation 4-4: Pre-kindergarten teachers and infant and toddler caregivers should:**

a) **create learning environments and provide age- and developmentally-appropriate art, music, play, and literature activities to engage young children who may be unfamiliar with out-of-home care or a formal education program;**
b) **routinely incorporate parents in play and learning activities when parents want to participate; and**

---

[126] FAMILY RESIDENTIAL STANDARD: EDUCATION POLICY, *supra* note 125, at 2.

c) **encourage parents to participate in programming as much as they want in order to help their child, especially at the onset, adjust to separating from them while in child care or prekindergarten.**

**Recommendation 4-5: The FRC pre-kindergarten and child care programs should follow the best practices guidelines for media use (e.g., watching television, using a tablet or computer) by young children set by the American Academy of Pediatrics and endorsed by the Mayo Clinic.**[127] **The guidelines discourage media use by children younger than age 2 and limiting older children's screen time to no more than two hours daily. However, this should not infringe on a parent's right to make independent choices regarding media use for their children when in their care.**

**Recommendation 4-6: Pre-kindergarten teachers and infant and toddler caregivers should update parents informally about their children's activities and skills during daily drop off and pick up times. Formal progress reports should be issued weekly, like at Dilley, and not every six weeks, which is the current practice at Karnes, resulting in the likelihood of families with shorter detention stays not receiving formal reports. Progress reports should be reviewed with parents in a language they understand well (ideally in their primary language).**

**Recommendation 4-7: Pre-kindergarten teachers and infant and toddler caregivers should understand:**

a) **the value of acknowledging and reinforcing cultural and family strengths;**
b) **the way stress, trauma, and coping affect infant and toddler adjustment to the detention environment;**
c) **the way stress, trauma, and coping affect parenting in the detention environment; and**
d) **that parents' cultural values or lack of formal education do not invalidate good parenting skills, but that they may need additional information to orient them to U.S. parenting norms.**

**Recommendation 4-8: Pre-kindergarten teachers and infant and toddler caregivers should have the training and skills to encourage learning and good behavior. Practices that grant or deny young children food or playtime as rewards or punishments should be prohibited.**

### 3. Program Quality

**Recommendation 4-9: Pre-kindergarten teachers and infant and toddler caregivers should be bilingual in Spanish or another language frequently spoken at the FRCs and should be credentialed in early childhood education.**

**Recommendation 4-10: Pre-kindergarten teachers and infant and toddler caregivers should be monitored by:**

---

[127] *Media and Children*, AM. ACAD. OF PEDIATRICS, https://www.aap.org/en-us/advocacy-and-policy/aap-health-initiatives/Pages/Media-and-Children.aspx; *Screen Time and Children – How to Guide Your Child*, MAYO CLINIC (Aug. 6, 2016), http://www.mayoclinic.org/healthy-lifestyle/childrens-health/in-depth/screen-time/art-20047952.

a) **a contractor representative with pre-kindergarten content expertise, using multiple monitoring techniques: unscheduled weekly walkthroughs, scheduled quarterly observations, and mid-year and end-year performance reviews with feedback and professional development support for corrective action; and**
b) **a qualified independent, impartial oversight authority annually for contract compliance and for quality, and all monitoring reports should be submitted directly to ICE and available to the public.**

### 4. Pre-Kindergarten Preparation and School Readiness

**Recommendation 4-11: Since learning one language does not impair the ability to learn a second language in the long run, pre-kindergarten teachers should partner with parents to promote dual language learning. For example, pre-kindergarten teachers should encourage retention of children's primary language at the same time children are learning English.**

**Recommendation 4-12: Pre-kindergarten teachers should encourage young children to use trial-and-error speech in both their primary language and in English.**

**Recommendation 4-13: Pre-kindergarten teachers should continue to base their curriculum on their respective state's early childhood education standards and guidelines, and should teach:**[128]

a) **pre-literacy skills through interactive storybook reading;**
b) **mathematical knowledge and skills through exposure to number words, names of shapes and sizes, and comparison of quantities;**
c) **science literacy through interaction with the natural world. (For example, water and earth; hot and cold; motion and gravity; liquids and solids; living and inanimate objects; and day and night);**
d) **cultural and self-expression through music, art, movement, and play in activities;**
e) **learning readiness skills: waiting, sitting, attending to others and materials, changing responses based on prompts, following individual instructions, and following group instructions; and**
f) **young children how to draw pictures of themselves and write their names.**

**Recommendation 4-14: Pre-kindergarten teachers should allow young children to participate in activities silently or as quiet observers since apprehension is normal for those inexperienced with out-of-home care or early education programs and for those who experienced trauma or are adjusting to disorienting circumstances.**

**Recommendation 4-15: Pre-kindergarten teachers should label bulletin boards, toys, and educational materials with visual icons and in English, Spanish, and other languages frequently spoken at FRCs.**

**Recommendation 4-16: Pre-kindergarten teachers should assess young children using a validated kindergarten readiness indicators checklist that minimally assesses: expressive and**

---

[128] CAL. DEP'T OF EDUC., FAMILY PARTNERSHIPS AND CULTURE: BEST PRACTICES FOR PLANNING CURRICULUM FOR YOUNG CHILDREN (2016), http://www.cde.ca.gov/sp/cd/re/documents/familypartnerships.pdf.

**receptive language, approaches to learning and cognition, phonological awareness and print knowledge, mathematics, social-emotional learning, physical development, and self-care. An example of a best practices readiness checklist is developed by the National Center for Learning Disabilities.**[129]

**Recommendation 4-17: Pre-kindergarten teachers should prepare an early learning passport for each child transitioning from FRCs to kindergarten in U.S. schools. This best practice is a folder that contains information about a young child's skills and development, including assessment results and work samples to share with prospective teachers.**[130]

### 5. Early Childhood Development

**Recommendation 4-18: Pre-kindergarten and infant and toddler child-care activities should foster young children reaching normative developmental milestones at certain ages regarding how they play, learn, speak, behave, and move. The FRCs should use the best practices checklist of the Centers for Disease Control and Prevention on developmental milestones from birth through age 5 and the best practices formative assessment of developmental milestones, the *Desired Results Developmental Profile: A Developmental Continuum from Early Infancy to Kindergarten Entry*, produced by the California Department of Education.**[131]

**Recommendation 4-19: Young children with special education or special health needs should be included in all infant and toddler child-care and pre-kindergarten activities to the extent possible.**

**Recommendation 4-20: Young children should have safe, structured, and age-appropriate opportunities to play daily.**

## B. K-12 School Schedule

The general education guidelines in the Family Residential Standards specify that K-12 "educational services are provided . . . Monday through Friday, excluding holidays, and are modeled after a year-round program."[132] The standards and resident handbooks require that students receive at least one hour of instruction in each of the five core subjects. Yet, the standards also say that school attendance is recorded twice daily for morning and afternoon sessions, suggesting half-day attendance.[133] Perhaps the FRCs have split school days only when enrollment exceeds the FRC standard of one teacher to 20 students or the respective state's student-to-teacher ratio. However, during ACFRC site visits at each of the FRCs we did not observe classroom

---

[129] NAT'L CENTER FOR LEARNING DISABILITIES, INC. & THE AM. FEDERATION OF TEACHERS, TRANSITIONING TO KINDERGARTEN: SCHOOL READINESS (2006), http://www.aft.org/sites/default/files/t2k_schoolreadiness.pdf.
[130] *Id.*
[131] *Developmental Milestones*, CENTERS FOR DISEASE CONTROL AND PREVENTION (Mar. 15, 2016), http://www.cdc.gov/ncbddd/childdevelopment/positiveparenting/toddlers.html; California Department of Education, *Desired Results Developmental Profile: A Developmental Continuum from Early Infancy to Kindergarten Entry* (2015), http://www.cde.ca.gov/sp/cd/ci/documents/drdp2015infanttoddler.pdf.
[132] FAMILY RESIDENTIAL STANDARDS: EDUCATION POLICY, *supra* note 125, at 2.
[133] *Id.* at 4.

instruction at any of them, and heard from ICE education contractors, ICE staff, and parents that the school schedule has not routinely operated on either full-day and year-round schedules.

**Recommendation 4-21: FRC schools should operate on a year-round, full-day schedule. If limitations to expansion from a half-day schedule are due to classroom capacity or the number of teachers, then the library or other buildings should be utilized and additional staff hired.**

### C. K-12 Curriculum and Instruction

Curriculum (i.e., the content of the courses offered) and instruction (i.e., the ways the content is taught) are at the core of the FRC K-12 education program. Our understanding is that under the supervision of a contracted school administrator, a contracted teacher develops the curriculum in the form of a weekly lesson plan for a particular grade using state-specific, standards-based curriculum (Dilley and Karnes use Texas state standards and Berks uses Pennsylvania state standards). The Family Residential Standards for education states that "best practices"[134] curricula are used, but there is no corroborating information. In addition, the standards fail to provide any information about expectations for and guidance about effective instructional practices. Without evidence of the content of what students are taught, we recommend a number of best practice curricula to draw upon for developing the FRC curriculum that have engaging content for English language learners and students who are academically behind grade level. Similarly, without standards and observation of instructional practices, there is no way to know what teaching routinely looks like across grades and FRCs and, therefore, we recommend FRC schools adopt the effective instructional practices and approaches listed below.

Our recommendations also depart from ICE's existing standards in one critical way: we recommend, given the current context of relatively short stays of most students, especially at Dilley and Karnes where stays are currently short in comparison to Berks, that the education services and programs focus foremost on English language development instead of academic content. The current guidelines state: "While education services will focus primarily on the development of academic competencies, the secondary focus shall be on English Language Training."[135] This is misguided for students attending schools for several days or a few weeks. (It is much more appropriate for students with longer detention stays, which seems to be more common at Berks.) We proposed a number of recommendations for integrating academic content through curriculum and instruction while primarily focusing on developing critical language skills for students who are detained for less than one month.

#### 1. Qualified Staff

**Recommendation 4-22: FRC schools should continue to only hire credentialed teachers who are bilingual in English and Spanish or another language frequently spoken at the FRCs or who are credentialed in English as a Second Language (ESL), and staffing at each facility should include at least one credentialed special education teacher.**

---

[134] *Id.* at 1.
[135] *Id.* at 2.

### 2. Curriculum

**Recommendation 4-23: FRC schools should continue to provide a self-paced curriculum adapted to student skill and knowledge levels.**

**Recommendation 4-24: For the first month in detention, FRC schools should provide students with grade-level proficiency in the core content areas (e.g., language arts, math, science, social studies) and English language learning and literacy development curriculum that integrates content-based teaching.**

**Recommendation 4-25: After students have been in detention for one month, FRC schools should provide students with grade-level proficiency in the core content areas (i.e., language arts, math, science, social studies) a standards-based curriculum that fully integrates English language learning and preparation to transition at grade level to U.S. schools in post-release communities.**

**Recommendation 4-26: For students with below grade-level proficiency in the core content areas (e.g., language arts, math, science, social studies), or with histories of interrupted schooling in their country of origin, FRC schools should use an English language learning and literacy development curriculum that integrates content-based teaching.**

**Recommendation 4-27: Teachers should develop and use a curriculum that:**[136]

**a) integrates the content and instructional approaches in best practice curricula such as Do the Math, Math Upgrade, Math Pathways and Pitfalls, Language Central for Math, ST Math, MasterPieces, Step Up to Writing, WriteToLearn, and WRiTE BRAiN BOOKS, Fast ForWord, and Reading Apprenticeship;**

**b) emphasizes 21st century learning skills:**

- **i. critical thinking (e.g., analyzing, classifying, explaining);**
- **ii. creative thinking (e.g., brainstorming, designing, imagining, questioning);**
- **iii. communicating (e.g., analyzing the situation, evaluating messages, following conventions, listening actively); and**
- **iv. collaborating (e.g., goal setting, delegating, managing time, resolving conflict);**

**c) focuses on the components of reading (i.e., phonemic awareness, phonics, fluency, vocabulary, and text comprehension) and increasingly unifies instruction in English language and the core content areas;**

---

[136] BETHANN BERLINER, IMAGINE THE POSSIBILITIES: SOURCEBOOK FOR EDUCATORS COMMITTED TO THE EDUCATIONAL SUCCESS OF STUDENTS EXPERIENCING HOMELESSNESS (2001), http://files.eric.ed.gov/fulltext/ED463335.pdf; [hereinafter IMAGINE THE POSSIBILITIES]; CENTER FOR APPLIED LINGUISTICS, PROCEEDINGS OF THE FIRST NATIONAL CONFERENCE FOR EDUCATORS OF NEWCOMER STUDENTS (Beverly A. Boyson et al., eds., 2002), http://crede.berkeley.edu/pdf/newcomer.pdf [hereinafter NEWCOMER STUDENTS PROCEEDINGS]; *These Innovative Programs Can Help Build Student Confidence in Their Writing Skills*, LANGUAGE MAGAZINE (May 2015), http://languagemagazine.com/?page_id=124450; A Selection of Products Designed to Help English Learners Master the Nuances of the New Math Standards, Language Magazine (Aug. 2016), http://languagemagazine.com/?page_id=123802; ; RUTH SCHOENBACH ET AL., READING FOR UNDERSTANDING: A GUIDE TO IMPROVING READING IN MIDDLE AND HIGH SCHOOL CLASSROOM (1999); DEBORAH J. SHORT & BEVERLY A. BOYSON, HELPING NEWCOMER STUDENTS SUCCEED IN SECONDARY SCHOOLS AND BEYOND (2012), http://www.cal.org/content/download/2222/28779/file/Helping%20Newcomer%20Students%20-%20Report.pdf [hereinafter HELPING NEWCOMER STUDENTS].

**d) explores in-depth real-world issues (e.g., communities, migration, ecosystems, climate, use of energy) thematically across the core content areas;**
**e) integrates learning readiness skills for transitioning to U.S. schools in post-release communities. For example:**
   **i. developing an identity as a student (e.g., knowing strengths, interests, and learning styles);**
   **ii. understanding classroom routines (e.g., daily attendance, completion of homework and assignments);**
   **iii. engaging in learning (e.g., participating, asking questions, learning from mistakes, taking academic risks, persevering); and**
   **iv. basic school study skills (currently, Dilley is the only FRC that reports integrating learning readiness skills across the curriculum); and**
**f) Incorporates student interests, strengths, cultures, and self-expression.**

**Recommendation 4-28: FRC curriculum should be offered as "mini-lessons" so that students can experience completion and mastery of parts of lessons if their detention stay is short in duration. This can include experiential learning such as field trips outside of FRCs or project-based activities that can be completed in short time frames such as composing music in GarageBand, building small robots, conducting science experiments, and gardening.**

**Recommendation 4-29: FRC schools should include safe, structured, and age-appropriate opportunities to play daily. This includes offering inclusive team games, developing basic sports skills, teaching fitness principles, and modeling fair play.**

### 3. Instruction

**Recommendation 4-30: Teachers should consistently use instructional practices that education experts widely agree hold promise or have high-levels of effectiveness such as:**[137]

**a) using mastery learning instructional techniques so all students can achieve the same level of learning, including advanced organizers, guided practice, modeling, nonlinguistic representations such as symbols and physical models to convey information, teaching to learning objectives, and providing feedback and corrective strategies to students;**
**b) providing ample wait time for students to respond to instructions or questions to ensure adequate time to process new content and information in a new language;**
**c) modeling effective learning to read instructional techniques: previewing text, visualizing the story, asking questions, predicting what will happen, inferring from cues, making connections to other texts or the real world, summarizing, and discussing what was liked or disliked in the text;**
**d) incorporating extensive oral language development in literacy instruction;**
**e) encouraging students to explore the meaning of their ideas by practicing language skills. For example, instruction should use open-ended questions, asking students to**

[137] Imagine the Possibilities, *supra* note 136; NEWCOMER STUDENTS PROCEEDINGS, *supra* note 136; MARZANO ET AL, HELPING NEWCOMER STUDENTS, *supra* note 136.

**elaborate on their ideas using additional descriptors and more complex language to summarize or explain what they understood; and**

f) **directly teaching math vocabulary and using drawings, diagrams, graphs and other visual aids to help English language learner students develop math concepts and understanding.**

**Recommendation 4-31: Teachers should focus their instruction on growth, not ability. For example, teachers should communicate high expectations for learning and performing and a belief in the ability of students to grow and improve, routinely providing students with opportunities to relearn content, revise work, and re-take tests.**

**Recommendation 4-32: Teachers should explicitly teach students study skills across the curriculum.**

### 4. English Language Instruction

**Recommendation 4-33: Teachers should use instructional approaches that are aligned with the Common Core State Standards and have a record of success with English language learners with limited and/or interrupted formal education. The Sheltered Instruction Observation Protocol (SIOP) Model is a set of best instructional practices for designing and delivering lessons for English language learners. Currently, Dilley is the only FRC that reports using SIOP.**[138]

**Recommendation 4-34: Teachers should use a wide variety of instructional strategies to develop language and literacy in both a student's primary language and in English. Examples of best practices include:**[139]

a) **instruction that incorporates English language and literacy development (e.g., listening, speaking, reading, and writing) across the core content areas (e.g., language arts, math, science, social studies);**

---

[138] JANE ECHEVARRIA, MARY ELLEN VOGT, & DEBORAH J. SHORT, MAKING CONTENT COMPREHENSIBLE FOR ENGLISH LEARNERS: THE SIOP MODEL (2016).

[139] U.S. DEP'T OF EDUC., NCEE 2014-4012, TEACHING ACADEMIC CONTENT AND LITERACY TO ENGLISH LEARNERS IN ELEMENTARY AND MIDDLE SCHOOL (Apr. 2014), http://ies.ed.gov/ncee/wwc/Docs/practiceguide/english_learners_pg_040114.pdf; Andrea DeCapua & Heather Marshall, *Reaching ELLs at Risk: Instruction for Students with Limited or Interrupted Formal Education*, 55 PREVENTING SCHOOL FAILURE: ALTERNATIVE EDUCATION FOR CHILDREN AND YOUTH, no. 1 (2011) at 35–41; INDIANA DEPARTMENT OF EDUCATION, OFFICE OF ENGLISH LANGUAGE LEARNING & MIGRANT EDUCATION. EFFECTIVE PROGRAMS FOR ENGLISH LANGUAGE LEARNERS (ELL) WITH INTERRUPTED FORMAL EDUCATION. http://www.brycs.org/documents/upload/ELLswithInterruptedFormalEducation.pdf; Kristina Robertson & Lydia Breiseth, *How to Support Refugee Students in the ELL Classroom*, COLORINCOLORADO (2015), http://www.colorincolorado.org/article/how-support-refugee-students-ell-classroom; Kristina Robertson & Susan Lafond, *How to Support ELL Students with Interrupted Formal Education (SIFE)*, COLORINCOLORADO (2008). http://www.colorincolorado.org/article/how-support-ell-students-interrupted-formal-education-sifes; Jeff Whittingham et al., *Use of Audiobooks in a School Library and Positive Effects of Struggling Readers' Participation in a Library Sponsored Audiobook Club.* 16 School Library Research (Dec. 19, 2012), http://www.ala.org/aasl/sites/ala.org.aasl/files/content/aaslpubsandjournals/slr/vol16/SLR_Use_of_AudiobooksV16.pdf.

**b) for students without basic literacy skills, literacy instruction that focuses on the fundamentals such as the alphabet, vowel and letter sounds, phonemic awareness, phonics, and syllables. Using wordless picture books can also promote vocabulary, speaking, and writing;**

**c) for students with basic literacy skills, literacy instruction that incorporates chanting vocabulary words, guided reading groups, choral reading, interactive read-alouds, echo reading, and silent, independent reading;**

**d) instruction that incorporates academic English such as vocabulary, word parts, grammar, punctuation, syntax, discipline-specific terminology, and rhetorical conventions;[140]**

**e) instruction that incorporates sheltered English-language instruction techniques such as the use of gestures; graphics, maps, and other visuals; collaborative learning activities, demonstrations, and other interactive instructional tools such as the SMARTBoard, videos, and manipulatives;**

**f) instruction that routinely uses online dictionary features that in addition to definitions include images, audio pronunciation, and related words. An example is the Merriam-Webster Visual Dictionary; and**

**g) instruction that integrates the use of English-language audiobooks as an assisted reading strategy for introducing new vocabulary and concepts and giving students access to content and literature above their reading fluency levels.**

**Recommendation 4-35: Since learning in one language does not impair the ability to learn a second language in the long run, teachers should partner with parents to promote dual language learning by encouraging retention of the primary language at the same time K-12 students are learning English.**

### D. Assessing and Communicating K-12 Student Progress

The Family Residential Standards for education have clear guidelines about assigning students to a specific grade based upon student age and educational assessment outcomes.

These standards are more vague about the nature of ongoing student evaluation and the reporting schedule for communicating about student progress. They state that "Student progress reports are distributed to all students on a regular and consistent schedule, and facility policy encourages the scheduling of parent-teacher conferencing to discuss student achievement."[141] The standards further specify that academic progress be measured every 90 days using the same testing instrument, regardless of a student's length of detention stay. This does not represent best practices in the field, especially for students with interruptions in their formal education. Students should receive regular feedback during the learning process to improve student outcomes. Feedback should be individualized, relevant, timely, specific, address advancement toward learning goals, and directly involve the student. Across the FRCs, school practices reportedly vary in how and how often they assess student performance.

---

[140] These language skills are needed for students at all grade levels to understand classroom lessons, books, tests, assignments, and school policies.

[141] FAMILY RESIDENTIAL STANDARDS: EDUCATION POLICY, *supra* note 125, at 4.

### 1. Grade-Level Placements

**Recommendation 4-36: FRC schools should continue to make grade-level placements based on a student's age to align with U.S. schools practices.**

**Recommendation 4-37: Given the special circumstances and often short duration of attending school in FRCs, students should be assessed for grade level readiness and shortfalls for age-based placements should be identified and addressed to prepare students to transition to U.S. schools in post-release communities.**

**Recommendation 4-38: FRC schools should continue to include documentation about grade placements in student education records that are shared with students and parents upon release, to facilitate enrollment and the transition to U.S. schools in post-release communities.**

### 2. Feedback to Students and Parents about Progress

**Recommendation 4-39: Teachers should routinely use multiple informal teacher-made assessments to measure student English language skills and content knowledge such as journal writing, oral presentations, and writing tasks in the primary language.**

**Recommendation 4-40: Teachers should supplement the currently used quarterly assessment that tracks academic progress from baseline results with a weekly report-card-in-progress that is completed with student participation and shared with parents since most students have shorter stays in detention. Currently, Dilley is the only FRC that reports providing weekly progress reports.**

**Recommendation 4-41: Teachers should routinely use a basic rubric to measure achievement of learning targets to enable students and parents to easily understand and monitor progress. A recommended rubric is: exceeding a target, meeting a target, approaching a target, and not yet approaching a target. The rubric should use icons to help supplement the text that describes the performance levels.**

**Recommendation 4-42: Formal parent-teacher conferences to discuss student adjustment to school, classroom behavior, and achievement should be scheduled at the end of the first week of enrollment with guidance about how to support student progress. Thereafter, formal conferences should be scheduled monthly and continue to be available upon request from a parent, a student, or a teacher.**

## E. Special Education Services

The Family Residential Standards for education state that all incoming students will be assessed for special needs. Students determined to have a disability under the Individuals with Disabilities Education Act (IDEA), the federal law that requires schools to serve the educational needs of students with disabilities, and who are eligible for special education services, will receive an Individualized Education Plan (IEP), the plan for a student's special education services, and appropriate services at FRC schools or from the local education agency. The standards include additional guidelines about furnishings and equipment, on-site and off-site availability of services, and assessments and records, among other issues related to complying with the requirements of IDEA. The ACFRC has little corroborating information about how special education actually

works in FRCs, and received information that students at Karnes and Berks may not have access to a qualified IEP team. (Karnes reported to the ACFRC that it has never organized an IEP team and Berks reported that its IEP team only includes a special education teacher.) Given the limited English proficiency of most students enrolled in FRC schools, and the trauma of their immigration journey and detention experience, determining eligibility for special education is especially complex and providing appropriate education services is critical.

### 1. Eligibility

**Recommendation 4-43: In accordance with federal law (IDEA):**[142]

a) **FRC schools should not exclude children on the basis of a diagnosed long term or temporary disability or unexplained academic, behavioral, or health challenges at school.**
b) **Parents should be informed of their child's right to be referred to and assessed for special education and, if eligibility for special education is determined, to receive services.**
c) **Special education assessment results should be reviewed with parents in a language they understand well (ideally their primary language).**

**Recommendation 4-44: Students with obvious signs of cognitive or physical disabilities such as known brain damage, impaired hearing or vision, impaired mobility or dexterity, polio, cerebral palsy, cleft palate, malnutrition, or traumatic stress should be immediately assessed for special education needs and, if eligibility for special education is determined, FRC schools should provide services from a credentialed special education teacher.**

**Recommendation 4-45: Students should be assessed by FRC medical and mental health staff or, upon parental request, by medical or mental health staff outside of FRCs, for Section 504 accommodations.**[143] **These plans fall under Section 504 of the Rehabilitation Act of 1973, which prohibits discrimination against public school students with disabilities and specify accommodations to ensure that students can participate in the general education program. Additionally, FRCs should have a process for teachers and school administrators to refer students to medical and mental health staff for screenings based on behaviors observed in school.**

**Recommendation 4-46: Students should be assessed for a disability if a parent requests it or if health or education professionals suspect a need for special education services.**

**Recommendation 4-47: With respect to special education and trauma, FRC schools should ensure that qualified special education professionals who are also familiar with the cultural background and trauma experiences of the FRC student population oversee the determination if a student qualifies for special education services and is eligible for an IEP or**

---

[142] *10 Basic Steps in Special Education*, CTR. FOR PARENT INFO. AND RES. (Apr. 2014), http://www.parentcenterhub.org/repository/steps/; U.S. DEP'T OF EDUC., OFFICE OF SPECIAL EDUC. PROGRAMS, 300.366, DETERMINATION OF ELIGIBILITY. (Oct. 4, 2006), http://idea.ed.gov/explore/view/p/%2Croot%2Cregs%2C300%2CD%2C300%252E306%2C.
[143] *Protecting Students with Disabilities: Frequently Asked Questions about Section 504 and the Education of Children with Disabilities*, U.S. DEP'T OF EDUC. (Oct. 16, 2015), http://www2.ed.gov/about/offices/list/ocr/504faq.html.

**504 accommodation. Special consideration should be given to the needs of students who present trauma symptoms that may impede learning and functioning in school, including symptoms that may mask or amplify other disabilities.**

**Recommendation 4-48: With respect to special education and limited English proficiency, assessing for special education needs is especially complex when students are English language learners and may also exhibit trauma symptoms. A best practice for determining if a student is struggling in the classroom due to language barriers or disabilities is to document if their academic progress advances at the same rate as other English language learners with similar linguistic, cultural, educational, and immigration experiences. Students who progress much more slowly should be assessed for unidentified special needs.**[144]

#### 2. Provision of Services

**Recommendation 4-49: In accordance with IDEA:**[145]

a) **The IEP team should be composed of a parent, a student, at least one general education teacher, at least one special education teacher, a district staff member who can supervise special education services, an educator who can interpret evaluation results such as a school psychologist, a parent advocate, and a translator if needed. Currently, Dilley is the only FRC that reports having this kind of IEP structure.**
b) **IEP accommodations, modifications, and supports should be developed with parents and the contents explained to them in their primary language or in a language in which they are proficient as defined by federal law.**
c) **A skilled interpreter should be present at all IEP meetings to explain the process and to ensure parental consent to special education services.**
d) **Parents of children classified with a disability should be allowed to examine all education records and participate (e.g., provide input, make requests, refuse provisions, and be informed in their primary language) in all meetings regarding the identification, evaluation, and educational placement of their child.**
e) **Parents with children classified with a disability and provided with an IEP or a 504 accommodation should receive a thorough explanation of the plan(s) and their purpose in a language they understand well, ideally their primary language, and should receive written and electronic copies of the plans for continuity of services in schools in post-release communities.**

### F. K-12 Student Orientation to Transition to U.S. Schools

The Family Residential Standards for education do not reference or provide guidelines about student orientation to transition to U.S. schools in post-release communities. The ACFRC did not receive any requested information about how students and their parents are informed about enrollment, school requirements and norms, or managing the cultural and logistical challenges that

---

[144] Kristina Robertson, *How to Address Special Education Needs in the ELL Classroom*, COLORÍN COLORADO http://www.colorincolorado.org/article/how-address-special-education-needs-ell-classroom.

[145] *Topic: Individualized Education Program (IEP), Team Meetings, and Changes to the IEP*, U.S. DEP'T OF EDUC.,. OFFICE OF SPECIAL EDUC. PROGRAMS (Oct. 4, 2006), http://idea.ed.gov/explore/view/p/%2Croot%2Cdynamic%2CTopicalBrief%2C9%2C.

many new immigrant students face. Because school attendance is compulsory under law and beneficial to families and students as they rebuild their lives in a new country, and because attending school also encourages families to appear in court for their immigration cases, the ACFRC recommends that facilitating the transition to schools in post-release communities is critical. Further, the U.S. Department of Education recognizes that immigrant families need detailed information and support to transition to the K-12 school system, and has made efforts to encourage enrollment and attendance, to prevent discrimination, and to address the learning needs of newcomers.[146]

**Recommendation 4-50: FRC schools should orient K-12 students about:**

a) **conventional school routines and expectations such as sitting still for periods of time, riding a school bus, attendance and report cards, raising a hand to speak, co-educational classes, using a locker, changing clothes for gym classes, school discipline, following a schedule and rotating classes and teachers, working independently or in a group, participating in activities, and completing in-class and homework assignments;[147] and**
b) **immigrant discrimination and bullying in the form of taunts and slurs, threats, aggression, cyber bullying, social exclusion, dating violence, sexual assault, stalking, and human trafficking that may occur in U.S. schools. Acculturation about peer and cultural norms related to hygiene, dress, personal space, gestures, mannerisms, expressions, and how to make friends may ease the transition, reduce victimization, and increase student safety.[148]**

**Recommendation 4-51: FRC schools should inform students ages 16+ that they may not be able to accrue the required high school credits to graduate by the time they reach the maximum age of enrollment in U.S. schools (which varies by jurisdiction from age 19-21), but that this fact does not negate their right to a free education until they age out. Related, secondary students who are over-age for their grade level should be informed about alternative education options including alternative high school completion certificates, alternative schools, community college programs, and job training programs.**

**Recommendation 4-52: FRC schools should provide each exiting student with a backpack containing school supplies, a checklist detailing the steps for enrolling in U.S. schools, and information on troubleshooting enrollment challenges; how to get additional help with school issues or abuse, threats, bullying, or other discrimination in school; and how to file a complaint.**

---

[146] *Resource Guide: Supporting Undocumented Youth*, U.S. DEP'T OF EDUC. (Oct. 20, 2015), http://www2.ed.gov/about/overview/focus/supporting-undocumented-youth.pdf; *Newcomer Toolkit*, U.S. DEP'T OF EDUC. (June 2016), http://www2.ed.gov/about/offices/list/oela/new-comer-toolkit/ncomertoolkit.pdf.
[147] *Welcoming and Orienting Newcomer Students to U.S. Schools*, BRIDGING REFUGEE YOUTH & CHILDREN'S SERVICES (2008), http://www.brycs.org/documents/upload/brycs_spotspring2008-2.pdf.
[148] *Back to School: Challenges and Strengths of Refugee Students*, BRIDGING REFUGEE YOUTH & CHILDREN'S SERVICES (2003), http://www.brycs.org/documents/upload/brycs_spotsept.pdf.

### G. Trauma-Informed Education Practices

The Family Residential Standards for education offer no explicit guidelines about the culture and climate of FRC schools. This omission is particularly concerning given the stress students experience from immigrating, living in custody, and worrying about an uncertain future. While there are guidelines about twice-annual teacher training requirements on related topics such as cultural sensitivity, child development theory, and mental health issues, they are silent about developing the knowledge and skills to routinely integrate trauma-informed practices in the classroom. It is imperative that classroom practices use a trauma-informed approach to establish a culture and climate that is welcoming and safe, and to develop curriculum, deliver instruction, and manage the classroom in ways the show caring and minimize trauma responses.

#### 1. Social-Emotional Learning

**Recommendation 4-53: FRC schools should require explicit instruction in social-emotional skills. Best practice social-emotional learning curricula focus on five general research-based competencies endorsed by the Collaborative for Academic, Social and Emotional Learning (CASEL): self-awareness, self-management, social awareness, relationship skills, and responsible decision-making.[149] Curricula recommended by CASEL are listed in the guides Effective Social and Emotional Learning Programs: Preschool and Elementary School Edition and Effective Social and Emotional Learning Programs: Middle and High School Edition.[150]**

**Recommendation 4-54: Teachers should:[151]**

a) **develop core content curriculum, deliver instruction, and manage classrooms in ways that incorporate the development of social-emotional skills. (For example, they should model and expect from students effective listening, conflict resolution, problem solving, personal reflection and responsibility, and ethical decision-making.);**
b) **encourage positive social skills and self-image development by both respecting the various cultural attributes and backgrounds of their students and providing exposure to U.S. cultural norms; and**
c) **provide a space and routine for students to manage their emotions in age-appropriate ways in the classroom using, for example, a cool-down corner for younger students or writing in a journal or talking into a recorder for audio journaling for older students.**

#### 2. Classroom Management Practices

**Recommendation 4-55: Teachers and students should jointly establish and maintain classroom behavior expectations, rules, and routines that reinforce caring and safety.**

---

[149] Roger P. Weissberg &Jason Cascarino, *Academic Learning + Social-Emotional Learning = National Priority*, PHI DELTA KAPPAN, Oct. 2013, at 8-13.
[150] *2013 CASEL Guide: Effective Social and Emotional Learning Programs: Preschool and Elementary School Edition*, COLLABORATIVE FOR ACAD., SOC. AND EMOTIONAL LEARNING (2012), http://www.casel.org/preschool-and-elementary-edition-casel-guide; *2013 CASEL Guide: Effective Social and Emotional Learning Programs: Middle and High School Edition*, COLLABORATIVE FOR ACAD., SOC. AND EMOTIONAL LEARNING (2012), http://www.casel.org/middle-and-high-school-edition-casel-guide.
[151] *Newcomer Toolkit*, *supra* note 146.

**Recommendation 4-56: FRC classroom behavior management practices should never:**

a) **punish or penalize students for behaviors that are associated with experiencing trauma such as falling asleep during class, having difficulty concentrating on an assignment, or being reluctant to participate in an activity;**
b) **use exclusionary sanctions that remove students from the classroom or reduce instructional time, including detention or suspension, unless under exigent circumstances;**
c) **use punishment-based strategies, including reprimands, ultimatums, loss of privileges, or office referrals, absent positive behavior support strategies; or**
d) **reward or punish students with food or play for learning or behavior.**

**Recommendation 4-57: FRC schools should adopt best practice classroom behavior management strategies including:**[152]

a) **Positive Behavioral Interventions and Supports (PBIS). Instead of being reactive to misbehaviors, including disengagement, PBIS introduces, models, reinforces, and rewards positive social behaviors and creates a more positive school climate.**
b) **Restorative justice approaches to behavior disruptions with the goals of repairing harm and restoring relationships between those impacted. This includes teachers collaborating with parents and mental health professionals to design and carry out agreed upon consequences.**

### 3. Trauma-Informed Practices

**Recommendation 4-58: Teachers should take into account:**

a) **the impact of childhood trauma on learning, development, and behavior. For example, teachers need to understand how trauma can impair concentration and memory; cause intrusive thoughts, frustration, aggression, perfectionism, or withdrawal; and dysregulate executive functioning such as goal setting, organizing, or anticipating consequences; and**
b) **student expressions of trauma and dysregulation in classrooms, and that coping behaviors should not be viewed as misconduct and addressed with punishment but rather they should elicit trauma-informed supportive responses.**

**Recommendation 4-59: Teachers should maintain a classroom culture and climate that ensures students have: physical, social, and emotional safety at school; and academic safety to encourage students taking educational risks and learning from mistakes.**

**Recommendation 4-60: FRC schools should have protocols for educators and mental health practitioners to routinely collaborate and to provide integrated trauma-informed**

---

[152] Trevor Fronius, et al., *Restorative Justice in U.S. Schools: A Research Review*, WESTED, Feb. 2016, http://jprc.wested.org/wp-content/uploads/2016/02/RJ_Literature-Review_20160217.pdf; Rob H. Horner, George Sugai, & Timothy Lewis, *Is School-Wide Positive Behavior Support an Evidence-Based Practice* (April 2015), https://www.pbis.org/research; HANDBOOK OF POSITIVE BEHAVIOR SUPPORT (Wayne Sailor, Glen Dunlap, George Sugai & Rob Horner eds., Issues in Clinical Psychology 2008).

**interventions for students exhibiting trauma symptoms in the classroom such as inattentiveness, agitation, hypervigilance, persistent anxiety or depression, preoccupation, helplessness, detachment, or suicidal thoughts.**

**Recommendation 4-61: FRC school schedules should be routinized and predictable, and changes should be clearly communicated to students in advance, including changes in teachers, routines, or the student composition of the class.**

**Recommendation 4-62: Students should have small daily jobs that directly communicate that they are valued and belong in the school community. Examples include tending to indoor plants, a garden, or pets; setting up activities; or helping younger students or peers with their school work.**

### H. Educator Professional Development

U.S. teachers are not trained to work with newcomer students[153] or in schools that serve students detained with their parents while transitioning to an uncertain future in post-release communities or in their home countries. Given the unique circumstances of FRCs, FRC teachers need to be equipped with the knowledge, skills, and personal dispositions to work under significantly different circumstances than a tradition school setting.

The Family Residential Standards for education offer guidance about educator development requirements. They specify, for example, that teaching staff require a minimum of twice annual trainings on several key education topics and that they have a staff development plan, overseen by a school administrator, which aligns with the respective state requirements.[154] Documentation provided by ICE further indicates that at some of the FRCs there are other professional development opportunities, such as the weekly professional learning community meetings held at Dilley and regularly scheduled administrator-led monthly trainings at Dilley and Berks. However, the Committee has no additional information about the content and quality of professional development. Specifically, there is no indication that there is in-depth training on cultural competence, especially about indigenous cultures; on using trauma-informed curriculum, instruction, and management practices in classrooms; or on Prison Rape Elimination Act (PREA) compliance with employee training requirements.

#### 1. Instruction

**Recommendation 4-63: Teachers and school administrators should be trained and supported to use the curriculum, instructional strategies, and classroom management techniques recommended above.**

**Recommendation 4-64: Secondary teachers should receive specialized training for teaching adolescent students since these students are just developing proficiency in academic English without the foundation of academic literacy and grade-level schooling in their primary language, and students need targeted preparation to transition to U.S. schools in post-release communities.**

---

153 *Newcomer Toolkit*, *supra* note 146.
154 FAMILY RESIDENTIAL STANDARDS, EDUCATION POLICY, *supra* note 125, at 5.

### 2. Performance Evaluation

**Recommendation 4-65: ICE should ensure that a qualified independent, impartial oversight authority formally monitors the performance of FRC-contracted teachers and school administrators annually, and that all monitoring reports are submitted directly to ICE and available to the public. Given the high mobility and the low grade-level proficiency of students in FRC schools, teachers should not be evaluated primarily on student achievement outcomes but through a combination of measures such as multiple classroom observations, curriculum and lesson plan reviews, student work, teacher self-reflections, and student and parent surveys that assess instructional effectiveness in context. These evaluations should identify teachers in need of improvement and provide feedback and corrective support to teachers to help them improve their practice. Ineffective teachers and administrators should be terminated.**

**Recommendation 4-66: Teachers should be monitored by the contracted school administrators using multiple techniques: weekly unscheduled walkthroughs, quarterly scheduled classroom observations, and mid-year and end-year performance reviews with feedback and professional development support for corrective action.[155] Ineffective teachers should be terminated.**

### 3. Trauma

**Recommendation 4-67: Teachers and school administrators should receive in-depth, ongoing training about the effects of childhood trauma on learning, development, and behavior, which can be provided by the National Center for Trauma-Informed Care.[156] The reported level of training on trauma that educators are offered is inconsistent across the FRCs.**

Currently, Dilley reports annual trainings plus monthly teacher-led professional development sessions; Karnes reports an initial training upon employment; and Berks reports no specific training on trauma, only training to identify and report suspected physical and sexual abuse.

**Recommendation 4-68: Teachers and school administrators should be trained and accountable to:[157]**

a) **identify behaviors that may indicate current or past traumas that impact student success and safety; and**
b) **routinely use evidence based trauma-informed school practices that are documented in The National Child Traumatic Stress Network's Child Trauma Toolkit for Educators and the Massachusetts Advocates for Children and Harvard Law School's Helping Traumatized Children Learn.**

---

[155] Currently, Dilley is the only FRC that reports this kind of teacher performance monitoring process.
[156] http://www.smahsa.gov/nctic.
[157] *Helping Traumatized Children to Learn: Supportive School Environments for Children Traumatized by Family Violence*, MASS. ADVOCATES FOR CHILDREN (2009). https://traumasensitiveschools.org/wp-content/uploads/2013/06/Helping-Traumatized-Children-Learn.pdf; *Child Trauma Toolkit for Educators*, NAT'L CHILD TRAUMATIC STRESS NETWORK SCH. COMM. (Oct. 2008), http://www.nctsn.org/sites/default/files/assets/pdfs/Child_Trauma_Toolkit_Final.pdf.

**Recommendation 4-69: Teachers and school administrators should be trained to routinely collaborate with mental health practitioners to provide complementary trauma-informed interventions for students.**

**Recommendation 4-70: Teachers and school administrators should be trained to understand the basics of the U.S. immigration system and the rights of families to request protection, a hearing, and due process. They should also be trained to never provide students and their families with legal advice or to comment about their prospects for release.**

#### 4. Prevention and Reporting

**Recommendation 4-71: Teachers and school administrators are required under the ICE PREA standards to complete training in all topics for PREA employee training. They should understand the standards and develop skills to prevent, detect, and report sexual and physical abuse, including human trafficking.**

**Recommendation 4-72: Teachers and school administrators should be trained to prevent, detect, and report bullying.**

**Recommendation 4-73: Teachers and school administrators should know about appropriate referral resources for parents and students who show signs of stress, distress, or trauma.**

### I. K-12 School Performance

The Committee received only limited information, and therefore has an incomplete understanding of FRC school performance (e.g., administration and operation, characteristics of the education services and programs, student achievement and growth, school environment and resources). FRCs schools should be monitored for compliance with both ICE standards and effective implementation of the recommended best education practices herein.

**Recommendation 4-74: ICE should ensure that a qualified independent, impartial oversight authority monitors the performance of school contractors twice annually for compliance with ICE education standards and contract obligations, and that all monitoring reports are submitted directly to ICE and available to the public. These performance audits should include information from classroom observations, curriculum and lesson plan reviews, administrative and financial document reviews, and interviews with students, parents, teachers, and school administrators and should hold contractors accountable to address infractions.**

**Recommendation 4-75: ICE should ensure that a qualified independent, impartial oversight authority monitors the overall quality of the FRC K-12 education program twice annually for consistency with education best practices for English learners, students behind grade level, students who experience trauma, and students with interrupted formal schooling, and that all monitoring reports are submitted directly to ICE and available to the public. These evaluations should include information from classroom observations, curriculum and lesson plan reviews, administrative and financial document reviews, and interviews with students, parents, teachers, and school administrators and should hold contractors and their teachers and school administrators accountable for corrective actions.**

### J. Education Records

While the Family Residential Standards for education specify the documentation that should be included in each student's education record, the Committee received supplementary information from the FRCs that suggest the contents of the files vary and that the transfer of records to families upon release from detention is inconsistent. Ensuring families exit with these records may facilitate enrollment, placement, and services for students transitioning to schools in post-release communities.

**Recommendation 4-76: Education records should be standardized across FRCs. Currently there is variation. Minimally, records should include: grade placement; assessment results; progress reports and report cards; special education referrals, assessments, and IEP and 504 accommodation plans; earned credits; student work; and parent-teacher conference notes.**

**Recommendation 4-77: A hard copy and access to an electronic copy of each student's education records should be available to each family upon release from FRCs. This currently varies across FRCs.**[158]

**Recommendation 4-78: Education records should be available to families and receiving schools through an electronic record system to ensure expedited and secure access to information for enrollment, grade placement, and continuity of special education services and other education programming. If, as planned, according to ICE staff during the ACFRC site visits, ICE develops and implements a web-based portal for the transmission of FRC detainees' medical records, it should also be used to transmit education records. For example, the education and health records of migrant students enrolled in U.S. schools are managed through a web-based platform to enable the national exchange of information for highly-mobile students through the Migrant Student Information Exchange (MSIX) by the U.S. Department of Education.**[159]

**Recommendation 4-79: Education records should provide a detailed accounting of the credits each student earns while in detention, and these credits should be equivalent to those earned in U.S. schools and transferable to schools in post-release communities.**

### K. Parent Education

The Family Residential Standards for education do not address parent education. However, additional information provided by ICE documented that detained parents have access to some formal and informal educational opportunities, including English language classes and other scheduled self-care activities. This was corroborated through interviews with parents during Committee site visits, but the content and quality of parent education appear to be inconsistent. Providing parents with information about their children's education and the transition to new

---

[158] Berks reports that hard copies are routinely provided to parents; Dilley reports that they are provided upon request; and Karnes reports that it does not provide hard copies to exiting families.
[159] *Migrant Student Records Exchange Initiative*, U.S. DEP'T OF EDUC. (Aug. 26, 2014), http://www2.ed.gov/admins/lead/account/recordstransfer.html.

schools, and family support and self-care strategies, can ease both the stress of living in custody and the move to post-release communities.

### 1. Information about K-12 Schooling

**Recommendation 4-80: Parents should be informed in a language they understand well (ideally their primary language) about:**[160]

- **a) the curriculum, instructional strategies, and classroom management techniques, expectations, and requirements of their children's education program;**
- **b) their right to a free, public education notwithstanding their child's country of origin, child's best or first language, or child's disability, and their concurrent responsibility to send their school-age children to school daily and on time, to make sure they complete homework assignments, and to monitor their school performance;**
- **c) their right to have a written translation or an interpreter translate school paper work and communications. Their children should not serve as translators about education issues; and**
- **d) the contents of their child's education records.**

**Recommendation 4-81: Parents should be notified immediately of any student behavior issues or disciplinary measures, including exclusion from activities or assignment of extra work. Disciplinary measures should be determined with input and approval from parents.**

### 2. Orientation to Transition Children to U.S. Schools

**Recommendation 4-82: Parents should receive information in a language they understand well (ideally their primary language), about:**

- **a) the U.S. school system, in particular: the preschool, kindergarten, middle school, and high school curricula and grade-level expectations; and services for English language learners and newcomer students, before- and after-school care, special education, and free-reduced price school meal programs;**
- **b) the U.S. school calendar, compulsory school attendance laws, consequences of violating these laws, where to go for help when children are not attending school, and daily school attendance requirements;**
- **c) U.S. school operations and procedures. For example, enrollment, transportation, absences, grades and report cards, parent-teacher conferences, interpreters for meetings, fees for events and activities, school events, and school rules and discipline;**
- **d) the option of enrolling their children in a newcomer school or program if one is available in their post-release communities. Newcomer programs are specialized academic environments that serve newly arrived, immigrant English language learners for a limited period of time and focus on: acquisition of English language skills, limited instruction in the core academic areas, cultural adjustment to the U.S. school system, and development of literacy in the primary language; and**

---

[160] INT'L RESCUE COMM., EDUCATIONAL HANDBOOK FOR REFUGEE PARENTS (2006), http://www.brycs.org/documents/upload/Educational-Handbook-English.pdf.

e) **the importance of completing a high school degree to increase postsecondary education and employment options and high school transitions such as dropping out, earning alternative diplomas, job training, vocational certificate programs, and college.**

### 3. Parenting Support

**Recommendation 4-83: Parents should receive evidence-based, culturally sensitive information about U.S. parenting norms in a language that they understand well (ideally their primary language). An example is the Nurturing Skills for Families curriculum offered at Dilley, which is recognized by the Child Welfare League of America and the Substance Abuse and Mental Health Services Administration.**[161]

**Recommendation 4-84: Parents should be informed in a language that they understand well (ideally their primary language) about the therapeutic supports available at FRCs to alleviate trauma symptoms caused by their immigration and detention experiences such as the struggle to manage their families or protect their children from the uncertainty of their situation and FRC rules and regulations that may conflict with family or cultural traditions and preferences.**

**Recommendation 4-85: Parents should have access to self-care and stress reduction activities that focus on maintaining good nutrition, simple exercise routines (e.g., walking, stretching), and therapeutic mindfulness breathing exercises.**

### 4. English Language Instruction

**Recommendation 4-86: ICE should provide daily scheduled English language classes taught by credentialed English as a Second Language (ESL) adult education teachers to learn basic conversational English. Language instruction should focus on speaking practice, pronunciation improvement, and vocabulary expansion.**

**Recommendation 4-87: Parents should have structured opportunities to practice English language skills during hands-on activities such as playing with children, preparing food, or making crafts.**

### 5. Newcomer Education

**Recommendation 4-88: ICE should provide parents with information about key newcomer issues (e.g., learning English, receiving an education, finding housing, searching for a job, securing child care, using public transportation, banking and managing personal finances, and accessing legal and health, mental health, and dental services) to ease the transition to post-release communities.**

---

[161] NURTURING PARENTING (n.d.), http://www.nurturingparenting.com/.

## 5. LANGUAGE ACCESS

The families detained at ICE's Family Residential Centers (FRCs) have been through tremendous stress and danger. Immigration processing and detention both add more anxiety and trauma. All the detainees need information about the situation they find themselves in and about what lies ahead; many also have significant medical and mental health needs. Effective communication is vital for fair treatment, and the stakes of their communication could hardly be higher: their ability to understand and convey information can affect their liberty and immigration status, their ability to care for and make decisions about their child or children, and their own and their children's health and safety.

But meaningful and timely access to both legal proceedings and services through effective communication is challenging. Very few of the adult detainees of ICE's three FRCs are comfortable communicating using either written or spoken English. Most of them speak Spanish – but some do not. We understand that the non-Spanish speakers usually speak one of many indigenous Central American languages, or Portuguese. There are at least a few detainees, not from Latin America, who speak other languages, including various Chinese dialects and (we have heard) Urdu; no doubt there are others as well. Thus DHS faces significant language barriers in providing safe and humane detention and immigration processing for this population. Crucially, Spanish language services can meet an important part of this need, but by no means all of it.

Executive Order 13166, *Improving Access to Services for Persons with Limited English Proficiency*, requires that people whose English proficiency is limited nonetheless receive "meaningful access" to federal programs, benefits, and services. Throughout DHS, the obligation to provide language access for LEP (limited English proficient) individuals is particularly urgent, because of the very high prevalence of limited English proficiency and the very high stakes of communication. Language access to DHS programs, benefits, and services is thus a vital matter of equality, fairness, and safety.

DHS's overarching Language Access policy statement[162] covers the key needs:

> It is the policy of DHS to provide meaningful access for individuals with limited English proficiency to operations, services, activities, and programs that support each Homeland Security mission area by providing quality language assistance services in a timely manner. DHS Components, therefore, should incorporate language access considerations into their routine strategic and business planning, identify and translate crucial documents into the most frequently encountered languages, provide interpretive services where appropriate, and educate personnel about language access responsibilities and how to utilize available language access resources.

---

[162] U.S. DEP'T OF HOMELAND SEC., MESSAGE FROM THE SECRETARY https://www.dhs.gov/sites/default/files/publications/crcl-language-access-plan-s1-message-english.pdf, (Feb. 2012).

As DHS's 2012 Language Access Plan[163] explains, under applicable guidance from the Department of Justice,

> [A] four-factor analysis . . . assists in assessing meaningful access. These factors are the:
> 1) Number or proportion of LEP individuals encountered or likely to be encountered;
> 2) Frequency of contact with LEP individuals;
> 3) Nature and importance of the program, activity or service provided; and
> 4) Resources available and costs to provide the meaningful access.

In ICE family detention, the first three factors each weigh heavily in favor of comprehensive language access services: nearly all of the detainees have limited English proficiency; the contact is full-time during their stay in the facilities; and as already mentioned, the programs, activities, and services provided are essential to their safety, health, and fair treatment as would-be immigrants. In addition, relevant to the fourth factor, the fact that FRC population is large and the need is concentrated creates substantial economies of scale, ameliorating the costs needed to provide adequate language services.

ICE's Language Access Plan[164] confirms the agency's commitment to providing language access services throughout the course of detention:

> [T]he [ICE] standards . . . require that language services be offered in all detention facilities. . . . The standards also require that language services be offered throughout the detention process (e.g., during admission/intake, medical, classification, grievance system, discipline, legal rights group presentations, telephone access, transfer, and visitation).

Finally, ICE's Family Residential Standard 2.8 (Staff-Resident Communication), states, generally: "Where required, residents have regular access to translation services and/or are provided information in a language that they understand."[165] This requirement is then repeated many times, with respect to particular programs, including, for example, Legal Rights Group Presentations and Sexual Abuse and Assault Prevention and Intervention, among others.[166]

Thus DHS policy on language access, including for families in detention, is quite robust. However, that policy is neither appropriately implemented nor appropriately communicated to families detained in ICE's FRCs. This Part offers recommendations for improvement. From the moment LEP families arrive in DHS's custody, they are in need of language access services. Most

---

[163] U.S. DEP'T OF HOMELAND SEC., LANGUAGE ACCESS PLAN 3 (Feb. 28, 2012), https://www.dhs.gov/sites/default/files/publications/crcl-dhs-language-access-plan.pdf [hereinafter DHS Language Access Plan].
[164] U.S. IMMIGRATION & CUSTOMS ENFORCEMENT, LANGUAGE ACCESS PLAN 10 (June 14, 2015), https://www.dhs.gov/sites/default/files/publications/final-ice-lep-plan.pdf [hereinafter ICE Language Access Plan].
[165] U.S. IMMIGRATION & CUSTOMS ENFORCEMENT, ICE/DRO RESIDENTIAL STANDARD 2.8 STAFF-RESIDENT COMMUNICATION 1 (Dec. 21, 2007), www.ice.gov/doclib/dro/family-residential/pdf/rs_staff_resident_communications.pdf.
[166] U.S. IMMIGRATION & CUSTOMS ENFORCEMENT, ICE/DRO RESIDENTIAL STANDARD 2.7 SEXUAL ABUSE AND ASSAULT PREVENTION AND INTERVENTION 1 (Dec. 21, 2007), www.ice.gov/doclib/dro/family-residential/pdf/rs_sexual_assault_prevention-intervention.pdf; U.S. IMMIGRATION & CUSTOMS ENFORCEMENT, ICE/DRO RESIDENTIAL STANDARD 6.3 LEGAL RIGHTS GROUP PRESENTATIONS 1 (Dec. 21, 2007), www.ice.gov/doclib/dro/family-residential/pdf/rs-legal-rights-presentations.pdf.

typically, the first DHS component such families encounter is Customs and Border Protection (CBP), whose interactions with families are beyond the scope of this Committee. At some point, however, some (unknown to us) portion of families are transferred into ICE custody and the decision is made to detain them in family detention. That's where our recommendations will begin. Our recommendations are all framed by the family detention setting – but in our view they actually apply equally to *non-family* detention; implementation in all immigration detention facilities would improve ICE's language access considerably.

### A. Non-Spanish Speakers: Overarching Recommendation

In this Part, we explore the language-related needs of ICE FRC detainees who have limited English proficiency. Most are Spanish speakers; their needs are very significant and are addressed below. However, the Spanish-language issues are dwarfed by the needs of detainees who speak various Central American indigenous languages. For the latter group, it seems clear that DHS systematically fails to provide appropriate language access. That failure threatens both their health and safety while they are in DHS custody, and their fair immigration adjudication.

DHS Secretary Jeh Johnson announced in 2014 that DHS should avoid detaining members of various groups particularly vulnerable to harm in detention:

> Absent extraordinary circumstances or the requirement of mandatory detention, field office directors should not expend detention resources on aliens who are known to be suffering from serious physical or mental illness, who are disabled, elderly, pregnant, or nursing, who demonstrate that they are primary caretakers of children or an infirm person, or whose detention is otherwise not in the public interest.[167]

Individuals who speak only (or nearly only) a language that ICE is unable to accommodate are as vulnerable to harm from detention as persons who are disabled, elderly, or pregnant. Moreover, they cannot receive fair immigration processes. The changes needed to provide effective language access are identified below. But it is our view that providing indigenous language interpretation is almost certainly too challenging for ICE to manage. There are too many languages, each spoken by only a few people at any given time. Competent interpreters are few and far between, and telephonic interpretation, even when available, largely fails to provide effective communication. The time for processing detainees who are in expedited removal proceedings is too short to find necessary language services. Effective communication for detainees who speak indigenous languages is extremely difficult and in many instances impossible. Accordingly, we make one overarching recommendation on the subject of language access: that individuals who speak rare languages that pose these kinds of language access difficulties should be kept out of detention, to avoid the threats to their health and safety there and to reduce government costs related to identifying and providing interpretation for indigenous individuals, including the cost of their often prolonged detention while these services are located. And they should be placed into ordinary rather than expedited proceedings, to expand the time available to arrange language services. In the rare case where it is impossible or inappropriate to avoid expedited removal proceedings and/or

---

[167] U.S. Dep't of Homeland Sec., *Policies for the Apprehension, Detention, and Removal of Undocumented Immigrants* (Nov. 20, 2014), https://www.dhs.gov/sites/default/files/publications/14_1120_memo_prosecutorial_discretion.pdf.

detention, DHS should continue to strive to ensure appropriate interpretation and appoint each such person a lawyer, who can in turn facilitate fair processes and language access.[168]

**Recommendation 5-1: When DHS encounters an individual who speaks a rare language that poses severe language access difficulties – such as a Central American indigenous language – such a person should not be detained, but should rather be released with a Notice to Appear, on their own recognizance or with the support of a case management support program. In the rare event that this approach is inappropriate or impossible, such persons should be provided with appointed counsel who can facilitate both effective language access and fair immigration proceedings.**

### B. Disability Access

We note that language access is a particularly acute need for detainees with communications-related disabilities – who may be sight-impaired, hearing-impaired, or speech-impaired. The Rehabilitation Act of 1973, 29 U.S.C. § 794, forbids discrimination against such individuals, and the Rehabilitation Act's DHS regulation requires all its components to "take appropriate steps to ensure effective communication with applicants, participants, personnel of other Federal entities, and members of the public" including by "furnish[ing] appropriate auxiliary aids where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a program or activity conducted by the Department." The regulation notes that, "In determining what type of auxiliary aid is necessary, the Department shall give primary consideration to the requests of the individual with a disability."[169] A DHS Management Directive elaborates further that the "effective communication" obligations apply to "persons who are deaf or hard of hearing or are blind or have low vision," and also require "modifying practices and materials to ensure effective communication with persons with intellectual or developmental disabilities."[170]

The Committee requested that ICE provide us all "communication policies/SOPs [Standard Operating Procedures]/strategies to ensure effective communication for people with communications disabilities," and were told they were being provided. But the only relevant documents provided concerned telephone usage and FRC policies on "Sexual Abuse/Assault Prevention and Intervention Programs." Similarly, ICE's response to our question "What auxiliary aids and services are available (hearing aids, TTY, videophone, captel, etc.)?" was that the facilities have a TTY – a telephonic communications (TTY stands for **Tele****TY**pewriter) device for people who are deaf and literate – and that "after medical prescription-hearing aid[s]" are available.

We conclude that there are no general policies, standard operating procedures, or strategies in place to ensure compliance with the above legal requirements and other best practices for the

---

[168] In their inability to communicate and navigate the immigration system, people who speak rare languages are similar to those with mental disabilities, for whom the government is under court order to provide counsel. *See* Franco-Gonzales v. Holder, No. 2:10-cv-02211-DMG, 2013 WL 3674492 (C.D. Cal. Apr. 23, 2013), *settlement approved sub nom.* Gonzalez v. Holder, No. 2:10-cv-02211-DMG, 2015 WL 11116905 (C.D. Cal. Sept. 25, 2015).
[169] 6 C.F.R. § 15.60 (2004).
[170] U.S. Dep't of Homeland Sec., Directive No. 065-01, Nondiscrimination for Individuals with Disabilities in DHS-Conducted Programs and Activities (Non-Employment) § V.A.1.c (Sept. 25, 2013), https://www.dhs.gov/sites/default/files/publications/dhs-management-directive-disability-access_0.pdf.

confinement of persons with communications disabilities. This absence of policies and procedures are devastating if a detainee with a communication-related disability enters FRC custody. There is no system in place to ensure appropriate orientation, to facilitate effective communication during immigration processing, or to provide appropriate medical and mental health care. For each of the sections of this report that follow this one, both policy and practice would have to be altered to accommodate the communications needs of any detainee who was deaf or hard-of-hearing, blind or low-vision, speech-impaired, or whose communications abilities are undermined by an intellectual or developmental disability. The communications difficulties would be further augmented when, as is highly likely, the affected detainees have limited written English (and perhaps limited written Spanish) proficiency – particularly because there are many different sign languages used by deaf Central and South Americans. For each such detainee, the required auxiliary aids and services would have to be specially assessed and would be both urgent and extremely challenging – perhaps even impossible – to provide in a timely way.

The presence of a TTY machine is far from sufficient to provide effective communication. Even considering only the issue of telephonic communication, a TTY cannot work at all for a deaf detainee who cannot type in English or Spanish. And even for detainees who are literate, a TTY requires access to a relay service for it to be useful to reach anyone who doesn't him or herself have a TTY.[171] For someone whose written language is Spanish, that needs to be a Spanish relay service. Both Texas and Pennsylvania have both Spanish and English relay services – TTY users simply dial 711. But, unless staff are trained in how to use the TTY and how to access the relay service, they will not know it exists, and the TTY will be ineffective.

For non-telephonic communication for deaf detainees, live and/or video sign-language interpretation would often be needed, and would likely require multiple interpreters (e.g., English to Spanish to the appropriate sign language). For blind detainees, a variety of accommodations are necessary for safe detention and effective communication. For detainees with intellectual or developmental disabilities, the complex written and oral materials given to detainees are far too sophisticated for effective communication, and are compounded by their likely limited English proficiency.

ICE informed us that there has been just one FRC detainee with a communications disability, a sight-impaired detainee in June 2016. Detention of any such persons in the future is unlikely to comply with the applicable legal or humanitarian imperatives. Such persons will require substantial resources and assistance to facilitate fair immigration processing. Accordingly, and consistent with the Secretary's 2014 reference to persons with serious disabilities, we make the following overarching recommendation:

**Recommendation 5-2: Immediately upon taking custody of a potential detainee, ICE should assess each such person to determine if his or her ability to communicate is impaired by a disability – because he or she is deaf or hard-of-hearing, low-vision, speech-impaired, or has a developmental or intellectual disability. Absent extraordinary circumstances, such persons should not be detained, but should be released to the community with a Notice to Appear and if feasible, enrolled in a family case management-based program or other support program. If ICE declines to adopt this recommendation, it is urgent that policy and practice be**

[171] The relay service allows the deaf individual using the TTY to type her message; the relay operator then reads what is typed out loud to a person using a regular phone on the other side of the conversation; that other person responds verbally and the relay operator types what is said to be read by the deaf individual using the TTY.

**modified and individualized for every type of communication for any detainee with a communications disability, and that adequate monitoring and oversight policies be put into place to ensure that such individualized plans are followed.**

### C. Identification

The first step to providing language services is identification. ICE's process for identifying language needs for FRC detainees saw significant improvements after ICE promulgated its language access plan in the summer of 2015.[172] The current procedure is described in an undated ICE memo titled *New Protocol for Identifying Indigenous Language Speakers at Family Centers*,[173] apparently issued sometime after August 2015. The memo explains, correctly, that "one-word responses are insufficient to assess understanding" of a given language and therefore directs staff to "engage residents in conversation to elicit responses that convey meaningful understanding." The process begins with a script, in Spanish; ICE staff are instructed to use the script to "address all Mexican, Central and South American individuals to determine the resident's primary language." The script includes several questions that call for discursive answers;[174] staff are instructed to gauge each detainee's comfort level in Spanish based on her answers.

Even if the staff administering the script believe, based on the answers, that the detainee is proficient in Spanish, they are instructed to next "ask a control question to determine if the resident feels more comfortable speaking a language other than Spanish." This is:

> "You seem to understand Spanish. Is there another language you speak more often with your family or children when in your home country?"

If the detainee responds "no," Spanish is recorded as her primary language. If the answer is "yes," then the detainee is asked "Are you more comfortable speaking this language?"

If the detainee's answers to the script questions indicate that she is not comfortable in Spanish, or if the answer to this second control question is yes, the next step is an "Indigenous Language Slideshow." These slides include written text (using the standard English/Spanish alphabet) and audio that ask, in a series of languages: "We need to identify your native language. Please raise your right hand if this is the language you speak at home with your family." Included in the slides are nearly a dozen indigenous languages from Central America (Quechua, Mam, Q'anjob'al, K'iche, Q'eqchi, Achi, Awakateco, Chuj, Popti, Ixil, Mixteco) and two African languages (Amharic, prevalent in Ethiopia, and Tigrinya, prevalent in Eritrea).[175]

---

[172] ICE Language Access Plan, *supra* note 164, at 1. The Language Access Plan has a date of June 14, 2015 on the first page, but the Director's signature, on the second page, is dated August 7, 2015.
[173] *See* Decl. of Jon Gurule, Exh. 5, Flores v. Holder, No. 2:85-cv-04544 (C.D. Cal. June 3, 2016), www.clearinghouse.net/chDocs/public/IM-CA-0002-0030.pdf. We note that this document was not provided to us by ICE, though it is clearly encompassed by our request for information and it was described to us during one of the Committee meetings.
[174] In Spanish: 1. Where do you normally shop for clothing and food in your home country? 2. Describe the area where you and your family live in your home country. 3. Tell me about the school or education your children had in your home country. *Id.*, Exh. 6.
[175] *Id.* Exh. 8.

The policy provides that "when an indigenous speaker has been identified the language must be documented in EADM [ENFORCE Alien Detention Module] and the detainee file and communicated to FRC staff. Intake staff will seek interpretive assistance from one of several language lines available."[176] ICE staff are further directed to a non-public intranet page: "For more information on available language lines please visit https://insight.ice.dhs.gov/ero/custody/Pages/jfnnu.aspx."[177] ICE briefed us on this protocol in March 2016, and told us that "[a]ffirmation of full compliance is pending, as the program continues its 'rollout' phase."[178]

Thus ICE policymaking has been attentive to the need to identify the language needs of detainees. However, it is not clear to us that ICE has in place the tools or procedures needed to succeed in these efforts:

First, the language identification slideshow does not cover all the languages used by FRC detainees. When we requested a list of languages spoken by detainees, the answer ICE provided was "Languages vary, but currently residents throughout the FRCs speak Spanish, English, Portuguese, Mam, Kiche, and Q'anjab'ol, Akateko, and different Chinese dialects." The slideshow does not include Akateko (which is a different language from Awakateco[179]), Portuguese, or Chinese. It also omits other languages that may also be appropriate to include; a recent NGO complaint to DHS about indigenous language services at the FRCs listed four other languages not covered by the slideshow – Maya, Garifuna, Kaqchikel, and Lenca – as notable needs.[180] Without fuller information about what languages are spoken by detainees, we cannot advise ICE – and ICE cannot itself determine – what is needed.

Second, we are unable to evaluate how well the processes that exist are working, even for the languages that are covered. We note that in a recent court filing by the *Flores* plaintiffs, the Policy Director for the NGO RAICES (Refugee and Immigrant Center for Education and Legal Services) explained that her colleagues were able to review the situations of 250 families, "primarily from Guatemala, who speak variations of Akateco, Kanjobal [Q'anjab'ol], Quiche, Kekchi, Mam,

---

[176] *Id.* Exh. 5.
[177] We were also shown a DHS resource, the *I-Speak* booklet, which is designed to facilitate LEP persons' identification of their language, if they are literate, by listing languages in the applicable characters, and allowing them to point to those they can understand. But this resource cannot help someone who is illiterate, and it was not explained to us how the I-Speak booklet is used. Because the I-Speak booklet is not referenced in the memo just described or in the process flowchart that accompanies that memo, we infer that it is not used, in practice.
[178] U.S. Immigration & Customs Enforcement, *Advisory Comm. on Family Residential Centers Read Aheads* 7 (Mar. 16, 2016), https://www.ice.gov/sites/default/files/documents/Document/2016/acfrcBriefingMaterialsMar2016.pdf; *see also* U.S. Immigration & Customs Enforcement, *Advisory Comm. on Family Residential Centers Summary of Meeting* (Mar. 16, 2016), https://www.ice.gov/sites/default/files/documents/Document/2016/ACFRC-201603.pdf.
[179] Compare *Akatek Language*, Wikipedia (last modified Sept. 18, 2015), https://en.wikipedia.org/wiki/Akatek_language, with *Awakatek Language*, Wikipedia (last modified Jan. 13, 2016), https://en.wikipedia.org/wiki/Awakatek_language.
[180] Compl. submitted by Karen S. Lucas, et al., CARA Family Detention Pro Bono Project, to Megan Mack, Office for Civil Rights & Civil Liberties, U.S. Dep't of Homeland Sec., and John Roth, Office of Inspector Gen., U.S. Dep't of Homeland Sec., AILA Doc. No. 15121011 (Dec. 10, 2015), http://www.aila.org/File/DownloadEmbeddedFile/66618 [hereinafter CARA Complaint].

Maya, Popti, Achi, Garifuna, Kaqchikel, Chuj, Ixil, Lenca, and other Mayan languages." She explained:

> Based on our review, several trends emerged, including: (1) inadequate screening of language ability by CBP and ICE both at the border and in the family detention facilities; (2) DHS's failure to provide written materials concerning *Flores* rights or asylum in indigenous languages; and (3) DHS's failure to provide indigenous language interpreters to enable government officials, detention center staff and service providers to convey critical information.[181]

This leads to a third point: ICE does not adequately track either non-Spanish languages needed for interpretation/translation, or how well its language access processes are working. We were unable to obtain from ICE any of the following:

- a comprehensive list of languages detainees speak or read;
- the number of language-line interpretation requests;
- the number of hours of language-line usage; or
- languages for which interpretation services were used for medical care.

ICE also informed us that it does not track either the proportion of adult detainees not fluent in Spanish or the proportion of adult detainees not literate in Spanish. Without keeping better records than we have evidence of, ICE simply cannot provide adequate language access to non-Spanish speakers.

**Recommendation 5-3: ICE should ensure that each adult detainee can effectively communicate to DHS, ICE, and FRC staff what language she and her children speak (these may differ). This information should be tracked individually for both the adult and children, by ICE and by FRC staff, and the appropriate language used whenever necessary for meaningful access to ICE programs, activities, and services. The current audio slideshow is a good step towards the goal of language identification. But it should be augmented with other languages that detainees have used since the FRCs opened, including, e.g., Akateko and other indigenous languages, Portuguese, various Chinese dialects, and Urdu. ICE policy and procedure should cover the possibility that a detainee may not confirm any language covered by the slideshow. In that event, ICE should undertake additional individualized steps to identify the language need. All detainees without exception – children – and adults – should have a primary language noted in their file, and on their ID.**

**Recommendation 5-4: ICE should track the languages spoken by FRC detainees, and their needs for interpretation and translation services, so that statistical information on the frequency of language needs is readily available to ICE and throughout DHS. This will facilitate planning and service provision.**

In addition, the language access needs of detainees vary with their literacy level. A 50-page handbook or even a single page form constitutes ineffective communication if she is illiterate. We

---

[181] Plaintiff's Exhibits in Support of Motion to Enforce Settlement and for Appointment of Special Master [Part 6: Exhibits 48-69] Exh. 67 (Decl. of Amy Fischer), ¶ 6, Flores v. Johnson, No. 2:85-cv-04544 (C.D. Cal. May 19, 2016), www.clearinghouse.net/chDocs/public/IM-CA-0002-0024.pdf.

have no precise information on the literacy level of the FRC's adult detainees, regardless of their language, because ICE does not track that information. But we do know from many sources that the rate of illiteracy is high, which affects the steps ICE should take to provide effective communication: translations of complex English documents are not sufficient.

**Recommendation 5-5: For each document provided with FRC detainees, ICE should create versions that are as accessible as possible, using simple language, flowcharts, graphics, and similar non-text strategies that assist in comprehension and understanding for a variety of potential obstacles including literacy level, education level, intellectual capacity and disabilities of any kind.**

**Recommendation 5-6: ICE should assess and track the literacy of each adult FRC detainee, in each language she speaks, noting low literacy in detainees' files. Whenever ICE communicates in writing with a detainee whose literacy is low, it should use documents that are both (a) in a language the detainee understands and (b) adapted to be more accessible, in light of her literacy level. In addition, oral communication of rules, procedures, and expectations is particularly important for detainees with low literacy and should be conducted, using simple and direct phrasing, in a language detainees understand or using a qualified interpreter.**

### D. Orientation

Once a detainee's language needs are ascertained, those needs should be met. The first situation in which good language access is needed is orientation; that's when detainees are given an explanation of rules, services, and what is going to happen to them. FRC orientation includes both a spoken presentation in Spanish and the provision of the resident handbook already mentioned. The handbooks are very lengthy, facility-specific documents (Berks: 38 pages; Karnes: 45 pages; Dilley: 79 pages). ICE rules dictate that they must be available in English and Spanish, but do not require availability in any other language, unless that language is more prevalent than Spanish.[182] Facility policies are a bit more ambiguous,[183] but in fact, the handbooks have not been translated into any other languages.

Yet if more than a few detainees who are literate in other languages are housed in an FRC – the absence of statistical information mentioned above means we cannot know if this is the case – ICE should translate the resident handbooks into additional languages. An NGO that has had substantial interaction with detainees suggests that written translations are appropriate in Akateco, Kanjobal, Kiche, Kekchi, Mam, Maya, Popti, Achi, Garifuna, Kaqchikel, Chuj, Ixil, and Lenca.[184] In our view, translated written materials should be prepared for any language that is the primary language for 0.5% of detainees, or for 50 detainees per year, whichever is lower. (ICE reported in May 2016 to the *Flores* district court that nearly 19,000 persons had been detained over the prior

---

[182] *See* U.S. Immigration & Customs Enforcement, Detention and Removal Operations Performance Monitoring Tool, Monthly Compliance Review Report (requiring availability of "[o]rientation material in English, Spanish or most prevalent second language. All orientations are conducted in person" and "[r]esident handbook . . . [a]vailable in both English and Spanish and/or second most prevalent language.").
[183] *See, e.g.*, Dilley Policy 14-101, Resident Grievance Procedures 2 (Aug. 17, 2015) ("Each resident shall be provided, upon admittance, a copy of the resident handbook which provides notice of the following in English, Spanish, and other languages most widely spoken among the residents.").
[184] CARA Complaint, *supra* note 180, at 9.

seven months; an average of about 2,700/month. On that admissions rate, 0.5% is 13 in an average month.)

Again, given what are likely low adult literacy rates among all detainees, regardless of their language, it is vital to make available simplified summaries of the voluminous orientation materials. In addition, oral communication, in a language each detainee understands, of all rights, rules, and requirements during orientation is particularly important. All three facility policies provide for such oral communication. At Dilley, for example, the policy requiring that detainees receive a copy of the resident handbook also explains about it that "Interpretation or translation services will be provided to residents who are not proficient in English."[185] All three handbooks state that residents "have the right to be informed of the rules, procedures and schedules concerning the operation of the facility where you are detained" and "have the responsibility to know them and abide by them."[186] However, only the Karnes handbook tells detainees themselves that they are entitled to language assistance in order to understand orientation. It states (in the section on grievances):

> If a resident cannot read or does not understand the language of the handbook, the Facility Administrator arranges for the orientation materials to be read to the resident, provide the material using audio or video tapes in a language the resident does understand, or provide a translator or interpreter within a reasonable amount of time.[187]

We are not, however, aware that any such video or audio tapes have ever been used. And it seems highly likely that the necessary interpretive services – though they may be available, via telephonic language lines – are not consistently used at the FRCs.

We cannot be absolutely certain of this last conclusion because, as already explained, ICE declined to tell us the number of language-line interpretation requests or the number of hours of language-line usage. And (as we discuss in Section M, below), ICE does not currently conduct any systematic self-monitoring or language access assessment. But we do have some important evidence: the NGO report cited above, which was based on review of 250 files, and an ICE compliance review.

The NGO report alleges that FRC staff systematically fail to communicate with non-Spanish speakers in their languages. It claims that the following is typical:

> When Elana and her two-year-old son first arrived at the Dilley detention center after being detained on August 26, 2015, she informed officials that she spoke Mam, an indigenous Mayan language spoken by half a million Guatemalans, and that her religion was Mam. But during the three weeks that she and her two-year-old son spent in detention, neither ICE nor Corrections Corporations of America (CCA) (the private prison contractor operating the Dilley detention center) staff

---

[185] Dilley Policy 14-101, *supra* note 183, at 2.
[186] Berks Resident Handbook 6 (undated); Dilley Resident Handbook 11 (2016); Karnes Resident Handbook 2 (2015).
[187] Karnes Resident Handbook, *supra* note 186, at 24.

> communicated with her in Mam. ICE never found a Mam interpreter for Elana or gave her any documents written in Mam."[188]

Since August 2015, a company called Danya International has conducted monthly compliance reviews of all three facilities, to evaluate their compliance with ICE's Family Residential Standards. The reviews include evaluation of facility compliance with Family Residential Standard 2.8, which requires language access services. (It states, in part: "Where required, detainees have regular access to translation services and/or are provided information in a language that they understand.") Notwithstanding their relevance to our task, ICE unfortunately declined to make these documents available to us. However, out of the dozen-plus reviews conducted for each facility, ICE chose one review per facility to provide to the *Flores* District Court.[189] The one review of Dilley ICE chose to include in its court filing describes both a documentation problem and an underuse of interpretation. It noted, earlier this year, that "Review of both the log and the list of the detainee's primary and second language (dated 1/04/16) does not show consistent use or consistent documentation of use of the language line." And it recommended that officials "Ensure that staff assigned to intake are aware of when to use and document the use of the language line. For those detainees where the primary and secondary language is not English or Spanish and the language line is not used, develop and implement a process [to] document why."[190]

In short, we are unable to assess how prevalent language line use is, and, correspondingly, the extent of underuse, because ICE declined to provide the necessary information. But we think it likely that FRC detainees who do not speak English or Spanish are not receiving interpretive services during orientation.

Even if telephonic interpretation were provided consistently when appropriate, the extensive discussion that is necessary to substitute for such lengthy documents as the resident handbooks undermine the efficacy of such interpretation. During one of our facility visits, staff explained to us that an Urdu-speaking ICE staff member temporarily assigned to one of the Texas facilities was able to greatly ease the detention experience of one detainee family who were otherwise dependent on language line interpretation. As this explanation suggests, language lines are helpful, but live interpretation – or, even better, bilingual staff – are far more effective. Presumably it is for this reason that Dilley has contracted with a Mam speaker. Video or audio tapes – if ICE were sure that they were in the right language – would likewise be better than an extensive interpreted session.

**Recommendation 5-7: After tracking the languages spoken and the language access needs for several months, ICE should ensure that the FRC resident handbooks are translated into any additional languages that are used by the lower of 0.5% or more detainees, or 50 detainees in the course of a year. ICE should ensure that video or audio taped summaries of the handbooks are available for any detainees who are not highly literate in any language for which a translation is available, and should offer an opportunity to listen to or watch such a recording to all detainees.**

---

188 CARA Complaint, *supra* note 180, at 5.
189 *See* Decl. of Jon Gurule, *supra* note 6, Exh. 1-3 (Danya International Reports of Compliance Inspections of BFRC (Berks) (Nov. 10, 2015), KCRC (Karnes), (Sept. 10, 2015), and STFRC (Dilley), (Jan. 27, 2016)).
190 Decl. of Jon Gurule, *supra* note 6, Exh. 3, at 4.

### E. General Provision of Language Access Services

For all three facilities, once orientation is complete, neither facility policy documents nor the resident handbooks include any general statement describing language access policy/rights. There is no policy that repeats the general command of ICE Family Residential Standard 2.8 ("Where required, residents have regular access to translation services and/or are provided information in a language that they understand."). And the availability of language services is not communicated – at least not in writing – to detainees. Each of the resident handbooks includes a section "Resident Rights and Responsibilities," for example, but those sections do not inform detainees of their right to language assistance that provides meaningful access to programs, benefits, and services. Policies and the handbook occasionally mention language services – but for only a very few of the many situations where such services are needed for LEP detainees' equal access. Indeed, the explicit reference in a few circumstances to interpretation services might easily be read by detainees to suggest that such services are not more broadly available, even when needed in order to communicate effectively with FRC staff, ICE, USCIS, FRC health care, child care, food service, mental health, teachers and others at the FRC.

This failure to communicate the language access services is in violation of the direction of the Attorney General to all federal agencies to "Notify the public, through mechanisms that will reach the LEP communities you serve, of your LEP policies, plans, and procedures, and LEP access-related developments."[191] In addition, orderly management of the facilities and fair and equal treatment of the detainees depends on their understanding of what is going on. All three of the handbooks explain that it constitutes misconduct for a resident to fail to "follow[] specific rules and/or orders which have been designated for the clean, safe, orderly operation of the facility which residents have been told in advance through posting or have been given verbally by an employee of the facility or person who has charge of the resident at the time."[192] Yet, the handbooks — which, remember, constitute the material that is supposed to be presented during orientation to each non-Spanish speaking detainee via interpretation – do not inform detainees how they are supposed to respond to a command or an instruction in a language they do not speak, if they do not understand it.

ICE has not shared with the ACFRC the information we would need to thoroughly understand general language assistance practices and when current efforts are falling short. We do know, however, that problems exist. The NGO report already cited alleges a systemic failure to provide interpretive services and documents in indigenous languages. And ICE itself has disclosed some problems to the *Flores* court: in the one standards compliance report the government recently chose to file in the *Flores* court about Berks, the evaluation noted problems with compliance with Family Residential Standard 2.8:

> "Observation: The following forms signed by residents were not provided in Spanish or other native languages: Food Service Agreement to Work; Maintenance

---

[191] *Memorandum from the Attorney General to Heads of Federal Agencies, General Counsels, and Civil Rights Heads, re. Federal Government's Renewed Commitment to Language Access Obligations under Executive Order 13166*, at 2 (Feb. 17, 2011), https://www.lep.gov/13166/AG_021711_EO_13166_Memo_to_Agencies_with_Supplement.pdf.
[192] Berks Resident Handbook, *supra* note 186, at 26; Dilley Resident Handbook, *supra* note 186, at 58; Karnes Resident Handbook, *supra* note186, at 13.

> Agreement to Work; Housekeeping Agreement to Work; Consent for Treatment; Right to Know; and Grievance Procedure. *(Observed 9/15/15)*
>
> "Recommendation: Translate forms into Spanish or any other native languages or document that language line was used to translate form prior to resident signing.
>
> "Follow-up: Resolved-The facility has translated into Spanish forms to be signed by residents for the following: Food Service Agreement to Work; Maintenance Agreement to Work; Housekeeping Agreement to Work; Consent for Treatment; Right to Know; Parental Notification Form and Grievance Procedures; New Admission Orientation Acknowledgement Form; and Voluntary Work Program Agreement Form. There is a box on each form for the signature of the interpreter used attesting to the information translated. *(Observed 10/26/15)*"[193]

It seems likely that the system in place to ensure effective communication with non-Spanish FRC detainees in their general lives is not succeeding.

For both Spanish speakers and non-Spanish speakers, we have also heard reports of children being asked to interpret for their mothers or for other adults. ICE policy forbids this practice absent exigent circumstances.[194] It is bad practice for many reasons:[195]

- Omissions: Particularly when information is sensitive – which in this setting is frequent – parents may omit important information, or soften the details, because they do not want the child to know sensitive aspects of their lives or because they do not want to traumatize or re-traumatize the child.
- Trauma: If a parent does not omit sensitive information, that information can be traumatizing to the child.
- Editing: Children may alter language to fit their own view of what is appropriate, convenient, or proper to say, or to spare parents from suffering embarrassment or because they are just not able intellectually or emotionally to convey the accurate information.
- Role reversal: It can interfere with parental discipline for the child to be called upon to provide help and support to the parent.
- Mistakes: Children are likely to make mistakes, even if they say (and believe) they understand and are interpreting correctly.
- Guilt: It is easy for children to feel they are the cause of suffering because they conveyed something painful or to fear that a bad outcome results from their inadequacy as an interpreter.
- Confidentiality: Even when cautioned, children do not understand issues of confidentiality and may inadvertently reveal sensitive material learned during interpreting.

---

[193] Decl. of Jon Gurule, *supra* note 66, Exh. 1, at 4.
[194] ICE Language Access Plan, *supra* note 164, at 9.
[195] The list in text is largely adapted from M.J. Gilbert, *The Case Against Using Family, Friends, and Minors as Interpreters in Health and Mental Health Care Settings*, in PROCESS OF INQUIRY – COMMUNICATING IN A MULTICULTURAL ENVIRONMENT (Nat'l Ctr. for Cultural Competence, Geo. Univ. Ctr. for Child and Human Dev. 2005), http://www.nccccurricula.info/communication/D15.html.

**Recommendation 5-8: For all detainees, ICE should facilitate effective communication and meaningful access to programs, benefits, and services by using clear, simple language whenever possible.**

**Recommendation 5-9: ICE should ensure that facility policy, resident handbooks, and oral orientation (whether live or recorded) clearly communicate the overarching policy that detainees have a right to language assistance that provides meaningful access to programs, benefits, and services, and that this right includes interpretive services, if necessary, for all important conversations with ICE and contractor staff.**

**Recommendation 5-10: ICE should ensure that all routinely used documents are translated into all languages read by the lower of 0.5% or more detainees, or 50 detainees in the course of a year. Documents should also be adapted into a summary bullet point or into graphics when possible, to facilitate understanding by detainees with low literacy. Every document should be tested with detainees to ensure understanding and effective communication before being finally adopted.**

**Recommendation 5-11: ICE should provide qualified interpretation whenever necessary to provide meaningful access to programs, benefits, and services. This right includes interpretive services, if necessary, for conversations involving DHS or contractor staff. Interpretation can be provided using telephonic or video interpretation,[196] but in addition, ICE should investigate the option of local interpretive service providers who specialize in regional dialects and indigenous languages.**

**Recommendation 5-12: Having identified what non-Spanish languages are frequently needed, ICE should explore various ways to provide live interpretation or bilingual staff, by, e.g., hiring contractors and bringing in detailees.**

**Recommendation 5-13: ICE should record each time a detainee receives qualified interpretation services, whether by language line or in-person interpreter, and should conduct frequent checks of detainees' language needs against language line and interpreter usage, systematically auditing when detainees who do not speak Spanish are receiving communication in a language they understand and when they are not, and then implementing resources, training, and other supervision to improve language access as the audit reveals various needs. The audits should pay particular attention to orientation, medical and mental health care, case processing, and release conditions.**

**Recommendation 5-14: ICE should track and report monthly statistics relating to interpretive services, including how many times interpreters – telephonic or in-person – are used, for how many detainees, and the languages and situations involved. The statistics**

---

[196] For discussion of video interpretation, see 45 C.F.R. § 92.201(f) (2016), https://www.federalregister.gov/documents/2016/05/18/2016-11458/nondiscrimination-in-health-programs-and-activities.

**should include how often per week in detention interpretive services are provided to non-Spanish speakers.**[197]

**Recommendation 5-15: Children should not be used as interpreters. With proper planning and staffing, the exigent circumstances that are the prerequisite to such use under ICE policy can be entirely avoided.**

### F. Access to Fair Immigration Procedures: Law Library

ICE does not provide counsel to FRC detainees, but rather supports their access to legal services less directly – via provision of a law library and facilitation of communication with potential and actual counsel. Part 3.E of this Report covers the law library more generally, including its appropriate content. It is vital for the libraries to include legal materials in Spanish and other languages detainees read, when those are available. Even if this is done, however, many books and other materials in the law library are, necessarily, in English, so this particular language access issue is applicable to all the Spanish-speaking detainees, as well as those who speak neither Spanish nor English.

The Supreme Court case law from the analogous situation in prison demonstrates that it is constitutionally insufficient for a detaining authority to provide non-English-speaking detainees with law books unusable by them. In *Lewis v. Casey*, the Court wrote: "Of course, we leave it to prison officials to determine how best to ensure that inmates with language problems have a reasonably adequate opportunity to file nonfrivolous legal claims challenging their convictions or conditions of confinement. But it is that capability, rather than the capability of turning pages in a law library, that is the touchstone."[198] Facility policies recognize this point. Karnes's policy, for example, states:

> Unrepresented illiterate, non-English speaking or disabled detainees who wish to pursue a legal claim related to their immigration proceedings or detention, and who indicate difficulty with the legal materials must be provided assistance beyond access to a set of English-language law books. To the extent practicable and consistent with the good order and security of the facility, all efforts will be made to assist all illiterate, limited-English proficient and disabled persons in using the law library."[199]

The Karnes policy then sets out "[p]rocedures to meet this obligation:"

> "1. Helping the resident obtain assistance in using the law library and drafting legal documents from residents with appropriate language and reading-writing abilities; and
> "2. Assisting in contacting pro legal-assistance organizations from the ICE approval

---

[197] The kind of report the Committee has in mind in the last sentence of the recommendation might read, e.g.:
Number of non-Spanish speakers in detention, January 2017: 72.
Interpretive services provided: 1 per week: 10
2 per week: 22
3 per week: 40.

[198] Lewis v. Casey, 518 U.S. 343, 356–57 (1996).

[199] Karnes Policy 6.1.1, Law Library and Legal Materials 6.

> list.
> "3. Where required, residents have regular access to translation services and/or are provided information in a language they understand.
>
> "If such methods prove unsuccessful in providing a particular non-English-speaking or illiterate resident with sufficient assistance, the facility shall notify JFRMU, ICE Field Office, and ICE Chief Counsel. The standard complies with federal laws and with DHS regulations regarding residents with special needs."[200]

Both Dilley and Berks policies similarly cover what the Karnes' policy labels items 1 and 2 – but both omit the Karnes' policy's item 3. That is, at Dilley and Berks, the policy completely omits translation or interpretation.[201]

Moreover, neither the Dilley nor the Berks resident handbook mentions anything about even this limited language assistance policy in connection to the law library – so detainees are given no information about what help is available to them. And even at Karnes, where the policy mentions translation, the resident handbook does not. It simply states:

> By submitting a Resident Request Form, you may be permitted to obtain assistance from other residents in researching and preparing legal documents, except when such assistance may pose a security risk. Such assistance is voluntary; no resident will be allowed to charge a fee or accept anything of value for assistance. Illiterate, unrepresented and non-English speaking residents will be provided with access to more than English-language law books, assistance in using the Law Library, and contacting Pro Bono legal assistance organizations, upon request. ICE will not pay compensation to a resident for researching or preparing legal documents on behalf of another resident.

Moreover, the Karnes Resident Handbook actually states – inappropriately – "Printing of documents can only be done in the English language; therefore you will have your printed documents checked by the Library staff before you depart the law library." This renders detainees unable to print any certain legitimate legal documents, including, for example, the *Flores* pro-se handbooks, explanations of parental rights, and many other important and helpful tools and resources, as well as witness declarations and USCIS explanatory material. (See the USCIS Language Access Plan[202] for a description of ongoing USCIS efforts to provide many different documents in high-use languages, including Spanish.)

More generally, it is apparent from descriptions in all three handbooks, and from the Dilley and Berks policies, that interpretation and translation services for law library access are not routinely – and perhaps not ever – offered. This is not only a language access failure under Executive Order 13166; it may also constitute an inappropriate denial of access to the courts. As the Supreme Court explained in the passage from *Lewis v. Casey* cited above, what is important is that the detainees have an adequate opportunity to make their claims (here immigration rather than prison-related

---

[200] *Id.*
[201] Berks Policy 15.010, Law Library and Legal Material 2 (Dec. 1, 2013); Dilley Policy 14-105, Law Libraries and Legal Materials 5 (Jan. 15, 2016).
[202] U.S. DEP'T OF HOMELAND SEC., U.S. CITIZENSHIP & IMMIGRATION SERVS., LANGUAGE ACCESS PLAN (June 3, 2016), https://www.uscis.gov/sites/default/files/USCIS/Outreach/LanguageAccessPlan06042016.pdf.

claims), both with the agency and with the courts. The help of other detainees is unlikely to meet the need – FRC detainees, who are responsible for caring for their children, do not have the time available to develop the expertise to become "jailhouse lawyers." And access to legal assistance organizations may or may not be sufficient to provide the constitutionally required opportunity. Where it is not, translation and/or interpretation may be needed.

**Recommendation 5-16: As much as possible of the FRC law library material should be in Spanish and other languages detainees read, in addition to English.**

**Recommendation 5-17: ICE should provide language access services for detainees who use the law library, including translation and interpretive services. Bilingual paralegal services may prove necessary to meet language access needs. Facility policy and the resident handbooks should state clearly that language access services are available if needed for access to the law library, and that these include necessary translation and interpretive services. Signs conveying this information should also be placed in FRC law libraries and housing units.**

**Recommendation 5-18: Printing in the law library may be limited to appropriate legal documents and supporting materials, but non-English documents should not be categorically excluded. ICE should ensure that the Karnes Resident Handbook so reflects, and if the same rule is imposed at another FRC, it should be changed.**

### G. Access to Fair Immigration Procedures: Asylum Processes

FRC detainees participate in five different kinds of immigration proceedings/interviews. (1) They may meet with lawyers to discuss their cases. (2) They receive orientation about the immigration process. (3) They meet with USCIS asylum officers for "credible fear" or "reasonable fear" interviews.[203] (4) They have conversations about their cases with ICE personnel, including deportation officers and ICE lawyers. (5) They appear before immigration judges in immigration court, an adjudicatory body organizationally located within the Department of Justice's Executive Office for Immigration Review (EOIR). The detainees' language access needs in each of these settings are similar – but the practical, statutory, and regulatory settings are different.

#### 1. Conversation with Potential or Retained Immigration Lawyers

Because the government is not on either side of detainees' conversations with lawyers about their cases, DHS incurs no language access obligations.

#### 2. Asylum Orientations

According to government filings in the *Flores* litigation, within the first few days of an individual's stay at an FRC, "DHS conducts an orientation for the individual during which DHS explains the credible fear or reasonable fear process, and provides the individual with the Executive Office for Immigration Review's list of free legal service providers who may be

[203] Most people claiming a fear for their safety if they are returned to their home country are screened to determine if they have a credible fear of torture or persecution. But individuals facing reinstatement of a prior removal order receive, instead, what is called a "reasonable fear" interview and determination. For our purposes, this difference is unimportant.

available to provide legal assistance if the individuals wish to utilize them."[204] We do not precisely understand what this declaration is referring to – perhaps it is a video orientation that we observed in part. In addition, several non-profit advocacy organizations contract with the Department of Justice to do "Legal Orientation Presentations." It is unclear whether ALL individuals receive such a presentation before a credible fear or reasonable fear interview. However, where they do and where the presentation is part of a federal program – certainly if these programs are what the government is referring to in the quotation above – we believe that they are covered by DHS's language access obligations, and that DHS accordingly has the obligation to provide translation and interpretive services.

We have already addressed the lack of adequate language accommodations made at orientation and in the Handbook generally. We understand that the orientations just described are offered in Spanish. We have not been told of any special efforts made to provide additional language access. Obviously interpretive services are needed for all non-Spanish speakers. But we have no reason to think such services are being provided by the government.

### 3. Asylum Officer Interviews

USCIS conducts thousands of screenings of FRC detainees, generally 3-5 days after asylum orientation. These are extensive interviews: asylum officers conduct only two to three each day.[205] They are a crucial part of immigration processing. Applicable credible fear interview regulations require provision of interpretive services, stating "If the alien is unable to proceed effectively in English, and if the asylum officer is unable to proceed competently in a language chosen by the alien, the asylum officer shall arrange for the assistance of an interpreter in conducting the interview."[206] The regulation also states that "The interpreter must be at least 18 years of age. . . ."[207] It is our understanding that the interviews are sometimes conducted in Spanish, by USCIS asylum officers who are competent in that language. Often, however, telephonic interpretation is used. When this occurs, many have observed problematic results.[208] We discuss, below, the ways in which telephonic interpretation can fail to achieve effective communication.

For FRC detainees who speak indigenous languages, we understand that sometimes telephonic interpretation is used, and other times, USCIS decides to forego the credible/reasonable fear interview,[209] proceeding directly to immigration court. This may actually prolong detention, if an

---

[204] Decl. of John L. Lafferty at 2, Flores v. Lynch, No. 2:85-cv-04544 (C.D. Cal. June 3, 2016), www.clearinghouse.net/chDocs/public/IM-CA-0002-0030.pdf.
[205] *See id.*
[206] 8 C.F.R. § 208.30(d)(5) (2016); *see also* 8 C.F.R. § 235.3(b)(2)(i) (on initial inspection by examining officer for individuals placed in expedited removal, "[i]nterpretative assistance shall be used if necessary to communicate with the alien").
[207] 8 C.F.R. § 208.30(d)(5).
[208] *See, e.g.*, John Washington, *The U.S. is Locking Up Immigrant Children in Private Prisons Under Inhumane Conditions*, IN THESE TIMES (July 6, 2015), http://inthesetimes.com/article/18140/lockingup-immigrant-kids (describing a telephonically interpreted credible fear interview in which the interpreter and interviewee had difficulty hearing each other and the interpreter several times misinterpreted the testimony).
[209] *See* AM. BAR ASS'N, COMM'N ON IMMIGRATION, FAMILY IMMIGRATION DETENTION: WHY THE PAST CANNOT BE PROLOGUE 38 (2015), http://www.americanbar.org/content/dam/aba/administrative/immigration/FamilyDetentionReport2015.authcheckdam.

immigration judge is reluctant to release the detainee during the pendency of her proceedings without the reassurance of a credible fear finding.[210]

### 4. Conversations with ICE Personnel, Including Deportation Officers and Lawyers

If the Asylum Officer finds credible (or reasonable) fear, the matter is next referred to an immigration judge. For persons not facing reinstatement of removal, typically, the family is released from detention at this point. If the Asylum Officer does *not* find credible (or reasonable) fear, the individual may request review by an immigration judge. Either way, individuals are likely to have conversations with ICE personnel, conceivably including lawyers. Some of these conversations deal with release conditions (see Part 5.K, below). Other conversations may involve other aspects of the person's life or immigration case. All such encounters require effective communication. Unless ICE personnel are competent in the detainee's language or a qualified interpreter is provided, the result is LEP persons' discriminatory exclusion from full access to the arrangements that could be discussed.

### 5. Appearances Before an Immigration Judge.

Some immigration court hearings occur via video at the FRCs; others take place after FRC detainees are released from detention. Either way, Executive Office for Immigration Review (EOIR) policy is to provide interpreters at government expense in immigration court.[211] EOIR is part of the Department of Justice, not DHS, and therefore its activities are beyond our scope. We note, however, that many observers have criticized the resulting interpretative services as inadequate. The problem is amplified for FRC detainees because they appear in court by video. As the American Bar Association recently summarized:

> This [language-related] procedural unfairness continues throughout the proceedings in the immigration courts, even after the women pass their credible or reasonable

---

pdf ("For those women who speak indigenous languages, immigration authorities frequently skip the credible fear interview altogether, moving directly to the merits determination.") [hereinafter ABA Report].

[210] *See id.* ("But without a positive credible fear determination, judges are hesitant to grant release pending conclusion of the proceedings, thereby further prolonging detention."); *see also* LUTHERAN IMMIGRATION AND REFUGEE SERV. & THE WOMEN'S REFUGEE COMM'N, LOCKING UP FAMILY VALUES, AGAIN: A REPORT ON THE RENEWED PRACTICE 10–11, 15, 19 (2014), http://lirs.org/wp-content/uploads/2014/11/LIRSWRC_LockingUpFamilyValuesAgain_Report_141114.pdf (noting that, while Immigration Judges may release individuals who pass a credible fear interview, there are "deep flaws" in the initial screening of individuals for eligibility for a credible fear interview).

[211] *See* EXEC. OFFICE FOR IMMIGRATION REVIEW, U.S. DEP'T OF JUSTICE, IMMIGRATION COURT PRACTICE MANUAL § 4.11 66 (2016) ("Interpreters are provided at government expense to individuals whose command of the English language is inadequate to fully understand and participate in removal. In general, the Immigration Court endeavors to accommodate the language needs of all respondents and witnesses. The Immigration Court will arrange for an interpreter both during the individual calendar hearing and, if necessary, the master calendar hearing."), https://www.justice.gov/sites/default/files/pages/attachments/2016/02/04/practice_manual_-_02-08-2016_update.pdf; ("Interpreters are provided at government expense to individuals whose command of the English language is inadequate to fully understand and participate in removal. In general, the Immigration Court endeavors to accommodate the language needs of all respondents and witnesses. The Immigration Court will arrange for an interpreter both during the individual calendar hearing and, if necessary, the master calendar hearing."). S*ee also* 8 C.F.R. § 1003.22 ("Any person acting as an interpreter in a hearing shall swear or affirm to interpret and translate accurately, unless the interpreter is an employee of the United States Government, in which event no such oath or affirmation shall be required.").

> fear interviews, because the families must attend their hearings virtually through video-conferencing. As a result, the interpreter is often not in the same location as either the asylum-seeker or the judge, significantly impeding the ability of the interpreter to understand the detainee and increasing the probability of inaccurate communication that affects procedural due process rights.[212]

At each of these five stages, both Spanish and non-Spanish speakers face endemic problems, which overlap but are not the same:

For Spanish speakers, there seem to be occasional deprivations of needed interpretive services altogether – but more often, the problem is that telephonic and video interpretation is not very effective. Consider two accounts of communications problems. The first account was filed by the *Flores* plaintiffs; it is a declaration by one Spanish-speaking resident who explained that when it was time for her release:

> I did not want to leave with grillete [an ankle monitor]. I had asked my daughter in Minnesota to help pay my bond.
> The officer spoke very fast and I could not understand what he was saying.
> I understood that those who passed through the bridge would not have grillete. . . . I signed the docs because the officer said it was "only to prove that you were here detained in this center."
> They told me that they didn't know much about the grillete after we leave because they said it depends on the state. . . .
> I did not understand that I was signing a document agreeing to leave with grillete.[213]

A second published account last year described a similarly ineffective credible fear interview of a Spanish speaker, this one marred by the problems inherent in telephonic interpretation:

> For Carolina's CFI, the AO used a phone-in interpretation service. . . . At first, Carolina had trouble hearing the interpreter. Then the interpreter has trouble hearing Carolina. In the playroom, heard through the thin trailer wall, a child started crying. Throughout the interview, the interpreter repeatedly misunderstood Carolina. I tried to correct the translation, but the AO officer wouldn't let me speak. The AO missed the most important thread of Carolina's story – that of being intimidated by the rival gangs, the fear she most often described to me.[214]

Generally, telephonic and video interpretation suffers from numerous flaws that tend to make important legal processes less fair and accurate:

---

[212] *See* ABA Report, *supra* note 209, at 38; *see also* LAURA ABEL, BRENNAN CENTER FOR JUSTICE, LANGUAGE ACCESS IN IMMIGRATION COURTS 8-9 (2011), http://www.brennancenter.org/sites/default/files/legacy/Justice/LangAccess/Language_Access_in_Immigration_Courts.pdf (describing problems with remote interpreting technologies).

[213] Plaintiff's Exhibits in Support of Motion to Enforce Settlement and for Appointment of Special Master Part 1: Exhibits 1-13 [hereinafter Flores Plaintiff's Exhibits Part 1], Exh. O, Attach. to Exh. 13 (Ankle Monitor Coercion Affidavit), Flores v. Johnson, No. 2:85-cv-04544 (C.D. Cal. May 19, 2016), www.clearinghouse.net/chDocs/public/IM-CA-0002-0020.pdf.

[214] Washington, *supra* note 208.

- Technological limitations mar telephonic interpretation and lead to the loss of important information.
  - Telephonic interpreters can have trouble hearing the speaker, and being heard. The result is frequent miscommunication. In fact, many telephonic interpretation services allow interpreters to use cell phones; the result is often lots of background noise or added difficulty hearing.
  - Telephonic interpretation often uses a speaker phone that allows only one person to talk at a time. That means interpreters can't interrupt to clarify or seek clarification.
  - Telephonic interpreters are frequently cut off. When the parties reconnect, they may or may not get the same interpreter. The result is at best delay and at worst starting all over.
  - Decision makers often express frustration and/or impatience with the long wait times, difficulty hearing, and other challenges of telephonic interpretation. This can affect their temperament, or lead the speaker to believe the decision maker is hostile to her.

- Compared to in-person interpreters, telephonic interpreters are less likely to facilitate trust and solve communication problems.
  - Telephonic interpreters lack the opportunity to introduce themselves to the client, test for language "match," and establish rapport.
  - Speakers who believe that the interpreter can't hear them for technological reasons are likely to abbreviate their story, cut to the chase, and omit details that are extremely important to the accurate adjudication.
  - Detainees – adults and children – are less likely to disclose traumatic information over the phone. Families in detention may have many reasons to distrust government officials or anyone associated with the government. In general, people are less likely to trust someone they cannot see. And detainees may believe that the interpreter is not the only person on the telephone line. When there is lack of trust, the speaker is particularly likely to be nervous about disclosing traumatic information, and may abbreviate or omit details. This may undermine the factual accuracy of the proceeding.
  - Live interpreters can read body language and visual clues, especially those specific to a given culture or dialect; this can both help with interpretation and allow an interpreter to understand when the speaker does not understand something.A live interpreter but not a telephonic one can see if a speaker looks confused, even if the speaker is too scared to ask for clarification.
  - It is difficult if not impossible for detainees to be confident that telephonic interpreters will not compromise the safety of a detained individual. Without face-to-face contact it is equally difficult for the detainee to develop a sense of trust or assess the reliability and trustworthiness of an interpreter. Conflict situations like the ones many families have fled mean that individuals on different sides of a conflict may arrive in the U.S. Detained individuals may therefore fear that their interpreter will share information about them with a person or state actor from whom they have fled.

- Visual cues can be vital to effective communication.

- Live interpreters are easily able to signal, without interrupting, that they need a break in the communication to catch up the interpretation. Telephonic interpreters cannot do this. When there's a telephonic interpreter, the speaker's narrative is apt to get too long and the interpreter may therefore lose details or summarize or paraphrase.
- An interpreter who is not in the room, observing the speaker's gestures, has difficulty conveying the gravity of a violent act or the seriousness of an injury. The speaker may point to a part of the body, for example, but if the interpreter cannot see, the interpretation is inadequate.

These problems are difficult or even impossible to avoid when using telephonic interpretation. But the size and high concentration of Spanish speakers mean that the FRCs can avoid telephonic interpreters; economies of scale minimize the cost of using staff who speak Spanish and in-person interpreters.

**Recommendation 5-19: DHS should avoid use of telephonic Spanish interpreters, developing and implementing policies and practices to instead provide in-person Spanish interpretive services, except in unusual or exigent circumstances, at each and every stage of the immigration proceedings, including, e.g., legal orientation; asylum officer interviews; and conversations with ICE personnel about matters such as procedures and release conditions. EOIR should do the same for appearances in immigration court.**

**Recommendation 5-20: DHS should undertake systematic efforts to improve the quality of language line interpretation.**

a) **For each use of telephonic interpretation, DHS should ask DHS staff, facility staff, court staff, interpreters (when appropriate) and the assisted detainee to rate the effectiveness of interpretation and describe any problems; when a rating is low, DHS staff should review the circumstances and take corrective steps.**
b) **DHS should track the ratings/problems and address them. For example, if cell phone usage by interpreters emerges as an issue, the contract terms should be quickly modified to bar cell phone usage.**

Language access problems affecting immigration proceedings are yet more severe for non-Spanish speakers. Interpretive services seem to be offered only a fraction of the time that they are needed, and are often ineffective when offered. Indigenous language interpretation can fail for a number of reasons: technical, dialect related, and because sometimes (when the DHS speaker does not speak Spanish, and the interpreter does not speak English) because it's a cumbersome two-step process that may resemble a game of telephone – English to Spanish, Spanish to dialect. All of these combined in an example described in one NGO letter to the Directors of ICE and USCIS:

> "Eliana," a Guatemalan Mam-speaking mother, and her four children, ages four, five, nine, and thirteen, were detained at Dilley for more than a month. An asylum officer interviewed Eliana on November 18, 2015. But the transcript of the interview revealed clear communication difficulties because Eliana could not understand the particular dialect spoken by the Mam interpreter, who in turn spoke to a telephonic Spanish interpreter, who then communicated with the asylum officer. On multiple occasions, Eliana asked for a different interpreter and stated she did not understand the language being used, but the asylum officer responded

> that this was "proably [sic] as good as it gets" and forged ahead with the interview. At two points of the interview, the interpreter service was disconnected, first for twenty minutes and then for five minutes. . . .[215]

Another account described a similar situation before an immigration judge:

> I also sat in on a tele-hearing in which an indigenous Mam speaker from Guatemala appeared before a flat screen television to appeal an AO's decision that she did not have credible fear of persecution. In Miami, the judge held court in front of a camera and a screen of her own. She had a Spanish interpreter in the courtroom and a Mam interpreter on a telephone loudspeaker. The questions to the client went from Judge (in Miami) to Spanish Interpreter (Miami) to Mam interpreter (undisclosed location) to client (Dilley) back to Mam Interpreter (undisclosed location) to Spanish interpreter (Miami) back to judge (Miami). That is: English to Spanish to Mam to Mam to Spanish to English, in three locations. Not surprisingly, it was a total bungle . . . .[216]

It also seems likely that often, non-Spanish speakers are simply processed without being able to understand or communicate effectively. For example, in a declaration filed in the *Flores* court by the plaintiffs, one former Dilley resident explained that she was released without an interview with an asylum officer because she speaks Kiche rather than Spanish. But notwithstanding the difficulty she had understanding Spanish – which was known to DHS and was significant enough to preempt her interview with an asylum officer – she describes signing papers she didn't entirely understand, in Spanish, related to her ankle monitor.[217]

All in all, it seems clear that indigenous language speakers are not receiving equal access to immigration benefits – and that their cases are probably not receiving fair processing.

**Recommendation 5-21: DHS should provide interpretive services to indigenous-language speakers at each and every stage of the immigration proceedings, including, e.g., legal orientation; asylum interviews; and conversations with ICE personnel about matters such as procedures and release conditions. EOIR should do the same for appearances in immigration court. For non-Spanish speakers, each and every encounter that can impact the detainee's liberty or safety should be interpreted.**

**Recommendation 5-22: DHS should systematically monitor and improve the quality and availability of language access for indigenous-language speakers, ensuring that interpretive services are offered and that they are effective. For each use of interpretation services:**

- **a) DHS should ask DHS staff, facility staff, court staff, interpreters (when appropriate) and the assisted detainee to rate the effectiveness of interpretation and describe any problems and when a rating is low, DHS staff should review the circumstances and take corrective steps;**
- **b) DHS should track the ratings/problems and address them; and**

---

[215] *Flores* Plaintiff's Exhibits Part 1, supra note 213, Exh. Q, Attach. to Exh. 13, at 9 (Dec. 24, 2015 Letter to León Rodríguez & Sarah Saldaña).
[216] Washington, *supra* note 208.
[217] *Flores* Plaintiff's Exhibits Part 1, *supra* note 213, Exh. K, Attach. to Exh. 13 (Decl. of former Dilley resident).

c) **DHS should make every effort to avoid "two step" telephonic interpretation, e.g., from English to Spanish to a third language.**

### H. Grievances and Requests

All detainees, regardless of their language proficiency, need to be able to make requests and report misconduct or other problems. Presenting requests or grievances presents serious difficulties for any FRC resident who is either illiterate or does not speak Spanish.

#### 1. Grievances

We received blank grievance forms for all three FRCs. A requirement that officials accept the forms when filled out in a non-English language is neither part of the relevant policies nor mentioned in the resident handbooks, and we have been unable to verify if that this occurs in practice. Still, forms for all three FRCs use both English and Spanish, so we infer that written responses to the form's questions in Spanish are accepted and processed at all three facilities.

We are less optimistic about access to the grievance system for non-Spanish speakers. In this area, existing policy is not the problem. Grievance policy documents for all three facilities provide for language assistance:

- Karnes: "Mothers and children are informed about the facility's informal and formal grievance system in a language or manner they understand."[218] "For mothers and children with limited proficiency with English, every effort will be made to find a staff member who speaks the primary language as the mother and child, to help them complete the written grievance form."[219]
- Dilley: "Written policy and procedures as established herein provide for a resident grievance system that: . . . Ensures information, advice, and directions are provided to residents in a language they can understand, or that interpretation/translation services are utilized."[220]
- Berks: "The Program Director shall ensure that procedures accommodate the need for special assistance to residents who are disabled, illiterate, or limited in English in preparing and pursuing a grievance."[221]

However, detainees are not provided adequate notice of the availability of these language services; rather they are simply told to ask for help. At Karnes, detainees are notified by the resident handbook that they can request help from "staff members, other residents or outside sources such as members or legal representatives";[222] at both Berks and Dilley, the resident handbooks list the possibility of requesting help from "other residents, family members, legal representatives or staff."[223] Thus there is no particularized notice to detainees that they can get language assistance for grievances.

---

[218] Karnes Policy 6.1.3, Grievance Procedure 1.
[219] *Id.* at 3.
[220] Dilley Policy 14-101, Resident Grievance Procedures 2 (Aug. 17, 2015).
[221] Berks Policy 11.010, Resident Grievance Process 3 (Jan. 26, 2015).
[222] Karnes Resident Handbook, *supra* note 186, at 35.
[223] Berks Resident Handbook, *supra* note 186, at 21; Dilley Resident Handbook, *supra* note 186, at 51.

### 2. Non-grievance Requests

We have no information on the rate of grievance-filing at the FRCs, but our experience suggests that it is likely extremely low. Detainees' relatively short stays at Karnes and Dilley, and the grievance process's formality at all three facilities, make the process described in the policies quite cumbersome for them. Therefore, non-grievance requests and other written and verbal methods of bringing needs or problems to the attention of authorities are more practically important for resident welfare and safety than grievances are.

As with the grievance forms, we have been provided non-grievance request forms in both Spanish and English, and we infer (though there is no policy so stating) that they are accepted when filled out in Spanish.[224] However, we did not receive such a form for Dilley, so have not confirmed that that facility's form includes Spanish. In addition, the various Resident Handbooks reference several additional documents which we were not provided, so we do not know if they are available or accepted in Spanish. These include a "Program Request" form (Berks); "Talton telephone resolution form" (Karnes); and "14-100G Lost / Damaged / Stolen Personal Property Claim" (Dilley).

Unlike with respect to grievances, where the language assistance policy is clear – though, as described above, not communicated clearly to detainees – for non-grievance requests, there are no applicable facility policy discussions. In addition, only in the Karnes Resident Handbook is language access mentioned, stating:

> A resident may obtain assistance from another resident, counselor, or other facility staff in preparing a request form. The Facility Administrator will ensure that the standard operating procedures cover residents with special requirements, including those who are disabled, illiterate, or know little or no English. KCRC staff is encouraged to use the Language Line available to them for translation services.[225]

For both Dilley and Berks, the resident handbooks do not mention language assistance, but do inform residence that they "may obtain assistance from another resident or staff member in preparing" the form.[226]

Given the high importance of these request forms, language access assistance should be readily available – and detainees should be explicitly informed about that availability.

**Recommendation 5-23: ICE should ensure that all grievance and request forms, including specialized request forms (e.g., Program Request, Talton telephone resolution form, 14-100G Lost/Damaged/Stolen Personal Property Claim) are provided to detainees routinely in both Spanish and English. In addition, written translations for other languages that tracking reveals are prevalent in any significant numbers should be conducted and made readily available, using the same cutoff for translation as described in Recommendation 5-7.**

**Recommendation 5-24: ICE should ensure that facility policy and the resident handbooks state expressly that both grievances and request forms filed in Spanish or any other written**

---

[224] We have reviewed forms from both Berks and Karnes headed "General Request." The Resident Handbooks in all three facilities refer to a "Resident Request Form" which we assume is this same document.
[225] Karnes Resident Handbook, *supra* note 186, at 24.
[226] Berks Resident Handbook, *supra* note 186, at 8–9; Dilley Resident Handbook, *supra* note 186, at 10, 15, 18.

**language will be accepted and processed. ICE should ensure there is a process in place for response to such non-English written requests/grievances, including for any needed language assistance in communicating that response with the resident who submitted the request.**

**Recommendation 5-25: ICE should ensure that resident handbooks expressly state that interpretation services are available if needed for grievances and requests and that there is a zero tolerance policy for retaliation by ICE or facility staff; this also should be part of the oral orientation provided non-Spanish speakers, and should be printed on the grievance and request forms. For any oral communication conducted with a detainee in connection with the grievance or request, interpretation services should be offered without waiting for a request by a detainee.**

**Recommendation 5-26: ICE should conduct audits of requests and grievances made by non-Spanish speakers, to ensure that (a) such requests are actually being made at approximately the same rate as Spanish speakers (because under-use of the system likely indicates a failure of language access); (b) language assistance is being used when useful for such requests.**

### I. Medical and Mental Health Care

Particularly in light of the traumatic experiences many of the FRC's detainees have lived through, their medical and mental health care may be far from routine – so effective communication is an urgent need.

ICE's Family Residential Standard 4.3 (Medical Care),[227] covers language issues, requiring that:

- "Newly admitted residents will be informed how to access health services, in a language they can understand."
- "Where required, residents have regular access to translation services and/or are provided information in a language that they understand."
- "If language difficulties prevent the health care staff from sufficiently communicating with the resident to complete the intake screening, the staff shall obtain interpreter assistance."
- "Such assistance may be provided by another staff or by a professional service, such as a telephone interpreter service."
- "Only in emergency situations may a resident be used for interpreter assistance, and then only if the interpreter is proficient and reliable, and only with the consent of the resident being screened."
- "If the procedure [for requesting health care services] is a written request slip, they shall be provided in English and the most common languages spoken by the resident population of that facility. If necessary, residents, especially those illiterate or non-English speaking, shall be provided assistance to complete a request slip."
- "Informed consent standards of the jurisdiction shall be observed, and consent forms shall either be in a language understood by the resident, or interpreter assistance shall be provided and documented on the form."

---

[227] U.S. Immigration & Customs Enforcement, ICE/DRO Residential Standard 4.3 Medical Care (Dec. 21, 2007), www.ice.gov/doclib/dro/family-residential/pdf/rs_medical_care.pdf.

The resident handbooks do not include any reference to detainees' right to language access services relating to medical or mental health care. However, we received intake medical screening forms for both adults and children, each of which included a question to elicit the patient's language.[228] The ACFRC has not received any documentation of any particular process used to ascertain the language spoken by any resident, when there is any difficulty. Presumably, medical and mental health staff rely on the process already described, in Section C (Orientation).

In addition, the intake screening forms include several relevant checkboxes, presumably indicating goals, if not universal achievement of those goals. For the adults, these are:

> ☐ Resident given medical orientation and health information handouts in Residents language.
> ☐ Resident was given written orientation materials and/or translations in Residents own language.
> ☐ If a literacy problem exists, screener assisted the Resident with understanding education handouts.
> ☐ Resident verbalized understanding of any teaching or instruction and was asked if he or she had any additional questions.

As these check boxes indicate, there seem to be various handouts used for medical and mental health care. Karnes, at least, distributes a health information handout as part of its resident handbook, including (we assume) a translated version in the Spanish version of the handbook. We do not understand that any of the materials, or sick call slips (where they are used) have been translated into any non-Spanish languages.

For most of the detainees, providing effective medical and mental health care requires Spanish language services – by translation of documents (which may be occurring already) and by Spanish-language conversation or interpretation of oral communications.

However, it is worth noting that interpretation can obstruct development of an appropriate therapeutic relationship for providers – particularly for mental health providers. So ideally, both medical and mental health treatment professionals would speak good Spanish, and therefore have no need for interpretation. We do not know the language skills of ICE Health Service Corps (IHSC) and contracted medical and mental health staff at the FRCs, but in a recent court filing, the *Flores* plaintiffs filed evidence that, at least at Berks in August 2015, there were no Spanish-speaking mental health staff. The plaintiffs' witness, a social worker who toured the facility and spoke with its mental health staff, observed:

> During the tour, I was most struck by our discussion with the mental health staff. They explained to us that there were no Spanish-speaking mental health staff at Berks, that all services were provided through a phone interpreter, and that they had no problem with this arrangement. As a long time practitioner in the field of mental health, I found this arrangement concerning as the inability to communicate with

[228] The adult form is labeled "GEO," which is odd, since the Geo Group does not provide the medical care even at Karnes, where it operates the facility more generally. *See* HS-168 Intake Screening (rev. Jan. 2014).

> clients effectively has a deleterious impact on a clinician's ability to build rapport and trust with a client. These are the bedrocks of the therapeutic relationship.[229]

We have no more up-to-date information, or any information on this issue for Dilley and Karnes.

If providers are not adequately fluent in Spanish – and for patients who speak neither English nor Spanish – telephonic, video, or live interpretation is needed.[230] As with non-medical interpretation, we are, unfortunately, unable to evaluate whether interpreter services are being used appropriately. ICE's Language Access Plan states: "Using the electronic Health Record (eHR), IHSC has the capability to track interpretation services provided to LEP individuals by searching the Registry for the languages utilized." We requested this information for each of the FRCs, including: a. languages utilized; b. situations covered; and c. whether the interpretation was live or via telephone. But ICE declined to answer those questions, deeming them – incorrectly, we think – outside the committee's scope.

**Recommendation 5-27: ICE should notify all detainees – using resident handbooks and signs posted in medical clinics for those who read Spanish or English, and orally in a language that others understand – that they have a right to language-related services needed to meaningfully access medical and mental health care.**

**Recommendation 5-28: ICE should attempt to meet most FRC detainees' need for Spanish-language medical and mental health services by adjusting its staffing decisions to prioritize Spanish-language skills among medical and mental health staff.**

**Recommendation 5-29: ICE should audit the medical and mental health encounters of detainees who speak indigenous languages, to see how their language access needs are being met. Whenever the audits reveal a problem, ICE should promptly develop particular policy, resource, or training solutions.**

### J. Discipline

The FRC disciplinary process is to be used only "as a last resort."[231] But if a detainee's alleged misconduct is made the subject of formal discipline, a multi-step process ensues. First, there is an investigation. Next comes a hearing either before a Management Review Committee or – for more serious offenses or on referral by the Management Review committee – before an Executive Review Panel. Then the facility administrator reviews the findings of the Executive Review Panel. Finally, there are avenues of appeal.

---

[229] Plaintiff's Exhibits in Support of Motion to Enforce Settlement and for Appointment of Special Master Part 6: Exhibits 48-69, Exh. 62 (Decl. of Jessica Gorelick), ¶ 7, Flores v. Johnson, No. 2:85-cv-04544 (C.D. Cal. May 19, 2016), www.clearinghouse.net/chDocs/public/IM-CA-0002-0024.pdf.
[230] Cf. 45 C.F.R. § 92.201, https://www.federalregister.gov/documents/2016/05/18/2016-11458/nondiscrimination-in-health-programs-and-activities.
[231] Karnes Resident Handbook, *supra* note 186, at 10.

ICE's Family Residential Standard 3.1 (Discipline and Behavior Management)[232] provides that "The Facility Administrator (FA) or designee shall, upon the resident's request, assign a staff representative to help prepare a defense. This help will be automatically provided for illiterate residents, residents with limited English-language skills, and residents without means of collecting and presenting essential evidence." It also states more generally that "Where required, residents have regular access to translation services and/or are provided information in a language that they understand."

However, the FRCs' practice is apparently inconsistent with these requirements. All three resident handbooks tell detainees that they have a right to have an interpreter present during hearings before the Management Review Committee and the Executive Review Panel.[233] This is useful, but insufficient and non-compliant with the ICE standard. First, no mention is made of the right to interpretive and translation services prior to the hearing, although that is clearly required by Standard 3.1. Second, there is no notice given of the right to a staff representative, to assist detainees to prepare a defense, again, clearly required by Standard 3.1.

**Recommendation 5-30: ICE should ensure that FRC policy and practice is to provide limited English proficient detainees needed translation and interpretation services not only during disciplinary hearings but during investigations as well. Detainees should be notified of their entitlement to such services in the resident handbook and by other orientation methods.**

**Recommendation 5-31: ICE should ensure that FRC policy and practice is to automatically assign LEP detainees facing disciplinary charges a staff representative to help prepare a defense. If the staff representative needs interpretation services to talk to the resident, these should be provided.**

**Recommendation 5-32: ICE should conduct audits of disciplinary proceedings and investigations involving non-Spanish speakers, to ensure that language assistance is being used.**

### K. Release

ICE declined to share with us any information about resident release conditions or processes, including language access services. Many NGOs have complained that detainees who are released do not receive effective communication of their release conditions or options, including, for non-Spanish speakers, instructions in a language they understand about when and where to appear in court.[234] Released individuals are often confused about their simultaneous obligations to report to both ICE *and* the court. This is a problem that can be solved going forward by better language access practices. But some detainees who were already released without effective communication about their court appearance requirements were then ordered removed *in absentia*. They need a backward-looking remedy.

---

[232] U.S. IMMIGRATION & CUSTOMS ENFORCEMENT, ICE/DRO RESIDENTIAL STANDARD 3.1 DISCIPLINE AND BEHAVIOR MANAGEMENT (Dec. 21, 2007), www.ice.gov/doclib/dro/family-residential/pdf/rs_discipline_and_behavior_management.pdf.
[233] Berks Resident Handbook, *supra* note 186, at 24; Dilley Resident Handbook, *supra* note 186, at 55–56; Karnes Resident Handbook, *supra* note 186, at 12.
[234] *See, e.g.*, CARA Complaint, *supra* note 180, at 7.

**Recommendation 5-33: DHS should ensure that all detainees are given clear instructions in a language they understand well (ideally their primary language) – written as well as oral – about their release obligations and options. To facilitate understanding, the materials should include easy-to-follow visual indications that explain the simultaneous obligations to report to both ICE and the court. Release materials should also include information (telephone numbers, websites, and the like) in a language a detained individual understands well to assist with language access for immigration encounters and proceedings after the resident arrives to her post-release community, as well as information about services to assist victims of sexual abuse, assault and human trafficking.**

**Recommendation 5-34: DHS should audit the language services used for limited English proficient individuals – including, particularly, non-Spanish speakers – in communicating with them about their release to ensure that detainees are receiving communication in a language they understand well, and should implement resources, training, and other supervision to improve language access as the audit reveals various needs.**

**Recommendation 5-35: DHS should review the files of indigenous language and other non-Spanish speakers who have been issued *in absentia* removal orders. If no language access services were provided to ensure that the conditions of release were communicated to the former detainee in a language she could understand, DHS should reopen the immigration proceeding, without waiting for a request.**

### L. Training

The DHS Language Access Plan explains that there are three components to language access:

> (1) providing the necessary language assistance services; (2) training staff on policies and procedures; and (3) providing notice of language assistance services.[235]

Our recommendations above cover the first and third of these components. We are, unfortunately, less able to offer feedback with respect to training, because ICE has declined to share with us the necessary information. In particular, ICE was unwilling to share its training documentation and materials with us. We were informed, merely: "ICE Staff are provided with language access training during orientation and refresher training annually," and "Headquarters IHSC is formalizing training, specific to healthcare services and is on track to be released by the end of FY16." ICE further took the unfortunate – and in our view incorrect – position that the language access training provided to volunteers and contractors – the latter of whom have nearly constant contact with FRC detainees – was outside the scope of the Committee's work.

Accordingly, we do not know if contractors, in particular, receive any training at all on language access obligations, and we are unable to assess the quality of any ICE or IHSC training that is provided. We are therefore unable to offer little more than general recommendations:

**Recommendation 5-36: DHS should ensure that ICE staff, IHSC staff, contractors and volunteers receive high quality training on language access requirements and procedures, with an emphasis on application of the policies to particular situations where they are likely**

---

[235] DHS Language Access Plan, *supra* note 163, at 3.

**to arise, and on how to communicate effectively with detainees who do not speak English, and with detainees who speak neither English nor Spanish.**

**Recommendation 5-37: DHS should share with this Committee or (if the Committee is no longer in operation) with stakeholder groups the orientation and refresher language training provided ICE staff, the IHSC training currently in development, and any training provided FRC contractors, in order to obtain feedback.**

### M. Quality Monitoring and Improvement

ICE has already undertaken to develop systematic assessment and quality improvement tools. The ICE Language Access Plan, which was finalized a year ago, includes three relevant provisions:

- "During initial processing, ICE, through ERO, identifies the LEP individuals in custody for whom language services are not readily available, as well as the points of interaction requiring language services. As of March 2015, the following Mayan dialects are represented within the ICE family residential facilities: Quiche (K'iche), Mam, Achi, Ixil, Awakatek, Jakaltek (Popti), and Qanjobal (K'anjob'al). Efforts are currently underway to improve the language services provided in ICE residential facilities including identifying vendors through ICE's existing Language Services Blanket Purchase Agreement that can provide interpretation services to indigenous speakers."[236]
- "ERO [Enforcement and Removal Operations] will develop an LEP assessment tool to assess language access procedures as well as the effectiveness of LEP interventions for the detainee."[237]
- "ODCR [Office of Diversity and Civil Rights] will facilitate the establishment of a plan for monitoring the quality and effectiveness of current language service programs and activities within ICE. The plan will include assessing the effectiveness of the use of tools such as "Tips on Working with Interpreters" and training as needed based on the results of the monitoring."[238]

Unfortunately, in the year since ICE's Language Access plan was finalized, it seems little progress has been made. We asked questions about each of these items and received no information about any improvements. Rather, ICE informed us that the assessment tool "is not yet developed," that the quality monitoring plan is "not yet finalized." In response to the question "what is the status of the efforts to improve the [telephonic] language services?" ICE stated only that "ICE has access to language lines with a wide range of languages available."

As we have emphasized throughout this Part, ICE is unlikely to be able to improve language access services if it does not systematically self-monitor its needs, successes, and challenges.

**Recommendation 5-38: ICE should complete and solicit public comment on its LEP assessment tool and language access quality monitoring plan. These should include criteria for prevalence of a language in a given population that justifies translation of orientation and**

---

[236] ICE Language Access Plan, *supra* note 164, at 10.
[237] *Id.* at 15.
[238] *Id.* at 16.

**other documents. The quality monitoring plan should include systematic solicitation of anonymous feedback from detainees.**

## 6. MEDICAL, MENTAL HEALTH AND TRAUMA-INFORMED CARE

In the past three years, thousands of women and children apprehended on the southwestern border fled from violence in their native countries of Honduras, Guatemala, and El Salvador, seeking humanitarian protection in the U.S. Despite efforts to deter immigration from these countries, unaccompanied children and families (mainly mothers and children) continue to brave the treacherous journey to a safer location. Many have endured domestic violence, sexual assault, rape, and threats to their lives.[239] Women interviewed by the United Nations High Commissioner on Refugees reported being victims of extortion and further sexual and physical assaults on the journey.[240] It is within this context that families arrive at the Family Residential Centers (FRCs), traumatized and coping with the separation from family members and friends. Newly arrived families at the FRCs are in need of health, mental health, and victim services provided by professional staff trained in trauma-informed care.

The families residing in the FRCs are in civil immigration detention. They are not being held as a result of criminal arrests or convictions and in fact the current policy is that anyone with a criminal background may not be detained in an FRC. They should not be treated as criminals, particularly when it comes to access to critical health, mental health, and victim services. The U.S. government has an obligation to provide them trauma-informed medical, mental health, and victim services. These services should never be withheld to correct behavior or as punishment to any person detained by the U.S. government.

Detention in and of itself has been found to be traumatizing and have significant mental and physical health consequences.[241] The indefinite nature of immigration detention may trigger a profound sense of powerlessness and loss of control, contributing to additional severe and chronic emotional distress for asylum seekers.[242] Detaining families undermines family relationships in very damaging ways – for example, adult detainees' ability to parent is compromised because they lose authority in the eyes of their children (and in reality); parents are unable to protect their children from guards or outside authorities; children blame their parents for being locked up; the stress, fear and powerlessness has a direct effect on children's behavior and simultaneously undermines parents' ability to address that behavior.[243] Children are especially impacted;

---

[239] UNITED NATIONS HIGH COMM'R FOR REFUGEES, WOMEN ON THE RUN: FIRST-HAND ACCOUNTS OF REFUGEES FLEEING EL SALVADOR, GUATEMALA, HONDURAS, AND MEXICO (October 2015), http://www.unhcr.org/5630f24c6.html [hereinafter UNHCR, WOMEN ON THE RUN]; Krista M. Perreira & India Ornelas, *Painful Passages: Traumatic Experiences and Post-Traumatic Stress Among Iimmigrant Latino Adolescents and their Primary Caregivers*, 47 INT'LMIGRATION REV. 28, 43 (Dec. 2013).

[240] UNHCR, WOMEN ON THE RUN, *supra* note 239.

[241] *See*, *e.g.*, Guy J. Coffey, et al., *The Meaning and Mental Health Consequences of Long-Term Immigration Detention for People Seeking Asylum*, 70 SOC. SCI. & MED. 2070 (2010); *see also* U.S. COMM'N ON INT'L RELIGIOUS FREEDOM, REPORT ON ASYLUM SEEKERS IN EXPEDITED REMOVAL (2005).

[242] CTR. FOR VICTIMS OF TORTURE, TORTURED & DETAINED: SURVIVOR STORIES OF IMMIGRATION DETENTION (2015), http://www.cvt.org/sites/cvt.org/files/Report_TorturedAndDetained_Nov2013.pdf.

[243] LUTHERAN IMMIGRATION & REFUGEE SERV. (LIRS) & WOMEN'S REFUGEE COMM'N (WRC), LOCKING UP FAMILY VALUES: THE DETENTION OF IMMIGRANT FAMILIES (2007), http://lirs.org/wp-content/uploads/2012/05/RPTLOCKINGUPFAMILYVALUES2007.pdf; LUTHERAN IMMIGRATION & REFUGEE SERV. & WOMEN'S REFUGEE COMM'N, LOCKING UP FAMILY VALUES AGAIN (2014), https://www.womensrefugeecommission.org/resources/document/1085-locking-up-family-values-again.

international research has found that the unique vulnerabilities of children place them especially at risk of health and development issues even if the detention is for short periods.[244] It is crucial that the environment of the FRCs be normalized in order to continue to maintain the normal parent-child relationship and to avoid destabilization of the family.

The fact that mothers and their children have suffered trauma in their home countries and often have suffered additional abuse, sexual assault, and victimization on their journey amplifies and exacerbates the negative impact of FRC detention. For the overwhelming majority, the persecution suffered by the child or adolescent has taken the form of violence – either through physical violence the child or adolescent suffered themselves or through exposure to violence against close family members and friends.[245] Even more significantly, a substantial body of psychological and physiological research shows that childhood or adolescent exposure to trauma and/or violence negatively impacts cognitive, social, and biological development.[246] Moreover, neurobiological studies show that the impact of trauma on children's brain development is not just measured by diagnoses of post-traumatic stress disorder (PTSD) or other psychiatric diagnoses; in fact, research indicates that the physical development of the human brain is negatively impacted when a child or adolescent faces maltreatment or violence, particularly when such trauma is long-term or continuing.[247] The endogenous chemicals that stimulate the emotional centers of the brain and the "fight or flight" response have a counter effect on the frontal lobes, reducing activity in those lobes, which are the most important brain areas regarding executive functions.[248] In essence, child trauma victims' brain development and abilities will be developmentally behind children or adolescents of the same age without such a history of trauma, and these difficulties will have long-lasting impacts. All of these difficulties are amplified for children in FRCs by the continuing traumatic impact of detention.

Thus, since the majority of the detainees are children, special consideration of the best interests of children should be taken in all aspects of care for this vulnerable group.[249] Studies have shown negative physical and emotional symptoms among detained children[250] and experts have

---

[244] INT'L DETENTION COAL., CAPTURED CHILDHOOD 1, 50 (2012), http://idcoalition.org/wp-content/uploads/2012/03/Captured-Childhood-FINAL-June-2012.pdf.
[245] *See* Krista M. Perreira, *Painful Passage: Traumatic Experiences and Post-Traumatic Stress Among Immigrant Latino Adolescents and Their Primary Caregivers*, 47 INT'L MIGRATION REV. 976 (2013); *see also* UNHCR, WOMEN ON THE RUN, *supra* note 239; NAT'L CHILD TRAUMATIC STRESS NETWORK, UNACCOMPANIED MIGRANT CHILDREN (2014), http://www.nctsn.org/sites/default/files/assets/pdfs/um_children.pdf.
[246] *See, e.g.*, J. Cobb. Scott, et al., *A Quantitative Meta-Analysis of Neurocognitive Functioning in Posttraumatic Stress Disorder*, 141 PSYCH. BULL. 105, 113 (2015).
[247] *See, e.g.*, Vidanka Vasilevski & Alan Tucker, *Wide-Ranging Cognitive Deficits in Adolescents Following Early Life Maltreatment*, 30 NEUROPSYCHOLOGY 239, 241(2016).
[248] *See, e.g.*, John Best et al., *Executive Functions After Age 5: Changes and Correlates*, 29 DEVELOPMENTAL REV. 180, 187-8 (2009).
[249] SUBCOMM. ON BEST INTERESTS OF THE INTERAGENCY WORKING GRP. ON UNACCOMPANIED & SEPARATED CHILDREN, FRAMEWORK FOR CONSIDERING THE BEST INTERESTS OF UNACCOMPANIED CHILDREN 1, 5-6 (2016) ("The Framework developed by the Interagency Working Group seeks to ensure consideration of the best interests of unaccompanied immigrant children . . . This Framework envisions consideration of the best interests of the child from the moment the child is identified by federal officials as unaccompanied until there is a durable solution."
[250] Ann Lorek et al., *The Mental and Physical Health Difficulties of Children Held Within a British Immigration Detention Center: A Pilot Study,* 33 CHILD ABUSE & NEGLECT 573, (2009); Rachel Kronick, Cécile Rousseau, & Janet Cleveland, *Asylum-seeking Children's Experiences of Detention in Canada: A Qualitative Study,* 85 AM. J.

concluded that even brief detention can cause psychological trauma and induce long-term mental health risks for children.[251] Given the potential to re-traumatize children under the custody of the FRCs, specialized precautions should be taken.

Medical and mental health care delivered at the FRCs must comply with applicable state and federal regulations and with ICE Family Residential Standards. In addition, the FRCs must adhere to applicable sections of ICE's most recent version of Performance Based National Detention Standards (PBNDS 2011) where these standards provide a higher level of care for the detainees. All contractors that the ICE Health Service Corps enlists must adhere to the above standards. For the recommendations outlined in this Part, the Committee reviewed both sets of standards, as well as the best practices in the fields of medicine, mental health, victim services, and trauma-informed care. Where data and reports on the actual provision and staffing of the services were not provided for ACFRC review, recommendations are based on best practices in the field. Each recommendation reflects the most appropriate standard, and when the Family Residential Standards and/or the PBNDS 2011standards are not aligned with best practices or nationally recognized professional standards, they should be rewritten. (In addition, as ICE revises its standards over time, it should always be the case that the FRCs follow whatever standard imposes the highest level of care for detainees.)

**Recommendation 6-1: ICE should update the Family Residential Standards to include all of the additional protections, medical treatment, and opportunities for assistance included in the PBNDS 2011, without shrinking any existing Family Residential Standard requirements. In the many areas in which both the PBNDS 2011 and the Family Residential Standards are inadequate and not aligned with current best practices in the medical, mental health, and trauma fields, ICE should update both sets of standards to include these best practices.**

### A. Medical Assessment and Care

Medical screenings for certain medical conditions are fundamental in any basic medical service system. The selection of medical screenings/tests should be directly related to age group, country of origin and infectious disease exposure. All detainees transferred to ICE custody who were previously in held by Customs and Border Protection (CBP) will have arrived at the FRC with medical records transferred to ICE from CBP. Both adults and children may have received some medical screening while in CBP custody. FRCs will need to include the medical or mental health information received from CBP in the medical and mental health records created for the detainee at the FRC. FRC medical and mental health staff will also need to review those medical records as part of their assessment and screening of detainees' health care needs in the same manner as they should review any medical records the detainee brought from their home country. All medical records sent from CBP and copies of the medical records the detainee brought from their home country should be included as part of the detainees' full FRC medical/mental health record. Detainees should be provided full and complete copies of their records upon release and medical records should also be accessible to detainees and any medical providers or legal representatives

---

ORTHOPSYCHIATRY 287, 291 (2015); Sarah Mares & Jon Jureidini, *Psychiatric Assessment of Children and Families in Immigration Detention--Clinical, Administrative and Ethical Issues,* 28 AUSTL. & N.Z. J. OF PUB. HEALTH 520 (2004).

[251] SOC'Y FOR CMTY. RESEARCH AND ACTION, *Policy Statement on the Incarceration of Undocumented Migrant Families*, 57 AM. J. COMMUNITY PSYCHOL. 255 (2016).

with proper HIPAA release forms that detainees are to be provided full access to post-during their stay in detention and post release.

### 1. Essential Health Care Screenings

There are several important sources that list what health care screenings should be offered to detainees. The U.S. Department of Health and Human Services (HHS) has published a chart of the health screenings that are recommended for women.[252] The Centers for Disease Control and Prevention (CDC) has published sexually transmitted disease (STD) and HIV screening recommendations. [253] The general detention standards PBNDS 2011 require that "preventative services specific to women shall be offered for routine age appropriate screenings, to include breast examinations, pap smear, STD testing and mammograms."[254]

The current Family Residential Standard on Sexual Abuse and Assault Prevention and Intervention states, "Provision is made for testing for sexually transmitted diseases (e.g., HIV, gonorrhea, hepatitis, and other diseases and counseling, as appropriate)."[255] This could, unfortunately, be interpreted to allow rather than require medical staff to offer STD and HIV testing to sexual assault victims; perhaps that is part of the reasons FRC medical staff appear to be authorizing STD testing only for detainees who exhibit symptoms.

**Recommendation 6-2: All appropriate health screenings and tests should be offered to detainees, free of charge. This includes health screenings and tests recommended by the CDC and HHS, as well as the preventative health services required by PBNDS 2011; more detail is included in subsequent recommendations. To facilitate access to all of the health screenings listed below, ICE and the FRCs should either provide the screenings and tests or contract with nearby federally qualified health centers and/or organizations that provide mobile health screenings. Consent laws of the state in which the FRC is located should govern patient consent, including parental consent for testing children and adolescents.**

**Recommendation 6-3: All FRC detainees should receive medically indicated health screenings and tests including any tests or screenings indicated by a thorough medical history or other information provided by the detainee verbally or through documentation:**

- **a) All women should be offered: breast examinations, mammograms, pelvic examinations, pap smears, blood pressure tests, cholesterol tests, and diabetes screenings.**
- **b) Women age fifty or older, should receive bone mineral density tests and colorectal cancer screening.**

---

[252] U.S. DEP'T OF HEALTH AND HUMAN SERVICES, OFFICE OF WOMEN'S HEALTH, *Screening Tests for Women* (2013), http://www.womenshealth.gov/publications/our-publications/screening-tests-for-women.pdf.
[253] CENTERS FOR DISEASE CONTROL AND PREVENTION, *STD & HIV Screening Recommendations* (2016), http://www.cdc.gov/std/prevention/screeningreccs.htm.
[254] U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, 2011 ICE PERFORMANCE-BASED NATIONAL DETENTION STANDARDS (2012), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011.pdf [hereinafter PBNDS 2011], at 306.
[255] U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, FAMILY RESIDENTIAL STANDARD 2.7, SEXUAL ABUSE AND ASSAULT PREVENTION AND INTERVENTION 7, https://www.ice.gov/doclib/dro/family-residential/pdf/rs_sexual_assault_prevention-intervention.pdf.

c) **Adults and adolescents over age 13 should be offered STD testing, including for Chlamydia, Gonorrhea, Syphilis, Hepatitis B, Hepatitis C, Human Papillomavirus (HPV), Trichomonas,[256] and HIV.**

d) **Medical screening tests should be administered to each adult and child detainee based on the infectious diseases endemic in their country of origin or in countries through which they may have travelled en route to the U.S. The World Health Organization (WHO)[257] provides up-to-date information on relevant infectious diseases that are endemic internationally.**

**Recommendation 6-4: FRC medical providers should continue to offer pregnancy tests to every female of child-bearing age who is newly detained at an FRC. In addition, all requests for a pregnancy test during the period of detention should be promptly granted. Vaccines related to pregnancy should be offered pursuant to CDC guidelines and all states recognize adolescents right to consent for sexuality care including laws governing age of consent of adolescents for pregnancy and STD testing. Additional screening for pregnant women, including for anemia, gestational diabetes, Rh incompatibility, urinary tract infection, and cystic fibrosis should be provided.[258] Pregnant women should always be offered lead protection or alternatives to x-ray screenings. ICE should comply with its recent *Memo on the Identification of Pregnant Detainees*,[259] and with guidelines laid out in the PBNDS 20011 for women's health, including with respect to access to abortion, and should consider release. If detention continues ICE should ensure timely referral for appropriate pre-natal and medical care, reporting of detention to ICE Headquarters and continued review of the need to detain.**

**Recommendation 6-5: Every potentially sexually active detainee (male or female), including any detainee who requests testing, and any detainee who may have been sexually assaulted either during detention or prior to detention – whether or not the assault took place in the U.S. – should be offered tests for sexually transmitted diseases (STDs), including HIV. Testing should be offered whether or not the detainee has a history of symptoms, pursuant to guidelines of the CDC for sexually assaulted women in order to identify, prevent, and treat STDs.**[260]

---

[256] CENTERS FOR DISEASE CONTROL AND PREVENTION, *Screening Recommendations and Considerations Referenced in the Treatment Guidelines and Original Sources*, http://www.cdc.gov/std/tg2015/screening-recommendations.htm. (testing for Trichomonas is needed for detainees because of the nature of the detention setting and because of the high numbers of detainees who have experience and fled sexual assault in their home countries or have suffered sexual assault in route to the U.S.).

[257] *Common Infectious Diseases Worldwide,* INFOPLEASE, http://www.infoplease.com/ipa/A0903696.html.

[258] *See How is Cystic Fibrosis Diagnosed?,* NAT'L INSTITUTES OF HEALTH, NAT'L HEART, LUNG, AND BLOOD INSTITUTE, https://www.nhlbi.nih.gov/health/health-topics/topics/cf/diagnosis.

[259] Thomas Homan, U.S. Immigration & Customs Enforcement, *Memo: Identification and Monitoring of Pregnant Detainees* (Aug. 15, 2016), https://www.ice.gov/sites/default/files/documents/Document/2016/11032.2_IdentificationMonitoringPregnantDetainees.pdf.

[260] CENTERS FOR DISEASE CONTROL AND PREVENTION, *Sexual Assault and Abuse and STDs*, http://www.cdc.gov/std/tg2015/sexual-assault.htm.

**Recommendation 6-6: ICE should amend the Family Residential Standards to conform with Recommendations 6-1 through 6-4 and to meet the CDC's guidelines for testing of sexual assault victims.**

**Recommendation 6-7: All FRCs should offer all medical screenings and tests using a trauma-informed approach that recognizes that some exams, like pap smears, can re-traumatize victims of sexual assault. Medical screenings/tests should be conducted as a multi-part process. An educational video should be developed in English, Spanish, and other primary languages spoken by detainees that describes the testing and screening offered, and explains that there is no cost, how the testing is useful to adult detainees and their children, and the screening and testing process. The video should additionally explain that detainees will be informed of test results in a timely manner and provided with copies of the test results to take with them when they are released from detention. Finally, the video should inform detainees that they may choose not to have certain tests (e.g., pap smears) or can ask medical personnel to stop at any point during the screening/testing if they wish. For detainees who do not understand a language used in the video, qualified interpretive services should be provided.**

**Recommendation 6-8: ICE should update the Family Residential Standards to include the following PBNDS 2011's requirements relating to followup to sexual assault:[261]**

a) **"Prophylactic treatment, emergency contraception and follow-up examinations for sexually transmitted diseases shall be offered to all victims, as appropriate."**
b) **"Following a physical examination, a mental-health professional shall evaluate the need for crisis intervention counseling and long-term follow-up."**

**The detainee has the right to refuse treatment, counseling, and follow-up if she is competent, unless failure to receive such services poses an imminent danger to the detainee or others.**

### 2. Medical Screenings for Children

The Family Residential Standards require every child in the FRCs to have a health assessment and physical exam done in the first 24 hours at the FRC.[262] Staff at both Dilley and Karnes indicated during the ACFRC visits that children are given a physical exam by a nurse, tested for tuberculosis (using a PPD test) and screened by measuring blood pressure, weight, and vital signs. For children without existing immunization records, and for children behind on their immunizations according to the records they brought from their home country, immunizations should be provided to protect the child and the general population according to the age-appropriate recommendations of the Centers for Disease Control and Prevention.[263]

**Recommendation 6-9: In order to provide appropriate health care to each child detainee, a standardized screening and physical examination should be conducted to assess the child's physical health based on medical standards. This examination should include a history taken from the child's parent, including any chronic illnesses or medications taken by the child; a review of any medical records or medicine the detainee has brought from his or her home**

---

[261] PBNDS 2011, *supra* note 254, at 160.
[262] FAMILY RESIDENTIAL STANDARDS: MEDICAL CARE, *supra* note 307, at 2.
[263] http://www.cdc.gov/vaccines/schedules/hcp/imz/child-adolescent.html

**country, and a review of any medical records created for the detainee by Customs and Border Protection (CBP). The FRC pediatrician should review the child's immunization records if the family brought copies with them from their home country; children without existing immunization records, and children behind on their immunizations according to their records, should receive age-appropriate immunizations recommended by the Centers for Disease Control and Prevention.**

**Recommendation 6-10: All child detainees should be tested for tuberculosis. PPD should generally be used for children younger than 5 years old and IGRA (Interferon-Gamma Release Assays) for children 5 years and older. However, IGRA is preferred for children under 5 years old who have a history of BCG vaccine (as well as those with inconsistent follow-up), which covers the majority of children in family detention.[264]**

### 3. Children's Health Care

Preventative care and health promotion are hallmarks of health care for children. The American Academy of Pediatrics' Bright Futures Guidelines[265] provide the recognized standard for preventive care for children. The Family Residential Standard on Medical Care[266] closely follows the Bright Futures Guidelines. However, on the issue of the immediate needs of sick children, the only references in the standard is in the section about sick call.[267] This section provides no specific direction with respect to sick children, and the general procedure it outlines is problematic, because it offers no time frame for either triage or treatment. The PBNDS 2011 text is slightly better, stating that detainees can "freely request health care services," and requiring triage within 24 hours, and that medical personnel be contacted immediately for urgent situations.

Parents and children should not have to wait 24 hours for treatment and should not have to wait for their health care needs to become urgent to receive quicker attention and treatment.

**Recommendation 6-11: Medical services by a licensed professional should be available 24 hours per day, 7 days per week.**

**Recommendation 6-12: The Family Residential Standards should be updated to include the provisions for Sick Call and Emergency Medical Services and First Aid from the PBNDS 2011, modified to require response within two hours by a licensed medical professional to requests by parents for treatment of sick children. This two-hour triage response is in addition to the requirements in the PBNDS 2011 to needs for emergency medical services and first aid.**

### 4. Parents Accompanying Children Needing Hospital Care or Mental Health Residential Treatment

---

[264] BCG vaccine rates are 88-96% for Guatemala, El Salvador, Honduras, and Mexico. *See* WORLD HEALTH ORGANIZATION, VACCINE-PREVENTABLE DISEASES: MONITORING SYSTEM 2016 GLOBAL SUMMARY, http://apps.who.int/immunization_monitoring/globalsummary.
[265] AM. ACAD. OF PEDIATRICS, BRIGHT FUTURES, *Recommendations for Preventive Pediatric Health Care* (Jan. 2016), https://www.aap.org/en-us/Documents/periodicity_schedule.pdf.
[266] *See* FAMILY RESIDENTIAL STANDARDS: MEDICAL CARE, *supra* note 307, at 2.
[267] FAMILY RESIDENTIAL STANDARDS: MEDICAL CARE, *supra* note 307, at 17-18.

Current Family Residential Standards do not address the ability of a parent to accompany a child when offsite health care or mental health care in a hospital or other facility is needed. The American Academy of Pediatrics recommends that parents not only accompany children to the hospital but remain with them during their hospital stay as a best practice to improve health outcomes and involve families in medical decision making.[268] Family presence during health care procedures decreases anxiety for the child and the parents.

ICE does recognize the fundamental rights of parents to make decisions concerning the care, custody, and control of their minor children without regard to the child's citizenship as provided for and limited by applicable law.[269] But the Family Residential Standards do not specify if the FRC Non-Medical Emergency Trip Request and Approvals process can be used to allow parents to accompany their children for medical treatment that takes place outside the FRC. This process could be used for parents to accompany their children to offsite medical or mental health care.

Whether children are alone or with a parent, the use of shackles or restraints should be avoided for both parent and child during medical visits, hospitalizations, and associated transport. Shackles and other similar restraints cause additional stress, and interfere with medical treatment and recovery.

**Recommendation 6-13: Parents should be allowed to accompany their child to a hospital or to another health facility and remain with the child for medical services that are provided outside the FRC.**

**Recommendation 6-14: If a child is placed in a mental health treatment facility, parents should be given ready access to visit the facility to see their child and meet with the mental health providers as needed.**

**Recommendation 6-15: Children and their accompanying parents should not be shackled during transport to hospitals and other health facilities or during treatment or resulting stays.**

**Recommendation 6-16: When a detainee's family member is provided medical or mental health care, ICE and the FRCs should provide information and support to the detainee in order to communicate what is happening and to avoid further traumatization. The family should be immediately reunited upon the patient's release from medical care.**

**Recommendation 6-17: When medical or mental health needs require separation of a detainee parent from a child for over 72 hours, ICE should consider the best interests of the child and should proceed under the policy developed pursuant to Recommendation 2-18.**

---

[268] COMM. ON HOSPITAL CARE AND INST. FOR PATIENT AND FAMILY-CENTERED CARE., *Patient and Family Centered Care and the Pediatrician's Role*, 129 PEDIATRICS 394 (2012), http://pediatrics.aappublications.org/content/pediatrics/129/2/394.full.pdf.

[269] U.S. Immigration and Customs Enforcement, Facilitating Parental Interests in the Course of Civil Immigration 1, 2 (Directive 11064.1Aug. 23, 2013), https://www.ice.gov/doclib/detention-reform/pdf/parental_interest_directive_signed.pdf.

### 5. Communicable Screening for the Zika Virus

The CDC issues guidelines for screening for communicable diseases that are continually updated to reflect new and emerging diseases globally. The FRCs seem to be screening for Zika according to best practices set out by the CDC guidelines.[270]

**Recommendation 6-18: All FRCs should continue to screen for Zika in accordance with best practices set out by current CDC guidelines. The FRCs should keep abreast of CDC guidelines in terms of screening for communicable diseases applicable to detainees. Any pregnant female who tests positive for Zika should be provided with appropriate counseling and any related follow-up services.**

### 6. Sexual Assault, Domestic Violence, and Human Trafficking Screenings

ICE and the FRCs routinely screen women and children for sexual assault and child abuse that occurred in detention, but do not routinely screen for victimization that occurred outside of detention. Specifically, none of the FRCs are screening for domestic violence, sexual assault, and child abuse that occurred prior to detention. Such screening should be part of any medical and mental health examinations conducted by FRC staff. HHS and the CDC include screening for domestic and sexual violence among the standard recommended best practices and services offered to all women in health care settings.[271] HHS has developed a recommended screening tool for healthcare providers to use to screen patients for human trafficking.[272] The most commonly used questionnaire to screen for sexual assault in health care settings was developed by the CDC and can be used for both adults and minors above the age of 13. (Below the age of 13, a minor is considered a child and children's screening processes should be used.[273]) The Substance Abuse and Mental Health Services Administration (SAMHSA) recommends an approach to screening that uses universal precautions that take into account the fact that someone who may have experienced violence will need help, support, and a screening process that accounts for and allows the trauma victim to understand the purpose of the screening and consent to the screening. When conducting screening for trauma the SAMHSA recommended approach uses a two-step process,

---

[270] Centers for Disease Control and Prevention, Clinical Guidance for Healthcare Providers Caring for Pregnant Women 1 (Aug. 16, 2016), http://www.cdc.gov/zika/hc-providers/pregnant-woman.html.

[271] CENTERS FOR DISEASE CONTROL AND PREVENTION, NAT'L CTR. FOR INJURY PREVENTION AND CONTROL, INTIMATE PARTNER VIOLENCE AND SEXUAL VIOLENCE VICTIMIZATION ASSESSMENT INSTRUMENTS FOR USE IN HEALTHCARE SETTINGS (Kathleen C. Basile, Marci F. Hertz, & Sudie E. Back, eds., 2007), http://www.cdc.gov/violenceprevention/pdf/ipv/ipvandsvscreening.pdf [hereinafter INTIMATE PARTNER VIOLENCE]; *see also Preventative Care Benefits for Women,* HEALTHCARE.GOV, https://www.healthcare.gov/preventive-care-women.

[272] U.S. DEP'T OF HEALTH AND HUMAN SERVICES, RESOURCES: SCREENING TOOL FOR VICTIMS OF HUMAN TRAFFICKING, http://www.acf.hhs.gov/sites/default/files/orr/screening_questions_to_assess_whether_a_person_is_a_trafficking_victim_0.pdf [hereinafter SCREENING TOOL].

[273] Jane Leserman, et al., Sexual and Physical Abuse History Questionnaire, http://www.karger.com/ProdukteDB/katalogteile/isbn3_8055/_98/_53/suppmat/p41-SPAHQ.pdf.

which first identifies patients who have experienced trauma in the past and second focuses on the symptoms the patient is experiencing related to the trauma.[274]

The American Academy of Pediatrics suggests to begin screening children over the age of three.[275] ICE detention facilities should utilize distinct sexual assault screening processes for adults and for minors. Even though "[a]dolescents and young adults have the highest rates of sexual assault of any age group,"[276] children are much less likely to come forward about incidents of violence. The American Academy of Child and Adolescent Psychiatry and American Professional Society on the Abuse of Children have published a questionnaire and guidelines that can be used for screening practices.[277] The Department of Justice's Office on Violence Against Women funded Teen Dating Violence Technical Assistance Center has issued recommendations for conducting sexual and domestic violence screenings for teen victims.[278]

The PBNDS 2011 requires that that "All detainees shall receive medical and mental health screenings, interventions and treatments for gender-based abuse and/or violence, including sexual assault and domestic violence."[279] PBNDS 2011 requires that if the initial medical intake screening indicates recent sexual assault or violence, then an initial health appraisal shall be completed within 24 hours.[280] Additionally, the PBNDS 2011 recognizes that victims have both medical and mental health consequences of gender-based violence.[281]

**Recommendation 6-19: FRCs should conduct an initial medical intake screening for sexual assault, domestic violence, child abuse, human trafficking, and gender-based abuse as part of the initial required medical and mental health screenings of all detainees over the age of three using a separate form for each detainee, adult and child.[282]**

**Recommendation 6-20: The tools to be used by FRCs for screening should be selected from the following list:**

**a) For domestic violence and/or sexual assault, ICE should use:**

---

[274] U.S. DEP'T OF HEALTH AND HUMAN SERVICES, CTR. FOR SUBSTANCE ABUSE TREATMENT, SMA 14-4816, TRAUMA INFORMED CARE IN BEHAVIORAL HEALTH SERVICES 92 (2014), http://store.samhsa.gov/shin/content//SMA14-4816/SMA14-4816.pdf.
[275] Nancy Kellogg, et al., *The Evaluation of Sexual Abuse in Children,* 116 PEDIATRICS 506 (2005), http://pediatrics.aappublications.org/content/116/2/506.
[276] Miriam Kaufman, Care of Adolescent Sexual Assault Victim American Academy of Pediatrics Committee on Adolescence, 122 PEDIATRICS 462-470 (2008), http://pediatrics.aappublications.org/content/pediatrics/122/2/462.full.pdf.
[277] Kellogg, et al., *supra* note 275.
[278] Mitru Ciarlante, *A Development Approach to Working With Teens,* (June 2008), http://www.breakthecycle.org/sites/default/files/A Development Approach to Working with Teen Victims.pdf.
[279] PBNDS 2011, *supra* note 254, at 280.
[280] *Id.* at 305.
[281] *Id.* at 117. In the context of sexual assault, the PBNDS 2011 states "It is common for victims of sexual assault to have feelings of embarrassment, anger, guilt, panic, depression and fear several months or even years after the attack. Other common reactions include loss of appetite, nausea or stomach aches, headaches, loss of memory and/or trouble concentrating, and changes in sleep patterns."
[282] Kellogg, et al., *supra* note 275.

i. **one of the assessment instruments listed by the CDC in *Intimate Partner Violence and Sexual Violence Victimization Assessment Instruments for Use in Healthcare Settings*;**
ii. **screening tools developed by the National Health Resource Center on Domestic Violence;[283] or**
iii. **tools developed by Kaiser Permanente's Family Violence Prevention Program.[284]**http://www.cdc.gov/violenceprevention/pdf/ipv/ipvandsvscreening.pdf

b) **For human trafficking, ICE should use the *HHS Screening Tool for Victims of Human Trafficking*.[285]**
c) **For trauma victims, ICE should use tools developed by the National Technical Assistance Center on Trauma Informed Care (NCTIC); these include but are not limited to training videos on medical interviews of trauma victims.**

**Recommendation 6-21: If the initial medical/mental health intake indicates that a detainee has suffered sexual assault, domestic violence, child abuse, human trafficking, or gender-based abuse, an initial health/mental health appraisal should be completed within 24 hours regardless of when the victimization occurred. That appraisal should comply with the following:**

a) **All screening and appraisal for sexual assault, domestic violence child abuse, human trafficking, and/or gender-based abuse should be conducted in a private, safe environment.**
b) **Mothers should be screened/appraised separately and without their children present. Mother should be offered the opportunity to have their children within their line of sight, in a nearby room, or to place the child in childcare – whichever the mother prefers.**
c) **Information on gender-based violence and abuse obtained during screenings should be both noted in a detainee's medical records and provided to the victim's current and future attorneys in a manner that is HIPAA compliant and provides swift access to the screening results.**
d) **ICE/FRC staff should not infer, assume, conclude, or note in medical or immigration records, that, because a detainee failed to self-identify during screening as a victim of violence, abuse, or trauma, the detainee is not a trauma victim.**
e) **To ensure that detainee victims are connected with proper continued treatment and services, ICE/FRC staff should provide identified victims with information about their rights as crime victims, existing services statewide and nationwide, and safety planning for post-release.**

---

[283] https://www.futureswithoutviolence.org/health/national-health-resource-center-on-domestic-violence/*National Health Resource Center on Domestic Violence,* FUTURES WITHOUT VIOLENCE (2016), https://www.futureswithoutviolence.org/health/national-health-resource-center-on-domestic-violence.
[284] *Family Violence Prevention,* KAISER PERMANENTE, https://share.kaiserpermanente.org/category/fvpp/?kp_shortcut_referrer=kp.org/domesticviolence.
[285] SCREENING TOOL, *supra* note 272.

### 7. Prison Rape Elimination Act Implementation

When sexual assault occurs in detention, the response required by the Family Residential Standards[286] is substantially inferior to the response required by the PBNDS 2011.[287] The latter aligns more closely with the requirements of the DHS Prison Rape Elimination Act (PREA) regulation. In the PBNDS 2011, most sections of the existing Family Residential Standards language were updated and strengthened and many new requirements were added. Examples include:

- Adopting a "zero tolerance policy"
- Mandating that sexual assault forensic examination and evidence gathering be conducted by external independent and qualified health care personnel
- Providing a detailed description of sexual assault, which covers threats, intimidation to coerce sexual acts, and sexual harassment
- Mandating staff training on vulnerable populations, sexual assault definitions, sexual harassment, prohibitions on retaliation, requirements for maintaining privacy of reports and victims, and "how to ensure that evidence is not destroyed"
- Privacy and disclosure limitations protections
- Removing staff suspects from duties that require detainee contact
- Requiring disciplinary sanctions for staff, including termination
- Encouraging detainees to report sexual assault and abuse observed with guarantee of no punishment for reporting, no retaliation, no impact on detainees' immigration case
- Notifying ICE/ERO immediately of any sexual assault/abuse reports
- Mandating posting of DHS produced posters on sexual assault awareness and hotline
- Maintaining/attempting to maintain a Memorandum of Understanding with community-based organizations with expertise serving victims of sexual assault
- Mandating that the FRC arrange forensic medical exams
- Requiring that victims' future safety, medical, mental health, and legal needs are addressed

DHS's Prison Rape Elimination Act (PREA) rule confirms and strengthens these requirements.[288]

**Recommendation 6-22: ICE and the FRCs should come into full compliance with the DHS PREA regulation and the PBNDS 2011's Sexual Abuse and Assault Prevention and Intervention Section requirements; the Family Residential Standard is insufficient.**

**Recommendation 6-23: FRCs should contract with an entity in the community that provides a coordinated community response to sexual violence, such as Sexual Assault Response**

---

[286] FAMILY RESIDENTIAL STANDARDS: SEXUAL ABUSE AND ASSAULT PREVENTION AND INTERVENTION, *supra* note 255.
[287] PBNDS 2011, *supra* note 254, at 150-77, 306.
[288] *See* 6 C.F.R. Part 115.

**Teams (SARTs) or Sexual Assault Response and Resource Teams (SARRTs) for forensic evidence collection, treatment and support.**[289]

**Recommendation 6-24: FRCs should transport recent victims of sexual assault to the contracted community-based program whether or not the recent sexual assault occurred in the FRC. Victims should not be required to have their children accompany them but should have that option if they are anxious about separation. If a child remains at the FRC while the mother is takes to the program, the child should be left with qualified childcare staff or with another parent of the mother's choice. The contracted programs should include victim advocate involvement and informed choice and should have standards for victim-centered sexual assault evidence collection that meet or exceed the following standards:**

a) **U.S. Department of Justice, Office on Violence Against Women, National Protocol for Sexual Assault Medical Forensic Examinations: Adults/Adolescents,**[290] **and all updates.**
b) **U.S. Department of Justice, Office on Violence Against Women, National Protocol for Sexual Assault Medical Forensic Examinations: Pediatric,** [291] **and all updates.**

### 8. Communication of Medical Screening and Test Results

How medical screening and test results are communicated to a detainee has important health and safety consequences. Some detainees fled their home country due to their own or their child's rape, and others were raped during travel (either abroad or in the U.S.). A detainee may first learn through tests administered at the FRC that:

- She is pregnant due to the rape;
- She has contracted an STD or is HIV positive;
- Her daughter is pregnant or has contracted an STD or is HIV positive; or
- Her son has contracted an STD or is HIV positive.

Mechanisms need to be implemented to ensure that information about test results are communicated to detainees, both while in detention and post release, in a manner that is confidential, safe, and secure, taking account of safety issues that may arise if husbands, mothers, fathers, or other family members learn about the pregnancy or STD test results. Delivery of test results should occur in a culturally competent way.[292]

---

[289] *See* National Sexual Violence Resource Center, *Sexual Assault Response Team Development: A Guide for Victim Service Providers* (2011), http://www.nsvrc.org/sites/default/files/Publications_NSVRC_Guide_SART-Development.pdf; End Violence Against Women International, *Best Practices: SARRTs*, http://www.evawintl.org/PAGEID7/Best-Practices/Resources/SARRTs.

[290] U.S. DEP'T OF JUSTICE, OFFICE ON VIOLENCE AGAINST WOMEN, A NATIONAL PROTOCOL FOR SEXUAL ABUSE MEDICAL FORENSIC EXAMINATIONS: ADULTS/ADOLESCENTS (2d ed 2013), https://www.ncjrs.gov/pdffiles1/ovw/241903.pdf.

[291] U.S. DEP'T OF JUSTICE, OFFICE ON VIOLENCE AGAINST WOMEN, A NATIONAL PROTOCOL FOR SEXUAL ABUSE MEDICAL FORENSIC EXAMINATIONS: PEDIATRIC (2016) https://www.justice.gov/ovw/file/846856/download.

[292] *See* U.S. DEP'T OF HEALTH AND HUMAN SERVICES, OFFICE OF MINORITY HEALTH, WHAT IS CULTURAL COMPETENCY, http://www.cdc.gov/nchhstp/socialdeterminants/docs/what_is_cultural_competency.pdf.

FRC detainees should receive the same care and concern with respect to the delivery of information about results of medical/mental health testing as they would experience if they were receiving care from private or public providers in the community. That includes appropriate language access practices: for patients who have limited English proficiency, information about test result findings is provided in a language the patient understands well (ideally her primary language).

In addition, privacy for adolescents (under 18) is important, particularly with respect to sex-related health care in all states adolescents must themselves consent to health care related to sexual activity, including the treatment of sexually transmitted infections, prenatal care, and contraceptive services.[293]

**Recommendation 6-25: The results of medical and mental health screenings and tests should be delivered to detainees in a sensitive and HIPAA compliant manner. Specifically:**

a) **Results should be delivered to detainees in a confidential location, outside of the presence of the detainees' children, in a language the detainee understands well (ideally her primary language), and with the appropriate involvement of mental health professionals at the FRC.**
b) **Information about pregnancy or test results that are positive for an STD or other disease or mental health condition should be delivered in a culturally competent manner as defined by the CDC[294] and should involve staff with expertise in trauma-informed care. Adolescents under 18 should receive information independent of their parent.**
c) **Mechanisms should be implemented to ensure that information about test results are communicated to former detainees in a manner that is confidential, safe, and secure, and in compliance with HIPAA.**
d) **In the case of victims of sexual assault and/or abuse perpetrated at the FRCs, victims should receive information about test results from the same external independent and qualified health care personnel who performed the testing or screening.**

### 9. Dental Health

Oral health is essential to general health and well-being. The link between general health and socio-economic status is well established. Poor oral health is not only associated with poor socio-economic status but also with deprivation. In both high and lower income countries, low socio-economic status is significantly associated with increased oral cancer risk. The CDC reports that more than 40% of children have teeth decay by the time they reach kindergarten. Parents should accordingly be taught strategies to prevent teeth decay in young children.

---

[293] Aviva L. Katz, Sally A. Webb (Committee on Bioethics), *Informed Consent in Decision-Making in Pediatric Practice*, 138 PEDIATRICS (2016), http://pediatrics.aappublications.org/content/pediatrics/early/2016/07/21/peds.2016-1485.full.pdf,

[294] CENTERS FOR DISEASE CONTROL AND PREVENTION, *NCHHSTP Social Determinants of Health* (Mar. 21, 2014), http://www.cdc.gov/nchhstp/socialdeterminants/definitions.html.

**Recommendation 6-26: Adult and child FRC detainees should receive appropriate dental screening and care:**

a) **A dental examination should be conducted of each adult and child as part of the FRCs' general health examination at intake.**
b) **For adults, dental care should adhere to the standards promulgated by the CDC[295] and the American Dental Association.[296]**
c) **For children, dental care for children should adhere to standards promulgated by the American Academy of Pediatric Dentistry.[297]**

### 10. Pharmaceutical Management

Health care organizations have policies and procedures that determine how pharmaceuticals are managed. This includes a formulary, prescription practices, storage, and controlled substances. FRC pharmaceutical management is currently subject to the applicable Family Residential Standards,[298] which are much less specific and much less well-crafted than the PBNDS 2011.[299] The PBNDS 2011 contains requirements regarding medications to be used for treatment of specific diseases and various national guidelines. For example, the PBNDS 2011 requires that TB must be treated medically following the guidelines set by the American Thoracic Society and the CDC and all medications currently approved for treatment of HIV/AIDS by the Food and Drug Administration must be available to detainees.[300]

**Recommendation 6-27: Policies and procedures for pharmaceutical management should comply with national accreditation, such as JCHAO or NCQA, state laws, and licensure standards. The Family Residential Standards should be updated to include each of the requirements in the PBNDS 2011; to cover pharmaceutical management and medication requirements imposed by national accreditation surveyors such as JCHAO or NCQA; and to ensure continuing compliance with relevant State standards.**

### 11. Care of Pregnant Women

In a memorandum to ICE Field Officers issued in August 2016, ICE explicitly states that if a pregnant detainee is not subject to mandatory detention or is eligible for parole following a positive credible fear interview, she will be released unless the Field Office Director determines that there are extraordinary circumstances.[301] The ACFRC agrees that pregnant women should not be detained in the FRCs. This policy is consistent with the information provided by ICE.

---

[295] CENTERS FOR DISEASE CONTROL AND PREVENTION, *Oral Health* (Oct. 8, 2015) http://www.cdc.gov/oralhealth/basics/index.html.
[296] AM. DENTAL ASS'N (ADA), *Dental Standards*, http://www.ada.org/en/science-research/dental-standards/.
[297] AM. ACAD. OF PEDIATRIC DENTISTRY, *2015-2016 Definitions, Oral Health Policies, and Clinical Practice Guidelines,* http://www.aapd.org/policies/.
[298] *See* FAMILY RESIDENTIAL STANDARDS: MEDICAL CARE, *supra* note 307, at 10-11.
[299] *See* PBNDS 2011, *supra* note 254, at 279, 281, 283, 284, 287-88, 295-96.
[300] *Id.* at 283-85.
[301] U.S. Immigration and Customs Enforcement Memorandum from Thomas Homan, *Identification and Monitoring of Pregnant Detainees* (Aug. 15, 2016),

Of course while a woman is in detention, she may become pregnant or find out that she is pregnant. In that case, she needs immediate counseling and access to the full range of reproductive health care options.

**Recommendation 6-28: Barring extraordinary circumstances, no pregnant woman or her children should be detained in an FRC.**

**Recommendation 6-29: A detainee who is pregnant should be informed in a balanced manner by medical staff of all options – including raising the child herself, placing the child up for adoption, and terminating the pregnancy -- and the relevant risks of each option.[302] Discussion of options should proceed with cultural awareness and sensitivity. An unwanted pregnancy always requires responsive and expeditious care. Pregnancy termination is generally to be performed as safely and as early in pregnancy as possible. ICE and FRC staff should be required to swiftly facilitate access to whatever option each woman chooses, including emergency contraception if medically appropriate and other pregnancy termination methods. Termination of pregnancy should not depend on whether or not the specific procedure is available on site. Each woman will decide what option to choose depending on her unique circumstances and preferences; this decision is to be made without undue interference by outside bodies, including governmental bodies.**

### 12. Emergency Medical Services and Procedures

Every health care organization should have and comply with standards for providing emergency medical services. According to the Family Residential Standards, FRC staff should be "trained at least annually to respond to medical emergencies."[303] The ACFRC was unable to verify during the FRC site visits that this standard was met. In other respects, the Family Residential Standards are significantly less detailed than the PBNDS 2011.[304]

**Recommendation 6-30: ICE should amend the Family Residential Standards to include the PBNDS 2011 provisions relating to emergency medical services, and additional provisions required for national accreditation surveys. FRC medical emergency policies, procedures, services, and training should comply with national accreditation organization requirements, state laws, and licensure standards.**

**Recommendation 6-31: In the case of the deteriorating physical or mental health of a detainee, FRCs should consider the possibility of release into the care of a hospital to stabilize the patient, followed by release to the community. Other possible options could be intensive out-patient care and utilization of stable housing services, depending on the needs of the detainee. In the event of hospitalization, when discharged the resident should be**

---

https://www.ice.gov/sites/default/files/documents/Document/2016/11032.2_IdentificationMonitoringPregnantDetainees.pdf.

[302] Am. College of Obstetricians and Gynecologists, College Statement of Policy: Abortion Policy (No. 2014), https://www.acog.org/-/media/Statements-of-Policy/Public/sop069.pdf?dmc=1&ts=20160921T1319339411.

[303] *See* FAMILY RESIDENTIAL STANDARDS: MEDICAL CARE, *supra* note 307, at 15-19.

[304] PBNDS 2011, *supra* note 254, at 278, 282, 286, 294-295, 306.

**discharged to the community and provided with the same services, referrals, and legal rights information received had the individual been discharged directly from the FRC.**

See Part 6.B.2 for additional recommendations regarding deteriorating mental health conditions.

### 13. Accreditation and Compliance with Joint Commission on the Accreditation of Health Care Organizations (JCAHO) Standards

In order to provide the "safest, highest quality, best value health care across all settings,"[305] health organizations adopt certain health care standards; in most instances a health care organization will request that a national health care accreditation organization conduct an accreditation review as a strategy to assure the general public of its health care standards. There are multiple facets to a review or survey conducted by such an organization. These include but are not limited to patient rights and education, infection control strategies, medication management, prevention of medical errors, emergency preparedness, quality improvement and assurance strategies, and verification of the qualifications and competence of professional staff.

Among the Joint Commission on the Accreditation of Health Care Organizations (JCAHO) Standards are the Ambulatory Care Standards and Behavioral Health Standards. The Family Residential Standards require compliance with JCAHO standards, including standards of hygiene, for environmental health conditions.[306] The Family Residential Standards also state that at FRCs "The health care program and the medical facilities shall be under the direction of a health services administrator (HSA) and shall be accredited and maintain compliance with the standards of the Joint Commission on the Accreditation of Health Care Organizations (JCAHO)."[307] Finally the Family Residential Standards state that, "All health care staff shall have valid professional licenses and/or certifications. DIHS shall be consulted to determine the appropriate credentials requirements for health care providers. Medical personnel credentialing and verification shall comply with the standards established by JCAHO."[308]

Another national health care accreditation standard is the National Committee for Quality Assurance (NCQA), which could be an option for the FRC's. Although best practices in the medical field and compliance with JCAHO require conducting accreditation surveys and require that such surveys be conducted on a regular basis, the Committee was unable to obtain information from ICE about the extent to which such surveys are being conducted at FRCs.

As explained above, FRCs are required to follow PBNDS 2011 where the PBNDS 2011 provides more detailed guidance than the Family Residential Standards. The PBNDS 2011 requires that "All health care staff must be verifiably licensed, certified, credentialed, and/or registered in compliance with application state and federal requirements. Copies of documents must be

---

[305] Joint Commission, *Vision Statement*, http://www.jointcommission.org/mobile/about_us.aspx.
[306] U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, FAMILY RESIDENTIAL STANDARDS 1.2, ENVIRONMENTAL HEALTH AND SAFETY 18, https://www.ice.gov/doclib/dro/family-residential/pdf/rs_environmental_health_and_safety.pdf.
[307] *See* FAMILY RESIDENTIAL STANDARDS: MEDICAL CARE, *supra* note 307, at 5.
[308] *Id.* at 11.

maintained on site and readily available for review."[309] With regard to administration of the FRCs' medical departments, PBNDS 2011 requires that the Health Services Administrator for every FRC do the following: convene quarterly meetings with medical staff to account for the effectiveness of the health care program and recommend corrective actions, as necessary. The minutes of each meeting are to be recorded and kept on file.[310] The HSA is also required to implement a system of internal review and quality assurance and to implement an intra-organizational, external peer review program for all independently licensed medical professionals at least annually.[311] Thus, all FRCs are required to maintain information on medical and mental health staff credentials and licensing and keep records from its effectiveness and peer quality reviews. The ACFRC requested that ICE provide information about credentialing of medical/mental health professionals at facilities and compliance with JCAHO standards, but ICE declined to do so.

**Recommendation 6-32: Each FRCs should comply with health care accreditation standards issued either by JCHAO or NCQA. All professional staff should comply with credentialing standards of national and state accreditation and professional licensure bodies. This includes the requirement that accreditation surveys be conducted on a regular basis.[312] Maintenance of national accreditation standards should be part of any ICE contract or sub-contract relating to medical or mental health care.**

**Recommendation 6-33: The Family Residential Standards should be amended to include the PBNDS 2011 requirement[313] that copies of documents verifying the licenses, certifications, credentials and/or registrations of medical and mental health personnel be maintained on site and readily available for review, and that personnel with restricted licenses may not provide health care at FRCs.**

## B. Mental Health Assessment and Care

### 1. Mental Health Screening

The ICE medical evaluation forms include historical questions about past mental health conditions, history of trauma, and limited behaviors such as suicidal ideation.[314] But the FRC population has very limited health and mental health literacy, with little understanding or awareness of prior mental health conditions. Coupled with the lack of access to mental health services in their home countries and significant mental health stigma that interferes with self-identification or diagnosis, the result can be under-identification. Given similar stigmas in the U.S., accurate mental health screenings can be conducted using systematic, valid, and reliable screening tools that ask respondents about key symptoms that can then be scored to evaluate risk for possible psychiatric disorders. This approach has been used in emerging integrated behavioral health programs within primary care, where patients are asked to rate key symptoms described in these tools. Scoring these algorithms lead to assessment of risk for various diagnoses, and then further evaluation and

---

309 PBNDS 2011, *supra* note 254, at 288.
310 PBNDS 2011 *supra* note 254, at 301.
311 *Id.* at 301-302.
312 *See generally* JOINT COMMISSION, 2017 COMPREHENSIVE ACCREDITATION MANUALS. A JCHAO accreditation is in effect for up to three years.
313 PBNDS 2011, *supra* note 254, at 288.
314 Form IHSC-794, *in* PBNDS 2011, *supra* note 254, at 290.

treatment can be targeted efficiently and effectively. This screening approach integrated within primary care has also been used for children and has strong evidence of efficiency and beneficial outcomes for both populations, including improving access and reducing stigma for Latinos.[315]

In addition, Family Residential Standards require the FRCs to use the ICE Health Service Core Pediatric Intake Form (IHSC–795 J).[316] While this form provides some basic information on an immigrant child's health and development, it does not include sufficient information, particularly with regard to the child's development and mental health status. The American Academy of Pediatrics recommends conducting a mental health evaluation using a validated screening instrument, specific screening for trauma, and a developmental screen with an age-appropriate screening instrument for all immigrant children.[317]

**Recommendation 6-34: All adult detainees should undergo systematic mental health screening using evidence-based tools immediately upon intake during their health screening and evaluation. The following tools should be used:**

a) **Patient Health Questionnaire-9 item (PHQ-9, which screens for depression and suicidality)[318];**
b) **General Anxiety Disorder 7-item (GAD-7, which screens for clinical anxiety);**
c) **Mood Disorders Questionnaire (MDQ), which screens for bipolar disorder);[319]**
d) **CAGE-AID, which screens for both alcohol and substance abuse);[320] and**
e) **Abbreviated Post-Traumatic Stress Check List (PCL), which screens for post-traumatic stress disorders.[321]**

**Recommendation 6-35: All child detainees should undergo systematic mental health screening using evidence-based tools immediately upon admission during their health screening and evaluation. Tools to be used should include:**

a) **Pediatric Symptoms Checklist (PSC-35), for children ages 6 to 17;**
b) **Survey of Wellbeing of Young Children (SWYC) for children 5 years old or younger; and**

---

[315] Jürgen Unutzer, et al., *Collaborative Care Management of Late-Life Depression in the Primary Care Setting: A Randomized Controlled Trial*, 288 J. AM. MED. ASS'N. 2863 (2002); Barry Sarvet, et al., *Improving Access to Mental Health Care for Children: The Massachusetts Child Psychiatry Access Project*, 126 PEDIATRICS 1191 (2010); Jeanne Miranda, et al., *State of the Science on Psychosocial Interventions for Ethnic Minorities*, 1 ANNUAL. REV. CLINICAL PSYCHOL. 113 (2005).

[316] *See* FAMILY RESIDENTIAL STANDARDS: MEDICAL CARE, *supra* note 307, at 22.

[317] AMERICAN ACADEMY OF PEDIATRICS, IMMIGRANT HEALTH TOOLKIT 4-5, https://www.aap.org/en-us/Documents/cocp_toolkit_full.pdf.

[318] Kurt Kroenke, Robert Spitzer, & Janet Williams, *The PHQ-9: Validity of a Brief Depression Severity Measure*, 16(9) J. GEN. INTERNAL MED. 606 (2001)

[319] Christopher Miller, et al., *Sensitivity and Specificity of the Mood Disorders Questionnaire for Detecting Bipolar Disorder*, 81 J. AFFECTIVE DISORDER 167 (2004).

[320] Richard Brown & L.A. Ronds, *Conjoint Screening Questionnaires for Alcohol and Other Drug Abuse Criterion Validity in a Primary Care Practice*, 94(3) WIS. MED. J. 135 (1995).

[321] Kroenke, *supra* note 318; A.J. Lang & M.B. Stein, *An Abbreviated PTSD Checklist for Use as a Screening Instrument in Primary Care*, 43 BEHAVIOUR RES.& THERAPY 585 (2005).

**c) CAGE-AID as a substance abuse screen for all youth 12 to 17 years of age.**

**Recommendation 6-36: The FRCs should fully implement the guidelines for mental health screening embedded within the health screenings section in PBNDS 2011, as well as those listed above.[322] Validated Spanish versions should be used for Spanish speakers, and the tools should be administered orally for detainees who lack reading literacy. For those detainees whose primary language is neither English nor Spanish, all the screening tools should be translated into languages regularly used by FRC detainees (using the cutoff described in Recommendation 5-7), or communicated by oral interpretation by a qualified interpreter. The record should reflect in what language and how the tool was administered. The administration of mental health screening tools should be conducted by credentialed health care providers who are trained in culturally and developmentally appropriate interaction around their administration with detainees.**

### 2. Mental Health Referrals and Response

In the above-cited integrated and collaborative mental health care screening models, cut-off scores from screening tools are used to identify individuals in need of more in-depth mental health assessment. These assessments are typically conducted by a master's level mental health professional, in consultation with a psychiatrist.[323] However, there should be capability for rapid response to individuals who demonstrate agitation or signs of psychosis, or who screen for suicidality. In the mental health clinical context, such evaluations lead to a comprehensive treatment and care plan that outlines needed interventions and professional responsibilities. Mechanisms for urgent and emergent mental health responses that are accessible at any time are critical when working with a population that is especially vulnerable to mental health related emergencies. Additionally, cultural competence in the delivery of all mental health services is key given the special origins and contextual circumstances of FRC families.[324]

This is an area in which the requirements currently contained in the Family Residential Standards and the PBNDS 2011 are inadequate; both are missing requirements that conform with best practices in the field.

**Recommendation 6-37: When a detainee's mental health screening results indicate positive total scores or sub-scores or positive items on the historical screen within health forms, or a history of psychiatric symptoms or conditions, the detainee should be referred by the primary care provider conducting the screening for a comprehensive evaluation by qualified mental health professionals. These qualified health professionals may work either at the FRCs or at a community-based programs.**

**Recommendation 6-38: Psychiatric evaluation of FRC detainees should at least conform to the outline in PBNDS 2011,[325] plus include a full psychiatric review of systems, developmental history, and collateral history (from the parent present for children), any prior treatment history, a full mental status examination, and a DSM-5 diagnostic**

---

[322] PBNDS 2011, *supra* note 254, at 292.
[323] Unutzer, et al. *supra* note 315.
[324] Andrés J. Pumariega, et al., *Practice Parameter for Cultural Competence in Child and Adolescent Psychiatric Practice*, 52(10) J. AM. ACAD. CHILD ADOLESCENT PSYCHIATRY 1101 (2013).
[325] PBNDS 2011, *supra* note 254, at 292.

**assessment. If the FRC does not have on staff a qualified mental health professional with expertise in using these instruments, the FRC should have a contract with a qualified mental health professional in the community who can conduct the evaluations described here. In particular:**

**a) A detainee identified through the screening process should be seen by a qualified mental health professional within 24 hours of screening and within 72 hours of admission into the FRC.**
**b) Referrals for mental health evaluation involving suicidality or psychotic symptoms should occur within 4 hours of identification.**
**c) Detainees identified with mental health needs should all have a comprehensive treatment plan developed to meet their unique needs, with collaboration between the mental health professional, primary care physician, and psychiatrist outlining treatment modalities during detention and recommended treatment modalities and services upon release. The treatment plan should be a permanent part of the detainee's health record and updated every 4 weeks if the detainee has a longer stay (for outpatient level care) and every week if the detainee is referred to more intensive services (such as inpatient care).**

**Recommendation 6-39: Given the special origins and contextual circumstances of detained families, the comprehensive mental health evaluation and treatment plan needs to incorporate and address multiple cultural elements of cultural competence as outlined in the American Academy of Child and Adolescent Psychiatry, *Practice Parameter for Cultural Competence in Child and Adolescent Psychiatric Care*, for both adults and children. This should include linguistic support, cultural context of symptoms, impact of immigration trauma history, treatment selection, and parental involvement for children.**[326]

**Recommendation 6-40: FRCs should have on-site crisis response capabilities by masters (or higher) level therapists, including on-call response 24/7, possibly including after-hours tele-video accessibility. Detainees or detention staff should be able to access this resource 24/7 without need for a prior mental health diagnosis or mental health treatment plan. This will facilitate the decision to call outside mental health crisis services.**

**Recommendation 6-41: If the FRC cannot provide the appropriate level of mental health care, detainees should be transferred to receive that care in community.**

**a) The Level of Care Utilization System (LOCUS, for adults) or Child and Adolescent Level of Care Intensity Instrument (CASII, for children 6 years of age and over) should be used to determine the appropriate level of care.**
**b) If a detainee is determined to need an inpatient or residential level of care, he or she should be sent to inpatient services first for comprehensive evaluation and stabilization, then transferred to a residential mental health facility.**
**c) If clinicians at the mental health facility believe that remaining in the FRC or returning to the FRC post-discharge would be deleterious to the detainee's health, then ICE should release the detainee to a post-release community with the following:**

[326] Pumariega, *supra* note 324.

**i. safe and reliable transport to the post-release community;**
**ii. stable housing once the detainee arrives; and**
**iii. clear arrangements and appointments to receive the recommended level of care in the post-release community (using the LOCUS or CASII to determine level of care), arranged by ICE case management. ICE should collaborate with any outside clinical facility in making these arrangements.**

**Any minor released for mental health reasons should be accompanied by his/ her parent to a post-release community.**

**Recommendation 6-42: ICE and FRC staff should receive crisis intervention training about on-site prevention and management of mental health crisis and agitation, and about formation of a behavioral rapid response team, including training on mental health restraints and medications for acute management.[327]**

**Recommendation 6-43: ICE should amend the Family Residential Standards on use of restraints to incorporate the provisions of the PBNDS 2011.[328] The FRCs should immediately follow the PBNDS 2011 both as to procedures and the substantive decision with respect to restraints.**

**Recommendation 6-44: ICE should amend the Family Residential Standards to specify policies governing external mental health crisis services for detainees. Provisions should cover: communication with crisis mental health services and first responders (including, particularly local/state police); safe method for transport; appropriate interpretation services; procedures for communication of results and recommendations from crisis evaluations back to on-site mental health providers, and communication with an inpatient facility if a detainee is hospitalized. The standard should also require formal review of sentinel events (e.g., suicide attempts, episodes of agitation/ aggression, and psychotic episodes), including debriefing with all involved staff, root causes analysis, and practices improvement based on the review. FRCs should be required to develop specific procedures and training to implement the policy, including developing contacts in advance with external providers.**

**Recommendation 6-45: ICE should treat detainees with mental health needs, including suicidality, in a non-punitive, therapeutic manner. Use of isolation cells or other isolated housing should be avoided for anyone exhibiting suicidality or symptoms of mental illness; any such use should be only in response to a threat to the physical safety of the detainee or others, if no other less restrictive option is appropriate, and for the shortest time practicable; and only if authorized by a mental health professional.[329] Use of isolation cells and segregation should particularly be avoided if such use would separate parents from their**

---

[327] COLLABORATIVE INSTITUTIONAL TRAINING INITIATIVE (CITI), https://www.citiprogram.org/.
[328] *See* PBNDS 2011, *supra* note 254, at 297, 208-224. FAMILY RESIDENTIAL STANDARDS: MEDICAL CARE, *supra* note 307, at 4, and FAMILY RESIDENTIAL STANDARDS 2.10: USE OF PHYSICAL FORCE AND RESTRAINTS 1-14, https://www.ice.gov/doclib/dro/family-residential/pdf/rs_use_of_force.pdf, are less robust.
[329] *See, e.g.*, CRISIS PREVENTION INST., JOINT COMMISSION STANDARDS ON RESTRAINT AND SECLUSION/ NONVIOLENT CRISIS INTERVENTION TRAINING PROGRAM (2010), https://www.crisisprevention.com/CPI/media/Media/Resources/alignments/Joint-Commission-Restraint-Seclusion-Alignment-2011.pdf.

**children. In lieu of isolation cells, FRCs should practice a policy of heightened observance of at-risk detainees. In cases of suicidality or aggressive behavior, FRCs should institute special observations and therapeutic interventions, or, if the circumstances require, admit the detainee to a mental health facility.**

### 3. Psychiatric Management and Pharmacotherapy

In the above-cited integrated and collaborative care mental health care models, pharmacological treatment responsibilities are shared between the primary care physician (PCP) and psychiatrist using a stepped care model. Most patients with uncomplicated mental health problems managed by the PCP and the master's level mental health professional (MHP) with available indirect psychiatric consultation; middle complexity patients are managed with some intermittent involvement of a psychiatrist with primary management by the PCP and MHP; and patients with more complex conditions are managed primarily by the psychiatrist and MHP with PCP input and involvement. Psychiatric formularies are often complex and can include a significant number of pharmacological agents, many at significant costs. However, there are well established pharmacotherapy treatment algorithms that take into account both clinical needs and cost-effectiveness. One of the most established national standards is the Texas Medication Algorithm Project (TMAP), sponsored by the Texas Department of Mental Health in conjunction with academic institutions in the state,[330] which provides both an evidence-based guide as well as readily available consultation for the FRCs. The TMAP standards are applicable nationally and the Texas Department of Mental Health routinely provides consultations to programs in any state on the TMAP and could provide such consultations to FRCs, without regard to the state in which the FRC is located. Given the ethnicity of the families detained in FRCs (with strong indigenous origin), ethno-pharmacotherapy considerations around dosing also requires special attention.[331]

**Recommendation 6-46: All available formularies of psychiatric medications should follow the Texas Medication Algorithm Project (TMAP).[332] This nationally accepted professional standard should set the minimum requirements for the FRCs. Should state licensing laws or best practices of professional affiliations require compliance with standards of care that are higher than those contained in the TMAP, then FRC staff operating in the state should meet the higher standard. FRC medical providers, in collaboration with the psychiatric/ behavioral health providers and the ICE Medical Director, should develop and reliably implement a collaborative care algorithm using a stepped care model. Such algorithm should at minimum include the following levels of care:**

a) **Entry-level pharmacological treatment for depression or anxiety should be performed by primary care providers (PCPs), in collaboration with the on-site mental health professional serving the detainee.**
b) **Management of detainees with moderate complexity mental health problems (including PTSD) should be managed jointly by the PCP and the consulting psychiatrist, in collaboration with the on-site mental health professional serving the detainee.**

---

[330] A. John Rush, William V. Rago, M. Lynn Crismon, et al., *Medication Treatment for the Severely and Persistently Mentally Ill: the Texas Medication Algorithm Project*, 60 J. CLINICAL PSYCHIATRY 284 (1999).
[331] ETHNICITY AND PSYCHOPHARMACOLOGY (Pedro Ruiz, ed. 2000).
[332] Rush et al., *supra* note 330.

c) **Management of highly complex patients, including those with severe depression or anxiety, bipolar disorder, psychosis, and autism spectrum, should be overseen by a consulting psychiatrist, with PCP input, in collaboration with the on-site mental health professional serving the detainee.**

**Recommendation 6-47: Criteria for psychiatric evaluation should include psychiatric evaluation under integrated behavioral health models,[333] guided by the above -mentioned stepped care algorithm and using offsite resources when the patient's needs for stepped care cannot be managed by on-site primary care providers, mental health professionals, or psychiatrists at the FRC. Psychiatric evaluation and management can be conducted either live or via televideo; the latter should follow the applicable provisions of the Family Residential Standard,[334] PBNDS 2011,[335] and practice parameters for telepsychiatry from the American Psychiatric Association and the American Academy of Child and Adolescent Psychiatry.[336]**

**Recommendation 6-48: As recommended by the Texas Medication Algorithm Project, the FRCs should have "as clinically necessary," psychiatric medication on formulary in the dispensary (including injectables as last resort to manage severe agitation). These should be used only for clinically necessary, not detention related, reasons.**

**Recommendation 6-49: FRCs should be cautious about ethopsychopharmacology issues given the high percent of detained families from indigenous ethnic groups (who are often slow metabolizers of psychotropics). The Addendum to the Texas Medication Algorithm Project provides specific guidance on this issue.[337]**

### 4. Credentials of Mental Health Professionals

During the Committee's visit to the FRCs, we were introduced to individuals who were the behavioral health staff for each facility. However, when we asked to see their credentials these were not made available. Similarly, the Committee requested specific information about credentials, but ICE chose to provide only a general statement about the competency and skills of the on-site mental health professionals. Thus, we are unable to comment on the credentials of the available mental health professionals at the FRCs, which should be considerable given the complex needs of the detained families. The Family Residential Standard on Medical Care is fairly specific as to basic credentialing rules and documentation and availability of such credentials, but the credentialing process is not addressed, nor are added credentials needed for mental health professionals tied to their specific areas of therapeutic skill and competency.

---

[333] Unutzer et al., *supra* note 315.
[334] *See* FAMILY RESIDENTIAL STANDARDS: MEDICAL CARE, *supra* note 307, at 16.
[335] PBNDS 2011, *supra* note 254, at 288-289, 292.
[336] American Academy of Child and Adolescent Psychiatry, Telepsychiatry and Your Child (Apr. 2013), http://www.aacap.org/AACAP/Families_and_Youth/Facts_for_Families/FFF-Guide/Telepsychiatry-and-Your-Child-108.aspx.
[337] ETHNICITY AND PSYCHOPHARMACOLOGY, *supra* note 331.

**Recommendation 6-50: FRC should develop full credentialing procedures and standards as per the Joint Commission for Accreditation of Healthcare Organizations (JCAHO)[338] or the National Council for Quality Assurance (NCQA) standards,[339] state licensure requirements[340] and best practices. Facilities should comply with both national and state standards. If the state in which the FRC is located has higher standards in a given area, then the state standards should be followed. Further standards that should be applied include:**

a) **Credentialing procedures should include original source verification of credentials (i.e., education, licensure for the state in which the FRC is located, added training and certificates).[341]**
b) **A Credentialing Committee for the FRC should review credentials and grant clinical privileges.**
c) **Credentials should be specific to the scope of practice and procedures/practice for each level and type of professional.[342]**
d) **Credentials should address the professional's language competency for clinical services, taking account that few detainees are proficient in English.**
e) **Credentials should address the professional's continuing education in cultural competence and cultural literacy and training around the populations at the FRCs.[343]**
f) **FRC therapists should have documented training in basic brief Cognitive Behavioral Therapy for depression and anxiety.[344]**
g) **Credentials of medical and mental health professionals should be on file and posted on the ICE website (with appropriate privacy protections for staff) and made available for inspection at each FRC by CRCL, Danya, and others.[345]**

**Recommendation 6-51: ICE should enter contracts for FRC mental health services with clinical entities that have established credentialing and quality assurance processes and can establish satellite offices within the FRCs. (In Texas, two possible options are the University of Texas Health Sciences Center in San Antonio and the Center for Health Care Services under Bexar County MHMR in San Antonio; in Pennsylvania, Reading Hospital and Medical Center, Lehigh Valley Health System, and Lancaster General Medical Center are potential partners.)**

### 5. Psychotherapies

The mental health needs of the families detained in the FRCs are complex, and can include both general psychiatric problems and problems resulting from traumatization by pre-immigration and immigration stresses, as well as detention itself. Effective mental health care should include evidence-based standard psychotherapy modalities, not only to treat depression and anxiety but

---

[338] JOINT COMMISSION, 2017 COMPREHENSIVE ACCREDITATION MANUALS.
[339] NAT'L COMM. FOR QUALITY ASSURANCE, *Accreditation Programs*, http://www.ncqa.org/Programs/Accreditation.aspx.
[340] For more detail on state licensure, see Federation of State Medical Boards, https://www.fsmb.org/.
[341] *See* FAMILY RESIDENTIAL STANDARDS: MEDICAL CARE, *supra* note 307, at 3.
[342] *Id.*
[343] Miranda et al. *supra* note 315.
[344] *Id.*
[345] *See* FAMILY RESIDENTIAL STANDARDS: MEDICAL CARE, *supra* note 307, at 5.

also to treat acute stress disorder and PTSD. Due to the uncertain length of custody, and often short stays in detention , interventions need to be short-term and time limited, but also build a foundation for future longer term psychological interventions.

**Recommendation 6-52: ICE should consider a detainee's fragile health or mental health, and trauma experiences and potential re-traumatization caused by detention, as factors favoring non-admission to or release from detention. For detainees – adults or children –found to have significant mental and physical health conditions, release of the whole family from detention is probably the most appropriate outcome.**

**Recommendation 6-53: FRCs should provide detainees with care by master's or doctoral level therapists who:**

a) **have documented training in Psychological First Aid, Trauma-focused Cognitive Behavioral Therapy and other evidence-based modalities for PTSD, Acute Stress Disorder (both for adults and children); and treatment of domestic violence, sexual violence and child abuse;**
b) **are certified through post-professional training; and**
c) **are certifiably bilingual with significant experience with Latino patients.[346]**

**Recommendation 6-54: FRCs should establish a formal connection between the ICE Medical Office and the National Child Traumatic Stress Network[347] technical assistance centers to provide training resources for local therapists in evidence-based therapies for psychological first aid, trauma-focused cognitive behavioral therapy and other evidence-based modalities for PTSD (many of these online). A similar relationship should be established with the National Center for Trauma Informed Care funded by SAMHSA and SAMHSA experts at HHS.**

**Recommendation 6-55: FRCs should provide, or contract with outside service providers, the above-mentioned psychotherapy to detainees as indicated by their mental health assessments and also incorporated into their individualized treatment plans.**

### 6. Support/Therapeutic Groups

The limited mental health literacy among FRC detainees requires a psychoeducational approach to prepare them to recognize possible mental health conditions and to provide information about available treatment modalities and resources. There is evidence that psychoeducational groups can provide this level of mental health literacy as well as reduce stigma of mental illness, mental health problems, and address sensitive topics such as domestic violence, particularly in the Latino population.[348] Additionally, groups can provide parents with information on parenting and

---

[346] *Id.*; Josef I. Ruzek, et al., *Psychological First Aid,* 29 J. MENTAL HEALTH COUNSELING 17 (2007); Esther Deblinger, et al., *Trauma-Focused Cognitive Behavioral Therapy for Children: Impact of the Trauma Narrative and Treatment Length*, 28 DEPRESSION AND ANXIETY 67 (2011).
[347] NAT'L CHILD TRAUMATIC STRESS NETWORK, http://www.nctsn.org/.
[348] Edil Torres Rivera, Ivelisse Torres Fernandez & Whitney Alexander Hendricks, *Psychoeducational and Counseling Groups with Latinos/as*, *in* HANDBOOK OF GROUP COUNSELING AND PSYCHOTHERAPY 242-52 (Janice DeLucia-Waack, Cynthia Kalodner & Maria Riva eds., 2nd ed. 2014).

preventive mental health for their children.[349] Facilities should develop a psychoeducational group program to educate detainees about basic mental health concepts, diagnoses, and treatments, especially around PTSD.

**Recommendation 6-56: FRCs should create individual and group support opportunities, which may include individual counseling as well as support group sessions. FRCs should also recognize that trauma victims need access to these programs, but their autonomy to decide whether they are ready, able, or interested in participating in such programs needs to be respected.**

**Recommendation 6-57: FRCs should develop a psychoeducational group program to educate detainees about basic mental health concepts, diagnoses, and treatments, especially around PTSD and domestic and sexual violence. This can be done in collaboration with the state and local chapters of the National Alliance for the Mentally Ill (NAMI), which has considerable experience in outreach to and engagement with Latino populations and could provide group facilitators from the Latino communities and with organizations with expertise in running group sessions for victims of domestic violence and/or sexual assault These should be made available to all detained mothers and to interested teenagers who opt to participate in a psychoeducational group program. Groups may also be staffed with FRC Trauma Informed Care Coordinators with the credentials and experience to run these groups.**

**Recommendation 6-58: FRCs should develop longer term cognitive behavioral psychotherapeutic groups for trauma, depression, anxiety, and parenting issues for children with behavioral difficulties and for families who have longer term stays.**

**Recommendation 6-59: FRCs should offer brief cognitive behavioral therapy for individual detainees experiencing symptoms related to, e.g., trauma, PTSD, flashbacks, and suicide risk. This cognitive behavioral therapy needs to be available at each FRC; it should be provided in Spanish (and interpreted into other needed languages) by someone with training, qualifications, and experience to provide cognitive behavioral therapy to trauma victims.**

**Recommendation 6-60: FRCs should develop a list of practical topics that can be covered pre-release to facilitate resilience, follow-up treatment, and services for the short- stay detainees. Topics should include stress management, including breathing exercises.**

### C. Trauma-Informed Care

Many of the mothers and children living in FRCs have been victims of or witnesses to domestic violence, sexual assault, human trafficking, child abuse, or other violence. Working with detained families who have suffered trauma requires that facilities adopt a trauma-informed care approach to identify and assist women and children in ICE custody.

Understanding the context of trauma is critical to developing an environment that reduces re-traumatization. The following background on trauma and trauma-informed principles provide

---

[349] Kimberly Ehntholt & William Yule, *Practitioner Review: Assessment and Treatment of Refugee Children and Adolescents Who Have Experienced War-Related Trauma* 47 J. CHILD PSYCHOL. & PSYCHIATRY 1197, 1197-210 (2006).

context for our recommendations set forth below; the discussion is primarily based on SAMHSA's Concept of Trauma and Guidance for a Trauma-Informed Approach[350] and from SAMHSA's TIP 57.[351]

Trauma is a widespread, harmful, and costly public health problem. It occurs as a result of violence, abuse, neglect, loss, disaster, forced displacement, war, and other emotionally harmful experiences. Trauma has no boundaries with regard to age, gender, socioeconomic status, race, ethnicity, geography or sexual orientation.

Emerging research has documented the relationships among exposure to traumatic events, impaired neurodevelopmental and immune systems responses and subsequent health risk behaviors resulting in chronic physical or behavioral health disorders. Furthermore, previous research indicates that victimization as a child or adolescent increases the likelihood that victimization will reoccur in adulthood. Research has also shown that traumatic experiences – especially those traumatic events that occur during childhood – are associated with both behavioral health and chronic physical health conditions. Substance use (e.g., smoking, excessive alcohol use, and taking drugs), mental health problems (e.g., depression, anxiety, or post-traumatic stress disorder), and other risky behaviors (e.g., self-injury and risky sexual encounters) have been linked with traumatic experiences. In addition, traumatic experiences can contribute to chronic physical health conditions, such as diabetes and cardiovascular diseases.

We now understand that a framework for addressing trauma – "trauma-informed care" or "trauma-informed approach" – is essential. A trauma-informed approach includes an understanding of trauma and an awareness of the impact it can have across settings, services, and populations. It involves viewing trauma through ecological and cultural lenses and recognizing that context plays a significant role in how individuals perceive and process traumatic events, whether acute or chronic.

SAMHSA's concept of a trauma-informed approach is grounded in a set of four assumptions and six key principles.

The four key assumptions for a trauma-informed approach (sometimes referred to as the four Rs) are: (1) *realizing* the prevalence of trauma; (2) *recognizing* how trauma affects all individuals involved with the program, organization, or system, including its own workforce; (3) *responding* by putting this knowledge into practice; and (4) *resisting* re-traumatization.

A trauma-informed approach reflects adherence to six key principles rather than a prescribed set of practices or procedures. SAMHSA's six key principles are: safety; trustworthiness and transparency; peer support; collaboration and mutuality; empowerment, voice and choice; and cultural, historical and gender issues.

---

[350] *See generally* SAMHSA, SAMHSA CONCEPT OF TRAUMA AND GUIDANCE FOR A TRAUMA-INFORMED APPROACH (Oct. 7, 2014), http://store.samhsa.gov/product/SAMHSA-s-Concept-of-Trauma-and-Guidance-for-a-Trauma-Informed-Approach/SMA14-4884?WT.mc_id=EB_20141022_SMA14-4884.

[351] *See generally* SAMHSA, *TIP 57: Trauma-Informed Care in Behavioral Health Sciences* (Mar. 2014), http://store.samhsa.gov/product/TIP-57-Trauma-Informed-Care-in-Behavioral-Health-Services/SMA14-4816. For information, training tools, and examples of best practices in providing trauma informed care, see this Report's Appendix D, Examples of Federal Resources, Tools, and On-Line Trainings on Trauma-Informed Care.

A trauma-informed approach is distinct from trauma-specific services or trauma systems. A trauma-informed approach is inclusive of trauma-specific interventions, whether assessment, treatment or recovery supports, yet it also incorporates key trauma principles into the organizational culture. In particular, a trauma-informed approach seeks to resist re-traumatization of clients as well as staff. Organizations often inadvertently create stressful or toxic environments that interfere with the recovery of clients, the well-being of staff and the fulfillment of the organizational mission. Staff who work within a trauma-informed environment are taught to recognize how organizational practices may trigger painful memories and re-traumatize clients with trauma histories.

Developing a trauma-informed approach requires change at multiple levels in the FRCs and systematic alignment with these principles.

### 1. Implementing a SAMHSA Trauma-Informed Approach

Internment within an institution with restricted freedom of movement and a regimented schedule in itself has been found to be highly stressful for any detainee, and particularly for young children. A trauma-informed approach thus requires that FRCs establish, to the maximum extent possible, a non-institutionalized environment. This includes predictability and establishment of natural contact points between children and parents similar to those existing in communities outside of detention. Children can suffer distress when separated from parents even for routine activities such as school, and therefore need ready physical access on demand to their parent. A goal of a trauma-informed approach at FRCs is to make the environment less penal and institutionalized, with greater internal freedom of movement, and normalization of daily activities with flexibility and natural flows in their scheduling. Practices with historical roots in prison settings should be eliminated. (See Part 2.B.1, on normalization more generally.)

Notwithstanding the critical need for a trauma-informed approach in the FRCs, there are virtually no existing trauma-informed policies in the FRC policies. An initial limited trauma-informed training is reportedly offered for some FRC staff at some, but not all, of the FRC facilities. This training is a start, but more in-depth training and ongoing implementation support is required for all staff, coupled with revision of policies and practices at all the FRCs.

A successful trauma-informed approach recognizes the widespread impact of trauma and creates a safe and compassionate environment. Success requires that trauma-informed trainings be mandatory, and policies implemented by, all staff in FRCs, not just medical staff and operations. To adopt a more trauma-informed approach, each FRC will need to start with an environmental scan of their policies, procedures, and practices relative to each of ten SAMHSA-identified domains, with the goal of incorporating SAMHSA's key principles. The ten implementation domains are: governance and leadership; policy; physical environment; engagement and involvement; cross sector collaboration; screening, assessment, treatment and services; training and workforce development; progress monitoring and quality assurance; financing; and evaluation. For each, the six key principles apply (to repeat, safety; trustworthiness and transparency; peer

support; collaboration and mutuality; empowerment, voice and choice; and cultural, historical and gender issues).[352]

Best practices for trauma-informed care include securing contracts with agencies that have expertise providing training and technical assistance on trauma-informed care. ICE can collaborate with other federal government agencies including SAMHSA, the HHS Family Violence Prevention and Services Act (FVPSA) office, and the DOJ Office on Violence Against Women (OVW) to identify potential contractors with the appropriate expertise and training capacity to assist ICE and the FRCs with trauma-informed environmental scans, implementation of work plans, staff training, and technical assistance. SAMHSA has an established contracting process with its grantees that SAMHSA may use to facilitate other government agencies contracting with SAMHSA grantees. Should ICE and any of its FRCs choose to contract with SAMHSA's grantees, SAMHSA could expedite the process of contracting with its grantees making them available to assist ICE and FRCs more rapidly.

**Recommendation 6-61: ICE and the FRCs should holistically implement a trauma-informed approach, in coordination with relevant federal agencies and their recommended subject matter experts:**

a) **ICE and the FRCs should coordinate with the Substance Abuse and Mental Health Services Administration (SAMHSA), Department of Justice Office on Violence Against Women (OVW), and/or the Department of Health and Human Services Family Violence Prevention and Services Program (FVPSP) in as many arenas as possible, to take advantage of their deep expertise.**
b) **ICE and the FRCs should consult with SAMHSA-recommended experts about general policies and procedures, and in particular about sensitive approaches to management of agitation, distress, or other adverse behaviors.**
c) **All trauma-informed care polices developed by FRCs and ICE should be reviewed and approved by experts at SAMHSA and OVW; ICE should secure consensus from SAMHSA and OVW that the policies meet trauma-informed standards.**
d) **ICE and FRC staff should contract to receive technical assistance on trauma-informed care and work with immigrant-crime-victims subject matter experts on trauma-informed care recommended and/or funded by SAMHSA, OVW, and/or FVPSA.**
e) **ICE and FRC staff should contract with FVPSA-recommended subject matter experts to receive training and technical assistance on trauma-informed care and care for victims of domestic violence, sexual assault, child abuse, and human trafficking.**
f) **ICE and FRC staff should contract with SAMHSA-recommended subject matter experts, with particular expertise and experience in trauma-informed training, to provide ongoing staff training and education on trauma-informed care for all ICE and FRC staff who have contact with actual or potential FRC detainees or supervise staff who have such contact.**

---

[352] SAMHSA'S TRAUMA AND JUSTICE STRATEGIC INITIATIVE, SAMHSA'S CONCEPT OF TRAUMA AND GUIDANCE FOR A TRAUMA-INFORMED APPROACH (JULY 2014), http://store.samhsa.gov/shin/content/SMA14-4884/SMA14-4884.pdf (providing a road map for a trauma-informed environmental scan). Additional resources are available at this Report's Appendix D.

**Recommendation 6-62: ICE and FRC trauma-informed training should have the objectives of increasing staff understanding of trauma, awareness of the impact of trauma on behavior, and how to implement trauma-informed responses.**

**Recommendation 6-63: ICE should designate Trauma Informed Care Coordinators for each FRC. The Coordinators should conduct environmental scans based on SAMHSA guidelines, identifying gaps and needs for trauma-informed care, and should develop a plan for the facilities to operate in a trauma-informed manner, taking corrective steps that prioritize the most readily-accomplished reforms and then moving on to more difficult areas. Coordinators should report to and coordinate with a staff member at the national leadership level at the ICE Enforcement and Removal Operations. Technical assistance on trauma-informed care and trauma-informed environmental scans can be provided by the National Center for Trauma Informed Care.**[353]

**Recommendation 6-64: ICE and the FRCs should use SAMHSA guidelines for recognizing the signs and symptoms of trauma in detainees and families. The FRCs should implement programs that provide support for women and children who have experienced trauma, while avoiding "caretaking" or "rescuing" responses, and should foster an environment that encourages self-care by maximizing opportunities for choice and control in their daily lives.**

**Recommendation 6-65: The FRCs should provide a culturally appropriate environment that is as non-institutional as possible, with special attention to language access, diet, customs and traditions,**[354] **daily routines, ambiance and decor (of housing units and of common areas), and adult parenting tasks, so as to minimize culture shock and to create as normal a daily structure as possible.**

### 2. Trauma-Informed Approach: Elimination of Nighttime Bed Checks

Hourly bed checks during sleep hours that include turning on lights, using flashlights or making any physical contact to confirm that all members of a detained family are present are routine in FRCs; these practices are clearly disruptive and intrusive. They are inconsistent with trauma-informed care of detainees. It is common for individuals who have been psychologically traumatized to have extreme startle reactions, terror, and insomnia as a result of such actions or practices. Sleep disruption and deprivation has adverse implications for both general health and child development. The rationale for searches in detention is to ensure a "safe living environment" and "to prevent escapes."[355] The actual needs of these non-criminal families could be met with far less intrusive measures. As with so many other aspects of FRC operations, the current prison-based approach is inappropriate.

---

[353] National Center for Trauma-Informed Care and Alternatives to Seclusion and Restraint (NCTIC), http://www.samhsa.gov/nctic.
[354] Andres J. Pumariega et al., *Practice Parameter for Cultural Competence in Child and Adolescent Psychiatric Practice*, 52 J. AM. ACAD. CHILD ADOLESC. PSYCHIATRY 1101 (2013).
[355] U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, FAMILY RESIDENTIAL STANDARDS 2.6, SEARCHES OF RESIDENTS, https://www.ice.gov/doclib/dro/family-residential/pdf/rs_searches_of_residents.pdf.

**Recommendation 6-66: All FRCs should immediately discontinue the practice of nightly bed checks, which are intrusive, harmful to parents and children, and undermine the provision of trauma-informed-care at FRCs.**

### 3. Trauma-informed Approach: Supports for Parenting

Despite being in a detention facility, adults detained in the FRCs must continue parenting their children. This serves, in part, to reassure the children that they are in a predictable, nurturing, and safe environment, which is essential for every child's well-being. The FRC environment is an unfamiliar and a potentially stressful one for both parents and children. Such an environment may further compound the prior stress and trauma experienced by the parents and children before entering the United States. The general well-being of families while they are in the FRCs is highly dependent on the FRC environment, which should therefore support their parenting using a trauma-informed approach.

The Office of Refugee Resettlement (ORR) within HHS takes custody of unaccompanied children who cross the border without legal status. ORR takes responsibility to "[e]nsure that the interests of the child are considered in decisions related to the care and custody of unaccompanied children."[356] Children in the FRCs, although not unaccompanied, are still children and are the majority of FRC detainees. And the U.S. Court of Appeals for the Ninth Circuit recently ruled that they are entitled to the same protections as unaccompanied children.[357] The same underlying philosophy of safeguarding children's interests should pervade all aspects of the care of children in the FRCs.

**Recommendation 6-67: FRC Trauma Informed Care Coordinators should coordinate trauma-informed care for parents and children detained at the FRCs. The FRCs should provide and/or facilitate access to services and programming that support parents' and children's resilience and prevent re-traumatization, such as educational and information sessions, support groups, self-esteem building, and other activities that help parents and children heal from trauma and build upon their own strengths and resiliency. The Coordinators should track the numbers of detained mothers who participate in such programs.**

**Recommendation 6-68: FRC Trauma Informed Care Coordinators should regularly offer – and should reach out to detainees to invite them to participate in – informational sessions for detainees on domestic violence, sexual assault, human trafficking, and child abuse and providing an overview of help available to victims in the United States. This should include handing out the USCIS brochures discussed in Recommendation 3-35 and 3-38, above. Alternatively or additionally, these information sessions could be provided through contract with a community-based organization with expertise serving victims of domestic violence and sexual assault.**

---

[356] *About Unaccompanied Children's Services*, U.S. DEP'T OF HEALTH AND HUMAN SERVICES, OFFICE OF REFUGEE RESETTLEMENT (2015), http://www.acf.hhs.gov/orr/programs/ucs/about.
[357] Flores v. Lynch, 828 F.3d 898 (9th Cir. 2016).

**Recommendation 6-69: Each FRC should conduct systemic surveys of detainees to document and assess family experiences in FRCs and to identify services that could help minimize re-traumatizing parents and children.**

**Recommendation 6-70: ICE and the FRCs should transparently communicate to detainees their rights and responsibilities with respect to parenting their children while in detention. The policies and communications materials should be developed with a trauma-informed approach to normalize the parent-child relationship and create the greatest possible opportunities for parental responsibility, choice, and control over their children's lives, within the confines of detention.**

**Recommendation 6-71: ICE should ensure that the best interests of child detainees are considered in all decisions related to their care and custody, and that children are not subjected to further trauma by the decisions related to the care and custody of children in the FRCs. Children should not be present for their mother's credible or reasonable fear interview, mental health screening, or delivery of the results of mental health screenings or tests.**

### D. Release Preparation, Case Management, Continued Care and Access to Mental Health Professionals

Immigrant mothers and children who are seeking asylum or who have suffered from domestic violence, sexual assault, human trafficking, and violence, and who have trauma histories related to these and other events, need support to help them heal both while in detention and in their post-release communities. Detention itself is traumatizing and can exacerbate pre-existing trauma. Non-punitive and non-restrictive community support and case management programs can offer much-need services. So time in custody, if it is absolutely necessary, can be used to screen and identify trauma, to inform detainees of services available to them, and to connect them to relevant assistance programs in the communities to which they will be released.

Appropriate community services and support can strengthen the ability of mothers to heal, to care for their children and to fully participate in their immigration cases. Immigration case participation involves retelling the story of abuse in writing and orally, often to several persons. Retelling their stories of persecution, crime victimization, and abuse often leads victims to relive the trauma. Programs with experience working with immigrant victims of violence or persecution have needed expertise on the full range of legal protections such victims are eligible to receive, and they know how to provide assistance to victims in a trauma-informed manner.[358] This type of support will

---

[358] *See* Advocates Tool for Developing a Survivors Story; Trauma Informed Approach, http://library.niwap.org/wp-content/uploads/2015/pdf/TRAUM-Qref-AdvocatesToolDevelopingSurvivorStory.pdf; Mary Ann Dutton et al., Trauma Informed Structured Interview Questionnaire (2013), http://library.niwap.org/wp-content/uploads/2015/SIQI.edited.di-tb-6.15.15.pdf; National Immigrant Women's Advocacy Project, *Training for Advocates and Attorneys on Trauma-Informed Work With Immigrant Women*, https://www.youtube.com/watch?v=05Z95q1bkG4 (Apr. 23, 2014); Krisztina Szabo et al., *Advocate's and Attorney's Tool For Developing A Survivors Story: Trauma Informed Approach* (2013), http://library.niwap.org/wp-content/uploads/2015/pdf/TRAUM-Qref-AdvocatesToolDevelopingSurvivorStory.pdf.

enhance appearance at and participation in immigration case proceedings and will simultaneously help victims and their children heal from the effects of trauma.

A systematic approach to case management has been found to be most effective in improving outcomes for other populations with complex needs – particularly an approach that directly connects persons to needed services in their communities.[359] The case management program currently piloted by ICE is promising, but requires more focus and capacity around mental health case management. In addition, a referral system and a directory of service providers in communities across the U.S. is necessary to ensure that women and children being released from detention have the access to services they need to facilitate their own healing and care for their families. Because detained mothers are new arrivals in the U.S. and are unfamiliar with the communities to which they are released, it is particularly important to not only provide referrals, but also to work to set up appointments with service providers in the communities to which detainees will be released.

**Recommendation 6-72: ICE should enroll all released detainees who need support in a community-based support program, such as ICE's Family Case Management Program, and should expand the scope of such programs to include health and mental health case referrals. Communication between detainees and counselors and mental health providers should be privileged, and their participation in counseling and mental health treatment should be entirely voluntary.**

**Recommendation 6-73: Case management for detainees as they approach release should include the services described below – but inability to secure a post-release appointment for a detainee should never delay a detainee's release.**

a) **Referral to community-based mental health programs, social services, victim services, and community support organizations in their post-release communities. FRC staff should consult the SAMHSA mental health locator[360] and National Council for Behavioral Health[361] to locate mental health providers in post-release communities. FRC staff should also provide detainees with the information about the Federally Qualified Health Center (FQHC) in post-release communities, because FQHC staff can either provide care or provide information about low-cost mental health services available in their communities.**
b) **Provision of information and education shortly before release about community mental health resources, Federally Qualified Health Centers, victim services programs, and social services programs in their post-release community, including the rationale for the mental health, victim or social services referral; a description of the help and support offered by the programs; program income eligibility; and an explanation of the programs' intake and enrollment procedures.**
c) **Referral calls to community mental health and social service agencies, with a goal of securing an intake appointment for each detainee within 7 to 14 days after release.**

---

[359] Steven J. Ziguras et al., *A Meta-Analysis of the Effectiveness of Mental Health Case Management Over 20 Years*, 51 PSYCHIATRIC SERVICES 1410 (2000).
[360] Substance Abuse and Mental Health Services Admin., *Behavioral Health Treatment Services Locator*, https://findtreatment.samhsa.gov/.
[361] Nat'l Council for Behavioral Health, http://www.thenationalcouncil.org.

d) **For detainees who have been identified (including who have self-identified) as victims of domestic violence, sexual assault, child abuse, human trafficking or other gender-based abuse, provision of the names of and appointments with programs in post-release communities that have expertise in working with immigrant victims of gender-based violence. Staff preparing detainees for release can identify programs with the requisite expertise using the directory of program and services available developed with funding from the Office on Violence Against Women, U.S. Department of Justice.**[362]

e) **For detainees with medical care needs, the names and contact information and appointments made with the Federally Qualified Health Center in post-release communities.**

**Recommendation 6-74: All referral information should be provided to each detainee in a language that detainee understands well (ideally her primary language).**

### E. Medical, Dental, and Mental Health Records

Under HIPAA, individuals have a right to confidentiality of protected health information (PHI) and access to inspect and obtain a copy of their medical records. Under the Family Residential Standards, detainees are to be provided a request form to receive copies of their medical records.[363] The PBNDS 2011 requires that facilities are to provide detainees with limited English proficiency and detainees who are hearing impaired with interpretation and translation services to complete the written request and that "Detainees released or removed from detention shall receive a discharge treatment plan to ensure continuity of care, full copy of their medical record, medication, and referrals to community-based providers as medically appropriate."[364]

It is essential that there be clear and easily accessible procedures in place for detainees and former detainees to be able to obtain their medical, dental and mental health records. This is useful for continuity of care and other purposes. The Family Residential Standards indicate that form I-813 can be used to request medical records.[365] But this form inappropriately requires the requester to specify why health records are being requested.[366] Whatever the reason – health, immigration case related, victim or social services, or anything else, detainees are entitled to their medical, dental, and mental health records. The PBNDS 2011 standards on provision of medical records to detainees have much stronger requirements for records provision than those required by the Family Residential Standards. The PBNDS 2011's approach eliminates the questions that the FRC requires asking about why the detainee is requesting medical records. [367]

**Recommendation 6-75: Medical, dental, and mental health records should be kept in secured and locked locations that ensure confidentiality and privacy protection, consistent with**

---

[362] Nat'l Immigrant Women's Advocacy Project, Directory of Services Providers, http://www.niwap.org/directory/.
[363] *See* FAMILY RESIDENTIAL STANDARDS: MEDICAL CARE, *supra* note 307, at 25.
[364] PBNDS 2011 at, *supra* note 254, at 301.
[365] *See* FAMILY RESIDENTIAL STANDARDS: MEDICAL CARE, *supra* note 307, at 24.
[366] U.S. Dep't of Justice, Immigration and Naturalization Serv., INS Health Care Program Authorization for Disclosure of Information (Jan. 17, 1990), https://www.prisonlegalnews.org/media/publications/usdoj_ins_health_care_program_authorization_for_disclosure_of_info_form_i_813.pdf.
[367] PBNDS 2011 at, *supra* note 254, at 278, 299–300.

**HIPAA as well as all local or state confidentiality regulations. The latter may require added privacy protections for psychotherapy notes and for addiction history and treatment records.**

**Recommendation 6-76: Policies and procedures should be developed and established specifying the clearance for accessing medical, dental, and mental health records by appropriate health and mental health professionals who are directly involved in a detainee's care. As per HIPAA, any access to records by any professional should be tracked either on paper or electronically. Specifically:**

a) **Policies and procedures should be established specifying which non-health care staff have access to any medical, dental or mental health information, specific reasons for such access, and the level of detail for such sharing or access. The policies should balance maintaining confidentiality versus clinical or emergent need to know for effective care.**
b) **Any non-health care staff accessing records, including interpreters and other support staff, should sign an appropriate confidentiality protection oath per HIPAA.**
c) **Policies and procedures should be established that prevent any individual who has any personal or outside relationship with a detainee from access to their health records unless the detainee gives signed informed consent.**

**Recommendation 6-77: On request when in detention and automatically upon release from detention, detainees should be provided with a full copy, not a summary, of medical, dental and mental health records for themselves and their children, both in an accessible electronic format such as a CD or flash drive, and in hard copy. This includes documents relating to both initial screening, immunization, and health care they received while in detention (including lab tests and any radiograph readings). To facilitate requests for records:**

a) **ICE should develop, translate into the languages spoken in the FRCs (using the cutoff described in Recommendation 5-7), and make easily accessible in hardcopy at all FRCs and on its website a uniform form to be used by former detainees seeking copies of their medical, dental and mental health records. This request form should be HIPAA-compliant and should not include questions about the purpose, need or reason for the request for medical, dental and mental health records. If the form is unavailable in a needed language, interpreter services should be offered to provide language access.**
b) **Within one business day of receiving a HIPAA-compliant request to release detainee medical, dental, and mental health records, ICE should provide a copy of such records – whether to a detainee still in custody, a former detainee, or any individual or agency the detainee or former detainee designates in the request, including health care and mental health care professionals, schools, attorneys and others.**

## 7. INSPECTIONS, COMPLAINTS, AND OVERSIGHT

DHS compliance with this Report's recommendations will require very substantial changes in policy and practice, which will need to be managed and monitored. DHS already has in place two mechanisms that can help: contracted inspections (currently performed by Danya International), and inspections by the DHS Office for Civil Rights and Civil Liberties (CRCL), which already plays an important role in monitoring ICE detention centers including the FRCs. Danya's inspections largely address processes rather than outcomes, and are tied tightly to the Family Residential Standards. CRCL's approach is more outcome-focused and utilizes the professional knowledge and skill of a range of contracted experts – physicians, psychologists, penologists, and other professionals. CRCL's inspections are not done at routine intervals and are not required; they are currently conducted in response to formal complaints, or on CRCL's initiative. Both are useful methodologies, which we recommend be continued and used to monitor FRC conditions generally and compliance with the ACFRC's recommendations in particular. However the methodological limitations of the Danya inspections, and the intermittent and discretionary nature of the CRCL inspections render them insufficient without further attention.

More generally, problems that arise at the FRCs may require sustained attention at the leadership level to solve. Whether related to the Committee's recommendation or not, detainees and their attorneys need to be able to easily bring problems to the attention of ICE and, through ICE, to DHS. Detainees need to be able raise concerns about their treatment – for example to inform ICE and DHS officials if adults or children are not receiving timely needed health care or mental health care, or are not receiving food that meets their dietary needs and restrictions. One goal is to have a mechanism that fosters quick responses and provides solutions to problems as they arise. More generally, the same mechanism can improve the information that ICE and DHS have about the internal workings of each FRC and can be harnessed to facilitate not only individual but systemic interventions. The idea is to build a system by which on-the-ground knowledge is communicated to leadership, analyzed, and routinely and transparently used for continuous quality improvement.

**Recommendation 7-1: DHS should immediately identify each ACFRC recommendation it intends to adopt and then monitor the extent to which the FRCs and ICE implement those recommendations.**

**Recommendation 7-2: DHS should require that ICE's contracted inspections (currently performed by Danya International) incorporate the recommendations contained in this Report, along with the PBNDS 2011 and the Family Residential Standards, and are routinely provided to ICE and DHS leadership, to CRCL, and to the public.**

**Recommendation 7-3:**

a) **CRCL should conduct investigations two times a year at each FRC for the first two years following the issuance of this Report. In these investigations CRCL should investigate and report on the extent to which the FRCs and ICE are implementing the ACFRC recommendations DHS has adopted.**
b) **Each year thereafter CRCL should conduct an annual inspection of each FRC.**
c) **CRCL inspection teams should minimally be composed of physicians with expertise on Joint Commission on the Accreditation of Health Care Organizations (JCAHO) inspections and compliance, and expertise on medical care for women, children and**

**adolescents; psychiatrists with specialized expertise on immigrant and detained populations; trauma-informed-care experts; educators with expertise on students with interrupted educations and immigrants; and experts in non-correctional congregate care.**

d) **CRCL inspections should pay particular attention to areas in which the Family Residential Standards and PBNDS 2011 differ, to ensure that FRCs are aware of and complying with the higher standard.**
e) **Inspections should include not only detention conditions but the processes and outcomes relating to decisions to detain and release, and the conditions and service referrals related to release.**
f) **DHS should ensure that CRCL has full access to the FRCs and to ICE and FRC files, including complaint records, and is able to speak confidentially with FRC staff, ICE officers, and detainees.**
g) **CRCL should provide ICE leadership investigation memos (by its experts) following its inspections at FRCs within 60 days of its inspections, and with a final CRCL recommendation memo within 90 days of its inspections.**

**Recommendation 7-4: Upon receipt of a CRCL recommendation memo:**

a) **Within 30 days, ICE should inform CRCL and the DHS Secretary whether it concurs with each CRCL recommendation. In that response ICE should provide an explanation for any non-concurrence.**
b) **Any ICE non-concurrence should be reported to the DHS Secretary; the Secretary should promptly determine whether to direct ICE to reconsider or reverse its non-concurrence.**
c) **Any non-concurrences that remain should be reported to the chair and ranking minority member of all congressional committees with relevant oversight responsibilities (including budgetary jurisdiction), and included in CRCL's public (and web-posted) quarterly reports to Congress.**
d) **For each CRCL recommendation with which it concurs, ICE should provide CRCL within 60 days with an implementation plan, and then should report every 60 days until completion on implementation progress.**
e) **Every quarter, CRCL should inform the DHS Secretary of any outstanding implementation issues.**

**Recommendation 7-5: ICE should create an ombudsperson office to receive complaints and reports from detainees and their attorneys, or other knowledgeable entities, about problems arising for detainees at FRCs and to ensure that complaints and reports are appropriately investigated and responded to. The ombudsperson office should be located within the ICE Director's Office, and should address all the subjects covered in this report, including but not limited to decisions to detain and release, alternatives to detention, detention conditions, VAWA compliance, conditions of release, community supervision, and prosecutorial discretion. All complaints and reports and resulting actions or declinations to act should be reported weekly to a senior official within the DHS Secretary's Office. At least annually, ICE should analyze complaints and reports more systematically, considering any need for systemic responses, and should report the results of that analysis to DHS.**

**Recommendation 7-6: DHS and ICE leadership should routinely review and analyze information – from contracted inspections, CRCL inspections, ombudsperson office complaints, NGO reports, and any other credible sources – about problems and areas of needed improvement relating to policies on family detention in general (e.g., decisions to detain and decisions to release) as well as detainee treatment at FRCs, and should direct immediate corrective action when appropriate.**

## APPENDIX A: MEMBERS OF THE DHS ADVISORY COMMITTEE ON FAMILY RESIDENTIAL CENTERS

Dr. William Arroyo, Regional Medical Director/Medical Director, Children's System of Care, Los Angeles County Department of Mental Health (LACDMH)

Howard Berman, Senior Advisor/Attorney, Covington & Burling LLP

BethAnn Berliner, Senior Researcher and Project Director, WestEd

Michelle Brané, Director, Migrant Rights and Justice, Women's Refugee Commission (WRC)

Judith Dolins, Chief Implementation Officer, American Academy of Pediatrics

Anadora Moss, President, The Moss Group, Inc.

Karen Musalo, Professor, U.C. Hastings College of the Law, and Director, Center for Gender & Refugee Studies

Jennifer Nagda, Policy Director, Young Center for Immigrant Children's Rights at the University of Chicago

Leslye Orloff, Adjunct Professor and Director, National Immigrant Women's Advocacy Project (NIWAP), American University, Washington College of Law

Sonia Parras-Konrad, Co-Director, ASISTA

Dr. Andres Pumariega, Professor and Chair, Department of Psychiatry, Cooper University Hospital and Health System, Cooper Medical School of Rowan University

Margo Schlanger, Henry M. Butzel Professor of Law, University of Michigan Law School

Dr. Dora Schriro, Commissioner, Connecticut Department of Emergency Services and Public Protection

Kurt Schwarz, Partner, Jackson Walker LLP

## APPENDIX B: ADVISORY COMMITTEE ON FAMILY RESIDENTIAL CENTERS (ACFRC) COMMITTEE TASKING

Posted at https://www.ice.gov/acfrc (click on "Committee Tasking")

Develop recommendations for best practices at family residential centers that will build on ICE's existing efforts in the areas of educational services, language services, intake and out-processing procedures, medical staffing, expansion of available resources and specialized care, and access to legal counsel.

Detail mechanisms to achieve recommended efficiencies in the following focus areas:

1. Educational Services
    1. Providing educational services to a juvenile population that will be in custody for a short period of time.
    2. Providing individualized educational services to a transient juvenile population with little to no English language capabilities and from a variety of socio-economic and educational levels.
    3. Phasing full delivery of services over a 15 – 20 day period with an expectation that the juvenile will be released and enrolled in a public school located in the United States pending resolution of their immigration proceedings.
2. Language Services
    1. Providing accurate and timely language services.
3. Detention Management
    1. Evaluating intake and out-processing procedures to improve overall management, to include screening, communication of resources available, and alternatives to detention.
4. Medical Treatment
    1. Expanding existing resources and specialized care to enhance medical treatment of family units.
    2. Providing mental health services/trauma-informed services to a multi-lingual population whose average length of stay may not lend itself to full delivery of treatment.
    3. Recruiting, placing, and retaining qualified health care providers.
        1. Recruitment through a contract for services, the U.S. Public Health Service Corps, and Title V/Title 38 general schedule personnel.
5. Access to Counsel
    1. Evaluating existing resources and tools.

## APPENDIX C: A BRIEF HISTORY OF INS/ICE FAMILY RESIDENTIAL FACILITIES

| | | Net change in beds | Total bed capacity |
|---|---|---|---|
| | **INS** | | |
| March 2001 | INS contracts with Berks County (Co.) Pennsylvania for 84 beds, government's first FRC. Berks Co. operates the Berks Co. FRC (Berks), using it to detain both mothers and fathers with minor children. | | 84 |
| | **ICE** | | |
| Nov. 2002 | Congress passes the Homeland Security Act creating DHS. ICE assumes INS's contract for the Berks FRC. | | |
| May 2006 | ICE contracts with Williamson Co., Texas for 512 beds, and opens the T. Don Hutto Residential Center (Hutto), previously a medium security, adult male prison; the county subcontracts management of Hutto, named after a CCA co-founder, to CCA. ICE co-locates adult women and moms with children at Hutto. About 300 beds are for the FRC. | + ~300 | 384 |
| March 2007 | ICE establishes the Juvenile and Family Residential Management Unit (JFRMU) wi/the Office of Detention and Removal Operations (DRO); now, Enforcement and Removal Operations (ERO). | | |
| Dec. 2007 | ICE promulgates Family Residential Standards | | |
| Sept. 2007 | ICE contracts with the Nakamoto Group (Nakamoto) to provide on-site monitoring of the FRCs. | | |
| Sept. 2009 | ICE removes all families from Hutto; as many as possible are released and the rest are transferred to Berks. | - ~300 | 84 |
| Feb. 2013 | Berks is relocated to a larger building on the county campus; ICE increases its capacity to 96 beds. | + 12 | 96 |
| June 2014 | ICE opens and operates Artesia FRC (Artesia), capacity 672 beds. Artesia, previously a federal law enforcement training barrack, is located on government property in the southeast corner of NM. ICE uses Artesia to detain only mothers with children. | + 672 | 768 |
| August 2014 | ICE repurposes its detention facility for adult males, capacity 532 beds, in Karnes, Texas (Karnes) to detain families. ICE contracts with GEO for its operation, and uses it to detain only mothers with children. | + 532 | 1300 |

| | | | |
|---|---|---|---|
| Dec. 2014 | Karnes Co. approves a 626-bed expansion of Karnes. Construction is completed in 2015. Karnes's current operating capacity is 830 beds. | (+626)<br>+298 | 1598 |
| Dec. 2014 | ICE closes Artesia. | - 672 | 926 |
| Dec. 2014 | ICE opens the South Texas FRC (Dilley), capacity 2400 beds, in Dilley Texas. ICE assigns moms and their children only. | +2400 | 3326 |
| Sept. 2015 | Berks's 3rd floor is finished, creating capacity for an additional 92 beds; ICE has not yet activated the additional beds. | (+92) | 3326 |
| May 2015 | ICE contracts with Danya International (Danya) to provide on-site monitoring at the FRCs. | | |

## APPENDIX D: EXAMPLES OF FEDERAL RESOURCES, TOOLS, AND ON-LINE TRAININGS ON TRAUMA-INFORMED CARE

### TRAINING RESOURCES

***TIP 57: Trauma-Informed Care in Behavioral Health Services***
**DHHS, Substance Abuse and Mental Health Services Administration**
**http://store.samhsa.gov/product/TIP-57-Trauma-Informed-Care-in-Behavioral-Health-Services/SMA14-4816**

TIP 57 is a guide to assist behavioral health professionals in understanding the impact and consequences for those who experience trauma. It discusses patient assessment, treatment planning strategies that support recovery, and building a trauma-informed care workforce. The guide can be useful to any system that is looking to be more responsive to the trauma-related needs of the population served and to implement a trauma-informed workforce and organizational change strategy. This Treatment Improvement Protocol (TIP) is divided into three parts:

Part 1: *A Practical Guide for the Provision of Behavioral Health Services*
Part 2: *An Implementation Guide for Behavioral Health Program Administrators*
Part 3: *A Review of the Literature*

***Trauma-Informed Care for Women Veterans Experiencing Homelessness***
**DOL, Women's Bureau**
**https://www.dol.gov/wb/trauma/**

Trauma-Informed Care for Women Veterans Experiencing Homelessness: A Guide for Service Providers, also known as the "Trauma Guide," was created to address the psychological and mental health needs of women veterans. The guide is also a compilation of best practices aimed at improving effectiveness in engaging female veterans. Written for service providers, the guide offers observational knowledge and concrete guidelines for modifying practices with the goal of increasing re-entry outcomes. The Guide Includes:

- *User's Guide*
  A handbook offering information on the experiences and needs of female veterans, what it means to provide trauma-informed care, and resources for staff training and education.
- *Organizational Self-Assessment for Providers Serving Female Veterans*
  A manual of best practices that can be integrated into daily programming for homeless female veterans.
- *Resource Lists*
  Compilations of provider-targeted materials, videos, and websites on a variety of topics, including: female veterans, homelessness and trauma, cultural competence, trauma-informed services, participant involvement, and self-care.

***A Checklist for Integrating a Trauma-Informed Approach into Teen Pregnancy Prevention Programs***
**DHHS, Office of Adolescent Health**
**http://www.hhs.gov/ash/oah/oah-initiatives/teen_pregnancy/training/Assests/traumainformed-checklist.pdf**

While a teen pregnancy prevention (TPP) program generally focuses on providing sexual health education, ensuring access to youth friendly health care services, and engaging youth, families, and communities, a trauma-informed approach (TIA) is a way of addressing vital information about sexuality and well-being that takes into consideration adverse life experiences and their potential influence on sexual decision-making. A trauma-informed approach to sexual health is critical to promoting lifelong sexual health and well-being for anyone who has had adverse childhood and/or adult experiences. Principles of a trauma-informed approach can be integrated into any TPP program.

***Trauma-Informed Victim Interviewing***
**DOJ, Office for Victims of Crime**
**https://www.ovcttac.gov/taskforceguide/eguide/5-building-strong-cases/53-victim-interview-preparation/trauma-informed-victim-interviewing/**

Part of the Human Trafficking Task Force eGuide, developed in partnership by the U.S. Department of Justice's Office for Victims of Crime (OVC) and Bureau of Justice Assistance (BJA), this chapter provides helpful tips to building rapport in with victims in a culturally responsive and trauma-informed manner to engage more effectively.

***Think Trauma: A Training for Staff in Juvenile Justice Residential Settings***
**DOJ, National Institute for Corrections**
**http://nicic.gov/library/027731**

This training provides an overview for juvenile justice staff of how to work towards creating a trauma-informed juvenile justice residential setting. Creating a trauma-informed setting is a process that requires not only knowledge acquisition and behavioral modification, but also cultural and organizational paradigm shifts, and ultimately policy and procedural change at every level of the facility. "Think Trauma" is a PowerPoint-based training curriculum including four modules that can be implemented back-to-back in a single all-day training or in four consecutive training sessions over the course of several weeks or even months. Each module takes approximately one to two hours, depending on the size of the trainee group, and whether you elect to implement all of training materials and activities. It contains six case studies of representative youth who've been involved with the juvenile justice system." The complete curriculum is available (but you must create an account on the Learning Center in order to join the community.) The following resources are provided: the workshop package--Facilitator's Guide, Participant Handbook, Supplemental Materials, and multi-part Slide Deck; supplemental resources--Implementer's Guide, case vignettes and puzzles, and activity materials; and a discussion forum on which implementation questions will be answered.

***Treating the Hidden Wounds: Trauma Treatment and Mental Health Recovery for Victims of Human Trafficking***
**DHHS, Office of the Assistant Secretary for Planning and Evaluation**
**https://aspe.hhs.gov/basic-report/treating-hidden-wounds-trauma-treatment-and-mental-health-recovery-victims-human-trafficking**

This issue brief addresses the trauma experienced by most trafficking victims, its impact on health and well-being, some of the challenges to meeting trauma-related needs of trafficking victims, and promising approaches to treatment and recovery. While this issue brief touches on trauma across human trafficking populations, it has a special emphasis on trauma resulting from sex trafficking of women and girls. It includes core issues related to trauma and culture, as well as strategies for engagement and core components for trauma-specific and trauma-informed services.

***Developing a Trauma-Informed Child Welfare System***
**DHHS, Administration on Children, Children's Bureau**
**https://www.childwelfare.gov/pubs/issue-briefs/trauma-informed/**

This issue brief discusses the steps that may be necessary to create a child welfare system that is more sensitive and responsive to trauma. Every child welfare system is different, and each State or county child welfare system will need to conduct its own systematic process of assessment and planning, in collaboration with key partners, to determine the best approach. After providing a brief overview of trauma and its effects, this issue brief discusses some of the primary areas of consideration in that process, including workforce development, screening and assessment, data systems, evidence-based and evidence-informed treatments, and funding.

***Immigration and Child Welfare***
**DHHS, Administration on Children, Children's Bureau**
**https://www.childwelfare.gov/pubPDFs/immigration.pdf**

This issue brief provides information, practical tools, resources and tips for working with immigrant children and families using culturally competent and trauma-informed practices.

***Trauma-Informed Practice***
**DHHS, Administration on Children, Children's Bureau**
**https://www.childwelfare.gov/topics/responding/trauma/**

To provide trauma-informed care to children, youth, and families involved with child welfare, professionals must understand the impact of trauma on child development and learn how to effectively minimize its effects without causing additional trauma. This section provides information on building trauma-informed systems, assessing and treating trauma, addressing secondary trauma in caseworkers, and trauma training. It also offers trauma resources for caseworkers, caregivers, and families.

## FEDERALLY-FUNDED TRAINING, TECHNICAL ASSISTANCE, AND RESOURCE CENTERS

**SAMHSA's National Center for Trauma-Informed Care**
**http://www.samhsa.gov/nctic**
**Targeted Technical Assistance, Coaching, and Training**

NCTIC provides technical assistance to advance the implementation science for trauma-informed approaches through in-person organizational technical assistance, virtual learning networks, technical assistance materials, and links to other resources supported by the federal government. NCTIC provides technical assistance and training to a range of service systems:

- Community-based behavioral health agencies
- Institutions
- Criminal and juvenile justice settings
- Homeless and HIV service providers
- Domestic violence organizations
- State and federal agencies

**SAMHSA's GAINS Center**
**http://www.samhsa.gov/gains-center**
**Training**

The GAINS Center focuses on expanding access to services for people with mental and/or substance use disorders who come into contact with the justice system. As part of its training program, the GAINS Center provides trauma-informed response training for professionals.

**ASISTA Immigration Assistance**
**http://www.asistahelp.org**
**Advanced Technical Assistance and Training**

Provides national leadership, advocacy, training, and technical support to enhance access to safety and justice for crime survivors seeking secure immigration status.

**American University - National Immigrant Women's Advocacy Project (NIWAP)**
**http://www.wcl.american.edu/niwap/**
**Improving Access to Services and Legal Options for Immigrant Survivors**

Through this project, the National Immigrant Women's Advocacy Project (NIWAP) at the American University Washington College of Law will provide in-person trainings, webinars, online learning modules, a family law community of practice, and technical assistance and training to OVW grantees, subgrantees, grant partners and potential grantees on legal options for immigrant victims of domestic violence, sexual assault, stalking and dating violence. Topics to be covered include: immigration, family and public benefits laws, language access and access to victim services.

**Domestic Violence Resource Network** (DVRN)
**http://www.acf.hhs.gov/fysb/programs/family-violence-prevention-services/programs/centers**
**Network of Resource Centers**

The Domestic Violence Resource Network (DVRN) is funded by the U.S. Department of Health and Human Services to inform and strengthen domestic violence intervention and prevention efforts at the individual, community, and societal levels. The DVRN works collaboratively to promote practices and strategies to improve our nation's response to domestic violence and make safety and justice not just a priority, but also a reality. DVRN member organizations ensure that victims of domestic violence, advocates, community-based programs, educators, legal assistance providers, law enforcement and court personnel, health care providers, policy makers, and government leaders at the local, state, tribal and federal levels have access to up-to-date information on best practices, policies, research and victim resources.

The DVRN includes two national resource centers, four special issue resource centers, three culturally-specific resource centers, the National Domestic Violence Hotline, and the National LGBTQ DV Capacity Building Learning Center. A few of these are listed:

- ***National Latin@ Network for Healthy Families and Communities***
  **www.nationallatinonetwork.org**
  **Training and Resource Development**
  The National Latin Network for Healthy Families and Communities, a project of Casa de Esperanza, is the national institute on domestic violence focusing on Latin@ communities. Working both domestically and internationally, we address four primary issues: increasing access to resources for Latin@s experiencing domestic violence; providing training and tools for professionals and community advocates; conducting culturally relevant research; and advocating for public policy based on the lived realities of Latin@s.

- ***National Center on Domestic Violence, Trauma & Mental Health***
  **http://www.nationalcenterdvtraumamh.org/**
  Training and Consultation
  The Center provides training, support, and consultation to advocates, mental health and substance abuse providers, legal professionals, and policymakers as they work to improve agency and systems-level responses to survivors and their children. Our work is survivor defined and rooted in principles of social justice.

- ***National Health Resource Center on Domestic Violence***
  **http://www.futureswithoutviolence.org/health**
  **Training and Resource Development**
  The HRC offers personalized, expert technical assistance, an online toolkit for health care providers and DV advocates to prepare a clinical practice to address domestic and sexual violence, a free E-Bulletin and webinar series. The HRC also holds the biennial National Conference on Health and Domestic Violence—a scientific meeting at which health, medical and domestic violence experts and leaders explore the latest health research and programmatic responses to domestic violence.

**Training and Technical Assistance Centers funded by DHHS, Administration on Children and Families, Office of Refugee Resettlement**
**http://www.acf.hhs.gov/orr/resource/technical-assistance-providers-1**
**Training and Technical Assistance**

In order to assist ORR-funded agencies in providing the highest quality in services, ORR has funded a number of grants to organizations with technical assistance expertise in a particular area related to community integration, linguistic and cultural competence, addressing the needs of survivors of torture, etc.

## APPENDIX E: ACRONYMS USED IN THE REPORT

| | |
|---|---|
| ACFRC | Advisory Committee on Family Residential Centers |
| ACLU | American Civil Liberties Union |
| AO | Asylum Officer |
| ATD | Alternatives to Detention |
| BCG | Bacillus Calmette–Guérin |
| BFRC | Berks Family Residential Center |
| BOP | Federal Bureau of Prisons |
| CARA | **C**atholic Legal Immigration Network; **A**merican Immigration Council; **R**efugee and Immigrant Center for Education and Legal Services; **A**merican Immigration Lawyers Association |
| CASEL | Collaborative for Academic, Social and Emotional Learning |
| CBP | Customs and Border Protection |
| CCA | Corrections Corporations of America |
| CDC | Centers for Disease Control |
| CFI | Credible Fear Interview |
| CGRS | Center for Gender & Refugee Studies |
| CRCL | DHS Office for Civil Rights and Civil Liberties |
| COOP | Continuity of Operations |
| DHS | U.S. Department of Homeland Security |
| DHHS | U.S. Department of Health and Human Services y |
| DOL | Department of Labor |
| DRO | Detention and Removal Operations |
| EADM | ENFORCE Alien Detention Module |
| EOIR | Executive Office for Immigration Review |
| ERO | Enforcement and Removal Operations |
| ERP | Executive Review Panel |
| ESL | English as a Second Language |
| FCMP | Family Case Management Program |
| FRC | Family Residential Center |
| FRS | Family Residential Standards |
| FQHC | Federally Qualified Health Center |
| FVPSA | Family Violence Prevention and Services Act |
| GAO | Government Accountability Office |
| HHS | U.S. Department of Health and Human Services |
| HIPAA | Health Insurance Portability and Accountability Act |
| HOH | Head of Household |
| HPV | Human Papillomavirus |
| HSA | Health Services Administrator |
| IACHR | Inter-American Commission on Human Rights |
| ICE | U.S. Immigration and Customs Enforcement |
| IDEA | Individuals with Disabilities Education Act |
| IEP | Individualized Education Plan |
| IGRA | Interferon-Gamma Release Assays |

| | |
|---|---|
| IHSC | ICE Health Service Corps |
| IIRIRA | Illegal Immigration Reform and Immigrant Responsibility Act |
| INA | Immigration and Nationality Act |
| INS | Immigration and Naturalization Service |
| ISAP | Intensive Supervision Appearance Program |
| JCAHO | Joint Commission on the Accreditation of Health Care Organizations |
| JFRMU | Juvenile and Family Residential Management Unit |
| LEP | Limited English Proficient |
| MDQ | Mood Disorders Questionnaire |
| MHP | Mental Health Professional |
| MISX | Migrant Student Information Exchange |
| MOU | Memorandums of Understanding |
| MRC | Management Review Committee |
| NAMI | National Alliance for the Mentally Ill |
| NCTIC | National Technical Assistance Center on Trauma Informed Care |
| NGO | Non-Governmental Organization |
| NIWAP | National Immigrant Women's Advocacy Project |
| NTA | Notice to Appear |
| NCQA | National Committee for Quality Assurance |
| OIG | Office of the Inspector General |
| ORR | Office of Refugee Resettlement |
| OVW | Office on Violence Against Women |
| PIRC | Pennsylvania Immigration Resource Center |
| PBIS | Positive Behavioral Interventions and Supports |
| PBNDS | Performance Based National Detention Standards |
| PCL | Abbreviated Post-Traumatic Stress Check List |
| PCP | Primary Care Physician |
| PHI | Protected Health Information |
| PHQ-9 | Patient Health Questionnaire-9 |
| PREA | Prison Rape Elimination Act |
| SAMHSA | Substance Abuse and Mental Health Services Administration |
| SARTs | Sexual Assault Response Teams |
| SARRTs | Sexual Assault Response and Resource Teams |
| SIJS | Special Immigrant Juvenile Status |
| SIOP | Sheltered Instruction Observation Protocol |
| SME | Subject Matter Expert |
| SOP | Standard Operating Procedure |
| STD | Sexually Transmitted Disease |
| TMAP | Texas Medication Algorithm Project |
| TICC | Trauma Informed Care Coordinator |
| UNHCR | United Nations High Commission for Refugees |
| USCIRF | United States Commission on International Religious Freedom |
| USCIS | U.S. Citizenship and Immigration Services |
| VAWA | Violence Against Women Act |
| WHO | World Health Organization |
| WRC | Women's Refugee Commission |

# EXHIBIT 37

# Trump Targets Workplaces as Immigration Crackdown Widens

nytimes.com/2025/06/07/us/trump-immigration-raids-workplaces.html

Lydia DePillis, Ernesto Londoño June 7, 2025



Federal agents formed a barrier to block protesters after performing a raid on Friday in Los Angeles.Credit...Luke Johnson / Los Angeles Times, via Getty Images

The chaos that engulfed Los Angeles on Saturday began a day earlier when camouflage-clad federal agents rolled through the garment district in search of workers who they suspected of being undocumented immigrants. They were met with protesters, who chanted and threw eggs before being dispersed with pepper spray and nonlethal bullets.

The enforcement operation turned into one of the most volatile scenes of President Trump’s immigration crackdown so far, but it was not an isolated incident.

Image



Law enforcement during a protest in California on Saturday.Credit...Eric Thayer/Associated Press

Last week, at a student housing complex under construction in Tallahassee, Fla., masked immigration agents loaded dozens of migrants into buses headed to detention centers. In New Orleans, 15 people working on a flood control project were detained. And raids in San Diego and Massachusetts — in Martha's Vineyard and the Berkshires — led to standoffs in recent days as bystanders angrily confronted federal agents who were taking workers into custody.

The high-profile raids appeared to mark a new phase of the Trump administration's immigration crackdown, in which officials say they will increasingly focus on workplaces — taking aim at the reason millions of people have illegally crossed the border for decades. That is an expansion from plans early in the administration to prioritize detaining hardened criminals and later to focus on hundreds of international students.

"You're going to see more work site enforcement than you've ever seen in the history of this nation," Thomas D. Homan, the White House border czar told reporters recently. "We're going to flood the zone."

Image



Thomas D. Homan, the White House border czar, at a news conference last month.Credit...Eric Lee/The New York Times

It remains to be seen how aggressively Mr. Trump will pursue sectors like construction, food production and hospitality. Raids are sometimes directed based on tips, but otherwise appear to be distributed without a clear pattern, hitting establishments large and small.

A spokeswoman for the Department of Homeland Security did not respond to an email seeking details about the government's plans, including an explanation about why the administration is ramping up work-site arrests now.

Over the past month, though, the White House has pressured immigration officials to increase deportations, which have fallen short of the administration's goals.

The number of arrests has risen sharply in the past week, according to figures provided by the Department of Homeland Security.

Tricia McLaughlin, a spokeswoman for Homeland Security, said 2,000 immigrants per day were arrested over the last week, up from 600 earlier in the administration. It was not clear how many of those arrests were made at raids of work sites.

More than 4 percent of the nation's 170 million person work force was made up of undocumented immigrants in 2023, according to estimates from Goldman Sachs, making job sites a prime setting for agents to find people.

The number of immigrants who could be subject to such sweeps increased by at least 500,000 at the end of May, as the Supreme Court allowed the administration to revoke the temporary status that had allowed many Venezuelans, Cubans, Haitians and Nicaraguans to work.

Workplace raids require significant planning, can be costly and draw on large teams of agents, but they can yield more arrests than pursuing individual targets. The raids may have become feasible in recent weeks, experts said, as personnel from the F.B.I. and other law enforcement agencies have been enlisted on immigration operations.

“Goosing the numbers is a big part of this because it’s so much more efficient in manpower to raid a warehouse and arrest 100 illegal aliens than it is to send five guys after one criminal,” said Mark Krikorian, director of the Center for Immigration Studies, which advocates less immigration.

Workplace raids also send a warning to a far broader group of undocumented people, most of whom have not committed crimes. “If you want to get people packing up and leaving, that isn’t going to happen if you’re just focusing on the criminals,” Mr. Krikorian said.

Image




A crowd formed at the back gate of Ambiance Apparel in Los Angeles on Friday after federal immigration agents gathered at the company.Credit...Alex Welsh for The New York Times

In interviews, migrants and employers expressed alarm about the toll a sustained crackdown could take on the work force. Undocumented immigrants are concentrated in a few American industries, making up 19 percent of landscaping workers, 17 percent of farm workers and 13 percent of construction workers, according to the estimates from Goldman Sachs.

Gus Hoyas, a Republican who runs a construction firm in Cleveland, said his industry has long leaned heavily on people with valuable skills who are in the country without permission.

“They’re undocumented, but we’ve got to do something, because these people are tradesmen — they’re pros in the field,” said Mr. Hoyas, a naturalized immigrant from Colombia. “You get rid of these folks, and it’s going to kill us in the construction arena.”

During his first term, Mr. Trump — whose own businesses have employed workers without papers — sent mixed messages about his eagerness to crack down on undocumented labor. Early on, his administration carried out several workplace raids, and conducted more audits of worker eligibility paperwork than the Obama administration had.

But Mr. Trump’s Justice Department prosecuted relatively few employers for hiring undocumented workers. And in 2017, the president commuted the sentence of an Iowa meatpacking plant executive convicted in the Obama era after a jury found that he knowingly hired hundreds of undocumented workers and paid for their forged documents.

The Covid-19 pandemic halted efforts to go after undocumented workers. “These were people who were processing our food, making our food, delivering our food so we could all live in the comfort of our Zoom existence,” said Muzaffar Chishti, a senior fellow at the nonpartisan Migration Policy Institute. “That was not lost on people.”

Mr. Biden, who began his presidency facing a beleaguered economy and a severe labor shortage, never prioritized workplace immigration enforcement.

The system that gave rise to this shadow work force dates to 1986, when President Ronald Reagan signed a bill granting amnesty to nearly three million undocumented immigrants, allowing them to pursue citizenship. The bill also criminalized hiring people without legal status and required that employers collect an I-9 form from every new hire, substantiating their work authorization with identification.

In 1996, the Internal Revenue Service created an alternative to a Social Security number that allowed immigrants to file federal tax returns on their earnings. Unauthorized immigrants often do so because it can be beneficial on citizenship applications down the line and also count toward Social Security benefits if they are able to naturalize. Their payments generate tens of billions of dollars in tax revenue each year.

Since then, enforcement of immigration labor laws has varied widely. In the late 1990s, the government prioritized egregious cases of employers who abused workers or who knowingly hired large numbers of undocumented migrants. After the Sept. 11, 2001, attacks, investigators focused on sensitive sites such as airports and military bases.

Over the years, raids at farms, meatpacking plants and construction sites have grabbed headlines, but employers have seldom faced severe consequences. Many subcontract to avoid liability, and managers have long asserted that it is difficult to identify fake documents.

Image




Workers were guided to a bus after a raid by immigration officials at a plant in 2019.Credit...Rogelio V. Solis/Associated Press

"They have plausible deniability for just about any hires," said Daniel Costa, an immigration labor expert at the Economic Policy Institute, a left-leaning think tank. "The system was kind of rigged against workers and in favor of employers from the beginning."

Immigrant workers tend to be younger, while the U.S.-born population is aging into retirement. Millions of people who arrived between 2022 and 2024, largely from Latin America, Ukraine and Afghanistan, were generally eligible to work, since the Biden administration granted most of them some kind of temporary legal status.

For those reasons, the share of the labor force that is foreign born rose to 19.7 percent in March, the highest on record.

That is why a serious work-site crackdown could severely affect some industries, especially if employers begin preemptively firing people known to be undocumented. Employers also must balance verifying a worker's status with risking accusations of discrimination on the basis of race and national origin, which is also illegal.

"If you've done your due diligence as an employer, your own doubt or suspicion isn't going to be enough for me to say, 'Yeah, fire that person,'" said Eric Welsh, an attorney with Reeves Immigration Law Group, which helps both individuals and companies with visa issues. "You're damned if you do and damned if you don't."

After Mr. Trump's election, employers started performing more internal audits to verify employees' identification documents and work permits, immigration attorneys said.

Chris Thomas, a partner with the firm Holland & Hart in Denver, said his business clients had seen more notices of investigation and letters from the Internal Revenue Service flagging Social Security numbers that don't match the agency's records.

The Department of Justice raised the stakes in early February with a memo that directed attorneys to use "all available criminal statutes" to enforce immigration laws.

"If you know you have undocumented workers, and you're not severing ties with them at this stage, you're in a position where they're coming pretty soon," Mr. Thomas said. "If you wait until they arrive on the scene it's probably too late."

Greg Casten, who co-owns several restaurants, a fish wholesaler and a few other hospitality businesses in Washington D.C., has watched the government's shifting approach to undocumented workers for more than 40 years. Many of his 600 employees are immigrants. He has found Salvadorans in particular, to be skilled at cutting fish.

Every year he gets a list from the I.R.S. of Social Security numbers on his payroll that don't match official records, and every year he goes through to try to address any gaps. Still, it's not perfect.

Image




Greg Casten, owner of Ivy City Tavern.Credit...Jason Andrew for The New York Times

"I do have some people who work for me who can barely speak English, and I find it hard to believe sometimes when they're giving me paperwork," Mr. Casten said. But since he puts in the necessary effort, he doesn't worry much about punishment.

In early May, the Department of Homeland Security served inspection notices to 187 businesses in Washington, though none of Mr. Casten's.

"Right now, as fragile as this industry is, if they came in and took 20 percent or 10 percent of someone's work staff, they would be out of business," he said.

The heightened risk of enforcement has led some employers to preemptively let go of workers they suspect are undocumented.

Miriam, a mother of five in Los Angeles who crossed the border illegally 26 years ago, said the Trump administration's immigration policies led her boss at a 24-hour laundromat to fire her recently.

"Many people have lost their jobs overnight," said Miriam, who is 40 and agreed to be identified only by her first name out of concern about drawing the attention of immigration officials. "We're all afraid."

Hamed Aleaziz contributed reporting.

# EXHIBIT 38

IMMIGRATION COURT PRACTICE MANUAL

## Chapter 3 - Filing with the Immigration Court

# 3.1 - Delivery and Receipt

**(a) Filing**

Documents are filed either with the Immigration Judge during a hearing or with the immigration court outside of a hearing. For documents filed outside of a hearing, the filing location is usually the same as the hearing location. However, for some hearing locations, documents are filed at a separate "administrative control court." See subsection (1), below, 8 C.F.R. §§ 1003.31, 1003.13.

**(1) Administrative control courts –** "Administrative control courts" create and maintain the Records of Proceeding for the immigration courts within an assigned geographical area. 8 C.F.R. § 1003.11. A list of the administrative control courts along with their areas of assigned responsibility and other hearing locations is available to the public on the Executive Office for Immigration Review website at www.justice.gov/eoir.

**(2) Shared administrative control -** In some instances, two or more Immigration Courts share administrative control of cases. Typically, these courts are located close to one another, and one of the courts is in a prison or other detention facility. Where courts share administrative control of cases, documents are filed at the hearing location. Cases are sometimes transferred between the courts without a motion to change venue. However, if a party wishes for a case to be transferred between the courts, a motion to change venue is required. See Chapter 5.10(c) (Motion to Change Venue). A list of courts with shared administrative control is available on the Executive Office for Immigration Review website at www.justice.gov/eoir.

**(3) Receipt rule -** An application or document is not deemed "filed" until it is received by the immigration court. All submissions received by the Immigration Court are date-stamped on the date of receipt. Chapter 3.1(c) (Must be "Timely"). The Immigration Court does not observe the "mailbox rule." Accordingly, a document is not considered filed merely because it has been

received by the U.S. Postal Service, commercial courier, detention facility, or other outside entity.

**(4) Postage problems -** All required postage or shipping fees must be paid by the sender before an item will be accepted by the immigration court. When using a courier or similar service, the sender must properly complete the packing slip, including the label and billing information. The immigration court does not pay postage due or accept mailings without sufficient postage. Further, the Immigration Court does not accept items shipped by courier without correct label and billing information.

**(5) Filings -** Filings sent through the U.S. Postal Service or by courier should be sent to the immigration court's street address. Hand-delivered filings should be brought to the Immigration Court's public window during that court's filing hours. Street addresses and hours of operation for the Immigration Courts are available in on the Executive Office for Immigration Review website at www.justice.gov/eoir. Addresses are also available in Appendix A (EOIR Directory).

Given the importance of timely filing, parties are encouraged to use courier or overnight delivery services, whenever appropriate, to ensure timely filing. However, the failure of any service to deliver a filing in a timely manner does not excuse an untimely filing. See Chapter 3.1(c)(3) (Delays in delivery), below.

**(6) Separate envelopes -** Filings pertaining to unrelated matters should not be enclosed in the same envelope. Rather, filings pertaining to unrelated matters should be sent separately or in separate envelopes within a package.

**(7) Faxes -** The Immigration Court does not accept faxes unless the transmission has been specifically authorized by the immigration court staff or the Immigration Judge. Unauthorized transmissions are not made part of the record and are discarded without consideration of the document or notice to the sender.

**(8) Electronic filing through ECAS** — Electronic filing through ECAS is mandatory for attorneys and accredited representatives appearing as practitioners of record, as well as for DHS, in every case eligible for electronic filing. The Immigration Judge retains authority to accept paper filings at their sole discretion.

**(b) Timing of Submissions**

Filing deadlines depend on the stage of proceedings and whether the alien is detained. Deadlines for filings submitted while proceedings are pending before the Immigration Court (for example, applications, motions, responses to motions, briefs, pre-trial statements, exhibits, and witness lists) are as specified in subsections (1), (2), and (3), below, unless otherwise specified

by the Immigration Judge. Deadlines for filings submitted after proceedings before the immigration court have been completed are as specified in subsections (4) and (5), below.

Deadlines for filings submitted while proceedings are pending before the immigration court depend on whether the next hearing is a master calendar or an individual calendar hearing.

Untimely filings are treated as described in subsection (d)(2), below. Failure to timely respond to a motion may result in the motion being deemed unopposed. See [Chapter 5.12](https://www.justice.gov/eoir/reference-materials/ic/chapter-5/12) (Response to Motion). Immigration Judges may deny a motion before the close of the response period without waiting for a response from the opposing party. See [Chapter 5.12](https://www.justice.gov/eoir/reference-materials/ic/chapter-5/12) (Response to Motion). "Day" is constructed as described in subsection (c), below.

**(1) Master calendar hearings**

**(A) Unrepresented, non-detained aliens -** For master calendar hearings involving unrepresented non-detained aliens, filings must be submitted at least fifteen (15) days in advance of the master calendar hearing if requesting a ruling at or prior to the hearing. Otherwise, filings may be made either in advance of the hearing or in open court during the hearing.

When a filing is submitted at least fifteen days prior to a master calendar hearing, the response must be submitted within ten (10) days after the original filing with the immigration court. If a filing is submitted less than fifteen days prior to a master calendar hearing, the response may be presented at the master calendar hearing, either orally or in writing.

**(B) Represented, non-detained aliens** — In proceedings in which the Form EOIR-28 is filed at least fifteen (15) days prior to a master calendar hearing, the hearing will be vacated. The Immigration Judge will issue a scheduling order that establishes the deadline by which the parties must submit written pleadings and any evidence related to the charge(s) of removability.

In proceedings in which the Form EOIR-28 is filed less than fifteen (15) days prior to the master calendar hearing, or at the master calendar hearing itself, the practitioner of record and the respondent must appear at the scheduled hearing. If needed, the Immigration Judge will issue a scheduling order at the master calendar hearing.

The parties generally will be given thirty (30) days from the date of the vacated hearing to submit written pleadings and any evidence related to the charge(s) of removability. Responses to the filings specified above should be filed within twenty (20) days after the original filing with the immigration court.

If the Immigration Judge finds that removability has been established, the court will issue a scheduling order establishing the deadline for the submission of any applications for relief or

protection from removal and supporting documents. The deadline will generally be sixty (60) days from the date of the order finding removability, unless otherwise ordered by the Immigration Judge. Failure to abide by the deadlines set by the Immigration Judge for the filing of applications may result in a finding that all applications for relief have been abandoned. A request for a master calendar hearing or an extension of the deadlines for filing should be made by written motion. See Chapter 3.1(c)(4) (Motions for extensions of filing deadlines), 3.1(c)(5) (Motions for master calendar hearing).
Where a master calendar hearing is held in a case involving a non-detained, represented respondent, filings must be submitted at least fifteen (15) days in advance of the hearing if requesting a ruling at or prior to the hearing. Otherwise, filings may be made either in advance of the hearing or in open court during the hearing. When a filing is submitted at least fifteen days prior to a master calendar hearing, the response must be submitted within ten (10) days after the original filing with the immigration court. If a filing is submitted less than fifteen (15) days prior to a master calendar hearing, the response may be presented at the master calendar hearing, either orally or in writing.

**(C) Detained aliens -** For master calendar hearings involving detained aliens, filing deadlines are as specified by the immigration court.

**(2) Individual calendar hearings**

**(A) Unrepresented, non-detained aliens -** For individual calendar hearings involving unrepresented, non-detained aliens, filings must be submitted at least thirty (30) days in advance of the hearing. This provision does not apply to exhibits or witnesses offered solely to rebut and/or impeach. Responses to filings that were submitted in advance of an individual calendar hearing must be filed within ten (10) days after the original filing with the immigration court. Objections to evidence may be made at any time, including at the hearing.

**(B) Represented, non-detained aliens —** For individual calendar hearings involving represented, non-detained aliens, amendments to applications for relief, additional supporting documents, updates to witness lists, and other such documents must be submitted at least thirty (30) days in advance of the individual calendar hearing. This provision does not apply to exhibits of witnesses offered solely to rebut and/or impeach. Responses to filings must be filed within ten (10) days after the original filing with the immigration court. Objections to evidence may be made at any time, including at the hearing.

**(C) Detained aliens** - For individual calendar hearings involving detained aliens, filing deadlines are as specified by the immigration court.

**(3) Asylum applications -** Asylum applications in removal proceedings are categorized as either “defensive” or “affirmative.” A defensive asylum application is filed with the immigration court by an alien already in proceedings. An affirmative asylum application is filed with the

Department of Homeland Security (DHS) Asylum Office by an alien not in removal proceedings. If the DHS Asylum Office declines to grant an affirmative asylum application, removal proceedings may be initiated. In that case, the asylum application is referred to an Immigration Judge, who may grant or deny the application. See 8 C.F.R. § 1208.4.

An alien filing an application for asylum should be mindful that the application must be filed within one year after the date of the alien's arrival in the United States, unless certain exceptions apply. INA § 208(a)(2)(B), 8 C.F.R. § 1208.4(a)(2).

For information on asylum applications in streamlined removal proceedings, see Chapter 7.6 (Streamlined Removal Proceedings).

**(A) Defensive applications -** Defensive asylum applications are filed electronically, by mail, courier, in person at the court window, or in open court at a master calendar hearing.

**(B) Affirmative applications -** Affirmative asylum applications referred to an immigration court by the DHS Asylum Office are contained in the Record of Proceedings. Therefore, there is no need for the alien to re-file the application with the immigration court. After being placed in immigration court proceedings, the alien may amend their asylum application. For example, the alien may submit amended pages of the application, as long as all changes are clearly reflected. Such amendments must be filed by the usual filing deadlines, provided in subsections (b)(1) and (b)(2), above. The amendment should be accompanied by a cover page with an appropriate caption, such as "AMENDMENT TO PREVIOUSLY FILED ASYLUM APPLICATION." See Appendix E (Sample Cover Pages).

**(4) Reopening and reconsideration -** Deadlines for filing motions to reopen and motions to reconsider with the immigration court are governed by statute and regulation. See Chapter 5 (Motions before the Immigration Court). Responses to such motions are due within ten (10) days after the motion was received by the immigration court, unless otherwise specified by the Immigration Judge. See Chapter 5.7 (Motions to Reopen), Chapter 5.8 (Motions to Reconsider). See also Chapter 5.12 (Response to Motion).

**(5) Appeals -** Appeals must be received by the Board of Immigration Appeals no later than 30 calendar days after the Immigration Judge renders an oral decision or provides a written decision either by mail or electronic notification**.** See 8 C.F.R. § 1003.38, Chapter 6 (Appeals of Immigration Judge Decisions).

**(6) Specific deadlines -** The deadlines for specific types of filings are listed in Appendix C (Deadlines).

**(c) Must be "Timely"**

The immigration court places a date stamp on all documents it receives. Absent persuasive evidence to the contrary, the immigration court's date stamp is controlling in determining whether a filing is "timely." Because filings are date-stamped upon arrival at the immigration court, parties should file documents as far in advance of deadlines as possible.

**(1) Construction of "day" -** All filing deadlines are calculated in calendar days. Thus, unless otherwise indicated, all references to "days" in this Practice Manual refer to calendar days rather than business days.

**(2) Computation of time -** Parties should use the following guidelines to calculate deadlines.

**(A) Deadlines on specific dates -** A filing may be due by a specific date. For example, an Immigration Judge may require a party to file a brief by June 21, 2024. If such a deadline falls on a Saturday, Sunday, or legal holiday, the deadline is construed to fall on the next business day.

**(B) Deadlines prior to hearings -** A filing may be due a specific period of time *prior to* a hearing. For example, if a filing is due 15 days prior to a hearing, the day of the hearing counts as "day 0" and the day before the hearing counts as "day 1." Because deadlines are calculated using calendar days, Saturdays, Sundays, and legal holidays are counted. If, however, such a deadline falls on a Saturday, Sunday, or legal holiday, the deadline is construed to fall on the next business day.

**(C) Deadlines following hearings -** A filing may be due within a specific period of time *following* a hearing. For example, if a filing is due 15 days after a master calendar hearing, the day of the hearing counts as "day 0" and the day following the hearing counts as "day 1." Because deadlines are calculated using calendar days, Saturdays, Sundays, and legal holidays are counted. If, however, such a deadline falls on a Saturday, Sunday, or legal holiday, the deadline is construed to fall on the next business day.

**(D) Deadlines following Immigration Judges' decisions -** Pursuant to statute or regulation, a filing may be due within a specific period of time following an Immigration Judge's decision. For example, appeals, motions to reopen, and motions to reconsider must be filed within such deadlines. See 8 C.F.R. §§ 1003.38(b), 1003.23. In such cases, the day the Immigration Judge renders an oral decision or either mails or sends electronic notification of a written decision counts as "day 0." The following day counts as "day 1." Statutory and regulatory deadlines are calculated using calendar days. Therefore, Saturdays, Sundays, and legal holidays are counted. If, however, a statutory or regulatory deadline falls on a Saturday, Sunday, or legal holiday, the deadline is construed to fall on the next business day.

**(E) Deadlines for responses -** A response to a filing may be due within a specific period of time following the original filing. For example, if a response to a motion is due within 10 days after the motion was filed with the immigration court, the day the original filing is received by the immigration court counts as "day 0." The following day counts as "day 1." Because

deadlines are calculated using calendar days, Saturdays, Sundays, and legal holidays are counted. If, however, such a deadline falls on a Saturday, Sunday, or legal holiday, the deadline is construed to fall on the next business day.

**(F) Automatic extension of deadlines —** In the event of an unexpected court closure, any deadline described in paragraphs (c)(2)(A)-(E) of this chapter that falls on the date of the immigration court's closure will be automatically extended to the first business day that the immigration court is reopened. This automatic extension applies to all filings, including electronic filings through ECAS and paper filings. When an immigration court closes, an alternative filing location at a different court that remains open will continue to be provided to accommodate parties who require immediate processing of documents on an emergency basis.

**(3) Delays in delivery -** Postal or delivery delays do not affect existing deadlines. Parties should anticipate all postal or delivery delays, whether a filing is made by first class mail, priority mail, or overnight or guaranteed delivery service. The immigration court does not excuse untimeliness due to postal or delivery delays, except in rare circumstances. See Chapter 3.1(a)(3) (Receipt Rule), above.

**(4) Motions for extensions of filing deadlines -** Immigration Judges have the authority to grant motions for extensions of filing deadlines that are not set by regulation. A deadline is only extended upon the *granting* of a motion for an extension. Therefore, the mere filing of a motion for an extension does not excuse a party's failure to meet a deadline. Unopposed motions for extensions are not automatically granted.

**(A) Policy -** Motions for extensions are not favored. In general, conscientious parties should be able to meet filing deadlines. In addition, every party has an ethical obligation to avoid delay.

**(B) Deadline -** A motion for an extension should be filed as early as possible, and must be received by the original filing deadline.

**(C) Contents -** A motion for an extension should be filed with a cover page labeled "MOTION FOR EXTENSION" and comply with the requirements for filing. See Chapter 3 (Filing with the Immigration Court), Appendix E (Cover Pages). A motion for an extension should clearly state:

- when the filing is due
- the reason(s) for requesting an extension
- that the party has exercised due diligence to meet the current filing deadline
- that the party will meet a revised deadline
- if the parties have communicated, whether the other party consents to the extension

- a proposed revised deadline.

**(5) Motions for master calendar hearing** — If a party believes that a master calendar hearing is necessary where a hearing has been vacated or none has been scheduled, the party must make a written motion for master calendar hearing. The motion should be filed with a cover page labeled “MOTION FOR MASTER CALENDAR HEARING” and comply with the requirements for filing. See Chapter 3 (Filing with the Immigration Court), Appendix E (Cover Pages). The motion should also clearly state:

- the date of the last master calendar hearing (if any)
- the reason(s) for requesting a master calendar hearing
- the best language for the respondent
- proposed dates and times (morning or afternoon) for the new hearing

Examples of circumstances that may warrant a master calendar hearing include cases in which the respondent is an unaccompanied noncitizen child or exhibits indicia of mental incompetency.

**(d) Defective Filings**

Filings may be deemed defective due to improper filing, untimely filing, or both.

**(1) Improper filings -** If an application, motion, brief, exhibit, or other submission is not properly filed, it is rejected by the immigration court with an explanation for the rejection. Parties are expected to exercise due diligence. Parties wishing to correct the defect and refile after a rejection must do so promptly. See Chapters 3.1(b) (Timing of Submissions), 3.1(c) (Must be "Timely"), both above. See also subsection (2), below. The term “rejected” means that the filing is returned to the filing party because it is defective and therefore will not be considered by the Immigration Judge. It is not an adjudication of the filing or a decision regarding its content. Examples of improper submissions include:

- if a fee is required, failure to submit a fee receipt or fee waiver request
- failure to include a proof of service upon the opposing party
- failure to comply with the language, signature, and format requirements
- illegibility of the filing

If a document is improperly filed but not rejected, the Immigration Judge retains the authority to take appropriate action.

**(2) Untimely filings -** The untimely submission of a filing may have serious consequences. The Immigration Judge retains the authority to determine how to treat an untimely filing. Accordingly, parties should be mindful of the requirements regarding timely filings. See Chapters 3.1(b) (Timing of Submissions), 3.1(c) (Must be "Timely").

Untimely filings, if otherwise properly filed, are not rejected by immigration court staff. However, parties should note that the consequences of untimely filing are sometimes as follows:

- if an application for relief is untimely, the alien's interest in that relief is deemed waived or abandoned
- if a motion is untimely, it is denied
- if a brief or pre-trial statement is untimely, the issues in question are deemed waived or conceded
- if an exhibit is untimely, it is not entered into evidence or it is given less weight
- if a witness list is untimely, the witnesses on the list are barred from testifying
- if a response to a motion is untimely, the motion is deemed unopposed

**(3) Motions to accept untimely filings -** If a party wishes the Immigration Judge to consider a filing despite its untimeliness, the party must make an oral or written motion to accept the untimely filing. A motion to accept an untimely filing must explain the reasons for the late filing and show good cause for acceptance of the filing. In addition, parties are strongly encouraged to support the motion with documentary evidence, such as affidavits and declarations under the penalty of perjury. The Immigration Judge retains the authority to determine how to treat an untimely filing. EOIR will maintain an ECAS Outage Log that will note planned and unplanned ECAS system outages. Planned system outages will not impact filing deadlines since these can be proactively addressed by the parties. If EOIR determines that an unplanned outage has occurred, filing deadlines that occur on the last day for filing in a specific case will be extended until the first day of system availability that is not a Saturday, Sunday, or legal holiday.

**(4) Natural or manmade disasters -** Natural or manmade disasters may occur that create unavoidable filing delays. Parties wishing to file untimely documents after a disaster must comply with the requirements of subsection (3), above.

**(e) Filing Receipts -** The immigration court does not issue receipts for paper filings. Parties are encouraged, however, to obtain and retain corroborative documentation of delivery, such as mail delivery receipts or courier tracking information. As a precaution, parties should keep copies of all items sent to the immigration court. Parties who electronically file through ECAS will receive electronic notification upon successful upload and when the filing is accepted and added to the electronic record of proceeding.

**(f) Conformed Copies -** A time-and-date stamp is placed on each filing received by the immigration court. If the filing party desires a "conformed copy" (i.e., a copy of the filing bearing the immigration court's time-and-date stamp), the original must be accompanied by an accurate copy of the filing, prominently marked "CONFORMED COPY; RETURN TO SENDER." If the filing is voluminous, only a copy of the cover page and table of contents needs to be submitted for confirmation. The filing must also contain a self-addressed stamped envelope or comparable return delivery packaging. The immigration court does not return conformed copies without a prepaid return envelope or packaging. If a case has an eROP, ECAS users may download electronic copies of filings with watermarked time-and-date stamps through ECAS.

Chapter 3 - Filing with the Immigration Court 3.2 - Service on the Opposing Party

**Executive Office for Immigration Review**

5107 Leesburg Pike
Falls Church, VA 22041

Phone: 703-305-0289

# EXHIBIT 39

REFUGEES INTERNATIONAL

# Addressing the Legacy of Expedited Removal: Border Procedures and Alternatives for Reform

Dr. Yael Schacher
May 2021



*Guatemalan youth arrive on an ICE deportation flight from Brownsville, Texas to Guatemala City. Photo by John Moore/Getty Images*

# Introduction

Though he has already revoked some of the former administration's highly restrictive policies on asylum, President Biden has thus far left in place an expulsion policy first imposed by the Trump administration under Title 42 of the U.S. Code, and based on the unreasonable assertion that public health requires such restrictive measures be essentially directed at asylum seekers. Ports of entry have remained closed to asylum seekers except to a select few exempted from Title 42 in response to a lawsuit challenging the policy. This month, the Biden administration moved to expand the humanitarian exemption process further, tasking NGOs with identifying vulnerable migrants in Mexico and getting information about them to U.S Customs and Border Protection officials (CBP) in order to speed processing at ports. In addition, since February, Mexico's refusal to accept back expelled Honduran, Salvadoran, and Guatemalan families with young children has meant that the Border Patrol has released some families and allowed them to proceed to their destinations—often the homes of relatives—to pursue their claims for asylum there. This is currently a practice borne of the necessity of limiting congregate detention during the pandemic. But a return to the pre-existing policy and practice—a border screening process called expedited removal—will recreate long-standing problems, and the Biden administration should now consider alternatives.

Under expedited removal, border officials are tasked with asking migrants who lack valid travel documents about their fear of return to their home country and with referring them to preliminary interviews with asylum officers if they express this fear. U.S. asylum officers assess whether the migrants have "a credible fear" of persecution—that is, a significant possibility of establishing eligibility for asylum. If they fail this interview, they are removed or remain detained (without real access to counsel) for a review by an immigration judge within seven days. A negative decision by a judge is final and leads to removal. A positive credible fear decision leads the Department of Homeland Security (DHS) to place the asylum seeker in full (non-expedited) proceedings designed to secure the "removal" of unauthorized migrants, and the asylum seeker must then prove to an immigration judge (who works for the Executive Office of Immigration Review in the Department of Justice) that they merit refugee status.

Expedited removal created an entirely "defensive" system—whereby asylum seekers are presumed removable. It is also an adversarial system, and, as applied, has undermined the right to seek asylum at the border and recognition that asylum is a legal pathway to

protection regardless of status. For example, prior to a determination of eligibility, U.S. officials have criminally prosecuted those who have sought refuge but have been without travel documents or have entered without inspection. Many arriving asylum seekers get screened out even before credible fear assessments can be made, as they have been unfairly rejected by CBP officers who did not ask them about fear or inform them of their right to seek protection. Those who CBP refer for credible fear interviews are required to show they can meet a complex legal protection standard just after arrival and while detained; those denied at the credible fear stage have inadequate opportunity for appeal. Expedited removal has cut off access to the federal courts for border arriving asylum seekers; as a result, asylum jurisprudence is left to develop without addressing protection issues raised by a large majority of today's asylum seekers. In practice, expedited removal has limited the ability of Central Americans in particular to obtain access to protection and fair assessments of their asylum claims, and many have been removed to life-threatening danger.

Expedited removal has been justified as a means to promote efficiency in asylum processing. Yet over the last decade, when large numbers of families have come to the border to seek refuge, expedited removal has proven extremely inefficient. President Trump expanded expedited removal—extending its application far beyond the border (anywhere within the United States to anyone present for less than two years without authorization), putting credible fear interviews in the hands of enforcement officers, and raising eligibility standards.

On February 2, 2021, President Biden issued Executive Order 14010 on "Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border." The Executive Order called for a review of the use of expedited removal within 120 days. The Order suggests that the Biden administration intends to implement expedited removal in a way that is more efficient and respectful of due process after the lifting of Title 42. For reasons described in this brief, it is highly questionable that such a system will prove to be fair or even effective and workable. Thus, this issue brief suggests alternative ways the United States can have a fair and efficient system that better fulfills its obligation to provide access to protection at the border. A different reception system at the border is an essential component of a new, comprehensive, protection-oriented approach to migration from Central America.

# Background

**Before Expedited Removal: The Refugee Act and Reception of Asylum Seekers, 1980–1996**

In March 1980, Congress passed and the President signed the Refugee Act, which mandated the establishment of a procedure whereby those present in the United States or at a land border or port of entry, irrespective of their status, could apply for asylum. The Act also forbade return of anyone to a country where their life or freedom would be threatened on account of race, religion, nationality, membership in a particular social group, or political opinion. This meant that the Attorney General, and later the Department of Homeland Security (DHS), was required to permit migrants to request asylum at the border or after entering the country and could not deport anyone before ensuring they would not face persecution.

Just after the law was enacted, more than 100,000 Cubans and some 15,000 Haitians sought refuge in Florida in the span of three months. President Carter used the parole authority of the Immigration Act and established a special entrant status for them in part to avoid undercutting the right to seek asylum before the procedures called for in the Refugee Act were established. A provision of the Refugee Act giving the Office of Refugee Resettlement the authority to set up reception centers was invoked to accommodate the Cubans.[1]

In 1981, the Select Commission on Immigration and Refugee Policy suggested that the United States plan for "mass asylum emergencies" by creating an interagency planning body, the development of federal processing centers, and "group profiles" that would help speed adjudication of individual claims in such circumstances. Instead, the Reagan administration opted for a policy of interdiction that prevented Haitian asylum seekers who fled Haiti by boat from reaching the United States.

The Reagan administration did not publish a regulation clarifying asylum procedures (for those who did reach the United States) until the end of the decade. Immigration officials interpreted existing regulations and policy guidance in ways that limited access to asylum at the southwest border. For example, officials in California expelled

[1] "The Secretary is authorized…to make arrangements (including cooperative arrangements with other Federal agencies) for the temporary care of refugees in the United States in emergency circumstances, including the establishment of processing centers." This provision of the Refugee Act was invoked later to accommodate Kosovar Albanians and Iraqi Kurds in the 1990s.

Salvadoran asylum seekers by forcing them to sign voluntary departure forms. In 1988 and 1989, the Immigration and Naturalization Service first instituted a policy forbidding Central American asylum seekers from leaving South Texas, thus overwhelming local communities, and then a policy of adjudicating their asylum claims within a single day and detaining them to encourage abandonment of immigration court hearings.

Federal courts ultimately ruled that the Refugee Act of 1980 required a fairer chance to seek asylum and an assessment of claims unbiased by enforcement or foreign policy considerations. Further, Congress, in the Immigration Act of 1990, created an emergency contingency fund to reimburse localities for their support of sudden large numbers of asylum seekers.[2] A Government Accountability Office (GAO) report at about the same time suggested such funding for communities was well advised. "We do not believe that it is feasible to expand INS' detention capabilities sufficiently" to handle a mass influx, the GAO reported, adding that "detaining all aliens until their cases are resolved is too costly."[3]

In the early 1990s, the Immigration and Naturalization Service (INS) began to develop an asylum adjudication system that was separated from enforcement and that applied to all asylum seekers, including those who arrived at the border. Asylum officers worked in seven new offices in different parts of the country and reported to the INS Central Office. Asylum seekers applied at these offices and had non-adversarial interviews with specially trained asylum officers. One study of the new system found that, though additional training and staffing were needed, asylum adjudication was becoming fairer—with the exception of newly devised interviews assessing which of more than 36,000 Haitian asylum seekers at Guantanamo Bay had "credible fear of persecution," a standard that was not found in the Refugee Act or the regulations and consequently was "ill defined."[4]

INS officials constructed a separate process to handle the asylum cases of Haitians who fled from Haiti after the military coup in September 1991 and whom the Coast Guard indicted on the high seas. INS asylum officers conducted credible fear interviews of these Haitians at the United States military base at Guantanamo Bay from October 1991 to June 1992. Haitians who passed these credible fear interviews could enter the United States to pursue their claims in the asylum office, while those who failed were

[2] Section 705 of the Immigration Act of 1990, https://www.congress.gov/101/statute/STATUTE-104/STATUTE-104-Pg4978.pdf.
[3] Immigration Control: Immigration Policies Affect INS Detention Efforts, June 1992, https://www.gao.gov/assets/ggd-92-85.pdf.
[4] Sarah Ignatius, Interim Assessment of the Asylum Process of the Immigration and Naturalization Service (National Asylum Study Project, Harvard Law School, 1992), 44.

repatriated to Haiti. Procedural problems abounded with the credible fear interviews at Guantanamo: the interviews were not private and did not allow access to counsel; asylum officers asked applicants for documents to support their cases but did not explain the asylum process. More striking, however, was that credible fear interview pass rates fluctuated from a high of 85 percent in January 1992 to a low of 2 percent in April 1992.[5] The credible fear interview standard used to handle a "crisis" of mass asylum seeker migration proved manipulatable for political and policy reasons; in early 1992, high ranking INS officials stated publicly and at asylum officer trainings that almost all Haitians would be denied.[6] As a result of this flawed process, some Haitian asylum seekers were wrongfully repatriated. Moreover, those admitted to the United States were treated differently than other asylum seekers.[7] Further, because large numbers of asylum officers were diverted to conduct credible fear interviews at Guantanamo Bay, backlogs of cases developed in the asylum offices in the United States.

Concurrently, the INS was also using the credible fear standard to prescreen asylum seekers (who arrived at ports of entry without proper travel documents) to determine whether to release them from detention during their asylum cases. Those who failed credible fear under this process were not returned to their home countries but rather remained detained pending full adjudication of their claims. A pilot parole program, in which credible claimants would be released pending a determination of their claims, had already proved effective; the problem was that, when the INS General Counsel's office tried to expand it, enforcement officers rejected parole recommendations for asylum seekers of particular nationalities or required bonds for parole, which asylum seekers could not afford.

The same procedural problems were evident as in the Haitian screenings; credible fear interviews took place without access to counsel and only after several weeks. While waiting, the asylum seekers remained detained. [8] The program overall was under resourced, shirked altogether in some districts, and never effectively evaluated. Officials

---

[5] Ibid., 4.
[6] Ibid., 58, citing a presentation by INS Deputy Commissioner R. Inzunza at the Fletcher School of Law and Diplomacy, Tufts University.
[7] At least 54 Haitians whom INS had found to have a credible fear of persecution were mistakenly repatriated to Haiti due to faulty record keeping; 89 who passed credible fear screenings but were HIV positive were forcibly repatriated to Haiti. Those who passed credible fear screenings and were admitted to the United States were scheduled for interviews in asylum offices on an expedited schedule and grants of asylum received additional scrutiny by the Central Office. (Ibid, 42-58).
[8] Lawyers Committee for Human Rights, "Detention of Refugees: Problems in Implementation of the Asylum Pre-Screening Officer Program," September 1994.

responsible for overseeing asylum-prescreening were unable to assess the correlation between credible fear determinations made and the ultimate outcome of asylum claims. As the Associate INS Commissioner observed at the time, "asylum pre-screening" and parole of those screened-in was "not a core commitment of the agency."[9]

**The Screening System in the Illegal Immigration Reform and Immigrant Responsibility Act, (IIRIRA), 1997–2004**

Despite these experiences, Congress mandated credible fear interviews for asylum seekers in the 1996 Illegal Immigration Reform and Immigrant Responsibility Act. Under the new law, those failing to establish credible fear would be subject to removal. But Congress deliberately set a "low" standard or threshold of proof of potential entitlement to asylum, recognizing that, within two or three days of arrival, asylum seekers are still traumatized and have not had time to gather evidence to support their claim.[10] The 1997 INS regulation implementing the law did not further refine the credible fear standard, insisting that INS would do extensive training that would "ensure that the standard is implemented in a way which will encourage flexibility and a broad application of the statutory" definition (i.e., a significant possibility of establishing eligibility for asylum.)

At the same time, in the name of deterring abuse of the asylum system by migrants without good faith claims of persecution, the statute called for the detention of asylum seekers who arrived without travel documents and eliminated federal court appeals for those who failed credible fear interviews. The 1997 regulation applied expedited removal only to ports of entry, so that it affected less than 10 percent of all asylum seekers and precisely those who asked for asylum at ports of entry rather than those who entered without inspection.

The 1997 regulation devised a particular screening system that went into effect in April 1997. If they did not have valid documents, migrants would be asked "standard questions" regarding "any fear or concern of being removed." It is this important inspection stage—when there is no access to counsel or assured interpretation—and which determines access to the credible fear interview itself—that has remained of most

---

[9] T. Alexander Aleinikoff, quoted in Margaret Taylor, "Promoting Legal Representation for Detained Aliens: Litigation and Administrative Reform," *Connecticut Law Review* 29.4 (Summer 1997).
[10] 142 Cong. Rec. S11491 (daily ed. Sept. 27, 1996) (statement of Sen. Orrin Hatch: "The [credible fear] standard adopted in the conference report is intended to be a low screening standard for admission into the *usual full asylum process*.") (emphasis added).
It was not, however, the same as the "manifestly unfounded" screen-out standard used by immigration ministers in the European Union.

concern to many advocates since expedited removal went into effect. As the U.S. Commission on International Religious Freedom (USCIRF) observed on its visits to ports of entry early in the new millennium, CBP inspecting officers did not provide required information and refer all who expressed fear to asylum officers. Significantly, at the land border port of entry on the U.S.-Mexico border observed by the Commission, CBP officers were least likely than elsewhere to inform migrants of the existence of protection for those who feared return to their home country or to refer a migrant to credible fear interviews if the migrant expressed fear. The majority of cases observed in which a CBP officer encouraged migrants to withdraw their applications for admission after they expressed fear involved Central Americans. Another study found that women survivors of rape and abuse were particularly vulnerable because they had difficulty expressing fear to border officials and even asylum officers conducting credible fear interviews did not believe they could claim asylum based on gender-related persecution.[11]

Expedited removal underlined a distinction between the few people subject to the "defensive" asylum system—claiming asylum as a defense against removal—and the vast majority of asylum seekers at the time, who were in the "affirmative" asylum system. Many of the latter were people who had the resources to enter the country initially on a temporary visa (such as a tourist, student, or business visa) and then applied to the asylum office. After a non-adversarial interview, an asylum officer granted or denied them asylum; if denied, they had access to a new hearing in immigration court and were not typically detained. The treatment of asylum seekers in the two systems diverged dramatically—in 2003, 190 of the 56,120 affirmative asylum seekers were detained, while 13,759 of the 17,034 placed in expedited removal and applying defensively were detained.[12] Detention is traumatizing and dramatically reduces the ability to secure counsel that can be crucial to winning asylum. In 2003, the immigration court grant rate for those applicants who initially applied for asylum affirmatively was almost double that of the grant rate for those who applied defensively.[13] Further, release from detention of asylum seekers who passed credible fear interviews varied widely from one part of the country to another despite the

[11] Lawyers Committee for Human Rights, "Refugee Women at Risk: Unfair U.S. Laws Hurt Asylum Seekers," 2002 https://web.archive.org/web/20170926002402/http://www.humanrightsfirst.org/wp-content/uploads/pdf/refugee_women.pdf.

[12] Department of Homeland Security Oversight: Terrorism and Other Topics, Hearing before the Committee on the Judiciary, United States Senate, 108th Congress, 2nd Session, June 9, 2004, 93.

[13] See figure 17 and figure 18 in the Executive Office for Immigration Review FY2003 Statistical Yearbook showing that the immigration court affirmative grant rate was 44 percent while the immigration court defensive grant rate was 26 percent. https://www.justice.gov/sites/default/files/eoir/legacy/2008/04/18/fy03syb.pdf.

existence of policy guidance clearly authorizing parole to credible claimants who showed they were neither a flight risk nor a danger to the community. In 2003, while one ICE field office paroled almost 98 percent of applicants, another paroled just 0.5 percent. Release rates in other parts of the country varied widely between those two figures.[14]

After the implementation of expedited removal, the Women's Refugee Commission interviewed dozens of asylum-seeking women and children who were detained for prolonged periods under "appalling conditions." At the Wicomico County detention center in Maryland, the Women's Commission interviewed a Guatemalan asylum seeker whose husband was an affirmative asylum applicant living near Washington D.C. As Wendy Young of the Commission told Congress:

> Her husband traveled three hours to deliver some toiletries and personal items to her. The facility refused to let her have them….He…had to tell her to stop phoning him, because [of] the exorbitant rates charged for collect calls...He returned one more time to the prison… [and] was told to "get lost" or risk deportation himself. After five months of incarceration, his wife abandoned her asylum claim and was deported to Guatemala.[15]

Senator Edward Kennedy, one of the co-authors of the Refugee Act, found it particularly disturbing that credible fear interviews occurred while asylum seekers were in detention—frequently alongside criminals in state and local prisons and subject to abusive treatment and a lack of adequate care—and that many asylum seekers were detained after passing these interviews. "By immediately detaining those who have been subjected to persecution and who have lived in constant fear, we contribute to their trauma and hardship. By detaining asylum seekers, we are also restricting their access to adequate legal representation, which they need in order for their claims to be decided fairly….We need to do more to protect the rights of asylum seekers," he stated to Congress. Senator Kennedy also noted that U.S. practice of detaining asylum seekers was out of line with the guidelines of the United Nations High Commissioner for Refugees.[16]

---

[14] USCIRF Report on Asylum Seekers in Expedited Removal, Feb. 8, 2005, Statistical Report on Detention, 2001-2003, https://www.uscirf.gov/sites/default/files/resources/stories/pdf/asylum_seekers/detentionStats.pdf.

[15] Statement of Wendy A. Young, "INS Oversight and Reform: Detention" Hearing before the Subcommittee on Immigration of the Senate Committee on the Judiciary, 105th Congress, 2nd Session, September 16, 1998, 146.

[16] "INS Reform" Hearing before the Subcommittee on Immigration of the Senate Committee on the Judiciary, 105th Congress, 2nd Session, September 16, 1998, 102.

Between 1999 and 2002 a bipartisan group of legislators—including Senator Kennedy and others who were aware that IIRIRA's expedited exclusion provisions were not thoroughly discussed during final Congressional consideration of the legislation and, in the words of Senator Sam Brownback, were "flawed"—introduced the Refugee Protection Act.[17] The bill included "safeguards against erroneous exclusion of asylum seekers" (specifically expanded review of removal orders) and mandated parole or alternatives to detention for asylum seekers who passed a credible fear screening. The first version of the bill also excepted from expedited removal anyone coming from countries with poor human rights records or where "conflict or other extraordinary conditions would pose a serious threat to the alien's safety."[18] The bill reinforced the idea that different asylum seekers should not be subjected to different treatment based on how they entered the country. The bill also recognized that migrants from particular countries should be presumed to have credible fears and be exempted automatically from expedited removal.[19]

Though the RPA was not enacted, it is significant that, in the early 2000s, certain Central Americans were not subjected to expedited removal precisely because the process lacked safeguards mandated by federal courts for them before IIRIRA.[20]

---

[17] "A Overview of Asylum Policy," Hearing Before the Subcommittee on Immigration of the Senate Judiciary Committee, 107th Congress, 1st Session, May 3, 2001, 2.
During the Conference on the Senate and the House versions of IIRIRA, the Republican conferees announced that the Democrats would not be allowed to offer any of their amendments, including to the provisions on expedited removal, for consideration. Senator Leahy protested about his "summary exclusion" from negotiations on the bill. See Philip Schrag, *A Well-Founded Fear: The Congressional Battle to Save Political Asylum in America* (New York: Routledge, 2000) 182.
[18] https://www.congress.gov/bill/106th-congress/senate-bill/1940/actions
https://www.congress.gov/bill/107th-congress/house-bill/4074
The earliest version of the bill also defined credible fear as not manifestly unfounded (when a claim of eligibility for asylum "is not clearly fraudulent and is related to the criteria for granting asylum").
[19] It is worth noting that, between 1987 and 1995, it remained INS policy to, essentially, provide Nicaraguans with complementary protection: their denied asylum applications received another review and, regardless, they generally were not deported. To take just one year as an example, in 1990, 7460 Nicaraguan asylum applications were denied, covering over 10,000 individuals. 107 people were deported to Nicaragua in 1990 and 253 in 1991.
https://eosfcweb01.eosfc-intl.net/U95007/OPAC/Search/AdvancedSearch.aspx
For the policy on Nicaraguans, see:
https://www.washingtonpost.com/archive/politics/1987/07/09/meese-signs-order-giving-nicaraguans-haven-in-us/3041bc0a-814f-4b69-bdd1-2a7e390d0d3d/;
https://www.aila.org/infonet/ins-phase-out-of-the-nicaraguan-review-program
[20] "Expedited Removal cannot be applied to the following aliens… due to judicial action:… El Salvadorans; and verified members of the class action settlement in American Baptist Churches (ABC) v. Thornburgh." See "Solving the OTM undocumented alien problem: Expedited Removal for Apprehensions Along the U.S. border," Hearing before the Subcommittee on Economic Security, Infrastructure Protection, and

## The Problems with Expedited Removal, 2005–2021

If, in 2000, expedited removal seemed "a key tool in overall border control and anti-fraud strategy" because "the vast majority of people subjected to it never assert a fear of return or of persecution,"[21] this seems less plausible in 2021, given the demographic shift of border arrivals from single Mexican adults to asylum seeking families and children from Central America.

Early warning signs were visible between 2004-2006, when the number of people placed in expedited removal doubled as it was expanded to apply to those who entered between ports of entry, especially the rising number of "other than Mexicans," primarily Brazilians and Central Americans.[22] While one of the stated goals of the expansion of expedited removal was to "decrease the deaths of illegal immigrants in the [Arizona] deserts," the number of bodies found in Arizona kept rising.

Though violence was on the rise in Central America, DHS and State Department officials insisted to Congress that "economic factors" were spurring all Central American migration and that the appropriate response was detention and rapid repatriation.[23] Because DHS wanted to put migrants who crossed the border into expedited removal but did not have sufficient detention space for families, it separated children and sent them to Office of Refugee Resettlement facilities.[24] Pressured by advocates concerned about family separation, Congress, in report language, urged DHS "to release families or use alternatives to detention…whenever possible."[25] But, in 2006, DHS announced the opening of a detention center in Texas to detain families subject to expedited removal so as to "send the clear message that families entering the United States

---

Cybersecurity of the Committee on Homeland Security, House of Representatives, 109th Congress, 1st session, September 28, 2005, 26.

[21] David A. Martin, "Two Cheers for Expedited Removal in the New Immigration Laws," *Virginia Journal of International Law* 40, no. 2 (Winter 2000): 675.

[22] It is important to point out that expedited removal was originally only meant to be applied to Mexicans if they were criminals or has several unauthorized entries. The majority of Mexican nationals were given voluntary departure, as they always had been, before 2008.

[23] "Solving the OTM undocumented alien problem: expedited removal for apprehensions along the U.S. border," Hearing before the Subcommittee on Economic Security, Infrastructure Protection, and Cybersecurity of the Committee on Homeland Security, House of Representatives, One Hundred Ninth Congress, first session,
September 28, 2005 30. In December 2004, the Intelligence Reform and Terrorism Prevention Act authorized an increase in detention and removal operation bed space by 8,000 beds each year from fiscal year 2006 through 2010 for a total increase of 40,000 detention beds.

[24] Office of Inspector General, Department of Homeland Security, "A Review of DHS' Responsibilities for Juvenile Aliens," OIG-05–45 4 (2005). https://www.oig.dhs.gov/assets/Mgmt/OIG_05-45_Sep05.pdf.

[25] H.R. Rep. 109–79 (2005), at 38. https://www.congress.gov/congressional-report/109th-congress/house-report/79

illegally will be returned home." Families remained detained there for months even after passing credible fear screenings despite Congressional appropriations for alternative to detention programs that had proven effective.[26] In 2008, the Trafficking Victims Protection Act reaffirmed that unaccompanied children would not be placed in expedited removal proceedings and instead have their asylum claims adjudicated fully by asylum officers in a non-adversarial setting.[27] But the problem of families remained.

In the early 2010s, expedited removal certainly did not deter non-Mexican nationals fleeing violence, absence of rule of law, and human rights violations from coming to the border.[28] Credible fear interviews more than doubled between 2012 and 2013 and asylum officers sent an increasing number of Central Americans who passed their credible fear hearings on to the immigration courts for consideration of their claims; the number of defensive asylum claims eclipsed affirmative ones by 2014.[29] Still, the U.S. Commission on International Religious Freedom (USCIRF), the American Civil Liberties Union (ACLU), and Human Rights Watch documented the way expedited removal as administered hindered the ability to seek asylum, penalized asylum seekers—including those who passed credible fear screenings—with detention, limited their access to counsel, and led to refoulement. As the USCIRF found, "certain CBP officers [expressed] outright skepticism, if not hostility, toward asylum claims." Human Rights Watch found that CBP referred a particularly small percentage of Central Americans for credible fear assessments and that, more generally, most credible fear referrals came from agencies

---

[26] Women's Refugee Commission and Lutheran Immigration and Refugee Service, "Locking Up Family Values: The Detention of Immigrant Families," February 2007, https://www.womensrefugeecommission.org/research-resources/locking-up-family-values-the-detention-of-immigrant-families/

[27] Under the TVPRA, unaccompanied children are placed directly into Section 240 removal proceedings, but their cases are initially adjudicated by the Asylum Office. Before that, generally, unaccompanied children were not placed in expedited removal. See INS, Memorandum, "Unaccompanied Minors Subject to Expedited Removal" (Aug. 21, 1997).

[28] That Central Americans are bona fide asylum seekers with viable claims under U.S. law is clear from the fact that, despite caselaw developments and procedural changes have made it more difficult for them to lodge claims and qualify as refugees, Honduras, El Salvador and Guatemala have been among the top 10 countries of origin for individuals granted asylum for the last several years.
https://www.dhs.gov/immigration-statistics/refugees-asylees
UNHCR recognized Central American migration as a refugee crisis almost a decade ago and has since found that Central Americans have valid refugee protection claims: UNHCR and International Centre for the Human Rights of Migrants, "Forced Displacement and Protection Needs produced by new forms of Violence and Criminality in Central America," May 2012; UNHCR, Women on the Run (Oct. 2015), http://www.unhcr.org/en-us/publications/operations/5630f24c6/women-run.html; UNHCR, Children on the Run, http://www.unhcr.org/56fc266f4.html; UNHCR, Eligibility Guidelines for Assessing the International Protection Needs of Asylum-Seekers from El Salvador (March 2016); UNHCR, Eligibility Guidelines for Assessing the International Protection Needs of Asylum-Seekers from Honduras (July 2016)

[29] https://www.dhs.gov/immigration-statistics/readingroom/RFA/credible-fear-cases-interview
https://trac.syr.edu/phptools/immigration/asylum/

other than CBP, despite CBP encountering most migrants and being obliged to inform them about the interviews. The ACLU found that language barriers were a major problem in encounters with CBP and that officers pressured asylum seekers to sign forms they did not understand. Further, CBP officers did not accurately record accounts of asylum seekers they inspected on official forms which later were relied upon by asylum officers and immigration judges.[30]

At the same time, the credible fear interview grew more detailed and more like a full merits adjudication than a preliminary screening. In light of the increase in credible fear interviews in 2013, the asylum division of USCIS revised its lesson plan for officers as to how to conduct these interviews. It removed language on the function of the credible fear as a low-threshold screening and instead cautioned against passing those with only a minimal or mere possibility of winning asylum. In the wake of the revision of the 2014 lesson plan, there was a reduction in the grant rate. Before the lesson plan was implemented, in January 2014, 83 percent of those who received credible fear interviews were permitted to apply for asylum. In July 2014, six months later, that figure was 63 percent.[31]

Despite these wide fluctuations, the large majority of asylum seekers still passed credible fear screenings between 2014 and 2019 and were sent on to the immigration courts; the asylum case backlog grew in both the immigration courts and the asylum office, since so many asylum officers were diverted from handling the affirmative case load to conduct credible fear interviews.[32] Unfortunately, resources for adjudication remained insufficient to keep up with need while DHS's enforcement and detention budgets grew. Asylum officers detailed to the border to conduct credible fear screenings did not obtain adequate training or have adequate time and it showed in the quality of their work: a 2018 USCIS review found that asylum officer notes did not reflect a skilled interview in an estimated 58 percent of cases. For most of these cases, the reason for

---

[30] John Washington, "Bad Information: Border Patrol Arrest Reports Are Full of Lies that Can Sabotage Asylum Claims," *The Intercept,* Aug. 11, 2019, https://theintercept.com/2019/08/11/border-patrol-asylum-claim/

[31] Human Rights Watch, "You Don't Have Rights Here": US Border Screening and Returns of Central Americans to Risk of Serious Harm," October 16, 2014, https://www.hrw.org/report/2014/10/16/you-dont-have-rights-here/us-border-screening-and-returns-central-americans-risk
In family residential centers, the passage rate for credible fear interviews was 43.4 percent in July 2014, although in the five months that followed it rose to nearly 90 percent and then fell back to 67.5 percent in 2016.

[32] The 2020 USCIS Ombudsman report details the large percentage of asylum officers that have been temporarily reassigned from adjudicating asylum applications to carry out fear screenings at the border since 2016.
https://www.dhs.gov/sites/default/files/publications/20_0630_cisomb-2020-annual-report-to-congress.pdf

the error was insufficient follow-up questions.[33] Asylum officers also faced logistical problems with accessing telephone interpretation and private interview space at detention centers. At credible fear interviews, indigenous language speakers received poor interpretation,[34] women survivors of gender violence had to speak to male officers while in front of their children, and some officers cut off asylum seekers and did not elicit important information.[35] In 2019, at least 16 percent (472 out of 2891) of adult women at the Karnes family detention center in Texas failed their credible fear interviews and nearly half (45 percent) of those negative determinations were later vacated, indicating errors in asylum office adjudication.[36]

Despite a late 2009 memo that directed DHS to parole credible claimants, between 2015 and 2017, increasing numbers and percentages of asylum seekers remained detained long after passing their credible fear hearings.[37] After a 2015 federal court ruling that limited the time families with children could be detained, expedited removal led to family separations in an effort to subject at least one parent—usually the father—in a family that had entered without inspection to a deterrent "consequence." Refugees International interviewed a Salvadoran asylum seeker who was released with her children while her husband was placed in expedited removal and detained in January of 2017; the detention of the father and the several month family separation was extremely, and needlessly, traumatic.[38] The GAO reported that for families who were subject to expedited removal and detained at Family Residential Centers, immigration judges vacated more than half of asylum officers' negative credible fear determinations between 2014 and 2019. This was on top of an already extremely high positive credible fear determination rate at the Family Residential Centers. Not surprisingly, in early 2017 the GAO also found that the right "consequence" (a measure of overall policy efficiency

---

[33] Government Accountability Office, February 2020, "Actions Needed to Strengthen USCIS's Oversight and Data Quality of Credible and Reasonable Fear Screenings," https://www.gao.gov/assets/gao-20-250.pdf, 33.
[34] Report of the DHS Advisory Committee on Family Residential Centers (2016), 96-99.
[35] Regulations require that, during the credible-fear interview, the asylum officer "elicit all relevant and useful information bearing on whether the applicant has a credible fear of persecution or torture." 8 C.F.R. § 208.30(d).
[36] This data, and all the data about Karnes in this report, are from Andrea Meza, Director of Family Detention Services, RAICES.
[37] Human Rights First, "Lifeline on Lockdown," July 2016, https://www.humanrightsfirst.org/sites/default/files/Lifeline-on-Lockdown.pdf
[38] Refugees International, "Meet Mirna Linares": https://www.refugeesinternational.org/reports/2021/2/19/wecanwelcome-asylum-seekers-meet-mirna-linares
This was a common process in El Paso, where the family entered, and other places along the border. See, Border Immigration Council, "Discretion to Deny," Feb. 2017, https://www.borderlandimmigrationcouncil.org/discretion-to-deny.

and effectiveness) for families arriving without authorization was a notice to appear in immigration court—not expedited removal and credible fear interviews.

Notable, too, is that, while almost two in three inadmissible Haitians in 2016 were issued notices to appear and paroled into the United States (that is, not subject to expedited removal), the majority of inadmissible Haitians in 2017 were placed in expedited removal (5,200, up from 1,100 in 2016).[39] As such, detention of credible claimants has not been an issue confined to those from Central America. Credible claimants from Haiti and Africa, some interviewed by Refugees International, spent many months in ICE detention, where they lacked access to adequate care and faced discrimination, many to be, eventually, granted asylum.[40]

During the Trump administration, expedited removal was further modified in ways that had discriminatory impacts and led to increases in human rights violations and refoulement. CBP officers increased the pressure on Central Americans to abandon their claims through the documented use of lies, threats, intimidation and coercion, as well as verbal and physical abuse. An activist who had been tortured by police in Honduras told Refugees International that CBP tried to force him to accept deportation in 2018 by transferring to several "hieleras"—freezing detention cells—and telling him his prospects for winning asylum were poor.[41] The credible fear standard was drastically changed to limit who could pass and CBP officers (rather than asylum officers) were assigned to conduct interviews, leading grant rates to plummet.[42] The administration introduced a consequential pilot program—called Prompt Asylum Claim Review (PACR)—that sped up the expedited removal process such that credible fear interviews and reviews of denials by immigration judges were all done telephonically and while Central American asylum seekers were in CBP custody, conditions that the DHS inspector general found were

---

[39] DHS Office of Immigration Statistics, Annual Report, Immigration Enforcement Action: 2017, 8, https://www.dhs.gov/sites/default/files/publications/enforcement_actions_2017.pdf.
[40] https://www.aclu.org/legal-document/damus-v-nielsen-damus-habeas-petition ; https://www.law360.com/articles/1060143; https://www.law360.com/articles/1115617; https://www.refugeesinternational.org/reports/2019/4/15/us-immigration-detention-centers-amp-treatment-of-immigrants-in-detention; https://www.refugeesinternational.org/reports/2019/6/17/world-refugee-day-2019-spotlight-6-mohamed-tounkara
[41] Refugees International, "Meet Jose Murillo": https://www.refugeesinternational.org/reports/2021/3/9/wecanwelcome-asylum-seekers-meet-jose-murillo.
[42] The new credible fear interview lesson plan in 2019 stated that officers could require applicants to provide country conditions materials and eliminated language that officers should consider the impact of cross-cultural issues, trauma, and the effects of detention, on credibility assessments, as well as other previously listed factors which might explain or mitigate inconsistencies. It also eliminated text imposing on officer an "affirmative duty to elicit all information relevant to the nexus determination." The lesson plan was vacated by a federal court.

substandard and limited access to counsel. Under this program, almost 70 percent received negative credible fear determinations in contrast to the 80 percent that received positive fear determinations during the George W. Bush and Obama administrations. Immigration judges upheld 99 percent of all negative credible fear determinations in "reviews" of PACR credible fear determinations.[43] And just at the time when the entire screening process was becoming ever more *pro-forma*, the Supreme Court ruled that an asylum seeker threatened with removal after being denied at the credible fear stage has absolutely no recourse to the federal courts—not even a petition for habeas corpus. In that case, both the credible fear interview and the review by the immigration judge were inadequate, as has been observed in many other cases.[44]

The implications of the Supreme Court's ruling are all-the-more significant in light of the arbitrary nature of the process and the resulting risks to applicants. As is true for all asylum proceedings in the immigration courts, which immigration judge presides is all important.[45] Moreover, data from the Karnes family detention center raise important questions relating to possible discrimination. The Refugee and Immigration Center for Educational and Legal Services (RAICES), an organization that provides free legal services to detainees at Karnes, reported that immigration judges vacated nearly half of non-Haitian negative credible fear determinations in 2019, but only a quarter of Haitian negative credible fear determinations, with one judge affirming 100 percent of the Haitian cases.

[43] Even outside of the HARP and PACR context, these reviews were done in about half an hour, mostly by video. They do not always involve testimony or attorney participation. Attorneys frequently were not notified of review hearings or notified just before they occur. The government also took the position that there is "no right to representation prior to or during" immigration judge review of negative credible fear determinations.  Exec. Office Immigration Review, Immigration Court Practice Manual, Ch. 7.4(d)(iv)(C) (Dec. 2016) ("the alien is not represented at the credible fear review")18.

[44] See amicus briefs in *DHS v. Thuraissigiam* from human rights organizations and asylum law professors. Jeffrey Chase, "Attorneys and Credible Fear Review," July 22, 2018 https://www.jeffreyschase.com/blog/2018/7/22/attorneys-and-credible-fear-review
Amicus Brief of Refugee and Human Rights Organizations and Scholars in *Rosa Elida Castro v. DHS*, https://www.scotusblog.com/wp-content/uploads/2017/01/16-812-Refugee-Organization-Cert-Amicus-Brief.pdf

[45] "During fiscal Years 2015 and 2016, one IJ reviewing credible fear determinations at the family detention center in Dilley, Texas affirmed 228 of the 333 credible fear determinations he reviewed, while another affirmed only 17 of 332 determinations." Ibid.

# Proposed Fixes: The Good, the Bad, and the Insufficient

Over the last three years there have been several proposed "fixes" to the asylum system. Some administrative fixes are straightforward and should be adopted immediately. For example, the Migration Policy Institute (MPI) has suggested removing from the asylum backlog applicants for cancelation of removal, a discretionary form of relief available to those without legal immigration status who have been present in the United States for ten years or more and whose removal would impose hardship on a U.S.-citizen or permanent- resident family member. Currently, many people seeking cancelation of removal apply for asylum to United States Citizenship and Immigration Services (USCIS) in order to be rejected and placed in removal proceedings so that they can ask an immigration judge for cancelation. MPI has suggested creating a process for individuals to apply to USCIS specifically for cancelation of removal.

Another suggestion from MPI is to allow asylum officers to fully adjudicate particularly strong cases. This is a good suggestion—first raised by the USCIRF in 2005—but insufficient because, at most, it will apply to a very small percentage of cases, while numerous asylum officers would continue to be diverted from full adjudication to conduct partial credible fear interviews.

The problems with credible fear interviews would likely be exacerbated if Congress were to enact recently introduced legislation suggesting that they be conducted at CBP-run processing centers at the border within 72 hours. Under these circumstances, traumatized and tired asylum seekers with meritorious claims will be denied. The imperative for speed would quickly overwhelm concerns about fairness, and it is very doubtful that sufficient counsel or other support could be available at the border to help with all arrivals at a time of mass influx and within such a short period of time.[46] Further, the legislation leaves unclear whether those who pass credible fear interviews will be detained or released.

Another suggestion in the legislation is that, in times of large-scale migration influx, all border arrivals be put on an expedited immigration court docket. This perpetuates the

[46] Although RAICES provided free, universal representation to all detainees at the Karnes family detention center, it was only able to meet with 157 women before their credible fear interview in 2019, even though hundreds/thousands were detained there that year.

misconception that, *because* people arrive at the border without documents, their cases are less likely to be meritorious and should be rushed through the system faster than those of other asylum seekers. The legislation establishes a blanket rocket docket for all border arrivals at a certain time. It is in opposition to the idea, in the 1980 Refugee Act, that the asylum system should be uniform and that claimants, regardless of status and mode of arrival, be treated similarly.

On a related issue, Refugees International would not support any expedited policy that effectively creates negative presumptions about cases believed to be weak due to general characteristics of the relevant population. Mistakenly removing a refugee through this process is too grave a risk. (On the other hand, Refugees International would not object to reducing the evidentiary burden for members of a group whose characteristics have made them particularly vulnerable to persecution, as this could increase processing efficiency without risking denial of meritorious claims).

Refugees International would support efforts to develop one system in which all asylum applications received substantive assessment (excluding appeals) within a reasonable period of time, say six months, rather than a bifurcated system in which border arrivals have their adjudication, such as it is, completed within three weeks while detained, and all others—including those who enter without inspection and travel far from the border—have a process that can last years. Such a system would require that the United States sufficiently fund adjudication such that there are enough officers to handle cases in six months. If asylum seekers were not detained and could find counsel, that ought to be sufficient time to collect and translate evidence, including from home countries, and expert evaluations.

If any screening needs to be done at processing centers at times of a large-scale migration influx, it should simply be to determine if a migrant is an asylum seeker (i.e., has a fear of return) or has any special vulnerabilities (is a victim of torture, trafficking, gender violence, is severely ill or disabled), rather than an interview about his or her claim. Those not engaged in enforcement (and who do not report to CBP) should be tasked with asking about fear after CBP confirmed identity and completed security checks. The officers would ask the questions in the migrant's primary language and in private. Ideally processing centers would be overseen by an agency not engaged in enforcement and run by non-profit, non-governmental contractors.

As an alternative to expedited removal, those migrants who express fear could be given a short legal orientation and then released to pursue their cases. As lain out further in the recommendations below, this report suggests pilot programs proposing that asylum seekers who arrive at the border could have their claims adjudicated fully by asylum officers at their destination cities. This could ultimately result in a system similar to the one in place before expedited removal was instituted and which was proposed in the 2019 version of the Refugee Protection Act.[47] The best data indicates that if asylum seekers are released and provided with NGO-run case management and representation by attorneys, almost all attend their hearings. The focus of enforcement should be on ensuring that those who lose their cases—after getting a genuine opportunity to have their cases fairly considered—leave the country. Rather than blocking access to due process and keeping asylum seekers detained, the United States should devote resources to repatriation programs *at the end of the process* that would encourage safe return.

Some may argue that reverting to a system more similar to one that existed in the early 1990s is unworkable at a time when the numbers of asylum seekers coming to the border has increased so dramatically and that the only way to handle so many asylum seekers efficiently is through expedited processing that rapidly screens out most claims.

There is a certain logic to that approach.

If you build a wall, virtual or otherwise, you will deter, physically prevent entry, or remove many though not all of those fleeing persecution and seeking admission to the United States. But we cannot escape the simple reality that expedited procedures, as applied, have not only been of limited effect in deterring non-meritorious claims, but also have almost certainly resulted in the denial of many thousands, if not tens of thousands, of meritorious ones. We also cannot escape the fact that further tinkering with the system is likely to be of limited benefit in terms of avoiding injustices against asylum seekers.[48]

---

[47] Refugee Protection Act, S.2936/H.R. 5210, sec. 104(d) (vesting initial jurisdiction for asylum applications in the Asylum Division).

[48] It is worth noting that, during the last decade, England adopted a fast-track system similar to expedited removal that proved both unfair (in terms of access to counsel and appeals and especially to vulnerable populations with complex cases) and inefficient (if safeguards are in place and because it mandates unnecessary detention). The system was rejected by the UK judiciary and abandoned. See: https://www.hrw.org/news/2010/02/26/uk-women-fast-tracked-asylum-denial#; https://www.bbc.com/news/uk-33113132; https://www.ein.org.uk/news/tribunal-procedural-committee-decides-fast-tracked-immigration-appeals-should-not-be

Given those challenges, it makes sense to at least pilot projects adopting different approaches, as suggested in the next section, to see if alternatives might, in fact, work better.[49]

A 2018 UNHCR study on refugee status determination and backlog reduction notes, "temporary protection and stay arrangements" may be the best way to handle large numbers of asylum seekers. Both the Trump and the Biden administration recognized that granting temporary protection to Venezuelans would help alleviate the asylum backlog. The MPI report suggests that it was administrative fixes and expedited removal that helped keep down the asylum case backlog before 2010, leaving to a parenthetical the extremely significant fact that a large share of the backlog was "ultimately resolved by provisions of the 1997 Nicaraguan Adjustment and Central American Relief Act, which eased the permanent-residence requirements for certain asylum seekers from El Salvador, Guatemala, and former Soviet-bloc countries."

Without Congressional help—through legislation regularizing the status people who have been waiting for protection or in temporary protected status for several years—it will be difficult to clear the large asylum backlog. It will also be difficult to make most expansive use of the Central American Minors program, which requires that a parent in the United States have legal status in order to sponsor a child's migration through the U.S. Refugee Admissions Program, as well as other legal migration pathways from Central America.

# Recommendations to the Biden Administration

Changing the reception system at the border will be most effective if it is part of a new comprehensive approach to addressing forced migration issues, some of which has been discussed in earlier Refugees International reports and which involve reform of asylum and efforts to develop other forms of protection and legal pathways for Central Americans in the United States and in the region.

[49] At the for-profit Hutto detention center, notorious for its poor conditions, there are currently increasing numbers of women who have high credible fear pass rates, who are pregnant so should not be detained, who are from Venezuela and Cuba, where they cannot be soon returned—so should never have been placed in expedited removal, which is a discretionary program.

**Short-term Measures, while Title 42 is in Place and Ports Remained Closed to Asylum Seekers**

As emphasized in previous reports, Refugees International believes that the imposition of Title 42 is unjustified, but we recognize that it is currently being enforced. Confident, or at least hopeful, that it will be ended within two to four months, Refugees International recommends the following interim measures.

***Responsibly and Effectively Process Urgent Protection Cases***

The criteria to qualify and the registration system for the Title 42 humanitarian exemption process being established by the Biden administration should also be made accessible to asylum seekers in Northern Mexico who may not be known to NGOs. The registration must remain just that and *not* an externalized screening system of any kind that would channel migrants into different procedures or evaluate the substance of claims. Transparency and formal U.S. responsibility for the exemption system will facilitate its expansion, ensure fairness, and make it a truer test of whether such a registration system will work effectively to incentivize migration through ports of entry and facilitate efficient port processing after Title 42 is lifted. The United States also needs to ensure the safety and security of those organizations and migrants involved in the system. The administration should consider family unity as one possible goal of the exemptions, especially for parents and children separated by the Title 42 policy or other Trump administration anti-asylum policies that are now canceled or being unwound. Those exempted from Title 42 should be given notices to appear in immigration court at their destination and be paroled.

In addition, the existing humanitarian parole system should be improved and expanded to handle particularly vulnerable cases. People should be able to apply for parole electronically, and remote adjudications should be available. In addition, applicants should be able to obtain their biometrics and I-94 cards at U.S. embassies or consulates, with I-94 cards permitting vehicular or air travel. These elements would help to diminish crowding at ports of entry. This would require additional State Department and USCIS resources be devoted to humanitarian parole.

***Continue the Practice of Family Release & Issue Instructions Regarding Such Cases***

U.S. Customs and Border Protection (CBP) should continue the practice, now in place in Rio Grande Valley and to a limited extent elsewhere along the border, of releasing families who have entered without inspection to proceed to their relatives at destination locations. (As mentioned above, this practice is apparently based upon the Mexican government's refusal to accept expelled Central American families with young children). Congress has recently appropriated funds through FEMA's Emergency Food and Shelter Program for NGOs that serve families released by DHS, and NGOs operating in border communities can arrange for COVID-19 testing, short-term accommodations, legal orientation, and transportation.

Right now, some families are being released by CBP with notices to appear in immigration court at their destination location, and others with instructions to check in with Immigration and Customs Enforcement, also at their destination location. The former group, put into the defensive asylum system, is likely to languish in the asylum backlog, while the process for the latter group is simply unclear. The Biden administration can correct this by directing DHS and immigration judges to instruct the families to apply to the asylum office after they arrive at their destination locations, thus putting them in the affirmative system and enhancing the likelihood of efficient processing.[50]

### *Revoke Restrictions on Asylum Eligibility Based on Unreasonable and Unfair Legal Interpretations*

The Biden administration should vacate Trump administration rulings, including Attorneys General decisions *Matter of A-B-* (partially enjoined), *Matter of A-C-A-A-* and *Matter of L-E-A-*, that unlawfully narrow asylum eligibility.[51] These decisions are causing denials of protection that would have previously been granted, as well as unnecessary litigation and protracted appeals, so vacating them is an immediate imperative. Doing so will prevent wrongful denials and appeals while DHS and the Executive Office of Immigration Review (EOIR) develop new guidance and regulations, consistent with U.S. and international law, on how to prove the failure of state protection where the persecutor is a non-state actor, how to prove a nexus between the persecution and a statutorily protected ground when persecutors have mixed motives, and on how to interpret persecution based upon particular social group and political opinion and to

---

[50] For those sent to immigration court, EOIR could exercise its discretion to defer cases so that they can be adjudicated by USCIS. For those families sent to ICE check-ins, ICE should refer families to legal services to help them apply for asylum to USCIS and to NGO-run case management programs if needed.

[51] For a list of problematic rulings, see appendix of this document by Human Rights First and the Center for Gender and Refugee Studies, https://www.humanrightsfirst.org/sites/default/files/FairandTimelyAsylumHearings.pdf

evaluate domestic-violence and gang-violence claims. Given the ongoing hiring of immigration judges, it is also crucial that leadership at EOIR immediately ensure that newly hired immigration judges come from diverse backgrounds and have experience in immigration and asylum law. It is also important that immigration judges—two thirds of whom were appointed during the Trump administration—receive training to reflect the Biden administration's approach. Given the previous administration's politicized policies regarding, and promotions to, the Board of Immigration Appeals, it is also worth considering establishment of a separate board within EOIR to hear appeals in asylum cases.[52]

**Medium-term Measures Once Title 42 is Lifted and Ports Open to Asylum Seekers**

The administration should retract the *nationwide* expansion of expedited removal. While the pilot programs recommended below are implemented such that many asylum seekers are not subject to expedited removal, safeguards need to ensure that any ongoing application of expedited removal in border areas (despite the inefficiencies and problems of doing so already mentioned) does not lead to refoulement or the detention of credible claimants. After CBP completes biometrics and preliminary processing, officers who are not from an enforcement agency should ask the preliminary questions about fear of return and this should be monitored (by NGOs, USCIRF, or UNHCR). Asylum officers, who should be the only personnel conducting credible fear interviews, should base their inquiries on the statutory standard and USCIS guidance, training modules, and early lesson plans, updated in collaboration with experts who serve asylum seekers to reflect research on the impact of trauma and the dynamics of LGTBQ and gender-based persecution. Asylum officers should be sure to elicit all information relevant to claims and to apply circuit law most favorable to the applicant. No bars or restrictions to asylum (including the possibility of internal relocation) should be assessed at the credible fear stage, as these involve complicated findings of fact and law. Inconsistencies or lack of details that do not go to the heart of the applicant's claim should not lead to an adverse credibility finding. Quality assurance of credible fear decisions should be done in a way that does not incentivize negative decisions. Counsel should be given access to clients to prepare for the credible fear interview but also must be given notice and be allowed to consult and represent clients at immigration judge reviews. The asylum office process of reconsidering cases after an immigration judge affirms denial should be expanded. DHS should release all who pass credible fear

---

[52] This is a variant on a proposal first made by David Martin in early 1990s. See Martin's testimony at Hearing before the Subcommittee on Immigration and Refugee Affairs, Senate Judiciary Committee, May 28, 1993.

interviews and have them apply for asylum at the asylum office in their final destination.

### *Implement and Evaluate Two Pilot Programs as Alternatives to Expedited Removal*

Over the course of some 25 years, the United States has been unable to devise a sustainable approach to expedited removal that guarantees fairness and proves efficient. Thus, it seems self- evident that the Biden administration ought to be exploring real alternatives. In fact, the Biden administration has already developed the makings of two pilot programs through the current Title 42 humanitarian exemption process and the family release practice.

The administration is currently not generally applying expedited removal at ports of entry but rather directing applicants included in the humanitarian exemption into full asylum processing. This effort could be transitioned into a pilot program for a more expanded population, possibly focusing on groups for which expedited removal has proven particularly unfair and inefficient. (It would not be hard to identify candidate groups, from Central American families to indigenous or rare language speakers—including speakers of Haitian Creole and many African languages.) Those within the selected population who ask for asylum at ports of entry could be released from CBP OFO with instructions to check in with ICE at their final destination. ICE could instruct them to apply to USCIS and refer them to legal counsel and NGO-run case management as needed. If they do not file timely asylum applications, DHS could then issue them a notice to appear in immigration court. USCIS should also designate a sufficient number of asylum officers to schedule interviews with these applicants within 45 days of application filing.

A second pilot could be modeled on current release policy (based on Mexico's refusal to accept all families apprehended by CBP). The pilot could establish a post–CBP processing reception center to receive people who are from countries to which it is difficult to effect removal and who DHS places in full, rather than expedited, removal proceedings. The reception center could be run under the Office of Refugee Resettlement (ORR). Officers at the centers who do not have enforcement responsibilities could ask migrants if they feared return to their home country and identify those with particular vulnerabilities who need special services. But no assessment of asylum claims would take place here; the reception centers would just

provide shelter and care for very short periods until transportation arrangements to final destinations could be arranged for those who are asylum seekers. Before asylum seekers departed, they would receive a legal orientation and be placed in an ORR-funded community case management program, if necessary. DHS and DOJ could work together so that ICE and the immigration judges terminate court proceedings at destination locations and refer these asylum seekers to the asylum office. Assessments of the two pilots should be made within a year with a view towards a possible modification of the use of expedited removal generally. The report on the first pilot should include the demographics of those in the program, their destination cities, whether they had access to counsel, how long it took to resolve claims, and grant rates. The report on the second pilot should evaluate the quality of services provided at the reception center, the demographics of individuals and families served, the number placed in case management programs, case management participants' access to housing, legal services, health services, how long it took to adjudicate claims, and grant rates.

Since those denied asylum by USCIS will have their cases referred for immigration court removal hearings, the administration must ensure cases there are handled fairly and efficiently. To do so, the Biden administration must restore judge authority to manage dockets; have DOJ work with DHS to identify cases that can be closed or terminated; support legal orientation programs and legal representation initiatives; and allow for electronic filing.

**Long-term Reforms, Some Needing Congressional Cooperation**

As discussed in previous Refugees International reports, forced migration must be addressed comprehensively. Most of what follows would increase the availability of protection and diminish pressures on the border in the long term.

***Expand Legal Pathways***

The United States should expand refugee resettlement and other legal pathways from Central America, including through creative use of parole, in-country processing, processing from within Mexico and other countries in the region, and an expanded Central American Minors program. Moreover, the U.S. Congress should take legislative action to ease the evidentiary burden for categories of applicants likely to be at particular risk of persecution, as it has done in the past. Through this combination of approaches, the goal should be a five-year program that could annually provide protection in the United States, on average, to 50,000 or more Central Americans who would otherwise be at risk within or outside their countries of origin. In addition,

Congress should be prepared to consider an expansion of the immigration quotas from Central American countries.

President Biden should encourage Congress to pass legislation providing a path to permanent residence for asylum seekers whose cases have been backlogged for more than five years and for those who have had Temporary Protected Status for at least five years. The vast majority of such individuals are not likely to depart under any circumstances and most, if not the overwhelming majority, are likely to have serious protection concerns. In any event, their regularization will enhance their well-being as well as bring significant benefits to communities where they live. Further, regularizing the status of asylum seekers in this way, as Congress did in the 1990s, will eliminate a significant amount of the asylum backlog and allow relatives to sponsor family members.

### *Improve Asylum Adjudication with Increased Resources*

The President should continue to press Congress to appropriate increased funds specifically to the asylum office for staffing, training, and space, as well as for legal services (orientation and representation) and community-based, NGO-run case management for asylum seekers. Given the increased role of asylum officers in adjudication, it is important that officers have legal and immigration experience, foreign language and regional expertise, or have worked with vulnerable populations in the United States or abroad. Resources should also be provided to the research division of the asylum office so that it can prepare country of origin information to facilitate adjudication.

### *Support Establishment of a Complementary Protection Screening*

The administration should work with Congress to establish complementary protection that allows asylum officers to determine if applicants who do not qualify for asylum would be seriously harmed if returned to their home country and provide them temporary relief from removal.

### *Support Congressional Establishment of an Independent Immigration Court*

The current Department of Justice immigration court system is neither efficient nor fair. A better system would be one in which an asylum officer establishes the administrative record and issues a decision which could be reviewed directly by a court established pursuant to Article I of the U.S. Constitution and part of the judicial branch. This would

eliminate unnecessary layers of administrative appeal but still allow for review by Article 3 federal courts, which have made important contributions to the development of asylum law.

# EXHIBIT 40

U .S. Department of Homeland Security

# Notice and Order of Expedited Removal

## DETERMINATION OF INADMISSIBILITY

**Event Number:**

File No: ____________________

Date: ____________________

In the Matter of: ________________________________________________

Pursuant to section 235(b)(1) of the Immigration and Nationality Act (Act), (8 U.S.C. 1225(b)(1)), the Department of Homeland Security has determined that you are inadmissible to the United States under section(s) 212(a) ☐ (6)(C)(i); ☐ (6)(C)(ii); ☐ (7)(A)(i)(I); ☐ (7)(A)(i)(II); ☐ (7)(B)(i)(I); and/or ☐ (7)(B)(i)(II) of the Act, as amended, and therefore are subject to removal, in that:

SAMPLE

______________________________ Name and title of immigration officer (Print)

______________________________ Signature of immigration officer

## ORDER OF REMOVAL
## UNDER SECTION 235(b)(1) OF THE ACT

Based upon the determination set forth above and evidence presented during inspection or examination pursuant to section 235 of the Act, and by the authority contained in section 235(b)(1) of the Act, you are found to be inadmissible as charged and ordered removed from the United States.

______________________________ Name and title of immigration officer (Print)

______________________________ Signature of immigration officer

______________________________ Name and title of supervisor (Print)

______________________________ Signature of supervisor, if available

☐ Check here if supervisory concurrence was obtained by telephone or other means (no supervisor on duty).

## CERTIFICATE OF SERVICE

I personally served the original of this notice upon the above-named person on ______________________
(Date)

______________________________
Signature of immigration officer

# EXHIBIT 41

# Cuban man tries to strangle himself following arrest in Miami immigration court

Arrests after dismissal of immigration proceedings ramping up nationwide

BY: **JACKIE LLANOS** - MAY 30, 2025 5:49 PM



Jesus Rodriguez Delgado holds his granddaughter. He tried strangled himself after federal agents placed him in handcuffs at the immigration court in Miami on May 30, 2025. (Photo courtesy of Elisavel Torres)

*This story discusses suicide. If you or someone you know may be experiencing a mental health crisis, contact the 988 Suicide & Crisis Lifeline by calling or texting "988" or chatting online at http://988lifeline.org/.*

A 64-year-old man from Cuba started strangling himself and saying he was going to kill himself after federal agents arrested him at the Miami immigration court on Friday morning.

Jesus Rodriguez Delgado, 64, started yelling in Spanish that he would kill himself rather than be sent back to Cuba, said Karla De Anda, a community advocate who called for help as U.S. Immigration and Customs Enforcement agents struggled to remove Rodriguez Delgado's handcuffed hands from his neck.

"It was the most horrible thing I've seen in my life," De Anda said in Spanish. "Hopefully, they'll help him because he can't go back to Cuba."

The man's reaction wasn't surprising to his partner, Elisavel Torres, who told Florida Phoenix from inside the courthouse that Rodriguez Delgado had been a political prisoner in Cuba for 28 years and had lived in Mexico for six years before coming to the U.S. De Anda added that Rodriguez Delgado had said he had been imprisoned and would be killed if deported to Cuba.

Torres wept as she said that she couldn't understand why the judge agreed to dismiss Rodriguez Delgado's deportation case – exposing him to expedited removal. An application for permanent residency that Rodriguez Delgado submitted in January states he entered the country under humanitarian parole in 2021. Torres said Rodriguez Delgado received a work permit in April.

"He had told me he wouldn't go back to Cuba, that he would die first, and it will be that way," Torres told the Phoenix in Spanish.

ICE and Homeland Security Investigations officials arrested at least seven people during the four hours that the Phoenix reporter observed activity inside the courthouse.

Reports emerged last week of arrests in immigration courts across the country after judges dismissed cases at the request of the Department of Homeland Security. Still, Rodriguez Delgado's attempt to strangle himself was the strongest reaction advocates witnessed on Friday. Others arrested cried and some remained quiet and looked at the ground.

## 'You show up and get deported anyway': Migrants with court hearings face an impossible choice




Federal immigration officials continued targeting people at the Phoenix Immigration Courthouse on Thursday, surveilling and detaining migrants whose cases were dismissed minutes earlier in ways that appear to be an attempt to minimize attention from both protestors and media.  Berta, a soft-spoken 48-year-old woman who was afraid to give her last name, spoke to the … Continue reading

Arizona Mirror

The agents told Torres that they would make sure Rodriguez Delgado was OK and would give him a list of pro bono attorneys, but couldn't at the time of his arrest say where he would go. Torres, a U.S. citizen, said the couple knew about the arrests but still decided to come to the hearing from Naples rather than requesting an online hearing.

"We had faith in God that we were doing everything right, so we said we would come in person," Torres said. "What a huge mistake."

Her tears intensified as she told Rodriguez Delgado's daughter about her father's arrest over the phone.

"I was born in this country, and I am ashamed to say I'm American," Torres said, adding that there were no words to describe how she felt when federal agents placed her partner in handcuffs.

## Immigrants lack legal representation

Immigration attorney Cindy Blandon told the Phoenix that she's noticed those who end up arrested for expedited removal lack

lawyers. Few people in the court on Friday morning had attorneys, with some citing money as a barrier to obtaining legal representation.

Having an ongoing asylum or permanent residency case doesn't exempt people from expedited deportations, Blandon said.

"Being placed under an expedited removal process doesn't mean your case is closed," she said. "People have a right to due process. The problem is that if you don't have legal representation and you don't know how to navigate the situation, you will likely end up deported."

The mood on various floors of the courthouse grew more tense as people awaiting hearings heard about or saw the arrests.

But Blandon, De Anda, and Maria Asuncion Bilbao, with the American Friends Service Committee, noted that the arrests in the court appeared much calmer compared to the mass raids, such as the one that took place in Tallahassee on Thursday.

GET THE MORNING HEADLINES.

SUBSCRIBE

MIAMI

REPUBLISH

*Our stories may be republished online or in print under Creative Commons license CC BY-NC-ND 4.0. We ask that you edit only for style or to shorten, provide proper attribution and link to our website. AP and Getty images may not be republished. Please see our republishing guidelines for use of any other photos and graphics.*



JACKIE LLANOS

Jackie is a recent graduate of the University of Richmond. She has interned at Nashville Public Radio, Virginia Public Media and Virginia Mercury.

Florida Phoenix is part of States Newsroom, the nation's largest state-focused nonprofit news organization.

MORE FROM AUTHOR

## MORE FROM OUR NEWSROOM



**Broward County sheriff doesn't want to focus on immigration crackdown. Uthmeier says he must.**

BY **JACKIE LLANOS**

June 9, 2025




**State officials discuss how FHP officers are now making immigration arrests**

BY **MITCH PERRY**

May 12, 2025

QUALITY JOURNALISM FOR CRITICAL TIMES

DEMOCRACY TOOLKIT

The Phoenix is a nonprofit news site that's free of advertising and free to readers. We cover state government and politics with a staff of five journalists located at the Florida Press Center in downtown Tallahassee.

We're part of States Newsroom, the nation's largest state-focused nonprofit news organization.

DEIJ Policy | Ethics Policy | Privacy Policy

Our stories may be republished online or in print under Creative Commons license CC BY-NC-ND 4.0. We ask that you edit only for style or to shorten, provide proper attribution and link to our website. (See full republishing guidelines.)